

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 9, 2015

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**    *United States* **v.** *Ahmed Mohammed El Gammal*, **15 Cr. 588 (ER)**

Dear Judge Ramos:

      The Government respectfully submits this response in opposition to the defendant's December 2, 2015 application for pre-trial release. This constitutes the defendant's second application for pre-trial release. The first application was made in August 2015, following his arrest in the District of Arizona, and was denied on September 1, 2015 after a multi-day detention hearing. Following the hearing, Magistrate Judge Bridget S. Bade concluded that the defendant posed both a risk of flight and a danger to the community, finding that the defendant "has the resources to flee, . . . contacts in another country to where he could flee, . . . [and] every incentive to flee," and that the defendant had a "mindset that poses a very significant and serious danger to the community and to others." Transcript of September 1, 2015 Detention Hearing, Defense Exhibit B, at 12. Magistrate Judge Bade memorialized her findings in a written opinion, which is attached as Exhibit A.

      Notwithstanding those findings, the serious nature of the offenses charged, which include providing, and conspiring to provide, material support to the Islamic State of the Iraq and the Levant ("ISIL"), aiding and abetting the receipt of military-type training from ISIL, and conspiring to receive military-type training from ISIL, the strength of the evidence against him, and the absence of any new facts that support pre-trial release, the defendant renews his application by largely re-hashing the very arguments that were rejected in Arizona. For the reasons that follow, the defendant's application should be denied because he cannot overcome the presumption in favor of detention, and he remains a risk of flight and a danger to the community. Accordingly, he should continue to be detained pending trial.

## I.  The Charged Conduct

The defendant characterizes the Government's case as a "claim that Mr. El Gammal introduced one social media acquaintance to another."  Defendant's Motion for Pretrial Release ("Def.'s Mot".) at 1.  That assertion grossly understates the extent and severity of the defendant's conduct.  Over the course of months, the defendant, a 43-year-old dual citizen of Egypt and the United States who traveled to Egypt as recently as 2013, did all that was necessary, including traveling across the country from Arizona to New York City, to facilitate the travel of a young American college student ("CC-1") to Syria to join ISIL.  The defendant not only visited with CC-1 in person but actively counseled and encouraged him during numerous discussions over social media, and most importantly, the defendant introduced CC-1 to an associate in Turkey ("CC-2") who assisted CC-1 in the final and most challenging leg of his travel from Turkey to Syria.  Because of the defendant, CC-1 was able to successfully join and receive terrorist training from ISIL at a time when ISIL had made it abundantly clear that it was a sworn enemy of the United States and committed to killing American citizens.

However, facilitating the travel of others to join ISIL was not enough for the defendant.  A matter of months after facilitating CC-1's travel to Syria, the defendant himself expressed a desire to leave the United States to join ISIL.  As part of that plan, he enlisted CC-1's assistance, in coded language, to determine whether he would be accepted by ISIL.  And in a separate discussion with another associate, he explored his ability to transfer all of his assets to Turkey in the name of the other associate who lived there.  The defendant indicated that he planned to liquidate his business and suggested that he intended to buy his airline tickets less than a week before his planned travel date.  Shortly thereafter, the defendant was arrested.  Accordingly, and as described in more detail in the Complaint, the defendant did far more than introduce two acquaintances over the internet.

More specifically, in August 2014, CC-1 learned that the defendant had posted comments supportive of ISIL in an online forum.  Complaint, *United States* v. *Gammal*, 15 Mag. 2945, attached as Exhibit B ("Ex. B"), at ¶ 20(c).  Minutes later, CC-1 contacted the defendant via social media and asked the defendant to communicate via another communications platform.[1]  Over the next two months, CC-1 and the defendant continued to communicate with each other over social media, using different communications platforms which they believed would allow them to freely discuss their support of ISIL and CC-1's plans to join ISIL without law enforcement detection.  *Id.* ¶ 20(e).

In the midst of these discussions, in late August and early September 2014, ISIL published videos showing the beheadings of American citizens James Foley and Steven Sotloff.  And, on or about September 21, 2014, ISIL spokesperson Abu Muhammad al-Adnani called for attacks against citizens—civilian or military—of the countries participating in the United States-led coalition against ISIL.  *Id.* ¶ 11.

---

[1] The social media communications discussed herein were obtained pursuant to court-authorized search warrants issued in this District.  Returns from these search warrants have been produced to the defendant in discovery.

In October 2014, the defendant traveled to New York City to meet with CC-1 in person. *See id.* ¶ 22. Based on toll records and cellsite location data, it appears that that the primary, if not the sole, purpose of the defendant's trip to New York City was to meet with CC-1.[2] Over the course of two days, the defendant and CC-1 met in person multiple times in the New York City area, including in Manhattan. *See id.* In a videotaped statement to the FBI made after his arrest, the defendant admitted he had traveled to New York to meet with CC-1 during this time.

During his trip to New York, the defendant also took the initial steps to put CC-1 in contact with a Turkish-based facilitator, CC-2. *See id.* ¶ 23(a). And shortly after leaving New York, the defendant sent CC-1 contact information for CC-2. *See id.* ¶ 23(b). CC-1 then made airline reservations to travel to Turkey in November 2014, which he subsequently cancelled. *Id.* ¶ 23(c). The defendant later informed CC-2 that CC-1 had to cancel this trip for the time being because "[h]is mother has a problem," *id.* ¶ 23(d), which appears to reflect that CC-1's family members discovered his travel plans.

CC-1 then booked another flight from New York City to Istanbul, which was scheduled to leave on January 27, 2015. Eleven days before his scheduled departure, CC-1 contacted CC-2, introducing himself as a friend of the defendant's and seeking help with an "internship for the summer." *Id.* ¶ 26. CC-2 replied, "we are at your service." *Id.* Throughout their communications, CC-1, CC-2, and the defendant used employment-related language, like "job," "company," and "internship," to refer to CC-1's desire to join ISIL.

Armed with the assurance that CC-2 could help with his "internship," CC-1 abruptly left New York for Istanbul on January 27, without telling his parents and several of his close friends. *See id.* ¶ 27. After CC-1's arrival in Turkey, the defendant continued to advise CC-1 on meeting with CC-2 and traveling to Syria. *See id.* ¶¶ 28-30. For example, on January 29, 2015, the defendant advised CC-1 on how much it would cost to travel to particular towns on the border between Syria and Turkey, hundreds of miles from Istanbul and close to ISIL's capital in Syria. *See id.* ¶ 30. The defendant also discussed the progress of CC-1's travel with CC-2 during this time. *See id.*

There is no serious question that CC-1 then traveled to Syria to train, and ultimately fight with, ISIL. Two weeks after being advised by the defendant about traveling to towns near the Turkey-Syria border, CC-1 told his brother ("Brother-1") that his cellphone and laptop had been confiscated by his "new company" and that he was "going through religious training" to be following by his "main training [*i.e.*, military-type training] which will take a month to complete." *See id.* ¶ 31.

After completing his main ISIL training course, CC-1 was able to briefly resume social media contact in early May 2015. During this time, CC-1 voiced his support for ISIL's immolation of a Jordanian pilot, reasoning that the pilot had been "dropping tons of campfires on our people living all over the forests **here** and **we** made him see the results of his campfires before **we** decided to return him the favor." *See id.* ¶ 33 (emphasis added). And, around this same time, CC-1 told another contact that he was living in the "state of Islam" or the "Islamic State." *See id.* ¶ 35. CC-1 also later posted a photograph of himself in front of a mural of a

---

[2] The defendant, for example, did not call any New York-area phone numbers other than CC-1's while in New York.

Syrian political figure that was riddled with bullets, while wearing camouflage pants and making a gesture that signals support for ISIL. *See id.* ¶ 36.

The defendant was one of the select group of friends and associates who CC-1 contacted in early May. In a brief social media message, CC-1 told the defendant, "I'm doing well and I just wanna let you u know im safe and secure and everything is going according to plan." *See id.* ¶ 34.

Seven days later, the defendant sent a social media message to CC-1 in which the defendant broached the possibility of his own travel to Syria to join ISIL, asking, "Is it easy to park a car into ur job parking lot?" CC-1 responded in July 2015,[3] stating, "I don't know, I need to ask my superiors at work first inshallah, but I think it's risky because the parking lot these days is going under a lot of renovation, especially in the north side. Khair inshallah, you planning on driving anytime soon?" In response, the defendant indicated that he was considering traveling to CC-1's "parking lot"—i.e., ISIL controlled areas of Syria—"in mid August inshallah, check [social media] more often." Following this exchange, CC-1 asked the defendant to engage in further communications over a different communications platform and then said, "I'll help u make ur parking job easier inshAllah."

On August 19, 2015, the defendant was charged in a four-count complaint with (i) providing material support and resources to ISIL, in the form of personnel, and aiding and abetting the same, in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2; (ii) conspiring to provide material support to ISIL, also in violation of 18 U.S.C. § 2339B; (iii) receiving military-type training from a designated foreign terrorist organization, and aiding and abetting the same, in violation of 18 U.S.C. § 2339D and 18 U.S.C. § 2; and (iv) conspiring to receive military-type training from ISIL, in violation of 18 U.S.C. § 371.

## II.  The Defendant's Arrest and the Order of Detention in the District of Arizona

The defendant was arrested at his residence outside of Phoenix, Arizona, on August 24, 2015. Agents searched the defendant's apartment and garage pursuant to court-authorized search warrants and found, among other things, 100 rounds of 9mm ammunition and a quadcopter or drone.

The defendant initially appeared in the District of Arizona on the day of his arrest. The court held a status conference two days later, at which it scheduled a preliminary hearing and a detention hearing for Friday, August 28. On Thursday, August 27, a grand jury in the Southern District of New York indicted the defendant on the same charges as were contained in the Complaint.

On August 28, the defendant's detention hearing began before the Honorable Bridget S. Bade in the District of Arizona. Def.'s Mot. Ex A. The Government argued for detention on the grounds of both risk of flight and danger to community. In short, the Government noted that a presumption of detention applied, *id.* at 1, summarized the offense conduct above, *id.* at 2-6, and noted the defendant's extensive foreign ties, including his sister in Dubai; his mother, who

---

[3] Based on information obtained from a search warrant, CC-1 had no activity on this social media account between May 12 and June 27, 2015, except for a single session on June 1, 2015.

although temporarily in the United States, resided in Egypt;[4] and his connections to Turkey, including CC-2 and another person, to whom, based on evidence obtained via social media search warrants, it appeared the defendant planned to transfer significant amounts of money. *Id.* at 8-11.

Defense counsel made an extensive argument for the defendant's release.  Counsel raised many of the same arguments that are made in the current motion, suggesting, for example, that the defendant's contact with his sister in Dubai was limited and that the Government's evidence was circumstantial. Following a defense request that Pre-Trial Services evaluate the suitability of the defendant's purported former mother-in-law as a third-party custodian, *id.* at 14-15,[5] the Court continued the detention hearing until the following Tuesday to allow Pre-Trial Services to determine whether the former mother-in-law was a suitable custodian and to determine whether the defendant's residence was suitable for location monitoring.  *Id.*  at 19.  The Court also asked the Government to provide the defense with certain social media communications that the Government had cited during its proffer.  *Id.*

The parties re-appeared before Magistrate Judge Bade on September 1, 2015.  Def.'s Mot. Ex B. The Government provided Magistrate Judge Bade with copies of certain social media postings that it had referenced in the prior bail proceeding[6] but did not present any additional evidence regarding risk of flight or danger.  *Id.* at 4.  Defense counsel argued that the defendant should be released into the custody of Cherie Dubrow, who was purportedly the defendant's mother-in-law.  *Id.* at 4-6.

In response, the Government noted that Ms. Dubrow's residence in Arizona had recently been the scene of multiple drug sales and a police search warrant, which led to the seizure of drugs and guns.  *Id*. at 7.  In addition, the Government noted that Cherie Dubrow was apparently the ex-mother–in-law from a prior marriage of the defendant's ex-wife (and thus not the defendant's mother-in-law) and thus her relationship with the defendant was "attenuated."  *Id.* Defense counsel did not respond to this assertion.

After hearing from the parties, Magistrate Judge Bade ordered the defendant detained pending trial.  Magistrate Judge Bade began by noting that there was a presumption in favor of detention in this case and found that the defendant had not rebutted the presumption.  The Court noted that Celeste Dubrow was "found not to be suitable" as a third-party custodian and that Cherie Dubrow's residence was not a suitable location for Gammal to reside in "because of criminal activity at the residence."  *Id.* at 9.

---

[4] Although the defendant now claims his mother permanently re-located to the United States, his mother told FBI agents on the day of the defendant's arrest that she planned to stay in the country only until January 2016.

[5] Although Pre-Trial Services had initially suggested the defendant's ex-wife, Celeste Dubrow, as a third-party custodian, Pre-Trial Services later determined that Ms. Dubrow was unsuitable. *See id.*

[6] The Government can make these exhibits, and the other social media communications cited herein, available for the Court's review.

Turning to the issue of risk of flight, the Court also noted the seriousness of the charges, "the defendant's dual citizenship, strong family ties to Egypt, [and] friends in Turkey." *Id.* at 10. Further, Magistrate Judge Bade explained that the social media posts offered by the Government substantiated the Government's proffer that the defendant appeared to be sending large sums of money to Egypt and that the defendant had been communicating with CC-1 about moving to Syria. *Id.* at 10-11 (describing the communication as "coded but not particularly difficult coding"). In short, Magistrate Judge Bade held the defendant had not rebutted the presumption as to risk of flight because "he has the resources to flee. He has contacts in another country to where he could flee. And he has every incentive to flee. He's facing very significant charges . . . ." *Id.* at 12.

In addition, Magistrate Judge Bade found that the defendant posed a danger to the community. The court noted that, with respect to the drone found in the defendant's house, there was "an argument that owning a drone plane is innocuous, but there was also discussion in the [social media postings] about using that plane to load bombs on it and that it could be dropped on Gaza." *Id.* at 12. Magistrate Judge Bade found that the defendant had a "mindset that poses a very significant and serious danger to the community and to others." *Id.*

Magistrate Judge Bade also memorialized her findings in a written order. In the order, the court noted, among other things, the "serious" nature of the charges, social media exchanges involving "the use of a drone to carry bombs and what appeared to be discussions of support for ISIL," the defendant's dual citizenship and connections to Egypt and Turkey, his significant cash assets, social media conversations "in which [the defendant] discussed, in code, leaving the United States to join ISIL in Syria," and the unsuitably of the potential third-party custodians or their residences. *See* Ex. A at 1-2.

## III.   Applicable Law

A presumption of detention exists in this case. Specifically, because the defendant is charged with federal crimes of terrorism as defined in Title 18, United States Code, Section 2332b(g)(5)(B), for which a maximum term of imprisonment of 10 years or more is prescribed, it is "presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(C). "[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)." *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted).

"The presumption [in favor of detention] reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States* v. *Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) (citing *United States* v. *Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) ("Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found."), and *United States* v. *Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of dangerousness . . . represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions.").

In such presumption cases, the defendant "'bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight.'" *English*, 629 F.3d at 319 (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).  "Satisfying the burden of production does not eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'" *Id.* (quoting *Mercedes*, 254 F.3d at 436).  The government always "'retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.'"  *Id.* (quoting *Mercedes*, 254 F.3d at 436).

In assessing the extent to which the defendant presents a danger to the community or a risk of flight, courts are to look to the factors in 18 U.S.C. § 3142(g)—(i) "the nature and circumstances of the offense charged, including whether the offense is a. . . . Federal crime of terrorism . . ."; (ii) "the weight of the evidence against the person"; (iii) "the history and characteristics of the person . . . "; and (iv) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

A district court reviews *de novo* a magistrate judge's order of pretrial release or detention, and should "not simply defer to the judgment of the magistrate, but reach its own independent conclusion."  *See United States* v. *Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *see also United States* v. *Dominguez*, 509 F. App'x 28 (2d Cir. 2013) ("On a Section 3145(a) review, the district court was free to review the magistrate's factual findings *de novo* and make new factual findings.").

## IV.     Discussion

Here, the defendant fails by a wide margin to overcome the presumption that "no condition or combination of conditions will reasonably assure [his appearance] as required and the safety of the community."  And even he if could overcome the presumption, he still presents a significant danger to the community and a risk of flight, and should be detained on both of these bases.

### A.  Danger to the Community

The very nature of the charges in this case suggests that the defendant is a danger to the community; the circumstances of his alleged crime and the characteristics, actions, and words of the defendant himself leave no doubt.

*First*, the defendant is a proud supporter of ISIL whose support crossed the line to action. He played a critical role in facilitating the travel of a young American college student from New York to Syria to train and fight with ISIL at a time when ISIL was posting videos of beheadings of American citizens and calling for attacks against citizens—both civilian and military—of the countries participating in the United States-led coalition against ISIL.  Thus, given ISIL's history of violence and stated mission—which was clear to anyone during the time of the charged conduct—the abhorrent and dangerous nature of the defendant's actions here are apparent.

Moreover, only a few months ago, the defendant expressed a desire to travel to Syria himself to join ISIL.  The FBI's investigation also revealed that the defendant, in at least 2014

and 2015, exchanged dozens of social media messages with what appear to be other Islamic extremists articulating his support for ISIL and its violent acts of terror, and expressing his desire to join ISIL and engage in these acts himself.

For instance, in July 2014, the defendant stated to another individual on social media ("Individual-1") that "ISIS will teach these people a lesson" and "the Caliphate will come from the East."  The defendant went on to state that "if ISIS gets to Egypt, I will join it" in order to "torture the Egyptians."  He explained to Individual-1 that he will "lash them" and "take all the [female] supporters of Al-Sisi as bondwomen."[7]  The defendant told Individual-1 that he would rather live in a tent in order to be under the rule of the Islamic State than live in luxury in an infidel country.

In January 2014, the defendant corresponded over social media with another individual ("Individual-2") and expressed a desire to engage in acts of violence and murder:

| | |
|---|---|
| Defendant: | when the time comes for assassinations I will specialize in Media people. |
| Defendant: | I will enjoy sniping them. |
| Individual-2: | Hahaha |
| Individual-2: | I will prepare a Dragunov for you. |
| Defendant: | Do you still have access to weapons? |
| Defendant: | There are people who want to hunt. |

Thus, the defendant hopes to "specialize" in "assassinations" of "Media people" because he will "enjoy sniping them."  After Individual-2 indicated he is able to procure a "Dragunov"— a type of sniper rifle—the defendant asked whether Individual-2 "still has access to weapons" and indicated that he has associates who want to commit acts of violence ("There are people who want to hunt").

Based on these discussions, there is no question Magistrate Judge Bade was correct in finding that the defendant has a "mindset that poses a very significant and serious danger to the community and to others."  Def.'s Mot. Ex. B at 12.

Further, the defendant also acquired the means to carry out acts of violence.  As noted above, in their August 24, 2015 search of the defendant's residence, agents recovered 100 rounds of 9mm ammunition.  While agents did not recover a firearm, the significant quantity of ammunition recovered, in conjunction with the evidence cited above regarding the defendant's state of mind, reinforces the danger to the community posed by the defendant.

During the August 24 searches, FBI agents also recovered a quadcopter or drone.  Again, while the drone is not itself illegal, it must be viewed in context with evidence of the defendant's state of mind, such as social media messages that the defendant exchanged with another individual ("Individual-3") in which they discussed remote-control planes that can carry cameras—a popular function of drones.  The defendant also told Individual-3, however, that these devices are "good for Gaza" because "[t]hey can load it with bombs."

---

[7] Abdel Fattah El-Sisi is the current President of Egypt and has been outspoken in his desire to fight terrorism, including ISIL, with help from the United States.

*Second*, the defendant's internet-based support of ISIL could easily resume if he is released on bail, and there are no conditions that could guarantee that he would not continue supporting ISIL by sending men overseas to fight.  More specifically, as described in the Complaint, much of the defendant's criminal activity occurred online, including over multiple communications platforms.  Given the ease with which the defendant could acquire a new internet-enabled device or cellphone, and the range of online communications applications, it would be nearly impossible for Pretrial Services to ensure that the defendant does not continue his support of terrorism while on any form of pretrial supervision.

Given that the charges against the defendant allege federal crimes of terrorism, the defendant's specific conduct in facilitating a U.S. citizen's travel to Syria to train and fight with ISIL, and the strong and disturbing evidence uncovered during the investigation regarding the defendant's state of mind and his intent to continue to support ISIL, there are no bail conditions that can be set in this case to guarantee the safety of the community.  Accordingly, the defendant who has been charged with federal crimes of terrorism, and is thus in the relatively limited "class[] of offenders [who] should ordinarily be detained pending trial," *Stone*, 608 F.3d at 945-46,[8] should be detained because he presents a serious danger to the community.

## B.  Risk of Flight

There also can be no doubt that the defendant poses a significant risk of flight.

*First*, the defendant has no significant ties to the United States, much less the Southern District of New York, and the ties that the defendant does have do little to reduce the risk of flight.  The defendant was born and raised in Egypt, he has family in Egypt and he travelled to Egypt as recently as 2013.  The defendant moved to the United States from Egypt when he was in his twenties, and he is not married and does not have any children. Moreover, the defendant's internet business can be conducted from anywhere in the world with an internet connection.

In addition, there are no individuals resident in the United States who can exercise sufficient moral suasion over him.  His mother arrived in the United States just days before the defendant's arrest and told the FBI that she intended to stay in the United States only until January 2016.  While the defendant suggests that his mother could be a "moral suasion" co-signer on a bond, her ability to influence the defendant to stay in the United States appears to be extremely limited given her own extremely limited ties to this country.

---

[8] Defendant cites an unreported case from the Southern District of Texas—*United States* v. *Khan*, 15 Cr. 263—as the sole authority for the proposition that "bail is not unprecedented in cases involving allegations of terrorism offenses."  Def.'s Mot. at 2.  Based on public reports, that case involves a 19-year old who traveled to Turkey but who, before actually entering Syria, was persuaded by his parents to return home to Texas.  *See* Adam Goldman, *An American family saved their son from joining the Islamic State. Now he might go to prison*, The Washington Post, Sept. 6, 2015. Further, reports suggest that the defendant in Khan, unlike Gammal, had significant family connections in the United States, including both of his parents, who successfully dissuaded him from joining ISIL, and nothing indicates Khan was financially independent to the same extent that Gammal appears to be.

The defendant's other "closest family members" in the United States appear to be his ex-wife, Celeste Dubrow, and his ex-mother-in-law, Cherie Dubrow.  Although the defendant asserts that he and Celeste remain "close," they are in fact no longer married.  Further, Celeste Dubrow appears to have at least four criminal convictions, including a prior felony drug conviction from 1996. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████

The defendant's third proffered bond co-signer is Cherie Dubrow, who is either the defendant's ex-mother-in-law or Celeste Dubrow's ex-mother-in-law from a prior marriage.  *See* Def.'s Mot. Ex. B at 7.  Magistrate Judge Bade, however, declined to release the defendant into the custody of Cherie Dubrow after learning that police searched Cherie Dubrow's residence earlier this year and seized drugs and guns.

In short, two of the defendant's three "closest family members" are people with whom he has no blood or legal relationship, and there are significant questions about the ability of all three individuals to ensure the defendant's future appearances, given their limited ties to the U.S., health issues, and/or prior association with criminal conduct.  If released on bail, therefore, the defendant has scant reason to remain in the United States and face the charges against him, and the defendant's ties to the United States are, at most, minimal.  Accordingly, he poses a significant risk of flight for this reason alone.

*Second*, the FBI's investigation has revealed that, at the time of his arrest, the defendant himself was seriously considering leaving the United States to join ISIL.  Between May and July 2015, the defendant and CC-1 exchanged the following messages on social media:

| | |
|---|---|
| Defendant: | Is it easy to park a car into ur job parking lot? |
| CC-1: | I don't know, I need to ask my superiors at work first inshallah, but I think it's risky because the parking lot these days is going under a lot of renovation, especially in the north side.  Khair inshallah, you planning on driving anytime soon? |
| Defendant: | Yes, mid August inshallah , check [social media] more often |

Following this exchange, CC-1 asked the defendant to engage in further communications over a different communications platform and then said: "I'll help u make ur parking job easier inshAllah."

Agents who are familiar with this investigation believe that, in this exchange, the defendant is using coded language to ask CC-1 whether there is room for him to join ISIL along with CC-1 ("park a car in ur job parking lot").[9]  CC-1 responded, again using coded language, that he will have to check with his ISIL superiors but that ISIL is undergoing restructuring, especially in the northern part of Syria ("the north side").  CC-1 then asked the defendant if he is planning on traveling ("driving") soon.  The defendant responded that yes, he intended to travel in mid-August.

---

[9] As described in the Complaint at paragraph 26, in prior communications, CC-1 used coded language and referred to ISIL as "the company" and his position in ISIL as his "internship" or "career opportunity."

Notably, Magistrate Judge Bade largely concurred in this interpretation of these messages, concluding that it was "fairly obvious from reading the communications that the discussion is about leaving the United States and going to the Middle East, at least to Turkey and perhaps into Syria." Def.'s Mot. Ex B at 11.

Moreover, as discussed above, in July 2014, the defendant stated to Individual-1 that he would travel to join ISIL "if ISIS gets to Egypt" in order to "torture the Egyptians." The defendant further told Individual-1 that he would rather live in a tent under the Islamic State than in luxury in an infidel country. The defendant thus has repeatedly made clear his desire to travel overseas to join ISIL.

Social media messages that the defendant sent to another person who is believed to live in overseas ("Individual-4")[10] corroborate that the defendant was planning to leave the United States when he was arrested. On July 16, 2015, the defendant messaged Individual-4, asking if she was "legal in Turkey," "[m]eaning that you are free and you have your bank account and you can withdraw from it whenever you want." The defendant explained that he was "thinking of transferring my money to you over there" because "I cannot travel out of here with [a] large amount of money, the maximum you can take when you leave is ten." Thus, the defendant appears to be explaining that he cannot leave the United States ("here") with more than $10,000 ("ten") because of currency transaction reporting requirements, and thus, he wants to transfer a significant amount of money to Individual-4, before he leaves the United States. In response to a question from Individual-4 about "when [the defendant was] planning to travel," the defendant responded "[a]pproximately by the end of the 8th month (August)." The defendant also told Individual-4 that "this booking can be made two days prior to travel or a week at the most," which appears to be a reference to buying airline tickets. Individual-4 stated that she was "in Egypt right now" and would "be returning to Turkey by the end of September."[11] The defendant also stated that he is "liquidating [his] business," further supporting the fact that he was in the process of planning to leave the U.S. in the late summer or early fall of 2015.

*Third*, the defendant is relatively sophisticated about surreptitious international travel and has at least one contact in Turkey. The proof in this case centers on the defendant's ability and desire to facilitate illicit international travel to parts of the world from where extradition back to the United States would be nearly impossible. As described above and in the Complaint, up until

---

[10] The Government believed that Individual-4 was a relative of the defendant's. The defendant disagrees, and claims that the person does not live in Egypt. Def.'s Mot. at 5 n.4 . In any event, it is clear from this discussion that, before his arrest, the defendant was considering transferring tens of thousands of dollars to bank accounts in Turkey in preparation to leave the United States.

[11] While the defendant was in negotiations to rent another residence in the Phoenix area at the time of his arrest, those negotiations were never finalized. *See* Def.'s Mot. Ex D. Thus it remains very possible that the defendant was still planning, or at least actively considering, leaving the United States when he was arrested. Among other things, as noted above, Individual-4 indicated she would not be in Turkey to receive the defendant's money until late September. And, in any event, the defense submitted evidence of these negotiations to Magistrate Judge Bade at the proceedings in Arizona, *See* Def.'s Ex. B at 3-4, and she nonetheless found the defendant a risk of flight.

he was arrested and detained, the defendant maintained regular contact with CC-2, who helped the defendant facilitate the travel of an American citizen from New York to Turkey and Syria. Indeed, the defendant and CC-2 were in contact up until shortly before the defendant's arrest.  In short, the defendant has demonstrated the requisite knowledge and wherewithal to undertake surreptitious international travel, which significantly heightens the risk of flight here.

*Fourth*, the defendant's incentive to flee is particularly compelling in this case in light of the significant sentencing exposure he faces, which includes a maximum sentence of 55 years on all charges, with a Sentencing Guidelines range of 360 months to life imprisonment if convicted after trial, and forfeiture of all of his assets pursuant to federal terrorism forfeiture laws. Moreover, as detailed in the Complaint and in this letter, the Government's case against the defendant is very strong, giving the defendant further incentive to abscond.[12]

*Fifth*, the defendant has the financial means to flee this country.  He reported to Pretrial Services in Arizona that he has liquid assets of nearly $140,000.  Indeed, one reason the proceedings in Arizona were adjourned on the day of the defendant's arrest was because the defendant did not financially qualify for court-appointed counsel and asked for time to retain counsel.  In addition, the FBI has learned that the defendant has bank accounts in other countries that he has not reported to Pretrial Services.  These financial resources would allow the defendant to purchase his way out of the United States should he decide to flee.

Accordingly, the defendant presents a serious risk of flight and cannot overcome the presumption in this case.

---

[12] Defendant cites *United States* v. *Sabhnani*, 493 F.3d 63 (2d Cir. 2007) for the proposition that the nature and circumstances of the offense and the weight of the evidence, "by themselves, do not support detention based on risk of flight."  Def.'s Mot. at 8.  Notably, the crimes charged in *Sabhnani* did not carry a presumption of detention.  493 F.3d at 78 (distinguishing prior Second Circuit precedent by noting that, "in this case, the statutory presumption is in favor of release"). Further, the defendants in *Sabhnani* had significant ties to the United States, including four young adult children, and over $3 million in real estate holdings in Manhattan and on Long Island.  *Id.* at 65.

**V.      Conclusion**

Almost three and a half months ago, Magistrate Judge Bade ordered the defendant detained, finding that he "has the resources to flee, . . .  contacts in another country to where he could flee, . . . [and] every incentive to flee," and that the defendant had a "mindset that poses a very significant and serious danger to the community and to others."  Despite the passage of time, the defendant's current bail motion presents no new evidence to assuage these concerns. To the contrary, both the words and actions of the defendant, recounted above, make it clear that the defendant is a committed supporter of ISIL, who has extensive foreign ties, and who was actively taking steps to leave the United States at the time of his arrest.

Because of the presumption of detention in this case, and because the defendant presents a danger to the community and a serious risk of flight, the Government respectfully requests that defendant continue to be detained pending trial.


Respectfully submitted,

PREET BHARARA
United States Attorney

By:     Andrea Surratt/Brendan Quigley
Assistant United States Attorneys
(212) 637-2493/2190