**EXHIBIT B**

Approved: _____
NEGAR TEKEEI / BRENDAN F. QUIGLEY
Assistant United States Attorneys

Before: THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

ORIGINAL
U.S. DISTRICT COURT
FILED
AUG 20 2015
S.D. OF N.Y.

15 MAG 2945

DOC # 1

------------------------------------x
                                     :
UNITED STATES OF AMERICA,            :
                                     :   SEALED
        - v. -                       :   COMPLAINT
                                     :
AHMED MOHAMMED EL GAMMAL,            :   Violations of
   a/k/a "Jammie Gammal,"            :   18 U.S.C. §§ 2, 371,
                                     :   2339B, and 2339D
        Defendant.                   :
                                     :   COUNTY OF OFFENSE:
                                     :   NEW YORK
                                     :
                                     :
------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   LE T. NGUYEN, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation, and
charges as follows:

### COUNT ONE

(Material Support to a Designated Foreign Terrorist
Organization)

   1.   From at least in or about 2014, up to and including
the date of this Complaint, in the Southern District of New York
and elsewhere, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal,"
the defendant, together with others, did knowingly and
intentionally provide "material support or resources," as that
term is defined in Title 18, United States Code, Section
2339A(b), to a foreign terrorist organization, and attempt to do
the same, to wit, the Islamic State of Iraq and the Levant
("ISIL"), which has been designated by the Secretary of State as
a foreign terrorist organization since 2004, pursuant to Section
219 of the Immigration and Nationality Act ("INA"), and is
currently designated as such as of the date of the filing of
this Complaint, including, among other things, personnel,

knowing that ISIL was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that ISIL engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that ISIL engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), and did aid and abet the same.

(Title 18, United States Code, Sections 2339B and 2.)

## COUNT TWO

(Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization)

2. From at least in or about 2014, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, together with others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, namely, ISIL, which has been designated by the Secretary of State as a foreign terrorist organization since 2004, pursuant to Section 219 of the INA, and is currently designated as such as of the date of the filing of this Complaint.

3. It was part and an object of the conspiracy that AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, and others known and unknown, would and did provide ISIL with material support and resources, including, among other things, personnel, knowing that ISIL was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that ISIL engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that ISIL engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

### Overt Acts

4. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a.  On or about October 7, 2014, while in Manhattan, New York, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, contacted a co-conspirator not named as a defendant herein ("CC-1").

   b.  On or about January 16, 2015, while in Orange County, New York, CC-1 communicated with a co-conspirator not named as a defendant herein ("CC-2") through social media regarding CC-1's plans to join ISIL.

   c.  On January 27, 2015, CC-1 traveled from New York City to Istanbul, Turkey.

   d.  On or about May 7, 2015, CC-1 contacted EL GAMMAL from Syria to inform EL GAMMAL that "everything is going according to plan," among other things.

(Title 18, United States Code, Section 2339B.)

### COUNT THREE

(Receiving Military-Type Training from a Designated Foreign Terrorist Organization)

5.  From at least in or about 2014, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, together with others, did knowingly and intentionally aid and abet the receipt of military-type training, as defined in Title 18, United States Code, Section 2339B(c)(1), from a foreign terrorist organization, to wit, ISIL, which has been designated by the Secretary of State as a foreign terrorist organization since 2004, pursuant to Section 219 of the INA, knowing that ISIL was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that ISIL engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that ISIL engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(Title 18, United States Code, Sections 2339D and 2.)

## COUNT FOUR

(Conspiracy to Receive Military-Type Training from a Designated Foreign Terrorist Organization)

6. From at least in or about 2014, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, together with others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 2339D.

7. It was a part and an object of the conspiracy that another person would and did knowingly receive military-type training, as defined in Title 18, United States Code, Section 2339B(c)(1), from a foreign terrorist organization, to wit, ISIL, which has been designated by the Secretary of State as a foreign terrorist organization since 2004, pursuant to Section 219 of the INA, knowing that ISIL was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that ISIL engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that ISIL engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

### Overt Acts

8. In furtherance of the conspiracy and to effect the illegal object thereof, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," and others known and unknown, committed the overt acts previously alleged in paragraph 4 above, which are incorporated by reference herein as if set forth here in full, among others.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

9. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the New York Joint Terrorism Task Force (the "JTTF"). I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of

4

## Overview

### EL GAMMAL Encourages and Facilitates CC-1's Travel from the United States to Syria So CC-1 Can Receive Training from ISIL

12. As set forth in greater detail below, in or about the fall of 2014, CC-1, a resident of New York City, participated in social media discussions regarding ISIL and traveling to the Middle East. During this time, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, and CC-1 began corresponding via multiple communications platforms, after CC-1 learned of EL GAMMAL's support for ISIL.

13. In the midst of these discussions, in October 2014, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, traveled to Manhattan, New York, where CC-1 was enrolled in college, and contacted CC-1. While in New York City, EL GAMMAL also contacted CC-2, who lived in Turkey, about CC-1's plans to travel to the Middle East.

14. Days after his trip to New York, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, provided CC-1 with social media contact information for CC-2. Thereafter, EL GAMMAL and CC-2 had multiple social media exchanges about CC-1 traveling to the Middle East. In addition, CC-1 began communicating with CC-2, introducing himself as a friend of EL GAMMAL's.

15. On or about January 27, 2015, without telling his parents or several of his friends, CC-1 left New York City for Istanbul, Turkey. After arriving in Turkey, CC-1 had social media contacts with AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, regarding meeting with CC-2 and traveling to Syria.

16. On or about January 29, 2015, after CC-1 arrived in Turkey, CC-2 met with CC-1 and facilitated CC-1's travel to Syria in order to train with ISIL. CC-1 then traveled to Syria, where, between early February and at least early May 2015, he received military-type training from ISIL.

### EL GAMMAL and His Co-conspirators

17. AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, is a United States citizen and currently lives in the United States. In the latter half of 2014, EL GAMMAL and CC-1 spoke about CC-1's desire to travel to Syria to support ISIL, and, during the course of these discussions, EL GAMMAL traveled

6

to Manhattan, New York, where he contacted CC-1. Following his trip to New York, EL GAMMAL continued to facilitate CC-1's travel to Syria by, among other things, putting CC-1 in contact with CC-2 and providing advice to CC-1 after CC-1 left the United States.

18. CC-1 is a 24-year old United States citizen. Before departing to Turkey in January 2015, CC-1 lived in New York City and attended college in Manhattan.

19. CC-2 is not a U.S. citizen and currently lives outside the United States. In October 2014, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant provided CC-1 with contact information for CC-2 at a particular social media account ("Account-1"). Before leaving the United States, CC-1 contacted CC-2 at Account-1, introduced himself as a "friend" of EL GAMMAL and, using coded language, asked CC-2 to help him travel to Syria after he arrived in Istanbul, Turkey. After CC-1 arrived in Istanbul, CC-2 met with CC-1 and facilitated CC-1's travel to Syria to join ISIL. In addition, based on my review of summaries of social media postings by CC-2, which were prepared by FBI translators, I have learned that, among other things, in September 2014, CC-2 told EL GAMMAL that he might join ISIL, and, in April 2015, expressed his desire to die as a martyr.

## Summer/Fall 2014: CC-1's Increasing Radicalism and Initial Plans to Travel to the Middle East

20. Based on interviews with family members of CC-1 and my review of social media accounts used by CC-1 and others, I have learned, in substance and in part, the following:

    a. In the latter half of 2014, CC-1 appeared to become more radical in his religious views and more vocal about his frustration over U.S. foreign policy regarding the Middle East. For example, in a social media message sent on or about December 14, 2014, CC-1 told another person that ISIL was the "reaction . . . to the real problem which is US imperialism, mass murder, economic exploitation, systematic torture, the whole 9 yards[.]"

    b. CC-1 discussed traveling to Turkey and Syria. For example, CC-1 frequently discussed the different routes that people took to travel to Syria via Turkey, and commented on how there were special routes that led from Turkey into Syria.

    c. CC-1 also engaged in social media discussions with other individuals regarding ISIL. For example, on or about

7

August 14, 2014, another individual ("Individual-1") attempted to send CC-1 a picture of a "kid" who was "with da3ish"—another name for ISIL—"pulling a dead man from his hair and smiling." Individual-1 told CC-1, in sum and substance, that EL GAMMAL had posted social media comments about the picture and, in response to a question from CC-1, confirmed EL GAMMAL was "defending" ISIL.

        d.    Based on my review of results from a search warrant that was executed on CC-1's social media account, I have learned that minutes after this exchange confirming that AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, supported ISIL, CC-1 exchanged multiple social media messages with EL GAMMAL. I have also learned that the contents of those messages appear to have been deleted by CC-1 from CC-1's social media account.

        e.    Throughout the next two months, CC-1 and AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, had numerous discussions via social media. CC-1 appears to have deleted many of these discussions from his social media account. EL GAMMAL's social media account, however, retained some of these exchanges. Based on my review of the communications retained by EL GAMMAL which were obtained pursuant to a search warrant issued in this District, I know that, between August and October 2014, EL GAMMAL and CC-1 discussed communicating with each other via different communications platforms. Based on my training, experience, and participation in this investigation, I believe that EL GAMMAL and CC-1 wanted to communicate via different platforms so that they could freely discuss their support of ISIL and CC-1's plans to join ISIL without law enforcement detection.

### AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," Facilitates CC-1's Initial Attempt to Travel to Turkey

    21.    During the fall of 2014, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant and CC-2 began attempting to facilitate CC-1's travel to Turkey. Based on my training, experience, and participation in this investigation, I know that ISIL recruits from Western countries often transit through Turkey on their way to joining ISIL in Syria.

    22.    In the midst of discussions between CC-1 and AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, over online social media, EL GAMMAL traveled to New York City on or about October 6, 2014 and stayed in New York City for approximately two days. During this time, EL GAMMAL and CC-1

contacted, or attempted to contact, each other approximately 11 times via telephone. Based on my review of historical cell site information for the phones used by EL GAMMAL and CC-1, I know that EL GAMMAL and CC-1 appear to have met in Queens, New York on October 6, 2014, and then again in Manhattan, New York on October 7, 2014, where EL GAMMAL also called CC-1.

23. Based on my review of e-mail and social media content, which were obtained pursuant to search warrants issued in this District, I have learned the following:

    a. On or about October 7, 2014—the same day AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant called CC-1 from Manhattan, New York—EL GAMMAL also exchanged multiple messages with CC-2 over their social media accounts, including the following:

        i. EL GAMMAL asked CC-2 for CC-2's telephone number in Turkey so that EL GAMMAL's "American friend" could call CC-2 when he arrived.

        ii. CC-2 asked EL GAMMAL why EL GAMMAL had not been writing to CC-2, and EL GAMMAL responded that he was currently in New York.

        iii. EL GAMMAL suggested that they speak on Skype, and CC-2 sent his telephone number to GAMMAL.

    b. Four days later, on or about October 11, 2014, after EL GAMMAL left New York City, EL GAMMAL sent a message to CC-1 containing a link to CC-2's social media page. CC-1 responded "jzk im gonna add him now. lemme know when ur back online so we can test this cat out lol." Based on my participation in this investigation, I believe that CC-1's reference to "add him now" meant that CC-1 was going to add CC-2 as a contact or "friend" to facilitate future communications between CC-1 and CC-2. Further, I believe the reference to "test[ing] this cat out" was a reference to testing a new communications program that CC-1 and CC-2 were planning on using to attempt to avoid law enforcement detection.

    c. Also in October 2014, CC-1 booked a flight from New York City to Turkey, which was scheduled to arrive in Istanbul on or about November 25, 2014. Based on my review of airline travel records for CC-1 and travel reservation e-mails received by CC-1, I have learned that CC-1 subsequently cancelled this flight.

    d. On or about November 18, 2014, EL GAMMAL and CC-2 exchanged multiple messages over social media. In substance and relevant part, EL GAMMAL told CC-2 that EL GAMMAL's "friend" was expected to arrive on November 24, but that he had to cancel for the time being because "[h]is mother has a problem[.]" Based on the similarity between the date of EL GAMMAL's "friend's" anticipated arrival in Turkey and CC-1's anticipated arrival, I believe CC-1 was the "friend" that EL GAMMAL was referring to. Further, I believe that EL GAMMAL was telling CC-2 about CC-1's travel plans because CC-2 was going to facilitate CC-1's travel from Turkey to Syria.

### CC-1 Secretly Leaves the U.S. for Turkey

  24. Based on my review of airline travel records for CC-1 and travel reservation e-mails received by CC-1, I have learned, in sum and substance, that, soon after cancelling his planned November 2014 trip, CC-1 booked a flight from New York City to Istanbul, scheduled to depart on January 27, 2015. CC-1 also reserved a room at a hotel in Istanbul, Turkey for January 28, 2015.

  25. However, based on my interviews of members of the family of CC-1 as well my review of the content of certain of CC-1's social media accounts, I have learned that CC-1 kept his travel plans secret from his parents and from several of his friends.

  26. On or about January 16, 2015, approximately eleven days before his scheduled departure from the United States, CC-1, via social media, contacted CC-2.[1] The following exchange occurred, in substance and relevant part:

| 1/16, 17:05 | CC-1 | As-Salamu Alaikum Ateyya my name is Samy, I'm **Gammal's** friend. He told me you could help me with a career opportunity in Istanbul. I'll be visiting soon to look for an internship for the summer inshaAllah. I'd really appreciate your help. Please reply whenever you get the chance. BarakAllahu feek [may Allah bless you] [emphasis added] |

---

[1] CC-1 was in Orange County, New York, when he contacted CC-2 for the first time using social media.

10

| 1/16, 17:14 | CC-2 | We are at your service |

Based on my training, experience, and participation in this investigation, I believe that when CC-1 told CC-2 he was seeking help with a "career opportunity in Istanbul" and was looking for an "internship," he was looking for someone who could facilitate his travel to Syria to support ISIL. Further, CC-1 indicated AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, referred him to CC-2 ("He told me you could help me . . . ."). I further believe that, by responding "We are at your service," CC-2 expressed his willingness to facilitate CC-1's travel. In addition, CC-1's use of coded language with CC-2 suggests CC-2's knowledge of CC-1's plans regarding joining ISIL

27. Based on my interviews of relatives of CC-1, I have learned that CC-1 left his parents' residence in Orange County, New York on January 26, 2015, ostensibly to return to his apartment in Queens, New York. However, based on my review of travel records, I know that CC-1 flew aboard a commercial airliner from John F. Kennedy Airport in New York City to Istanbul, Turkey, departing on or about January 27, 2015 and arriving on or about January 28, 2015.

### After CC-1 Arrives in Turkey, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," and CC-2 Continue to Facilitate CC-1's Travel

28. After CC-1 arrived in Turkey, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant continued to facilitate his travel to join ISIL in Syria.

29. Based on my review of content obtained from social media accounts, which were obtained pursuant to search warrants issued in this District, for example, I have learned that on or about January 28, 2015, CC-1 contacted AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, and explained that it had been difficult "to meet up" with CC-2 because CC-2 "doesn't speak [E]nglish." In the same exchange, CC-1 told EL GAMMAL to "remind [CC-2] that my simcard is shit right now. I can't make any calls and I only receive them." EL GAMMAL and CC-1 also discussed whether CC-1 should buy an "app" to help in translating conversations with CC-2. In addition, in this same exchange, CC-1 told EL GAMMAL that "the sooner i start the internship the better u know what I mean? I wanna get close to the interview." Based on my training, experience, and participation in this investigation, I believe that CC-1's references to the "internship" and the "interview" are references to joining ISIL. Further, CC-1's use of coded

11

language with EL GAMMAL suggests EL GAMMAL's knowledge of CC-1's plans regarding joining ISIL.

30. The following day, on or about January 29, 2015, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, and CC-1 continued to exchange social media messages regarding CC-1's progress in joining ISIL. The following exchange occurred between EL GAMMAL and CC-1, for example:

| 1/29, 6:58-7:03 | EL GAMMAL | Found info from [CC-2] |
|---|---|---|
| 1/29, 7:26 | EL GAMMAL | I think long trip to Adana or gazentep is like 35 or 40 dollar |
| 1/29, 8:55 | CC-1 | ah ok ya thats nothing |
| 1/29, 8:56 | EL GAMMAL | Sorry<br><br>Turkish |
| 1/29, 9:10 | CC-1 | even better |
| 1/29, 9:40-10:01 | CC-1 | im in contact with someone from the company<br><br>directly inside the company<br><br>and he knows ppl here, can probably help me get there in 3-4 days isA[2] |

Based on my training, experience, and participation in this investigation, I believe that, in the above exchange, EL GAMMAL was telling CC-1 that CC-2 had provided information to facilitate CC-1's travel to Syria. EL GAMMAL further stated that a bus trip to Adana or Gaziantep ("gazentep"), two Turkish cities near the Syrian borders, costs only 35 or 40 Turkish dollars. In addition, I believe that CC-1's reference to "the company" was a reference to ISIL, and that, when CC-1 stated that he was "in contact with someone from the company" who "knows ppl here," he was referring to a member of ISIL who could coordinate his travel to Syria through Adana and Gaziantep.

---

[2] Based on my training, experience, and participation in this investigation, as well as my review of thousands of messages exchanged by CC-1 using his social media accounts, I believe that "isA" is shorthand for "inshallah," the Arabic word for "if Allah wills it."

12

### CC-1 Trains with ISIL

31. From approximately January 30, 2015 to approximately February 16, 2015, CC-1 remained largely inactive on social media. On or about February 16, 2015, CC-1 sent the following message to his brother ("Brother-1") regarding his training and activities:

> I'm so sorry for the sudden disappearance man, I've got a lot of explaining to do but first off I just wanna say that I'm sorry for not being aware about the protocol in my new company. Hours after our last . . . conversation i had my phone and laptop taken from me by the company for safety reasons. They're gonna give it back to me after my training is over inshaAllah. Right now im going through the religious training which will end in 9 days. Then I'm gonna be enrolled in my main training course which will take a month to complete.
>
> after that ill be a regular employee and they'll give me back all my stuff and I can contact u 24/7 like I did before. That'll probably be around end of March to mid April
>
> Im sorry i cant say more, im only able to contact u from a local café right now but i just want to let you know everything is normal and safe and im having a great time bro
>
> i got a lot to talk about with u isA just stay calm and please remind [our parents] that everything is cool

    a. Internet protocol ("IP") records for this message show that CC-1 was communicating using an Internet service provider believed to be used by ISIL members located in ISIL-controlled locations within Syria.

    b. In addition, based on my training, experience, and participation in this investigation, including my discussions with other FBI agents who have knowledge of ISIL's recruitment and training activities, I have learned, in substance and in part, that (i) ISIL confiscates communications devices—such as cellphones and laptops—upon a new member's entry

13

into ISIL and (ii) ISIL's training occurs in phases, beginning with religious training and then, subsequently, military training.  Therefore, I believe, in substance and in part, that, in the message described above, (i) CC-1 told Brother-1 that he was about to begin religious training with ISIL, after which he would begin his military training ("Right now im going through the religious training which will end in 9 days.  Then I'm gonna be enrolled in my main training course which will take a month to complete."), and (ii) CC-1's mention of "the protocol in my new company" in this exchange was a reference to the security rules of the organization that CC-1 was receiving training from, which I believe to be ISIL.  That "protocol," according to CC-1, included his "laptop" and "phone" being taken away from him "by the company for security reasons."

32.  In approximately March and April 2015, CC-1 again remained largely inactive on social media.  For several days in early May 2015, however, CC-1 began communicating with friends and associates, including AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, using his own social media account.  Based on my training, experience, and participation in this investigation, I have learned that the IP address information for some of these communications indicates that CC-1 was communicating through an Internet service provider associated with a Turkish satellite communications company believed to be used by ISIL members located in ISIL-controlled locations within Syria.

33.  In particular, on or about May 5 and 6, 2015, CC-1 had a social media exchange with Brother-1.  During this exchange, Brother-1, in sum and substance, expressed skepticism about whether "certain acts . . . are justified in the Quran."  CC-1 asked Brother-1 whether he was talking about "the bonfire or the one on the beach," which I believe are references to ISIL's widely publicized immolation of a Jordanian pilot in February 2015 and its mass execution of Christians on a Libyan beach in April 2015.  While CC-1 expressed reservations about the mass execution of the Christians, he said he supported the execution of the Jordanian pilot.  He explained the immolation was justified because "this guy was dropping tons of campfires on our people living all over the forests **here** and **we** made him see the results of his campfires before **we** decided to return him the favor." [emphasis added]

34.  Based on my review of documents obtained pursuant to search warrants issued in this District, I have learned that on or about May 7, 2015, CC-1 contacted AHMED MOHAMMED EL GAMMAL,

14

a/k/a "Jammie Gammal," the defendant and stated, in substance and relevant part, "it's been a long time but I'm doing well and I just wanna let u know im safe and secure and everything is going according to plan. When I get completely settled over the coming months I will contact u more to let u know what's up at my new job." Based on my training, experience, and involvement in this investigation, I believe that CC-1's reference to "everything . . . going according to plan" shows EL GAMMAL's prior knowledge, and involvement in, CC-1's travels to Syria to join ISIL.

35. On or about May 7, 2015, CC-1 using his Facebook account, sent the following message to a friend ("Friend-1"):

| 5/7, 21:02 | CC-1 | I live in bilad al Islam now, the real bilad al Islam, and its beautiful |
|---|---|---|

Based on my training, experience, and participation in this investigation, I have learned that "balad al Islam" translates to "country of Islam" in English, which can also be interpreted as "state of Islam," or "Islamic State." I have also learned that "bilad al-Sham" is a general reference to regions of Syria. Therefore, I believe, in substance and in part, that CC-1's reference to "bilad al Islam," or "balad al Islam," is a direct reference to the "Islamic State," or ISIL, and further demonstrates that CC-1, at the time of this May 7, 2015 message, was in Syria and providing material support to ISIL.

15

36. In late July 2015, I viewed a publicly available portion of a social media account believed to be used by CC-1. Based on information obtained pursuant to a grand jury subpoena, I know that the account was created in May 2015 and that the e-mail address associated with the account is an e-mail address used by CC-1. The account contains a picture of CC-1, standing in front of what appears to be a mural of a Syrian political figure, which has been riddled with bullets. In the photograph, CC-1 is wearing camouflage pants and raising his index finger in a gesture, which, based on my training, experience, and participation in this investigation, I understand to be a sign of support for ISIL.

WHEREFORE, deponent prays that a warrant be issued and that AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," the defendant, be arrested and imprisoned, or bailed, as the case may be.

FURTHER, the Government respectfully moves for the complaint and arrest warrant to remain sealed - - with the exception that the complaint and arrest warrant are unsealed for the limited purpose of disclosing the existence of or disseminating the complaint and/or arrest warrant to relevant authorities, at the discretion of the United States and in connection with efforts to arrest or prosecute the defendant and his coconspirators, or as otherwise required for purposes of national security.

_____
LE T. NGUYEN, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
20th day of August, 2015

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK