```
FCBJGAMH                    Bail Hearing
```

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              15 Cr. 588 ER

5   AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7   ------------------------------x

8

9                                      December 11, 2015
                                       10:30 a.m.
10

11

12  Before:

13                    HON. EDGARDO RAMOS,

14                                       District Judge

15

16                    APPEARANCES

17

18  PREET BHARARA,
         United States Attorney for the
19       Southern District of New York
    BRENDAN FRANCIS QUIGLEY,
20  ANDREA LEE SURRATT,
         Assistant United States Attorneys
21
    FEDERAL DEFENDERS SERVICES UNIT
22       Attorneys for defendant El Gammal
    BY:  DANIEL G. HABIB,
23       SABRINA P. SHROFF,
         Assistant Federal Defenders
24

25

FCBJGAMH                          Bail Hearing

1          (In open court)

2          (Case called)

3          THE COURT:  Good morning, everyone.  Please be seated.

4    Good morning to you, Mr. El Gammal.

5          MS. SHROFF:  Good morning, your Honor.

6          THE DEFENDANT:  Good morning.

7          THE COURT:  This matter is on for a bail hearing.

8    Federal Defenders has made a proposal to have Mr. El Gammal

9    released on certain conditions prior to trial, and the

10   government objects and requests that he continue to be detained

11   prior to trial.

12         Let me begin with you, Mr. Habib or Ms. Shroff?

13         MR. HABIB:  Yes, your Honor.

14         THE COURT:  Go ahead.

15         MR. HABIB:  Thank you.

16         I want to focus on a few key points this morning, your

17   Honor.  Mr. El Gammal is a United States Citizen who on Sunday

18   celebrated his 43rd birthday in the MCC.  He has been a

19   resident of the United States since the late 1990's and his

20   ties to this country are great.  All of his closest family

21   members, his mother, his sister reside in Phoenix, Arizona,

22   where Mr. El Gammal resided at the time of his arrest.

23         THE COURT:  Can I request some clarification on whose

24   mother-in-law Ms. DuBrow is?

25         Is she, in fact, Ms. Celeste DuBrow's mother or she is

FCBJGAMH                          Bail Hearing

1    Celeste DuBrow's other mother?

2           MR. HABIB:  Cherie DuBrow is Celeste Dubrow's

3    biological mother.  As I said, all three reside in the Phoenix

4    area where Mr. El Gammal was residing at the time of his arrest

5    in this case.

6           At the time of his arrest, Mr. El Gammal exhibited all

7    the characterizes of someone who was tied to the United States

8    and not planning to go anywhere.  He had just a few days before

9    his arrest brought his mother Samia over from Egypt to live

10   with him.  Samia is financially dependent on him and is in the

11   early stages of Alzheimer's disease.  Mr. El Gammal was in the

12   process of renting a larger home where the two would live

13   together, with her in his care.

14          He has for the last 10 years operated a thriving

15   automotive repair business in Phoenix, Cars R Us, and on the

16   day of his arrest had prepaid for merchandise he was importing

17   from China, merchandise that had not yet delivered.  He was

18   actively engaged in a thriving, successful business for which

19   he pays taxes to the city of Phoenix, the State of Arizona and

20   the federal government.

21          At the time of his arrest, he had undertaken no steps

22   to travel anywhere.  He had not bought a plane ticket anywhere,

23   not booked a hotel anywhere.  He had not transferred any money

24   out of the United States.  In short, he was a law abiding, tax

25   paying citizen whose life was upset and upended by this arrest.

FCBJGAMH                      Bail Hearing

1          THE COURT:  But the government tells me that he was,

2    in fact, making efforts to transfer money out of the U.S.,

3    correct?

4          MR. HABIB:  The government has pointed to a

5    conversation that Mr. El Gammal had with someone named Marwa El

6    Gammal, who is not a relation, in July of 2015, those

7    conversations bore no fruit.  He took no steps to transfer any

8    money anywhere other --

9          THE COURT:  Can you provide any insight as to what the

10   relationship is between Marwa El Gammal and Mr. El Gammal is?

11         MR. HABIB:  A friend, a friend, not a biological

12   relative, not someone that Mr. El Gammal would be free to stay

13   with or on whom Mr. El Gammal could depend for assistance of

14   the kind the government suggests.

15         THE COURT:  Okay.

16         MR. HABIB:  As to the bail package we have proposed in

17   this case, we respectfully suggest the bail package is more

18   than adequate to ensure Mr. El Gammal's appearance and the

19   safety of the community.  We have proposed a substantial

20   personal recognizance bond, co-signed by all three of Mr. El

21   Gammal's closest family members.  All are eager to co-sign a

22   bond on his behalf.

23         Cherie DuBrow, Mr. El Gammal's ex-wife with whom he

24   remains extremely close, is employed full time.  Celeste DuBrow

25   is retired and receives social security.  As I have mentioned,

FCBJGAMH                          Bail Hearing

1    Mr. El Gammal's mother would be happy to sign as an FRP, but

2    likely would not qualify as such in light of her lack of

3    income, but will sign for moral suasion.

4              THE COURT:  The government tells me that Ms. Sherif,

5    her then current plans when she was interviewed by the FBI were

6    that she was intended to leave the United States in January of

7    next year.  Is that correct?

8              MR. HABIB:  So we don't have access to a recording or

9    notes of the statement that Ms. Sherif made to the FBI.  What I

10   can tell your Honor in light of Mr. El Gammal's case, that is

11   no longer the plan.  She will stay in the United States with

12   Mr. Gammal for the duration of this case, and she has been in

13   touch with us over the course of the case to confirm that plan.

14             Whatever her plans were at the time have changed in

15   light of changed circumstances.

16             THE COURT:  Okay.

17             MR. HABIB:  In addition, for security, we are

18   proposing 35,000 in cash.  Cherie DuBrow's home in Arizona has

19   a substantial assessed market value for home detention for a

20   residence to be determined either in Arizona or in the Southern

21   District of New York where Mr. El Gammal would reside with

22   Cherie DuBrow as a third-party custodian, and I know she was

23   approved as a third-party custodian by Pretrial in the District

24   of Arizona.

25             Mr. El Gammal is prepared to submit to location

FCBJGAMH                         Bail Hearing

1    monitoring by GPS to make sure he respects those boundaries,

2    internet monitoring, surrender of travel documents and any

3    other conditions this Court deems appropriate.

4              THE COURT:  Sorry.  Remind me.  Didn't the Pretrial

5    Services in Arizona reverse its position that Ms. Cherie DuBrow

6    was an appropriate --

7              MR. HABIB:  No, your Honor.  They reversed a decision

8    her home was an appropriate place for Mr. El Gammal to reside.

9    They made no reversal of their position she herself was an

10   appropriate custodian.

11             THE COURT:  I thought that was curious.  The reason

12   they found the home not appropriate was because of certain

13   active criminal activity in that home, in the home in which Ms.

14   DuBrow lived.

15             MR. HABIB:  Yes, your Honor.

16             Pretrial Services based that finding on an arrest of

17   Ms. DuBrow's grandson, Christian, who was at the time residing

18   at the home.  It was activity carried on without Ms. DuBrow's

19   knowledge by a grandson.

20             THE COURT:  As I understand it, the police or Pretrial

21   Services found both drugs and guns at that location, correct?

22             MR. HABIB:  That is what the government has told us.

23             We haven't obviously been able independently to

24   confirm the return of the search warrant executed by the

25   Arizona State Police, but it is quite clear from the Pretrial

FCBJGAMH                         Bail Hearing

1    Services finding in Arizona and Magistrate Bates' conclusion

2    the detention, the problem was the home and not Ms. DuBrow.  A

3    grandmother is not privy to everything her teenage grandson is

4    doing in the home where both reside together.

5              THE COURT:  I understand that.

6              There appears to have been significant and serious

7    criminal activity going on literally under her nose, and for

8    that reason I think it at least curious that Pretrial Services

9    would have deemed her to be an appropriate custodian.  Does Ms.

10   Cherie DuBrow have a criminal record herself?

11             MR. HABIB:  The government has indicated a very old

12   criminal record.  The only date they have provided is 1996,

13   which is obviously more than 20 years' old.  I am sorry, your

14   Honor.  Your Honor was asking about Cherie DuBrow.  Cherie

15   DuBrow does not have a criminal record.

16             THE COURT:  Ms. Celeste DuBrow does, the ex-wife.

17             MR. HABIB:  As the government has indicated, the last

18   conviction the government has flagged is in 1996, so about 20

19   years ago.

20             THE COURT:  What was that conviction for?

21             MR. HABIB:  The government indicated it is a drug

22   conviction.

23             THE COURT:  How long were they married, Mr. El Gammal

24   and Ms. Celeste DuBrow?

25             MR. HABIB:  From 2000 to 2015.

FCBJGAMH                          Bail Hearing

1            THE COURT:  15 years?

2            MR. HABIB:  Yes.

3            THE COURT:  So they've just divorced?

4            MR. HABIB:  The couple divorced in January of this

5     year but remain extremely close, as is evidenced by Ms. Celeste

6     DuBrow's willingness to co-sign a bond and also by the fact she

7     is currently caring for Mr. El Gammal's mother.

8            THE COURT:  Is she financially depend or was she

9     financially dependent on Mr. El Gammal at least to some extent

10    at the time of his arrest?

11           MR. HABIB:  In the way that all married couples --

12    during the time their relationship, obviously, they shared

13    assets.  Subsequent to their divorce, no.  She earns a modest

14    salary, but she is employed full time and also receives

15    financial support from her own mother so, no, not financially

16    dependent on Mr. El Gammal.

17           THE COURT:  Okay.

18           MR. HABIB:  So in light of those conditions, we feel

19    that the presumption, statutory presumption that no condition

20    or combination of conditions can ensure Mr. El Gammal's

21    appearance and the safety of the community has been provided.

22           THE COURT:  What, if any, insight can you provide into

23    the fact that Mr. El Gammal, as I understand it, had some

24    ammunition in his home?

25           MR. HABIB:  Yes, your Honor.  So Mr. Gammal lawfully

1    possessed ammunition in the home, a right protected by the

2    Second Amendment.  It is my understanding he had purchased it

3    about a year or so prior to the search of his home for the

4    purpose of shooting target practice at a gun range in

5    Scottsdale where he went twice.  There was no firearm in the

6    home.

7                THE COURT:  Okay.  Thank you.

8                MR. HABIB:  Your Honor, as I am sure your Honor can

9    appreciate, the laws differ with respect to shooting and target

10   practice and gun possession in Arizona from here.

11               I do, lest I ignore the elephant in the room, address

12   the nature of the charges and basis of the government's case

13   against Mr. El Gammal, and I want to say this.  This is not the

14   forum to litigate Mr. El Gammal's guilt or innocence, but I

15   want to emphasize to everyone really the core of the

16   government's case against Mr. Gammal is based on this:

17               He introduced one person he knew to another person he

18   knew by sending the former a link to the latter's Facebook

19   page.  Without that allegation, I doubt the government can even

20   make a material support case here.

21               THE COURT:  But he did more than that, didn't he?  He

22   continued?  He made a trip from Arizona to -- was it New York?

23               MR. HABIB:  Yes, your Honor.

24               THE COURT:  To meet with that person?

25               MR. HABIB:  In his post-arrest statement, Mr. Gammal

1    indicated he traveled to New York, like millions of people do

2    as tourists every year, and while in New York he met with a

3    person with whom he formed an acquaintance over the year on the

4    internet.  Again as any traveler to a strange city when he

5    arrives, he seeks out people he knows.

6              There is no evidence, period, as to what was discussed

7    or transpired during that trip, certainly no evidence that

8    during that trip the parties discussed ISIS, the parties

9    discussed foreign terrorist organizations, the parties

10   discussed radical Islam, that Mr. El Gammal encouraged CC-1 to

11   travel, that Mr. El Gammal told him he would help him travel or

12   did any of the things the government is suggesting transpired.

13   All of that is simply a matter of speculation from the fact the

14   two were in the same place.

15             THE COURT:  Okay.

16             MR. HABIB:  Thank your Honor.

17             THE COURT:  Thank you.  Mr. Quigley or Ms. Surratt.

18             MR.  QUIGLEY:  Your Honor, I won't rehash everything

19   that is in our letter, but we do think this is a case where

20   there is both, the defendant poses both a significant danger to

21   the community and a significant risk of flight, and just to

22   respond to some of the points defense counsel made, this is a

23   defendant whose ties to the United States aren't great.  In

24   fact, they are quite limited.  He has no children here.  He

25   appears to own no real estate and the ties he does have cannot

1    provide the court with sufficient assurance that he will either

2    appear or continue, or not continue to support ISIS.

3          His mother is here in the country.  Well, three

4    co-signers have been proposed.  Two of those three people are

5    people with whom the defendant has no legal or blood

6    relationship.  His mother has limited ties to the U.S.  She got

7    here a few days before the defendant was arrested and did tell

8    the FBI that she planned to return to Egypt in January 2016.

9          His former wife whom he is divorced from was deemed

10   not to be a suitable third-party custodian in Arizona.  She

11   does have a criminal record, as your Honor pointed out.  She

12   has multiple prior convictions.  The most recent conviction, it

13   appears, is from 2003.  She was also in a case in 2010 for

14   disorderly conduct where the disposition was not reported.  We

15   don't know what happened.  That was the case where part of our

16   submission was redacted.

17         THE COURT:  Do you know why it was Pretrial services

18   in Arizona deemed her not to be a suitable custodian?

19         MR. QUIGLEY:  I don't know why.  I can't say for sure.

20   I was not privy to their decision.  Then his ex-mother-in-law,

21   Ms. Cherie DuBrow, and I think your Honor was correct, even

22   though she wasn't arrested or charged in that search warrant in

23   her house, it does raise significant questions about her

24   ability to monitor what is going on in her house, to keep the

25   people in her house out of trouble, and as such, it raises

1    significant questions about her ability to monitor the

2    defendant while he would be on pretrial release in her custody.

3            With respect to the ammunition in the defendant's

4    home, certainly possessing ammunition is not in and of itself

5    necessarily illegal.  This was a significant quantity of

6    ammunition, though.  It was a hundred rounds, and I think in

7    light of some of the other evidence we put forth in our letter,

8    for example, the defendant's January 2014 social media exchange

9    with Individual 2 where he talks about when a time comes for

10   assassinations, I will specialize in meeting people.  I will

11   enjoy sniping them.

12           He also talks about --

13           THE COURT:  How did that conversation take place?

14   Over what medium?

15           MR. QUIGLEY:  Facebook, your Honor.

16           THE COURT:  Facebook?

17           MR. QUIGLEY:  Yes.  So I think in light of some of the

18   other conversations that we talked about where he talks about

19   drones being good for Gaza because they can be loaded with

20   bombs, the possession of a hundred rounds of ammunition is

21   certainly troubling.

22           Lastly, on the nature of the offense conduct, again we

23   strongly disagree with defense counsel that this is just a case

24   about one Facebook associate, the defendant introducing one

25   Facebook associate to another.  He did, as your Honor pointed

1    out, travel to New York.  He met with CC-1 based on cell site

2    records three times in a less than a 48-hour period when they

3    were in New York.

4           He only, the only New York area number he called

5    during that time was CC-1s, phone and I think most

6    significantly, during that time is when he reached out to CC-2,

7    the defendant reached out to CC-2 and said that -- talked,

8    asking about, saying he was with his American friend.  Shortly

9    thereafter is when the defendant passed to CC-1 CC-2s contact

10   information.

11          THE COURT:  Tell me, if you would, how do you link

12   those conversations and those contacts to ISIS?

13          I take it that the gravamen of the indictment is that

14   the defendant aided CC-1 in traveling to Syria in order to join

15   and receive training from ISIS, correct?

16          MR. QUIGLEY:  Yes, your Honor.  So I think a couple of

17   things:

18          Number one, looking at the totality and just going

19   kind of broad brush strokes here, the defendant and CC-1 had

20   known each other prior to August 2014, but in August 2014 CC-1

21   learns from a third party that the defendant posted comments

22   supportive of ISIS in an online forum.  CC-1 then reaches out

23   to the defendant within minutes of that conversatin, and they

24   have over the next few weeks a series of conversations on

25   Facebook where they talk about shifting their communications to

1    other social media platforms because they believe those would

2    be less susceptible to law enforcement detection.

3           In the middle of those conversations is when CC-1

4    travels to -- sorry -- defendant travels to New York to meet

5    with CC-1, under the circumstances the defendant is in contact

6    with CC-2, and then we have the defendant, ultimately after a

7    false start in November, the defendant provides guidance to

8    CC-1 after CC-1 travels to Turkey.  He directs them to certain

9    certain border towns, provides advice on traveling to certain

10   border towns near the Turkish Syrian border.

11          THE COURT:  Who does that?  Mr. El Gammal does?

12          MR. QUIGLEY:  Yes, your Honor, which are hundreds of

13   miles from Istanbul.  And he tells him that -- and then

14   subsequently we have, frankly, I think it is extremely clear

15   that CC-1, in fact, joined ISIS, just based on frankly the

16   picture that we reference in the complaint where he is standing

17   in front of a mural of a Syrian political figure making an ISIS

18   sign.

19          THE COURT:  How do you know it is a Syrian political

20   figure?

21          MR. QUIGLEY:  You can kind of make out the mural.

22          THE COURT:  Do you know who it is, the individual is?

23          MR. QUIGLEY:  Bashar Al-Assad, the former Syrian

24   president.  It has been shot up quite a bit so you can't tell

25   totally, but it looks like Bashar Al-Assad.  That is our

1    assessment.  He is making a sign, a raised pointer finger which

2    has been on social media known as a sign for ISIS.  One state,

3    one God is what it represents.

4                THE COURT:  What is the sign?  Just this?

5                MR. QUIGLEY:  Yes, your Honor.

6                THE COURT:  That means?

7                MR. QUIGLEY:  It means one state, one God.  It is not

8    a gang sign, but it is the equivalent of that for ISIS.  Then

9    we have the defendant himself -- let me back up a second.

10               There are coded conversations about an accompanying

11   internship between the defendant and CC-1.  We would anticipate

12   introducing evidence that CC-1 understood those things to mean

13   ISIS.

14               THE COURT:  Okay.  Very well.  Mr. Habib?

15               MR. HABIB:  Briefly, your Honor.

16               With respect to the government's objections to the

17   various sureties, I think that puts the cart before the horse.

18   If your Honor is prepared -- that is to say, complaints about

19   the adequacy of the sureties presuppose Mr. El Gammal is

20   bailable.  We certainly believe that he is.

21               If your Honor or the government have concerns about

22   particular individuals identified as potential sureties, those

23   concerns can be addressed in the ordinary course either by the

24   government vetting them through ordinary purposes FRP or before

25   your Honor.

1          With respect to the ammunition found in Mr. El

2   Gammal's home, it is my understanding that is a single box of

3   ammunition that you can buy at a Wal-Mart in Phoenix, and you

4   can take to shoot at a target range, and it is difficult to

5   understand what Mr. El Gammal was going to do that was

6   dangerous with ammunition without a gun.

7          The conversations that the government has alluded to

8   occur regarding Mr. El Gammal's supposed violent proclivities

9   occurred in January and July of 2014 respectively.  At this

10  point they're quite stale, and more to the point, as the

11  circuit told us just this week in Valle, there is a difference

12  between what people say online and what they really believe,

13  and there is a difference between what people say they will do

14  online and what they will really do.

15         I think your Honor is quite aware that online

16  communications are often a forum for exaggeration, for

17  rhetoric, for hyperbole, and in the context of a communication

18  about the political situation in Egypt, in Mr. El Gammal's

19  native Egypt, it is not surprising in discovery production of

20  more than 40,000 pages drawn from Mr. El Gammal's Facebook

21  account, the government can cherry-pick one or two statements

22  that out of context sound radical.

23         With respect to the allegation that there was a drone

24  recovered from Mr. El Gammal's house, I think this frankly is

25  emblematic of the overblown nature of the charges in this case.

1    This is a three pound, mass marketed, commercially available

2    drone that holds a camera.  It can't hold a bomb.  It can't

3    drop a bomb anywhere.  It is the kind of drone, frankly, that

4    television stations use to cover rallies, people use to film

5    their weddings.

6          Let me go to the core here which is the allegations

7    with respect to the link to ISIS.  I think that your Honor hit

8    on a very important point.  It is not enough for the government

9    to make out its case here to show not -- it would be

10   insufficient to convict on any of these offenses merely to show

11   Mr. El Gammal facilitated CC-1s travel to Turkey.  It would

12   still be insufficient to show that he facilitated CC-1 travel

13   to Syria.

14         The government would have to prove that Mr. El Gammal

15   had the specific intent to facilitate CC-1s joining with a

16   foreign terrorist organization.  There are more than a thousand

17   armed -- to back up.  We don't concede Mr. El Gammal did either

18   of those things.  Even if the government could prove those

19   things, there are more than a thousand armed groups currently

20   fighting in Syria.  Many are not foreign terrorist

21   organizations.  Many of them are backed by the United States

22   Government.

23         In particular, there are Islamic groups like the Free

24   Syrian Army and Syrian Muslim Brotherhood that certainly oppose

25   the Assad regime.  Who wouldn't?  It is a brutal despotic

1    regime that is massacring its own citizens.

2            THE COURT:  The conversations Mr. El Gammal is alleged

3    to have had, at least the snipets that were put before me seem

4    to indicate that he would not be supportive of those

5    organizations in Syria, but rather organizations that are ISIS

6    or like ISIS in terms of their politics, correct?

7            MR. HABIB:  Let me say two things about that:

8            First, these conversations far predate the alleged

9    offense conduct in this case.

10           THE COURT:  Not that far.

11           MR. HABIB:  January and July of 2014, your Honor.

12           More important, those conversations pertain not to the

13   political situation in Syria, but to the political situation in

14   Egypt.  If I may, it is important to Mr. El Gammal that I

15   provide your Honor with some context.

16           As your Honor is aware, Mr. El Gammal left Egypt in

17   1997, at the time really at the mid-point of the military

18   dictatorship of Hosni Mubarak.  During the Arab Spring Mubarak

19   was deposed and a democratically-elected president, Mohamed

20   Morsi, aligned with the Muslim Brotherhood, came to power.

21   This was a time of great hope and great pride for Egyptians and

22   particularly Mr. El Gammal who, as we have noted, came to the

23   United States like many immigrants, seeking a freer society.

24           That government was deposed in a military coup in 2013

25   by the Morsi government.  Understandably, that caused Mr. El

1  Gammal a great deal of anger.  So when he is talking about the

2  Morsi government and political situation in Egypt, and he says

3  in a hyperbole link that if ISIS comes to take down the Morsi

4  government, I'll support them, those things cannot be linked

5  for a desire to back a different string of ISIS, in a different

6  country, in a different political context, and it can't be

7  linked to the travel that is alleged in this case.

8         Moving on, as to the communication between Mr. El

9  Gammal and CC-1, I challenge the government on this point.

10  There is not a single communication between those two people

11  that the government has produced in discovery in which they

12  discuss ISIS, in which they discuss Syria, in which they

13  discuss Islamic jihad, any of those concepts.  There isn't.

14  Your Honor has gone right to the point.  There simply isn't

15  that link.  It is essential that that link exists to prove the

16  charges in this case.

17         Very briefly on two more points.

18         With respect to travel to border towns in Turkey, I

19  must correct the government.  Mr. El Gammal did not direct CC-1

20  to any border towns.  The communication is Mr. El Gammal

21  provides an estimate of the cost of bus fare to towns in

22  southern Turkey and those towns, I will say this, the town of

23  Gaziantep, one of the towns referenced in the communication, is

24  a town of 1.5 million people, it is 40 miles from the Syrian

25  border, also the site of the Syrian interim opposition

FCBJGAMH                        Bail Hearing

government.  It is a hub for relief organizations.  It is a

place where there are 300 Syrian refugees.  The idea because

one is going there, one is necessarily planning to travel then

to Syria and join ISIS is too far --

        THE COURT:  There is another conversation that the

government emphasizes, and it provides a particular take

concerning a plot that it says is coded conversation for Mr. El

Gammal's desire to join CC-1 in Syria and join ISIS.

        Do you have a different take that you would want me to

consider?

        MR. HABIB:  I will say this.  The chronology of that

particular chat is rather drawn out.  Mr. El Gammal sends this,

alleged to have sent the initial message in May 2015.  CC-1

logs onto Facebook in the interim, does not respond, and

responds months later, in July 2015.  This isn't a

communication that was occurring with any urgency.

        All I can say with respect to that communication is

what happens next?  The answer is nothing.  The answer is

nothing happens next.  Mr. El Gammal doesn't buy a plane

ticket.  He doesn't engage in any further communication with

CC-1 about details.  They don't discuss where Mr. El Gammal

should go or who he should contact once he arrives.

        There is no -- as we have said already, at the time of

his arrest, Mr. El Gammal is not a person who is making any

immediate plans to leave the country.

1        THE COURT:  Do you know Mr. Habib -- I don't -- what

2   is the temporal proximity between that conversation and the

3   conversations that Mr. El Gammal was having with Marwa El

4   Gammal about transferring money to Turkey?

5        MR. HABIB:  The conversation with CC-1 concludes in

6   July 2015.  The conversation with Marwa El Gammal also occurs

7   in July 2015.  Again in the time between that point in time and

8   the time of Mr. El Gammal's arrest, nothing happens.  There are

9   no steps along any of these lines.  He doesn't buy a plane

10  ticket, book a hotel room or move any money.

11       To the contrary, he does things fully consistent with

12  a person who intends to remain firmly planted in his adopted

13  country.  He brings this mother from Egypt, who spends time

14  with him.  He is actively engaged in business.  On the morning

15  of his arrest, he was going to a big box store to buy

16  groceries.

17       THE COURT:  Why was he buying an ice maker, if you

18  know?

19       MR. HABIB:  I do know, your Honor.

20       In addition to automotive sales, his business also

21  imports goods from China for resale in the United States.  He

22  is importing ice makers from China to resell them to

23  restaurants in Phoenix.

24       MS. SHROFF:  Your Honor, may we have a second?

25       THE COURT:  Sure.

1          (Off-the-record discussion)

2          MR. HABIB:  Your Honor, just to clarify one point.

3          Your Honor asked about the conversation with CC-1.  As

4    I have indicated, the conversation began in May of 2015 and

5    concluded in July of 2015.  Thank you.

6          THE COURT:  Mr. Quigley.

7          MR. QUIGLEY:  Just to respond to the point about the

8    conversations with CC-1, your Honor, and I would like to make

9    two quick points in response.

10         The conversation did begin in May.  CC-1 did not

11   respond until July.  I think what happened when he responded in

12   July, the defendant re-engaged.  He didn't ignore him.  He said

13   I am thinking about traveling in mid-August.  As your Honor

14   noted, around the same time is when the defendant is having

15   conversations with Marwa El Gammal, who we referred to in our

16   papers as Individual 4.  He talks with her about avoiding

17   currency transaction reporting requirements to send money over

18   to Turkey.  He says the maximum you can take is 10.

19         He talks about liquidating his business, and she says

20   -- he talks about being able to buy a plane ticket a day or two

21   in advance, and she says to him she won't be in Turkey

22   available to receive the money until the end of September.  The

23   fact he didn't travel, we don't think, really necessarily means

24   anything here.  He was at the very least seriously considering

25   in the summer of 2015 traveling overseas and traveling to ISIS,

FCBJGAMH                    Bail Hearing

1   and I think that is a significant fact for both danger and risk

2   of flight.

3            THE COURT:  Thank you.

4            Mr. Habib, unless there is anything more you wanted to

5   say?

6            MS. SHROFF:  May we have one second?

7            THE COURT:  Sure.

8            (Off-the-record discussion)

9            THE COURT:  I have one additional question for you,

10   Mr. Quigley.  Does the government have an estimate, as you sit

11   here, concerning the guidelines that Mr. El Gammal is facing

12   should he be convicted of these charges?

13            MR. QUIGLEY:  The guidelines on all counts we believe

14   will be 360 months to life.  Count 3 carries a 10 year

15   mandatory sentence as well.

16            MS. SHROFF:  We are going to address that issue.  We

17   strongly disagree with that response.  Give us a second.

18            THE COURT:  Okay.  Yes.

19            (Off-the-record discussion)

20            MR. HABIB:  Thank you, your Honor, for your Honor's

21   indulgence.  Two quick points:

22            One, with respect to Mr. El Gammal's business, as we

23   have indicated, the business was active and ongoing as of

24   August 2015.  It is not -- Mr. Gambino was importing ice

25   machines from China, and he prepaid for the delivery of three

1   other sets of merchandise from three other Chinese

2   manufacturers, a wheel alignment and towing machine relative to

3   his automotive repair business.

4            THE COURT:  What is a towing machine?

5            THE DEFENDANT:  A trailer.

6            MR. HABIB:  It is a trailer.  For example, a body shop

7   goes to pick up a car broken down on the side of the road, and

8   it loads the car onto a trailer and uses the truck to pull the

9   trailer to a shop.

10            With respect to the charge under 18 U.S.C. 2339 (d) of

11   receiving, aiding and abetting the receipt of military-type

12   training and conspiring to do so, the statutory -- in brief,

13   our position is there is no mandatory-minimum sentence

14   associated with that charge.  The provision provides that

15   anyone who knowingly receives military training shall be fined

16   under this title or imprisoned or for 10 years, or both.

17            And the Second Circuit, construing materially

18   identical language in United States versus Pabon-Cruz, and I

19   can provide the citation to the court once I have a computer,

20   but construing materially identical language in the

21   pre-amendment 2251 said that that language meant a fine could

22   be imposed or 10 years could be imposed, or both, but there was

23   no mandatory term of incarceration.

24            THE COURT:  Okay.  Thank you both for that.

25            I have read the parties' submissions very carefully

FCBJGAMH                    Bail Hearing

1    and listened very carefully to you this morning, and I find

2    that the proposed bail package submitted by Mr. El Gammal was

3    not sufficient to rebut the presumption either that he is not a

4    risk of flight or a danger to the community.

5            With respect to risk of flight, despite the fact

6    Mr. El Gammal is, indeed, an American citizen, he has

7    incredibly scant connections to this country for someone who is

8    a citizen.  The three people, the only three people that can

9    vouch for him are is ex-wife, his ex-mother-in-law, and his

10   mother who recently arrived from Egypt and apparently intends

11   to return to Egypt.

12           His ex-wife was deemed by Pretrial Services in Arizona

13   not to be a fit custodian, and his ex-mother-in-law, as I

14   indicated, and suggested very recently in her home allowed or

15   took place in her home a conspiracy to distribute narcotics

16   which included handguns.  I don't see how she would be a proper

17   custodian.  In any event, Mr. El Gammal, as I noted from the

18   papers, does have connections outside of the United States.  He

19   has a sister who lives in the Middle East.  He has friends in

20   Turkey and he is a citizen of Egypt.

21           He is facing an incredibly long prison sentence if

22   convicted and has every incentive to go back to certainly Egypt

23   with his mother rather than face that prison sentence.  While

24   it is certainly true that the conversations that the government

25   has proffered thus far do not conclusively establish a link to

FCBJGAMH                         Bail Hearing

1    ISIS, the conversations are coded and not in a very

2    sophisticated way, and it is obvious at least at this point

3    that the government's take of those conversations that Mr. El

4    Gammal conspired to assist CC-1 in traveling to Syria in order

5    to join with and be trained by and fight with ISIS is a

6    perfectly reasonable reading of those conversations, in the

7    context of those conversations.

8            With respect to danger to the community, there is, of

9    course, the nature of the charges which are incredibly serious.

10   They involve terrorism and assistance of an organization that

11   has as its goal, at least one of its purported goals, stated

12   goals, is to attack the United States and its allies and the

13   American people.

14           They're very, very serious charges which a grand jury

15   sought fit to indict him on, and while there are, of course,

16   absolutely innocent explanations for the ammunition that was in

17   his home and the conversations that he had about the use of

18   drones, and I take Mr. Habib, Mr. Habib's point about the

19   Second Circuit's recent opinion in Valle, there is also in

20   context, when you look at those items in the context of the

21   conversations that he has had and in the context of the actual

22   steps that he allegedly took to aid ISIS, one has to look at

23   those types of items and take those conversations somewhat more

24   seriously.

25           Again because this is a case because of the charges in

1    the indictment that require me to assume that there are no

2    conditions or combination of conditions that will reasonably

3    assure the return of Mr. El Gammal to future court appearances,

4    I find that the package that has been proposed does not serve

5    to rebut that presumption.  Accordingly, I find that Mr. El

6    Gammal should remain in custody.

7              Anything else we need today, Mr. Quigley?

8              MR. QUIGLEY:  Your Honor, one second?

9              THE COURT:  Sure.

10             (Off-the-record discussion)

11             MS. SHROFF:  We have certain matters to raise.  I

12   think Mr. Quigley is turning to us.

13             THE COURT:  Okay.

14             MS. SHROFF:  May I respond?

15             THE COURT:  Sure.

16             MS. SHROFF:  We have two matters to raise with the

17   court -- actually three.  The first is the protective order in

18   this case.  The second is the current state of discovery, and

19   the third is the return of certain properties the government

20   has taken that do not belong to Mr. El Gammal, but belonged to

21   third parties that have not yet been returned.

22             If I may, I would like to start with the protective

23   order?

24             THE COURT:  Okay.

25             MS. SHROFF:  The court is backed up, so I will try to

1    be succinct.  Page 2 of the protective order -- I provided the

2    government a copy, I provided one to the court -- designated

3    people with whom we can share this information does not include

4    any fact witnesses.  According to the government, fact

5    witnesses would present such a nature of danger to security,

6    they override Mr. El Gammal's interest in preparing for a

7    defense.  We strongly disagree.  We ask the court to consider

8    modifying its protective order so we can approach fact

9    witnesses.  We don't need to provide them with a copy to keep,

10   but we need to have our fact witnesses --

11              THE COURT:  I don't have a copy of the protective

12   order.

13              MS. SHROFF:  I gave you one, your Honor.

14              (Pause)

15              THE COURT:  I have a copy of the protective order.

16              Page 2?

17              MS. SHROFF:  Yes.  Subsection (c), 1, 2, 3, those are

18   the only people we can show discovery to.  I am not asking to

19   put it on the internet, I am not asking to share it randomly,

20   but certainly if I am going to be a lawyer for Mr. El Gammal, I

21   need to talk to fact witnesses about discovery.  I can't do it

22   without that.

23              The provision here that says I could come to you, the

24   Court, to seek permission to show it to a fact witness.  Let's

25   play that out.  Say I come to you and say I want to show this

FCBJGAMH                          Bail Hearing

1    to fact witness John Smith.  The court is not going to know who

2    John Smith is, right?  To know who John Smith is, you have to

3    eventually come back to the government.  To come back to the

4    government, that means they know who I am talking to, who my

5    witnesses are and how I am preparing.

6          I ask the court to consider a modification in the

7    proposed language.  It would allows us to share fact witnesses,

8    discovery, know who provided to them a copy, but allow us an

9    opportunity to show, discuss and take back the material that we

10   currently have.

11         THE COURT:  Mr. Quigley.

12         MR. QUIGLEY:  Yes, your Honor.

13         Of course, this protective order was signed by the

14   defendant and entered by the Court at our initial appearance

15   before your Honor.  We think it is entirely appropriate for

16   this case.  This is a very sensitive and ongoing investigation

17   involving facilitation of people fighting with the Islamic

18   state, and there is a mechanism in here for the defense to

19   apply to the court to modify the protective order, but we don't

20   think that given the defense has the ability to show these

21   discovery materials to unspecified fact witnesses is really

22   consistent with the sensitivities of the ongoing investigation.

23         THE COURT:  I am not going to amend the protective

24   order at this point, Ms. Shroff.  We'll proceed in the way that

25   you suggest may be unworkable, and I'll see whether or not it

1   becomes unworkable, but for now to the extent that there are

2   specific fact witnesses to which you wish to show the materials

3   that are covered under the order, you should approach the court

4   and we'll discuss those on an individual basis.

5          Again, if if becomes, that becomes unworkable, we'll

6   see how this might be amended to facilitate the defendant's

7   preparation for trial.

8          MS. SHROFF:  I am assuming if we provide a list of

9   fact witnesses, they will not be shared with the government?

10         THE COURT:  Well, as I sit here, I don't know how that

11  is going to work.  It may be necessary perhaps for some

12  different taint team to take a look at who those individuals

13  might be and vet whether or not we can or should reasonably

14  provide those individuals with sensitive material.  I don't

15  know.  Let's take it one step at a time, and I well guarantee

16  you that I will be available to you and your colleagues as

17  needed.

18         MS. SHROFF:  Right.  When I send you the list, I am

19  assuming you won't share it with the government?

20         THE COURT:  I will not as an initial matter share it

21  with the government.

22         MS. SHROFF:  Will you allow me the opportunity to

23  withdraw the fact witnesses if you say they get to look at it?

24         THE COURT:  Yes, I will provide you with that

25  opportunity.

FCBJGAMH                        Bail Hearing

1          MR. QUIGLEY:  In that case, we would just ask that if

2     the list is not shared with the government, the application at

3     least be made on notice so that we we have the opportunity to

4     respond.

5          THE COURT:  Let's take it one step at a time and see

6     how it plays.

7          MS. SHROFF:  I am going to respond my telling you here

8     is a list of fact witnesses they can't see?  I am impressed.

9          The second point is discovery, please.  Discovery

10    hasn't yet been completed.  We understand, you know, the

11    government has a lot of search warrants to execute still, but

12    we would like to know by a cutoff at least by which discovery

13    will be completed.  The government has informed us it is

14    classified discovery.  We like to know when that will be

15    produced, the volume of it, so we can have some sense when we

16    can take the case to trial.

17          That is my second request and --

18          THE COURT:  Let me turn to Mr. Quigley.  What is the

19    state of discovery?

20          MR. QUIGLEY:  What I think will be the majority of

21    discovery in this case has been produced.  It has been produced

22    for some time.  Our last significant production was on October

23    27th.  There have been a couple of small productions since

24    then.  It is large, there are over a hundred pages -- sorry --

25    a hundred thousand pages of social media search warrant

1    returns.  The two areas of unclassified discovery that we're

2    still waiting on are two things:

3            One, very recent, within the last month, we executed a

4    number of additional social media search warrants.  We have not

5    gotten returns for those warrants back yet.  We will, of

6    course, produce them promptly once we get the returns back.

7            The secondary is there were certain electronic devices

8    seized during the premises search warrant on Mr. El Gammal's

9    residence.  It took some time to get those from Arizona to New

10   York.  They're currently in the process of being downloaded and

11   analyzed by the FBI.  We have been producing those to the

12   defendant, or at least the returns from the search warrants

13   that were executed on those devices on a rolling basis.

14           Just last week we produced two cell phones, the images

15   on two cell phones and we anticipate continuing to do that

16   going forward.

17           THE COURT:  How long will that take?

18           MR. QUIGLEY:  I am hopeful we can do it within the

19   next few weeks.  We asked the agents to put additional

20   resources on it.  There is somewhat of a backlog at the FBI

21   generally now, but we are trying to push it through as fast as

22   possible.

23           THE COURT:  Within a month, that will be completed.

24           MR. QUIGLEY:  Yes, we'll tell the agents to get it

25   done within a month.

1    THE COURT:  Okay.

2    MR. QUIGLEY:  With respect to classified discovery,

3    and obviously I don't want to get into too many details here,

4    but Ms. Surratt and I spent a significant amount of time over

5    the last few months investigating the potential universe of

6    classified discovery.

7    We have put in a request to Washington, D.C. to get

8    authorization to produce certain materials.  We were told we

9    would expect to get that approval within 30 to 45 days as of I

10   think 10 days ago.  Again I think about a month would be

11   realistic to produce that.

12   THE COURT:  Are you in a position to tell the court

13   what the volume of those materials might be?

14   MR. QUIGLEY:  It is rather large, your Honor.  Yes,

15   without telling you, we can provide something ex-parte and

16   classified as to what they might be.

17   THE COURT:  It will be voluminous?

18   MR. QUIGLEY:  Yes, your Honor.

19   THE COURT:  Okay.  Ms. Shroff, the third item?

20   MS. SHROFF:  The third item, your Honor, I have tried

21   and I am sure that neither of these two attorneys are trying to

22   impede the return on their own, but apparently the FBI is so

23   backlogged they haven't had the time to go through Mr. El

24   Gammal's mother's I pad and iPhone.  They are a family of

25   limited means.  They would like their devices back.  They have

1   no objection to the government keeping a copy.  They don't

2   care.  They just want their devices back.  Could you tell them

3   to return them?

4              THE COURT:  When you say "they," you mean Mr. El

5   Gammal and his mother?

6              MS. SHROFF:  Mr. El Gammal's mother wants her two

7   devices back.

8              THE COURT:  Okay.  Mr. Quigley?

9              MS. SHROFF:  It has been months literally.

10             THE COURT:  I understand.

11             MR. QUIGLEY:  Your Honor, that is not one of the

12  phones that has been analyzed yet, I don't think.

13             Certainly if there is evidence on the phone, we would,

14  whether it is Mr. El Gammal's statements or not, there could be

15  evidence on that phone that we would want to use and need to

16  hold onto the phone for authentication purposes at a trial.  We

17  haven't reached that.

18             THE COURT:  This isn't that category of information

19  that you believe can be completed within the next month?

20             MR. QUIGLEY:  Yes, your Honor.

21             THE COURT:  Make sure that you do that.

22             MS. SHROFF:  I would like to come back in a month so

23  we can make sure this happens.

24             THE COURT:  We can set a subsequent date now.

25             Anything else anything else, Mr. Quigley?

FCBJGAMH                           Bail Hearing

1             MR. QUIGLEY:  No.

2             MS. SHROFF:  No.  Thank you.

3             THE COURT:  Do you want to set a status conference for

4    a month?

5             MS. SHROFF:  Yes.

6             THE COURT:  Ms. Rivera.

7             THE CLERK:  January 15, 2016, at 12:30 pm.

8             MR. QUIGLEY:  Your Honor, I am starting a trial the

9    week of the 11th.  Can we do it the Friday of that week?

10            THE CLERK:  The Friday of the week of the 11th.

11            THE COURT:  The 15th, okay.

12            Anything further?

13            MS. SHROFF:  No.  Thank you.

14            MR. QUIGLEY:  Your Honor, the government moves to

15   exclude speedy trial time between now and January 15th.  Among

16   other things, the request for exclusion will allow the

17   defendant to review discovery produced and contemplate any

18   motions, and the parties can engage in negotiations regarding a

19   disposition.

20            THE COURT:  Mr. Habib?  Ms. Shroff?

21            MS. SHROFF:  Your Honor, I guess we continue plea

22   negotiations, but the other two would not be a proper basis for

23   excluding time.  To the extent we continue to have plea

24   discussions, that is fine.

25            THE COURT:  Okay.

FCBJGAMH                          Bail Hearing

1           MS. SHROFF:  I meant discussions.  Sorry.

2           THE COURT:  I will exclude the time between now and

3    January 15th under the speedy trial clock.

4           I find Mr. El Gammal's interests in having his

5    attorneys continue having discussions with the government about

6    a potential pretrial disposition outweigh the interests of the

7    public and the defendant in a speedy and public trial, so that

8    time will be excluded.

9           I will see you folks on January 15th.

10          (Court adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25