**<u>EXHIBIT B</u>**

G9cWsenC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                            15 Cr. 706 (VSB)
4
     NG LAP SENG,
5    a/k/a "David Ng" and
     JEFF C. YIN,
6    a/k/a "Yin Chuan,",

7                                             Oral Argument
                    Defendants.
8    ------------------------------x
                                             New York, N.Y.
9                                            September 12, 2016
                                             12:15 p.m.
10
     Before:
11
                    HON. VERNON S. BRODERICK,
12
                                             District Judge
13
                         APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   DANIEL C. RICHENTHAL
     JANIS M. ECHENBERG
17   DAVID S. JONES
          Assistant United States Attorneys
18
     HUGH H. MO
19        Attorney for Defendant Ng Lap Seng
          -and-
20   PARK JENSEN BENNETT LLP
     BY:  TAI H. PARK
21        CHRISTOPHER GREER
          -and-
22   SHAPIRO ARATO LLP
     BY:  ALEXANDRA A.E. SHAPIRO
23
     DAVID E. PATTON
24        Federal Defenders of New York, Inc.
          Attorney for Defendant Yin
25   BY:  SABRINA P. SHROFF
          ALLEGRA GLASHAUSSER

G9cWsenC

1     THE COURT:  Could the parties please note their

2     appearances.

3     MS. ECHENBERG:  Good morning, your Honor.  Janis

4     Echenberg, for the government, and with me at counsel table

5     from the criminal division of the U.S. Attorney's Office is

6     Daniel Richenthal and also from the FBI Special Agent Ryan

7     Carey.  And I believe Mr. Jones can introduce himself.

8     MR. JONES:  Yes, your Honor.  I'm David Jones from the

9     civil division of the U.S. Attorney's Office, and I've been

10     requested to appear here today by the State Department.  In the

11     event any questions concerning the U.N.'s privileges and

12     immunities arise, I'll be prepared to address those from the

13     perspective of the State Department, if that's helpful.

14     THE COURT:  All right.  Thank you.

15     MR. MO:  Good afternoon, your Honor.  Hugh H. Mo for

16     Mr. Ng Lap Seng, and his appearance, by the way, has been

17     waived, with your Honor's approval.  And with me is Alexandra

18     Shapiro, my cocounsel, as well as Tai Park as well as

19     Christopher Greer.

20     MS. SHROFF:  Good afternoon, your Honor.  Sabrina

21     Shroff and Allegra Glashausser for Mr. Yin, whose appearance

22     today is waived.  He is still in California.  He is going to be

23     informed of the proceedings both with the conversation with the

24     two of us and we will provide to him a copy of the transcript

25     of today's proceeding.

G9cWsenC

1          THE COURT:  OK.  Is he aware of it?

2          MS. SHROFF:  He is, your Honor, but we haven't gone

3     over all the various issues that will be discussed.

4          THE COURT:  The only thing, obviously, if he requests

5     a copy of the transcript, there will be some substantive issues

6     that we discuss, as I mentioned in my order, but his

7     appearance, as Mr. Ng's appearance, will be waived for purposes

8     of this court proceeding.  I will say that most of the

9     discussions, I think, that we'll be having relate to legal

10    issues and oftentimes clients decline to be present, but having

11    said that, obviously I'd be more than happy for them to be here

12    and it's their right to be here.

13          First I want to talk about motion schedule, and I'll

14    just run through where things currently stand.  Right now the

15    date for pretrial motions, with the exception of the motions

16    that had already been filed, would be today.  Ms. Shroff and

17    Ms. Glashausser had asked for an extension of time for two

18    weeks to September 26.  And Mr. Park on behalf of Mr. Ng

19    indicated that if it was going to change the trial date, Mr. Ng

20    would also like to avail himself of additional time.  The

21    government expressed concern that there was going to be a

22    backup of motions and that that might impact the government's

23    ability to respond and also perhaps the trial date of January

24    23.

25          In response, Mr. Park wrote, in an Emily Litella

G9cWsenC

moment, and basically said "never mind," as I understand it; in

other words, that you would file your briefs today and adhere

to the schedule because you didn't want, again, anything to

happen with the trial date of January 23.

This is what I'm going to propose, and then I'll hear

from the parties.  I took a look at the transcript from July

11, where we talked about motion schedules, and I noted that we

for no particular reason set 30 days for a reply.  What I would

propose is this:

Ms. Shroff, Ms. Glashausser, you can have until

September 26 to file your opening brief.  The government will

be given an additional two weeks, and I recognize that

literally falls after Thanksgiving weekend, so I'd be willing

to give you until November 30 to get your papers in, and then

the date for the replies would remain consistent.  In other

words, if Mr. Park and counsel for Mr. Ng decide to file their

papers today, fine.  Actually, I would suggest that maybe

sooner rather than later would be better because obviously I

suspect there are going to be a lot of motions that I'm going

to have to deal with, as well as I'm sure there are going to be

*in limine* motions.  So I would say December 16 for the reply,

because if I'm giving the government an additional two days,

I'll add two days on.

But if at all possible, I guess, Ms. Shapiro, Mr. Mo,

Mr. Park, if you can get it in earlier, I would ask that you do

that.  Obviously it gives you more time on the back side if you

think you're going to have a lot to say on reply.  That's what

I propose doing.  It doesn't really alter the schedule and it

keeps us, I think, on track for trying the case on January 23.

          First, Ms. Shroff, since it was the application of Mr.

Yin, I'll hear from you first.

          MS. SHROFF:  Your Honor, my bigger problem is the

trial date.  When I was here setting the trial the last time, I

think I was clear.

          THE COURT:  Early January trial before Judge Wood.

          MS. SHROFF:  Yes, but I had also this problem trial

before Judge Ramos, and that trial was supposed to start in

ample time to be completed and for me to have enough time to

work on Jeff Yin's trial.  In the Judge Ramos case, which is

United States v. Gammal, the U.S. Attorney's Office in their

wisdom decided to go get a FISA warrant at the last moment and

then give us FISA notice.  If they gave us FISA notice, we have

to do FISA briefing, so that pushed that trial date into early

December.  Now I have a December 5 trial date before Judge

Ramos, and I was supposed to have completed that trial well

before December 5.  The December 5 trial is a terrorism trial.

We anticipate it's going to take us a week just to pick the

jury, and then it's a two-week trial.  There's no way for me to

have a January 23 trial before this Court on Jeff Yin.  I have

an "in" defendant in Gammal and an "out" defendant in Yin.  So

G9cWsenC

1    even if I were to give away my Judge Wood's trial, which seems

2    will now be a nonissue because the prosecutor in the Gammal

3    case is also the prosecutor in the Wood case, so he can't be in

4    two places at one time, and neither can I, so we've decided to

5    move the Wood case to later on, but even if I were to ask

6    someone to take over the wood case, I still would not be able

7    to do a terrorism trial and this trial back to back with no

8    break in the middle.

9            THE COURT:  All right.  This is what I propose to do.

10   Let's go through some of the other issues, Ms. Shroff.  Did

11   Judge Ramos know about this trial also when they rescheduled

12   that case?

13           MS. SHROFF:  No, because in all candor, no, I didn't

14   really have any thought that an "in" defendant, who's been in

15   custody longer than Jeff Yin, that case is almost a year older.

16   And the request was ours, so it's not Judge Ramos's fault; it's

17   completely mine.

18           THE COURT:  OK.  No.

19           MS. SHROFF:  Your Honor, I understand what you're

20   saying, but, yes, I didn't tell him.

21           THE COURT:  That's fine.  Have you spoken with

22   Mr. Ng's counsel and the government concerning this issue?

23           MS. SHROFF:  Sure.  Mr. Ng's counsel wants a January

24   23 trial date.  I'm assuming that the government wants the

25   January 23 trial date.  I think the best solution would be to

G9cWsenC

1    just sever the two defendants, let the government and Mr. Ng be

2    happy and go with the January 23 trial date and let us go

3    later, but I'm assuming nobody's going to go for that.

4              THE COURT:  The main thing is efficiency.  What you'd

5    be asking, in essence, is for us to impanel two juries for the

6    same case for two defendants who are not incarcerated for whom

7    there isn't any speedy trial issue.  Putting aside I have no

8    problem trying cases and presiding over cases, but it seems to

9    me to be inefficient.  We'll come back to this issue of the

10   trial date a little bit later because I will have to give it

11   some thought, quite frankly.  I'll have to give it some thought

12   about how best to handle that, and I'll obviously hear from

13   Mr. Ng's counsel about this issue and from the government about

14   the issue a little bit later.  But let's talk about some things

15   that I think are a little bit more substantive.

16             First I want to deal with the issues in my order,

17   specifically, the first issue.  I'd like to ask the government

18   whether in connection with the documents that have been

19   produced by the United Nations, has the government produced all

20   the documents that it has received from the United Nations to

21   the defense?

22             MR. RICHENTHAL:  Yes, your Honor, typically within

23   days of receipt.

24             THE COURT:  OK.

25             Mr. Park, I want to talk a little bit about the reply.

G9cWsenC

1    I know you made a request to file a reply on the 19th, and as a

2    scheduling matter I don't really think I have an issue with

3    that.  Quite frankly, at least at this juncture, I don't feel I

4    need a reply.  I've read through all of the papers that have

5    been submitted.  I admit I haven't given it a second pass

6    through, but I'm not sure I need a reply, so I want to talk at

7    least a little bit about the different categories of documents

8    that as I understand it are part of the request, the first I

9    guess being the PGA documents, which as I understand it would

10   be documents that would be coming in entirety in light of the

11   government's representation that they've produced documents

12   that they've received from the U.N., they've produced to the

13   defense, these would be documents that would be in the U.N.'s

14   possession that would be coming from them that, as I understand

15   it, I have no power or authority to direct the United Nations

16   to do anything.  But based upon the letter that was attached to

17   the government's submission, as I understand it, and your

18   letter also, Mr. Park, the U.N. has indicated that they'll work

19   with the defense as they've worked with the government, and

20   then I assume produce or not produce or produce whatever they

21   feel is an appropriate amount of documents.

22        I guess what I'll say is this.  With regard to the

23   argument about the United Nations and an indication in press or

24   media that they're cooperating with the government and somehow

25   creating more of a connection with the government, I reject

G9cWsenC

1    that notion.  As you point out, public companies and even

2    private companies make statements that they're cooperating with

3    the government, but that doesn't convert those entities to be

4    sort of government agents, nor does it mean that those entities

5    merely turn over documents without, and I think my former

6    clients would be very surprised and your current and former

7    clients would be very surprised if you came in and said, We

8    have to turn over, they've asked for this stuff, without any

9    filter, in other words, saying, No, we're not going to do that.

10   And in this case, in any event, it's a statement in the media

11   from an entity that has immunity, and so they'll cooperate as

12   they see fit, as I understand it.

13        I guess what I'm saying is I don't think there's any

14   direction that I would give the government in connection with

15   this, so I think with regard to those documents, at least a

16   reply with regard to those, I don't see that there's much of an

17   issue.  And quite frankly, I'll suggest that it would probably

18   be more beneficial just to proceed with the communications,

19   whatever they may be, that you may be having with the United

20   Nations to get whatever documents that you can from them

21   relating to the PGA documents.  But I'll hear from you with

22   regard to those documents or at least that category of

23   documents.

24        MR. PARK:  Thank you, your Honor.  Frankly, the only

25   reason I asked for an opportunity to file a reply was because I

G9cWsenC

1    was concerned that your Honor would have exactly this reaction

2    and rule before I had a chance to be heard.

3              THE COURT:  Sure.

4              MR. PARK:  And I was on trial last week and preparing

5    for trial before, otherwise I would have filed a reply by

6    today, frankly.

7              THE COURT:  Just to be clear, I'm not going to say

8    that you can't file it.  What I'm saying is that, at least my

9    reading of the law, and also, quite frankly, my power to do

10   anything, I don't have any, with the exception of the

11   government, but I'm not sure what I would do or say to them.

12             MR. PARK:  Here's what I would ask you to say to the

13   government, to cut to it, just direct the government to do

14   everything in its power to get the documents that the defense

15   is seeking so that the trial is not delayed and that Mr. Ng's

16   due process rights are not jeopardized.  That's all.  And they

17   may say, OK, we'll do the best we can, but they will at least

18   be under a court order.

19             Let me explain to you, Judge, some of the chronology

20   that I think is important for you to understand as you think

21   about the serious problem that we are having as defense counsel

22   in preparing for the defense of Mr. Ng.  We submitted to the

23   government a request for these U.N. documents because we have

24   been receiving from the government periodically, and it's not

25   clear where the rhyme or reason is, but the documents are

G9cWsenC

1    clearly from the United Nations.  The U.N. has submitted to the

2    government with a Bates number and a designation below that

3    says "voluntarily produced without prejudice to our immunity."

4    Now, they've been doing that, and they have had that

5    relationship with the government in terms of getting requests

6    from the government, producing to the government with this

7    designation, presumably for months, and it may well precede the

8    investigation.  We don't know.

9         Now, here we are.  We're trying to get documents that

10   we think the government should have collected, reviewed, even

11   before the prosecution was begun so that they can assess

12   whether they've actually had a criminal defendant on their

13   hands versus somebody as to whom there may simply be probable

14   cause as to whether a crime was committed.

15        Now, we don't profess to tell the government how to do

16   its job, but what we do know is this.  They have been working

17   with the United Nations for a period of time to collect

18   documents on a regular basis, documents presumably that the

19   government believes are essential to their case and in response

20   to requests that they have fashioned for their case.  Fair

21   enough.  Now they are on notice, if they weren't before.  They

22   are on notice as to what the defendants' views are as to what

23   is material to the defense.  All we're asking is that they use

24   their same office and the channels they've already established

25   with the United Nations to obtain those documents.  Given the

G9cWsenC

1    shortness of time between now and setting the trial date,

2    Judge, we think it is eminently fair.  It is typically the U.S.

3    Attorney's position that they represent justice and not just

4    winning the case.  All we're saying is please give us the

5    documents that we have articulated are necessary to prepare for

6    the defense of Mr. Ng, if they're not outright Brady, and we've

7    set out some of the reasons why we think some of them aren't

8    truly Brady materials.

9          That's the first part.  The second part is this.  When

10   we first made our request to the government, we had a telephone

11   call with them, and they said, Talk to Dan Gitner, he's

12   representing the United Nations.  I happily called up Dan

13   Gitner and had a discussion with him.  It turned out that a

14   request that we had written, Mr. Mo had written a carefully

15   drafted document request to the United Nations that sought some

16   of the same categories of documents.  It was directed to

17   essentially the general counsel of the United Nations.  Weeks

18   later we're told by Mr. Gitner it never got to him.  The mail

19   doesn't apparently work.  So it never got to him.  If you're

20   going to make a request, you've got to go through the U.S.

21   Mission, so we did that.

22         We sent the same exact letter to the United Nations

23   Mission, to the U.N., got no response.  I followed up just last

24   week asking, Did you ever get our request, and if so, where is

25   it?  And finally he emailed a response to me saying yes, we got

G9cWsenC

1     it.

2                 In the meantime, as your Honor will probably have seen

3     in their opposition to our motion to compel, the government

4     attached a letter from the United Nations to the U.S.

5     government through the U.S. Mission, Ambassador Samantha

6     Powers, her office, saying, We got this request finally and

7     here's all the things that have to get done, we have immunity,

8     we have this, we have that, an elaborate international

9     communique, if you will.  Now, that was sent to the government,

10    not to us, not to the party that actually asked for it, but to

11    the government, talking about our request.  That was sent to

12    the government on August 18.  That's a letter dated August 18.

13    We don't find out about it, your Honor doesn't find out about

14    it, until 12 days later when the government appends it to their

15    opposition to the motion to compel, on August 31.

16                Here's the point, Judge.  It is, to put it lightly, a

17    byzantine system of channels.  We do not have the wherewithal.

18                THE COURT:  Mr. Park, I'll cut to the chase.

19                Look, I'm not going to issue an order, but what I'm

20    going to say, Mr. Richenthal, to the extent you have contacts

21    and you can facilitate communications with whoever the people

22    are that need to be communicated with to get the documents, I'd

23    ask that you do that.  Let me make one thing very clear.  While

24    I have no doubt that the requests were carefully crafted, there

25    are probably a lot of those things, there may be some things,

G9cWsenC

1  and I think you've already started this process of, as you say,

2  prioritizing, but in circumscribing the request.  I think that

3  in the end of the day, I don't know where the U.N. is going to

4  come out and what they're going to produce, but you may be in a

5  better position than you were if you were to come to me and try

6  to get a 17(c) subpoena to get the documents.  What I'm going

7  to do, and again if there is an issue or problem, I'm going to

8  ask the government to basically, when you call and if you're

9  having problems, to try and put you in touch to expedite this

10  as fast as we can.

11          I understand that there's a process.  You referred to

12  it as byzantine.  I think there is just a protocol concerning

13  the way these things happen, that I think I would hazard a

14  guess that prior to these prosecutors being involved, they

15  probably, What do you mean, just call them up and you get the

16  documents.  For whatever reason, that's not apparently the way

17  it works.  I'm going to do that in connection with this, and

18  let me hear from Mr. Richenthal.

19          MR. PARK:  Thank you, your Honor.

20          THE COURT:  Do you have an objection to that,

21  Mr. Richenthal?

22          MR. RICHENTHAL:  Absolutely not.  We've already done

23  it and we've continued to do it, and indeed the defense already

24  has the information.  In fact, well before we came into your

25  Honor's courtroom this afternoon, Mr. Park emailed the

G9cWsenC

1    pertinent person at the United States Mission to the U.N.  That

2    email address is not public.  Mr. Park, for his own purposes,

3    was able to determine who to contact, and he did it promptly,

4    as is his right.  So if there is some confusion, we're happy to

5    remind him of the information he already has.

6        THE COURT:  It's not a back-and-forth thing.  My

7    object, and again by me commenting on these documents I'm not

8    in any way indicating that, A, they necessarily will be

9    relevant; B, they necessarily will be admissible at all.  I

10   think that's for another time.  With regard to the scope of the

11   request, it's up to the U.N. and its counsel to determine

12   whether or not they, how they view the scope.  The issue is

13   there's no recourse.  They have committed to, as I understand

14   it, and I think the actual wording is "willing to cooperate to

15   facilitate the proper administration of justice in this case,"

16   and that they've agreed to consider the request.  I take them

17   at their word, whatever that means.  To the extent they feel

18   it's appropriate, they'll respond.

19       Mr. Jones, I don't know if you have anything to add.

20   Am I correct at least on the law?

21       MR. JONES:  Yes, and I did want to convey -- and thank

22   you, your Honor, for the opportunity to be heard -- that the

23   State Department and the U.N. are interacting in the ordinary

24   and appropriate course.  I can confirm that I've been informed

25   by the State Department that it has conveyed the defendants'

G9cWsenC

1      document requests through the proper channels, which is the

2      U.S.U.N., the U.S. Mission to the United Nations, to the U.N.

3      That occurred on August 29.  In case it helps and because I may

4      never be back here again, let me say one thing.

5             THE COURT:  Don't be so sure about that.

6             MR. JONES:  One can always hope.  I'll try to keep

7      hope alive just by making clear, first off, I was asked by the

8      State Department at the U.N.'s request to make clear the U.N.'s

9      immune status, and I don't think there's any confusion about

10     that, and also to underscore that the U.N. has committed

11     voluntarily and stated voluntarily, just as your Honor said,

12     using the exact same words, its willingness to cooperate and

13     facilitate the proper administration of justice.

14             There is just one other thing I want to note about

15     exactly how the immunities work and particularly the limits on

16     the executive branch's authority.  The government's opposition

17     to the motion to compel noted Section 2 of Article II of the

18     convention on the privileges and immunities of the United

19     Nations, which conveys immunity from legal process on the U.N.

20     That same convention, in Section 4, specifically provides that

21     the archives of the U.N. are, it's called inviolable.  It's the

22     term of art, and I'm told by the State Department that means

23     that the executive branch or any other component of government

24     is equally powerless to compel the U.N. to act or produce

25     documents.  I want to make that very explicit, that that's the

G9cWsenC

1    terms of the convention, and it is the State Department's

2    understanding that the executive branch simply lacks the power

3    to compel the U.N. to act, so it is indeed the case that

4    following this voluntary protocol and enlisting the assistance

5    and cooperation of the U.N. is the way to go and the only way

6    to go.

7            The other thing I would note, and I'm a stranger to

8    the case and the issues presented, but the U.N. has advised

9    that it's very concerned about the extraordinary breadth or

10   what it perceives as the extraordinary breadth of the

11   defendants' requests, both just simply from a searchability and

12   administrability perspective and then also just on the

13   substantive legal perspective.  I'm not here to comment on

14   that, but I did want that to be conveyed to the Court and all

15   parties so that everyone's clear the U.N. undertakes to work

16   cooperatively, but at the same time it's going to have a

17   difficult time handling the current requests.

18           THE COURT:  Sure.  And I think, Mr. Park, I took it

19   from your letter that the process at least of, whether it's

20   winnowing down or narrowing, whatever it may be, has begun.

21           MR. PARK:  It has, your Honor, and as your Honor knows

22   and everyone who's experienced in this area knows, you send out

23   a broad request and then you have a discussion with counsel for

24   the respective parties to get the priority you need.  It just

25   took so much time to figure out who the parties are, and we've

G9cWsenC

subsequently sent a winnowing-down letter to the U.S. Mission

for that process, and I remain hopeful that with Mr. Richenthal

and Ms. Echenberg's cooperation that we'll start getting

things, and I appreciate the Court's input.

THE COURT:  Sure.  What I will say is this, obviously

what we don't have control over is the timing, and there are a

series of communications that have to happen before, I think,

even the requests make their way to a decision maker, and I'm

not saying there's one person, but whoever is going to make the

decision about production of documents or even engage in a back

and forth.  I guess as quickly as you can establish, and I

don't know if it will be even quick, the ability to do that

back and forth as you would normally do in the case, the better

off we would be in terms of obviously where we currently stand

in the trial date.  But I'd ask that you keep me informed with

regard to that progress, and this will come up in a bit when we

start talking about the trial date also.

As I understand it, the next tranche of documents are

the conference center documents, which as I understand, based

on the government's representation they've produced the

documents they've received from the United Nations and relating

to this tranche of information.  Were there other entities in

those requests?

Let me ask this of the government.  With regard to the

conference center requests, I understand you've turned over all

G9cWsenC

1    the United Nations documents relating to that.  Were there

2    other entities from whom the government would have gotten

3    documents that are part of those requests?  In other words, is

4    there some other entity?  I assume it's just the United

5    Nations.  That's all I want to confirm.

6          MR. RICHENTHAL:  I'm not sure what other entities

7    there would be, so I guess I don't know how to answer your

8    Honor's question.  We've certainly turned over every single

9    thing the United Nations or any component thereof has given us

10   typically within days.  And let me just say apropos of that,

11   Mr. Park made a representation that we're working with the

12   U.N., there's no rhyme or reason, that's not accurate.  We

13   don't work with the U.N.  We make requests to the U.N. and then

14   the U.N. complies or doesn't comply, and that can take a

15   significant period of time.  When they give us documents,

16   within days we turn them over.  There's no working relationship

17   with the U.N.  That's not a knock on the U.N., simply an

18   inaccurate statement on Mr. Park's behalf.  But I'm not aware

19   of any other entity.  When we get documents we turn them over.

20   We don't slice and dice them.

21          THE COURT:  OK.  Referring to the conference center

22   documents, "all the documents regarding communications," and

23   this is the second request in Mr. Park's submission on page 11,

24   and it's item 6, "all documents regarding communications

25   between the United States government and the government in

G9cWsenC

1    Antigua regarding the prosecution of Ambassador Ashe,

2    including, but not limited to," and then it lists various

3    subsets within that.

4            MR. RICHENTHAL:  I'm sorry.  I didn't realize that's

5    what your Honor was asking.

6            THE COURT:  I'm sorry.  That's my mistake.  The

7    conference center documents are actually above that.  The next

8    documents are the internal documents.  The conference center

9    documents refer to information, internal communications with

10   the United Nations, minutes of meetings within the United

11   Nations, positions taken or arguments by members of the United

12   Nations.

13           I think all of those documents, and just correct me if

14   I'm wrong, Mr. Park, all of those documents are U.N. documents

15   for the conference center document request.

16           MR. PARK:  I'm just taking a quick look.  I think

17   that's right.

18           THE COURT:  All right.  I apologize.  I had jumped

19   ahead.  Similarly with regard to the PGA document requests,

20   Mr. Park you should work in a similar way to get whatever

21   documents you feel are important with regard to that.

22           MR. PARK:  Yes, your Honor.

23           THE COURT:  Now I think we're to the internal

24   documents, and with regard to that, Mr. Park, it's up to you.

25   As I said, I'm not going to stand in the way of you filing a

G9cWsenC

1   reply.  With regard to the first two categories of documents, I

2   don't think a reply is necessary.

3            With regard to the third category of documents, which

4   are really internal documents that are related to the United

5   States and the United States has opposed that for various

6   reasons, I think if there is going to be a focus of your reply,

7   it should be there.  In addition, and I don't believe this

8   necessarily was raised, I know that you've raised it in the

9   context of the purpose or the motivation behind the prosecution

10  of the case and suggest that there may be a political or

11  international political motivations, and I understand that

12  argument, but what I'd like you to also address in your reply

13  is putting aside the government's motivations and how they came

14  to decide to prosecute one person versus another, how they

15  decided on the timing, what charges they intended to bring

16  typically are covered by the deliberative process privilege.

17           I don't think either party has addressed that issue in

18  this context.  I suppose your argument will be, Well, that may

19  be well and good, but we believe our Brady argument, everything

20  trumps that, but I'd like you to address the issue of

21  deliberative process, in cases where basically the government's

22  thought process -- by saying that I'm not saying how or what

23  thought process was involved.  I'm just saying that normally

24  those communications are protected, and I don't know under what

25  circumstances that protection is vitiated or waived, or however

G9cWsenC

1      you want to put it, putting aside again the substance of what's

2      being sought.

3              I'll make just an observation and apologize in advance

4      to the assistants and the agent in this case.  It would seem

5      odd to me that that sort of responsibility in terms of the

6      government's own position vis-à-vis another country is being

7      entrusted to people who are prosecutors, not State Department

8      people and people who have experience in what they're doing.

9              Off the record for a second.

10             (Discussion off the record)

11             THE COURT:  I understand the argument.  I'm just not

12     sure I see the connection in the sense that there would be,

13     based upon what you've cited in your papers.  So I would

14     address sort of that aspect of it also, in other words, and

15     that goes to sort of more of what the support is that gets you

16     to the place that you're seeking, in other words, to get the

17     internal communications and actually whether or not there is

18     any evidence to suggest that those communications would even

19     exist in the form that you're seeking.  I mean, I guess with

20     regard to the third, that's fine.  And again I'm not saying you

21     don't address the other two tranches of documents, but I think

22     it's really the third tranche because certain of those

23     documents are within the control of the United States

24     Attorney's Office.  There are other documents that you've

25     requested that I think are internal State Department documents.

G9cWsenC

1              Well, let me ask this.  Am I correct that it's not

2      only documents that were necessarily communicated to the U.S.

3      Attorney's Office; am I correct that some of the requests deal

4      with documents that may never have made it to the U.S.

5      Attorney's Office, just internal communications within the

6      State Department?

7              MR. PARK:  That's correct, your Honor.

8              THE COURT:  All right.

9              MR. PARK:  Can I address, and I will address the

10     issues that your Honor has flagged in my reply, but the last

11     question you asked is directly related to why kind of the

12     national foreign relations issue would be entrusted to

13     prosecutors.  First of all, this is the Southern District U.S.

14     Attorney's Office.  Secondly, I will reemphasize --

15             THE COURT:  And everybody in the office is going,

16     Yeah, it is the Southern District.

17             MR. PARK:  That office has for decades been entrusted

18     with matters of national importance, so they're well versed in

19     how to deal with these things.

20             Secondly, it took a mere arrest and mere complaint for

21     the U.N. to stop altogether any further consideration, as far

22     as we know, of the South-South Conference, permanent conference

23     in Macau.  So why do we want the State Department files?

24     Because we think the State Department files may reflect

25     considerable discussion about what is the most efficient and

G9cWsenC

1    effective way of either stopping or putting an obstacle to the

2    progress of the U.N.'s consideration of this issue, and it

3    really doesn't take much for the criminal authorities to do

4    that or a lot coordination, frankly, with the criminal

5    authorities.  We don't know.  We're in a black box here, and

6    that's why we're asking your Honor, based on all the extraneous

7    circumstances that I've outlined, to at least give that serious

8    consideration.

9              THE COURT:  All right.  Let me just see whether

10   there's anything else.

11             Ms. Shroff.

12             MR. PARK:  Your Honor, I'm sorry.  I just want the

13   record to be clear and the Court to understand that while

14   Mr. Richenthal says to his knowledge all of the documents that

15   the government received from the U.N. were promptly turned over

16   to the defense, that's not exactly accurate.  We are told that

17   there is a tranche of additional documents from the U.N. that

18   they've identified that is scheduled for disclosure that hasn't

19   yet been disclosed, so it is a process.  I don't discount what

20   Mr. Richenthal says.  I think he should be aware, if he's not

21   already, that there is a considerable lag before we ever get

22   those documents, even if the government intends to make them

23   available, just because of the mechanics of these things.

24             THE COURT:  Yes, and I don't profess to know exactly

25   how that needs to happen, but my main concern and the main

G9cWsenC

1    thrust of my questions was to make sure that whatever the

2    government got from the United Nations it was turned over and

3    hopefully as expeditiously as possible.  I just want to make

4    sure that it was, in fact, turned over.  In other words, I want

5    to confirm there were no documents in their possession from the

6    United Nations that they had not turned over, because then

7    that's a different argument because it is in their possession

8    at that point in time, if there were such documents, there may

9    be arguments or steps they would need to take to produce them,

10   I don't know, but apparently there are no such documents, even

11   though there are some documents in the pipeline yet to be

12   produced.

13           Does anybody need a break?

14           MS. SHROFF:  Can I have one second with Mr. Park

15   before we leave this topic?

16           THE COURT:  You can have as many seconds as you'd

17   like.  Go ahead.

18           Yes.

19           MS. SHROFF:  Your Honor, we may submit to the Court

20   Mr. Yin's position on this issue such that it will not affect

21   any timing or timetable set, that the same schedule that is set

22   for Mr. Park's client can be set for ours.  But we may have

23   something that we would like to submit to the Court on behalf

24   of Mr. Yin in regard to this issue.

25           THE COURT:  OK.  I guess I want to try and understand

G9cWsenC

the issue.  Are you saying that you're joining in Mr. Park's

application?  In other words, as I understand right now, you

haven't separately sent your own requests to the United

Nations.  I don't know what implications that may mean, in

other words, if documents are produced or once they're produced

to Mr. Ng, whether or not they then -- I assume, but I don't

know.  I assume that since the U.N. basically says that they're

willing to cooperate to facilitate the proper administration of

justice that it means for both defendants.  I have no doubt

that that's the case, but they may require something from you,

whether it's a "me too" or something to make sure you're in the

queue along the same way so you're included in the

conversations or communication, whatever they may be that might

occur.  But if what you're saying is something different, in

other words, there may be some of these documents that you

either don't have any interest in or actually more to the point

that you just, for whatever reason, say you're objecting to,

that's different.  I guess what I'm asking is what exactly

would be the submission that you're giving to me?

          MS. SHROFF:  I think it would be the two and a slight

augmentation of what Mr. Park has requested, but I'm certain

that maybe Mr. Jones and I can speak after and resolve it.

          THE COURT:  OK.  That may be, but again it may be just

because of the process that's at least been described to me

here, you may need to put something into the American mission

G9cWsenC

1   in order to get the ball rolling in terms of communicating with

2   the United Nations, as I understand it.

3            MS. SHROFF:  That's fine.

4            THE COURT:  OK.  I wanted to switch to the issue of

5   the ex parte motion the government has filed under CIPA.  Ms.

6   Shroff, you had an application and I think Mr. Mo at the July

7   11 conference indicated that he would join, so I am taking it

8   as a submission that basically both defendants are requesting.

9   At the conference, I asked whether there were any cases where a

10  court has granted defense counsel access to the government's ex

11  parte motion papers at this stage of the proceeding.  My

12  reading of the submissions and my looking at the cases suggests

13  to me that there aren't any courts that have done so.  And I

14  just want to make sure from both parties that I haven't missed

15  anything.  Is that accurate?

16           MS. SHROFF:  That's what my research shows, your

17  Honor.

18           THE COURT:  All right.  As I understand my authority

19  here, while I have discretion, no other court to date has ruled

20  that the ex parte motion filed by the government for me to

21  consider to make a decision about whether or not the documents

22  that they have in their possession, whether or not they are

23  relevant, whether or not they're discoverable, and whether or

24  not the third question is I think -- I can't remember the

25  language.  I apologize.

G9cWsenC

1          MR. RICHENTHAL:  Whether they're helpful, your Honor.

2          THE COURT:  Helpful to the defense.  As I understand

3    it, no court has done that, and while I recognize the argument

4    that you make concerning the nature of this case -- in other

5    words, as I understand the argument, this is not a terrorism

6    case and I think the suggestion being that therefore the

7    underlying issues, they don't involve issues relating to

8    terrorism.  I don't want to put words in your mouth.  With

9    regard to that particular prong of the argument, I thought that

10   was where you were coming from.

11         MS. SHROFF:  That is right, but your Honor,

12   traditionally that's the government's interest.  Right?  That's

13   the reason that the government holds out and says:  Look, in

14   balancing it all out, in balancing the concerns that we have,

15   what is of primary concern is national security.  What is of

16   primary concern is the safety of the public.  What is of

17   primary concern is that we all remain safe.

18         Those concerns which generally most courts take into

19   account when deciding these motions are clearly absent.  I'm

20   trying to distinguish this kind of a case and the case that

21   every other court has seemingly considered and it's considered

22   only in the national security context.

23         THE COURT:  OK.

24         MS. SHROFF:  And just for the record, today it's

25   clear, as it was before and I'm sure this is fair, we're not

G9cWsenC

seeking widespread disclosure.  We're seeking disclosure only
to cleared counsel.  Right?  Now, the government may stand up
and say, Look, we don't know the nature of the application and
even though this is not a national security case, there are
national security concerns that are nevertheless raised.  And
if that's how the Court ultimately analyzes the government's
application, then I guess my argument would be diluted to that
extent.  But to the extent that what we know of the discovery
in the case, what we know of the allegations in the case, it
seems to us that the analysis here could be qualitatively
different and therefore the results should be qualitatively
different.  That said, I want to make extremely clear that the
defense bar had waited years for United States v. Booker.

            THE COURT:  I'm sorry?

            MS. SHROFF:  The ruling in United States v. Booker.

            THE COURT:  OK.

            MR. PARK:  Nobody thought that would come down, and it
did.  And I still continue to believe that CIPA never meant to
substitute secrecy over discovery, not just in this case or in
any terrorism case.  I would not want the government citing my
oral argument today to say she's drawn a distinction between
terrorism and nonterrorism cases.  CIPA's not supposed to eat
up Rule 16.  CIPA is not supposed to eat up my client's due
process rights, not in this case and not in a terrorism case.
Our position should be clear, cleared counsel should be

G9cWsenC

entitled to information that they can then seek under a CIPA

proceeding to declassify or to get subsequent classification.

THE COURT:  OK.  I think with regard to the argument

that the case is substantively different or I should consider

the motion as substantively different because it's, I guess,

not a terrorism case, CIPA was passed, I think, in 1980.

Although terrorism existed back then, it was a totally

different situation.  Right?  That was before the '93 bombing

of the World Trade Center, before 9/11, before the incident in

the embassies overseas.  So it was passed at a time period when

there wasn't really consideration of those cases, and the law

developed even prior to terrorism cases that the government,

and again CIPA provides in itself that "the court may permit

the United States to make a request for such authorization in

the form of written statement to be inspected by the court

alone."  So CIPA provides for that, that the Court in its

discretion can have that occur.

I think, Ms. Shroff, you mentioned the argument is

somewhat diluted by the fact, and I think that's right because

CIPA has been around for a long time.  And while I recognize

there are other national security issues other than that relate

to terrorism, and even before CIPA's passage, there have been

different classifications of documents.

There are many circumstances, I think, when the

defense has no access.  In other words, Rule 16 provides and

G9cWsenC

1    puts in the government's hands the decision-making with regard

2    to what is or is not 3500 material, what is or is not covered

3    by Rule 16, so there may be documents and things out there that

4    the defense doesn't seek.  Here what is occurring, and there

5    have been *ex parte* applications that have been permitted by

6    various courts outside of CIPA's consideration.  I understand

7    the argument that you make, that the defense is probably in the

8    best position to make a determination with regard to relevancy,

9    but here I've got to balance several things, and I have in past

10   cases been asked to make rulings *ex parte* on various issues.

11        In this circumstance I think the way I'm going to

12   proceed is the way I outlined earlier, because as I read both

13   the Second Circuit's case in Abu-Jihaad, it stated, "Insofar as

14   Abu-Jihaad faults the district court for entertaining the

15   government's motions for a protective order *ex parte*, his

16   argument is unconvincing.  Abu-Jihaad does not dispute that

17   Section 4 of CIPA and Rule 16(d)(1) of the Federal Rules of

18   Criminal Procedure both authorize *ex parte* proceedings.

19   Accordingly, his contention that such submissions are improper

20   'absent a showing of exceptional circumstance' amount to a

21   challenge of the district court's exercise of discretion to

22   proceed *ex parte*.  The argument fails in light of the decisions

23   in United States v. Aref in which we recognize that where the

24   government moves to withhold classified information from the

25   defense, 'an adversary hearing, with defense knowledge, would

G9cWsenC

defeat the very purpose of the discovery rules.'"

The Court goes on to say, "In such circumstance, a district court's decision to conduct *ex parte* hearings manifests no abuse of discretion," and the Court goes on to cite various cases: United States v. Stewart in this circuit; United States v. Klimavicius-Viloria in the Ninth Circuit, and I'll add to that United States v. Amawi, which isn't cited in the case, but that did reject either obtaining the *ex parte* submissions or the *ex parte* hearings that certain courts have conducted after those submissions had been made.  I think the way we're going to proceed here is I'm going to deny the request by the defense for the government's motion papers that were submitted *ex parte*.  As I've indicated in the past, what we will do, and what I will ask defense counsel to do, is figure out a time or date that would work when I can meet with defense counsel *in camera* under seal with a court reporter so that I can get a sense.

I already have a sense obviously, Mr. Park, Mr. Mo, and Ms. Shapiro, of what some of the defense issues are because in your motion to compel, I think you lay out some of the defense, where you may be coming from in terms of your defense, but this will allow you to give me a more detailed version of that so that I have a better understanding of your views when I review the government's motion and review any of those underlying documents that relate to it.

G9cWsenC

1           I'd ask you to consider sort of when that will work,

2     perhaps dates, somewhere in between.  I think we should do it

3     sometime in October, if that's possible, so if you could

4     provide me with dates in October, and obviously you can

5     proceed.  This is something that I'm not directing that you do,

6     but I think it seems to make sense, and other judges have

7     adopted a similar process, but it's up to you after consulting

8     with your clients about how they want to proceed, and obviously

9     I would hear you each separately about that.  I think I've

10    gotten the government's application.  I don't know if there's

11    anything in addition that they think they need to add at all.

12    That is the way we're going to proceed.

13          MR. RICHENTHAL:  I just want to say we think our

14    submission speaks for itself, but if the Court wants to hear

15    from us on an *ex parte* basis, obviously we'll make ourselves

16    available.  Section 6 of CIPA expressly contemplates an *ex*

17    *parte* proceeding if your Honor would want to have one, but we

18    do think the submission speaks for itself.

19          THE COURT:  Yes, and I think in light of that, what I

20    will say is that after meeting with the defense, obviously I

21    have a certain idea in terms of, Mr. Park, what some of

22    Mr. Ng's defenses will be and I'll have more, perhaps, once I

23    see the motions that get submitted.  But once I communicate

24    with the defense counsel, I may have questions for the

25    government -- I may not -- concerning their position with

G9cWsenC

1    regard to the documents that are referenced in their *ex parte*

2    submission.

3           The one thing I will say, and Mr. Park, this may help

4    Mr. Ng's defense deem in focusing on sort of requests to the

5    United Nations, there is an argument, I think, in your papers

6    about other countries, missions -- I don't know what it would

7    be, but other countries and how they were supportive of the

8    idea of having a conference center in Macau.  In thinking about

9    it, it seems to me that the mere fact that there may have been

10   support, and just in terms of maximizing what you would seek,

11   it seems to me only becomes relevant, because you mentioned

12   what Mr. Ng's state of mind would be.  It only is relevant if

13   Mr. Ng is aware of those particular entities or individuals who

14   represent those entities, what their views are, and I'm not

15   saying that even then it's necessarily admissible.  In other

16   words, I guess what I'm asking is, and this is for you to just

17   think about, the mere fact that there may have been others

18   within the United Nations who basically think, Well, this is a

19   good idea, vis-à-vis this criminal case and Mr. Ng or Mr. Yin's

20   defense, I don't see it being something that is necessarily

21   connected to a defense other than impacting some individual's

22   state of mind, in other words, that they didn't formulate the

23   intent that's necessary for the bribery statute.

24           I think the argument was everybody believed it was a

25   good idea, but unless Mr. Ng was aware of those positions --

G9cWsenC

and again, I'm in a way just talking about what I was thinking

about it as I was reading the motions -- it would seem to me

that the documents, the things he was unaware of couldn't

impact his state of mind.

Yes.

MR. PARK:  A couple of things, your Honor.  Obviously

we state the obvious, it is the government's burden of proving

a corrupt intent.

THE COURT:  Correct.

MR. PARK:  How do they do that with respect to

somebody who was espousing a program that he believes is

something that's going to widely receive acceptance and even

encouragement and support?  And in fact, if it turns out, if

the documents show, that in fact the other members of the

general assembly, especially those in the South-South nations,

which comprise the vast majority of the United Nations

membership, also say that could be a good idea, so it's their

burden, and I think that from a defense perspective as we

figure out how to prepare for the defense on the issue of

corrupt intent, it's obviously material.  Now, as to whether it

is ultimately exculpatory, we don't know yet, but I think it's

beyond possible that it will be material to the defense.

That's the first part.  And Judge, I think everyone

should assume that the defense will put on a defense, and so we

can't sit here now, and I don't think the Court or the

G9cWsenC

1    government can be in a position to say, Well, how do we know

2    whether he knew or not.  With respect, I don't think that's the

3    test for whether we should get access to those documents for

4    the purposes of defense preparation.

5          THE COURT:  I understand.  I mean, there's

6    preparation, but I guess what I'm saying is when you're

7    thinking about documents to focus on, documents and individuals

8    whom Mr. Ng may have had interaction with may be a closer call

9    than if he never heard about the documents, in other words,

10   didn't know anything about.  I'm not saying what I'm going to

11   rule on that.  I'm just saying in my thinking about it, I'm not

12   sure in a criminal case how it becomes relevant that people all

13   thought it was a good idea.

14         MR. PARK:  Here's why, Judge, because this is the

15   appeal to the jury.  Right?  A person makes a decision as to

16   whether he's going to step over the line and become a criminal

17   or not.  That's what criminal intent is about, the willfulness,

18   desire and willingness to break the law.

19         THE COURT:  Yes.

20         MR. PARK:  Now, if he genuinely believes and the

21   audience to which this program is directed generally believes

22   this is a good idea, why would he break the law?

23         THE COURT:  Here's the problem, though, and we don't

24   need to get into this back and forth.  I'm just saying in terms

25   of what you're seeking to get in prioritizing things, I'm

G9cWsenC

giving you my initial view.  I know this is going to be a

subject of *in limine* motions, but there's a disconnect between

what Mr. Ng, and again we're talking hypothetically here

obviously.  But there's a disconnect if he's unaware.  He may

think and suspect that everybody at the U.N. thinks this is a

good idea, and certainly the countries that are part of the

South-South contingent would think it's a good idea, and that

can be expressed in some way, but if he doesn't know that -- I

mean, he's assuming that.  In other words, unless he's aware of

something that would change his state of mind, that would

impact -- again, it's whether or not he had the criminal intent

to do what the government's claiming he did.

          MR. PARK:  And I think this will be obviously the

subject of a more thorough *in limine* motion.

          THE COURT:  Yes.

          MR. PARK:  But I will just leave the Court with this

thought, because I think it is important for your Honor to have

an orientation which understands our position, the point that

you make is a big if, Judge, if he didn't know or if he was not

aware of the members' general views and receptivity to this,

that's a big if.  We don't have to hurdle that if obviously in

order for this to ultimately be discoverable.

          THE COURT:  Right.

          MR. PARK:  Whether it becomes ultimately admissible,

that's a separate question for *in limine*, I agree with that,

G9cWsenC

Judge.

    THE COURT:  Yes.

    MR. PARK:  And it may well be something we submit, but we have to get it first.

    THE COURT:  Yes, I understand.  I wanted to give you some of my preliminary thoughts as I was thinking about the different categories of documents that you were seeking to get.

    MR. PARK:  Thank you, your Honor.

    THE COURT:  OK.  Trial.  We're sort of coming full circle, and this is sort of an outline.  I know, Ms. Shroff and Ms. Glashausser, because of your trial schedule and other issues that you've expressed concern about that date.  This is what I'm going to propose.  I'm going to hold that date right now, because I don't know what's going to happen in those other cases.  I understand that there will come a point where I'll have to make a decision about whether we're going forward on the 23rd, but I also want to see, quite frankly, what the situation is with the documents that I expect, however many they may be, will come from the U.N. and how long that's going to take.  What I'm saying is, look, I've expressed it in the past, that January 23 was the date we were going to trial and I want to hold that.

    Having said that, I understand that Ms. Shroff and Ms. Glashausser are the most knowledgeable people at the Federal Defenders about the case.  Oftentimes there have been

G9cWsenC

1   situations, and usually it's not with the defense, it's usually

2   with the government, where a judge will say, OK, someone else

3   can try the case.  I'm not going to obviously do that here; I'm

4   not going to suggest that that even occur.  You've been on the

5   case long enough.  But I'm going to wait and see if we can make

6   that January 23 date work, because I know that Mr. Park and

7   Mr. Mo and Ms. Shapiro on behalf of Mr. Ng want to go to trial

8   on that date, as do I.

9           Having said that, we're not trying this twice.  That

10  simply makes no sense.  Unless you can in the scheme of this

11  case where there really aren't any other issues, other than the

12  availability of counsel and perhaps the documents that are

13  going to be produced -- in other words, there's no other issue

14  that would warrant severance.  At least at this stage, I would

15  exercise my discretion and say we're going to try the cases

16  together obviously, because there's nothing at least in my mind

17  that would prevent these cases from being tried together, as

18  most cases where defendants are accused under one indictment

19  and in the same counts.  That's my thought on that.  I think

20  that would probably make sense.

21          Let me ask this, Ms. Shroff, and it sounds like it's

22  really the Judge Ramos case, are there any court appearances

23  between now and the trial date, and if so when are they?

24          MS. SHROFF:  May I just tell the Court something?

25          THE COURT:  Yes.

G9cWsenC

1          MS. SHROFF:  Here's the thing.  The government in the

2     Gammal case, which is the Judge Ramos case, served their FISA

3     notice on July 13 of 2015.  Mr. Gammal was arrested more than a

4     year before that.  So since they always say they're one office,

5     boohoo to them, because this is not our doing in the Gammal

6     case; they did it, and that is why we were forced to adjourn

7     that trial date.  Although I may not have told Judge Ramos

8     about this trial date, we tried to pick a trial date in Gammal

9     which was closer to November so we could have enough time

10    between two lawyers to still plan to be prepared on Jeff Yin,

11    but the agent in the Gammal case, his wife was having a baby or

12    is still having a baby, so we don't want to say no to his

13    request for additional time, which is why that date was pushed

14    to December 5.

15          I'm giving you this long-winded story just so you know

16    that we didn't want to be unmindful of the agent's personal

17    life, so we agreed to that and also because I had very candidly

18    told this Court that my January 23 trial date was not a date

19    that I could promise that I could stick to completely.  Right?

20          THE COURT:  It's on the record.  You did couch, it

21    wasn't an unequivocal, "yes, I can go forward, no problem."

22    You did mention the trial before Judge Wood at that time.  I'm

23    just trying to find a place for this case to go to trial and

24    also accommodate -- obviously, Ms. Shroff, if you have a

25    detained defendant, for reasons as I'm sure everybody knows,

G9cWsenC

1    that case, especially if it's an older case, is a case that you

2    should put priority to.  The only reason I was asking is I want

3    to set another date when we can come back or when I can get an

4    update from the parties on where things stand in terms of

5    getting whatever documents there may be from the U.N. and

6    including whether your schedule has freed up.

7            MS. SHROFF:  My final pretrial conference before Judge

8    Ramos is on November the 21st.

9            THE COURT:  All right.  Why don't we do this.  Why

10   don't we have a status update from the parties, basically a

11   letter, why don't we say in a month so that I have a sense of

12   where things are going in terms of documents from the United

13   Nations.  And also quite frankly, obviously try and get a

14   sense, and this is directed to Mr. Ng's counsel and also the

15   government, about what the timing's going to be about getting

16   these documents produced.

17           I guess, Mr. Richenthal, what I would ask is, if you

18   can, in thinking about how the government obtained these

19   documents, how much time it took, speak with defense counsel

20   and sort of impart to them about when you may have made your

21   initial request.  Just give them a sense of timing so that I

22   have a sense of timing, or even if you don't want to give them

23   a sense, give me a sense so that I know whether or not January

24   23 is realistic even for Mr. Ng, because if it's not, what I'd

25   want to do is get a date that everybody is available that we

G9cWsenC

1    can try this case and not leave a trial date that is

2    unrealistic.

3            MR. RICHENTHAL:  I'm happy to give your Honor a sense

4    and Mr. Park a sense.  It's substantial.  In our experience,

5    it's typically been measured in months, not weeks and certainly

6    not days.  We asked for a lot less than Mr. Ng has asked for,

7    and it still took a very long time, and I understand why.

8    That's not to be negative about the U.N.  Given the breadth of

9    Mr. Ng's requests, I can't imagine how much time it will take.

10           THE COURT:  I hope there has been a little bit of at

11   least greasing of the wheels, so to speak, because I don't know

12   how often the U.N. gets requests like this.  I'd hazard to

13   guess it may not be all that often.  I don't know.  I'm sure on

14   their end they're also used to requests that are not related to

15   court proceedings as opposed to other requests that they get

16   through the State Department or even, I guess, privately.  So

17   if you can give me a sense in a month -- does October 12 fall

18   on a weekday -- of where things stand, and once I get that

19   communication, I'll decide whether or not we need to get

20   together and talk about an alternative trial date.

21           What I would say is this.  If it becomes clear to you

22   that the 23rd, and I guess this is directed to Mr. Ng's team,

23   that you're not going to get the documents in time such that

24   you would be able to review them and that you would be able to

25   make use, obviously the defense doesn't need to submit any

G9cWsenC

1    documents and doesn't need to put on any witnesses.  Having

2    said that, if you have a sense of what you're thinking about

3    doing, and also, quite frankly, since we've discussed that

4    these documents might be the subject of an *in limine* motion,

5    we're going to need to know in the next month what the scope of

6    those documents are before the trial.  It may be that I make

7    rulings on the *in limine* motions and you never use the

8    documents, but it may be that you want to use them, and we have

9    to know that sooner rather than later both in terms of -- and

10   again, I'm not saying how either side intends to try the case,

11   but in terms of how you're going to open, and the like.  So I

12   want to try and do that in advance.  If it turns out you're

13   going to say there's no way we're going to get this stuff in

14   time, meet and confer, figure out dates in the future,

15   obviously including Mr. Yin's counsel, and propose dates for

16   me.

17          I can tell you just in terms of the criminal trials I

18   have, and obviously it's not going to be anything earlier.  The

19   only trial I have after January is in April.  No.  I have a

20   February trial, February 21, which will last why don't we say

21   three weeks, just to be on the safe side.  The allegation is

22   kidnapping that resulted in death, so why don't we say three

23   weeks for that, and then I have a trial in April, and that's a

24   detained defendant's case, and April is also a detained

25   defendant's case, April 27, so the end of April.  Just with

G9cWsenC

1    that in mind -- April 17.

2                    MR. PARK:  Judge, how long is that expected to take,

3    that trial?

4                    THE COURT:  Right now there are still nine defendants,

5    so depending upon who's in, it's going to take several weeks.

6    Right now some of the defendants have made a severance motion,

7    but at least one part of that case will go forward on that

8    date, on the 17th, and it will last three weeks, again, just to

9    be on the safe side.  I guess the first case is United States

10   v. O'Neill, and this is just in case you want to speak to the

11   counsel on either side that are on that case, 16 Cr. 29.  The

12   other case is United States v. Jones, which is 15 Cr. 153, to

13   get a better sense, because again what do I know in terms of

14   how long something's going to take.  Speak both with folks in

15   the U.S. Attorney's Office and the defense counsel on those

16   cases to get a sense from them of what's going to happen.  But

17   communicate with one another.  If in fact it looks like the

18   23rd is not going to work, we'll come up with another date.

19                    Is there anything else?

20                    Mr. Park.

21                    MR. PARK:  Yes, your Honor.  There is the issue of the

22   postarrest statement.

23                    THE COURT:  Yes.  Have you been able to talk to the

24   government about the postarrest statement?  Let me confirm

25   something just for myself, because I couldn't quite figure it

G9cWsenC

1    out.  Is it that the defense team got a disk but not a

2    transcript and that your team created a transcript?  Is that

3    what happened?

4              MR. PARK:  Yes, your Honor.

5              THE COURT:  OK.

6              MR. PARK:  First, before our firm was involved in this

7    case, one of the first things that was disclosed was a

8    videotape of the postarrest statement of our client, Mr. Ng.

9              THE COURT:  Yes.

10              MR. PARK:  Apparently when that was sent over to

11   Mr. Brafman at the time, they put on an index, a discovery

12   index, of all the things that they'd produced, they put the

13   "confidential" legend on that index.  I'm not aware that that

14   confidential legend appears actually on the video itself, just

15   on the index of discovery that they produced.

16              THE COURT:  OK.

17              MR. PARK:  And if I'm wrong about that, I stand

18   corrected, but in any event, when we subsequently started

19   working on the motion to compel, I was not aware that there had

20   been any designation.

21              THE COURT:  It was a mistake.

22              MR. PARK:  I had never seen anything like that.  It

23   would never have occurred to me that a postarrest statement

24   would be designated as confidential.  We then prepared a

25   transcript of that interview.  It's a rough transcript that our

G9cWsenC

1    firm prepared, so it was that transcript that was then appended

2    to our motion to compel.  The government then asked us to agree

3    to withdraw that.  We had that dialogue, as your Honor is

4    aware.

5              THE COURT:  Yes.

6              MR. PARK:  And then your Honor agreed because we were

7    not objecting to it at that time to withdraw that transcript

8    just because we had not complied with the procedures that we

9    had thought applied.  Obviously now we're making a motion to

10   suppress the statements.  It is critical that that transcript

11   and video come into evidence before your Honor so that your

12   Honor can view it and rule on it.  We do not see any basis for

13   designating that document, either the transcript or the video,

14   as confidential.  It is an exchange that the government had

15   with our client before there was any protective order in place

16   at all, so everything that appears in that interview clearly

17   was not subject to protective order.  The government cannot

18   unilaterally decide that they're going to designate something

19   as confidential.  It violates public policy.  There's no basis

20   for it.  And the other thing Ms. Shroff pointed out, as we were

21   discussing this just on Friday, is that paragraph 5 of the

22   protective order actually exempts the scope of the protective

23   order and the confidentiality when the parties are making a

24   motion in connection with the document.

25             THE COURT:  To just be clear, it may be that the

G9cWsenC

1    language that you used was that you were withdrawing it.  I

2    think what has happened in reality -- I'm reviewing it in

3    connection with your motion.  It's something that has been, I

4    think, and I'm not sure, I haven't checked recently, it may be

5    only accessible to the Court, to me, and just not to others.

6    So in connection with any motion you make, and putting aside

7    the confidentiality, I'm absolutely going to consider it.  In

8    other words, whether it's confidential or not, it's a document

9    that will be before me and I'll make a ruling on that basis.

10   But let me ask this, because I just don't know what the basis

11   is, have you spoken since?

12          MR. PARK:  Yes, your Honor.

13          THE COURT:  OK.

14          MR. PARK:  Mr. Richenthal told me before this

15   conference began this morning that the basis is because there

16   are some references to parties or targets, investigative

17   issues, and they would be fine as long as all of that is

18   redacted.  I don't think that's appropriate.  I don't think you

19   get to redact something after the fact.

20          THE COURT:  Go ahead.

21          MR. PARK:  Your Honor, I just don't think that's

22   appropriate.  If the agents had sensitivities to those issues,

23   they should not have specifically referenced it.  It's akin to

24   muzzling our client, because he has a recollection of

25   everything that transpired.

G9cWsenC

1          THE COURT:  There are different issues here.  Let me

2     be clear.  It's not muzzling your client because that statement

3     is going to be before me.  All of those things will be before

4     me.  I'm not just reading a redacted version, I'm reading a

5     full version.  Again, whether there was a protective order in

6     place, or not, the government may make an application now

7     because they have an ongoing investigation so they would like

8     those names not in the public record, and they can make that

9     application.  But with regard to your motion, let me be clear,

10    I'm considering, and I don't know what the relevance of those

11    names or places may be, I don't know what relevance they have

12    to your motion or not, but they will be before me.  And I

13    understand, we can revisit because now I don't know and perhaps

14    you can think about this and we can talk about it at a later

15    date, I would need to have a sense of what those redactions

16    are, and I'm not sure that now is the time to sort of go

17    through that, because it sounds to me as if there's no

18    objection to I think much of the statement, but there may be an

19    objection to parts of it.

20          Yes, Ms. Shroff.

21          MS. SHROFF:  I want to be very clear on Jeff Yin's

22    postarrest statement.  The protective order that we signed

23    specifically states that we can make public and attach to our

24    motion papers Mr. Yin's postarrest statement.

25          THE COURT:  OK.  I'm not precluding you.  There are

G9cWsenC

1    two separate issues here.  There's one thing about attaching it

2    to your motion.  Absolutely, no question you can attach it to

3    your motion and it's something I'll consider.  There's another

4    issue about whether or not when someone goes on ECF on our

5    PACER and they click on it, they'll have access to the whole

6    document.

7                MS. SHROFF:  But that is the motion.  Motions are

8    filed publicly.  The public has an interest in hearing about

9    the motion.

10               THE COURT:  Ms. Shroff, I'll decide that once in fact,

11   and I don't even know if they're the same issues with regard to

12   Mr. Ng and what interest Mr. Ng has.  I understand what the

13   public interest is -- you don't have to tell me about that, but

14   what interest Mr. Ng has with regard to those particular items

15   that the government is seeking to redact.

16               MS. SHROFF:  I'm not speaking for Mr. Ng.  I'm

17   speaking for Mr. Yin.

18               THE COURT:  I'm sorry.  I apologize.

19               MS. SHROFF:  And No. 2, the government used my

20   client's postarrest statement when they sought to detain him.

21   They didn't hold back.  Right?  They took whatever helped them,

22   whatever made them look good.  They put it out there.  It was

23   quoted everywhere, all over the newspaper.  The New York Times

24   had a photo of Mr. Yin in custody making his postarrest

25   statement, and now they can't suddenly say because they don't

G9cWsenC

1   want the whole postarrest statement revealed because somehow

2   now they believe it makes them look bad, or for whatever their

3   reason is, somehow or the other Mr. Yin's statement cannot be

4   made public.  But most of all, your Honor, we would very much

5   appreciate if the Court were to ask the United States

6   Attorney's Office to please inform the defense in writing, not

7   in a conference call, not in a talking-points situation, in

8   writing, what is their basis to state that when we're filing a

9   public motion to suppress our client's postarrest statement it

10  may not be accessible to the public, because we have asked and

11  the government, instead of simply sending us a written

12  response, like most lawyers would, insist that their reasoning

13  only be communicated to us in a conference call, and we would

14  like to know in writing so that we can then take their argument

15  and write to the Court and seek relief.

16          THE COURT:  How about this; let's do it a different

17  way.  Do you know, Ms. Shroff, what portions of your client's

18  postarrest statement the government is proposing redacting?

19          MS. SHROFF:  No, because --

20          THE COURT:  Stop.  This is what I'm going to propose.

21  You get that.  I'm directing the government to provide to the

22  defense a redacted version of whatever the statements are to

23  both counsel, and obviously as I understand it --

24          Mr. Park, is it all right if they use your draft

25  version to indicate if there are additional places -- I just

G9cWsenC

1    want everybody to know what's being redacted.  Once we have

2    that, then I'll be able to then assess whether or not the

3    materials that are redacted are things that the public should

4    have access to.  I think that's the way to proceed.

5          MR. PARK:  Just a couple things.  That's fine, Judge.

6    Just to be clear, though, our draft has nothing to do with the

7    statements of Mr. Yin.

8          THE COURT:  I understand.

9          MR. PARK:  The second thing is what Ms. Shroff alludes

10   to is a communication I had with Mr. Richenthal this past

11   Friday where I said, Put it down in writing so we can then be

12   ready to discuss where we disagree.  He declined to do that.

13   So now we're in a position where you're now directing him to

14   tell us.  We were supposed to file the motions today.  I'm fine

15   with the process, Judge, if he will put down, using our draft,

16   the portions that he would like us to redact and if there's no

17   issues from our perspective, then there isn't.  If there is,

18   we'll bring it to your Honor's attention.

19         THE COURT:  You can file those.  I don't know whether

20   Mr. Yin is making a challenge to his postarrest statement, but

21   assuming he is, file those under seal right now.  You have my

22   permission to do that.  I understand you have an issue, but I

23   have to resolve this issue, and I understand that the press has

24   an interest in this, but I ask that to the extent you express

25   your displeasure, you're more than welcome to come speak with

G9cWsenC

1    me about that, because I need to resolve this issue.  And right

2    now the issue isn't crystallized for me, so I'd like you to do

3    that, and the parties should meet and confer about that.

4           The other thing is more generally, and I understand

5    perhaps the issue with regard to this specific issue that you

6    didn't necessarily want to put in there because then the letter

7    itself you might view because you have to indicate something

8    that you believe should be under seal, but having said that,

9    I'd like the parties to do a better job of communicating with

10   each other and not talking past one another.  I received, and

11   again, I understand sometimes it's easier to write a letter

12   than get in touch with folks on the phone, but I received, and

13   this is separate and apart from this last issue, the transcript

14   issue, which I think -- does that process work?

15          And as I said, I'm considering, and I understand that

16   your motions are due today, Mr. Park, so you can file it under

17   seal.

18          Ms. Shroff, you have some more time, so however you

19   want to proceed; hopefully we'll have resolved that issue by

20   that point in time.  What will be filed, and once you agree, is

21   a redacted copy of the statement, both Mr. Ng's statement and

22   Mr. Yin's statement.  They will be filed and then I'll make a

23   decision about whether or not the portions that are redacted

24   should be unredacted, as I understand it.

25          Let me ask the government this.  Are we talking

1    about -- I mean, I'll see the redactions when we get them, but

2    it's my sense that we're not talking about wholesale redactions

3    of paragraphs or pages; we're talking about words, names,

4    dates, places, and the like.  But having said that, I'll wait

5    to see exactly what it is.  But let me be clear that while I'm

6    giving permission to file the statement by Mr. Ng under seal

7    now, what I expect is that a redacted statement get filed

8    promptly once the parties have communicated what the

9    government's position is with regard to those redactions,

10   because that is something that, A, my individual rules provide

11   for and, B, there are substantial portions of the statement

12   which I think there's no question that the public should have

13   access to.

14          Getting back to my other point about communications,

15   my sense is, based upon the advocacy to date on the case, there

16   is going to be a substantial amount of communication with me

17   and with my staff.  For example, I got four or five letters

18   related to scheduling.  I'd ask that once you realize that

19   there is some dispute, speak to one another so that everybody

20   understands exactly where things stand, and I understand there

21   was a little bit of people talking past one another or talking

22   to each other through the letters, and that shouldn't be the

23   case.  There is going to be time during the case when there are

24   motions filed during the course of the trial where that's

25   what's going to happen, because of the nature of trials, but at

G9cWsenC

this stage, I'd like to try and do a little better job of

communicating, understanding that obviously you have to

zealously advocate on the defense side for your client.  I'm

not saying don't submit something.  What I'm saying is, if you

can, talk it through before bringing it to my attention, if you

can.  If not, look, I'm not going anywhere.

       Yes, Mr. Park.

       MR. PARK:  Your Honor, I'd certainly endeavor to do

that.  Inasmuch as we are no longer being directed to file

today given the timetable, we have further revisions to the

draft, so it may make sense for us to refine that and share

that with the government so they can tell us of those revisions

what should be changed and then we can file ultimately the

redacted as well as the unredacted under seal.

       THE COURT:  Yes, and while we're talking about drafts

and the like, does the government have an objection?

Typically, when the government produces drafts, they do so

saying that you're not going to use it in connection with some

sort of cross-examination.  From what I've heard, Mr. Ng has

not made that request.  I would assume it's under the

assumption when the government takes that position that you

would not utilize the drafts in connection with any trial, in

other words, to cross-examine Mr. Ng, for example.

       MR. RICHENTHAL:  Absolutely, your Honor.

       THE COURT:  OK.  I just wanted to be clear.  So it's a

G9cWsenC

1    draft.

2              MR. PARK:  Thank you, your Honor.

3              THE COURT:  We understand it's a draft, and we'll just

4    proceed from there.  That's fine.  You should refine it as you

5    see fit, and talk about when it's going to be final and talk

6    about, as the government's going to produce its own version

7    obviously down the line, hopefully you can agree on exactly

8    what the correct transcription should be, but that's down the

9    line.

10             MS. SHROFF:  Your Honor, Mr. Yin's statement is in

11   English, so there's no transcript to be given, and so the

12   government should let us know promptly what it is.

13             THE COURT:  Tell you what.  It's 2:00, but if you have

14   time, if the government has time, I don't know whether you have

15   the statement here, or you can call Ms. Shroff after the

16   conference and just let her know what the redactions are.

17             MR. RICHENTHAL:  We do have the statement here, but

18   it's a video, and it's quite lengthy.  Mr. Ng's statement is

19   more than two hours long.  Mr. Yin's statement is more than an

20   hour and a half long.  While we have a sense of what our

21   concerns are, I don't have second markings, and so it's going

22   to take some effort for us to provide those clips, so to speak,

23   but we'll do so expeditiously.

24             THE COURT:  Fine.  Is there anything else we need to

25   deal with today?

G9cWsenC

1      MR. RICHENTHAL:  I don't recall whether your Honor

2  excluded time through January 23.  I think you did, but in the

3  event you didn't, we would respectfully request that time be

4  excluded so that the defense can prepare and file its motions,

5  the parties may continue to produce discovery, deal with this

6  issue involving transcripts, and so on and so forth.

7      THE COURT:  I think in my order that was filed on the

8  docket July 11, I did exclude time and I would exclude the time

9  now also for the same basis, to allow review of discovery,

10  pretrial motions, and the ends of justice served by the

11  exclusion outweigh the interests of the public and the

12  defendants in a speedy trial.

13      Yes, Mr. Park.

14      MR. PARK:  Judge, just so it's clear, there are a

15  number of different motions, motion to suppress, motion for

16  bill of particulars, motion to dismiss.  Just so it's clear, we

17  will file one motion after we've sorted out the draft and this

18  postarrest statement issue and file it.  It won't be today but

19  certainly as soon as you feel that all that's been clarified.

20      THE COURT:  That's fine.  As I mentioned, you have the

21  same amount of time, to the 26th, as Ms. Shroff, but it sounds

22  like you're going to be able file your motion earlier.

23      MR. PARK:  Yes, your Honor.  That's correct.

24      THE COURT:  And that will allow you to have more time.

25  The only thing I will say is that you still have your reply on

G9cWsenC

1    the motion to compel, due on the 19th.

2              MR. PARK:  Yes, your Honor.  Thank you.

3              THE COURT:  Ms. Shroff.

4              MS. SHROFF:  No, I have nothing more.

5              THE COURT:  All right.  Thank you very much for coming

6    in.  I'm sure you didn't expect it would be this long, but we

7    did accomplish some things today.  We'll stand adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25