UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15 Cr. 588 (ER)

**MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS *IN LIMINE***

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
*Attorney for the United States of
America*

Andrew J. DeFilippis
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
*Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. -<br><br>AHMED MOHAMMED EL GAMMAL,<br>a/k/a "Jammie Gammal,"<br><br>Defendant. | 15  Cr. 588 (ER) |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMMENT'S MOTIONS *IN LIMINE*

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motions for the following relief.

First, the Government moves to preclude any reference to, or cross examination concerning, the fact that certain materials to be offered by the Government as evidence at trial (the "FISA Materials") were obtained through searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended, 50 U.S.C. §§ 1821-1829.

Second, the Government moves for the issuance of an order permitting the Government to offer into evidence various communications involving a co-conspirator ("CC-1") of Ahmed Mohammed El Gammal, a/k/a "Jammie Gammal," (the "defendant"), with a relative of the defendant ("Relative-1"), and with others concerning CC-1's activities in support of the Islamic State of Iraq and the Levant ("ISIL")—including CC-1's receipt of military training from ISIL.

Third, the Government moves for the issuance of an order permitting it to offer into evidence a handwritten letter that an unidentified individual sent electronically to a member of

CC-1's family, which CC-1 had drafted while in ISIL-controlled territory for the purpose of notifying his family in the event of his death.

Fourth, the Government moves for the issuance of an order permitting it to offer into evidence a video obtained from the social media website YouTube (the "YouTube Video") depicting CC-1, in which CC-1 states, among other things: (1) that CC-1 had joined, and was residing in territory controlled by, ISIL, and (2) that no one—including the defendant—had assisted or supported CC-1 in joining ISIL and traveling to ISIL-controlled territory.   The Government also seeks to offer communications involving CC-1 and another co-conspirator ("CC-2") leading up to the creation of the YouTube Video.

Fifth, the Government moves for an order denying the defendant's request for the use of a jury questionnaire during *voire dire* at trial.

## BACKGROUND

### A.   The Charged Conduct

The charges against the defendant stem from his facilitating the travel of a 24-year-old United States citizen, CC-1, so that CC-1 could train and fight with ISIL, a designated foreign terrorist organization.   With the assistance of the defendant and another co-conspirator, CC-2, CC-1 traveled to Syria in approximately February 2015, trained to fight with ISIL over the next several months, and, ultimately, was killed in approximately November 2015.

Before traveling to Syria, CC-1 lived in New York City and attended college in Manhattan.   Beginning in the latter half of 2014, CC-1 began expressing an increased interest in militant forms of Islam and became more vocal in his opposition to U.S. foreign policy, both in personal conversations with his associates and over social media.

2

On August 14, 2014, CC-1 learned via Facebook that the defendant had posted comments in an online forum that appeared to be supportive of ISIL.  Within minutes of learning this, CC-1 contacted the defendant and asked whether he was familiar with an online application (the "Application") that offers users the ability to send encrypted text messages between one another. After the defendant indicated he was not, CC-1 sent him a link to the Application's website and added, "Glenn Greenwald used it when he was in Hong Kong to keep his messages with Edward Snowden private."[1]  The defendant then asked whether the Application was "safer than Facebook," and CC-1 responded affirmatively.  Approximately one hour after the conclusion of this Facebook discussion, the defendant sent CC-1 a link to a video, which was a *Vice News* documentary depicting life under ISIL in Raqqah, Syria, the capital of ISIL's caliphate.

Over the next several weeks, the defendant and CC-1 repeatedly corresponded over communications platforms that offer users the ability to send encrypted messages, including the Application.  Thereafter, on October 6, 2014, the defendant traveled from Pheonix, Arizona to New York City to meet with CC-1.  The defendant's stay in New York City lasted less than 48 hours.  During that period, the defendant and CC-1 contacted or attempted to contact each other eleven times via telephone and met with one another multiple times, including during a two-hour meeting in midtown Manhattan on October 7, 2014.

During his stay in New York, late on the night of October 6, the defendant also contacted CC-2, who was in Turkey, via Facebook.  The defendant asked CC-2 for his contact information

---

[1] According to public information, Glenn Greenwald is a journalist who authored a series of reports published by *The Guardian* newspaper, beginning in June 2013, purporting to describe United States and British global surveillance programs, which reports it claimed were based on classified documents illegally obtained by Edward Snowden from the National Security Agency.

so that the defendant's "American friend"—*i.e.*, CC-1—could contact CC-2 when CC-1 arrived in Turkey.

After the defendant left New York City and returned to Arizona, he and CC-1 continued to communicate with each other.  The defendant also communicated with CC-2 regarding CC-1's anticipated travel to Turkey.  On or about November 17, 2015, however, CC-2 sent an Arabic-language Facebook message to the defendant, asking, "Where is the man[?]  You said the 17th?" The defendant replied, "I said the 24th but anyway, cancel . . . His mother has a problem so he canceled the travel for now."  In response, CC-2 complained, stating that he had "prepared housing, food, and drink for him."

On January 16, 2014, CC-1 contacted CC-2 on Facebook, introducing himself as "Gammal's friend," *i.e.,* the defendant's friend, and asking for CC-2's help with "a career opportunity in Istanbul."  CC-2 replied, "We are at your service."  CC-1 added that he would be "landing in Istanbul on January 28," and asked whether CC-2 could pick him up at the airport, which CC-2 agreed to do.

### B. CC-1 Departs from the United States for Syria

On or about January 26, 2015, CC-1 left his parents' home in Middletown, New York, and told them that he was returning to college in New York City.  On the evening of January 27, however, CC-1 sent another Facebook message to CC-2 stating that his initial flight to Istanbul, Turkey had been canceled due to weather, but that it had been rescheduled and would arrive in Istanbul at "10 am inshAllah [God willing]."  CC-1 then traveled from New York City to Istanbul.

After his arrival in Istanbul, CC-1 communicated with the defendant over Facebook, discussing how it had been difficult to "meet up" with CC-2 because CC-2 did not speak English, and asking the defendant to relay a message to CC-2.  CC-1 also told the defendant about his eagerness to start his "internship," writing, "the sooner I start the internship the better u know what I mean.  I wanna get close to the interview," which was a coded reference to CC-1's desire to join ISIL in Syria.  In addition, on January 29, 2015, the defendant told CC-1 that he had "found info from [CC-1]," and wrote that a "long trip to Adana or gazentep is like 35 or 40 dollar."  Adana and Gaziantep ("gazantep") are two cities near the Syrian border, approximately 700 miles from Istanbul.

Later that day, CC-1 also told the defendant that he was "in contact with someone from the company[,] directly from inside the company, and he knows ppl here, can probably help me get there in 3-4 days [God willing]."  The evidence presented at trial will show that CC-1 used "the company" as a code to refer to ISIL.

### C.      CC-1's Communications While in Syria

Sometime before mid-February 2015, CC-1 arrived in ISIL-controlled territory in Syria. On February 16, 2015, CC-1 sent the following message to Relative-1:

> I'm so sorry for the sudden disappearance man, I've got a lot of explaining to do but first off I just wanna say that I'm sorry for not being aware about the protocol in my new company.  Hours after our last PQChat conversation i had my phone and laptop taken from me by the company for safety reasons.  They're gonna give it back to me after my training is over inshaAllah.  Right now im going through the religious training which will end in 9 days.  Then I'm gonna be enrolled in my main training course which will take a month to complete.

Over the next several months, CC-1's social media presence became more sporadic. Nevertheless, the defendant was one of a small group of people with whom CC-1 maintained contact during this period.  For example, on May 7, 2015, CC-1 sent the defendant a Facebook message saying, "it's been a long time but I'm doing well and I just wanna let u know im safe and secure and everything is going according to plan.  When I get completely settled over the coming months I will contact u more to let u know what's up at my new job."  On May 14, 2015, the defendant sent CC-1 a Facebook message saying, "is it easy to park a car into ur job parking lot?"  CC-1 responded on July 13, 2015, stating, "I don't know.  I need to ask my superiors at work first inshallah, but I think its risky because the parking lot these days is going under a lot of renovation, especially in the north side.  Kahir inshallah, you planning on driving anytime soon?"  The defendant responded, "Yes, mid August, check Facebook more often."  In short, the defendant was using code to ask CC-1 whether it would be possible for him to travel to ISIL-controlled territory in Syria, (*i.e.*, "park a car into ur job parking lot"), and CC-1 responded that it would be "risky" because of activities that were occurring in the northern part of Syria ("renovation. . . in the north side").[2]  Similarly, on July 16, 2015, CC-1 exchanged messages with the defendant via a text-messaging application in which CC-1 stated, among other things,

---

[2]  According to public information, the time period during which CC-1 made these statements was one of significant unrest and violence in northern Syria.  For example, in July 2015, ISIL fighters launched an offensive in the Al-Hasakah Governorate—which is in the northeastern region of Syria—as part of the ongoing Syrian Civil War.  ISIL forces attempted to capture the Governorate's city of Al-Hasakah, which was divided into two areas held separately by Syrian Armed Force and Kurdish forces.  By early August 2015, after a period of intense fighting, ISIL forces had been expelled from the city.  Furthermore, in late June 2015, ISIL launched an offensive against the city of Kobani in northern Syria, killing at least 233 civilians.

that "Life has changed a lot for me at this new job, but I love it and I don't regret taking up the offer [praise be to God]. [May God reward you with Goodness!]."

CC-1's communications with friends and associates during this time period also indicate that he was, in fact, training and fighting with ISIL.  In May 2015, for example, CC-1 told Relative-1, in a coded Facebook exchange, that he supported ISIL's immolation of a Jordanian pilot because the pilot had been dropping bombs "on our people living all over the forests here and we made him see the results of his campfires before we decided to return him the favor." Again, on May 7, 2015, CC-1 sent the following message to one of his Facebook friends: "I live in bilad al Islam now, the real bilad al Islam, and its beautiful."  "Bilad al Islam" translates to "country of Islam" in English, which can also be interpreted as "state of Islam," or "the Islamic State."  Later, on July 5, 2015, the FBI also obtained a photograph of CC-1, who appeared to be in Syria, raising his index finger in a gesture which is a known sign in support of ISIL, as well as a photograph of CC-1 with what appears to be an AK-47 assault rifle, standing in front of an ISIL flag.  In a similar vein, on June 29, 2015, CC-1 sent the following private message to another individual on social media:

> Life in Raqqah is normal for the most part, when the K's aren't bombing us. All women in niqab, mujahideen walking everywhere. It's a nice
>
> . . . I don't trust most ppl here tbh and I just got back on Twitter after all these months. Training has been real busy[3]

---

[3]  As noted, Raqqah is a city within ISIL-controlled territory in Syria and is considered by ISIL to be the capital of its caliphate.  "K's" as used in this instance appears to be an abbreviated reference to "kuffar," which is an Arabic term meaning "non-believer" commonly used by ISIL to refer to the United States and her Western allies.  "Niqab" is an Arabic term for the traditional head-covering that is worn by some Muslim women and is required to be worn under ISIL's version of shari'a law.  Lastly, "mujahideen," is an Arabic term used to refer to an Islamic fighter or holy warrior.

D.      The YouTube Video and Related Communications

On August 26, 2015, the defendant was arrested for his participation in the crimes charged in the Indictment and detained without bail.  The Government intends to offer evidence at trial that after CC-1 and CC-2 learned of the defendant's arrest, they attempted to conceal the means by which CC-1 (and possibly others) traveled to ISIL-controlled territory, and to cover up the fact that CC-2 and the defendant had assisted CC-1 in traveling to join ISIL.  Indeed, the evidence at trial will show that this is one of the goals of ISIL, namely, to conceal from law enforcement its means and methods of recruiting as well as the routes and facilitators who assist foreign fighters in traveling to ISIL-controlled territory.  Specifically, on September 5, 2015, ten days after the defendant's arrest, CC-2 sent a Facebook message to CC-1 in which he stated, "You cause big problem for Ahmed. . . It [sic] is now in prison."  CC-2 went on to tell CC-1 that the defendant was "accused of facilitating the arrival to the State."  CC-1 expressed skepticism that the defendant's arrest related to CC-1's travel, stating, "I do not know why they did not arrest him earlier, if I really am the cause . . . they how a lot of time to do this to him, I don't know why they choose now."

Later in the conversation, CC-2 sent CC-1 an *Associated Press* news article and a link to a press release and other articles about the defendant's arrest.  CC-2 repeatedly told CC-1 that CC-1's father was responsible for the defendant's arrest and asserted, "Do not leave yoru [*sic*] brother[.]  You have to tell them he had nothing to do by going to Syria."  CC-1 responded, in contrast to the Facebook conversations where the defendant assisted CC-1 in meeting CC-2 and directing him to towns on the Turkey-Syria border, "I will because it's true."  CC-2 told CC-1 that "we want to record video," and that "Ahmed," *i.e.*, the defendant, "says that the thing does

8

not know about your trip and I," *i.e.*, CC-2 "also . . . Ahmed did not know anything about your trip.  I do not know anything about your trip.  Your father injustice Ahmed to be the reason for your return."

The next day, September 7, 2015, CC-2 again messaged CC-1, stating that he had spoken to the defendant, who had implored CC-1 to send a video, stating "Now I spoke with [the defendant], who is asking you to send video is very necessary.  Please and Please Send video[,] Ahmed says he is important.  He says that going to Syria the result of personal desire to have and Ahmed had nothing to do so."  CC-1 responded, "Its late night over here and I do not have the ability to make a video where I am.  I will let u know tomorrow inshAllah."

On September 8, 2015, CC-1 recorded a video, referred to above and hereinafter as the YouTube Video (attached hereto as Exhibit A).  In the YouTube Video, CC-1, clad in military fatigues, admitted that he is in the "Islamic State," but claimed—in marked contrast to the Facebook communications from January 2015 described above, and in a unabashed effort to falsely exculpate el Gammal—that no one assisted him in traveling to Syria, including "Ahmed Mohammed El Gammal."  Specifically, CC-1 stated as follows:

> My name is Samy Mohammed Elgoarany.  I'm 24 years old, and I'm an American citizen currently residing in the Islamic State.  I came here and I made this video to let you know that I came here out of my own will.  It was my own choice, and it was out of my own resources.  I didn't come to this decision with anybody's influence or anybody's recruitment.  I came here.  It was my decision and mine alone.  Nobody financed me to come here.  Nobody bought my plane ticket.  All that with my own money.  Nobody showed me the way to get here.  And nobody helped me along the way to get here— including Ahmed Mohammed El Gammal, in America.  And I'm making this video just to let the authorities know this.  This is my statement, and use it however you wish.

The Government found the video in a hyperlink embedded in a Facebook message sent from CC-2 to one of Gammal's overseas associates.

9

**E.       CC-1's Death and the CC-1 Letter**

In November 2015, an unidentified person contacted Relative-1 via Viber, an instant

messaging platform, and told Relative-1, in sum and substance, that CC-1 had been killed

fighting in Syria.  The person also provided Relative-1 with photographs of a handwritten note

from CC-1 (attached hereto as Exhibit B), which stated, among other things:

> . . . The Lord of Mercy. . . Giver of Mercy. . . And prayers and peace be upon
> the Messenger by Allah.
>
> [Relative-1] if you're reading this then know that I've been killed in battle and
> am now with our Lord InshaAllah.  I want you to know how much I love you, and our
> parents, but I don't think words will ever be enough to describe it.  Remember what I
> told you that day at the train station, the last time I saw you. . . We will win this war
> one day, this war between Iman (Belief) and kufr (Disbelief) between Good and Evil.
> And I will come back for you, with Allah's permission I will come back for you.  Not
> in this temporary, transitory life, but in the life to come.  When Allah summons us all
> for Judgment.  I will pray for you and seek Allah's mercy for you inshaAllah.  This is
> Allah's promise to the martyrs, and know that if I'm accepted [U/I] Allah does not
> fail [U/I] do not cry for me for [U/I] life of this world for Jannah.
>
> "Do not think of those who [U/I] in Allah's cause as dead.  They are [U/I]
> their lord, well provided for, happy with [U/I] Allah has given them of His favor:
> rejoicing that for those they have left behind who have yet to join them there is no
> fear, nor will they grieve; (rejoicing) in Allah's blessing and favor, and that Allah will
> not let the reward of the believers be lost."  [Surat Al-Imran: 169 – 171]
>
> The only certainty in this life is death.  And when we go, we take nothing with
> us except our deeds.  Do NOT let go of your Islam bro.  Hold on to it and never let it
> go.  Build it and fortify it with knowledge, so that Allah may have mercy on you on
> the Day none of us can escape from.  And call our family to the truth and never
> compromise in it, so that Allah may have mercy on them too.  You see how my life
> changed for the better when I came to the Land of Islam, you are a witness to my
> transformation.  You're a witness to my change of character and to the blessings of
> Allah showered me with my marriage, my devotion to prayer and the Qur'an, my
> happiness.  Things I never had when I was in America.  Remember this when
> embarking on your own journey towards Allah.  This is real.  Life is serious.  Don't
> waste it away doing anything that doesn't bring you to righteousness.  And
> remember, "Put your trust in Allah, you are on the path of dear truth."  [Surat Al-
> Naml: 79]

Keep reading.  And read the Sahih International Qur'an, it's the best translation.  Also read Al-Nawaqadul Islam (The Nullifiers of Islam) by Mohammed ibn Abdel Wahhab.  And "The Victory of Allah is Near," by Sheikh Sulayaman Al-Ulwan, a jailed scholar in Saudi Arabia, read that too.  These books have too many jewels to seize from.  And lastly, listen to [U/I] Al-Awlaki's lectures [U/I].

Tell mom and dad that I love them more than they'll ever realize.  Tell them they don't know how much I cried for them over here, and how much I prayed for Allah to guide them.  And tell them they will see me again, inshaAllah, so long as you all stay on the real Islam.  We will be together in Jannah one day.  And tell my wife to be patient with Allah's will, and we will be together soon inshaAllah.

This is not farewell, only a "see you later."  I love you [Relative-1].  I love you mom.  I love you dad.

[. . .]

(To Allah we belong and to Him is our return)

**F.   The FISA Materials**

On July 13, 2016, the Government filed a notice pursuant to Title 50, United States Code, Scetion 1825(d), informing the defendant and the Court that it intended "to offer into evidence, or otherwise use or disclose information obtained and derived from physical searches conducted pursuant to [FISA]."  (Doc. 51).  On August 12, 2016, the defendant filed a motion to suppress the materials that were the subject of the Government's July 13, 2016 notice, *i.e.*, the FISA Materials.  The FISA Materials are described in further detail in the un-redacted, classified version of the Government's Opposition to Defendant's Pretrial Motion to Suppress Evidence. The defendant's motion is pending as of the filing of this memorandum.

## ARGUMENT

I.     **The Court Should Issue an Order Precluding Reference to the Fact That Certain Materials Were Derived from FISA Searches**

Defense counsel has indicated that they intend to cross examine one or more law enforcement witnesses concerning the fact that certain evidence offered by the Government at trial, namely, the FISA Materials, was derived from searches conducted pursuant to FISA.  Any reference at trial (or in any public proceeding, for that matter) to the fact that the FISA Materials were obtained through FISA-authorized searches is impermissible and should be precluded for at least two reasons.

First, the fact that the FISA Materials were derived from FISA-authorized searches is legally irrelevant and would be offered only to confuse the jury and unfairly prejudice the Government and the defendant by suggesting that the jury should consider matters outside of their purview as the finders of fact in this trial.  This fact simply has no bearing on defendant's guilt or innocence, or on any related factual matters to be considered properly by the jury. Indeed, that is why courts in this and other districts customarily advise juries, with regard to all lawful searches conducted in a case, that "evidence obtained from these searches was properly admitted" and that jurors should consider such evidence "[w]hether you approve or disapprove of how it was obtained."  *See United States* v. *Ogando*, 90 Cr. 469 (PNL) (S.D.N.Y. 1991), *aff'd*, 968 F.2d 146 (2d Cir. 1992).  Evidence derived from searches conducted pursuant to a FISA-authorized warrant is no different from evidence obtained through a Rule 41 search warrant, a consent search, or any other means.  Indeed, the law permits—and the defense here has availed itself of—the opportunity to file a suppression motion before trial challenging the admissibility of evidence obtained pursuant to FISA.  Such suppression motions—not jury trials—are the

proper venue to litigate claims about the legality or propriety of the Government's collection of evidence pursuant to FISA.  *United States* v. *Turner*, F. Supp. 3d (N. D. Ill. Sept. 22, 2014) (noting that defense counsel did not oppose Government's motion to preclude the defendant from re-litigating the FISA suppression issue at trial, and citing 50 U.S.C. §§ 1806(e)–(f), 1825(f)-(g), which provides that FISA suppression motions "shall be made before the trial" pursuant to an *ex parte*, *in camera* review procedure).

Simply put, once the Court has determined that evidence was obtained in a manner that did not violate a defendant's Constitutional rights (*i.e.*, that evidence should not be suppressed), the authority under which the Government obtained such evidence has no bearing on the defendant's guilt *vel non*, or on the jury's evaluation of the facts and evidence presented to it. Indeed, presenting such matters to the jury as a subject of cross examination would unfairly prejudice the Government by suggesting that the jury should question entirely lawful methods used to obtain evidence offered at trial.  Conversely, there is also a substantial risk of unfair prejudice to the defendant.  This is so because the Foreign Intelligence Surveillance Act is legislation specifically designed to combat national security threats involving foreign powers. As such, disclosing to the jurors that FISA was used in furtherance of the Government's investigation of the defendant very likely will lead some jurors to conclude that a court has already concluded that the defendant is a threat to national security, and that he therefore must be guilty of the crimes with which he is charged.

Second, information describing the precise nature and scope of evidence constituting the FISA Materials, which was provided to cleared defense counsel and to the Court, remains classified and is therefore protected from disclosure at trial.  While the fact that the FISA

Materials were obtained through FISA searches remains classified, the materials themselves are

not classified and may be offered at trial.  In other words, it is the association of specific

evidence with FISA-authorized search procedures that is classified, not the evidence itself.  Thus,

any argument or examination seeking to associate specific evidence with a FISA-authorized

search necessarily would introduce into the public record classified information which is

protected from public disclosure.  As such, if defense counsel seek to elicit at trial that specific

exhibits were the result of FISA-derived searches, they knowingly would be disclosing a

classified fact in a public forum in violation of federal law and the Court's classified protective

Order in this matter.[4]  If the defendant intends to offer classified evidence in furtherance of his

defense, Section 5(a) of the Classified Information Procedures Act sets forth a formal notice

procedure that a defendant must follow before seeking to disclose or cause the disclosure of

classified information in court.  *See* 18 U.S.C. App. 3 at §5.  This requirement applies both to

documentary exhibits and to oral testimony, whether it is anticipated to be brought out on direct

or on cross-examination.  *See, e.g.*, *United States* v. *Wilson*, 750 F.2d 7 (2d Cir. 1984) (same).

Thus, absent notice pursuant to Section 5(a) and a determination by the Court that such

disclosure would be permissible here, defense counsel should not be permitted to refer to any of

the FISA Materials as having been derived from searches conducted pursuant to FISA.  And, as

previously explained, there is no legitimate basis to permit the defense to refer to FISA at trial,

so any such notice and motion practice would be frivolous here.

---

[4]  To the extent defense counsel contends that they do not intend to link any specific exhibit or category evidence to FISA, and therefore would not run afoul of the classified protective Order or federal laws, such argument is unavailing for the reasons previously stated.

Accordingly, the Government respectfully requests that the Court preclude any reference to FISA or the fact that certain materials were obtained pursuant to FISA.

## II.   CC-1's Statements and Communications Concerning His Support of ISIL are Admissible

At trial, the Government intends to introduce various statements and communications described above that CC-1 made concerning his activities in support of ISIL.  This evidence includes: (1) statements made by CC-1 to Relative-1 and others concerning his activities in ISIL-controlled territory in 2015; (2) the CC-1 Letter; and (3) the YouTube Video and related communications with CC-2.  As described in detail below, each of these categories of evidence is admissible as non-hearsay statements that are not offered for their truth pursuant to Rule 801(c)(2), or as statements against the declarant's penal interest pursuant to Rule 804(b)(3), and/or as statements made by a coconspirator during and in furtherance of the charged conspiracy pursuant to Rule 801(d)(2)(E).

### A.   Applicable Law

#### 1.   Hearsay Statements

Pursuant to Federal Rule of Evidence 801(c)(2), an out-of-court statement that a party seeks to offer at trial is hearsay only if "[the] party offers [the statement] in evidence to prove the truth of the matter asserted in the statement."  Accordingly, "[o]ut-of-court statements not offered for the truth of the matter asserted" may be admissible to, among other things, "furnish an explanation of the understanding or intent with which certain acts were performed."  *United States* v. *Reifler*, 446 F.3d 65, 92 (2d Cir. 2006) (internal quotation marks omitted).  Such evidence can also "constitute appropriate rebuttal to initiatives launched by the defendant."  *United States* v. *Reyes*, 18 F.3d 65, 70 (2d Cir.1994).  However, such evidence should be

excluded if "its probative value [in its permitted evidentiary use] is substantially outweighed by the danger of unfair prejudice . . . resulting from the impermissible hearsay use of the declarant's statement." *United States* v. *Johnson*, 529 F. 3d 493, 500 (2d Cir. 2008) (internal quotation marks omitted).  *See* Fed. R. Evid. 403.

## 2.  Statements Against Penal Interest

Pursuant to Federal Rule of Evidence 804(b)(3), an out-of-court statement that is against the declarant's penal interests is admissible if the declarant is unavailable and the following conditions are met:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Under Rule 804(b)(3), the statement of an unavailable witness is admissible if, when made, the statement so far tended to subject the speaker to criminal liability that a reasonable person would not have made the statement unless he believed the statement to be true.  *See United States* v. *Bakhtiar*, 994 F.2d 970, 977 (2d Cir. 1993).  For the Rule 804(b)(3) exception to apply, "the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in the declarant's position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States*

16

v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983) (internal quotations and modifications

omitted).  "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even

reasonable people who are not especially honest, tend not to make self-inculpatory statements

unless they believe them to be true."  *Williamson* v. *United States*, 512 U.S. 594, 599 (1994).

### 3.   The Confrontation Clause of the Sixth Amendment

The Sixth Amendment of the United States Constitution guarantees a defendant the right

to be confronted by the witnesses against him.  Thus, "testimonial" statements may be introduced

against the defendant only when the declarant is unavailable and the defendant had a prior

opportunity to cross-examine the declarant regarding the statement.  *Crawford* v. *Washington*,

541 U.S. 36, 68 (2004); *United States* v. *McClain*, 377 F.3d 219, 221 (2d Cir.2004).  By contrast,

non-testimonial statements do no implicate the Sixth Amendment's Confrontation Clause.

*Crawford*, 541 U.S. at 68.  Although the Supreme Court in *Crawford* declined to offer a precise

definition of "testimonial" statements, *see id.* at 68, it provided examples—*i.e.*, prior testimony

in court or before a grand jury, or statements given in a police interrogation, from which the

Second Circuit has concluded that testimonial statements "involve a declarant's knowing

responses to structured questioning in an investigative environment or a courtroom setting where

the declarant would reasonably expect that his or her responses might be used in future judicial

proceedings."  *United States* v. *Logan*, 419 F.3d 172, 178 (2d Cir. 2005) (citing *United States* v.

*Saget*, 377 F.3d 223 (2d Cir. 2004)). *See also Crawford*, 541 U.S. at 51–52 (identifying as

testimonial "ex parte in-court testimony," "extrajudicial statements . . . contained in formalized

testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and

"statements that were made under circumstances which would lead an objective witness

17

reasonably to believe that the statement would be available for use at a later trial.").  Courts have found statements to be non-testimonial where, for example, they are made in less formal settings, or are made to someone whom the declarant does not know is obtaining and/or recording the statements on behalf of the Government.  *See Davis* v. *Washington*, 547 U.S. 813, 840 (2006) (911 call was non-testimonial because it "did not constitute formalized dialogue" and surrounding circumstances "did not render [the] statements sufficiently formal [because] the statements were neither Mirandized nor custodial, nor accompanied by any similar indicia of formality."); *Saget*, 377 F.3d at 229 (co-conspirator's statements against defendant to a confidential informant, whose true status was unknown to co-conspirator, were not testimonial); *United States* v. *Watson*, 525 F.3d 583, 589 (7th Cir. 2008) ("[A] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes."); *United States* v. *Hendricks*, 395 F.3d 173, 182 n.9, 184 (3d Cir. 2005) ("[B]ecause [statements of various defendants and coconspirators] constitute admissions unwittingly made, the [conversations] are clearly nontestimonial statements and are thus not subject to the *Crawford* rule."); *United States* v. *Honken*, 541 F.3d 1146, 1161-62 (8th Cr. 2008) (maps sketched by defendant's girlfriend and then provided to a government informant, which then led investigators to victims' bodies, were non-testimonial and admissible as statements against penal interest under Fed R. Evid. 804(b)(3)).

### 4.  Co-conspirator Statements Made in Furtherance of a Conspiracy

Pursuant to Federal Rule of Evidence 801(d)(2)(E), a statement offered at trial against a party is not inadmissible hearsay if it was "was made by the party's coconspirator during and in furtherance of the conspiracy."  To admit a coconspirator statement under Rule 801(d)(2)(E), a

18

trial court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy. *See United States* v. *Padilla*, 203 F. 3d 156, 162 (2d Cir. 2000) (quoting *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990).  Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance."  *United States* v. *Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (quoting *United States* v. *Provenzano*, 615 F.2d 37, 45 (2d Cir.)), *cert. denied*, 446 U.S. 953 (1980).  Furthermore, the fact that one defendant has been arrested does not preclude the admission of statements by other, un-arrested coconspirators who continued the conspiracy after the arrest.  *See United States* v. *Persico*, 832 F.2d 705, 715-16 (2d Cir. 1987) ("[The fact that] some of the conspirators had been indicted and were under arrest is unimportant" where "the [criminal enterprise] was quite capable of continuing operations despite the fact that some of its members were incarcerated."); *United States* v. *Taylor*, 802 F.2d 1108, 1117 (9th Cir.1986) ("Although statements made by a coconspirator after his arrest cannot be used against fellow conspirators, the converse is not true; statements made by an unarrested co-conspirator who is still operating in furtherance of the ongoing conspiracy may be introduced against the arrested conspirator."); *United States* v. *Wentz,* 456 F.2d 634, 637 (9th Cir.1972) ("An unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be

introduced against the arrested one if the conspiracy is still in operation."); *United States* v.

*Ascarrunz*, 838 F.2d 759, 764 (5th Cir. 1988) (same).

The Court is not bound by the rules of evidence in assessing a proffered co-conspirator statement, and proof as to each prong may include hearsay statements and other admissible evidence. *See Bourjaily* v. *United States*, 483 U.S. 171, 178-79 (1987) ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)); *United States* v. *Cota*, 953 F.2d 753, 758 (2d Cir. 1992) (hearsay statement will be considered along with independent evidence that defendant participated in the conspiracy). Further, in making these determinations, the Court may properly rely on any available evidence, including the hearsay statements itself. *Bourjaily*, 483 U.S. at 181 ("court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted"); *accord Glenn* v. *Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996).

**B.     Discussion**

**1.     CC-1's Statements to Relative-1 and Others Concerning His Support for ISIL Are Admissible**

The Government seeks to offer at trial various communications that CC-1 had with Relative-1 and with others regarding his activities in ISIL-controlled territory in Syria (including his receipt of military training). These statements are admissible as statements against penal interest pursuant to Federal Rule of Evidence 804(b)(3). The communications falling into this category that the Government intends to offer at trial include, among others:

- CC-1's February 16, 2016 messages to Relative-1 concerning his "religious training," "main training," and other activities in ISIL-controlled territory;

- CC-1's May 2015 communications with Relative-1 over Facebook, in which CC-1 stated that he supported ISIL's immolation of a Jordanian pilot, whom he describes as

dropping bombs "on our people living all over the forests here and we made him see the results of his campfires before we decided to return him the favor;"

- CC-1's message to a Facebook friend stating, "I live in bilad al Islam now, the real bilad al Islam, and its beautiful;"

- CC-1's June 2015 private message to an individual on social media that "Life in Raqqah is normal for the most part, when the K's aren't bombing us. All women in niqab, mujahideen walking everywhere. It's a nice. . . I don't trust most ppl here tbh and I just got back on Twitter after all these months. Training has been real busy."

These communications—and similar communications to be offered at trial—are admissible as statements against penal interest pursuant to Rule 804(b)(3). First, and as noted above, CC-1 died fighting on behalf of ISIL and is therefore unavailable to testify. Second, their content suggests that these statements would have been made "only if true" because they plainly expose CC-1 to criminal liability. In particular, CC-1's statements that he received training from ISIL; that he supported the immolation of a person in retaliation for bombings of "our people," *i.e.*, ISIL; and that he lived in ISIL-controlled territory ("in bilad al Islam" and "in Raqqah"), all provide evidence that he conspired to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, among other offenses.

Finally, these statements are supported by extensive "corroborating circumstances that clearly indicate their trustworthiness," Fed. R. Evid. 804(b)(3)(B). This corroborating evidence includes, among other things: (1) the above-referenced social media messages in which CC-1 and CC-2 discuss the creation of the YouTube Video; (2) other exchanges cited herein that CC-1 conducted in-person and over social media, in which CC-1 discussed his extremist views and his plans to travel to Syria; and (3) the above-referenced electronic and documentary evidence— including toll records, location data, and travel records, evidencing CC-1's discussion of plans to join ISIL and subsequent travel to Syria. Moreover, the Government will offer testimony at trial

that authenticates all of the records from which the aforementioned social media messages and other content were obtained.  This evidence is sufficient to meet the requirement of trustworthiness set forth in Fed. R. Evid. 804(b)(3)(B).  Accordingly, the above-described statements are admissible.

### 2.     The CC-1 Letter is Admissible

The Government also seeks to offer into evidence the CC-1 Letter, which, as noted above, was drafted by CC-1 and informed CC-1's family of his death in ISIL-controlled territory. The CC-1 letter, which Relative-1 received from an unknown individual via Viber in November 2015, is also admissible on several grounds.  In the letter, CC-1: (1) informs Relative-1 that if he is reading the letter, then CC-1 was killed in battle; (2) expresses apparent militant Islamist views; (3) exhorts CC-1's family to study Islam and embrace similar views; and (4) expresses his love for his family and desire to be reunited with them.  The CC-1 letter is admissible in its entirety on three separate grounds.

First, the CC-1 letter is admissible as a statement against penal interest.  *See* Fed. R. Evid. 804(b)(3).  The overarching purpose and content of the letter—which informed CC-1's family that he was "killed in battle" on behalf of ISIL—incriminates CC-1 because it demonstrates CC-1's willingness to fight and die on behalf of a designated foreign terrorist organization.  Although the letter was apparently delivered after CC-1's death, it would have been devastating evidence at a trial of CC-1 if he had not been killed fighting for ISIL.  The letter's numerous references to CC-1's fundamentalist and militant views—including reference to the writings of violent

extremist Anwar al-Awlaki[5]—corroborate the Government's allegations that CC-1 embraced a violent extremist ideology and traveled to join ISIL in Syria.  In addition, the Government expects to offer proof of extensive "corroborating circumstances that clearly indicate [the CC-1 Letter's] trustworthiness."  Fed. R. Evid. 803(b)(3)(B).  For instance, the Government expects that Relative-1 will testify concerning the circumstances in which he received the letter via Viber.  The Government further expects that Relative-1 will identify the handwriting in the letter as that of CC-1 based on Relative-1's prior interactions with CC-1.  These corroborating circumstances, when combined with those set forth in Section B(1) above—including the extensive evidence of CC-1's travel to Syria to fight for ISIL—are sufficient to meet Rule 803(b)(3)(B)'s requirement of trustworthiness.  Accordingly, the letter is admissible as against CC-1's penal interest.

The CC-1 letter is also admissible on separate grounds pursuant to Rule 801(d)(2)(E) because it was drafted by CC-1 during, and in furtherance of, the charged conspiracy.  Although the date of the letter is unknown, it was evidently prepared in connection with CC-1's activities as a trained fighter providing material support to ISIL and therefore falls within the time period during which the charged conspiracy continued.  And the letter was prepared "in furtherance" of the conspiracy, for at least two reasons.  Fed R. Evid. 801(d)(2)(E).  First, the letter facilitated CC-1's fighting and ultimate martyrdom on behalf of ISIL by providing a mechanism to ensure that his family would be notified upon his death.  Second, the dissemination of the letter also

---

[5]  According to public information, al-Awlaki was an American citizen and terrorist recruiter who was involved in, among other things, espousing militant Islamist views and planning terrorist operations for the designated foreign terrorist organization Al Q'aida in the Arabian Peninsula. Al-Awlaki was killed in September 2011.

itself provided support to ISIL by promoting ISIL's militant ideology.  Specifically, CC-1 exhorted family members to embrace a violent and fundamentalist interpretation of Islam espoused by ISIL and other violent Islamic groups.  ("This is Allah's promise to the martyrs. . . You see how my life changed for the better when I came to the Land of Islam, you are a witness to my transformation. . . And lastly, listen to [U/I] Al-Awlaki's lectures").  Therefore, the CC-1 letter is admissible pursuant to Rule 801(d)(2)(E).

Finally, even if the CC-1 letter were not admissible pursuant to one of the above exceptions, it is admissible on separate grounds pursuant to the so-called residual hearsay exception set forth in Federal Rule of Evidence 807 because of its highly probative value with respect to CC-1's receipt of military training and engagement in combat on behalf of ISIL.  *See United States* v. *Morgan*, 385 F.3d 196, 209 (2d Cir. 2004) (co-defendant's letter to boyfriend was trustworthy and thus admissible under Fed. R. Evid. 807, because it was written to intimate acquaintance in private, not in response to police questioning, and was probative because it tended to show that defendants were expecting suspiciously large payment for acting as courier).

Based on the foregoing, the CC-1 Letter is admissible in its entirety on several independent grounds.

### 3.     The YouTube Video and Related Communications Between CC-1 and CC-2 are Admissible

The Government also seeks to offer into evidence the YouTube Video, which, as noted above, depicts the defendant in military attire speaking of, among other things, his travel to ISIL-controlled territory in Syria.  *See supra*, pgs. 8-9.  Relatedly, the Government seeks to offer the communications between CC-1, CC-2, and the defendant that led to the creation of the video.  *Id.* Both the YouTube Video and the related communications are admissible, for several reasons.

24

First, the entire YouTube Video is admissible because it is comprised of statements made by the defendant's co-conspirator, CC-1, during and in furtherance of the charged conspiracy following the defendant's arrest. *See* Fed. R. Evid. Rule 801(d)(2)(E). As an initial matter, it is well-settled that the arrest of one member of a conspiracy does not alone terminate the existence of a conspiracy, nor does it necessarily constitute a withdrawal by the arrested co-conspirator. *See United States* v. *Leslie*, 658 F. 3d 140, 143–44 (2d Cir. 2011) ("[m]ere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal.") (citing *United States* v. *Eppolito*, 543 F.3d 25, 49 (2d Cir.2008)). Indeed, "while arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must." *United States* v. *Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) (internal quotation marks omitted). Rather, the defendant "must also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *Leslie*, 658 F.3d at 143. In addition, and as noted above, where, as here, "[a]n unarrested co-conspirator [is] still operating in furtherance of the conspiracy," the statements made by such a co-conspirator "may be introduced against a defendant who was arrested at the time the statements were made." *Taylor,* 802 F.2d at 1108. *See also Wentz,* 456 F.2d at 637.

Accordingly, the statements contained in the YouTube Video are admissible because they were made in furtherance of an ongoing conspiracy in which CC-1 continued to provide material support and resources—namely, himself, as personnel—to ISIL. Moreover, the statements advanced the objectives of the ongoing conspiracy to support ISIL by: (1) publicizing CC-1's

25

support for ISIL, thereby garnering attention for the group's message and potentially drawing additional recruits, and (2) disseminating misleading information concerning the means by which CC-1 traveled to ISIL-controlled territory, thereby maintaining secrecy in ISIL's methods—and the methods used by CC-1 and CC-2—to facilitate recruitment and travel of personnel.  Indeed, CC-2 was then—and is now—at liberty, and may thus have been in a position to facilitate further travel by other recruits to ISIL-controlled territory.  In such circumstances, CC-1's statements are admissible because his "concealment of the existence of the conspiracy served not only to cover up the declarant's past participation in criminal behavior, but to shield the ongoing conspiracy as well."  *United States* v. *Pecora*, 798 F.2d 614, 630 (3d Cir. 1986) (citing *Grunewald* v. *United States*, 353 U.S. 391, 405–06 (1957)).  *See also United States* v. *Koppers Co.*, *Inc.*, 652 F.2d 290, 298 (2d Cir. 1981) ("post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy."); *United States* v. *Bermudez*, 526 F. 2d 89 (2d Cir. 1975) ("[e]vidence obtained by searches conducted after the termination of a conspiracy has frequently been held admissible to prove the existence of the conspiracy even though occurring after its conclusion").

The Second Circuit's decision in *Persico*, cited above, is instructive.  98 F.3d at 715-16. In that case, the Court held that statements made by a member of an organized crime and racketeering conspiracy while hiding from law enforcement at a co-conspirator's home were admissible against his codefendants, even though an indictment had been unsealed and several defendants arrested at the time the statements were made.  *Id.*  The statements at issue concerned "the activities of the enterprise and the various roles of the [defendants]," and prompted a co-conspirator to "respond in a way that facilitate[d]" further criminal activity.  *Id.* at 716.  The

Court held that the statements were made in furtherance of the charged conspiracy because, among other reasons, the "conspiracy was ongoing at least until the time of trial;" the purpose of the declarant's "presence in the [] household. . . was to avoid prosecution;" and "some members of the conspiracy found prison no obstacle to continuing their association with the enterprise." *Id.*  Here, as in *Persico*, the defendant, CC-1, and CC-2, acted with the apparent intent to shield the defendant from criminal prosecution, and to continue the secrecy and ongoing criminal activities of the organization they supported (*i.e.*, ISIL).  As the co-conspirator communications cited above make clear, the defendant not only was aware of, but in fact requested that, his co-conspirators create and distribute the YouTube Video for this very purpose.   Accordingly, because "the mere imprisonment of [a member of the conspiracy] does not precipitate the demise of the conspiracy," and because the communications regarding the creation of the YouTube Video all were in furtherance of the conspiracies with which the defendant is charged, they are admissible at trial.  *Id.* at 716.  *See also Glenn*, 98 F.2d at 728 (statements by co-conspirator to law enforcement officer that the co-conspirator "would have to talk to [the defendant] about getting the combination for the suitcase [containing drugs]" was admissible because it was "intended to prevent [law enforcement] from discovering the drugs [and facilitate] their escape from this unwanted police attention."); *United States* v. *Drozdowski*, 313 F.3d 819, 824 (3d Cir. 2002) (co-conspirator's false statements to state trooper during a car stop were admissible because they "were an effort to cover up the conspiracy").

Even if the YouTube Video and related communications did not contain statements during and in furtherance of the charged conspiracy, they would nevertheless be admissible.  The YouTube Video itself is admissible because it contains two categories of statements, both of

which qualify for applicable hearsay exceptions.  The first category of statements contained in

the video are CC-1's inculpatory assertions in which he identifies himself by name and age, and

announces his presence in ISIL-controlled territory.  Specifically, CC-1 states, "I'm an American

citizen currently residing in the Islamic State.  I came here and I made this video to let you know

that I came here out of my own will."  The Government intends to rely on these statements as

direct proof of the Indictment's allegations that the defendant and CC-2 conspired with CC-1,

and aided and abetted CC-1, to travel to Syria in order to join ISIL.  These assertions are plainly

against the declarant's penal interest because they corroborate his travel for the purpose of

joining a designated foreign terrorist organization, and therefore meet the requirements of Rule

804(b)(3).

As an initial matter, these statements meet Rule 804(b)(3)'s requirement concerning the

unavailability of a witness because CC-1 died fighting on behalf of ISIL and therefore is

"unavailable" to testify.  Fed R. Evid. 804(b)(3).  Moreover, CC-1's assertion that he is "residing

in the Islamic State" "expose[s] the declarant. . . to criminal liability" within the meaning of Rule

804(b)(3)(A) because it supports the Government's theory that CC-1 traveled to Syria to join a

designated foreign terrorist organization.  *United States* v. *Persico*, 645 F.3d 85, 102 (2d Cir.

2011) ("While [the] statements would not have been sufficient, standing alone, to convict

[declarant] of any crime, they would have been probative in a criminal trial against [declarant] to

show his membership in the [a criminal organization] and to support an inference that criminal

messages were passed.").  Finally, CC-1's statements are supported by extensive "corroborating

circumstances that clearly indicate [their] trustworthiness," Fed. R. Evid. 804(b)(3)(B), including

the circumstances set forth in Sections B(1) and B(2) above, as well as expected testimony from

a law enforcement witness and/or custodial witness authenticating the video.   Accordingly, these statements contained in the YouTube Video are admissible as against the declarant's penal interest.

In addition, these statements are not "testimonial" pursuant to the holding of *Crawford*, 541 U.S. at 36, and therefore do not implicate the Confrontation Clause.  Although CC-1 states in the video that he made "this video just to let the authorities know this," and that "[t]his is my statement, and use it however you wish," the creation of the video was prompted not by law enforcement, but by CC-2 and by the defendant himself for the apparent purpose of falsely exculpating the defendant ("Now I spoke with [the defendant], who is asking you to send video is very necessary.  Please and Please Send video[,] Ahmed says he is important").  Moreover, the video was sent not to "the authorities" but to CC-2 and other associates of the defendant.  Indeed, the Government located the video only months later while reviewing the contents of CC-2's Facebook account.  These facts underscore that the concerns underlying the Confrontation Clause are not implicated here.  *United States* v. *Williams*, 506 F.3d 151, 156 (2d Cir. 2007) (affirming as declaration against interest non-testifying co-defendant's admission to his associates that he had participated in the murder on trial); *accord United States* v. *Sebbern*, 641 F. Appx. 18, 23 (2d Cir. 2015), *cert. denied*, (U.S. Oct. 3, 2016) (letter sent from prison by non-testifying co-conspirator not testimonial); *United States* v. *Nighbert*, 2009 WL 393773, at *4 (E.D. Ky. Feb. 13, 2009) (holding that *Crawford* did not bar introduction of tape-recorded statements because "when the entire tapes are played[,] [the declarants'] words appear to exculpate, rather than incriminate, [the declarants] or anyone else [which] tends to undercut the defendant's argument that the statements were made with the intent to bear testimony against

him.").  More generally, CC-1's assertions—apparently made via home video from a location

inside ISIL-controlled territory—fall short of the "hallmarks of testimonial statements identified

in *Crawford*."  *Logan*, 419 F.3d at 179.  *See Crawford*, 541 U.S. at 51–52 (identifying as

testimonial "ex parte in-court testimony," "extrajudicial statements . . . contained in formalized

testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and

"statements that were made under circumstances which would lead an objective witness

reasonably to believe that the statement would be available for use at a later trial.").  *See also

Davis*, 547 U.S. at 840.

     The remaining statements contained in the YouTube Video are those in which the

defendant asserts, in substance, that no one—including the defendant—aided or assisted his

efforts to travel to ISIL-controlled territory.  ("I didn't come to this decision with anybody's

influence or anybody's recruitment.  I came here.  It was my decision and mine alone.  Nobody

financed me to come here. . . .  And nobody helped me along the way to get here—including

Ahmed Mohammed El Gammal, in America.")  These statements are also admissible because the

Government is not offering them for their truth.  Fed R. Evid. 801(c)(2).  Rather, the

Government will argue at trial that these statements are obvious falsehoods offered by CC-1 to

deceive others (including U.S. authorities) and falsely exculpate the defendant following his

August 26, 2015 arrest.  The Government therefore intends to rely on these statements to argue

that the defendant, CC-1, and CC-2 demonstrated consciousness of guilt through their efforts to

deceive others regarding their criminal conduct.  Such statements are admissible where, as here,

they are not offered for their truth.  *United States* v. *Aponte*, 31 F.3d 86, 88 (2d Cir. 1994)

(defendant's "fabricated statement and false descriptions were not offered for the truth of the

matter asserted and therefore were not hearsay").  Finally, such statements are not unfairly prejudicial because they concern the Government's core factual allegation in this case—namely, CC-1's decision to conspire with the defendant to travel to Syria to join ISIL.  Accordingly, they are no more or less inflammatory than the other evidence to be presented at trial, and their probative value far outweighs any purported prejudicial effect.  *Johnson*, 529 F.3d at 600.  *See* Fed. R Evid. 403.  Therefore, the statements are admissible pursuant to Rule 801(c)(2).[6]

Furthermore, the above-described communications between CC-1 and CC-2 concerning their decision to create the YouTube Video are similarly admissible.  First, such statements are not offered for their truth but, rather, will be offered to explain the circumstances under which CC-1 and CC-2 learned of the defendant's arrest and decided thereafter to create the YouTube Video. ("[CC-2: "You cause big problem for Ahmed. . . It [sic] is now in prison.").  Second, the statements are not offered for their truth because the Government will contend at trial that the statements were false—*i.e.*, they promoted the same false narrative contained in the YouTube Video concerning CC-1's purported lack of assistance from the defendant and others, which evidences consciousness of guilt and efforts by CC-1, CC-2, and the defendant to conceal evidence of an ongoing conspiracy.  ("[CC-2:] Do not leave yoru brother[.]  You have to tell them he had nothing to do by going to Syria.". . .  [CC-1:] "I will because it's true.")  Accordingly, these statements are not hearsay and are admissible pursuant to Rule 801(c)(2).

---

[6] The admission of these statements would not constitute a violation of the Confrontation Clause because "t[]he [Confrontation] Clause. . .  does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *Logan*, 419 F.3d at 177–79 (citing *Crawford,* 541 U.S. at 59 n. 9).

Alternatively, these communications concerning the YouTube Video are admissible as co-conspirator statements made during, and in furtherance of the charged conspiracy, for the same reasons set forth above with regard to the YouTube Video itself.  *See* Fed R. Evid 801(d)(2)(E).[7]

Finally, both the YouTube Video and the related communications described above are, like the CC-1 Letter, also admissible pursuant to the residual hearsay exception set forth in Federal Rule of Evidence 807 because they are highly probative of the material facts that CC-1 traveled to Syria to join ISIL (*i.e.*, the "Islamic State"); that he did in fact join ISIL; and that he and his co-conspirators took extensive measures both before and after his arrival in Syria to maintain secrecy in their—and ISIL's—methods for recruiting personnel and facilitating the travel of such personnel.  The conversations described above are extremely probative of these facts because they include implicit admissions by CC-1 of his efforts to join ISIL, and apparent efforts by CC-1, CC-2, and the defendant to conceal their ongoing conspiracy by falsely denying any involvement by the defendant and CC-1 in that conspiracy.  Similarly, the YouTube Video itself is highly probative of these facts because it contains extremely compelling live images of CC-1 wearing military attire and admitting to his presence in ISIL-controlled territory while denying (implausibly) that anyone assisted him in traveling to Syria or joining ISIL.

---

[7] These statements do not implicate the Confrontation Clause because, "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial." *Logan*, 419 F.3d at 79.  *See also Crawford*, 541 U.S. at 56.  *See also United States* v. *Shyne,* 617 F.3d 103, 108 (2d Cir. 2010) (statements in furtherance of conspiracy were non-testimonial and were thus not covered by protections of Confrontation Clause).

Accordingly, both the YouTube Video and the related communications cited herein are non-hearsay which is admissible at trial, or, to the extent the Court finds that they are hearsay, fall within an applicable exception to the rule against hearsay.

### III.     The Court Should Deny the Defendant's Request for a Jury Questionnaire

On October 3, 2016, the defendant submitted a proposed jury questionnaire to be used in connection with *voire dire*. (Docket No. 69). The Government respectfully submits that the traditional method of selecting a jury in this District—judge-conducted *voir dire*, in which the parties are allowed to submit further questions that the Court may ask if it considers them proper—is appropriate here.  There is no reason to use either a juror questionnaire or, as the defense also suggests, to have lawyer-conducted *voir dire*.

#### A.     Applicable Law

It is well-settled that "judges have been accorded ample discretion in determining how best to conduct the *voir dire*," *Rosales-Lopez* v. *United States,* 451 U.S. 182, 189 (1981), and that "an appellate court will not interfere with the manner in which it has been conducted absent a clear abuse of discretion."  *United States* v. *Salameh,* 152 F.3d 88, 121 (2d Cir.1998) (internal quotation marks omitted).  Indeed, the Second Circuit has stated that the methodology of *voir dire* is not only within the district court's discretion, but "quintessentially so."  *United States* v. *Lawes,* 292 F.3d 123, 128 (2d Cir. 2002).

Courts in the Southern District of New York have routinely exercised their substantial discretion to deny defendants' requests for written questionnaires, including in cases that were more high-profile, and involved more inflammatory allegations, than this one.  *See, e.g., United States* v. *Salameh*, 152. F.3d 88, 121 (2d Cir. 1998) (holding that district court did not abuse

discretion in declining to use a written questionnaire at the trial of the defendants allegedly

responsible for the 1993 World Trade Center bombing); *United States* v. *Tomero*, 486 F. Supp.

2d 320, 324 (S.D.N.Y. 2007) (denying request for questionnaire in RICO murder case involving

the acting boss of Genovese crime family).

 In addition, notwithstanding courts' significant discretion as to how to conduct jury

selection, attorney-driven *voir dire* is disfavored in the federal system, since the opportunity is

often abused to delay and to prejudice the jury.  *See, e.g., United States* v. *Barnes*, 604 F.2d 121,

142 n.10 (2d Cir. 1979) (citing "many articles relating abuses of attorney-controlled *voir dire*,

which suggest that a reasonable inquiry into the essentials raised in the particular case should be

sufficient, and that the trial judge should retain the discretion to apply limits.").

 **B.**  **Discussion**

 The defendant has made no showing that a written questionnaire or attorney-conducted

*voir dire* is necessary.

 As an initial matter, this is not, for example, a case that has received significant pre-trial

publicity.  *Cf. United States* v. *Stewart*, 433 F.3d 273, 303 (2d Cir. 2005) (jury questionnaire

used in trial of media personality Martha Stewart); *United States* v. *Rahman*, 189 F.3d 88, 121

(2d Cir 1999) (jury questionnaire used in trial of "Blind Sheikh" and co-conspirators concerning

1993 World Trade Center Bombing and additional plot to blow up bridges and tunnels in New

York City area).  A search of Lexis's "Major Newspapers" database for "El Gammal," for

example, shows the most recent news story related to this case was published in September 2015,

over a year ago.

Moreover, while the defendant is accused of assisting the travel of CC-1 to the Islamic State of Iraq and the Levant, he is not personally accused of committing any violent acts, much less attacks on innocent New Yorkers.  *Cf. Salameh*, 152 F.3d at 121 (jury questionnaire not used in trial concerning 1993 World Trade Center bombing).   The Government's proposed *voir dire* questions, which ask prospective jurors, for example, whether they could "fairly and impartially [view] a case involving" ISIL-related charges, Gov't Proposed *Voir Dire* ¶ 6; whether they have "feelings about Islam or Muslims" that would impact their ability to serve "impartially as a juror," *id.* ¶ 17; and about their general views on terrorism prosecutions, *id.* ¶¶ 11-12, serve to adequately screen out any potential jurors who may be unable to fairly and impartially serve in this case.

By contrast, juror questionnaires are time-consuming to create, and copying and reviewing completed questionnaires is a substantial administrative burden and time-consuming for both the Court and counsel.  There is no reason to believe that any written questionnaire would elicit a juror's views in any clearer or better fashion than the standard *voir dire* practices in this District.  Indeed, there is every reason to think that at least some potential jurors will find written responses ambiguous and confusing, ultimately requiring the very oral questioning that the defendant purportedly seeks to limit.  *See United States* v. *Treacy*, 639 F. 3d 32, 47 (2d Cir. 2011) (affirming decision to refuse use of jury questionnaires and noting the district court's expressed view that "jurors tended to understand written questions differently from those who drafted the questions, leading to substantial difficulty in parsing their responses").  Thus, in addition to consuming substantial time among the parties and the Court in pre-trial preparation, a written questionnaire is likely to consume an excessive amount of time at trial.  In-court *voir dire*

practice is more efficient, and has the added benefit of permitting the Court and counsel to observe the demeanor of prospective jurors in answering questions.

Similarly, there is no reason to think that attorney-conducted *voir dire* will be more effective at screening out potentially biased jurors than traditional judge-led *voir dire*.  Indeed, there are significant potential risks and inefficiencies with attorney-conducted *voir dire*.  As Judge Weinfeld observed over 30 years ago in denying a request for attorney-conduct *voir dire*:

> It is a blunt fact that at times the thrust of inquiry where lawyers conduct the *voir dire*, as in the state courts, is not to obtain a fair and impartial jury, but rather by a calculated effort to establish a rapport with a juror or jurors in the hope of encouraging partiality in favor of the client .   .   .   . It is notorious that in the state courts, where lawyers conduct the examination, the selection of a jury may take longer than the trial proper.   .   .   .

*United States* v. *Wilson*, 571 F. Supp. 1422, 1428–29 (S.D.N.Y. 1983) (footnote omitted).

In short, there is no reason why traditional, court-conducted *voir dire* would be ineffective in selecting a fair and impartial jury.  Accordingly, the Court should deny the defendant's request for a jury questionnaire.

\

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should issue an order (1) precluding reference to the fact that the FISA Materials were obtained through searches authorized pursuant to FISA, (2) permitting the Government to offer into evidence the above-referenced statements by CC-1 to Relative-1 and others concerning his support for ISIL, (3) permitting the Government to offer into evidence the CC-1 Letter, (4) permitting the Government to offer into evidence the YouTube Video and related communications, and (5) denying the defendant's request to use a jury questionnaire during *voire dire* at trial.

Dated: New York, New York
      October 17, 2016

                               Respectfully submitted,

                               PREET BHARARA
                               United States Attorney for the
                               Southern District of New York


By:     _____/S/_____
              Andrew J. DeFilippis
              Brendan F. Quigley
              Negar Tekeei
              Assistant United States Attorneys
              Tel.: 212-637-2231/2190/2482