UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -   x
UNITED STATES OF AMERICA          :
                                  :
        - v -                     :
                                  :          **15 Cr. 588 (ER)**
**AHMED MOHAMMED EL GAMMAL,**     :
          Defendant.              :
- - - - - - - - - - - - - - - - -   x


**DEFENDANT AHMED MOHAMMED EL GAMMAL'S MOTIONS IN LIMINE**


Federal Defenders of New York
Daniel Habib, Esq.
Annalisa Mirón, Esq.
Sabrina Shroff, Esq.
Attorneys for Defendant
    **Ahmed Mohammed El Gammal**
52 Duane Street – 10th Floor
New York, NY 10007
Tel.: (212) 417-8700


TO:     PREET BHARARA, ESQ.
        United States Attorney
        Southern District of New York
        1 St. Andrew's Plaza
        New York, NY 10007

Attn:   **Andrew DeFilippis, Esq.,**
        **Brendan Quigley, Esq.,**
        **Negar Tekeei, Esq.**
        Assistant United States Attorneys

Pursuant to Fed. R. Evid. 103(a), Ahmed Mohammed El Gammal submits these motions in limine.  See, e.g., United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995) ("[A] motion in limine may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge"').  We respectfully reserve the right to make further evidentiary objections, whether by motion in limine or at trial, as needed.

As we explain below, the government has not provided sufficient specificity regarding its intended trial evidence to enable the defense to move now on all objectionable material.  Thus, we have made several general MILs, e.g., regarding statements by the defendant and third parties.  But, in the interest of timely resolving some disputed questions -- involving evidence the government has told us that it plans to introduce and as to which we have definite objections -- we have also made some specific MILs, e.g., regarding El Gammal's jail calls, certain of Samy El-Goarany's statements, and the government's 404(b) notice.

At this juncture, the defense moves:

- For an order requiring the government to specify, from its draft exhibit list, the particular material that it intends to introduce at trial, and to provide final English-language translations, both by October 31, 2016;

- To preclude El Gammal's statements, generally, on grounds of relevance and prejudice;
- To preclude El Gammal's jail calls;
- To preclude El Gammal's general statements about ISIL and Middle Eastern politics in general pursuant to the First Amendment and 18 U.S.C. § 2339B(i);
- To preclude statements of third parties, generally, on grounds of relevance, prejudice, and hearsay;
- To preclude certain statements by Samy El-Goarany, viz., his communications with "Mustafa Tarek" (GX-110-D); a video in which El-Goarany purports to speak from inside "the Islamic State" (GX-143); posts from his @AbuMurad_IS Twitter account (GX-301); and a letter to El-Goarany's family that is said to confirm his death (GX-1000);
- To preclude the government's Rule 404(b) evidence.

## 1.   Specification of Government's Evidence and Provision of Final Translations.

At the threshold, the defense requests that this Court order the government to specify, from the hundreds of thousands of pages and gigabytes of data produced in discovery (and reproduced in its draft exhibit list) the particular material that the government intends to introduce at trial.  Numerous courts have granted such requests.  See, e.g., United States v. Chalmers, 474 F. Supp. 2d 555, 572-73 (S.D.N.Y. 2007); United States v. Giffen, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004); United States v. Upton, 856 F. Supp. 727, 748 (E.D.N.Y. 1994); United States v. Turkish, 458 F. Supp. 874, 882 (S.D.N.Y. 1978). The defense also requests that this Court set a firm date of October 31, 2016, which is five weeks from trial, for the production of final English-language translations of the

government's exhibits.  That time is necessary for the defense
to evaluate the translations with our client and with the
assistance of our own Arabic-language expert.

      As this Court has observed, <u>see</u> 8/2/15 Status Conf. Tr. 29-
30, the government has produced "voluminous discovery" in this
case, much of it in Arabic, and much of it (now, as then)
untranslated.  The defense has several times attempted, without
success, to clarify the scope of the government's anticipated
trial presentation.  On July 12, 2016, the defense requested,
pursuant to Fed. R. Crim. P. 12(b)(4)(A) and (B), "notice ... of
any evidence that the government intends to use at trial, so
that El Gammal may have the opportunity to object before trial."
<u>See</u> Def't Discovery Letter (July 12, 2016), at 5.[1]  In
particular, the defense requested that the government "specify
which of El Gammal's prior statements, of the thousands
produced, the government intends to use at trial."  <u>Id.</u>  The
government did not respond to this request.

      Next, the defense sought, and this Court ordered, the
production of the government's draft exhibit list on October 3,
2016.  <u>See</u> 8/2/16 Status Conf. Tr. 29-30; Dkt. No. 54.  That
list has unfortunately proved of little use in formulating the
defense's motions in limine or in preparing for trial in

_____

[1] El Gammal will provide the Court with a CD containing relevant
exhibits.

general.  In substance, the list merely reorganizes the
government's discovery production, enumerating 130 exhibits,
some of them tens of thousands of pages long, without specifying
what material in those exhibits the government intends to
present to the jury.  For example:

- **GX-1-B-N**: "Videos from Toshiba Laptop." The government has
  produced 14 such videos, running more than 85 minutes in
  length, almost all in Arabic.  **GX-1-BT-NT**, "Translations of
  Videos," appears on the government's exhibit list but has
  not been produced to the defense.
- **GX-100**: "El Gammal 5/12/15 Facebook SW." The return from
  the search warrant executed on El Gammal's Facebook account
  runs 28,673 pages.  See also **GX-102** ("El Gammal 8/26/15 FB
  warrant") (1,220 pages).  To be sure, the government's
  draft exhibit list includes excerpts from that report, but
  those overbroad excerpts likewise offer little guidance as
  to the government's expected evidentiary presentation.
  See, e.g., **GX-100-C** ("CC-2 - El Gammal messages from El
  Gammal 5/12/15 FB SW") (484 pages of Facebook messages,
  spanning almost two years, between El Gammal and Attia
  Aboualala"); **GX-100-E** ("El Gammal-Mah Moud messages from El
  Gammal 5/12/15 FB SW") (372 pages of Facebook messages,
  spanning almost two years, between El Gammal and an
  individual with the username "Mah Moud").
- **GX-110**: "CC-1 3/19/15 FB SW return." The return from the
  search warrant executed on El-Goarany's Facebook account
  runs 43,764 pages.  See also **GX-111** ("CC-1 5/12/15 FB SW
  return") (144 pages); **GX-112** ("CC-1 8/26/15 FB SW return")
  (184 pages); **GX-113** ("CC-1 3/19/16 FB return") (32,271
  pages); **GX-114** ("CC-1 11/17/15 FB returns") (1,015 pages).
  Once more, the listed excerpts sprawl.  See, e.g., **GX-110-D**
  ("CC-1 messages with Mustafa Tarek from 3/19/15 FB SW")
  (1,126 pages of Facebook messages, spanning almost four
  years, between El-Goarany and an individual with the
  username "Mustafa Tarek").
- **GX-120**: "CC-2 5/26/15 FB SW."  The return from the search
  warrant executed on Aboualala's Facebook account runs
  98,301 pages, almost all in Arabic.  See also **GX-122** ("CC-2
  3/19/16 FB SW") (99,626 pages).  The listed excerpts
  likewise run long.  See, e.g., **GX-120-A** ("CC-2-Gammal

messages from 5/26/15 FB SW") (573 pages of Facebook messages between El-Gammal and Aboualala).

Since receiving this list, the defense asked the government to confirm, from these exhibits, the particular material -- the messages, posts, records, etc. -- that the government intends to introduce.  Consistent with its practice in this case, the government refused to do so.  The government has also refused to tell the defense when its final translations will be done.

The defense cannot prepare for trial or make appropriate evidentiary objections under these conditions.  Moreover, the defense is compelled to point out that, despite having flagged this issue at the August 2, 2016 status conference, the government has not produced even preliminary translations of much of the Arabic source material here, and has refused to provide a firm date on which it will produce final translations. Without focus, El Gammal will be denied due process, in violation of the Fifth Amendment, and will be unable to present a complete defense, in violation of the Sixth Amendment.

Consequently, the defense requests that this Court order the government to specify by October 31, 2016, from its draft exhibit list, the individual communications and records that it intends to introduce at trial.  The defense also requests a firm date of October 31, 2016, for final translations of the government's exhibits.  This request is consistent with this District's practice under Fed. R. Crim. P. 16 and a district

court's inherent authority to regulate discovery.  See, e.g., Chalmers, 474 F. Supp. 2d at 572-73 (Chin, J.) (ordering pretrial disclosure of government's "preliminary trial exhibit list and copies of those exhibits" in light of "the large volume of documents produced by the Government thus far, a significant portion of which are in Arabic and have yet to be translated by the Government"); Giffen, 379 F. Supp. 2d at 344 (Pauley, J.) (same, in light of government's production of "approximately 450 boxes of documents, containing more than one million pages"); Turkish, 458 F. Supp. at 882 (in case involving 25,000 documents, ordering government "to identify to the defendants those documents which it intends to offer, or to use or to refer to in connection with the testimony of any witness, on its case in chief" and "to identify any other documents when and if a decision is made between now and trial to offer or to use or to refer to such documents").  As Judge Glasser explained in Upton, "[t]he purpose of requiring the government to identify which documents it will rely upon at trial in a situation such as this -- where there are thousands of documents -- is to allow the defendant to adequately prepare his or her defense.  General familiarity with the nature of the documents, as in this case, will not allow defendants to do that."  856 F. Supp. at 748.

This Court also has authority to order the requested disclosure under Fed. R. Crim. P. 12(b)(4)(B), which provides:

6

"At the arraignment or as soon afterward as practicable, the defendant may, in order to have the opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief in trial) any evidence that the defendant may be entitled to discover under Rule 16." The 1974 Advisory Committee's Note clarifies that Rule 12(b) "provides a mechanism for insuring that a defendant knows of the government's intention to use evidence to which the defendant may want to object," in order to promote the efficient pretrial disposition of evidentiary objections. The Note adds that "the committee believes that attorneys for the government will in fact comply and that judges have ways of insuring compliance." Although Rule 12 by its terms addresses motions to suppress, its rationale -- giving defendants notice of the government's evidence to facilitate the litigation of evidentiary matters without disrupting and delaying trial -- applies with equal force and a fortiori to motions in limine.

As relevant, the government's undifferentiated production of Rule 16 discovery, without further specificity, does not meet Rule 12(b)(4)(B)'s notice requirement. See United States v. De La Cruz Paulino, 61 F.3d 986, 993 (1st Cir. 1995) (open-file policy "does not, in and of itself, satisfy this notice requirement because it does not specify which evidence the government intends to use at trial" (quoting United States v.

Brock, 863 F. Supp. 851, 868 (E.D. Wis. 1994)).  Thus, disclosure that merely reproduces voluminous discovery "does not satisfy [Rule 12(b)(4)(B)] because 'the defendant is still 'left in the dark' as to exactly what evidence, discoverable under Rule 16, the government intends to rely upon in its case in chief at trial.'"  Id. (quoting United States v. Kelley, 120 F.R.D. 103, 107 (E.D. Wis. 1988)).  Relying on this Rule, courts in this Circuit have ordered the government to narrow the focus of a massive discovery production.  See, e.g., United States v. Fell, 2015 U.S. Dist. LEXIS 165835 (D. Vt. Dec. 2, 2015); United States v. Jacobs, 650 F. Supp. 2d 160, 171-72 (D. Conn. 2009); see also United States v. Lujan, 530 F. Supp. 2d 1224, 1246 (D.N.M. 2008) (collecting cases).[2]

## 2.   Preclusion of Defendant's Statements, Generally

With little specificity as to which of El Gammal's statements, from the tens of thousands of pages of relevant discovery produced, the government intends to introduce at trial (and no final translations), the defense is constrained to make a general objection to the admission of all such statements on grounds of relevance and prejudice, Fed. R. Evid. 401-403.

---

[2] This Court also has authority to order the requested disclosures pursuant to Fed. R. Crim. P. 57(b), as well as this Court's inherent authority to regulate discovery, see United States v. Cannone, 528 F.2d 296 (2d Cir. 1975).  The Fifth Amendment right to due process and the Sixth Amendment right to present a complete defense also require disclosure.

Rule 401 provides that evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  Rule 402 provides that relevant evidence is generally admissible, but "irrelevant evidence is not admissible."  Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Applying those principles, many of El Gammal's statements are plainly inadmissible.  Some are irrelevant.  See, e.g., GX-100-D and GX-100-D-T, p.842 (September 13, 2014 Facebook post linking to newspaper article entitled "Egypt issues stamps to mark new Suez Canal – but uses pictures of Panama Canal").  Some are unduly prejudicial as well.  See, e.g., GX-100-E and GX-100-E-T, pp.16,353-16,360 (July 15-16, 2014 Facebook discussion between El Gammal and "Mah Moud" regarding pro-Israel bias in the American media); GX-100-L and GX-100L-T, pp.1936-37 (July 5, 2014 Facebook post containing an image entitled "The Rightful Islamic Caliphate" and reproducing a hadith of Muhammad discussing the concept of the caliphate in Islamic theology, but making no reference to ISIL).  But without notice from the

9

government as to what statements it plans to introduce, the defense is not in a position to go line-by-line through the thousands of pages in the proposed exhibits to identify all such objections.  Consequently, the defense reiterates its MIL No. 1 and demands that the government, as the proponent of El Gammal's statements, first identify a relevance theory, see Fed. R. Evid. 401 and 402, for each that it seeks to admit, so that we can respond.

**2A.  Preclusion of Specific Statements by Defendant**

<u>1.   El Gammal's Prison Calls</u>

Although absent from its exhibit list, the government recently indicated that it may introduce four calls El Gammal made from the Arizona detention center where he was detained before being brought to New York.  The government has yet to identify exactly which portions of the calls it will seek to introduce.  Nor has the government served 404(b) notice relating to the calls.  Thus the basis for the calls' admissibility is presently unclear to the defense; what remains clear is only their improper prejudicial effect.

A significant portion of the recorded calls pertain to El Gammal's desire to retain private counsel and for counsel to file a bail appeal on his behalf. These topics are irrelevant to trial and their admission would impinge upon El Gammal's Sixth Amendment right to counsel and a fair trial.

10

When not discussing the issue of representation, El Gammal's mother indicates that she has been in contact with Aboualala, as well as El-Goarany's father about gathering evidence for El Gammal's defense.  Her statements constitute classic inadmissible hearsay.  For his part, El Gammal's statements indicate that he wants nothing to do with his family's attempts to gather evidence on his behalf. Indeed he is surprised and concerned that Aboualala has asked for a video to be made by El-Goarany (a reference to GX-143).

Even if El Gammal's phone calls from prison meet the threshold for relevance, the calls should still be excluded because the probative value is outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury pursuant to Rule 403.  See, e.g., United States v. Condon, 720 F.3d 748 (8th Cir. 2013).

Finally, the calls should be precluded because their limited probative value is strongly outweighed by the prejudicial effect of referencing El Gammal's status in custody. As the Supreme Court has explained in the context of defendant's prison clothing, "The presumption of innocence ... is a basic component of a fair trial under our system of criminal justice ... to implement the presumption, courts must be alert to factors that may undermine fairness of the fact-finding process. In the administration of criminal justice, courts must carefully

guard against dilution of the principle that guilty is to be established by probative evidence and beyond a reasonable doubt." <u>Estelle v. Williams</u>, 425 U.S. 501, 503 (1976) (citing <u>In re Winship</u>, 397 U.S. 358, 364 (1970)).

**2B.  Preclusion of Defendant's Statements Regarding ISIL Pursuant to the First Amendment and 18 U.S.C. § 2339B(i).**

The government's draft exhibit list contains several statements in which El Gammal communicates his views about ISIL and Middle Eastern politics in general terms in public Facebook posts and with persons not alleged to be co-conspirators.  <u>See, e.g.</u>, GX-100-E and GX-100-E-T, p.16,229 (April 25, 2014 Facebook message to "Mah Moud") ("I was never with the Free Syrian Army. I was with Jabhat al Nusra and at the time with the State."); GX-100-O and GX-100-OT, pp.21,730, 21,734 (July 1, 2014 Facebook conversation with "Huda Ali") ("If Daesh gets to Egypt I will join them so I can torture the Egyptians and whip them. ... I hope they get to Egypt. ... I am willing to live in a tent under an Islamic State instead of all the luxuries under an Infidel state.").  The defense moves to preclude these and similar statements, i.e., statements regarding El Gammal's beliefs about ISIL and Middle Eastern politics in general made to persons not involved in the charged conspiracy.

The First Amendment protects the rights to freedom of speech and association.  Section 2339B(i) provides: "Nothing in

this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." In light of those constitutional and statutory provisions, the Supreme Court has held that "under the material-support statute," i.e., § 2339B, individuals "may say anything they wish on any topic" and "may speak and write freely about" ISIL. Holder v. Humanitarian Law Project, 561 U.S. 1, 25-26 (2010). "The statute does not prohibit independent advocacy or expression of any kind." Id. And § 2339B "does not prohibit" persons from "becoming members" of ISIL "or impose any sanction on them for doing so." See also United States v. Farhane, 634 F.3d 127, 137 (2d Cir. 2011) (§ 2339B "does not prohibit independent advocacy of any kind" and "does not prohibit or punish mere membership in or association with terrorist organizations").

To admit evidence of lawful statements expressing awareness of, support for, or even membership in foreign terrorist organizations such as ISIL to prove guilt would contravene the First Amendment, § 2339B(i), and the express holdings of Humanitarian Law Project and Farhane. Sustaining a conviction on the basis of protected speech would "apply" the material-support statute so as to "abridge" El Gammal's First Amendment rights. § 2339B(i). To be clear, the defense does not disagree with the general proposition that words that themselves

13

constitute crimes -- e.g., the words that a defendant uses to join and further a criminal conspiracy -- lack First Amendment protection.  But in the context of a statute that expressly precludes any construction or application that would "abridge" First Amendment rights, to base a conviction on core protected speech -- i.e., political speech on a matter of public concern, see, e.g., Frisby v. Schultz, 487 U.S. 474, 479 (1988) -- would be unlawful.  The government can prove El Gammal's knowledge and intent through communications with his alleged co-conspirators El-Goarany and Aboualala regarding ISIL, but inviting a jury to convict him based on lawful speech, no matter how unpopular, would "abridge" core First Amendment rights.

3.   **Preclusion of Third-Party Statements, Generally**

As discussed above, the government has produced thousands of statements by third parties, including El-Goarany and Aboualala.  As with MIL No. 2, the defense objects on grounds of relevance and prejudice to all such statements.  See Fed. R. Evid. 401-403.  In addition, the defense objects that all such statements constitute inadmissible hearsay.  Rule 801(c) provides that "hearsay" is "a statement that the declarant does not make while testifying at the current trial" that "a party offers in evidence to prove the truth of the matter asserted in the statement."  Hearsay is generally inadmissible.  Rule 802. The government will not call El-Goarany or Aboualala, so the

14

defense requests that it identify the hearsay exception or other legal basis for admission of any of their statements.

To the extent that the government relies on the co-conspirator exclusion, see Rule 801(d)(2)(E), we note that the government must show "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Mandell, 752 F.3d 544, 552 (2d Cir. 2014) (quoting United States v. Coppola, 671 F.3d 220, 246 (2d Cir. 2012)).

In determining when the conspiracy began and ended, this Court considers "'the scope of the conspiratorial agreement, for it is that which determines ... the duration of the conspiracy.'" United States v. Roshko, 969 F.2d 1, 7 (2d Cir. 1992) (quoting United States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir. 1982)). "Once we have ascertained the scope of the conspiracy, we must then determine when it terminated, keeping in mind that a conspiracy continues 'until its aim has been achieved.'" Id. (quoting United States v. Rucker, 586 F.2d 899, 906 (2d Cir. 1978)). The government has alleged a conspiracy to provide material support, in the form of personnel (i.e., El-Goarany) to ISIL, and a conspiracy for El-Goarany to receive military-type training from ISIL. Based on the government's

Rule 16 productions, we see no evidence that the conspiracy
began earlier than August 14, 2014, when El-Goarany and El
Gammal began communicating in earnest on Facebook.  See also
Complaint (Dkt. No. 1) ¶¶ 17, 20 (indicating that El Gammal and
El-Goarany spoke about the latter's desire to travel to Syria in
"the latter half of 2014" and citing Facebook communications
beginning on August 14"); id. ¶ 21 (El Gammal and Aboualala
began attempting to facilitate El-Goarany's travel "[d]uring the
fall of 2014").  Likewise, the conspiracy ended by "early 2015,"
when, the government alleges, El-Goarany had joined ISIL (i.e.,
had been "provided" to ISIL) and "received military-type
training from ISIL," Indictment (Dkt. No. 3), ¶ 4(d).  See,
e.g., United States v. Lovell, 16 F.3d 494, 497 (2d Cir. 1994)
("[A] conspiracy ... endures until its objectives are either
completed or abandoned."); Roshko, 969 F.2d at 7-8 (conspiracy
terminated when its "singular objective, as alleged in the
indictment, was achieved"); United States v. Costello, 222 F.2d
656, 662 (2d Cir. 1955) (conspiracy "necessarily had terminated
on the achievement of [its] objective").  Consequently, Rule
801(d)(2)(E) can only operate to admit statements made between
August 14, 2014 and early 2015.

In addition, to come within Rule 801(d)(2)(E), a statement
must also have been made "in furtherance of" a conspiracy.  "In
general, this requirement bars 'mere narratives of past

successes and failures,'" and "narrative declarations that do not serve conspiratorial purposes do not satisfy the furtherance requirement."  Weinstein's Fed. Evid. § 801.34[5].  In particular, a co-conspirator's statement that is "entirely retrospective" does not qualify, United States v. Lieberman, 637 F.2d 95, 102 (2d Cir. 1980), unless it serves "some current purpose in the conspiracy," United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994).  Consequently, even as to statements made "during" the relevant time frame, the government must show a purpose to further the conspiracy's goals, not just a recapitulation of past events.

To the extent that the government relies on the exception for statements against penal interest, Fed. R. Evid. 804(b)(3), it must prove unavailability, see id. R. 804(a)(1).  The government takes the position that El-Goarany is deceased, but, as discussed below, the defense disagrees that GX-1000 establishes that fact.  As to Aboualala, he resides in Turkey and is represented by counsel, so the government must show why it cannot procure his attendance and testimony as a prerequisite to the admission of any of his statements under this Rule.

**3A.  Preclusion of Specific Third-Party Statements**

1.  <u>GX-110-D: "CC-1 messages with Mustafa Tarek from 3/9/15 FB
    SW"</u>

    As discussed above (MIL No. 1), the government's draft

exhibit includes GX-110-D, Facebook messages between El-Goarany

and a person with the username "Mustafa Tarek."  Those messages,

as produced in discovery, run 1,126 pages and the government has

not specified which messages it seeks to introduce.  To the

extent that the government intends to introduce the August 14,

2014 communications excerpted in the Complaint (¶ 20(c))

concerning an alleged post by someone "Mustafa Tarek" calls "El

Jammal," that evidence should be precluded as hearsay,

irrelevant, and prejudicial.

    In that Facebook conversation, <u>see</u> GX-110-D, pp. 2143-51,

 "Mustafa Tarek" tells El-Goarany that he wants to send him a

picture of "a kid pulling a dead man from his hair and smiling

... a kid with da3ish .. they killed this man and ikhwan says he

was a pious sheikh in ... Iraq."  "Mustafa Tarek" adds: "one of

the ikhwans I know shared the pic and insulted da3ish ..

surprisingly I found El Jammal commenting saying: seriously kos

omak, El dawla (he means da3ish) will continue to expand. ...

but El Jammal is so hostile in his opinions, I don't know him

well anyway."  El-Goarany responds: "and for Jammal he's a good

dude but he's a little crazy sometimes haha ... ive known him

for a while."  "Mustafa Tarek" repeats: "I was just looking at the comments section at that ikhwani bro and I found jammal insulting cuz he defends da3ish."  El-Goarany asks: "im confused ... jammal was defending the ikhwani? or defending da3ish?" "Mustafa Tarek" clarifies: "da3ish ... saying to the ikhwani kos omak ... the dawla will continue to expand."

First, to the extent that these communications are offered to prove that El Gammal made the statements attributed to "El Jammal" or "jammal," they are hearsay.  Indeed, the reliability concerns underlying the hearsay rules have special force here, where there is no evidence that this picture was ever posted to Facebook or that anyone, let alone El Gammal, made the comments described.  Second, the evidence is irrelevant because it is not clear that "El Jammal" or "jammal" is in fact El Gammal.  The government has executed four searches of El Gammal's Facebook account, and if he had made these comments, the government would have found evidence of it.  Third, the evidence -- which imagines a brutal killing and implicates a child soldier -- is highly inflammatory and needlessly prejudicial.  The evidence should be excluded.  If, however, this Court elects to admit these statements to show their effect on the listener (El-Goarany), then (i) the jury should be so instructed, and should further be instructed that there is no evidence that El Gammal made the comments described; and (ii) the statements should be

redacted to remove any references to their (imaginary) content,
viz., a killing involving a child solider.

2.   GX-143: "CC-1 Video sent from CC-2 to Marwa El Gammal"

     GX-143 is a video that was produced shortly after El
Gammal's arrest, which depicts El-Goarany sitting on a mat in a
sparsely decorated room.  For the first minute or so, El-Goarany
states his name, explains that he is a United States citizen and
that he is "currently residing in the Islamic State."  He also
explains that nobody helped him arrive there, and that he
purchased his airline ticket with his own money. At the end of
the video, El-Goarany explicitly says that El Gammal did not
assist him in traveling or arriving in the Islamic State.

     As an initial matter, at least part of the video -- the
minute or so where El-Goarany indicates that he traveled to the
Islamic State -- is being offered for the truth of the matter
asserted and therefore constitutes inadmissible hearsay under
Fed. R. Evid. 801 and 802.  The first part of the video, which
is being offered for the truth of the matter asserted, is
inadmissible hearsay.  It falls under no exception to the
hearsay rule.  It does not qualify as a co-conspirator statement
because the main objective of the conspiracy - providing
material support in the form of personnel to ISIS had ended by
that point.  See Anderson v. United States, 417 U.S. 211, 218-
19, (1974); Weinstein's Federal Evidence, § 801.34[4][a]; supra,

MIL No. 3.  Nor does it qualify under the statement against penal interest exception, Rule 804(b)(3), because, when made, the statement had no chance of exposing El-Goarany to criminal liability: as he explained, he was completely out of the grasp of United States law enforcement in Syria.

Additionally, the entire video should be precluded as overly prejudicial.  As the government does not believe El-Goarany's statement about El Gammal's lack of involvement is true, the government's purported reason for offering the video is to impeach El-Goarany or to argue that he engaged in misconduct by attempting to cover up El Gammal's alleged involvement.  This is problematic for a few reasons.  First, El-Goarany's uncharged conduct in attempting to "cover up" an alleged co-conspirator's involvement constitutes bad acts evidence which is inadmissible against El Gammal. Additionally, if El-Goarany is unavailable to testify at El Gammal's trial, he cannot further explain the ways in which El Gammal did not facilitate his travel.  In this sense, the video is unreliable and overly prejudicial and should be precluded under Rule 403 and the Due Process Clause of the Fifth Amendment.

3.   GX-301: "Abu Murad_IS SW Return"

GX-301, the contents of El-Goarany's second Twitter account (under the handle @AbuMurad_IS), is not admissible.  The statements do not qualify as co-conspirator statements under

Rule 801(d)(2)(E) because they were made after the alleged
conspiracy ended.  The first tweet was made on May 11, 2015, and
the latest possible overt act in furtherance of the conspiracy,
even according to the Indictment, was performed on May 7, 2015.
(As explained above, see supra MIL No. 3, the better view is
that the conspiracy ended in "early 2015," after El-Goarany had
been "provided" to ISIL and had received military-type training.
But even indulging the government, this account falls outside
the conspiracy's temporal scope.)  See Anderson, 417 U.S. at
218-19.  These Twitter comments have limited probative value.
There is no evidence that El Gammal viewed the statements (he
was not following the account), adopted them, or even replied to
them.  The statements are inflammatory and overly prejudicial.
Therefore they should be precluded under Rule 403.

4.   GX-1000: "Letter from CC-1 to family"

GX-1000 is a four-page letter purportedly created by El-
Goarany and delivered to a member of his family through an
unknown third person.  The letter purports to inform El-
Goarany's family that he has died.  Based on the information to
date received by the defense, this letter cannot be
authenticated.  Nobody can confirm that the letter was written
by El-Goarany.  There is no clear chain of custody, and indeed
the original letter is not in the possession of the government,
only a photocopy of the letter is.  As such, the letter cannot

be authenticated and its admission would violate Fed. R. Evid. 1002, which requires the production of an original writing "in order to prove its content."

Additionally, the letter is inadmissible hearsay.  The government's clear motive in submitting it is to prove the truth of the statements within, including "If you're reading this then know that I've been killed in battle."  Similarly, the author's statement to the reader -- "See how my life has changed since I came to the Land of Islam, you are a witness to the transformation" -- is being offered to prove he joined the "Land of Islam."  The letter would not qualify under any hearsay exception and should be precluded on that ground.

The rule barring the admission of hearsay evidence is generally concerned with the reliability of evidence, as well as fairness and due process.  As far as the defense is aware, the statements regarding El-Goarany's projected death in battle are unreliable.  Indeed, El-Goarany had written to his brother in the weeks prior to the receipt of the letter (and after learning the news that the government suspected he joined ISIS) that he might have to fall out of contact.  El-Goarany wrote: he "might have to disappear for a bit. Maybe ever. It would only be for your own safety, because.. as you can see I am clearly being monitored now."  He later wrote that "I haven't made a decision yet. Just warning u so u don't get surprised if I do."  It is

23

not beyond the stretch of the imagination that the letter was written so that El-Goarany could "disappear."

Finally, the letter's limited probative value is strongly outweighed by the unduly prejudicial effect of referencing El-Goarany's death, especially when the government cannot otherwise prove that fact. The limited probative value -- that El-Goarany "fought in battle" and "came to the Land of Islam" -- can be established through other means. For example, El-Goarany's Facebook communications with his brother explain that he was in training and injured by gunfire. The extremely prejudicial nature of evidence relating to El-Goarany's purported death would inflame the passions of the jury and distract from the critical issues at this trial. Any such evidence should be precluded as irrelevant and overly prejudicial.

## 4.    **Fed. R. Evid. 404(b) Evidence**

Rule 404(b)(1) provides: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But Rule 404(b)(2) provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The government has served notice of four prior acts that it seek

to introduce under Rule 404(b).  See Gov't 404(b) Letter (Oct.
3, 2016).  None should be admitted.

1.  "Milestones"

    The government intends to introduce evidence of El Gammal
and El-Goarany's "receipt of the book Milestones by Sayyid Qutb
on or about June 21, 2009."  This is pure propensity evidence,
and weak evidence at that; the government plainly plans to call
Qutb a jihadi and lump El Gammal in with him.  At the threshold,
there is no evidence that El Gammal read this book (as would be
necessary to support a Rule 404(b) inference) -- only that he
received it, in a .pdf file, more than five years before the
government alleges that the charged conspiracies commenced.  See
United States v. Trujillo, 376 F.3d 593, 605 (2d Cir. 2004)
(before admitting Rule 404(b) evidence, "the district court must
decide whether there is sufficient evidence that the other act
in question actually occurred").

    In addition, the Second Circuit has held that when prior
act evidence is offered to prove a defendant's intent or
knowledge, it must be similar to the charged offense.  United
States v. LaFlam, 369 F.3d 153, 156 n.1 (2d Cir. 2004) (per
curiam); see also United States v. Brand, 467 F.3d 179, 197 (2d
Cir. 2006) (government must show "similarity or some connection"
of prior act evidence to charged crime, in order to establish
that the prior act is relevant to a disputed element, such as

intent); <u>United States v. Gordon</u>, 987 F.2d 902, 908 (2d Cir. 1993) (probative value of other-act evidence depends largely on whether or not there is a "close parallel" between the crime charged and the acts shown).  "Rule 404(b) does not authorize the admission of any and every sort of other-act evidence," <u>Gordon</u>, 987 F.2d at 908; the other act must be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence."  <u>Id.</u> (citing <u>United States v. Peterson</u>, 808 F.2d 969, 974 (2d Cir. 1987)).  Here, there is no relationship between receiving a book and participating in a conspiracy to provide material support to a terrorist organization.

Nor is this evidence admissible to prove motive. <u>Milestones</u>, a lawful, mainstream religious tract written more than 50 years ago, has little to do with present-day ISIL. <u>Milestones</u> is available on Amazon (http://amzn.to/2divz7R), and appears on college syllabi (http://bit.ly/2eableC).  Evidence that El Gammal received a copy of <u>Milestones</u> would be little different from evidence that he owned a Qur'an, i.e., far too generic to support the necessary inference.  Indeed, modern-day critics have observed the disconnect between Qutb and ISIL: "[T]he Islamic State disdains other Islamists who reason by analogy to adapt to changing context —- including the Muslim

Brotherhood [and] its controversial midcentury thinker Sayed Qutb." David D. Kirkpatrick, <u>ISIS' Harsh Brand of Islam Rooted in Austere Saudi Creed</u>, N.Y. Times (Sept. 24, 2014), http://nyti.ms/1stjC0C. <u>Milestones</u> contains no language approving or encouraging ISIL's present-day activities.

Finally, if the government introduces this evidence, then the defense intends to introduce excerpts from <u>Milestones</u> (so that the jury can make up its own mind regarding the accuracy of the government's preferred inference), including the following, all from the chapter entitled "Jihad in the Cause of Allah":

- "Islam does not force people to accept its belief, but it wants to provide a free environment in which they will have the choice of beliefs." (p.65)
- Islam "forbids the imposition of its belief by force, as is clear from the verse 'There shall be no compulsion in religion.'" (p.66) (quoting Qur'an 2:256)
- "It is not the intention of Islam to force its beliefs on people .... When Islam releases people from ... political pressure and presents to them its spiritual message, appealing to their reason, it gives them complete freedom to accept or not to accept its beliefs." (p.70)

No doubt, the government has a different interpretation of this text. But admitting this evidence will spawn a mini-trial (complete with expert and rebuttal expert opinion testimony) about a dusty religious tome that the government can't even prove El Gammal read.

2.   <u>Anwar al-Awlaki</u>

The government also intends to introduce El Gammal's August 2014 statements "to the effect that Anwar al-Awlaki 'was really

27

committed to the cause ... and his words still apply today,'" as
well as El Gammal's statements that he uploaded videos of al-
Awlaki's lectures to YouTube.  As to the "committed" statement,
the defense disputes the accuracy of the government's
translation (and has told the government so), and must await the
government's final translation before finalizing its motion.  As
to the uploads, without evidence the specific content of the
videos El Gammal is alleged to have uploaded, the government
cannot prove a relationship between those videos and one of the
permitted purposes under Rule 404(b)(2).  Presumably, the
government intends to show that al-Awlaki preached violent
jihad, and to ask the jury to infer from El Gammal's endorsement
of his lectures that those lectures shaped El Gammal's mental
state.  No question, some of al-Awlaki's lectures would support
that inference, but many of them addressed more mundane
questions of Islamic theology (e.g., "Obesity and overeating in
Islam," "Marriage in Islam," "Love of wealth," etc.).  <u>See,
e.g.</u>, <u>http://bit.ly/2dJu9zi</u>.  Indeed, the only evidence of the
specific content of the videos El Gammal is said to have
uploaded is the statement that al-Awlaki "accused the Arab
leaders and the sheikhs as being followers of Zionism."  GX-100-
E-T, p.16,398.  Uploading two of al-Awlaki's lectures does not
prove that El Gammal's mental state reflected the totality of
al-Awlaki's political or religious philosophy -- nor would, say,

28

uploading two of George W. Bush's speeches prove the uploader's endorsement of evangelical Christianity or the war in Iraq. Again, admission of this evidence will compel the defense to respond by developing a more nuanced portrait of al-Awlaki for the jury, necessitating another trial-within-a-trial.

3.   "Military Action"

The government intends to show that on January 23, 2014, El Gammal engaged in a confusing exchange with Aboualala regarding setting up positions "close to every station at a distance of 500 meters."  See "Ateia-Gammal FB comms," Bates pp.23-0750 to 23-0756.  As is evident from the full exchange, El Gammal and Aboualala are discussing someone else's "vision" or "dream" that a million and a half supporters come out to sit in the street for a few days starting January 24, 2014.  They will win by spreading out near the stations, to avoid being bombed or killed by snipers just as protesters were killed in Rabaa Square, Egypt, in 2013 (a protest in which Aboualala and El Gammal first participated).

Nothing about this exchange is direct evidence of an alleged conspiracy to provide material support to ISIL in Syria. Moreover, the statements do not qualify under any of the exceptions to Rule 404(b).  For example, discussing someone else's "vision" or "dream" of a large-scale protest simply does not qualify as preparation, plan or intent to provide material

support to ISIL. The statements are irrelevant, do not qualify under 404(b) and are barred by Rule 403 because they are confusing and overly prejudicial. The statements also constitute speech protected by the First Amendment.

4.   "AK47"

   Similarly, El Gammal's "wish" that he could be in Egypt with "an AK47 and four magazines" because he feels "coerced" remembering the day of the coup which overthrew President Morsi. "Ateia-Gammal FB comms," Bates pp.23-0963 to 23-0964, is irrelevant to the trial.  El Gammal of course did not travel to Egypt in January 2014 or after his "wish" in July 2014. Introduction of his frustration and hypothetical wish that he had an AK47 in Egypt is designed to prejudice the jury and has no proper basis of admissibility.  That statement should be precluded under Rules 401 and 403 and because it is protected by the First Amendment.  Like the "vision" in January 2014, evidence of the "wish" in July 2014 is classic character evidence designed to lead the jury to conclude that El Gammal has violent tendencies.

## Conclusion

For the foregoing reasons, El Gammal's motions in limine should be granted.


Dated:      New York, New York
            October 17, 2016

                              Respectfully submitted,
                              Federal Defenders of New York

                              /s/
                              Daniel Habib, Esq.
                              Annalisa Mirón, Esq.
                              Sabrina Shroff, Esq.
                              Attorneys for Defendant
                                   **Ahmed Mohammed El Gammal**
                              52 Duane Street – 10th Floor
                              New York, NY 10007
                              Tel.: (212) 417–8700

31