UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15 Cr. 588 (ER)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
*Attorney for the United States of
America*

Andrew J. DeFilippis
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
        *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15  Cr. 588 (ER)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to defendant Ahmed Mohammed El Gammal's motions *in limine* ("Def. Mot.") to preclude (1) the defendant's statements, generally, on grounds of relevance and prejudice, (2) the defendant's statements about the Islamic State of Iraq and the Levant ("ISIL") and Middle Eastern politics in general pursuant to the First Amendment and 18 U.S.C. § 2339B(i), (3) statements of third parties, generally, (4) certain statements by one of the defendant's co-conspirators, CC-1, and (5) Rule 404(b) evidence.[1]

## BACKGROUND

### I.    The Charged Conduct

The defendant is charged in Indictment 15 Cr. 588 (ER) (the "Indictment") with:

(1) from at least in or about 2014, up to and including in or about August 2015, providing material support and resources to ISIL, to wit, personnel, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 2339B and 2 (Count One);

---

[1] The defendant also moved to preclude his jail calls.  At this time, the Government does not intend to offer any of the defendant's jail calls, but reserves the right to do so depending on, among other things, defense arguments at trial.

(2) from at least in or about 2014, up to and including in or about August 2015, conspiring to providing material support and resources to ISIL, to wit, personnel, in violation of Title 18, United States Code, Section 2339B (Count Two);

(3) from at least in or about 2014, up to and including in or about August 2015, aiding and abetting the receipt of military-type training from ISIL, in violation of Title 18, United States Code, Section 2339D and 2 (Count Three); and

(4) from at least in or about 2014, up to and including the date of the Complaint, conspiring to receive military-type training from ISIL, in violation of Title 18, United States Code, Section 371 (Count Four).

As described in prior submissions to the Court, the Government expects the evidence at trial will show, among other things, that the defendant facilitated the travel of a 24-year-old United States citizen ("CC-1"), so that CC-1 could train and fight with ISIL, a designated foreign terrorist organization.  With the assistance of the defendant and another co-conspirator ("CC-2"), CC-1 traveled to Syria in approximately February 2015, trained to fight with ISIL over the next several months, and, ultimately, was killed in approximately November 2015.  (*See generally* Government's Memorandum of Law in Support of its Motions in *Limine* at 2-11.)

## II. The Defendant's Motion to Preclude His Statements "Generally" as Irrelevant and Prejudicial Should Be Denied.

### A. Applicable Law: General Standards for Admissible Evidence

Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also United States* v. *Quinones*, 417 Fed. Appx. 65, 68 (2d Cir. 2011) ("[R]elevant evidence" is "evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (emphasis added).  Federal Rule of Evidence 402, in turn, provides that "[r]elevant evidence is admissible unless any of the

3

following provides otherwise: the United States Constitution; a federal statute; these rules; or

other rules prescribed by the Supreme Court."  Fed. R. Evid. 402; *accord United States* v.

*Figueroa*, 548 F.3d 222, 229 n.8 (2d Cir. 2008) (quoting Rule 402).  "The fact to which the

evidence is directed need not be in dispute."  *Old Chief* v. *United States*, 519 U.S. 172, 179

(1997) (citing Fed. R. Evid. 701 advisory committee's note).

Only when evidence is "clearly inadmissible on all potential grounds" should evidence be

excluded on a motion *in limine*.  *United States* v. *Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y.

2001); *see also Nat'l Union Fire Ins. Co.* v. *L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287

(S.D.N.Y. 1996).  The Second Circuit has described the relevance standard as "very low."  *See*

*United States* v. *White*, 692 F.3d 235 (2d Cir. 2012) (quoting *United States* v. *Al-Moayad*, 545

F.3d 139, 176 (2d Cir. 2008)).  "To be relevant, evidence need not be sufficient by itself to prove

a fact in issue, much less to prove it beyond a reasonable doubt."  *United States* v. *Abu-Jihaad*,

630 F.3d 102, 132 (2d Cir. 2010) (citing *Contemporary Mission, Inc.* v. *Famous Music Corp.*,

557 F.2d 918, 927 (2d Cir. 1977) ("Evidence need not be conclusive in order to be relevant.").

"Nonconclusive evidence should still be admitted if it makes a proposition more probable than

not."  *United States* v. *Schultz,* 333 F.3d 393, 416 (2d Cir. 2003) (internal quotation marks

omitted).  Rather, evidence is "relevant" if it has "any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence."  Fed. R. Evid. 401; *accord Schultz*, 333 F.3d at 415.

Moreover, the length of the chain of inferences required to show the probative value of

any evidence does not determine whether the evidence is relevant.  *See United States* v.

*Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier

of fact to conclude that the proffered submission affects the mix of material information, the

evidence cannot be excluded at the threshold relevance inquiry.");  *United States* v. *Ravich*, 421

F.2d 1196, 1204 n.10 (2d Cir. 1970) ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved . . . does not render the evidence irrelevant."). Indeed, the mere fact that proffered evidence came into existence *after* the events that the evidence is proffered to prove does not render the evidence irrelevant. *See United States* v. *Kelley*, 551 F.3d 171, 175–76 (2d Cir. 2009) (per curiam) (finding that fraudulent account statements sent by defendant two to four years after alleged securities violations were relevant to defendant's intent at the time of the alleged violations); *see also United States* v. *Mangual-Santiago*, 562 F.3d 411, 428–29 (1st Cir. 2009) (finding that evidence of bank account activity after a conspiracy had ended was relevant to defendant's intent to conceal funds).

Federal Rule of Evidence 403 states, in relevant part, that the Court "may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States* v. *Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *Figueroa*, 618 F.2d at 943); *see also* Advisory Committee's Notes on Rule 403 ("'Unfair prejudice' within [Rule 403's] context means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one."). Stated differently, all evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial. *Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (emphasis in original)). Moreover, "[p]robative evidence is not

5

inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States* v. *Salameh*, 152 F.3d 88, 122–23 (2d Cir. 1998).

In these cases, Rule 403 mandates that the district court balance the probative value of evidence and its potential prejudicial effect. When the Second Circuit reviews a District Court's evaluation of evidence under Rule 403, it "generally maximize[s] its probative value and minimize[s] its prejudicial effect." *Abu-Jihaad*, 630 F.3d at 132 (citing *United States* v. *LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004) (internal quotation marks and brackets omitted)). Furthermore, District Courts can properly minimize the risk of unfair prejudice through limiting instructions. *Id.* at 133 (citing *United States* v. *Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence "not especially worse or shocking than the transactions charged" and where district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence")).

### B.      The Defendant's Statements Are Relevant

The defendant's blanket objection to the introduction of his statements, "generally," (Def. Mot. at 8) should be swiftly denied. Motions *in limine* should only be granted if there is no theory of admissibility. *See Paredes*, 176 F. Supp. at 193. Here, the statements of the defendant that the Government intends to offer at trial are admissible as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A). And the relevance of these statements is plain. They are probative of, among other things, the defendant's participation in the charged offenses, including his efforts to facilitate the travel of CC-1 to join, train with, and fight with ISIL; his work with CC-2 to facilitate CC-1's travel; the formation of the criminal conspiracy with CC-1 and CC-2; and his knowledge and intent in committing the charged offenses.

As an initial matter, the defendant's argument that he cannot determine which of his statements the Government intends to introduce at trial is equally meritless. The Government's

Draft Exhibit List—which was provided to the defense on October 3, 2016—identifies the specific records that it intends to offer at trial.  There is simply no ambiguity as to which statements of the defendant that the Government intends to offer, and there has not been for more than a month.

In particular, the defendant's statements contained in the records identified in the Government's Draft Exhibit list are statements of a party opponent, and thus not hearsay.  *See* Fed. R. Evid. 801(d)(2)(A).  They also are relevant under Rule 401 because, among other reasons, they establish (a) the defendant's knowledge that he was facilitating CC-1's travel to join ISIL, and not some other organization in Syria, (b) the defendant's knowledge that ISIL is a designated foreign terrorist organization, engaged in "terrorist activity" or "terrorism," and (c) the ongoing relationship between the defendant, CC-1 and CC-2 throughout the time period of the conspiracy.  Despite having the Government's Draft Exhibit List, the defendant does not make particularized objections to particular exhibits, but rather asserts a "general[]" objection to the admission of his statements.  Such a global objection is insufficient, and it is not the Government's responsibility to affirmatively defend the admissibility of each statement of the defendant.  *See Baxter Diagnostics, Inc.* v. *Novatek Med., Inc.,* 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (reserving judgment on motions in limine that "lack[ed] the necessary specificity with respect to the evidence to be excluded" and were "too sweeping in scope to be decided *in limine*.") (quoting *National Union Fire Ins. Co.* v. *L .E. Myers Co. Group*, 937 F.Supp. 276, 287 (S.D.N.Y.1996)).  *See also Colton Crane Co., LLC* v. *Terex Cranes Wilmington, Inc.,* 2010 WL 2035800, at *1 (C.D. Cal. May 19, 2010) ("[M]otions in limine must identify the evidence at issue and state with specificity why such evidence is inadmissible."); *Koch* v. *Koch Indus., Inc*., 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998) ("The Court may deny a motion *in limine* when it lacks the necessary specificity with respect to the evidence to be

excluded." ); *Auenson* v. *Lewis*, 1996 WL 457258 at *1 (E.D. La. Aug. 12, 1996) ("[E]vidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds."); *Hawthorne Partners* v. *AT & T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) (same). But to take one example, the defendant exchanged text messages with CC-1 on July 16, 2015, during which the defendant told CC-1 "Great to here from u,"[2] and CC-1 replied, "Life has changed a lot for me at this new job but I love it and I don't regret taking up the offer[.]" (GX 4-B).  These messages, which were found on the defendant's iPhone, are highly probative of the defendant's knowledge of CC-1's plans to join ISIL.  The fact that the defendant continued to communicate with CC-1, and that those communications confirmed the ongoing success of the conspiracy, make it more probable that the defendant knew he was facilitating CC-1's travel to Syria to join and receive military training with ISIL.

As more examples, the defendant's communications with his friends and associates regarding his extremist political beliefs, including his support for jihad, demonstrate his increasingly extremist views, support for ISIL throughout 2014 and, especially, in the summer of 2014, and willingness to engage with close associates regarding his beliefs.  These statements tend to establish, among other things, the defendant's knowledge regarding ISIL, support for ISIL, and intent in facilitating CC-1's travel to Syria to join and receive military-type training from ISIL.  For example, on April 25, 2014, the defendant wrote one of his friends, ███████, the following:

| | |
|---|---|
| The defendant: | I was never with the Free Syrian Army.  I was with Jabhat Al Nusra now I am with the State. |
| ███████ : | what do you mean by the State? |
| The defendant: | The State of Iraq and Syria. . . . that is a Jihadi |

---

[2] The communications quoted herein have not been altered to correct for all grammatical, spelling, or other errors that exist in the native communications.

group over there in Syria and the dirty media
calls them Daesh.[3]

(GX 100-E-T).  Throughout the course of the next several months, the defendant then continued
to discuss the merits of ISIL, Al Nusra, and other jihadi militant groups with ██████.  On
August 10, 2015, four days before CC-1 began exchanging messages with the defendant that
culminated in the defendant sending CC-1 a link to a *Vice News* documentary entitled
"Grooming Children for Jihad: The Islamic State (Part 2)," the defendant wrote to ██████:
"I have been with Sheikh Ayman and Anwar Al Awlaki, may Allah have mercy on him, if you
know him.  [B]ut I do not like to show my Jihadi personality."[4]  The defendant also wrote:  "I
spent two hours with Amro Quraishi trying to convince him that democracy is against the laws of
Islam and must do Jihad against the military."  These statements to ██████ are probative of
the defendant's state of mind when he facilitated CC-1's travel to Syria to join and receive
military training from ISIL, and establish the defendant's knowledge and intent during the course
of the charged conduct.

The defendant identifies only three specific examples of Facebook posts that he believes
are irrelevant.  First, the defendant objects to the admissibility of a July 5, 2014 Facebook post
regarding the "Islamic Caliphate" as unduly prejudicial.  (Def. Mot. at 9).  That post reproduced
a report of the words of the prophet Mohammed regarding the concept of a "Caliphate" and
"forceful rule" with the following image entitled "The Islamic Caliphate":

---

[3] "Daesh," sometimes spelled "Da3sh," is another name for ISIL.

[4] At trial, the Government expects to introduce evidence that Anwar al-Awlaki was an important
English-language speaker within the militant jihadist movement.  Although al-Awlaki was killed
in 2011, his works remain influential to the jihadist community.



The Government expects the testimony at trial to establish that, in June 2014, ISIL formally declared itself a caliphate, which is a type of historic Islamic government which had not existed since the abolition of the Ottoman caliphate in 1924.  The Government also expects that the trial evidence will establish that on July 5, 2014—the same day as the defendant's Facebook post regarding the Islamic Caliphate—ISIL leader Abu Bakr al-Baghdadi made an important, widely publicized speech in Mosul, Iraq regarding the formation of the caliphate.  No other group announced its intention to form a caliphate around this time.  Therefore, the timing and content of the defendant's post are highly probative to his knowledge and intent to provide material support to ISIL.

Second, the defendant also objects to the relevance of his September 13, 2014 Facebook post linking to a newspaper article entitled "Egypt issues stamps to mark new Suez Canal - but uses pictures of Panama Canal."  (Def. Mot. at 9).  This post demonstrates the defendant's awareness of local events in the Middle East, and serves to counter any argument that the defendant was not sufficiently aware of local events to know that CC-1, in traveling to a city near the Syrian-Turkish border, intended to join ISIL.

Third, the defendant specifically objects to the admissibility of his July 15 to July 16, 2014 Facebook conversation with ███████ regarding pro-Israel bias in the American media as unduly prejudicial.  (Def. Mot. at 9).  The Government is amenable to discussing with the defense

redactions to the identified statements regarding pro-Israel bias in American media.  The

remainder of the defendant's July 16, 2014 Facebook conversation with ████████ discussing,

topics such as ISIL, Abu Bakr al-Baghdadi, the Muslim Brotherhood fighting the "mujahideen,"

and the defendant's statement, "I support jihad everywhere," are highly probative to the

defendant's knowledge and intent to provide material support to ISIL.

   The defendant's motion to preclude all of his statements as irrelevant should be denied.

**C. No Danger of Unfair Prejudice Exists Because the Defendant's Statements are Highly Probative and No More Prejudicial than the Charged Conduct.**

   The defendant also makes a general objection to the admission of all of his statements on

the basis of prejudice, citing Federal Rule of Evidence 403.  (Def. Mot. at 8).  This argument also

lacks merit.  The highly probative value of the defendant's statements as evidence of his

participation in the charged conduct and his state of mind when committing the offense conduct,

*see infra* II.B., is not "*substantially* outweighed" by a danger of unfair prejudice when his

statements are no more prejudicial than the terrorism crimes charged.  The defendant is charged

with conspiring to provide and providing material support and resources to ISIL, a designated

terrorist organization and jihadist militant group that is widely known for its videos of

beheadings of soldiers and civilians, including journalists and aid workers, and widespread

human rights abuses and war crimes.  In no way are his statements—which show his

participation in that conduct and his intent to support ISIL, among other things—any more

prejudicial than the conduct with which he is charged.  Indeed, courts in this Circuit have

routinely admitted a defendant's statements supporting terrorist groups in terrorism cases.  *See,*

*e.g.*, *Abu-Jihaad*, 630 F.3d at 132–33 ("[W]e conclude that the recorded discussions were both

highly probative of the charged crime and, to the extent they referenced uncharged

contemporaneous support for jihad, no more inflammatory than the charges alleged in the

indictment."); *United States* v. *Mostafa*, 16 F. Supp. 3d 236, 257 (S.D.N.Y. 2014) ("[T]he

statement's potentially prejudicial impact does not outweigh its high probative value.  While it is

prejudicial that the defendant has stated that he supports violent jihad, this is similar to, and no

more prejudicial than, the crimes with which he has been charged."); *id.* at 258 ("Here, the

defendant is charged with precisely the type of conduct described in this—his own—statement.

His statement is no more prejudicial than that with which he has already been charged.").[5]

Accordingly, the Court should reject the defendant's Rule 403 challenge to the

admissibility of his statements.

## III.    The Defendant's Statements Regarding ISIL and Middle Eastern Politics Are Admissible and Not Precluded by the First Amendment or 18 U.S.C. § 2339B.

In contravention of well-established Supreme Court and Second Circuit precedent, the

defendant argues that his statements communicating his views about ISIL and Middle Eastern

politics in general terms in public Facebook posts and with persons not alleged to be co-

conspirators should be precluded as protected by the First Amendment and 18 U.S.C. § 2339B(i).

(Def. Mot. at 12.).  His argument is meritless and his motion should be denied.

The Supreme Court and Second Circuit have long permitted the evidentiary use of speech

to establish the elements of a crime or to prove motive or intent.  *United States* v. *Salameh*, 152

F.3d 88, 112 (2d Cir. 1998) (per curiam) ("[I]t is beyond cavil that "[t]he First Amendment . . .

does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove

motive or intent.") (quoting *Wisconsin* v. *Mitchell*, 508 U.S. 476, 489 (1993)).  In *Mitchell*, the

Supreme Court unequivocally held:

---

[5] The Second Circuit has also regularly allowed terrorist propaganda to be admitted, particularly
in the context of material support offenses, in order to prove the *mens rea* element of the offense.
*See, e.g.*, *United States* v. *Kaziu*, 559 Fed.Appx. 32, 35 (2d Cir. 2014) (summary order); *Abu-
Jihaad*, 630 F.3d at 133–34.

> The First Amendment, moreover, does not prohibit the evidentiary
> use of speech to establish the elements of a crime or to prove
> motive or intent. Evidence of a defendant's previous declarations
> or statements is commonly admitted in criminal trials subject to
> evidentiary rules dealing with relevancy, reliability, and the like.

*Mitchell*, 508 U.S. at 489.   Therefore, "[r]egardless of whether [the defendant's] speech *qua*

speech is protected by the First Amendment, the Government . . . may use [the defendant's]

words as 'relevant evidence of the knowledge and the intent with which he acted."  *United States*

v. *Hashmi*, No. 06 Cr. 442 (LAP), 2009 WL 4857608, at *2 (S.D.N.Y. Dec. 11, 2009)

(precluding defense proposed expert testimony regarding whether the statements of a defendant

charged with providing material support to al Qaeda, in violation of 18 U.S.C. § 2339B, were

within the historical norm of "protected speech").

A First Amendment challenge is "meritless" here, where "the speech is not 'itself the

proscribed conduct.'"  *United States* v. *Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (quoting *United*

*States* v. *Caronia*, 703 F.3d 149, 161 (2d Cir. 2012)).  Conspiracy is an offense that is

"characteristically committed through speech."  *United States v. Rahman,* 189 F.3d 88, 117 (2d

Cir. 1999).  Thus, evidence regarding the defendant's statements regarding ISIL and Middle

Eastern politics are admissible because this "speech [is] not the basis for the prosecution, but

instead it [is] used to establish the existence of, and [the defendant's] participation in, the alleged

[conspiracy]."  *Id.* (citing *Mitchell*, 508 U.S. at 489).  Such statements are further admissible as

to the defendant's knowledge of the conspiracy, as well as his intent and motive in committing

the crime, among other bases.  *See Salameh*, 152 F.3d at 112 (terrorist materials seized from co-

defendant were used appropriately to prove the existence of the conspiracy and its motive)); *see*

*also Mostafa*, 16 F. Supp. 3d at 253 & n.4 (admitting, in a prosecution for violations of 18 U.S.C.

§ 2339B, statements in which the defendant discussed his views "on waging jihad, acceptable

conduct toward non-Muslims, justifications for violent and homicidal acts toward non-Muslims,

bin Laden and the events of September 11, and the bombing of the U.S.S. Cole in Yemen" and

noting that the First Amendment does not "prohibit the evidentiary use of speech to establish the

elements of a crime or to prove motive or intent"); *United States* v. *Hassan*, 742 F.3d 104, 127

(4th Cir. 2014) (in a terrorism prosecution, defendants' Facebook postings advocating violent

jihad, as well as their conversations to that effect, served as compelling support for the jury's

finding that the defendants traveled abroad with the hope of acting on their beliefs by engaging

in jihad and fighting against the "kuffar").

The defendant cites two examples of statements to individuals not alleged to be co-

conspirators to support his argument.  As demonstrated below, these statements are admissible

pursuant to the above-cited, well-established case law as proof of the charged conduct—namely,

conspiring to provide, providing and attempting to provide material support or resources to ISIL,

and conspiring to receive and aiding and abetting the receipt of military-type training from ISIL.

First, the defendant's April 25, 2014 statement to ██████████—"I was never with the Free

Syrian Army.  I was with Jabhat al Nusra and now I am with the State." (Def. Mot. at 12)—is

unquestionably highly relevant evidence establishing the elements of the crimes with which he is

charged and proof of his motive or intent.  *See Mitchell*, 508 U.S. at 489.  At trial, the

Government expects to introduce testimony about the creation of the Free Syrian Army in

approximately June or July 2011, and the fact that ISIL sent a group to Syria, which later became

known as Jabhat al-Nusra and rejected ISIL leader Abu Bakr al-Baghdadi's announcement that

Jabhat al-Nusra was part of ISIL.  The Government also expects to offer evidence that ISIL also

is referred to as the "Islamic State," and intends to argue that the defendant's mention of "the

State" was a reference to ISIL.  The defendant's statement that he was "never with the Free

Syrian Army" but that he "was with Jabhat al Nusra and now I am with the State" is, therefore,

evidence of his knowledge of and support for ISIL and establishes the intent with which he acted

when he facilitated the travel of CC-1 to Turkey and then Syria to join and obtain military

training from ISIL.

Second, the defendant's July 1, 2014 Facebook conversation with Huda Ali, in which he

states—"If Daesh gets to Egypt I will join them so I can torture the Egyptians and whip them. ...

I hope they get to Egypt. . . . I am willing to live in a tent under an Islamic State instead of all the

luxuries under an Infidel state." (Def. Mot. at 12)—is also relevant evidence of his support for

ISIL and, therefore, his knowledge, motive, and intent when, in August 2014, he began

communicating with CC-1 regarding ISIL ("Daesh") and facilitating CC-1's travel to Syria to

join and receive military-type training from ISIL.

The defendant's reliance on *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) and

*United States* v. *Farhane*, 623 F.3d 127 (2d Cir. 2011) is misguided.  In *Humanitarian Law

Project*, the Supreme Court rejected a First Amendment challenge to 18 U.S.C. § 2339B, finding

that the statute properly prohibits "the act of giving material support" to designated foreign

terrorist organizations, which is what the plaintiffs wanted to do, and not "being a member of [a]

designated group[] or vigorously promoting and supporting the goals of the group."  561 U.S. at

39-40.  Likewise, in *Farhane*, the Second Circuit rejected the defendant's First Amendment

challenge to 18 U.S.C. § 2339B, holding the statute "does not prohibit simple membership in a

terrorist organization," but "prohibits the knowing provision of material support to a known

terrorist organization."   *Farhane*, 634 F.3d at 138.  The Second Circuit went on to hold that

"[p]roof of such provision (whether actual, attempted, or conspiratorial) together with the dual

knowledge elements of the statute is sufficient to satisfy the personal guilt requirement of due

process."  *Id.*  Thus, nothing in the *Humanitarian Law Project* or *Farhane* decisions can be seen

to prohibit using a defendant's statements to prove what is prohibited by 18 U.S.C. §§ 2339B

and 2339D—the knowing provision of material support and resources, and knowing receipt of training from, a designated terrorist organization.

Thus the defendant's speech is not itself the proscribed conduct. *See Pierce*, 785 F.3d at 841. The defendant's words are relevant evidence of, among other things, the knowledge and the intent with which he acted, and therefore admissible at trial.

## IV.   Statements by the Defendant's Co-Conspirators Are Relevant, No More Prejudicial than the Charged Conduct, and Admissible

The defendant's blanket objection to the admissibility of all "third-party statements," and, in particular, statements made by his co-conspirators, CC-1 and CC-2, is meritless.

### A.   Applicable Law

#### 1.   Hearsay Evidence, Generally

Pursuant to Federal Rule of Evidence 801(c)(2), an out-of-court statement that a party seeks to offer at trial is hearsay only if "[the] party offers [the statement] in evidence to prove the truth of the matter asserted in the statement."  Accordingly, "[o]ut-of-court statements not offered for the truth of the matter asserted" may be admissible to, among other things, "furnish an explanation of the understanding or intent with which certain acts were performed." *United States* v. *Reifler*, 446 F.3d 65, 92 (2d Cir. 2006) (internal quotation marks omitted).  Such evidence can also "constitute appropriate rebuttal to initiatives launched by the defendant." *United States* v. *Reyes*, 18 F.3d 65, 70 (2d Cir. 1994).  However, such evidence should be excluded if "its probative value [in its permitted evidentiary use] is substantially outweighed by the danger of unfair prejudice . . .  resulting from the impermissible hearsay use of the declarant's statement." *United States* v. *Johnson*, 529 F. 3d 493, 500 (2d Cir. 2008) (internal quotation marks omitted); *see* Fed. R. Evid. 403.

### 2.   Co-conspirator Statements Made in Furtherance of a Conspiracy

Pursuant to Federal Rule of Evidence 801(d)(2)(E), a statement offered at trial against a party is not inadmissible hearsay if it was "was made by the party's coconspirator during and in furtherance of the conspiracy."  To admit a coconspirator statement under Rule 801(d)(2)(E), a trial court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.  *See United States* v. *Padilla*, 203 F. 3d 156, 162 (2d Cir. 2000) (quoting *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990).  Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance."  *United States* v. *Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (quoting *United States* v. *Provenzano*, 615 F.2d 37, 45 (2d Cir.)), *cert. denied*, 446 U.S. 953 (1980).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy.  Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States* v. *Maldonado-Rivera*,  922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance,"  *Desena*, 260 F.3d at 158  (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7)

inform a co-conspirator of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States* v. *Thai*, 29 F.3d 785, 813 (2d Cir. 1994).

Furthermore, the fact that one defendant has been arrested does not preclude the admission of statements by other, un-arrested coconspirators who continued the conspiracy after the arrest. *See United States* v. *Persico*, 832 F.2d 705, 715-16 (2d Cir. 1987) ("[The fact that] some of the conspirators had been indicted and were under arrest is unimportant" where "the [criminal enterprise] was quite capable of continuing operations despite the fact that some of its members were incarcerated."); *United States* v. *Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986) ("Although statements made by a coconspirator after his arrest cannot be used against fellow conspirators, the converse is not true; statements made by an unarrested co-conspirator who is still operating in furtherance of the ongoing conspiracy may be introduced against the arrested conspirator."); *United States* v. *Wentz,* 456 F.2d 634, 637 (9th Cir. 1972) ("An unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be introduced against the arrested one if the conspiracy is still in operation."); *United States* v. *Ascarrunz*, 838 F.2d 759, 764 (5th Cir. 1988) (same).

The Court is not bound by the rules of evidence in assessing a proffered co-conspirator statement, and proof as to each prong may include hearsay statements and other admissible evidence. *See Bourjaily* v. *United States*, 483 U.S. 171, 178-79 (1987) ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)); *United States* v. *Cota*, 953 F.2d 753, 758 (2d Cir. 1992) (hearsay statement will be considered along with independent evidence that defendant participated in the conspiracy). Further, in making these determinations, the Court may properly rely on any available evidence,

including the hearsay statements itself.  *Bourjaily*, 483 U.S. at 181 ("court, in making a

preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements

sought to be admitted"); *accord Glenn* v. *Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996).

### 3.   Statements Against Penal Interest

Pursuant to Federal Rule of Evidence 804(b)(3), an out-of-court statement that is against

the declarant's penal interests is admissible if the declarant is unavailable and the following

conditions are met:

> (A) a reasonable person in the declarant's position would have made [the
> statement] only if the person believed it to be true because, when made, it
> was so contrary to the declarant's proprietary or pecuniary interest or had
> so great a tendency to invalidate the declarant's claim against someone
> else or to expose the declarant to civil or criminal liability; and
>
> (B) [the statement] is supported by corroborating circumstances that clearly
> indicate its trustworthiness, if it is offered in a criminal case as one that
> tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Under Rule 804(b)(3), the statement of an unavailable witness is admissible if, when

made, the statement so far tended to subject the speaker to criminal liability that a reasonable

person would not have made the statement unless he believed the statement to be true.  *See*

*United States* v. *Bakhtiar*, 994 F.2d 970, 977 (2d Cir. 1993).  For the Rule 804(b)(3) exception to

apply, "the proponent must show (1) that the declarant is unavailable as a witness, (2) that the

statement is sufficiently reliable to warrant an inference that a reasonable man in the declarant's

position would not have made the statement unless he believed it to be true, and (3) that

corroborating circumstances clearly indicate the trustworthiness of the statement."  *United States*

v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983) (internal quotations and modifications

omitted).  "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even

reasonable people who are not especially honest, tend not to make self-inculpatory statements

unless they believe them to be true." *Williamson* v. *United States*, 512 U.S. 594, 599 (1994).

**B.  Statements by CC-1 and CC-2 are Admissible to Show the Relationships Between the Defendant, CC-1 and CC-2, and as Co-Conspirator Statements Made in Furtherance of the Conspiracy.**

The defendant argues generally that statements by CC-1 and CC-2 are irrelevant,

prejudicial, and inadmissible hearsay.  (Def. Mot. at 14).[6]  But that argument defies common

sense and the Federal Rules of Evidence.  Communications between the defendant, CC-1 and

CC-2, before the time period of the conspiracy and throughout the conspiracy, are relevant to

show the development of the relationships of trust that existed between the defendant, CC-1 and

CC-2, and explain why they would choose to become involved in charged conduct.  *See United*

*States* v. *Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (affirming, in robbery and firearm prosecution,

evidence of uncharged crimes involving the defendant and cooperating witnesses because the

evidence (i) "was relevant as background information to make the story of the crimes charged

complete and to enable the jury to understand how the illegal relationship between the co-

conspirators developed[,]" (ii) "explained to the jury how the relationship between Pipola and his

underlings evolved[,]" and (iii) made charged conspiracy, in which cooperating witnesses were

also involved, "more plausible").  Furthermore, the highly probative value of CC-1's and CC-2's

statements cannot be said to be "*substantially*" outweighed by any "unfair" prejudice,

particularly where, as here, the statements are no more prejudicial than the terrorism crimes

charged.

---

[6] The defendant does not make particularized objections to particular exhibits, but rather asserts a "general[]" objection to the admission of statements by CC-1 and CC-2.  As stated *supra* II.B., such a global objection is insufficient, and it is not the Government's responsibility to affirmatively defend the admissibility of each statement of the defendant.

In addition, statements made by co-conspirators "during and in furtherance of the conspiracy" are plainly admissible pursuant to Rule 801(d)(2)(E) where, as here, (a) a conspiracy existed that included the defendant, CC-1 and CC-2, and (b) the statements were made during the course of and in furtherance of that conspiracy. *See Padilla*, 203 F. 3d at 162 (quoting *Gigante*, 166 F.3d at 82); *Maldonado-Rivera*, 922 F.2d at 958.  CC-1's and CC-2's statements to each other and to the defendant during the time period of the conspiracy were designed to promote or facilitate the achievement of the goal of the ongoing conspiracy—namely, providing material support and resource to ISIL and receiving military-type training from ISIL—in that they (1) informed or provided updates as to the status or progress of the conspiracy, (2) prompted the listener to respond in a way that promoted or facilitated the carrying out of criminal activity, (3) sought to induce a co-conspirator's assistance, (4) provided reassurance, (5) served to foster trust and cohesiveness, (6) facilitated and protected the conspiratorial activities, and (7) informed co-conspirators of the identity and activities of other co-conspirators.  *See Desena*, 260 F.3d at 158; *Maldonado-Rivera*,  922 F.2d at 958; *Diaz*, 176 F.3d at 87; *Rastelli*, 870 F.2d at 837.

The defendant's factual assertion that "the conspiracy ended by early 2015" when CC-1 joined ISIL and began receiving military-type training from ISIL is plainly wrong.  While CC-1 certainly joined ISIL and began receiving military-type training from ISIL in early 2015, the conspiracy was ongoing and continued as CC-1 continued to provide material support and resources to ISIL—*i.e.*, himself—and to receive military-type training from ISIL through his death in November 2015.  The conspiracy did not end when the defendant and CC-2 "provided" CC-1 to ISIL, but continued throughout the time that CC-1 received military training from and fought for ISIL, thereby continuing material support in the form of himself and furthering the goals of the conspiracy.  *United States* v. *Grimm*, 738 F.3d 498, 505 (2d Cir. 2013) ("Once a conspiracy is shown to exist, which in its nature is not ended merely by lapse of time, it

continues to exist until consummated, abandoned or otherwise terminated by some affirmative act." (quoting *United States v. Rucker,* 586 F.2d 899, 906 (2d Cir. 1978)).  Nor did the defendant's arrest in August 2015 end the conspiracy or alter the analysis of whether his co-conspirator's statements can be used against him pursuant to Federal Rule of Evidence 801(d)(2)(E).  *See Persico*, 832 F.2d at 715-16.[7]

Certain of CC-1's and CC-2's statements are also admissible as statements against penal interest pursuant to Rule 804(b)(3).  As discussed in the Government's Memorandum in Support of its Motions *In Limine*, CC-1 died fighting on behalf of ISIL and, therefore, is unavailable to testify at trial.  (Gov't Mot. at 21).[8]  CC-2 currently lives in Turkey, is outside the United States and is not a United States "national or resident."  Therefore, CC-2 is beyond the Court's subpoena power, and the Government cannot compel his attendance at trial.  *See* Fed. R. Crim. P. 17(e); 28 U.S.C § 1783; *United States* v. *Casamento*, 887 F.2d 1141, 1169-70 (2d Cir. 1989) (holding that witness who was in Italy was "unavailable" and rejecting argument that Government "should have made a formal written request for [the witness's] extradition" where "such a request would most likely have been futile and '[t]he law does not require the doing of a futile act'") (quoting *Ohio* v. *Roberts*, 446 U.S. 56, 74 (1980)).[9]

_____

[7] Certainly, evidence of *acts* of co-conspirators which occur after a conspiracy has ended and is complete may be introduced against all co-conspirators if the evidence tends to prove the existence of the conspiracy.  *Lutwak* v. *United States*, 344 U.S. 604, 617 (1953); *United States* v. *Super*, 492 F.2d 319, 323 (2d Cir. 1974) (evidence of a conspirator's post-conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of the alleged conspirator and, therefore, subsequent drug transaction was certainly probative of the prior venture of the parties).

[8] Photographs of CC-1, provided to a family member of CC-1 after CC-1's death, also establish CC-1 died.  *See* Exhibit A (requested to be filed under seal).

[9] Even if CC-2 were in the United States and subject to the Court's subpoena power, he would likely invoke his Fifth Amendment right against self-incrimination, and be unavailable to testify to the substance of the statements at the defendant's trial.  *See United States* v. *Dolah*, 245 F.3d 98, 102 (2d Cir. 2001) ("It is settled in this Circuit that a witness who invokes the privilege

Therefore, statements between the defendant, CC-1 and CC-2 are relevant, not precluded by Rule 403, and admissible as co-conspirator statements made in furtherance of a conspiracy and statements against penal interest.  Specific communications involving CC-1 and CC-2 that are challenged by the defense (Def. Mot. at 18-24) are discussed below.

       **1.    CC-1's Messages with ████████████ Are Admissible as Non-Hearsay, Relevant and Not Unfairly Prejudicial.**

The Government seeks to offer the following messages between CC-1 and a person with the username "Mustafa Tarek" on August 14, 2014:

| | |
|---|---|
| ███████ | anyways it's a kid pulling a dead man from his hair and smiling<br><br>a kid with da3ish . . they killed this man and ikhwan[10] says he was a pious sheikh in Iraw<br><br>Iraq<br><br>one of the ikhwans I know shared the pic and insulted a da3ish .. surprisingly I found El Jammal commenting saying : seriously kos omak,[11] El dawla[12] (he means da3ish) will continue to expand |
| CC-1 | he said that? |
| ███████ | as I told u the difference between ikhwan and da3ish is huge , no hope<br><br>. . . |
| CC-1 | u know, a lot of the tension between ikhwan and Da3ish is due to the role ikhwan plays in Syria and Iraq<br><br>in Iraq they participated in the govt, and in Syria they backed the FSA and Jabhat Islamiya, who are against Da3ish. This is where a lot of the animosity stems from |

against self-incrimination is 'unavailable' within the meaning of Rule 804(b) even though the Government has the power to displace the witness's privilege with a grant of use immunity.").

[10] "Ikwhan" is a reference to the Muslim Brotherhood.

[11] "Kos omak" is a curse term.

[12] "Dawla" is a reference to ISIL, which is also known as "Dawla al Islamiya."

| | |
|---|---|
| | wise analysis<br><br>but El Jammal is so hostile in his opinions , I don't know him well anyway |
| CC-1 | Da3ish admire Hassan Al-Banna and Sayyid Qutb, but they believe the current ikhwan is deviant<br><br>and for Jammal he's a good dude but he's a little crazy sometimes haha<br><br>ive known him for a while<br><br>. . . |
| | subhan Allah I was just looking at the comments section at that ikhwani bro and I found jammal insulting cuz he defends da3ish , the world is small and it seems da3ish grabbed the attention of the world |
| CC-1 | im confused.<br><br>jammal was defending the ikhwani? or defending da3ish? |
| | da3ish |
| CC-1 | ah ok |
| | saying to the ikhwani kos omak<br><br>the dawla will continue to expand |
| CC-1 | I see |

Minutes after this exchange with [redacted], CC-1 exchanged multiple Facebook messages with the defendant, the contents of which all appear to have been deleted by CC-1 but some of which were retained by the defendant.  In those messages, CC-1 contacted the defendant and asked whether he was familiar with Cryptocat, an online application that offers users the ability to send encrypted text messages between one another.  After the defendant indicated he was not, CC-1 sent him a link to Cryptocat's website and added, "Glenn Greenwald used it when he was

24

in Hong Kong to keep his messages with Edward Snowden private."[13]  The defendant then asked

whether the Application was "safer than Facebook," and CC-1 responded affirmatively.

Approximately one hour after the conclusion of this Facebook discussion, the defendant sent CC-

1 a link to a video entitled "Grooming Children for Jihad: The Islamic State (Part 2)," which was

a *Vice News* documentary depicting life under ISIL in Raqqah, Syria, the capital of ISIL's

caliphate.

 The above messages between CC-1 and ███████ are not being offered for the truth

of the matter asserted in them—namely, that the defendant, "El Jammal," supports ISIL[14]—but

for the effect they had on CC-1.  After an explicit discussion regarding ISIL and ███████'s

assertion that "El Jammal" was a supporter of ISIL, CC-1 immediately engaged in a messages

exchange with the defendant during which CC-1 and the defendant discussed encrypted

communications and which culminated in the defendant sending CC-1 a documentary regarding

life under ISIL in Raqqah, Syria.  "El Gammal," the defendant's name, can be pronounced, in

Arabic, with a "J" sound, making ███████'s reference to postings by "El Jammal" even

more probative of CC-1's belief that El Gammal, the defendant, was the "El Jammal" that

███████ was discussing.  In addition, the defendant and ███████ were Facebook

friends, and communicated with each other via Facebook in the summer of 2014, before and

after CC-1's August 14, 2014 message exchange with ███████ and the defendant.  CC-1's

---

[13] According to public information, Glenn Greenwald is a journalist who authored a series of reports published by *The Guardian* newspaper, beginning in June 2013, purporting to describe United States and British global surveillance programs, which reports it claimed were based on classified documents illegally obtained by Edward Snowden from the National Security Agency.

[14] The defendant argues that "if he had made these comments, the Government would have found evidence of it" in the defendant's Facebook search warrant returns.  (Def. Mem. at 19.)  But nothing about ███████'s messages suggests that "El Jammal" posted pro-ISIL comments on Facebook, rather than any other social media platform.

25

message exchange with ███████████ is highly relevant to CC-1's state of mind when contacting the defendant, and makes more probable that CC-1 sought out the defendant for advice regarding how to effect his desire to join and fight with ISIL.  The defendant's argument that these messages imagine a brutal killing implicating a child solder, and are, therefore, prejudicial ignores the nature of the charged offense conduct.

### 2.   The YouTube Video of CC-1 is Admissible and Not Unfairly Prejudicial.

The defendant's argument that the YouTube Video of CC-1 consists of inadmissible hearsay and should be precluded as evidence at trial is without merit.  (Def. Mot. at 20-22.)

The defendant first argues that the portion of the video in which CC-1 admits to traveling to and residing in ISIL-controlled territory "does not qualify as a co-conspirator statement admissible [pursuant to Fed. R. Evid. 801(d)(2)(E)]" because "the main objective of the conspiracy—providing material support in the form of personnel to ISIS—had ended by that point."  (Def. Mot. at 20).  This assertion is plainly false; the conspiracy was still very much ongoing.  CC-1's efforts to provide himself as personnel to ISIL—which he undertook with the assistance of the defendant and others—were active and ongoing at the time the YouTube Video was made.  In fact, CC-1 admits in the video that he was "*currently* residing in the Islamic State" and is depicted wearing military attire, which reflects his then-status as a fighter for ISIL.  Moreover, other evidence to be offered at trial—including social media messages and correspondence such the CC-1 Letter—will establish that CC-1 in fact trained and fought with ISIL, and then died in battle for ISIL sometime after the video was created.  (*See* Memorandum in Law in Support of the Government's Motions *In Limine* ("Gov't Mot.") at 28-29; Exhibit A.)  Accordingly, CC-1's actions in furtherance of the conspiracy were ongoing at the time the video was made.

Moreover, and as set forth in the Government's motions *in limine*, even if one were to assume that the defendant's involvement in the charged conspiracy had ended by the time the YouTube Video depicting CC-1 was created—a fact which is undermined by social media messages suggesting his potential involvement in conversations regarding the creation of the video—"[m]ere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal." *United States* v. *Leslie*, 658 F. 3d 140, 143–44 (2d Cir. 2011) (citing *United States* v. *Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008)).  Where, as here, "[a]n unarrested co-conspirator [is] still operating in furtherance of the conspiracy," the statements made by such a co-conspirator "may be introduced against a defendant who was arrested at the time the statements were made." *United States* v. *Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986).  *See also United States* v. *Wentz,* 456 F.2d 634, 637 (9th Cir. 1972).  Indeed, and as also noted in the Government's motions *in limine*, CC-1's statements in the video that he was residing in the Islamic State furthered the objectives of CC-1's ongoing conspiracy to support ISIL by publicizing his own support for the group, thereby garnering attention for its message and potentially drawing additional recruits. (Gov't Mot. at 25-26).

*Anderson* v. *United States*, 417 U.S. 211, 219 (1974), on which the defendant relies, is inapposite.  (Def. Mot. at 21).  In that case, the Supreme Court affirmed the admission of non-hearsay evidence (*i.e.*, prior testimony of a co-conspirator that was not being offered for its truth) that post-dated an alleged conspiracy to falsify votes in an election.  The Court noted that while "out-of-court declarations by a conspirator [must be] be shown to have been made while the conspiracy charged was still in progress[,]" "the ongoing conspiracy requirement is [] inapplicable to evidence, such as that of acts of alleged conspirators, which would not otherwise be hearsay." *Id.*  Because the district court admitted the relevant evidence as non-hearsay, the jury was not required to find whether the charged conspiracy was in progress.  *Id.* at 221.

Moreover, the circumstances of the conspiracy in that case—involving an election fraud—bore no relevant factual similarities to those at issue here.  Accordingly, the Court's decision in *Anderson* does not aid the defendant's argument that the charged conspiracy here had ended at the time the YouTube Video was created.

Equally unavailing is the defendant's second argument that the YouTube Video does not qualify as a statement against penal interest because "[CC-1 was completely out of the grasp of United States law enforcement in Syria."  (Def. Mot. at 21).   The defendant argues, in essence, that because CC-1 was in a remote location in which it might be difficult for United States authorities to locate and arrest him, his inculpatory statements were not against his penal interest. (*Id.*).  The defendant offers no support for this proposition.  Indeed, his motion cites no case law—and the Government is aware of none—holding that the unlikelihood of effecting a declarant's arrest is a relevant in determining whether a particular statement "exposes the declarant to . . . criminal liability" pursuant to Rule 804(b)(3).  Rather, the Rule's focus is on whether a declarant's statements themselves tend to create exposure to criminal liability (*i.e.*, whether they might contribute to the filing of criminal charges).  *See Persico*, 645 F.3d at 102 ("While [the] statements would not have been sufficient, standing alone, to convict [declarant] of any crime, they would have been probative in a criminal trial against [declarant] to . . .  support an inference that criminal messages were passed.").  It is therefore irrelevant whether a defendant is likely to avoid or evade capture in connection with those charges.  Here, the defendant does not dispute—nor could he—that a United States citizen's activities in support of ISIL overseas would tend to create criminal exposure in the United States.

 Moreover, even if the likelihood of a declarant's arrest were a relevant factor in determining whether statements are against one's penal interest, it is beyond dispute that the United States Government has apprehended numerous terrorism defendants in foreign countries

and transported them to the United States for prosecution.  Thus, there is no reasonable basis on which to conclude that a declarant's statements are not against his penal interest simply because law enforcement authorities might have difficulty in effecting the declarant's arrest. Accordingly, the defendant's hearsay arguments are without merit.

The Court should also reject as meritless the defendant's additional argument that the "entire video should be precluded as overly prejudicial." (Def. Mot. at 21).  As noted in the Government's motions *in limine*, the statements contained in the YouTube Video are not unduly prejudicial because they concern the Government's core factual allegation in this case—namely, CC-1's decision to conspire with the defendant to travel to Syria to join ISIL. (Gov't Mot. at 31).  Accordingly, the statements are no more or less inflammatory than the other evidence to be presented at trial, and their probative value far outweighs any purported prejudicial effect. *Johnson*, 529 F.3d at 600; *see also* Fed. R  Evid. 403.

The defendant is also incorrect in his assertion that undue prejudice would result from the YouTube Video because CC-1's "attempt[] to 'cover up' an alleged co-conspirator's involvement constitutes bad acts which [are] inadmissible." (Def. Mot. at 21).  As set forth in the Government's motions, the Government does not seek to introduce CC-1's statements concerning the defendant's purported lack of involvement in the charged conspiracy as uncharged "bad acts."  Rather, the Government seeks to offer these statements on four separate and independent bases. (Gov't Mot. at 24-32).  First, these statements are admissible as statements made during and in furtherance of the charged conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  (Gov't Mot. at 26).  In particular, CC-1's statements in the YouTube Video furthered the objectives of charged conspiracy by disseminating misleading information concerning the means by which CC-1 traveled to ISIL-controlled territory, thereby maintaining secrecy in ISIL's methods—and the methods used by CC-1 and CC-2—to facilitate recruitment

and travel of personnel.  (Gov't Mot. at 25-27).  CC-1's statements are therefore admissible because his "concealment of the existence of the conspiracy served not only to cover up the declarant's past participation in criminal behavior, but to shield the ongoing conspiracy as well." *United States* v. *Pecora*, 798 F.2d 614, 630 (3d Cir. 1986) (citing *Grunewald* v. *United States*, 353 U.S. 391, 405–06 (1957)).  *See also United States* v. *Koppers Co.*, *Inc.*, 652 F.2d 290, 298 (2d Cir. 1981) ("post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy"); *United States* v. *Bermudez*, 526 F.2d 89, 95 (2d Cir. 1975) ("Evidence obtained by searches conducted after the termination of a conspiracy has frequently been held admissible to prove the existence of the conspiracy even though occurring after its conclusion.").  Second, certain of CC-1's statements on the YouTube Video are also admissible because the Government is not offering them for their truth.  *See* Fed R. Evid. 801(c)(2). (Gov't Mot. at 30).  Rather, the Government will argue at trial that these statements are obvious falsehoods offered by CC-1 to deceive others (including U.S. authorities) and falsely exculpate the defendant following his August 26, 2015 arrest.  Such statements are admissible.  *United States* v. *Aponte*, 31 F.3d 86, 88 (2d Cir. 1994) (defendant's "fabricated statement and false descriptions were not offered for the truth of the matter asserted and therefore were not hearsay").  Third, the statements contained in the YouTube Video are admissible because they are against CC-1's penal interests pursuant to Rule 804(b)(3).  Finally, and as also set forth in the Government's motions *in limine*, the statements are admissible pursuant to the residual hearsay exception set forth in Federal Rule of Evidence 807.  (Gov't Mot. at 32).

### 3. The Contents of CC-1's Twitter Account Should Be Admitted as Co-Conspirator Statements in Furtherance of the Conspiracy, and Are No More Prejudicial than the Charged Conduct

CC-1's "AbuMurad_IS" account returns are admissible as (a) statements against penal interest, *see* Fed. R. Evid. 804(b)(3), and (b) statements of the state of mind of the declarant, *see* Fed. R. Evid. 803(3).

CC-1's Abu Murad_IS account was created on May 11, 2015, when he was living in ISIL-controlled territory in Syria, providing support to ISIL, and receiving military-type training from ISIL. In Twitter posts and direct messages to other Twitter users, CC-1 repeatedly described living in ISIL's capital, Raqqah, and ISIL-controlled territory and announced his support for ISIL's ideology ("The baraka in Sham is real, you feel it when you see the beautiful landscape, the generosity of the brothers, the masajid. . . ." and "Life in Raqqah is normal for the most part, when the K's aren't bombing us. All women in niqab, mujahideen walking everywhere. It's a nice")[15], receiving training ("Training has been real busy"), and general statements in support of ISIL and ISIL ideology ("It's one thing to not support us, but do not allow yourself to become a mouthpiece for the kuffar who are fighting us."). These statements would be highly probative at any trial against CC-1. Thus, Rule 804(b)(3) applies here because, (a) as described in Section IV.B., above, CC-1 is unavailable as a witness, (b) these statements are sufficiently reliable to warrant the inference that a reasonable person in CC-1's position would not have made these statements unless he believed it to be true because they are contrary to CC-1's penal interest, and (c) corroborating circumstances—for example, CC-1's Facebook messages confirming his location, support for ISIL, and receipt of military-type training from

---

[15] "Sham" refers to "Islamic State of Iraq and al-Sham," or "ISIS," and, geographically, to greater Syria, including Syria, Lebanon, Jordan, Israel, and Palestine. "K" in the message "when the K's aren't bombing us" is a reference to "kuffars," or "infidels." "Mujahideen" means "one who struggles," though, in context, it can mean "holy warrior."

ISIL during this time period—clearly indicate the trustworthiness of these statements.  *See United States* v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983).

CC-1's statements on his Abu Murad_IS account are also statements of his then-existing state of mind and, in particular, his support for ISIL.  Pursuant to Rule 803(3), "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is admissible for the truth of the matter asserted.  Fed. R. Evid. 803(3).  "[T]he reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation."  *United States* v. *Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991) (citing *United States* v. *Harris*, 733 F. 2d 994, 1004 (2d Cir. 1984)).  CC-1's Abu Murad_IS Twitter statements are classic examples of declarations of then-existing state of mind.

Finally, CC-1's Abu Murad_IS statements cannot be deemed "unfairly" prejudicial.  These statements are highly probative of CC-1's location in ISIL-controlled territory, confirmation of the organization to which CC-1 was providing material support and resources (ISIL), CC-1's state of mind, and CC-1's receipt of military-type training from ISIL and activities in support of ISIL while in Syria.  Thus, these statements are highly probative of the participation in the charged conspiracy by the defendant, who facilitated CC-1's travel, as well as of the defendant's knowledge.  CC-1 created the Abu Murad_IS account on May 11, 2015—four days after he sent the defendant a Facebook message saying "everything is going according to plan."  CC-1's creation of the Abu Murad_IS account and his statements on that account confirm what that "plan" entailed—joining ISIL, receiving military-type training from ISIL, and providing material support to ISIL.   Furthermore, these statements are no more prejudicial than the crimes with which the defendant has been charged.

**4.  CC-1's Letter to His Family Can Be Authenticated and is Admissible**

The defendant's arguments seeking to preclude admission of the CC-1 Letter at trial are similarly meritless.

The defendant's principal argument concerning the CC-1 Letter is that the letter is inadmissible hearsay that is not "reliable" and "cannot be authenticated."  (Def. Mot. at 22-23).  As an initial matter, the defendant does not address—much less refute—*any* of the specific bases on which the Government seeks to offer this evidence at trial, namely (1) as statements against penal interest pursuant to Rule 804(b)(3); (2) as statements made during and in furtherance of the charged conspiracy pursuant to Rule 801(d)(2)(E), and (3) pursuant to the residual hearsay exception pursuant to Rule 807.  (Gov't Mot. at 22-24.)  The defendant simply asserts in blanket fashion that the letter is "unreliable" hearsay and should be precluded.  (Def. Mot. at 23.)

The defendant's argument concerning the reliability of the CC-1 Letter lacks merit.  As set forth in the Government's motions *in limine*, the Government expects to offer proof of extensive corroborating circumstances that clearly indicate CC-1 Letter's authenticity and reliability.  (Gov't Mot. at 23).  For instance, the Government expects that a relative of CC-1, referred to in the Government's motions as "Relative-1," will testify concerning the circumstances in which he received the letter via the social media platform Viber.  The Government further expects that Relative-1 will identify the handwriting in the letter as that of CC-1 based on Relative-1's prior interactions with CC-1.  Moreover, to the extent the defendant seeks to cast further doubt on the reliability of the CC-1 Letter's by undermining its assertion that CC-1 had died in battle (Def. Mot. at 23-24), the defendant's arguments are baseless.  Indeed, the Government recently produced to defense counsel photographs received by a member of CC-1's family depicting CC-1 after his death (attached hereto under seal as Exhibit A).  The Government respectfully submits that the letter's contents, when combined with the

other corroborating circumstances described above, are sufficient to authenticate the CC-1 Letter

and establish its reliability.

Moreover, to the extent that the Court is not prepared to admit the CC-1 Letter based on

the Government's factual proffers, the Court may hold a hearing pursuant to Rule 104 to make a

determination regarding the admissibility of the CC-1 Letter.  *See* Fed. R. Evid. 104(a) (stating

that the Court "must decide any preliminary question about whether . . . evidence is admissible

[and] is not bound by evidence rules, except those on privilege").  *See also* Fed. R. Evid. 104(c)

(stating that "the court must conduct any hearing on a preliminary question so that the jury

cannot hear it if . . . justice so requires").

Finally, the Court should reject as meritless the defendant's additional argument that "the

letter's limited probative value is strongly outweighed by the unduly prejudicial effect of

referencing [CC-1's] death[.]" (Def. Mot. at 24).  The probative value of CC-1 Letter—which

contains direct admissions from CC-1 concerning his desire to fight and die for ISIL—is

extremely high and can hardly be described as "limited."  (*Id.*)  In particular, CC-1's statements

reflecting his willingness to fight and die for ISIL lie at the very core of the Government's

factual allegations in this case because they directly support the charges that he conspired with

the defendant to provide himself as personnel to ISIL and to receive military training from ISIL.

Moreover, the CC-1 Letter and the YouTube Video constitute the only direct admissions from

CC-1 that the Government intends to offer in which CC-1 directly refers to his support for ISIL

without the use of coded language.  Thus, the CC-1 Letter is highly relevant and probative.

Moreover, any purported prejudicial effect of this evidence is limited, given that ISIL's violent

activities—including the willingness of many of its members to die for the group—are well

known to the public and will not unduly surprise, shock, or prejudice members of the jury.  This

is particularly so because the letter contains no graphic descriptions or images but merely reports

CC-1's death to his family ("if you're reading this then know that I've been killed in battle and am now with our Lord InshaAllah").  Accordingly, the probative value of the CC-1 Letter vastly outweighs any limited prejudicial effect it may have upon the jury.

**V.      Evidence of the Defendant's "Other Acts" is Admissible as Direct Proof of the Charged Crimes and Background to the Charged Conspiracies and Pursuant to Rule 404(b)**

The Government also seeks to admit four categories of evidence—(a) the defendant's and CC-1's sharing of *Milestones* by Sayid Qutb, (b) the defendant's statements regarding Anwar Al-Awlaki, (c) the defendant's and CC-2's discussion of military action in Egypt, and (d) the defendant's statement to CC-2 regarding an AK-47—that are admissible both as direct proof of the crimes charged in the Indictment and as background to the charged conspiracies.  In the alternative, this evidence is also admissible in the Government's case-in-chief pursuant to Rule 404(b) as (1) proof of the defendant's motive, intent, preparation, plan, knowledge, identity, and/or absence of mistake or accident with respect to the charges, (2) evidence of how the relationship between the defendant and his co-conspirators evolved, and (3) makes the story of the crimes charged complete and the charged conduct more plausible.

**A.      Applicable Law**

"It is well established that evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined  with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (alterations and internal quotation marks omitted); *United States* v. *Kassir*, No. 04 Cr. 356 (JFK), 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009), *aff'd*, *United States* v. *Mustafa*, 406 Fed.Appx. 526 (2d Cir. 2011).  Such evidence is direct evidence of a crime.  *See Kassir*, 2009 WL 976821, at *2.  However, courts have found

that a Rule 404(b) analysis is, however, prudent where it is not manifestly clear that the evidence

in question is proof of the charged crime.  *United States* v. *Mostafa*, 16 F. Supp. 3d 236, 251

(S.D.N.Y. 2014) (citing *Kassir*, 2009 WL 976821, at *2).

   "Other act" evidence may be admitted under Rule 404(b) so long as the evidence: (1) is

advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial;

and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect.

*See United States* v. *Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are

admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").

Rule 404(b)(2) identifies that proper purposes for other act evidence include "proving motive,

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident."  *Id.*  The Supreme Court has stated, "Extrinsic acts evidence may be critical to the

establishment of the truth as to a disputed issue, especially when that issue involves the actor's

state of mind and the only means of ascertaining that mental state is by drawing inferences from

conduct."  *Huddleston* v. *United States*, 485 U.S. 681, 686 (1988).  As such, the Second Circuit

evaluates 404(b) evidence under an "inclusionary approach."  *United States* v. *Paulino*, 445 F.3d

211, 221 (2d Cir.2006) (citations and internal quotation marks omitted); *United States* v.

*Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992).

   "One legitimate purpose for presenting evidence of extrinsic acts is to explain how a

criminal relationship developed; this sort of proof furnishes admissible background information

in a conspiracy case."  *United States* v. *Pipola*, 83 F.3d at 566 (holding that a district court did

not abuse its discretion in admitting evidence of prior illicit activities involving the defendant

and his co-conspirators that showed how the relationship between the defendant and his co-

conspirators evolved, made the story of the crimes charged complete, and made the charged

conduct more plausible); *United States v. Lasanta,* 978 F.2d at 1307-08.  "Such proof may also

be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust." *Pipola*, 83 F.3d 566 (citing *United States v. Rosa,* 11 F.3d 315, 334 (2d Cir. 1993), *cert. denied,* 511 U.S. 1042 (1994)).  Completing the story of the crimes is also a legitimate use of prior act evidence.  *United States* v. *Williams*, 585 F.3d 703, 707 (2d Cir. 2009) (citing *United States* v. *Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006)).

"Other act" evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged.  *United States* v. *Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990); *Abu-Jihaad*, 630 F.3d at 133 (finding that conversations referring to support of jihad were no more inflammatory than the charges in the indictment); *United States* v. *Mercado*, 573 F.3d 138, 142 (2d Cir.2009) (upholding a Rule 403 determination where the challenged evidence was "not especially worse or shocking than the transactions charged" and where the district court instructed the jury as to what inferences could properly be drawn from such evidence).

The district court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).

**B.  The Defendant's and CC-1's Receipt of *Milestones***

The defendant is incorrect in asserting that his and CC-1's receipt of the book *Milestones* by Sayid Qutb is propensity evidence that should be precluded at trial.  (Def. Mot. at 25).  As an initial matter, this evidence is admissible as direct evidence of the charged conspiracy because it helps to demonstrate the common ideological orientation and an important influence on CC-1's decision to join ISIL.  *Milestones* is a book by Egyptian author Sayid Qutb published in 1964.  In the book, Qutb calls for the recreation of the Muslim world based on strict adherence to Islam. *Milestones* has had far-reaching effects within Islamists movements, and has been invoked by

various militant jihadist groups (including ISIL) to support, among other things, calls for the restoration of an Islamic State (or caliphate) and hostility toward Western influence and civilizations.  Accordingly, the fact that the defendant and CC-1 both received *Milestones* years prior to their alleged participation in the charged conspiracy directly supports the Government's allegations that they embraced fundamentalist and/or extremist Islamist views that led ultimately led CC-1 to travel to Syria to fight and die with ISIL.  Indeed, several Facebook messages attached hereto as Exhibit B reflect that CC-1—while in ISIL-controlled territory in Syria—encouraged Relative-1 to read *Milestones*, apparently as part of CC-1's efforts to explain to Relative-1 the virtues of the extremist form of Islam promoted by ISIL.

Moreover, the aforementioned evidence is admissible on an alternative basis pursuant to Rule 404(b) because it "explain[s] how a criminal relationship developed" and thus "furnishes admissible background information in a conspiracy case."  *Pipola*, 83 F.3d at 566.  In particular, evidence of the defendant's and CC-1's receipt of *Milestones* provides "admissible background" in two key respects.  First, it tends to suggest a common ideological orientation between the defendant and CC-1, which helps to explain how their relationship with each other evolved and led to the charged conspiracy.  Second, their receipt of this text is part a larger pattern of behavior in which the defendant and CC-1—both together and separately—viewed or distributed material over social media or email that reflected militant jihadist thinking.  This fact is crucial to understanding how CC-1 and the defendant joined the charged conspiracy despite the fact that they lived in different regions of the country, had a significant age difference, and did not typically meet or interact in person.  Thus, their possession of these materials helps to complete the story of the charged offense conduct and is admissible.  *Williams*, 585 F.3d at 707.

### C.  The Defendant's Statements Regarding Anwar Al-Awlaki

The defendant's argument that his (a) August 2014 statements to the effect that Anwar Al-Awlaki "was really committed to the cause . . . and his words still apply today," and (b) admissions that he posted videos of Al-Awlaki's lectures on his YouTube Channel should be precluded misstates the highly probative value of these statements.  (Def. Mot. at 27-29.).

First, the Government believes the defendant's statements about Anwar Al-Awlaki are direct evidence of the charged conspiracy because it helps to demonstrate the common ideological orientation and evolution of the defendant and CC-1 towards militant jihadism, which motivates ISIL and is a crucial aspect of the charged conspiracy.  At trial, the Government expects to introduce evidence that Anwar al-Awlaki was an important English-language speaker within the militant jihadist movement and was a leader of al Qaeda in the Arabian Peninsula. Although al-Awlaki was killed in 2011, his works remain influential to the jihadist community. They also remained influential to the defendant, who, as discussed in Section IV.A., above, wrote to a friend on August 10, 2014, "I have been with Sheikh Ayman and Anwar Al Awlaki, may Allah have mercy on him, if you know him.  [B]ut I do not like to show my Jihadi personality."  Accordingly, the fact that the defendant praised Al-Awlaki and posted videos of Al-Awlaki's lectures on his YouTube channel, as well as spoke of Al-Awlaki in the same breath that he spoke of his own "Jihadi personality," supports the Government's argument that the defendant embraced extremist Islamist views that led ultimately led to his facilitating CC-1 to travel to Syria to fight and die with ISIL, as opposed to some other non-militant-jihadi organization.

Second, the defendant's statements regarding Al-Awlaki and posting of Al-Awlaki lectures are admissible on an alternative basis pursuant to Rule 404(b) because they establish the defendant's motive, intent, and knowledge, and provide relevant background information to

make the story of the crimes charged complete and to enable the jury to understand how the

illegal relationship between the co-conspirators developed. *Pipola*, 83 F.3d at 566. These

statements, when read in the context of CC-1's statements regarding and exploration of militant

jihad during the same time frame, tends to suggest a common ideological orientation between the

defendant and CC-1, which helps to explain how their relationship with each other evolved and

led to the charged conspiracy despite the fact that they lived in different regions of the country,

had a significant age difference, and did not typically meet or interact in person.

Third, the notion that admission of the defendant's statements regarding Al-Awlaki will

require the defense to paint a more nuanced portrait of Al-Awlaki and somehow cause a trial

within a trial (Def. Mot. at 29) is surprising given the defendant's express statement that he

aligned himself with Al-Awlaki notwithstanding his desire not to "show my Jihadi personality."

This statements makes more likely that the defendant was not expressing his support for Al-

Awlaki's positions on "more mundane questions of Islamic theology" such as "obesity and

overeating" (*Id.*) but, instead, on Al-Awlaki's jihadist ideology.

Finally, this evidence is no more sensational or disturbing than the terrorism crimes with

which the defendant has been charged and, therefore, its highly probative value is not

substantially outweighed by any unfair prejudicial effect. *See Abu-Jihaad*, 630 F.3d at 133

(finding that conversations referring to support of jihad were no more inflammatory than the

charges in the indictment).

### D. The Defendant and CC-2's Discussion of Military Action in Egypt and the Defendant's Statement to CC-2 Regarding an AK-47

In January 2014, the defendant exchanged Facebook messages with CC-2 regarding planning

military action in Egypt. During these messages, the defendant advised CC-2, for example, that CC-

2 should set up "position[s] close to every station at a distance of 500 meters," have "3 shifts

[including] a team [that] will rest and a team [that] will hit and run," that "we need a command and

field coordination on the ground," and "they cannot hold . . . unless they hit us with planes."

Approximately six months later, on July 11, 2014, the defendant wrote to CC-2, who was in Egypt at

the time, that he "wish[es he] could be in Egypt with an AK47 and four magazines."  One minute

later, CC-2 and the defendant exchanged the following messages:

| | |
|---|---|
| CC-2: | I want to travel |
| The defendant: | Good . . . Where? . . . Iran . . . or Daesh? |
| CC-2: | [Sending the defendant an image of a visa, in his name, to Turkey valid from June 10, 2014 through August 7, 2014] Turkey |
| The defendant: | You are a Daesh gigolo . . . Congratulations |

Then, three days later, on July 16, 2014, the defendant wrote to CC-2 that "if the State comes to

fight the Egyptian army I will not object."  These statements—the discussion of military action

in Egypt, the defendant's desire to bring an AK47 and four magazines to Egypt, the defendant's

identification of CC-2 as a "Daesh" (ISIL) "gigolo" because CC-2 wanted to travel to Turkey,

and the defendant's alignment with ISIL as against the Egyptian army—when viewed together,

are direct proof of the charged conspiracy.  Specifically, these statements demonstrate the

defendant's familiarity with military operations and weaponry, CC-2's support for ISIL ("You

are a Daesh gigolo"), Turkey's status as a destination for those who want to join ISIL, and

recognition and alignment with ISIL's desire to acquire territory through the use of military

action—all of which, are inextricably intertwined with evidence regarding the charged

conspiracy and, as such, are direct proof that the defendant knowingly facilitated CC-1's travel to

Turkey and Syria so that CC-1 could join and receive military-type training from ISIL.  *See*

*Gonzalez*, 110 F.3d at 942.

      In the alternative, the defendant's statements regarding planning military action in Egypt

and desire to have an AK-47 in Egypt are admissible pursuant to Rule 404(b) because the

provide background information regarding the defendant and CC-2 in demonstrating the free manner in which they communicated to each other regarding and explaining how their criminal relationship developed.  In other words, they are admissible to the show the development of the relationship of trust that existed the defendant and CC-2, partially explaining why they would choose to become involved in the charged terrorism offenses together.   In addition, this evidence is no more sensational or disturbing than the terrorism crimes with which the defendant has been charged and, therefore, its probative value is not substantially outweighed by any unfair prejudicial effect.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should deny the defendant's motions *in limine*.

Dated:  New York, New York
        November 4, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

                        By:     ____/s/_____
                                        Andrew J. DeFilippis
                                        Brendan F. Quigley
                                        Negar Tekeei
                                        Assistant United States Attorneys
                                        One St. Andrew's Plaza
                                        New York, New York 10007
                                        Tel. No.: (212) 637-2231/2190/2482