UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -   x
UNITED STATES OF AMERICA            :
                                    :
        - v -                       :
                                    :        **15 Cr. 588 (ER)**
**AHMED MOHAMMED EL GAMMAL,**       :
            Defendant.              :
- - - - - - - - - - - - - - - -   x


**DEFENDANT AHMED MOHAMMED EL GAMMAL'S OPPOSITION**

**TO THE GOVERNMENT'S MOTIONS IN LIMINE**


                        Federal Defenders of New York
                        Daniel Habib, Esq.
                        Annalisa Mirón, Esq.
                        Sabrina Shroff, Esq.
                        Attorneys for Defendant
                            **Ahmed Mohammed El Gammal**
                        52 Duane Street - 10th Floor
                        New York, NY 10007
                        Tel.: (212) 417-8700


TO:     PREET BHARARA, ESQ.
        United States Attorney
        Southern District of New York
        1 St. Andrew's Plaza
        New York, NY 10007

Attn:   **Andrew DeFilippis, Esq.,**
        **Brendan Quigley, Esq.,**
        **Negar Tekeei, Esq.**
        Assistant United States Attorneys

The defense submits this memorandum of law in opposition to the government's motions in limine ("Gov't MILs"), Dkt. No. 80.

1.   **This Court Should Allow The Defense To Elicit That The FISA Search Of ███████████████████████████ Did Not Yield Certain Inculpatory Evidence.**

The government says that the defense "intend[s] to cross examine one or more law enforcement witnesses concerning the fact that certain evidence offered by the Government at trial," namely, ████████████████████████████████████ ████████████████ "was derived from searches conducted pursuant to FISA."  Gov't MILs 12.  To block that line of questioning, the government seeks "an order precluding reference to the fact that certain materials were derived from FISA searches."  Id.

The government's motion should be denied as moot.  The defense does not intend to elicit that a FISA search yielded ██████████████████  We do, however, intend to elicit that the government employed the extraordinary technique of a FISA search but did not find various forms of inculpatory evidence that might have been expected if El Gammal were guilty as charged.  Specifically, the government found no discussions of a terrorist attack or domestic terrorist activity, no evidence of the existence of a domestic terrorist cell, and no references to members of leaders of ISIL, among other omissions.  That absence of evidence is exculpatory and therefore relevant.  Both the

Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment right to present a defense require its admission.

Pointing a jury to the fact that the government's investigative techniques have failed to yield evidence of guilt is a staple of criminal defense practice.  See, e.g., Jackson v. Conway, 763 F.3d 115, 141 (2d Cir. 2014); Bierenbaum v. Graham, 607 F.3d 36, 53 (2d Cir. 2010).  Defense attorneys routinely, and properly, elicit such evidence on cross-examination of law enforcement witnesses -- for example, that a victim's rape kit did not reveal the defendant's DNA, Jackson, 763 F.3d at 141; or that the search of a murder defendant's apartment did not reveal evidence of a violent crime, Bierenbaum, 607 F.3d at 53.

Here, the defense is entitled to show that the government undertook various steps to investigate El Gammal, but failed to uncover evidence -- e.g., plans for a terrorist attack, references to members of ISIL or another foreign terrorist organization, among others -- that might have existed had El Gammal in fact committed the offenses charged.  Indeed, it's precisely because, as the government observes, jurors will know that FISA is "specifically designed to combat national security threats involving foreign powers," Gov't MILS 13, that this absence of evidence is probative.  The defense wants to show that the government left no stone unturned in probing El

2

Gammal's life, invoking even FISA's extraordinary authority, but did not obtain definitive proof of his affiliation with ISIL.

"The absence of evidence in a criminal case is a valid basis for reasonable doubt." United States v. Bautista, 252 F.3d 141, 145 (2d Cir. 2001). Likewise, the Sixth Amendment right to present a defense encompasses the right to elicit "exculpatory evidence" and so "have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" Crane v. Kentucky, 476 U.S. 683, 690-91 (1986) (quoting United States v. Cronic, 466 U.S. 648, 656 (1984)). This Court should permit El Gammal to meet what will surely be a lengthy presentation of what the government found with counterbalancing evidence of what the government didn't find, despite its best efforts.[1]

## 2. Some of Samy El-Goarany's Social Media Communications Are Inadmissible Hearsay.

---

[1] Because the government's MIL No. 1 is moot, El Gammal need not respond to the government's arguments regarding relevance (Gov't MILs 12-13) and classified information (13-14). However, the defense notes that if the source of evidence is indeed "legally irrelevant," we expect that the government will not elicit testimony from its law enforcement witnesses that, for example, various items were recovered following the execution of "a Rule 41 search warrant" on El Gammal's home. Gov't MILS 12. Similarly, because the defense does not plan to show the "association" of ██████████████ "with FISA-authorized search procedures," this issue does not implicate the government's concerns regarding the dissemination of classified information. Gov't MILs 13-14.

The government intends to introduce "various communications" between Samy El-Goarany and his brother Tarek El-Goarany, as well with his friend Khalafalla Osman and a Twitter user with the handle @GleamingRazor, specifying four such messages.  Gov't MILs 20-22.[2]  The government contends that these hearsay statements are admissible as against penal interest pursuant to Fed. R. Evid. 804(b)(3).  For now, we have the following objections:

**May 2015 Communications with Tarek El-Goarany (Gov't MILS 20-21):**  Statements that El-Goarany "supported the immolation of a person in retaliation for bombings of 'our people,' i.e., ISIL," are inadmissible.  Assuming unavailability, the statements do not expose El-Goarany to criminal liability because they constitute protected speech that falls within the square holding of Holder v. Humanitarian Law Project: 18 U.S.C. § 2339B "does not penalize mere association with a foreign terrorist organization" and "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group."  561 U.S. 1, 39 (2010) (quoting Humanitarian Law Project v. Reno, 205 F.3d 1130, 1133 (9th Cir. 2000)).  Under the material-support statute,

---

[2] The government says that it will offer other "similar communications" "at trial," but doesn't specify which ones. Gov't MILs 21.  The defense will object as necessary once the government does so.

persons "may say anything they wish on any topic" and "may speak
and write freely" about designated foreign terrorist
organizations.  561 U.S. at 25-26.  Section 2339B "does not
prohibit independent advocacy or expression of any kind" and
"does not prevent" persons "from becoming members of" FTOs "or
impose any sanction on them for doing so."  Id. at 26.

     In addition, even if admissible under Rule 804(b)(3), these
statements should be excluded as unduly prejudicial under Rule
403.  Descriptions of ISIL's gruesome extrajudicial killings
(for example, burning a pilot alive) will only arouse the jury's
passions and have little probative value.  The fact that El-
Goarany expressed approval of this killing in May 2015 -- after,
on the government's view, months of indoctrination by ISIL --
says nothing about his mental state at the relevant time, i.e.,
when he is alleged to have conspired with El Gammal to travel to
Syria.  Indeed, there is no evidence that El-Goarany had these
views during the period between August 2014 and January 2015, or
if he did, that he shared them with El Gammal.  At best, this
statement shows that El-Goarany developed and expressed staunch
pro-ISIL views long after his active relationship with El Gammal
ceased.

**May 2015 Communications with Khalafalla Osman Regarding
"bilad al Islam" (Gov't MILs 21):** Again, assuming
unavailability, these statements are inadmissible under Rule

5

804(b)(3) because they are too ambiguous to expose El-Goarany to criminal liability.  "Bilad al Islam" means simply "lands of Islam," and there is no necessary link between that phrase and "the Islamic State," as the complaint suggests (¶ 35).  To the contrary, the phrase has long been used to describe "lands of Islam" or "the Muslim world" (often as opposed to "bilad al-kufr," or "lands of non-Muslims").  See, e.g, Muslims on the Americanization Path? 57, Yvonne Yazbeck Haddad & John L. Esposito, eds. (2000) (citing ninth-century commentary by Islamic legal scholar Al-Shafi'i).  Indeed, in the context of the full conversation, even El-Goarany's interlocutor Osman appears to understand the reference to mean "Turkey."  See GX-113, pp.17,421-422 (Osman opining that "Turkey honestly is the best of our countries" and that he wants to honeymoon there).

### 3.    El-Goarany's Letter Predicting His Death "In Battle" Is Inadmissible.

The government seeks to introduce GX-1000, a letter it says El-Goarany wrote in order to apprise his family in the event of his death "in battle."  Gov't MILs 22-24.  The letter is hearsay and, contrary to the government's contentions, does not fall within any exception.  Even if it does, it should be excluded as minimally probative but highly prejudicial under Rule 403.

A.    The Letter Is Not Admissible As A Statement Against Penal Interest.

First, the government says, the letter is a statement against penal interest. Gov't MILs 22-23. Assuming unavailability, to introduce the letter as a statement against penal interest under Rule 804(b)(3), the government must show that "a reasonable person in [El-Goarany's] position would have made" the statement "only if the person believed it to be true because, when made, it ... had so great a tendency ... to expose the declarant to ... criminal liability." "Statements against interest are admissible because it is presumed that one will not make a statement damaging to one's self unless it is true." Weinstein's Fed. Evid. § 804.06[1] (LexisNexis 2016) ("Weinstein"). In light of that rationale, to justify application of the exception, the statement must pose an actual, not just a theoretical, risk of liability. Consequently, courts have refused to apply Rule 804 to statements made by declarants who, like El-Goarany, expect to die before their words would expose them to any harm. See, e.g., United States v. Lemonakis, 485 F.2d 941, 957 n.24 (D.C. Cir. 1973) ("penal interest" was "an interest of no moment to a dead man"); United States v. Angleton, 269 F. Supp. 2d 878, 889 (S.D. Tex. 2003) (statements in suicide note "would not, as a practical matter, subject" declarant "to criminal liability"); United States v. Crowder, 848 F. Supp. 780, 781-82 (M.D. Tenn. 1994) (statements by terminally ill declarant not against interest because no real

7

prospect of liability); <u>Commonwealth v. Pope</u>, 491 N.E.2d 240, 243 (Mass. 1986) ("We do not believe that concern for penal consequence would inspire a suicide victim to truthfulness.").

The same analysis applies here.  On the government's own interpretation, the letter exposed El-Goarany to no criminal liability at all because it was not to be disseminated -- i.e., the statement was not to be "made" -- until after El-Goarany died.  Indeed, the government has offered no evidence that the letter was disclosed even to El-Goarany's confidants before his death.  It is just as plausible that El-Goarany hid the letter on his person or among his personal effects, disclosed its existence only when he knew that he was dying, or told his confidants only that he had a letter he wished transmitted to his family upon his death, without specifying the letter's contents.  Because it's the government's burden to satisfy Rule 804(b)(3)'s prerequisites, that failure of proof is fatal.  This Court must presume that no one knew the contents of El-Goarany's letter until after he died, that is, until after the risk of liability had passed.  <u>See, e.g.</u>, <u>Morales v. Portuondo</u>, 154 F. Supp. 2d 706, 726 (S.D.N.Y. 2001)(declarant had expectation that statements made to priest would remain confidential).

B.   <u>The Letter Is Not Admissible As A Co-Conspirator Statement.</u>

Next, the government says, the letter is admissible as a co-conspirator statement under Rule 801(d)(2)(E).  Gov't MILs

23-24.  To satisfy that exception, the government must prove by a
preponderance of the evidence that El-Goarany wrote the letter
"during the course of and in furtherance of the conspiracy."
United States v. Mandell, 752 F.3d 544, 552 (2d Cir. 2014).  The
government fails on both counts.

First, "[s]tatements made after the main objective of the
conspiracy has been ... achieved ... do not fall within the
rule's coverage."  Weinstein § 801.34[4][a].  That is, "[t]he
hearsay-conspiracy exception applies only to declarations made
while the conspiracy charged was still in progress, a limitation
that this Court has 'scrupulously observed.'"  Anderson v.
United States, 417 U.S. 211, 218-19 (1974).  As El Gammal has
explained (see Dkt. No. 83, at 15-16), the conspiracies charged
here began in August 2014 and ended by "early 2015," when, the
government alleges, El-Goarany had been "provided" to ISIL and
had received military-type training.  Because the government
acknowledges that "the date of the letter is unknown," Gov't
MILs 23, the government cannot prove that El-Goarany wrote it
"during" the relevant time.  Indeed, because the letter refers
to dying "in battle," the more likely inference is that its
author was ready to participate in battle because he had already
completed receipt of his military training.

The government's suggestion that the conspiracy "continued"
as long as El-Goarany was engaged in "activities as a trained

fighter providing material support to ISIL" is mistaken.  Gov't
MILs 23.  A conspiracy "may be deemed terminated when, in a
broad sense, its objectives have ... been accomplished ..., not
when its last overt act was committed."  United States v.
Persico, 832 F.2d 705, 713 (2d Cir. 1987) (quoting United States
v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir. 1980)).  That is,
"the scope of the conspiratorial agreement ... determines ...
the duration of the conspiracy."  United States v. Grimm, 738
F.3d 498, 502 (2d Cir. 2014) (quoting United States v.
Salmonese, 352 F.3d 608, 614 (2d Cir. 2003)).  The Supreme Court
has often held that statements made after the main objective of
the conspiracy has been accomplished do not fit the exception.
See, e.g., Anderson, 417 U.S. at 218; Dutton v. Evans, 400 U.S.
74, 81 (1970); Wong Sun v. United States, 371 U.S. 471, 490
(1963); Lutwak v. United States, 344 U.S. 604, 615-20 (1953);
Krulewitch v. United States, 336 U.S. 440, 443-44 (1949).

    One "objective" of this conspiracy was to provide material
support (in the form of personnel, namely, El-Goarany) to ISIL.
That objective was complete once El-Goarany joined ISIL.
Imagine that instead of "personnel," the government had charged
El Gammal with conspiring to provide material support in the
form of "weapons," "lethal substances," or "explosives."
§ 2339A(b)(1).  That conspiracy would surely have concluded once
ISIL had received the tangible goods -- the guns, the poison,

the bombs -- and would not have continued as long as ISIL
possessed them.  So too, here, and the government cites no
authority for the contrary proposition that a material support
conspiracy endures after the support has been provided.  Another
objective of this conspiracy was for El-Goarany to receive
military-type training from ISIL.  By the government's own
allegation, that objective was realized in "early 2015."  Dkt.
No. 3 (Indictment), ¶ 4(d).

Second, the government can't show that El-Goarany wrote the
letter "in furtherance of" the conspiracy, Rule 801(d)(2)(E),
because "this requirement bars mere narratives of past
successes," Weinstein § 801.34[5].  "'[I]n furtherance of the
conspiracy' implies that 'the statements must in some way have
been designed to promote or facilitate achievement of the goals
of the ongoing conspiracy, as by, for example ... seeking to
induce a coconspirator's assistance, serving to foster trust and
cohesiveness, or informing coconspirators as to the progress or
status of the conspiracy.'"  United States v. Diaz, 176 F.3d 52,
85 (2d Cir. 2002) (quoting United States v. Tracy, 12 F.3d 1186,
1192 (2d Cir. 1993).

El-Goarany's letter, the government says, "facilitated" his
"fighting and ultimate martyrdom on behalf of ISIL by providing
a mechanism to ensure that his family would be notified upon his
death."  Gov't MILs 23.  The government provides no authority

11

for the proposition that a declarant's statement furthers a conspiracy as long as it encourages the declarant himself to continue his participation in the conspiracy.  Rather, Circuit precedent explains that the effect on the listener is what's significant.  See, e.g., United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990) ("[T]he statements must be such as to prompt the listener -- who need not be a coconspirator -- to respond in a way that promotes or facilitates the carrying out of a criminal activity."); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989) (same); United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987) (same).  Moreover, the government offers no evidentiary support for the premise that El-Goarany required a "mechanism" for notifying his family of his death before undertaking this conspiracy.  Rather, on the government's version, El-Goarany traveled to a war zone in Syria, joined a violent terrorist organization, received military training from that organization, and may have fought in battle, all without the benefit of this letter.  "Key in the determination" whether a statement was in furtherance of a conspiracy "is whether it was the speaker's purpose to advance the conspiracy."  Weinstein § 801.34[5].  See also Mueller & Kirkpatrick, Fed. Evid. § 8:61, at 513 (4th ed. 2013) ("[W]hat counts is the intention of the speaker to aid the venture.").  Nothing but the government's speculation supports the assertion

12

that El-Goarany's purpose in writing was to steel himself to participate in the conspiracy -- which he had done long before penning this letter.  Rather, the obvious purpose of this statement was for a son to let his family know what had happened to him.  That is insufficient because "[n]arrative declarations that do not serve conspiratorial purposes" and are not made to co-conspirators "do not satisfy the furtherance requirement." Weinstein § 801.34[5].  See also, e.g., Beech-Nut Nutrition Corp., 871 F.2d at 1199.

As a backup, the government ventures that "dissemination of the letter ... itself provided support to ISIL by promoting ISIL's militant ideology."  Gov't MILs 23-24.  But the letter was not to be "disseminated" until El-Goarany died -- which, we expect even the government would agree, ended this conspiracy -- and "[t]here can be no furtherance of a conspiracy that has ended."  Lutwak, 344 U.S. at 617-18.  Moreover, it's immaterial that "dissemination" of the letter might have "promoted" ISIL's "ideology" (even though it's hard to imagine that a grieving family's reaction to their son's death would have prompted them to take up arms, too, or that they would have published his letter more widely).  Promoting ISIL's worldview was not the objective of this conspiracy.  Providing El-Goarany was.  A statement that arguably advances the former purpose does not further a conspiracy to do the latter.  El-Goarany did not ask

his family to join the conspiratorial venture or help him achieve its goals.  Rather, he knew that they would receive the letter only after his death had ended the conspiracy.

C.   The Letter Is Not Admissible Under The Residual Exception.

Finally, the government makes the one-sentence argument that the letter is admissible under Rule 807 "because of its highly probative value with respect to [El-Goarany's] receipt of military training and engagement in combat on behalf of ISIL." Gov't MILS 24.  Rule 807 "is 'applied in the rarest of cases.'" United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993) (quoting United States v. DeVillio, 983 F.2d 1185, 1190 (2d Cir. 1993)).  This is not such a case because the letter fails to satisfy the Rule's requirements.

The letter offers non-cumulative proof of only one fact -- El-Goarany's death -- and that is uncharged conduct, not a "material fact."  Rule 807(a)(2).  To the extent that the letter is offered to prove "receipt of military training" -- although one searches the letter in vain for any words to that effect -- or El-Goarany's fighting on ISIL's behalf, the letter is not "more probative" on those points "than any other evidence that the proponent can obtain through reasonable efforts."  Rule 807(a)(3).  On the contrary, the government has indicated its intent to offer substantial direct evidence on both points, including El-Goarany's own statements regarding his "training,"

14

being subject to "bombing" in "Raqqah," and associating with

"mujahideen" (see Gov't MILs 20-21); and photos of El-Goarany in

what the government says is Syria holding an AK-47 (GX-901

through 903).  As discussed in more detail below (§ 3.E),

admitting such an inflammatory letter would not promote "the

interests of justice."  Rule 807(a)(4).  Finally, Rule 807 does

not apply to the letter because the statements contained therein

are "specifically covered" by Rules 803 and 804, even though

they do not qualify for admission under that Rule.  See United

States v. Zapata, 356 F. Supp. 2d 323, 327 (S.D.N.Y. 2005)

(excluding evidence under Rules 804(b)(3) and 807 because "the

admissibility of statements such as Londono's is governed by

Rule 804, thus, by the plain language of the Rule, Rule 807 does

not apply.").

D.   The Viber Transmission Of The Letter Adds Layers Of Hearsay
For Which The Government Identifies No Exception.

Even if El-Goarany's letter qualifies under a hearsay

exception, the Viber transmission of photographs of the letter

adds layers of hearsay for which the government has identified

no exception.  And under Rule 805, each layer of hearsay

requires one.  As the government has explained (Gov't MILs 10-

11), its view is that El-Goarany wrote the letter, someone took

photographs of the letter, and "an unidentified person"

transmitted the photographs to El-Goarany's brother Tarek El-

15

Goarany "via Viber, an instant messaging platform."  The defense acknowledges that photographs don't constitute "statements" for hearsay purposes, see Weinstein § 801.10[2][a], but the Viber transmission of those photographs does.  The transmission is a written assertion by the "unidentified person" that the photograph is El-Goarany's letter, offered to prove the truth of the matter asserted (viz., that the photograph is El-Goarany's letter).  See Fed. R. Evid. 801(a).  In that sense, the Viber transmission is equivalent to an email, and numerous cases recognize that emails containing statements present double-hearsay concerns.  See, e.g., United States Nat'l Bank Ass'n v. PHL Variable Life Ins. Co., 112 F. Supp. 3d 122, 141 (S.D.N.Y. 2015).

E.   The Letter Should Be Excluded Under Rule 403.

Finally, the letter should be precluded under Rule 403 because its admission would be unduly prejudicial, would risk confusing and misleading the jury, and would invite the jury to punish El Gammal for El-Goarany's death.  To reiterate, the letter offers non-cumulative proof of only one fact, viz., El-Goarany's death.  But that fact is not material.  It is not an element of any charge and it is not essential to the government's case.  Indeed, it is said to have happened while El Gammal was in federal custody.  Granted, if El-Goarany did in fact die in battle, that fact offers modest proof that he was

16

"provided" to ISIL and, perhaps, that he received military-type training. (But not necessarily: ISIL would not be the first irregular militia to send untrained fighters into battle).  But Rule 403 directs this Court to consider the "marginal probative value" of this evidence, i.e., its value in comparison to other evidence proving the same facts, and to weight that value against the dangers of unfair prejudice and confusing the issues.  See, e.g., United States v. Ulbricht, 79 F. Supp. 3d 466, 492-93 (S.D.N.Y. 2015).  As just discussed, the government can prove that El-Goarany was "provided" to and received military-type training from ISIL in many ways, in particular through his own statements.  The fact of his death will add little to that proof.  But, on the other side of the balance, the allegation that El-Goarany died in Syria is highly inflammatory.  All of the media coverage of this case led with that fact.  See infra § 5.  Jurors confronted with a 24-year-old college student's death will, quite understandably, want to punish someone for that loss, and El Gammal will be their only choice.

**4.    El-Goarany's YouTube Video And The Related Facebook Communications Are Inadmissible.**

The government seeks to admit a YouTube video depicting El-Goarany in military garb, speaking from what he says is "the Islamic State," in which he exculpates (falsely, the government

contends) El Gammal, as well as related Facebook communications concerning the video's creation.  Gov't MILs 24-33.  As the government correctly recognizes (at 27-28), this evidence falls into two subsets: El-Goarany's self-inculpatory statements, which the government seeks to offer for their truth; and the "false exculpatory" statements and Facebook communications, offered nor for their truth but to demonstrate consciousness of guilt.  Both subsets are inadmissible.

A.   The Confrontation Clause Bars El-Goarany's Self-Inculpatory Statements.

The Confrontation Clause bars admission of the portion of the video being offered for its truth (i.e., the portion in which El-Goarany identifies himself and says that he's in "the Islamic State"), because El-Goarany's statements constitute testimonial hearsay and El Gammal has had no prior opportunity to cross-examine him.  Crawford v. Washington, 541 U.S. 36, 68 (2004).  The government contends (MILs 29-30) that El-Goarany's inculpatory statements are not testimonial because "the creation of the video" was not "prompted by law enforcement," because the video was sent to Attia Aboualala, not the authorities, and was too informal.  On the contrary, "the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial."  United States v. Saget, 377 F.3d

223, 228 (2d Cir. 2004).  See also id. (testimonial statements
are those "where the declarant would reasonably expect that his
or her responses might be used in future judicial proceedings").
Thus, in determining whether a statement implicates the
Confrontation Clause, "the crucial inquiry is whether the record
was 'created ... for the purpose of establishing or proving some
fact at trial.'"  Weinstein § 802.05[3][b] (quoting Melendez-
Diaz v. Massachusetts, 557 U.S. 305, 324 (2009)).

     Here, El-Goarany's statement itself establishes that its
primary purpose was to supply evidence at a future judicial
proceeding.  He says: "I'm making this video just to let the
authorities know this."  Gov't MILs 9.  There can be no stronger
indication of a hearsay statement's testimonial character than
the declarant's own explicit confirmation that he's making the
statement for the benefit of "the authorities" -- which, read in
context with his Facebook communications with Aboualala,
obviously means "the authorities" prosecuting El Gammal.  As a
result, it is immaterial that the video was not "prompted by" or
delivered to law enforcement.  From El-Goarany's perspective, he
was addressing law enforcement and, having no way to deliver the
video to law enforcement directly, he sent it to Aboualala, who,
he believed, would forward it to the U.S. government.  As to
formality, the statement may have been shot on "home video," but
it looks for all the world like an affidavit or a deposition: it

features El-Goarany addressing a video camera directly; it
begins with an announcement of his full name, age, citizenship,
and location; it is structured as a legal declaration might be;
and it invites "the authorities" to "use it however you wish."
Gov't MILs 9.

B.   The Relevance Rules Bar El-Goarany's "False Exculpatory"
Statements And The Related Facebook Communications.

     The government's MIL depends upon, and several times
repeats, a serious misstatement of the facts, namely, that El
Gammal "requested that ... his co-conspirators create and
distribute the YouTube video."  Gov't MILs 27.  See also id. at
29 ("the creation of the video was prompted ... by the defendant
himself"); id. at 32 ("efforts by [El-Goarany], [Aboualala], and
the defendant to conceal their ongoing conspiracy by falsely
denying any involvement by the defendant ... in that
conspiracy").  No evidence supports that assertion.  El Gammal
was detained during the entire period of time when the video was
discussed and created.  He was not capable of communicating with
the outside world except through monitored phone calls and
emails.  The government has not produced a single call or email
in which El Gammal asked anyone to create this video or endorsed
its creation and distribution.  That omission would be
inconceivable if such evidence existed.  In fact, it appears
that the only statement El Gammal makes about the video on any

of the phone calls he made while detained in Arizona (recordings and transcripts of which appear on the CD provided to this Court in conjunction with the defense's MILs) was to tell his mother that making the video would be "stupid." (Tr. 7, Gov't Exh. 10.61.0.21).  To be sure, the government reports statements by Aboualala to El-Goarany indicating that El Gammal has requested production of the video (Gov't MILs 9), but those statements are just not true, as the government well knows.  El Gammal was not capable of unmonitored communication with Aboualala, and the government has not offered a single communication to corroborate Aboualala's claim.

As a result, the government's analysis of the video's admissibility (Gov't MILs 24-33) skips a fundamental step: the relevance of the "false exculpatory" statement and the related Facebook communications under Rules 401 and 402.  The government offers a single relevance theory: "The Government intends to rely on these statements to argue that the defendant, [El-Goarany], and [Aboualala] demonstrated consciousness of guilt through their efforts to deceive others regarding their criminal conduct."  Gov't MILs 30.  Absent evidence that El Gammal orchestrated, sought, or even endorsed the video's creation, there is no basis to infer that the video demonstrates anything about El Gammal's "consciousness" at all, much less "consciousness of guilt."  To be sure, a false exculpatory

21

statement may evince the speaker's (or the procurer's)
consciousness of his own guilt, but neither El-Goarany nor
Aboualala's consciousness of his own guilt is relevant in
prosecuting El Gammal.[3]

5.    **This Court Should Use A Jury Questionnaire.**

Thanks to the government's last public filing (Dkt. No.
80), which disclosed El-Goarany's name and the sensational
allegation that he died while fighting for ISIL in Syria, this
has become a high-profile case.  Since October 17, stories on
the case have appeared in national and local media outlets,
including CNN, Fox News, Reuters, the Washington Post, the Daily
News, and New York magazine.  <u>See</u> Exh. A (collecting articles).
The defense's proposed jury questionnaire offers an efficient
method of screening venirepersons to cull those who can be
excused for cause or hardship, so that this Court and the
parties can focus voir dire on those prima facie qualified to
serve.

The government agrees that the use of a questionnaire lies
within this Court's discretion (Gov't MILs 33-34), and cites no
case where the Second Circuit has reversed a district court for

---

[3] Because the government is not seeking to introduce this
evidence for its truth, the hearsay rules do not apply.  <u>See</u>
Fed. R. Evid. 801 and 802.  Consequently, the defense need not
address the government's Rule 801(d)(2)(E) and 807 arguments,
except to point out that qualification under a hearsay exception
does not, without basic relevance, establish admissibility.

choosing to employ one.  To the contrary, the use of jury
questionnaires in terrorism cases, which involve inflammatory
allegations and the real possibility of juror bias against
Muslim or Arab-American defendants, has become common.  See,
e.g., United States v. Pugh, 15 Cr. 116 (NGG) (E.D.N.Y.), Dkt.
Nos. 87, 100 (minute entry reflecting completion of juror
questionnaires); United States v. Kareem, 15 Cr. 707 (D. Ariz.),
Dkt. No. 209 (same); United States v. Abdulmutallab, 2011 U.S.
Dist. LEXIS 104159, at *10 (E.D. Mich. Sept. 14, 2011) ("[T]he
Court has fashioned an extensive written questionnaire.");
United States v. Awadallah, 457 F. Supp. 2d 246, 254 (S.D.N.Y.
2006) (Schiendlin, J.) ("Choosing an impartial jury for
Awadallah's retrial will require a comprehensive juror
questionnaire"); United States v. Elashi, 2005 U.S. Dist. LEXIS
4559, at *11 n.5 (N.D. Tex. March 23, 2005) ("The court will
require prospective jurors to complete a questionnaire.").

    The government contends that this case has not "received
significant pre-trial publicity."  Gov't MILs 34.  That claim is
disingenuous.  In that very filing, by disclosing for the first
time El-Goarany's name, the allegation that he died fighting
with ISIL in Syria, and descrbing El-Goarany as a 24-year-old
college student from New York, the government assured
significant pretrial publicity, which has ensued.  See Exh. A.
Indeed, the government included sensational evidence (El-

Goarany's letter to his family) whose admissibility El Gammal challenges.  Moreover, it's not dispositive that this case did not involve an attack on New York.  Gov't MILs 35.  New York was the target of a terrorist attack in September, and accused bomber Ahmad Rahimi's radicalization by Anwar al-Awlaki -- whose videos the government intends to introduce as evidence of El Gammal's culpable state of mind, <u>see</u> Dkt. No. 83, at 27-29) -- was widely reported.  <u>E.g.</u>, AP, US Terror Attacks' Common Denominator: Anwar al-Awlaki (Sept. 25, 2016), http://apne.ws/2eHBss5.  It is also conceivable that many in the venire will have been affected by the Rahami attack, or perhaps 9/11 years earlier.

The government has not objected to the substance of any of El Gammal's proposed questions (hence the strangeness of its objection that questionnaires will be "time-consuming to create," Gov't MILs 35), so the only issue is how and when the questions will be asked.  In the defense's view, questionnaires offer the advantage of screening out obviously unqualified venirepersons and saving time.  After that screening process is complete, the defense agrees that voir dire will afford an opportunity for clarification and follow-up, but it makes sense to voir dire a more focused pool.

## Conclusion

For the foregoing reasons, the government's motions in limine should be denied.

Dated:      New York, New York
           November 4, 2016

                                   Respectfully submitted,
                                   Federal Defenders of New York

                                   <u>/s/</u>
                                   Daniel Habib, Esq.
                                   Annalisa Mirón, Esq.
                                   Sabrina Shroff, Esq.
                                   Attorneys for Defendant
                                        **Ahmed Mohammed El Gammal**
                                   52 Duane Street – 10th Floor
                                   New York, NY 10007
                                   Tel.: (212) 417-8700