GASJGAMC                        Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                          15 Cr. 588 ER

5    AHMED MOHAMMED EL GAMMAL,

6               Defendant.

7    ------------------------------x

8

9                                          October 28, 2016
                                           11:30 a.m.
10

11

12   Before:

13                    HON. EDGARDO RAMOS,

14                                          District Judge

15

16                         APPEARANCES

17   PREET BHARARA,
          United States Attorney for the
18        Southern District of New York
     NEGAR TEKEEI,
19        Assistant United States Attorney

20   FEDERAL DEFENDERS SERVICES UNIT
          Attorneys for defendant El Gammal
21   BY:  Annalisa Mirón,
          SABRINA P. SHROFF,
22        Assistant Federal Defenders

23   Also Present:
          VANESSA QUINONES,
24        Paralegal Specialist USAO

25

GASJGAMC                        Conference

1          (In open court)

2          (Case called)

3          THE COURT:  Very well.  Good morning to you, all.

4      This matter is on at the request of the defendant

5   because he wants to expedite the disclosure of certain

6   materials from the government; specifically, I guess a more

7   precise witness or exhibit list, final translations of Arabic

8   recordings, and additional detail concerning the government's

9   experts.  Ms. Shroff or Ms. Mirón?

10          MS. MIRÓN:  Your Honor, I would like to start.

11          So the first issue relating to the exhibit list is

12   spelled out a little bit in the brief that we filed on October

13   17th, but let me start with the issue relating to the devices.

14          So the first exhibit that the government has listed is

15   the laptop seized that belonged to Mr. El Gammal.  I at this

16   point do not understand whether the government is seeking to

17   introduce the entirety of the contents of the laptop or some

18   expert's conclusion about a certain video or a certain

19   communication that is visible on the laptop.

20          THE COURT:  So the laptop is listed as an exhibit?

21          MS. MIRÓN:  Correct.

22          THE COURT:  Okay.

23          MS. MIRÓN:  The government has also specified 13

24   videos that they would seek to introduce from the laptop.  We

25   still have no draft translations of those videos at this point,

GASJGAMC                    Conference

 1   and they total approximately 85 minutes of communication.

 2             THE COURT:  But you have the videos and you have seen

 3   them?

 4             MS. MIRÓN:  We have the videos.  I can't understand

 5   them because they're in Arabic.

 6             THE COURT:  Okay.

 7             MS. MIRÓN:  The first issue about the laptop is that

 8   the government has produced an image of the laptop, produced

 9   that back in February, but we are seeking additional expert

10   notice regarding what their expert will testify about the

11   laptop, if anything.

12             From our perspective, there is nothing relevant from

13   the laptop.  There are communications, Mr. El Gammal's

14   conducting business transactions, searching the internet in a

15   normal manner.  At this point, we don't see how it is relevant

16   to introduce that entire laptop.

17             THE COURT:  So are you moving in limine to preclude

18   the introduction of the laptop?

19             MS. MIRÓN:  Or in the first instance, we are asking

20   whether the government intends to introduce the entire

21   contents.

22             THE COURT:  Let's take these one at a time.

23             Ms. Tekeei.

24             MS. TEKEEI:  Thank your Honor.

25             Your Honor, with respect to the laptop, we do not

GASJGAMC                    Conference

1    intend to introduce the contents of the entirety of the laptop.

2    In our draft exhibit list that we produced to counsel on

3    October 3rd, we marked the laptop as an exhibit because that's

4    where certain videos that we do intend to introduce are

5    contained.

6           We originally identified approximately 13 videos as

7    part of the exhibit.  We are now looking at at most two of

8    those videos and seeking to offer two of those videos, two to

9    three of those videos into evidence.  So the evidence from the

10   laptop that we are seeking to introduce or we will be offering

11   at trial is very limited.

12          THE COURT:  Have those videos been translated?

13          MS. TEKEEI:  They're in the process of being

14   translated.  To Ms. Mirón's second point or sort of part of the

15   discussion today on the translations, we, as the court is

16   aware, have provided draft translations of the vast majority of

17   the Arabic source material.

18          With respect to the videos, the drafts of those are in

19   progress.  We aim and our hope and our intention is to be able

20   to produce final translations of all of the material that we

21   have including those videos by November 5th, which is well in

22   advance of the trial date.

23          THE COURT:  And that is when?  Is that next week?

24   Isn't that a Saturday?

25          MS. TEKEEI:  That's correct.  We do work around the

1   clock.

2           THE COURT:  I understand.

3           Now, I take it that you do want production of all of

4   the final drafts?

5           MS. TEKEEI:  That's correct, your Honor.  We have some

6   of the finalized translations.  We are reviewing them.  We have

7   not produced them on a rolling basis, partly because we don't

8   want to open ourselves up to criticism as to our rolling

9   discovery.  We intend to produce them all together in one

10  batch.

11          THE COURT:  So you do have some that are finalized

12  already?

13          MS. TEKEEI:  That's correct, your Honor.

14          THE COURT:  I don't think you would be criticized by

15  the defense if you were to turn them over on a rolling basis.

16          MS. TEKEEI:  Previously defense counsel has raised

17  concerns about rolling discovery in this case, so our hope was

18  if we produce them all at once by November 5th, they would have

19  all of them well in advance of the trial date.  We are, of

20  course, amenable to rolling discovery.

21          THE COURT:  Are you in a position to tell the parties

22  and the Court the actual number of transcripts?

23          MS. TEKEEI:  I am not at this moment, your Honor.

24          THE COURT:  Ms. Mirón, would you object to have a

25  rolling production of the final versions of the transcripts?

1          MS. MIRÓN:  We would prefer that.

2          THE COURT:  So, Ms. Tekeei, if you can see your way

3     clear to providing the final drafts or the final transcripts as

4     they are made available, that would help.  You will be

5     submitting all of them by no later than November 5th?

6          MS. TEKEEI:  That's correct, your Honor.  Your Honor,

7     we are amenable to that.

8          THE COURT:  Would that include the video transcripts?

9          MS. TEKEEI:  It will.  By November 5th, it will, yes,

10    your Honor.

11         THE COURT:  That should take care of that issue.

12         MS. MIRÓN:  To the extent that translations, that we

13    will have final translations by November 5th, yes.

14         If the government is in a position to direct us to the

15    two or three videos they now are certain that they're going to

16    seek to introduce, we would like those told to us so we don't

17    spend our time in the other 10 videos.

18         THE COURT:  Are you in a position to provide the

19    defense with that position, Ms. Tekeei?

20         MS. TEKEEI:  Yes, we can e-mail with those cites to

21    those videos after the conference.

22         THE COURT:  Great.  That takes care of that.

23         Next issue?

24         MS. MIRÓN:  The iPhone 6 Plus which is listed as the

25    government's proposed Exhibit No. 2 and the Report 2-A, this

1    ties into the government's purported expert notice related to

2    two witnesses, Horvath and Roth.

3           I take from the government's letter last night that

4    they are going to call Mr. Roth to testify about possibly three

5    expert reports provided to the defense.  Mr. Roth prepared five

6    reports and, honestly, they're not reports so much as data

7    dumps.  There are no conclusions drawn on those reports.

8    They're just copies of the devices.  So specifically relating

9    to the iPhone 6 Plus, this is a very large report.  I think it

10   is almost a gigabyte of information.

11          THE COURT:  Is it your understanding that Mr. Roth

12   will be testifying essentially to the procedures that were used

13   to extract the information from the iPhone?

14          MS. MIRÓN:  I assume that is the beginning of his

15   testimony, but there is likely going to be additional testimony

16   about certain data on the iPhone which we are not aware at this

17   point.

18          I don't know, for example, what Mr. Roth will say and

19   what conclusions he drew about the timing of communications,

20   the place in which the communication was made; in other words,

21   if the iPhone is connected to a network at a certain point in

22   time.  These are all expert conclusions that we have not been

23   provided notice of.

24          THE COURT:  I am sorry?  Wouldn't it be -- and I am in

25   an area I know nothing about -- wouldn't it be clear from the

1    information that was extracted that a particular communication

2    took place on a particular day and time?

3              MS. MIRÓN:  Possibly.  It depends on the type of

4    communication.  We're talking about a thousand images on an

5    iPhone report, a month of web browser history on the iPhone

6    report.  We're talking about numerous videos, voice mails,

7    calls.  We do not know what the government is focused on from

8    that report.  It is very, very voluminous, so we're asking that

9    the government provide us with which communications they're

10   focused on so we can see if we need our own expert to draw its

11   own conclusions about the types of communications they seek to

12   introduce.

13             It is a really large amount of data and it is not so

14   much a report as just a copy of that data.  So we're asking for

15   the government to specify exactly what they're going to

16   introduce into trial because not all of it is relevant.

17             THE COURT:  No.  I understand.  So you have complaints

18   with respect to this area.  One is the amount of information,

19   and can there be some additional culling, additional precision

20   from the government in what they'll use.  The other is you

21   don't know whether Mr. Roth will be testifying substantively

22   after certain of that information?

23             MS. MIRÓN:  Precisely.

24             THE COURT:  Ms. Tekeei, let me ask you about that

25   first part.  Is Mr. Roth a technician, if you will, who will

GASJGAMC                    Conference

1   testify how this material was extracted or will he be opining

2   on some of that information?

3        MS. TEKEEI:  Your Honor, we view Mr. Roth as providing

4   information about how the information on these devices was

5   extracted.  To the extent that some of the information on the

6   devices includes dates and times of communications, it only

7   seems natural that he would be explaining and describing how

8   that information was also extracted.

9        THE COURT:  I guess that maybe I am just dense, but

10  everything I have on my iPhone has a date stamp so I know when

11  a picture was put on and when I received a text, et cetera.  Is

12  there going to be some controversy concerning some of these

13  materials?

14       MS. TEKEEI:  Not that we're aware of.

15       If defense has identified certain communications, that

16  the timing of the communications on those devices as it is

17  reflected in the report they believe that they want to

18  challenge, obviously we will consider that, but we're not aware

19  of anything that should be in dispute in terms of the data that

20  was extracted from the devices.

21       THE COURT:  With respect to narrowing the universe of

22  this information, are you in a position to provide any further

23  direction to the defense?

24       MS. TEKEEI:  With respect to the iPad?

25       THE COURT:  Sorry.  Are we talking about an iPhone or

GASJGAMC                    Conference

1     iPad?

2              MS. MIRÓN:   The iPhone exhibit listed No. 2 on the

3     list, iPhone 6 Plus.

4              THE COURT:   The question was for you, Ms. Tekeei.

5              MS. TEKEEI:   I am sorry.   I was trying to understand

6     whether they were asking about the iPhone or iPhone 6 Plus.   My

7     misunderstanding.

8              There are communications on there between the

9     defendant and his co-conspirators that we would seek to be

10    offering.   We have described those communications to defense

11    counsel and went through the exhibit list with them, in fact.

12             Off the top of my head, your Honor, with respect to

13    the iPhone 6 Plus, I have to say I don't know at this moment,

14    but we would certainly be happy to go back.   This is the first

15    time this question has been posed to me anyway, and we would go

16    back and look to the contents of the iPhone 6 Plus and be happy

17    to point defense counsel to portions of that that we think are

18    most relevant.

19             THE COURT:   Have you had a conversation with the

20    defense concerning the iPhone in the recent past in which you

21    have identified those communications with alleged

22    co-conspirators?

23             MS. TEKEEI:   With respect to the iPhone 5 C, we have.

24    There are a couple of iPhones at play here.   I do not recall

25    being involved in a conversation about the iPhone 6 Plus, but

1    we are happy to go back and look at the report and happy to

2    point defense counsel to portions of it we find to be relevant.

3              THE COURT:  Can you do that by early next week?

4              MS. TEKEEI:  Yes, absolutely.

5              MS. MIRÓN:  That would be great.  We have not had a

6    conversation with the government regarding the things that they

7    think are relevant from the report.

8              THE COURT:  Okay.

9              MS. MIRÓN:  The same issue will arise really to the

10   iPad and its report.  We don't know what the government thinks

11   is relevant to this trial.

12             THE COURT:  Ms. Tekeei.

13             MS. TEKEEI:  With respect to the iPad, your Honor,

14   there are a few things that are relevant with respect to the

15   data on the iPad.  The first is that it demonstrates the

16   Facebook account that the defendant used and his use of that

17   account and matches that to many of the other communications,

18   social media communications we have produced to defense counsel

19   and will be seeking to offer at trial as listed on our exhibit

20   lists.

21             There is IP data, internet protocol address

22   information on that iPad that also corroborates the location

23   and certainly the IP addresses related to the defendant's

24   communications with his co-conspirators and his use of social

25   media and his use of --

GASJGAMC                    Conference

1          THE COURT:  Have you identified for the defense those

2     IP addresses?

3          MS. TEKEEI:  If we haven't, we certainly can.  They're

4     in an easily segmented portion of the report we can certainly

5     point them to.

6          THE COURT:  Okay.

7          MS. TEKEEI:  There is also the fact that the defendant

8     searched for a map of Syria, and evidence of that is found on

9     the iPad, and in addition to that, more generally the use of

10    various accounts, for example, his e-mail address, and again it

11    ties the defendant to certain of the social media accounts and

12    other accounts that he used.  That is one of the purposes of

13    introducing the iPad.

14         THE COURT:  Okay.

15         MS. MIRÓN:  It would help a lot if the government

16    would direct us to the IP data they're seeking to introduce

17    into trial and perhaps a disclosure about how they conclude

18    this IP data relation to a certain location.

19          I am assuming that their experts have familiarity with

20    with IP addresses and what networks they connect to.  I don't

21    think this relates to the iPad.  Another theory the government

22    has about IP data is that they're able to assess where Mr.

23    El-Goarany was when he was making communications abroad.

24    They're going to have somebody testify about the IP networks

25    used during those communications.

GASJGAMC                          Conference

1          We don't know at this point how they're going to try

2     to prove that and whether we need our own expert to analyze

3     that.  I don't know if it is the same person who will testify

4     about the IP addresses or a different person.  We haven't

5     received any notice about that.  We ask, number one, as it

6     relates to the iPad, direction of IP data and this reference to

7     searching a map of Syria, where that is in the report, and also

8     notice about any expert testimony relating to the IP data.

9          THE COURT:  What you want to know is how -- and again

10    I am working in a situation of complete ignorance.  I thought

11    an IP address is something that is in this laptop here?

12          MS. MIRÓN:  I think my co-counsel wants to chime in

13    with me.

14          THE COURT:  We'll give her an opportunity.

15          So you want to know how the government figured out, in

16    using a particular IP address, Mr. El Gammal was in Syria or

17    Turkey or Upstate New York?

18          MS. MIRÓN:  Correct.

19          THE COURT:  Ms. Shroff.

20          (Off-the-record discussion)

21          MS. SHROFF:  Your Honor, this point becomes just a

22    little bit more important and I wanted to put it in context for

23    the court.  This is from memory.

24          I think that the search warrants that allowed the

25    government to get certain IP addresses and that will be the

GASJGAMC                    Conference

1    subject of testimony here, it is my recollection that the facts

2    supporting that search warrant made mention that the IP address

3    actually is physically in Turkey, but it is the government's

4    view, thought, hope, evidence, whatever word they want to use,

5    that it is people from quote-unquote ISIS or people on their

6    way to ISIS or from ISIS, it would be in that part of Turkey

7    and would then use that particular IP connection.

8         If that is their continuing position, this is what I

9    think it was in the search warrant.  If I am wrong and it is

10   from faulty memory, and I am not making an accusation, that is

11   the problem.  That is what supported part of their search

12   warrant.  If that continues to be what testimony they're going

13   to elicit and ask the jury to conclude even if the IP address

14   is in Turkey, it is really close enough to Syria they should

15   conclude Mr. El Gammal should reach Syria.

16        That should come under the auspices of their expert

17   testifying to that.  If that is part of their expert testimony,

18   they should tell us.  That informs the defense differently and

19   that calls for the defense to do different work.  So I raise

20   that just to put the issue in context.

21        THE COURT:  Ms. Tekeei.

22        MS. TEKEEI:  I will say with respect to the IP

23   addresses on the iPad and the U.S. IP addresses at issue, the

24   government has produced records from the service providers with

25   respect to those IP addresses that identify the locations where

GASJGAMC                    Conference

1    those IP addresses operate or live, the physical locations

2    within the United States.  We don't expect that to be a topic

3    of expert testimony at this moment.

4          With respect to overseas IP addresses, again this is

5    the first time that question has been posed to us, and we'll

6    certainly consider this and maybe along the lines of the early

7    next week time-frame the court suggested with respect to

8    pointing defense counsel to certain addresses of evidence

9    within the iPhone 6 Plus, have a discussion with defense

10   counsel about overseas IP addresses that are at issue.

11         THE COURT:  What I am trying to understand is this

12   issue from the defense perspective.  Does the defense think

13   that the government is going to produce expert testimony

14   tending to show the IP addresses were projected from their

15   actual location to some other location, or do you just want to

16   know where the IP address was?

17         MS. MIRÓN:  Two things:  One, where it was located,

18   where the connection was located.  I believe Ms. Shroff is

19   right that the network provider is in Turkey, according to the

20   government.

21         But then the agent who drafted the search warrant

22   request explained that it was his or her belief ISIS used that

23   network; and, therefore, I believe the government will argue at

24   trial or elicit testimony that because he was using this

25   network, he was likely in ISIS at the time that he made the

1    communications.

2              THE COURT:  So ISIS was using the network that also

3    connected to a particular IP address that Mr. El Gammal was

4    using?

5              MS. MIRÓN:  I believe that is their position.

6              MS. SHROFF:  Nothing we agree with or concede to or

7    acknowledge as true, that is the position the government took

8    when they wrote the search warrant affidavit, that the IP

9    address was in Turkey.  Nevertheless, it was a very special IP

10   address, and somehow they knew that ISIS, you know, frequents

11   the coffee shop.

12             THE COURT:  Perhaps you might enlighten me.  Are

13   networks localized?

14             MS. SHROFF:  It seems to be that is what we learned.

15             Frankly, we only get an expert when they call an

16   expert.  My knowledge on that is very limited, but I think it

17   is localized at least to a certain geographic area.  The IP

18   address for this building, I don't think I could access it if I

19   was on 21st Street.  I think that would be out of range.

20             THE COURT:  So your concern is that if it is a network

21   that's in Turkey, but close to the Syrian border, that your

22   concern is that the government might argue from that that he

23   was or may have been in Syria?

24             MS. SHROFF:  I think it is more than a concern.  I am

25   pretty sure that is where they're going.

GASJGAMC                    Conference

1          THE COURT:  Ms. Tekeei, when can you provide -- will

2    you be able to provide the defense more information along these

3    lines by early next week?

4          MS. TEKEEI:  Yes, your Honor, we will.

5          THE COURT:  Next.

6          MS. MIRÓN:  The cell phone report relating to the

7    iPhone 5 C.  The government has detailed a lot of exhibits that

8    were culled I believe from this report.  We don't have

9    objections in terms of relevance to 4 (b) or 4 (c), but I would

10   just ask whether the government is committing to only

11   introducing these Sub-Exhibits 4 (b) through 4 (g), or whether

12   they're also going to seek to introduce other data from the

13   cell phone report?

14         THE COURT:  Ms. Tekeei.

15         MS. TEKEEI:  Your Honor, what we have listed here

16   represents what we believe we would be seeking to offer when we

17   drafted this exhibit list and it represents what we are seeking

18   to offer today.

19         If in the course of trial preparation and witness

20   preparation we identify other portions, and in the course of

21   hearing the defense's theories on some of these issues, we

22   identify other portions of that that we find to be relevant,

23   we, of course, reserve the right to further specify additional

24   portions of that report.

25         THE COURT:  I think that is reasonable.  As we sit

GASJGAMC                    Conference

1    here, these are the exhibits from the iPhone 5 C you intend to

2    offer?

3            MS. TEKEEI:  That's correct, your Honor.

4            THE COURT:  Ms. Mirón.

5            MS. MIRÓN:  This issue might get a little more

6    complicated.  It relates to the Facebook records and those in

7    the Series 100 of the draft exhibit list.  We have laid out

8    some of our arguments about the inadmissibility of wide swaths

9    of data on Facebook.

10           Let me start with Exhibit 100.  It is my understanding

11   from the government's recent filing that they do not seek to

12   introduce that entire search warrant return listed in Exhibit

13   100, which is approximately 15,000 pages, but instead they are

14   seeking to introduce every Sub-Exhibit 100 A through 100 P.

15   Let me start with that understanding.

16           THE COURT:  Ms. Tekeei.

17           MS. TEKEEI:  Your Honor, the entirety of the search

18   warrant return demonstrates and helps us to prove authenticity

19   of the return.  If defense counsel is willing to stipulate to

20   that, perhaps we can have a different discussion, but we also

21   are concerned about the issue of or being sort of seem to be

22   pulling only certain excerpts of the Facebook search warrant

23   return and our exhibit list as we further delineated the

24   sub-exhibits, and not entering or offering the entirety of the

25   search warrant return, to the extent there are criticisms or

1  arguments that the government is trying to only elicit or

2  demonstrate or show the portions that show what we have

3  delineated here.

4          The defendant was a prolific communicator on social

5  media, and again without knowing what defense's theories are

6  with respect to this evidence, we, of course, have marked that

7  on our draft exhibit list produced more than 60 days before

8  trial as an exhibit.

9          THE COURT:  Ms. Mirón, are you contesting the

10  authenticity of the Facebook documents?

11          MS. MIRÓN:  No.

12          THE COURT:  Would you be willing to stipulate to their

13  authenticity?

14          MS. MIRÓN:  Yes.  I mean, there are other issues

15  relating to the Facebook evidence.

16          For example, the government is seeking to introduce

17  different returns from Facebook.

18          THE COURT:  Sorry?  What is a return from Facebook?

19          MS. MIRÓN:  I should say returns after the search

20  warrant was executed, so the data that they produced, which was

21  produced to the defendant in PDF form, but I believe he has a

22  different way of accessing that information.  I am speaking of

23  the PDF we received.

24          THE COURT:  These are subsequent productions from

25  Facebook concerning his account?

GASJGAMC                    Conference

1          MS. MIRÓN:  Right.  There was an original production

2     and there was another production, and there are some

3     differences between the two productions.

4          I think the government might worry that some of this

5     discussion would broach into classified information, so I am

6     not going to try to guess about the differences between the

7     productions, but I can't right this minute say we will have no

8     objection to the authenticity of these subsequent productions

9     because there are different issues that --

10          THE COURT:  There may be different issues, but I don't

11     know if they would touch authenticity.  Do you have a

12     representative of Facebook that would come in and talk about

13     these documents?

14          MS. TEKEEI:  We are planning to call a witness,

15     custodial records witness regarding various legal process that

16     was served with respect to the defendants and his

17     co-conspirators and other relevant social Facebook accounts in

18     this case, and that goes for also other other social media

19     accounts.

20          THE COURT:  It sounds like you have more of a

21     substantive objection.

22          (Off-the-record discussion)

23          MS. MIRÓN:  This is a Facebook witness that the

24     government is seeking to call?

25          MS. TEKEEI:  We are seeking to call a Facebook

GASJGAMC                    Conference

1   witness.

2              THE COURT:  I take it a documents custodian?

3              MS. TEKEEI:  That's correct, your Honor.

4              MS. SHROFF:  We can sort this out, maybe get on a

5   joint call with the Facebook witness and see if we can talk to

6   them in the presence of the government.  Otherwise, we'll see

7   if we can work out a stipulation.  That is fine.

8              THE COURT:  Perfect.

9              MS. MIRÓN:  That issue is resolved.

10              I think the government is not committing to seeking to

11   introduce other material from Exhibit 100 without knowing the

12   defense's theory.  The problem here is that not all the

13   material in Exhibit 100 has been translated, and I sought an

14   answer from the government whether they're seeking to continue

15   to have draft translations prepared for that exhibit, and I

16   have not received an answer yet.

17              THE COURT:  Does this fall into the same category of

18   the documents you will have completed by November 5?

19              MS. TEKEEI:  Your Honor, with respect to these

20   sub-exhibits that are on the exhibit list that are Arabic by

21   their source material, we have provided defense counsel with

22   draft translations of the vast majority of them even as of

23   several months ago.

24              As of November 5, we intend to have final translations

25   to the exhibits.  To the extent Ms. Mirón is talking about

GASJGAMC                    Conference

1    items of communications not listed specifically on this exhibit

2    list or delineated by sub-items, we have been provided summary

3    and draft translations that we have sought translations for

4    since almost more than a year ago.

5            We have produced those to defense counsel on a timely,

6    in a timely fashion.  As to November 5th, yes, the items that

7    are on here as sub-exhibits have already been -- draft

8    translations of those have already provided to defense counsel,

9    and we will finalize those translations by November 5th.

10           MS. MIRÓN:  I am talking about Exhibit 100, not the

11   sub-exhibits.  100, I asked whether the government is

12   continuing to have certain communications translated.

13           THE COURT:  So that I understand, I guess the Exhibit

14   100 is the universe of the Facebook documents?

15           MS. MIRÓN:  Right.

16           THE COURT:  And it is listed on the exhibit or the

17   draft exhibit list?

18           MS. MIRÓN:  Correct.

19           THE COURT:  As I understand it -- and Ms. Tekeei will

20   correct me -- what they intend to introduce are subsets which

21   are marked 100 A through whatever.

22           However, they are also looking at the entire universe

23   and are preparing and have prepared draft translations and have

24   been providing them to you but have not committed to using

25   them.  Is that all accurate from your perspective?

1          MS. MIRÓN:  Right, they are still outstanding

2     communications in Exhibit 100 that have not been translated, to

3     our knowledge.

4          THE COURT:  I guess, Ms. Tekeei, do you intend to

5     translate them if you're not going to use them?

6          MS. TEKEEI:  Again without knowing defense counsel's

7     theories about those communications, why they are or wouldn't

8     be relevant, but the short answer is, your Honor, we are

9     translating and have translated everything that has been marked

10    as a sub-exhibit.

11         To the extent there are additional translations that

12    we have with respect to those, with respect to the larger

13    search warrant return, we have provided those to defense

14    counsel.  We are not currently translating any additional

15    material, but we reserve the right to translate additional

16    material depending on what we learn about defense's theories

17    about that material.

18         THE COURT:  Ms. Mirón, that sounds reasonable to me.

19         MS. MIRÓN:  I understand.  As it relates to Exhibit

20    100 DT, which is Mr. El Gammal's shared Facebook content, we

21    made a motion to preclude all of his statements because we

22    think that the government -- that exhibit, we think the

23    government in the first instance needs to narrow this universe.

24    There are clearly irrelevant communications made, for example,

25    leading to the Suez Canal and some played out on Page 9 of our

1    motion.  These are not all relevant to this trial.

2              THE COURT:  Tell me what is shared content, if you

3    know?

4              MS. MIRÓN:  My understanding is it is publicly posted.

5              THE COURT:  What is on your news feed or whatever it

6    is called?

7              MS. MIRÓN:  Yes, news feed or comments.

8              THE COURT:  Okay.

9              (Off-the-record discussion)

10             MS. MIRÓN:  Yes, news feed, comments, back-and-forth

11   that are viewable than more than the message recipient.

12             THE COURT:  Got it!

13             MS. MIRÓN:  We think that cannot come in wholesale

14   into this trial.

15             THE COURT:  How much of that is there?

16             MS. MIRÓN:  I think it is over 400 pages, but possibly

17   up to a thousand.  I am not sure.  The paralegal might have the

18   right answer.

19             (Off-the-record discussion)

20             THE COURT:  Ms. Tekeei, is it your intention to put

21   that wholesale before the jury?

22             MS. TEKEEI:  Your Honor, as Ms. Mirón points out, it

23   is the subject of a motion in limine.  We are prepared to

24   respond to that fully on Monday, and so if the court is alright

25   with waiting until our response to that motion, we would like

1   to reserve the right to answer that.

2            THE COURT:  Okay, we'll wait.

3            MS. MIRÓN:  That might also address Exhibit 100 E,

4   which is the translation of which is a 400-page exhibit

5   relating to communications between Mr. El Gammal and an

6   individual by the name of Mahmood who is not a charged

7   co-conspirator.  If the government wants to reserve on that as

8   well, we are flagging it for the court, but we don't think that

9   should come in.

10            THE COURT:  Very well.

11            MS. MIRÓN:  There is one other exhibit I would like to

12   raise to the court's attention, 110 D, which is approximately

13   1,000 pages, communications between CC-1, Mr. El Gammal and

14   Mustafa Tarik which spans four years.  I don't see how a

15   four-year communication between an individual and uncharged

16   co-conspirator are relevant to this trial.

17            THE COURT:  I take it we'll hear about that as well on

18   Monday, Ms. Tekeei?

19            MS. TEKEEI:  Yes, your Honor.

20            THE COURT:  Ms. Shroff.

21            MS. SHROFF:  I want to start with the expert issue, if

22   I may.

23            THE COURT:  Okay.

24            MS. SHROFF:  Let me start with the one that is at

25   least for me most familiar, which is the expert on ISIS, Mr.

1   Zelin.  The government's notice to us initially which was in

2   October, in their October 3rd letter, was then supplemented on

3   October 17th.

4            THE COURT:  Have you gotten today's or yesterday's

5   letter?

6            MS. SHROFF:  I got yesterday's letter also.

7            Yesterday's letter basically sort of sets out the

8   testimony from Pugh.  I have here if the court wants -- and I

9   will just give you a copy -- the indictment in Pugh or the

10  complaint in Pugh.  Pugh is a very different case, okay?  The

11  guy actually travels, is a United States army guy.  He is not

12  from Egypt.

13           THE COURT:  You are talking about Mr. Pugh now?

14           MS. SHROFF:  Right, I am talking about Pugh.

15           If the government wants to give me notice and say the

16  basis, the same basis that the expert invoked to justify his

17  opinion in Pugh applies here, that is fine.  We just can't get

18  that concession from them now.  I want to make sure that is

19  really what they're saying because they keep sending me back to

20  Pugh, and I am happy to go to Pugh, but the topics are now

21  changing for them.

22           Initially it was all about Pugh, and then on October

23  17th it is no longer about Pugh because they then gave me

24  notice of Mr. Zelin testifying about the sitting government in

25  Egypt, Morsi and the Muslim Brotherhood, and then how Morsi was

1    overthrown, the Valley and Rabat Square.  None of that is in

2    Pugh.

3            THE COURT:  Isn't it all the same cloth?

4            MS. SHROFF:  No.

5            THE COURT:  History of ISIS?

6            MS. SHROFF:  No.  It has nothing to do with ISIS,

7    actually.  The October 17th disclosure, I am happy to hand it

8    up to the court.

9            (Pause).

10           MS. SHROFF:  It has zero to do with ISIS.  In fact, I

11   am pretty sure it is not even mentioned.

12           THE COURT:  Or the history of that part of the Middle

13   East since 9-11.

14           MS. SHROFF:  A supplement of their expert disclosure,

15   I may or may not have received that.  They may have

16   supplemented it on their own.  All I am saying to you now is

17   there is a shift from this expert's focus which in the Pugh

18   case does not talk about Egypt at all, okay?

19           Now suddenly we are talking about Egypt here, and I

20   want to make certain that our position is clear we do not know

21   yet because we have not yet gone through all of the

22   bibliography, whether Mr. Zelin would qualify as an expert to

23   speak about matters of Egypt because his background seems to be

24   Tunisia and other countries.  We are not conceding he is, in

25   fact, properly qualified as an expert on those topics, but I am

GASJGAMC                    Conference

1    trying to tell the court the shifting sands, so to speak, on

2    what topics Mr. Zelin would cover and in what areas Mr. Zelin

3    is an expert.

4           So going back to the rule itself, the rule itself

5    states clearly that for expert notice to be considered

6    sufficient, the summary that is provided under that subchapter

7    must describe the witness's opinions, the bases and the reasons

8    for those opinions and the witness's qualifications.

9           So they've given us a CD, and that is fine if that is

10   the CD they want to rely on for his qualifications.  They have

11   given us the articles he has given, specifically the basis and

12   reasons for -- the reasons, for example, the basis for his

13   opinions in their latest disclosure I have handed up to the

14   court, I don't see any mention of how he comes to those

15   conclusions.

16          In fact, I am not even sure that is expert notice.

17   That seems to be just some kind of historical idea that somehow

18   has -- and that is somehow or the other going to be presented

19   to the jury as expert testimony.  That is like saying after

20   1947, India became an independent country and was separated out

21   and it was India and Pakistan.  That is one way of looking at

22   history.  There could be 15 others ways of looking at the

23   separation.

24          THE COURT:  But if you're an historian of Indian

25   history, why can't you say in 1947 it became independent?  Why

GASJGAMC                    Conference

1    can't Mr. Zelin provide similar-type testimony?

2              MS. SHROFF:  One, he is not historian; two, that was

3    not subject of testimony in Pugh; unless they continue to

4    supplement, Pugh is not adequate specific disclosure; three, he

5    has no basis nor has he provided any reasons for having come to

6    that conclusion.

7              THE COURT:  All of this stuff, some of this stuff

8    appears to be purely historical fact.

9              MS. SHROFF:  A lot of that can be a stipulation.  They

10   can get a stipulation from me or seek from the court a notice

11   of the court, we all take notice of these facts and consider

12   them from both sides as being accurate.  To present that as

13   expert testimony is incorrect.  I can brief that out for the

14   court -- you're looking puzzle.

15             THE COURT:  No, no.

16             MS. SHROFF:  I don't think Mr. Zelin has any expertise

17   in talking about the Muslim Brotherhood.

18             THE COURT:  Okay.

19             MS. SHROFF:  I still think their disclosure for expert

20   disclosure is inadequate, but I want to be clear that if they

21   start to go beyond Pugh, there will be an objection, and that

22   objection should properly be sustained because they have given

23   me Pugh and this one letter.

24             THE COURT:  And the letter from yesterday?

25             MS. SHROFF:  No.  The letter from yesterday delineates

1   everything in Pugh.  They have given you a long recitation and

2   basically they have given you the transcript citations to Pugh.

3   I have read the transcript.  I didn't say Pugh was inadequate.

4   I just am looking for somebody to say to me okay, great, yes,

5   we are limited to Pugh.  That is what I am looking for.

6            Look at the letter from yesterday, starting at Page 2,

7   when they start giving the little bullet Point C, Pugh

8   Transcript 854 to 856, 857, 857, and then they give me some

9   information in that footnote you see that footnote there No. 2?

10           THE COURT:  Yes.

11           MS. SHROFF:  He has they have reviewed

12   publicly-disclosed questionnaires that ISIS puts out, but they

13   don't give me questionnaires.  They don't tell me which

14   questionnaire he viewed.  Were they questions that are

15   publically available?  If they formed the basis of the opinion,

16   I need to know which they are.  Sent me a link, send me a

17   photo, whatever.  Until they do, I think their disclosure is

18   inadequate.  The same thing you see the page itself, if you go

19   to Page 3, all of the text is refers back to Pugh.

20           THE COURT:  Ms. Tekeei.

21           MS. SHROFF:  The footnote I don't have, again the

22   execution videos.  That is a lot of execution videos, right?  I

23   don't know.  Not only that if you give me execution videos, for

24   example, that was made in 2016 or after Mr. El Gammal's arrest

25   or -- I need to know when all of that was.  Yeah, I am going

1   through the letter.  Then four is also the same.  It is a lot

2   with Pugh.  That is fine.  I just want to make sure that we're

3   limited in content, and that may be what the government's

4   position will be.  That is okay.  If you want, I can sit down

5   and go back to the other two experts.

6           THE COURT:  Yes.  Ms. Tekeei.

7           MS. TEKEEI:  Your Honor, we have noticed Mr. Zelin as

8   an expert on militant jihadist groups.  We have summarized the

9   areas of his testimony both from what he has previously

10  testified in the Pugh trial and in our supplemental disclosures

11  and provided additional information with respect to --

12          THE COURT:  Militant jihadist groups not limited to

13  ISIS?

14          MS. TEKEEI:  That's correct.

15          To the extent that the question is which publicly

16  disclosed questionnaires did Mr. Zelin review, which execution

17  videos are we referring to in the footnotes in this letter, we

18  are, of course, happy to point defense counsel to those, but we

19  feel that our disclosures which happen on October 3rd and were

20  supplemented on October 17th and again further delineated in

21  our letter from last night, as well as his curriculum vitae and

22  his background, are more than sufficient for the topics on

23  which we noticed him.

24          THE COURT:  Can you give me a nutshell first on his CV

25  and, secondly, on Pugh in a nutshell?

GASJGAMC                    Conference

1           MS. TEKEEI:  Your Honor, I'll do my best.

2           In Pugh, he testified regarding the background about

3    ISIL and jihadist groups in the Middle East, the events in the

4    Middle East during the relevant time period, what gave rise to

5    ISIL, how they operate and sort of in further detail what is

6    set forth in our letter.

7           He was certified as an expert in that case, and we of

8    course reserved, to the extent the defense theories differ from

9    what is delineated in our notice, to the extent that they

10   choose to challenge any of what we've set forth in our various

11   notices, we of course reserve the right to go back to Mr. Zelin

12   and ask him questions regarding those challenges and have

13   provided additional disclosures if necessary and as required.

14           THE COURT:  Is he an academic?  Is he a writer?

15           MS. TEKEEI:  He is, your Honor, he is an academic.

16           MS. SHROFF:  Let me step back for a minute, okay?

17           I want to make sure everybody is clear what Mr. El

18   Gammal is charged with.  Mr. El Gammal is not charged with

19   joining a militant jihadist group.  Were he charged with that,

20   we would win the motion to dismiss because that is not a crime.

21   The crime has to be a foreign terrorist organization, right?

22           So to qualify this man more broadly, that is up to

23   them, but the testimony should be limited to the facts in the

24   indictment, okay?

25           That's just something I am flagging now because

1    whether or not Mr. Zelin was qualified in the Eastern District

2    or not, the government has used another expert called Mr.

3    Quomen, and Mr. Quomen has a long and sordid history and he is

4    qualified in some cases and he is not qualified in others, and

5    as the court is extremely familiar, he has been qualified in

6    this district, much to the chagrin of every defense lawyer who

7    has had the misfortune to have to cross him.

8        What the Eastern District did, Good Lord, I would say

9    if the Eastern District did it, it should be done here because

10   that would be a very happy Sabrina Shroff.  To invoke it in

11   this situation, I don't think it is going to pan out correctly.

12       Anyway, this is for a later date.  I understand that

13   those arguments will be closer to the trial and it will also be

14   much closer if we need to, if we I have to brief it on whether

15   or not he is properly qualified and if the scope of his

16   testimony should be more limited.

17       I have flagged for the court the concerns I have about

18   the disclosure being inadequate.  The government says they'll

19   supplement again, and I am okay with that.

20       THE COURT:  I didn't hear Ms. Tekeei saying they will

21   supplement again.

22       MS. SHROFF:  She said she will show us the videos and

23   she said she will direct us to the questionnaires, and those

24   are the documents.  I would ask the court to tell the

25   government, and I think the government would be happy to

1    comply, to give us all the documents they have shown the expert

2    on which he is properly basing his opinion.

3         If they have shown the government expert witness some

4    videos from Mr. El Gammal's computer, they should tell us which

5    videos he saw.  If, for example, they showed him Mr. El

6    Gammal's passport, they should tell us what documents from our

7    case that they provided to the expert on which the expert's

8    opinion is based.  That is what the rule calls for, and I

9    acknowledge I am sure the government will comply with that

10   shortly anyway.

11            THE COURT:  But what?

12            MS. SHROFF:  Deadlines are best.

13            THE COURT:  Ms. Tekeei.

14            MS. TEKEEI:  Your Honor, we believe our expert notices

15   are more than sufficient and especially with respect to Mr.

16   Zelin.  If Ms. Shroff and defense counsel would like to know

17   what is being referred to in Footnotes 2 and 3, we are, of

18   course, are happy to point them to the underlying source

19   material there.

20            THE COURT:  Okay.  That seems adequate for now.

21            Ms. Shroff or Ms. Mirón?

22            MS. MIRÓN:  Relating to their cell site expert, I

23   think it is a narrow issue because after we filed our motion

24   protesting the sufficiently of the notice, they did provide a

25   demonstrative report from this expert which shows certain

1    mapped-out locations of I presume -- well, this is the way I

2    understand cell site data works when it is based on historical

3    cell site records.  Certain cell phones are connected to

4    towers, and the expert concludes the phone was located within a

5    certain area of that tower.  So we are asking the government to

6    write to us an explanation of this demonstrative and just

7    explain whether or not he is drawing the conclusion that Mr. El

8    Gammal was in a certain area or not.  It is not obvious from

9    the graphics we received.

10          I think the point of their expert is to try to show

11    when Mr. El Gammal was in New York City, where he was and where

12    Mr. El-Goarany was, and I guess draw the conclusion they were

13    in the same area, but that is not obvious from the report.

14          We are asking for a narrative summary of the expert's

15    conclusions.

16          THE COURT:  Ms. Tekeei.

17          MS. TEKEEI:  We have provided your Honor the

18    underlying historical cell site data records for both the

19    co-conspirator who is named as CC-1 in the indictment and for

20    Mr. El Gammal.  We have provided defense counsel with a report

21    of our cell site expert's conclusions which include locating on

22    a map where Mr. El Gammal and CC-1 were co-located at the same

23    time periods in New York City.  We think those disclosures are

24    sufficient.

25          THE COURT:  Ms. Mirón, that sounds like precisely the

1    information you were asking for.

2              MS. MIRÓN:  The report doesn't have any narrative

3    summary of the expert's proposed testimony about locations.

4              It does have maps and dots on the maps and certain

5    arrows, but I don't know for those conclusions what the expert

6    is going to say.  So we're asking for a paragraph that on such

7    and such a date, as demonstrated on Page 4 of the report, Mr.

8    El-Goarany was on the area of this location and Mr. El Gammal

9    was in the area of this location.  It is not asking for very

10   much.  We would like our own expert to review those conclusions

11   and determine if we need to call someone.  It is a narrow

12   issue, or stipulate as to the cell site issue.

13             THE COURT:  Ms. Tekeei, can the government see its way

14   clear to providing that additional information?

15             It sounds like the government has given up, quite

16   honestly.  You have a chart that says these two phones were in

17   these locations on this date.  Why do you need the narrative,

18   the sentence to go along with that?

19             MS. MIRÓN:  The report doesn't show that.

20             I am sorry I don't have a copy of it.  It is a matter,

21   and there are some dots that are highlighted and directions.  I

22   don't know what the expert's going to say.  They're not the

23   same cell tower, for example, and I don't know if the expert

24   will say they were still in the same location even though they

25   didn't hit the same cell tower.  I want to know that in advance

1    of trial.

2              THE COURT:  Is it one chart or more than one chart?

3              MS. MIRÓN:  There are 10 different demonstratives,

4    maps of New York City with arrows and dots.

5              THE COURT:  Does it have a date and time of each map?

6              MS. MIRÓN:  I don't know off the top of my head.

7              THE COURT:  Let me ask you?

8              MS. TEKEEI:  It does, your Honor.

9              THE COURT:  I am not going to make the government give

10   you a narrative.  Next?

11             MS. SHROFF:  May I just have one second?

12             THE COURT:  Sure.

13             (Off-the-record discussion)

14             MS. SHROFF:  Your Honor, I don't think we have

15   anything more on the issues that I raised in the letter asking

16   for the status conference, but since we are here, I think maybe

17   we seem to be fairly close to a trial date now.  I just wanted

18   to ask the court maybe we could get a date at which time we

19   would get all the 3500 material.

20             The government, Ms. Tekeei actually specifically, and

21   I have had some preliminary conversations and the government

22   has agreed to give me at least the 3500 for one witness which

23   is going to be fairly voluminous by sometime this week.

24             THE COURT:  What was that name?

25             MS. SHROFF:  Sometime this week.

1          THE COURT:  What was the name?

2          MS. SHROFF:  I didn't mention the name.  Would you

3     like me to mention the name?

4          THE COURT:  No.  I thought you did.  You don't have to

5     give me the name.

6          MS. SHROFF:  One witness she has kindly agreed to give

7     us sometime this coming week.  Just for the rest of the 3500

8     material, we could set a deadline for things like a witness

9     list, witness list and 3500 material.  If we could get some

10    kind of date, that would be great.

11         THE COURT:  Haven't we already agreed on a date prior

12    to trial?

13         MS. SHROFF:  Not for 3500, your Honor.  I think we

14    agreed on dates for a lot of things, just not 3500.

15         THE COURT:  Ms. Tekeei.

16         MS. TEKEEI:  Your Honor, as in the ordinary course, we

17    provide our 3500 for most if not all of our witnesses within 7

18    to 10 days before trial.

19         As Ms. Shroff has mentioned, we're prepared to produce

20    and are preparing to produce a witness who has an extensive

21    3500 material by next week, and so we think that sticking to

22    the ordinary course, which is for the rest of our witnesses,

23    providing that material within 7 to 10 days is perfectly

24    appropriate in this case.  To the extent we identify other

25    witnesses who also have extensive material, we will, of course,

1    provide those disclosures in advance of that 7 to 10 day time

2    frame.

3              THE COURT:  Okay.

4              MS. SHROFF:  Here's the thing.  I don't celebrate

5    Thanksgiving, for all of those historical reasons, but other

6    people do.  Apparently this falls -- I am not kidding.  This is

7    the truth -- apparently this falls during the Thanksgiving

8    week.  To the extent they can help us out here and give it

9    before that, I would really appreciate it.  Maybe they can keep

10   it for my witnesses and give it during the Thanksgiving week.

11   I don't care.  I am just saying, you know?

12             THE COURT:  It seems as though the government has been

13   trying to work with you all.  Certainly you have had a very

14   pleasant conference here today, and it appears as though the

15   government is trying to get you all the information you're

16   requesting on a timely basis, and they've identified someone

17   who has substantially 3500, gave you that sooner than later.

18   They represented if they identify a similar person with similar

19   volume of 3500, they will give you that in advance.  I don't

20   think there is any need to push the government any more on

21   that.

22             I would, since she gave a range, I will direct them to

23   provide the 3500, the balance of the 3500 no later than 10 days

24   before trial.

25             MS. SHROFF:  Okay.

GASJGAMC                      Conference

1            THE COURT:  Okay?  Is there anything else that we need

2     to do today?

3            MS. SHROFF:  Not from the defense.

4            MS. TEKEEI:  Not from the government.

5            THE COURT:  In that event, we are adjourned.

6            (Court adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25