UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15 Cr. 588 (ER)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SECOND MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
*Attorney for the United States of America*

Andrew J. DeFilippis
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15  Cr. 588 (ER)

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S SECOND MOTIONS *IN LIMINE*

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to defendant

Ahmed Mohammed El Gammal's motions *in limine* ("Def. Mot.") to preclude the introduction of

(1) videos from the defendant's Toshiba laptop, (2) a post on the defendant's Facebook Wall

reproducing a hadith about the Islamic Caliphate, (3) the defendant's July 2014 Facebook profile

picture of an armed commando, (4) Facebook messages between the defendant and ███████

██████, during which the defendant discusses smuggling weapons and ammunition into Egypt,

(5) certain Facebook communications between the defendant's co-conspirator, referred to as

"CC-2" in the Indictment, and ███████████, and (6) Facebook communications between

CC-2 and ██████████.

The defendant also moved to preclude Facebook messages between him and ███████

in which he advises ██████ to provide false information to U.S. immigration authorities in

order to be able to travel to the United States and seek political asylum.  The Government does

not intend to offer these statements in his case-in-chief, but, should the defendant testify,

reserves the right to cross-examine the defendant about these statements.  Finally, the defendant

moved to preclude an email from his co-conspirator, identified as "CC-1" in the Indictment, to
███████  The Government does not, at this time, intend to offer this email.

## I.     The Charged Conduct

The defendant is charged in Indictment 15 Cr. 588 (ER) (the "Indictment") with:

> (1) from at least in or about 2014, up to and including in or about August 2015,
> providing material support and resources to the Islamic State of Iraq and the
> Levant ("ISIL"), to wit, personnel, and aiding and abetting the same, in
> violation of Title 18, United States Code, Sections 2339B and 2 (Count One);
>
> (2) from at least in or about 2014, up to and including in or about August 2015,
> conspiring to providing material support and resources to ISIL, to wit,
> personnel, in violation of Title 18, United States Code, Section 2339B (Count
> Two);
>
> (3) from at least in or about 2014, up to and including in or about August 2015,
> aiding and abetting the receipt of military-type training from ISIL, in violation
> of Title 18, United States Code, Section 2339D and 2 (Count Three); and
>
> (4) from at least in or about 2014, up to and including the date of the Complaint,
> conspiring to receive military-type training from ISIL, in violation of Title 18,
> United States Code, Section 371 (Count Four).

As described in prior submissions to the Court, the Government expects the evidence at

trial will show, among other things, that as ISIL expanded across Iraq and Syria in the summer of

2014, and declared a caliphate, the defendant became a vocal ISIL follower and supporter, and in

the following months, facilitated the travel of a 24-year-old United States citizen ("CC-1"), so

that CC-1 could train and fight with ISIL.  *See generally* Government's October 17, 2016

Memorandum of Law in Support of its Motions *in Limine* at 2-11; Government's November 4,

2016 Memorandum of Law in Opposition to the Defendant's Motions *in Limine*.

**II.     The Defendant's Motion to Preclude Certain Videos Obtained from his Laptop Should Be Denied.**

   **A.  Background**

At trial, the Government expects the evidence to show that, in connection with the defendant's arrest on August 24, 2015, the Federal Bureau of Investigation lawfully searched multiple electronic devices found in the defendant's home.  One of those devices was the defendant's Toshiba laptop (the "Laptop").  Amongst the computer files extracted from the Laptop were the following videos, which had been downloaded to the Laptop (collectively, the "Laptop Videos") [1]:

1.   Government Exhibit 11: A one minute, 48 second portion of a *New York Times* video report entitled "Surviving an ISIS Massacre," which was published on September 4, 2014 and downloaded to the defendant's computer on February 21, 2015.  The portion of the video extracted from the Laptop includes sub-excerpts of an ISIL propaganda video showing ISIL's capture and subsequent execution of new Iraqi Army recruits in Tikrit, Iraq.  (GX 11, GX 11-T).

2.   Government Exhibit 12: An approximately one minute, 30 second portion of a video, downloaded to the defendant's computer on February 21, 2015, in which an ISIL fighter, flanked by several gunmen, delivers a speech to the civilian population in what appears to be a Syrian town, while other ISIL members parade behind him with ISIL flags.  The video begins with the introduction: "In the name of God the Merciful The Information office of the State of Aleppo presents The persistence of the knights in the battlefield."  The ISIL fighter then states in his speech:

> Praise be to God[2] . . . and peace upon the most honorable of God's creatures, Mohammad Bin Abdellah, and upon his family, companions, and those who support him. Praise be to God, the one who gives pride to Islam through His victories . . . and who humiliates the heretic through applying His defeat upon it . . . the One who made no perpetual prevalence through His justice . . . and gave victory to His struggling servants through His grace.  We do not want to talk too much or too long . . . but we are talking about the words of God Almighty.. Who said in His book, "And Our word

---

[1] The Government does not intend at this time to introduce Government Exhibit 14, the video of the masked Hamas fighter discussing the "unique important, and efficient role played by the Palestinian journalist in the Palestinian resistance."

[2] The ellipses here are not intended to signify omissions, but where the speaker pauses.

has already preceded for Our servants, the messengers, that indeed, they would be those given victory; and that indeed, Our soldiers will be those who overcome."

By God, if America and the ones who side with it come together.. and try to put a thorn into only one Mujahid . . . they would not be able to do it except with the will of God Almighty. We say may God greatly compensate the difficult times because through them . . . I identified my enemy from my friend. We are not nobler than Mohammad, peace be upon him, who ate the leaves of trees and so did his followers.  We are not nobler than Mohammad, peace be upon him, when one of his companions described the situation when.. when they were besieged by saying, "None of us had a hope to achieve his need while he [the Prophet], by my father and mother, was striking while being in the ditch[.]"

(GX 12, GX 12-T).

3.  Government Exhibit 13:  A two-minute, 20 second video downloaded to the defendant's computer on January 5, 2015 depicting a still image of the ISIL flag while a speaker—believed to be ISIL spokesman Mohammad al-Adnani[3]—espouses ISIL's extremist ideology, including providing descriptions of ISIL's military tactics:

We do not fight whoever we have evidence about his apostasy unless he starts by launching against us a war and a fight. This is what we did with the leadership of what is known as the "*Hilf Al Fudul*" in Hazzan and Idlib countryside. This leadership signed [a covenant] with the Crusaders to fight us, shed our blood, mobilize people against us, incite them to fight us day and night, and it collects signatures for that purpose by alleging that we are *Khawarij* [illegitimate dissidents.] God knows that we never fought anyone in the Levant other than the Nusairis unless we were forced to. In addition to that, [we believe that] it is wise to neutralize the enemies and reduce the number of frontlines. It is foolish to open several frontlines and fight everybody. Moreover, no platoon ever fired a bullet on anyone except the Nusai[recording cut off].

(GX 13, GX 13-T).

---

[3] A web search indicates that the recording is an excerpt of a September 2013 speech by al-Adnani called "May Allah be With You O' Oppressed State." *See* https://azelin.files.wordpress.com/2013/09/shaykh-abc5ab-mue1b8a5ammad-al-e28098adnc481nc4ab-al-shc481mc4ab-22may-god-be-with-you-oh-the-oppressed-state22.pdf, at 10 (last visited December 21, 2016).

4.  Government Exhibit 15: A video downloaded to the defendant's computer on December 24, 2014 depicting armed men in fatigues guarding and striking bound prisoners in civilian clothes.  The narrator of the video begins by stating in Arabic:

> Long grew the night of the infidel tyrants. Long grew the night of Bashar and his followers. Long grew the night of the infidel Nusairis. Long grew the night of the enemies of the religion. O God, confuse the miscreants. O God, count them all, kill them extensively, and do not leave any one of them. O God, give victory to [those] who helped the religion. O God, be with your worshippers fighters. O God, lift the affliction away from the children, the elderly, the women and the weak. O God, take from our blood until you are satisfied. O God, grant us martyrdom.

(GX 15, GX 15-T).

A second voice is then heard stating:  "Our God, Our God be with our oppressed Muslim brothers in Syria. O God, O God, [Crying]. Our God, O Ghoutah, O Ghoutah, O Ghoutah. Our God, our God, whoever used his power against them, we will use your power against him. Our God, whoever used his power against them."

## B.  Discussion

These exhibits are highly relevant for multiple reasons.

First, to convict the defendant on both Counts One and Three, the Government must prove the defendant knew (i) that ISIL was a designated foreign terrorist organization, (ii) that ISIL was engaged in "terrorist activity", or (iii) that ISIL was engaged in terrorism.  *See* Gov't Requests to Charge, Requests 7, 22; 18 U.S.C. § 2339B(a)(1) (defining "terrorism" and "terrorist activity" by reference to 8 U.S.C. § 1182(a)(3)(B)(iii) and 22 U.S.C. § 2656f(d)(2)).  "Terrorist activity" includes, among other activity:

- seizing, detaining, or threatening to kill, injure or further detain another person to compel some third party, including a government, to do or abstain from doing some act;

- assassination;

- use of any explosive, firearm, or other weapon or dangerous device, other than for monetary gain and with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; or

6

- threat, attempt, or conspiracy to do any of the above.

8 U.S.C. § 1182(a)(3)(B)(iii).  "Terrorism" is defined as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C. § 2656f(d)(2).

ISIL's actions, depicted in Government Exhibit 11, of capturing large numbers of raw Iraqi Army recruits and then shooting them are a clear indication that the defendant was well aware that ISIL was engaged in "terrorist activity"—both by "seizing or detaining, and threatening to kill" the recruits and then publicizing it through a propaganda video, to "compel" the population in Iraq and Syria to submit to ISIL's rule, and by "us[ing] . . .firearm[s] or other weapon[s] or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals."  8 U.S.C. § 1182(a)(3)(B)(iii)(II), (V)(b).

Similarly, Government Exhibit 12, which depicts an ISIL militant flanked by armed riflemen, making a speech to a group of civilians about "humiliat[ing] the heretic through applying His defeat"; "our soldiers [being] those who overcome"; and the greatness of the "Mujahid," a name for an Islamic fighter; also shows the defendant's knowledge that ISIL engaged in terrorist activity that entails threatening to injure or kill persons in order to "compel" third parties to submit to ISIL's rule.  8 U.S.C. § 1182(a)(3)(B)(iii)(II).

Similarly, Government Exhibit 13 tends to show that the defendant knew that ISIL engaged in both "terrorist activity" by using firearms against their opponents, 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b), and "terrorism" by engaging in politically-motivated violence against supporters of the Syrian regime, 22 U.S.C. § 2656f(d)(2).  For instance, during the speech captured in Government Exhibit 13, al-Adnani states: "[N]o fighting group ever shot a bullet on anyone except a Nusairi . . ."

In addition to showing that the defendant was aware that ISIL was engaged in both terrorism and terrorist activities, Government Exhibits 11, 12 and 13 are also relevant to show the defendant's knowledge of ISIL more generally, including its military and other activities and goals, and its geographic location.  These videos are directly relevant to the defendant's knowledge that CC-1 was traveling to Turkey and then Syria to join ISIL (and not some other organization) and to receive military-type training from ISIL.  Government Exhibit 11 demonstrates more than just the fact that the defendant "keeps up with current events."  (Def. Memo. at 2).[4]  When viewed in the context of the other evidence in this case, it demonstrates the defendant's knowledge of ISIL and its terrorist activities during the critical time period in which he was conspiring to provide material support to ISIL by facilitating CC-1's travel to Syria to join ISIL and receive military-type training from ISIL.

In addition, Government Exhibits 11, 12, and 13 contain precisely the type of terrorist propaganda[5] that the Second Circuit has regularly allowed to be admitted, particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense and to provide the jury with an explanation of the understanding or intent with which the offense conduct is carried out.  *See, e.g.*, *United States* v. *Abu-Jihaad*, 630 F.3d 102, 133–34 (2d Cir. 2010) (affirming admission of "pro-jihadist contents of videos" as "relevant to understanding [the defendant's] motive and intent" in committing the offense conduct); *United States* v. *Salameh*, 152 F.3d 88, 110–11 (2d Cir. 1998) (affirming the admission of certain terrorism

---

[4] Nonetheless, the fact that the defendant "ke[pt] up on current events" regarding ISIL it itself highly probative to counter anticipated defense arguments that the defendant was unaware that he was assisting CC-1 travel to *ISIL* (as opposed to some other location or group) or that CC-1 somehow duped the defendant into assisting him.

[5] As noted above, although Government Exhibit 11 is a *New York Times* report, the report itself contains excerpts from an ISIL propaganda video.

propaganda documents possessed by the defendants because they evidenced motive and "provided the jury with background and 'an explanation of the understanding or intent with which certain acts were performed'").  Other courts have also found that terrorist-related pictures, videos, and literature are probative of a defendant's motive and intent.  *United States* v. *Mehanna*, 735 F.3d 32, 60–61 (1st Cir. 2013) ("The pictures, videos, and literature that he absorbed and endorsed during that evolutionary process, as well as the materials that he used to recruit others to follow a similar path, doubtless bear on his motive and intent . . . . While no picture, video, book, or tract spoke directly to the defendant's purpose in going to Yemen, evidence need not achieve the conspicuousness of a smoking gun in order to have probative value."); *United States* v. *El-Mezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from the defendant, "including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the [defendant] to support Hamas").

Finally, although Government Exhibit 15 does not appear to be an ISIL-produced video, it is nonetheless relevant as probative of the defendant's motive, intent, and support for militant forms of jihadism and also shows that the defendant was keenly aware of the conflict in Syria. For instance, while the video shows armed men in fatigues guarding and striking bound prisoners in civilian clothes, the narrator states: "Long grew the night of the enemies of the religion. O God, confuse the miscreants. O God, count them all, kill them extensively, and do not leave any one of them."

The defendant argues that there is no evidence that he watched the Laptop Videos and, therefore, "they prove nothing about his mental state (the only conceivable relevance theory)." (Def. Memo. at 2).  But that is a challenge to the *weight* of the Laptop Videos, and not to their relevance and admissibility.  In *Mehenna*, the defendant challenged the admissibility of

"thumbnail" images retrieved from his computer, arguing that the images could exist on a person's computer without the person's involvement or knowledge. *Mehenna*, 735 F.3d at 64. The First Circuit, affirming the admissibility of the evidence, held that the defendant's objection "goes to the weight of the evidence, not to its admissibility" because "[o]ne logical inference from the discovery of the thumbnails is that the defendant viewed and approved of such images." *Id*. at 65. As such, "[t]he government was free to argue in favor of this inference, and the defendant was free to argue otherwise. Jurors are not so naive that they must be shielded from choosing among reasonable but competing inferences extractable from proven facts." *Id*. Similarly, here, the defendant's objection goes to the weight of the evidence and not its admissibility. At trial, the Government may argue that the jury should infer, from the fact that the Laptop Videos were downloaded to the defendant's laptop, that he watched them, and the defense may argue that he did not watch them but, instead, "click[ed] on links to them and then clos[ed] them" (Def. Memo. at 3). It is the role of the jury to decide which inference to credit.

Finally, the highly probative value of the Laptop Videos as evidence of the defendant's state of mind when committing the offense conduct is not "*substantially* outweighed" by a danger of unfair prejudice when the Laptop Videos are no more prejudicial than the terrorism crimes charged here. *See* Fed. R. Evid. 403. The defendant is charged with conspiring to provide and providing material support and resources to ISIL, a designated terrorist organization and jihadist militant group that is widely known for its videos of beheadings of soldiers and civilians, including journalists and aid workers; its widespread human rights abuses and war crimes; and its commission of terrorist attacks that have spanned the globe and taken many innocent lives. In no way are the Laptop Videos—which show his knowledge of ISIL's terrorist activities, military goals, and extremist propaganda—any more prejudicial than the conduct with which he is charged. This is particularly true because the Laptop Videos are highly probative of

10

the defendant's state of mind, and the Government must prove beyond a reasonable doubt the defendant's knowledge that ISIL was engaged in "terrorism," "terrorist activities," or is a designated terrorist organization.

Thus, it is not surprising that courts in this Circuit regularly have admitted of such videos and, when appropriate, minimize any risk of unfair prejudice through limiting instructions. *Abu-Jihaad*, 530 F.3d at 133 (affirming admissibility of pro-jihadist contents of videos where "any danger of unfair prejudice was . . . minimized by the district court's limiting instructions . . . which we presume the jury followed"); *Salameh*, 152 F.3d at 110–11 (holding that where video depicting embassy bombing and instructions for making explosive devices was relevant to motive and nature of conspiratorial agreement, district court did not abuse its discretion in concluding that probative value of evidence outweighed any unfair prejudice); *United States* v. *Pugh*, 162 F. Supp. 3d 97, 117–18 (E.D.N.Y. 2016) (videos recounting the history of ISIL, actions of ISIL fighters in the battlefield, and depicting ISIL fighters "rounding up half-clothed prisoners and, ultimately, forcing them to lie down in a sprawling human pile" spoke strongly to the defendant's state of mind and the charged conduct, and any prejudice was not substantially outweighed by the probative value of the videos).  Other courts have similarly concluded that jihadist propaganda videos and documents found in a defendant's possession are admissible to show intent in material support cases, despite the fact that such videos and documents may risk prejudice.  *See, e.g.*, *Mehanna*, 735 F.3d at 59–64 (finding terrorist media admissible in material-support trial because it was highly probative to state of mind); *United States* v. *El–Mezain*, 664 F.3d 467, 508–511 (5th Cir. 2011) (admitting propaganda evidence in a material support case despite a Rule 403 challenge); *United States* v. *Hammoud*, 381 F.3d 316, 340–42 (4th Cir. 2004) (admitting evidence of terrorist propaganda videos found in defendant's home because they were relevant to motive and were not unduly prejudicial), *vacated on other grounds*, 543 U.S. 1097,

11

125 S.Ct. 1051, 160 L.Ed.2d 997 (2005).  In *Mehanna*, the First Circuit remained "mindful that

terrorism-related evidence is often emotionally charged," but found that "much of this emotional

overlay is directly related to the nature of the crimes that the defendant has set out to commit."

735 F.3d at 64.  Therefore, "[i]t should not surprise a defendant that proof of his participation in

conspiracies to provide material support to terrorist organizations . . . will engender the

presentation of evidence offensive to the sensibilities of civilized people. . . . Terrorism trials are

not to be confused with high tea at Buckingham Palace."  *Id.*

Accordingly, the Laptop Videos are probative of the defendant's motive, knowledge and

intent, and any risk of prejudice is not substantially outweighed by their probative value.

### III.    Facebook Posting Reproducing a Hadith about the "Islamic Caliphate"

The defendant argues that Government Exhibit 100-L, which is a posting on his

Facebook page of an image entitled "The Islamic Caliphate," accompanied by the words of the

prophet Mohammed regarding the concept of a "Caliphate" and "forceful rule" (the "Islamic

Caliphate Posting" (GX 100-L, GX 100-L-T), is irrelevant because the defendant did not himself

post it but instead was tagged in the posting.  That argument ignores the context and important

facts about the posting.

To begin with, the Islamic Caliphate Posting is highly relevant.  *First*, as discussed in the

Government's Opposition to the Defendant's First Motions *in Limine*, the Government expects

the testimony at trial to establish that, in June 2014, ISIL formally declared itself a caliphate,

which is a type of historic Islamic government which had not existed since the abolition of the

Ottoman caliphate in 1924, and, in early July days before the Islamic Caliphate Posting, ISIL

leader ██████████████ made an important, widely publicized speech in Mosul, Iraq

regarding the formation of the caliphate.  The Government expects the evidence to show

(including Government Exhibit 100-L) that ISIL's establishment of a caliphate, was a significant development in the defendant's own view of, and support for, ISIL.

Moreover, although the defendant himself did not post the Islamic Caliphate Posting, it is still relevant to his state of mind, his motive, and intent.  Facebook users "can easily remove [a] tag" if they choose to do so.  *See* https://www.facebook.com/about/tagging (last visited December 22, 2016).  Depending on the user's privacy settings, the user may "review things [the user] is tagged in before they go on your timeline." *Id.*

Here, the Islamic Caliphate Posting—a posting justifying and applauding ISIL's actions—was made in July 2014 and remained on the defendant's account when the defendant obtained records from Facebook in May 2015, almost a year later.  In the same way that support for an organization or a cause could be inferred from the fact that a physical sign or banner remained on a person's office wall or front lawn for an extended period of time, regardless of who placed it there in the first place, it would be reasonable to draw inferences about the defendant's support for, and knowledge of, ISIL—key issues in this case—from the fact that the Islamic Caliphate Posting remained on his Facebook Wall for an extended period of time.

Moreover, the defendant exchanged Facebook messages with ██████ regarding the proclamation of the "Islamic Caliphate" before the posting and again after the posting, bolstering the relevance of the Islamic Caliphate Posting, the defendant's knowledge of the posting, the defendant's embrace of having the posting associated with him, and the defendant's refusal to remove the tag as evidence of his support for ISIL.  On July 4, 2014, ██████ wrote to the defendant:

> All the scholars who reject the proclamation of the Caliphate, do so because they are scared of the infidels' aggregation and the whole world's siding against the Muslims as if the world has not declared war on the Muslims for two hundred years. They also reject it out of the principle of "avoiding troubles has a priority over bringing

> benefits" and applying the principle of "blocking pretences" They
> give many excuses to impede the law of Allah; but I have never
> found one of them discussing this matter from a legitimate approach
> or if it is allowed or not based on the Quran and Sunnah. By Allh,
> those scholars are the biggest obstacle facing the rise of the Muslims
> and their liberation from the influence of the infidels. We should spit
> on them and on their *fatwas*[.]  I like it, I like it. Share.

(GX 100-E, GX 100-E-T).  Minutes later, the defendant responded: "Exactly."  (*Id.*).  The next

day, ███████ tagged the defendant in the Islamic Caliphate Posting. The day after that, July 6,

███████ wrote to the defendant, in reference to the Islamic Caliphate Posting:

> the people added to my page are pretending that they are not seeing
> the picture and the topic of the Caliphate that I posted in my page
> hehehe =D so what if I spoke directly about Abu Bakr Al-Baghdadi,
> what will they do[?]… and I spoke to someone whom I found out
> that he took the subject as a joke and avoided to reply to me

(*Id.*).  Seconds later, the defendant responded: "I know[.]  there are too many like that. sadly."

(*Id.*).  Significantly, rather than remove the tag that associated his name with the Islamic

Caliphate Posting and which resulted in the posting appearing on his Facebook Timeline, the

defendant allowed the post to remain on his Facebook page while engaging in a dialogue with

███████ about ISIL and Abu Bakr Al-Baghdadi, ISIL's leader and the self-proclaimed caliph

(or religious ruler).

In short, the Islamic Caliphate Posting should be admitted as evidence of the defendant's

knowledge of, and support for, ISIL.

## IV. The Defendant's Facebook Profile Picture of a Fighter is Relevant Evidence of the Defendant's Pro-Jihadist Mindset

On or about July 9, 2014, within days of ISIL's announcement of the Islamic caliphate,

the defendant changed his publicly viewable Facebook profile picture from a photo of himself

sitting in a restaurant to a picture of a masked fighter, wearing a headband with what appears to

be an Arabic inscription, holding an AK-47 (the "Fighter Profile Picture") (GX 100-N at 12).  A

Facebook profile picture appears next to the user's "name in different places throughout Facebook . . . and helps friends identify [the user's] posts and comments on Facebook." *See* Cover Photo and Profile Picture, https://www.facebook.com/help/mobile-touch/439209606157906/?helpref=hc_fnav (last visited December 22, 2016).  Six days later, the defendant changed his profile picture back to a picture of himself in a restaurant.

The Fighter Profile Picture is relevant as evidence of the defendant's state of mind.  It is particularly probative because, by replacing more traditional Profile Picture of the himself with a picture of the fighter, the defendant was essentially identifying himself with the fighter.  As such, the Fighter Profile Picture shows the defendant's mindset as a supporter of jihad and jihadist organizations.  The fact that a web search by the defense team shows that the fighter appears to be a member of Hamas (another designated foreign terrorist organization)[6], and not ISIL, does not undercut the probative value of this evidence.  For one, there is no evidence that the defendant was aware that the photo was apparently of a Hamas fighter.  And such arguments go to the weight, not the admissibility, of the Profile Picture; the defense is free to make arguments at trial why the jury should disregard the Profile Picture.  Moreover, even under the defense's argument, the Profile Picture is still relevant to the defendant's pro-militant state of mind, which is relevant to his support of a foreign terrorist organization, terrorism, and terrorist activity.

**V.    The Defendant's Facebook Messages Discussing Smuggling Weapons into Egypt are Relevant to His Motive and Intent**

The Government expects the evidence at trial will show that, in the summer of 2014, the defendant became increasingly supportive of ISIL and its military and terrorist activities, and espoused his views publicly and to individual associates via Facebook.  One of the individuals

---

[6] Hamas was designated a foreign terrorist organization by the Secretary of State on October 8, 1997, and remains so designated today.  *See* http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited December 23, 2016).

with whom the defendant communicated his views in support of ISIL was ███████████.
For example, on July 1, 2014, the defendant wrote, in messages to ████████: "[A]lthough you
are against the State and a total liberal hehehehehe[.]  God grants them victory and take over
Jordan then Saudi Arabia to conquer Egypt after that."  In response, ████████ wrote: "OK my
friend, I am not against the State but I am against some mistakes and exaggeration; I see them as
Mujahideen and say good things about them[.]"[7]  (GX 100-J, GX 100-J-T).

Days later, on July 7, 2014, the defendant asked ████████, "how can you bring
weapons into Egypt???? or even bullets" and engaged in a message exchange with ████████
regarding smuggling weapons and bullets through land borders and entry points into Egypt, and
assembling an AK-47 assault rifle.

These messages are directly relevant to the defendant's knowledge, intent and motive,
especially to the extent the defense argues that the defendant's statements in support of ISIL are
not to be taken seriously and were meant in jest.  To the contrary, the messages regarding
weapons smuggling, coming soon after a discussion in which the defendant beseech God to
"grant [ISIL] victory and take over Jordan then Saudi Arabia to conquer Egypt," tend to show
that the defendant was seriously committed to his support for ISIL and was not merely
expressing off-the-cuff, less-than-sincere sentiments.  Thus, the exchange regarding how to
smuggle weapons and ammunition into Egypt demonstrates that the defendant had the requisite
motive and intent to facilitate CC-1's travel to Syria to join and receive military-type training
from ISIL.

---

[7] The defendant does not challenge the admissibility of this portion of the conversation, which is
clearly relevant and admissible on the issue of the defendant's state of mind.  *E.g.*, ("May God
grant [the State] victory and take over Jordan, then Saudi Arabia, then conquer Egypt after that.").

Contrary to the defendant's arguments, the probative value of this exchange is not substantially outweighed by a danger of unfair prejudice or confusing the issues.  When viewed in the context of his other messages with ███████, the defendant's questions about how to smuggle weapons into Egypt and his messages about assembling an AK-47 provide clarity as to the sophisticated nature of his knowledge and mindset. In addition, this evidence is no more inflammatory or prejudicial than the charged offenses and the other proof of the defendant's conduct and ISIL's activities.

**VI.   Certain Facebook Communications Between CC-2 and ███████ Are Highly Probative of the Relationship Between CC-2 and the Defendant, and Provide Necessary Foundation for the YouTube Video of CC-1**

As an initial matter, the Government does not intend to offer all of what is currently marked as Government Exhibit 122-A-T.  At this time, the Government is seeking to offer pages 105-113 and 38-52, which comprise communications between ███████ and CC-2 from September 4 to September 9, 2015 regarding (a) the defendant's arrest, including false exculpatory statements by CC-2 regarding their roles in the charged conduct, and (b) a message during which CC-2 provides ███████ with a link to CC-1's YouTube Video, which the Court has already rule admissible (GX 122-A-T at 51) and the message "check this website."

For one, the communications surrounding the posting of CC-1's YouTube video are relevant to explain how the Government located the video and to provide context for its admission.  Government Exhibit 122-A-T contains the hyperlink to the video, which CC-2 intended to be transmitted back to the defendant through CC-2's communication with ███████ ███████:

CC-2:            ███████████████

CC-2:            check this website

███████:   yes . . . good

17

CC-2:                          send it then to Ahmed's mother

(GX 122-A-T at 52).  These excerpts of Government Exhibit 122-A-T are highly probative of the

relationships between the defendant, CC-1 and CC-2.

Moreover, and consistent with the Court's recent rulings on the Government's *motions in*

*limine* at its December 19, 2016 status conference, they are admissible as statements made during

and in furtherance of the charged conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  In finding that

portions of CC-1's martyrdom letter "are statements by a co-conspirator under Rule

801(d)(2)(E)," this Court reasoned:

> As the Second Circuit noted in *Gigante*, the objective of the joint
> venture need not be the crime charged in the indictment or the
> objective of the conspiracy charged in the indictment.  *See also*
> *United States* v. *Lyles*, 593 F.2d 182. "However, the conspiratorial
> objective being furthered by the declarant's statement must in fact
> be the objective of the conspiracy between the defendant and the
> declarant." *U.S.* v. *Russo*, 302 F.3d 37.  As the Second Circuit has
> held, even where particular crimes have already been committed,
> "the conspiracy does not necessarily end; it continues until its aim
> has been achieved, it has been abandoned, or otherwise terminated."
> *U.S.* v. *Arrington*, 867 F.2d 122. Moreover, the fact that some of the
> conspirators have been indicted or incarcerated does not inevitably
> lead to the conclusion that the conspiracy has been terminated.  *U.S.*
> v. *Persico*, 832 F.2d 705.

Dec. 19, 2016 Tr. at 44-45.  Similarly, the Court also held that "as to the written communications

about the creation of the YouTube video, the Court finds them admissible as

statements by co-conspirators."  *Id.* At 48.

The same reasoning applies squarely here with respect to CC-2's statements to █████████

███████.  Like the statements leading up to the creation of the YouTube Video, these statements

were part and parcel of the efforts by the defendant, CC-2, and CC-1 to provide material support

to ISIL.  Specifically, CC-2's instruction to "send [the video] to [the defendant's] mother" was

merely a continuation of earlier efforts by the defendant, CC-1, and CC-2 to achieve one of the

conspiracy's core objectives—maintaining secrecy in the covert means and methods by which

they (and ISIL) facilitated CC-1's travel to ISIL-controlled territory in Syria.  In addition, ███

███ agreed to assist in this effort ("yes. . . good.").  This and other evidence to be offered

at trial will support the inference that the defendant and his co-conspirators sought to maintain

such secrecy since the inception of their criminal activity and wanted to send the YouTube Video

to the defendant's mother so that they could continue to conceal the means and methods by

which they had assisted CC-1 in providing support to ISIL.  Indeed, at the time the statements

were made, CC-1 was still actively providing material support to ISIL in Syria.  Accordingly,

"concealment of the existence of the conspiracy served not only to cover up the declarant's past

participation in criminal behavior, but to shield the ongoing conspiracy as well."  *United States*

v. *Pecora*, 798 F.2d 614, 630 (3d Cir. 1986) (citing *Grunewald* v. *United States*, 353 U.S. 391,

405–06 (1957)).  *See also United States* v. *Koppers Co., Inc*., 652 F.2d 290, 298 (2d Cir. 1981)

("post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy.");

*United States* v. *Bermudez*, 526 F. 2d 89 (2d Cir. 1975) ("[e]vidence obtained by searches

conducted after the termination of a conspiracy has frequently been held admissible to prove the

existence of the conspiracy even though occurring after its conclusion").

    The fact that the defendant had been arrested did not end the conspiracy—instead, since

CC-1 was still providing material support to ISIL and receiving military-type training from ISIL

well after the defendant's arrest, these statements were made in furtherance of the ongoing

conspiracy.  And, as with CC-1's statements in the YouTube video that the Court held were

admissible as co-conspirator statements, CC-2's statements about the YouTube video "advance[]

the objects of the conspiracy, that is to say carrying out the plan to provide material support to

ISIL, as opposed to thwarting its purpose."  *See* Dec. 19, 2016 Tr. at 47-48 (holding that the

YouTube video contains co-conspirator statements because it "advances the objects of the

conspiracy" and the statements "furthered the purpose of the conspiracy between defendant and CC-1 because the statements regarding defendant's lack of involvement with CC-1 are being offered as allegedly false exculpatory statements"). In addition, where, as here, "[a]n unarrested co-conspirator [is] still operating in furtherance of the conspiracy," the statements made by such a co-conspirator "may be introduced against a defendant who was arrested at the time the statements were made." *United States* v. *Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986). *See also United States* v. *Wentz,* 456 F.2d 634, 637 (9th Cir. 1972).

**VII.  CC-2's Facebook Communications with ▮▮▮▮▮▮▮ are Relevant to CC-2's Knowledge and State of Mind During the Time Period of the Conspiracy**

CC-2's April 2015 Facebook communications with ▮▮▮▮▮▮▮, during which he uses the phrase "Daesh Brotherhood" to refer to one of his associates and conveys a desire for God to "accept me as a martyr," are directly relevant to CC-2's knowledge and state of mind during the time period of the conspiracy, in particular his commitment to militant jihadism. *United States* v. *Farhane*, 634 F.3d 127, 165 (2d Cir. 2011) (affirming admission of evidence indicating that co-conspirator had radical views on Islam where "such views fueled the conspiratorial agreement to provide support for *jihad*"); *United States* v. *Kaufman*, No. 13 Cr. 411 (JMF), 2014 WL 2048198, at *10 (S.D.N.Y. May 19, 2014) (explaining that evidence of alleged co-conspirator's state of mind during time of charged conspiracy was relevant to show existence of conspiracy and "the fact that [the defendant] was not involved in the recorded conversations at issue is of no moment"). To the extent that one of the defendant's theories is that he and CC-2 were supporters of the Muslim Brotherhood and not ISIL, or that the Muslim Brotherhood is antithetical to ISIL, CC-2's statement linking "Daesh" (*i.e.*, ISIL) with "Brotherhood" (*i.e.*, the Muslim Brotherhood) is probative of CC-2's state of mind in connection with his participation in the charged conspiracy. This is especially true in light of CC-2's prior statements in support of ISIL (*i.e.*,

"There is a probability I will join the State" (GX 100-X, 100-X-T)) and his statement to  expressing a desire for God to "accept [him] as a martyr."  Therefore, the Court should admit these statements as relevant to CC-2's knowledge and state of mind.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should deny the defendant's motions *in limine*.

Dated:  New York, New York
        December 23, 2016

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                     By:   ___/s/_____
                              Andrew J. DeFilippis
                              Brendan F. Quigley
                              Negar Tekeei
                              Assistant United States Attorneys
                              One St. Andrew's Plaza
                              New York, New York 10007
                              Tel. No.: (212) 637-2231/2190/2482