GCJ3GAM1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        15 CR 588 (ER)

5   AHMED MOHAMMED EL GAMMAL,

6                    Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           December 19, 2016
9                                          3:00 p.m.

10
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                           District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BRENDAN F. QUIGLEY
17  NEGAR TEKEEI
    ANDREW J. DeFILIPPIS
18       Assistant United States Attorneys

19
    FEDERAL DEFENDERS OF NEW YORK
20       Attorneys for Defendant
    SABRINA P. SHROFF
21  ANNALISA MIRON
    DANIEL G. HABIB
22

23

24

25

GCJ3GAM1

1          THE DEPUTY CLERK:  In the matter of the United States

2    of America v. El Gammal, counsel, please state your name for

3    the record.

4          MR. QUIGLEY:  Good afternoon, your Honor.  Brendan

5    Quigley and Negar Tekeei for the United States.

6          THE COURT:  Good afternoon.

7          MS. SHROFF:  Good afternoon, your Honor.  On behalf of

8    Mr. El Gammal, Federal Defenders of New York by Sabrina Shroff,

9    Annalisa Miron, and Daniel Habib.  Good afternoon.

10          THE COURT:  Good afternoon to you.  And good afternoon

11    to you, Mr. El Gammal.

12          THE DEFENDANT:  Good afternoon.

13          THE COURT:  We are here at the request of the

14    defendant following a flurry of letters that I received

15    concerning primarily, although perhaps not exclusively, a

16    request that the protective order that has been entered into in

17    this case be modified to declassify certain categories of

18    documents, which presumably will assist Mr. Gammal in his

19    preparation for trial, and which documents apparently are

20    already in the public realm, either because of their nature,

21    having been created on social media, or because of the use of

22    the government in connection of those documents in connection

23    with this case.

24          I do note we are scheduled for trial on January 9, so

25    we are some small number of weeks away, and we'll he deal with

GCJ3GAM1

1    this issue and then I do have a decision for you on some of the

2    motions in limine.

3            So let me turn to the defense in the first instance.

4    How are you being prevented or burdened in your preparation for

5    trial as a result of the protective order currently in place?

6            MS. SHROFF:  Your Honor, but that's simply not the

7    standard, and the government knows that.  The government knows

8    full well that's not the standard.  The government knows full

9    well the burden is upon them to mark documents that are

10   confidential as confidential.  They know all of this.  That's

11   why they didn't address it in their motion papers.

12           It is not my burden to show.  I don't have to be

13   prejudiced, I don't have to be burdened, it doesn't have to be

14   cumbersome for me.

15           Bottom line is this:  If you want to put certain

16   documents under a confidential designation, they have to show

17   that in fact they're confidential.  And if you want me to

18   assume the government's burden, which is rightly theirs, I can

19   explain to the Court specifically ex parte why it is

20   burdensome.  But the one issue I do have with the government's

21   response I want to lay out very clearly.

22           The government's letter implies that most of their

23   witnesses at trial will be non-fact witnesses, and they have in

24   fact been studious and careful in how they have used this

25   discovery.  Which witnesses the government puts on is not the

GCJ3GAM1

inquiry.  The inquiry is which witnesses have they talked to.

So they have talked to plenty.  And if they don't want to come

clean as to which fact witnesses they've talked to, that's a

conversation the Court should have with them.

THE COURT:  I'm sorry.  These two issues overlap.  The

issue of --

MS. SHROFF:  They overlap because they get to use

these documents to prepare their case, they don't have to write

to you, they don't have to seek your permission.  They get to

mark something confidential and use it in a non-confidential

way.

Let's take a simple example.  Are they suggesting they

haven't talked to Samy El-Goarany.  The father, mother,

brother, second brother?  Of course they've talked to them.

Did they talk to them without having access to all of these

documents that they marked as confidential?  I don't think so.

But you know what?  They're right here.  Ask them.  They've

interviewed all of these people.  They've gone over the

Facebook posts, they've gone over the language.  Their 3500

makes clear that they've done so with Tarek El-Goarany.  I

don't understand.

THE COURT:  You're saying that the fact that the

government, irrespective of who they may call at trial, the

fact that the government has reviewed with fact witnesses

documents that have been marked confidential would require me

GCJ3GAM1

1   to direct them to recategorize those documents at this point?

2          MS. SHROFF:  They should rightly be recategorized

3   anyway.  If I was to say, if you were to hold them to their

4   burden as only marking those Facebook chats, Facebook posts

5   from 2013, 2014, 2009, YouTube videos, they are not

6   confidential.

7          And there is no method or means.  It is ridiculous for

8   the government to argue that somehow or the other if these

9   documents become public ISIS is going to find out what

10  mechanism the United States government knows.  They know that

11  that's not a good argument for them.  Their own discovery

12  production in other cases have included Inspire Magazine which

13  clearly set out that ISIS knows far more than anything this

14  case could possibly give them.

15         Is it really the government's position that ISIS does

16  not know that the United States uses a search warrant?  Or that

17  they have instruments for their use, including all of these

18  different mechanisms by which they can go get documents?  Are

19  they really saying that ISIS does not know that Twitter is

20  used, Facebook is used, that all of these social media posts

21  are used?  ISIS uses them, they know.

22         I don't understand what method are they going to

23  disclose if we are able to share these posts with a fact

24  witness.

25         THE COURT:  Ms. Shroff, you and I know that when we

GCJ3GAM1

1    start talking about what the government classifies as national

2    security or confidential for one reason or another is

3    contextual, and sometimes what is classified in one fashion and

4    one instance is classified in some other fashion and some other

5    instance.

6            MS. SHROFF:  But --

7            THE COURT:  And these prosecutors are required, I

8    assume, to follow those regulations.  So let's talk about --

9            MS. SHROFF:  No, no, we're not talking about

10   classified.  Classified is a whole different category.  I'm not

11   even touching classified.  I am happy to draw that line.

12   Classified they can go talk about national security all they

13   want.  These are simply documents that they have marked

14   confidential.  They want you to muddy up classified and

15   confidential.  I'm not talking about classified at all.  That's

16   sitting in their CIPA room, that's in the SCIF, I'm not

17   touching that.  To have any discussion I would have to be in

18   that robing room with cleared counsel.

19           I'm simply talking, I want to be very clear, because

20   they obfuscate on this point as well in their response.  I'm

21   only talking about documents they marked confidential.  They

22   are Facebook posts, 2009, 2010, '11, '12, '13, '14, '15, he has

23   been in jail for 15 months.  Okay.  There is nothing recent,

24   there is no investigation pending.  All of the fact witnesses

25   in this case they have spoken to.  They know every single

GCJ3GAM1

1    person they know, they have talked to them.

2            Their letter is quite nicely written in the sense when

3    it lastly says only those individuals who are party to these

4    conversations are going to be their witnesses at trial.  That

5    isn't the question.  They have been able to use these documents

6    to prepare.  That's all I'm asking for.

7            THE COURT:  I want to make sure we're talking based on

8    actual facts here.  Obviously I don't have the 3500 material.

9    I assume that you're referring to the 3500 material.

10           MS. SHROFF:  No.  They're right here.  Just ask

11   them -- yeah, I have 3500 for one person, and that, too, has

12   not been updated.  I've been asking for days to update it.

13   They haven't updated.

14           The government is right here.  They can simply be

15   asked, hey, by the way, sir, have you spoken to Mr. El-Goarany

16   the dad, El-Goarany the mom, brother Khalid, cousin Emmett.

17   They're right here.  Ask them.

18           THE COURT:  Well, I don't know that I need to do that.

19   But I'm trying to figure out, you're saying that based on your

20   review of the certain 3500 materials it is clear that the

21   government has been using these confidential documents in their

22   conversations with these fact witnesses.

23           MS. SHROFF:  Yes.

24           THE COURT:  And that is the basis for the motion?

25           MS. SHROFF:  No.  My basis for the motion is that

GCJ3GAM1

1    these documents should never have been marked confidential.  It

2    is their burden to show that they should be confidential, that

3    they should remain confidential.  The government knows they are

4    not confidential.  That is why they keep making this argument

5    that we signed the protective order and we've been able to make

6    do for 15 months so we should make do for a month more.

7    Knowing full well we did not agree to this, that we tried to

8    argue, and initially we lost.  We lost the motion to modify the

9    protective order to include fact witnesses and here we are

10   again.

11           And we think we have a stronger argument now.  We have

12   a stronger argument now because perhaps we've been more

13   articulate in later cases, and judges have noticed that they're

14   over-designating, so they've said to them stop.  Stop

15   over-designating.  Narrow the volume, narrow the group of

16   documents to which those that are truly confidential, or

17   modify.  They can do either.  Right.  But what they can't do is

18   say I get to use it, I've marked them in an overbroad manner,

19   you don't get to use them, and that's the law.  That's not

20   right.

21           THE COURT:  I guess I'll hear you ex parte on how, if

22   at all, you've been burdened by the designations.

23           MS. SHROFF:  Okay.

24           THE COURT:  But I guess I'm trying to figure out --

25           MS. SHROFF:  It is a very simple question.  If he gets

GCJ3GAM1

1    to do it, why not me.  If he gets to talk to a witness and use

2    all of the information in a Facebook post, why not me.

3              THE COURT:  That's the question.  Have you been

4    prevented from speaking with fact witnesses and not allowed to

5    use these documents?

6              MS. SHROFF:  Yeah, we have.  We have to keep coming to

7    you each time.  We have to keep coming to you, and they don't.

8    It is the same exact document, and the document is publicly

9    available.  It is a Facebook post.

10             THE COURT:  And on those occasions that you have made

11   application to me, I believe I've granted you --

12             MS. SHROFF:  That's not --

13             THE COURT:  -- the authority to use it on each

14   occasion, correct?

15             MS. SHROFF:  No, that's not the point.  The point

16   isn't that.  The point is they have no such restriction and why

17   should -- why are they in a better position to prepare for

18   trial than I am.  Why?

19             THE COURT:  Okay.

20             MS. SHROFF:  Right?  They know full well that the

21   burden is theirs.  Right.  They've litigated this over and over

22   again.  They just litigated it in front of Judge Berman and

23   they lost.  This exact same United States attorney's office

24   litigated this before Judge Berman, and Judge Berman said you,

25   no, this universe is far too broad.  So go back, and narrow the

GCJ3GAM1

1    universe.  Meet and confer.  And we met and conferred once, we

2    met and conferred twice, we met and conferred three times, and

3    they reduced and they shrunk and they shrunk which documents

4    they would be categorizing as confidential.  Finally, even

5    after that, Judge Berman ordered them to undertake a review

6    every four months to make sure the documents that were

7    confidential a month ago still need to be confidential today.

8              We're not asking them to undertake that burden right

9    now.  All we are saying is let us talk to our fact witnesses.

10   We're less than a month away from trial now.  We are not asking

11   you to let us send copies.  Do you know how burdensome it is to

12   sit there and read discovery out loud to people in an effort to

13   discuss it with them?  It's absurd.  They don't have to do

14   that.  They take the document and they say, hey, here, take a

15   look and we'll call you.  They're not stopped from doing it.

16             THE COURT:  Okay.  Let me hear from Mr. Quigley or

17   Ms. Tekeei.

18             MR. QUIGLEY:  Your Honor, our position is pretty set

19   out in our papers.  We are happy to lift, recognizing trial is

20   coming up, we're happy to lift the protective order with

21   respect to the majority of the documents on our October 3, 2016

22   exhibit list, just because, given the likelihood of trial and

23   the likelihood those will become part of the public record, and

24   frankly, the fact that those are the key documents in the case,

25   we're happy to do that.

GCJ3GAM1

1          To the extent there are additional documents that the

2    defense wants to discuss lifting a protective order for, we're

3    happy to do that as well.

4          I think the fact is, though, requiring us to do a

5    wholesale review of hundreds of thousands of pages of discovery

6    at this point, three weeks before trial, would be extremely

7    burdensome and, frankly, it's not the standard.  The government

8    does not need to demonstrate good cause on a

9    document-by-document basis.  The *Smith* case, which both parties

10   cited in their brief, talks about that.  And again, and this

11   was a protective order that was stipulated to a year ago.  If

12   there are specific documents during the course of the

13   litigation they wanted to discuss, we would be happy to discuss

14   those.  As your Honor stated, there is a mechanism for them to

15   show those to fact witnesses and they have taken advantage of

16   that.

17          THE COURT:  Can they under the protective order show

18   them the documents?

19          MR. QUIGLEY:  Yes, your Honor.

20          THE COURT:  They don't have to read them the

21   documents?

22          MR. QUIGLEY:  That's not my view of the protective

23   order, no.

24          THE COURT:  But it seems, Mr. Quigley, that there

25   would appear to be one or more categories of documents that

GCJ3GAM1

1  Ms. Shroff has mentioned that from a common sensical point of

2  view would be prone to reclassification.

3          MR. QUIGLEY:  Your Honor, I hear what you are saying.

4  I disagree with her characterization of a lot of the social

5  media evidence in this case though.  It is not actually

6  publicly available.  You know, the Facebook -- the documents we

7  get from Facebook and Twitter include some publicly available

8  posts, like the things that a person puts on their wall and

9  their Tweets.  But they also, and frankly, this is the majority

10  of what we received from Facebook, concern private messages

11  between different people, and same with Twitter as direct

12  messages between different people.  Those are not publicly

13  available documents by any means.

14          THE COURT:  Have the publicly available documents been

15  reclassified or are they still under the same categorization?

16          MR. QUIGLEY:  Your Honor, I don't know what's

17  publicly -- I can tell you as a kind of a general matter, I am

18  aware that certain Facebook and Twitter content is generally

19  available to the public.  It may have been available to the

20  public when we served the search warrant back in 2014 or 2015,

21  but that doesn't mean that it's still publicly available.  That

22  the person's Twitter page is still up or their Facebook page is

23  still up.  The answer to that is no, but what was publicly

24  available at the time of the search warrant was obtained is not

25  necessarily what's publicly available now.

GCJ3GAM1

1      THE COURT:  Yes, but I guess, does its nature change

2  so much that we ought not to treat it differently because it's

3  been taken down for whatever reason?  If it was publicly

4  available once upon a time, what's the harm now?

5      MR. QUIGLEY:  Your Honor, I think the issue there

6  would be that I could see it shows who the government viewed as

7  a subject in this investigation, who the government obtained

8  process on, and I think that would -- while the defense

9  certainly has a right to that information in terms of the

10  discovery, I do think making publicly available the

11  government's -- kind of the way the government went about this

12  investigation and different people it investigated could

13  raise -- it would raise law enforcement sensitivities down the

14  line.

15      THE COURT:  What we're talking about is Facebook posts

16  of individuals other than Mr. El Gammal or the young man that

17  allegedly traveled to Syria and the individual in Turkey?

18      MR. QUIGLEY:  In some cases, yes, your Honor.  I'd say

19  even with respect to the shared content and publicly available

20  content, that's still going to require a significant review by

21  the government at this stage.  Some of these Facebook returns

22  which were produced again in September, majority of them in

23  September 2015, well over a year ago are over -- close to

24  100,000 pages long.  Going through that, figuring out, oh, this

25  is in the shared content, this is in the direct messages so

GCJ3GAM1

1    this is public, this isn't.  It will still require hours and

2    hours of review.

3              THE COURT:  It sounded like you mentioned at the

4    outset that you were open to engaging in conversations with the

5    defense concerning particular documents or particular

6    categories of documents that you would be willing to reconsider

7    reclassifying.  Is that right?  And if so, have those

8    conversations already taken place or not?

9              MR. QUIGLEY:  Your Honor, there has been some.  I

10   think not at the level of granularity and particularity that

11   really would make for a more productive conversation.  We've

12   had conversations, "Are you going to lift protective order?"

13   "No."  "Okay."  But if it's "Are you going to lift the

14   protective order with respect to some portion of one of these

15   Facebook returns," or even "Can we show a portion of this

16   Facebook return to fact witnesses," that would be fine with us.

17             THE COURT:  I can give them leave to do that, right?

18             MR. QUIGLEY:  Yes, your Honor.  That procedure has

19   been employed in this case by defense and it seems to have

20   worked.

21             THE COURT:  Ms. Shroff.

22             MS. SHROFF:  Let me understand what Mr. Quigley is

23   saying to the Court.  Mr. Quigley is saying that whereas for

24   good cause shown, that clause in the protective order means

25   nothing to him.  He doesn't have to undertake review to make

GCJ3GAM1

sure there is good cause for these documents to be marked

confidential.  He doesn't have to go through them.  He just has

to take a lump big category of documents and say I think

they're confidential, boohoo.  Nobody's reviewing these.  If we

come back to you, that's just delay.  And you know what?  I get

to use them.  You don't.  But whereas for good cause shown,

that phrase should mean absolutely nothing.  That's one of his

arguments.

Because, essentially, the government has marked every

Facebook return from every individual, including individuals

they have mentioned by name in their motion practice, not us,

they did.  Right.  Their press release, the articles on their

motions revealed Samy El-Goarany's name.  Not ours, theirs.

Essentially they're still saying to us go back and

look at our very tentative exhibit list, and only those

documents that we think should come out at trial are those

documents that we are willing to mark as non-confidential.

Regardless of the fact that those documents, when made

non-confidential, would reveal who the person being spoken to

is, whether it's Samy El-Goarany, Tarek, Emmett, Mamoud,

whoever.  Right.  All of these people are known, they're

publicly known people.  They have spoken to them.

Their investigation is over.  There is not a single

law enforcement personnel still working on any person who is

being investigated in this case.  It's finished.  The fact that

GCJ3GAM1

1   they use search warrants to investigate this case, they made

2   that public.

3          All this Court has to do is to designate publicly

4   available documents, all of the documents, the entire universe

5   of documents in this case consist of nothing but Facebook

6   posts.  Okay.  There is nothing other than Facebook and

7   Twitter.  And for the government to sit here and say somehow

8   that the Twitter exchanges between two people is somehow

9   confidential, there's no rhyme or reason they've given.  Right.

10  Their position basically is take my word for it, Judge Ramos,

11  two people talking on Twitter, it's confidential.  I can use

12  it, but not you.  I've used it in fact.  I have reviewed those

13  very Twitter exchanges that I'm telling you, defense, you can't

14  use, I have actually used them to talk to at least six or seven

15  fact witnesses that I'm now not going to call.  Right.  That's

16  all preparation for trial.

17         And I don't know why Mr. Quigley keeps saying we

18  agreed to it.  If you want to order the transcript,

19  Mr. Quigley, we shall, we shall undertake it, we objected to

20  the very phrase that we are still fighting about 15 months

21  later.  And for those 15 months, they have been using them as

22  they see fit.  If the government could have an ex parte

23  conversation with the Court, we would not object.

24         Let them tell you who else they are investigating at

25  this point.  Are they still investigating somebody 15 months

GCJ3GAM1

1    later?

2              MR. QUIGLEY:  Judge, if I may.

3              THE COURT:  Sure.

4              MR. QUIGLEY:  Judge, I take very strong exception to

5    the insinuation that we've been less than careful with these

6    documents.

7              MS. SHROFF:  It is not an insinuation.

8              MR. QUIGLEY:  Or showing these documents to different

9    fact witnesses.  Ms. Shroff has no idea who the government has

10   not shown these documents to.

11             There was one public filing where we did inadvertently

12   mention CC-1's name.  His name has not appeared in any press

13   release, it hasn't appeared in any complaint, it hasn't

14   appeared in any forum before that one document that was

15   recently filed in motions in limine.

16             The fact is we're not in the habit of showing fact

17   witnesses documents before trial preparation.  We certainly

18   don't show fact witnesses other people's communications.  So to

19   say we've shown this to six or seven fact witnesses is

20   completely incorrect, and I don't know how Ms. Shroff would

21   have any way of knowing that.

22             THE COURT:  That's what I was trying to figure out.

23   That's why I asked her about the 3500 materials.

24             MS. SHROFF:  But it is a simple question.  The

25   government can just tell you which fact witnesses they've

1    talked to.  They're right here.

2            THE COURT:  I guess I just assumed that because you

3    were making this argument, you had some basis.

4            MS. SHROFF:  I do.  And I'm happy to share how.  But I

5    think the government is right here.  They could just easily

6    stand up and say, you know what, I haven't talked to Nico.

7    Have they?  We're right here.  Any answer would do.  Andres,

8    how about Andres?  Have you spoken to Andres?

9            MR. QUIGLEY:  Judge, obviously --

10           THE COURT:  Why don't parties address themselves to

11   me.

12           Let me ask you, Mr. Quigley, do you or do you not have

13   to show good cause as to why the documents should continue to

14   be designated?

15           MR. QUIGLEY:  Your Honor, I think that's not the

16   standard for modification of a protective order.  The standard

17   is good cause in the first instance.  We established good

18   cause.  And I think in deciding whether a protective order

19   should be modified, the Court can consider, among other things,

20   the parties' reliance on the protective order throughout the

21   course of the litigation, and the fact that this is -- and the

22   burden on the party from modifying a protective order at this

23   stage, three weeks before trial.

24           MS. SHROFF:  He should not bear the burden three weeks

25   before trial but we should.

GCJ3GAM1

1          It's very clear, your Honor, this is extremely clear,

2     the protective order says whereas for good cause shown, and

3     recently -- they know this.  They know this, they know that the

4     waiver argument doesn't work because in front of Judge Berman

5     on *United States v. Rahimi*, 16 CR 760, that very argument was

6     rejected.  Judge Berman clearly said, clearly noted, clearly,

7     clearly noted, that it is an ongoing burden upon the government

8     to continue to show that only those documents that truly need

9     to be marked confidential are marked confidential.  And again,

10    we did not consent to this protective order.

11          THE COURT:  I'm sorry?

12          MS. SHROFF:  We argued about it being overly

13    burdensome, overly broad, and at that point we lost.

14          THE COURT:  Well, I don't want to put too fine a point

15    on it, but the protective order is designated as a stipulated

16    protective order.  It is agreed and consented to by yourself

17    and Ms. Miron on behalf of Mr. Gammal, and is signed on

18    September 16, 2015.

19          MS. SHROFF:  And we had an oral argument, your Honor.

20    If you want, I can pull up the transcript.  We had an oral

21    argument, we argued about this.  The Court overruled us over

22    objection.  We then stated on the record we were signing it so

23    we could get the discovery.  And then the Court said you would

24    hear us ex parte, and the Court also said that if we had to

25    approach you ex parte and you decided you could not respond to

GCJ3GAM1

1    us ex parte, you would then give us the option of withdrawing

2    the application.

3            But really, if the government is solely relying on

4    consent, we withdraw consent.

5            THE COURT:  Okay.  I'll see you in the robing room,

6    the defense.

7            (Pages 21-40  sealed)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GCJ3GAM5

```
 1              (In open court)

 2              THE COURT:  Here's where I am, having spoken now with

 3     both sides ex parte.

 4              I will amend the stipulated protective order, and I'll

 5     allow Mr. El Gammal's attorneys, subject to filing appropriate

 6     certifications which I'll leave up to the defense in the first

 7     instance to propose, and I would ask you to share it with the

 8     government to see whether they could be consented to in that

 9     regard.  That going forward the defense will not be required to

10     come to the Court in every instance where they wish to show or

11     to share documents that have been designated confidential under

12     the protective order to potential witnesses, that they would be

13     free to do so in each case where they have a good faith basis

14     to believe that the individual can be useful to the preparation

15     of Mr. El Gammal's defense or there is potential they may be

16     called by the defense as a fact witness.

17              However, one category of documents will be subject to

18     the current restrictions, and those are any sealed court

19     filings, including sealed search warrant applications.

20              With respect to the 3500 materials, I'll allow the

21     defense to use those materials as well, with the caveat that

22     the witness not be told that that material has been prepared by

23     law enforcement.

24              So I will expect the proposed certifications from the

25     defense, hopefully on consent, but if not, I will make a
```

GCJ3GAM5

1    determination as to what the appropriate content should be.  So

2    I think that takes care of that issue.

3        Now as I indicated, I do have some decisions for you

4    concerning some of the pending motions in limine, beginning

5    with government's October 17 motion.

6        There is a motion concerning preventing the defense

7    from referencing how FISA materials were obtained.  I will

8    withhold judgment until the FISA motion is decided.

9        With respect to the government's motion concerning

10   CC-1's statements to relatives and others concerning his

11   support for ISIL, government seeks to offer at trial various

12   communications that CC-1 had regarding his activities in ISIL

13   controlled territory.  The government identifies four specific

14   communications, and seeks to offer those communications as well

15   as similar communications at trial.  To the extent that the

16   government seeks to introduce additional communications,

17   defendant indicates he will object as appropriate.

18       The specific communications, the four specific are

19   CC-1's February 16, 2016, messages to an individual identified

20   as Relative-1 concerning his "religious training," "main

21   training," and other activities in ISIL controlled territory.

22       CC-1's May 2015 communications with Relative-1 over

23   Facebook stating his support of the treatment of an ISIL

24   prisoner.

25       CC-1's message to a Facebook friend stating "I live in

GCJ3GAM5

1   bilad al Islam now the real bilad al Islam, and it's

2   beautiful."

3           And finally, CC-1's June 2015 private message to an

4   individual on Twitter that "life in Raqqah is normal for the

5   most part, when the K's are not bombing us."  Paraphrasing now.

6   "It's a nice...I don't trust people here tbh I just got back on

7   Twitter after all these months.  Training has been real busy."

8           In regards to CC-1's statements, the Court finds that

9   three of the four statements are admissible and will be allowed

10  at trial, assuming that all of the relevant foundational

11  elements are met.  And they are CC-1's February 16, 2016,

12  message to Relative-1, his message to a Facebook friend stating

13  "I live in bilad al Islam," and his June 2015 private message

14  to an individual on social media regarding life in Raqqah.

15          The Court finds that these statements are admissible

16  as statements under penal interest under Rule 804(b)(3)

17  because, taken together, they tend to expose CC-1 to criminal

18  liability based on admissions of military training with ISIL.

19  And again, it is based on and will be subject to proper

20  authentication.

21          The Court finds that the statement concerning CC-1

22  May 2015 communication with a relative over Facebook concerning

23  ISIL's treatment of a prisoner is inadmissible.  The statement

24  is inadmissible hearsay, and the government has not shown that

25  the statement qualifies as non-hearsay under Rule 804(b)(3).  I

GCJ3GAM5

1    also find that the statement is more prejudicial than not.

2          So those are the Court's findings with respect to

3    those four statements.

4          Moving now to the handwritten CC-1 so-called martyr

5    letter, Government Exhibit 1000.

6          The government seeks to introduce as evidence a

7    handwritten letter, Government Exhibit 1000, that an

8    unidentified individual sent electronically to a member of

9    CC-1's family, which CC-1 drafted while in ISIL controlled

10   territory, allegedly for the purpose of notifying his family in

11   the event of his death.  The relative received the letter from

12   an unknown individual via Viber in November 2015.  The creation

13   date of the letter is unknown.

14         With regards to this letter, subject again to the

15   government's proper authentication of the letter at trial, the

16   Court finds that most portions of Government Exhibit 1000

17   admissible, and certain portions are inadmissible as

18   essentially irrelevant.

19         The Court finds that portions of the letter are

20   statements by a co-conspirator under Rule 801(d)(2)(E).  As the

21   Second Circuit noted in *Gigante*, the objective of the joint

22   venture need not be the crime charged in the indictment or the

23   objective of the conspiracy charged in the indictment.  *See*

24   *also United States v. Lyles*, 593 F.2d 182.  "However, the

25   conspiratorial objective being furthered by the declarant's

GCJ3GAM5

statement must in fact be the objective of the conspiracy

between the defendant and the declarant." *U.S. v. Russo*, 302

F.3d 37.

As the Second Circuit has held, even where particular

crimes have already been committed, "the conspiracy does not

necessarily end; it continues until its aim has been achieved,

it has been abandoned, or otherwise terminated." *U.S. v.*

*Arrington*, 867 F.2d 122.  Moreover, the fact that some of the

conspirators have been indicted or incarcerated does not

inevitably lead to the conclusion that the conspiracy has been

terminated.  *U.S. v. Persico*, 832 F.2d 705.

The Court finds that the following portions of the

letter are non-hearsay under Rule 802(d)(2)(E):

The top portion of the letter identifying that it is a

letter to CC-1's brother.  The statement on the first page that

reads "If you are reading this, then know that I've been killed

in battle and am now with our Lord Allah.  The statement on the

first page that reads "I told you that day at the train

station, the last time I saw you...we will win this war one

day, this war between Iman and Kufi."  (War between belief and

disbelief.)  And the statement on the first through second

pages that reads "This is Allah's promise to the martyrs, and

know if I am accepted as a martyr, that Allah has not failed in

his promise."

These statements were made in furtherance of the

GCJ3GAM5

1  conspiratorial objective of facilitating the fighting and

2  martyrdom of CC-1 on behalf of ISIL.  The Court does not adopt

3  the defendant's approach that any conspiracy between the

4  parties ended when CC-1 joined ISIL.  As long as the government

5  is able to establish the existence of a conspiracy, then this

6  evidence comes in at trial as a statement by a co-conspirator.

7  Additionally, the Court finds that the probative value of these

8  statements cannot be said to be substantially outweighed by any

9  unfair prejudice.

10      The Court finds that the remaining portions of the

11  letter, which focus generally on CC-1's love for his family,

12  religious passages, and general philosophical thoughts about

13  life after death, do not qualify as non-hearsay under either

14  the co-conspirator rule or the statements against penal

15  interest.  These statements do not further the goal of any

16  conspiracy or subject CC-1 to any potential liability.  Nor are

17  these statements against CC-1's penal interest.  Nor does the

18  Court apply the residual hearsay exception to the remainder of

19  the letter.

20      The Court also rejects defendant's contention that the

21  letter constitutes hearsay within hearsay because the

22  photograph was transmitted via Viber social media.

23      I do note for the parties that the copy that the Court

24  has is a very poor copy.  So please give us as good a copy as

25  you have, so we can identify specifically for you what portions

GCJ3GAM5

1    of the letter are deemed admitted.

2            The next issue concerns CC-1's YouTube video and

3    related communications between CC-1 and CC-3.

4            The government seeks to introduce as evidence a

5    YouTube video depicting CC-1 in military attire in which CC-1

6    states, among other things, that he joined and was residing in

7    a territory controlled by ISIL; that no one, including the

8    defendant, had assisted or supported CC-1 in joining ISIL or

9    traveling to ISIL controlled territory.  The government also

10   seeks to offer communications involving CC-1 and CC-2 leading

11   up to the creation of the video, including a conversation where

12   CC-2 told CC-1 that CC-2 spoke with the defendant, and the

13   defendant expressed that he wanted CC-1 to create the video.

14           The Court finds that the YouTube video is admissible,

15   and therefore grant's the government's motion in limine to

16   admit the video and denies the defendant's motion to exclude

17   the video.

18           To address defendant's argument that the beginning

19   portion of the video is offered for its truth is inadmissible

20   under *Crawford*, the lynchpin of the *Crawford* decision is its

21   distinction between testimonial and non-testimonial hearsay.

22   The rule announced in *Crawford* applies only to testimonial

23   statements.  The Court finds that the portion of the video

24   offered for its truth is not testimonial.  And the Court finds

25   that the video is not akin to extrajudicial statements

GCJ3GAM5

1    contained in formalized materials, such as affidavits,

2    depositions, prior testimony, or confessions.

3           As to the remainder of the video, the video contains

4    statements by a co-conspirator made during and in furtherance

5    of the charged conspiracy because the video advances the

6    objects of the conspiracy, that is to say carrying out the plan

7    to provide material support to ISIL, as opposed to thwarting

8    its purpose.  And in this case, the statements furthered the

9    purpose of the conspiracy between defendant and CC-1 because

10   the statements regarding defendant's lack of involvement with

11   CC-1 are being offered as allegedly false exculpatory

12   statements.  As long as the government is able to establish the

13   existence of the conspiracy, then this evidence comes in at

14   trial as a statement by a co-conspirator.

15          Additionally, all of the statements in the video after

16   CC-1 identifies himself and states that he is in the Islamic

17   state are not being offered for the truth of the matter

18   asserted, but rather to show the alleged falsity of the

19   exculpatory statements.

20          As to the written communications about the creation of

21   the YouTube video, the Court finds them admissible as

22   statements by co-conspirators.  Again, provided that the

23   government is able to establish the existence of the conspiracy

24   and the authenticity of the statements.

25          The government also moved at that time for a jury

GCJ3GAM5

questionnaire.  However, the Court has already determined we

will not be using a jury questionnaire, and accordingly, that

portion of the motion is moot.

          Turning now to defendant's October 17 motion in

limine.  The first part of that motion addressed the

government's evidence and the provision of final translation of

documents.  I believe that all of these issues were decided at

the October 28 conference, and there should be nothing

remaining with respect to that.  If there is, I will ask the

parties to bring that to my attention.

          MR. HABIB:  Does the Court want to hear us on that

right now?

          THE COURT:  Sure.

          MR. HABIB:  Okay.  There are a few categories, one is

we -- as to exhibits, we have a draft exhibit list dated

October 3.  It's not a final exhibit list, the government has

confirmed to us.  So our first question would be when the

government will provide us with that.

          As to translations, we were provided yesterday with

some additional videos that haven't been translated, so we

don't have final translations of those.

          THE COURT:  Are those on the exhibit list?

          MR. HABIB:  No.

          THE COURT:  Those videos?

          MR. HABIB:  I don't believe so.  Links to those

GCJ3GAM5

1    videos -- there are links to YouTube videos that are exchanged

2    via Facebook communication.  The links may have been provided,

3    but the videos were not.  And I simply, I can't recall off the

4    top of my head whether all of those links would have been

5    accessible from the Facebook production itself.  But they have

6    not been specifically called out as videos that the government

7    intended to offer in evidence.  So those videos in Arabic, for

8    the most part not translated.

9          Finally, we are aware the government has been

10   undertaking a review of some of its translations with a

11   different translator, so we'd simply ask whether the

12   translations thus far designated as final are in fact final or

13   whether they're subject to review.  Those are the additional

14   evidentiary issues.

15         MR. QUIGLEY:  Judge, I think taking those in reverse

16   order.  We did notice an interpreter on October 3 consistent

17   with the Court's expert deadline.  That person produced what we

18   represented and were told were final translations in early

19   November.  We produced those to the defense.  When we sat down

20   to prep with that person, right after Thanksgiving, I think it

21   was the week after Thanksgiving, she expressed some reservation

22   about having to testify in a public proceeding.  There is no

23   other way to explain that.  She was provided to us by the

24   translation company as an expert witness for this case.  She

25   was the second translation witness that they had provided.

GCJ3GAM5

1    They knew this was going to be a trial.

2            This is obviously -- we've expressed our displeasure

3    and concern about that to the contractor.  We found another

4    interpreter, we noticed that person promptly.  And he is

5    rereviewing the interpretations.  We anticipate hopefully

6    having all that done by the end of this week, and we will be

7    producing that on a rolling basis.

8            THE COURT:  So the fact that you now have another

9    expert has nothing to do with your questioning of the finality

10   of those translations, simply with a too timid interpreter.

11           MR. QUIGLEY:  Exactly.  I think the prep session, I

12   wasn't in it, but Ms. Tekeei was, I think five or 10 minutes.

13   And it was clear this person did not -- had concerns -- did not

14   understand the scope of the work she had been asked by the

15   translation company to undertake.

16           There is no other way around it, that's what it is,

17   we're not happy about it, but we're doing the best we can to

18   get everything refinalized.  We provided expert notice promptly

19   as soon as we had the additional or the new person identified.

20   And he's been working round the clock.

21           THE COURT:  The videos.

22           MR. QUIGLEY:  The videos, Judge, the videos are links

23   that are contained mostly in the shared content portion of

24   Mr. El Gammal's Facebook.  So these are essentially things

25   where Mr. El Gammal has said, look at this, you know, put it

GCJ3GAM5

out to the world.  The links are accessible in the -- for the
most part the links are accessible in the actual Facebook
return.  That shared content is on the government's October 3
exhibit list.  It's been the subject of some motion in limine
briefing.

          We went back as the issues in trial crystalized, and
in part due to the motion in limine briefing and some of the
arguments that defense raised, and we identified a couple of
additional videos, there are a few additional videos that we
are able to download.  We've provided those to the defense, and
again we have asked the translation company to finalize those
translations by the end of the week.

          THE COURT:  Was there a third category or was that it?

          MR. HABIB:  Maybe I can just seek clarification.  When
will we have final translations of all of the government's
trial exhibits?  Because we, as the Court I'm sure can
appreciate, want consultation with our expert as to the
accuracy of the translations.  This is a case about words.

          THE COURT:  I understand.  I understood Mr. Quigley to
say about the end of this week this second person will have
completed his review.

          MR. QUIGLEY:  That's the timeline we've given him,
your Honor.  We've emphasized that he needs to make that.  By
the weekend at the latest.

          MR. HABIB:  Okay.

GCJ3GAM5

1          THE COURT:  Secondly, with respect to the defendant's

2    motions, they make a general objection to the admission of all

3    statements of Mr. El Gammal, as they don't know at this time

4    what exact statements will be used, including specific

5    objections to the use of Mr. El Gammal's calls from prison and

6    his statements regarding ISIL.

7          With respect to the jail calls, at this time the

8    government has represented it does not intend to offer any of

9    the defendant's jail calls, but reserves the right to do so

10   depending, among other things, on the defense arguments at

11   trial.  Accordingly, there is nothing for me to decide at this

12   time.  I will, if things develop otherwise, make a decision at

13   the appropriate time.

14         With regards to his statements concerning ISIL, the

15   defense argues that the government's draft exhibit list

16   contains several statements in which Mr. El Gammal communicates

17   his views about ISIL and Middle Eastern politics in general

18   terms in public Facebook posts and with persons not alleged to

19   be co-conspirators.  These include an April 25, 2014 Facebook

20   message to an individual in which he says "I was never with the

21   Free Syrian Army.  I was with Jabhat al Nusra and at the time

22   with the state."

23         Secondly, a July 1, 2014 Facebook conversation with an

24   individual in which he states "If Daesh gets to Egypt, I will

25   join them there" and it goes on "I hope they get to the Egypt,

GCJ3GAM5

1    I am willing to live in a tent under an Islamic State instead

2    of all luxuries under an infidel state."

3         Third, a July 5, 2014 Facebook post regarding the

4    "Islamic Caliphate" which defense objects as unduly

5    prejudicial.

6         Fourth, a September 13, 2014 Facebook post linking a

7    newspaper article entitled "Egypt Issues Stamps to Mark New

8    Suez Canal" but apparently mistakenly uses pictures of the

9    Panama Canal.  Defendant states this post is irrelevant.

10        Fifth, a July 15 to July 16 Facebook conversation from

11   defendant regarding pro-Israel bias.  Defendant objects as

12   unduly prejudicial.

13        With respect to the general argument, defendant moves

14   to preclude these and similar statements regarding Mr. El

15   Gammal's belief about ISIL and Middle Eastern politics in

16   general made to persons not involved in the charged conspiracy.

17        The First Amendment protects the right to free speech

18   and association.  In *Holder v. Humanitarian Law Project*, the

19   Supreme Court held that 18 U.S.C. Section 2339B does not

20   penalize mere association with a foreign terrorist organization

21   and does not prohibit being a member of one of the designated

22   groups or vigorously promoting and supporting the political

23   goals of that group.  Under the material support statute,

24   persons may say anything they wish on any topic, and may speak

25   and write freely about designated foreign terrorist

GCJ3GAM5

1    organizations.  Section 2339B does not prohibit independent

2    advocacy or expression of any kind, and does not prevent

3    persons from becoming members of foreign terrorist

4    organizations or impose a sanction on them for doing so.

5           The defendant has raised concerns that it does not

6    know which of the defendant's statements the government will

7    seek to introduce at trial, and makes a general objection to

8    the admission of all defendant's statements.

9           The Court denies defendant's broad objection to the

10   admissibility of all statements made by him.  The Court will

11   not categorically exclude all statements made by the defendant,

12   but must look instead to the specific statement and relevant

13   context for any evidentiary ruling.  The Court further notes

14   that statements made by the defendant qualify as non-hearsay

15   under Rule 801(d)(2)(A), as they are statements by a party

16   opponent.  To the extent the government introduces statements

17   at trial other than the specific statements the Court rules

18   upon here, the defendant is free to object on other bases other

19   than hearsay, such as relevance, if he so desires.

20          Again, the government has indicated that it does not

21   seek to offer any of his jail calls.

22          As to the specific statements raised by the defendant,

23   the Court rules that the following statements by the defendant

24   are admissible as statements by a party opponent and rejects

25   the defendant's additional objections regarding their

GCJ3GAM5

admissibility.

First, defendant's April 25, 2014 Facebook statement regarding the Free Syrian Army.

Second, defendant's July 1, 2014, Facebook statement regarding the Islamic State in Egypt.

Third, the defendant's July 5, 2014 Facebook post regarding the Islamic Caliphate.

Next, July 15 to July 16, 2014 Facebook statements from the defendant.  The Court finds that this conversation is admissible in part.  In its briefing, the government indicated it is amenable to discussing with the defense redactions to the identified statements regarding pro-Israel bias in American media.  The parties are directed to meet and confer on redactions regarding that portion of the conversation.

The remainder of defendant's July 16 Facebook statements discussing topics such as, for example, ISIL, Abu Bakr al-Baghdadi, the Muslim Brotherhood fighting the mujahideen and defendant's statement "I support the jihad" are admissible.

And finally, defendant's August 10, 2015 statement regarding his jihadi personality and jihad against the military.

Further, the Court finds the following specific statement by defendant inadmissible on the basis of relevance: The September 13 Facebook post linking to a newspaper article

GCJ3GAM5

1    entitled "Egypt Issues Stamps to Mark the New Suez Canal."

2                Next we turn to defendant's objections concerning

3    third-party statements.  Defendant objects to --

4                MR. HABIB:  Your Honor, I apologize just very briefly.

5                THE COURT:  Sure.

6                MR. HABIB:  On that point.  On the third of those

7    statements, a July 5 post regarding the Islamic Caliphate, I

8    would respectfully request that the Court withdraw its ruling

9    on that point and reserve decision, as we've included some

10   additional briefing on that exhibit in our December 9 motions

11   in limine.

12               Specifically, we are objecting on the ground that the

13   post was not in fact made by Mr. El Gammal.  It was made by

14   another individual who, in the parlance of Facebook, tagged

15   Mr. El Gammal in that post.  That is to say, the other

16   individual, not Mr. Gammal, is responsible for the post.

17               I'm happy to speak at more length now, but I think in

18   light of the fact that we've briefed it and the government has

19   an opportunity to respond, I would ask the Court to withdraw

20   the ruling on that exhibit.

21               THE COURT:  Okay.  I will do that.  I will reserve

22   decision and wait to hear the government on further on it.

23               MR. QUIGLEY:  We'll respond Friday, your Honor, with

24   the schedule.

25               THE COURT:  Okay.  We are on third-party statements.

GCJ3GAM5

1          So, more narrowly Mr. El Gammal seeks to preclude the

2    following specific third-party statements:  CC-1 messages from

3    Mr. Tarek from August 14, 2014; CC-1 video sent from CC-2 to

4    Marwa El Gammal; the letter from CC-1 to his family; and

5    finally, Government Exhibit 301, the contents of CC-1's second

6    Twitter account under a particular handle.

7          Concerning the August 14, 2014 message between CC-1

8    and Mr. Tarek, the Court finds that these statements are

9    admissible not for the truth of the matter asserted, but for

10   the effect on the listener, CC-1.  However, the Court will

11   grant defendant's alternative request that the jury be

12   instructed at the time that the statement is received that

13   there is no evidence that the defendant made the comments

14   described in this conversation.  And the evidence shall not be

15   admitted for the truth of the matter asserted, but rather for

16   the effect on the listener, CC-1.  And I will look to the

17   defense in the first instance to provide appropriate language

18   for the jury instruction.

19         As to the CC-1's Twitter account, the Court has

20   previously held that CC-1's June 2015 private message to an

21   individual on Twitter regarding life in Raqqah and the

22   mujahideen is admissible.  Additionally, the Court finds that

23   the additional Twitter statements offered by the government on

24   page 31 of its opposition that (1) training has been real busy;

25   (2) the statements regarding the Baraka in Sham; and (3) the

GCJ3GAM5

1    statement that it's one thing not to support us, but do not

2    allow yourself to become a mouthpiece for the Kuffar who are

3    fighting us, are also admissible as statements against penal

4    interest under Federal Rule of Evidence 804(b)(3), because they

5    could be used to show the receipt of military-type training

6    from ISIL and expose CC-1 to liability.  The Court in this

7    regard rejects defendant's argument that CC-1's statements

8    could not expose him to liability because he was physically

9    outside the reach of the United States at the time.

10          So I think that resolves the defendant's motions in

11   limine.

12          Now turning to the motions to exclude the government's

13   Rule 404(b) evidence.  The government seeks to admit four

14   categories.  The defendant's and CC-1's receipt of the book

15   *Milestones* by Sayid Qutb, (b) defendant's statements regarding

16   Anwar al-Awlaki, (c) the defendant's and CC-2's discussion of

17   military action in Egypt, and (d) the defendant's statement to

18   CC-2 regarding Egypt and an AK-47 that are admissible both as

19   direct proofs of the charge and as background to the charged

20   conspiracies.  In the alternative, the government argues that

21   this evidence is also admissible in the government's case in

22   chief pursuant to Rule 404(b) as proof of the defendant's

23   motive, intent, preparation, plan, knowledge, identity, and/or

24   absence of mistake or accident with respect to the charges.

25   That it is evidence of how the relationship between the

GCJ3GAM5

defendant and his co-conspirators evolved, and because it makes

the story of the crimes charged complete and the charged

conduct more plausible.

With respect to the receipt of the book *Milestones*,

the defense argues this is pure propensity evidence, and the

government wants to call the author of the book a jihadi and

lump defendant with him.  As to the evidence regarding the book

*Milestone*s, the Court grants defendant's motion to exclude

reference to the defendant and CC-1's receipt of the book and

finds this evidence inadmissible.  The Court agrees with

defendant that there is no relationship between receiving the

book, in the case of the defendant five years before the

conspiracy that's charged, and participating in a conspiracy to

provide material support to a terrorist organization.  Nor is

the evidence admissible to prove motive.

The Court further rejects the government's argument

that this evidence is admissible under a separate basis under

Rule 404(b) because it explains how the conspiracy relationship

developed.

Concerning the defendant's statements regarding Anwar

al-Awlaki, the government seeks to introduce defendant's

August 2014 statements to the effect that Anwar al-Awlaki was

really committed to the cause...and his words apply today, as

well as the defendant's statements that he uploaded videos of

al-Awlaki's lectures to YouTube.

GCJ3GAM5

1          With regards to the defendant's statements regarding

2    Mr. al-Awlaki, defendant disputes the accuracy of the

3    government's translation.  The Court therefore defers ruling on

4    this motion in limine.

5          As to the video uploads, the Court grants defendant's

6    motion to exclude defendant's statement that he uploaded videos

7    of al-Awlaki's lectures to YouTube.  The Court agrees with

8    defendant that without evidence of the specific content of the

9    videos El Gammal is alleged to have uploaded, the government

10   cannot prove a relationship between those videos and one of the

11   permitted purposes under Rule 404(b)(2).

12         Turning, finally, to defendant's and CC-2's discussion

13   of military action and the defendant's statement to CC-2

14   regarding an AK-47, the government claims that in January of

15   2014 the defendant exchanged Facebook messages with CC-2

16   regarding planning military action in Egypt.  He later wrote he

17   wished he could be in Egypt with an AK-47 and four magazines.

18   One minute later the defendant and CC-2 exchanged messages that

19   stated that CC-2 wanted to travel to Turkey and defendant

20   stated that CC-2 was a Daesh gigolo.

21         As to defendant CC-2 statements regarding military

22   action in Egypt, the Court finds this evidence inadmissible

23   because the exchange does not constitute direct evidence of a

24   conspiracy to support ISIL and the statements do not qualify

25   for any exceptions to Rule 404(b).

GCJ3GAM5

1           As to defendant's July 1, 2014 statements to CC-2

2    regarding his desire to bring an AK-47 and four magazines to

3    Egypt, and the conversations between CC-2 and the defendant

4    regarding travel, the Court finds this evidence admissible.

5    The Court agrees with the government that the statements, taken

6    together, are direct evidence of the charged conspiracy because

7    they demonstrate defendant's familiarity with military weapons,

8    CC-2's support for ISIL, and Turkey's status as a destination

9    for those who want to join ISIL.

10          So that constitutes the Court's decision on those

11   issues.  I do note that there is currently pending the parties'

12   second motions in limine, opposition to which are currently due

13   on December 23, 2016.

14          Unless there is anything more, I believe we are done

15   for today, except I do want to inquire as to the parties'

16   availability over the next two weeks for further opinions which

17   I expect to provide from the bench.  As long as folks are going

18   to be around.

19          MR. QUIGLEY:  Judge, I think we'll have at least one

20   person, if not two, from the government here at all times.

21          MR. HABIB:  We'll also have someone here, your Honor,

22   at least one person.

23          THE COURT:  Okay.

24          MS. SHROFF:  One is out, one's coming back.  We're

25   taking turns.

GCJ3GAM5

1          MR. HABIB:  If the Court wants to hear argument as

2    opposed to simply ruling from the bench --

3          THE COURT:  I will let you know in advance if there is

4    any particular issue as to which I will want to hear further

5    argument.  Okay?  Anything further?

6          MS. SHROFF:  Can we just have one second?

7          THE COURT:  Sure.

8          (Pause)

9          MS. SHROFF:  Your Honor, we have one issue to raise

10   but we would like to raise it ex parte with the Court.  It will

11   be brief.

12         THE COURT:  Certainly.  Do we need Mr. El Gammal to

13   remain?

14         MS. SHROFF:  He does not need to accompany us.

15         THE COURT:  So can I excuse him with the marshals?

16         THE DEFENDANT:  Okay.

17         MS. SHROFF:  That's fine, your Honor.  I will update

18   Mr. Gammal.

19         THE COURT:  Very well.

20         (Pages 64-65 sealed)

21         (Continued on next page)

22

23

24

25

GCJ3GAM7

1              (In open court)

2              THE COURT:  Unless there is anything else?

3              MR. QUIGLEY:  Not from the government, your Honor.

4    Thank you.

5              MS. SHROFF:  No, your Honor.  Thank you.

6              THE COURT:  We are adjourned.  Thank you, folks.

7                              o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25