UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA :

- v - :

15 Cr. 588 (ER)

**AHMED MOHAMMED EL GAMMAL,**
Defendant.
- - - - - - - - - - - - - - - - x

**DEFENDANT AHMED MOHAMMED EL GAMMAL'S OPPOSITION TO THE GOVERNMENT'S DECEMBER 30, 2016 MOTION TO PRECLUDE THE TESTIMONY OF DEFENSE EXPERTS ANDREW MARCH, AYMENN JAWAD AL-TAMIMI, AND MARWAN ABDEL RAHMAN**

Federal Defenders of New York
Daniel Habib, Esq.
Annalisa Mirón, Esq.
Sabrina Shroff, Esq.
Attorneys for Defendant
**Ahmed Mohammed El Gammal**
52 Duane Street - 10th Floor
New York, NY 10007
Tel.: (212) 417-8700

TO: PREET BHARARA, ESQ.
United States Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

Attn: **Andrew DeFilippis, Esq.,**
**Brendan Quigley, Esq.,**
**Negar Tekeei, Esq.**
Assistant United States Attorneys

The defense submits this memorandum of law in opposition to the government's motion to preclude the testimony of defense experts Andrew March and Aymenn Jawad Al-Tamimi, and translator Marwan Abdel Rahman, Dkt. No. 130 (Dec. 30, 2016) ("Gov't Mot."). The motion should be denied because the defense's notices are timely and adequate, and, in any case, preclusion would be a disproportionate sanction.

## Background

### A. Experts on ISIS, Jihadism, Muslim Brotherhood (Andrew March and Aymenn Jawad Al-Tamimi)

On October 3, 2016, the government provided its first set of expert notices. As relevant, the government noticed Aaron Zelin as an expert "in militant jihadist groups." Dkt. No. 81-1. On October 17 (the so-ordered due date for defense expert notice, see Dkt. No. 54), the defense objected to the adequacy of the government's notice and requested "additional time" to "provide its expert notice follow[ing] the government's supplementation." Dkt. No. 81, at 1. On October 27, the government did supplement, stating that it had "no objection to a reasonable extension of the defendant's expert notice deadline." Dkt. No. 89, at 1. This Court did not rule on the defense's request for an extension of time.

Even before the government's supplement, the defense had begun a diligent search for an expert to counter Zelin. All

three counsel, as well as investigators Anna Finkel and Sarah Howard, conducted research to identify potential experts on, among other things, Islamic jihadist groups such as ISIS; mainstream Islamist political groups such as the Muslim Brotherhood; domestic Egyptian politics, the election of Mohammed Morsi, and the military coup of Abdel Fattah Al-Sisi; the Syrian civil war and the movement of fighters and refugees across the Syria-Turkey border. Between July and December, we contacted no fewer than two dozen academics, print and broadcast journalists, and research fellows as potential experts.[1] Many

1 [redacted]

declined to work with us because of the nature of this prosecution, reluctance that increased after October 17, when the government first disclosed in a public filing Samy El-Goarany's name and the allegation that he had died in Syria. Dkt. No. 80. (Indeed, in declining, one potential expert cited "the death of a young man.") Some were unavailable, and others lacked the necessary expertise.

In late December, we retained Andrew March. We gave prompt notice on December 27. Dkt. No. 130-1. In language that tracked the government's own notice of Zelin (Dkt. No. 81-1), we indicated that March would testify "as an expert in the global jihadist movements and the designated foreign terrorist organization, ISIL[,] as well as the Muslim Brotherhood. In particular, he is expected to testify about the [principles] and customs of Islam, [t]he history, structure, strategic goals, geographic location, and methods and means, including current and historical sources and influences on ISIL's ideology as well as the ideology of the Muslim Brotherhood." Dkt. No. 130-1, at 1. We also provided his CV, which included a thorough list of

---

[redacted]

his prior publications on Islamic jihadism. About the same time, we retained Aymenn Jawad Al-Tamimi. On December 29, we noticed Al-Tamimi, providing his CV, which included a complete list of his prior publications, including many posted on jihadology.net, the website maintained by the government's expert, Zelin.

On December 30, the government moved to preclude. Dkt. No. 130. On December 31, the defense supplemented its notice, adding that March would discuss turmoil in the Middle East from 2011 to the present, in particular in Egypt; the election of the Morsi government and civil unrest following the 2013 military coup; the Rabaa Square protest and the Egyptian military's crackdown on dissent; the organization and structure of the Muslim Brotherhood and its activity in Egypt; and the Brotherhood's support among the Egyptian public. In addition, we noticed that March or Al-Tamimi might address the fact that one could join and leave ISIS.

B. Expert in Translation (Marwan Abdel Rahman)

In the October 3 disclosure cited above (Dkt. No. 81-1), the government provided notice that Laila Sabara would testify as an Arabic-English translator. The government produced most of Sabara's final translations on November 1, but did not furnish the defense with a full set until November 13, well past the November 5 deadline set by this Court, see 10/28/16 Tr. 6.

The defense gave many of Sabara's final translations to our expert, Abdel Rahman, for review, as we had done with many of the government's draft translations. Our objective was (and remains) to reach an agreed-upon set of translations, stipulate to their accuracy, and avoid the need for either side to call an expert. Thus, on December 12, we gave the government a set of proposed changes to Sabara's translations, inviting the government to confer with a view to resolving any differences by stipulation.

Hours later, the government provided notice that Sabara would not testify and that Ahmed Abdel-Motaleb would instead. The government produced most of Abdel-Motaleb's translations on December 23, but not a full set until December 30. As the Court is aware, these translations differed in significant ways from Sabara's. We were hopeful (and remain hopeful) that the issue could be resolved by stipulation, but in an abundance of caution, we noticed our translator, Abdel Rahman, as a potential defense witness on December 27. Dkt. No. 130-1, at 2. And on December 31, we moved to preclude the use of Abdel-Motaleb's new translations. Dkt. Nos. 131 and 132.

## Argument

**The Government's Motion To Preclude Should Be Denied Because The Defense's Notices Are Timely And Adequate, And, In Any Case, Preclusion Would Be A Disproportionate Sanction.**

Rule 16(b)(1)(C)(i) provides: "The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rulels 702, 703, or 705 ... as evidence at trial, if ... the defendant requests disclosure under [Rule 16(a)(1)(G)] and the government complies." (emphasis added). "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Rule 16(d) provides that if "a party fails to comply with this rule," court may consider a range of remedies, including an order to compel, a continuance, to preclusion, or "any other order that is just under the circumstances." Rule 16(d)(2)(A)-(D).

A. The Defense's Notices Are Timely.

The government's argument that the defense's notices should be precluded as untimely (Gov't Mot. 2-3) is easily resolved. First, the defense moved to extend the October 17 deadline and the government consented. Dkt. No. 81, at 1; Dkt. No. 89, at 1. That request remains pending. The government's proposal -- enforcing an inoperative deadline with what the government itself calls the "severe" sanction of preclusion, Dkt. No. 89, at 1, notwithstanding a pending, consented-to motion for an

extension -- would be inequitable. Indeed, the government has provided disclosures of its own well after its October 3 deadline, including its expert translations, which arrived between December 23 and 30. See also, e.g., GX-5 and GX-6 (trial PowerPoint presentations of forensic experts Roth and Horvath, produced in late December, reflecting new testimony).

Second, and more important, the defense has acted with diligence. As explained above, we undertook an exhaustive search for experts on Islamic radicalism beginning more than six months ago, but were unable to secure experts until late December. It takes little imagination to appreciate the reluctance of potential experts (many with past government service, aspirations to serve in government in the future, or dependence on government grants) to appear on behalf of the defense in a case charging material support for ISIS. And media coverage of El-Goarany's death, prompted by the government's disclosure of his identity in a public filing, further frustrated our efforts. In short, we worked hard to find experts and noticed them as soon as we found them. And we still provided notice two weeks before the start of trial -- and about a month before the anticipated start of the defense case on January 23 -- well within the range of reasonableness.[2]

[2] The government cites only three cases supporting preclusion as a sanction for untimeliness (Gov't Mot. 2-3). Each involved a

Finally, with respect to our translator, Abdel Rahman, the government has had his revisions to its first set of translations since December 12. We provided notice of the possibility that he would testify four days after receiving the government's final translations from its new translator, Abdel-Motaleb. The defense's obligation to provide expert notice does not arise until "the defendant requests disclosure under [Rule 16(a)(1)(G)] and the government complies." Rule 16(b)(1)(C)(i) (emphasis added). That did not occur until we had Abdel-Motaleb's final translations. We always intended to resolve the issue of translations on consent and through stipulation, and we engaged in good-faith efforts to do so with the government between October and December. Indeed, we gave the government all of Abdel Rahman's revisions to its expert's translations on December 12. In light of the government's extremely late disclosure of revised final translations that diverge sharply from the first set, we had no choice but to notice Abdel Rahman as a potential witness in case the parties could not agree.

---

much later disclosure. See United States v. Mahaffy, 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (day of trial); United States v. Wilson, 493 F. Supp. 2d 484, 484-86 (E.D.N.Y. 2006) (Friday and Sunday before Monday trial, day of trial, and two weeks into trial); United States v. Petrie, 302 F.3d 1280, 1288 (11th Cir. 2002) (Friday before Monday trial).

B. The Defense's Notices Are Adequate.

The defense's notices, as supplemented, comport with Rule 16(b)(1)(C). However, in the interest of resolving this issue, we offer the following further supplement. (We are also providing the government with a transcript of March's testimony in United States v. Mehanna, 09 Cr. 10017 (GAO) (D. Mass.), the only prior case in which he has testified. We do not believe that this testimony has much relevance, but we're providing it in an effort to reciprocate the government's production of the transcript of Zelin's testimony in United States v. Pugh, 15 Cr. 116 (NGG) (E.D.N.Y.).) If called, March and Al-Tamimi would testify, in addition to the opinions disclosed in prior notices:

- ISIL originated in Afghanistan. Its founder was Abu Musab al Zarqawi.
- After 2011 attacks, Zarqawi moved his base to Iraq.
- From 2003 to 2009, ISIL was active, although it was somewhat dormant after 2009 and seemed defeated.
- In 2011, during the "Arab Spring," the sitting government in Egypt under President Hosni Mubarak was ousted after mass public protests, and was replaced by democratically-elected Mohammed Morsi, a member of the Muslim Brotherhood. In 2013, Morsi's government was deposed in a military coup and he was jailed.
- The Muslim Brotherhood is an Islamic organization that was founded in Egypt in the 1920s as an Islamist religious, political, and social movement. The group spread to other Muslim countries but has its largest, or one of its largest, organizations in Egypt, where it has often been subject to government crackdowns. The Brotherhood has endeavored to bring about political and social change by participating in

governmental institutions, in contrast to ISIL, which uses violence.

- In its "bylaws," the Muslim Brotherhood states that its goals include informing the world about Islam and spreading its teachings; unifying the world under Islam; raising the standard of living and achieving social justice; fighting disease, poverty, ignorance, and hunger; and building a new world civilization based on sharia and Islam.

- Protests by members of the Muslim Brotherhood, among others, came together in Rabba Square in Cairo. In 2013, the Egyptian military attacked the protestors, killing hundreds, if not thousands.

- In 2011, Syrian leader Bashar al Assad attacked civilian protestors against his regime, prompting the start of the Syrian Civil War and the formation of the Free Syrian Army.

- Armed groups were active in the locations of turmoil. Such groups included the Free Syrian Army, Jabhat al-Nusra and ISIL. ISIL's leader, Abu Bakr al-Baghdadi, announced that Jabhat al-Nusra was aligned with ISIL, but Jabhat al-Nusra rejected that claim.

- In June 2014, ISIL declared itself a "caliphate," which is an Islamic form of government.

- ISIL is a Sunni Muslim organization, which views Shiite Muslims (i.e., the other major sect of Islam) as enemies that should be executed. ISIL is also highly anti-American and anti-Muslim Brotherhood. Among other things, ISIL believes that the Muslim Brotherhood's participation in the democratic process in Egypt is improper.

- ISIL has declared that the Muslim Brotherhood are "apostates."

- The U.S. government has considered designating the Muslim Brotherhood as a foreign terrorist organization.

- In its propaganda magazine, Dabiq, ISIL has referred to the Brotherhood as a "devastating cancer" and "deviant." ISIL rejects the Brotherhood's

interpretation of Islam as well as the Brotherhood's political methods.

- The border between Turkey and Syria is porous. There are many refugee camps in the vicinity of the Turkey-Syria border.
- Many jihadist groups remain active in Iraq and Syria. Likewise, many non-governmental organizations ("NGOs") are active in these regions, including NGOs who assist refugees fleeing violence in those countries.

March and Al-Tamimi's experience in this field, their research with primary and secondary sources, and their academic writings and presentations on these subjects, as detailed in their CVs, will serve as the bases for their testimony and opinions.

In light of the above supplement, which tracks the government's in its degree of detail and specificity, see Dkt. No. 89, the defense's notice complies with Rule 16.

C. Preclusion Would Be A Disproportionate Sanction.

Finally, even if this Court determines that a Rule 16 violation has occurred, preclusion would be a disproportionate sanction. Although Rule 16(d)(2)(C) permits this Court to preclude the admission of evidence to punish a discovery violation -- which the defense does not agree has occurred -- preclusion "is a drastic remedy," United States v. Ahmed, 2015 WL 1611947, at *2 (E.D.N.Y. Apr. 9, 2015), reserved for "egregious cases," United States v. Valentin, 2016 WL 1211304, at *3 (D. Conn. March 25, 2016). When a defendant violates a discovery rule, "alternative sanctions" to preclusion "would be

'adequate and appropriate in most cases.'" Michigan v. Lucas, 500 U.S. 145, 152 (1991) (quoting Taylor v. Illinois, 484 U.S. 400, 413 (1988)). The circumstances in which preclusion would be "justified" are limited to "'willful misconduct' ... designed to obtain 'a tactical advantage.'" Id. (quoting Taylor, 484 U.S. at 417). In the civil context, "[b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties the violation causes, and must consider less drastic responses." Outley v. City of New York, 837 F.2d 587, 591 (2d Cir. 1988). In light of the constitutional magnitude of El Gammal's interest in presenting a defense, Outley's caveat applies with special force to the preclusion of important defense witnesses. In determining what remedy is appropriate for a Rule 16 violation (if one has occurred), this Court should consider "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party," and "the feasibility of rectifying that prejudice by a continuance." 2 Wright & Henning, Fed. Practice & Proc. § 264, at 204-05 (4th ed. 2009).

As shown above, the defense has acted with diligence to identify and retain qualified experts, and has demonstrated good faith in noticing them promptly and supplementing those notices. The government's motion to preclude alleges no prejudice at all -- no surprise, given that even today, the government has more

than two weeks to prepare cross-examination of March and Al-Tamimi, who would not testify until the defense case begins, which is not likely to occur before the week of January 23. Al-Tamimi, in particular, is well known to the government's expert, Zelin, who has published much of the former's work. Finally, this Court has alternative remedies in its medicine chest: this Court may direct a more specific disclosure (if it deems one necessary) on any point, see Rule 16(d)(2)(A); or may grant a continuance once the trial turns to the defendant's case-in-chief, see Rule 16(d)(2)(B). All of the relevant factors weigh against preclusion: diligence and good faith by the defense; no prejudice to the government; and feasible alternatives.

**Conclusion**

For the foregoing reasons, the government's motion to preclude the defense's experts should be denied.

Dated: New York, New York
January 5, 2017

Respectfully submitted,
Federal Defenders of New York

/s/
Daniel Habib, Esq.
Annalisa Mirón, Esq.
Sabrina Shroff, Esq.
Attorneys for Defendant
**Ahmed Mohammed El Gammal**
52 Duane Street - 10th Floor
New York, NY 10007
Tel.: (212) 417-8700