H133gam1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                              15 CR 588 (ER)

AHMED MOHAMMED EL GAMMAL,

           Defendant.

------------------------------x

                          New York, N.Y.
                          January 3, 2017
                          3:00 p.m.

Before:

                  HON. EDGARDO RAMOS,

                             District Judge

                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
    Assistant United States Attorneys


FEDERAL DEFENDERS OF NEW YORK
    Attorneys for Defendant
SABRINA P. SHROFF
ANNALISA MIRON
DANIEL G. HABIB

H133gam1

1

2            THE DEPUTY CLERK:  In the matter of the United States

3     v. El Gammal.  Counsel, please state your appearances for the

4     record.

5            MR. QUIGLEY:  Good afternoon, your Honor.  Brendan

6     Quigley, Negar Tekeei, and Andrew DeFilippis for the United

7     States.

8            MS. SHROFF:  For Mr. Gammal, Federal Defenders of New

9     York by Sabrina Shroff, Annalisa Miron, Daniel Habib and Hannah

10    Sotnick.

11           THE COURT:  Good afternoon to you, and good afternoon

12    to you, Mr. El Gammal.

13           THE DEFENDANT:  Good afternoon.

14           THE COURT:  This matter is on for a final pretrial

15    conference, and I know we're at least calling it that, and

16    there are also some motions that we needed to get to.  And in

17    addition, unless something else came in over the last five

18    minutes, I think I received something from the government a

19    little over an hour or so ago.  So I don't think we're going to

20    get everything done that we need to get done today, because I

21    haven't had an opportunity to go over some of the briefing.  So

22    we'll need to come back either Thursday afternoon or Friday

23    afternoon as the parties are available.

24           But I did want to cover, before we get to some of the

25    motions, just some of the mechanics.  First of all, the parties

H133gam1

 1   are aware that the trial will take place in the courtroom on

 2   the fifth floor.  Not in this courtroom.  I believe it is

 3   courtroom --

 4               MS. SHROFF:  Your Honor, from what you said, I think

 5   506.

 6               THE COURT:  506.  We'll be in courtroom 506.  Have the

 7   Federal Defenders made a determination as to which they prefer

 8   by way of trial day?

 9               MS. SHROFF:  Yes, your Honor.  9:30 to 4.

10               THE COURT:  9:30 to 4, Monday through Friday.

11               MS. SHROFF:  Yes, please.

12               THE COURT:  Very well.  The trial will take place 9:30

13   to 4, Monday through Friday.  As the parties are aware, I'm

14   sure, I do start on time.  So please, I do expect the lawyers

15   to be here or to be available 9 o'clock every morning so we can

16   take care of whatever issues come up.  In my experience, issues

17   come up every day.  And if what I just heard from back there is

18   any indication, I'm sure there will be stuff coming up every

19   day in this trial as well.

20               I'll take two breaks, one midmorning, one

21   midafternoon.  I tend to take the morning break at about

22   11 o'clock.  I typically take an hour and 15 minute lunch hour.

23   However, because of the truncated day, I may take just one

24   hour.  And also in the afternoon, again, I plan on one break,

25   but if I see that the jury is getting heavy lidded, I may take

H133gam1

| 1 | an additional break in the afternoon just to make sure everyone
| 2 | is bright eyed.

3          Now, let me ask.  Do the parties have any objection or
4    any view on my questioning Mr. El Gammal prior to the beginning
5    of trial concerning any plea offers that have been made?

6          MR. QUIGLEY:  Your Honor, we think that would be
7    prudent in light of the Supreme Court's decision in *Lafler* and
8    *Frye*.

9          Just for the record, we did extend a plea offer to
10   Mr. El Gammal a few weeks ago.  We understand that was
11   rejected.

12         THE COURT:  Was it in writing?

13         MR. QUIGLEY:  It was, your Honor, yes.

14         THE COURT:  Okay.

15         MS. SHROFF:  I don't think it was a few weeks ago.  I
16   think Mr. Quigley should provide the Court with a date.

17         THE COURT:  Best as you can.

18         MR. QUIGLEY:  A few days before Christmas, your Honor.
19   I don't know the exact date.

20         THE COURT:  So then I will question Mr. El Gammal on
21   the day of trial prior to voir dire concerning the plea offer
22   that was made.

23         As I believe I we spoke about before, I don't allow
24   speaking objections.  So if you have an objection, stand up,
25   say "objection, hearsay," "objection, asked and answered."

H133gam1

1    Nothing beyond that.  And if there is any need to have any

2    further discussion, I'll let you know.  Any discussion will be

3    had at sidebar.

4             One other thing that I do not allow is for discovery

5    to be made in front of the jury.  So, for example, if a witness

6    makes reference to a document, I would prefer that the lawyers

7    do not look to me and say "your Honor," in front of the jury,

8    "that document was not provided to us and I would demand it be

9    provided as soon as possible."  Don't do that in front of the

10   jury.

11            With respect to the jury selection, I do have a voir

12   dire form.  I know that you folks did recommend that questions

13   be asked.  I think I took most of them.

14            Can you give these, three to one side and three to the

15   other.

16            The only thing that I believe I did not include, and I

17   don't know which one of you made these requests, were questions

18   to the jury concerning where were you born, where are your

19   parents from, things of that nature.  I think that the other

20   questions that I ask concerning views on particular

21   organizations, etc., are sufficient to trigger responses of

22   that type.

23            I do use the struck method in selecting a jury, and so

24   I forget how big a venire we're going to have.  I believe it

25   will be upwards of 100 or so.  And I expect that jury selection

H133gam1

1    will take at least one day -- I'm hoping it doesn't take much

2    longer than that -- because I think we'll have a lot of people

3    that are going to want off for one reason or another because of

4    the nature of the charges.

5         And what I do is I put, so there is going to be -- I'm

6    not going to be able to do the math now, but however many

7    jurors minus strikes the parties will have are going to be put

8    in the box.  And I'll do the math and we'll get back to you on

9    this on Thursday or Friday, depending on when we get together.

10   But there will be in the box a sufficient number of jurors so

11   that theoretically if both sides exercise all of their

12   peremptories, what we will have left will be the jury.  And

13   then we'll do another round with I think one strike each per

14   side, and what we will have left will be the alternates.

15        And I figure four alternates for this case would be

16   sufficient?

17             MR. QUIGLEY:  That should be fine, your Honor, yes.

18             THE COURT:  Assuming it's going to be a three, maybe a

19   four-week trial, going into four weeks.

20             MS. SHROFF:  We leave it up to the Court, your Honor.

21             THE COURT:  We'll go with four alternates.

22        The way that I use the form, and I think it is

23   consistent with the practice that a lot of my colleagues do on

24   the bench, is I tell the jury before we begin that I'm going to

25   ask Juror No. 1 every question in part one of the form and they

H133gam1

should listen along, and I'll provide them each with a copy of
the form, everyone will have a copy of this form, and everyone
will be provided with a pen.  And I will direct everyone to
listen.  And if there is an affirmative response to any
question in part one, I will ask them to circle it.  Because
what I will do is with Juror No. 1 in the box, I will go
through with that juror every question on part one.  So right
now, there are 60 questions in part one.  I will go over with
Juror No. 1 60 questions.  With respect to every other juror,
then I'll go through part one first with the entire venire
that's in the box.  With respect to each subsequent potential
juror, I will simply ask him or her do you have any affirmative
responses to any of the part one questions.  And then I'll go
directly to those questions rather than go through all of the
questions with that juror.

It will be during that process, during the process we
go through part one that generally speaking we will take care
of any challenges for cause.  Because the responses to the part
one questions will trigger any objections.  That's where we get
to any bias that they may have or any experience that they may
have that may render them inappropriate for this particular
trial.

And if there is a challenge for cause that is upheld,
that potential juror will be removed immediately.  They will be
replaced immediately.  And so, for example, if I'm talking to

H133gam1

Juror No. 1, and he says he can't preside over this case for

one reason or another and the parties agree and I agree, he

will immediately be replaced by someone from the venire, from

another person in the venire, and that person will become

potential Juror No. 1 and I'll start with that person with all

the questions from beginning to end.

So once we have in the box however many jurors who

have been able to make it through part one, and presumably,

therefore, are not objectionable for cause, then I go back and

I start again with potential Juror No. 1 and I go over all the

part two questions.  And I ask each juror in the box each

question on part two.  And those are questions that are not so

much going to bias but to their backgrounds, who they are,

where they live, who their parents are, education, family, etc.

That's just to give you an idea of who these people are to give

you some sense of how you may want to exercise your peremptory

challenges.

Any questions on any of that?

MR. QUIGLEY:  Just one, your Honor, if I may.  Is your

Honor's practice to refer to the jurors by name or by number?

We've not asked for an anonymous jury and we don't intend to,

but I think our slight preference would be to have them

referred to by number rather than by name, given the nature of

the case.

MS. SHROFF:  Given the nature of the case they didn't

H133gam1

1    want a jury questionnaire.  Given the nature of the case they

2    didn't want to proceed in the way every other case of this

3    nature would have proceeded.  Mr. Gammal has been in general

4    population for this entire case.  There is nothing about this

5    case that should lead the jury to believe that something could

6    possibly happen to them.  And this case should be treated like

7    every other case in an Article III courtroom.

8           THE COURT:  I'm inclined to do that.  Both for the

9    reasons stated on the record by Ms. Shroff, and also for the

10   other reason that I always get hopelessly confused if I try to

11   remember each juror's number.  So we'll refer to them, and what

12   I typically do is as I address each one I'll confirm that

13   you're Ms. Smith or Mr. Jones and we'll take it from there.

14          So then at the end of the process of having gone

15   through with each person in the box each question on part two,

16   and then at that point we'll do the peremptory challenges.  And

17   I take it there is no need, no one is asking for any additional

18   peremptory challenges than the rules provide for, correct?

19          MS. SHROFF:  No, your Honor.

20          MR. QUIGLEY:  No, your Honor.

21          THE COURT:  So we'll have that number of jurors in the

22   box plus the total number that would add up to the peremptory

23   challenges for both sides, and assuming you all use up your

24   peremptory challenges, who's ever left will be our jury.  If

25   you waive any particular round, then you lose that challenge,

H133gam1

1    and then the first 12, even though there may be additional

2    people in the box, will be the jury.  And that should take care

3    of that.

4              Any questions on that?

5              MR. QUIGLEY:  Not from the government, your Honor.

6              MS. SHROFF:  No, your Honor.

7              THE COURT:  So that takes care of the mechanics,

8    unless the parties have any additional issues they wish to

9    raise concerning the conduct of the trial.

10             MS. SHROFF:  Your Honor, I am assuming we'll pick a

11   jury the normal way.  So if there is a sensitive issue with a

12   particular juror, we'll have a sidebar on it.

13             THE COURT:  Correct.  I will emphasize to them and it

14   says on the form that if there is any issue that they don't

15   wish to discuss in public, we can discuss it at the sidebar.

16             MS. SHROFF:  I will say we've not had much luck in

17   getting Southern District to consider, but definitely in state

18   court, but occasionally in the Eastern District of New York,

19   lawyers are allowed do their own voir dire.  We would ask the

20   Court to consider allowing us to do that.

21             THE COURT:  Denied.

22             MS. SHROFF:  Okay, thank you.

23             THE COURT:  With that, I know there are a number of

24   motions and I want to start first with the CIPA motion and I

25   will read the Court's opinion into the record.

H133gam1

1          The Court has received an ex parte motion from the

2     government seeking a protective order pursuant to Section 4 of

3     the Classified Information Procedures Act, 18 U.S.C. App. 3 at

4     Section 4, and Federal Rule of Criminal Procedure 16(d)(1),

5     regarding disclosure of certain classified information.   The

6     Court has also received a motion from the defendant requesting

7     that the Court deny the government's request to file its

8     Section 4 application ex parte and compel disclosure thereof to

9     cleared defense counsel.   For the following reasons, the

10    government's motion is granted and the defendant's motion is

11    denied.

12          The government seeks authorization to withhold from

13    discovery materials describing certain communications or

14    statements.   The government seeks a determination that the

15    materials in question are not discoverable pursuant to *Brady v.*

16    *Maryland* or Federal Rule of Criminal Procedure 16, and that

17    they are not relevant and helpful under *United States v. Aref*,

18    533 F.3d 72.

19          Pursuant to Section 4 of CIPA, the Court, upon

20    sufficient showing, may authorize the United States to delete

21    specified items of classified information from documents to be

22    made available to the defendant through discovery under the

23    Federal Rules of Criminal Procedure.   18 U.S.C. App. 3 at

24    Section 4.   The Federal Rules of Criminal Procedure likewise

25    permit the Court to, for good cause, deny discovery or

H133gam1

inspection or grant other appropriate relief.  CIPA was

designed to establish procedures to harmonize a defendant's

right to obtain and present exculpatory material upon his trial

and the government's right to protect classified material in

the national interest.  *United States v. Pappas*, 94 F.3d 795.

However, CIPA was not intended to expand a traditional rules of

criminal discovery under which the government is not required

to provide criminal defendants with information that is neither

exculpatory nor, in some way, helpful to the defense.  *United*

*States v. Varca*, 896 F.2d 900.  Rather, CIPA applies the

general law of discovery in criminal cases to classified

information and further restricts discovery of that information

to protect the government's national security interests.  *See*

*United States v. Klimavicius-Viloria*, 144 F.3d 1249, and *United*

*States v. Johnson*, 139 F.3d 1359, which provides that CIPA has

no substantive impact on the admissibility or relevance of

probative evidence.  *See also U.S. v. Baptista-Rodriguez*, 17

F.3d 1354, explaining that CIPA simply ensures that questions

of admissibility will be resolved under controlled

circumstances calculated to protect against premature and

unnecessary disclosure of classified information.

The Second Circuit case of *Aref* outlines the standard

governing this Court.  The Second Circuit there adopted and

applied the standards set forth in *Roviaro v. United States*,

353 U.S. 53, to determine when the disclosure of classified

H133gam1

information is appropriate.  *Roviaro* asks first whether the

classified information is discoverable and then whether the

government has properly invoked the state secrets privilege

with respect to that information.  For the states secrets

privilege to apply, there must be a reasonable danger that

compulsion of the evidence will expose matters, which, in the

interest of national security, should not be divulged.

*Reynolds v. United States*, 345 U.S. 1.

          If the information is both discoverable and

privileged, then the Court must decide whether it is also

helpful or material to the defense.  That is, useful to counter

the government's case or to bolster a defense.  *Aref*, 533 F.3d

at 80.  To be helpful or material to the defense, evidence need

not rise to the level that would trigger the government's

obligation under Brady to disclose exculpatory information.

The Court of Appeals for the D.C. Circuit explained the

standard as follows:

          "We hold, in short, that classified information is not

discoverable on a mere showing of theoretical relevance in the

face of the government's classified information privilege, but

that the threshold for discovery in this context further

requires that a defendant seeking classified information is

entitled only to information that is at least 'helpful to the

defense of the accused.'"

          *United States v. Yunis*, 867 F.2d 617; *see also U.S. v.*

H133gam1

*Passaro*, 577 F.3d at 207, explaining that CIPA permits the

district court to exclude irrelevant, cumulative or

corroborative classified evidence; and *U.S. v. Smith*, 780 F.2d

1102, noting that a district court may order disclosure only

when the information is at least essential to the defense,

necessary to the defense, and neither merely cumulative nor

corroborative, nor speculative.

Only when information is relevant or helpful to the

defense must the Court then take the third step of balancing

the public interest of protecting the flow of information

against the individual's right to prepare his defense.  In

*Yunis*, the D.C. Circuit noted that much of the government's

national security interest lies not so much in the contents of

the conversations, as in the time, place, and nature of the

government's ability to intercept the conversations at all.

The government's ex parte motion was supported by

declarations submitted by officials with classification review

authority.  I am satisfied that those declarations sufficiently

establish that the materials at issue are classified.  In

addition, the Court has carefully reviewed the materials in

question.  On consent of the government, I held an ex parte

conference with counsel for the defendant to become better

informed of their theories of defense.  I conclude that, based

on my review, defense counsel's presentation, and in accordance

with the legal principles described above, that the information

H133gam1

sought to be kept classified would not be relevant and/or helpful to the defense.  The Court finds that granting the government's motion will not impinge upon the defendant's right to a fair trial.

I have also considered defendant's motion that I deny the government's request and allow the participation of cleared defense counsel.  That request is denied.

As a preliminary matter, it is clear that Section 4 of CIPA and Federal Rule of Criminal Procedure 16(d)(1) both authorize ex parte proceedings.  Therefore, defendant's contention that ex parte submissions are improper absent exceptional circumstances finds no support in that authority or in the case law.  Indeed, as the Second Circuit has stated, where the government moves to withhold classified information from the defense, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.  *United States v. Abu-Jihaad*, 630 F.3d 102.  For that reason, courts routinely uphold the practice of proceeding ex parte when the substance of classified information that the government seeks to be withhold from discovery is explicitly discussed in the relevant motion.  *See, e.g., U.S. v. Zazi*, 10 CR 60, a John Gleeson case reported at 2011 WL 2532903, at *3, indicating with respect to the government's request to delete irrelevant classified materials from discovery, an adversary proceeding would be particularly anomalous, as it would provide defense

H133gam1

counsel access to sensitive information to which, if the
government is correct, they're not entitled under any theory.

Moreover, as indicated above, the Court has held an ex
parte conference with defense counsel during which we held a
robust conversation about defense counsel's view of the
evidence and their legal theories.  While perhaps not ideal,
such a procedure has been held to adequately balance the
government's need to protect sensitive classified information
with a criminal defendant's ability to mount an adequate
defense.

For these reasons, the government's motion is granted
and the defendant's motion is denied.

A protective order will issue and all papers submitted
in connection with that motion shall remain under seal with the
Court.

I received today a motion from the government to allow
them to use certain maps in their opening statements.  Have the
defendants been able -- has defense team been able to review
that submission?

MS. SHROFF:  Your Honor, we had maybe five minutes to
review it.  We took a quick look at it.  So, I haven't -- I
don't think any one of us looked up the cases they cited or
anything like that.

THE COURT:  Okay.

MS. SHROFF:  I e-mailed one of the government's

H133gam1

1    lawyers about a question I had about the cases they cited, and

2    I didn't get a response back.  So I haven't finished reviewing

3    the motion at all.  And I don't think we took too long in

4    replying.  I think we just got it.  I can't keep track of the

5    timing on everything, but I do think we got it literally 30

6    minutes --

7            THE COURT:  I think I got it this morning, late this

8    morning.

9            MR. DeFILIPPIS:  Your Honor, we have the answer to the

10   defense's questions.  I can say it on the record or privately

11   to defense counsel.

12           THE COURT:  I'm sorry?

13           MR. DeFILIPPIS:  We have the answer to the question

14   that Ms. Shroff posed just about an hour ago, and I'm happy to

15   say it on the record or to Ms. Shroff privately.

16           THE COURT:  Why don't you tell us all.

17           MR. DeFILIPPIS:  So the question was whether in the

18   cases we cited in the Southern District defense counsel

19   objected to the use of maps.  And in each of the terrorism

20   cases cited, the answer is that defense counsel objected.  In

21   the other cases they did not.

22           THE COURT:  Based on my review of the maps, they

23   appear to be straightforward maps, unadorned except that I did

24   note that there were certain red boxes in some of them.  Do you

25   know what those are?

H133gam1

1          MR. DeFILIPPIS:  Your Honor, I'm not -- I think the

2     red boxes that exist on the existing maps are a function of

3     Google Earth, and I'm not expert enough in that to say what

4     they are.  But we may, as I indicated in the government's

5     letter, we may draw a circle around or in some sense highlight

6     the particular cities we want to reference as we talk about

7     them.  But in terms of -- I think I recall what your Honor is

8     referring to.  I don't know what the shading is.

9          THE COURT:  That's not something you intend to rely on

10    or to focus on.

11         MR. DeFILIPPIS:  Correct, right.

12         THE COURT:  I'm inclined to let them use the maps.  So

13    far as I know, the relative position on the globe of Syria,

14    Egypt, and Turkey is not going to be at issue in this case.

15    Correct?

16         MS. SHROFF:  Well, I don't know.  First of all, it is

17    a Google map they've gone on the Internet and printed out.

18    That's one.  Second, your Honor, the opening is supposed to be

19    the government laying out its charge, right.  It is supposed to

20    be simple and straightforward.  The government informing -- not

21    making an argument, an argument is for the summation, and the

22    opening it is to lay out what the government is going to show

23    through credible evidence what the evidence will show.  I don't

24    think they need a map.

25         But to the extent the Court wants to allow them to use

H133gam1

1    a map here, I am assuming that the Court would allow us the

2    same leeway.

3          THE COURT:  Absolutely.  And again, they provided me

4    with the maps that they intend to use.  They appear to me to be

5    fairly non-controversial depictions of some cartographer's view

6    of where these countries are and where they are in relation to

7    each other.

8          I think I would be of a different view if the

9    government were to thereafter draw a stick figure of a man with

10   one leg in Turkey and one leg in Syria, but I don't expect that

11   is something they would do.

12         I think it would be helpful to the jury, perhaps many

13   are not aware of where precisely these countries are in

14   relation to each other.  To that extent, I think it would be

15   helpful to the jury if it is a non-controversial issue as to

16   which I think the government should be allowed to use a

17   demonstrative.

18         But, if you do some research and find I am going

19   dangerously off course, I am happy to reconsider.

20         MS. SHROFF:  I would never think you are going

21   dangerously off course.  As long as it is good for the goose,

22   it is good for the gander.

23         THE COURT:  If you are going to use a map or any other

24   demonstrative in your opening statement, you should first show

25   it to the government so they can raise an issue if they have an

H133gam1

1    objection.

2           MS. SHROFF:  Certainly, your Honor.

3           THE COURT:  Okay.  Now with respect to the

4    government's third motions in limine, I just received the

5    defense response today so I'm not going to be able to rule on

6    that until we next meet.

7           Mr. Quigley.

8           MR. QUIGLEY:  Just one quick thing on that, your

9    Honor, and I have not reviewed that in full.  But just after

10   perusing it, there was one reference to the defense I think

11   believed that we were going to argue that Mr. Abu Geer was

12   going to travel to Syria.  I want to point for the record

13   that's not our -- we don't intend to argue that.

14          THE COURT:  Mr. who?

15          MR. QUIGLEY:  I think it was the individual referenced

16   in one of the exhibits, 120-U I want to say.  Yes, in their

17   argument regarding Government's Exhibit 100-U-T, they said they

18   anticipate we'll use that exhibit to insinuate that the

19   defendant was helping a particular individual travel to Syria.

20   That's not our theory as to that communication.  We want to

21   make that clear.

22          MS. SHROFF:  Then maybe the government can clarify for

23   us what exactly their theory is on getting that document into

24   evidence.

25          THE COURT:  I'm sorry, this is Government Exhibit U-T?

H133gam1

|     |                                                                                    |
|-----|------------------------------------------------------------------------------------|
|  1  |         MR. QUIGLEY:  100-U, yes, your Honor.  It is an                             |
|  2  | admission by the defendant, and it is about how he knows CC-2.                      |
|  3  |         THE COURT:  I received a motion from the defense to                         |
|  4  | allow a particular expert to testify by video.  Assuming there                     |
|  5  | is no objection to the expert testifying, is there an objection                    |
|  6  | to him testifying by video?                                                        |
|  7  |         MR. QUIGLEY:  We -- yes, your Honor.  And we may                            |
|  8  | oppose him testifying at all, but we're definitely going to                        |
|  9  | object to him testifying by video.  I think that was just filed                    |
| 10  | yesterday and we'll file a response in the next day or two.                        |
| 11  |         THE COURT:  Okay.  Try to file a response by tomorrow                      |
| 12  | so we can get together either Thursday or Friday to discuss it.                    |
| 13  |         MR. QUIGLEY:  Will do, your Honor.                                          |
| 14  |         THE COURT:  I ask this with some trepidation.  Where                       |
| 15  | are we with the translations and the conversations concerning                     |
| 16  | the translations?                                                                  |
| 17  |         MR. QUIGLEY:  Your Honor, I don't think there has been                     |
| 18  | any change from when we put in our opposition to the                              |
| 19  | defendant's motion, which I guess was yesterday or on the 1st.                     |
| 20  | We have not had any conversations about the translations since                    |
| 21  | then.                                                                              |
| 22  |         THE COURT:  Ms. Miron.                                                      |
| 23  |         MS. MIRON:  Your Honor, we ask the Court to seriously                      |
| 24  | consider the remedy of precluding the new Arabic expert when                      |
| 25  | the defense is willing to stipulate to the original                               |

H133gam1

```
 1    translations coming in.  It sounds like the government was in a
 2    bind, because they learned too late that their old interpreter
 3    wouldn't testify at trial.  I don't know when that was learned
 4    exactly.  But, we have been forced into the position where
 5    we've had approximately one week before trial to review this
 6    500-page spreadsheet of revisions.  Not every page contains
 7    redlines, but the majority of pages do, and there are some
 8    significant changes to the exhibits.  And the Court gave the
 9    government a deadline back in October of presenting draft
10    exhibits.  Those exhibits have now changed as of a week before
11    trial in significant ways.
12            So, I provided the Court a copy of the 500-page
13    document, but I want to point out this new interpreter has,
14    first of all, added inserts into the government's proposed
15    exhibits about what he believes is being implied.  So on page
16    two where it was not translated until we received the new
17    revisions this interpreter wrote "May God reward you with
18    goodness (for what you did)."  This is a communication from
19    Samy El-Goarany to Mr. Gammal.  And I don't think that's a fair
20    reading.  We're consulting with our own expert.  This kind of
21    subtle change, we noticed this going page by page through this.
22            THE COURT:  I have not studied the 500-page document.
23            MS. MIRON:  Of course.
24            THE COURT:  When you say he includes stuff that I
25    guess that he intuits?
```

H133gam1

1              Mr. Quigley, do you know what it is he did?

2              MR. QUIGLEY:  There are several places or a number of

3       places where he has put in translator's notes to clarify

4       meaning.

5              But I would just add that these new interpretations or

6       the revised translations were produced on December 23.  So even

7       with the government's having to change translators, these were

8       still produced over two weeks before trial.  That's consistent

9       with the schedule in many other cases in the district.  The

10      November deadline was when we had a December trial date.

11             So, it is unfortunate, it put us in a bind as well

12      having to change translators.  There are other things we would

13      like to have been doing over the last few weeks rather than

14      redoing or having to revise all these translations, but we did

15      the best we could to get them done promptly.

16             THE COURT:  I'm confused as to the remedy that you

17      seek, Ms. Miron.  So you're asking me to direct the government

18      to go with their initial draft translations?

19             MS. MIRON:  Well, we believe they were -- they were

20      given to us as final translations, first of all, on November 5.

21      So we made reliances based on that representation.  So it was

22      never a draft that we're asking to be admitted into this trial.

23      We're asking to be able to stipulate to the final translations

24      that were presented to us in a timely manner.

25             THE COURT:  Maybe this is part of your defense theory,

H133gam1

 1    and if so, just tell me.  But if the government says those

 2    translations or the government now says those translations are

 3    not accurate, do you agree or disagree?

 4            MS. MIRON:  Your Honor, this is the problem.  I don't

 5    speak Arabic, I don't read Arabic, so we have to consult with

 6    our interpreter as to whether that's true or not true.  I think

 7    as to page two we fully disagree with the insertion of "for

 8    what you did."

 9            THE COURT:  Right.

10            MS. MIRON:  There are other -- for example, the new

11    interpreter spells Mr. Gammal's name J-A-M-A-L.  And he writes

12    this when he's making an interpretation of what Attia says to

13    Mr. Gammal.  So he's implying in this new interpretation that

14    Attia spells Mr. Gammal's name with a J.  And as the Court is

15    aware, there is a dispute between the parties as about whether

16    or not Mustafa Tarek was referring to Mr. Gammal when he said

17    Mr. Jamal.  And so this is a prime example of us having to go

18    back to our interpreter, asking why did he insert a J as

19    opposed to a G there.

20            I've made a quick look at the other exhibits.  There

21    are other places where interpretation uses the G for Gammal.

22    And we think it is wrong to use a J when speaking in Egyptian

23    Arabic.  But this is a big issue.

24            So I don't think the remedy that we seek is

25    outrageous.  We are not saying no interpretations can come in.

H133gam1

We're saying those we relied on when we consulted with our
interpreter, proposed to the government our corrections, they
reviewed them and agreed with most of them and then we
proceeded with our case.  So we've made strategic decisions.
We're in a situation where we don't have time to review every
single one of these closely with our interpreter again.

　　　　So, I think we believe that the old final translations
are accurate.  The new interpretations are for the most part
inaccurate, the ones we have reviewed that are significant.
There are minor changes, we agree.  I wouldn't be raising this
issue if it was just capitalized letter versus non-capitalized
letter.

　　　　There are significant changes in the meaning.  So what
we're asking for is a court order, precluding these late
translations, because we don't have time to review the
underlying documents and to consult with our own Arabic expert
and present testimony about a different meaning of the same
words.

　　　　THE COURT:  I frankly have not been involved in a case
where there was any controversy concerning translations, so the
parties at the end of the day agreed.  But to the extent that
you have expert translators, isn't this something for the jury?

　　　　MS. MIRON:  It puts us in a position where we're not
permitted to present an adequate defense about the
communications and the meaning that the government is

H133gam1

1     eliciting.

2              THE COURT:  I'm incredibly sensitive to that,

3     Ms. Miron, and I'm thinking maybe there are some set of

4     translations which are important to the defense.  And maybe if

5     we were to isolate those, I don't want to give anyone any extra

6     work, but my concern is with putting before the jury the best

7     possible translations that we have, so they are able to make a

8     determination based on the facts.  I'm thinking maybe we

9     isolate some issues that are substantive and important.  We can

10    make a determination on a one-off basis, because I'm sure there

11    are going to be a lot of issues that are not going to be that

12    important.  However, I am concerned about these translator's

13    notes, I don't know that there is any place for that in what

14    goes to the jury.

15             MR. QUIGLEY:  Your Honor, we can revisit those.  I

16    think our intention, again, in getting these done, was to get

17    them to defense as fast as possible.  And the translator did

18    put in the notes.  We can look back at those and see about

19    taking those out in various places.

20             I would add that we're open to suggestions from the

21    defense about specific translations.  When they sent over

22    several pages of proposed revisions to the translations, we

23    accepted most of those, and even if it wasn't really something

24    that was substantive, we just in the interest of agreeing

25    accepted most of those.

H133gam1

1          THE COURT:  Will your expert testify before the jury?

2          MR. QUIGLEY:  We anticipate he will, your Honor.  If

3   only there may be certain words in largely English documents

4   that we would ask him to take a look at and interpret.

5          THE COURT:  English words?

6          MR. QUIGLEY:  No, Arabic words.

7          THE COURT:  Ms. Miron.

8          MS. MIRON:  First off, we would object to the

9   insertion of anything that is not a verbatim translation.  It's

10  not the translator's role to interpret the meaning of words.  I

11  think the government can make arguments in closing statements

12  about how the context plays out, whether someone was joking or

13  being sarcastic, but it is not the interpreter's role to type

14  in in parentheses "for what you did."  That's a conclusion he's

15  drawing based on context and not on translation.  So we would

16  object to the inclusion of all of those.

17         I've reviewed some of the interpretation notes and

18  they are changes like he, instead of in English the original is

19  the letter U, and he's written Y-O-U, so that is improper.

20  That's not, again, that's not a translation, that's an edit, so

21  we would object to those types of change.

22         This is a really time consuming task that we don't

23  have time to do.  That's why we've asked the government to

24  reconsider its translations that it thought was accurate and

25  gave to us in a final version as of November 5.  We're not

H133gam1

asking the government not to put in its evidence.  It is the

evidence that they proposed to us as final evidence, and we

made judgment calls based on that.  We spent lots of time and

money having our interpreter review them, and that's why we

proposed to the government the changes we thought were

necessary.  Now he's got to go back through every single change

that the new interpreter made, and I think the remedy is

appropriate.  It is a slightly unusual remedy, but it is

appropriate.  It solves our problem of having to spend money

and time, when we should be preparing for opening statement on

Tuesday.

THE COURT:  Mr. Quigley, why not do that?

MR. QUIGLEY:  Your Honor, I think number one, we'll

have to have a translator testify anyway.  Number two, this was

only proposed this week really on the 31st.  They knew -- I

think we had a conference here on the 9th when we raised the

fact or maybe it was the conference on the 19th, but they've

known for a number of weeks of this issue with our translator,

with our interpreter.

If they had said they were willing to stipulate at

that point to the November translations, we would have

considered that, rather than wasting our own time and money.

Now these are the translations, these revised translations are

the ones we've been preparing with, and it would be a not

insignificant investment in our own time to go back and

H133gam1

unrevise everything.

MS. MIRON:  To make the record clear, when we provided our suggested changes, I wrote in an e-mail please call me about resolving, maybe we can agree about the translations over all.  That was November 12.  So we did open up the idea of stipulating, and we're asking the Court to order that the new interpreter is precluded.  We were open to it.  Nobody wants to waste anyone's time.

THE COURT:  I will review the materials that have been submitted.  But I'm wondering whether we put on the government the -- or maybe on both sides rather than just the government or just the defense just go through and figure out which of these translations are important and substantive and will actually be argued and which -- does it matter one way or the other whether we use the first expert or the second expert or the defense expert?

MR. QUIGLEY:  Your Honor, again, we're happy to do that and we solicited the defense's input on that because I think that could streamline this whole process.  We would be happy to get a stipulation.  We don't want to call unnecessary witnesses.  But without knowing what they agreed to, it's hard to do that.

THE COURT:  What is the universe of these changes, Ms. Miron, if you know?  I know I'm asking perhaps a tough question.

H133gam1

1          MS. MIRON:  The work involved, the Court is suggesting

2     that we go through and see which ones are significant and I'm

3     saying that's the work I'm worried about doing.  That's going

4     to take multiple days to see whether a slight change that

5     includes a "not" which is the opposite of the original, whether

6     that's significant or not.  They're numerous.

7          So if the Court just peruses just through the 500-page

8     document, virtually every page has redlines, and many pages has

9     many redlines, so it takes time for us to read and compare the

10     original and think about the meaning and how it has changed in

11     the context of the conversation.

12          THE COURT:  Are those 500 pages going to be read to

13     the jury?

14          MR. QUIGLEY:  No, your Honor.  I think another point

15     is since we produced these 500 pages on December 23, we've gone

16     back, and as the defense is aware, and narrowed the scope of

17     the translated materials we're planning on using.  I can't

18     provide a precise page number but it's fewer than what we

19     produced on December 23.  For some of the longer translations,

20     between the defendant and CC-2, for example, we cut that down

21     significantly.  So, they're not all going to be read to the

22     jury, and they're not even going to be introduced into evidence

23     at this point.

24          MS. MIRON:  Oh.  Is the Court inquiring whether

25     they're all going to be introduced into evidence or whether --

H133gam1

1          THE COURT:  Again, I haven't looked at those 500 pages

2     but I can't imagine that those 500 pages are going to be read

3     to the jury in addition to whatever other evidence the

4     government has.  There are other areas of evidence or other

5     sections of evidence that they'll have.

6          MS. MIRON:  I don't think they will read those

7     communications, but they will close on them.  And we'd like to

8     close on them, the ones that are important.

9          So, for example, there was a change from -- this is a

10     communication between Attia and Mr. Gammal on November 18,

11     2014.  Mr. Gammal writes "But in general, he did not show up."

12     And the change is "Anyways, the matter canceled."  That's a

13     subtle change, and it takes us thinking through how that might

14     change the government's theory and our theory if the meaning of

15     the communication is slightly different.  The matter canceled

16     versus he didn't show up.  So, it's one line, but it takes some

17     time to think through whether it is going to matter.

18          I appreciate the Court's suggestion that the parties

19     attempt to work it out, but I think that would take us as much

20     time as us reviewing them on our own and having our own

21     interpreter check them.

22          THE COURT:  I understand that there is a lot of work

23     to be done.  I just don't know that the answer to avoiding all

24     that work is for me to say, okay, let's go to status quo ante

25     November 9.  I will think about that and I'll take a look at

H133gam1

1    that submission.

2              Can I get that in hard copy, by the way, so as to save

3    some trees.

4              MS. MIRON:  Sure.  In redline, sure.  We'll color

5    print it.

6              THE COURT:  Great.  Mr. Quigley.

7              MR. QUIGLEY:  Nothing, your Honor.

8              THE COURT:  Okay.  Is everything else fully briefed at

9    this point?

10             MR. QUIGLEY:  We had a motion to preclude a couple of

11   defense experts, your Honor.  I don't think there has been an

12   answer on that.

13             MR. DeFILIPPIS:  And your Honor, we will be submitting

14   a motion to preclude cross-examination on several topics with

15   regard to two witnesses.

16             THE COURT:  What witnesses?

17             MR. DeFILIPPIS:  Mohammed El-Goarany and one of the

18   special agents, Timothy McNulty.

19             THE COURT:  And Mohammed is the --

20             MR. DeFILIPPIS:  The father of Samy El-Goarany.

21             THE COURT:  And Special Agent McNulty.

22             MR. DeFILIPPIS:  Yes.

23             MS. SHROFF:  Could we find out what it is they're

24   going to move on because --

25             THE COURT:  It's Tuesday.

H133gam1

1          MS. SHROFF:  Thank you.

2          MR. DeFILIPPIS:  Your Honor, we'll be filing it under

3     seal but we're happy to -- it will be done, if not tonight,

4     then first thing tomorrow, and we will also share with defense

5     counsel immediately after the conference what it is we intend

6     to move on.

7          THE COURT:  Okay.

8          MS. MIRON:  Can we confer one moment, your Honor?

9          THE COURT:  Sure.

10         (Pause)

11         MS. SHROFF:  Your Honor, I think there are a couple of

12    outstanding issues.  Should I raise them now?

13         THE COURT:  Yes.

14         MS. SHROFF:  Okay.  I think one is the matter of the

15    defense experts and Drew Marsh and Mr. al-Tamimi the government

16    moved to preclude.  We sent them a supplemental disclosure much

17    like they had sent us for Mr. Zelin.  We're unclear if the

18    government is still objecting to our experts testifying.  If

19    they're not, we won't further brief it.  But other than that,

20    that's one issue that I think the Court may need to rule on at

21    some point.

22         THE COURT:  I think we have four defense experts that

23    are currently in play.  Mr. Marsh, Mr. al-Tamimi is it?

24         MS. SHROFF:  Tamimi.

25         THE COURT:  Jason Roloff.

H133gam1

1          MS. SHROFF:  Yes, please.

2          THE COURT:  And your translation expert, who is that?

3          MS. SHROFF:  Mr. Marwan Abdel Rahman.  He is a court

4    certified interpreter.

5          MR. QUIGLEY:  We also moved on the social media

6    expert.  I don't think there was a response to that also.

7          MS. MIRON:  We have not provided notice of him so I

8    think the motion is moot.

9          THE COURT:  So you're not going to put Sultan on?

10          MS. MIRON:  That's right.

11          THE COURT:  With respect to Mr. Roloff, and I think

12    the government is still objecting to Mr. Marsh and Mr. Tamimi?

13          MR. QUIGLEY:  That's correct, your Honor.

14          THE COURT:  So did you want to put papers in on that?

15          MS. SHROFF:  Sure.  I also want to supplement even

16    right now in court for Mr. Tamimi, I think the government

17    should simply check Mr. Zelin's website.  I think Mr. Zelin has

18    quite a bit to say about Mr. Tamimi, and that should also

19    provide them with a very deep view of what Mr. Tamimi would

20    have to say.

21          THE COURT:  Zelin being the government's expert?

22          MS. SHROFF:  Yes.  He has a website.  Jihadology.

23          THE COURT:  Jihadology.

24          MS. SHROFF:  Jihadology.  Like biology, your Honor.

25    Anthropology, your Honor.  Any of the other -ologies.

H133gam1

1      THE COURT:  I don't think that is going to address the

2  government's concern about there is some stuff on the website.

3  But what is Mr. Tamimi going to say?

4      MS. SHROFF:  We provided -- it's clear what Mr. Tamimi

5  is going to say.  Mr. Tamimi is going to talk about the

6  different ways and different means from which people go from

7  Turkey to other countries.  What ISIL is all about, what ISIS

8  is all about.  How somebody gets radicalized or does not get

9  radicalized.  Much of what our expert will say depends on what

10  their expert says.

11      We've argued to them that their expert notice

12  continues to remain insufficient.  They've referenced to us

13  major terms that Mr. Zelin will testify to.  He's going to

14  opine on what jihad means, and I don't know what the other

15  phrases they want him to testify to.  But frankly, I don't see

16  what relevance that has in this case.  They're having Zelin

17  testify as to videos of beheadings, I really don't see the

18  relevance.  So honestly, after Zelin is done, only then will I

19  know the true scope of what the expert in our case will say.

20  It really depends on what Mr. Zelin has to say.  I don't know

21  what Mr. Zelin has to say.  Mr. Zelin's notice was very broad.

22      THE COURT:  Didn't you receive a copies of Mr. Zelin's

23  testimony in other cases?

24      MS. SHROFF:  I did in *United States v. Pugh*, one case.

25      THE COURT:  And --

H133gam1

1          MS. SHROFF:  Very different case.

2          THE COURT:  Mr. Quigley, will he be testifying

3     consistently with respect to general topics as he did in the

4     *Pugh* case?

5          MR. QUIGLEY:  Yes, your Honor.  And we've supplemented

6     that notice with some additional things he'll be talking about.

7     We did that back in October so we think the notice with respect

8     to Mr. Zelin is clearly sufficient.  And Rule 16(b)(1)(C)

9     applies to the defense, obviously.  That requires pretrial

10    disclosure of the witnesses' opinions and the bases for their

11    opinions.  They don't get to wait until the witness testifies.

12         MS. SHROFF:  We have provided that notice.  We've

13    provided -- in fact, I think if you put the two notices side by

14    side, you will see that they're almost identical.

15         THE COURT:  I'm sorry, what two notices?

16         MS. SHROFF:  If you put the government's notice and

17    our notice side by side, I'm pretty sure we say the same thing.

18    So if their notice is sufficient, our notice is sufficient.

19         And *Pugh* involved a very different case.  *Pugh*

20    involved Mr. Pugh actually being part of the United States

21    military and traveling, physically traveling.  It is a totally

22    different case.  Okay, the topics that Mr. Zelin is supposed to

23    cover in this case are quite different than the topics he

24    covered in *Pugh*.  Not every terrorism case is the same case.

25    So just because notice was sufficient --

H133gam1

1          THE COURT:  I understand not every terrorism case is

2     the same case, but the history of ISIS and ISIL is the same,

3     presumably, and Mr. Zelin will not testify to a different

4     history.

5          MS. SHROFF:  The question isn't whether he testifies

6     to a different history.  The question is the relevance of the

7     history.  Pugh was in a different position.  Pugh's advocacy

8     was different.  Pugh was a different defendant.  What was

9     relevant in Pugh may not necessarily be relevant in Gammal.

10    That's all I'm saying.

11          THE COURT:  I understand.

12          MS. SHROFF:  Right.  So I think our notice is

13    sufficient.  I've supplemented it.  I think I supplemented it

14    last night or I supplemented it on the 31st.  I remember

15    because it was the 31st.  I supplemented by e-mail on the 31st.

16    And I'm not entirely clear what the government's complaint is.

17    It really dovetails their notice to me.  There is nothing --

18    there's no more or less notice between the four people

19    involved.

20          I do think that the difference between Mr. Zelin and

21    Mr. Tamimi might be an issue of primary source, but I think

22    they can figure that out.

23          THE COURT:  Mr. Quigley.

24          MR. QUIGLEY:  We continue to believe the notice is

25    insufficient, your Honor.  And that to the extent very limited

H133gam1

1      additional notice has provided, that is still insufficient and

2      on topics that are aren't necessarily relevant to the trial.

3              THE COURT:  What about with respect to Mr. Marwan?

4      That's his first name, correct?

5              MS. SHROFF:  Marwan Abdel Rahman is his full name.

6              THE COURT:  Do you object to him on notice basis or

7      tardiness basis or both?

8              MR. QUIGLEY:  Just on tardiness, your Honor.  They

9      have had him for -- Ms. Shroff said they've had him for months.

10     And we just got notice of him on December 30.  Maybe it was not

11     the 30th.  It was after Christmas though.

12             MS. SHROFF:  Of course.  Why would we provide notice

13     beforehand?  We didn't know they were going to interject a

14     brand new translator with brand new translations that are

15     inaccurate.  Why would I call an expert if their translations

16     were accurate?  They propelled my late notice.

17             THE COURT:  Did you want to put in any further papers

18     on your experts on their motion to preclude your experts?

19             MS. SHROFF:  Sure.  We'll augment some more if you

20     want.

21             THE COURT:  It hasn't been briefed.  They've objected

22     and --

23             MS. SHROFF:  We'll brief it.

24             THE COURT:  When do you want to do that by?

25             Let me ask, do you guys want to come back on Thursday

H133gam1

or Friday?

MR. QUIGLEY:  Friday would be better for the government, your Honor.

THE COURT:  It gives Mr. Habib a little more time.

MR. HABIB:  It's always appreciated, your Honor.

MS. SHROFF:  Mr. Habib is engaged on Friday afternoon. So if you want, if we can do it like --

MR. HABIB:  Your Honor, I would say this, your Honor. I'm also happy with Friday.  I have a sentencing at 2:30 with Judge Gardephe.  If the Court was inclined to convene in the morning on Friday, that's fine.  Or really any time before 2:30 as long as we're done by 2:30.

MS. SHROFF:  11 o'clock is fine for us.

MS. MIRON:  I will be here for a different case at 10. After that would be great.

THE COURT:  I'm available at 11:30 on Friday.

MS. SHROFF:  Sounds good.

MR. HABIB:  If it's acceptable to the Court, I'll submit our response to the government's motion to preclude our experts on Thursday.

THE COURT:  That's fine.

MR. HABIB:  Thank you.

THE COURT:  So we've got the experts.  We've got, to the extent he's allowed to testify, Mr. Roloff by video, we've got the translations, anything else?

H133gam1

1        MR. QUIGLEY:  One moment, your Honor.

2        MS. SHROFF:  Your Honor, obviously they're going to

3   give us notice sometime tonight about the Giglio, so we may

4   have to brief that.  Maybe they should wait until next week and

5   then give us the motion papers.

6        Just kidding.

7        THE COURT:  Was there some other CIPA you wanted to

8   raise?

9        MS. SHROFF:  Yes, please, but I have one more issue to

10  raise.

11       THE COURT:  Just so I'm clear, we have the experts, we

12  have the translations.  Okay.

13       MS. SHROFF:  And Giglio, you'll have the briefing at

14  some point.  Just want to make sure your list is complete.

15       THE COURT:  Giglio being the --

16       MS. SHROFF:  The father and their Agent McNulty.

17       THE COURT:  Okay.

18       MS. SHROFF:  So your Honor, just one thing about

19  Government Exhibit 520.  I don't think -- may I hand this up?

20       THE COURT:  Sure.

21       MS. SHROFF:  I didn't bring a copy for them because

22  it's their own exhibit.  So if the Court could just take a look

23  at the front page and two pages that say "example" if you don't

24  mind.

25       THE COURT:  I don't know which is the front page.

H133gam1

1          MS. SHROFF:  The front page is the one that says

2    "violent crimes unit."

3          THE COURT:  Says what?

4          MS. SHROFF:  Violent crimes unit.

5          THE COURT:  Violent crimes unit.

6          MS. SHROFF:  Yup.  That's it.

7          MR. DeFILIPPIS:  Your Honor, perhaps I can short

8    circuit the discussion of the front page.  As Ms. Shroff is

9    well aware, we agreed over the phone to remove the reference to

10   the violent crimes unit, so that will not be an issue.

11         MS. SHROFF:  No, no, Mr. DeFilippis informed me he

12   retracted that compromise because I would not agree to the flag

13   being removed.

14         MR. DeFILIPPIS:  I'm sorry, Ms. Shroff must have

15   misunderstood me.  There is another dispute between the

16   parties, but we're not retracting our offer to remove that

17   language.  So the issue on the front page is settled.

18         THE COURT:  So what we're talking about is removing

19   this front page of Government Exhibit 520.

20         MS. SHROFF:  We don't think that the violent crimes

21   unit is relevant.

22         MR. DeFILIPPIS:  With the caveat that the substantive

23   information about the date range of the data on the front page

24   we will find a way to keep in the presentation.  Whether it is

25   on a front page or elsewhere.  But we will remove the

H133gam1

1   violent -- the reference to a violent crimes unit, but keep the

2   reference to the unit in which the agent -- the other unit, the

3   cellular analysis survey team, that will remain.  The reference

4   to violence will be taken out.

5          MS. SHROFF:  So if you could just look at the page

6   that's marked "example," please.

7          THE COURT:  Yes.

8          MS. SHROFF:  You see that American flag waving over

9   there?

10          THE COURT:  Yes.

11          MS. SHROFF:  Yes.  We don't think the American flag

12   has any relevance whatsoever to the cell tower.  First of all,

13   let me just back up.  I'm not sure why the jury needs examples

14   of what an expert does.

15          THE COURT:  Just so I know what I'm looking at.  Are

16   these supposed to be examples of places where cell towers are

17   placed?

18          MR. DeFILIPPIS:  Yes, your Honor.  These are examples,

19   and this is a sheet which has been presented or substantially

20   the same sheet which has been presented in probably dozens of

21   trials.  These are examples of cell towers that are concealed

22   so as to not appear as cell towers for aesthetic purposes and

23   are often testified to by cell site experts in order to provide

24   the jury with experts in the context of this business and this

25   field, how cell towers work, how they appear, just as

H133gam1

background for the expert's testimony.

MS. SHROFF:  There is no issue here as to whether or not Samy El-Goarany or any other player in this trial was hiding from cell towers or was trying to evade cell towers or any such thing.  It doesn't matter what has happened in other cases.  The question for this Court is, really, what is the relevance of the two pages of examples for the jury.

Cell towers are not a foreign concept.  We live in a -- in a day and age where every single person has a cell phone.  Almost everybody knows what a cell tower is. Nevertheless, the government has this demonstrative they want to put in, which includes the flag of the United States as part of the government's presentation.  The flag has a very special place, first of all, in a courtroom.  There is a flag right behind you, your Honor.  It sends a message.  And there is no place for that message in a demonstrative.

THE COURT:  Just so the record is clear, I am looking at pages two of 24 and three of 24 of Government Exhibit 520.

MS. SHROFF:  Yes, please.

THE COURT:  And page three of 24 is a montage of photographs.  It is labeled "example."  And there are on this page, among others, two large or tall cacti, presumably fake cacti, a grain silo, a windmill, the facade of a building, various different structures upon which cell technology can be placed, including a fake tree that looks quite fake.

H133gam1

1          And so, tell me, Mr. DeFilippis, what is your witness

2     going to say about this?

3          MR. DeFILIPPIS:  Your Honor, the witness in the

4     context of explaining his work as an analyst of cellular

5     location technology and data will explain to the jury what,

6     first, what a cell tower is, which I think we can assume a jury

7     will or will not know.  And in the context of doing so will

8     provide examples, first, of how cell towers appear, where

9     they're placed, how they function, and how they interact with

10    the devices we all carry around every day.

11         So, again, it has been offered in many trials in this

12    district and I assume others, is intended to give the jury a

13    sense of that, and to illustrate for them how a cell tower

14    appears in its various forms.

15         THE COURT:  That's fine.  I think I'll allow it, but

16    take the picture of the flag out.  It doesn't hurt the

17    government.  It addresses one of their issues.

18         MR. DeFILIPPIS:  Okay.  Your Honor, I'll look into

19    whether that will require redacting the montage or creating a

20    new montage.  The government's position is there -- I don't

21    know that the defense has articulated any prejudice or harm

22    here.  But we will look into --

23         THE COURT:  I think the defendant's position is simply

24    it is the government wrapping itself in the flag in a way that

25    it doesn't need to.

H133gam1

1          MR. DeFILIPPIS:  Understood, your Honor.

2          MS. SHROFF:  Thank you, your Honor.  It was a much

3     better articulation than I have done.

4          THE COURT:  Okay.  Anything else?

5          And by the way, there are at least a dozen other

6     pictures on the montage so I don't think the government is

7     losing anything.

8          MR. QUIGLEY:  Just actually one other thing from the

9     government.  We had submitted based on the Court's ruling a

10    proposed judicial notice for the designation of ISIS as a

11    foreign terrorist organization.

12         THE COURT:  Yes, I have that.  If there is no

13    objection from the defense, perhaps even if there is, I intend

14    to enter that.

15         MR. HABIB:  There is no objection.

16         THE COURT:  That will be entered.  I will also enter

17    the protective order on the CIPA motion.

18         MS. MIRON:  Just want to raise one thing.  We e-mailed

19    the government to inquire whether they are withholding 3500 for

20    an agent who we believe to have been intricately involved from

21    the beginning, Lee Nguyen.  We only received two documents.  If

22    they're withholding it based on a relevance objection, we'd ask

23    the Court to conduct an in camera review.

24         THE COURT:  This is the affiant on some of the search

25    warrants we saw?

H133gam1

1          MR. QUIGLEY:  Yes, Agent Nguyen is no longer assigned

2     to the New York office.  He left the New York office some time

3     ago.  If he does testify at trial, his testimony would be

4     limited to about the defendant's post-arrest statement.

5          We've provided the defense with all 3500 materials

6     related to the post-arrest statement.  And obviously he was --

7     he was one of the case agents for a while.  He did sign search

8     warrants, he did sign -- he has e-mails and things like that

9     relevant to other things, but given his testimony at trial

10    would be limited to the post-arrest statement, that's the

11    subject matter of his testimony and that's our disclosure

12    obligation.

13         THE COURT:  Okay.  So, the response to Ms. Miron's

14    question the answer is no.  You are not withholding anything.

15         MR. QUIGLEY:  Not that we have an obligation to

16    produce, no, your Honor.

17         MS. MIRON:  The question is whether they are

18    withholding something.  If the answer to that is yes, then

19    we're asking for a proceeding under 3500(c) which is the court

20    conduct an in camera review as to whether the material's

21    relevant to the direct testimony.  The government isn't

22    entitled to make that judgment call on its own.

23         MR. QUIGLEY:  Your Honor, if I may, 3500(c) does

24    envision that, but I think the defense needs to make at least

25    some prima facie showing that we may be withholding something.

H133gam1

1    Here his testimony is going to be very narrow.  It's going to

2    be about one event on a specific day that was an hour long.  I

3    don't think that triggers the in camera review of every single

4    e-mail he sent regarding this case.

5              MS. MIRON:  The statutory language is clear.  I can

6    read it.  "If the United States claims that any statement

7    ordered to be produced under this section contains matter which

8    does not relate to the subject matter of the testimony of the

9    witness, the Court shall order the United States deliver such

10   statement for the inspection of the Court in camera."  And then

11   it goes on to describe what happens if it's related.  Then it

12   gets disclosed.  If it is not related, it is not disclosed.

13   But it is a simple process.

14              I know it is not invoked very often, but we're asking

15   for it because it was the main case agent.  I don't understand

16   why they're withholding things.  Why are they even calling him?

17   I'm sure they could call someone else.

18              I have a fear he will testify as to additional

19   opinions about his -- about Mr. Gammal's post-arrest statement,

20   you know, whether he thought things were credible or incredible

21   based on his knowledge, and that's why it is a little bit more

22   complicated.  That's why these prior statements might become

23   relevant to his direct testimony.

24              THE COURT:  So this agent was the main case agent as

25   he's been described in this case?

H133gam1

1          MR. QUIGLEY:  He was one of the case agents prior --

2     there were a number of case agents.  I think it is fair to say

3     he was the main case agent for a time.  He is not testifying as

4     a case agent here.  He's testifying, if at all, about the

5     defendant's post-arrest statement.

6          THE COURT:  Presumably there is some body of other

7     documents he created over the course of his involvement in this

8     investigation that has not been turned over because of the view

9     of the government that it does not come under the definition of

10    material that should be turned over pursuant to Section 3500.

11         MR. QUIGLEY:  That's correct.  There are materials

12    that have been turned over, not as his 3500, but as other

13    people's 3500 that he wrote.  So the defense does have a

14    substantial corpus of material from Agent Nguyen.  But we did

15    not turn over everything he ever wrote on the case because the

16    subject matter of his testimony is going to be very limited.

17         THE COURT:  I have a representation from the

18    government they're not withholding anything.

19         MS. MIRON:  They're not withholding much.  What

20    they're withholding we'd ask for an in camera review.

21         THE COURT:  The way I think of "withholding," it is

22    discoverable or producible pursuant to this provision or

23    they're withholding it for one reason or another.  They are

24    saying it doesn't come under the definition because of what

25    he's going to be testifying about.

H133gam1

1          MS. MIRON:  But the procedure is clear.  If they do

2     not turn over materials because they think they're not

3     relevant, the Court shall conduct an in camera review.  That's

4     the procedure.

5          MR. QUIGLEY:  Your Honor, I think the statute also,

6     the procedure under the statute is also that we're supposed to

7     turn over the witness's 3500 after he testifies, in which case

8     the Court is going to be better informed about making such an

9     in camera review.

10          Here we're proffering that the subject matter of his

11     testimony is going to be extremely limited.  It is not going to

12     be like he's going to testify about bank robberies two and

13     three but not about bank robbery one.  It is going to be just

14     about the defendant's post-arrest statement.  And if for some

15     reason that changes, we will -- which I don't think it will --

16     but if it does, we'll reevaluate what we've produced.

17          THE COURT:  I don't think I'm required to do anything

18     more, require the government to do anything more at this point.

19     So, to the extent that you're asking me to direct them to turn

20     over for in camera inspection the balance of Agent Nguyen's

21     materials, that request is denied.

22          Okay.  What else do we need to do today?

23          MR. QUIGLEY:  We don't have anything else, your Honor.

24          MS. SHROFF:  Nothing more other than the short CIPA

25     proceeding, your Honor.

H133gam1

1            THE COURT:  So then let's do that.  We'll do that in

2   the robing room.

3            MS. SHROFF:  Sure.

4            (Pages 51-60 sealed)

5                            o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25