H161elgc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        15 Cr. 588 (ER)

5   AHMED MOHAMMED EL GAMMAL,

6                Defendant.                Final Pretrial
                                             Conference
7   ------------------------------x

8                                         New York, N.Y.
                                          January 6, 2017
9                                         11:34 a.m.

10
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                          District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  BRENDAN F. QUIGLEY, ESQ.
17       ANDREW J. DeFILIPPIS, ESQ.
         NEGAR TEKEEI, ESQ.
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys for Defendant
20  BY:  SABRINA P. SHROFF, ESQ.
         ANNALISA MIRON, ESQ.
21       DANIEL G. HABIB, ESQ.

22

23

24

25

H161elgc

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4              MR. QUIGLEY:  Good morning, your Honor.  Brendan

5    Quigley, Andrew DeFilippis, and Negar Tekeei for the United

6    States.

7              MS. TEKEEI:  Good morning, Judge.

8              THE COURT:  Good morning.

9              MS. SHROFF:  Good morning, your Honor.  Sabrina

10   Shroff, Daniel Habib, and Annalisa Miron on behalf of

11   Mr. El Gammal, who's standing at counsel table.

12             THE COURT:  And good morning to you all, and good

13   morning to you, Mr. El Gammal.

14             THE DEFENDANT:  Good morning.

15             THE COURT:  We have a number of things to do today.

16   Let me begin with mechanics.

17             I've done the math, and what we will have by way of

18   jury selection is a total of 36 individuals that will be in the

19   box at any one time.  That is because both sides will have 16

20   peremptories.  The government has 6, the defense has 10, and if

21   you add that to 12, that gives us 28.  In connection with the

22   alternates, there will be four.  Each side will have two

23   peremptories, for a total of four.  So that means eight

24   potential jurors in the box, for a total of 36.  And the way

25   that it's set up in courtroom 506, I think it is, we can only

H161elgc

1    fit 22 in the box, and so what we'll do is we'll put 22 in the

2    box and then we'll have the first two benches, and we'll put

3    seven in the first bench and seven in the second bench.  And we

4    can go downstairs and we can let you know how we're going to

5    sit juror 1, potential juror 1 through potential juror No. 36

6    so that you can make whatever charts.  So that is the math of

7    it.

8              There have been, as has become customary, a number of

9    documents that have come in over the transom over the last day

10   or day and a half or so, but what I want to do is, I want to

11   start with some of the *in limine* motions that have been made,

12   and if you'll give me a moment here.

13             Let me begin with the translation.  So is there

14   agreement, Mr. Quigley?

15             MR. QUIGLEY:  Your Honor, I don't think there's

16   agreement yet.  What we've done, since the last conference, is,

17   immediately afterward, we went back, the government, we went

18   through the translations, removed anything that could even

19   arguably be considered translator's commentary, sent those over

20   to the defense.  We've looked at the translations, the revised

21   translations ourselves, and that's where we are.  I mean, we're

22   happy, as we have been from the outset, if there are specific

23   translations the defense has issues with, to consider those,

24   their proposed edits, and potentially make those in hopes of

25   reaching an agreement.  When they sent over edits before, back

H161elgc

in mid December, we ended up incorporating most of those in the final translations.  They've had the revised translations for two weeks now, and they've only raised, you know, two or three things, and I think one of those relates to an exhibit we're no longer using, and again, we're open to any suggestions that they have.

THE COURT:  Ms. Miron?

MS. MIRON:  Your Honor, our problem with the new translations is that our translator is not able to review them in a manner that allows us to prepare for opening statement on Tuesday.  He is about a third of the way through the 500-page document that we provided to him to review when he became available after the holiday.  We've reached out to the government on some of the issues I raised I believe Tuesday, and they've disagreed with our requests.

So for example, on page 2 -- I don't know if the Court has the 3500, but I can provide a copy if not.  The government is not willing to delete the very last parentheses in its translation.  So this would go to the jury --

THE COURT:  I'm sorry.  I am looking at page 2 of 3505.06, correct?

MS. MIRON:  Just one moment.

THE COURT:  And by the way, it's page 2 of the approximately 500 pages that you gave me.

MS. MIRON:  That's right.

H161elgc

1          THE COURT:  Okay.

2          MS. MIRON:  So this is a What's App messenger exchange

3    between Samy El-Goarany and Mr. El Gammal, and the new

4    translator has inserted "for what you did" in parentheses, and

5    we strongly object to that going to the jury.  The government

6    is calling a witness who could explain how he interprets or

7    translates that "may god reward you with goodness" phrase, but

8    in going to the jury, it would have an undue weight in implying

9    that Samy is thanking Mr. Gammal, quote, for what he did.  So

10   we're asking them to remove that parentheses because our

11   translator fully disagrees with that being included.

12         THE COURT:  Disagrees with something is said that is

13   being wrongly translated or disagrees that it is said at all?

14         MS. MIRON:  Wrongly translated by including that

15   parentheses.

16         THE COURT:  Okay.  Well, let me hear from the

17   government.  I mean, why is it in brackets?

18         MR. QUIGLEY:  Your Honor, it's in brackets because the

19   translator felt that was necessary to achieve clarification,

20   and I guess Tuesday night, I went back to him and said, is this

21   necessary to achieve clarification?  This very specific

22   exhibit, is this something you're inserting as commentary or is

23   this necessary to give the sentence meaning in English?  And he

24   said it was necessary to give the sentence meaning in English.

25         THE COURT:  I don't know how he can do that.  I mean,

H161elgc

I understand that translations are sometimes awkward, but it is

his interpretation of what would give it meaning.  So, I mean,

I think I would put this in the category of something that

ought to be taken out.  But anyway.

MS. MIRON:  So that's the level of lack of agreement.

I mean, the translator has gone beyond his role, in my opinion.

So in that same page, the English that Samy writes in

the column called Contents, he writes at the beginning of the

first paragraph, "salaam.  I'm available to reach on What's

App," etc., and then at the end he says, "so feel free to

contact me when u," with the letter u, "have a chance."  The

translator has spelled out Y-O-U, and I think that's absolutely

wrong.  It's not a translation from Arabic to English.  He's

changing the meaning of the English-speaking --

THE COURT:  Well, let me stop you there.

MS. MIRON:  -- communication.

THE COURT:  Let me stop you there, because I take it

that with texting, etc., all of us are losing our ability to

write sentences.  And is the "u" that is in the Contents

section the same type of "u" that my 19-year-old would use in a

text to me?

MS. MIRON:  Probably.

THE COURT:  So "how r u" refers to "how are you?"

MS. MIRON:  But he's not an expert in teenage

communication.

H161elgc

1          THE COURT:  No, I understand that, but I'm just trying

2     to see how much of a dispute we have here.  Because if it's the

3     letter "u" meaning "you," Y-O-U, and he's written Y-O-U,

4     strictly speaking, that may be improper as a matter of

5     translation, whatever conduct they use, but it means the same

6     thing.  Right?

7          MS. MIRON:  It might, but there's a different tone.

8     "u" is a quick transmission.  That's essentially, in my

9     opinion, thoughtless, doesn't place a lot of weight to it.  And

10    of course it is a very important communication, it's in July of

11    2015, between CC1 and Mr. Gammal.  And it has significance,

12    every single word that is said, or written.  And so I would

13    argue that by changing it from the letter "u" to Y-O-U, he

14    changes the English meaning to a different English meaning.  It

15    changes the English tone to a different English tone.  And it's

16    not his role to do that.

17          Let me give a different example.  This translator has

18    reviewed -- I think the government has narrowed their exhibits

19    a bit.  And so there are Facebook exchanges between two people,

20    where they've cut out portions of the exchanges.  That may be

21    permissible, but the translator has not necessarily indicated

22    when he has, when there's an omission.  I'll find the exhibit

23    when we get a chance, but it's essentially one speaker says,

24    "Amen," several lines are excerpted from the exhibit, and then

25    the next speaker says, "Good."  And there's no indication that

H161elgc

1    this is not a response to "Amen"; this is a later word.  So

2    it's that type of revision, I think this translator --

3              THE COURT:  That's not revision.  That's just wrong.

4              MS. MIRON:  It's a similar error.  We're going exhibit

5    by exhibit, but it's a time-consuming process.  And I would ask

6    that the government be required to review that to make sure

7    there are no errors in that regard so that we don't miss any,

8    and that the English words not change, because the meaning may

9    be the same or it may be different, but it's not his role.

10             THE COURT:  I suppose that that's correct.  I mean, if

11   there is an English word that's used in the vernacular, the

12   translator ought not be using the more formal word in his or

13   her translation.  But again, I sort of put that in the category

14   of, what are we fighting about.

15             So this is where I come down on all this.  And I did

16   review the 500-odd pages that were provided, and to be sure,

17   there are thousands of changes from what was I guess originally

18   provided to the defense and what this new translator has

19   indicated.  I did not do a mathematical analysis of this.  I

20   was worried with the jury math.  But the vast majority of

21   changes appear to me to be -- and I say this with some degree

22   of trepidation -- fairly inconsequential.  There are a lot of

23   situations where a sentence begins with a lower case letter,

24   they change it to an upper case letter.  There are a lot of

25   conversations here.  And again, I don't know what the

H161elgc

1    government intends to do.  But there are a lot of conversations

2    here concerning activities, events, etc., that I don't know the

3    government is even going to use.  A lot of the changes that I

4    saw -- and I'll just pick some sort of example.  And I'm

5    reading from page 218.  In the middle of the page, a statement

6    is attributed to Mr. Gammal, and the way that it used to

7    read -- and I'll do it in two parts.  "Emotional people always

8    have problems with the society."  It used to read, "Emotional

9    people always have problems with the community."  And it

10   continues, "and sometimes it affects the creed."  And it used

11   to read, "with the community, and sometimes with the ideology

12   as well."  Now let me read it both ways.  "Emotional people

13   always have problems with the community, and sometimes with the

14   ideology as well."  It now reads:  "Emotional people always

15   have problems with the society, and sometimes it affects the

16   creed as well."  That, to me -- and I'm not steeped in the

17   facts of the case or the theories of the case, but that to me

18   seems like two different ways of saying essentially the same

19   thing.  And there are numerous, numerous examples precisely

20   like that, where you have someone who's saying something in a

21   perhaps somewhat more informal way and then the next translator

22   coming in and doing it in a slightly more formal way or using a

23   particular word differently, which, again, to my mind, not

24   being steeped in the facts and in the particular theories, are

25   six of one, half dozen of the other.  And because of that, I

H161elgc

1    think that the best way to proceed -- because I find, by the

2    way, that there's no blame to be ascribed here.  It is what it

3    is.  It's a case involving a lot of documents, involving a lot

4    of Arabic translations, involving a defendant who is absolutely

5    intent on vindicating his constitutional right to a speedy

6    trial, and who wants to go forward with a trial, and parties on

7    both sides -- and I've seen it, parties on both sides working

8    very, very, very hard to be ready for trial.  So even though

9    there have been these problems with the government's initial

10   expert, for whatever reason, determining that she did not want

11   to testify, and even with the defense expert, you know,

12   vindicating his constitutional right to take a vacation during

13   the holidays, things happen in the course of a trial.  And I've

14   seen that the parties have been working very, very hard, and I

15   don't think that there is any basis to impose any sanctions on

16   either side.  Certainly not the defense.  And I don't mean to

17   suggest that you are subject to sanctions for any of this.  But

18   I think that the way to do it, the way to approach this -- and

19   I disagree with Ms. Miron that certain things should not be put

20   before the jury, because the case law in this circuit is that

21   where there is a disagreement between one side or the other

22   concerning what the appropriate translation is, both sides get

23   to put their version before the jury and the jury decides.  So

24   what I think the best way to approach this is, if there is --

25   and I can't imagine that it's all of the conversations in this

H161elgc

binder that was provided to me –– if there are particular

conversations that are particularly salient, where there are

translations that are different in substantive, consequential

ways, then the defense ought to have the opportunity and does

have the opportunity to put in their version of what they think

the translation should be.  And just to cite to the case law,

I'm reading now from *U.S. v. Chalarca*, 95 F.3d 239, 246.  "The

decision to receive in evidence English translations of foreign

language transcripts lies in the discretion of the district

court.  Moreover, when litigants disagree as to the precise

words on a tape or as to the accuracy of transcripts, the

district court may permit each party to submit an alternative

transcript to the jury."  Citing *U.S. v. Carson*, 464 F.2d 424.

See also *U.S. v. Chiarizio,* 525 F.2d 289, holding that in cases

where the defense and prosecution disagree as to the contents

of the tape, the proper procedure is for the jury to receive

transcripts of both sides' version.  And so that's the way that

I think we should proceed.

      Having said that, and knowing that the parties have

been working very hard and attempting to work collaboratively,

that should not prevent the parties from continuing to achieve

agreement where agreement is possible.  Are we all clear on

that?  Let me hear from Ms. Shroff.

      MS. SHROFF:  Your Honor, I understand what the Court

is saying, and I agree, obviously, with the case law as the

H161elgc

1    Court has just recited.  If there was an argument about what

2    can be heard on the tape, I would not be raising and Ms. Miron

3    would not have raised the issue that we have raised in terms of

4    the phrase *"jazak allah khair,"* okay?  That is, the insertion

5    put by the translator is not open to the kind of debate that

6    the case law addresses.  What they have inserted is, and as

7    Mr. Quigley has told the Court now, is what the translator

8    thinks is necessary, and that should come out.  This isn't that

9    we're disagreeing on whether the words were said, or what the

10   translation is.  It's not.  It's clear how, especially given

11   the male person speaking and the male recipient, that the words

12   *"jazak allah khair,"* there's no debate about the literal

13   translation, and that is what a translator's job is, a literal

14   translation, not to insert in parentheses what he or she

15   believes is necessary for the jury to get from that literal

16   translation.  That's not the translator's job.

17           THE COURT:  I agree with that.  I agree with that.

18           MS. SHROFF:  I just wanted to make that particular

19   argument, outside of the case law the Court just said.  Thank

20   you.

21           THE COURT:  Absolutely.  So to the extent that the

22   translator was trying to be helpful by inserting words that

23   were better put in context in the English language what was

24   meant, that should not be happening in the transcripts that we

25   provide to the jury.

H161elgc

1          MR. QUIGLEY:  That's fine, your Honor.

2          THE COURT:  Okay.

3          MS. SHROFF:  And of course this is an Arabic

4     translator, right?  There's no reason for him to translate

5     English into better English.  English is English.  There is

6     absolutely no reason for an Arabic translator to get involved

7     in spelling out English words.  There's no reason to undertake

8     that work.  It's a waste of the government's money.  It wastes

9     my and Federal Defenders' money, because I literally am

10    obligated to check every single change he makes.  The problem

11    is not whether the changes are inconsequential, your Honor; the

12    problem is we're having to sit there and decide whether they're

13    inconsequential.  That's all I'm saying.

14         THE COURT:  I understand that.  And I agree with that

15    point as well.

16         So to the extent there are English words or English

17    letters that are used, those should be used in the translations

18    as well.

19         MR. QUIGLEY:  Yes, your Honor.

20         MS. MIRON:  Your Honor, I'd just like to add what I

21    think Ms. Shroff is saying but about a different translation,

22    and that is, on page 383 of that same 3500 document, I don't

23    know if the government revisited this issue, but this

24    translator, within one exhibit -- and it's Exhibit 128T for the

25    record -- writes Mr. Gammal's name in two different ways.  So

H161elgc

1    page 383, he, we think incorrectly, leaves --

2              THE COURT:  I'm sorry.  Can you repeat that.

3              MS. MIRON:  This translator has left the correct

4    spelling in this particular page.  But in a different segment

5    of this same exhibit, he changed Gammal to Jamal, with a J,

6    which is improper in Egyptian Arabic.  We reached out to the

7    government to ask them to revisit that and to change it back to

8    Gammal, and they proposed a stipulation that it could be either

9    name is proper, especially in formal Arabic, which Attia is not

10   writing as; he is writing in Egyptian Arabic.  And keep in

11   mind, Attia knows Mr. Gammal's, El Gammal's Yahoo name, so he

12   would not use the J.  So we're asking that the government

13   change it back to Gammal.  It's important because of the stuff,

14   that Tarek exchange that the Court is permitting.  Mustafa

15   Tarek says to Samy, in August of 2014, El Jamal, with a J, "I

16   viewed an exchange with El Jamal and he seems to be supporting

17   ISIS."  And we strenuously disagree that that is Mr. Gammal.

18   So in leading the jury to conclude that his name could be

19   spelled with a J, it lends credibility to the government's

20   argument that it is Mr. Gammal.  Indeed, his name is never

21   spelled with a J when it's properly translated.  That's what

22   our translator says.  And apparently this same translator

23   missed it, at least once.  So we're asking that the government

24   change it back within the same exhibit to Gammal.

25             THE COURT:  Mr. Quigley, is this a typo or was this a

H161elgc

1    conscious decision?

2            MR. QUIGLEY:  Your Honor, I'm not sure it was either,

3    really.  The name can be spelled -- the name can be

4    pronounced -- we've spoken to our translator about this.  We

5    have spoken to both our original translator and our new

6    translator about this, and both of them have said that the name

7    could be pronounced either Gammal or Jamal in Arabic, and, I

8    mean, I said to the defense, we'd be happy to conform

9    everything in the transcripts to Gammal with a G, as long as

10   they're willing to stipulate to what I just described, that the

11   name could be pronounced either way in Arabic.  We would

12   anticipate --

13           THE COURT:  So let me ask you this, because this will

14   determine the Court's decision:  Does Attia sometimes say

15   Gammal and sometimes say Jamal?

16           MS. SHROFF:  No.

17           MR. QUIGLEY:  Well, I don't know how he pronounces it,

18   your Honor, because it's in text messages.  He's not spelling

19   it with a G or a J.  He's spelling it in Arabic.

20           THE COURT:  Does he spell it the same way?

21           MS. SHROFF:  Always.

22           MR. QUIGLEY:  It's in Arabic, your Honor, yes.

23           THE COURT:  But, I mean, Mr. Habib?

24           MR. HABIB:  He uses the same Arabic letter on each

25   occasion, yes.

H161elgc

1          MS. SHROFF:  And it's never Jamal in Egypt.  It's only

2     Jamal in Saudi Arabia.  It's always Gammal in Egypt.  It would

3     be like Tarek and Tariq.  Tarik in India, Tariq in Pakistan,

4     Tarek in Egypt.  That is why I can never spell it right because

5     I'm from one area and the Tarek at issue here is from Egypt.

6     You would not spell it the way you would in another country.

7     It's clear.  There is no Jamal in Egypt.

8          THE COURT:  Well --

9          MR. QUIGLEY:  Your Honor, I mean, that's the subject

10    of a motion and testimony.

11         MS. SHROFF:  It's not a subject of motion, your Honor.

12    Mr. Gammal --

13         THE COURT:  Now, Ms. Shroff, now you're acting as an

14    expert witness.  But, again, so I just want to make sure that

15    we're all talking about the same thing, because I think there's

16    an easy fix to this.

17         MR. QUIGLEY:  Your Honor, we're happy to change it to

18    a G.  And we'll elicit testimony from the expert that it can be

19    pronounced both ways and they can cross him all they want on

20    that.

21         THE COURT:  And that's the easy fix.  Okay.

22         MS. MIRON:  And one other easy fix we would ask from

23    the Court.

24         THE COURT:  Oh, here it comes.

25         MS. MIRON:  Our translator is not translating our

H161elgc

1   potential exhibits because he's reviewing this 500-page

2   document, so we're asking for a little leeway from the Court,

3   if we have additional defense exhibits that we'd like to

4   present, that the Court not preclude us from doing so because

5   they were late being translated.

6          THE COURT:  We'll take that as it comes.  And by that,

7   I mean make the appropriate application and I'll decide it

8   then.  Okay?

9          MR. QUIGLEY:  Thank you, your Honor.

10          THE COURT:  So that takes care of the transcript

11   issues.  At least for this morning.

12          Now I have received, but I've not had an opportunity

13   to review, the defense objections to the government's motion *in*

14   *limine* concerning the restriction of cross examination of two

15   of the government's potential witnesses.  I took a very quick

16   look at the defense submission.  There appear to be some issues

17   there that I think I should devote some more time to, so I'm

18   not going to make a determination at this point.

19          Mr. Quigley?

20          MR. QUIGLEY:  Your Honor, just, if it helps the Court,

21   with respect to both of those witnesses, I would anticipate

22   that neither of them would be in the first day or two of trial,

23   so I think we have some time.

24          THE COURT:  And I know the government has submitted

25   this *ex parte*.  I may want to see the parties at the end --

H161elgc

1   remind me -- just to get some additional background on these

2   individuals, or at least one of the individuals.

3                Okay.  Moving now to the government's motion to

4   preclude the defense experts.  The government moves to preclude

5   the testimony of Josiah Roloff, whom the defense has noticed as

6   an expert to testify regarding forensic evidence located on a

7   Toshiba laptop and Apple iPad seized from the defendant's

8   residence.  The government contends that the notice provided by

9   the defendant on January 1 was untimely under my scheduling

10  order and the substance insufficient under Rule 16 of the

11  Federal Rules of Criminal Procedure and Rule 701 of the Federal

12  Rules of Evidence.  Now while the expert disclosure does not

13  meet the particular deadlines set by this Court's order, in

14  light of the confluence of evidence the defense has faced,

15  including the Roth and Horvath disclosures and the objections

16  thereto and the termination of their testimony, the Court's *in*

17  *limine* ruling regarding the laptop videos and the updated

18  extraction report provided by the government in late December,

19  the Court denies the government's motion to preclude the

20  testimony of Mr. Roloff based on timeliness grounds.

21  Additionally, the Court finds that the notice provided by the

22  defendant on January 1 and its supplemental January 2 filing is

23  sufficient to describe the witness' opinions as well as the

24  bases and reasons for those opinions.  Therefore, the Court

25  denies the government's motion to preclude the testimony of

H161elgc

1    Mr. Roloff.

2              Concerning the defense request to permit Mr. Roloff to

3    appear remotely, that request is also granted.  The defendant

4    has stated its preference for Mr. Roloff to testify live.

5    However, he has a commitment in Georgia where he is expected to

6    testify before he's expected to testify in this case, and the

7    defense is instructed to convey this information from the Court

8    and Mr. Roloff should, if possible, testify here in court.

9              Moving to the government's motion to preclude the

10   testimony of Andrew March, whom the defendant has noticed as an

11   expert in global jihadist movements, ISIL, and the Muslim

12   Brotherhood, the government again objects based on both

13   timeliness and insufficiency of notice.  Again, the Court

14   denies the government's motion to preclude Mr. March's

15   testimony.  Although the testimony was noticed in December, the

16   defendant did request an undetermined extension for expert

17   notice and the government agreed.  Given the defendant's

18   representations in its *ex parte* letter, the Court will not

19   preclude the testimony based on lack of timeliness.

20   Additionally, the Court finds the expert notice sufficient.  In

21   its letter to the Court yesterday, defendant provided

22   additional supplementation to its prior notices.  The defendant

23   is ordered to provide this additional supplement to the

24   government immediately, if it has not done so already.

25             With respect to the government's motion to preclude

H161elgc

the testimony of Aymenn Jawad Al-Tamimi, the government seeks

to preclude his testimony, whom the defendant has also noticed

as an expert in global jihadist movements and ISIL, and the

government objects again on the basis of timeliness and the

insufficiency of the notice.  The Court denies the government's

motion to preclude the testimony of Mr. Al-Tamimi for the same

reasons discussed above with respect to Mr. March.

Additionally, the Court finds that the supplemental expert

notice outlined in the defendant's January 5, 2017 letter

sufficient, as this notice tracks the government's notice of

its expert in the degree of detail and specificity.

        And finally, with respect to the motion to preclude

the testimony of Marwan Abdel Rahman, the government seeks to

preclude his testimony concerning the English translations of

Arabic language materials and Arabic vernacular and slang

terminology.  The government claims it has not received

Mr. Rahman's résumé.  The government objects to Mr. Rahman only

on the basis of timeliness and not on the basis of adequate

notice.  The Court denies the government's motion, in light of

the government's recent disclosure of updated translation.

Have you received Mr. Rahman's résumé?

        MR. QUIGLEY:  Not yet, your Honor, no.

        THE COURT:  When can you get it to him?

        MS. SHROFF:  Your Honor, actually, we're trying to get

it from the interpreter's office here.  We'll endeavor to get

H161elgc

1    it for them by the end of the day.

2              THE COURT:  Okay.  Very well.

3              So that takes care of the defense experts.

4              Moving now to the government's December 27 motion to

5    preclude or third-party motions *in limine*, the government has

6    moved to preclude statements offered by the defendant and made

7    by the defendant to third parties marked as Defense

8    Exhibits 100-BB, 100-CC, 100-DD, and Defense Exhibit 2-AA.

9    Defense Exhibit 2-AA is an August 2015 What's App exchange

10   obtained from Mr. El Gammal's cellphone between Mr. El Gammal

11   and CC2.  In the exchange, Mr. El Gammal and CC2 discuss the

12   shutdown of a television station run by Egyptian exiles

13   affiliated with the Muslim Brotherhood and the purchase of an

14   electronic device.  Do we know what that device is, by the way?

15             MR. QUIGLEY:  Sorry?

16             THE COURT:  The device that's discussed in that

17   particular exhibit?

18             MR. QUIGLEY:  I believe it's an iPhone, your Honor.

19             THE COURT:  Okay.  Defense Exhibit 100-BB is a

20   January 8, 2014 exchange between Mr. El Gammal and another

21   individual, during which Mr. El Gammal and the other individual

22   engage in a general discussion regarding Egypt and an Egyptian

23   billionaire businessman, during which Mr. El Gammal makes

24   statements such as "infidelity in Egypt is worse than that of

25   Americans," and "average Americans are good people."

H161elgc

          Defense Exhibit 100-CC is a July 2, 2014 exchange

between the defendant and an individual, during which Mr. El

Gammal generally discusses Egyptians who have left Egypt for

Turkey.

          With respect to Defense Exhibit 2-AA, the Court finds

this exhibit is admissible because the statements are not being

offered for the truth.  Specifically, the Court agrees with the

defendant that this exhibit can be offered to show the

defendant's awareness that CC2 worked in and was familiar with

the TV journalism industry in Turkey and stations supportive of

the Muslim Brotherhood.  Additionally, the statements by the

defendant contained within this exhibit, even if hearsay, are

admissible under Rule 106 for completeness.

          As to Defense Exhibit 100-BB, the Court also finds

this exhibit admissible because statements are not offered for

the truth of the matter asserted but to show the defendant's

viewpoint, attitudes, or state of mind.  The Court rejects the

government's argument that this evidence is more prejudicial

than probative because the defendant is not charged with

disliking the United States or Americans but instead providing

material support to ISIL, and this evidence has a tendency to

demonstrate evidence or beliefs inconsistent with the mental

state required to commit the charged offense.

          As to Defense Exhibit 100-CC, the defense argues that

these statements are not offered for the truth, just the fact

H161elgc

that there are Egyptian exiles in Turkey, and the defendant

does not oppose a limiting instruction to that effect.  The

Court finds the statements admissible, again, not for the truth

but because they reflect the defendant's understanding that the

statements were true, and will issue a limiting instruction,

should the government so request.

　　　　　As to the statements regarding the defendant's belief

about America and Americans, the Court finds this evidence

admissible, again, because it his a tendency to demonstrate

evidence of beliefs inconsistent with the mental state required

to commit the charged offense.

　　　　　Turning now to the government's motion to preclude

statements made by CC2 in the course of communications with

third parties, marked as Defense Exhibits 122-AA, 122-BB,

122-CC, 122-DD, and 122-EE, 122-FF, and 123-AA.  Several

Facebook exchanges from late 2015 and early 2016, after

Mr. El Gammal's arrest, in which CC2 comments about events

allegedly involving ISIL are contained in Defense

Exhibits 100-CC and 122-BB.  There appears to be a typo in what

the government has provided because Defense Exhibit 100-CC is

the exhibit with comments from Mr. El Gammal and not CC2.  So

there is a typo somewhere in there.  Defense Exhibit 100-CC

describes ISIL's taking responsibility for the crash of a

Russian aircraft.  122-BB discusses CC2's position regarding

certain terrorist attacks and political issues.  CC2's

H161elgc

conversation with different individuals about various topics,
including moving to Turkey, are contained within Defense
Exhibits 122-DD, 122-AA, 122-EE, and 122-FF.  DD discusses the
Egyptian president and the Muslim Brotherhood.  AA discusses
how CC2 could purchase a computer for editing, for video
editing.  EE discusses communications about an individual's
desire to move to Turkey.  FF concerns communications where CC2
discusses with an individual moving to Turkey and potential job
opportunities.  And 123-AA is a June through September exchange
between CC2 and a relative of CC1, in which the relative
implores CC2 to try to get CC1 to travel to Turkey and asks
whether CC2 is able to provide any reassurance about CC1.

          As to Defense Exhibit 100-CC, the government claims
that this exhibit is a Facebook exchange discussing ISIL's
taking responsibility for the crash of a Russian aircraft.
Again, that appears to be the wrong exhibit number.  Assuming
that the correct exhibit is 122-CC, the Court finds that this
exhibit is admissible in its entirety.  The statements from CC2
in the document are not offered for the truth but to show CC2's
attitudes, viewpoints, and beliefs, and would also qualify as
an exception under Federal Rule of Evidence 803(3), statements
of the declarant's then existing mental state.  Based on the
government's representations regarding duration of the alleged
conspiracy, the Court rejects the government's contention that
the statements within occurred too late in time.

H161elgc

The statements of the other Facebook user contained in DX 122-CC should be viewed contemporaneously under Rule 106 and are therefore also admitted.

As to Defendant's Exhibit 122-BB, which describes CC2's position regarding certain terrorist attacks and political issues, this exhibit also is admissible in its entirety for the same reasons.

Defense Exhibit 122-AA, which describes the purchase of a computer or how a computer could be purchased, this exhibit is admissible because they are nonhearsay or statements of future intent excepted by Rule 803(3), and the Court further agrees with the defendant that the other Facebook user's statements are admissible under Rule 106.

With respect to Defense Exhibit 123-AA, this exhibit is also admissible.  Defendant argues that two sentences contained in the first page regarding whether CC2 will join ISIS -- the question of the Facebook user is, "Are you going to join?" -- is nonhearsay and CC2's answer is a statement of future intent.

Now let me just point out that some of these defense exhibits that I reviewed are a little confusing.  There are multiple-page exhibits, and the parties focus on certain statements.  Is it the parties' intent to put in the entirety of the exhibit, and if so, why is it necessary?

MS. MIRON:  Just a minute.

H161elgc

THE COURT:  Yes.

MR. HABIB:  Your Honor, we just included the full exhibits for context.  As we prepare our trial exhibits, we'll endeavor to cut them down to the relevant material.

THE COURT:  Okay.  So do be in communication with the government concerning precisely what you will be putting before the jury to make sure that there's no --

MR. HABIB:  Yes, we will confer with the government, yes.

THE COURT:  Very well.

Turning now to Defense Exhibit 100-DD, which the government seeks to preclude, which is a June 28, 2014 message to Mr. El Gammal in which an individual states, "Peace be on you.  May you be well every year.  We arrived to Malaysia, thank god.  You introduced me to a wonderful man in Jakarta.  May god reward you all goodness."  The government argues that this statement bears no apparent relevance to any of the facts at issue at trial and constitutes inadmissible hearsay.  The defense says that this statement is admissible under Rule 106 to provide necessary context to Government Exhibit 100-U, which is also a Facebook conversation between the individual and Mr. El Gammal, where the person tells the defendant that he anticipates, the defendant, that he's still in Malaysia but is trying to arrange a trip to Turkey.  Defendant's argument for admissibility of this exhibit rests on Rule 106, under the

H161elgc

doctrine of completeness.  The Court agrees.  Should the

government introduce Government Exhibit 100-U, the transcript

thereof, under the doctrine of completeness, the defendant can

introduce Defense Exhibit 100-DD to place in context the

government's evidence.

Turning next to the defense request that the Court

revise its December 19 ruling, admitting evidence of the

defendant's statements to CC2 regarding his desire to be in

Egypt with an AK-47 and four magazines, we've discussed this at

some length already.  The government's initial translation was

where I think CC2 described the defendant as a "Daesh gigolo."

Its subsequent translation was that the defendant was a "wimpy

or a sissy Daesh," and the defense has asked to change that

ruling on the basis of that change in translation.  The

defendant argues that the entire exchange is light-hearted

conversation and that the description of the defendant as a

"wimpy or sissy Daesh" is therefore a joke.  However, whether

the exchange is a joke is a question of weight and not

admissibility and is a question for the jury.  Therefore, the

Court finds that its ruling will not change and the evidence is

admissible.  The revised translation will not alter the Court's

previous ruling.

Finally, as to the motion to preclude the testimony of

Mr. Soltani, the defense has indicated that they will not be

calling Mr. Soltani.  And I assume that it's a Mr. Soltani,

H161elgc

1      correct?

2                   MS. MIRON:  Yes.

3                   THE COURT:  Accordingly, that request is moot.

4                   So that takes care of those motions.

5                   With respect to Defense Exhibits 122-DD, 122-EE, and

6      122-FF, the defense has actually indicated that it is

7      considering not introducing these exhibits.

8                   MR. HABIB:  I'm sorry.  We would just ask the Court to

9      just defer ruling on that until we --

10                  THE COURT:  Very well.

11                  MR. HABIB:  Yes.  Thank you.

12                  THE COURT:  I did indicate that I would be allocuting

13     Mr. El Gammal concerning the plea offer that was made by the

14     government.  We can do that now or we can do that Monday

15     morning before we begin jury selection, whatever the parties

16     prefer.

17                  MR. QUIGLEY:  We have no preference, your Honor.

18                  MR. HABIB:  We also have no preference, your Honor.

19     As to the substance of the allocution, we are just mindful of

20     two concerns.  One is obviously Rule 11, which prohibits the

21     Court from participating in plea negotiations; and the other is

22     the substance of attorney-client communications.

23                  THE COURT:  Why don't I do this.  Why don't I give you

24     what I intend to ask and give you an opportunity to comment,

25     and we'll do it Monday morning.

H161elgc

1          MR. HABIB:  That's fine.

2          THE COURT:  Okay.  And finally, the final voir dire

3  form, the defense made a couple of objections.  The government

4  made no objections, so far as I am aware.

5          With respect to the defense objections, I accepted

6  your change on Question No. 6.  Do we have the version for

7  them?  On Question No. 6.  And I overrule your objection with

8  respect to Question No. 36.  And I accepted your typographical

9  correction with respect to that other question.

10          MR. HABIB:  I just want to clarify on 36 that that's

11  without prejudice to seeking such an instruction in the final

12  charge.

13          THE COURT:  Oh, absolutely.  And that would be an

14  appropriate instruction.  And in fact, I think it's touched

15  upon in the preliminary instructions that I give to the jury,

16  and it will absolutely be an instruction, final instruction.

17          MR. HABIB:  That's fine.  Thank you.

18          THE COURT:  So I think the only thing that I wanted to

19  discuss now was the letter that I received from the government,

20  12:02 a.m., concerning the use of juror number as opposed to

21  juror name.  Has the defense had an opportunity to review that

22  letter and does it have a position?

23          MR. HABIB:  May we have one moment, please?

24          THE COURT:  Sure.  And also, as you are discussing, I

25  am trying to figure out what in fact that would entail

H161elgc

mechanically, because it may affect how quickly we get a

venire.

          MR. QUIGLEY:  Your Honor, if I may?

          THE COURT:  Well, let them talk and then --

          MR. QUIGLEY:  Okay.

          MR. HABIB:  Your Honor, I think we all read it briefly

because we, like our colleagues, are up late.  I think I would

say three things.

          One, the government has, in essence, moved for

reconsideration.  Of course reconsideration requires a

demonstration that there has been an intervening change in law,

changed factual circumstances, or manifest error on the Court's

part, and I don't understand the government's submission to

have demonstrated any of those three things.

          Two, for the reasons Ms. Shroff articulated at our

last conference, we feel there's a real risk of prejudice to

Mr. El Gammal that a jury would perceive the use of anonymizing

identifiers to reflect a judgment by the parties, and more

important the Court, that they were in some danger as a result

of serving on this jury.  That's not well supported by the

evidence, we don't think.  As we've pointed out, Mr. El

Gammal's been in general population at the MCC since August of

2015.  His alleged co-conspirator in Turkey is at liberty.  And

two members of the El-Goarany family who the government has

determined faced criminal exposure for assisting Samy

H161elgc

1   El-Goarany in traveling and received nonprosecution agreements

2   are also at liberty.  So the idea that there is some danger to

3   the jury that necessitates the unusual step the government has

4   requested to me seems incorrect.

5          With respect, the Court exercised its broad discretion

6   in ruling on this issue on Tuesday, and I don't think anything

7   has changed.

8          THE COURT:  Mr. Quigley?

9          MR. QUIGLEY:  Your Honor, just two things.  I think,

10  you know, the danger does not have to be from the defendant

11  himself or anyone else in this case.  The danger is that there

12  have been a number of cases, or a number of situations, some

13  here in New York, where ISIS or ISIS supporters have publicly

14  published the names and addresses of people, and that is

15  obviously of great concern, it is of great concern, and I've

16  been at the FBI when they've had to call those people and tell

17  them, hey, your name showed up on an ISIS hit list, basically.

18  And the concern obviously is that, you know, you can see

19  something in the public forum that, hey, here are the jurors

20  or, you know, one of the jurors in the El Gammal trial is a,

21  you know, Mary Smith, a 32-year-old woman from Westchester, and

22  if that name gets out there in the public domain and ends up on

23  an ISIS list somewhere, that creates a big problem for Mary

24  Smith, obviously.

25          In terms of the mechanics, secondly, in terms of the

H161elgc

1    potential prejudice to the defendant or anything like that,

2    unless these jurors have served on a federal jury before,

3    unless they remember their service on a federal jury before,

4    they're not going to remember that, they're not going to know

5    that there's anything unusual about this, and I've had other

6    trials in this courthouse where judges, without a government

7    request, have just referred to the jurors by number.  So even

8    if they have served on a federal jury before, not being

9    referred to by their name may be consistent with their past

10   experience.

11           THE COURT:  Well, now these lists that you've

12   mentioned, and these incidents, when did those happen?

13           MR. QUIGLEY:  They've happened over the last several

14   years on a somewhat, you know -- I'm not aware of every one,

15   but there was definitely a number.  I mean, as recently as a

16   few months ago, I recall being over at the FBI when one of

17   these lists came out, and they were having to notify the people

18   in New York that they were on the list.

19           THE COURT:  So before October of this year, or last

20   year.

21           MR. QUIGLEY:  Yes, your Honor.

22           THE COURT:  I have to say, I was surprised to receive

23   your letter, and when I did, I recalled the government's

24   objection to the use of a jury questionnaire.  And part of your

25   letter, there are a number of bases.  One is the publicity that

H161elgc

1    this case has gotten, and two is the serious nature of the

2    charges.  And I recalled the submission that the government

3    made -- and I pulled it out, because I wanted to make sure that

4    I got this, that I didn't misquote it.  But in your submission

5    of October 17, 2016, concerning the nature of the charges, in

6    the government's memorandum of law in support of its motions *in*

7    *limine*, Document 80 at page 34 indicates, "As an initial

8    matter, this is not, for example, a case that has received

9    significant pretrial publicity.  The search of LEXIS' 'Major

10   Newspapers' database for 'El Gammal,' for example, shows the

11   most recent news story related to this case was published on

12   September 2015, over a year ago."  I understand that there may

13   have been some articles since then.  "Moreover, while the

14   defendant is accused of assisting the travel of CC1 to the

15   Islamic State of Iraq and the Levant, he is not personally

16   accused of committing any violent acts, much less attacks on

17   innocent New Yorkers."  And you compare that to the *Salameh*

18   case.  "The government's proposed voir dire questions, which

19   ask prospective jurors, for example, whether they could fairly

20   and impartially view a case involving ISIL-related charges,

21   whether they have feelings about Islam and Muslims that would

22   impact their ability to serve impartially and their general

23   views on terrorism prosecutions, serve to adequately screen out

24   any potential jurors who may be unable to fairly and

25   impartially serve in the case."

H161elgc

1          Now, I mean, I accept that we're talking about two

2     slightly different things here, but the factual bases as

3     described by the government are now dramatically different.  So

4     what has changed?

5          MR. QUIGLEY:  Your Honor, I mean, I think nothing's

6     changed about the defendant.  There has been some increased

7     media coverage of the case.  I think, you know, within our

8     office, the threat to potential jurors, the potential of a

9     threat has been reassessed, and that was the reason we made the

10    motion we did.  We had talked about internally moving for an

11    anonymous jury initially, during that October 17th time

12    period.  We decided against that in terms of, you know -- they

13    did move for an anonymous jury and they got an anonymous jury

14    in the *Pugh* trial in the Eastern District, which I know

15    Ms. Shroff thinks is different but is in many ways a factually

16    similar case.  There, it was not a conspiracy; it was a guy who

17    actually traveled over there and got turned around, but

18    somebody who is not, you know, himself accused of any violent

19    acts, and they had an anonymous jury there.  We decided not to

20    move for one, but, you know, as we got closer to trial and

21    there became more media coverage and there have been a number

22    of, you know, trials, we just reassessed I think the potential

23    of having somebody's name in the paper, which could be bad for

24    them.

25          THE COURT:  Well, I mean, obviously, it's good to know

H161elgc

1    the government is constantly making these types of assessments,

2    but this is not the first material support case that has been

3    brought in this district.  Probably this district has more than

4    any other district in the country.  So I was, frankly,

5    surprised to receive the letter that I received this morning

6    and to read some of the provocative aspects of this case and

7    the group involved in this case.

8         But I am still trying to determine what precisely

9    mechanically it will entail and whether, if I were to grant

10   your motion, it would require some lengthy delay -- and by

11   lengthy, I mean not weeks but hours -- and so I still need to

12   make that determination.  But I have to say, I was quite

13   surprised to receive the letter, in light of the way this case

14   has been conducted up until yesterday.

15        Mr. Habib.

16        MR. HABIB:  Thank you.  Very briefly, your Honor.

17        Two quick points.  One, as I was re-reading the

18   government's letter quickly on my phone, I didn't see any

19   evidence that jurors had ever appeared on a kill list in any

20   case, and so I wonder whether the government has provided an

21   adequate factual basis for its claim.

22        I would also add, I'm aware from my own research that,

23   for example, the jurors in the Boston Marathon bombing case,

24   their names are all public.  The district court unsealed their

25   names and they are now a matter of public record, and I'm not

H161elgc

1    aware that any --

2               THE COURT:  After the case?

3          MR. HABIB:  After the case, yes, your Honor.  So I'm

4    not aware that anything untoward has happened to any of them.

5               Finally, if the Court is inclined to grant some relief

6    along the lines of what the government is proposing, for the

7    reasons the government has given, which, as the Court has quite

8    accurately noted, are inconsistent with the position the

9    government took in opposing the use of a jury questionnaire, we

10   would respectfully renew our request for the use of a

11   questionnaire which now, by the government's own account, is

12   justified based on what the government is now characterizing as

13   a high degree of pretrial publicity and highly provocative

14   nature of the case.  So respectfully, the government can't have

15   it both ways.

16          THE COURT:  Okay.  I'm not going to impose an

17   obligation on you to submit anything, but if you want to, do.

18   I will take this under consideration, and I'm sure we'll be in

19   close contact.

20          MS. SHROFF:  Your Honor, may we just have one minute?

21          THE COURT:  Sure.

22          MR. QUIGLEY:  Your Honor, if I may.

23          THE COURT:  Why don't you let them speak.

24          MS. MIRON:  Thank you, your Honor.

25          MR. HABIB:  So a very quick point that my wiser

H161elgc

1    colleague reminds me to mention with respect to the jury issue

2    is that almost everyone involved in this case has had their

3    name public for quite some time.  All of the relevant

4    witnesses' names have made it into pretrial pleadings,

5    counsel's names have made it into pretrial pleadings, court

6    staff, all of these status conferences have been conducted in

7    public.  With respect, the information about this case and

8    really the identities of anybody who ISIL might, in the

9    government's speculation, place on a kill list, has been well

10   known for quite some time.

11           I also must question -- and again, we're all working

12   hard and the defense appreciates that, because we're working

13   hard too, but, you know, the issue of the anonymous jury was on

14   the government's radar, has been for months, and we too were

15   surprised to get a filing on the Friday before jury selection

16   is to commence, and, you know, if we elect to oppose in

17   writing, that's time we could be using --

18           THE COURT:  No, I understand.  I understand.

19           MR. HABIB:  So putting that aside, we had a couple of

20   questions about exhibits to which we plan to object and whether

21   the government's going to open on them.  The government, in its

22   most recent exhibit list, has produced photos, reproductions of

23   photos of what it says is Samy El-Goarany's dead body in which

24   there is a bullet hole visible in the middle of his forehead.

25   We intend to raise authentication as well as 403 objections to

H161elgc

1    that exhibit.  We'd ask that the government certainly not

2    display the photo in opening, but not necessarily open on the

3    promise of that evidence pending the ruling.

4         The government has also provided photos of the

5    El-Goarany family that just appear to be social photos of the

6    family, posed photos of the father and two sons together, posed

7    photos of the family together, of the two brothers together.

8    These appear to have no conceivable relevance to the case and

9    are surely being offered only to generate sympathy for the

10   El-Goarany family.  We intend to object to those as well.  So

11   again, we're just seeking clarification on whether the

12   government's going to refer to or incorporate those into

13   opening in any way.

14        THE COURT:  The only thing I could tell you for sure

15   is that they will not be showing the El-Goarany picture, the

16   dead body picture to the jury during their opening.

17        MR. HABIB:  Okay.

18        THE COURT:  Beyond that, I don't know what they intend

19   to do.

20        MR. DeFILIPPIS:  Your Honor, that was the government's

21   plan for sure, not to show that during opening.  We also have

22   no intent to show the other picture, or to discuss it, the

23   family picture.  The only graphic to be shown during opening

24   will be the maps that your Honor and defense saw, and those

25   maps will be the maps with circles and/or arrows around three

H161elgc

1    cities in Turkey, but that would be the only graphics shown.

2    We will not discuss any photographs during the opening.  And my

3    expectation is that the photograph of the Goarany family, we

4    only provided that to defense because they asked for it, and we

5    have not marked it as an exhibit.

6         THE COURT:  Okay.

7         MR. HABIB:  Sorry.  One quick point.  I appreciate the

8    government's representation with respect to the nature of

9    opening.  I just want to clarify, is the government going to

10   open on the claim that Samy died because he was shot in the

11   head?  Is that fact going to be adduced in the opening?

12   Because the only way of proving that fact would be this photo.

13   Just curious.

14        MR. DeFILIPPIS:  And your Honor, I just want to be

15   clear also that we have not committed not to introduce the

16   photo as evidence at trial --

17        THE COURT:  Understood.

18        MR. DeFILIPPIS:  -- but we reserve the right to

19   reference his death in opening, but not anything regarding the

20   particular graphic nature of what happened.

21        THE COURT:  Okay.

22        MR. HABIB:  Thank you, your Honor.

23        THE COURT:  Ms. Shroff.

24        MS. SHROFF:  Your Honor, just two matters on the issue

25   of the government's letter of this morning, or last night.  I

H161elgc

1    want the record to reflect that we've been in a proceeding I

2    think for about an hour or more.  There is no press present

3    here today.  I don't think the press decided to show up at the

4    last court appearance.  And apparently they have better things

5    to report on than the trial of *United States v. El Gammal*.

6          I also note that, unlike the other cases that have had

7    anonymous juries, which ISIL decided to publicly comment on --

8    and the government knows this, they comment on trials and

9    arrests all the time in their magazines, including the Inspire

10   magazine that the government is familiar with, as well as the

11   magazine Dabiq, which the government also knows about.  ISIL

12   has apparently also decided not to comment on either Mr. El

13   Gammal's arrest or his prosecution, and they do tend to comment

14   when they are taking note of a case or a person or an entity

15   that they feel deserves attention.  Apparently we do not.

16         And I ask the Court to consider those issues when

17   considering the late filing by the United States.

18              THE COURT:  Yes.  That's all I have.

19              MR. QUIGLEY:  Thank you, your Honor.

20              MR. DeFILIPPIS:  Your Honor, just briefly, if I could

21   just ask to return just very briefly to Mr. Roloff, the expert.

22   Understanding your Honor's ruling that he'll testify by video

23   if necessary, I think the government, just recognizing that

24   video testimony is not preferred by anyone if it's avoidable

25   and that it presents logistical challenges for cross

H161elgc

1    examination and direct examination, we have two requests.  The

2    first is that the defense now, or as soon as they have it,

3    provide the government and the Court with more detailed

4    information about the case in which Mr. Roloff is testifying

5    and the expected trial schedule, the expected length of his

6    testimony, just so we can gauge the likelihood that he'll have

7    an absolutely unmoveable conflict and can all plan accordingly.

8    That would be our first request.

9         And then the second request is that with regard to

10   documents that he testifies to during his examination, it's a

11   particularly difficult sort of examination to do remotely

12   because the one extraction report is over a couple thousand

13   pages and the government may not in fact introduce the vast

14   majority of that into evidence.  The other is of a forensic

15   image of a laptop that doesn't even exist in paper.  And so we

16   would ask that the defense be required to, or that they agree

17   to produce, significantly in advance of the testimony: (1) any

18   documents they intend to rely on; and (2) the relevant page

19   numbers of any government exhibits that they intend to

20   reference so that we can: (1) prepare for cross examination;

21   but (2) address any *in limine* matters or any other matters that

22   may come up as a result of what they intend to focus on.

23        MS. MIRON:  We're happy to comply with the latter and

24   provide, as soon as we have it, to the government any documents

25   he's going to reference and any documents he reviewed in

H161elgc

| | |
|---|---|
| 1 | preparing for his own expert testimony.  That should be done |
| 2 | hopefully this weekend, maybe early next week. |
| 3 | As it relates to the exact nature of his conflict, he |
| 4 | is committed to a trial that begins on the 23rd of January |
| 5 | and is a capital murder trial.  He has agreed to be present in |
| 6 | the trial to listen to the prosecution's witnesses, because a |
| 7 | lot of it is forensic analysis.  He committed to another client |
| 8 | that he would be available to them starting around the 18th |
| 9 | of January locally and that he would attend every day.  I think |
| 10 | the trial is supposed to be about a month.  So we really don't |
| 11 | think he's going to be available.  We've asked him to try, and |
| 12 | I don't think it's going to happen.  What we would propose is |
| 13 | maybe that he attend the federal courthouse in Atlanta and |
| 14 | communicate with this courthouse to do the video testimony. |
| 15 | It's going to be a pretty limited direct.  The government's |
| 16 | witness has the same extraction reports.  I don't anticipate |
| 17 | any problems with the cross examination. |
| 18 | THE COURT:  I only know the last time I tried this, or |
| 19 | the last time I did this, we actually had to go across the |
| 20 | street because we didn't have the technical capacity to do a |
| 21 | video hookup where the jury and everyone could see.  So we need |
| 22 | to look into that as well. |
| 23 | But to the extent you have as much information, just |
| 24 | be in touch with Mr. Roloff and provide as much information to |
| 25 | the prosecution as you can, as you have been, regarding his |

H161elgc

1    availability in Georgia or wherever he is.

2              MS. MIRON:  Okay.  I believe it's Atlanta.  But we

3    will send them as much detail as we can gather in the next day.

4              THE COURT:  Okay.

5              MR. DeFILIPPIS:  And your Honor, for the parties'

6    planning purposes, is it your Honor's definite expectation that

7    we will not open on Monday or put on any witnesses on Monday?

8    In other words, is your Honor willing to plan with that

9    definite expectation or --

10             THE COURT:  Well, first of all, it's going to take a

11   little while to bring the venire up, so if they're ready at

12   9:30, it will have been a miracle.  It's going to be 125.

13   That's a lot of massaging that needs to be done of logistically

14   putting people in place.  Given the nature of the case, I doubt

15   very much that we will complete jury selection on Monday.  And

16   in any event, to allay your concern, I will not require the

17   parties to open on Monday.

18             MR. DeFILIPPIS:  Okay.  Thank you.

19             MS. SHROFF:  It's supposed to be a brisk 24 degrees.

20             THE COURT:  And so it may take awhile for the jurors

21   to get here from their respective homes.

22             That's it for now.  And if anyone wants to go to the

23   courtroom and see the setup, you can arrange that with

24   Ms. Rivera.

25             MR. DeFILIPPIS:  Your Honor, you had just asked us to

H161elgc

1    remind you that you may want to see us *ex parte*.

2              THE COURT:  This has taken too long, and since neither

3    of those witnesses will be testifying in the first day or two,

4    maybe we can do what I wanted early next week.

5              MR. DeFILIPPIS:  Fine.

6              THE COURT:  Okay?  Okay, folks.

7              THE DEPUTY CLERK:  All rise.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25