H1A5gamF                         TRIAL

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                            15 Cr. 588 (ER)

5   AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            January 10, 2017
9                                           2:45 p.m.

10
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                            District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BRENDAN F. QUIGLEY
17  NEGAR TEKEEI
    ANDREW J. DeFILIPPIS
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
20  BY:  SABRINA SHROFF
         ANNALISA MIRÓN
21       DANIEL G. HABIB

22

23

24

25


                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

H1A5gamF

| | |
|---|---|
| 1 | (Case called) |
| 2 | MS. TEKEEI:  Your Honor, one quick question.  Do you |
| 3 | expect that we will start our first witness today? |
| 4 | THE COURT:  No. |
| 5 | MS. TEKEEI:  So, if it is all right, I will let the |
| 6 | first witness know that they are relieved for the day.  They |
| 7 | have been on standby. |
| 8 | THE COURT:  Yes. |
| 9 | MS. TEKEEI:  Thank you, your Honor. |
| 10 | THE COURT:  Other than the defense objection on the |
| 11 | basis of Batson, does either side have any objections as to the |
| 12 | procedures used to choose the jury in this case? |
| 13 | MR. QUIGLEY:  No, your Honor. |
| 14 | MS. SHROFF:  No, your Honor. |
| 15 | THE COURT:  Very well. |
| 16 | As soon as the jury is all here, we will bring them |
| 17 | out.  I don't know what the status of their presence is. |
| 18 | We will bring the jury out. |
| 19 | (Continued on next page) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

H1A5gamF

1            (Jury present)

2            THE COURT:  Everyone, please, be seated.

3            Ms. Rivera, please, swear the jury.

4            THE DEPUTY CLERK:  Please stand and raise your right

5    hand.

6            (Whereupon, a jury of 12 jurors and 4 alternates was

7    impaneled and sworn)

8            THE COURT:  Please, be seated.

9            Ladies and gentlemen, you are now a jury and there is

10   no higher function in our legal system.  From now on, whenever

11   you enter or leave the courtroom as a jury, the parties and the

12   audience will rise the same as they do for me because you are

13   every bit as important as any Judge.

14           Let me introduce or reintroduce myself and some of the

15   people who are here in the courtroom.  As I told you before, my

16   name is Edgardo Ramos.  You have all right been introduced to

17   the defendant Mr. El-Gammal and his Attorneys and the Assistant

18   United States Attorneys, my courtroom deputy is Ms. Jazmin

19   Rivera, and she is the person you will be talking to most

20   throughout the trial.  If you have any questions or

21   difficulties, she's the person that you are going to consult in

22   the first instance.

23           Ms. Lauren Biksacky is my law clerk and her job is to

24   help me research any legal issues that could come up during the

25   course of the trial.

H1A5gamF

1          As you will note, as you have seen, we have two court

2     reporters who will be here throughout the trial and who will be

3     taking down every word that's said throughout the trial.

4          I want to give you some preliminary instructions now

5     and then at the end of the trial I will give you the full jury

6     charge.

7          In the American system of justice, the Judge and the

8     jury have separate roles.  My job is to instruct you as to the

9     law that governs the case.  I will give you some instructions

10    now and others from time to time during the trial.  At the end

11    of the trial, I will give you detailed instructions about the

12    law you will need to apply when you deliberate.  Your job as

13    jurors is to determine the facts based on the evidence.  You

14    are the only triers of fact and your decisions on the factual

15    issues will determine the outcome of this case.  You must not

16    take anything that I may say or do during the trial as

17    indicating what my opinion is, or what your verdict should be.

18    It is not my job to even have such an opinion and, if I did, it

19    should not influence you in any way.

20         You must pay close attention to all of the evidence

21    presented in the case.  Evidence consists of the testimony of

22    the witnesses, exhibits that are admitted as evidence, and

23    stipulations agreed to by the attorneys.  A stipulation is

24    simply an agreement between the lawyers about facts or

25    testimony.  Certain things are not evidence in the case and you

must not consider them as evidence.  For example, statements

and arguments by lawyers are not evidence.  They are simply

arguments in which they will tell you what they think the

evidence proves and how they think you should analyze the

evidence.  My statements are not evidence either.  Questions by

the lawyers are not evidence.  Only the answers given by the

witnesses are evidence.  For example, if a witness is asked it

was raining that day, wasn't it?  And the witness says, no, it

wasn't.  Then, based on that question and answer, there is no

evidence in the case that it was raining that day no matter how

convinced the lawyer sounded when he or she was asking the

question.

          Objections to questions are not evidence.  The lawyers

are obligated to make an objection when they believe evidence

is being offered for an improper purpose under the federal

rules.  You should not be influenced by the objection or the

Court's ruling on it.

          Any testimony that I exclude or strike, or tell you to

disregard is not evidence and you must not consider it.  If I

instruct you that some evidence is only to be considered for a

certain purpose, you must follow that instruction.

          And, of course, anything you may see or hear outside

the courtroom is not evidence and should be disregarded by you.

          In deciding the facts of the case, you will have to

decide the credibility of the witnesses, that is, how truthful

H1A5gamF

and believable they are.

Now, how do you decide what to believe and what not to believe?  Well, you are going to listen to the witnesses, observe them, and then decide just as you would decide such questions in your everyday life.  Did they know what they were talking about?  Were they honest, open, and truthful?  Did they have a reason to falsify or exaggerate their testimony?  Is there any reason to think they might be mistaken about what they are telling you and how did their testimony square with the other evidence in the case?  Sometimes it is not what a witness says but how he or she says it that may give you some clue as to whether or not to accept that witness' version of an incident or an event as credible or believable.

So, what the witness says, the way the witness says it and the rest of the evidence in the case will play important roles in your reaching a judgment as to whether or not you can accept the witness' testimony as reliable.

As the trial proceeds, you may have impressions of a witness or a subject but you must not allow those impressions to become fixed or hardened because if you do, in a sense you foreclose consideration of testimony of other witnesses or other evidence that may be presented after the witness you heard.  This would be unfair to one side or the other.

Now some rules of conduct.

In order to ensure that you decide the case based only

H1A5gamF

on the evidence and that you not be influenced in any way by anything that might occur outside the courtroom, I must give you a specific set of instructions.

First, do not discuss the case with anybody while the case is going on.  That includes friends or members of your own family.  You may tell your friends and family that you are a juror in a case and that it is expected to last three weeks or so, but don't tell them anything else about the case until after you have been discharged.  You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, or through any blog or website or through any Internet chat room or by way of any other social networking websites.

My instructions that you not discuss the case also includes not discussing it even amongst yourselves while the trial is going on.  You will have the opportunity and indeed the duty to discuss the case among yourselves later on but that can happen only after all of the evidence is in and the case is given to you to discuss and to decide in the jury room.

Next, you are not to read anything in the newspapers, on the Internet, your cell phones, or anywhere else about this case.  You are also not to listen or to view any reporting about this case if it should be broadcast on TV, on the radio, or on the Internet.

Next, do not do any research or any investigation

H1A5gamF

1    about the case on your own.  Do not go visit any place that you

2    may hear described during the trial.  Do not research on the

3    Internet or in the library or any other reference source.

4    Don't Google anyone.

5          Next, you are not to allow anyone to speak to you

6    about this case.  If you are approached by anyone to speak

7    about it, politely tell them that the Judge has directed you

8    not to do so.  If any person approaches you or seeks to contact

9    you about the case, you are required to report the incident

10   promptly to me and you can do that by telling Ms. Rivera in the

11   first instance.

12         The lawyers and the parties and the witnesses are not

13   supposed to talk to the jury outside of the courtroom, even to

14   offer a friendly greeting.  So, if you happen to see any of

15   them outside the courtroom, they will and should ignore you.

16   Please take no offense to this.  They will only be acting

17   properly by doing so.  Indeed, they will be following my

18   express directions to do so.  Experience has shown even

19   innocent conversations with jurors can sometimes be

20   misinterpreted so Courts have a hard and fast rule that the

21   lawyers, parties, and witnesses, cannot speak to jurors,

22   period.

23         Finally, a few words about trial procedure.  The trial

24   has five parts.  First, each side will have an opportunity to

25   make an opening statement and they will do that shortly.  The

H1A5gamF

government has the burden of proof so it will go first.  The

defendant has no burden of proof and does not have to do

anything at this trial so the defendant does not have to give

an opening statement.  But, if he does, the defendant's lawyers

will go next.

　　　　After opening statements, you will hear the testimony

of the witnesses.  Again, the government's witnesses go first.

Each witness will first give direct testimony and then he or

she may be cross-examined by the other side.  Following the

government's case the defendant may but need not present

witnesses and other evidence.  If the defendant does present

witnesses, those witnesses will be examined and cross-examined

just as the government's witnesses were.

　　　　Third.  After all of the evidence has been received,

each side will have an opportunity to make closing arguments.

These arguments are also not themselves evidence but may be

helpful to you in summarizing your case before deliberations.

　　　　Fourth.  After closing arguments, I will give you

detailed instructions as to the law that applies and you must

follow those instructions.  These instructions to the jury are

sometimes referred to as the jury charge.

　　　　Fifth, and most importantly:  After the jury charge

you will go to the jury room to deliberate and discuss the

evidence in order to decide the facts and render a verdict.

　　　　Finally, a few housekeeping matters before we begin.

H1A5gamF

Ms. Rivera has already shown you the jury room.  That's where
you will report in the morning.  She will also give you her
phone number if she has not already.  Please give her your
phone numbers so she can contact you in the event of any
last-minute schedule change.

As I have indicated, our trial day will start promptly
at 9:30 so I would appreciate if all of you were in the jury
room no later than 9:20 each morning.  My commitment has been
and will be throughout the trial, I will make sure that myself,
myself and the lawyers are all here every day at 9:30 waiting
for you.  And, we will end at 4:00 each day.  We will have two
breaks, one in the morning, one in the afternoon, and we will
break for approximately one hour for lunch.  If anyone needs to
take a break in the morning or in the afternoon, please raise
your hand and we will certainly accommodate you.

If you wish, you may take notes.  I know that pads
have been provided to you for that purpose.  Now, it is
completely up to you whether or not you want to take notes.
You don't, strictly speaking, have to because, as I have
indicated, each and every word is being taken down by the court
reporters.  Some people find that it helps them concentrate or
remember when they take notes.  Other people find it
distracting.  So, it is entirely up to you.  But, if you do not
take notes, you should rely on your independent recollection
and not on the notes of some other juror.

1           And, with that, we will begin with the government's

2    opening statement.  And who will be speaking for the

3    government?

4           MR. DEFILIPPIS:  Thank you, your Honor.

5           THE COURT:  Mr. DeFilippis.

6           MR. DEFILIPPIS:  About two years ago Samy El Goarany,

7    a 24-year-old man, left his home in New York and traveled to

8    Syria where he joined, trained with, and fought for the

9    terrorist organization known as ISIS.  How did Samy El Goarany

10   get to ISIS?  How did Samy El Goarany join a brutal terrorist

11   organization that slaughters innocent people including

12   Americans?  He did it with the help of this man, Ahmed Mohammed

13   El Gammal, the defendant.  The defendant guided and supported

14   Samy El Goarany on his path to ISIS in Syria.  He acted as a

15   launching pad for El Goarany's mission.  And once he launched

16   that mission, he worked with others to make sure that

17   El Goarany got to Syria where he trained with ISIS and fought

18   for ISIS.  By doing those things, the defendant committed

19   federal crimes because, ladies and gentlemen, it is a federal

20   crime to provide material support to a terrorist organization

21   like ISIS and it is a federal crime to help someone else get

22   military training from a terrorist organization like ISIS.

23   That is exactly what this defendant did and that is why we are

24   here today.

25           Now, ladies and gentlemen, ISIS -- or the Islamic

1    State, as it is sometimes called -- is a terrorist organization

2    that seeks to inflict violence and bloodshed against any who

3    oppose them.  They carry out beheadings, massacres,

4    kidnappings.  They have even burned people alive.  They have

5    instructed their followers to attack cities with bombs and

6    gunfire.

7           Now, ISIS also controls large amounts of territory in

8    Syria which is their base, their hub.  Syria is where the

9    leaders of ISIS rule with violence and have declared their own

10   Islamic State or, as they call it, they are Caliphate.

11          Now, Syria is also where ISIS trains its operatives

12   and fighters, and those operatives and fighters seek to carry

13   out attacks -- bloody attacks around the world.

14          Now, in order to do these things ISIS needs members,

15   they need terrorist fighters who are committed to their cause

16   and who are willing to fight and die for their cause.  So, they

17   have made unprecedented efforts to recruit men and women into

18   their ranks from around the world including right here in the

19   United States.

20          ISIS has called on those followers to travel to Syria

21   to fight what they call a jihad or a holy war.  But, ladies and

22   gentlemen, ISIS doesn't only need fighters, they also need

23   supporters around the world, supporters who may not join the

24   terrorist group themselves but who help to guide, encourage,

25   and assist those who do.

1              The evidence at this trial will show that the

2     defendant, an American citizen living in Arizona, became

3     committed to ISIS and supported them right here in the United

4     States.  How?  He wasn't a fighter or a terrorist operative

5     himself but he played an equally crucial role.  He guided Samy

6     El Goarany, an American college student, into the hands of

7     ISIS.  He helped ISIS find one more person, one more recruit,

8     one more fighter who was willing to train, kill, and die for

9     ISIS.

10             Now, let me tell you specifically what the evidence at

11    this trial will show.  You are going to hear that the defendant

12    and El Goarany first became friends on social media -- on

13    Facebook -- more than eight years ago.  At the time the

14    defendant was living in Arizona and El Goarany was living in

15    New York.  The defendant was in his 30s.  El- Goarany was just

16    a teenager.

17             Now, by 2014, several years later, El Goarany was 23,

18    he was attending college here in New York City.  And that same

19    summer ISIS took over large amounts of territory in Syria and

20    Iraq and the defendant made his support for ISIS and what they

21    were doing crystal clear in his online messages and postings.

22    He wrote that he was "with the State," referring to the Islamic

23    State or ISIS.  He wrote that he supported beheadings saying

24    that they had a "magical effect."  He said that if the Islamic

25    State ever expanded to Egypt he would "join them so I can

1    torture the Egyptians."

2           Now, he also said, ladies and gentlemen, that he

3    wanted to keep some of his views secret.  He said he didn't

4    like to show his, "jihadi personality."  But the defendant's

5    support for ISIS was not just talk.  His words, his jihadi

6    personality soon became actions -- criminal actions -- because

7    that same summer, the summer of 2014, the defendant started

8    speaking more often online with El Goarany and he and

9    El Goarany together started coming up with a plan for

10   El Goarany to travel to Syria to join ISIS.

11          What was the plan?  There were three parts to that

12   plan.  First, El Goarany would travel from New York City to

13   Turkey.  Why Turkey?  Because, as you will learn, Turkey shares

14   a land border with Syria.  You will hear that at the time

15   Turkey's land border with Syria was the prime place where ISIS

16   fighters from around the world came to enter ISIS controlled

17   territory in Syria, the place where ISIS exercises their brutal

18   rule and where they trained operatives and fighters.

19          So, getting El Goarany to Turkey was the first part of

20   the plan.  What was the second part of this plan?

21          The second part was that El Goarany would meet, in

22   Turkey, with a trusted co-conspirator of the defendant, a man

23   named Attia, and Attia would help facilitate El Goarany's

24   travel over the border from Turkey to ISIS controlled territory

25   in Syria.

1        Third, once El Goarany got to Syria, he would join

2   ISIS.  He received military training like all ISIS recruits do.

3   And, with that military training, he could fight for ISIS.

4        So, that was the plan, a plan that the defendant,

5   El Goarany, and Attia in Turkey, carried out.

6        Now, how did the defendant help carry out this plan?

7   You are going to hear that he did it step by step.  You will

8   hear that first, in October 2014, he traveled thousands of

9   miles from Arizona to New York to meet in person with

10  El Goarany.  You will hear that they spent two days together.

11  It was then that the defendant provided to El Goarany the phone

12  number for Attia, his co-conspirator in Turkey, who would help

13  facilitate El Goarany's travel across the border to ISIS

14  territory.

15       You are also going to hear that soon after the

16  defendant returned to Arizona, he took another step.  He

17  connected Attia and El Goarany online so that they could also

18  communicate over Facebook.

19       Now, over the following months, the defendant took

20  even more steps.  He continued to communicate with El Goarany

21  by phone and over social media about their plan.  And he also

22  kept communicating with Attia in Turkey about El Goarany's

23  travel.

24       Now, you are going to learn that in January 2015 an

25  important thing happened.  Just before the end of his winter

college break, El Goarany boarded a plane at JFK Airport and

traveled to Istanbul, Turkey, just like he had planned with the

defendant.  Once he got to Turkey he met up with Attia, the

defendant's contact, just like he had planned with the

defendant.  And the defendant, who was still here in the United

States, took even more steps to make sure that El Goarany found

his way to ISIS-controlled territory in Syria.  First, he

exchanged messages with El Goarany and Attia to make sure that

they had met.

Second, he even coached El Goarany on how to

communicate with Attia.  For example, he suggested they

communicate through Google translate because Attia didn't speak

English.

And third, he even advised El Goarany about traveling

to two specific cities in Turkey, Adana and Gaziantiep.  Why

those two cities?  Because both of those cities are near

Turkey's border with Syria and the defendant's plan was to help

El Goarany get to ISIS in Syria.

Now, soon after the defendant did those things,

El Goarany made his way to ISIS in Syria.  There he joined

ISIS' ranks.  He messaged his friends and his family at home

that he was living in Raqqah, which is the capital of ISIS'

Islamic state, their Caliphate.  He also messaged friends and

family about his religious training, his military training, and

later about deployments in which ISIS actually sent him to

1   fight with weapons for ISIS.  And very importantly, ladies and

2   gentlemen, after he got to ISIS territory in Syria, El Goarany

3   messaged the defendant.  He sent him a message in which he said

4   that everything had gone "according to plan."  Those were his

5   words:  According to plan.

6          Why did he say that?  Because it had.  Because the

7   plan, all along, was for the defendant to help El Goarany join

8   ISIS in Syria and that's exactly where he was, that's exactly

9   what he had done.

10          In fact, the plan had gone so well that the defendant

11   even asked El Goarany whether he, himself, could come to Syria

12   to join ISIS.

13          Now, you are going to hear that as this entire plan

14   unfolded, ladies and gentlemen, the defendant, El Goarany, and

15   Attia, took step after step to hide their crimes and cover

16   their tracks.  From the beginning they used encrypted messages

17   for many of their conversations.  Why?  So they could keep

18   their plans a secret.  They also used code words.  They didn't

19   say ISIS, they referred to ISIS as "the company" and to

20   El Goarany's intended time or membership with them as an

21   internship; his training as an interview.  And maybe most

22   tellingly, ladies and gentlemen, the defendant and El Goarany,

23   on multiple occasions, deleted dozens of their own messages to

24   hide any trace of what they had done.  All powerful proof that

25   they had something to hide.

1                 Now, you are also going to see other proof that they

2      had something to hide and that will come in the form of a video

3      recording.  You are going to learn that after the defendant was

4      arrested in this case, after it was already clear that the

5      government was on to the defendant, Attia, and El Goarany,

6      Attia in Turkey sent messages to El Goarany in Syria asking him

7      to create a videotaped denial -- a videotaped denial that they

8      hoped would get defendant out of trouble.  You will see that

9      videotape.  You will see that in it El Goarany, dressed in full

10     military attire, announces that he is a fighter for the Islamic

11     State and then, in an obvious lie, says that no one, including

12     the defendant, Ahmed Mohammed El Gammal, in America, helped him

13     get to ISIS in Syria.  It is a transparent, almost ridiculous

14     denial that is powerful proof of exactly what did happen here

15     which is that Ahmed Mohammed El Gammal, in America, helped Samy

16     El Goarany get to ISIS in Syria.

17                 Now, ladies and gentlemen, you are also going to learn

18     that Samy El Goarany never came back to America.  For almost a

19     full year his parents, his brothers desperately hoped that he

20     would come back home.  They searched for him, they communicated

21     with him trying to convince him to come back but he was too far

22     down the path that the defendant had helped pave for him.  In

23     November of 2015, a representative of ISIS sent an electronic

24     message to El Goarany's family.  Attached to it was a picture

25     of a four-page, handwritten letter in Samy El Goarany's

1    handwriting.  It began:  If you are reading this, then know

2    that I have been killed in battle and I am now with our Lord

3    Allah.

4              So, ladies and gentlemen, El Goarany trained as a

5    terrorist killer with ISIS and died fighting for ISIS in Syria

6    but his journey to ISIS began right here in New York City.  And

7    it succeeded with the help of the defendant.  That is what the

8    evidence at this trial will show.

9              Let me take just a minute to explain how the

10   government intends to prove its case.  The government intends

11   to offer several different types of evidence.  First, you are

12   going to see social media messages and posts from platforms

13   like Facebook.  You will read the defendant's own words and the

14   words of Attia and El Goarany, words they never thought would

15   be used as evidence in a public U.S. courtroom, words that they

16   describe what they did and words that they tried to delete.

17             Second, you will see documents like bank records,

18   travel records, cellular phone records and location data.

19   Those documents will establish key facts about the timing and

20   location of the defendant's communications and meetings as

21   events unfolded.

22             Now, third, you are going to see evidence that was

23   recovered from the defendant's electronic devices.  For

24   example, you will see videos showing ISIS propaganda, videos of

25   brutal violence carried out by ISIS, videos that will give you

1   a window into the mindset of the defendant as he committed his

2   crimes.

3            Now, you are also going to hear from a number of

4   witnesses, ladies and gentlemen.  For example, you will hear

5   from several law enforcement witnesses what will describe the

6   investigation that was conducted in this case.  You are also

7   going to hear from an expert on ISIS and similar terrorist

8   groups and he will tell you, among other things, how ISIS seeks

9   to recruit people just like Samy El Goarany.

10           You will also hear from members of El Goarany's family

11  and they will describe to you his words, his behavior, his

12  actions in the days before he left for Syria to join ISIS.  And

13  they will also describe for you their unsuccessful efforts to

14  get him home.

15           Now, finally, just a word about the charges in this

16  case.  The defendant is charged with four counts.  In Counts

17  One and Two he is charged with conspiring to provide and

18  providing material support to a terrorist organization.  And in

19  Counts Three and Four he is charged with conspiring and

20  assisting someone else -- Samy El Goarany -- in receiving

21  military training from a terrorist organization -- ISIS.

22           Now, ladies and gentlemen, the defendant himself did

23  not join ISIS.  He personally did not receive military training

24  from ISIS.  But, as I expect you will hear from Judge Ramos, it

25  is illegal -- it is illegal -- to assist another person or to

1    agree to assist another person in doing those things.  And so,

2    over the course of this trial the evidence will show you that

3    the defendant committed these crimes.  You will learn that in

4    every step he took, big and small, to help Samy El Goarany get

5    to ISIS and receive military training, he violated the laws of

6    the United States.

7          Now, the government will also have a chance to speak

8    to you again when all the evidence is in but between now and

9    then I want to ask you to do three things:

10         First:  Pay careful attention to all of the evidence.

11         Second:  Listen carefully to Judge Ramos' instructions

12   on the law.

13         Third:  Use your common sense, the same common sense

14   you use every day in your lives.  If you do those three things

15   you will reach the one conclusion that is consistent with the

16   law and consistent with the evidence, which is that the

17   defendant, Ahmed Mohammed El Gammal, is guilty as charged.

18         THE COURT:  Thank you, Mr. DeFilippis.

19         Did Mr. El-Gammal wish to make an opening statement?

20         MS. MIRÓN:  Yes, your Honor.

21         THE COURT:  Ms. Mirón.

22         MS. MIRÓN:  It is January 27th, 2015, and Samy

23   El Goarany is sitting at the airport at JFK.  There is a snow

24   storm in the city.  He is holding a round trip ticket in his

25   hand, a trip that he used his father's money and his student

1    loans to pay for.  He is sitting there thinking about the

2    mission that he, and he alone, has dedicated himself to:  A

3    mission to join ISIS.  It is a mission that he planned by

4    himself without the support and without the encouragement of

5    Jammie El Gammal.  Mr. El-Gammal is the scapegoat for what Samy

6    did.

7              You see, Samy kept most people in the dark about his

8    plans and he told different versions of his plan to different

9    people.  To some people he said he was going to work with

10   refugees, Syrian refugees.  To those very people he asked to

11   communicate on encryption apps.  To other people he said he was

12   going to work at a computer company abroad.  And still, others

13   in his family thought he was going to join some group in

14   Syria -- maybe not ISIS.  Samy told his college that he planned

15   to re-enroll so he could get his financial aid.  Samy used

16   people to get to ISIS.

17             Mr. El-Gammal is not guilty.  He is not guilty because

18   he did not help Samy El Goarany.  He did not know what Samy

19   El Goarany was up to.  He is not an ISIS recruiter.  He did not

20   help Samy El Goarany join ISIS.  He is the scapegoat.

21             Now, throughout this case the government will

22   reference Egypt, Syria, and ISIS, and they will invoke ISIS'

23   name over and over again but this case is not about ISIS as a

24   group or expressions of support for ISIS.  It is about three

25   people, what each of those individuals did and what they did

1    not do.

2            So, the first person, Jammie El Gammal, is sitting

3    here.  He is the only person here on trial and he is accused of

4    something he did not do.

5            The second person, Attia Aboualala, is an Egyptian

6    journalist living in Istanbul.  He is a member of the Muslim

7    Brotherhood, he is not ISIS.

8            The third person, Samy El Goarany, is ISIS; he is the

9    man who joined ISIS.

10           So, let me start with Mr. El-Gammal.  You should see a

11   photo of Mr. El-Gammal on the screen from November of 2014.

12   Mr. El-Gammal is a 44-year-old naturalized United States

13   citizen who is originally from Egypt.  He lives in Phoenix,

14   Arizona, and he is an American.  He smokes Marlboro cigarettes,

15   he drinks Red Bull, he goes to the shooting range.  He takes

16   weekend trips to California, Las Vegas, New York City, and

17   Niagara Falls.  He listens to R & B music and he has a poster

18   of Marilyn Monroe on his wall.  He is a fan of Jimmy Carter.

19   He owns a business called Cars Are Us.  Mr. El-Gammal spends a

20   lot of time on Facebook and his social circle is online.  He

21   spends hours discussing Egyptian politics and the developments

22   in the Middle East as they occur.  He talks to friends who are

23   in that area.  They talk about ISIS and they talk about Syria

24   because that is nearby.

25           Mr. El-Gammal talks about serious topics and takes a

provocative tone.  He prods people by saying things that will

get a reaction.  He does not have much of a filter and he has a

sharp sense of humor.  Most of his friends understand his sense

of humor.  Attia Aboualala is one of his friends.

As I said, Attia Aboualala is an Egyptian journalist

living in Istanbul.  Mr. El-Gammal and Attia met when they were

in Rabaa Square in Egypt.  You see, Attia is a life-long Muslim

Brotherhood member.  Muslim Brotherhood is an organization that

believes in change through democratic means.  And in Egypt,

when the Arab spring gave Egyptians hope and they, for the

first time, elected democratically a president, that president

was President Morsi and there was hope for Egyptians.  But soon

after Morsi was elected he was overthrown by a military coup

and Egyptians were outraged and they protested.  That's what

happened in Rabaa Square.  During those protests Attia was shot

in the leg.  After that, he fled to Istanbul because he was

being persecuted.  He is in Istanbul now.

You will hear that once Attia arrived in Istanbul, he

was hired as a journalist at a Muslim Brotherhood station.  He

has thousands of online friends, some of whom come to visit him

in Turkey.  Some of whom he picks up from the airport.

You will hear evidence that when Samy El Goarany

reached out to Attia Aboualala to get a ride from the airport,

Attia Aboualala did not show.  Samy was not important to Attia.

His arrival was neither important nor significant.  Samy made

H1A5gamF                         Opening – Ms. Mirón

1   no impression on him whatsoever.  Samy was just some guy from

2   America coming to Istanbul and he agreed to met with him for a

3   couple of hours but he had no idea what Samy was up to.  You

4   see, Attia is not ISIS.  He posts critical things about ISIS

5   online on his Facebook account, the same account that

6   Mr. El-Gammal reviews.

7            So, finally, the third man, Samy El Goarany.  This is

8   a picture of Samy El Goarany about 11 days before he took his

9   own mission to join ISIS.  It was a mission that surprised

10  people who were close to him because he hid what he was going

11  to do.  He was smart, he thought four steps ahead, and he

12  planned his own way there, he got his own connections.

13           In the fall of 2014, Samy El Goarany was in his sixth

14  year at Baruch College.  He had changed his major three times.

15  He increasingly spent hours and hours online in his room, he

16  was on different web pages.  He spent 90 percent of his time on

17  Twitter and on Twitter he met ISIS recruiters.

18           Even days before he took his trip he was back and

19  forth with people about his plans and perhaps back and forth

20  with himself.  He made to-do lists about what he was planning

21  to do, to-do lists about getting a job, getting financial aid

22  for college.  He cancelled his plane tickets twice and he

23  cancelled his hotel reservations twice.

24           See, the only people who knew Samy El Goarany was

25  going to join ISIS were his brother and his cousin.  Samy

H1A5gamF

1    El Goarany's brother is name Tarek.  Tarek knew what Samy

2    El Goarany was up to.  Tarek helped Samy El Goarany accomplish

3    his mission.  Tarek went with Samy El Goarany to purchase his

4    airplane tickets in cash.  Tarek went with Samy El Goarany to

5    throw away his hard drive which has evidence of his plans.

6    Tarek lied to his parents about Samy El Goarany's travel and he

7    lied to the FBI, too.  He lied to the FBI for months.  Samy's

8    brother Tarek is getting immunity from prosecution at this

9    trial.  Please keep that in mind when he testifies.

10          Tarek is not the only member of the El Goarany family

11   getting immunity.  Samy's father is as well.  You will hear

12   evidence that Samy's father was not exactly opposed to ISIS.

13   Samy's father is getting immunity for lying to the FBI.  He was

14   in contact with the FBI for months after Samy left, succinct

15   contact but he did not tell them that he, too, was going to

16   travel to Turkey.  He traveled to Turkey behind the backs of

17   the FBI to do his own investigation.  And, he lied to the FBI

18   so he is getting immunity from the prosecution.

19          Here in this trial on this evidence you will see that

20   Jammie El Gammal has been made the scapegoat of what Samy did.

21   The government is looking for someone to blame and they've

22   chosen him, but Mr. El-Gammal did not buy Samy's ticket, he is

23   not an ISIS recruiter, he did not know what Samy was up to, he

24   is not guilty.

25          THE COURT:  Thank you, Ms. Mirón.

H1A5gamF

1          Ladies and gentlemen, because there is not enough time

2     to complete the first witness we are going to end early today

3     so, I will be excusing you in just a few minutes.  I just

4     wanted to mention that we will have breakfast for you tomorrow

5     in the jury room as a further incentive to being here on time.

6     However, before you get too excited, the breakfast will be

7     provided by our in-house cafeteria.  But, please do try to be

8     in the jury room no later than 9:20 so we can get started at

9     9:30.  Until then, please do not discuss the case.  Please

10    avoid any media coverage of the case.  Please do no research on

11    your own concerning the case.  I will see you tomorrow, have a

12    very good evening.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H1A5gamF

```
 1              (Jury not present)
 2              THE COURT:  Okay.  Anything for me?
 3              MR. QUIGLEY:  Not from the government, your Honor.
 4              MS. SHROFF:  No, your Honor.  Thank you.
 5              THE COURT:  I take it the defense is aware of who the
 6     government's first witness or two or three are going to be?
 7              MR. QUIGLEY:  Yes, your Honor.
 8              MS. SHROFF:  It is best that they -- could they just
 9     confirm for us?  That would be very helpful.  Thank you.
10              THE COURT:  Okay.  If you can confirm it.  It doesn't
11     have to be on the record.
12              MR. QUIGLEY:  I will confirm it as soon as we are
13     done, your Honor.
14              THE COURT:  Okay.  Unless there is anything else, I
15     will see you tomorrow.  Be available by 9:00 in the event there
16     is any work that we need to do.
17              MS. MIRÓN:  Your Honor, I had anticipated a 9:30 start
18     time based on our submission.  Would it be possible to meet at
19     9:15 here?
20              THE COURT:  9:15 is fine.
21              MS. MIRÓN:  Thank you.
22              THE COURT:  Unless there is something that the parties
23     wish to raise.  In which case, be here at 9:00.
24              (Adjourned to 9:15 a.m., January 11, 2017.)
25
```