H1B5gam1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        15 Cr. 588 (ER)

5    AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         January 11, 2017
9                                        9:15 a.m.

10
     Before:
11
                      HON. EDGARDO RAMOS,
12
                                         District Judge
13

14                     APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BRENDAN F. QUIGLEY
17   NEGAR TEKEEI
     ANDREW J. DeFILIPPIS
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
20   BY:  SABRINA SHROFF
          ANNALISA MIRÓN
21        DANIEL G. HABIB

22

23

24

25

H1B5gam1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, folks.

3              MS. SHROFF:  Good morning, your Honor.

4              MR. QUIGLEY:  Good morning, your Honor.

5              THE COURT:  We are ready for business, if you are.  I

6    understand the government wanted to raise an issue?

7              MR. DEFILIPPIS:  Yes, your Honor.

8              As we said in our letter last night, defense counsel

9    let us know which specific items they would like to offer that

10   were seized from the house.  This matter was discussed briefly

11   yesterday and those are laid out in our letter.  They consist

12   of a thumb drive, a cellular phone that the government is not

13   offering into evidence, a Sony Cybershot camera, a GoPro

14   camera, an Avondale Smoke Shop card, and an Arizona voter

15   identification card.

16             The government believes that these items are plainly

17   irrelevant and would only distract the jury.  By essentially

18   dumping these items into evidence, the defense would introduce

19   a huge amount of data, particularly on the iPhone 5S for which

20   they have proffered no relevance theory other than that they

21   are trying to prove that their client was somehow an average

22   American or was not anti-American.

23             THE COURT:  Can I stop you for a second there?

24             MR. DEFILIPPIS:  Sure, your Honor.

25             THE COURT:  Because I want to ask the defense whether

H1B5gam1

```
1    what they want to do is simply to admit these items as opposed

2    to the information that's in them, or do you wish to also make

3    available the information that's in them?

4           MR. HABIB:  So, at this point we thought it prudent to

5    raise the issue of introducing the devices because the agent

6    who seized them will be testifying, so that seemed like a

7    proper witness to authenticate them.  We don't intend to

8    introduce the entire contents of all the devices, no.  We can

9    specify for the Court today some materials that we propose to

10   introduce but, obviously, our full evidentiary presentation

11   depends, in some respects, on the government's.

12          THE COURT:  Okay.  So then I suppose I will need to

13   defer decision on this issue.  I had thought that it was just

14   the items themselves, the totems, as it were.

15          MR. HABIB:  To clarify.  At the conclusion of

16   yesterday's proceedings, the Court ruled admissible what we

17   proffered would be six or seven photos taken by agents during

18   the execution of the search.

19          THE COURT:  Correct.

20          MR. HABIB:  Those aren't at issue.

21          What we communicated to the government last night was

22   our intention to have the physical exhibits authenticated but

23   obviously not to introduce, as substantive evidence, all of the

24   contents of all of those devices but, as I said, we can specify

25   some exhibits now and some will depend on the government's
```

H1B5gam1

1    presentation.

2                THE COURT:  Isn't the government going to put some of

3    these items into evidence?

4                MR. DEFILIPPIS:  No, your Honor.  The government will

5    offer the cellular phones and devices on which the government

6    found relevant information but the camera, the smoke shop card,

7    the voter identification card, we believe that they're

8    irrelevant.  The government, again, to the extent they're being

9    proffered under a theory that the defendant was an average

10   American or was not anti-American, the government is not

11   alleging that the defendant was not an average American or that

12   he was specifically anti-American.  This is a material support

13   case in which we are alleging very specific things he did to

14   help someone who fought for a terrorist organization, and

15   whether he smokes at the Arizona smoke shop is an utter

16   sideshow.

17               THE COURT:  Is there any information, either in the

18   smoke shop card or the voter I.D. card other than the fact of

19   what they are?  I mean, are there markings?  Are there

20   punch-outs of how many times he has visited the smoke shop or

21   the -- or how many times he has voted?

22               MR. DEFILIPPIS:  Your Honor, I don't think so.  I

23   would have to look back at them.

24               MR. HABIB:  The smoke shop card is like a Starbucks

25   card, it has a number of Xs indicated.

H1B5gam1

1          THE COURT:  So, every 10 packs he gets a free pack.

2          MR. HABIB:  The voter registration card --

3          MR. DEFILIPPIS:  Which I think underscores the sort of

4    sideshow nature that we are asking the jury to consider how

5    many times he has been to a smoke shop in a material support of

6    terrorism case.  It is just so far afield of anything relevant

7    to their consideration of the charges here.

8          THE COURT:  Let's see what, if anything, the defense

9    is going to want to put in, actual data from these devices.

10         (Pause)

11         THE COURT:  Mr. Habib?

12         MR. HABIB:  Thank you, your Honor.

13         So, to clarify, is the Court's ruling that the

14   devices, as such, can be introduced through the agent with any

15   objection to the relevance of particular communications to be

16   ruled on as the defense proffers the evidence?

17         THE COURT:  I think the -- yes, certainly the

18   equipment, the electronic equipment, the thumb drive, the

19   iPhone 5S, the Sony Cybershot, the GoPro camera to the extent

20   those items were seized by the government, they can be

21   introduced but I defer decision on any actual data that's

22   contained in any of those items.

23         MR. HABIB:  Thank you.

24         And the cards?

25         THE COURT:  I want to see the cards.

H1B5gam1

1          MR. HABIB:  Okay.  We have a photo.

2          MR. DEFILIPPIS:  Your Honor, apologies.

3          Just because Agent Collie, who we expect to testify

4     today, we don't want this to be sort of resolved midstream.  I

5     think defense has known that Agent Collie was going to be one

6     of our first witnesses and if they're not prepared now to

7     proffer the specific items and data that they want to introduce

8     then it is a bit too late.

9          THE COURT:  I don't know that the Agent Collie would

10    be -- am I pronouncing your name right, sir?

11         AGENT COLLIE:  Yes, sir.

12         THE COURT:  I don't know that Agent Collie would be

13    competent in the legal sense of testifying about any data

14    that's contained in the devices.

15         MR. DEFILIPPIS:  Right.

16         THE COURT:  So, I don't know that they could

17    cross-examine with respect to those items.

18         MR. DEFILIPPIS:  I think, your Honor, the relevance of

19    these devices would be depend on the data that is in them and

20    so I don't know we can conclude they're relevant until defense

21    has provided a theory.

22         THE COURT:  Well, they can come in, subject to

23    connection.

24         And now let's fix the technical issue.

25         (Pause)

H1B5gam1

1          THE COURT:  Mr. DeFilippis, wants to talk.

2          MR. DEFILIPPIS:  Sorry, your Honor.  I'm talkative

3     this morning.

4          THE COURT:  Yes, sir.

5          MR. DEFILIPPIS:  In terms of preparing for and

6     streamlining Agent Collie's testimony, the defense does have

7     photographs of the smoke shop card and voter I.D. card that I

8     think they would like to offer.  In the interest of resolving

9     this matter before Agent Collie takes the stand so the jury

10    isn't shown things that the Court later determines are

11    irrelevant or not --

12         THE COURT:  Okay.

13         MR. DEFILIPPIS:  -- we just ask your Honor if you

14    would review them and we can try to resolve now whether these

15    are relevant and will be shown to Agent Collie.

16         THE COURT:  Let me see the pictures.

17         MR. HABIB:  So, your Honor, the government has

18    represented that it does not have the physical cards.  So, we

19    would be requesting that the government produce the physical

20    items seized during the search of Mr. El-Gammal's home,

21    specifically the wallet and its contents.  We are informed

22    today that the government doesn't have them.  We have a photo,

23    and again these are photos that the government took during the

24    search.  We have a photo of the smoke shop card that I can hand

25    up and we have a larger -- we have a photo that includes the

H1B5gam1

1    voter I.D. card as well as a number of other cards that we

2    aren't seeking to introduce.  So, we can put that up on the

3    screen.

4              THE COURT:  Okay.  Sure.

5              MR. HABIB:  And, in addition, we request that the

6    Court seek clarification from the government as to whether

7    these items are no longer in the government's possession at

8    all, whether they were seized and not preserved or what their

9    status is.

10              THE COURT:  Okay.  Let me ask you about, since I can

11    read the smoke shop card, what is the argument here?

12              MR. HABIB:  Sure.

13              The smoke shop card is relevant because we expect

14    testimony would show that, among the other things, among the

15    many things that ISIS interprets Sharia law to preclude

16    smoking, just as more mainline acts of Islam prohibit drinking.

17    ISIS, in particular, precludes it.  So, just as evidence, if

18    such existed, that Mr. El-Gammal had alcohol in his home would

19    tend to negate the government's argument that he possessed the

20    necessary mental state to aid and abet the provision of

21    materials that purport to ISIS, so too the possession of an

22    item and frequent consumption of an item that ISIS regards as

23    sinful.

24              THE COURT:  What about the voting card?  Is that

25    against Shariah law?

H1B5gam1

1          MR. HABIB:  Similarly, we expect extensive testimony

2     will show that a critical, ideological and doctrinal difference

3     between the Muslim Brotherhood on the one hand and ISIS on the

4     other is that the Muslim Brotherhood, throughout its history in

5     Egyptian and pan-Arab politics, has sought to achieve its

6     objectives in the participation with the democratic process.

7     Indeed, Mohammed Morsi, the president of Egypt who succeeded

8     Hosni Mubarak and was a member of the Muslim Brotherhood.  We

9     expect there will be evidence that Mr. El-Gammal attended

10     protests in Rabaa square objecting to the ouster of Morsi.  In

11     contrast, ISIS has described participation in western democracy

12     sin and described Muslim Brotherhood as deviant with respect to

13     Islamic principles for that reason, and so it is the same

14     relevance theory that tends to negate the mental state.  And,

15     again, the threshold for relevance doesn't make a fact of

16     consequence more probable than not.

17          THE COURT:  Right.  Okay.

18          MR. HABIB:  At one point, Ms. Shroff reminds me, that

19     Samy communicates to his mother -- and this is after Samy

20     joined ISIS -- that she should not vote.

21          THE COURT:  That what?

22          MR. HABIB:  That she should not vote.  The one thing

23     she should not do is vote.

24          And so, evidence that Mr. El-Gammal did two things

25     that ISIS interprets as sinful and prohibits, in our view,

H1B5gam1

1    certainly clears the modest Rule 401, 402 issue.

2               THE COURT:  I will allow --

3               MR. DEFILIPPIS:  Your Honor, may I be heard?

4               THE COURT:  Go ahead.

5               MR. DEFILIPPIS:  The Government was very clear in its

6    opening statement that we are not alleging that the defendant

7    was a member of ISIS, we are not alleging that he joined ISIS,

8    we are not alleging that embraced every or even a majority of

9    the tenets of ISIS' ideology.  All the government has alleged

10   is that he provided material support to ISIS by helping Samy

11   El- Goarany travel to Syria.

12               It is well settled in the rules of evidence that in

13   order to proffer evidence like this you have to also proffer

14   how you will prove a particular fact that it is relevant hinges

15   on and, for example, defense counsel's expert notice did not

16   state and they still haven't stated that their expert will

17   testify that someone providing material support to ISIS

18   necessarily does not smoke or does not vote.

19               There is, you know, if the defendant had been alleged

20   to be a full-fledged member who conspired to kill Americans or

21   who embraced every tenet of the ideology this might tend to

22   make his guilt less more likely, but even under the defense's

23   own proffered facts and theory of relevance, it is simply not

24   relevant.

25               I think what is really at work here is a more thematic

H1B5gam1

1    presentation that the defense is trying to make that

2    Mr. El-Gammal was just an average guy who a juror can relate

3    to, he did the kind of things that Americans do and that is

4    impermissible, it is a side show, it is intended to appeal to

5    the emotion and irrelevant everyday experiences of the jury and

6    not to the elements -- what is relevant to the elements of the

7    crime here.

8             And just briefly, your Honor, in two cases we have

9    cited in several of our briefs, Courts have excluded evidence

10   on theories -- on an even much more narrow basis than what is

11   being posited here.  *United States v. Williams*, 205 F.3d 23, a

12   case involving drug trafficking where the defendant was alleged

13   to have made drug trips to Jamaica, and there Court held that

14   evidence of travel to Jamaica for innocent purpose, purposes

15   separate from the drug trips, was not permissible because it

16   simply is not relevant to prove the occurrence of innocent

17   behavior in other circumstances.  And then second, United

18   States v. Walker, that is 191 F.3d 326, in that case it was an

19   immigration fraud case and the defense sought to introduce

20   instances of non-fraudulent asylum applications that the

21   defendant had prepared in addition to the allegedly fraudulent

22   applications and there the Court said it's irrelevant whether

23   on other occasions he did benign things or prepared truthful

24   applications.  What is relevant is what the government has

25   alleged.

H1B5gam1

1          And so, I think those principles apply very squarely

2     here, whether the defendant smoked, didn't smoke, voted, didn't

3     vote, and how bad, accorded with his possible religious

4     beliefs, is not relevant.

5          MR. HABIB:  Briefly, your Honor.

6          If we wanted to create a sideshow we would be

7     proffering all of those cards, instead we are proffering two.

8     The defense is entitled, constitutionally, to present a

9     complete defense and the government has alleged that

10    Mr. El-Gammal possessed the knowing and intentional mental

11    state to provide material support to ISIS, to aid and abet the

12    provision of material support to ISIS, to conspire to do so and

13    the government, to prove that, will put in voluminous evidence

14    of Mr. El-Gammal's political beliefs, his religious beliefs and

15    state of mind at various points throughout the conspiracy.

16    Indeed, Mr. El-Gammal's state of mind is likely the dispositive

17    issue in this case.  The government's innocent conduct cases

18    are not material because we are not putting in evidence of

19    innocent conduct here, we are putting in -- I think the Court

20    has our argument.

21         THE COURT:  Yes.  I think that the defense proffer on

22    these items meet the minimal threshold for relevance under Rule

23    104 so the cards will be admitted.  The electronic devices will

24    be admitted subject to connection.

25         MR. HABIB:  Thank you.

H1B5gam1

1           THE COURT:  We have a jury.

2           So, are we ready?

3           MR. DEFILIPPIS:  I think so, your Honor.

4           THE COURT:  Do we have the witness ready?

5           MS. TEKEEI:  Yes, your Honor.  She's outside the

6    courtroom.

7           THE COURT:  Okay.  Let's go.

8           MS. TEKEEI:  Your Honor, would you like the witness to

9    take the stand already?

10           THE COURT:  No, you can call her.

11           MS. TEKEEI:  Thank you.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1

1          (Jury present)

2          THE COURT:  Everyone, please, be seated.

3          Good morning, ladies and gentlemen.  I want to thank

4    you, as always, for your promptness.  We are starting a couple

5    of minutes late this morning.  I want to assure you we were all

6    here.  We were doing legal work to make sure our presentation

7    to you will be as efficient as possible.  With that, I

8    indicated the government would go first and call its witnesses

9    who will be subject to direct and cross-examination.

10          Will the government please call its first witness?

11          MS. TEKEEI:  Thank you, your Honor.  The government

12    calls Shannon Chance.

13          THE COURT:  Ms. Chance, please, step up.  Watch your

14    step and when you step into the witness box, please, remain

15    standing.

16    SHANNON CHANCE,

17         called as a witness by the Government,

18         having been duly sworn, testified as follows:

19          THE COURT:  Just a word or two.  Ms. Tekeei and

20    Ms. Chance, please speak directly into the microphone.

21    Ms. Tekeei, I won't chain you to the podium but do be cognizant

22    that when you walk away from the microphone, this is a large

23    room and we may lose your voice.  So, please, keep your voice

24    up.

25          And with that, you may proceed.

H1B5gam1                          Chance – direct

1              MS. TEKEEI:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MS. TEKEEI:

4    Q.  Ms. Chance, where do you work?

5    A.  Facebook.

6    Q.  How long have you worked at Facebook?

7    A.  Four years.

8    Q.  Where is Facebook located?

9    A.  Menlo Park, California.

10   Q.  What is Facebook?

11   A.  Facebook is a social networking site.

12   Q.  What does Facebook allow people to do?

13   A.  Once they create profiles online they can connect and share

14   with friends.

15   Q.  What is your position at Facebook?

16   A.  I am a custodian of records.

17   Q.  What are your duties as a custodian of records at Facebook?

18   A.  I respond to legal process and testify, as needed.

19   Q.  In your work at Facebook, have you become familiar with the

20   different ways that Facebook functions?

21   A.  Yes.

22   Q.  Can anyone sign up for a Facebook account?

23   A.  Yes.

24   Q.  And what is a Facebook user?

25   A.  A Facebook user is someone who has created an account on

H1B5gam1                          Chance - direct

1   Facebook.

2   Q.  What information does someone have to provide to Facebook

3   if he or she wants to sign up for an account?

4   A.  Name, date of birth, gender, e-mail address or phone

5   number, and password.

6   Q.  Describe how Facebook validates the information that a user

7   provides.

8   A.  Once an account has been created, if the user has provided

9   an e-mail address, an e-mail will be sent to that e-mail

10  address asking them to confirm that that account is associated

11  with the Facebook account.

12  Q.  What are the types of information a user can convey using

13  his or her Facebook account?

14  A.  I'm -- I don't understand what are you asking.

15  Q.  Earlier you described a profile, a user can set up a

16  profile.  What type of information can a user convey on their

17  profile page, for example?

18  A.  We can share photos.  There is a section called About Me

19  where they can describe themselves; they can post status

20  updates as wall posts.

21  Q.  We will go through those in just a few minutes but are

22  Facebook profile pages open to the public?

23  A.  It depends on the privacy settings for the account.

24  Q.  What is a privacy setting?

25  A.  A privacy setting is one that determined the visibility of

1    the account or the post.

2    Q.  Who determines a privacy setting for an account?

3    A.  The user who owns the profile.

4    Q.  Can the user who owns the profile change his or her privacy

5    settings?

6    A.  Yes.

7    Q.  And what are the different ways a user can limit viewing of

8    the content that they post to their profile?

9    A.  For every piece of content that is posted they can set the

10   privacy settings at that time to either public, friends, or

11   only me, or a custom list.

12   Q.  All right.

13        What is a profile picture?

14   A.  A profile picture is the main picture on the account that

15   helps to identify the person that the account belongs to.

16   Q.  Can someone change his or her profile picture?

17   A.  Yes.

18   Q.  How does a user do that?

19   A.  They go into the account and select "edit profile picture"

20   and upload a new picture.

21   Q.  What is a Facebook friend?

22   A.  A Facebook friend is another account of another online

23   profile on Facebook that the account is connected to.

24   Q.  What is a Facebook friend request?

25   A.  A friend request is when a request is sent from one account

1   asking the other account to be friends and be connected on

2   Facebook.

3   Q.  What does being Facebook friends allow users to do?

4   A.  It allows more visibility into status updates and sharing

5   of photos and videos.

6   Q.  Can anyone send a friend request?

7   A.  Yes.

8   Q.  What can a user do if he or she no longer wants to be

9   friends with someone on Facebook?

10  A.  They can remove the friend from their profile.

11  Q.  What does removing a friend from their profile entail?

12  A.  Going to that friend's profile account and de-selecting the

13  friends option.

14  Q.  What is a friends list?

15  A.  The friends list, it, in the records, will indicate the

16  list of friends that are connected to the account holder.

17  Q.  Let's talk about each of the ways that someone can

18  communicate over Facebook.

19          First, how can Facebook users send private messages to

20  each other?

21  A.  They can send private messages using the Facebook messenger

22  application or just through the Facebook messaging system.

23  Q.  What is the Facebook messenger application?

24  A.  It is a separate application that allows users to send a

25  private message to one or more other people connected on

H1B5gam1                         Chance - direct

1   Facebook.

2   Q.   And when a user exchanges messages with one or more other

3   users using Facebook messenger who, if anyone, can see those

4   messages?

5   A.   The sender and the recipient of those messages.

6   Q.   What is another way that a Facebook user can communicate

7   with another Facebook user?

8   A.   They can post on the other person's wall or timeline or

9   profile.

10  Q.   All right.

11  A.   Those words are kind of interchangeable, so.

12  Q.   So that takes me to my next question which is when you use

13  the phrase "timeline," to what are you referring?

14  A.   Of the Facebook profile.

15  Q.   When you use the phrase "wall," what are you referring to?

16  A.   The Facebook profile.

17  Q.   What is a wall post?

18  A.   A wall post is when the account holder goes to another

19  person's account and posts a message on their wall.

20  Q.   Who, if anyone, can see a wall post?

21  A.   That will depend on the privacy settings of the account to

22  which it is posted.

23  Q.   You testified earlier that users can comment on wall posts.

24  How does one do that?

25  A.   There is a comment link under the wall post so if it is

H1B5gam1                          Chance – direct

1   visible, they can just click on comment and comment on it.

2   Q.  What is shared content?

3   A.  Shared content is any content that is shared by that

4   account that can include, for example, a news article or video.

5   Q.  What are the different ways that someone, who is a Facebook

6   user, can share a news article?

7   A.  There are a few different ways.  One would be to share the

8   article within Facebook message, that's private.  Another way

9   would be to include the link in a status update.  And then,

10  finally, to post on someone else's wall the link to the

11  content.

12  Q.  So, if a Facebook user shares a news article, can they add

13  a message with it?

14  A.  Yes.

15  Q.  You mentioned videos just a minute ago.  What are the

16  different ways that someone who is a Facebook user can share a

17  video?

18  A.  The three ways I just described.

19  Q.  If a Facebook user does share a video, can they add a

20  message with it?

21  A.  Yes.

22  Q.  How do they do that?

23  A.  When they go to shape the video, they can just enter some

24  text and some content and share it.

25  Q.  Where does that text or content appear?

1    A.   It will depend on where they shared it, so.

2    Q.   Can you explain that?

3    A.   So, for example, if they are sharing their content in a

4    status update, it will appear on their own timeline or profile.

5    If they share it on a wall post it will appear on that other

6    person's timeline or profile.  And then, in the message, if it

7    is shared that way, it will be visible just to the parties

8    within that messenger conversation.

9    Q.   What is a mobile upload?

10   A.   A mobile upload is when content has been uploaded via the

11   mobile app on their phone.

12   Q.   What type of content can someone upload using the mobile

13   app on their phone?

14   A.   Photos and videos.

15   Q.   And can they add messages with those photos or videos?

16   A.   Yes.

17   Q.   Ms. Chance, what is the process when someone on your

18   Facebook team receives a request for legal process?

19   A.   We review the legal process and respond accordingly.

20   Q.   What are some of the types of requests for legal process

21   that Facebook receives?

22   A.   Subpoenas, court orders, and search warrants.

23   Q.   In your work at Facebook, have you become familiar with the

24   records that Facebook maintains?

25   A.   Yes.

1    Q.  What is a preservation request?

2    A.  A preservation request is a request to preserve the account

3    for 90 days.

4    Q.  And what -- how does Facebook process a preservation

5    request?

6    A.  If the preservation request is submitted via the online

7    request system it is automatically processed.

8    Q.  And what does Facebook preserve in response to a

9    preservation request?

10   A.  A snapshot of the account is preserved as it exists on the

11   day of the preservation.

12   Q.  When you take a snapshot of the account, can you explain

13   what you mean by that?

14   A.  It means all of the data is preserved for that account.

15   Q.  What types of data does that include?

16   A.  Subscriber information, IP addresses, messages, photos, and

17   videos.

18   Q.  What does Facebook do when it receives a search warrant?

19   A.  We review the legal process and respond accordingly.

20   Q.  When Facebook receives a search warrant, does it provide

21   data that was preserved by a preservation request in response

22   to that search warrant?

23   A.  Yes.

24   Q.  When Facebook receives a search warrant, does Facebook

25   provide data added to the account after the preservation

H1B5gam1                        Chance - direct

1    request?

2    A.  Yes.

3    Q.  When law enforcement gets a search warrant for the accounts

4    of different Facebook users who are in contact with each other,

5    do their communications always match up exactly?

6    A.  I would like to go back to your previous question about if

7    data was added after the preservation request.

8            The data that is retrieved in response to a search

9    warrant, so that message would only be available if it was

10   within the parameters as set by the search warrant.  I just

11   wanted to clarify that.

12   Q.  Thank you for that.  That's helpful.

13   A.  In terms of messages matching up, can you clarify what you

14   mean by that?

15   Q.  Sure.

16           Does Facebook sometimes receive search warrants for

17   different -- for the accounts of different users who are in

18   communication with each other?

19   A.  Yes.

20   Q.  And do their communications always match up exactly?

21   A.  No.

22   Q.  So, let's talk about a situation where two Facebook users

23   are communicating with each other and search warrants are

24   obtained for each user's account.  Is it possible that a

25   message would still be available in one user's account but not

H1B5gam1                          Chance – direct

1   in the other user's account?

2   A.  Yes.

3   Q.  Why is that?

4   A.  It's possible that one of the parties deleted the message

5   so it is no longer in that party's account, whereas at other

6   one kept the message and it still appears in their account.

7   Q.  In preparation for your testimony in this case, have you

8   reviewed records that Facebook provided in connection with

9   legal process in this case?

10  A.  Yes.

11  Q.  I am going to show you several CDs that have been marked

12  for identification as Government Exhibit 100, Government

13  Exhibit 102, Government Exhibit 110, Government Exhibit 111,

14  112, 113, 120 and 122.

15          Do you recognize those disks?

16  A.  Yes.

17  Q.  How do you recognize them?

18  A.  I reviewed them prior to my testimony today as indicated by

19  my initials and the date that I reviewed the files.

20  Q.  And, generally speaking, what do they contain?

21  A.  Records of account activity.

22  Q.  Are the records contained on these disks true and accurate

23  copies of the contents of the Facebook accounts that's

24  responsive to the legal process that Facebook received?

25  A.  Yes.

H1B5gam1                          Chance – direct

1   Q.  Does Facebook maintain these records in the regular course

2   of business?

3   A.  Yes.

4   Q.  Is it the regular practice of Facebook to maintain these

5   records?

6   A.  Yes.

7   Q.  And are those records generated at or near the time of the

8   offense that are reflected therein?

9   A.  Yes.

10  Q.  I'm going to show you what's been marked for identification

11  as Government Exhibit 100-A.  Do you recognize that?

12  A.  Yes.

13  Q.  How do you recognize it?

14  A.  My initials and the dates are on the exhibit.

15  Q.  Is Government Exhibit 100-A an excerpt of the records that

16  are contained in the CD that's marked Government Exhibit 100?

17  A.  Yes.

18  Q.  Does Facebook maintain the records reflected in 100-A in

19  the regular course of its business?

20  A.  Yes.

21  Q.  Is it the regular practice of Facebook to maintain those

22  records?

23  A.  Yes.

24  Q.  And are those records generated at or near the time of the

25  events they reflect?

1   A.  Yes.

2           MS. TEKEEI:  Your Honor, we offer Government Exhibit

3   100-A.

4           THE COURT:  Any objection?

5           MS. MIRÓN:  No, your Honor.

6           THE COURT:  100-A will be received.

7           (Government's Exhibit 100-A received in evidence)

8           MS. TEKEEI:  Thank you, your Honor.  May we publish it

9   to the jury?

10          THE COURT:  You may.

11  BY MS. TEKEEI:

12  Q.  Ms. Chance, you may look at the hard copy in front of you

13  or at the screen, whichever is easier.  Looking at Government

14  Exhibit 100-A, what is it?

15  A.  These are basic subscriber records for the account listed

16  in Exhibit 100.

17  Q.  What is a subscriber?

18  A.  A Facebook user.

19  Q.  And, does the Facebook user information contained on

20  Government Exhibit 100-A pertain to all of the records that are

21  contained on the CD marked Government Exhibit 100?

22  A.  No.  This is just limited to the subscriber information and

23  the IP addresses for that account.

24  Q.  For the same account that's reflected on Government Exhibit

25  100; is that correct?

H1B5gam1                        Chance - direct

```
 1   A.  That's correct.

 2   Q.  Okay.

 3           What is the name of the user of this account?

 4   A.  The first name is Jammie, the last name is El Gammal.

 5   Q.  What is the registered address or addresses?

 6   A.  El.gammal.30@facebook.com.  El.gammal44@yahoo.com.

 7   Q.  At the top of 100-A there is a line that says "Target."

 8   What does that mean?

 9   A.  That is the account I.D. that is unique to this account.

10   Q.  Looking at the next line, what does "Generated" mean?

11   A.  That is the date that the records were retrieved by

12   Facebook.

13   Q.  And what is the generated date for these records?

14   A.  June 8, 2015.

15   Q.  So, just to be clear, the generated date shown in 100-A is

16   the date that Facebook retrieved the records pursuant to a

17   court order?

18   A.  Or a search warrant, yes.

19   Q.  And, what records were generated on June 8th pursuant to

20   the search warrant?

21   A.  Records of account activity for the account on Exhibit 100.

22   Q.  And the records in Government Exhibit 100 that come after

23   this page, are those records in the account as it existed on

24   June 8th, 2015?

25   A.  Yes; and it may also include a preservation as well.
```

1    Q.   Thank you.  We will get to that in a few minutes.

2                What does "date range" mean at the top of 100-A?

3    A.   Date range is the date that was applied to the records when

4    retrieving them as specified by the search warrant.

5    Q.   And what is the date range here?

6    A.   May 6, 2005, to May 12, 2015.

7    Q.   So, just to be totally clear, the records that come after

8    Government Exhibit 100-A, are those the records in the account

9    from the date range May 6, 2005 through May 12, 2015, as they

10   existed on June 8th, 2015?

11   A.   That's correct.

12   Q.   So, what would happen if there was data in the account on

13   May 12th, 2015 that was deleted before June 8th, 2015?

14   A.   That was deleted before the retrieval of the records?

15   Q.   Yes, ma'am.

16   A.   It would either be completely deleted, or if there was

17   preserved data it may be in the preservation.

18   Q.   Looking back at 100-A, what is a vanity name?

19   A.   A vanity name is another way to identify the account.

20   Q.   And at the bottom of the first page of 100-A there is a

21   category for IP addresses.  What does that section reflect?

22   A.   This reflects the IP address activity associated with the

23   account.

24   Q.   What types of activity generate IP records?

25   A.   Log-ins, log-outs, session updates, photo uploads, and

1    there are more.  So, those are just some examples.

2    Q.  I also placed in front of you what's been marked for

3    identification as Government Exhibit 100-N.

4              THE COURT:  Was that the letter M?

5              MS. TEKEEI:  N as in Nancy.

6    Q.  Do you recognize that exhibit?

7    A.  Yes.

8    Q.  And, generally speaking, what does it contain?

9    A.  Photos.  This is an excerpt of the photo section for the

10   account listed in Exhibit 100.

11   Q.  Does Facebook maintain these records in the regular course

12   of its business?

13   A.  Yes.

14   Q.  Is it the regular practice of Facebook to maintain these

15   records?

16   A.  Yes.

17   Q.  Are these records generated at or near the time of the

18   events that are reflected therein?

19   A.  Yes.

20             MS. TEKEEI:  The government offers Government Exhibit

21   100-N.

22             MR. HABIB:  May we approach briefly?

23             THE COURT:  You may.

24             And, ladies and gentlemen, I apologize for the

25   distraction.  I am having some technical issues so, please, do

H1B5gam1                         Chance – direct

1    pay attention to the witness.

2                    (Continued next page)

 1                (At side bar)

 2                MR. HABIB:  With respect to this exhibit and others

 3      going forward, I would just like know how the Court wants to

 4      proceed if we have relevance and/or prejudice objections to

 5      some of the contents.  Does the Court want to hear them one by

 6      one as this witness is just authenticating them or when the

 7      agent brings them in?  How does the Court want to do it?

 8                THE COURT:  Well, how many exhibits are we talking

 9      about?

10                MS. TEKEEI:  Your Honor, the same picture that defense

11      counsel used in their opening is what we are going to put up

12      here today.  These exhibits defense counsel has had for several

13      months now, so to the extent they had objections to them we are

14      surprised to hear that there are objections today.

15                With respect to this witness, she is authenticating

16      and confirming that certain aspects of Government Exhibit 100

17      are business records.  The pictures that are contained in 100-N

18      are business records and so we are just going through the

19      categories of information that appear when a person posts a

20      profile picture to their profile page.  We are not putting up

21      the picture, for example, that defense counsel, although we

22      will attempt to get it in later, that defense counsel objected

23      to in their motions in limine, the picture of the soldier.  We

24      are just using, for this witness' purpose, the picture -- the

25      profile picture that they themselves showed during their

1   opening.

2                MR. HABIB:  And that's exactly my point, your Honor.

3                So, this exhibit contains, the Court may recall, the

4   photo of what we said was a Hamas fighter emerging from the

5   water with the rifle.

6                THE COURT:  Yes.

7                MR. HABIB:  We object to that.  Just for purposes of

8   preserving our appellate record I want to make sure I renew my

9   relevance and prejudice objections so I am asking if the Court

10  wants us to do that now or later.

11               THE COURT:  Well, I want to do this as efficiently as

12  possible, so to the extent you are going to -- you are just

13  going to be preserving the record and that is one thing.  If it

14  is a decision that I have already made then just stand up, say

15  objection, relevance.  And if it is something else, then you

16  can ask for a side bar.

17               MR. HABIB:  Okay.  But do you want to do all of that

18  with this witness?

19               THE COURT:  I'm sorry?

20               MR. HABIB:  To the extent there are new substantive

21  objections, do you want to do them with this witness or when

22  they actually publish the exhibits?

23               THE COURT:  Let's just get them -- well, when they

24  actually publish the exhibit.

25               MR. HABIB:  Okay.

H1B5gam1                          Chance - direct

1             MS. TEKEEI:  Your Honor, may I?  What objections do

2     you have to 100-N?  You used the photograph from it in the

3     opening.

4             MR. HABIB:  Just the photo we already objected to.

5             MS. TEKEEI:  And we are not going over that with this

6     witness.  I think that will be said.

7             MR. QUIGLEY:  That will come into the case later.

8             (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You may proceed.

2          MS. TEEKEI:  Thank you, your Honor.  We offer

3  Government Exhibit 100N.

4          THE COURT:  Government Exhibit 100N will be received.

5          (Government's Exhibit 100N received in evidence)

6          MS. TEEKEI:  Your Honor, may we publish it to the

7  jury?

8          THE COURT:  You may.

9  Q.  Ms. Chance, does this profile picture, do these profile

10  pictures in Government Exhibit 100N relate to the account we

11  just reviewed that was in Government Exhibit 100A?

12  A.  Yes.

13  Q.  All right.  Showing you what's been marked for

14  identification as Government Exhibit 100X, which I believe is

15  also in the stack that I provided you with earlier.  Do you

16  recognize that exhibit?

17  A.  Yes.

18  Q.  Is Government Exhibit 100X an excerpt of the records that

19  are contained on the CD marked Government Exhibit 100?

20  A.  Yes.

21  Q.  Does Facebook maintain the records reflected in Government

22  Exhibit 100X in the regular course of its business?

23  A.  Yes.

24  Q.  Is it the regular practice of Facebook to maintain these

25  records?

1   A.  Yes.

2   Q.  And are these records generated at or near the time of the

3   events they reflect therein?

4   A.  Yes.

5            MS. TEEKEI:  Your Honor, we offer Government Exhibit

6   100X.

7            THE COURT:  Any objection?

8            MS. MIRON:  No, your Honor.

9            THE COURT:  100X will be received.

10           (Government's Exhibit 100X received in evidence)

11           MS. TEEKEI:  Thank you, your Honor.  May we publish it

12   to the jury?

13           THE COURT:  You may.

14   Q.  Looking at Government Exhibit 100X, what does it contain?

15   A.  This is subscriber information for the account listed in

16   Exhibit 100.

17   Q.  And to be clear, that was the account we just reviewed with

18   user name Jammie Gammal?

19   A.  Yes.

20   Q.  What does the date in the generated field represent on

21   100X?

22   A.  February 23rd, 2015.

23   Q.  And what does that field represent, the generated field?

24   A.  The date the records were generated.

25   Q.  And in this instance, were the records generated, what type

1   of legal process were the records generated in response to?

2   A.  It appears this is, this was generated in response to a

3   preservation request that we processed.

4   Q.  Just to be clear, the generated date that's shown in 100X

5   is the date that Facebook preserved the records after receiving

6   a preservation request, is that correct?

7   A.  Yes.

8   Q.  And the records in Government Exhibit 100 that come after

9   this page, are those records in the account as it existed on

10  February 23, 2015?

11  A.  Yes.

12  Q.  And the records that follow -- withdrawn.

13          What does the date in the date range field in

14  Government Exhibit 100X represent?

15  A.  May 6, 2005 to May 12, 2015.

16  Q.  How can the date range go past the generated date?

17  A.  The same date ranges apply to all of the records when the

18  records are retrieved in response to the search warrant.

19  Q.  So how can there be two sets of records generated for the

20  same account?

21  A.  One was retrieved as the account existed on the date we

22  retrieve the records in response to the search warrant.  The

23  other set includes any of the preserved data.

24  Q.  All right.  Showing you what's been marked as Government

25  Exhibit 100D.  Do you recognize Government Exhibit 100D?

H1BFGAM2                              Chase - direct

1   A.  Yes.

2   Q.  Is that an excerpt of the records on the CD marked

3   Government Exhibit 100?

4   A.  Yes.

5   Q.  Does Facebook maintain these records in the regular course

6   of its business?

7   A.  Yes.

8   Q.  Is it the regular practice of Facebook to maintain these

9   records?

10  A.  Yes.

11  Q.  Are these records generated at or near the time of the

12  events that they reflect?

13  A.  Yes.

14          MS. TEEKEI:  Your Honor, we offer Government Exhibit

15  100D.

16          THE COURT:  Any objection?

17          MS. MIRON:  No, your Honor.

18          THE COURT:  100D will be received.

19          (Government's Exhibit 100D received in evidence)

20          MS. TEEKEI:  Your Honor, may we publish it to the

21  jury?

22          THE COURT:  You may.

23          MS. TEEKEI:  Thank you.

24  Q.  Looking at the first page of 100D, what is shown here?

25  A.  This is the sharing content for the accounts on the Exhibit

H1BFGAM2                          Chase - direct

1   100.

2   Q.  So let's look at an example.  Turning to page 849 at the

3   top of those records.  There's a status update that says, "Date

4   created 8/29/2014."  Do you see that?

5   A.  Yes.

6   Q.  I'd just like to go through the categories of information

7   listed here.  What is the date created?

8   A.  That is the date of the shared, the content was shared.

9   Q.  And what is the link?

10  A.  That is the Facebook link for the contents.

11  Q.  What is the summary?

12  A.  The summary is the short description that is taken from the

13  original content.

14  Q.  When you say taken from the original content, can you

15  describe what that means?

16  A.  That means this would have been part of the original

17  content that was shared.

18  Q.  What's reflected in the text field?

19  A.  This is the, this is where the user entered a description

20  of what they were sharing.

21  Q.  So just to be clear, who generates the text in the text

22  field?

23  A.  The Facebook account holder.

24  Q.  What's in the title field?

25  A.  This is the title of the shared content that was taken from

H1BFGAM2                         Chase - direct

1    the original content.

2    Q.  And what is the URL field?

3    A.  That is the original link to the content.

4    Q.  Thank you.  Showing you what is marked for identification

5    as Government Exhibit 100B.  Can you take a moment and look at

6    that?  Do you recognize that?

7              MS. MIRON:  Your Honor, I didn't hear.  V or B?

8              MS. TEEKEI:  100B.

9    A.  Yes.

10   Q.  Is 100B an excerpt of the records contained on the CD

11   marked Government Exhibit 100?

12   A.  Yes.

13   Q.  Does Facebook maintain these records in the regular course

14   of its business?

15   A.  Yes.

16   Q.  Is it the regular practice of Facebook to maintain these

17   records?

18   A.  Yes.

19   Q.  Are these records generated at or near the time of the

20   events they reflect therein?

21   A.  Yes.

22             MS. TEEKEI:  Your Honor, we offer Government Exhibit

23   100B.

24             MS. MIRON:  No objection.

25             THE COURT:  100B will be received.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Government's Exhibit 100B received in evidence)

2              MS. TEEKEI:  Thank you.  May we publish it to the

3    jury?

4              THE COURT:  Yes you may.

5    Q.  Ms. Chance, can you describe what appears in Government

6    Exhibit 100B?

7    A.  These are the unified messages for the account holder

8    listed in Exhibit 100.

9    Q.  And what is a unified message?

10   A.  It is all the messaging content for that account.

11   Q.  Does that include what you described earlier, which are

12   communications exchanged over Facebook Messenger, for example?

13   A.  Yes.

14   Q.  All right, turning to what is at the top, page 22,049 of

15   Government Exhibit 100B.  Okay, I'd like to look at each field.

16   Starting with the message that begins at the middle of the page

17   on August 14, 2014.  I'd like to go over the categories here.

18   What does the recipients category reflect?

19   A.  Those are the accounts that received the message.

20   Q.  And what are the numbers that appear after each of those

21   names?

22   A.  That is the unique account identifier for those accounts.

23   Q.  And what are the two accounts that are communicating with

24   each other?  Who are the two users communicating with each

25   other in this message?

H1BFGAM2                          Chase - direct

1   A.  Jammie Gammal and Samy Mohamed.

2   Q.  What does the author field represent?

3   A.  The account that sent the message.

4   Q.  And what does the sent field represent?

5   A.  The date and time the message was sent.

6   Q.  What does IP represent?

7   A.  The IP address that was logged for the sending of the

8   message.

9   Q.  And what does the body field represent?

10  A.  The content of the message.

11  Q.  How about the deleted field?

12  A.  That indicates where the message has been deleted.  Or

13  marked for deletion.

14  Q.  Can you describe what you mean by marked for deletion?

15  A.  It's possible that it was marked for deletion and you'll

16  see deleted, but it hasn't been removed from our servers.

17  Q.  So what happens when a user marks something for deletion?

18  A.  It's deleted soon thereafter, at or near the time of the

19  deletion request.

20  Q.  So we'll take a look at an example of that.  I'm looking at

21  page 22,057.  The message with the sent date and time

22  August 14, 2014 at 5:20.  What does it say in the deleted field

23  here?

24  A.  In the top example, deleted is true.

25  Q.  And what about in the bottom example?

H1BFGAM2                          Chase - direct

1   A.   Deleted is false.

2   Q.   What does it mean when it says deleted true?

3   A.   The message has been deleted or marked for deletion by the

4   account holder.

5   Q.   And why is the body field empty?

6   A.   Because the message has been deleted from the servers.

7   Q.   We've been looking at records that are from the disk marked

8   Government Exhibit 100 and those are the records from the

9   account with the name Jammie Gammal, is that right?

10   A.   Yes.

11   Q.   Earlier you testified that Government Exhibit 100 contained

12   two sets of records, records that were generated in February of

13   2015 and records that were generated in June of 2015, is that

14   right?

15   A.   Yes.

16   Q.   If there were messages contained in the February 2015

17   records that were not contained in the June 2015 records, what

18   does that mean?

19   A.   It means that the message was deleted between the time the

20   preservation occurred, the preservation occurred on the account

21   and when the messages were retrieved in response to the search

22   warrant.

23   Q.   By whom?

24   A.   The target as listed or the account as listed on the search

25   warrant.

H1BFGAM2                         Chase - direct

1    Q.  All right.  Showing you what's been marked for

2    identification as, and there are a bunch of them there,

3    Government Exhibit 102B --

4    A.  I don't have that.

5    Q.  All right, showing you what is Government Exhibit 102B,

6    110A, 111G, 112E, 113B and 120B, 122H, what are those?

7    A.  These are excerpts from the original disks that I

8    authenticated earlier.

9    Q.  So, for example, is Government Exhibit 100B an excerpt of

10   the records contained on the CD marked Government Exhibit 102?

11   Excuse me, is Government Exhibit 102B an excerpt of the records

12   on the CD marked Government Exhibit 102?

13   A.  Yes.

14   Q.  Just to be clear, for the rest of the exhibits I handed you

15   are they each excerpts of the records contained in the

16   corresponding CD with the same number, but without the

17   additional letter?

18   A.  Yes.

19   Q.  And did you have a chance to review those before your

20   testimony here today?

21   A.  Yes.

22   Q.  And did you mark those documents in any way?

23   A.  Yes, I did.  I put my initials and the date I reviewed the

24   records on the front of each copy.

25   Q.  Does Facebook maintain these records in the regular course

H1BFGAM2                          Chase - direct

1    of its business?

2    A.  Yes.

3    Q.  Is it the regular practice of Facebook to maintain these

4    records?

5    A.  Yes.

6    Q.  Are these records generated at or near the time of the

7    events they reflect therein?

8    A.  Yes.

9           MS. TEEKEI:  Your Honor, we offer Government Exhibits

10   102B, 110A, 111G, 112E, 113B, 120B and 122H.

11          THE COURT:  I'm sorry, is that 113B as in boy?

12          MS. TEEKEI:  Yes, your Honor.

13          THE COURT:  And 120B as in boy?

14          MS. TEEKEI:  Yes.

15          THE COURT:  Any objection?

16          MS. MIRON:  No, your Honor.

17          THE COURT:  Very well.  Those exhibits will be

18   received.

19          (Government's Exhibits 102B, 110A, 111G, 112E, 113B,

20   120B and 122H received in evidence)

21          MS. TEEKEI:  Thank you.  Your Honor, we'd like to

22   publish them for the jury one by one.

23          THE COURT:  Very well.

24   Q.  Beginning with Government Exhibit 102B.  What is the

25   account number reflected on Government Exhibit 102B?

H1BFGAM2                          Chase - direct

1   A.  1231043183.

2   Q.  And what is the name of that account holder?

3   A.  Jammie Gammal.

4   Q.  And can you review the registered e-mail address for that

5   user?

6   A.  L.gammal.35@facebook.com.

7   Q.  Are all of the records contained on the CD marked

8   Government Exhibit 102 from the account ending in 183 that

9   belongs to Jammie Gammal?

10  A.  Yes.  There was another e-mail address.

11  Q.  Oh, sure.  I'm sorry.  What's the other e-mail address?

12  A.  Lgammal44@yahoo.com.

13  Q.  Putting that to the side, looking at Government Exhibit

14  110A, what is the account number reflected here?

15  A.  828589780.

16  Q.  And what is the name of the user of this account?

17  A.  Samy Mohamed.

18  Q.  What are the e-mail addresses associated with this account,

19  registered to this account?

20  A.  Sbey1453@facebook.com; samy.elgoarany@baruchmail.cuny.edu;

21  samybey1@gmail.com, samyelgoarany08@stjohn's.edu.

22  Q.  Looking at Government Exhibit 111G.  What is the account

23  number for this account?

24  A.  828589780.

25  Q.  And the name on the account?  The vanity name for this

H1BFGAM2                        Chase - direct

1    account?

2    A.   Sbey1453.

3    Q.   What does the registration date field represent?

4    A.   The date the account was created.

5    Q.   All right, turning to government -- excuse me, one more

6    question.  Are all the records that are contained on the CD

7    marked Government Exhibit 113 -- excuse me one moment.  On

8    Government Exhibit 111 belonging to the account ending in 780?

9    A.   Yes.

10   Q.   All right, let's take a look at Government Exhibit 112E.

11   What's the account number for this account?

12   A.   82889720.

13   Q.   This is the account we just reviewed?

14   A.   Yes.

15   Q.   And are all of the records contained on the CD marked

16   Government Exhibit 112 from the account belonging to the

17   account -- excuse me, from the account ending in 780?

18   A.   Yes.

19   Q.   All right, let's look at 113B, Government Exhibit 113B.

20   What is the name associated with this account?

21   A.   Samy Mohamed.

22   Q.   Is this the same account, are these records for the same

23   account that we reviewed in Government Exhibit 112, the account

24   that ends in 780?

25   A.   Yes.

H1BFGAM2                          Chase - direct

1    Q.  And are all the records that are contained on the CD marked

2    Government Exhibit 113 from the account ending in 780 belonging

3    to Samy Mohamed?

4    A.  Yes.

5    Q.  Let's look at Government Exhibit 120B.  What is the account

6    number associated with this account?

7    A.  100000348062495.

8    Q.  What is the vanity name for this account?

9    A.  Ateia5.

10   Q.  And the first registered e-mail address, what is that?

11   A.  Ateia1986@hotmail.com.

12   Q.  Are all the records contained on the CD marked Government

13   Exhibit 120 from the account ending in 495 for the user with

14   the vanity name ateia5?

15   A.  Yes.

16   Q.  Government Exhibit 122H, if you could take a look at that.

17   What is the -- what are the last four digits of the account

18   number reflected in this exhibit?

19   A.  2495.

20   Q.  And what is the vanity name for the user of this account?

21   A.  Ateia5.

22   Q.  Are all of the records contained on the CD marked

23   Government Exhibit 122 from the account ending in 2495

24   belonging to the, associated with the vanity name ateia5?

25   A.  Yes.

H1BFGAM2                          Chance - cross

1              MS. TEEKEI:  Thank you.  No further questions at this

2     time.

3              THE COURT:  Cross-examination?

4              MS. MIRON:  Yes, your Honor.

5              THE COURT:  Ms. Miron.

6     CROSS-EXAMINATION

7     BY MS. MIRON:

8     Q.  Good morning.

9     A.  Good morning.

10    Q.  I just want to get a sense of the type of data that

11    Facebook maintains about its users.  Facebook maintains user

12    names, right?

13    A.  That's correct.

14    Q.  Every time a user changes his or her password, correct?

15    A.  That's correct.

16    Q.  The date and time of the password change is maintained on

17    your servers, right?

18    A.  Yes.

19    Q.  Facebook maintains every time a friend removes another user

20    as a friend?

21    A.  Yes.

22    Q.  And also when friend requests are made and accepted or

23    rejected, that data is maintained, correct?

24    A.  I'm not sure about the date and time of the friend request,

25    but the friend request activity is logged.

Q.  And maintained on the server?

A.  Yes.

Q.  And you mentioned on direct that Facebook maintains IP

address information when users log in to their accounts, right?

A.  That's correct.

Q.  Can you explain to the jury essentially what an IP address

is?

A.  Generally speaking, an IP address represents a series of

numbers and letters that represents a connection to the

internet.

Q.  And is it unique to each login?  In other words, is there

only one IP address associated with each login?

A.  To clarify, are you saying that for each account there's

only one IP address associated with that login at that time?

Q.  Correct.

A.  Yes.

Q.  How are preservation requests received by Facebook?  Are

they phone calls?  Are they letters?  How does Facebook receive

a preservation request from law enforcement?

A.  The primary way that we receive preservation requests is

through our online request system.  Additionally, law

enforcement can submit a preservation request via an e-mail

alias that we have that would be sent to our records team.

They could also send, physically send a letter in the mail.

Q.  Let's assume that one is made on the online request system.

1   Are those reviewed before Facebook preserves the data of the

2   user's account?

3   A.   No.

4   Q.   The account is automatically preserved upon request by law

5   enforcement?

6   A.   That's correct.

7   Q.   Okay.  Facebook also maintains the cookie which is

8   associated with a session, is that correct?

9   A.   That's correct.

10  Q.   Can you explain generally what a cookie is?

11  A.   I can explain generally, but I'm not an expert in this

12  area.  A cookie is a text file that is placed on the browser

13  while you're within, using the Facebook app, to make it easier

14  to navigate throughout the site.

15  Q.   And so it's possible to discern from Facebook records what

16  type of machine a user was using based on the cookie data, is

17  that right?

18  A.   The type of machine?

19  Q.   Or the individual information about a machine?  Is that --

20          MS. TEEKEI:  Objection.

21          THE COURT:  Could you rephrase the question,

22  Ms. Miron?

23          MS. MIRON:  It might be easier to display it when

24  she's authenticated the records, so I'll move forward.

25          THE COURT:  Very well.

H1BFGAM2                          Chance - cross

1   Q.  Okay.  So I'd like to show you some disks that you reviewed

2   and see if you recognize them.  Those are Defense Exhibits 104,

3   105, 130, 140 and 114.

4   A.  Yes.

5   Q.  Have you reviewed those before?

6   A.  Yes, I have.

7   Q.  And how do you know that you've reviewed them?

8   A.  I placed my initials and the date I reviewed the records on

9   the disk.

10  Q.  And, generally speaking, what type of records are those?

11  A.  Records of account activity.

12  Q.  From Facebook?

13  A.  From Facebook.

14  Q.  Okay.  Are they true and accurate records, reflections of

15  the records maintained by Facebook?

16  A.  Yes.

17  Q.  Does Facebook maintain the records in its regular course of

18  business?

19  A.  Yes.

20  Q.  Is it the regular practice of Facebook to maintain those

21  records?

22  A.  Yes.

23  Q.  Are they generated at or near the time of the events

24  reflected in the records?

25  A.  Yes.

H1BFGAM2                          Chance - cross

1   Q.  Okay.  So let me show you a hard copy of Defense Exhibit

2   114.  If you could just look at the very first page?

3            MS. TEEKEI:  May I just take a look at it?

4            (Pause)

5   Q.  Okay, so could you review the first page of Defense Exhibit

6   114.  Is that a true and accurate depiction of the data

7   maintained by Facebook?

8   A.  It appears to be, but I haven't authenticated this

9   document.

10  Q.  Okay.  Would you like to see the electronic version that

11  you did authenticate?  You can insert the disk.

12  A.  I mean, do you -- I don't know.  I mean, if you need me to

13  authenticate this document then I would need to see the disk

14  that I've already looked at.

15           MS. MIRON:  Your Honor, may we take a brief moment to

16  insert the disk?

17           THE COURT:  Sure.  But the screen may need to be

18  turned away from the jury if you're going to show her on her

19  screen.

20           (Pause)

21  Q.  Are you able to view it now?

22  A.  Yes.

23  Q.  The first page?

24  A.  Yes.

25  Q.  Are you able to tell the jury whether this is a true and

H1BFGAM2                          Chance – cross

1    accurate depiction of the data maintained by Facebook?

2    A.  Yes.  This first page.

3    Q.  This very first page depicts a record that is maintained in

4    the regular course of business by Facebook?

5    A.  Yes.

6    Q.  And it is a regular practice to maintain this record by

7    Facebook?

8    A.  Yes.

9    Q.  And it is generated at or near the time of the event

10   reflected in the record?

11   A.  Yes.

12           MS. MIRON:  I would ask that just the first page of

13   Defense Exhibit 114 be admitted into evidence.

14           THE COURT:  Any objection?

15           MS. TEEKEI:  No objection.

16           THE COURT:  So 114, page 1 of Defense Exhibit will be

17   received.

18           MS. TEEKEI:  I believe that was 104, your Honor?

19           THE COURT:  104, I'm sorry.

20           MS. MIRON:  No, it's 114.

21           THE COURT:  I'm not sorry.  So 114 page 1.

22           MS. MIRON:  Thank you.

23           (Defendant's Exhibit 114 page 1 received in evidence)

24           MS. MIRON:  Perhaps you can make it a little larger.

25   That's good.

H1BFGAM2                          Chance - cross

1   Q.  Can you list the account number for this record for the

2   jury?

3   A.  8282589780.

4   Q.  And when was this record generated?

5   A.  November 24, 2015.

6   Q.  And what is the user name, if you can see it?

7   A.  The name or -- the proper name?

8   Q.  The first and last name listed.

9   A.  Samy Mohamed.

10  Q.  Without displaying this to the jury, could you also please

11  review pages 387 and 388 of Defense Exhibit 114?  And if you

12  need to review it electronically, that can be done.  Do you

13  need to review the display?

14  A.  Can you put the display on 388?

15  Q.  Sure.

16          THE COURT:  And it will only be on your screen, Miss.

17  Q.  Are you able to review it?  Both pages 387 and 388.

18  A.  Yes.

19  Q.  Great.  So the same questions for these two pages.  Are

20  they true and accurate copies of the records maintained by

21  Facebook?

22  A.  Yes.

23  Q.  Are those records maintained in the regular course of

24  business?

25  A.  Yes.

1   Q.  Is it a regular practice to maintain those records?

2   A.  Yes.

3   Q.  And were they generated at or near the time of the events

4   depicted?

5   A.  Yes.

6           MS. MIRON:  I'd ask that those two pages of Defense

7   Exhibit 114, specifically pages 387 and 388, be admitted.

8           MS. TEEKEI:  No objection.

9           MS. MIRON:  Thank you.  And displayed before the jury.

10           THE COURT:  Those two pages will be admitted and they

11   may be published.

12           (Defendant's Exhibits Exhibit 114 pages 387 and 388

13   received in evidence)

14   Q.  Starting with 387, if you could enlarge that page.  And

15   highlight the first full box of data.  Thank you.  So looking

16   at this box, what can you tell us about the information

17   depicted?

18   A.  This reflects the different accounts that were seen on the

19   same cookie as the target account for these records.

20   Q.  And the target account is Samy Mohamed's account?

21   A.  Yes, the ID that I read out before.

22   Q.  Could you, the third user listed is Tarek El-Goarany,

23   correct?

24   A.  Correct.

25   Q.  Are you able to tell which of the users logged in on those

H1BFGAM2                          Chance - cross

1   dates to their individual accounts?

2   A.  Not by looking at this record.

3   Q.  Is there a different record that would inform you of that

4   information?

5   A.  I would have to look at the IP addresses for all four of

6   those accounts to determine when they logged in.

7   Q.  And you would compare, say, the seconds of the different

8   log-in dates and times and associate that with the IP address

9   information?

10  A.  Yes.

11  Q.  Does this mean that a user, one user logged in to Tarek

12  El-Goarany's account on the same machine that a user logged in

13  to Samy Mohamed's account?

14  A.  The records reflect that these four accounts were seen on

15  the same machine.

16  Q.  Okay.  Thank you.  Could you just highlight page 388 --

17          THE COURT:  I'm sorry, could I just ask a question for

18  clarification?  When you say seen on the same machine, what

19  machine are we talking about or what type of machine?

20          THE WITNESS:  It's not indicated here what type of

21  machine.

22          THE COURT:  But are we talking about a computer, an

23  iPhone, a laptop, an iPad, or some other type of machine?

24          THE WITNESS:  It could be any of those types of

25  machines.

H1BFGAM2                          Chance - cross

1   Q.  But to be clear, it's the same machine?  In other words,

2   it's one iPhone, if it's an iPhone, that used all the dates

3   seen, correct?

4   A.  Correct.  This is the same machine that these accounts were

5   seen on.

6   Q.  Could we review 388?  Yes.  And could you highlight that

7   box, the third box.  And the two users who -- I'm sorry, the

8   two accounts that were logged into are Mohamed El-Goarany's

9   account and Samy Mohamed's account, correct?

10  A.  Correct.

11  Q.  And those accounts were logged into on the same machine,

12  correct?

13  A.  Logged in or being used on the same machine, yes.

14  Q.  Would you clarify for us what you mean?

15  A.  So to use Facebook, it's not required to log in and log out

16  every single time you use it, so it's possible that this

17  session was, the Facebook session was running and it was being

18  used by this account, not necessarily logging in and logging

19  out.

20  Q.  I see.  So a user could send a message, for example, on an

21  account that's already logged into, and that might be reflected

22  in the seen data?

23  A.  Yes.  I mean, it can include logins.  I want to be sure we

24  also realize that it can be just usage of the account.

25  Q.  And you are not able to tell which account was logged into

1    or used on the various seen dates, right?

2    A.  Correct.

3            MS. MIRON:  Let me just check one thing and then I

4    think I have no further questions.  I don't think that I listed

5    Defense Exhibit 124 as one that I'd like to make sure you can

6    authenticate, so I'll just go over those questions with you.

7    It's the disk.

8    Q.  Okay, so just to be clear for Defense Exhibit 124, that's a

9    true and accurate copy of the data maintained by Facebook,

10   right?

11   A.  Correct.

12   Q.  And it's the regular course of business to maintain that

13   data?

14   A.  Yes.

15   Q.  I'm sorry, the records were maintained in the regular

16   course of business?

17   A.  Yes.

18   Q.  And it's regular practice to maintain it?

19   A.  Yes.

20   Q.  The records were generated at or near the time of the

21   events reflected therein?

22   A.  Yes.

23           MS. MIRON:  No further questions at this point.

24           THE COURT:  Any redirect?

25           MS. TEEKEI:  One moment, your Honor.

H1BFGAM2                    Collie - direct

1               THE COURT:  Sure.

2               MS. TEEKEI:  No further questions, your Honor.

3               THE COURT:  Very well.  Ms. Chance, you may step down.

4       Thank you.

5               (Witness excused)

6               THE COURT:  If I could bother Ms. Miron just to pick

7       up the other disks and will the government call its next

8       witness.

9               MR. QUIGLEY:  Yes, your Honor.  The government calls

10      Komaal Collie.  Your Honor, with the Court's permission would

11      it be okay to put a cart next to Mr. Collie?

12              THE COURT:  Certainly.  As long as it's not

13      obstructing anyone's way or vision.

14       KOMAAL COLLIE,

15           called as a witness by the Government,

16           having been duly sworn, testified as follows:

17              THE COURT:  Please sit down.  Make yourself

18      comfortable, and please begin by stating your full name and

19      spelling your last name for the record.

20              THE WITNESS:  Full name is Komaal Cornelius Collie,

21      last name is C-o-l-l-i-e.

22              THE COURT:  Mr. Quigley.

23              MR. QUIGLEY:  Thank you, your Honor.

24      DIRECT EXAMINATION

25      BY MR. QUIGLEY:

H1BFGAM2                         Collie - direct

1    Q.  Mr. Collie, where do you work?

2    A.  I work for the U.S. Department State, Diplomatic Security

3    Service.

4    Q.  What is the Diplomatic Security Service?

5    A.  The Diplomatic Security Service is the law enforcement arm

6    of the U.S. Department of State.  It focuses on protection of

7    U.S. diplomats overseas, foreign diplomats overseas and

8    passport and visa fraud investigations.

9    Q.  What's your title at the Diplomatic Security Service?

10   A.  I am a special agent.

11   Q.  And are you presently -- where are you presently assigned?

12   A.  I'm presently assigned to the New York Joint Terrorism Task

13   Force.

14   Q.  And what agency oversees the New York Joint Terrorism Task

15   Force?

16   A.  The FBI.

17   Q.  Is that the Joint Terrorism Task Force also known as the

18   JTTF?

19   A.  Yes, sir.

20   Q.  How long have you been assigned to the New York JTTF?

21   A.  Just a little over two years.

22   Q.  I want to direct your attention to February 2015.  Did you

23   become involved in an investigation around that time?

24   A.  Yes, sir.

25   Q.  And about how long had the investigation been going on for

1  when you got involved?

2  A.  About a couple of weeks.

3  Q.  And can you generally describe the nature of the

4  investigation?

5  A.  Yes, sir.  The investigation was into a Mr. Samy

6  El-Goarany.  The Joint Terrorism Task Force had received

7  information that he had traveled to Syria, from New York to

8  Turkey, ultimately into Syria to join ISIS.

9  Q.  What were the goals of the investigation?

10  A.  The goals of the investigation first and foremost to figure

11  out if that actually did happen, if he did join ISIS.  Also,

12  identify anyone that might have helped him get over there and

13  figure out what he was doing over there.

14  Q.  And what if anything did you learn about El-Goarany's

15  whereabouts?

16  A.  We learned that he ultimately did get over and fight for

17  ISIS.

18  Q.  What if anything did you learn about whether he had gotten

19  help --

20          MS. SHROFF:  Your Honor, I apologize but we're having

21  a hard time hearing.

22          THE COURT:  Agent Collie, if I could ask you to slow

23  down a little bit and speak directly into the microphone.

24  A.  Yes, sir.  I'm sorry.

25  Q.  What if anything did you learn about whether he had gotten

H1BFGAM2                        Collie – direct

1    help in going overseas?

2    A.  Our investigation revealed that he did receive help in

3    getting over to ISIS.

4    Q.  Who was he helped by?

5    A.  The defendant, Mr. El Gammal.

6    Q.  Did there come a time when an arrest was made in the

7    investigation?

8    A.  Yes, sir.

9    Q.  When was that?

10   A.  That was August 24th.

11          THE COURT:  Okay, maybe you took my instruction a

12   little too literally.  If you could take it down a notch.

13          THE WITNESS:  Yes, sir.

14   Q.  August 24 of what year?

15   A.  2015.

16   Q.  Where was the arrest made?

17   A.  Just outside Phoenix, Arizona.

18   Q.  And who was arrested?

19   A.  The defendant, Mr. El Gammal.

20   Q.  Were you there when he was arrested?

21   A.  Yes, sir, I was.

22   Q.  Can you describe some of the steps the JTTF took between

23   February and August of 2015?

24   A.  Between February and August of 2015, conducted

25   investigation, including doing interviews, sending legal

H1BFGAM2                         Collie - direct

1    process to various service providers, analyzing information,

2    doing surveillance.

3    Q.  And during the investigation, did you view portions,

4    publicly available portions of the defendant's Facebook

5    account?

6    A.  Yes, sir, we did.

7    Q.  And did you also obtain records from Facebook for that

8    account?

9    A.  Yes, sir, we did.

10   Q.  Agent Collie, are you familiar with what's been marked for

11   identification as Government Exhibit 100?  The full search

12   warrant return?

13   A.  Yes, I am.

14   Q.  All right.  So in the cart next to you, can you take a look

15   at Government Exhibits 100C, E, F, G, H, I, J, K, M, N, O, P,

16   Q, R and S?

17   A.  Yes, sir.

18   Q.  Do you recognize those documents?

19   A.  Yes, sir.

20   Q.  Are those all excerpts from Government Exhibit 100?

21   A.  Yes, they are.

22   Q.  Your Honor, the government offers Government Exhibits 100C,

23   E through G, H, I, J, K, M, O, P and then Q through S.

24            THE COURT:  Any objection?

25            MS. SHROFF:  Yes, your Honor.  We do object and we

H1BFGAM2                           Collie - direct

 1   believe this would be a good time for your 11:00 break, so we

 2   can address it.

 3              THE COURT:  It is almost 11:00, so, ladies and

 4   gentlemen, let's take our morning break, 15 minutes.  As

 5   always, please do not discuss the case.  Please do not allow

 6   yourselves to view any media coverage of the case and please do

 7   not do any research.  Fifteen minutes.

 8              (Jury excused)

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court; jury not present)

 2                THE COURT:  Yes, ma'am.

 3                MS. SHROFF:  Before we get to the objections, I'm

 4      trying to make clear, we're having a hard time, I apologize,

 5      hearing the agent.  If he could just slow down.  I don't know

 6      what, I apologize, but I just couldn't hear, so not to bring it

 7      up in front of the jury.

 8                THE COURT:  I'll take it upon myself to slow it down

 9      when I have difficulties.

10                Very well.  Now, about the objections?

11                MS. SHROFF:  Your Honor, the problem is, and I

12      completely understand that the government is doing all it can,

13      but as we pointed out earlier this morning, some of the

14      translations still have bracketed information on them.  I'm

15      not -- I'm not clear if any of the ones Mr. Quigley wants to

16      move in now have the information, because Mr. Habib and I are

17      still working our way through that.  That was our initial

18      objection and maybe Mr. Quigley can just assuage our fear

19      there.

20                MR. QUIGLEY:  Your Honor, number one, we're not

21      introducing Mr. Collie, he's not introduced any translated

22      exhibits.  These are the originals.  We're not going to get to

23      the translator until later today or probably tomorrow at this

24      point.

25                THE COURT:  So it's not an issue as of yet.

H1BFGAM2                          Collie - direct

1          MS. SHROFF:  It's completely not an issue as yet.  I

2     thought the government may want to list the testimony to that

3     effect, but if not, it's not an issue.

4          THE COURT:  All right.  Anything else that you want to

5     raise right now?

6          MS. MIRON:  Just one moment.

7          MS. SHROFF:  So, your Honor, we're going to reserve

8     our objections on translations as well.

9          THE COURT:  Yes.

10         MS. SHROFF:  All right, thank you, then we have

11    nothing.

12         THE COURT:  Very well.  All right, fifteen minutes,

13    folks.  Don't be late.

14         (Recess)

15         (Continued next page)

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  The jurors pointed out that there are no

2     screens in the third row.  Have you spoken with Ms. Rivera

3     about this?

4           MR. QUIGLEY:  No, your Honor.

5           THE DEPUTY CLERK:  Yes.

6           THE COURT:  So, is someone working on that?

7           MS. TEKEEI:  Yes, your Honor.  At the next break we

8     will make sure to see if we can reach out to our IT people and

9     help fix that.

10          THE COURT:  See.  That was the right answer.  Yes.

11          Okay, we are ready?  So, those exhibits will be

12    received, correct?

13          MR. HABIB:  Your Honor, on that, two questions.

14          So, it is my understanding from conferring with the

15    government that they do not intend to introduce any

16    translations of Arabic language communications through this

17    witness, just the exhibits that reflect the underlying Arabic

18    language communications.  If we are making 401 and 403

19    objections to the translated material, do you want to hear

20    those now or later?

21          THE COURT:  I will hear those later.

22          MR. HABIB:  Okay.

23          I think also the government informs us that it intends

24    to introduce, I think, their 140 and 141 for the videos.

25          MR. QUIGLEY:  Yes.

H1B5gam3                          Collie - direct

1              MR. HABIB:  So, they intend, through this witness, to

2    introduce evidence of two videos produced by Vice News.

3              THE COURT:  By who?

4              MR. HABIB:  Vice News, V-I-C-E.

5              THE COURT:  Get closer to a microphone.

6              MR. HABIB:  There are two videos shared --

7              THE DEPUTY CLERK:  All rise.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Everyone, please be seated.  And for those

3     jurors in the hinterland of the third row, we are working on

4     getting you a screen and I am sure you realize that it is

5     exactly what is being put on the large screen across from you.

6     Okay.

7          Mr. Quigley?

8          MR. QUIGLEY:  Thank you, your Honor.

9     BY MR. QUIGLEY:

10    Q.  Agent Collie, earlier you mentioned that you participated

11    in an arrest in this investigation on August 24th, 2015; do you

12    recall that?

13    A.  Yes, sir.

14    Q.  Do you see the person who was arrested that day in the

15    courtroom here today?

16    A.  Yes, sir.

17    Q.  Can you identify him by an item of clothing that he is

18    wearing?

19    A.  Purple v-neck sweater with the white shirt under it sitting

20    at the defense table, fourth chair in.

21         MR. QUIGLEY:  Your Honor, I would ask that the record

22    reflect the identification of the defendant?

23         THE COURT:  The record will so reflect.

24    Q.  So, Agent Collie -- actually Ms. Quinones, can we put up on

25    the screen what is in evidence as Government Exhibit 100-A, the

H1B5gam3                      Collie - direct

1    first page?  And while Ms. Quinones is doing that, can I direct

2    your attention to Government Exhibit 1005?  Focusing on

3    Government Exhibit 1005, in your time as a law enforcement

4    officer with the State Department, have you become familiar

5    with the records that the state department keeps with respect

6    to passport applications?

7    A.  Yes, sir.

8    Q.  And, do you recognize Government's Exhibits 1005?

9    A.  Yes, sir.

10   Q.  And what is that?

11   A.  It is an application for a U.S. Passport in the name of

12   Ahmed Mohammed El Gammal.

13           MR. QUIGLEY:  Your Honor, the government offers

14   Government Exhibit 1005.

15           THE COURT:  Any objection?

16           MS. SHROFF:  Your Honor, we object on relevance.

17           THE COURT:  Over the defense objection, 1005 will be

18   received.

19           (Government's Exhibit 1005 received in evidence)

20   BY MR. QUIGLEY:

21   Q.  Ms. Quinones, can we publish Government Exhibit 1005 and

22   put it alongside 100-A?  And, Ms. Quinones, can you highlight

23   the phone number on this passport application?

24           Agent Collie, what did the defendant list as his phone

25   number on this application?

H1B5gam3                          Collie - direct

1    A.   The exact phone number is listed as 623-692-7880.

2    Q.   What did the defendant list as his e-mail address?

3    A.   E-mail address listed is elgammal44 --

4    e-l-g-a-m-m-a-l-4-4@yahoo.com.

5    Q.   And, Ms. Quinones, can we highlight the e-mail addresses on

6    Government Exhibit 100-A, and what e-mail addresses do you see

7    there, Agent Collie?

8    A.   I see el.gammal.35@facebook.com and elgammal44@yahoo.com.

9    Q.   We can take that down, Ms. Quinones.  Thank you.  If we

10   publish what is in evidence as Government Exhibit 100-N and can

11   we move ahead to --

12         MR. HABIB:  Your Honor, this is what we discussed at

13   side bar.  Objection; relevance and prejudice.

14         THE COURT:  Overruled.

15   BY MR. QUIGLEY:

16   Q.   Agent Collie, what portion of the defendant's Facebook

17   account is this?

18   A.   This is an image from the profile page.

19   Q.   And can we move ahead to page 6 of this document,

20   Ms. Quinones?  Is that another profile picture from the

21   account, Agent Collie?

22   A.   Yes, sir.

23   Q.   Who does that appear to be?

24   A.   It appears to be Mr. El-Gammal.

25   Q.   What is the uploaded date on that?

H1B5gam3                           Collie – direct

1   A.  The uploaded date is August 31st, 2014.

2   Q.  And what does the defendant appear to be doing there?

3   A.  Looks to be loading a magazine with ammunition.

4   Q.  And can we go to page 10?  Who does that appear to be?

5   A.  Once again, the defendant, Mr. El-Gammal.

6   Q.  And moving on to page 11, what was the uploaded date of

7   this picture?

8   A.  The upload date of this photo is July 15th, 2014.

9   Q.  And can we move ahead to page 12?  What does that appear to

10  be a picture of?

11  A.  It looks like an individual coming out of the water holding

12  an AK-47 with a black mask over their face.

13  Q.  And what was the date the defendant uploaded that picture

14  to his profile account?

15  A.  This was uploaded July 9th, 2014.

16  Q.  And, finally, can we go to page 14?  Who is that a picture

17  of again?

18  A.  Once again, the defendant.

19  Q.  You can take that down -- sorry, hold on one second.

20          What was the uploaded date on that last picture?

21  A.  The upload date is May 25th, 2014.

22  Q.  Sorry about that.  We can take that down.

23          Can we go to what is in evidence as Government Exhibit

24  100-D?

25  A.  Yes, sir.

H1B5gam3                         Collie – direct

1    Q.  And what portion of the defendant's Facebook account is

2    this, Agent Collie?

3    A.  This is shared content.

4    Q.  Can we go to page 2?  Can we blow up the entry on March

5    11th, 2015 at 20:19 UTC?

6            Can you read the summary of this shared content?

7    A.  The summary states:  In a very predictable move, the

8    Islamic state media wing Al Furqan has released a high

9    production value video depicting the execution of a

10   self-contested Mos...

11   Q.  What is the title of the video?

12   A.  The title of the video Mossad spy executed by ISIS child

13   soldier.

14           MS. SHROFF:  Your Honor, we object.

15           THE COURT:  Overruled.

16   BY MR. QUIGLEY:

17   Q.  Can we go to page 12 of the defendant's shared content and

18   specifically the entry on October 10th, 2014 at 23:44:18?

19   A.  Yes, sir.

20   Q.  Can you read the summary of that, Agent Collie?

21   A.  Summary:  Informations about the video–please read:  Date:

22   23/09/14//place:  Libya, Benghazi–division 913.  This is the

23   documentation of the Islamic state of --

24   Q.  What is title?

25   A.  Title:  Intro of enter upon them by the gate by the Islamic

H1B5gam3                        Collie - direct

1    State in Libya.

2    Q.  Directing your attention to page 17 at the bottom and going

3    over to page 18 to the entry on September 1st, 2014 at 3:29, do

4    you see where there is a link to a YouTube video?

5    A.  Yes, sir.

6    Q.  And in the course of this investigation were you able to

7    locate that same post on the defendant's publicly available

8    Facebook account?

9    A.  Yes, sir.

10   Q.  What did you do once you located it on the defendant's

11   Facebook account?

12   A.  Once I located this post on the defendant's publicly

13   available account following the Facebook link I went to the

14   video itself and recorded the video.

15   Q.  And what did that video depict?

16   A.  This video is a --

17            MS. SHROFF:  Objection.

18            THE COURT:  Overruled.

19   A.  This video is a YouTube video of an Orient news story about

20   a -- about the offensive -- ISIS offensive in Deir Zor Syria, I

21   think it was D-E-I-R space Z-O-R, I believe -- Syria, but the

22   spelling could be off.  The video itself contained fighting --

23   ISIS fighters using heavy weapons, Syrian soldiers being

24   marched through the desert in their underwear, being kicked,

25   taunted, and then ultimately executed.

1    Q.  Agent Collie, if you could look in the folder at Government

2    Exhibit 100-V -- sorry, in the cart for 100-V?

3    A.  Yes, sir.

4    Q.  100-V as in victor.

5    A.  Oh, V.  Sorry.

6    Q.  We will come back to that.

7         Shifting topics.  During this case did you also obtain

8    records for Samy El- Goarany's Facebook account?

9    A.  Yes, sir, we did.

10   Q.  So, if you could look in the cart for Government's Exhibits

11   110-B, F, and G?  Do you recognize 110-B, F, and G?

12   A.  Yes, sir.

13   Q.  And what are they?

14   A.  These are excerpts from Mr. El-Gammal's Facebook account.

15        MR. QUIGLEY:  Your Honor, the government offers --

16   Q.  Are they all exhibits from Government's Exhibit 110?

17   A.  Yes.

18        MR. QUIGLEY:  The government offers Government's

19   Exhibits 110-B, F, and G.

20        THE COURT:  Any objection?

21        MS. SHROFF:  Your Honor, B as in boy, right, correct?

22        THE COURT:  Correct.

23        MS. SHROFF:  We have no objection.

24        THE COURT:  Okay.  Those exhibits will be received.

25        (Government's Exhibits 110-B, 110-F, 110-G received in

H1B5gam3                     Collie - direct

1   evidence)

2   BY MR. QUIGLEY:

3   Q.  Can we publish what is in evidence, Ms. Quinones, as

4   Government Exhibit 100-B, as in boy?

5         Again, this is from the defendant's account, Agent

6   Collie?

7   A.  Yes, it is, sir.

8   Q.  What does Government Exhibit 100-B consist of?

9   A.  Government Exhibit 100-B consists of Facebook direct

10  messages between the defendant -- Mr. El-Gammal -- and Samy

11  El- Goarany.

12  Q.  And looking at 100-B in the upper right-hand corner, what

13  is the range of Facebook pages on Government Exhibit 100-B?

14  A.  The range begins at 22,045 and goes to 22,075.

15  Q.  And other than what is in 100-B, were you able to find

16  direct messages between the defendant and Samy El- Goarany

17  anywhere else in Government Exhibit 100?

18  A.  No, sir.

19  Q.  So, directing your attention to page 2 of 100-B, can we

20  read from the entry at 23:26:20 on June 9th, 2014, through the

21  entry at 23:27:44, the same date?  I will read the part of Samy

22  El- Goarany and I would ask you to read the part of the

23  defendant.

24  A.  Sorry.  Can you give me the first time stamp again?

25  Q.  Sorry.  23:26 on 6/9/14.

H1B5gam3                          Collie - direct

1              MS. SHROFF:  Your Honor, may we have a side bar?  We

2    have an objection, your Honor.

3              THE COURT:  Okay.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam3                      Collie - direct

1              (At side bar)

2              MS. SHROFF:  The agent should read it.

3              THE COURT:  I'm sorry?

4              MS. SHROFF:  The agent should read it.  If the agent

5     wants to read something in evidence, the agent should read it.

6     This is not a theater.

7              THE COURT:  If mr. Quigley wants to read it all

8     himself he can do so.  This is an item in evidence.

9              MS. SHROFF:  That is true, too, but it is not theater,

10    it is not a play, and there should be no part-playing here.  We

11    object.

12             THE COURT:  There is nothing inappropriate with the

13    government proceeding in the way that it proposes so I'm going

14    to overrule the objection.

15             MS. SHROFF:  Okay.

16

17

18

19

20

21

22

23

24

25

H1B5gam3                              Collie - direct

1              (In open court)

2              THE COURT:  The objection is overruled.

3              Mr. Quigley?

4              MR. QUIGLEY:  Thank you, your Honor.

5    BY MR. QUIGLEY:

6    Q.  So, Agent Collie, we are going to read from 23:26:20 on

7    June 9th, of 2014, to 23:27:44 the same day, and I will read

8    the part of Samy El- Goarany and ask you to read the part of

9    the defendant.

10   A.  Yes, sir.

11             "EL-GAMMAL:  Laugh out loud.  How you like my comment?

12             MS. SHROFF:  Objection.

13             THE COURT:  Yes.  I believe it is L-O-L.

14             THE WITNESS:  Yes, sir.

15             "EL-GAMMAL:  LOL.  How you like my comment?  Do you

16   read Arabic now?

17             "EL-GOARANY:  Bing translator works miracles ya basha.

18             MR. QUIGLEY:  Then there is an emoji.

19             "EL-GAMMAL:  Not on my comments.  Cannot be

20   translated.

21             "EL-GOARANY:  It didn't translate accurately but I

22   knew you were cursing al Habib Ali.

23   BY MR. QUIGLEY:

24   Q.  We can stop there.

25             Can we move ahead to the middle of page 5 to the entry

H1B5gam3                          Collie - direct

1    on 8/14/14 -- August 14th, 2014 -- at 04:06 UTC and can we read

2    from entry until the entry at 04:15:42 the same day, and I will

3    read the part of Mr. El Goarany if you can read the part of the

4    defendant.

5              "EL-GOARANY:  Salam, bro.  Do you know what cryptocat

6    is?

7              MS. SHROFF:  Your Honor, we object.  The date is --

8              THE COURT:  Objection sustained.

9              Why don't you read it exactly as it is written,

10   Mr. Quigley.

11             MR. QUIGLEY:  We read from 2014-08-14 at 04:06 UTC to

12   2014-08-14 04:15:42 UTC.

13             THE WITNESS:  Yes, sir.

14             "EL-GOARANY:  Salam, bro.  You know what cryptocat is?

15             "EL-GAMMAL:  No.

16             "EL-GOARANY:  Crypto.cat.

17             "EL-GAMMAL:  I heard of --

18             "EL-GOARANY:  Ha ha ha.

19             "EL-GAMMAL:  What it means?

20             "EL-GOARANY:  Nah, this is an app far your browser.

21   Check out the link.  I think you'll find it useful.

22             "EL-GAMMAL:  Okay.

23             "EL-GOARANY:  Http://crypto.cat.  Glenn Greenwald used

24   it when he was in Hong King to keep his messages with Edward

25   Snowden private.

1          "EL-GAMMAL:  You think it is safer than Facebook?

2          "EL-GOARANY:  It can be added on your browser like

3    Chrome or Firefox and you can use it for Facebook chats but

4    only with other people who have it.  I would like to use it

5    with you, if its cool.

6          "EL-GAMMAL:  Okay.

7          MR. QUIGLEY:  Can we move ahead to the bottom of page

8    8 to the entry on 2014/08/14 at 04:21:39 UTC and read until the

9    entry at 04:24:01 on the next page?  Again, I will read the

10   part of Mr. El Goarany, if you can read the part of the

11   defendant:

12         "EL-GAMMAL:  Made a chat called Samy.

13         "EL-GOARANY:  Hey.

14         "EL-GAMMAL:  How to connect?

15         "EL-GOARANY:  Hmm, can't say.  I can't download it on

16   my phone cuz I don't have IOS 7.

17         THE WITNESS:  Seems to be a string of code.

18         "EL-GAMMAL:  No, I got already, but how can I add you?

19         "EL-GOARANY:  Okay.  Try a different program from your

20   phone.  Its just as good.  Go to appstore and download

21   Surespot.  When you search for it you'll find an icon with a

22   blue circle and a line in the middle.  Download that one.

23         MR. QUIGLEY:  Can we move ahead, Agent Collie, to page

24   12, to the top of page 12 to the entry on 2014/08/14 at

25   04:25:38, and can we read from there to the entry at 04:29:42

H1B5gam3                     Collie – direct

1   on the same date and, again, I will read the part of

2   Mr. El Goarany if you would read the part of the defendant.

3            "EL-GAMMAL:  What about viper?  I have viper, what's

4   up, and tango.

5            "EL-GOARANY:  Ya, forget it.  Just try Surespot.

6   Trust me, it will work better.

7            "EL-GAMMAL:  Okay.  So delete crypto at?

8            "EL-GOARANY:  Ya, delete it.

9            "EL-GAMMAL:  Now what?

10           "EL-GOARANY:  Add me once you set up your account;

11  samyelza.

12  BY MR. QUIGLEY:

13  Q.  If we can scroll down a bit, Ms. Quinones?

14           Agent Collie, directing your attention to the next

15  entry there, 2014/08/14 at 05:20.  Do you see where it says:

16  Deleted:  True.

17  A.  Yes, sir.

18  Q.  Were you ever able to locate that message?

19  A.  No, we weren't.

20  Q.  Directing your attention to the next entry at 05:20:24, do

21  you see where there is a YouTube link there?

22  A.  Yes.

23  Q.  That appears to be sent from the defendant to Samy

24  El- Goarany?

25  A.  Yes, sir.

H1B5gam3                          Collie – direct

1    Q.  What did you do with respect to that link?

2            MR. HABIB:  Objection, your Honor, to the --

3            THE COURT:  Overruled.

4    A.  I used the link to go to the YouTube page that contained

5    this video and I recorded the video.

6    Q.  Can you look in the cart for what has been marked

7    Government Exhibit 140?

8    A.  Yes, sir.

9    Q.  Do you recognize that, Agent Collie?

10   A.  Yes, sir.

11   Q.  What is that?

12   A.  This is a CD containing the video that I downloaded using

13   this link.

14   Q.  That was the link that was sent from the defendant to

15   El Goarany?

16   A.  Yes, sir.

17   Q.  At 5:20 on 2014-08-14?

18   A.  Yes.

19           MR. QUIGLEY:  Your Honor, the government offers

20   Government Exhibit 140?

21           MR. HABIB:  Objection.  May we, your Honor?

22           THE COURT:  Sure.

23

24

25

1          (At side bar)

2          MR. HABIB:  So, two objections, your Honor.  One, we

3     are objecting on hearsay grounds.  The video contains -- I

4     don't know if the Court has watched the video.

5          THE COURT:  I have not.  Was this the subject of

6     motion practice?

7          MR. HABIB:  It was not.

8          This is a video report by Vice News, V-I-C-E news, it

9     is entitled "Grooming Children For Jihad," it is part 2 of a

10    five-part series in which a Vice reporter, embedded with ISIS

11    partisans in Raqqah interviews -- he's guided around by what is

12    described as ISIS media, he observes combat, he does a number

13    of things, interviews people in Raqqah.  In this particular

14    video there is -- I think what is particularly objectionable,

15    there is a lot of discussion of small children, there are a lot

16    of interviews with small children ages of 7, 8, 9, 10, who are

17    saying things like I kill all the infidels, I kill all the

18    infidels in Europe.  There was an exchange where a father has

19    come from Belgium to live in Islamic State with his 9-year-old

20    child, has completely brainwashed his child to repeat all of

21    this things -- I hate the infidels, I want to do a suicide

22    operation when I grow up.  It is also very high production

23    value, there is a music soundtrack.

24          So, number one -- there is also a child who describes

25    receiving military training which is one of the charges in this

1    case.  There is substantial danger that all of this material is

2    going to be perceived by the jury for its truth, that's number

3    one; and number two is a 403 objection.

4            MR. QUIGLEY:  Your Honor, a couple things.

5            This is highly, highly probative evidence.  This has

6    been on our exhibit list since October 3rd.  This is the Link

7    sent directly by the defendant to Samy El- Goarany.  It goes --

8    it is highly probative on multiple levels.  Most importantly,

9    it shows the nature of their relationship.  It's some of the

10   only direct proof in this case that they were talking directly

11   about ISIS as opposed to speaking in code.  It is -- this is

12   when they started communicating more frequently, this is right

13   at the beginning of when the defendant and Mr. El- Goarany

14   began hatching their plan and this is, again, highly probative

15   of what the nature of that plan was in terms of -- and it is

16   also probative of the defendant's knowledge of what ISIS was

17   and what it did.  And so, it goes both to the defendant and his

18   co-conspirator's knowledge.

19           THE COURT:  It goes from who to who?

20           MR. QUIGLEY:  It goes from the defendant to

21   El Goarany.

22           THE COURT:  How long is it?

23           MR. QUIGLEY:  It is about 10 minutes, your Honor.

24           THE COURT:  Do you propose to play the entire thing?

25           MR. QUIGLEY:  We can play the first five minutes or

1    so, your Honor.  The whole thing is in evidence.  They will get

2    the point after the first --

3              THE COURT:  Is there any violence depicted?

4              MR. QUIGLEY:  Yes, there is.  They discuss ISIS taking

5    over territory in Syria.  I think that is part of the probative

6    value of the evidence, it shows their relationship.

7              THE COURT:  No actual beheadings, shootings.

8              MR. QUIGLEY:  There is military action.  I don't have

9    a minute-by-minute but we could play the first.

10             MR. HABIB:  I think with -- so, on this video, I think

11   there is a second Vice video which does depict those things and

12   depicts beheaded Syrian regime soldiers with their heads on

13   fenceposts.  So, we will object to that when they offer it.  On

14   this one I think that there is a lot of -- everybody has a gun

15   in this video.  There are kids, very small children with guns,

16   8 or 9 years old.  And, I will say this:  With respect to

17   probative value, we don't object to a -- we don't object to the

18   agent describing the contents of the video but we think the

19   video, as such, will be highly salient to the jury.  It is a

20   very slick piece of work, very high production value, it has a

21   soundtrack, it has graphics.  The jury will see all of this as

22   very, very vivid and, in particular, the age of a small child

23   who says he is 9 but appears younger.

24             MR. QUIGLEY:  This is sent by the defendant.  This is

25   basically an adopted statement by the defendant.  It is

H1B5gam3                          Collie - direct

1     extremely probative.

2             MR. HABIB:  I don't think it meets the standard for an

3     adoptive statement.

4             MR. QUIGLEY:  In terms of relevance it does.  It is

5     extremely probative.

6             THE COURT:  I will allow it.

7             MR. QUIGLEY:  Thank you.

8             MS. SHROFF:  Your Honor, may I just raise one more

9     point?

10            So, in the readings that Mr. Quigley and the agent are

11    doing, they're skipping portions of what is being read, so one

12    of the lines that they skipped is an exchange between

13    Mr. Jammie Gammal where he says:  *Do not know what to do here*.

14    So, if they're going to read, they should read the entirety,

15    they should not skip lines, this is a probative line with

16    Jammie El-Gammal saying *do not know what to do here*.  Either

17    the government should real it all or the court should instruct

18    the jury.

19            THE COURT:  I think to the extent they are reading

20    excerpts that they should have read the entire excerpt.

21            MS. SHROFF:  Right.  It is part of the excerpt.

22            MR. QUIGLEY:  No, it is not part of the excerpt.  We

23    started at:  *What about viper*.

24            MS. SHROFF:  No.  It is a follow up and he says *do not*

25    *know what to do here* and then he says *what about viper*.

1          MR. QUIGLEY:  Yes, we started at what about viper.

2          MS. SHROFF:  Because he said.

3          MR. DEFILIPPIS:  There is cross.

4          THE COURT:  One at a time.

5          MS. SHROFF:  They're insinuating that somehow Jammie

6    El-Gammal would know what cryptocat and Surespot are when he is

7    clearly saying not sure what to do here.  If they want to play

8    a role they should do it accurately.

9          MR. QUIGLEY:  Your Honor, I think it is clear from the

10   reading that Mr. El-Gammal had technical difficulty in setting

11   up these things.

12         MS. SHROFF:  That's not the point.

13         THE COURT:  The whole thing is in evidence so you can

14   go back and cross-examine on that.

15         MS. SHROFF:  Okay, but I think it is only fair that

16   they read the entirety of what is exchanged at one conversation

17   between Mr. El-Gammal and Mr. El- Goarany.

18         THE COURT:  They're under no requirement to do that

19   unless you make an objection on 106 grounds at the appropriate

20   time.

21         MS. SHROFF:  Well, this is a 106 objection again, and

22   also they're cherry picking and I think that's objectionable as

23   well.

24         THE COURT:  All of this is an admitted exhibit.  They

25   can do with it what they want and you are free to use it in any

H1B5gam3                       Collie - direct

1    way that you want.  Okay?

2              MR. HABIB:  Will the Court give a limiting instruction

3    on the video, that it is not for its truth?

4              THE COURT:  A limiting instruction --

5              MR. QUIGLEY:  We have no issue with a limiting

6    instruction for the Vice News video.  We have no issue with

7    that.  It is not offered for its truth.  That's fine.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam3                        Collie – direct

1              (In open court)

2              THE COURT:  The objection is overruled.  The video may

3    be admitted.

4              (Government's Exhibit 140 received in evidence)

5              THE COURT:  Ladies and gentlemen, this video is being

6    admitted not for the truth of what is on the video itself.

7    Okay?  So you should not receive it as tending to establish any

8    fact in this case for the truth of that matter.  Okay?

9    BY MR. QUIGLEY:

10   Q.  So, Agent Collie, we were focused on the video, the link

11   that the defendant sent to Samy El- Goarany on August 14th,

12   2014; is that where we were?

13   A.  Yes.

14   Q.  That's Government Exhibit 140?

15   A.  Yes, sir.

16   Q.  Ms. Quinones, can we play what is in evidence as Government

17   Exhibit 140?

18              (File played)

19   Q.  Agent, and Ms. Quinones, can we focus on what is in

20   evidence as Government Exhibit 110-B and publish that?

21              Agent Collie, what is 110-B?

22   A.  110-B is made up of Facebook records.  It is a portion of

23   overall Exhibit 110.

24   Q.  From whose account?

25   A.  From Samy El- Goarany.

H1B5gam3                    Collie - direct

1    Q.  And specifically in 110-B, who are the messages between?

2    A.  These messages are between Samy El- Goarany and the

3    defendant, Mr. El-Gammal.

4    Q.  So how do the messages, if at all, do the messages in 110-B

5    overlap with what we saw in 100-B?

6              MS. SHROFF:  Objection.

7              THE COURT:  Overruled.

8    A.  It is essentially the same conversation, just from two

9    different accounts.

10   Q.  Okay.  So, can we put up page 4 of 110-B on the screen?

11   And what do you see, booking at 110-B, Agent Collie, with

12   respect to the entry on 2014/08/14 at 04:06 UTC?

13   A.  This message has been deleted.

14   Q.  From El Goarany's account?

15   A.  From Mr. El- Goarany's account; yes, sir.

16   Q.  Can we put up page 5 of 110-B next on the screen of page 6

17   of 100-B?

18              And, again, what do you see here with the number --

19   looking at 110-B, what do you see with respect to a number of

20   the messages in that conversation on 2014/08/14?

21   A.  They're deleted.  The messages are deleted from

22   Mr. El- Goarany's account.

23   Q.  Continuing on 110-B, can we scroll through up to page 12?

24   Thank you Ms. Quinones, that's fine.

25              So, what does it appear that El Goarany did with

H1B5gam3                    Collie - direct

1  respect to almost all the messages that he exchanged with the

2  defendant on 2014/08/14?

3  A.   He deleted them from his account.

4  Q.   Can we go back to 100-B, the defendant's account?  And can

5  we go to page 14 to the entry on 2014-09-02 at 17:59.  Do you

6  see where El Goarany asked the defendant to Surespot?

7  A.   Yes, sir.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1BFGAM3                              Collie - direct

1    Q.   What is Surespot?

2    A.   Surespot is an encrypted application for messaging.

3    Q.   And directing your attention to the entry on 2014-09-03 at

4    3:12:20, what does the defendant ask El-Goarany to do there or

5    say to El-Goarany there?

6    A.   The defendant tells Mr. El-Goarany, "Surespot."

7    Q.   How does Mr. El-Goarany respond?

8    A.   "K.  Give me a sec."

9    Q.   Directing your attention to the bottom of page 15 and the

10   top of page 16 to the entry on 2014-09-14 at 18:01, what does

11   El-Goarany say to the defendant?

12   A.   "Salam, bro.  Let me know if you're available to Surespot

13   today."

14   Q.   And how does the defendant respond?

15   A.   "Available now."

16   Q.   Now, directing your attention to the bottom of page 16 to

17   the entry on 2014-10-10 at 4:10:17, can we read from there to

18   the entry on 2014-10-21 at 15:47?  I'll read the part of Samy

19   El-Goarany and I'd ask you to read the part of the defendant.

20           "S. El-GOARANY:  Cryptocat.  That's the site I was

21   talking to you about.

22           "EL GAMMAL:  I am the cat, lol.  This is a Facebook

23   page.  Do you want me to read it?

24           "S. El-GOARANY:  That's fine.  JZK, I'm going to add

25   him now.  Let me know when you're back on line so we can test

H1BFGAM3                              Collie - direct

1    this cat out.

2              "EL GAMMAL:  On line.

3              "S. El-GOARANY:  I'm on line too.  You're at your

4    laptop?

5              "EL GAMMAL:  No, phone.  But they have an app.  They

6    tell me make a name and share it with whoever I will talk with.

7              "S. El-GOARANY:  Don't use the app.  We have Surespot

8    for that.  This is only for your comp.

9              "EL GAMMAL:  Oh, okay.

10             "S. El-GOARANY:  Yeah, I told you that before lol.

11   Salam ja Jimmy, are you available to Surespot today?

12             "EL GAMMAL:  Okay."

13   Q.  All right.  If we could go back to the entry on 2014-10-11

14   at 16:48?

15   A.  Yes, sir.

16   Q.  Do you see there's a reference to a Facebook, it's like a

17   Facebook address there?

18   A.  Yes, sir.

19   Q.  And during this investigation, did you obtain Facebook

20   records associated with that account?

21   A.  Yes, we did.

22   Q.  And who is that account associated with?

23   A.  This account is associated with Attiya.

24   Q.  If you could look at the binder on Government Exhibit 120A.

25   A.  Yes.

H1BFGAM3                           Collie – direct

1    Q.  What is 120A?

2    A.  120A is a Facebook communication between the defendant El

3    Gammal and Attiya.  These are a portion of the overall 120.

4    Q.  You can put that back in the cart.  If you could look at

5    102A.

6    A.  Yes.

7    Q.  What's 102A?

8    A.  102A, excerpts of more conversations between the defendant,

9    Mr. El Gammal and Attiya.

10   Q.  And is 102A an excerpt of Government Exhibit 102?

11   A.  Yes.

12        MR. QUIGLEY:  Your Honor, the government offers

13   Exhibit 120A and 102A.

14        THE COURT:  Any objection?

15        MS. SHROFF:  Your Honor, subject to the objections we

16   previously made, we have no objections to these being

17   admissible.

18        THE COURT:  Very well, they will be admitted.

19        (Government's Exhibits 102A and 120A received in

20   evidence)

21   Q.  What is the language in 102A and 120A for the most part,

22   Agent Collie?

23   A.  Arabic.

24   Q.  We can put those away, and if we could go back to

25   Government Exhibit 100B?

1   A.  Yes, sir.

2           MR. QUIGLEY:  Ms. Quinones, if we could go to the

3   bottom of page 119.  And looking at the entry on 10-22-14 at

4   19:54 when El-Goarany says, "Surespot me whenever you get the

5   chance today," do you see that?

6   A.  Yes.

7   Q.  When is the next Facebook message exchange between the

8   defendant and Samy El-Goarany after that?

9   A.  2015-01-08.

10  Q.  What did El-Goarany say in that message?

11  A.  "Salam, bro, did you get my voice mail yesterday?  Let me

12  know when you see this please.  We got a bit of a situation

13  here, bro."

14  Q.  Hold on one second.

15          MR. QUIGLEY:  So, can we now publish what's in

16  evidence as Government Exhibit 110F, and go to page 2?

17  Highlight the top two entries, Ms. Quinones.

18  Q.  So, Agent Collie, you may need to refer to page 1, the

19  bottom, but who is the first message on page 2 between?

20  A.  This message is from Samy El-Goarany to Attiya.

21  Q.  And what's the date on this message?

22  A.  This message is dated 2015-01-16.

23  Q.  What does El-Goarany state in the message?

24  A.  Mr. El-Goarany states, says, "Salam Alaikem, Attiya.  My

25  name is Samy.  I'm Gammal's friend.  He told me you could help

H1BFGAM3                          Collie - direct

1    me with a career opportunity in Istanbul.  I'll be visiting

2    soon to look for an internship for the summer, insha Allah.

3    I'd really appreciate your help.  Please reply whenever you get

4    the chance.  Barak Allahu feek."

5    Q.  If you go to the next message how does Attiya respond?

6    A.  "We are at your service."

7    Q.  What's your understanding of what the word "inshallah"

8    means?

9             MS. SHROFF:  Objection.

10            THE COURT:  Overruled.

11   A.  Inshallah is a common Arabic phrase basically meaning God

12   willing.

13   Q.  And Salam Alaikem?

14   A.  That's a greeting, a variation of peace be upon you.

15   Q.  So can we read from the entry on 2015-01-16 at 17:35 for

16   that entry we just let off at 17:17:42 to the entry at 17:35

17   the same day.  I'll read the part of El-Goarany, if you could

18   read the part of Attiya.

19            "S. El-GOARANY:  Thank you.  Do you have a phone

20   number I can reach you by?"

21            "ATTIYA:  00905060570555.

22            "S. El-GOARANY:  Thank you.  I have a favor to ask of

23   you brother.  I'm landing in Istanbul on January 28.  Would it

24   be possible for you to pick me up and give me a ride to my

25   hotel?

1       "ATTIYA:  Yes.  Called me just before.

2       "S. El-GOARANY:  Okay.  It will be very early in the

3   morning though.  I'm landing at 5:45 a.m.

4       "ATTIYA:  Do not worry.

5   Q.  Okay, we can stop there.  And can we go down, same exhibit,

6   to the bottom of page 3 to the entry on 2015-01-27 at 19:02 and

7   read the entry on 1-28-15 at 17:58:57.  And, again, I'll read

8   the part of Mr. El-Goarany if you could read the part of

9   Attiya.

10      "S. El-GOARANY:  Salam Alaikem Attiya.  There's been a

11  change of plans my flight has been canceled today due to the

12  snowstorm hitting New York City.  I will try to rebook my

13  flight for next Monday inshallah.  I will update you when I

14  have a confirmation.  Hope everything is will with you.  Well.

15      "ATTIYA:  Okay.

16      "S. El-GOARANY:  Good news.  I was able to rebook for

17  tonight at 11:40 p.m.  I will be in Istanbul at 10:00 a.m.

18  inshalah.  Will you still be ready to pick me up?  Correction I

19  will be there at 3:55 p.m. Ataturk Airport, terminal 1. I will

20  call you when I land inshallah.  My flight number is TK0012.

21      "Brother where are you?  I'm in the terminal now.  My

22  phone number is 05369288716.  My phone will activate in two

23  hours so call me at seven.

24      "ATTIYA:  Where are you now?  Where are you NW.

25  Thumbs up.

H1BFGAM3                          Collie - direct

1          "S. El-GOARANY:  I'm in my hotel now brother.  Call me

2     when you see this.  My sim card is now activated.  Hotel

3     Sultanahmet Suites."  Address.

4     Q.  So can we go back -- put that to the side and go back to

5     Government Exhibits 100B page 20, the defendant's, the messages

6     between the defendant El-Goarany and read from the top of page

7     20 to the entry at 17:53:28 UTC on page 22.  And I'll read the

8     part of Mr. El-Goarany if you can read the part of the

9     defendant.

10          "S. El-GOARANY:  We got a bit of a situation here bro,

11    lol.  Attiya doesn't speak English.  It's been tough for us to

12    meet up.  I'm in my hotel now and we agreed to meet tomorrow

13    for mahgrib in Sudahmet Mosque because we weren't able to meet

14    today.

15          "EL GAMMAL:  Good.

16          "S. El-GOARANY:  Did he inform you of anything or no?

17          "EL GAMMAL:  No, nada.

18          "S. El-GOARANY:  Okay, just wondering.  If you can,

19    please remind him that my sim card is [expletive] right now.  I

20    can't make any calls and I can only receive them.

21          "EL GAMMAL:  Okay.  We'll tell him.

22          "S. El-GOARANY:  Actually, forget that.  My phone is

23    working now.  For some strange reason it wasn't before.

24          "EL GAMMAL:  Cool.  Take pics.

25          "S. El-GOARANY:  Of myself?

1          THE WITNESS:  This message is deleted.

2          "S. El-GOARANY:  Will do."

3          MR. QUIGLEY:  Okay, we can stop there.  Okay.  So if

4    we can put that, Ms. Quinones, up on the screen next to page 7

5    of 110F which we were reading from earlier.  Page 7 of 110F.

6    Q.  And so what's, Agent Collie, the relationship in time

7    between the messages between the defendant and El-Goarany and

8    the top of the screen and the messages between El-Goarany and

9    Attiya on the bottom of the screen?

10   A.  These conversations are happening within seconds of each

11   other.

12   Q.  So let's go back to 100B, the messages between the

13   defendant and Samy El-Goarany and continue reading from where

14   we left off on 2015-01-28, 17:53 and on page 22 and can we read

15   from there to the entry at 23:37:57 on the same date.

16          "S. El-GOARANY:  Will do.

17          "EL GAMMAL:  Google translate app is a good idea.

18          "S. El-GOARANY:  For my conversations with Attiya,

19   right?  That's a good idea, I'm gonna download now isA.  This

20   will probably save me a lot of future headaches, lol.

21          "EL GAMMAL:  Yup.  Tons of apps to translate.  You

22   wanna also find the Haydarpasa train station.  Do so. Look maps

23   etc.

24          "S. El-GOARANY:  Yeah.  I didn't know Istanbul had a

25   metro system before.  I'll check the maps out isA.

1              "EL GAMMAL:  Hotel expensive?

2              "S. El-GOARANY:  Na, only 35 bucks.

3              "EL GAMMAL:  Train is cheaper than buses.  Longer time

4       but more comfortable, bathroom, etc. good.  Have fun.

5              "S. El-GOARANY:  You been to Istanbul before?

6              "EL GAMMAL:  Not really.  Izmir and Kusadasi one day

7       only.  Study maps and shop train tickets.  So many bus

8       companies.

9              "S. El-GOARANY:  Attiya won't mind if I stay some

10      nights with him, right?

11             "EL GAMMAL:  Ask him before he said okay.

12             "S. El-GOARANY:  Ya I'll ask tomorrow.  IsA.

13             "EL GAMMAL:  He works for some TV channels.  He might

14      hook you up, do some reporting, hahaha.  You like it so far?

15             "S. El-GOARANY:  Ha ha ha."

16      Q.  Okay, we can stop here.  Actually, one more, I'm sorry.

17             "S. El-GOARANY:  It's been a stressful day but

18      elhamdulillah I'm happy I'm here."

19             MR. QUIGLEY:  Can we have the next, Ms. Quinones?

20             MS. SHROFF:  Your Honor, the document reads I'm happy.

21             MR. QUIGLEY:  Go back up.

22             "S. El-GOARANY:  It's been a stressful day, man, but

23      elhamdulillah I'm happy I'm here."

24             MR. QUIGLEY:  Can we go to the next, Ms. Quinones, at

25      27:37:57.  What does it appear happened to the entry at

1   27:37:57?

2   A.  This entry has been deleted.

3   Q.  From whose account?

4   A.  From the defendant's account.

5   Q.  Now, can we put that to the side, Ms. Quinones, and put up

6   Government Exhibits 110B, page 25.  And we're going to find

7   that message in El-Goarany's account, Agent Collie?

8   A.  Yes, sir.

9   Q.  So looking at the first message on this page, what does the

10  message that the defendant deleted at 27:37:57 say?

11  A.  "The sooner I can start the internship the better, you know

12  what I mean?"

13  Q.  So let's stay on 110B, El-Goarany's account and read from

14  that message to the end.  I will read the part of El-Goarany

15  and I'd ask you to read the part of the defendant.

16          "S. El-GOARANY:  The sooner I can start the internship

17  the better, you know what I mean?  I wanna get close to the

18  interview.  Just wondering, btw, why specifically Haydarpasa

19  station.  Does Attiya live in that area?

20          "EL GAMMAL:  No idea.  It's a main train station

21  there.

22          "S. El-GOARANY:  Ah, I see.  I'm looking at a map now.

23  I know where it is.  I was just wondering about the importance

24  of it.

25          "EL GAMMAL:  Far from you?

H1BFGAM3                        Collie - direct

1           "S. El-GOARANY:  Nah, not really.  I'm close to

2      Sultanahmet Mosque and that's like six stations away.

3           "EL GAMMAL:  Cool.

4           "S. El-GOARANY:  When you take the New York City

5      subway all these other metro systems look easy lol.

6           "EL GAMMAL:  Found info from Aria, Attiya, ha ha ha.

7      True.  I think long trip to Adana or Gaziantep is like 35 or

8      40-dollar.

9           "S. El-GOARANY:  Ah, okay, ya.  That's nothing.

10          "EL GAMMAL:  Sorry, Turkish.

11          "S. El-GOARANY:  Even better.

12          "EL GAMMAL:  Yup.

13          "S. El-GOARANY:  By the way -- or btw.

14          "EL GAMMAL:  Did you exchange any money?

15          "S. El-GOARANY:  I'm in contact with someone from the

16     company directly inside the company and he knows people here,

17     can probably help me get there in three to four days isA.

18     Yeah, I exchanged like $210.

19          "EL GAMMAL:  What is the rate, 2.14 per lira?

20          "S. El-GOARANY:  One dollar equals 2.13 Turkish lira,

21     2.39 Turkish lira.

22          "EL GAMMAL:  Cool.

23          "S. El-GOARANY:  The lira here is stronger than I

24     though.  Thought.  That's a pretty good rate for a Middle

25     Eastern country.

H1BFGAM3                          Collie - direct

1              "EL GAMMAL:  Yup."

2    Q.  Okay.  And if we could go back up in 110B to page 27, do

3    you see the message on 2015-01-29 at 00:08:34 when the

4    defendant tells El-Goarany, "long trip to Adana or Gaziantep is

5    like 35 or $40?"

6    A.  Yes, sir.

7    Q.  And directing your attention to Government Exhibit 100B,

8    the defendant's account, what do you see when you look for that

9    entry on January 29, 2015 at 00:08:34?

10   A.  That message has been deleted.

11   Q.  From whose account?

12   A.  The defendant's account.

13   Q.  So going back to 110B, El-Goarany's account, do you see the

14   message on January 29, 2015 at 0:09:33?

15   A.  Yes, sir.

16   Q.  Where El-Goarany says "directly inside the company"?

17   A.  Yes, sir.

18   Q.  And, Ms. Quinones, can we put up on the screen 100B, page

19   29?  What do you see with respect to the entry at 0:09:43 when

20   El-Goarany said "directly inside the company" when you look at

21   Exhibit B?

22   A.  That message has also been deleted from the defendant's

23   account.

24   Q.  If we could go back to 110B for a second?  Do you see the

25   message on 2015-01-29 at 00:10:01?

H1BFGAM3                        Collie - direct

1   A.  Yes, sir.

2   Q.  Where El-Goarany says, "and he knows people here, can

3   probably help me get there in three to four days, isA."

4   A.  Yes.

5   Q.  Directing your attention back to 100B, page 29.

6   A.  Yes, sir.

7   Q.  What do you see when you look at that message in the

8   defendant's account?

9   A.  That message has also been deleted from the defendant's

10  account.

11  Q.  And that's the one at 00:10:20?

12  A.  That one has also been deleted from the defendant's

13  account.

14  Q.  So going back to 110B, do you see the message, the messages

15  where El-Goarany says at 00:10:20, "Yeah, I exchanged like

16  $210"?

17  A.  Yes, sir.

18  Q.  And then, it's the third one from the bottom, Ms. Quinones.

19  And then on the next page, at the very top of page 29, where

20  El-Goarany says, "per lira," what did you find when you looked

21  in 100B for those messages?

22  A.  Both of those messages were deleted from the defendant's

23  account.

24  Q.  Could we go back to 110F, the messages between Attiya and

25  Samy El-Goarany?

1    A.  Yes, sir.

2    Q.  And directing your attention to page 8 on 2015-01-29 and

3    the entry at 12:09:15.  And can we read from there to the end

4    and I'll read the part of El-Goarany and if you would read the

5    part of Attiya.

6            "S. El-GOARANY:  Do you want me to wait in my hotel or

7    do you want me to come to Sultanahmet Mosque?

8            "EL GAMMAL:  As you like.

9            "S. El-GOARANY:  Meet me at Sultanahmet Mosque.  This

10   is easier.  How much time do you think you will take?

11           "EL GAMMAL:  30M.

12           "S. El-GOARANY:  Okay I'm leaving my hotel now.

13           "EL GAMMAL:  Thumbs up sticker.

14           "S. El-GOARANY:  Please meet me there."

15           MR. QUIGLEY:  I'm sorry, go back up one, Ms. Quinones.

16           "S. El-GOARANY:  Please meet me there.  I will be in

17   front of the mosque."

18   Q.  All right, and what was the time stamp on that last

19   message, Agent Collie?

20   A.  That message is 2015-01-29, UTC time 12:18:12.

21           THE COURT:  Mr. Quigley, it's 12:30.  We're going to

22   break for lunch now.  Ladies and gentlemen, we'll break for one

23   hour.  Please do not read any coverage about the case, please

24   do not speak about the case and please do no research.  Please

25   be back in the courtroom a few minutes before 1:30.  If you do

H1BFGAM3                        Collie - direct

1   leave the building please appreciate the fact there may be a

2   line for you to get back in at the magnetometer.

3          (Luncheon recess)

4                                o0o

5                          AFTERNOON SESSION

6                             1:30 p.m.

7          (In open court; jury present)

8          THE COURT:  Ladies and gentlemen, very briefly before

9   we begin this afternoon, there's something I neglected to tell

10  you.  Do I sound more strong right now?  Monday is Martin

11  Luther King day so the court will be closed.  We will not be

12  sitting on Monday.  However, if you work and your employer is

13  open, feel free to check in.  Mr. Quigley?

14         MR. QUIGLEY:  Thank you, your Honor.

15  Q.  Agent Collie, before lunch we were talking about Government

16  Exhibit 100B from the defendant's account, 110B from the

17  El-Goarany's account and 110F from El-Goarany's account.  Do

18  you recall that?

19  A.  Yes, sir.

20  Q.  And what types of messages are those?

21  A.  These are direct messages or private messages.

22  Q.  What do you mean by private messages?

23  A.  These are messages that are sent between the two users that

24  are listed.

25  Q.  So these are not privately available on Facebook?

H1BFGAM3                        Collie - direct

1    A.  No, sir.

2             MR. QUIGLEY:  Ms. Quinones if we could go back to the

3    very last exhibit we were looking at before lunch, which is

4    110F.

5    Q.  Agent Collie, do you have 110F in front of you?

6    A.  Yes, sir.

7    Q.  And who are those messages between?

8    A.  These are messages between Samy El-Goarany and Attiya.

9    Q.  Could you go to the last page of 110F?  What's the date and

10   time stamp on the last entry there?

11   A.  2015-01-29.

12   Q.  At what time?

13   A.  At 12:18:12.

14   Q.  And what does Sammy El-Goarany say to Attiya at that

15   message?

16   A.  "Please meet me there, I will be in front of the mosque."

17   Q.  Agent Collie, could you get what's in the cart as

18   Government Exhibit 110G?  What is 110G?

19   A.  110G is a portion of overall 110.  These are direct

20   messages between Sammy El-Goarany and his brother, Tarek

21   El-Goarany.

22   Q.  And have you met Tarek El-Goarany in this investigation?

23   A.  Yes, sir.

24   Q.  What country does he live in?

25   A.  The United States.

1   Q.  Can we look at the entry -- actually, let's back up just a

2   second while Ms. Quinones -- our government computer here is

3   warming up.  Do you recall earlier this morning we talked about

4   Government Exhibit 100B, which was a video that you downloaded

5   from the defendant's Facebook account?

6   A.  Yes, sir.

7   Q.  And what did that depict, again?

8   A.  That was the Children of ISIS or Grooming Children for

9   ISIS.

10   Q.  You said that was the Deir ez-Zor?

11   A.  Yes, the Deir ez-Zor, the ISIS offensive on Deir ez-Zor.

12   Q.  I'm handing you what's been marked for identification as

13   Government Exhibit 110V.  Do you recognize that?

14   A.  Yes, sir.

15   Q.  Whats that?

16   A.  That's the CD containing the Deir ez-Zor video.

17           MR. QUIGLEY:  Your Honor, the government offers

18   Government Exhibit 110V.

19           THE COURT:  Any objection?

20           MR. HABIB:  Your Honor?

21           THE COURT:  Okay.

22           (Continued on next page)

23

24

25

H1BFGAM3                         Collie - direct

1               (At the side bar)

2               MR. HABIB:  To provide some context to your Honor, I

3     believe the agent will testify this is material, a video that

4     Mr. El Gammal shared publicly on Facebook on February 1, 2014.

5     It appears to be a news broadcast.  It's about two minutes

6     long, entirely in Arabic.  It's essentially combat footage, two

7     minutes of combat footage there.  Are images of ISIS tanks

8     firing mortar, nighttime video antiaircraft, there is ISIS

9     firing small arms.  At the end of the video there are some

10    prisoners stripped down to their underpants, running parched

11    through the desert.  At the very end of the video someone is

12    shot in a field and falls on the field.

13              We think in light of the fact that the Court has

14    already admitted some material showing what ISIS does to prove

15    Mr. El Gammal's state of mind this video is now cumulative.

16    Considering it provides precisely the kind of violent material

17    the Court was concerned about earlier it's unduly prejudicial.

18              MR. QUIGLEY:  Your Honor it's highly probative on

19    numerous bases.  As the Court is aware, the key issue in this

20    case is the defendant's knowledge and state of mind.  This goes

21    both to his state of mind in terms of his support of ISIS and,

22    moreover, to his knowledge that ISIS was engaged in terrorism

23    or in terrorist activities which are elements of the charged

24    offenses, the material support offenses.  There is no 403 issue

25    because the prejudicial nature, this is not more inflammatory

H1BFGAM3                              Collie - direct

    1     than the charged conduct and the fact -- this is not more

    2     inflammatory than the charged conduct.  The government has to

    3     prove that the defendant was aware that ISIS was engaged in

    4     terrorism and terrorist activities, evidence showing that is

    5     the charged conduct this is the offense he's charged with.

    6              MR. HABIB:  My colleague points out this type of

    7     evidence was ruled unduly prejudicial in El Maoyad.  More to

    8     the point the Court is now balancing the probative value

    9     against prejudice, not only with respect to the video on its

   10     own but in light of other evidence that's come in.  So the

   11     government again is going to be introducing a lot of material,

   12     it's already moved in a lot of material showing the knowledge

   13     of any educated person, certainly Mr. El Gammal, that ISIS is

   14     engaged in what the statute defines as terrorism.  That fact is

   15     not going to be disputed.

   16              So that the idea that this additional material, which

   17     again, is two minutes of violence, mortar fire, antiaircraft

   18     fire, small arms fire, prisoner abuse and killing of a man who

   19     dies in the middle of a field seems to me the game is not worth

   20     the candle.  The danger of prejudice here is very high compared

   21     to the low marginal probative value.

   22              MR. QUIGLEY:  It may be prejudicial but not unfairly

   23     prejudicial.  This is what the defendant is charged with.

   24              THE COURT:  I'm not familiar with the case you

   25     referred to earlier.

H1BFGAM3                          Collie - direct

1             MS. SHROFF:  United States v. El Maoyad.  The case was

2     before the Honorable Sterling Johnson.  At trial the judge let

3     in the evidence, I recall.  I'm not sure --

4             MR. QUIGLEY:  It was extremely --

5             MS. SHROFF:  It was evidence of a bus being set on

6     fire.  Judge Johnson allowed it in and the circuit ruled that

7     it was in fact overly prejudicial, not necessarily

8     inflammatory.  It was about the same level, it was longer,

9     true, but the content, the content of violence is comparable.

10    If the Court wants to take the two minutes to look at the

11    video, perhaps that's the way to go, but there is nothing in

12    the record now, where there's even a contention that Mr. Gammal

13    is arguing that ISIS is not violent.  There is no such factual

14    issue in dispute.  There is nothing in dispute about that.

15    Also not in dispute is that ISIL is an FTO.  That is also a

16    stipulated fact here.

17            THE COURT:  Okay.  Let me do this.  It's two minutes.

18            MR. QUIGLEY:  Yes.  Your Honor, just one thing I would

19    add.  I mean, I don't have El Maoyad in front of me.  This was

20    on our exhibit list for some time.  They could have moved on

21    it.  My recollection of El Maoyad is much of the stuff in that

22    case was attenuated in time from the charged conduct.  This is,

23    again, August 2014, at the beginning of the charged conspiracy.

24    The probative value has only increased on that basis.

25            (Continued on next page)

H1BFGAM3                    Collie – direct

1              (In open court; jury present)

2              THE COURT:  Let me –– ladies and gentlemen, I'm going

3    to have you go back to the jury room for just five minutes and

4    then we'll bring you right back out, okay?  So don't stray.

5              (Jury excused)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1BFGAM3                          Collie - direct

1              (In open court; jury not present)

2              THE COURT:  Why don't you pop it in, let me take a

3      look at it.

4              (Video shown)

5              THE COURT:  What more do you have by way of evidence

6      of this nature?

7              MR. QUIGLEY:  Your Honor, there's the first part of

8      that Vice news video and then there are two or three videos

9      that the Court ruled admissible.  I don't think on those videos

10     the defense is going to challenge that the defendant even

11     watched those because he was watching based on our expert

12     notice other Facebook, other internet activity at the same

13     time.  That's what they're going to argue, that he didn't watch

14     what's shown here.  This is even more probative because this is

15     something that he directly posted, so he was clearly aware of

16     it, and I think in terms of the undue -- any prejudice, there's

17     certainly no undue prejudice.  I mean, this is something that

18     could be on -- it is on the evening news, albeit in Lebanon.

19             This isn't any beheading or anything like that.  The

20     defendant is charged with aiding and abetting military-type

21     training from ISIS.  The fact there are pictures of guns and

22     rockets firing is no more inflammatory than the charged

23     offense.  That is military action.  He's charged with

24     military-type training.

25             MR. HABIB:  A few points, your Honor.  One, we're

1    entitled to obviously challenge the weight of the evidence on

2    any basis we choose.  That goes to the Court's 403 analysis.

3            THE COURT:  Sure.

4            MR. HABIB:  As to relevance, the relevance of material

5    that comes from a newscast and is disseminated for wide

6    consumption to me seems somewhat less than the relevance, for

7    example, of the video the Court just admitted which was a

8    direct communication from Mr. El Gammal to Sam El-Goarany.

9    That seems more probative to the defendant's state of mind.

10           This is a news program which, again, people concerned

11   with current events, people concerned with the import of events

12   in the Middle East will watch, so the import to me seems

13   weaker.  The core of the argument is this:  The government is

14   going to propose to introduce this, the first Vice video which

15   depicts beheadings of prisoners and heads of prisoners on fence

16   posts.  The first New York Times video which depicts summary

17   executions of prisoners as well as another video which was

18   moved in limine which shows abuse of prisoners.  This is a

19   piling.  The government is putting in a lot of evidence of the

20   defendant's mental state, but it appears the cumulative nature

21   of this material prejudices us in that the jury will substitute

22   quite legitimate antipathy for this conduct and punish

23   Mr. Gammal for it.

24           THE COURT:  Well, having watched the video -- a couple

25   of things.  First of all, I do think it's relevant.  I don't

frankly think it's close on 403 grounds.  The video depicts

fairly garden variety battlefield scenes of the type that I'm

sure the jurors have seen any number of dozens of times over

the course of their lives if they watch the news and they pay

attention.  The very last scene at the end where they show what

have been alleged to be or purported to be Egyptian soldier

prisoners running through a field, it's not particularly

distinct, it's blurry, and obviously any intelligent person

could put together that at the end someone appeared to be

running and is cut down, but it's far away.  I mean, it doesn't

depict a sort of individualized violence or even, or torture

that might make it a closer call.  So I am going to let the

video in.

          Let's get the jury.

          MR. HABIB:  Could the Court give the same limiting

instruction?

          THE COURT:  Sure.  What happened here, he sent it --

          MR. QUIGLEY:  It was posted on his wall, shared

confidence, your Honor.

          (Continued on next page)

H1BFGAM3                           Collie - direct

 1                (In open court; jury present)

 2                THE COURT:  The objection is overruled and Government

 3     Exhibit 110V will be received.

 4                (Government's Exhibit 110V received in evidence)

 5                MR. QUIGLEY:  Ms. Quinones, can you put that up on the

 6     screen?

 7                THE COURT:  Before you do, this exhibit like the

 8     previous one is not being admitted for the truth of the matters

 9     asserted on the video, simply that once upon a time Mr. El

10     Gammal posted this on his Facebook page and whatever relevance

11     you make of it concerning his state of mind at the time.

12                Go ahead.

13                (Video shown)

14     BY MR. QUIGLEY:

15     Q.  Agent Collie, have you seen aspects of outtakes of that

16     video before in other places?

17     A.  Yes.

18     Q.  Where was that?

19     A.  On YouTube, other news forces on the internet.

20     Q.  What types of videos?

21     A.  ISIS videos.

22     Q.  Can we go back to 110F and 110G, the private messages we

23     were looking at?  And 110F, Ms. Quinones, can we go to the very

24     last page?  Actually, sorry, the bottom of page 9, top of page

25     10.  And so what's the time stamp on that message at the bottom

1   of page 9, Agent Collie?

2   A.   The time stamp is 12:18:12.

3   Q.   What's the UTC?

4   A.   It's the standard by which time is, I don't know the

5   scientific term for it, but it's almost like a time zone.  It's

6   where they start Greenwich mean time.  All other times are set

7   by that.

8   Q.   And what does El-Goarany say in that message at 12:18:12

9   UTC to Attiya?

10   A.   "Please meet me there, I will be in front of the mosque."

11   Q.   Can we go to Government Exhibit 110G and go to page 5?  And

12   specifically the entry on 1-29-15, 2015-01-29 at 14:51:26.

13            And who are these messages between?

14   A.   This is between Sam El-Goarany and his brother Tarek

15   El-Goarany.

16   Q.   I think you said it before, but where does he live?

17   A.   Here in the United States of America.

18   Q.   What's the time stamp on this message?

19   A.   14:51:26.

20   Q.   What does Sam El-Goarany say to his brother in this

21   message?

22   A.   "Salam, bro.  I just want to let you know I'm safe and

23   about to head out in a bit.  Let mom and dad know I will reach

24   them in three days max to let them know I'm safe.  I'll be too

25   busy to do so before then but I promise I will reach them.

H1BFGAM3                     Collie - direct

1    Don't sorry."

2    Q.  Can we move ahead to page 6 to the entry on 2015-02-16 at

3    13:41:55.  How long after the last message is this, Agent

4    Collie?

5    A.  About two weeks, just over two weeks.

6    Q.  And what does El-Goarany say in this message to Tarek

7    El-Goarany?

8    A.  He says, "I'm so sorry for the sudden disappearance, man.

9    I've got a lot of explaining to do, but first off I just want

10   to say that I'm sorry for not being aware about the protocol in

11   my new company.  Hours after our last PQChat conversation I had

12   my phone and my laptop taken from me by the company for safety

13   reasons.  They're gonna give it back to me after my training is

14   over, insallah.  Right now I'm going through the religious

15   training which will end nine days.  Then I'm gonna be enrolled

16   in my main training course which will take a month to

17   complete."

18   Q.  Please go down to the next message, Ms. Quinones.  Can you

19   continue reading?

20   A.  "After that I'll be a regular employee and they'll give me

21   back all my stuff and I can contact you 24/7 like I did before.

22   That will probably be around the end of March to mid-April."

23   Q.  We can take that down.  Based on your involvement in the

24   investigation, how would you generally describe Samy

25   El-Goarany's social media activity between mid-February and

H1BFGAM3                    Collie - direct

1    early May of 2015?

2    A.   That pretty much was non-existent.  Very, very little.

3    Q.   And can you look in the cart for Government Exhibits 111A,

4    C, D, E and F and 112A, B, C and D.  And what are those?

5    A.   These are more excerpts, 111, with the letters that you

6    gave me on it, direct messages and part of the overall 111

7    exhibit.

8                   (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1a                      Collie - direct

```
 1    BY MR. QUIGLEY:
 2    Q.  And whose account are those from?
 3    A.  These are from Samy El- Goarany.
 4    Q.  And 112?
 5    A.  112, again, excerpts of direct messages from Mr. Samy
 6    El- Goarany's account.
 7              MR. QUIGLEY:  Your Honor, the government offers
 8    Exhibits 111-A, C, D, E and F and 112-A through D.
 9              THE COURT:  Any objection?
10              MS. SHROFF:  No, your Honor.
11              THE COURT:  Those exhibits will be received.
12              (Government's Exhibits 111-A, C, D, E and F and 112-A
13    through D received in evidence)
14    BY MR. QUIGLEY:
15    Q.  Did you also receive additional records for the defendant's
16    account in this investigation?
17    A.  Yes.
18    Q.  If you can take a look at Government's Exhibits 103 and
19    103-A?
20    A.  Yes, sir.
21    Q.  Do you recognize those?
22    A.  Yes, sir.
23    Q.  What are they?
24    A.  These are more records received from Facebook for the
25    defendants account.
```

H1B5gam1a                    Collie - direct

1           MR. QUIGLEY:  Your Honor, the government offers

2     Government Exhibit 103 and 103-A.

3           MS. SHROFF:  Your Honor, subject to the previous

4     objection, we object now.

5           THE COURT:  Very well, and over the defense objection

6     those exhibits will be received.

7           (Government's Exhibits 103 and 103-A received in

8     evidence)

9     BY MR. QUIGLEY:

10    Q.  Ms. Quinones, can we publish what is in evidence as

11    Government Exhibit 111-F from El Goarany's account?

12          What part of Samy El- Goarany's Facebook account is

13    this, Agent Collie?

14    A.  These are status updates from his wall or his main profile

15    page.

16    Q.  And so, these are publicly available?

17    A.  Yes, sir.

18    Q.  So, Ms. Quinones, if you could highlight -- actually, Agent

19    Collie, if you could read the entry on 2015-05-085 at 13:55:51

20    UTC?

21    A.  Apologies to all my friends and family whom I've lost

22    contact with over the last few months.  Life has been busier

23    for me than you guys know but I'm available on Facebook now

24    during some days of the week.  So, if anybody wants to reach

25    me -- I'm sorry -- so, if anyone wants to reach me, feel free

H1B5gam1a                    Collie - direct

1   to private message me.  Forgive me if I wronged any of you, it

2   was never my intention.  Salam.

3   Q.  Do you see where it looks like people commented on that

4   post?

5   A.  Yes, sir.

6   Q.  Ms. Quinones, if we can scroll down to the third entry in

7   the comments?

8         Do you recognize that Facebook account?

9   A.  Yes, sir.

10  Q.  Whose Facebook, the one ending in 2495?

11  A.  Yes, sir.

12  Q.  Whose Facebook account is that?

13  A.  This is Mr. Attia Aboualala's Facebook account.

14  Q.  How does it appear that he responded to that post by Samy

15  El- Goarany?

16  A.  Just a smiley face.

17  Q.  We can put that down for a second and publish what is in

18  evidence as Government's Exhibits 111-D, D as in David.  Thank

19  you.  You can highlight the entry in the middle.

20        Who is this message between Agent Collie?

21  A.  This is between Mr. Samy El- Goarany and his cousin Ahmed

22  El Goarany.

23  Q.  And what is the date of this message?

24  A.  This message is 2015-05-05.

25  Q.  So, the same date as the wall post we just looked at?

H1B5gam1a                    Collie - direct

1    A.  Yes, sir.

2    Q.  What does Samy El- Goarany say here?

3    A.  Allah yahfeekum ya, expect to hear from you again within

4    the week.  A lot has happened and I don't have time to go into

5    detail, but Tarek will fill you in inshAllah, so hit hik up

6    when you get the chance.  All you need to know is that I am

7    safe, happy, healthy, and training.  These people are on the

8    Hack and I don't regret coming here.  Please let me know how

9    you are and how Tarek has been coping.  Jazakum Allahu bi

10   Jannah.

11            And:  Hit him up.

12   Q.  If we can take that down, Ms. Quinones?  Thank you.

13            If we can publish what is in evidence as Government

14   Exhibit 111-E and go to page 4 and highlight the entry at

15   2015-05-06 at 10:51:35 UTC?

16            Who is this message between?

17   A.  This is a message between Samy El- Goarany and his father

18   Mohammed El Goarany.

19   Q.  What does it say here?

20   A.  Salam Alaikom ya baba.  I have good news.  I spoke with

21   some friends of mine here and they told me that it will be

22   possible for you to come and visit me in inshAllah but right

23   now is not a good time because I haven't finished some training

24   courses which I need to have a certification from the company.

25   Once I have my certification, I can move around and go to any

1   place I want so I can meet you when you come.  InshAllah a few

2   months more ya abouya.  Probably after Ramadan it will be

3   possible.

4   Q.  If we can publish what is in evidence as Government Exhibit

5   111-A and if you can blow that up?

6          Who are these messages between?

7   A.  These are messages between Samy El- Goarany and the

8   defendant, Mr. El-Gammal.

9   Q.  What is the date of these messages?

10  A.  This is 2015-05-07.

11  Q.  So, about a day or two after the messages we just looked

12  at?

13  A.  Yes, sir.

14  Q.  And can you read what Samy El- Goarany says in these

15  messages to the defendant?

16  A.  Salam alaikom ya.  It's been a long time but I'm doing well

17  and I just want to let you know I'm safe and secure and

18  everything is going according to plan.  When I get completely

19  settled over the coming months, I will contact you more to let

20  you know what's up at my new job.  I he hope everything is well

21  with you.  InshAllah.

22          And the defendant replies:  Hi Samy.

23  Q.  Can we go to Government Exhibit 112-D and, specifically,

24  page 3 and focus on the bottom entry on page -- sorry, page 3.

25          So, on page 3, who are these messages between?

1    A.   This message is between Samy El- Goarany and his father

2    Mohammed El Goarany.

3    Q.   Do you see where it appears Samy El- Goarany sends his

4    father an attachment?

5    A.   Yes, sir.

6    Q.   Can we go to the next page to see that file?

7         Who is that a photograph of?

8    A.   This is Samy El- Goarany.

9    Q.   And have you seen -- what is he doing with his hand?

10   A.   He's pointing his index finger up to the sky.

11   Q.   And have you seen that gesture elsewhere?

12   A.   Yes, sir.

13   Q.   And what is that a gesture of?

14   A.   From what I understand, it is a gesture of a oneness with

15   God or Allah.  It is in a lot of the ISIS videos that I have

16   had to watch.

17   Q.   And has it been kind of adopted by ISIS as a sign?

18        MS. SHROFF:  Objection.

19        THE COURT:  Sustained.

20   Q.   If we can go to Government Exhibit 112-A and look at -- who

21   are these messages between?

22   A.   The messages are between Mr. El-Gammal, the defendant, and

23   Samy Mohammed -- Samy El- Goarany.

24   Q.   And whose account is this from?

25   A.   This is from Samy El- Goarany's account.

H1B5gam1a                        Collie - direct

1    Q.   Can we blow that up a bit, Ms. Quinones?   Thank you.

2             When does this exchange begin?

3    A.   This exchange begins 2015-05-14.

4    Q.   A little bit after the messages we looked at before?

5    A.   Yes, sir.   About a week.

6    Q.   And what does the defendant ask Samy El- Goarany?

7    A.   The defendant asks:   Is it easy to park a car into your job

8    parking lot?

9    Q.   And can we scroll down?

10            How does the defendant respond?

11   A.   There is a thumbs up sent.

12   Q.   And how does Samy El- Goarany respond?

13   A.   I don't know.   I need to ask my superiors at work first

14   inshAllah, but I think it is risky because the parking lot

15   these days is going under a lot of renovation, especially in

16   the north side.   Khair inshAllah.   You planning on driving any

17   time soon?

18            Keep going?

19   Q.   Yes; how does the defendant respond?

20   A.   Yes.   Mid inshAllah.   Check Facebook more often.

21   Q.   What does El Goarany say next?

22   A.   You still on Surespot?   Add me.   User name is abmuradk.

23   I'll help you make your parking job easier inshAllah.

24   Q.   Now can we look at what is in evidence as Government

25   Exhibit 103?   And again, what are these, Agent Collie?

H1B5gam1a                    Collie - direct

1   A.   These are more Facebook records from the defendant's

2   Facebook account.

3   Q.   Can we go to the second page of 103?

4            What date did the FBI receive this data?

5   A.   I'm sorry.  One second.

6   Q.   What date did the FBI receive this data?

7   A.   On the 15th of May 2015.

8   Q.   And what is the captured end date of this data?

9   A.   That was the data, essentially, that the provider,

10  Facebook, finished getting the records together to give to the

11  FBI.

12  Q.   And what is that date in this case?

13  A.   2015-05-14, so May 14.

14  Q.   Can we go to the last page of this, Ms. Quinones?

15           Do you see where there are a few messages that we have

16  already seen on the last page there?

17  A.   Yes, sir.

18  Q.   Can we go to the page before that?  So, what do you see

19  with the rest of the messages -- and whose account is this

20  from?

21  A.   This is under the defendant's account, sir.

22  Q.   What do you see with the rest of the messages -- what

23  happened to the rest of the messages between the defendant and

24  Samy El- Goarany in a defendant's account as of May 14th, 2015

25  on this page?

H1B5gam1a                          Collie – direct

1    A.  They were deleted.

2    Q.  What about the page before?

3    A.  All deleted.

4    Q.  Let's slow down a second.

5           What about the page before that?

6    A.  These were all deleted as well.

7    Q.  And the page before that?

8    A.  All of the messages have been deleted.

9    Q.  The page before that?

10   A.  Once again, all the messages have been deleted.

11   Q.  The page before that?

12   A.  All messages deleted.

13   Q.  And then the page before that?

14   A.  All of the messages have been deleted.

15   Q.  Page before that?

16   A.  All of the messages are deleted.

17   Q.  And can you go through the, I think we are at about page 12

18   of 20, can you go through the remaining pages 1 through 12?

19   A.  Yes, sir.

20   Q.  What do you see on those pages?

21   A.  The messages, I would say 99 percent of the messages have

22   been deleted.

23   Q.  So, fair to say that almost all of the messages, as of May

24   14th, 2015, between the defendant and Samy El- Goarany had been

25   deleted from the defendant's account?

1            MS. SHROFF:  Objection to the leading.

2            THE COURT:  Overruled.

3   Q.  I'm sorry.  What was the answer?

4   A.  Yes, sir; they have been deleted.

5   Q.  Thank you.

6            Shifting topics; during the summer of 2015 did you

7   review publicly available portions of the Twitter account the

8   user name abumurad_IS?

9   A.  Yes, sir.

10  Q.  Did you look in the cart for Government Exhibit 903?

11  A.  Yes, sir.

12  Q.  Do you recognize that?

13  A.  Yes, I do.

14  Q.  What is that a photograph of?

15  A.  This is the profile picture from the Twitter account that

16  you just referenced.

17           MR. QUIGLEY:  Your Honor, the government offers

18  Government Exhibit 903 into evidence.

19           THE COURT:  Any objection?

20           MS. SHROFF:  No, your Honor.

21           THE COURT:  That Exhibit will be received.

22           (Government's Exhibit 903 received in evidence)

23           MR. QUIGLEY:  May we publish that, your Honor?

24           THE COURT:  You may.

25  BY MR. QUIGLEY:

H1B5gam1a                    Collie – direct

1    Q.  Agent Collie, who is that a photograph of?

2    A.  Samy El- Goarany.

3    Q.  What does he appear to be wearing in his trousers?

4    A.  Military pants, camo pants I would say.

5    Q.  And what type of sign is he making with his hand?

6    A.  He is pointing his index finger to the sky.

7    Q.  Is that the same gesture we discussed earlier?

8    A.  Yes, sir.

9    Q.  The gesture of tawhid?

10   A.  Yes.

11   Q.  Shifting topics again, in connection with the defendant's

12   arrest, did you participate in obtaining some electronic

13   devices from his home?

14   A.  Yes, sir.

15            MR. QUIGLEY:  May I approach, your Honor?

16            THE COURT:  You may.

17   Q.  I am handing you what's been marked for identification as

18   Government's Exhibits 1, 2, 3, 4.  Would you take a second to

19   look at those?

20   A.  Yes, sir?

21   Q.  Agent Collie, what are Government's Exhibits 1, 2, 3, and

22   4.

23   A.  These are four of the electronic devices that were seized

24   from the defendant's house pursuant to the search warrant.

25   Q.  If we can shift topics again, if you can take a look in the

H1B5gam1a                    Collie - direct

1   cart for what's been marked for identification Government's

2   Exhibits 1013 through 1015?

3        Directing your attention first to 1013 and 1014, do

4   you recognize those?

5   A.  Yes, sir.

6   Q.  And what are they?

7   A.  These are photos of the Howard Johnson Hotel in Queens New

8   York.

9   Q.  And what is 1015?

10  A.  1015 is of the note pad that the same Howard Johnson Hotel

11  provides the guests with when they say there.

12  Q.  Did you take the photos in 1013 through 1015?

13  A.  Yes, sir; I did.

14  Q.  And do 1013 and 1014 fairly and accurately depict the

15  outside of the Howard Johnson's in Queens, New York?

16  A.  Yes, sir.

17  Q.  Does 1015 fairly and accurately depict the note pad that

18  you saw there?

19  A.  Yes, sir.

20        MR. QUIGLEY:  Your Honor, the government offers

21  Government's Exhibits 1013 through 1015.

22        THE COURT:  Any objection?

23        MS. SHROFF:  No, your Honor.

24        THE COURT:  Those exhibits will be received.

25        (Government's Exhibits 1013, 1014 and 1015 received in

H1B5gam1a                    Collie - direct

1    evidence)

2    BY MR. QUIGLEY:

3    Q.  Sir, during this investigation did you attempt to obtain

4    additional content that the defendant had linked, had shared or

5    linked to on Facebook?

6    A.  Yes, sir.

7    Q.  Can we publish what is in evidence as 100-D and go to page

8    26, and specifically the entry on 2014-08-18 at 7:46:37; do you

9    see that?

10   A.  Yes, sir.

11   Q.  Were you able to locate the post in the link?

12   A.  Yes, I was.

13   Q.  And what did you do once you did that?

14   A.  I took a screen capture of the post.

15   Q.  And I am handing -- you should have in the cart what's been

16   marked for identification Government Exhibit 146.

17   A.  Yes, sir.

18   Q.  Do you recognize that?

19   A.  Yes, sir.

20   Q.  What is that?

21   A.  This is the screenshot of the page that I accessed using

22   this link.

23            MR. QUIGLEY:  Your Honor, the government offers

24   Government Exhibit 146 at this time.

25            THE COURT:  Any objection?

H1B5gam1a                     Collie - direct

1        MS. SHROFF:  No.  Could we have a second, please?

2        THE COURT:  Sure.

3        MS. SHROFF:  Thank you.

4        (pause)

5        MS. SHROFF:  We have no objection.

6        THE COURT:  That exhibit will be received.

7        (Government's Exhibit 146 received in evidence)

8        MR. QUIGLEY:  One moment, your Honor?  Thank you.

9        (Pause)

10  Q.  Then, on 100-D, can we go to page 24, Ms. Quinones?  Can we

11  go to the entry at 2015-08-23 at 02:06:24?

12        Agent Collie, do you see the link in that post?

13  A.  Yes, sir.

14  Q.  Did you go to that link?

15  A.  Yes, I did.

16  Q.  What did you say when you got there?

17  A.  This was a video, an LBCI News story on -- a video

18  depicting destruction, what looked like the aftermath of a

19  battle.

20        MS. SHROFF:  Objection, your Honor.

21        THE COURT:  Overruled.

22  A.  Signs that were shot up.

23  Q.  And what did you do with respect to that link?

24  A.  I recorded that as well, the video.

25  Q.  Do you have in the cart there what's been marked for

1    identification as Government Exhibit 148?

2    A.  Yes, sir.

3    Q.  Do you recognize that?

4    A.  Yes, sir.

5    Q.  What is that?

6    A.  This is a CD containing the video that I accessed using

7    this link from the defendant's publicly available Facebook

8    page.

9         MR. QUIGLEY:  Your Honor, the governments offers

10   Government Exhibit 148.

11        THE COURT:  Any objection?

12        MS. SHROFF:  Your Honor, subject to the previous

13   objections we have -- we continue to object.

14        THE COURT:  Very well.

15        Over the defense objection that exhibit will be

16   received.

17        (Government's Exhibit 148 received in evidence)

18   BY MR. QUIGLEY:

19   Q.  Agent Collie, can we shift topics to what's in evidence as

20   Government Exhibit 100-G, as in George?

21   A.  Yes, sir.

22   Q.  And who are these messages between?

23   A.  These messages are between the defendant Mr. El-Gammal, and

24   a Facebook user Asma Omar.

25   Q.  Can we go to page 2 to the entry at 23:35:38?

H1B5gam1a                    Collie - direct

1    A.  Yes, sir.

2    Q.  On 2015-08-13?

3          Can we read from this part to the end and I will read

4    the part of Asma Omar if you can read the part of the

5    defendant?

6          "OMAR:  I dnt have an opinion on ISIS.  I feel they

7    are extreme but you can't base it on anything reliable so I am

8    keeping quiet.

9          "EL-GAMMAL:  Good, stay quite.

10          "OMAR:  Ha ha.

11    Q.  Now do you see where two YouTube links at the bottom of the

12    page there, Agent Collie, and going on to page 25307?

13    A.  Yes, sir.

14    Q.  During the course of the investigation, did you follow

15    those links?

16    A.  Yes, I did.

17    Q.  What did you find in the first link?

18          MS. SHROFF:  Objection to the hearsay response, your

19    Honor.

20          THE COURT:  What was the question?

21          MR. QUIGLEY:  What did you find when you went to the

22    first link?

23          THE COURT:  Overruled.

24    A.  When I accessed the first link I found a YouTube video,

25    part one of a longer documentary, part one was entitled, I

H1B5gam1a                         Collie - direct

1   think, Spread of the Caliphate.

2   Q.  Does that appear to be the same documentary we watched

3   earlier -- or part of the same documentary we watched earlier

4   in Government Exhibit 140?

5   A.  Yes, sir.

6   Q.  So, in the cart you should have what's been marked for

7   identification as Government Exhibit 141?

8   A.  Yes, sir.

9   Q.  Do you recognize that?

10  A.  Yes, sir.

11  Q.  What is that?

12  A.  This is a CD containing the video that I accessed through

13  that link.

14          MR. QUIGLEY:  Your Honor, the government offers

15  Government Exhibit 141.

16          MS. SHROFF:  Objection.  Cumulative.

17          THE COURT:  Overruled.

18          (Government's Exhibit 141 received in evidence)

19          MS. SHROFF:  Your Honor, may we be heard at side bar?

20          THE COURT:  Sure.

21

22

23

24

25

H1B5gam1a                    Collie – direct

1              (At side bar)

2              MR. HABIB:  Thank you.

3              I know the court has heard our argument on this point.

4    I just want to clarify that this is the video with the

5    beheading and the heads on the fences.

6              THE COURT:  Understood.

7              MR. HABIB:  Okay.

8              THE COURT:  Overruled.

9              MR. HABIB:  So, we object.

10             THE COURT:  Understood.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1a                    Collie - direct

1              (In open court)

2    BY MR. QUIGLEY:

3    Q.  So can we, while we are still on the Facebook page, what

4    did you find when you followed the second link?

5    A.  The second link?  The second link also led to a YouTube

6    video, part of that documentary, the same video that we had

7    watched earlier.

8    Q.  So, the second link was the same video that was in

9    Government Exhibit 140?

10   A.  Yes, sir.

11   Q.  Can you look at Government Exhibit 142; is that the

12   video -- what is 142?

13   A.  142 is a CD containing that video, the second link that I

14   downloaded.

15   Q.  Ms. Quinones, can we now play what is in evidence as

16   Government Exhibit 141 which is the first video?

17              (File played)

18              MR. QUIGLEY:  Your Honor, we would also offer -- we

19   are not going to play it, but we also offer 142 which is the

20   second YouTube link.

21              MS. SHROFF:  Same objection, your Honor.

22              THE COURT:  It will be received over the defense

23   objection.

24              (Government's Exhibit 142 received in evidence)

25              MR. QUIGLEY:  A moment, your Honor?

H1B5gam1a                          Collie – direct

1                  (counsel conferring)

2                  THE COURT:  Yes.

3                  MR. QUIGLEY:  No further questions.

4                  I take it there is going to be cross-examination of

5       the agent?

6                  MS. SHROFF:  Yes, your Honor.

7                  THE COURT:  So let's take our break now.  15 minutes,

8       so 10 minutes before the hour.

9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1a                    Collie - direct

1          (Jury not present)

2          THE COURT:  Okay.  Anything for me?

3          MS. MIRÓN:  Yes, your Honor.

4          THE COURT:  Okay.

5          MS. MIRÓN:  We objected to the admission of Government

6   Exhibit 103 and my notes do not reflect that Ms. Chance

7   authenticated that exhibit, it is a different type of record

8   than all of the other Facebook records.  So, if that is true,

9   if she did not authenticate it, it is inadmissible hearsay and

10  we would move to strike.

11         THE COURT:  I have to admit, I didn't quite follow all

12  the numbers and which ones came in and which ones didn't, so.

13         MS. MIRÓN:  Perhaps during this next 10 minutes the

14  transcript could be reviewed about Exhibit 103 and Ms. Chance's

15  testimony?

16         THE COURT:  Very well.

17         MS. MIRÓN:  Thank you.

18         MR. QUIGLEY:  Your Honor, it wasn't authenticated by

19  Ms. Chance but we did offer it through Agent Collie.  It is a

20  record from the search that was subject to some pretrial

21  litigation and he, we think, authenticated it.

22         MS. SHROFF:  No.

23         MS. MIRÓN:  No.

24         MR. QUIGLEY:  It was admitted without objection just

25  now.  I could have asked more questions.

H1B5gam1a                        Collie - direct

1              THE COURT:  So, tell me again the provenance of this

2       document and how it is currently in evidence?

3              MR. QUIGLEY:  Your Honor, may we approach?

4              THE COURT:  Sure.

5              (Pages 186-189 SEALED by order of the Court)

6              (Pages 190-194 CLASSIFIED by order of the Court)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1a                    Collie – direct

1              (Recess)

2              (Jury present)

3              THE COURT:  Everyone, please, be seated.

4              THE COURT:  Mr. Quigley, did you have an application

5    to reopen direct?

6              MR. QUIGLEY:  Yes, your Honor.

7              THE COURT:  Go ahead.

8    BY MR. QUIGLEY:

9    Q.  Agent Collie, can you take out what's been marked in the

10   cart as Government Exhibit 103 and 103-A?  Do you recognize 103

11   and 103-A?

12   A.  Yes.

13   Q.  What are they or -- what are they?

14   A.  These are Facebook records from the defendant's Facebook

15   account.

16   Q.  And how did you obtain them?

17   A.  Pulled them from an FBI database called Data Warehouse

18   System.

19   Q.  And do only certain people have access control to that

20   system?

21   A.  Yes.

22   Q.  And were they in a particular location on that system?

23   A.  Yes.

24   Q.  Where were they?

25   A.  They were in a case file for the defendant, Mr. El-Gammal.

H1B5gam1a                    Collie - direct

1   Q.   When were those records received by the FBI?

2   A.   The 15th of May, 2015.

3            MR. QUIGLEY:  Your Honor, the government offers

4   Government Exhibit 103 and 103-A.

5            MS. SHROFF:  Objection.

6            THE COURT:  Overruled.  They will be received.

7            MS. SHROFF:  Your Honor, may we be heard on this at

8   the side bar, please?

9            THE COURT:  Yes.

10            MS. SHROFF:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1B5gam1a                          Collie - direct

1              (At side bar)

2              MR. HABIB:  Thank you, your Honor.

3              I want to clarify.  We are objecting principally to

4    the admission of 103 and 103-A on the grounds they are

5    inadmissible hearsay, they are records of Facebook constituting

6    statements by Facebook that our client deleted messages at

7    certain days and times.  That is being offered for its truth to

8    prove that our client did delete those messages at those dates

9    and times.  They have not met any hearsay exception.  Agent

10   Collie is not capable of testifying to the requirements of Rule

11   803.6.  Even if he can testify as to the provenance of the

12   document, he does not know that the record was made at or near

13   the time, that it was kept in the course of Facebook's

14   business, that it was the regular practice of Facebook to do

15   so, and he is not the custodian.

16             THE COURT:  So, is it an authentication objection or a

17   hearsay objection?

18             MR. HABIB:  Both.

19             MS. SHROFF:  Both.

20             MR. HABIB:  It is principally -- I would like to know

21   how they have met the 803.6 requirements.

22             MS. SHROFF:  The testimony is that's how he pulled the

23   physical documents.  That's his testimony.

24             MR. HABIB:  The principal argument is hearsay.  That

25   document is being offered to prove that Mr. El-Gammal deleted

H1B5gam1a                    Collie - direct

1    messages on certain days and times.  That is an out-of-court

2    statement made by Facebook that would ordinarily be a business

3    record if it could meet the criteria of Rule 803.6.  The agent

4    cannot satisfy those criteria because he is not the custodian.

5           In addition, as to authentication, he did not say this

6    is a Facebook record based on my experience reviewing other

7    Facebook records, etc.  He just testified as to where it came

8    from within the FBI.  The principal objection is the hearsay.

9           MR. QUIGLEY:  Judge, if you want, on authentication we

10   can have him match these up with the records from Facebook that

11   are already in evidence.  I think there is certainly a basis in

12   the record to do that already because the time stamps on those

13   and the parties correspond to the Facebook records that have

14   been authenticated by the Facebook records.

15          MR. HABIB:  The records are different, they have

16   different fields, and they take a different format.  I recall

17   that when Ms. Mirón asked the Facebook witness to authenticate

18   a third category of records -- no?

19          MS. MIRÓN:  Just so I can be heard on this.

20          When speaking with Ms. Chance over the phone yesterday

21   I asked her if she could authenticate a third type of record

22   from the discovery.  She said that she would not have been able

23   to do so.  Therefore, I think the Facebook witness would never

24   have been able to authenticate these records.

25          MR. HABIB:  Again, putting the authentication to one

H1B5gam1a                      Collie - direct

1    side, I still have not heard the hearsay answer.  So, we are

2    moving, we are objecting to the introduction of those exhibits,

3    moving to strike, and for a curative instruction.

4              THE COURT:  Mr. Quigley?

5              MR. QUIGLEY:  Your Honor, they're statements of the

6    defendant.  We have authenticated them in the same way that

7    authentication is a very low bar.  The Court can consider the

8    other evidence in the record pertaining to these Facebook

9    accounts.  In addition, I mean, this is the same way that a

10   wiretap is authenticated.  It doesn't have to be a business

11   record.  As long as there is a basis for the agent to say I

12   pulled this, people have been permitted access to it, that

13   satisfies the authentication.  It is the same thing in cases

14   with wiretap and text messages.

15             THE COURT:  I am not so concerned about

16   authentication.  At the end of the day authentication is simply

17   whether the Court is satisfied that the documents are what they

18   purport to be.  I have no doubt that these documents are, as

19   the government purports them to be, the records of Facebook or

20   created in the ordinary course of its business.  So, I really

21   don't see the problem with that.

22             The objection is noted and it is overruled.

23             MR. HABIB:  Okay.

24             (Continued next page)

25

H1BFGAM6                     Collie - cross

1          MR. QUIGLEY:  I have no further questions, your Honor.

2          THE COURT:  Cross-examination.

3          MS. SHROFF:  May I, your Honor?

4          THE COURT:  Yes, you may.

5          MS. SHROFF:  Thank you.

6    CROSS-EXAMINATION

7    BY MS. SHROFF:

8    Q.  Good afternoon, Agent.

9    A.  Good afternoon.

10   Q.  Sir, you testified on direct that you're a special agent

11   with the Diplomatic Security Service, correct?

12   A.  Yes, ma'am.

13   Q.  And there came a time when were you then assigned to the

14   task force with the FBI, correct?

15   A.  Yes, ma'am.

16   Q.  And that's the Joint Terrorist Task Force, JTTF, correct?

17   A.  Joint Terrorism Task Force.

18   Q.  And for this particular case you're not just the JTTF

19   representative, you are the case agent, correct?

20   A.  One of the case agents, yes.

21   Q.  Would it be fair to say you're the main case agent?

22   A.  For a time period, yes.

23   Q.  Okay.  And as the main case agent, you're the person that's

24   the point person for the investigation, correct?

25   A.  For a time period yes.

1    Q.  Let's get the time period in place.  For what time period

2    would you say you were the point person?

3    A.  I would say from July or maybe June of 2015 to roughly

4    November of 2015 and then once again beginning of December of

5    2015.

6    Q.  And when you were not the main point person, who was?

7    A.  Other FBI agents on our squad.

8    Q.  And who was that, do you know?

9    A.  Ghalian Stepho for like a month, I believe.  And then there

10   were co-case agents at the beginning that would be Le Nguyen

11   and Sussana Iljazi, I-l-j-z-a-z-i.  I don't know if I spelled

12   that right.

13   Q.  How about Colleen Brady?

14   A.  Colleen Brady?

15   Q.  Yes.  Is she a case agent here?

16   A.  I don't recognize the name.

17   Q.  Okay, fair enough.  So during the relevant time periods

18   you're the point person that ran the investigation, correct?

19   A.  The investigation into Samy El-Goarany, yes.

20   Q.  And as part of being the case agent you kept in touch with

21   the other agents on the case, correct?

22   A.  Yes, I did.

23   Q.  The prosecutors on the case, correct?

24   A.  Yes.

25   Q.  You essentially ran the investigation, right?

H1BFGAM6                        Collie - cross

1    A.  For a time period for Samy El-Goarany, yes.

2    Q.  And in running the investigation, you had search warrants

3    that you executed, correct?

4    A.  Yes.

5    Q.  You used trap and trace devices, correct?

6    A.  Pen register, yes, ma'am.

7    Q.  And after you served these search warrants you got returns

8    back from the various entities that you served the search

9    warrants on, correct?

10   A.  Yes, we did.

11   Q.  And you got returns back from Facebook?

12   A.  Yes, we did.

13   Q.  Twitter?

14   A.  Yes.

15   Q.  Instagram?

16   A.  I didn't personally get a return back from Instagram.  I'm

17   not sure if someone else did.

18   Q.  How about Kick?

19   A.  Again, not me personally but I can't speak for someone

20   else.

21   Q.  Is it fair to say that you personally had search warrants

22   on Facebook and Twitter, is that your testimony, sir?

23   A.  Definitely Facebook and, yes, I believe Twitter as well.

24   Q.  And you testified on direct that your investigation was

25   into Samy El-Goarany, correct?

H1BFGAM6                          Collie - cross

1    A.  Initially, yes.

2    Q.  When you initially began to investigate Samy El-Goarany,

3    you interviewed witnesses, is that correct?

4    A.  Yes, we did.

5    Q.  And the witnesses included Tarek El-Goarany, correct?

6    A.  Yes.

7    Q.  And Tarek El-Goarany would be Samy El-Goarany's brother,

8    correct?

9    A.  Yes, he is.

10   Q.  The brother in the United States, right?

11   A.  Yes, ma'am.

12   Q.  And also part of your investigation was Mohamed El-Goarany,

13   correct?

14   A.  Yes.

15   Q.  He's the father of Samy El-Goarany, correct?

16   A.  Yes, he is.

17   Q.  Also in the United States, right?

18   A.  Yes, he lives in the United States.

19   Q.  And you also had as a witness his mother, Teresa

20   El-Goarany, correct?

21   A.  You mean as someone we interviewed?

22   Q.  Yes.

23   A.  Yes.

24   Q.  As a witness.  I think I said witness.

25   A.  Yes, but I don't call them witnesses.

H1BFGAM6                          Collie - cross

1   Q.  That's Teresa El-Goarany, correct?

2   A.  Yes.

3   Q.  And that's the mother?

4   A.  Yes.

5   Q.  And what about Ahmed El-Goarany?

6   A.  Ahmed, yes.

7   Q.  And Ahmed El-Goarany is Samy El-Goarany's cousin, correct?

8   A.  Yes.

9   Q.  And he's the cousin who lives in Egypt, correct?

10  A.  Yes, he does.

11  Q.  And then you also interviewed or participated in interviews

12  with a whole slew of other people that Samy El-Goarany knew,

13  correct?

14  A.  Yes.

15  Q.  And one of those people was Khalafalla Osman, correct?

16  A.  Yes.

17  Q.  And he was a friend of Samy El-Goarany's, right?

18  A.  Yes.

19  Q.  How about Samir?  Do you remember interviewing Samir, a

20  friend of his?

21  A.  Yes.

22  Q.  By "his," I mean Samy El-Goarany?

23  A.  Yes.

24  Q.  How about Rameez Farooqi; you interviewed him as well?

25  A.  No, I never interviewed Rameez Farooqi.

H1BFGAM6                          Collie - cross

1   Q.  Did somebody on your team interview him?

2   A.  No.

3   Q.  How about Nico Marchese?  He was another friend of Samy

4   El-Goarany's, correct?

5   A.  Yes.

6   Q.  And you interviewed him, correct, along with the members of

7   your team?

8   A.  Yes.

9   Q.  And you learned from your investigation of all of these

10  people that these are people that Samy El-Goarany grew up with

11  and went to school with in Goshen, New York?

12  A.  Yes.

13  Q.  And they called themselves The Brown Squad, correct?

14          MR. QUIGLEY:  Objection.  Hearsay.

15          THE COURT:  Overruled.

16  A.  Yes.

17  Q.  They were a tight-knit group of friends, correct?

18  A.  Growing up, yes, they were.

19  Q.  You also testified on direct examination that as you were

20  running the investigation you had information that you were

21  gathering from the search warrants and other devices that you

22  had available to you, correct?

23  A.  Yes.

24  Q.  And then you were also getting information from various

25  witnesses, correct?

H1BFGAM6                    Collie - cross

1   A.  Yes.

2   Q.  And during this investigation you started to learn that

3   Samy El-Goarany had discussed with several people what his plan

4   was, correct?

5   A.  Not several people.

6   Q.  Okay.  Well, let's see.  It's fair to say that Samy

7   El-Goarany had definitely discussed his plan with his brother,

8   Tarek El-Goarany, correct?

9   A.  Parts of it, yes, ma'am.

10  Q.  Well, he had told -- let me rephrase that.  Tarek

11  El-Goarany was fully aware at all times that his brother was

12  going to ISIS, correct?

13              MR. QUIGLEY:  Objection.  Foundation and hearsay.

14              THE COURT:  Yes.  Sustained.

15  Q.  You were trying to investigate who helped Samy El-Goarany,

16  correct?

17  A.  Yes.

18  Q.  And you had a whole slew of people that Samy interacted

19  with, correct?

20  A.  Yes.

21  Q.  And you needed to know which one of those slew of people

22  helped Samy El-Goarany, correct?

23  A.  Yes.

24  Q.  And one of those people was Tarek El-Goarany, correct?

25              MR. QUIGLEY:  Objection.  Form.

H1BFGAM6                          Collie - cross

1          THE COURT:  Overruled.

2   A.  One of those -- I'm sorry, repeat the question.

3   Q.  And one of those people was Tarek El-Goarany, correct?

4   A.  One of the people that we investigated?

5   Q.  Investigated to see if he helped Samy El-Goarany with his

6   plan?

7   A.  Yes.

8   Q.  And Tarek El-Goarany accompanied his brother to JFK to buy

9   his airline ticket to Turkey, correct?

10  A.  Yes, ma'am.

11  Q.  And he was there when Samy El-Goarany paid for his ticket

12  in cash, correct?

13  A.  He was there, yes, ma'am.

14  Q.  And he knew what his brother was going to buy the ticket

15  for, correct?

16          MR. QUIGLEY:  Objection.

17          THE COURT:  Sustained.

18  Q.  Let's talk about his mother.  Okay?  This was another

19  person that was part of your investigation to see if she helped

20  him, correct?

21  A.  Yes, ma'am.

22  Q.  And you learned that she was also aware of Samy's plan,

23  correct?

24          MR. QUIGLEY:  Objection.

25          THE COURT:  Overruled.

H1BFGAM6                        Collie - cross

1    A.  No, I didn't learn that.

2    Q.  You didn't know that Teresa El-Goarany thought her son's

3    plan was to go and do humanitarian work in Turkey/Syria?

4    A.  Oh, that's what she told us, yes.

5    Q.  And the same with Mohamed El-Goarany, right, he also knew

6    that his son had some kind of plan, correct?

7            MR. QUIGLEY:  Objection.

8            THE COURT:  Overruled.

9    A.  No.  Mohamed El-Goarany did not know.

10   Q.  What about his friend Khalafalla Osman?

11   A.  What's the question; if he knew of --

12   Q.  Samy had some kind of plan?

13   A.  Some kind of plan, yes, ma'am.

14   Q.  And your investigation revealed to you that Samy El-Goarany

15   told different people different versions of what his plan was,

16   correct?

17   A.  Yes, ma'am.

18   Q.  Okay.  And he told some people he was going to go do

19   humanitarian work, correct?

20   A.  Yes.

21   Q.  And then he told other people that he was going to go get

22   an internship somewhere, correct?

23   A.  Yes, ma'am.

24   Q.  And then other people he just told them nothing, I'll be

25   gone for vacation and I'll be back, correct?

H1BFGAM6                      Collie - cross

1   A.  There's people he told nothing.  I don't know about "I'll

2   be gone for vacation."

3   Q.  Okay, so when you interviewed all of these witnesses, you

4   were trying to figure out what happened with Samy El-Goarany,

5   correct?

6   A.  Yes, ma'am.

7   Q.  Now, on your direct testimony you testified that one of the

8   social medias that you examined was Twitter, is that correct?

9   A.  Yes.

10  Q.  And you served a search warrant on Facebook and on Twitter,

11  correct?

12  A.  Yes, ma'am.

13  Q.  And the starting point of your investigation really was

14  with the electronic devices that everyone had, correct?

15  A.  No.

16  Q.  It wasn't?

17  A.  No.

18  Q.  Okay.  You tell me, where did you start?

19  A.  I mean, I wasn't there at the beginning of the

20  investigation but the starting point was interviewing family

21  members and associates.  That's where it started.

22  Q.  Did there come a point that you learned how many e-mail

23  addresses Samy El-Goarany had?

24  A.  There came a point where we found quite a few e-mail

25  addresses for Samy El-Goarany, yes.

H1BFGAM6                        Collie - cross

1    Q.  Let me see if I can help you out here.  Was one of His

2    e-mail addresses SamyElGoarany@Baruch.cuny.edu?

3    A.  Yes.

4    Q.  Was another one SamyElGoarany08@St.John's.edu?

5    A.  Yes.

6    Q.  And that's because he had been at college for six years,

7    correct; part of it at Baruch and part at St. John's?

8    A.  I believe so.

9    Q.  Fair to say he hadn't graduated, correct?

10              MR. QUIGLEY:  Objection.  Relevance.

11              THE COURT:  Overruled.

12   A.  As far as we knew he had not graduated.

13   Q.  How about SamyEl-Goarany@gmail.com; that was another

14   address?

15   A.  Yes.

16   Q.  Then he used sbey1453@facebook.com?  Correct?

17   A.  I don't believe he used that account.  I mean, you have to

18   speak with the Facebook, but that's usually an account that's

19   attached when you get a Facebook profile.  I don't think it's

20   actually an e-mail account.

21   Q.  You were aware of all of these e-mail accounts, correct?

22   A.  Yes, ma'am.

23   Q.  And as part of your investigation you looked into all of

24   those e-mail accounts, correct?

25   A.  Yes, we did.

H1BFGAM6                              Collie - cross

1  Q.  And you also, of course, the testimony has been quite

2  lengthy on his Facebook, but you definitely looked at all his

3  Facebook returns, correct?

4  A.  Yes, ma'am.

5  Q.  Just so the jury understands a return, that's just what you

6  get back from Facebook after you give them a search warrant?

7  A.  Yes.

8  Q.  Then you took a look at Mr. El-Goarany and by

9  Mr. El-Goarany, I mean Samy's Twitter accounts, correct?

10  A.  Yes.

11  Q.  And he had more than one Twitter account, is that fair to

12  say?

13  A.  Yes.

14  Q.  Did he actually have two or three Twitter accounts, do you

15  know?

16  A.  I remember two.

17  Q.  Okay.  All right, let's start with the two you remember.

18  One was @elgo-rhythm account, correct?

19  A.  Yes.

20  Q.  And the other one was called AbuMarad_is account?

21  A.  Yes.

22  Q.  What does the "is" stand for, by the way?

23  A.  I believe it stands for Islamic state.  I'm not sure.

24  Q.  You knew as the case agent because one of your specialties

25  is terrorism and social media, correct?

H1BFGAM6                      Collie - cross

1   A.  I wouldn't say it's a speciality of mine, no.

2   Q.  Well, when you write out that search warrant you tell the

3   judge that that's your expertise, right?

4   A.  I believe so.

5   Q.  In fact, you say your expertise is use of computer

6   technology by terrorist --

7           MR. QUIGLEY:  Objection to reading from a document not

8   in evidence.

9           THE COURT:  Overruled.

10  Q.  So you said that your training included and your expertise

11  includes use of computer technology by terrorist networks,

12  correct?

13  A.  Yes, we are trained in that.

14  Q.  And you're familiar with the way the network -- I mean, the

15  terrorist groups use the internet, correct?

16  A.  Yes.

17  Q.  And social media, correct?

18  A.  Yes.

19  Q.  And you subpoenaed his Twitter account, correct?

20  A.  Yes.

21  Q.  And you subpoenaed both of his Twitter accounts, is it fair

22  to say?

23  A.  Yes.

24  Q.  And when you got the -- let's just talk about the returns

25  you got on the elgo-rhythm account.

H1BFGAM6                          Collie – cross

1    A.  Yes.

2    Q.  Do you recall examining the returns on the elgo-rhythm

3    accounts?

4    A.  Some of them.

5    Q.  Is it fair to say that on the elgo-rhythm account Samy

6    El-Goarany was in touch with a person named Shami Witness,

7    correct?

8           MR. QUIGLEY:  Objection.  Document not in evidence.

9    Q.  Did you in your investigation learn that Samy El-Goarany

10   was in touch with Shami Witness?

11   A.  Yes.

12   Q.  Could you please tell the jury who Shami Witness is?

13   A.  Shami Witness is a moniker for an online ISIS sympathizer,

14   supporter, someone who operates on social networks.

15   Q.  Specifically he operates on the Twitter social network,

16   correct?

17   A.  Yes.

18   Q.  And he has 17,700 followers on Twitter, correct?

19   A.  I don't remember the exact number.

20   Q.  And Samy El-Goarany was one of them, correct?

21   A.  Yes.

22   Q.  And Samy retweeted several times what Shami Witness tweeted

23   in his account, correct?

24           MR. QUIGLEY:  Objection.  Document not in evidence.

25           THE COURT:  Sustained.

H1BFGAM6                          Collie - cross

1    Q.  In your investigation did you check the exchanges between

2    Samy and Shami Witness?

3    A.  Yes.

4    Q.  It's important for you to check, you're a terrorist agent,

5    correct?

6    A.  I'm assigned to the JTTF, yes.

7    Q.  And of course you checked those interactions, correct?

8    A.  We checked, yes.

9    Q.  And during your check you learned that Samy El-Goarany

10   repeatedly retweeted, with pleasure, Shammy Witness' tweets,

11   correct?

12          MR. QUIGLEY:  Same objection.

13          THE COURT:  Sustained as to the form.

14   Q.  Sir, in your investigation did you learn that Samy

15   retweeted Shami Witness' tweets?

16   A.  Yes.

17   Q.  How about a person named Ghazi Shami?  Fair to say another

18   ISIS supporter on Twitter?

19   A.  Yes.

20   Q.  And Samy was active with him as well?  Correct?

21   A.  Yes.

22   Q.  And both of these people were active with Samy El-Goarany

23   before he left the United States, correct?

24   A.  Active on Twitter?

25   Q.  Yes.

1   A.  Yes.

2   Q.  And of course there came a point when your investigation of

3   Samy El-Goarany's case led to you also investigating Mr. El

4   Gammal, correct?

5   A.  Yes.

6   Q.  And it's fair to say that Mr. El Gammal was not on Twitter,

7   correct?

8   A.  Yes.

9   Q.  Now, let's talk about Mr. Samy El-Goarany's Abu Marad

10  account, another?  He set up a Twitter account in the name of

11  Abu Marad, correct?

12  A.  Yes.

13  Q.  And you of course got a search warrant on the account,

14  correct?

15  A.  Yes, we did.

16  Q.  And you got a return from Twitter, correct?

17  A.  Yes.

18  Q.  And then you reviewed the Twitter, the returns from Twitter

19  on that account?

20  A.  They reviewed them.  I don't believe I was the one who

21  reviewed them.

22  Q.  Okay.  And then there was a third account.  Do you remember

23  learning that Samy's Twitter account had been suspended because

24  of the language he used?

25  A.  It was suspended.  We don't have an exact reason.

1    Q.  And in fact, it was suspended and you in your investigation

2    tried to find out what Samy El-Goarany was saying on that

3    account by going on to other people's Twitter accounts?

4    Correct?

5    A.  We were trying to figure out what he was saying on his

6    account.  We were actually searching cached pages of his

7    account, so not necessarily by going on other people's

8    accounts, but looking at I guess older content before his

9    account was suspended.

10   Q.  You wanted to find out his open content on Twitter,

11   correct?

12   A.  Yes.

13   Q.  And you actually did find some of his open content on

14   Twitter.  You found it at Lebanese Problem, correct?

15   A.  That is one, yes.

16   Q.  And when you found that Lebanese Problem had Samy's Twitter

17   on it, you made note of it for your investigation, correct?

18   A.  Yes, I did.

19   Q.  And when he was tweeting on that account you noted, did you

20   not, that you were on the right track with your investigation,

21   yes?

22   A.  Yes.  On the right track of confirming that that Twitter

23   account was being used by Samy, because we had not received the

24   legal process yet, the returns of the legal process.

25   Q.  It actually confirmed a little bit more for you, correct?

H1BFGAM6                          Collie - cross

1   It confirmed for you that Samy chose to like women in a

2   particular way, correct?  Confirmed that for you?

3   A.  Chose to like women in a particular way?

4   Q.  Right.  The tweets he chose was in keeping with the way he

5   had tweeted before.

6   A.  I'm sorry, repeat the question?

7   Q.  Did you note in reading the tweet on @Lebanese Problem that

8   Samy's rhetoric had changed but his need to teach, need to brag

9   are still there?  Do you recall coming to that conclusion, sir?

10  A.  Yes, I do.

11  Q.  And you recall that you also came to the conclusion that

12  aside from the obvious party lines you clearly saw Samy

13  El-Goarany's need to be right and to seek out arguments to show

14  it, correct?

15  A.  Yes, I did.

16  Q.  And that comported with your view of Samy El-Goarany,

17  correct?

18  A.  Yes.  That was his online presence, but yes.

19  Q.  Okay, fair enough, let's just talk about his online

20  preference.  It was clear that his online presence was

21  strong-willed, correct?

22  A.  Yes.

23  Q.  Vocal, correct?

24  A.  Yes.

25  Q.  He liked to talk on Twitter, Facebook, wherever.  Wherever

H1BFGAM6                          Collie - cross

1    he could talk he talked, correct?

2    A.   I don't know about wherever he could talk, but, yes, he

3    spoke a lot on social media.

4    Q.   And he invited discourse?

5    A.   Yes.

6    Q.   And he invited discourse on all sorts of causes, correct?

7    A.   Many causes, yes.

8    Q.   Is it fair to say there was never a cause that Samy

9    El-Goarany didn't like?

10   A.   I don't think it would be fair to say that.  I don't know

11   all the cases that he liked or doesn't like.

12   Q.   Okay.  How about do you recall Samy El-Goarany talking

13   about Occupy Wall Street as a cause, he opined on that,

14   correct?

15   A.   I believe so.

16   Q.   And he opined on Black Lives Matter, correct?

17   A.   I honestly can't remember specifically.

18   Q.   Would it refresh your recollection to know that Samy

19   El-Goarany posted that Officers Ramos and Yu were properly

20   killed because of what happened?

21           MR. QUIGLEY:  Objection.

22           THE COURT:  Overruled.  Would that refresh your

23   recollection?

24   A.   I don't think so.  I mean, I don't know the specific

25   comments.  I don't know if it would reflect my recollection.

H1BFGAM6                          Collie - cross

1   Q.  All right.  Do you recall Samy El-Goarany posting and

2   commenting on the Israeli-Palestinian conflict?

3   A.  Yes, ma'am.

4         MR. QUIGLEY:  Objection.  Documents not in evidence.

5         THE COURT:  Overruled.

6   Q.  You recall Samy El-Goarany being vocal and active about the

7   way Muslims were treated?

8   A.  Yes, ma'am.

9   Q.  And you recall Samy El-Goarany being argumentative and

10  vocal about the Arab Spring?

11  A.  Yes, ma'am.

12  Q.  And you recall Samy El-Goarany engaging in clearly

13  provocative language on social media, right?

14  A.  I think it depends on your viewpoint in terms of clearly

15  provocative.  He was argumentative on social media, yes.

16  Q.  Do you recall him calling somebody a white piece of shit on

17  social media?

18  A.  I believe so, yes.

19  Q.  You'd say that was pretty provocative, wouldn't you?

20  A.  That particular statement, yes.

21  Q.  Now, the other social media that Samy El-Goarany was active

22  on, I don't know if you even call it social media because, I

23  have to apologize, I don't do any of these things, was PQChat,

24  correct?

25  A.  Yes.

H1BFGAM6                         Collie - cross

1   Q.  Could you tell the jury, sir, what PQChat is?

2   A.  It's a encrypted messaging app.

3   Q.  And in your investigation you learned who was part of

4   Samy's PQChat group, correct?

5   A.  We found messages to indicate he had told specific people

6   about his PQChat or to download PQChat.

7   Q.  Could you tell the jury which ones those were?

8   A.  His brother, his father.

9   Q.  Let's just stop there.  His brother.  By his brother you

10  mean Tarek El-Goarany, correct?

11  A.  Yes.  His brother Tarek El-Goarany, yes.

12  Q.  Right, and who else?

13  A.  His father, Mohamed El-Goarany.

14  Q.  Okay, and who else?

15  A.  Mr. Khalafalla Osman.

16  Q.  Okay, how about Ahmed El-Goarany, the cousin in Egypt?

17  A.  Yes.

18  Q.  Is it fair to say that he had a code word between all of

19  them, right, he would say, "Let's go to the bat cave," right?

20  A.  We don't know if that was the code word for PQChat or

21  Cryptocat, which he used with the defendant.  We don't know

22  exactly, how many times he used the code word that it meant

23  whatever specific app.

24  Q.  You don't know because he used so many words so many

25  places, correct?

H1BFGAM6                          Collie - cross

1   A.  He used different apps, yeah.

2   Q.  Let's just talk about Cryptocat because you brought that

3   up.  Is it fair to say, sir, that he asked -- by "he" I mean

4   Samy El-Goarany asked Mr. Gammal to download Cryptocat,

5   correct?

6   A.  He asked him.  I don't think he told him that he has to.

7   Q.  Do you recall Mr. Gammal's response to Samy asking him

8   about Cryptocat?

9   A.  I think the first one was his asking or Samy asking if he

10  knew what Cryptocat was.

11  Q.  By he you mean Mr. Gammal, right?

12  A.  If Mr. El Gammal knew what Cryptocat was, yes.

13  Q.  And do you recall, sir, what Mr. Gammal's response was to

14  that?

15  A.  I believe it was no.

16  Q.  Okay.  And what was the next thing that happened, since

17  Mr. Gammal didn't know what Cryptocat was?

18  A.  Do you mind?  I can pull the conversation.

19  Q.  Certainly not.  Please do so.

20          (Pause)

21  Q.  I take it you're looking at Exhibit number -- what exhibit

22  number are you --

23  A.  I pulled out 100B.

24  Q.  100B?

25  A.  Yes.  So, yes, Mr. El-Goarany asked Mr. El Gammal if he

1    knew what Cryptocat is, or was at the time.  Mr. El Gammal said

2    no.  Mr. El-Goarany sent him I guess the extension crypto.cat

3    to which Mr. El Gammal said, "I heard of crypto Jew."

4    Q.  And that's not an app, right?

5    A.  Not that I know of.  And then Mr. El-Goarany replies, "ha

6    ha ha," and then Mr. El Gammal says, "What it means."  Keep

7    going?

8    Q.  Could you just enlarge that for me as to where the agent --

9    Mr. Gammal said what, sir?

10   A.  "What it means."  This is at 2014-08-14.

11   Q.  And you take from Mr. Gammal's response "what it means,"

12   meaning what is Cryptocat, correct?

13   A.  Yes.

14   Q.  And does that let you infer that Mr. Gammal did not know

15   what Cryptocat was?

16          MR. QUIGLEY:  Objection.

17   A.  At the time, no.

18   Q.  So then Samy educates him, correct?

19   A.  Yes, ma'am.

20   Q.  And then eventually as you go through this post you learn

21   that in fact Mr. El Gammal is not able to download Cryptocat,

22   correct?

23   A.  Are you saying -- no, that's not what we learned.  Mr. El

24   Gammal says, no, I got already, after sending a string of what

25   looks like code or encryption.

H1BFGAM6                         Collie - cross

1   Q.  I'm sorry, what page are you on, sir?

2   A.  Page 9.  22053.

3   Q.  Do you see where Mr. El Gammal says, "I do not know what to

4   do here?"  I think they're trying to pull it up for you.  And

5   could you enlarge that section, please?

6   A.  Which page is that?

7   Q.  Page 12.

8   A.  I see Mr. Gammal say "do not what to do here."

9   Q.  Right.  And if you could go one page back?

10  A.  Okay.

11  Q.  And one more page back?

12  A.  Okay.

13  Q.  That's the line you forgot to read when were you doing your

14  direct with Mr. Quigley.  So maybe you can go back to page

15  10 --

16          MR. QUIGLEY:  Objection to the speech.

17          THE COURT:  Sustained.

18  Q.  Sir, did you forget to read that line on direct when you

19  were doing your direct play-by-play with Mr. Quigley?

20  A.  Which line?

21  Q.  This line right there.  The line right there.  "Do not what

22  to do here."  Did you forget to read that line, sir, on direct?

23  A.  I don't think I forgot to read the line.

24  Q.  Do you think you read the line in direct?

25  A.  I mean, I had this in front of me.  I don't think I forgot.

H1BFGAM6                     Collie - cross

Maybe we stopped reading at that point?  Had I stopped reading?

Q.  You stopped reading right before that line.

A.  Right before the line.

Q.  And the line says "do not what to do here."  Right?

A.  Yes.

Q.  And that follows the conversation about Samy El-Goarany telling Mr. El Gammal to download Cryptocat, correct?

A.  Yes, it does.

Q.  And that's the point where he jokes around and there is no indication after that Mr. El Gammal ever downloads Cryptocat, correct?

A.  Incorrect.

Q.  Really?  Can you point me to any singular conversation --

A.  On -- sorry.

Q.  No, go ahead.

A.  Page 12, so after the line we just talked about. Mr. Gammal says, "What about viper."  I believe he's referring to Viber, but "What about viper, I have viper, What's Up, Tango."

        Mr. El-Goarany says, "Yeah, forget it.  Just try Surespot, it will work better."

Q.  Sir, my question was, and you can stop there, we can get to Surespot in just a minute, but stop there.  My question is about PQChat -- Cryptocat.  Sorry, my question is only about Cryptocat.  So my question is where to this point do you see

H1BFGAM6                        Collie - cross

1   any indication that Mr. Gammal is successful in downloading

2   Cryptocat to engage with Mr. El-Goarany?

3           MR. QUIGLEY:  I think he was stopped from answering

4   the question.

5   A.  Yeah, I was getting there, ma'am.  I mean, I can skip over

6   those portions if you like.  2014-08-14, the UTC is 04:26:25.

7   Mr. El Gammal asked Mr. El-Goarany so delete crypto at question

8   mark.

9   Q.  Right.

10  A.  To which Mr. El-Goarany replies, "Yeah, delete it."

11  Q.  And that's how many seconds after he tells him to download

12  the app?

13  A.  How many seconds after he tells him to download the app?

14  Q.  The request to download is at what time, sir?

15  A.  I'm sorry.  Okay, so Mr. El-Goarany sends -- are you asking

16  about the first time he asked him about Cryptocat or

17  specifically the http address he sends him?

18  Q.  Sir, pick the earliest time of when Mr. El-Goarany asks

19  Mr. Gammal to get Cryptocat.

20  A.  The earliest time would be UTC 04:06:00.

21  Q.  And what is that in English, if you don't mind me asking,

22  sir?

23  A.  So in the UTC it would be 4:06.

24  Q.  And at what time does the conversation end with "forget

25  about it."

1   A.  Forget about it?

2   Q.  What I mean is, when Mr. Gammal says so forget about it,

3   don't bother with it.  Maybe it would help you out if you just

4   look up at the screen.

5   A.  Oh, that says, "Ya, delete it."  You asked me about so

6   forget about it.  That's what I was looking for.

7   Q.  Okay so delete it.  How many minutes elapsed between the

8   two?

9   A.  How many minutes?

10  Q.  Yes.

11  A.  Twenty minutes.

12  Q.  So it's fair to say, right, there is no indication of

13  Mr. El Gammal and Mr. Samy El-Goarany ever speaking on

14  Cryptocat, correct?

15  A.  We wouldn't be able to see it if they did, no.

16  Q.  You would not be able to know the content, but you would

17  certainly be able to see if they did, correct?

18  A.  I don't know that for sure, no.

19  Q.  Really?

20  A.  No.

21  Q.  Your testimony is that as an expert in terrorism and social

22  media you do not know if a person can tell if there was, not

23  the content, just whether or not there was an exchange between

24  two people on Cryptocat?

25          MR. QUIGLEY:  Objection.  He's not testifying as an

H1BFGAM6                         Collie - cross

1    expert.

2              THE COURT:  Overruled.

3    A.  So the question is if -- no, I can't say for sure.

4    Q.  Let me show you what is marked as Defense Exhibit 113AA.

5              MS. SHROFF:  May I, your Honor?

6              THE COURT:  You may.

7    Q.  Do you recognize that as part of your Facebook returns?

8    A.  Yes, ma'am.

9    Q.  And it's fair to say that's an exchange between Samy

10   El-Goarany and his friend Rameez Farooqi, correct?

11   A.  Yes, ma'am.

12   Q.  And this is an exchange between the two of them where Samy

13   is once again asking somebody to download an app, correct?  The

14   first line, if you take a look, says Cryptocat, correct?

15   A.  Yes, ma'am.

16             MR. QUIGLEY:  Objection.

17             THE COURT:  Overruled.

18   Q.  And it's Samy El-Goarany is the author, so he's sending the

19   message and the recipient is Mr. Farooqi, correct?

20   A.  Yes, ma'am.

21   Q.  And if you could just take a look, and it talks, this is an

22   exchange between the two of them, correct?

23   A.  Yes, it is.

24   Q.  And on page, on the top corner, 290113, right, you see

25   these exchanges between them on Cryptocat, correct?

H1BFGAM6                         Collie - cross

1           MR. QUIGLEY:  Objection.  The document is not in

2    evidence.

3           MS. SHROFF:  Your Honor I move 113-AA into evidence.

4           THE COURT:  Objection?

5           MR. QUIGLEY:  Hearsay, your Honor.

6           THE COURT:  Let's talk.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1BFGAM6                          Collie - cross

1              (At the side bar)

2              THE COURT:  Is the point of all this just to get him

3    to admit that if there were to be a conversation on Cryptocat

4    between two individuals the government would know that fact

5    even though they wouldn't know the substance?  Is that what you

6    want him to admit to?

7              MR. QUIGLEY:  I don't think he knows what this is,

8    number one.

9              MS. MIRON:  Your Honor, if I may be heard.  They

10   established the hearsay foundation through their own witness,

11   Ms. Chance.  This is from Government Exhibit 113.  So the

12   hearsay objection should not be sustained because they

13   established the hearsay foundation.

14             MR. QUIGLEY:  We had a whole slew of pretrial, if the

15   document was admissible in its entirety as a business record

16   there would be no need to have three rounds of motions in

17   limine litigating whether portions of these Facebook records

18   fall into other hearsay objections like statements against

19   interest.  This would be hearsay within hearsay.  These

20   documents contain an additional level of hearsay.

21             MS. MIRON:  It's not being admitted for the truth of

22   the matter.  It's the reflection of the Cryptocat exchange,

23   which is in code.

24             THE COURT:  I don't know that we need to have this

25   conversation which is why I started with is the whole point of

H1BFGAM6                          Collie - cross

```
 1   this that the agent is either unwilling or unable to say

 2   whether the government would be able to see the fact of a

 3   conversation between two individuals on Cryptocat even if they

 4   can't get the content of the conversation?  Is that what the

 5   point you're trying to make?

 6            MS. MIRON:  Your Honor, there's more to it in this

 7   document.  Samy asks Rameez Farooqi to tell people he got an

 8   internship and then asked him to try out Cryptocat, so there is

 9   more relevance than just the fact that the agent wouldn't be

10   able to discern from a Facebook record.

11            THE COURT:  But the point of using the document now

12   with this witness and this line of questioning, that's the

13   point, right?

14            MS. SHROFF:  Twofold, your Honor.  One is Samy

15   El-Goarany told different people different plans and, two, that

16   the government can very easily tell when there's a conversation

17   on Cryptocat, it's clear from the document and the document is

18   a return got through law enforcement.  This is their return.

19            MR. QUIGLEY:  It's a bunch of code.  I mean, he may

20   speculate and say what that is.

21            MR. DEFILIPPIS:  Your Honor, it's also classic

22   statements that defense is not permitted to introduce which are

23   co-conspirator hearsay statements.

24            MR. HABIB:  None of Samy's statements are being

25   offered for the truth.
```

1              MR. QUIGLEY:  Yeah, they are.

2              MS. TEEKEI:  She just said they are.

3              MS. SHROFF:  No, they're not.  It doesn't matter what

4      the plan is.  Absolutely not.  That's not what I said.  What I

5      said is what the different things were is immaterial.  The fact

6      he said different things to different people is immaterial and

7      that's not hearsay.

8              MS. TEEKEI:  And you know that based on the words in

9      that document so the offer is being made for the truth.

10             MS. SHROFF:  It's not.  It doesn't say whether he went

11     on the damned internship or not.  Nobody cares.

12             THE COURT:  Is the agent to your knowledge familiar

13     with these documents?

14             MR. QUIGLEY:  Your Honor, these are parts of hundreds

15     of thousands of Facebook returns.  Is he generally familiar,

16     yes, but has he reviewed every conversation in there, no.

17             MS. SHROFF:  They're trying a Facebook case, right?  I

18     mean --

19             MR. DEFILIPPIS:  Just taking the representation that

20     their conversations about an internship, defense presumably

21     encloses and will try to argue that this corroborates that in

22     fact that Samy was going over for something other than --

23             THE COURT:  Let's do this.  I will sustain the

24     objection for now.  Move on to some other line of questioning.

25             MS. SHROFF:  Well, you only have ten minutes.

H1BFGAM6                         Collie - cross

1            THE COURT:  Yes, I know.  You're not going to finish

2     with him today.

3            MS. SHROFF:  No.

4            THE COURT:  So let's move on.

5            MS. SHROFF:  You want us to write on this, brief on

6     this?  What would you like us to do?

7            THE COURT:  Let's think about it some more.

8            MS. SHROFF:  No, no, we'd like this in evidence.  We

9     would like to know how you want to proceed.

10           THE COURT:  So the government is objecting.

11           MR. QUIGLEY:  Yes.

12           MS. SHROFF:  What is the basis for the objection?

13           MR. QUIGLEY:  Hearsay.

14           THE COURT:  Put it in a letter and respond.

15           MS. SHROFF:  Is the Court ruling it is hearsay or is

16     the Court holding it in abeyance?

17           THE COURT:  I'm holding it in abeyance.

18                 (Continued on next page)

19

20

21

22

23

24

25

H1BFGAM6                         Collie - cross

1                    (In open court; jury present)

2                    THE COURT:  Ms. Shroff.

3     BY MS. SHROFF:

4     Q.  Would you like to change your answer or would you like to

5     keep your original answer?

6                    MR. QUIGLEY:  Objection.

7                    THE COURT:  Sustained.

8     Q.  Agent Collie, am I correct that Mr. Samy El-Goarany was

9     also active on something called PQChat?

10    A.  Yes, ma'am.

11    Q.  And is it your testimony that the government would not know

12    when two people are engaged in a conversation on PQChat?

13    A.  As it's happening, no.

14    Q.  Not as it's happening.  What I mean is when you get a

15    Facebook return back, I mean, a search warrant return back

16    would you in your review be able to tell that two people

17    engaged in a conversation on PQChat?

18    A.  I think so.

19    Q.  Okay.  And if you've answered this already, I apologize,

20    but on PQChat Mr. El-Goarany spoke with his cousin, Ahmed,

21    correct?

22    A.  I know they discussed PQChat.  We've seen them discussing

23    PQChat.

24    Q.  And you already testified that he spoke with his father on

25    PQChat, correct?

H1BFGAM6                    Collie - cross

1   A.  Yes.

2   Q.  And you also testified that he spoke with his brother Tarek

3   on PQChat, correct?

4   A.  Yes.

5   Q.  And Samy had another brother as well, correct?

6   A.  Yes.

7   Q.  And that brother's name is Khalid El-Goarany, correct?

8   A.  His half brother, yes, ma'am.

9   Q.  And Khalid El-Goarany lives in the United States, correct?

10  A.  Yes.

11  Q.  Was he also on PQChat with Mr. Samy El-Goarany?

12  A.  I do not recall.

13  Q.  Fair enough.  Now, is it fair to say that Samy El-Goarany

14  also had a Kick account?

15  A.  I do not recall seeing a Kick account.

16  Q.  You do not recall him having a Kick account that is

17  A-b-u-g-e-h-a-d, S-o-b-h 7Z?  Do you recall him having a Kick

18  account with that name?

19  A.  I do not recall that, no.  I'm sorry, can you spell it

20  again?

21  Q.  Sure.  A-b-u-g-e-h-a-d.  If I were to pronounce it I would

22  pronounce it as Abu Gehad.  And then Sobh, S-o-b-h, which is

23  one of the names in his father's name, correct, Sobey,

24  S-o-b-e-y?

25  A.  Sobey, yes.

H1BFGAM6                    Collie - cross

1    Q.  And then 7Z.  Does that refresh your recollection that he

2    had a Kick account?

3    A.  No, ma'am.

4    Q.  Fair enough.  And he also had an Instagram account,

5    correct?

6    A.  I do knot recall.

7    Q.  You don't recall?  Do you recall if Mr. Gammal had an

8    Instagram account?

9    A.  I do not recall, no.

10   Q.  Do you recall Samy El-Goarany having a Tumbler account?

11   A.  I don't recall that.

12   Q.  And it's fair to say, right, that as part of your

13   investigation you also tried to figure out what internet sites

14   Samy El-Goarany accessed, correct?

15   A.  Yes.

16   Q.  And you noticed that Samy accessed a website so-called

17   ask.fm, correct?

18   A.  I don't recall.  I remember a discussion and exchange about

19   it, but I don't remember seeing him access that.

20   Q.  You recall him having a discussion about ask.fm?

21   A.  I can't say for sure.  I don't recall.

22   Q.  And of course Samy El-Goarany was prolific on YouTube,

23   correct?

24   A.  He did have a YouTube.  I don't know if I would call it

25   prolific.  A lot of people have a lot of videos.

H1BFGAM6                          Collie - cross

1    Q.  Could you tell the jury what it is that Samy El-Goarany did

2    on YouTube?

3    A.  Watched a lot of videos, subscribed to a lot of YouTube

4    videos.

5    Q.  And many of those videos included political topics,

6    correct?

7    A.  The videos did include political topics, yes.

8    Q.  And they included whatever was in the media at that time,

9    correct?

10   A.  Yes.  I believe there was media specific, yes.

11   Q.  Now, as part of your investigation you also tried to

12   inspect Samy El-Goarany's computer, correct?

13   A.  I don't think we inspected Samy El-Goarany's --

14   Q.  Oh, I know you didn't inspect it, I said you wanted to

15   inspect it.

16   A.  It would have been a step in the investigation.

17   Q.  Is there a reason why you didn't inspect his computer?

18   A.  By the time the investigation started Mr. El-Goarany was

19   gone and at the onset of the investigation we had no knowledge

20   that there was a computer.

21   Q.  And at some point you learned there was a computer,

22   correct?

23   A.  At some point we did learn, yes.

24   Q.  Could you tell the jury what happened to the computer?

25   A.  We were told the computer was thrown in a Dumpster.

H1BFGAM6                    Collie - cross

1  Q.  And who threw it in a Dumpster, sir?

2  A.  Samy El-Goarany.

3  Q.  And who helped him throw it in the Dumpster, sir?

4  A.  Our information is he threw it in himself.

5  Q.  Your information is not that his brother drove him to a

6  barnyard and helped him throw it in a Dumpster?

7  A.  Our information was Tarek was with him.

8  Q.  So Tarek was with Samy when he dumped his computer in a

9  Dumpster, correct?

10  A.  Yes.

11  Q.  And when that happened Samy had informed his brother that

12  he was leaving the United States, correct?

13          MR. QUIGLEY:  Objection.

14          THE COURT:  Overruled.

15  A.  Yes, ma'am.

16  Q.  By the way, did the FBI try and go find the computer at the

17  Dumpster?

18  A.  I believe so, but it was a long period of time after that.

19  Q.  But you tried to go find it?

20  A.  I didn't.

21  Q.  No, no, I meant your team.

22  A.  I believe so.  I'm not sure.

23  Q.  And that would be because it would be an important piece of

24  evidence, correct, in an investigation?

25  A.  Yes, ma'am.

H1BFGAM6                          Collie - cross

1    Q.   Now, you testified on direct that you also looked at the

2    Facebook search warrant returns for a person named Attiya

3    Aboualala, correct?

4    A.   Yes.

5    Q.   And it's fair to say that Attiya Aboualala is a person who

6    lives in Turkey, correct?

7    A.   Yes.

8    Q.   In fact, he still lives in Turkey today, correct?

9    A.   I don't know about today specifically, but last we knew he

10   was living in Turkey.

11   Q.   And when was that?

12   A.   Maybe three months ago.

13   Q.   And Attiya Aboualala is a journalist in Turkey, correct?

14   A.   Yes, ma'am.

15   Q.   He works for an actual TV station in Turkey, correct?

16   A.   I haven't seen any employment records for him.  It's based

17   on information that was information that you could put on your

18   own Facebook page as well as what was reported to us in

19   interviews.

20   Q.   Okay.  So what was reported to you, whatever intelligence

21   the FBI got confirmed for you that Mr. Attiya Aboualala is a

22   journalist in Turkey, correct?

23   A.   It indicated that he was a journalist.  Again, we don't

24   have confirmation on that.

25   Q.   You're the FBI, right?  You could go get confirmation,

1    correct?

2              MR. QUIGLEY:  Objection.

3              THE COURT:  Overruled.

4    A.  Can the FBI get confirmation on that?

5    Q.  Of course.  You're the FBI.

6    A.  Well, I'm not the FBI, I work with the FBI, but I don't --

7    I can't say yes or no either way.  We're talking about being in

8    a third country and confirming his work in a third country, I

9    don't know that the FBI can do that in every instance.

10   Q.  But you reviewed Attiya's Facebook interactions, correct?

11   A.  We did, yes.

12   Q.  And you reviewed Attiya's Facebook postings, correct?

13   A.  Yes.

14   Q.  And you reviewed Attiya's postings with Mr. Samy

15   El-Goarany, correct?

16   A.  Conversations, yes.

17   Q.  And you reviewed his conversations with Mr. El Gammal,

18   correct?

19   A.  Yes, we did.

20   Q.  And when you were investigating Mr. Attiya Aboualala, and

21   you were investigating him, correct?

22   A.  Yes.

23   Q.  And you learned certain facts about Mr. Attiya Aboualala,

24   correct?

25   A.  Yes.

H1BFGAM6                          Collie - cross

1   Q.   And one of the facts that you learned was that he was part

2   of the Muslim Brotherhood, correct?

3   A.   Yes.

4   Q.   And the Muslim Brotherhood, could you tell the jury --

5   A.   I would say -- I wouldn't say a fact, we don't have the

6   ability to search like Muslim Brotherhood membership,

7   specifically, to say that he's a card-carrying member of the

8   Muslim Brotherhood.   Based on the review of his accounts,

9   photos that he's posted, seems like he's a sympathizer or at

10  least supports the Muslim Brotherhood.

11  Q.   Well, you don't mean anything negative when you use the

12  word "sympathizer," correct?

13  A.   No.   Sympathetic to the Muslim Brotherhood.

14  Q.   The Muslim Brotherhood is a democratic organization, party

15  in Turkey, correct?

16  A.   There are people from the Muslim Brotherhood in Turkey.   In

17  Egypt the Muslim Brotherhood was a democratically-elected

18  party, yes, ma'am.

19  Q.   And you learned, did you not, through this investigation,

20  that Mr. Attiya Aboualala covered the Arab Spring and the Rab'a

21  Square protests, fair to say?

22  A.   Yes, ma'am.

23  Q.   And you learned through your investigation, including your

24  review of Attiya's Facebook, that there came a point when the

25  democratically-elected government in Egypt was overthrown,

H1BFGAM6                        Collie - cross

1    correct?

2    A.  Yes.

3    Q.  And you learned from your investigation that Attiya was at

4    risk in Egypt, correct?

5           MR. QUIGLEY:  Objection.  Hearsay.

6           THE COURT:  Sustained.

7    Q.  Sir, did there come a point in your investigation that you

8    learned that Attiya Aboualala left Egypt or escaped from Egypt

9    to go to Turkey?

10          MR. QUIGLEY:  Same objection.

11          THE COURT:  Overruled.

12   A.  Yes, left Egypt.  I think ultimately ended up in Turkey as

13   well.

14   Q.  He got a visa, correct?  In fact, you looked at Attiya's

15   passport because his passport is posted on Facebook, correct?

16   A.  Not posted on Facebook, but in Facebook messages.

17   Q.  See, I'm not on Facebook because I don't know what the

18   language is.  Whatever it is, his passport is on Facebook,

19   correct?

20   A.  Yes.

21   Q.  And whatever it is, he was so happy he posted an actual

22   picture of the visa, correct?  You don't have to look at him,

23   sir.

24   A.  He started to get up.  I don't know if he was excited.  I

25   wasn't there, but I know there was a Facebook message with his

1   passport.

2   Q.  And his visa to go to Turkey?

3   A.  And his visa.

4   Q.  And also on Facebook and also something you reviewed was

5   Attiya's resume, correct?

6   A.  Yes, ma'am.

7   Q.  And you actually reviewed Attiya's resume, correct?

8   A.  It was reviewed.  I wasn't, I didn't review it

9   specifically, but I know it was reviewed.

10          THE COURT:  Let's, it's 4:00, so let's review

11  Mr. Attiya's resume tomorrow.

12          MS. SHROFF:  Sure.

13          THE COURT:  Ladies and gentlemen, we are ending the

14  proceedings for this afternoon.  We will see you bright and

15  early tomorrow morning.  Please do try to be in the jury room

16  by no later than 9:20 so we can get started on time.  Until

17  then please do not discuss the case, please do not read about

18  it on any media and please do not do any research.  Have a

19  very, very good evening we'll see you tomorrow morning.

20          (Jury excused)

21          (Adjourned to January 11, 2017 at 9:30 a.m.)

22

23

24

25

<pre>
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    SHANNON CHANCE

 4    Direct By Ms. Tekeei . . . . . . . . . . . .58

 5    Cross By Ms. Miron . . . . . . . . . . . . .91

 6    KOMAAL COLLIE

 7    Direct By Mr. Quigley  . . . . . . . . . . . 102

 8    Cross By Ms. Shroff  . . . . . . . . . . . . 200

 9                        GOVERNMENT EXHIBITS

10    Exhibit No.                             Received

11     100-A   . . . . . . . . . . . . . . . . . .69

12     100N    . . . . . . . . . . . . . . . . . .77

13     100X    . . . . . . . . . . . . . . . . . .78

14     100D    . . . . . . . . . . . . . . . . . .80

15     100B    . . . . . . . . . . . . . . . . . .83

16     102B, 110A, 111G, 112E, 113B, 120B and  . . . .87

17           122H

18     1005    . . . . . . . . . . . . . . . . . . 113

19     110-B, 110-F, 110-G  . . . . . . . . . . . 118

20     140   . . . . . . . . . . . . . . . . . . . 133

21     102A and 120A  . . . . . . . . . . . . . . 138

22     110V    . . . . . . . . . . . . . . . . . . 160

23     111-A, C, D, E and F and 112-A through  . . . 164

24           D

25     103 and 103-A  . . . . . . . . . . . . . . 165
</pre>

```
 1    903      . . . . . . . . . . . . . . . . . . 173

 2    1013, 1014 and 1015   . . . . . . . . . . . 175

 3    146      . . . . . . . . . . . . . . . . . . 177

 4    148      . . . . . . . . . . . . . . . . . . 178

 5    141      . . . . . . . . . . . . . . . . . . 180

 6    142      . . . . . . . . . . . . . . . . . . 182
```

 7                    DEFENDANT EXHIBITS

 8    Exhibit No.                          Received

 9     114 page 1   . . . . . . . . . . . . . . . .96

10    Exhibit 114 pages 387 and 388   . . . . . . .98

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25