H1CFGAM1                          Trial

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              15 Cr. 588 (ER)

 5   AHMED MOHAMMED EL GAMMAL,

 6              Defendant.

 7   ------------------------------x

 8                                          New York, N.Y.
                                            January 12, 2017
 9                                          9:30 a.m.

10
     Before:
11
                         HON. EDGARDO RAMOS,
12
                                            District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BRENDAN F. QUIGLEY
17   NEGAR TEKEEI
     ANDREW J. DeFILIPPIS
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
20   BY:  SABRINA SHROFF
          ANNALISA MIRÓN
21        DANIEL G. HABIB

22

23

24

25

H1CFGAM1                        Trial

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everyone.  I guess we have

4     to do a couple of things.  First of all, has everyone spoken

5     with Mr. Rucker?

6          MS. TEKEEI:  Yes, your Honor, the government has.

7          THE COURT:  And Ms. Shroff?

8          MS. SHROFF:  Yes.  Good morning, your Honor.  I did

9     speak with Mr. Rucker, and I reaffirmed that I had followed,

10    all the protocols that were put in place were followed.

11         THE COURT:  Good.  After my conversation with him, I

12    believe the defense has objected.  I will be filing the sidebar

13    conversation that we had separately.  Yes?

14         MS. SHROFF:  Your Honor, I also gave CIPA Section 5

15    notice again orally, which I know does not comport with the

16    statute, but sometime today, you know, it's a full day, I will

17    put in a handwritten motion.

18         THE COURT:  This is a separate one?

19         MS. SHROFF:  Yes.

20         THE COURT:  Very well.  I received the parties'

21    letters concerning Defense Exhibit 113A.  Thank you.  They were

22    very helpful and having reviewed the submissions the exhibit

23    will be received in its entirety.

24         (Defendant's Exhibit 113A received in evidence)

25         THE COURT:  It's interesting and new for me that in

H1CFGAM1                    Trial

this case which involves so much social media, where we have

individuals speaking essentially in realtime, and in this

particular instance they are texting each other and the

argument has been made, I think appropriately so, that the

statements made in the exhibit do represent present sense

impressions despite the fact that they are individuals not

obviously in the same location and do have to type in their

statements to each other, but given the way that communications

occur, I do find it given that there are time stamps on the

exhibit indicating that all of these communications were taking

place within minutes of each other, essentially the call and

response, I do think that they do constitute present sense

impressions or are otherwise admissible under Rule 803.

            Is there anything else that we need to do?  Ms. Miron?

            MS. MIRON:  I've noticed several times that Juror No.

9 has dozed off starting with my opening, and then yesterday

direct and cross whoever was engaged in examination he seemed

to be sleeping through part of it.  I think at this point we

would just ask that the Court remind the jury to pay close

attention and then perhaps take some stretch breaks in between

witnesses?  We'd like this juror to participate.

            THE COURT:  I had not noticed that, actually.  Has

anyone else?

            MR. QUIGLEY:  No, your Honor.

            MS. MIRON:  I mean, I believe other people have

H1CFGAM1                         Trial

1    noticed --

2              THE COURT:  I'm not challenging you, I'm just

3    surprised because I myself had not noticed but I will pay close

4    attention and I will make some mention of it in a way that

5    doesn't at least in this first phase identify him personally

6    and we'll see how it goes.  But I think, I'm surprised because

7    I have noticed that generally the jury has been paying close

8    attention and has been awake throughout.  Okay?

9              MS. MIRON:  Since we're still waiting for the jury to

10   come in I do want to raise this issue that we asked the

11   government for original versions of the photographs Mohamed

12   El-Goarany gave to the government that purport to depict Samy

13   El-Goarany's death.  We first learned that these photographs

14   existed in November of 2016 when we filed the motion in limine

15   to preclude the martyr letter, raising the issue of we had not

16   received any proof of death.

17             THE COURT:  Okay.

18             MS. MIRON:  So since then we've received 3500 that

19   shows Mohamed El-Goarany forwarding pictures to his son in

20   November.

21             THE COURT:  Which son?

22             MS. MIRON:  Tarek El-Goarany.  I believe after the

23   government spoke to Tarek, but that's just a presumption.  I

24   had not seen the original transmission to Mohamed El-Goarany,

25   which is strange because he understood that the government

```
1   needed proof of Samy El-Goarany's death and in fact was trying
2   to get that proof, but I don't know why he wouldn't have given
3   it to the government when he got it sometime early 2016.  We've
4   never seen the e-mail, Viber transmission, text, however he
5   originally received it, we don't have that original
6   transmission.  So that raises a number of authentication
7   issues, hearsay issues and best evidence rules issues relating
8   to the admission of those photographs.
9            THE COURT:  Okay.
10           MR. DEFILIPPIS:  Your Honor, we're aware of this
11  inquiry of concern by defense counsel.  We have inquired
12  further with Mr. El-Goarany.  The fact of the matter is he does
13  not recall exactly when he received the photograph.  He
14  recently did a search of his devices in order to locate the
15  transmission.  He was unable to do that.  Whether the reason is
16  because it was not preserved or he deleted -- the bottom line
17  is we don't know why it's no longer on his electronic devices
18  but we have provided what copies of the photographs we do have
19  to defense counsel and they're free if he testifies to
20  cross-examine him on that.
21           THE COURT:  So is it the thought that the father,
22  Mr. El-Goarany, received the photograph via electronic
23  transmission?
24           MR. DEFILIPPIS:  It is.  What he did, according to our
25  discussions with him, is he saved that photograph to his photo
```

H1CFGAM1                    Trial

1    album on his phone and then ultimately e-mailed it to the

2    government through his son, as Ms. Miron indicates.  But in

3    terms of the original transmission he was just unable to locate

4    that transmission.

5         THE COURT:  So it's not necessarily the photograph,

6    because what the government has is an original photograph

7    presumably as Mr. El-Goarany the father received, just so many

8    digits, right?  So what you're really interested in is the date

9    and manner of the original transmission?

10        MS. MIRON:  That's one issue, yes.  We're interested

11   in that.  But also a more original version of the photographs.

12   We would like to have them inspected by an expert to determine

13   when they were taken, whether they were doctored in any manner

14   and to the extent that the provenance of these photographs

15   depends on Mohamed El-Goarany's credibility, that raises a

16   separate Giglio concern which we could discuss outside of the

17   public record.  But it certainly goes to our pending motions.

18        THE COURT:  Okay.

19        MR. DEFILIPPIS:  Your Honor, if they'd like to

20   cross-examine him on whether he doctored a photo of his son's

21   death, then they're free to.

22        THE COURT:  Okay.  Well, let me ask this:  Is the

23   government making any further effort or are there any further

24   efforts underway to identify or obtain that original

25   transmission?

H1CFGAM1                    Trial

1         MR. DEFILIPPIS:  Your Honor, last week we made a

2    fairly extensive effort and I think at this point we will

3    continue to try and do what we can, but I think we've exhausted

4    whatever efforts we could make.

5         MS. MIRON:  We would inquire.  Does that mean they

6    searched the devices, does that mean they searched the photo

7    album and if so was there any record of the photograph

8    preserved in the manner that Mohamed El-Goarany asserts?

9         MR. DEFILIPPIS:  Your Honor, we, both before this

10   issue came up, Mr. El-Goarany searched his devices for

11   transmissions that would be relevant to this case and that

12   would be discoverable.  Once defense counsel raised this issue

13   we instructed him to conduct another search that was done

14   partially in the presence of representatives of the government.

15   He was unable -- he searched all of the devices he still has

16   that he thought it might have been transmitted on.  He was

17   unable to find the photograph.

18        We have produced to defense counsel the transmission

19   in which he sent an e-mail last year to the government

20   transmitting the photograph.  We produced that to defense

21   counsel.  What more we can do beyond that I'm not quite sure.

22   We have also in an unprecedented step or an unusual step for a

23   witness, we have given defense counsel access to his devices

24   that were searched at JFK Airport when he returned from Turkey

25   in May 2015.  We actually allowed defense counsel to search the

H1CFGAM1                    Trial

1    entirety of the data on those devices including three phones

2    and a laptop, regardless of content.  They've been allowed to

3    peruse the entirety of these devices.

4                THE COURT:  These were the father's devices?

5                MR. DEFILIPPIS:  Yes.

6                THE COURT:  And they were physically provided to the

7    defense?

8                MR. DEFILIPPIS:  The data from them, they were allowed

9    to review it in our office, yes.

10               MS. MIRON:  Well, your Honor --

11               MR. DEFILIPPIS:  I don't mean to suggest that

12   addresses this issue, because his son's death, obviously,

13   postdated the seizure of the devices at the airport.  But we

14   have provided extensive access to his data.

15               MS. MIRON:  We would ask that the devices now be

16   provided for inspection.  We can propose to the Court a

17   subpoena for those devices so that we can do our own search of

18   it to determine whether there's any record of this

19   transmission.  In addition to that, we're asking for a Rule 104

20   hearing before these photographs are admitted.  They raise

21   significant issues about reliability and how they were first

22   obtained and whether they actually depict what they purport to

23   depict.

24               THE COURT:  I'm sorry, is there one photograph or more

25   than one photograph?

1          MR. DEFILIPPIS:  Your Honor, I believe there were a

2     couple of successive, two successive photographs that were

3     transmitted at the same time.  Both were, to the extent we have

4     them, produced to defense counsel.  You know, your Honor, this

5     is a private citizen.  This is not a government employee.  This

6     is someone who is entitled to some semblance of privacy.  We've

7     already allowed defense counsel to search, like I said, the

8     entirety of the data that we have from his devices and I think

9     that's far and beyond what is typically done in the context of

10     either discovery or 3500.

11          THE COURT:  Let me ask you this, Ms. Miron.  Now, Mr.

12     DeFillipis has stated that your team was provided access to

13     various devices of the father, Mr. El-Goarany.  You want them

14     again?

15          MS. MIRON:  Well, first of all, to make the record

16     complete about the devices, we have had a limited opportunity

17     to inspect them.  The inspection is going to occur today

18     because the first round was not, did not work technologically.

19          THE COURT:  I'm sorry; the inspection by whom?

20          MS. MIRON:  Today, since I'm engaged in trial it will

21     be conducted by an investigator in our office.

22          THE COURT:  That's what I meant, by the defense team.

23          MS. MIRON:  Correct.

24          THE COURT:  Okay.

25          MS. MIRON:  But these were devices that were seized in

1    May 2015 when Mr. Mohamed El-Goarany returned from his trip to

2    Turkey and they would never have contained any photographs,

3    because the photographs at the earliest date would have been

4    taken about a year later.  So that doesn't speak to this issue

5    in any respect.

6         THE COURT:  So when the photos were transmitted the

7    thinking is that those items that you are going to be

8    inspecting today had already been seized from Mr. El-Goarany

9    the elder?

10        MR. DEFILIPPIS:  That's correct, Judge.

11        THE COURT:  Okay.  So you can review them all day and

12   all night, you're not going to find those pictures is what

13   you're saying?

14        MS. MIRON:  Even the government says they would never

15   exist on the version of data we're reviewing today.

16        MR. DEFILIPPIS:  Correct.  And when Ms. Miron said

17   things didn't work, the data was provided to them in exactly

18   the format that we had.  When Ms. Miron reviewed the data she

19   raised that rather than instead of it being presented using a

20   prepackaged format they had to open each individual message on

21   the devices on it's own.  Again, that's a challenge we often

22   face with this data.  It's not to say it wasn't accessible.

23   It's a time-consuming process, we concede that.

24        THE COURT:  I didn't understand her to be castigating

25   you.  My understanding is they tried to review it and it didn't

H1CFGAM1                       Trial

1   work.

2                   MR. DEFILIPPIS:  Your Honor, I think it's not accurate

3   to say it didn't work.  It's just more time consuming than they

4   had anticipated is accurate.

5                   THE COURT:  That's neither here nor there.  We don't

6   need to discuss that.

7                   MS. MIRON:  The main point is there is a review

8   happening today.  In fact, I would ask for a little bit longer

9   lunch break to go over to the United States Attorney's Office

10  myself to help finalize it.

11                  THE COURT:  I think the issue that arises is to what

12  extent do I have the power or would it be permissible or I

13  would be authorized to grant a defense subpoena to have

14  Mr. El-Goarany turn over his phone.

15                  MS. MIRON:  Right, and this issue was litigated in

16  front of the Judge Torres recently in a trial that ultimately

17  resulted in a plea, but she did grant a subpoena to our office

18  to inspect for 24 hours the cellular phone of a complaining

19  witness because there was an issue about whether text messages

20  had been deleted from his cell phone.  It's essentially the

21  same issue, that's why we're raising it here.

22                  THE COURT:  Make your motion.

23                  MS. MIRON:  We will.  Thank you, your Honor.

24                  MR. DEFILIPPIS:  Thank you, your Honor.

25                  THE COURT:  Is the jury here?

H1CFGAM1                         Trial

1            MS. SHROFF:  Your Honor, may I just have one second?

2    I need to get the physical evidence.

3            THE COURT:  Do we have an agent?

4            MR. QUIGLEY:  He's in the hallway, your Honor.

5            (Continued on next page)

H1CFGAM1                       Collie - cross

1              (In open court; jury present)

2              THE COURT:  Ladies and gentlemen of the jury, good

3    morning.  We will now continue with the cross-examination of

4    Agent Collie.  Ms. Shroff.

5              MS. SHROFF:  May I, your Honor?

6     KOMAAL COLLIE,

7         called as a witness by the Government,

8         having been previous duly sworn, testified as follows:

9    CROSS-EXAMINATION (Cont'd)

10   BY MS. SHROFF:

11   Q.  Good morning, sir.

12   A.  Good morning, ma'am.

13   Q.  When we last left off yesterday evening, you were

14   testifying about Mr. Attiya's resume.  Do you recall?

15   A.  Yes, ma'am.

16   Q.  You've previously testified that you got search warrants on

17   various Facebook accounts, correct?

18   A.  Yes, ma'am.

19   Q.  And included in those Facebook accounts was obviously

20   Attiya Aboualala's Facebook account?

21   A.  Yes.

22   Q.  And on that Facebook account, Mr.  -- I'm just going to

23   call him Attiya.  Attiya sent his resume to Mr. Gammal,

24   correct?

25   A.  Yes.

H1CFGAM1                         Collie - cross

1    Q.  He sent his resume to Mr. Gammal more than once, right?

2    A.  I do not recall how many times.

3    Q.  Does it refresh your memory at all if I tell you he sent it

4    in October of 2013, November of 2013, in April of 2014?

5    A.  It doesn't, but I know the resume was sent more than once

6    from Mr. Attiya's account.  So those dates could make sense.

7    Q.  Did you by any chance review Attiya Aboualala's resume?

8    A.  I've only seen the Arabic version.  I haven't seen a

9    translated version of it.

10   Q.  The FBI has what I'll call linguists, correct?

11   A.  Yes.

12   Q.  Could you tell the jury what an FBI linguist is?

13   A.  An FBI linguist, like any other linguist, is someone who

14   speaks more than one language, English being one of them and

15   then they translate documents from conversations, stuff that's

16   in other languages.

17   Q.  And a linguist is somewhat different than a translator

18   that's used during a litigation.  A linguist actually reviews

19   the FBI documents while the investigation is still going on,

20   correct?

21   A.  In some cases, yes.

22   Q.  And you had a linguist in this particular case, correct?

23   A.  We had multiple linguists, yes.

24   Q.  And the multiple linguists were reviewing documents and

25   then e-mailing you because you were the case agent, correct?

H1CFGAM1                    Collie - cross

1   A.  Reviewing multiple documents, e-mailing various agents.

2   Q.  Of course.

3   A.  Most of the stuff was in Arabic so there were a lot of

4   documents multiple agents were asking for, requesting things

5   like that.

6   Q.  And you were also investigating Attiya at that time,

7   correct?

8   A.  Yes.

9   Q.  And you, not you, but the FBI, did not have that resume

10  translated by the linguist from Arabic into English, correct?

11  A.  I do not know.  Again, I've only seen it in Arabic.  I

12  haven't seen the translation.

13  Q.  A resume would tell you where a person works, correct?

14  A.  I think that's a point of a resume, yes, ma'am.

15  Q.  It would tell you how long a person has worked there,

16  correct?

17  A.  I think most resumes do, yes.

18  Q.  It would tell you where the person went to school, correct?

19  A.  In some cases, yes.

20  Q.  And all of those facts would have helped the FBI determine

21  that Attiya Aboualala was in fact Muslim Brotherhood, correct?

22  A.  Where he worked or where he went to school?  I don't know

23  if that's a fact that would help determine whether he was

24  Muslim Brotherhood.

25  Q.  Let's talk about that fact.  If you worked at a TV station

H1CFGAM1                          Collie - cross

1   that was sponsored and run by the Muslim Brotherhood, would

2   that help the FBI decide that the person was Muslim

3   Brotherhood?

4   A.  It would be an indicator, yes.

5   Q.  And you knew that Attiya worked for the station Rab'a in

6   Istanbul, Turkey, correct?

7   A.  I think it was a different TV station that he worked for.

8   I think it was Elsharq TV.

9   Q.  Did you investigate Elsharq TV?

10  A.  Me personally, no.

11  Q.  Do you also know that Elsharq is also Muslim Brotherhood,

12  sir?

13  A.  I know the owner is Muslim Brotherhood.  I don't know about

14  the full station.

15  Q.  Okay.  So at that time when you looked at it he was working

16  for a TV channel that was owned by somebody in the Muslim

17  Brotherhood, correct?

18  A.  Yes, ma'am.

19  Q.  Now, yesterday you said that it would be hard for the FBI

20  to verify in a foreign country where a person worked or did in

21  fact continue working, correct?

22  A.  I don't know if I said hard, but I think your initial

23  question was we're the FBI, we would know that.  It's not an

24  automatic thing that the FBI can go to a company in a third

25  country and essentially tell them, tell the company to tell the

H1CFGAM1                          Collie - cross

1   FBI all the people that worked there.

2   Q.  But there are different ways to find out if somebody works

3   at a company, correct?

4   A.  Yes.

5   Q.  You can make a phone call and say, I could call the

6   district court and say, "Hi, can I speak to Judge Ramos,"

7   correct?

8   A.  Yes, you could.

9   Q.  Of course, there's always a public website, correct?

10  A.  Yes.

11  Q.  Or, as Mr. Mohamed El-Goarany did, go on a Facebook page

12  and look up the person on Facebook, correct?

13  A.  Yes.

14  Q.  And that is in fact what Samy El-Goarany's father did,

15  correct?

16  A.  That's what he told us, yes.

17  Q.  Right.  He said he went on a public Facebook post for

18  Attiya Aboualala, right?

19  A.  Yes.

20  Q.  Looked him up, correct?

21          MR. QUIGLEY:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23  Q.  Did you examine Attiya Aboualala's Facebook page?

24  A.  I examined it, yes.

25  Q.  There were many photographs of Attiya Aboualala with Muslim

H1CFGAM1                    Collie - cross

1    Brotherhood people, right?

2    A.  I can't confirm all the photos were with Muslim Brotherhood

3    people.

4    Q.  How about some?

5    A.  Yes.

6    Q.  Is that in fact how Samy's father found Attiya Aboualala,

7    by looking at a photo?

8              MR. QUIGLEY:  Objection.  Hearsay.

9              THE COURT:  Sustained.

10   Q.  In your investigation you learned that Mr. Mohamed

11   El-Goarany went to Turkey behind the FBI's back, correct?

12   A.  Yes, he did.

13   Q.  He went to Turkey without telling the FBI, correct?

14   A.  Correct.

15   Q.  He got to Turkey, correct?

16   A.  He went, yes.

17   Q.  And when he was in Turkey, he reached out to Attiya

18   Aboualala, correct?

19   A.  That's what he told us, yes, ma'am.

20   Q.  And he did so by going through a Muslim Brotherhood

21   connection at the TV channel where Attiya worked, correct?

22   A.  Yes.

23   Q.  Now, when you were reviewing Attiya Aboualala's Facebook

24   page you had a linguist telling you what Attiya Aboualala was

25   talking about on Facebook, right?

H1CFGAM1                          Collie - cross

1    A.  Yes, linguist translated Facebook communications.

2    Q.  And Attiya Aboualala had a lot to say, did he not, about

3    the Egyptian revolution?

4    A.  Yes.

5    Q.  He talked incessantly about Rab'a Square, correct?

6            THE COURT:  About what, I'm sorry?

7    Q.  Rab'a Square?

8    A.  He did speak about Rab'a Square.

9    Q.  Where is Rab'a Square?

10   A.  In Egypt.

11   Q.  And what about Rab'a Square makes it so famous?

12   A.  During the Arab spring, slash, in its overthrow of the

13   government Rab'a Square is a very significant location where

14   troops clashed with protesters in Egypt.

15   Q.  Civilian protestors, correct?

16   A.  I believe so, yes.

17   Q.  Peaceful protesters, correct?

18   A.  I can't say.

19   Q.  And that was Sisi's attempt to overthrow the democratic

20   Muslim Brotherhood, correct?

21   A.  I can't say.

22   Q.  And Attiya Aboualala had a whole bunch of anti-Sisi

23   Facebook posts?

24   A.  Yes.

25           THE COURT:  I'm sorry, who was Sisi?

H1CFGAM1                         Collie - cross

1              MS. SHROFF:  He was the person trying to take over and
2      there was a coup --
3      A.  I know him as the president of Egypt.
4      Q.  Why don't you tell the jury who Sisi is, so I don't
5      testify?
6      A.  Sisi is the current president of Egypt.
7      Q.  And he took power by force, correct?
8      A.  Yes, ma'am.
9      Q.  He was not democratically elected in Egypt, correct?
10     A.  I don't believe so, no.
11     Q.  And the Muslim community, a large part of it was either pro
12     Sisi or anti Sisi, correct?
13             MR. QUIGLEY:  Objection.  Foundation.
14             THE COURT:  If he knows what the policies were in
15     Egypt.
16     A.  I do not.
17     Q.  Can you tell the jury how many hours you logged reading
18     Facebook posts, sir?
19     A.  I do not know how many hours I logged reading Facebook
20     posts.
21     Q.  Five?
22     A.  More than five, yes.
23     Q.  50?
24     A.  Facebook posts in general, throughout my career?
25     Q.  In this case.  I'm sorry.  No disrespect, but just this

H1CFGAM1                         Collie – cross

1   case.

2   A.   More than ten hours.  More than 20 hours.

3   Q.   More than 30?

4   A.   Probably, yes, ma'am.

5   Q.   And you're saying that in your 30 hours of review you

6   cannot come to a conclusion whether or not there was a pro and

7   anti Sisi faction?

8           MR. QUIGLEY:  Objection.  Mischaracterizes his

9   testimony.

10          THE COURT:  Sustained.

11  A.   Your question was --

12          THE COURT:  There's no question, Agent.  There's no

13  question before you.

14  Q.   Sir, is it fair to say that the public at large is either

15  pro Sisi or anti Sisi?

16          MR. QUIGLEY:  Objection.

17  Q.   Sir, why do you keep looking at him when I'm asking the

18  question?

19          THE COURT:  Sustained.

20  A.   When I see him move --

21          THE COURT:  The objection was sustained, agent.

22  Q.   You recall reviewing Mr. Aboualala's Facebook posts,

23  correct?

24  A.   Yes.

25  Q.   And many of the posts Mr. Aboualala received were about how

H1CFGAM1                          Collie - cross

1   he had managed to escape from Egypt, correct?

2   A.   Received or sent?

3   Q.   Both.

4   A.   There were posts about that.

5   Q.   And he talked about how he was and Sisi, correct?

6   A.   Yes.

7   Q.   And he talked about how he was pro Muslim Brotherhood and

8   trying to get out of Egypt, correct?

9   A.   Correct.

10  Q.   And, by the way, after he did that and actually got to

11  Turkey, he was contacted over and over again on Facebook by

12  others wanting to leave and do the same, correct?

13  A.   Correct.

14  Q.   And people reached out to Attiya Aboualala for help,

15  correct?

16  A.   Correct.

17  Q.   They asked him how to get to Turkey correct?

18  A.   Correct.

19  Q.   They asked him how to get an education in Turkey, correct?

20  A.   Correct.

21  Q.   They asked him how to get a job in Turkey, correct?

22  A.   Correct.

23  Q.   And Mr. Aboualala helped some and did not help some, is it

24  fair to say?

25            MR. QUIGLEY:  Objection.  Hearsay.

H1CFGAM1                        Collie - cross

1           THE COURT:  Sustained.

2    Q.  Do you know if Mr. Aboualala helped every single person who

3    asked for help?

4           MR. QUIGLEY:  Same objection.

5           THE COURT:  Sustained.

6    Q.  Do you recall reviewing Facebook posts that informed your

7    investigation as to whether or not Mr. Aboualala helped some

8    people when they asked for his help?

9           MR. QUIGLEY:  Objection.

10          THE COURT:  Overruled.

11   A.  I know he responded to people with advice, yes.

12   Q.  Now, on direct, you testified about certain conversations,

13   Facebook exchanges, posts, whatever they're called, between

14   Samy El-Goarany and Attiya Aboualala, correct?

15   A.  Correct.

16   Q.  And one such post was the exchange between the two of them

17   when he is asking -- I'm sorry, that's imprecise.  When Samy

18   El-Goarany is asking Mr. Aboualala as to where he is, correct?

19   A.  Correct.

20   Q.  And he's asking where he is because Mr. Aboualala did not

21   show up at the airport to pick up Samy El-Goarany, correct?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  Overruled.

24   A.  It would seem so, but I wasn't there, so I don't know.

25   Q.  None of us were there, but it seems so, right?

H1CFGAM1                        Collie - cross

1    A.  It seems so.

2    Q.  And when you were looking at Samy El-Goarany's Facebook

3    posts, that told you or uses the word -- if somebody could pull

4    it up, "where are you brother," is that what it says?  It's

5    okay, I don't need the precise language, but something to that

6    effect, correct?

7    A.  Yes.

8    Q.  Did you look at that time stamp and see where exactly

9    Attiya Aboualala was at that time when he didn't show up to the

10   airport?

11   A.  Did I look at the time stamp and see where he was?

12   Q.  Yeah.  What was he doing that he didn't bother to show up?

13   A.  I don't know what he was doing.

14   Q.  You don't know if he was just hanging out with a friend in

15   a library, correct?

16   A.  Correct.

17   Q.  You don't know what he was doing; he could have been at the

18   movies, correct?

19   A.  Honestly, I don't know, he could have been at another

20   terminal, I don't know.

21   Q.  Well, you do know that, correct?

22   A.  No, I don't.

23   Q.  There's no indication that says back from Mr. Attiya I'm at

24   another terminal at the airport, correct?

25             MR. QUIGLEY:  Objection.

H1CFGAM1                    Collie - cross

1          THE COURT:  He can answer that question.

2   Q.  Is there?

3   A.  No, there is not.

4   Q.  There's no exchange after that when Samy El-Goarany and

5   Attiya Aboualala are talking Attiya Aboualala says, hey, I was

6   at the airport, buddy, couldn't find you.  Correct?

7   A.  Correct.

8   Q.  Now, yesterday we talked about apps, correct?

9   A.  Correct.

10  Q.  Let me show you what's been marked as Defense Exhibit

11  113AA.

12          (Pause)

13  A.  Yes, ma'am.

14  Q.  Could you take a minute and review that document, sir?

15          (Pause)

16  Q.  Have you reviewed it, sir?

17  A.  Yes, ma'am.

18          MS. SHROFF:  Your Honor, the defense moves that

19  Defense Exhibit 113AA be admitted into evidence.

20          MR. QUIGLEY:  No objection.

21          THE COURT:  113AA will be received.

22          (Defendant's Exhibit 113AA received in evidence)

23  Q.  Sir, do you recognize this document to be an exchange

24  between Samy El-Goarany and Rameez Farooqi?

25  A.  Yes, ma'am.

H1CFGAM1                    Collie - cross

```
 1   Q.  This exchange took place in October of 2014, correct?

 2   A.  Correct.

 3   Q.  And this is a conversation between two people who you know

 4   from your investigation to be friends, correct?

 5   A.  Correct.

 6   Q.  And what does the conversation start with?

 7   A.  Crypto -- the body of the conversation?

 8   Q.  Yes, please?

 9   A.  Crypto.cat.

10   Q.  And who is sending the starter of that conversation?

11   A.  That message was sent by Mr. El-Goarany.

12   Q.  And it is sent to whom?

13   A.  Mr. Rameez Farooqi.

14   Q.  And the conversation continues, does it not?

15   A.  Yes, the conversation continues.

16   Q.  And Mr. Rameez Farooqi says, "Got it.  What should I tell

17   the fellows of they ask," right?

18   A.  Correct.

19   Q.  And what does Samy Mohamed El-Goarany tell his friend to

20   say?

21   A.  "If they ask just say I got an internship."

22   Q.  And what else does he say?

23   A.  "And it's taking up mad time and I can't talk."

24           Keep reading?

25   Q.  Yes, please.
```

H1CFGAM1                          Collie - cross

1    A.  "When we start talking on that il fill you in."

2    Q.  And Mr. Farooqi responds, does he not?

3    A.  Yes, he does.

4    Q.  And what does he say to his friend?

5    A.  "I got you."

6    Q.  Could you -- Mr. Samy El-Goarany then asks him, "Let me

7    know when you download it on your computer," correct?

8    A.  Correct.  Or on your comp.

9    Q.  And given the preceding language, by "it," he means

10   Cryptocat, correct?

11   A.  It would seem so, but I do not know for sure.

12   Q.  Okay, well let's keep going.  Mr. Farooqi replies, does he

13   not, "I'll do it when I get home."

14   A.  Correct.

15   Q.  And what does Mr. El-Goarany say?

16   A.  "No doubt good looks bro."

17   Q.  And then what does his friend say, what does his friend

18   reply?

19   A.  "Download it."

20   Q.  And on page 1, the app that they're talking about is

21   Cryptocat, correct?

22   A.  On page 1, yes, Cryptocat.

23   Q.  And it's fair to say, sir, that that conversation starts on

24   October 26th, 2014, 05:28:52, correct?

25   A.  Correct.

H1CFGAM1                        Collie - cross

1    Q.  Could you just take a look at the times on there?  I don't

2    need to belabor that but "download it" comes at 6:37:13 on the

3    same date, correct?  Am I missing something?

4    A.  No, correct.

5    Q.  And then Mr. Mohamed El-Goarany says, "Cool, you still up?"

6    A.  Mohamed El-Goarany is not in this conversation, no.

7    Q.  Say again?

8    A.  Mohamed El-Goarany is not in this conversation.

9    Q.  I'm sorry, Samy El-Goarany.

10   A.  Yes, ma'am.

11   Q.  And then Samy asks his friend, because his friend says

12   "just got ready for bed now," he says --

13   A.  I'm sorry, are you reading?

14   Q.  Go ahead, please.

15   A.  "I, you mind staying up just five more mins."

16   Q.  And he continues and says?

17   A.  "I just want to test it out."

18   Q.  Keep going.  Mr. Farooqi says, "Yeah, that's cool."  And

19   what does Mr. Samy El-Goarany say back?

20   A.  "K, give me a few il get on my comp."

21   Q.  And then what happens after that; Samy says, "I'm here?  "K

22   I'm here."  Right?

23   A.  Correct.

24   Q.  And "you using the thing right now."

25   A.  Correct.

H1CFGAM1                         Collie - cross

1    Q.  And then Mr. Farooqi says, "Yeah, but it says you're not

2    using it," correct?

3    A.  Correct.

4    Q.  Okay.  We're almost done, but, "K give me one minute I'll

5    get on it" is what Samy says, correct?

6    A.  Correct.

7    Q.  Farooqi says, "Sorry for the holdup, it's all right,"

8    correct?

9    A.  Correct.

10   Q.  And then after that, you see that body that says, "question

11   OTRv23"?

12   A.  Correct.

13   Q.  And that's where it stops being English and turns into

14   gibberish, correct?

15   A.  Correct.

16   Q.  And as an FBI agent in the Joint Terrorism Task Force, you

17   know that the document reflects continued conversation between

18   Mr. Farooqi and Mr. Samy El-Goarany that you could not

19   unencrypt, correct?

20   A.  Correct.

21   Q.  So that is what is called an encrypted conversation,

22   correct?

23   A.  Correct.

24   Q.  So in fact the FBI can tell when two people are on PQChat

25   exchanging messages through Cryptocat, right?

H1CFGAM1                              Collie - cross

1                MR. QUIGLEY:  Objection.  The question is compound.

2                THE COURT:  Start again, Ms. Shroff, and rephrase the

3      question please.

4                MS. SHROFF:  Sure.

5      Q.  Does that document inform you, sir, that two people on

6      Cryptocat can talk to each other in an encrypted format?

7      A.  Correct.

8      Q.  And the FBI can see that two people are talking?

9      A.  Correct.

10     Q.  Can't see what they're talking about?

11     A.  Correct.

12     Q.  But the FBI can know when they started a conversation,

13     correct?

14     A.  Correct.

15     Q.  How long the conversation lasted, correct?

16     A.  Correct.

17     Q.  And when the conversation ended, correct?

18     A.  Correct.

19                MS. SHROFF:  Thank you.

20     Q.  Now, you also testified to the app called PQChat, correct?

21     A.  Correct.

22     Q.  And yesterday you testified that Mr. Samy El-Goarany was on

23     PQChat, correct?

24     A.  Correct.

25     Q.  And he was on PQChat with only two people, correct?

H1CFGAM1                          Collie - cross

1    A.  We know of two people.

2    Q.  The only people he was ever on PQChat with was his brother

3    Tarek?

4           MR. QUIGLEY:  Objection.  Mischaracterizes the

5    testimony.

6           THE COURT:  Sustained.

7    Q.  How many people did he speak to on PQChat?

8    A.  I don't know how many people he spoke to on PQChat.  We

9    know of two people through our investigation.

10   Q.  So your investigation -- and you're the FBI, correct?

11   A.  I work with the FBI, yes, ma'am.

12   Q.  So your investigation led you to conclude he spoke to two

13   people on PQChat, correct?

14   A.  Yes.

15   Q.  Tarek, his brother?

16   A.  Correct.

17   Q.  And Ahmed, his cousin?

18   A.  Correct.

19           (Continued next page)

20

21

22

23

24

25

H1C5gam2                        Collie - cross

1    BY MS. SHROFF:

2    Q.  Now, he also spoke to people on Kik and Surespot, correct?

3    Those were two other apps he used?

4    A.  I personally am not aware of Kik.  Surespot; yes, ma'am.

5    Q.  And he spoke to three people on Surespot, correct?  That

6    you know of because you don't know of who else he would have

7    spoken to.

8    A.  Yes.

9    Q.  Okay.

10          Now, on Surespot he had two accounts, correct?  How

11   about if I help you out here.  Let's see if this works?

12   A.  Yes.

13   Q.  He one account called Samyelza.  S-A-M-Y-E-L-Z-A?

14          THE COURT:  Sorry, Ms. Shroff, can you get closer to

15   the microphone?  We lost you there momentarily.

16   BY MS. SHROFF:

17   Q.  S-A-M-Y-E-L-Z-A.  That was one account, correct?

18   A.  Correct.

19   Q.  And on the second account was AbumuradK, A-B-U-M-U-R-A-D-K,

20   correct?

21   A.  Correct.

22   Q.  And on AbumuradK Mr. El- Goarany spoke to somebody named

23   Abubakralsudani, correct?

24   A.  I do not recall.

25   Q.  Fair enough.

H1C5gam2                          Collie – cross

1              Tarekbey, correct?

2    A.   Yes.

3    Q.   And who is Tarekbey?

4    A.   I do not know.

5    Q.   You don't know who Tarekbey is?

6    A.   I don't.

7    Q.   You don't who Tarek is in this case?

8    A.   Tarek El Goarany is his brother.

9    Q.   And on that account he did not speak to anybody named

10   Jammie730, correct?

11             MR. QUIGLEY:  Objection.

12   Q.   If you know.

13             MR. QUIGLEY:  The document is not in evidence.

14             THE COURT:  The objection is overruled.

15   A.   I do not know.

16   Q.   You don't know if he spoke to Jammie730 on this account,

17   correct?

18   A.   I don't know.

19   Q.   And you don't know whether or not he spoke to Jammie730 on

20   the Samyelza account, correct?

21   A.   I do not know.

22   Q.   Now, I also asked you about some of the sites Samy

23   El- Goarany went on and one of them was ask.fm, correct?

24   A.   Yes.

25   Q.   People ask a lot of questions on ask.fm, correct?

H1C5gam2                          Collie - cross

1    A.  Yes.

2    Q.  Including questions about ISIS, correct?

3    A.  Yes.

4    Q.  How to get to Syria, correct?

5    A.  Yes, ma'am.

6    Q.  And Samy also visited a website called Electronic Intafada,

7    correct?

8            THE COURT:  Electronic?

9            MS. SHROFF:  Intafada.  I-N-T-A-F-A-D-A.

10           THE COURT:  I'm not sure.

11   Q.  Okay.

12           How about Angry Arab?  Do you recall him going on that

13   site?

14   A.  I do not recall.

15   Q.  Now, is it fair to say that your investigation informed you

16   that Samy spent a lot of time on the Internet, correct?

17   A.  Correct.

18   Q.  And fair to also say that your investigation also told you

19   that Samy was somewhat of a loner, correct?

20   A.  Correct.

21   Q.  He didn't have a girlfriend, correct?

22   A.  For what time period?

23   Q.  So let's talk about that because I know that Samy

24   El- Goarany talked a lot on Facebook posts about his trouble

25   with girls, correct?

H1C5gam2                        Collie - cross

1   A.   He spoke about his trouble with girls, yes.

2   Q.   And he bemoaned the fact that he really liked this girl

3   Saroj and she did not like him back, correct?

4   A.   Correct.

5   Q.   And he actually wanted to marry Saroj and Saroj said -- he

6   actually wanted to marry Saroj but she wasn't interested,

7   correct?

8   A.   I know he wanted to marry her but obviously didn't marry

9   her.

10  Q.   Now, did you learn at some point that his friend Saroj

11  actually ended up with one of his friends, in your

12  investigation?

13          MR. QUIGLEY:  Objection.

14          THE COURT:  Sustained.

15  Q.   By December of 2014, Samy had been in college for almost

16  six years; is that right?  By my calculation, my math says six

17  years; is that correct?

18  A.   Correct.

19  Q.   He started at Baruch or St. John, which one did he start

20  at?  I get confused.

21  A.   St. John.

22  Q.   He didn't like St. John so he moved to Baruch, correct?

23          MR. QUIGLEY:  Objection, foundation.

24          THE COURT:  Sustained.

25  Q.   He moved from St. John to Baruch College, correct?

H1C5gam2                    Collie - cross

1   A.  Correct.

2   Q.  Didn't graduate from St. John College, correct?

3   A.  Correct.

4   Q.  Didn't graduate from Baruch, correct?

5   A.  Correct.

6   Q.  Now, you learned from your investigation also, right, that

7   Samy El- Goarany applied for financial aid -- city and state

8   financial aid at those schools, correct?

9   A.  Correct.

10  Q.  And you learned that he in fact took that money and did not

11  use it for his education, correct?

12  A.  I do not know.

13  Q.  You don't know that he used that money to buy his airline

14  ticket to Turkey?

15  A.  His financial aid money specifically?  I do not know, no.

16  Q.  Okay.

17          Now, around this same time period we are talking

18  about, right, Mr. El- Goarany, and I mean Samy, decides to

19  leave the United States, correct?

20          MR. QUIGLEY:  Objection.  Foundation.

21          THE COURT:  Overruled.

22  A.  I think by that point he had decided to leave; yes, ma'am.

23  Q.  And there comes a point, does it not, where he says, okay,

24  I'm going to get on whatever avenue it is to get me to the

25  airport, correct?

1       He goes to the airport to leave, correct?

2    A.   In December?

3    Q.   Fair enough.  Let me try it a different way.

4       In December, late December early January, Tarek and

5    Samy El- Goarany, according to your investigation, are at their

6    parents' home, correct?

7    A.   Correct.

8    Q.   And while they're at their parents' home, Samy El- Goarany

9    leaves his parents' home and goes back to Queens to his

10   apartment in Queens, correct?

11   A.   Correct.

12   Q.   His brother stays back, correct?

13   A.   Correct.

14   Q.   Now, Samy had an apartment in Queens, correct?

15   A.   Correct.

16   Q.   Who paid for that apartment; do you know?  Who paid the

17   rent?

18   A.   His parents.

19   Q.   And when Samy left the United States for Turkey -- because

20   that's where his airline ticket was to, correct?

21   A.   Correct.

22   Q.   -- he was flying from New York to Istanbul, correct?

23   A.   Correct.

24   Q.   Flying on Turkish Airlines, correct?

25   A.   Correct.

H1C5gam2                              Collie - cross

1   Q.   He took with him his iPhone 5, correct?

2   A.   Correct.

3   Q.   Who paid for that phone?

4   A.   I think it was also family or his parents.

5   Q.   He took with him a 17 inch brand-new HP laptop, correct?

6   A.   I do not know.

7   Q.   Okay.

8          How about do you know if he took with him a phone

9   converter by any chance?

10  A.   I do not know.

11  Q.   Okay.

12         And when he left, two people knew what his real plan

13  was, correct?

14         MR. QUIGLEY:   Objection.

15         THE COURT:   Sustained.

16  Q.   Through your investigation, Agent Collie, did two

17  individuals tell the FBI that they knew that Samy El- Goarany

18  was going to go join ISIS?

19  A.   Yes.

20  Q.   And those two people were his brother Tarek and his cousin

21  Ahmed, correct?

22  A.   Correct.

23  Q.   Now, Samy told other people about what his plan was,

24  correct?

25  A.   Told other people what his plan was prior to leaving?

H1C5gam2                         Collie - cross

1   Q.  Yes.  Not the same plan, he had a different plan for

2   different people, correct?

3   A.  I'm sorry.  Which plan are you referring to?

4   Q.  So for Rameez Farooqi it is already in evidence, he said he

5   had an internship, correct?

6           MR. QUIGLEY:  Objection.  Mischaracterizes the record.

7           THE COURT:  Sustained.

8   Q.  To Rameez Farooqi he said make sure you tell my friends I

9   have an internship, correct?

10  A.  Yes, correct.

11  Q.  And to his mother he said he was going to go do some

12  humanitarian work in Turkey, correct?

13          MR. QUIGLEY:  Objection.  Hearsay.

14          THE COURT:  Sustained.

15  Q.  Did your investigation inform you, sir, that he told a lot

16  of people he was going to go do humanitarian work in Turkey?

17          MR. QUIGLEY:  Objection.  Hearsay.

18          THE COURT:  Overruled.

19          THE WITNESS:  He told people that he was going to do

20  humanitarian work, yes.

21  BY MS. SHROFF:

22  Q.  In Turkey, correct?

23  A.  In Turkey; yes, ma'am.

24  Q.  Let me show you what is marked as Defendant's Exhibit

25  112-AA .

H1C5gam2                        Collie – cross

1              Samy is speaking with a person by the name of Nasibah

2    Elmi, correct?

3    A.  Correct.

4              MR. QUIGLEY:  Objection.  The document is not in

5    evidence.

6              MS. SHROFF:  Your Honor, we move Exhibit 112-AA into

7    evidence.

8              MR. QUIGLEY:  Objection.  Hearsay.

9              THE COURT:  Let me see you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam2                         Collie - cross

1              (At side bar)

2              THE COURT:  Can I see it?

3              MR. QUIGLEY:  Right here.

4              So, Judge, we think that with that statement, looking

5    at the statement on page 2.

6              MS. SHROFF:  You can just use Mr. Habib's copy here.

7              MR. QUIGLEY:  At 18:01.

8              THE COURT:  Before you get into that, tell me who

9    Nasibah Elmi is.

10             MS. SHROFF:  She is a friend of his.

11             THE COURT:  And where is she?

12             MS. SHROFF:  Now?  I don't know where she is now.

13             THE COURT:  At the time.

14             MS. SHROFF:  At the time she was in Egypt, I think.

15             THE COURT:  Okay.

16             MR. QUIGLEY:  So, Judge, the statement is -- the main

17   statement is on page 2 where he says, remember a few months ago

18   I told you I was doing -- going to do humanitarian work?  The

19   fact that he told her a few months ago that he was going to do

20   humanitarian work is an out-of-court statement that is coming

21   in for the truth of the matter asserted.  That is hearsay.

22             MR. HABIB:  In several filings to the Court we have

23   provided authority that questions aren't hearsay.  And that's

24   and that's the *Oguns* case from the Second Circuit.  He is

25   asking the question.  In addition, we are not offering this

H1C5gam2                         Collie - cross

1    document to prove that he was doing humanitarian-related work.

2    To the contrary, we are offering it as evidence that he lied to

3    people and told them he was doing humanitarian work.

4            MR. QUIGLEY:  Right, for the truth of the matter

5    asserted in that statement, that he told her a few months ago

6    he was doing humanitarian work.

7            THE COURT:  It was in the form of a question.

8            MR. QUIGLEY:  It is an assertion, even if he says

9    remember a few months ago I told you I was going to do

10   humanitarian work, that is an assertion even if there is

11   question mark at the end of the sentence.

12           MR. HABIB:  He is asking a question and we know that

13   the statement -- put it this way.  If the premise of the

14   question were inaccurate, the respondent would surely say, What

15   are you talking about?  You never told me that.  So he is just

16   asking her, do you remember when I told you this a few months

17   ago?

18           THE COURT:  Okay.  I'm going to let it in.

19

20

21

22

23

24

25

H1C5gam2                              Collie - cross

1              (In open court)

2              MS. SHROFF:  The defense moves Exhibit 112-AA into

3    evidence.

4              THE COURT:  And over the government's objection, that

5    will be received.

6              (Defendant's Exhibit 112-AA received in evidence)

7    BY MS. SHROFF:

8    Q.  Sir, did you have a chance to read it?

9    A.  Yes, ma'am.

10   Q.  And this is a conversation, is it not, between Samy

11   El- Goarany and Nasibah Elmi, correct?

12   A.  Correct.

13   Q.  And it is dated May 24th, 2015, correct?

14   A.  Yes.  It begins May 24th, 2015.

15   Q.  And she is saying to him, hey Samy, wasn't sure if you

16   graduated because I don't think I saw any picks or anything,

17   LOL, but just in case, I wanted to say congratulations.

18              And there is some emoji which I can't tell, correct?

19   A.  Correct.

20   Q.  And Samy replies, again on May 6th:  Ramadan Mubarak.  My

21   bad for the delay.  Work really pre occupied me over the last

22   month and a half.  That, plus preparing for Ramadan.  It's been

23   a real mess LOL.  Anyways, I still got your number and I do

24   plan to keep my word.  What days in the week you free to chat?

25              Correct?

H1C5gam2                         Collie - cross

1    A.   I think the date was June 27th, though.

2    Q.   Sorry.

3            So, then he continues:  And yes, I have finished

4    college elhamdulillah.  Your congratulations is well

5    appreciated.

6            Let's stop there for a minute.  That's a false

7    statement, right?

8    A.   Correct.  Well, I'm sorry, he did not graduate college.

9    Q.   What do you think "finished college" means?

10   A.   He stopped going to college, he is done with college.

11   Q.   Okay.  So, when she is saying to him, wasn't sure if you

12   graduated but I wanted to say congratulations and he replies

13   back, yes, I have finished college, you think he is saying to

14   her, no, I didn't finish college but graduating but, anyway,

15   your congratulations is well appreciated because I only stopped

16   going to college.

17           That's your interpretation of this conversation?

18   A.   No.

19   Q.   Okay.

20           So what is your interpretation of this conversation

21   when Samy El- Goarany says to her congratulations:  Your

22   congratulations is well appreciated.  Smiley face?

23   A.   I think it could be, yeah, inferred that he is saying he

24   graduated college, yes.  Yeah.

25   Q.   And then Nasibah replies back to him and says Ramadan

H1C5gam2                    Collie - cross

Mubarak! hey, it's totally fine.  It's been like that for a lot

of people this year, haha, Ramadan snuck right up on us LOL.

But elhamdulillah, glad to hear you're well.  You actually

caught me right as I was leaving maha.  I'm actually headed out

of the country for a month or so.  I'll be seven hours ahead

but we'll he work something out.  InshAllah.

A.  Correct.

Q.  And then she goes on:  Oh, gone.  Oh, congratulations.  I

know you'll succeed in whatever you end up doing.  Wish you all

the best.

A.  Yes, ma'am.

Q.  And, Mr. El- Goarany says:  What if I told you I'm also

seven hours ahead of New York time right now too?  Smiley face.

Have a safe trip inshAllah.  Wishing you the best too.

A.  Yes, ma'am.

Q.  Nasibah replies:  Hahaha, no way.  Where are you.  Egypt?

Oh, oh, thank you!

A.  Yes, ma'am.

Q.  And Samy says:  You're close.  Smiley face.

        And Nasibah says:  Where?  Haha, where?  I had no idea

you left LOL.  Did you leave after graduation or before?

        Correct?

A.  Yes, ma'am.

Q.  And please, tell the jury what Mr. El- Goarany says.

A.  Mr. El- Goarany says:  Remember when I told you I was doing

H1C5gam2                         Collie - cross

1   humanitarian-related work a few months back?

2   Q.  And then let's skip down to where Nasibah replies and says:

3   Yeah, you mentioned that.  You're doing it overseas?  That's

4   pretty awesome!

5   A.  Correct.

6   Q.  Okay.  We can put that one aside.

7           Now, we are still around January 2015 and the FBI

8   knows that Samy did not re-enroll in college, correct?

9   A.  The FBI knew that in February of 2015.

10  Q.  Okay.

11          And at some point during your investigation you

12  learned that Samy bought airline tickets to go to Turkey,

13  correct?

14  A.  Correct.

15  Q.  He bought it in cash, correct?

16  A.  Correct.

17  Q.  Took -- bought the ticket in person, correct?

18  A.  Correct.

19  Q.  And made a hotel reservation for himself, correct?

20  A.  Correct.

21  Q.  You've reviewed how he made the hotel resolution?

22  A.  Correct.

23  Q.  Samy El- Goarany made the reservations, correct?

24  A.  The reservations in his name?  Yes, we believe he made the

25  reservation.

H1C5gam2                      Collie - cross

1   Q.  He made them openly on Expedia, correct?

2   A.  On Expedia, correct.

3   Q.  So Sultanahmet Suites, that's the hotel he picked, correct?

4   A.  Correct.

5   Q.  Now, after Samy got to Turkey, the FBI continued with its

6   investigation, right?

7   A.  Correct.

8   Q.  You kept in touch with Samy El- Goarany's mother, father,

9   and brother, correct?

10  A.  Correct.

11  Q.  FBI spoke to them periodically and consistently, correct?

12  A.  Correct.

13  Q.  And the brother lied and then stopped lying, correct?

14  A.  Correct.

15  Q.  To the FBI, correct?

16  A.  Correct.

17  Q.  Same for the father; lied and then stopped lying, correct?

18  A.  Correct.

19  Q.  Did you ever arrest them for lying to a federal agent?

20  A.  No.

21  Q.  Now, one of the other people that you investigated was

22  Ahmed El Goarany, correct?

23  A.  We didn't do an investigation into Ahmed El Goarany.

24  Q.  Did you question him, sir?

25  A.  Yes.

H1C5gam2                          Collie - cross

1   Q.  And he told you -- you know what -- when you were

2   investigating Samy El- Goarany's case, you spoke to Ahmed

3   El Goarany, correct, during that investigation?

4   A.  Correct.

5   Q.  And your review of the Facebook exchanges between Ahmed

6   El Goarany and Samy El- Goarany showed real-time exchanges

7   between the two, correct?

8           MR. QUIGLEY:  Objection.  Hearsay.

9   Q.  I will ask you a different way.  Did they talk to each

10  other on Facebook?

11  A.  Yes.

12  Q.  And they actually talked to each other on the very day Samy

13  was traveling, correct?

14          MR. QUIGLEY:  Objection.  Hearsay.

15          THE COURT:  Overruled.

16  A.  Correct.

17  Q.  In fact, Samy El- Goarany, from the airplane, let his

18  cousin know that he had succeeded in getting a window seat and

19  was excited about it, correct?

20  A.  I didn't review that communication, no.

21  Q.  Okay.

22          Now, after Samy El- Goarany had left and the FBI was

23  talking to his family, the FBI had many different interests in

24  the investigation, correct?

25          MR. QUIGLEY:  Objection.

H1C5gam2                         Collie - cross

1              MS. SHROFF:  I will rephrase.

2    Q.  The FBI wanted to arrest Samy El- Goarany, correct?

3    A.  The investigation was to figure out if he actually joined

4    ISIS and who helped him.

5    Q.  When did you figure out he had gone to ISIS?

6    A.  May of 2015.

7    Q.  So, by may of 2015 you knew that Samy El- Goarany had

8    committed a crime, correct?

9    A.  Correct.

10   Q.  And if you found him you would arrest him, correct?

11   A.  Most likely.

12   Q.  Most likely?  Really?  The FBI now knows that a man has

13   traveled from the United States of America to ISIS and it's

14   most likely that you would arrest him?  What would he have to

15   do to get arrested?

16   A.  What would he have to do to get arrested?

17   Q.  What would he have had to do to get arrested?

18   A.  Well --

19   Q.  You know what?  I will withdraw that?

20   A.  I was going to say -- okay.

21   Q.  Did there come a time when the FBI concluded that Samy had

22   violated the federal laws of the United States and was subject

23   to arrest?

24              MR. QUIGLEY:  Objection.

25              THE COURT:  Overruled.

H1C5gam2                          Collie - cross

1    A.   Yes.

2    Q.   And you did not want -- not you personally, sir, of course,

3    by you I mean the FBI -- did not want Samy to know that fact,

4    correct?

5    A.   Correct.

6    Q.   So you instructed his family not to tell Samy about that,

7    correct?

8    A.   Correct.

9    Q.   And there came a point when you were actively reviewing --

10   I keep saying you and I really apologize -- the FBI was

11   actually investigating every single exchange and reviewing

12   every single exchange between Samy El- Goarany and his family,

13   correct?

14   A.   We were reviewing exchanges between the family as to what

15   we could get to, yes.

16   Q.   Look.  It is fair to say, right, the FBI is very interested

17   in somebody who is in ISIS now, right?

18   A.   Correct.

19   Q.   I mean, that's a high value person for you, right?

20   A.   I would say everyone we investigate that's joined ISIS

21   would be high value.

22   Q.   That's what I mean.  Any person who goes to ISIS would be

23   high value for you, correct?

24   A.   Correct.

25   Q.   It would give the FBI a window into how ISIS worked because

H1C5gam2                          Collie - cross

1    the person had actually been there, correct?

2    A.   Correct.

3    Q.   And the same is true for Samy, correct?

4    A.   Correct.

5    Q.   And when Samy started to communicate back from where he

6    was, the FBI was interested, correct?

7    A.   Correct.

8    Q.   And Samy used other people's phones to communicate with his

9    family in the United States, correct?

10   A.   Correct.

11   Q.   He used the phone of an actual ISIS member and called the

12   United States, correct?

13   A.   We believe so, yes.

14   Q.   Right.   That was Abu Salam, correct?

15          It is okay about the name.   It was an ISIS person,

16   correct?

17   A.   Yes.

18   Q.   And when the FBI learned that he had done that, the FBI

19   spoke with the person who received that communique, correct?

20   A.   Correct.

21   Q.   And the person that received the communique was his brother

22   Tarek correct?

23   A.   Correct.

24   Q.   And then that ISIS person who had used, who had lent his

25   phone to Samy, actually reached out to Tarek; correct?

H1C5gam2                    Collie - cross

1   A.  Correct.

2   Q.  He friended Tarek, correct?  On Facebook?

3   A.  No.

4   Q.  Really?

5       Abu Salam didn't send a friend request to Tarek

6   El Goarany?  That's your testimony today?

7   A.  He did send a friend request.

8   Q.  And Tarek El Goarany actually accepted that friend request;

9   is that not true?

10  A.  For Abu Salam, yes.

11  Q.  And Abu Salam was ISIS, correct?

12  A.  Correct.

13  Q.  By the way, you didn't know that, right, until much later,

14  that Tarek had done that?

15  A.  It was later; yes, ma'am.

16  Q.  The FBI sought a search warrant on Abu Salam's cell phone

17  and Facebook, correct?

18  A.  No.

19  Q.  Okay.

20      Did the FBI learn that another ISIS individual, Abu

21  H-A-R-E-T-H, had also lent his phone to Samy?

22  A.  Correct.

23  Q.  And Samy used Abu Hareth's phone to call his family,

24  correct?

25  A.  Correct.

H1C5gam2                         Collie - cross

1    Q.  And he also used that phone to reach out from ISIS into the

2    United States, Middletown, New York or wherever it is that his

3    family lived, correct?

4    A.  Correct.

5    Q.  Same holds true for Abu Etsh, correct?  E-T-S-H, right?

6    A.  Right.

7    Q.  Samy used that phone, reached out to his family, correct?

8    A.  Correct.

9    Q.  And the FBI has no indication that he used any one of those

10   phones to contact Mr. El-Gammal, correct?

11   A.  Correct.

12   Q.  Now, there came a point, sir, did there not, when the FBI

13   arrested Mr. El-Gammal?

14   A.  Yes.

15   Q.  Could you tell the jury when that was, sir?

16   A.  August 24th, 2015.

17   Q.  And the arrest took place, did it not, at Avondale in

18   Arizona, correct?

19   A.  Correct.

20   Q.  And the arrest took place very early in the morning; is

21   that right?

22   A.  It was in the morning; yes, ma'am.

23   Q.  It was a planned arrest, right?

24   A.  Yes, ma'am.

25   Q.  You had a tactical meeting and you decided that's the day

H1C5gam2                          Collie - cross

1   you were going to effectuate the arrest, right?

2   A.  I didn't have a tactical meeting.  The Phoenix office

3   decided that was the day they were going to arrest him.

4   Q.  Were you there for the arrest, sir?

5   A.  Yes, I was.

6   Q.  And Mr. El-Gammal was arrested outside of his apartment

7   home, correct?

8   A.  Correct.

9   Q.  He was in an area outside of the apartment complex where he

10  lived, correct?

11  A.  No, he was inside the apartment complex.

12  Q.  He was inside the apartment complex or area, correct,

13  outside his apartment; correct?

14  A.  Correct.

15  Q.  And who was he with, sir?  Could you tell the jury?

16  A.  His mother.

17  Q.  And when you came upon him, was Mr. El-Gammal holding a

18  cigarette in his hand?

19  A.  Yes.

20  Q.  And the first thing the FBI yelled out when they

21  effectuated the arrest was drop the cigarette, correct?

22          MR. QUIGLEY:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  A.  I don't know.  I wasn't one of the people there yelling.

25  Q.  And his mother was there next to him, correct?

H1C5gam2                         Collie - cross

1   A.  His mother was there, yes.

2   Q.  His mother doesn't speak English too well, correct?

3   A.  Correct.

4   Q.  By the way, how many law enforcement agents were present

5   when you effectuated that arrest?

6   A.  I do not know.

7   Q.  20?

8   A.  There was an arrest and there was a search so there were

9   members there to conduct the search as well, so maybe 20.  Yes.

10  Q.  And did the FBI have a Hummer in which they had gone to

11  this complex?

12              MR. QUIGLEY:  Objection.  Relevance.

13              THE COURT:  Sustained.

14  Q.  Let me show you what is marked as Defendant's Exhibit 1.

15  Okay?

16              May I, your Honor?

17              THE COURT:  You may.

18  Q.  I am is just going to give you the whole stack so we can

19  not do this back and forth.  Do you recognize what is marked

20  for identification as Defendant's Exhibit 1?

21  A.  Yes, ma'am.

22  Q.  And, do you recognize Defendant's Exhibit 2 which is marked

23  for identification right now?

24  A.  Yes, ma'am.

25  Q.  Same question for Defendant's Exhibit 3.

H1C5gam2                        Collie - cross

1   A.  Yes, I do.

2   Q.  Defendant's Exhibit 4?

3   A.  Yes, ma'am.

4   Q.  Defendant's Exhibit 5?

5   A.  Yes, ma'am.

6   Q.  Defendant's Exhibit 6?

7   A.  Yes, ma'am.

8   Q.  And Defendant's Exhibit 7?

9   A.  Yes, I do.

10  Q.  Do they fairly and accurately represent Mr. El-Gammal's

11  home at the time you made the arrest and the search?

12  A.  Yes, ma'am.

13          MS. SHROFF:  Your Honor, the defense moves Exhibits 1

14  through 7 into evidence.

15          MR. QUIGLEY:  No objection.

16          THE COURT:  1 through 7 will be received.

17          (Defendant's Exhibits 1 through 7 received in

18  evidence)

19  BY MS. SHROFF:

20  Q.  Let's start with photograph no. 1; could you tell the jury,

21  sir, what this is a photograph of?

22  A.  This is the apartment building that Mr. El-Gammal lives in.

23  Q.  How about Defendant's Exhibit 2?

24  A.  This is a photograph of the kitchen area and the front door

25  of the apartment.

H1C5gam2                         Collie - cross

1   Q.  I'm sorry.  I have trouble hearing you.  The kitchen area

2   and?

3   A.  The kitchen and the front door of Mr. El-Gammal's

4   apartment, from the inside.

5   Q.  And, did you -- I withdraw that.

6           How about Defendant's Exhibit 3?

7   A.  This is like a step from the right from where we took the

8   last photo.  It is a closet area in the apartment.

9   Q.  What is that thing on the top shelf there, the white thing?

10  A.  Looks like -- it is a football.

11  Q.  And the Brooklyn Bridge is on the wall?

12  A.  A photo of it, yes.

13  Q.  Of course -- I'm sorry, he doesn't have the Brooklyn

14  Bridge, but.

15          You searched that closet, did you not, sir?

16  A.  The closet was searched by agents; yes, ma'am.

17  Q.  How about Defendant's Exhibit 4, was that in the living

18  room, sir?  What does this depict?

19  A.  This is the coffee table in the living room.

20  Q.  And what is on there in that can?  Do you recall?

21  A.  I don't know what is in the can.  I think it is a Red Bull

22  can.  I don't recall.

23  Q.  Marlboro cigarettes?

24  A.  There are cigarettes there, yes.

25  Q.  Wallet?

H1C5gam2                        Collie - cross

1    A.   Yes.

2    Q.   Looks like a bag of crackers on the left, correct?

3    A.   I don't see that picture --

4    Q.   That's okay.

5    A.   Yes.

6    Q.   And Defendant's Exhibit 5, what is that, sir?

7    A.   Compact disk, CD.

8    Q.   Of whom?

9    A.   What is written on the CD?

10   Q.   Yes.

11   A.   Ashanti Chapter 2.

12   Q.   A singer.  Is that person a singer, Ashanti?

13   A.   Ashanti is the name of a singer; yes, ma'am.

14   Q.   Defendant's Exhibit 6 -- actually, let me go back one

15   second to Defendant's Exhibit 5.  That is property that you

16   marked and took as evidence from his home?

17   A.   Yes, ma'am.

18   Q.   And how about Defendant's Exhibit 6?

19   A.   It is an Avondale Smoke Shop card.

20   Q.   That's in Avondale, Arizona?

21   A.   Yes, ma'am.

22   Q.   That's where you effectuated the arrest outside his home?

23   A.   Yes, ma'am.

24   Q.   And it shows somebody who has gone -- one, two, three,

25   four, five, six, seven, eight, nine -- ten times to the

1    Avondale smoke shop waiting for the eleventh free one, correct?

2    A.  Yes.  There are ten stamps on it, yes, ma'am.

3    Q.  And Defendant's Exhibit 7; what room does that depict?

4    A.  The bedroom in the apartment.

5    Q.  The bedroom didn't look like that, right?  I mean, you guys

6    stripped the bed, right?

7    A.  I believe so; yes, ma'am.

8    Q.  And you're the one -- not you, meaning the FBI, whoever

9    searched took the Marilyn Monroe photograph and disk off the

10   wall and put it on the floor, correct?  Before it was hanging,

11   right?

12   A.  I do not recall.

13   Q.  Okay.

14       All of these photos were taken by law enforcement,

15   correct?

16   A.  Correct.

17   Q.  And how many hours do you think you searched

18   Mr. El-Gammal's home?

19   A.  I do not recall.

20   Q.  You don't recall?

21   A.  No, ma'am.

22   Q.  How many agents did it take to search the home?

23   A.  I do not recall.

24   Q.  It is a modest home.  How many bedrooms, do you recall?

25   A.  I think it was one bedroom.

H1C5gam2                        Collie - cross

1    Q.  And where was Mr. El-Gammal's mother while you were

2    searching the home?

3              MR. QUIGLEY:  Objection.  Relevance.

4              THE COURT:  Sustained.

5    Q.  Now, you also recovered certain physical property from

6    within the home, correct?

7    A.  Correct.

8    Q.  And as you did with the property you testified about with

9    the government, you also seized other items that you properly

10   vouchered, correct?

11   A.  Correct.

12   Q.  And you followed all the FBI protocols when you vouchered

13   them, correct?

14   A.  Correct.

15   Q.  You wanted to maintain chain of custody, correct?

16   A.  Correct.

17   Q.  And you also seized, in addition to the evidence the

18   government introduced, a camera; is that correct?

19   A.  Correct.

20             MS. SHROFF:  May I, your Honor?

21             THE COURT:  You may.

22   Q.  Do you recognize that, sir?

23   A.  Yes, ma'am.

24   Q.  What is it?

25   A.  This is a camera that was seized during the time of the

H1C5gam2                         Collie – cross

1    search.

2            MS. SHROFF:  Your Honor, the defense moves the camera

3    into evidence.

4            THE COURT:  What number is it?

5            MS. SHROFF:  10.

6            MR. QUIGLEY:  Subject to our previous discussion, your

7    Honor.

8            THE COURT:  Very well.  It will be received, subject

9    to connection.

10           (Defendant's Exhibit 10 received in evidence)

11   BY MS. SHROFF:

12   Q.  You can put it aside if you want, whatever way you like.

13           When you searched the home or the apartment you also

14   found a GoPro camera, correct?

15   A.  Correct.

16   Q.  Let me give you what is marked as Defendant's Exhibit 11;

17   you vouchered it, correct?

18   A.  Correct.

19   Q.  Defense moves Defendant's Exhibit 11 into evidence.

20           MR. QUIGLEY:  Again, your Honor, subject to the

21   previous discussion we had.

22           THE COURT:  It will be received subject to section.

23           (Defendant's Exhibit 11 received in evidence)

24   BY MS. SHROFF:

25   Q.  And the same thing for the silver thumb drive.  You don't

H1C5gam2                          Collie - cross

1    need to open it if you recall that you --

2    A.   That's okay.

3    Q.   Okay.

4    A.   Thanks.

5            Yes, ma'am.

6    Q.   And you vouchered that, correct?

7    A.   Correct.

8    Q.   Seized and vouchered it, correct?

9    A.   Correct.

10           MS. SHROFF:  Your Honor, the defense moves that into

11   evidence, Defendant's Exhibit 12?

12           MR. QUIGLEY:  Again, subject to the same previous

13   objection.

14           THE COURT:  It will be received, subject to

15   connection.

16           (Defendant's Exhibit 12 received in evidence)

17           MS. SHROFF:  Your Honor, we need a side bar.

18           THE COURT:  Actually, let's take our morning break.

19   It is quarter of, 15 minutes.  Please do not discuss the case,

20   do not do any research, and do not read any media concerning

21   the case.

22           (Continued on next page)

23

24

25

H1C5gam2                         Collie - cross

```
 1              (Jury not present)

 2              THE COURT:  You can step down, Agent.

 3              Do you still want the side bar or can we do it here?

 4              MS. SHROFF:  If the jury is not here we can do it in

 5    open court.

 6              Your Honor, the issue of the voter I.D. card.  We had

 7    anticipated, we thought that the government would have the

 8    original but apparently they don't, so we need to -- we didn't

 9    realize we would have to put the photograph in.  So, we had a

10    photograph of the smoke shop by itself.  I don't want to upset

11    the government and put in the whole collage, so to speak,

12    because that was not what was ruled admissible.

13              THE COURT:  Okay.

14              MS. SHROFF:  So, the government can either stipulate

15    that it comes in and I can ask him about that by just showing

16    it to him and not publishing it, or you could give us 15

17    minutes and see if we can try and come up with something

18    together.

19              THE COURT:  I have already determined that it was

20    admissible, correct?

21              MS. SHROFF:  Yes, your Honor.

22              THE COURT:  And the original cannot be found or --

23              MS. SHROFF:  It was in his wallet.  I don't know why

24    it can't be found.

25              MR. DEFILIPPIS:  Our understanding, your Honor, is
```

H1C5gam2                         Collie - cross

1    that it was not actually seized.  It was photographed but they

2    didn't actually take it.

3              MS. SHROFF:  If the government has his wallet we would

4    just like to make sure that it is not in his wallet.

5              THE COURT:  I am assuming that the government made a

6    representation that they made a search and they didn't find it;

7    is that correct?

8              MS. SHROFF:  No.

9              There is an evidence log showing that it was seized.

10   We have all been up too long and it could slip by anyway.  I

11   don't think anybody has slept in days, so it's okay.

12             THE COURT:  I'm sorry.  So you are saying that you

13   have a voucher that reflects that the card itself has been

14   seized?

15             MS. SHROFF:  Yes, your Honor.  Would you like to see

16   the log?

17             THE COURT:  I believe you.

18             MS. SHROFF:  Okay.

19             MR. DEFILIPPIS:  Your Honor, we can do a little work.

20             THE COURT:  If the parties can stipulate to just a

21   cropped picture of the card, this doesn't need to take any

22   time.

23             MS. SHROFF:  We have 15 minutes, we would like to just

24   look for it.

25             MR. QUIGLEY:  Found it.

1          MR. DEFILIPPIS:  We found it, your Honor.

2          THE COURT:  What?  Okay.

3          MS. SHROFF:  Can we also have the smoke shop one, the

4    original, please?

5          MR. QUIGLEY:  It is not in here.

6          MS. SHROFF:  Okay.

7          MR. QUIGLEY:  Just driver licenses.

8          THE COURT:  Okay.  15 minutes.

9          MS. SHROFF:  Thank you.

10          (Recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam2                         Collie - cross

1          (Jury present)

2          THE COURT:  Everyone, please, be seated.

3          Ms. Shroff?

4    BY MS. SHROFF:

5    Q.  Special Agent Collie, let me hand up to you what I have

6    marked for identification as Defendant's Exhibit no. 13.  Okay?

7    I put the defendant tag on the yellow sticky.

8          Do you need the larger exhibit?

9    A.  Do you have it?

10   Q.  Thank you.

11   A.  Yes, ma'am.

12   Q.  Do you recognize what is marked as Defendant's Exhibit 13

13   for identification?

14   A.  Yes, ma'am.

15   Q.  And you recognize it as a piece of evidence you seized from

16   Mr. El-Gammal's home?

17   A.  Yes, ma'am.

18   Q.  And you seized it on the day of his arrest which was August

19   24th?

20   A.  Yes, ma'am.

21   Q.  2015?

22   A.  Yes, ma'am.

23   Q.  And is it in substantially the same condition as you saw it

24   back then?

25   A.  Yes, it is.

H1C5gam2                     Collie - cross

1              MS. SHROFF:  The defense moves Defendant's Exhibit 13

2      into evidence.

3              MR. QUIGLEY:  No objection.

4              THE COURT:  It will be received.

5              (Defendant's Exhibit 13 received in evidence)

6      BY MS. SHROFF:

7      Q.  Agent Collie, could you tell the jury what that is?

8      A.  It is a voter identification card.

9      Q.  And what does it tell you?

10     A.  County, Maricopa.

11     Q.  Let's start with whose identification card it is.  Whose is

12     it?

13     A.  It is in the name of Ahmed M. Gammal.

14     Q.  And does it give you a date of birth, sir?

15     A.  No, it does not.

16     Q.  Does it give you an address?

17     A.  Yes, it does.

18     Q.  And what address does it give?

19     A.  15441 West Laurel Lane, surprise, Arizona.

20     Q.  Do you recognize the address?

21     A.  Yes, ma'am.

22     Q.  And what is that address?

23     A.  That is a previous address for the defendant.

24     Q.  And does it tell you what party he is affiliated with?

25             MR. QUIGLEY:  Objection.  Relevance.

H1C5gam2                        Collie - cross

1          THE COURT:  Sustained.

2          MS. SHROFF:  Your Honor, may we publish it to the

3     jury?

4          THE COURT:  You may.

5          MS. SHROFF:  Thank you.

6     BY MS. SHROFF:

7     Q.  And you seized this voter identification card from

8     Mr. El-Gammal's wallet which was in his home at the time you

9     arrested him, correct?

10    A.  Yes, ma'am.

11    Q.  And you vouchered the entire wallet, correct?

12    A.  Not the entire wallet; no, ma'am.

13    Q.  You vouchered some contents of it, correct?

14    A.  Yes, ma'am.

15    Q.  And you kept a chain of custody because you were checking

16    paperwork, correct?

17    A.  Yes, ma'am.

18    Q.  Moving on, I would like you to focus, please, on the time

19    frame between or right before Mr. El-Gammal's arrest, right,

20    which was in August of 2015, right?

21    A.  Yes, ma'am.

22    Q.  Up until that point the FBI was keeping track of

23    Mr. El-Gammal, correct?

24    A.  He was under investigation; yes, ma'am.

25    Q.  Right.

H1C5gam2                    Collie - cross

1           And as part of being under investigation you wanted to

2      make sure that Mr. El-Gammal -- that you knew where

3      Mr. El-Gammal's whereabouts were, right?

4      A.  Correct.

5      Q.  And you took steps to make sure that you knew what his

6      whereabouts were, correct?

7      A.  Correct.

8      Q.  And you learned that Mr. El-Gammal lived in Avondale,

9      Arizona, correct?

10     A.  Correct.

11     Q.  He lived with two other people or one other person,

12     correct?

13              MR. QUIGLEY:  Objection.

14              THE COURT:  Overruled.

15     A.  Yes.

16     Q.  And you learned that he went to work, correct?

17     A.  Correct.

18     Q.  And he came back home, correct?

19     A.  Correct.

20     Q.  And you made sure that Mr. El-Gammal had not booked any

21     tickets to go to any foreign country, correct?

22     A.  Correct.

23     Q.  And you made sure he had not made any travel plans so that

24     he would leave Arizona, correct?  You wanted to arrest him,

25     right?

H1C5gam2                        Collie - cross

1   A.  I was going to say, we don't -- I don't really know what

2   his specific plans -- how we make sure he doesn't make travel

3   plans but, as you say, in terms of booking a flight, no, there

4   was no flight booked.

5   Q.  He had made no reservations whatsoever, correct?

6   A.  Correct.

7   Q.  Now, let me just focus you, please, from, or on your

8   testimony from yesterday which you gave during direct, okay?

9   You testified about certain videos that were played for the

10  jury, right?  Do you recall that?

11  A.  Yes.

12  Q.  And one of the videos that you played was a Vice News

13  video, correct?

14  A.  Correct.

15  Q.  Could you tell the jury what Vice News is?

16  A.  It's a news outlet, media outlet.

17  Q.  It is a lawful news outlet, correct?

18  A.  Yes, ma'am.

19  Q.  It is a United States registered news outlet, correct?

20  A.  Yes, ma'am.

21  Q.  It is owned by the Disney and A&E company, correct?

22  A.  I don't know who it is owned by.

23  Q.  Now, the second video that you watched was a video that was

24  on Mr. El-Gammal's Facebook wall; is that correct?

25  A.  I don't remember --

H1C5gam2                    Collie - cross

1   Q.  The Lebanese News Channel Video.  Do you recall that video?

2   A.  Yes, ma'am.

3   Q.  And that news channel on which that video was playing is

4   called LBCI, correct?

5   A.  Correct.

6   Q.  And LBCI is an acronym, is it not, for Lebanese

7   Broadcasting Corporation International; right?

8   A.  Correct.

9   Q.  And Lebanese Broadcasting Corporation International is a

10  news station in Lebanon, correct?

11  A.  Correct.

12  Q.  It is a news station comparable to ABC or CBS, correct?

13  A.  Correct.

14  Q.  Now, you testified about certain acronyms that the Islamic

15  State of Iraq and the Levant used, correct?  The short forms

16  for them, correct?

17  A.  Correct.

18  Q.  Some people call it ISIS, correct?

19  A.  Correct.

20  Q.  Some people call it ISIL?

21  A.  Yes.

22  Q.  Some just call it the Islamic State?

23  A.  Correct.

24  Q.  And the same holds true for the Muslim Brotherhood,

25  correct?  Sometimes it is noted as info Muslim Brotherhood or

H1C5gam2                         Collie - cross

1   sometimes noted as MB, correct?

2   A.   Correct.

3   Q.   And the Muslim Brotherhood has a hand sign, correct, does

4   it not?

5   A.   Yes, it does.

6   Q.   And a hand sign is basically the hand sign I am holding up

7   for the jury to is see; it is palm facing outward, correct?

8   A.   Correct.

9   Q.   Four fingers -- generally four fingers apart, correct?

10  A.   Correct.

11  Q.   And the thumb is on the palm of your hand, correct?

12  A.   Correct.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H1CFGAM3                          Collie - cross

1   Q.  Now, you testified, did you not, about Government Exhibit

2   903.  Could I please have that up?  Do you recall that

3   photograph, sir?  Mr. Quigley showed it to you on your direct.

4   A.  Yes, ma'am.

5   Q.  And you testified that Mr. Samy El-Goarany is wearing

6   military convo pants, is that your direct testimony?

7   A.  I said camo pants.

8   Q.  Say that again?

9   A.  Camouflage.

10  Q.  They're brown khaki pants, right?

11  A.  Yes, ma'am.

12  Q.  Do they have pockets?

13  A.  Yes, they do.

14  Q.  They're like hiking pants, right?

15  A.  They are like hiking pants, yes.

16  Q.  He's wearing normal boots, hiking boots?

17  A.  I don't think those are hiking boots, no.

18  Q.  Just regular boots, right?  Nothing special about them,

19  they're just shoes, right?

20  A.  He is wearing shoes, right.

21  Q.  And a shirt, correct?

22  A.  Yes.

23  Q.  Thank you.  Let's talk about Mr. El Gammal's passport that

24  Mr. Quigley had you testify to.  Could somebody put it up,

25  please?  Do you recall testifying about Mr. El Gammal's

H1CFGAM3                         Collie - cross

1    passport?

2    A.  His passport application, yes, ma'am.

3    Q.  And on the passport application, I think Mr. Quigley took

4    you through this, his phone number was listed as (623)692-7880.

5    A.  Are you putting it up?

6    Q.  I'm trying, but I'm not as well versed as Ms. Quinones.  Do

7    you have the exhibit?

8            MR. QUIGLEY:  We got it.

9    Q.  So the address is 14441 West Laurel?

10   A.  Correct.

11   Q.  Surprise, Arizona?

12   A.  Yes.

13   Q.  Phone number 623 that I already read off, correct?

14   A.  Correct.

15   Q.  And he gives an e-mail address, correct?

16   A.  Correct.

17   Q.  It's fair to say that the FBI checked all of this

18   information out, correct?

19   A.  Correct.

20   Q.  Phone number belongs to Mr. El Gammal?

21   A.  Yes.

22   Q.  Address belongs to Mr. El Gammal?

23   A.  In the past, yes.

24   Q.  Okay.  The phone number still belongs to Mr. El Gammal,

25   does it not?

H1CFGAM3                        Collie - cross

1   A.  It does.

2   Q.  He didn't dump that phone somewhere in a barnyard, right,

3   like Mr. El-Goarany?

4   A.  I don't know that Mr. El-Goarany dumped anything in a

5   barnyard, but Mr. El Gammal has that phone number still.

6   Q.  And he had it when you arrested him, correct?  Same phone,

7   same number?

8   A.  Right.

9   Q.  You did not have to go to a Dumpster in Middletown to find

10  it?

11  A.  No.

12  Q.  Now, you also testified to Mr. Ahmed El Gammal's

13  photograph, correct, the government introduced a photograph of

14  him loading up a gun, a magazine with ammunition, correct?

15  A.  Correct.

16  Q.  While she's getting the photograph for me, thank you, let

17  me ask you something.  Do you know where that photograph was

18  taken?

19  A.  I believe it was Scottsdale gun range.

20  Q.  Did you go to the Scottsdale gun range by any chance?

21  A.  Did I?  No.

22  Q.  Do you know what the Scottsdale gun range is?

23  A.  A gun range.

24  Q.  A legitimate, lawful gun range?

25  A.  Yes.

H1CFGAM3                        Collie - cross

1    Q.  It's in the state of Arizona, correct?

2    A.  Yes.

3    Q.  A lot of people in Arizona use guns, correct, at a shooting

4    range?

5    A.  At a shooting range, yes.

6    Q.  People stand up, shoot, it's a hobby, right?  I mean, it's

7    not my hobby but it's a hobby, correct?

8    A.  Shooting is a hobby for a lot of people.

9    Q.  So he has a headset on so he doesn't go deaf from the

10   shooting noise, correct?

11   A.  Yes.

12   Q.  Wearing regular pants, regular T-shirt, correct?

13   A.  Yes.

14   Q.  And, look, whole bunch of guns in the back where a person

15   can pick one from, correct?

16   A.  There are guns in the back, yes, ma'am.

17   Q.  So you go, it's kind of like football, right?  You go, you

18   pay the fee to go into Scottsdale whatever gun club it is and

19   you can use their facilities, right?

20          MR. QUIGLEY:  Objection.

21          THE COURT:  Overruled.

22   A.  Correct.

23   Q.  Yeah, okay.  By the way, you never went to the Scottsdale

24   gun club and asked whether he was a member or not?

25   A.  I did not, no, ma'am.

H1CFGAM3                          Collie - cross

1    Q.  And you did not find out whether or not they have like 300

2    people going to the Scottsdale gun club, right?

3              MR. QUIGLEY:  Objection.  Relevance.

4              MS. SHROFF:  It's okay.  I'll move on, your Honor.

5    Thank you.

6    Q.  Now, you also testified, did you not, about the many

7    interactions Mr. El Gammal and Samy had about using Surespot,

8    correct?

9    A.  Correct.

10   Q.  Do you recall that?

11   A.  Yes.

12   Q.  Mr. Quigley took you through to all the times that

13   Mr. El-Goarany said can we Surespot and he said yes, correct?

14   A.  Correct.

15   Q.  Did you, by the way, review the records to see all the

16   times Mr. El Gammal said ah, no, I can't, I'm busy?

17   A.  I did not.

18   Q.  How about we put up Government Exhibit 100B, page 14.  And

19   let's start with the first one, 9-02-2014, 17:59 and that is

20   Samy El-Goarany talking, Salam bro, down to Surespot, correct?

21   A.  Correct.

22   Q.  Mr. El Gammal replies, "not now."  Correct?

23   A.  Correct.

24   Q.  "Kinda busy," correct?

25   A.  Yes.

H1CFGAM3                          Collie - cross

1   Q.  Samy El-Goarany replies "K," right?

2   A.  Correct.

3   Q.  Okay, thank you.  By the way, do you recall how many

4   thousands of pages of Facebook returns you got for Samy

5   El-Goarany?

6   A.  I don't recall exactly.

7   Q.  Literally in the thousands, right?

8   A.  Yes.

9   Q.  Now, let me take you to Government Exhibit 100B, again,

10  page 29.  Do you see where Mr. Quigley asked you about that

11  message that says "I'm in contact with someone from the

12  company"?

13          MS. SHROFF:  Can you focus in on that?

14  Q.  Right?

15  A.  Yes.

16  Q.  That message was not deleted from Mr. Ahmed El Gammal's

17  Facebook post, correct?

18          MS. SHROFF:  Maybe you can put up both, Samy's return

19  and Mr. El Gammal's return.

20          (Pause)

21  Q.  Am I right?

22  A.  Yes, ma'am.

23  Q.  It's deleted from Samy's, not deleted from Mr. El Gammal's,

24  correct?

25          MR. QUIGLEY:  Objection.

H1CFGAM3                         Collie - cross

1           THE COURT:  Overruled.

2   A.  Your question was, was it deleted from Samy's and not

3   Mr. El Gammal's?

4   Q.  It's not deleted from Mr. El Gammal's Facebook post,

5   correct?

6   A.  Correct.

7   Q.  You've already testified that the returns were literally in

8   the thousands, correct?

9   A.  Correct.

10  Q.  And that holds same for the returns for Mr. Ahmed El

11  Gammal, correct?

12  A.  It was quite a bit, yes.

13  Q.  Same holds true for Attiya Aboualala, correct?

14  A.  Correct.

15  Q.  Same holds true for Tarek El-Goarany, correct?

16  A.  Correct.

17  Q.  Same holds true for any number of people whose Facebook

18  returns you looked at in this case, correct?

19  A.  Correct.

20  Q.  And you only focused on what the government told you to

21  focus on in terms of deletions, correct?

22  A.  No.

23  Q.  No?  Did you make a chart of every deletion Samy El-Goarany

24  had ever made?

25  A.  No.

H1CFGAM3                          Collie - cross

1   Q.  And you didn't make note of every deletion Mr. Ahmed El

2   Gammal had ever made?

3   A.  We didn't make note of?

4   Q.  Right, you didn't go back and make a chart of every single

5   Facebook that he deleted with every single person he was on

6   Facebook with?

7   A.  No, we did not make charts like that.

8   Q.  You did not make charts like that, right?

9   A.  No.

10  Q.  It's fair to say, Agent Collie, that you worked on this

11  investigation along with the prosecutors at this table,

12  correct?

13  A.  Correct.

14  Q.  And let me take you to Government Exhibit 100B, page 21 to

15  22.  22, please, on the side?  Do you see where Mr. Gammal says

16  to Samy, "take pics"?

17  A.  Yes.

18  Q.  Right, January 28, 2015, correct?

19  A.  Yes, ma'am.

20  Q.  And what does Mr. Samy El-Goarany reply?  And this is what

21  was not brought out in the direct testimony.  Would you tell

22  the jury?

23  A.  "Of myself?"

24  Q.  And the response from Mr. Gammal?

25  A.  There is no response there.

H1CFGAM3                        Collie - cross

1   Q.  Give it a minute.  She's going to show you the part 110B

2   which has the response and if you could focus now on the

3   response because -- I'll stop there.  Do you have the response

4   now?

5   A.  Yes, ma'am.

6   Q.  And what is the response, sir?

7   A.  "Of Turkey."

8   Q.  And what's the response back from Samy El-Goarany?

9   A.  "Will do."

10  Q.  And when you testified on direct, you did not have that

11  part of the record, correct?

12              MR. QUIGLEY:  Objection.

13              THE COURT:  Can you rephrase that?

14              MS. SHROFF:  Sure.

15  Q.  During your direct testimony, Mr. Quigley and you role

16  played and read out conversations, correct?

17  A.  We read out conversations, yes, ma'am.

18  Q.  Right.  And you read out this particular conversation,

19  correct?

20  A.  Parts of it, yes, ma'am.

21  Q.  Right.  And you stopped before the jury heard that

22  Mr. Gammal wanted pictures of Turkey, correct?

23  A.  Yes, ma'am.

24              MS. SHROFF:  I have nothing further at this time.

25              THE COURT:  Redirect.

H1CFGAM3                          Collie - redirect

1                MR. QUIGLEY:  Thank you, your Honor.

2                Please keep that up.  Thank you

3    REDIRECT EXAMINATION

4    BY MR. QUIGLEY:

5    Q.  Agent Collie, just so the record is clear, that "of Turkey"

6    reference doesn't appear in Government Exhibit 100B, right?

7    A.  No, it does not.

8    Q.  That's because the defendant deleted it, correct?

9    A.  Correct.

10               MS. SHROFF:  Objection to the leading, your Honor.

11               THE COURT:  Overruled.

12               MR. QUIGLEY:  All right, we can take that down.

13   Q.  Ms. Shroff finished up or one of the things she asked you

14   about was that Samy El-Goarany reached out to the defendant a

15   lot on Surespot, right?

16   A.  Yes, sir.

17               MR. QUIGLEY:  Ms. Quinones, would you pull up

18   Government Exhibit 100B, please?  And go to the bottom of page

19   14.

20   Q.  So there was the conversation that Ms. Shroff asked you

21   about at the bottom of the page.  Do you recall that?

22   A.  Yes, sir.

23               MR. QUIGLEY:  Ms. Quinones, can we go to the

24   conversations on 2014-09-03 at 03:11:45 that carries on to the

25   next page.

H1CFGAM3                          Collie - redirect

1   Q.  So what does the defendant say there?

2   A.  "Samy, you here?  Available?"

3   Q.  So this is actually, who is reaching out to who here?

4   A.  This is Mr. El Gammal reaching out to Samy.

5   Q.  Just go down a little bit.  And then what does Mr. El

6   Gammal say in the conversations the messages at 03:12:14 and

7   03:12:20?

8   A.  "Okay let's go Surespot."

9   Q.  And does Samy El-Goarany jump right on Surespot?

10  A.  No, he says, "K, give me a sec."

11  Q.  Can we go to 15 and 16, Ms. Quinones?

12          MS. SHROFF:  Your Honor, I'm going to object to the

13  language of "jump right on."  There's a time stamp on the

14  document and the government should read the time stamps.

15          THE COURT:  The objection is overruled.

16  Q.  And so, bottom of 15, reading on to 16, there's a time

17  stamp at 18:01:02?  Do you see that?

18  A.  Yes, sir.

19  Q.  And it says, Samy El-Goarany says "Salam bro.  Let me know

20  if you're available to Surespot today."

21  A.  Yes.

22  Q.  Do you see the message a few minutes later the defendant

23  responds "available now"?

24  A.  Yes.

25  Q.  What does Samy El-Goarany say in the next message?

H1CFGAM3                          Collie - redirect

1    A.  "K, give me a few min."

2    Q.  And the next one after that?

3    A.  "I'll hit you up isA."

4    Q.  You were asked some questions -- let's shift topics for a

5    second.  You were asked about the search warrant of the

6    defendant's apartment at the time of this arrest, right?

7    A.  Yes, sir.

8    Q.  Did you recover a phone there?

9    A.  Yes, we did.

10   Q.  In fact, you recovered several phones?

11   A.  Yes, sir.

12   Q.  What if any communications did you find between the

13   defendant and Samy El-Goarany on one of those phones?

14   A.  We found communications between the defendant -- I'm sorry,

15   what's the question?

16   Q.  What if any communications did you find between the

17   defendant and Samy El-Goarany on one of those phones?

18   A.  We found communications, we found Facebook communications.

19   Q.  Were there WhatsApp communications between the defendant

20   and Samy El-Goarany on those phones?

21   A.  Yes.

22   Q.  Was that before or after Samy El-Goarany went over to

23   Syria?

24   A.  After.

25             MR. QUIGLEY:  Can we pull up Defense Exhibit 112AA?

H1CFGAM3                          Collie - redirect

1    Q.  What's the date on these communications?

2    A.  They begin May 24, 2015.

3    Q.  And where is Samy El-Goarany at this point?

4    A.  He's in Syria.

5    Q.  And he doesn't tell this person that everything is going

6    according to plan?

7    A.  No, he does not.

8    Q.  There's no discussion about anybody parking any car in

9    anybody else's parking lot?

10   A.  No.

11   Q.  Could we just go back to 100B for a second, and go to page

12   28.  And if we could focus on the entry that Ms. Shroff asked

13   you about at 2015-01-29 at 00:09:40.  Do you see where the one

14   message here in this series the defendant didn't delete where

15   he says, "I'm in contact with someone from the company"?

16   A.  Yes, sir.

17   Q.  And this wasn't deleted in 100B, is that accurate?

18   A.  That is accurate.

19   Q.  We also looked at another exhibit yesterday, Government

20   Exhibit 103.  Do you recall that?

21   A.  Yes, sir.

22   Q.  What did that show about what did the defendant do with

23   pretty much all of his messages?

24            MS. SHROFF:  Your Honor, objection to the leading.

25            THE COURT:  Overruled.

H1CFGAM3                        Collie – redirect

1   Q.  What did 103 show that the defendant did with almost all of

2   his messages with Samy El-Goarany, including this one?

3   A.  He deleted them.

4           MS. SHROFF:  Your Honor, objection –– could we have a

5   sidebar, your Honor?

6           THE COURT:  Sure.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1CFGAM3                         Collie - redirect

 1                (At the side bar)

 2                THE COURT:  Ms. Shroff?

 3                MS. SHROFF:  Your Honor, I thought that the Court had

 4      not ultimately ruled on the admissibility of 103.  There was an

 5      issue about hearsay and authentication and I did not think that

 6      there was a complete ruling on it.

 7                MR. QUIGLEY:  The objection was overruled, your Honor.

 8                MS. SHROFF:  No.

 9                THE COURT:  I'm sorry, if I was not clear, I did

10      overrule the objection.

11                MS. SHROFF:  On both hearsay and authentication?

12                THE COURT:  Yes, I did.

13                MS. SHROFF:  Okay.

14                MR. HABIB:  For the record, I want to indicate that in

15      addition to hearsay we're objecting to the confrontation clause

16      for the same reasons.

17                THE COURT:  All right.

18                (Continued on next page)

19

20

21

22

23

24

25

H1CFGAM3                          Collie - recross

1                    (In open court)

2        BY MR. QUIGLEY:

3        Q.  When we left off, we were talking about Government Exhibit

4        103?

5        A.  Yes, sir.

6        Q.  You were asked some questions yesterday about some people,

7        Shami Witness, Ghazi Shami; do you recall that?

8        A.  Yes.

9        Q.  In the course of your investigation what evidence did you

10       find that either of those people traveled to New York to meet

11       with the defendant?

12       A.  None.

13                    MR. QUIGLEY:  No further questions.

14                    MS. SHROFF:  May I, your Honor?

15                    THE COURT:  You may.

16                    MS. SHROFF:  Thank you.

17       RECROSS EXAMINATION

18       BY MS. SHROFF:

19       Q.  Hello.

20       A.  Hello.

21       Q.  Mr. Quigley just asked you about a WhatsApp communication

22       between Mr. Gammal and Samy El-Goarany, correct?

23       A.  Correct.

24       Q.  And you testified that it happened while he was in Syria,

25       correct?

H1CFGAM3                           Collie - recross

1   A.   Correct.

2   Q.   Do you recall that WhatsApp conversation, sir?

3   A.   No, I do not.

4   Q.   How about if I give you something to refresh your

5   recollection.  Did you review it, sir?

6   A.   Yes, ma'am.

7   Q.   Does this refresh your recollection about the conversation

8   between Samy El-Goarany and Mr. Gammal after Mr. Samy

9   El-Goarany was in Syria?

10  A.   Yes, ma'am.

11  Q.   And without going into the content of it, is it fair to say

12  that Mr. El Gammal has a one-word response to Mr. El-Goarany,

13  all the way?  Just review the document.

14  A.   No.

15  Q.   And may I just see it for a second?  Is there any

16  acknowledgment -- did you in your investigation after reading

17  that WhatsApp chat conclude that there was any discussion

18  between Samy El-Goarany and Ahmed Gammal about him being in

19  ISIS at that time?

20          MR. QUIGLEY:  Objection.

21  A.   No.

22  Q.   Did you say no, sir?

23  A.   Yes.  I said no.

24  Q.   Okay.  And from that WhatsApp chat -- what date is that, by

25  the way?

H1CFGAM3                          Collie - recross

1    A.  July 16, 2015.

2    Q.  And Samy El-Goarany according to the FBI gets to Syria/ISIS

3    when?

4    A.  Before this.

5    Q.  Much before this, right?

6    A.  Correct.

7    Q.  May, in fact, correct?

8               MR. QUIGLEY:  Objection.

9               THE COURT:  Overruled.

10   A.  May?

11   Q.  Yes.

12   A.  Yes.

13   Q.  No WhatsApp in May, correct?

14   A.  Correct.

15   Q.  No WhatsApp in June, correct?

16   A.  Correct.

17   Q.  And May and June, Samy El-Goarany is talking up a storm, is

18   he not, with his brother Tarek El-Goarany?

19   A.  I do not recall the exact months.

20   Q.  You don't?

21   A.  I don't.

22   Q.  You don't recall him talking up a storm with his brother,

23   Tarek El-Goarany?

24   A.  I do recall him talking up a storm with his brother, yes,

25   talking to his brother.

H1CFGAM3                         Collie - redirect

1   Q.  And that is between May of 2015 and well before July of

2   2015 when he sends that WhatsApp to Mr. Ahmed Gammal, correct?

3   A.  I don't recall.

4   Q.  And July of 2015 is Eid, is it not?

5   A.  Yes, it is.

6           MS. SHROFF:  I have nothing further.

7           MR. QUIGLEY:  I have a few more.  Briefly, your Honor.

8           THE COURT:  Very briefly.

9           MR. QUIGLEY:  Two questions, your Honor.

10          Ms. Quinones, can we pull up what's in evidence as

11  Government Exhibit 111A?

12  REDIRECT EXAMINATION

13  BY MR. QUIGLEY:

14  Q.  And Agent Collie, do you recall Ms. Shroff just asked you

15  about communications between the defendant and Samy El-Goarany

16  in May and June?

17  A.  Yes, sir.

18  Q.  So if we could blow up that first communication there.

19  What's the date on that?

20  A.  May 7, 2015.

21  Q.  And who is that from?

22  A.  From Samy El-Goarany.

23  Q.  To who?

24  A.  To Mr. El Gammal.

25  Q.  And what does Samy El-Goarany say there?

H1CFGAM3                          Collie - recross

1    A.  Salam aleikum, ya, it's been a long time but I'm doing well

2    I just want to let you know I'm safe and secure and everything

3    is going according to plan.

4    Q.  And where was Samy El-Goarany at this time?

5    A.  In Syria.

6               MR. QUIGLEY:  No further questions.

7               MS. SHROFF:  Your Honor, I have one.

8               THE COURT:  That was six, by the way, Mr. Quigley.

9               MR. QUIGLEY:  Sorry.

10              MS. SHROFF:  Could you put that exhibit back up, the

11   one you just read?

12   RECROSS EXAMINATION

13   BY MS. SHROFF:

14   Q.  Did Samy El-Goarany tell Ahmed El Gammal it's been a long

15   time?

16   A.  Yes.

17              MS. SHROFF:  Thank you.  I have nothing further.

18              THE COURT:  Agent Collie, you may step down.

19              THE WITNESS:  Thank you, your Honor.

20              THE COURT:  Does someone want to grab these exhibits.

21   Is the government prepared to call its next witness?

22              MS. TEKEEI:  Yes, your Honor.  The government calls

23   Paul Mueller.

24              THE COURT:  Is Mr. Mueller here?

25              MS. TEKEEI:  Yes, your Honor.

H1CFGAM3                        Mueller - direct

1   PAUL MUELLER,

2        called as a witness by the Government,

3        having been duly sworn, testified as follows:

4             THE COURT:  Sir, you may sit down.  Pull your chair up

5   to the microphone and please begin by stating your full name

6   and spelling your last name for the record.

7             THE WITNESS:  Paul Mueller, M-u-e-l-l-e-r.

8             THE COURT:  Ms. Tekeei.

9             MS. TEKEEI:  Thank you, your Honor.

10  DIRECT EXAMINATION

11  BY MS. TEKEEI:

12  Q.  Agent Mueller, where do you work?

13  A.  The operational technology division.

14  Q.  Of what organization?

15  A.  FBI.

16  Q.  What is your job title at the FBI?

17  A.  I'm a supervisory special agent.

18  Q.  How long have you worked with the FBI?

19  A.  Twenty years.

20  Q.  Do you work for a specific -- excuse me, can you explain

21  what the operational technology division is?

22  A.  The operational technology division helps certain divisions

23  with technology-type issues.

24  Q.  Where is it physically located?

25  A.  Quantico, Virginia.

H1CFGAM3                    Mueller - direct

1   Q.  Do you supervise a particular division within, we'll call
2   it OTD, operational technology division?
3   A.  Yes, data intercept technology unit.
4   Q.  Basically speaking, what does the -- can we call it DITU --
5   the data intercept technology unit do?
6   A.  We help to facilitate the transmission of court orders from
7   certain providers so we help to collect, legally validate and
8   route that to a viewing station for the case agent.
9           MS. MIRON:  Your Honor, we're having trouble hearing.
10          THE COURT:  Could you move that microphone closer to
11  you?  Thank you.  And maybe slow down a bit if you could.
12  Q.  We'll get to that in just a minute, but very briefly, where
13  did you work prior to your current position at FBI?
14  A.  I worked at the Portland division.
15  Q.  What were your assignments within the Portland division?
16  A.  I worked bank robberies, high tech crimes, computer
17  forensic examiner.
18  Q.  Before that, where did you work?
19  A.  The Omaha division.
20  Q.  What did you do for the FBI at the Omaha division?
21  A.  Computer specialist.
22  Q.  Where did you attend college?
23  A.  Bellevue University in Omaha, Nebraska.
24  Q.  What degrees did you graduate with?
25  A.  I received my Bachelors and Masters degree in computer

H1CFGAM3                        Mueller - direct

1    information systems.

2    Q.   Earlier you described how the DITU receives electronic or

3    data pursuant to court orders.  I'm going to hand you what has

4    been marked in evidence as Government Exhibits 103 and 103A.

5    Can you take a moment to look at those, please?

6              Do you recognize those documents?

7    A.   Yes.

8    Q.   How do you recognize them?

9    A.   I recognize them by the account number on the top of the

10   page.

11             MS. TEKEEI:  Ms. Quinones, can you please publish

12   Government Exhibit 103?  Can you please go to the second page.

13   Q.   What is the account number for which these records pertain,

14   to which these records pertain?

15   A.   It is located at the top, it is 1231043183.

16   Q.   When did DITU receive this data?

17   A.   We received this data from the provider on May 15, 2015.

18   Q.   And who is the provider?

19   A.   Facebook.

20   Q.   Describe how this data was received by DITU?

21   A.   This is an electronic process where we receive the data

22   from the provider, we perform what's called an MD5 hash on that

23   data.  We then validate it against the court order that was

24   initially signed by the judge and then we disseminate that for

25   a viewing platform for the case agent to review.

H1CFGAM3                        Mueller - direct

1    Q.  Is there any human intervention involved in this system?

2    A.  No.

3    Q.  And what format is the data received?

4    A.  It's in electronic format.

5    Q.  Is it processed when it is received from the provider?

6    A.  It is generally in its raw form.

7    Q.  And what form was this data when it was received on May 15?

8    A.  The electronic raw form.

9    Q.  You described an MD5 hash a minute ago.  Can you describe

10   what that is?

11   A.  Immediately when we receive this information we perform

12   what's called an MD5 hash on the product we received.  What

13   this is, is a unique fingerprint or electronic signature

14   specific to that product.

15   Q.  You described a viewing platform earlier.  Describe what

16   that is?

17   A.  A viewing platform is some application that's used by the

18   case agent or the analyst to review the information that's

19   received.

20   Q.  And for this particular data, what viewing platform was it

21   put into?

22   A.  DWS, data warehouse system.

23   Q.  Who at the FBI has access to the raw data when it's

24   received from the provider?

25   A.  There's about five or six engineers who have access to

1    that.

2    Q.  And in this particular case, what happened to the raw data

3    once it was received from Facebook?

4    A.  The first thing we do is we perform the MD5 hash of that

5    data.

6    Q.  You described how it gets routed to a viewing platform.

7    Did that happen here with this information?

8    A.  Yes.

9    Q.  And once it got routed to that viewing platform, I believe

10   you said it was DWS, where within DWS is the information

11   placed?

12   A.  DWS loads that information to an account number and a case

13   number so that the case agent or analyst can locate that

14   information.

15   Q.  Was that done with respect to the data contained in 103 and

16   103A?

17   A.  Yes.

18   Q.  Can the data be altered once it gets into DWS?

19   A.  No.

20   Q.  In preparation for your testimony here today, were you able

21   to compare the MD5 hash that you just described of the data

22   that was received from Facebook on May 15, 2015, to the data

23   contained in Government Exhibits 103 and 103A?

24   A.  Yes.

25   Q.  What was the result of your comparison?

H1CFGAM3                          Mueller - direct

1    A.   The MD5 hashes match.

2               MS. TEKEEI:  Thank you.

3               THE COURT:  Anything further?

4               MS. TEKEEI:  No further questions from the government

5    at this time.

6               THE COURT:  Any cross-examination?

7               MS. MIRON:  Your Honor, may we have a brief sidebar?

8               THE COURT:  Sure.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1CFGAM3                          Mueller – direct

1                    (Page 343 SEALED by order of the Court)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  Okay.

3              MS. SHROFF:  Your Honor, may I just have a second?

4              THE COURT:  Sure.

5              (Pause)

6              MS. MIRON:  Your Honor, I don't believe I can conduct

7    any cross-examination without this issue resolved.  Can we take

8    a recess?

9              THE COURT:  Sure.

10             MS. TEKEEI:  May I say a couple of things, your Honor?

11   First, what he described is the process by which this data was

12   authenticated as data from the provider and this particular

13   document, these two documents have been the subject of

14   extensive litigation.  We in no way opened the door for them to

15   cross-examine him on the subjects of that litigation.  He

16   described -- defense counsel yesterday implied that this data

17   is not authentic because it came from, in their words, an FBI

18   system.  That is incorrect.  They know that is incorrect.  All

19   we did through this witness is to have him explain the process

20   by which it was received from the provider so that defense

21   counsel, although they understand and know this data, was not

22   FBI data and that it came from the provider, cannot then argue

23   later that the FBI concocted these two exhibits, which is what

24   they implied yesterday.

25             MS. SHROFF:  If it didn't come from anybody but the

1    provider, why go to the robing room?

2              THE COURT:  I don't know that we need to go back there

3    at all.  Now, I guess one issue that Ms. Miron raised, you

4    didn't get the raw data, is that --

5              MS. MIRON:  That's correct.

6              MS. TEKEEI:  That's actually incorrect.  We provided

7    the raw data to them in discovery.

8              MS. MIRON:  Can you please cite the discovery label so

9    we can --

10             MR. DEFILIPPIS:  Yes, we can do that.

11             MR. QUIGLEY:  You should discuss it in the robing

12   room.

13             MS. SHROFF:  If it's raw data provided in discovery

14   why in God's name should we go to the robing room?

15             THE COURT:  I'll step through this as tenderly as I

16   can.  So they provided the raw data.  How you look at it, how

17   you analyze it or how you process it I suppose is up to you.

18   He testified that he used a particular FBI process, MD hash 5?

19             MS. TEKEEI:  MD5 hash.  It's a unique signature placed

20   on the data that he can compare.  It's placed on 103 and 103A

21   and can authenticate that that was the same data received from

22   the provider on that date which goes directly to their

23   argument.

24             THE COURT:  We don't have to go to the robing room.  I

25   find the government has not opened the door to questions

H1CFGAM3                        Mueller - direct

1    regarding device process.

2              MS. SHROFF:  Could we ask the Court's schedule?  We

3    will need a proceeding today.  Mr. Harry Rucker is in the

4    courtroom today, he's here for other reasons also.  Maybe we

5    could have a longer lunch break also.

6              THE COURT:  I wanted to break early today, 12:15 or

7    so.

8              MS. MIRON:  In addition, your Honor, we didn't get a

9    court order, which what gives scope to his process.  I would

10   ask to examine on what was authorized because we would like to

11   examine that this was the complete set of data he found.

12             MS. TEKEEI:  No, your Honor, that is the subject of

13   prior litigation in this case, extensive litigation and

14   therefore we would object to that kind of questioning as well.

15             THE COURT:  You can't cross-examine on that.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

H1CFGAM3                          Mueller – direct

1                (In open court; jury present)

2                THE COURT:  Any cross-examination?

3                MS. MIRON:  Your Honor, I believe I have a single

4      question, but I would need to seek approval from the Court

5      before asking it.

6                THE COURT:  Okay.

7                (Continued next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam4b                          Mueller – cross

1              (Pages 348-350 CLASSIFIED by order of the Court)

2              (In open court)

3              THE COURT:  Ms. Mirón?

4              MS. MIRÓN:  No questions, your Honor.

5              THE COURT:  Very well.

6              Mr. Mueller, you may step down.

7              Ladies and gentlemen, it is now approximately five

8     minutes after 12.  What we are going to do today is break now

9     for lunch and we are going to take an extended lunch break

10    because there is some legal stuff that we have to do and I

11    don't want to take up your time.  So, let's take our lunch

12    break now.  Be back in the jury room no later than 1:30, so it

13    will be about an hour and a half, and we will be back with you

14    at that time.  Until then, do not discuss the case, do not read

15    any media, do not do any research.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

H1C5gam4b                          Mueller - cross

 1              (Jury not present)

 2              THE COURT:  Okay.  We can do the in camera session now

 3    or in an hour?  Does the government have a preference?

 4              MR. DEFILIPPIS:  We are ready now, your Honor, but if

 5    your Honor would rather wait?  Either way.

 6              THE COURT:  Let's do it now.

 7              (Pages 353-360 CLASSIFIED by order of the Court)

 8              (Pages 361-368 CLASSIFIED/EX PARTE by order of the

 9    Court)

10              (Pages 369-379 CLASSIFIED by order of the Court)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam4F                        Varani – direct

1                    A F T E R N O O N   S E S S I O N

2                              1:32 p.m.

3              THE COURT:  We are bringing in the jury.  Is the

4     witness ready?

5              MS. TEKEEI:  Yes, your Honor; the witness is ready.

6              THE COURT:  Very well.

7              (Jury present)

8              THE COURT:  Everyone, please, be seated.

9              Will the government please call its next witness?

10             MR. QUIGLEY:  Thank you, your Honor.  The government

11    calls Joe Varani.

12             Ms. Rivera?

13     JOSEPH BERNARD VARANI,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16             THE COURT:  Sir, please, sit down, pull up to the

17    microphone, and please begin by stating your full name and

18    spelling your last name for the record.

19             THE WITNESS:  Joseph Bernard Varani.

20    DIRECT EXAMINATION

21    BY MR. QUIGLEY:

22    Q.  Sir, where do you work?

23    A.  I work for the Department of Justice in the cybercrime lab

24    which is part of the Computer Crime and Intellectual Property

25    Section.

H1C5gam4F                        Varani - direct

1    Q.  Where is that located?

2    A.  That is in Washington, D.C.

3    Q.  And what do you do there?

4    A.  I am a digital investigative analyst.

5    Q.  And what sort of work do you do, in general, as a digital

6    investigative analyst?

7    A.  So, that means that I look at computers, cell phones, and

8    other electronic devices for evidence.

9    Q.  And, in your work at DOJ CCIPS -- that's the Computer Crime

10   and Intellectual Property Section?

11   A.  Yes.

12   Q.  In your work at CCIPS, have you developed a tool to

13   reformat Twitter records?

14   A.  Yes.

15   Q.  Can you describe what the tool does?

16   A.  So, the tool reads in the data that Twitter provides which

17   is in multiple different files, and it consolidates them into

18   one spreadsheet so we can easily see the activity on an account

19   without looking at multiple documents.

20   Q.  And how did you go about developing that tool?

21   A.  I used a programming language called Python which lets me

22   automate the process.  Basically, it reads the data in from the

23   files, it sorts them by time, and it writes this out to a

24   spreadsheet.

25            MR. QUIGLEY:  Your Honor, can I publish a stipulation

H1C5gam4F                          Varani - direct

1    at this time?

2              THE COURT:  You may.

3              MR. QUIGLEY:  Thank you.

4              THE COURT:  Ladies and gentlemen, as I believe I

5    mentioned during my preliminary instructions, a stipulation is

6    simply an agreement between the parties about testimony or some

7    facts.

8              MR. QUIGLEY:  So, it is hereby stipulated and agreed

9    between the parties that:

10             Government Exhibit 300 is a true and accurate copy of

11   the contents of Twitter account 166663012, as they existed on

12   or about March 23rd, 2015.

13             Government Exhibit 301 is a true and accurate copy of

14   the contents of Twitter account 3246592653, as they existed on

15   or about March 22nd, 2016.

16             Government's Exhibits 300-A and 301-A are true and

17   accurate copies of authentic business records of Twitter that

18   were made at or near the time of the acts and events recorded

19   in them by a person with knowledge, and were prepared and kept

20   in the course of Twitter's regularly conducted activity, and it

21   was the regular practice of Twitter to make such business

22   records, and the source of information or the method and the

23   circumstances of its preparation are trustworthy.

24             It is further stipulated that this stipulation may be

25   received in evidence at trial.

H1C5gam4F                          Varani – direct

1          Your Honor, the government offers the stipulation

2     which is Government Exhibit 1104.

3          THE COURT:  That will be received.

4          (Government's Exhibit 1104 received in evidence)

5          MR. QUIGLEY:  Thank you.  May I approach, your Honor?

6          THE COURT:  You may.

7     BY MR. QUIGLEY:

8     Q.  Mr. Varani, I am handing you two sets of folders, one is

9     Government's Exhibits 301 and 303, and the other is

10    Government's Exhibits 300 and 304.  Directing your attention

11    first to 301 and 303, and specifically 301, do you recognize

12    that?

13    A.  Yes.

14    Q.  And what is that?

15    A.  This is a CD that I previously reviewed that contains the

16    data from Twitter.

17    Q.  And, what is Government's Exhibits 303?

18    A.  303 is the printed spreadsheet that I created based on the

19    data from Twitter.

20    Q.  From Government's Exhibits 301?

21    A.  Yes.

22    Q.  And after creating 303, did you check that the data in 303

23    corresponded to what was in 301?

24    A.  Yes, I did.

25    Q.  Did you hide any of the columns in Government Exhibit 303?

H1C5gam4F                    Varani - direct

1   A.  Yes.  The spreadsheet is very wide because I tried to

2   incorporate lots of different data from Twitter, and so I hid

3   the columns that were not helpful to the data that we are

4   looking at here.

5   Q.  So, some extraneous columns that didn't contain the actual

6   tweets or direct messages?

7   A.  Yes.  They were mostly blank in this case.

8            MR. QUIGLEY:  Your Honor, the government also offers

9   Government Exhibit 303.

10           THE COURT:  Any objection?

11           MS. MIRÓN:  The earlier objection, your Honor.  We

12   renew that.

13           THE COURT:  With that objection, the exhibit will be

14   received.

15           (Government's Exhibit 303 received in evidence)

16   BY MR. QUIGLEY:

17   Q.  Turning to Government's Exhibits 300 and 304, what is

18   Government Exhibit 300?

19   A.  This is a CD of another Twitter account that I reviewed as

20   the data originated from Twitter.

21   Q.  What is 304?

22   A.  304 is the CD containing the spreadsheet that I produced.

23   Due to the size it is on a CD.

24   Q.  After creating 304, did you check that the data corresponds

25   with what was on 300?

H1C5gam4F                     Varani - direct

1   A.  Yes, I did.

2   Q.  Can we publish what is in evidence as Government Exhibit

3   303?

4        So, this is looking at the first page of your chart,

5   Mr. Varani?

6   A.  Yes, it is.

7   Q.  What is a tweet?

8   A.  A tweet is a message that a user on Twitter sends out to

9   other people using Twitter.  It is sort of a public message.

10  Q.  And what, on your chart, what color or how are the tweets

11  color-coded?

12  A.  Tweets are designated by yellow background.

13  Q.  And what is a direct message?

14  A.  A direct message is a communication between two specific

15  users on the service.

16  Q.  And what color are direct messages on your chart?

17  A.  Those are a red background.

18  Q.  Can we move to the second page?

19       What is the screen name of this Twitter account?

20  A.  The screen name is Abumurad_IS.

21  Q.  And what is the e-mail address associated with the account?

22  A.  The e-mail address is Samybey1@gmail.com.

23  Q.  When was this account created?

24  A.  It was created on May 11th, 2015, at 6:54 p.m.

25  Q.  What is the account number?

1   A.  The account number or account I.D. is 3246592653.

2   Q.  So, can we go to the next page, Ms. Quinones, please?  Can

3   you go to highlight the pink entry on 6-29-15 at 21:51:24?

4   Sorry, it is on the next page.

5          Mr. Varani, if you can read that entry on 6/29 at

6   21:54Z?

7   A.  21:51:24?

8   Q.  21:51:24, yes.

9   A.  It says:  No, just you.  I don't trust most people here

10  tbh, and I just got back on Twitter after all these months.

11  Training has been really busy.

12  Q.  Can we read the next few lines down to 6-29-2015 down to

13  21:55:48?  And I will read the part of the user of the account

14  if you can read the part of the person he is talking with.

15          So, first in the entry, 21:52:21?

16  A.  "I actually wanted to visit Raqqah to check out what life

17  is like under IS."

18  Q.  "It is a nice place akhi.  All of Syria is a beautiful in

19  its own unique way."

20  A.  "Whatever my disagreements with IS they are Muslims."

21  Q.  "Yes, and I wish more Muslims thought like that.  Life is

22  in Raqqah is normal for the most part when the K's aren't

23  bombing us.  All women in niqab, Mujahideen walking everywhere.

24  It's a nice"

25  A.  "I hate Muslims who kiss up to the kuffar, making excuses

H1C5gam4F                    Varani - direct

1    for their murder and ravaging but condemn other Muslims in

2    harshest terms."

3    Q.  You can stop there.

4         Can we move down, Ms. Quinones, to the tweet on July

5    4th, 2015, at 20:00:52Z?  That's on the bottom of page 6.

6    A.  "Over two years since Egypt's military coup, approaching

7    the second anniversary of the Rabaa massacre.  In case you are

8    wondering why I am here today."

9    Q.  Can we go next to the top of page 12 and read the tweets at

10   11:03 and 11:08 on July 15th, 2015?

11   A.  "These mushrikeen have a masochist obsession with stalking

12   IS tweeps, trying to talk us out of what we're doing here LOL.

13   They don't know.  We're not interested in dialogue we just want

14   to kill them and enslave their mothers and sisters."

15   Q.  Can we go to the bottom of page 16 and read the English

16   portion of the tweet there, as well as the first tweet on page

17   17?

18   A.  It is a retweet of a user IronMuhajir: Alhamdulilah that

19   Allah brought us from the lands of the kufr to the land of the

20   khilafa.  Wallah it's a dream co.

21        And the next tweet is a retweet of the user account

22   Mujahidreams:  When they killed Sheikh Osama Bin Laden they

23   thought Jihad would be extinct but their bullet only created a

24   new generation.

25   Q.  What is a retweet?

H1C5gam4F                      Varani - direct

1    A.  A retweet is the broadcasting of a tweet that another user

2    on Twitter had previously posted.

3    Q.  You see that there is a Z?

4    A.  After the date?

5    Q.  Yes, there is a Z at the end of the date?

6    A.  Yes.

7    Q.  Do you know what the Z denotes?

8    A.  That denotes Zulu time.  It is a shorthand of saying this

9    is in the UTC time zone.

10   Q.  That's a standard time zone?

11   A.  Yes.

12   Q.  Can we go on to page 18 and read the tweet at 20:02?

13   A.  It's one thing to not support us, but do not allow yourself

14   to become a mouthpiece for the kuffar who are fighting us.

15   Q.  And can you go to page 19 and look at the tweet at 7:21:15

16   at 20:07?

17   A.  I advise everyone to read Dabiq 10's chapter "Tawhid and

18   Our Duty to Our Parents."  Very well written and necessary for

19   Muslims today.

20   Q.  Can we go to the bottom of page 21 and look at the tweet on

21   7-23-15 at 20:03:07?

22   A.  Retweet from a user AbduRahmanshaam:   Syrian regime

23   dropped six bombs in the public market of Minbij.  Many

24   civilians died.  It is not about being "DAESH," it is about...

25   Q.  Can we go down to the bottom of that page to the tweet at

H1C5gam4F                        Varani - cross

1    20:03:07 on 7-23?

2    A.   Retweet from the user IrhabiWarrior:  Support the

3    Mujahideen.  Support your state.  Help us with your wealth,

4    your life, your blood, your media, your dua and ever.

5              MR. QUIGLEY:  Can I have one moment, your Honor?

6              THE COURT:  Yes.

7              (Counsel conferring)

8              MR. QUIGLEY:  No further questions.

9              THE COURT:  Cross-examination.

10             MS. MIRÓN:  Thank you.

11   CROSS EXAMINATION

12   BY MS. MIRÓN:

13   Q.   You had an opportunity to reformat a different Twitter

14   account, right?

15   A.   I reformatted two Twitter accounts, yes.

16   Q.   Different from the one you just read from, correct?

17   A.   Yes.

18   Q.   And that's in Government Exhibit 304?  Do you have that?

19   A.   Yes.  On the CD, yes.

20   Q.   I'm going to show you what's been premarked as Defendant's

21   Exhibit 304-A and I believe the government has had a copy.

22             Just to be clear, the Government Exhibit 304 is from

23   user Elgorhythm, right?

24   A.   Yes.

25   Q.   And it was opened on an earlier date than AbumuradK,

H1C5gam4F                         Varani - cross

1    correct?

2    A.  I would have to go check to be sure.

3    Q.  I'm sorry?

4    A.  I would have to look again to see if that's the case.

5    Q.  At the subscriber data?

6    A.  Yes.

7    Q.  Okay.  Let me get that for you.  Is it on the disk that you

8    reviewed with the government?

9    A.  Yes.  It should be there.

10   Q.  Let me just ask, looking at 304-A, was this a tweet from

11   Elgorhythm?

12   A.  Based on the title, I would assume so.

13              MS. MIRÓN:  Okay.

14              I would ask that 304-A be introduced into evidence?

15              MR. QUIGLEY:  No objection.

16              THE COURT:  304-A will be received.

17              (Defendant's Exhibit  304-A received in evidence)

18   BY MS. MIRÓN:

19   Q.  And if we can publish that?

20              I would just like you to note for the record the date

21   that this tweet was sent or published?

22   A.  The date for this tweet was January 20th, 2015 at 3:33 p.m.

23   UTC.

24   Q.  Could you read it for the record?

25   A.  The tweet is mentioning user ArabSecularist and mentions

1    user Levantina_.  The MB everywhere seems to disagree with or

2    despise ISIS so I don't see them ever drawing close.

3    Q.  This was a public tweet, it was not a direct message?

4    A.  It was a public tweet but it was referring -- it was

5    directed specifically towards these two users.

6    Q.  Understood.

7         From the Elgorhythm account?

8    A.  Yes.

9    Q.  I would like to show you what is marked as Defendant's

10   Exhibit 304-C.  Based on this data, are you able to confirm

11   this is sent from the Elgorhythm account?

12   A.  Again, based on the title of the header of this page, yes.

13          MS. MIRÓN:  And when was it --

14          And I move 304-C into evidence.

15          THE COURT:  Any objection to 304-C?

16          MR. QUIGLEY:  No objection, your Honor.  Sorry.

17          THE COURT:  It will be received.

18          (Defendant's Exhibit 304-C received in evidence)

19   BY MS. MIRÓN:

20   Q.  I ask that it be published.

21          When was this tweet made?

22   A.  This tweet was made on October 20th, 2014 at five past

23   midnight UTC.

24   Q.  Could you read it for the record?

25   A.  I have a lot of respect for those who can condemn Dae3sh on

H1C5gam4F                    Varani - cross

1    the loudest terms without compromising their own principles.

2    Most people can't do it.

3    Q.  To be clear Dae3sh is spelled D-A-3-E-S-H, right?

4    A.  Yes.

5    Q.  Okay.  You can put that aside.

6           Can we point your attention to Defendant's Exhibit

7    304-F?  Was this sent by the Elgorhythm account?

8    A.  Yes.  Looks like it.

9           MS. MIRÓN:  And I would move 304-F into evidence.

10          MR. QUIGLEY:  No objection.

11          THE COURT:  It will be received.

12          (Defendant's Exhibit 304-F received in evidence)

13   BY MS. MIRÓN:

14   Q.  I ask that it be published.

15          Would you read the date?

16   A.  January 14th, 2014 at 7:06 UTC p.m.

17   Q.  And do your best to read it to the jury?

18   A.  This is mentioning user Assyriac_, user ArabSecularist,

19   user Nadiadaniali, and Elhumom:  Nope.  All resistance

20   movements throughout history have made mistakes in killing

21   civilians.

22   Q.  Let me show you 304-H.  Is this, too, from the Elgorhythm

23   account?

24   A.  Yes.

25          MS. MIRÓN:  And I would move this Exhibit 304-H into

H1C5gam4F                    Varani - cross

1   evidence.

2              MR. QUIGLEY:  No objection.

3              THE COURT:  304-H will be received.

4              (Defendant's Exhibit 304-H received in evidence)

5   BY MS. MIRÓN:

6   Q.  I ask that it be published.

7              When was this tweet made?

8   A.  September 9th, 2013 at 3:07 a.m. UTC.

9   Q.  And is it a tweet or a retweet?

10  A.  It is a retweet.

11  Q.  Could you read it, please?

12  A.  It is retweeting a tweet by the user account MaxBlumenthal.

13  I made it into Zaatari refugee camp today, home to 120,000

14  Syrian refugees, site of unbelievable misery and resilience.

15             And then starts HTT...

16  Q.  Thank you.

17             I will show you 304-I; this too is from the Elgorhythm

18  account?

19  A.  Yes.

20             MS. MIRÓN:  And I ask, too, that it be moved into

21  evidence.

22             MR. QUIGLEY:  No objection.

23             THE COURT:  304-I will be received.

24             (Defendant's Exhibit 304-I received in evidence)

25  BY MS. MIRÓN:

H1C5gam4F                          Varani - cross

1    Q.  And published?

2           Would you read the date?

3    A.  It is October 4th, 2013, at 8:13 p.m. UTC.

4    Q.  And the substance?

5    A.  Is a retweet mentioning Elgindy_,  criminalMT, mentioning

6    Daliaeszat_:  For bloody same, Egypt.  36 refugees from Syria,

7    many of pal origin, deported to Syria today.

8           And begins with a link.

9    Q.  304-J from the Elgorhythm account, right?

10   A.  Yes.

11          MS. MIRÓN:  Any objection from the government to the

12   admission of this?

13          MR. QUIGLEY:  No objection.

14          THE COURT:  304-J will be received.

15          (Defendant's Exhibit 304-J received in evidence)

16   BY MS. MIRÓN:

17   Q.  Let's publish this and read the date and time, October

18   18th, 2013 at 6:15 -- sorry, no, 3:10 p.m.

19          What is the body of this one?

20   A.  Egypt should stop deporting Syrian refugees amnesty says --

21   and a shortened link via user Now_EMG.

22   Q.  All right.  Let's move on to August 2014.  I would ask you

23   to look at 304-L.  This is from the Elgorhythm account again?

24   A.  Yes.

25          MS. MIRÓN:  I would ask that this be moved into

H1C5gam4F                      Varani – cross

1   evidence.

2           MR. QUIGLEY:  No objection.

3           THE COURT:  304-L will be received.

4           (Defendant's Exhibit 304-L received in evidence)

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1CFGAM5                          Varani - cross

1   Q.  So this is August 17, 2014, right?

2   A.  Yes.

3   Q.  And it says, "People aren't bothering to do basic research

4   on Syria.  Tend to be the same people who had no clue/care

5   about the situation till now."  Right?

6   A.  Yes.

7   Q.  Okay.  And then let me show you 304N, and ask that that be

8   received into evidence.

9           MR. QUIGLEY:  No objection.

10          THE COURT:  304M as in Mary?

11          MS. MIRON:  And published.

12          MR. QUIGLEY:  I think it's N as in November.

13          MS. MIRON:  November.

14          THE COURT:  304N will be received.

15          (Defendant's Exhibit 304N received in evidence)

16  Q.  So this was tweeted by the elgo-rhythm account, and it was

17  a retweet, right?

18  A.  Yes.

19  Q.  But it was public to whoever wanted to view the elgo-rhythm

20  account, correct?

21  A.  Yes.

22  Q.  And it was a tweet on December 2 of 2014, correct?

23  A.  Yes.

24  Q.  Okay.  The body, apart from the retweet portion, the body

25  says, "There are only a few hours left to donate.  Please help

H1CFGAM5                           Varani - cross

```
1    keep one Syrian refugee warm by donating $20," correct?

2    A.  Yes.

3    Q.  Then there's a hashtag Syria and some link, correct?

4    A.  Yes.

5           MS. MIRON:  You can put that aside.

6    Q.  I'd like to show you a single, one other exhibit, and

7    that's 304D, which I have several copies of here.

8           MS. MIRON:  And I ask that this be received in

9    evidence.

10          MR. QUIGLEY:  No objection.

11          THE COURT:  304D will be admitted.

12          (Defendant's Exhibit 304D received in evidence)

13          MS. MIRON:  And published.

14   Q.  So this is a direct message, right?

15   A.  Yes.

16   Q.  You don't know the recipient ID, correct?  You don't know

17   who that user is, right, as you sit here today?

18   A.  I don't believe I do, no.

19   Q.  Do you know who the sender is?  Elgo-rhythm?

20   A.  I believe it would be elgo-rhythm, yes.

21   Q.  And this was sent on December 8 of 2014, correct?

22   A.  Yes.

23   Q.  The body of it says, "No matter how much training or

24   weapons they get I think the only effective remedy to IS is the

25   democratization and economic independence."  Correct?
```

H1CFGAM5                      Abdel-Motaleb - direct

1    A.  Correct.

2            MS. MIRON:  One moment, your Honor.  Nothing further.

3            THE COURT:  Any redirect?

4            MR. QUIGLEY:  No, your Honor.

5            THE COURT:  Mr. Varani, you may step down.

6            (Witness excused)

7            THE COURT:  Does the government have a next witness?

8            MR. QUIGLEY:  Yes, your Honor.  The government calls

9    Ahmed Abdel Motaleb.

10           THE COURT:  Can someone pick up the exhibits?

11           MR. QUIGLEY:  Will do, your Honor.

12    AHMED ABDEL-MOTALEB,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15           THE COURT:  Sir, you may take off your coat if you

16   wish.  Take your seat, make yourself comfortable, pull up your

17   chair to the microphone.  Please begin by stating your full

18   name, spelling your last name for the record.

19           THE WITNESS:  Ahmed Abdel-Motaleb, M-o-t-a-l-e-b.

20           THE COURT:  Mr. Quigley.

21   DIRECT EXAMINATION

22   BY MR. QUIGLEY:

23   Q.  Sir, what do you do for a living?

24   A.  I'm a professional interpreter translator.

25   Q.  And what languages do you work in?

H1CFGAM5                          Abdel—Motaleb - direct

1    A.   English/Arabic, Arabic/English.

2    Q.   And what's the difference -- are you familiar with the

3    terms interpreter and translator?

4    A.   Interpreter is a rendition from a source language to a

5    target language vocally and translation is written.

6    Q.   Is it recording, sir?

7    A.   Included.

8    Q.   Sir, you have to slow down a little bit and speak into the

9    microphone.

10   A.   Okay.

11   Q.   I think you said an interpreter, interpretation involves

12   the translation of --

13   A.   Vocal translation, rendition from a source language to the

14   target language and the translation is the written material

15   between source language and target language.

16   Q.   So a translation would be what you would do with a

17   recording, for instance?

18   A.   Yes, transcription and translation afterwards.

19   Q.   So, and in this case, well, did you speak Arabic growing

20   up?

21   A.   I was raised in speaking of three languages; Arabic,

22   English and French.

23   Q.   Where did you grow up?

24   A.   In Egypt.

25   Q.   And how far did you go in school in Egypt?

H1CFGAM5                          Abdel-Motaleb - direct

1    A.  College.  BA in law.

2    Q.  And when did you start doing Arabic/English interpretation

3    and translation?

4    A.  Eleventh grade in school.

5    Q.  And don't get mad at me, but when was that?

6    A.  Back in Egypt, 1976.

7    Q.  And have you been doing interpretation and translation

8    since that time?

9    A.  Since that time, yes.

10   Q.  What if any certifications do you have as an interpreter?

11   A.  I'm certified by the AOC, the Administrative Office of the

12   Courts of Jersey and also by the International Institute of New

13   Jersey and I work with them as a freelance interpreter to

14   translate.

15   Q.  I think you said you're certified by the AOC,

16   Administrative Office of Courts?

17   A.  I took tests to be certified, which are simultaneous

18   translation and written translation.

19   Q.  Did you have to go to any courses before you got certified

20   by the courts in New Jersey?

21   A.  Yes they have a certification course to be taken in

22   Rutgers, New Jersey which I took around 2007.

23   Q.  Since being certified have you worked as an Arabic

24   interpreter in the state courts in New Jersey?

25   A.  Yes.

1  Q.  And have you also worked as an Arabic interpreter in the

2  federal courts?

3  A.  Yes.

4  Q.  Where do you currently work as an Arabic/English

5  interpreter and translator?

6  A.  Currently my full time job is at the Permanent Mission of

7  Saudi Arabia to the United Nations.  I'm the interpreter

8  translator.

9  Q.  Do you also do freelance work in addition to that?

10 A.  Exactly.

11 Q.  In court cases, when doing freelance work, have you worked

12 for both the prosecution and the defense?

13 A.  Yes, I did.

14 Q.  Are you an employee of the United States Attorney's Office?

15 A.  Not at all.

16 Q.  So let's talk about the techniques that you use.  When you

17 transcribe Arabic from a recording, do you try to capture

18 exactly what was said?

19 A.  As much to reach 100 percent.

20 Q.  And when you transcribe an Arabic document, in redoing that

21 Arabic are you capturing the exact Arabic language used in the

22 original document?

23 A.  Exactly.

24 Q.  Now, when you interpret Arabic into English, is it always

25 possible to do a literal word-for-word translation?

H1CFGAM5                          Abdel-Motaleb - direct

1    A.   This is not the common practice.  It's literal

2    word-for-word if it conveys the meaning.  The professional way

3    of doing it is to convey it in the target language in the means

4    of making the person speaking this language understanding what

5    the true meaning of the source language is.

6    Q.   So the goal is to convey the meaning in the, accurately in

7    the target language?

8    A.   Exactly.

9    Q.   Which here is English?

10   A.   English.

11   Q.   Is that your own practice or is that a generally accepted

12   practice among interpreters and translators?

13   A.   It is the professional practice.

14   Q.   And over the last 30 years, about how many Arabic language

15   recordings have you transcribed and translated into English?

16   A.   Hundreds.  Close to thousands.

17   Q.   And over the last thirty years, about how many Arabic

18   language documents have you transcribed or translated into

19   English?

20   A.   I can't count that, but during a year of 365 days at least

21   I'm doing 265 to 270 days of work in translation.

22        MR. QUIGLEY:  Your Honor, the government offers Ahmed

23   Abdel-Motaleb as an expert in the field of Arabic translation

24   and interpretation.

25        MS. MIRON:  Objection, your Honor.

1         THE COURT:  Over objection he will be certified as an

2     expert.  Mr. Quigley.

3         MR. QUIGLEY:  Thank you, your Honor.

4     Q.  Sir were you involved in translating and transcribing

5     Arabic-language recordings in this case?

6     A.  Yes.

7     Q.  May I approach, your Honor?

8         THE COURT:  You may.

9     Q.  Sir, handing you a binder with Exhibits 11T, 12T, 13T, 15T,

10    100DT, 145T and 148T.

11    A.  Correct.

12    Q.  If you could just look through the binder and tell me

13    whether you recognize those documents.

14        MS. MIRON:  Your Honor, may we just hear the numbers

15    once again?

16    A.  All of them bear my initials on them.

17        MR. QUIGLEY:  For the record, it was 11T, 12T, 13T,

18    15T, 100DT, 145T and 148T.

19    A.  Correct.

20    Q.  And what are those documents?

21    A.  Those are transcription of the original material either

22    were PDF or audio/video material and was transcribed word by

23    word and there is a translation in the facing column in the

24    document.

25    Q.  Now, did you create these documents from scratch or were

H1CFGAM5                          Abdel—Motaleb - direct

1   you given drafts that you've reviewed against the recordings?

2   A.  They were given to me, but I made the full quality

3   management for it as expert.

4   Q.  Did the exhibit numbers correspond to the exhibit number of

5   the underlying recording?  So, for example, does Government's

6   11T correspond to Government Exhibit 11 and Government Exhibit

7   12T corresponds to the recording that's Government Exhibit 12?

8   A.  All of them correct, yes.

9   Q.  Do Government Exhibits 11T, 12T, 13T, 15T, 100DT, 145T and

10  148T reflect fair and accurate transcriptions and translations

11  of the Arabic portions of the recordings you were asked to

12  translate in this case?

13  A.  Yes.

14            MR. QUIGLEY:  Your Honor, the government offers

15  Exhibits 11T, 12T, 13T, 15T, 100DT and 148T.

16            MS. MIRON:  May we approach briefly?

17            THE COURT:  You may.

18            (Continued on next page)

19

20

21

22

23

24

25

1                (At the side bar)

2                MS. MIRON:  With respect to 11T, 12T, 13T, 15T and

3    148T, which are all transcripts of videos, we would object to

4    their relevance on prejudice grounds.

5                THE COURT:  That objection will be overruled.

6    Anything further?

7                MR. HABIB:  No.

8                THE COURT:  Okay.

9                (Continued on next page)

1          (In open court; jury present)

2          MR. QUIGLEY:  Your Honor, the government offers

3   Government Exhibit 11T, 12T, 13T, 15T, 100DT and 148T.

4          THE COURT:  And those transcripts will be received.

5          (Government's Exhibits 11T, 12T, 13T, 15T, 100DT and

6   148T received in evidence)

7          MR. QUIGLEY:  Ms. Quinones, can we publish the first

8   page of Government Exhibit 11T?  Sir, do you see all the

9   information at the top of the pages?

10  A.  Those are standard information that we put on every

11  document which starts by the source file name, which is there

12  on GX11.  Language used in this document, which is

13  Arabic/English.  Participants are the persons which were in the

14  original document which are those names over there, and

15  unidentified male or female narrator, we don't know the name of

16  the person participant over there, that's why it's written and

17  then we have the abbreviations as written which are U/A,

18  unintelligible in Arabic, which means we couldn't hear this on

19  the original material.

20  Q.  Sir, if you could please slow down a little bit.  Go ahead.

21  You were saying U/A means?

22  A.  Oh, slow down.  I'm sorry.  The abbreviations over there

23  are U/A for unintelligible in Arabic, which means we could not

24  hear it correctly so we cannot predict or speculate what's

25  there so we produce it in brackets.  Same for U/I,

H1CFGAM5                          Abdel-Motaleb - direct

1    unintelligible in English.  And A between brackets means

2    phonetic spelling in Arabic, which is sometimes transliteration

3    of Arabic spelling in Roman letters.  And PH, which is phonetic

4    spelling in English, the same.

5            And then between brackets translators note is an

6    addition from the translator to convey the correct meaning from

7    the source language to the target language.  And the two

8    slashes is overlap when on the audio two people would overlap

9    on top of each other.

10   Q.  Are these standard abbreviations that are used by

11   interpreters and translators?

12   A.  Yes.

13   Q.  Have you seen them in your 30 years experience?

14   A.  Always.

15           MR. QUIGLEY:  Can we go to the second page,

16   Ms. Quinones?

17   Q.  One last question on the first page.  Do all the audio

18   recording transcripts contain first page pages roughly similar

19   to this?

20   A.  Most likely, yes.  Some little additions but most likely

21   that's how it looks like.

22   Q.  So all the exhibits in the binder?

23   A.  Yes, that's what we have.

24   Q.  Could we go to the second page, please.  What do we see

25   here in the first column, sir?

H1CFGAM5                      Abdel-Motaleb - direct

1   A.  Participants.

2   Q.  The second column?

3   A.  That's the English translation transcription.

4   Q.  Third column?

5   A.  The third is the original language.

6   Q.  Again, do the audio transcriptions in the binder contain a

7   similar format to this and the English and the original

8   language?

9   A.  Yes.  Which it would bear my initials, correct translation

10  of which we have it here.

11          MR. QUIGLEY:  You could take that down, Ms. Quinones.

12  Thank you.

13  Q.  Did you also perform translations in this case on documents

14  including social media messages and text messages?

15  A.  Yes.

16  Q.  Handing you the binder, if you could just take a look

17  through that.  And that contains Government Exhibits 4BT, 4CT,

18  100DT through KT, 100MT, 100O, P, Q, R and ST, 100UT, 102AT,

19  113AT, 120AT, 122C, D, E, F and GT and 146T.

20  A.  Yes.

21  Q.  And do you recognize the documents in the binder?

22  A.  Yes.  I worked on all of them, I have my initials on them.

23  Q.  Are those translations that you prepared of documents in

24  this case, including social media, content and text messages?

25  A.  Yes.  I reviewed all the originals and the translations.

H1CFGAM5                         Abdel—Motaleb — direct

1    Q.  So do the exhibit numbers correspond to the exhibit number

2    on the underlying record, so, for example, Government 4CT

3    corresponds to Government Exhibit 4C and 100DT, for example,

4    corresponds to Government Exhibit 100D?

5    A.  Exactly.

6    Q.  Do Government Exhibits 4BT, 4CT, 100D, E, F, G, H, I, J and

7    KT, 100MT, 100O, P, Q, R and ST, 100UT, 102AT, 113AT, 120AT,

8    122C, D, E and F and GT and 146T reflect fair and accurate

9    translations of the Arabic language documents you were asked to

10   translate in this case?

11   A.  Yes.

12           MR. QUIGLEY:  Your Honor, the government offers

13   Government Exhibits 4BT, 4CT, 100D through KT, 100MT, 100OT

14   through ST, 100UT, 102AT, 113AT, 120AT, 122C, D, E, F and GT,

15   and 146T.

16           MS. MIRON:  May we approach briefly?

17           THE COURT:  Sure.

18           (Continued on next page)

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. HABIB:  So, first, just many of these are subject

3     to prior objections that we have by way of motion in limine so

4     subject to any prior objection made by motion in limine.

5              THE COURT:  Very well.

6              MS. MIRON:  In addition, the video, we objected on

7     relevance grounds to the videos that came in in the earlier

8     round of exhibits that he just testified to, and since those

9     videos, there's been no testimony about the videos and from

10    where they came, in other words, from Mr. Gammal's laptop, I

11    imagine this is subject to connection.

12             MR. QUIGLEY:  Yes, your Honor.  The video all the cart

13    stuff are electronic stuff on his phone and his laptop, all

14    would be subject to connection.

15             THE COURT:  Just so the parties are aware.  I do note

16    some heavy lids in the jury so we're going to break at 2:30 for

17    ten minutes and then break later in the afternoon for ten

18    minutes.

19             MS. MIRON:  I would appreciate it now because I have

20    not seen the final-final printed exhibits so I don't know if

21    certain communications were made in there.  If they do I'd like

22    to cross-examine.  If they don't, I'm not going to.

23             THE COURT:  Very well.

24             MR. HABIB:  Which one is 146, remind me?  Just one

25    second, please.

H1CFGAM5                          Abdel—Motaleb – direct

1              (Pause)

2              MS. MIRON:  Can we take a break before I cross so I

3     can review --

4              THE COURT:  Are you going to be done?

5              MR. QUIGLEY:  I have about another maybe ten, fifteen

6     minutes, your Honor.

7              THE COURT:  Yes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (In open court; jury present)
 2                 MR. QUIGLEY:  So, your Honor, the government would
 3      offer those exhibits we were offering.
 4                 THE COURT:  What were they, again?  I'm kidding.
 5      They'll be received.
 6                 MR. QUIGLEY:  Trying to avoid that, your Honor.
 7                 (Government's Exhibits 4BT, 4CT, 100D through KT,
 8      100MT, 100OT through ST, 100UT, 102AT, 113AT, 120AT, 122C, D,
 9      E, F and GT, and 146T received in evidence)
10                 MR. QUIGLEY:  Ms. Quinones, can we pull up in evidence
11      what's been marked as Government Exhibit 100ET?
12      Q.  Sir, is this the first page of one of the documents that
13      you translated?
14      A.  Yes, sir.
15      Q.  And do all the first pages contain a relatively similar
16      cover sheet?
17      A.  Yes, sir.
18      Q.  And so what does it list there?
19      A.  It says the source file name, which is the original
20      document which shows here GX 100 and 100E, and it says the
21      application, which is where it was transcribed from, the
22      original application which was Facebook Messenger in this
23      document, and the participants with their name.  I lost them.
24      Okay.  The participants, two people over there as it shows the
25      name.  Do you want me to state the name?
```

1    Q.  It's fine.  Could we go to the second page?  And sir, so

2    what do we see in the first column here?

3    A.  The first line over there says the document number and the

4    segment which is included in this document over there and it's

5    beginning at page 16118 which is from the original document.

6    Q.  So what does the date column reflect?

7    A.  In the first column?

8    Q.  Yes.

9    A.  The date.

10   Q.  And the time?

11   A.  Time next column.

12   Q.  Again, the author?

13   A.  The author is the person writing what's in the next column.

14   Q.  And the contents, where are those from?

15   A.  The contents are from the original document which is the

16   segment written on top of there.

17   Q.  And then when you were preparing these transcripts did you

18   check the contents against the contents column in the original

19   document?

20   A.  Word by word.

21   Q.  And the translation?  Who input that?

22   A.  It was brought to me by other translators and I did the

23   quality management, final quality management as being

24   responsible about it, that's correct.

25   Q.  Thank you.  And so all the translations of documents in

H1CFGAM5                          Abdel—Motaleb – direct

1   this case contain a generally similar format to this?

2   A.  Yes.

3          MR. QUIGLEY:  We can take that down, Ms. Quinones.

4   Q.  Sir, in your work in this case, do you translate Arabic

5   language communications involving a person whose name is, last

6   name is spelled G-a-f-m-a-l?

7   A.  Correct, sir.

8   Q.  How can that name be pronounced?

9   A.  Several translations.  If it's the formal Arabic it's going

10  to be Al Gemmel or Gemmel.  If it's the regular Arabic slang

11  it's going to be Gammal.

12         MS. MIRON:  Objection to relevance of formal Arabic.

13         THE COURT:  Overruled.

14         MR. QUIGLEY:  Could we publish what's in evidence as

15  Government Exhibit 4BT and go to the second page?  Can you

16  highlight, Ms. Quinones, the second column or second row in the

17  bottom?

18  Q.  Sir, do you see where it says in the Arabic, "Life has

19  changed for me a lot at this new job but I love it and I don't

20  regret taking up the offer elhamdulillah jazakallah khair you

21  too akhi."

22  A.  Yes.

23  Q.  How did you translate the term elhamdulillah?

24  A.  Elhamdulillah is thank God.

25  Q.  How do you translate jazakallah khair?

H1CFGAM5                          Abdel—Motaleb – direct

1    A.  May God reward you with goodness.

2    Q.  How did you translate it in the context of this

3    conversation?

4              MS. MIRON:  Objection.

5    A.  The context of may God reward you --

6              MS. MIRON:  Objection.

7              THE COURT:  Sustained.  May I see you guys at sidebar?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1CFGAM5                          Abdel—Motaleb - direct

1              (At the side bar)

2              THE COURT:  What do you propose to do, Mr. Quigley?

3              MR. QUIGLEY:  Your Honor, this was the translation

4     where it was added in interpreters brackets.  It's complicated,

5     because it's part in English, part in Arabic and he added after

6     God reward you with goodness for what you did in brackets with

7     the Arabic and the English.  We had an extensive discussion

8     about this at one of the pretrial conferences and we said we'd

9     take out the bracketed piece, but his interpretation, his

10    translators.  If they want to cross—examine him about this,

11    that's fine.

12             MS. SHROFF:  That's not my recollection.  My

13    recollection is the Court's rule was he's a translator, his job

14    is to translate and we're done.

15             THE COURT:  Yes, that was my ruling as I understood

16    it.  That was my ruling.

17             MR. QUIGLEY:  But he included those brackets to give

18    meaning to the sentence and he's, I mean, he's allowed to --

19             THE COURT:  He's testified that he has reviewed these

20    transcripts, that they are to his knowledge accurate

21    transcripts and that's that.

22             MS. MIRON:  We move to strike the testimony as it came

23    in.

24             THE COURT:  He had barely started to examine.

25             (Continued on next page)

H1CFGAM5                          Abdel-Motaleb - direct

1              (In open court; jury present)

2    Q.  Sir, in addition to this translation, did you look at other

3    documents in this case that were mainly in English but

4    contained some Arabic phrases here and there?

5    A.  Yes.  We call this transcription.

6    Q.  And can we put up what's in evidence, Ms. Quinones, as

7    Government Exhibit 100B and go to page 17.  And can we

8    highlight the entry on 10/11/14 at 17:45 UTC and the entry

9    right above that?

10   A.  Yes, I see that.

11   Q.  And do you see in the bottom phrase the bottom message

12   there's an abbreviation JZK?

13   A.  Yes, this is the same word we use.  It's may God reward

14   you.  Jazak.

15   Q.  What is the word again in Arabic?

16   A.  Jazak.

17   Q.  And what does it mean in this context?

18              MS. MIRON:  Objection.

19              THE COURT:  What does it mean?

20   A.  It means may God reward you.

21   Q.  And can we go to on the same page, go to page 25 of the

22   same exhibit on 1/28/15 at 23:35.  Do you see where it says isA

23   there, sir?

24   A.  IsA is an abbreviation for insallah.

25   Q.  What is that?

H1CFGAM5                          Abdel-Motaleb - direct

1    A.   God willing.

2    Q.   And then on the same page on the last message do you see

3    where it says, it's been a stressful day, man, but

4    elhamdulillah, I'm happy I'm here.  What does elhamdulillah

5    mean?

6    A.   It's pronounced both ways, either with an E or an A at the

7    beginning, and both of them mean thank God.

8    Q.   Sir are you familiar with the term Ikhwan?

9    A.   That's Muslim Brotherhood.

10             THE COURT:  I'm sorry, I didn't understand.  That's

11   Muslim --

12             THE WITNESS:  The Muslim Brotherhood.

13             THE COURT:  Thank you.

14   Q.   Can we go to Government Exhibit 111A and highlight the

15   first entry?  Do you see, sir, where it says Salam Aleikum ya

16   3am.  What does that mean?

17   A.   Salam Aleikum is the greeting which means peace on you.

18   Could be written with an a-l at the beginning or the same way

19   we see it here.  And 3am, well the three is a transliteration

20   for the Arabic letter Aam, it's uncle.  At this point it's

21   meant to be like buddy --

22             MS. MIRON:  Objection.

23             THE COURT:  Overruled.  What is it meant to be?

24   A.   It's meant to be, the meaning of the sentence is peace be

25   on you uncle, but actually here it's like --

1          MS. MIRON:  Objection.

2     A.  It's sarcasm for buddy or my friend or something like that.

3     Q.  Can we go to Government Exhibit 111C, to the second page?

4     And do you see where it says, "salam alaikom wa rahmatullahi wa

5     barakatuh bro wallahi."  What does that mean?

6     A.  That's what we said before Salam aleikum is peace be on you

7     or upon you.  The whole sentence is the Arabic translation

8     there, which is peace be on you.  Rahmatullahi is the mercy of

9     God.  Barakatuh is the blessing of God and brother.

10    Q.  Could we go to page 11, the same exhibit, the entry at

11    113356.  Do you see in the middle of that first line where it

12    says "subhanAllah"?

13    A.  That's a transliteration for the Arabic word subhanAllah,

14    most likely it's praising God or expressing surprise or

15    astonishment about something.  Praising God in general.

16    Q.  Could we go to page 16 of the same exhibit, the top entry.

17    The last word, b'ithnillah?

18    A.  B'ithnillah is with the permission of God.

19    Q.  Are you familiar with the Arabic term haqq?

20    A.  Haqq, the meaning is truth and here it means the righteous

21    path.

22          MS. SHROFF:  Objection.

23          THE COURT:  Overruled.

24    Q.  And what does the Arabic word "masjid" mean?  Masjid?

25    A.  Masjid is the mosque.

H1CFGAM5                          Abdel-Motaleb - direct

1    Q.   Could we go to Government Exhibit 303?  And this is the

2    first entry on the second page.  I'm sorry, third page.  Can we

3    highlight the first entry?  Thanks, Ms. Quinones.  Do you see

4    the last line where it says insallah elhamdulillah, khilafa?

5    A.   Khilafa.

6    Q.   What does that mean?

7    A.   Insallah is God willing.  Elhamdulillah, before we said is

8    thank God.  Khilafa is the califate.  Khilafa and califate in

9    English.

10   Q.   Can we go to page 5 of this exhibit?  To the entry on

11   20150629 at 21:53.  Do you see where it says it's a nice place

12   akhi?

13   A.   Akhi is a transliteration in Arabic for brother.

14   Q.   Can we go to page 8, the entry on 7-13-15 at 19:38 do you

15   see where it says "jazak Allah for this akh"?

16   A.   He missed the I.  Akhi.

17   Q.   What does jazak Allah mean?

18           MS. MIRON:  Objection.

19           THE COURT:  Sustained as to "he missed the I."  Go

20   ahead.

21           THE WITNESS:  It's clear it's brother, your Honor.

22   Akhi is brother.

23           THE COURT:  I've sustained the objection.

24   Q.   What does jazak Allah mean?

25   A.   May God reward you.

H1CFGAM5                          Abdel—Motaleb – direct

1              MR. QUIGLEY:  And can we go to page 11?  To the first

2       entry.

3    Q.  Do you see where it says, "I was finally able to access the

4       link after all this time, lol.  Jazak Allah hu khair, brother"?

5    A.  May God reward you.

6              MS. MIRON:  Objection.  Asked and answered.

7              THE COURT:  Yes, we've gone over this.

8    Q.  Move ahead.  One last one.  Can we go to the bottom of page

9       15.  What does that mean?

10   A.  Allahla yuwafek ya maliki.

11   Q.  What does that mean?

12   A.  That is transliterated from Arabic that may God not give

13      you the achievement or to what you want to do.  Maliki is a

14      person.

15             MR. QUIGLEY:  No further questions, your Honor.

16             THE COURT:  Ladies and gentlemen, we're going to take

17      our afternoon break, fifteen minutes, so please be back no

18      later than ten minutes before the hour in the jury room.

19             (Recess)

20             (Continued on next page)

21

22

23

24

25

H1CFGAM5                          Abdel-Motaleb - Cross

 1              (In open court; jury present)

 2              THE COURT:   Cross-examination.

 3   CROSS-EXAMINATION

 4   BY MS. MIRON:

 5   Q.   Is there a sort of art to translating from Arabic to

 6   English?

 7   A.   For any profession there is.

 8   Q.   It's not a science, right?

 9   A.   It's knowledge.

10   Q.   And it's based on a few things.   It's based on the context

11   between the two people who are speaking, correct?

12   A.   Yes.

13   Q.   Including their relationship?

14   A.   Included.

15   Q.   Whether they're family?

16   A.   Not that much.   Language is language.

17   Q.   Okay.   What about in terms of culture?   Does culture have

18   something to do with your translation?

19   A.   Deep connection.

20   Q.   Religious?

21   A.   Also.

22   Q.   And social?

23   A.   Also.

24   Q.   Okay.   I'd like to publish Government Exhibit 4BT for the

25   jury.   Page 2.   And highlight the first row.   Can you just read

H1CFGAM5                         Abdel—Motaleb - Cross

1    the first line as written?

2    A.   Salam Aleikum akhi.

3    Q.   You can stop there.  Is that a common phrase?

4    A.   Yes.  Greeting.

5    Q.   You use it between friends, right?

6    A.   Yes.

7    Q.   Acquaintances, correct?

8    A.   Yes.

9    Q.   All the time?

10   A.   Everybody.  Strangers, everybody.

11   Q.   Nothing special about that phrase, right?

12   A.   Well, akhi is brother.  Whenever it's used.

13   Q.   Okay.  And then the second paragraph, Eid Mubarak.  What

14   does that mean?

15   A.   Oh, this one, Eid is the feast and that's why we put it

16   italic because the Arabic translation Eid is the feast of the

17   Muslim and then blessed Samy.

18   Q.   But just to be clear, the first speaker, El-Goarany said

19   Eid Mubarak?

20   A.   Said what?

21   Q.   The first writer, the first communicator, El-Goarany, wrote

22   Eid Mubarak first?

23   A.   Yes.

24   Q.   And Gammal replied, yes?

25   A.   Yes.  Is last Eid, last feast.

H1CFGAM5                         Abdel—Motaleb – Cross

1    Q.  Nothing more.  Okay.  And then let's focus on the second to

2    last communication, so the one with El—Goarany starting, "Great

3    to hear from you too.  Jazak Allah Khair what does that mean?

4    A.  May God reward you with goodness.

5    Q.  It's true you may say that in response to someone saying

6    Eid Mubarak, correct?

7    A.  Could be.

8    Q.  Let me show you what's been previously marked as Defense

9    Exhibit 112BB.

10            MS. MIRON:  We'd ask that this be accepted into

11   evidence.

12            MR. QUIGLEY:  No objection.

13            MS. MIRON:  And published to the jury.

14            THE COURT:  112BB will be accepted.

15            (Defendant's Exhibit 112BB received in evidence)

16            (Continued next page)

17

18

19

20

21

22

23

24

25

H1C5gam6                    Abdel—Motaleb - cross

1    BY MS. MIRÓN:

2    Q.   Highlight the first sentence from Samy Mohammed.  Can you

3    read that?

4    A.   Yes.  It says:  Salam alaikom hana.  Just wanted to wish

5    you Ramadan Mubarak personally and let you know that I miss you

6    and the rest of the fam -- family.

7    Q.   And that was written by Samy Mohammed, right?

8    A.   Yes.  That's correct.

9    Q.   Can you read the next -- or, let me read the next paragraph

10   written by Hana Fino:

11          You too, Samy.  Words can't explain how much we all

12   miss you.  Seriously wishing you nothing but the best for your

13   happiness.  ISA we'll all see you soon.

14          What is ISA?

15   A.   InshAllah.  God willing.

16   Q.   Commonly used?

17   A.   Very.

18   Q.   You say it if you are planning to do something, right?

19   A.   Yes.

20   Q.   And if are you not planning to do something?

21   A.   No.  It has to be something.

22   Q.   Well, is there an occasion where you might say it just to

23   blow someone off?

24   A.   I wouldn't put it this way.  InshAllah means God willing,

25   God willing for something.

H1C5gam6                        Abdel—Motaleb - cross

1    Q.  Do you ever say it, or do people ever say it to act like

2    they're going to do something when they're actually going to

3    not do it?

4    A.  Could be.

5    Q.  So, let's go on.  The next phrase, could you please read

6    from Samy Mohammed?  Could you read that?

7    A.  Yes.  Jazak Allah Khair.  We will see each other again one

8    day, one way or another ISA —— inshAllah —— God willing.  This

9    is Allah's promise for the believers.  How's everything over

10   there?  How's school?  Anything new with you?

11   Q.  And to be clear, you too Samy, when Hana wrote:  You too,

12   Samy.  Hana was referred to Ramadan Mubarak, right?

13   A.  I don't see the context here but if it is the context, then

14   yes.

15   Q.  Well, you can review the context.

16   A.  If I can see the whole page?

17   Q.  Yes.

18   A.  Oh, it is here.

19   Q.  Yes.

20   A.  10909?  The first page?

21   Q.  Yes.  Just first three.

22   A.  Yes, he was greeting Hana in the beginning and then Ramadan

23   then you too Samy, yes, for Ramadan for the most of fasting

24   which is Ramadan, you too Samy, responding to this greeting,

25   and then Jazak Allah Khair, may God reward you to that.

H1C5gam6                          Abdel—Motaleb — cross

1    Q.   For what?

2    A.   That Samy is responding -- I mean, thank you for the

3    greeting.  Greeting.  Thank you.  Thank you.

4    Q.   Thank you for the greeting, right?

5    A.   Yes.

6    Q.   Okay.

7    A.   In this context.

8    Q.   Thank you.  You can put that aside.

9             Can you please publish what is in evidence as

10   Government Exhibit 122-GT, page 25 no, it is the third page,

11   thank you, and highlight the very last line.

12            Would you read Attiya's Arabic?

13   A.   Last line of Arabic?

14   Q.   Yes.

15   A.   The time 08:34:20.

16   Q.   That's right?

17   A.   *Wa An Yaqbedni Shahwedan.*

18   Q.   Is that a prayer?

19   A.   It is a supplication at this point, prayer.

20   Q.   Prayer from the Qur'an?

21   A.   He was asking to be accepted as a martyr.

22   Q.   But it is a prayer?

23   A.   Yes.

24   Q.   Thank you.

25            Please pull up Government Exhibit 120-A, segment G,

1    page 25.  We will go back to 122-G-T for a moment.

2              Now, 120-A, segment G, page 25.  Just the first line,

3    I would like you to closely read the Arabic and make sure that

4    that translation includes all of the words.

5    A.  Do you want me to read it loud?

6    Q.  Or to yourself for the moment.  This is your translation.

7    A.  Yes.  That's correct.

8    Q.  It is not missing the word "directly"?  "Gammal, I am

9    afraid to go directly to Turkey.  What do you think?"

10   A.  There is no directly in the Arabic.  Do you want me to read

11   word for word in Arabic?  I can read it in English.

12   Q.  I want you to review your work, make sure you included all

13   of the words.

14   A.  There is no.

15   Q.  Directly.

16   A.  No, neither in English nor in Arabic.

17   Q.  To be clear, you wrote the English, right?

18   A.  I reviewed it, yes.

19   Q.  And you -- you now believe it is correct?

20   A.  Let me try again.

21              Correct.

22   Q.  Okay.

23   A.  English and Arabic, correct.

24   Q.  How would you change it if you were to add the term

25   "directly?"

H1C5gam6                    Abdel-Motaleb - cross

1   A.  After the word Turkey in English and Arabic I would put the

2   word direct in English and Arabic.  I would put.  Do you want

3   the word direct specifically?  Directly.

4   Q.  This is the phrase --

5   A.  Okay.

6   Q.  -- that I would like you to spell in Arabic:

7   A.  Okay.

8   Q.  "I am afraid to go directly to Turkey."

9   A.  No.  He said go to Turkey.  That's Arabic.

10  Q.  We can move on.

11  A.  There is no directly at all.

12  Q.  Understood.

13        You testified that the way in which you write Gammal

14  in Arabic could be pronounced Jamal with a J or Gammal with a

15  G, correct?

16  A.  Soundwise; but it is written the same.

17  Q.  Soundwise, you believe, depending on the exact Arabic,

18  right?

19  A.  Depending on the person pronouncing it.  It is written the

20  same way in Arabic, the letter doesn't change but you pronounce

21  it Jamal or Gammal.

22  Q.  To be clear, if it is an Egyptian person pronouncing it,

23  that person would only pronounce it with a G .

24  A.  Heavy G.

25  Q.  Heavy G, hard G.

H1C5gam6                          Abdel—Motaleb - cross

1    A.  Gammal.

2    Q.  Gammal.

3            Not with a J?

4    A.  But from —— in other country they would pronounce it like

5    this.  Egyptians would pronounce it Gammal.

6    Q.  Egyptians would only pronounce the name with a hard G,

7    correct?

8    A.  I won't say only.  Depending on this or that.  Depending on

9    the person, if he likes to speak formal Arabic he would use

10   Jamal.

11   Q.  Okay.  So, but Egyptian Arabic, not formal.

12   A.  Not formal?

13   Q.  Not formal.

14   A.  Gammal.

15   Q.  Gammal with a hard G?

16   A.  Hard G; and hard M also, double M, Gammal.

17   Q.  Gammal.  Thank you.

18          MS. MIRÓN:  Just one moment?

19          THE COURT:  Yes.

20          (Pause).

21   BY MS. MIRÓN:

22   Q.  I am going to try to focus you on the second line, the word

23   wsh, is that there?

24   A.  Wsh.  A transliteration, obviously.  Not wish English, wsh

25   Arabic.

H1C5gam6                        Abdel—Motaleb - redirect

1    Q.  Understood.  What does that mean?

2    A.  Actually, this is not slang Arabic, this is Arabic from

3    other Arab countries, let's say in the Levant or somewhere

4    else, wsh talking to the person, stressing on you, what is your

5    opinion about something.

6    Q.  Okay.  Let me back out a little bit and focus on the third

7    line, the fourth line from Gammal.

8    A.  Yes.

9    Q.  Is there a word for "direct" in that communication?

10   A.  Yes, the second word mobashir is direct or directly.

11   Q.  It is your testimony that word isn't in the first one?

12   A.  No, it's not.

13   Q.  Anywhere?

14   A.  No.  Definitely.

15   Q.  Just a moment.

16           (pause)

17           MS. MIRÓN:  Okay, nothing further.  Thank you.

18           THE COURT:  Any redirect?

19           MR. QUIGLEY:  Yes, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. QUIGLEY:

22   Q.  Sir, Ms. Mirón asked you some questions about the way you

23   go about translating, right?  And you say that translation

24   depends on a number of things including the context?

25           You have to answer yes, sir.

1   A.  Yes, sir.

2   Q.  Can we put back up Government Exhibit 4-B-T, a conversation

3   between the defendant and Samy El- Goarany, and go to page 2?

4           So, I think Ms. Mirón asked you, referred you to the

5   top line or the top row where they talk about where Samy

6   El- Goarany is wishing the defendant a blessed Eid.  Do you see

7   that?

8   A.  The second part, that is Eid Mubarak.  Eid Mubarak, yes.

9   Q.  And down the second line, second row from the bottom, what

10  is Samy El- Goarany talking about in that message?

11          MS. MIRÓN:  Objection.

12          THE COURT:  Overruled.

13  A.  From the beginning it says:  Great to hear from you too Ya

14  basha.  Ya basha is a kind of respect in saying the words.  It

15  is Turkish, old times in Egypt.

16          Life has changed a lot for me at this new job but I

17  love it and I don't regret taking up the offer.

18  Elhamdulillah -- thank god.  Jazak Allah Khair -- you too,

19  thank God.  May God reward you with goodness you too, my

20  brother.

21  Q.  And interpreting Jazak Khair, how does that form your

22  interpretation there?

23          MS. MIRÓN:  Your Honor, objection.

24          THE COURT:  Overruled.

25  A.  Usually, we as Muslims, when we tell someone Jazak Allah

H1C5gam6                    Abdel-Motaleb - redirect

1   Khair -- you too, there is something either said or done in

2   this matter and I am thanking him for that.  In this context it

3   is a job so he is thanking the person --

4                MS. MIRÓN:  Objection.

5                THE COURT:  Sustained.

6                MR. QUIGLEY:  No further questions, your Honor.  Thank

7   you.

8                MS. MIRÓN:  Nothing, your Honor.  Thank you.

9                THE COURT:  Sir, you may step down.

10               THE WITNESS:  Thank you, your Honor.

11               THE COURT:  Let's grab the exhibits and, government,

12  please call your next witness.

13               MR. QUIGLEY:  Yes, your Honor.  The government calls

14  Aaron Zelin.

15               THE COURT:  Sir, please watch your step, step around

16  and step up into the witness box directly in front of me here.

17   AARON ZELIN,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20               THE COURT:  Sir, you may be seated.  Pull up to the

21  microphone and please begin by stating your full name and

22  spelling your last name for the record.

23               THE WITNESS:  It is Aaron Zelin.

24               THE COURT:  Mr. Quigley?

25               MR. QUIGLEY:  Thank you, your Honor.

H1C5gam6                          Zelin – direct

1    DIRECT EXAMINATION

2    BY MR. QUIGLEY:

3    Q.   Where do you work, Mr. Zelin?

4    A.   I work at the Washington Institute for Near East Policy.

5    Q.   What is the Washington Institute?

6    A.   It is a research center based in Washington, D.C.

7    Q.   And what area of the world does it cover?

8    A.   It primarily covers the Middle East and North Africa.

9    Q.   What do you do there at the Washington Institute?

10   A.   My research as a fellow there, I work on Sunni Arab jihadi

11   groups; primarily groups like al Qaeda, the Islamic State and

12   their affiliates.

13   Q.   We will talk about that more in a few minutes but how long

14   have you been in that role at the Washington Institute?

15   A.   I have been there for more than four and a half years now.

16   Q.   And, can you describe your educational background?

17   A.   Yes.

18          My bachelors degree is from Indiana University

19   Bloomington, in political science and near eastern languages

20   and cultures.  And then, after that, I received my masters

21   degree at Brandeis University in Islamic and Middle Eastern

22   studies and that's based in Boston.  And now I am currently in

23   the process of completing my Ph.D at King's College of London

24   in war studies.

25   Q.   What is your dissertation going to be in?

H1C5gam6                          Zelin - direct

1    A.  My Ph.D dissertation is on the history of the Tunisian
2    jihadist movement.
3    Q.  After you got your masters degree from Brandeis, what did
4    you do next?
5    A.  Afterwards, this was in May 2010, I then started to begin
6    working on a research project with one of the professors at
7    Brandeis in the politics department looking at western
8    jihadists from the early 1990s all the way until the present
9    time.
10   Q.  How long did you stay in that role for?
11   A.  I worked with this professor until May 2012, which is the
12   time that I then began working at the Washington Institute for
13   Near East Policy.
14   Q.  Besides the Washington Institute, are you affiliated with
15   any other academic or research institutions?
16   A.  Yes.  I am also affiliated with the International Center
17   for the Study of Radicalization of Political Violence which is
18   based in London and is part of King's College where I am doing
19   my Ph.D.
20   Q.  You mentioned you focus on the Islamic State and al Qaeda,
21   among other groups?
22   A.  Yes.
23   Q.  Where is the Islamic State based?
24   A.  The core of the Islamic State is based in Iraq and Syria.
25   Q.  Is the Islamic State also commonly called ISIS or ISIL?

H1C5gam6                        Zelin - direct

1   A.  Yes.

2   Q.  You said the core is based in Iraq and Syria.  Does it

3   operate anywhere else in the Middle East or North Africa?

4   A.  Yes.  The Islamic State claims that it has provinces in

5   other countries all the way from Nigeria to Algeria, to Libya,

6   to the Sinai peninsula which is in Northern Egypt, to Saudi

7   Arabia, Yemen, all the way over to Afghanistan, Pakistan

8   region, and up into the caucuses.

9   Q.  How do you go about learning about the Islamic State,

10  al Qaeda, and other militant jihadist groups operating in the

11  Middle East and North Africa?

12          MS. SHROFF:  Objection to the compound nature of the

13  question.

14          THE COURT:  Break it down, Mr. Quigley.

15  Q.  How would you describe your research methods?

16  A.  The way I go about my research is that I first begin

17  looking at the primary sources or the media releases that these

18  groups put out online.  So, whenever the Islamic State, for

19  example, puts out a video message, they will do it through a

20  particular social media platform.  Nowadays they primarily do

21  it on telegram, but a few years ago it was mainly on Twitter.

22  And then, from there, when I look at these documents or videos

23  or any other types of releases in Arabic, I will try and get a

24  better picture and contextualize it from previous releases that

25  they put out, as well as triangulate it with information from

H1C5gam6                          Zelin - direct

1   local press in the Middle East, as well as any western

2   reporting that is relevant.

3   Q.  Thank you.  If you can slow down a little bit for the court

4   reporter.  Thanks.

5        And in doing that research, have you become familiar

6   with the larger political issues in the region as a whole?

7   A.  Yes.

8             MS. SHROFF:  Objection.

9             THE COURT:  Overruled.

10  Q.  What is your familiarity with Arabic?

11  A.  I know Arabic though I wouldn't claim native fluency.

12  Q.  Can you read it?

13  A.  Yes.

14  Q.  What, if any websites, do you maintain?

15  A.  I maintain jihadology.net.

16  Q.  What is jihadology.net?

17  A.  It is a website where it is a primary source archive.

18  Essentially it has got documents from groups like the Islamic

19  State, al Qaeda, or any of their affiliates.  And it is

20  essentially an educational website or a research library for

21  other researchers who are interested in learning and studying

22  about the group or groups.

23  Q.  Have you traveled in the Middle East and North Africa?

24  A.  Yes, I have.

25  Q.  Where have you gone?

1  A.  I have lived in Egypt and Morocco, I have done extensive

2  field research in Tunisia for my Ph.D dissertation, and I have

3  also traveled to countries such as Israel, Lebanon, Jordan and

4  the United Arab Emirates.

5  Q.  Besides your own website, where have your -- have you had

6  articles published in other places?

7  A.  Yes.  Some of my articles are published on my own

8  institution's website, but also I have been published in more

9  policy publications such as Foreign Affairs, Foreign Policy,

10  The Atlantic, as well as CTC Sentinel, as well as academic

11  peer-reviewed publications.

12  Q.  Have you published in peer-reviewed journals?

13  A.  Yes.

14  Q.  What does peer-reviewed mean?

15  A.  Peer-reviewed essentially means that the editor of a

16  particular journal will blindly send it to some other academics

17  in field and they'll review and edit it and decide whether or

18  not to accept if it is up to the particular standards of an

19  academic journal.  And if it is, then they'll resend it to you

20  and provide you with feedback and then you will resubmit that

21  article to them, and then it will be published.

22  Q.  Have you lectured on issues related to jihaddism?

23  A.  I have.

24  Q.  Have you ever testified before Congress?

25  A.  I have.

H1C5gam6                              Zelin - direct

1   Q.   About what?

2   A.   I have testified twice before Congress; once was about

3   al Qaeda and the Islamic State in Tunisia, and the other was

4   about al Qaeda and the Islamic State in Libya.

5   Q.   Have you ever been qualified as an expert witness before?

6   A.   Yes, I have.

7   Q.   When and where was that?

8   A.   It was last spring, in 2016, in Brooklyn.

9   Q.   In federal court?

10  A.   Yes.

11  Q.   Are you being paid for your time here today?

12  A.   Yes.

13  Q.   How much?

14  A.   $350 an hour.

15  Q.   Is that within the going rate for such testimony?

16           MS. SHROFF:  Objection.

17           THE COURT:  Overruled.

18           If he knows.

19           THE WITNESS:  Yes.

20           MR. QUIGLEY:  Your Honor, I would ask to qualify

21  Mr. Zelin as an expert in militant jihadist groups.

22           THE COURT:  Any objection?

23           MS. SHROFF:  No objection, your Honor.

24           THE COURT:  He will be accepted as an expert.

25           You may proceed, Mr. Quigley.

1          MR. QUIGLEY:  Thank you, your Honor.

2     BY MR. QUIGLEY:

3     Q.  Sir, what does ISIS stand for?

4     A.  ISIS is the Islamic State of Iraq and al-Sham of Iraq and

5     al-Sham.

6     Q.  And what is el-Sham?

7     A.  El-Sham encompasses an area that includes the current

8     States of Syria, Lebanon, Jordan, Israel and Palestine, but it

9     also has historical references to an area within Muslim

10    caliphates or systems of government from the past in the 7th

11    through 10th centuries or so.

12         MR. QUIGLEY:  Your Honor, may I approach?

13         THE COURT:  You may.

14    Q.  Sir, handing you what's been marked for identification as

15    Government Exhibit 701; do you recognize that?

16    A.  Yes.

17    Q.  What is that?

18    A.  It is a picture of the Levant and the countries in el-Sham.

19    Q.  And does it fairly and accurately depict that region of the

20    world, based on your experience?

21    A.  Yes, it does.

22         MR. QUIGLEY:  Your Honor, the government offers

23    Government Exhibit 701.

24         THE COURT:  Any objection?

25         MS. SHROFF:  Your Honor, could I just have a second?

H1C5gam6                        Zelin - direct

1              THE COURT:  Sure.

2              (Pause)

3              MS. SHROFF:  No objection.

4              THE COURT:  701 will be received.

5              (Government's Exhibit 701 received in evidence)

6              MR. QUIGLEY:  Your Honor, can we publish 701?

7              THE COURT:  You may.

8              MR. QUIGLEY:  Thank you.

9    BY MR. QUIGLEY:

10   Q.  Sir, can you generally describe the area of el-Sham on this

11   map?

12             THE WITNESS:  Is it a touch screen?

13             THE COURT:  I don't believe it is such screen.

14             THE WITNESS:  Okay then.  Never mind.  The last court

15   I was it was a touch screen.  So, just asking.

16             So, essentially it is the countries of Lebanon, Syria,

17   Israel, Jordan, and then the Palestinian territories which is

18   parts of Israel.

19             MR. QUIGLEY:  Your Honor, may I approach to give

20   Mr. Zelin a pointer?

21             THE COURT:  You may.

22             Did they have a pointer at the other court house?

23             THE WITNESS:  No, it was just a telestrator.  I felt

24   like I was John Madden.

25   A.  It is essentially these countries right here.

H1C5gam6                           Zelin - direct

1    Q.  Thank you.

2          Now, you mentioned ISIS, the Islamic State of Iraq and

3    el-Sham.  Is the organization known by any other names?

4    A.  Yes.  ISIS is also known as ISIL or the Islamic State of

5    Iraq and the Levant, as well as DAEJ which is just Arabic

6    acronym of ISIS:  *Al-Dawlah al-Islamiyya fi al-Iraq wa al-Sham.*

7          THE COURT:  Can you spell that in American letters?

8          THE WITNESS:  A-L-D-A-W-A-L-A-H.

9    A-L-I-S-L-A-M-I-Y-Y-A  F-I  A-L-I-R-A-Q and that's W-A

10   A-L-S-H-A-M.

11   Q.  And any other names?

12   A.  Yes.  Just the Islamic State or IS, for short.

13   Q.  And how is the Islamic State or The State said in Arabic?

14   A.  Dawla.

15   Q.  That's D-A-W-L-A?

16   A.  Yeah.

17   Q.  And you mentioned ISIL is the Islamic State of Iraq and the

18   Levant.  What is the Levant?

19   A.  Levant is the same thing as el-Sham, it is just the French

20   word for it but is also used in English.

21   Q.  And, in your experience, who generally uses the term The

22   State or Dawla to refer to ISIS?

23   A.  Either members of the Islamic State or their supporters.

24   Q.  So, let's step back for a second.  When and where did ISIS

25   get started?

H1C5gam6                        Zelin - direct

A.   The Islamic State originally started in the 1999/2000 time

period with a man named Abu Musab al-Zarqawi who is Jordanian.

He was released from prison at that time period and went to

Afghanistan and set up a training camp there with seed money

from al Qaeda and was training there prior to the 9/11 attacks.

Q.   And did the group stay in Afghanistan?

A.   No, it did not.

         Following the U.S. invasion of Afghanistan in late

2001, Zarqawi, along with individuals that were training with

him and his group, then moved to northern Iraq and Kurdistan to

beginning training there because they foresaw that the U.S. was

going to invade Iraq and they wanted to be ready for that

invasion to then fight against the United States.

Q.   Can you just indicate on the map with the pointer where

northern Iraq is?

A.   Kurdistan is, like, in this area.

Q.   And so what, if anything, happened in 2003 in Iraq?

A.   In 2003 the U.S. would invade Iraq that spring.

Q.   And how did the group, now known as ISIS, respond?

A.   In response, Zarqawi's group began to conduct different

types of insurgent attacks against the U.S. forces as well as

their allies.  They also began to kill Shiites which is the

different Islamic sect from Zarqawi's group, and they also

began to conduct terrorist attacks such as one on the Jordanian

embassy as well as the one on the United Nations building in

H1C5gam6                        Zelin - direct

1    Baghdad.

2    Q.  Following the 2003-2004 time frame, what happened with the

3    group's relationship with al Qaeda?

4    A.  As a result of the popularity of Zarqawi's group amongst

5    the jihadi community, as well as the fact that after the 9/11

6    attacks Bin Laden and his associates fled to Pakistan and they

7    wanted to remain relevant but Zarqawi didn't necessarily have

8    the same level of money or contacts that Bin Laden had, they

9    decided to have a marriage of convenience at the time and

10   Zarqawi's group joined al-Qaeda in October 2004 and they

11   changed the name of the group from what at that time was Jamaat

12   al-Tawhid Wal-Jihad to al Qaeda and The Land of Two Rivers in

13   reference to the Euphrates and Tigris, but more commonly known

14   as just al Qaeda in Iraq.

15   Q.  And who is the leader of the organization?

16   A.  The leader of the organization at this time was still

17   Zarqawi.

18   Q.  What happened to him in 2006?

19   A.  Zarqawi was killed in an air strike by the United States in

20   that spring.

21   Q.  And what was the group's status as of about 2009?

22   A.  By 2009 the organization had been tactically defeated by

23   both a tribal rebellion against the organization, as well as

24   that being helped out by a surge of American troops.

25   Q.  And this was in what country?

H1C5gam6                          Zelin - direct

1   A.  This was in Iraq.

2   Q.  What did the group do between roughly 2009 and 2011?

3   A.  It was primarily trying to reorganize itself and trying to

4   build-up its strength again but it was relatively weakened at

5   that juncture.

6   Q.  So we will get back to that in a second but, shifting

7   topics, what is Sunni Islam?

8   A.  Sunni Islam is the major sect of Muslims in the world

9   today.  About 85 percent of Muslims are Sunni.

10  Q.  What is the other major sect?

11  A.  The other major sect is Shia Islam, which is 15 percent of

12  Muslims.

13  Q.  At a very high level, what are some of the differences

14  between Sunni Islam and Shiite Islam?

15  A.  The main differences originally relate to questions about

16  success during the early years of Islam after the Muslim

17  prophet Mohammed died.  And then, over time, they diverged on

18  theological issues as well, as well as legal issues and now,

19  today, there is more questions related to geopolitics between

20  some major Sunni countries as well as a Shia country like Iran.

21  Q.  And what sect of Islam is predominant in Egypt?

22  A.  Sunni Islam.

23  Q.  And what about Syria?

24  A.  In Syria it is Sunni Islam as well.

25  Q.  And what brand of Islam does ISIS adhere to?

H1C5gam6                          Zelin - direct

1    A.   ISIS follows the theology of Salafism which is a subset

2    within Sunni Islam.

3    Q.   And how do they view Shiites?

4    A.   They view them as apostates and deviants.

5              MR. QUIGLEY:  Your Honor, may I approach?

6              THE COURT:  You may.

7    Q.   Sir, handing you what's been marked for identification as

8    Government Exhibit 700; do you recognize that?

9    A.   Yes.

10   Q.   And what is that?

11   A.   It's the Greater Middle East and North Africa.

12             MR. QUIGLEY:  Your Honor, the government offers 700.

13             MS. SHROFF:  No objection.

14             THE COURT:  700 will be received.

15             (Government's Exhibit 700 received in evidence)

16             MR. QUIGLEY:  May we publish it?

17             THE COURT:  You may.

18   BY MR. QUIGLEY:

19   Q.   So, Mr. Zelin, what happened across this region in early

20   2011?

21   A.   In early 2011 you saw a bunch of uprisings in various

22   authoritarian regimes in the region; first in Tunisia, which is

23   right there, and then after there you saw it in Egypt as well

24   as other countries eventually like Libya, Syria, and then ones

25   that are not on this map but part over here, if the map

H1C5gam6                          Zelin - direct

1    continued, in Yemen and Bahrain.

2    Q.   Were these uprisings peaceful or violent?

3    A.   It depends which context, but in Tunisia and Egypt they

4    were peaceful, whereas in countries like Libya and Syria while

5    they started as peaceful, they turned violent as a result of

6    the governments beginning to shoot their weapons back at the

7    protesters.

8    Q.   And in Egypt, what happened as a result of these protests?

9    A.   The leader of the country, Hosni Mubarak, was overthrown.

10   Q.   And who eventually came to power?

11   A.   After democratic elections, Mohammed Morsi, who is the

12   leader of the Muslim Brotherhood, became leader of Egypt.

13   Q.   How long did he stay in power for?

14   A.   For about a year.

15   Q.   And what happened at the end of that time?

16   A.   After then, the Egyptian military decided to do a

17   coup d'etat against the Muslim Brotherhood as leaders of the

18   country.

19   Q.   And what happened -- and when was that, about?

20   A.   It was in around June/July 2013.

21   Q.   And what happened to supporters of the Muslim Brotherhood

22   in August of 2013?

23   A.   There was a big protest against the government's coup, and

24   as a result the government -- or the military, I should say --

25   massacred about up to 800 people in a particular location in

1    Cairo.

2    Q.  And what was the name of that location?

3    A.  Rabaa Square.

4    Q.  So, we have been talking about the Muslim Brotherhood.

5    What is the Brotherhood?

6    A.  Muslim Brotherhood is an Islamist --

7            MS. SHROFF:  Objection, your Honor.  May we have a

8    side bar?

9            THE COURT:  Sure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam6                        Zelin - direct

1              (At side bar)

2              MR. HABIB:  Your Honor, the objection is that

3    Mr. Zelin is qualified as an expert in militant jihadist

4    groups.  The Muslim Brotherhood is not a militant jihadist

5    group.

6              In addition, expert disclosure from the government

7    doesn't make clear that he was going to testify about the

8    Muslim Brotherhood.

9              MR. QUIGLEY:  Your Honor, it does say he would provide

10   background about the Muslim Brotherhood; I believe it is our

11   October 17th supplemental disclosures that he was going to

12   discuss Muslim Brotherhood.

13             MS. SHROFF:  And he did he provide background.  That's

14   it.

15             THE COURT:  Is he going to say anything other than the

16   Muslim Brotherhood is a democratic organization geared towards

17   the electing people in a democratic fashion?

18             MR. QUIGLEY:  I mean, I think he may disagree with

19   that somewhat but I'm going to ask about two more questions.

20             THE COURT:  Okay.  Keep it high-level.

21             MR. QUIGLEY:  Yes, your Honor.

22

23

24

25

H1C5gam6                          Zelin - direct

<pre>
 1              (In open court)
 2     BY MR. QUIGLEY:
 3     Q.  Just at a very high level, what is the Muslim Brotherhood?
 4     A.  Muslim Brotherhood is an Islamist political movement that
 5     started in Egypt but then spread out and created branches in
 6     other parts of the Middle East and broader Muslim world over
 7     the past decades.
 8     Q.  And what presence does the Muslim Brotherhood have on the
 9     ground in Syria now?
10              MS. SHROFF:  Objection.
11              THE COURT:  Overruled.
12     A.  It has some individuals in Northern Syria but it is not one
13     of the main players in the fighting.
14     Q.  Can we focus, shifting to Syria the events there in early
15     2011; what happened in Syria?
16     A.  In Syria, similar to the other countries, a series of
17     protests began in around March 2011 against Bashar al-Assad
18     regime as a consequence of his authoritarian policies and way
19     of governance.  In response, unlike in Tunisian Egypt where the
20     leaders left on their own accord, the Assad regime had its
21     military shoot back at the protesters and started killing some
22     of them.  In response, some of the members of the military
23     decided to defect because they didn't agree with this policy
24     and they helped create what became known as the Free Syrian
25     Army -- or the FSA -- eventually.
</pre>

H1C5gam6                         Zelin - direct

1    Q.  And how would you describe the FSA's orientation, at least

2    initially?

3    A.  The FSA was primarily secular and/or nationalistic.

4    Q.  So, going back to the Islamic State of Iraq, how does the

5    Islamic State and Iraq respond to the situation in Syria?

6    A.  As the Islamic State saw things unfolding in Syria, since

7    they had Syrian members of their group in Iraq, they decided to

8    dispatch some of these individuals back into Syria to set up a

9    cell and then try and recruit individuals to build up a group

10   in the Syrian context as well.

11   Q.  And what did that cell eventually become known as?

12   A.  They announced themselves eventually, in January 2012, as

13   Jabhat al-Nusra or the support front.

14   Q.  And who is ISIS' leader at that time?

15   A.  By that time the leader of ISIS was Abu Bakr al-Baghdadi.

16   Q.  And who is Abu Omar al-Shishani?

17   A.  Abu Omar al-Shishani became one the top military commanders

18   for the Islamic State.

19   Q.  Now, focusing on the group in Syria, Jabhat al-Nusra, how

20   would you describe the relationship between Jabhat al Nusra and

21   the FSA during this 2011/2012 time frame?

22   A.  At that point the relationship wasn't that close, they're

23   both more or less doing their own operations but, over time,

24   starting around fall 2012, you saw them integrating -- not

25   integrating -- I should say they began doing more military

H1C5gam6                    Zelin - direct

1    operations together, as well as Jabhat al-Nusra providing

2    low-level governance in some areas in Northern Syria.

3    Q.  What did the organization now known as ISIS do with respect

4    to Jabhat al-Nusra in April of 2013?

5    A.  As a result of Jabhat Al-Nusra sort of ingratiating itself

6    with the local Syrians and sort of the positive nature that

7    they saw them in in terms of the fight against the Assad

8    regime, the leader of ISIS -- Baghdadi -- decided that what was

9    known privately would become public in that ISIS -- or that at

10   that point the Islamic State of Iraq -- or ISI -- and Jabhat

11   al-Nusra were one in the same, and therefore he would change

12   the name of the group to Islamic State of Iraq and el-Sham --

13   or ISIS.

14   Q.  And how did Jabhat al-Nusra's leaders in Syria take this

15   announcement?

16   A.  The leader of Jabhat al- Nusra, Abu Mohammad al-Julani, he

17   decided to rebuff what Baghdadi said publicly essentially

18   saying that he was more going to be with Ayman al-Zawahiri who

19   was the leader of al Qaeda at that point.

20   Q.  How did the Jabhat al-Nusra rank and file, particularly

21   their foreign fighters, take this?

22   A.  In response to this announcement by Baghdadi, a lot of the

23   foreign fighters decided to leave Jabhat al- Nusra and join up

24   with the Islamic State instead.

25   Q.  Now, sir, in preparation for your testimony today, did you

H1C5gam6                         Zelin - direct

1   review certain social media context that was provided by the

2   government?

3   A.  Yes.

4   Q.  Have you reviewed all the government's evidence in this

5   case?

6   A.  No, I have not.

7   Q.  Ms. Quinones, can we publish what is in evidence as

8   Government Exhibit 100-I-T and go to page 5 -- actually, page

9   6, a message from defendant's Facebook account, and can you

10  highlight the first sentence in English on page 6?

11          Do you see where it says:  One of its soldiers is

12  al-Jawlani who asked al-Baghdadi to support him with men to go

13  perform jihad in Syria.

14  A.  Yes.

15  Q.  And who is al-Jawlani again?

16  A.  He was the leader of Jabhat al-Nusra.

17  Q.  And who is al-Baghdadi?

18  A.  He is the leader of ISIS.

19  Q.  Can you highlight, Ms. Quinones, the last sentence in the

20  final paragraph of that message where it says al-Jawlani

21  refused to submit to the state and a turmoil took place but, of

22  course, Jabhat al-Nusra has already lost too many men who

23  joined the state.

24          Again, is that organization, Jabhat al-Nusra, the

25  organization you have been talking about?

H1C5gam6                          Zelin - direct

1    A.   Yes.

2    Q.   So, we can take that down.   Thanks, Ms. Quinones.

3            So, what effect did gaining these foreign fighters

4    have on ISIS?

5    A.   It provided them with new individuals that could help them

6    out in their military operations as well as their burgeoning

7    administrative capacities to try and provide low-level

8    governance, as well as new resources in terms of finances.

9    Q.   And what was ISIL or ISIS able to do as a result of getting

10   these new members?

11   A.   They were able to have more military victories whether it

12   was in Syria or Iraq, but also they were able to use many of

13   these foreign fighters then in a bunch of their video messages

14   that they released to try and recruit even more people to come

15   over and join up with the organization.

16   Q.   And so, what were some of the areas in Syria that had come

17   under ISIS control by early 2014?

18   A.   One of the most well known is Al-Raqqah, which became its

19   de facto capital inside of Syria.

20   Q.   And what were some of the areas in Iraq that had come under

21   ISIS control by the early summer of 2014?

22   A.   The main cities were Fallujah, Ramadi, which primarily

23   happened in February 2014; and then in June 2014 was Mosul.

24           MR. QUIGLEY:  May I approach, your Honor?

25           THE COURT:  You may.

H1C5gam6                        Zelin - direct

1    Q.  Sir, handing you what's been marked for identification as

2    Government Exhibit 702; do you recognize that?

3    A.  Yes.

4          MS. SHROFF:  We have no objection to it coming in,

5    your Honor.

6          THE COURT:  702 will be received.

7          MR. QUIGLEY:  Thank you, your Honor.

8          (Government's Exhibit 702 received in evidence)

9          MR. QUIGLEY:  May we publish it?

10         THE COURT:  You may.

11   BY MR. QUIGLEY:

12   Q.  So, sir, I think you mentioned -- what are we looking at

13   here?

14   A.  We are looking at Syria and Iraq.

15   Q.  And can you just point to where Raqqah in Syria is?

16   A.  Raqqah is right there.

17   Q.  And you also mentioned a couple of cities in Iraq, Fallujah

18   and Ramadi?

19   A.  Ramadi and Fallujah is there, and then Mosul is up here.

20   Q.  So, when did ISIS take control of Raqqah?

21   A.  ISIS consolidated control over Raqqah in the spring of

22   2014.

23   Q.  And does it still control Raqqah today?

24   A.  Yes, they do.

25   Q.  How did ISIS view the border between Iraq and Syria?

H1C5gam6                    Zelin - direct

1    A.  They didn't view it as a border at all since they don't

2    believe in the nation state idea.

3    Q.  Are you familiar with the term Sykes-Picot?

4    A.  Yes.

5    Q.  What is that?

6    A.  It is essentially an agreement by British and French

7    diplomats about arrangements related to borders in the Middle

8    East during and after World War I.

9    Q.  And what's ISIS' view of the Sykes-Picot agreement?

10   A.  They view it as illegitimate.

11   Q.  Now, you said ISIS took over Mosul in June 2014.  What was

12   the significance of that?

13   A.  It was significant because not only was it the second

14   largest city in Iraq, but it was the largest city with main

15   Sunni Muslim population, but also the fact that it was a key

16   city that the U.S. had previously fought for during the Iraq

17   war last decade.

18   Q.  And when ISIS was seizing Ramadi, Fallujah, Mosul, Raqqah,

19   what did it do with people who had been loyal to the standing

20   government?

21   A.  They executed them or massacred them.

22   Q.  What did it do to people who weren't Sunni?

23   A.  Killed them.

24   Q.  Can we, Ms. Quinones, put up what is in evidence as

25   Government Exhibit 100-D-T from the defendant's Facebook page

H1C5gam6                         Zelin - direct

1   and go to the very last page?  Can you highlight the entry on

2   the text where it says:  Allah is great.  Mosul falls by the

3   hands of the state.

4           Can we go to the page before that and check the date

5   on that?  Thank you.

6           Mr. Zelin, what announcement did ISIS make at the end

7   of June 2014?

8   A.  Its official spokesperson, Abu Mohammed al-Adnani, he put

9   out an audio message claiming that ISIS was no longer calling

10  itself ISIS but just the Islamic State or IS, and that they

11  were establishing a caliphate.

12  Q.  What's a caliphate?

13  A.  A caliphate is just the Muslim system --

14          MS. SHROFF:  Your Honor, may we have the exhibit taken

15  down?  He has finished testifying about it.

16          MR. QUIGLEY:  That's fine, your Honor.

17          Can you take it down, Ms. Quinones?

18          MS. SHROFF:  Thank you.

19  A.  Caliphate is just a Muslim system of government

20  historically, which started after the death of the Muslim

21  prophet Mohammed and had various iterations over the centuries,

22  and it last had one after, or ended at the fall of the Ottoman

23  Empire following World War I.

24  Q.  And did anyone else declare a caliphate other than ISIS

25  around June or July 2014?

H1C5gam6                          Zelin - direct

1    A.   No.

2    Q.   When was the last time a caliphate had been in existence

3    before that?

4    A.   With the Ottoman Empire.

5    Q.   And that was?

6    A.   The Turkish republic, after the Ottoman Empire fell,

7    abolished it in the early 1920s.

8    Q.   Can we publish, Ms. Quinones, what is in evidence as

9    Government Exhibit 100-O-T from the defendant's Facebook

10   account?  If we can go to page 2?  Can you highlight the date

11   in the upper left-hand corner?  And then can we move ahead to

12   page 4, the entry at 9:23:29 where the defendant says:  Do you

13   know that they declared the caliphate state?

14          Can you expand that, the entry under that,

15   Ms. Quinones, where it says:  God willing, it will expand; and

16   highlight that?

17          Can we take the blow-up down and stay on the exhibit

18   and can you highlight the entries at 9:24:51, 9:24:52 and

19   9:25:08?

20          And Baghdad is in what country, Mr. Zelin?

21   A.   It is the capital of Iraq.

22   Q.   And then can you highlight, Ms. Quinones, the defendant's

23   comments between 9:25:42 --

24          MS. SHROFF:  Your Honor, we have an objection.  May we

25   have a side bar for a moment?

H1C5gam6                           Zelin - direct

1                THE COURT:  Sure.

2                MS. SHROFF:  Thank you.

3                Your Honor, can we ask that the exhibit be taken down?

4                THE COURT:  Is it in evidence?

5                MR. QUIGLEY:  Yes, your Honor.

6                THE COURT:  Then it can stay up.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1C5gam6                          Zelin - direct

1          (At side bar)

2          MS. SHROFF:  But he is not asking a question about his

3     expertise, he is asking him where Baghdad is.  Whether or not

4     it is the capital of Syria, Iraq, France is not Mr. Zelin's

5     expertise.  He is an expert witness.  If he has a question

6     about his expertise, then that's fine.  But, I don't think we

7     need testimony from Mr. Zelin to put this up.  This is an

8     excuse.

9          What they're doing is they're publishing

10    Mr. El-Gammal's post which is their prerogative, but it can't

11    come in through this witness.  This witness is not providing

12    expert testimony for this.  His question, after he put the

13    document up, is of what country is Baghdad the capital.  That's

14    not Mr. Zelin's expertise unless he is testifying to a new sort

15    of expertise which are countries and their capitals.

16         MR. QUIGLEY:  Your Honor, the document is in evidence.

17    It is designed to provide context for his testimony.  He is

18    testifying about things that may be obscure to the jury.

19         MS. SHROFF:  Really?  Baghdad being a city in a

20    country is obscure to the jury?

21         MR. QUIGLEY:  The declaration of a caliphate.  Most

22    people don't know what that is or what that appreciates.  He is

23    not opining on the document.  He is just --

24         MS. SHROFF:  Your Honor, he has elicited testimony

25    about the caliphate which we did not object to.  He talked

1   about how the caliphate was established which we did not object

2   to.  What he is doing is inflaming the jury.  What he is doing

3   is saying, look, this is what the expert has testified about

4   about ISIS and I want you to put it together with

5   Mr. El-Gammal's post.  That is a summation and he can do it, he

6   will have an opportunity, but Mr. Zelin is not an expert in

7   Baghdad.

8           THE COURT:  What he is doing is he is putting these

9   posts in historical context.

10          MR. DEFILIPPIS:  Right.

11          MS. SHROFF:  But he is not putting them in historical

12  context.

13          THE COURT:  Yes, because the first thing Mr. Quigley

14  did was highlight the date.  He is putting in historical

15  context.  I'm going to allow it.

16          MS. SHROFF:  But, your Honor, the historical content

17  is also irrelevant is to this case.  On relevance grounds there

18  is no issue about this.  He has testified ad nauseam about the

19  caliphate and, look, we didn't object.

20          THE COURT:  He has hardly testified ad nauseam.

21          MS. SHROFF:  Okay.

22          Your Honor, we have an objection with the way the

23  government is doing it and the testimony it is eliciting

24  because it is outside the scope of this person's expertise.

25          THE COURT:  The objection is overruled.

1              MS. SHROFF:  Thank you.

2              MR. QUIGLEY:   Thank you.

1              (In open court)

2              THE COURT:  You may continue.

3    BY MR. QUIGLEY:

4    Q.  Can we go to the next page, Ms. Quinones, and highlight the

5    three statements there on that by the defendant?  We can take

6    that down.  Thank you.

7              MS. SHROFF:  Your Honor, was there a question?

8              THE COURT:  There obviously was not a question.

9              You may continue, Mr. Quigley.

10             MR. QUIGLEY:  Thank you, your Honor.

11   BY MR. QUIGLEY:

12   Q.  You mentioned the announcement by ah Abu Bakr al-Baghdadi

13   about the caliphate?

14   A.  Yes.  A few days after the audio message that was put out

15   by al-Adnani, Abu Bakr al-Baghdadi then rose to the pulpit in a

16   mosque in Mosul and had a sermon and speech announcing the

17   caliphate as well as accepting that he would be the caliph or

18   the leader of the caliphate.  And this was in early July 2014

19   around the beginning of the Muslim month of Ramadan.

20   Q.  And what attention did this announcement draw?

21   A.  A lot of attention.  It was all over the mainstream media

22   whether from CNN, ABC, NBC, all the way to papers like the New

23   York Times and Wall Street Journal.

24   Q.  And around the time ISIS declared the caliphate, what were

25   its main strategic priorities?

H1C5gam6                    Zelin - direct

1  A.  The main priorities for the Islamic State was to continue

2  expanding its territory.  It was also to try and recruit more

3  individuals to join up with its state, and then also, beyond

4  that, they wanted to try and defeat al Qaeda by that juncture

5  since they saw them as a rival within the broader movement.

6  Q.  And how is ISIS going about this, achieving these goals in

7  the summer of 2015?

8  A.  '15 or '14?

9  Q.  I'm sorry.  2014.

10 A.  In 2014 they primarily used new resources that they had

11 from taking over these cities to then use that towards taking

12 over other cities whether it was Iraq or Syria.  They also put

13 out a series of video messages from foreign fighters from its

14 group calling individuals from their own countries in their own

15 languages.  So, for example, somebody from France was speaking

16 in French or a German speaking in German, and telling them that

17 it was imperative for them to come to join up with the Islamic

18 State in Iraq and Syria.

19 Q.  And has ISIS engaged in assassinations?

20 A.  Yes.

21 Q.  Have they engaged in kidnappings in order to force others

22 to do or not do something?

23 A.  Yes.

24 Q.  Have they engaged in violent attacks on internationally

25 protected persons?

H1C5gam6                        Zelin - direct

1    A.  Yes.

2    Q.  Have they used explosives and firearms to injure, kill,

3    cause damage?

4    A.  Yes.

5    Q.  Have they engaged in premeditated political violence

6    against non-combatants?

7    A.  Yes.

8    Q.  And were these actions by ISIS publicized in the media?

9    A.  Yes.

10   Q.  Ms. Quinones, can we go ahead to publish what's in evidence

11   as Government Exhibit 100-D-T?  Can we go to page 25 -- sorry,

12   the next entry?  Can we go to the entry on 8/28/2014 at 08:57?

13          Do you see in the title there it says:  Jamaat Bait al

14   Maqdis supporters publishes the visual publication.  They are

15   the enemy.  Beware of them.

16   A.  Yes.

17   Q.  What does that organization refer to in the first -- Jamaat

18   Bait al Maqdis?

19   A.  Jamaat Bait al Maqdis is a jihadi group based in northern

20   Sinai in Egypt.

21   Q.  What did they do shortly after this?

22   A.  In the fall of 2014 they would pledge bay'ah, or it is an

23   oath of allegiance to the leader of ISIS, Abu Bakr al-Baghdadi,

24   and then they would become part of the Islamic State and change

25   their name to We Lie at Sinai or the Sinai Province.

H1C5gam6                         Zelin – direct

1   Q.   And do you see in that row where it says they are the

2   enemy, beware of them?

3   A.   Yes.

4   Q.   What do you understand that to mean?

5   A.   They're talking about their enemy, in particular the

6   Egyptian state, or it is possible they're talking about Israel

7   as well.

8   Q.   And has that also been the name of a propaganda video?

9   A.   Yes, it is.

10  Q.   Ms. Quinones, can we move ahead to the entry on page 18?

11          THE COURT:  Actually, we are going to stop here.  It

12  is 4:00 so, ladies and gentlemen, we will meet again tomorrow

13  morning bright and early.  Please, be in the jury room no later

14  than 9:20 so we can get started on time.  Until then, have a

15  very good evening.  Do not discuss the case, do not do any

16  research, do not read any media about the case.

17          Have a good night.

18          (Continued on next page)

19

20

21

22

23

24

25

H1C5gam6                          Zelin – direct

1              (Jury not present)

2              THE COURT:  Okay.  I have got some other work to do so

3    if you folks have issues, stick around.  In the meantime, I

4    will see the agents in the back.

5              (Adjourned to 9:15 a.m., January 12, 2017)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   KOMAAL COLLIE

 4   Cross By Ms. Shroff  . . . . . . . . . . . 257

 5   Redirect By Mr. Quigley  . . . . . . . . . 326

 6   Recross By Ms. Shroff  . . . . . . . . . . 332

 7   Redirect By Mr. Quigley  . . . . . . . . . 335

 8   Recross By Ms. Shroff  . . . . . . . . . . 336

 9   PAUL MUELLER

10   Direct By Ms. Tekeei . . . . . . . . . . . 337

11   JOSEPH BERNARD VARANI

12   Direct By Mr. Quigley  . . . . . . . . . . 380

13   Cross By Ms. Mirón . . . . . . . . . . . . 389

14   AHMED ABDEL-MOTALEB

15   Direct By Mr. Quigley  . . . . . . . . . . 398

16   Cross By Ms. Miron . . . . . . . . . . . . 422

17   Redirect By Mr. Quigley  . . . . . . . . . 431

18   AARON ZELIN

19   Direct By Mr. Quigley  . . . . . . . . . . 434

20                      GOVERNMENT EXHIBITS

21   Exhibit No.                           Received

22    1104   . . . . . . . . . . . . . . . . . 383

23    303   . . . . . . . . . . . . . . . . . . 384

24    11T, 12T, 13T, 15T, 100DT and 148T  . . . . . 406

25    4BT, 4CT, 100D through KT, 100MT, 100OT . . . 412
```

```
1              through ST, 100UT, 102AT,

2              113AT, 120AT, 122C, D, E, F

3              and GT, and 146T
```

```
4    701   . . . . . . . . . . . . . . . . . . 441

5    700   . . . . . . . . . . . . . . . . . . 446

6    702   . . . . . . . . . . . . . . . . . . 455
```

```
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          DEFENDANT EXHIBITS

2    Exhibit No.                                        Received

3    113A    . . . . . . . . . . . . . . . . . 246

4    113AA   . . . . . . . . . . . . . . . . . 269

5    112-AA  . . . . . . . . . . . . . . . . . 287

6    1 through 7  . . . . . . . . . . . . . . . 300

7    10    . . . . . . . . . . . . . . . . . . 305

8    11    . . . . . . . . . . . . . . . . . . 305

9    12    . . . . . . . . . . . . . . . . . . 306

10   13    . . . . . . . . . . . . . . . . . . 311

11    304-A   . . . . . . . . . . . . . . . . . 390

12   304-C   . . . . . . . . . . . . . . . . . 391

13   304-F   . . . . . . . . . . . . . . . . . 392

14   304-H   . . . . . . . . . . . . . . . . . 393

15   304-I   . . . . . . . . . . . . . . . . . 393

16   304-J   . . . . . . . . . . . . . . . . . 394

17   304-L   . . . . . . . . . . . . . . . . . 395

18   304N    . . . . . . . . . . . . . . . . . 396

19   304D    . . . . . . . . . . . . . . . . . 397

20   112BB   . . . . . . . . . . . . . . . . . 424

21

22

23

24

25