H1D5gam1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                            15 Cr. 588 (ER)

AHMED MOHAMMED EL GAMMAL,

          Defendant.

------------------------------x

                              New York, N.Y.
                              January 13, 2017
                              9:15 a.m.


Before:

                  HON. EDGARDO RAMOS,

                            District Judge


                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
    Attorneys for Defendant
BY:  SABRINA SHROFF
    ANNALISA MIRÓN
    DANIEL G. HABIB

1           (Trial resumed; jury not present)

2           MS. MIRÓN:  I would like to raise one issue about Mary

3    Horvath's presentation.

4           THE COURT:  Okay.

5           MS. MIRÓN:  We object to the admission of evidence

6    regarding Telegram, both on relevance and 403B grounds because

7    my understanding is there is no record on the iPad of any

8    communications made on this application Telegram, certainly no

9    evidence has come in regarding Samy El- Goarany having or using

10   Telegram, Attiya Aboualala having or using Telegram.  I think

11   it is just designed to make a connection that Mr. El-Gammal is

12   pro-ISIS, again, but there is no real date associated with

13   Ms. Horvath's presentation, in other words I don't see an

14   installation date on her presentation so we think it is

15   irrelevant and overly prejudicial.

16          THE COURT:  What is the story with Telegram?

17          MR. DEFILIPPIS:  Your Honor, on a portion of the

18   presentation in which Ms. Horvath will discuss the various

19   applications that were installed on the defendant's phone, one

20   of those applications is Telegram, it is displayed in the

21   forensic report, and we expect to elicit testimony from

22   Ms. Horvath that in fact Facebook, Facebook Messenger, and

23   Telegram, along with Skype, were installed on the phone.  We do

24   not have any chats on the phone that Ms. Horvath has been able

25   to extract or interpret from the phone for Telegram but it is

H1D5gam1

offered in order to, one, explain to -- it is probative -- and,

again, we are not overselling this, we are not going to try and

argue that we were able to recover chats from the phone.  All

it is intended to prove is that the defendant downloaded and

was familiar with a variety of applications on his phone, one

of which Telegram is an encrypted application which goes to his

knowledge and state of mind as to encrypted applications which

is a very relevant issue in this case.  And so, we are offering

it just for that purpose.  We don't intend to introduce any

communications but merely to show his knowledge and proficiency

with encrypted applications to the extent that it shows that.

THE COURT:  So, what the government is aware of is

that Mr. El-Gammal downloaded the application onto his phone?

MR. DEFILIPPIS:  Correct.

THE COURT:  But so far as you're aware, he never used

it?

MR. DEFILIPPIS:  That analysis, and in fact

Ms. Horvath was looking at one additional thing overnight on

that issue but as of now her analysis -- she was not able to

conclude whether or not he used it.  She wasn't able to say he

wasn't, she wasn't able to say he did use it.  But, it was on

his phone and we think the fact that -- the mere fact that he

downloaded -- to the extent the defense intends to make an

argument that for example it was Samy El- Goarany who led him

to use encrypted applications or he never actually went down

H1D5gam1

1    the path of downloading or using encrypted applications which I

2    think wasn't present in defense counsel's examination –– and

3    again, we are not saying this moves the needle majorly in one

4    way or the other –– but it is a relevant and quite probative

5    fact that on his device he downloaded and had the Telegram

6    application.

7              THE COURT:  Isn't there already evidence in the record

8    that Mr. El-Gammal used encrypted applications?  Cryptocat,

9    Surespot or ––

10             MR. DEFILIPPIS:  I think on those, your Honor, the

11   government contends there is but I think defense counsel seems

12   to be, you know, as they should and are entitled to, contesting

13   that.  And so, I don't think it is cumulative in the sense that

14   to the extent another application was on his phone it supports

15   the government's theory that in fact he had some familiarity

16   with these applications.

17             THE COURT:  I'm not understanding.

18             So, there is evidence in the record that Mr. El-Gammal

19   communicated with at least Samy El- Goarany using encrypted

20   applications, correct?

21             I think at least with respect to one of them it was

22   Mr. El-Gammal told Mr. El- Goarany to download it so that they

23   could communicate using that application.  Am I misremembering

24   that?

25             MS. MIRÓN:  Yes, you are, your Honor.

H1D5gam1

1          MR. DEFILIPPIS:  Others will correct me if I am wrong,

2     but I think it was Samy who, in all instances, suggested it to

3     Mr. El-Gammal.

4          MS. MIRÓN:  That's right.

5          MR. DEFILIPPIS:  And the argument that underlied the

6     defense presentation on this was that Samy essentially badgered

7     or prompted or tried to prompt Mr. El-Gammal to use these

8     applications and with cryptocat, for example, the entire thrust

9     of their line of cross-examination was he deleted it, it was

10    only 20 minutes after downloading it.  And, there was no

11    evidence on Facebook that he actually used cryptocat.

12         And so, they are very much contesting that he had

13    familiarity with or used these applications and I think it is

14    not at all cumulative to -- and again, we are not going to push

15    this beyond what it proves which is just that he downloaded it

16    and Ms. Horvath is not able to say whether he used it.  But,

17    the act of downloading it is significant.  It shows it is

18    probative.

19         THE COURT:  I will allow it.  The objection is

20    overruled.

21         MR. DEFILIPPIS:  Thank you, your Honor.

22         (pause)

23         MR. DEFILIPPIS:  Your Honor, on the *in camera* issue,

24    the government is prepared to address that sometime today.

25         MS. SHROFF:  Your Honor, we can either do it today or

H1D5gam1

1    Tuesday morning.  I apologize, but there is a problem with our

2    office's computer.  I called your chambers earlier this

3    morning.

4                THE COURT:  Yes, I know.

5                MS. SHROFF:  We are not able to print any documents so

6    we --

7                MR. DEFILIPPIS:  Your Honor, we would happily print

8    any documents from Ms. Shroff.  We are hoping to get it as soon

9    as possible so that witnesses can plan and such.

10                THE COURT:  Okay.

11                MS. SHROFF:  Your Honor, before Mr. DeFilippis

12    interrupted me I was going to tell the Court I could not print

13    any of my documents for Mr. Zelin's cross which will follow the

14    direct which is on now.  So, we will need a break.

15                I Informed Mr. DeFilippis yesterday and we also

16    discussed with Mr. Harry Rucker who this morning, Harry Rucker

17    being the CSO on this case who is in the Eastern District of

18    New York, he thinks that he could take care of this sometime

19    between 1:30 and 2:00, and if I am not crossing Mr. Zelin, I

20    would be of course available to do that.

21                THE COURT:  I am sorry.

22                The problem, the technical problem that you are having

23    in your office, which Mr. DeFilippis very kindly offered to

24    help you with --

25                MS. SHROFF:  No, I think he was offering to help me

H1D5gam1

1    with the CIPA printing, not my printing.

2              THE COURT:  Okay.

3              In any event, so are you saying that if the government

4    finishes with Mr. Zelin's direct at some point this morning,

5    you would not be able to go forward with his cross-examination?

6              MS. SHROFF:  No.  I would just need five or 10 minutes

7    to see if they've fixed the problem between now and then.

8              THE COURT:  Okay.  Very well.

9              MS. SHROFF:  I just meant if I needed that time to

10   prepare for the cross I couldn't go to the CIPA room.

11             THE COURT:  Got it.

12             MS. SHROFF:  Thank you.

13             THE COURT:  We were waiting on one other juror about

14   three minutes ago, so we will see where they are.

15             Are we ready to proceed?  Is Mr. Zelin here?

16             MR. QUIGLEY:  He is in the hallway, your Honor.  We

17   will get him.

18             Your Honor, I actually have one quick thing.  We got

19   some maps last night from the defense that purport to be

20   from -- represent Syrian refugee camps registered in Turkey in

21   2014.  Mr. Habib just informed me --

22             MS. SHROFF:  Your Honor, Mr. Zelin is in the courtroom

23   right now.

24             THE COURT:  If you don't mind stepping out, Mr. Zelin,

25   just for a second?

H1D5gam1

1              MR. QUIGLEY:  Mr. Habib just informed me that they may

2       intend to introduce these through Mr. Zelin.  Obviously I don't

3       have any issue with maps of Turkey and Syria but I would like

4       to hand these up.

5              THE COURT:  Sure.  So each one of these little

6       triangles is what?

7              MR. HABIB:  Refugee camp, your Honor.

8              THE COURT:  This is as of a particular date.

9              MR. HABIB:  The dates are indicated on the maps

10      themselves, I believe.  December 2013.

11             THE COURT:  Okay.

12             MR. QUIGLEY:  So, number one, I don't think, from

13      speaking to Mr. Zelin, he can authenticate these documents;

14      number two, because he has no idea where the refugee camps are,

15      and number two, I think they're hearsay.  Mr. Habib has

16      proffered to us that they come in under the public records

17      exception and 803.8.  The think it problem with that is that

18      the public records exception, even if it does apply to the

19      U.N. --

20             THE COURT:  You are a little too close to the

21      microphone, Mr. Quigley.

22             MR. QUIGLEY:  Sorry.

23             -- even if it does apply to the U.N., requires that

24      the record or statement set out the office's activities of a

25      matter observed under a legal duty to report.  I'm not sure

H1D5gam1

what -- I don't think there is a legal duty to report -- the
U.N. had a legal duty to report this information.  This is not
where the refugee camps are.  This seems to be kind of general
information they're putting out there for public relations or
planning purposes.  There is no legal obligation on the U.N. to
report that information.

          MR. HABIB:  Your Honor, so, if the Court -- I can hand
up to the Court, if the Court wants to look at it, but Federal
Rule of Evidence 803.8, actually provides two alternative means
of qualifying for a hearsay exception and the rule reads:
Public records.  A record or statement of a public office, if
either it sets out the office's activities; or it sets out a
matter observed while under a legal duty to report.  So, those
are alternative means of satisfying the rule.  We satisfy
either.  First, the U.N. is a public office and the D.C.
Circuit has so held, that's *United States v. M'Biye*, 655 F.2d
1240, 1242 D.C. Circuit 1981.  The maps do set out the office's
activities pursuant to -- and, again, I can hand up a document
to the Court if the Court is interested -- pursuant to the 2014
Syria Regional Response Plan for Turkey.  U.N. HCR's duty is to
oversee and coordinate the management of refugee camps in
Turkey.  So, its activities include overseeing and coordinating
the efforts of refugee camps.  That would be sufficient under
the rule.

          THE COURT:  Let's bring out the jury.  I will -- now,

H1D5gam1

1    what Mr. Zelin is going to be able to say about them or not is

2    different matter, of course.

3              MR. HABIB:  The Court is admitting them?

4              THE COURT:  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning ladies and gentlemen of the

3    jury.  Thank you, as always, for being on time.  I hope and

4    trust everyone had a pleasant evening.

5          We will now continue with the direct examination of

6    Mr. Zelin.

7          MR. QUIGLEY:  Thank you, your Honor.

8     AARON ZELIN, continued.

9    DIRECT EXAMINATION (Cont'd)

10   BY MR. QUIGLEY:

11   Q.  Just to resituate ourselves, Ms. Quinones, can we put up

12   Government Exhibit 100-E-T at 5?

13         THE COURT:  Is there a way we can close the drapes

14   behind the jurors there?  Much better.  Thank you.

15   Q.  Ms. Quinones, can you highlight the date on this?

16         Do you see the first line where it says, Mah Moud

17   says:  Israel supports the Free Syrian Army and then the

18   defendant says:  Mah Moud, the Free Syrian Army is secular.  I

19   was never with the Free Syrian Army.  I was with Jabhat

20   al-Nusra and now with the state.

21         Do you see that, Mr. Zelin?

22   A.  Yes.

23   Q.  And Jabhat al-Nusra is what again?

24   A.  Jabhat al-Nusra is the al Qaeda group in Syria that split

25   away from the Islamic State.

1    Q.  Do you see where at 21:13:12 Mah Moud said:  What is meant

2    by the state?  And the defendant responds:  The State of Iraq

3    and the Levant/Syria.

4    A.  Yes.

5    Q.  And then do you see at 21:15:29 where the defendant says:

6    That is a jihadi group over there in Syria and the dirty media

7    calls them Daesh?

8    A.  Yes.

9    Q.  What is Daesh?

10   A.  Daesh is just the Arabic acronym of ISIS.

11   Q.  You can take that down, Ms. Quinones.

12       Toward the end of yesterday I asked you whether ISIS

13   used explosives or firearms to kill, injure or cause property

14   damage; do you recall that?

15   A.  Yes, I do.

16   Q.  Where has ISIS done that?

17   A.  ISIS has done that in its core territories in Iraq and

18   Syria, but it has also conducted similar types of attacks in

19   its other provinces outside which we spoke about yesterday as

20   well, but in addition to that it has conducted external

21   operations or guided people abroad in places from the U.S.,

22   Canada, Europe, to Southeast Asia.

23   Q.  And what are some of the more prominent attacks that ISIS

24   has claimed responsibility for in Europe?

25       MS. SHROFF:  Objection, your Honor, to the lack of

H1D5gam1                          Zelin – direct

1    time frame.

2            THE COURT:  Do you want to put a time frame on that,

3    Mr. Quigley?

4    BY MR. QUIGLEY:

5    Q.  In the last two years, what are some of the more prominent

6    attacks that ISIS has claimed responsibility for in Europe?

7            MS. SHROFF:  Objection as to relevance.

8            THE COURT:  Overruled.

9    A.  They've claimed attacks in places like Paris and Brussels

10   but also in places in the United States like Orlando.

11   Q.  And who was the perpetrator of the Orlando incident?

12   A.  Omar Mateen.

13   Q.  Was that a shooting?

14   A.  Yes.

15           MS. SHROFF:  Objection.

16           THE COURT:  Don't lead, Mr. Quigley.

17   Q.  What type of weapon was used in that attack?

18   A.  A gun.

19           MS. SHROFF:  Objection as to relevance.

20           THE COURT:  Overruled.

21   Q.  Going back to the summer of 2014, what were ISIS' main

22   activities in Iraq and Syria at that time?

23   A.  In the summer of 2014 they began to take over more and more

24   territory as a result of being able to gain new resources from

25   the new cities that they controlled, as well as more

H1D5gam1                          Zelin - direct

1    individuals joining up with the group.

2    Q.  Ms. Quinones, can we put up Government Exhibit 100-D-T from

3    the defendant's Facebook page and go to page 25?  Two more

4    pages, I think it is 26.  Can we actually go ahead to the entry

5    on page 18 on 8/29/14?  Sorry, it is page 19.  Sorry, 20.

6    Sorry, 22.

7            So, 22, the entry on 8/29/14, can you highlight the

8    title where it says Daesh sends a letter written in blood to

9    the allies of evil, America and Masoud Barzani?

10           Who is Masoud Barzani?

11   A.  He is a Kurdish leader.

12           THE COURT:  He is what?  I'm sorry.

13           THE WITNESS:  He is a Kurdish leader.

14           THE COURT:  Thank you.

15   Q.  If we can pull out and go to the next entry on that page?

16           Who is Sissi?

17   A.  Sissi is the current leader of Egypt and the one that is

18   involved in the coup d'etat against Muslim Brotherhood.

19   Q.  Mr. Zelin, are you familiar with the term Shariah?

20   A.  Yes.

21   Q.  What is Shariah?

22   A.  Shariah is just Islamic law.

23   Q.  So, in talking about ISIS' expansion in the fall and summer

24   of 2014, how far was ISIS from Baghdad's capital around August

25   of 2014?

H1D5gam1                        Zelin - direct

1    A.  About 30 miles or so.

2    Q.  And what did the U.S. and other countries do in response to

3    these events?

4    A.  In response to this, amongst other things, the United

5    States, along with allies it courted, began to conduct air

6    strikes against the Islamic State's assets and its members to

7    try and make sure it didn't take over Baghdad as well as other

8    places in Iraq.

9    Q.  And how did ISIS respond?

10   A.  In response, the Islamic State began to put out a series of

11   video messages online with American and British journalists and

12   humanitarian workers and showing them knelt down in the desert,

13   threatening the U.S. and its allies, and then at the end of

14   each one they beheaded the individuals.

15   Q.  Who was the first American beheaded?

16   A.  James Foley.

17   Q.  What did he do for a living?

18   A.  He was a journalist.

19          MS. SHROFF:  Objection.

20          THE COURT:  Overruled.

21   Q.  When was that, approximately?

22   A.  That was in August 2014.

23   Q.  Ms. Quinones, can we put up Government Exhibit 100-H-T and

24   go to page 4?  Can you highlight the date in the upper

25   left-hand corner and can you highlight where Elsaid asked the

H1D5gam1                         Zelin - direct

1    defendant:  Do you have the video of the American journalist

2    beheaded by ISIS?  And then can you highlight the entry at

3    21:58:53 where the defendant says:  Let me find out.  And then

4    the next column where the defendant says:  It was all over

5    Facebook.  And then at 22 --

6            MS. SHROFF:  Your Honor, we continue to object to the

7    leading.  If there is a question --

8            THE COURT:  He hasn't gotten to the question part yet.

9            Go ahead.

10   Q.  -- where the defendant says:  I want to see the

11   slaughtering action.

12           MS. SHROFF:  Objection.

13           MR. QUIGLEY:  Sorry.

14           MS. SHROFF:  That's not what the record reads.

15           MR. QUIGLEY:  I apologize.

16   Q.  Where Mr. Elsaid says:  I want to see the slaughtering

17   action.

18           Mr. Zelin, was this, August 20th, 2014, approximately

19   the time when Mr. Foley was executed?

20   A.  Yes.

21   Q.  And then can we go to page 5, Ms. Quinones, and highlight

22   the first four rows where the defendant says:  This is the

23   complete video.  Elsaid responds:  The first one you sent me

24   was better.  The defendant says:  What are you talking about.

25   And Elsaid says:  Slaughter.

1           We can take that down.  Can you put up Government

2    Exhibit 100-E-T, again from the defendant's Facebook account,

3    and go to page 68?  Can you highlight the date on this,

4    Ms. Quinones?  And can you highlight the entry 9:26:45 where

5    the defendant says:  But he is truly a journalist.

6           And then can you highlight the entry at 09:31:53 and

7    09:51 where Mah Moud asks:  Did you watch the video?  And the

8    defendant responds:  Yeah.  Of course.

9           And can we go to page 70 --

10          THE COURT:  Mr. Quigley, the jury can read and so can

11   Mr. Zelin, so if you are going to highlight various excerpts,

12   please, ask a question.

13          MR. QUIGLEY:  Okay.  Thank you, your Honor.

14   Q.  Can we highlight, at page 70, the entries between 09:39:31

15   and 09:40:30?  We can take that down.

16          Now, during this beheading campaign, Mr. Zelin, how

17   did ISIS publicize these videos?

18   A.  They mainly released these videos through their official

19   Twitter accounts at the time.

20   Q.  And what was their stated purpose in releasing videos like

21   the Foley video and the other videos?

22   A.  There are a few purposes.  The main one was to try and

23   intimidate the U.S. and its allies.  Another reason is the sort

24   of paradoxical aspect where they both wanted to deter the

25   United States but at the same time they also wanted to goad

H1D5gam1                         Zelin - direct

1   them into try and coming into the conflict even more so that

2   they can bleed their wealth dry like they saw that they did to

3   the United States previously in Iraq.

4   Q.  Now, did ISIS continue to publish videos of executions

5   going into 2015?

6   A.  Yes, she did.

7   Q.  And how were those disseminated?

8   A.  They were disseminated in a similar manner, through their

9   official Twitter accounts.

10  Q.  What were some of the more well known ones in early 2015?

11  A.  The most well known one was a case of a Jordanian pilot.

12  The Jordanians were part of the U.S. mission to conduct

13  aircraft strikes against Islamic State.  He was shot down and

14  they captured him -- the Islamic State -- and then they burned

15  him alive and they showed that video.

16           And then there are two other videos, both in Sirte,

17  Libya, on the beach, where they beheaded a group of Egyptian

18  and Ethiopian Christians.

19  Q.  Ms. Quinones, can we pull up what's in evidence as

20  Government Exhibit 100-K-T from the defendant's Facebook

21  account and go to page 4?  Can you highlight the name Maaz,

22  al-Kasaba?

23           Who is that, Mr. Zelin?

24  A.  Maaz al Kasaba is the Jordanian pilot that was burned alive

25  by ISIS.

1    Q.  Can we go you down to page 12 in this exhibit?  Can you

2    highlight the date, the two dates?  And can we go down also on

3    the 5th, to page 14, and highlight the entries between 05:18:24

4    and 05:19:46?

5             We can take that down, Ms. Quinones.

6             THE COURT:  I'm sorry, Mr. Quigley.  Perhaps you have

7    forgotten.  The exhibit is in evidence and of course you can

8    show it to jury, but if you are going to highlight excerpts

9    from the transcript, it would be helpful to the jury for you to

10   ask a question so that Mr. Zelin can comment on it, if

11   appropriate.

12   BY MR. QUIGLEY:

13   Q.  Mr. Zelin, that entry was from approximately -- if we can

14   go back and highlight the date on page 12, Ms. Quinones?  Was

15   that February 5th -- February 3rd and February 5th, 2015, was

16   that around the time that the Jordanian pilot was executed?

17   A.  Yes.

18   Q.  Are you familiar -- can we publish what is in evidence as

19   Government Exhibit 120-A-T and go to page 5/3/15?  The entry on

20   5/3/15?  Towards the end.  Page 49, Ms. Quinones.  Sorry about

21   that.  Can you highlight the top two entries, top three entries

22   where the defendant says:  Have you seen the new Harvest of the

23   Spies?  And Attiya says:  Send links.

24             Mr. Zelin, are you familiar with what is the Harvest

25   of the Spies?

H1D5gam1                         Zelin - direct

1    A.   It is the name of a video message released by the Islamic

2    State.

3    Q.   And what does that depict?

4    A.   The videos depict captured soldiers from either the Syrian

5    or Iraqi regimes and then in the videos these captured

6    individuals state what they are doing on behalf of these

7    regimes and at the end of it the Islamic State would execute

8    them.

9    Q.   We can take that down, Ms. Quinones, and can we put back up

10   100-D-T and go to page 5 -- sorry, page 6.  Can you highlight

11   the third row down, Salel al Sawarem?

12            Mr. Zelin, what is Salel al Sawarem?

13   A.   It just means clashing of the swords and it is a message

14   that the Islamic State has released over the last few years.

15   Q.   And what do those depict?

16   A.   The most relevant one is the fourth one which they released

17   in, I believe, May 2014, and essentially it's a lot of gory

18   cases of Islamic State killing people in many different ways

19   whether it is point blank executions, whether it is burying

20   people alive, whether it is drive-by shootings, as well as

21   other types of killings.

22   Q.   Does the Islamic State have official media outlets?

23   A.   Yes, they have a few.

24   Q.   What are the more prominent ones?

25   A.   The more prominent ones are al-Furaq, al-Hayat, and Ajnad

H1D5gam1                          Zelin - direct

1   Media.

2   Q.  Can we go to page 2 of Government Exhibit 100-D-T,

3   Ms. Quinones?

4          THE COURT:  I'm sorry.  Can I just ask, what are the

5   media outlets?  Are they television stations, are they

6   websites, are they newspapers, if you know?

7          THE WITNESS:  The media outlets essentially help

8   produce, edit, and then release either video messages,

9   magazines, Qur'annic recitations or nasheeds, which are

10  Islamically-sanctioned a cappela music.

11         THE COURT:  Thank you.

12         THE WITNESS:  You're welcome.

13  BY MR. QUIGLEY:

14  Q.  Can we go to page 2 of the exhibit?  Sorry, page 4.  Can

15  you highlight in the middle entry the summary where it says:

16  In a very predictable move, the Islamic State media wing

17  al-Furqan has released a high production value video depicting

18  the execution of a self-confessed -- was that the al Furqan

19  media you referred to a minute ago, Mr. Zelin?

20  A.  Yes.

21  Q.  Now, in addition to the media outlets you mentioned the

22  Islamic State -- what, if any, English-language publications

23  does Islamic State have?

24  A.  The most well known is their English-language magazine

25  called Dabiq.

1    Q.  Can we go back to 100-D-T again to the entry on September

2    2nd, 2014 which is on page 17, and can you highlight where it

3    says:  Dabiq media presents the Earth-shattering publication

4    and the ultimate response to all the suspicions about the

5    true/good caliphate.  By the God of Mohammed, it is a

6    caliphate.

7            Is that Dabiq media you were referring to a minute

8    ago?

9    A.  Yes.

10   Q.  Now, in addition to its official media outlets, how else

11   has ISIS disseminated material over the Internet and around the

12   world?

13   A.  In addition to those official media outlets, they also have

14   provincial media offices where they'll release content from

15   specific locations where they're operating.  So, for example,

16   in their Raqqah province it will be the Raqqah province media

17   office and so on and so forth with other examples like that.

18   Q.  How else?

19   A.  In addition to that, they also put out magazines and

20   nasheeds, as I mentioned, Qur'annic recitations, amongst other

21   things.

22   Q.  To what extent do they rely on people outside of Iraq and

23   Syria to disseminate their materials?

24   A.  They use people as force multipliers online.

25   Q.  What do you mean by that?

1    A.   Essentially these individuals, whether they're members of

2    the group or not members of the group, can then reproduce and

3    repost this content online.

4    Q.   So, these people are generally supportive of ISIS?

5              MS. SHROFF:   Objection to the leading.

6              THE COURT:   That was not a leading question.

7    Overruled.

8    A.   Yes.

9    Q.   Where do they live?

10   A.   They can live anywhere in the world.

11   Q.   Where?

12   A.   Anywhere from here in the United States to Canada, to

13   Europe, to Asia, to Africa.

14   Q.   And what do these people do for a living?

15   A.   They either can have a regular day job or they're

16   unemployed and they're just excited by Islamic State.

17   Q.   Do some of them go to school?

18   A.   Yes.

19   Q.   Do they all practice Shariah law in their own lives?

20   A.   No.

21             MS. SHROFF:   Objection.

22             THE COURT:   Sustained.

23   Q.   How do their practices compare with the practices in the

24   Islamic State itself?

25             MS. SHROFF:   Objection.

1                THE COURT:  Overruled.

2    A.   The practices of the individuals?

3    Q.   Yes; religious practices.

4    A.   It just depends, but since they live in a different

5    country, they're likely limited by the particular legal systems

6    in their own countries than what is being tried to be put

7    forward within the Islamic State's framework of their own legal

8    doctrine.

9    Q.   Shifting topics, you previously mentioned foreign fighters

10   coming into ISIS?

11   A.   Yes.

12   Q.   And what do you mean by foreign fighters?

13   A.   Foreign fighters are just individuals that are not from the

14   country of where a conflict zone is happening.  So, that would

15   be Syria/Iraq in this case.  And they would then come over to

16   join up with a particular insurgent faction -- in this case

17   what we are talking about is the Islamic State.

18               So, anybody that's essentially not from Iraq and Syria

19   that comes there to fight would be considered a foreign

20   fighter.

21               (Continued on next page)

22

23

24

25

1  Q.  And why -- focusing on the 2014-2015 time period again to

2  what extent was tracking these foreign fighters part of ISIS's

3  strategy?

4  A.  It was a very important part of their strategy.

5  Q.  And why did ISIS need or want these foreign fighters to

6  come to them?

7  A.  There were two reasons, since they had expanded their

8  territory they were looking for soldiers to defend their

9  territories from their enemies.  In addition to that, they also

10 wanted more people to be involved in their administrative and

11 bureaucratic governance since they were putting up new

12 structures for the territories controlled.

13         In addition to that, it provided them with more

14 individuals to be used in the propaganda efforts of the Islamic

15 State when they were putting up video messages to try to

16 recruit even more individuals.

17 Q.  Was ISIS successful at attracting foreign fighters?

18 A.  Yes.

19         MS. SHROFF:  Objection.

20         THE COURT:  Overruled.

21 Q.  How would you describe ISIS's success in attracting foreign

22 fighters as compared to other militant jihadist groups

23 historically?

24         MS. SHROFF:  Objection.  Outside the scope of his

25 expertise.

1          THE COURT:  Overruled.

2     A.  It was unprecedented.

3     Q.  How would you describe ISIS's success in recruiting

4     jihadists into foreign territories in 2014 or 2015?

5     A.  It was far more successful than other groups.

6     Q.  Why was ISIS so successful?

7     A.  Part of it is were a lot of people looking for things like

8     brotherhood and figuring out their own identity and they

9     announced this califate, which was seen by some as historically

10    momentous in providing this scene in their own life and they

11    wanted to join it.

12    Q.  Have you studied the way in which foreign fighters traveled

13    to ISIS?

14    A.  Yes.

15    Q.  And what sources have you relied on primarily?

16    A.  Primarily I've relied on sources directly from the Islamic

17    State that they put out publicly, in addition to leaked

18    documents from the Islamic State that I've been able to gain

19    access to.  Also, there are defectors from the Islamic State

20    who have since gone out and done interviews with the media

21    explaining their own experiences as well as local or western

22    reporting on the situation.

23    Q.  Is there one particular way that foreign fighters get to

24    the Islamic State?

25    A.  No.

H1DFGAM2                        Zelin - direct

1   Q.  Generally, focusing on the late 2014 early 2015 period, how

2   were the fighters getting to the Islamic State?

3   A.  Generally speaking, they were mainly getting there through

4   Turkey.

5            MR. QUIGLEY:  Could we publish what is in evidence as

6   Government Exhibit 701?

7   Q.  So where is Turkey on the map?  Up at the top?

8   A.  Yeah, Turkey is the northern country.  There we go, sorry

9   about that.

10  Q.  Can you point out where ISIS is based?

11  A.  ISIS was based in this area.

12  Q.  So why couldn't fighters come through Lebanon, for example?

13  A.  The Lebanese border was secured by Hezbolla, which is a

14  Shia non-state actor as well as a designated terrorist group by

15  the U.S. government that's allies with the Assad regime, the

16  ruling government that was fighting against the rebels as well

17  as the Islamic State and therefore they wouldn't want any Sunni

18  foreign fighters to traverse their own territory.

19  Q.  Why couldn't foreign fighters cross Israel's border with

20  Syria?

21  A.  Israel is a Jewish state so they wouldn't want any

22  individuals that are involved in the Islamic state califate

23  type of projects traverse their borders.

24  Q.  Why is not -- why couldn't the foreign fighters go through

25  Jordan?

H1DFGAM2                          Zelin - direct

1   A.   Jordan, which is an ally with the United States in helping

2   out in the campaign against the Islamic State, also wouldn't

3   want foreign fighters to go because it would create a security

4   situation there and it's not in their own best interests as a

5   country.

6   Q.   I know you said ISIS had gained territory in Iraq but why

7   couldn't foreign fighters get to Syria through Iraq?

8   A.   The main airport in Iraq is Baghdad International, which is

9   in the capital of the country and the government in the capital

10  is controlled by the Shia group, because shiites were the main

11  group inside of Iraq and therefore since they viewed ISIS as an

12  enemy they wouldn't want Sunni foreign fighters that would then

13  fight against them to come into their own country.

14           MR. QUIGLEY:  Your Honor, may I approach?

15           THE COURT:  You may.

16  Q.   Sir, I'm handing you what's been marked for identification

17  as Government Exhibit 703.  Do you recognize that?

18  A.   Yes.

19  Q.   What is that?

20  A.   A map of Turkey.

21  Q.   What's the bottom portion show?

22  A.   The border between Turkey and Syria.

23  Q.   Does it fairly depict that area of the world based in your

24  experience?

25  A.   Yes.

1          MR. QUIGLEY:  Government offers Exhibit 703.

2          MS. SHROFF:  No objection.

3          THE COURT:  703 will be received.

4          (Government's Exhibit 703 received in evidence)

5          MR. QUIGLEY:  May we publish it, your Honor?

6          THE COURT:  You may.

7   Q.  During the 2014/2015 time frame, Mr. Zelin, where were

8   these foreign fighters initially arriving in Turkey as a

9   general matter?

10  A.  They usually would come in through Istanbul which is, if I

11  could get the pointer on the screen.

12  Q.  Indicating the left-hand corner of the map?

13  A.  Yes.

14  Q.  Why Istanbul?

15  A.  Istanbul is a major thoroughfare between different parts of

16  the world in terms of where people would travel.  It's also

17  pretty easy to get there in terms of visa controls.  It's also

18  a huge tourist destination, so it's not necessarily seen as a

19  dubious place to go versus if you're trying to join up with a

20  jihadi group, say, in Afghanistan or Yemen if you tried to fly

21  to neighboring countries.

22  Q.  Are there particular cities in Turkey that were more

23  commonly used by these potential fighters to get into Syria?

24  A.  Yes.

25  Q.  What were they?

H1DFGAM2                          Zelin - direct

1   A.  They are cities like Gaziantep, Urfa, Reyhanli, Kilis,

2   among others.

3   Q.  Can you highlight where Gaziantep and Kilis are?

4   A.  There's Gaziantep, there's Kilis and Urfa, which is also

5   known as Sanliurfa, which it says in the map.

6   Q.  Can you highlight where Adana, Turkey is on the map?

7   A.  Right there.

8   Q.  So how would potential foreign fighters get from Istanbul

9   to these cities and then on to Syria?

10  A.  You could either drive there, take a train, take a plane

11  ride.

12  Q.  And how far is Gaziantep from Istanbul?

13  A.  About a ten to twelve-hour car ride or couple of hour plane

14  ride.

15  Q.  Were the border crossings in and around Gaziantep and those

16  areas used only by ISIS?

17  A.  No.

18  Q.  Based on your research, how long generally did it take or

19  does it take for ISIS recruits to get from Istanbul to

20  ISIS-controlled areas in Syria?

21  A.  It just depends on the particular security situation at the

22  time, but it can be anywhere from a few days to a month or two.

23  Q.  Have you studied what happened when recruits enter

24  ISIS-controlled territory?

25  A.  Yes.

1    Q.   What sources have you relied on for that?

2    A.   I've relied on sources from the Islamic State, both open

3    source as well as the leaked documents that I mentioned earlier

4    as well as defectors that have talked about the process since

5    they've left the Islamic State.

6    Q.   Is there kind of an in-processing that occurs?

7    A.   Yes.  They have a leader of the borders essentially like

8    when you get your visa stamped or something.

9    Q.   And what happens to them when they first get there?

10   A.   When you first get there and you talk to this border

11   control, they take a series of information from the individuals

12   as well as usually taking their cell phone and passport from

13   them.  From there, they'll then take you to a training course

14   where you have to learn the group's ideology.  After about a

15   three, four-week period, they'll then test you on whether

16   you've learned the proper ideology and education from the

17   Islamic State and from there they'll then take you on to a

18   military training camp and you'll conduct military types of

19   training.  If they see you're a really good fighter they then

20   might put you in some specialized military training after that.

21   Q.   What does the ideological training consist of?

22   A.   It primarily talks about what the Islamic State believes

23   in, their theology as well as political views.

24   Q.   And what if any information -- you said there were some

25   forms they have to fill out.  What if any information do

1  recruits have to give about next of kin?

2  A.  When they're at the border patrol they'll give a telephone

3  number of a parent, sibling, cousin, uncle, so on.  So in case

4  the individual gets killed they'll then call up the person and

5  let them know before it's leaked online by either the Islamic

6  State or the media reports on it.

7  Q.  You mentioned after the ideological training there's

8  military training?

9  A.  Yes.

10  Q.  Does everyone receive military training?

11  A.  Yes.

12  Q.  So how if at all did the movement of foreign fighters from

13  Turkey into Syria change between the beginning of 2015 and

14  mid-2015?

15  A.  It became a bit more difficult over that time period due to

16  the Turkish government beginning to crack down more forcefully

17  on the flow of foreign fighters into Syria.

18  Q.  Why did the Turkish government start to crack down more

19  forcefully?

20  A.  Part of it was related to the fact they were having their

21  own election that June of 2015 and therefore wanted to make

22  sure that the security situation was okay for that election,

23  but in addition to that, there was increased international

24  pressure from various countries for Turkey to stop their own

25  citizens from going in, especially the Europeans were concerned

1    about it.

2    Q.  And how would you describe ISIS's military operations in

3    northern Syria between, again, the beginning of 2015 and

4    mid-2015?

5    A.  That was sort of the time where they hit their apex or peak

6    and they had their first major loss around that period in the

7    city of Kobani, northern Kurdish village.

8    Q.  Kobani is in what country?

9    A.  It's in northern Syria.

10   Q.  Shifting topics, does ISIS have a flag or emblem?

11   A.  Yes.

12   Q.  How would you describe it?

13   A.  The flag was pitch black and then on the top of it it says

14   the first half of the Muslim testament of faith and on the

15   bottom half it has a circle with the second half of the Muslim

16   testament of faith in it, which is just the seal that the

17   Muslim prophet Mohamed used in his correspondence, sort of like

18   in medieval times when people used wax seals for

19   correspondence.

20   Q.  What significance does the flag have for ISIS?

21   A.  It's their official flag for their own state.  You'll see

22   it in their video messages, but also in the cities that they

23   control they'll have it on lampposts and different government

24   buildings in the same way that you'll see American flags on

25   government buildings and lampposts in parts of New York or

1   Washington, D.C. and other parts of the U.S.

2            MR. QUIGLEY:  Your Honor, may I approach?

3            THE COURT:  You may.

4   Q.  I'm handing you, Mr. Zelin, what's been marked for

5   identification as Exhibit 902.  Do you see where there appears

6   to be a flag in the background of that photo?

7   A.  Yes.

8   Q.  And what does that flag appear to be?

9   A.  That's the flag that the Islamic State uses.

10            MR. QUIGLEY:  Your Honor, the government offers

11   Government Exhibit 902.

12            MS. SHROFF:  No objection.

13            THE COURT:  902 will be received.

14            (Government's Exhibit 902 received in evidence)

15            MR. QUIGLEY:  May we publish it?

16            THE COURT:  You may.

17   Q.  Are you familiar with any hand gestures used by ISIS,

18   Mr. Zelin?

19   A.  Yes.

20   Q.  And what is that?

21   A.  The -- I should do the right hand.  The right hand is up

22   and the index finger is up and it's called isbah al-tawhid or

23   the finger of monotheism, which is essentially a representation

24   of there being one God in Islam.

25   Q.  Is that gesture exclusive to ISIS?

H1DFGAM2                          Zelin - direct

1    A.  No, it's not exclusive to them.

2            MR. QUIGLEY:  May I approach, your Honor?

3            THE COURT:  You may.

4    Q.  I'm handing you what's been marked for identification as

5    Government Exhibit 901.  Do you recognize the gesture in that

6    photo?

7    A.  Yes.

8    Q.  And whats that?

9    A.  That's the isbah al-tawhid that I just mentioned.

10           MR. QUIGLEY:  The government offers Government Exhibit

11   901?

12           MS. SHROFF:  Your Honor, may I have just one brief

13   voir dire question?

14           THE COURT:  Sure.

15   VOIR DIRE

16   BY MS. SHROFF:

17   Q.  Mr. Zelin, you have the photograph in front of you?

18   A.  Yes.

19   Q.  Could you tell from the photograph, sir, which hand is

20   holding up the monotheistic sign of one God?

21   A.  It's his left hand.

22           MS. SHROFF:  Thank you.  I have no objection.

23           THE COURT:  901 will be received.

24           (Government's Exhibit 901 received in evidence)

25           MR. QUIGLEY:  Can we publish that next to 903, which

H1DFGAM2                        Zelin - direct

1   is already in evidence?

2                THE COURT:  Okay.

3   BY MR. QUIGLEY:

4   Q.  Now, Mr. Zelin, what is the -- in your study of Islamic

5   terrorist groups, have you become familiar with some of the

6   religious terms and principles used to justify acts of

7   violence?

8   A.  Yes.

9                MR. QUIGLEY:  Ms. Quinones, can we put up Government

10  Exhibit 100ET, and go to page 59.  And highlight the entries of

11  13:06:55 and 13:07:17.  Can we move that to the side and put up

12  Government Exhibit 120AT at 24?

13  Q.  So in 120A, do you see where it says, Attiya says, "By

14  Allah, Gammal, if the situation in Iraq will continue the same

15  way and they will start winning then we will be like pimps if

16  we continue to be peaceful."

17               And Gammal says, "And before Iraq, jihad is a duty

18  Attiya."  Do you see that?

19  A.  Yes.

20  Q.  Could we put back up 100ET?  The page is up there from

21  100ET at the top.  And do you see where defendant says, "But I

22  have been with Sheik Ayman Anwar Awlaki, may Allah have mercy

23  on him if you know him, but I do not like to show the jihadi

24  personality."  Do you see that?

25  A.  Yes.

H1DFGAM2                          Zelin - direct

1   Q.  What is jihad?

2   A.  Jihad means to struggle or to strive, but in this they're

3   talking about military-type activities for their own ends.

4   Q.  Who is Sheik Ayman Anwar Awlaki?

5   A.  Sheik Ayman is a reference to Ayman al-Zawahiri, who is the

6   leader of Al Quada, and Anwar Awaki is a now dead former

7   spokesperson and propagandist for AQAP or Al Quada in the

8   Arabian Peninsula, which is based in Yemen.

9           MR. QUIGLEY:  Ms. Quinones, we can take those down and

10   go to 100 DT, to the entry on 8-10-14 on page 38.

11   Q.  Do you see the text, "Finally one of the Muslim Brotherhood

12   said something good."

13           And then it says, "May Allah give strength to the

14   mujahideen in Iraq.  It is a legitimate duty to stand by them,

15   for they are coming."  Who are the mujahideen?

16   A.  At that point the mujahideen in Iraq were just the Islamic

17   State.

18   Q.  What does mujahideen mean?

19   A.  Means a group of people striving, but in this case holy

20   warriors.

21   Q.  What about the term janna?

22   A.  Means paradise or heaven.

23   Q.  And it's spelled j-a-n-n-a?

24   A.  Yes.

25   Q.  And the terms kuffar or kuffir?

H1DFGAM2                         Zelin - direct

1   A.  Means disbelievers and infidels.

2              MR. QUIGLEY:  Ms. Quinones, could we put up Government

3   Exhibit 100 OT, page 2?  And looking at the entry the last two

4   entries on the page from 9:15:20 down to the bottom of the

5   page.

6   Q.  What does the worth "hadith" mean?

7   A.  Hadith is just the doings and sayings of the Muslim prophet

8   Mohamed from when he was alive.

9              MR. QUIGLEY:  If we go to the entry on -- sorry, we

10  can take that down, Ms. Quinones.  Thank you.  Could we put up

11  Government Exhibit 303?  Go to the entry on 6/28/15 at 1650,

12  which is on page 4, I believe.  Sorry, page 3.  Could you blow

13  up the entry at the bottom of the page?

14  Q.  And who was Sisi again?

15  A.  Sisi was the leader of the Muslim Brotherhood.

16  Q.  Who was Morsi?

17  A.  Morsi was the leader of the Muslim Brotherhood-led

18  government.

19  Q.  Now, Mr. Zelin, we asked you to review a number of videos

20  in this case.

21  A.  Yes.

22  Q.  Handing you what's been marked for identification as

23  Government Exhibit 12 and 13.  Do you recognize those?

24  A.  Yes.

25  Q.  And are those videos that you viewed in connection with

1   preparing for your testimony today?

2   A.  Yes.

3           MR. QUIGLEY:  Your Honor, the government offers

4   Government Exhibit 12 and 13.

5           MS. SHROFF:  Your Honor, subject to the prior record,

6   we have no objection.

7           THE COURT:  Very well, they will be received subject,

8   rather, over the defense objection.

9           MR. QUIGLEY:  These are among the documents we had

10  translated, so at this time I would ask to pass out binders to

11  the jury.

12          THE COURT:  Very well.

13          (Government's Exhibits 12 and 13 received in evidence)

14          THE COURT:  What exhibits will those be, the

15  transcript exhibits?

16          MR. QUIGLEY:  12T and 13T.

17          MS. SHROFF:  Your Honor, may we have a sidebar,

18  please?

19          THE COURT:  While those binders are being handed out.

20          (Continued on next page)

21

22

23

24

25

H1DFGAM2                              Zelin - direct

1          (At the side bar)

2          MS. MIRON:  Your Honor, at this point, this witness

3    has testified about multiple videos that he reviewed himself

4    and he's testified at length about the execution, shootings,

5    etc.  In addition, the government has already played three

6    videos to the jury.  The videos that the government has passed

7    out binders for are laptop binders and those were cached in

8    Mr. El Gammal's laptop.

9          We litigated this, but the rule that allows evidence

10   to be admitted in trial allows the Court to look at the

11   cumulative nature and the low probative value of the evidence.

12   We will provide testimony from our expert witness that there is

13   no record that he intentionally downloaded these videos.  In

14   fact, he was streaming through Facebook and others posted

15   videos.  They weren't there in their entirety and it's overly

16   prejudicial at this point for the jury to read about them and

17   view them.

18         MR. QUIGLEY:  Your Honor, this is briefed in the

19   motions in limine.  The Court ruled the videos admissible.  The

20   fact they were cached in his browser, that was one of the

21   arguments the defendant made and they obviously can make that,

22   the video expert, that argument to the jury.

23         THE COURT:  The objection is overruled.

24         (Continued on next page)

25

1          (In open court; jury present)

2          MR. QUIGLEY:  If everybody could turn in their binders

3   to Government Exhibit 12T and could we publish Government

4   Exhibit 12?

5          (Video shown)

6   Q.  So, Mr. Zelin, who put out this video?

7   A.  That video was put out by the Aleppo province media office

8   of the Islamic State.

9   Q.  How do you know that?

10  A.  Based off of -- it's hard to see it here, but there's a

11  logo here which says Halab, which is Aleppo in Arabic and then

12  at the beginning where it had that script in Arabic it said it

13  was from the Aleppo province media office, which is part of the

14  Islamic State.

15  Q.  What is this a scene of?

16  A.  It's a scene in a square somewhere in Aleppo province where

17  one of the members of the Islamic State is giving a speech

18  talking about different stories related to Islamic history that

19  they perceive as relevant to what was going on at the time and

20  then he also explains that if the United States lays one finger

21  essentially or spills one drop of blood of any of the soldiers

22  of the Islamic State that there will be retribution.

23  Q.  Can we go to page, take that down, please, and go to

24  Government Exhibit 13T in the binders?

25

1            MR. QUIGLEY:  Could we queue up 13, Ms. Quinones?

2            (Video shown).

3   Q.  Now, what's the, turning back to the symbol on the screen,

4   Mr. Zelin?

5   A.  That is the black flag of the Islamic State.

6   Q.  And do you recognize the speaker in that speech?

7   A.  Yes, it's Sheik Abu Mohamed Al Adnani, who is the official

8   spokesperson of the group which we mentioned yesterday

9   afternoon.

10  Q.  And the group being the Islamic State?

11  A.  Yes.

12           MR. QUIGLEY:  One moment, your Honor.  No further

13  questions.

14           THE COURT:  Should we take a break?

15           MS. SHROFF:  No, your Honor.

16           THE COURT:  Cross-examination.

17           MS. SHROFF:  Thank you.

18  CROSS-EXAMINATION

19  BY MS. SHROFF:

20  Q.  Good morning, Mr. Zelin.

21  A.  Good morning.

22  Q.  Mr. Zelin, during the course of your direct testimony, you

23  testified about various videos, correct?

24  A.  Yes.

25  Q.  And various newspaper articles, correct?

H1DFGAM2                          Zelin - cross

1    A.  Yes.

2    Q.  And as part of your preparation for your testimony here,

3    you reviewed with the government literature, correct?

4    A.  Could you be more specific about what you mean by

5    literature?

6    Q.  Sure.  They showed you some video clips, correct?

7    A.  Yes, a few.  Not everything, I don't think.

8    Q.  Right, but they showed you whatever was the subject of your

9    testimony, maybe more, maybe less, correct, is that fair to

10   say?

11             MR. QUIGLEY:  Objection.

12             THE COURT:  Overruled.

13   A.  Yes.

14   Q.  And, Mr. Zelin, it's also fair to say that none of that was

15   any surprise to you, right; you were very familiar with that

16   material?

17   A.  Well, I mean one of the videos was from Walgreens, which is

18   kind of weird, but, yes.

19   Q.  Could you tell me how you got a video from Walgreens?

20   A.  It was from I believe the client's hard drive.

21   Q.  It was from Walgreen's, though, which is the regular store?

22   A.  Yes.

23   Q.  And would it be fair to say that you're familiar with this

24   material because that is exactly how you do your research,

25   correct?

1   A.  Yes.

2   Q.  And you testified on direct, and you correct me if I'm

3   wrong, the way you start your research is you start to see what

4   the organization or the issue that you're researching itself

5   has posted, correct?

6   A.  Yes.

7   Q.  And then you said the next step would be you would check

8   the social media for that, correct?

9   A.  Well, I said that I check the local press in a particular

10  country.  So either Syria, Tunisia, Libya, so on and so forth.

11  Q.  So, for example, if you were researching ISIS on a

12  particular day, you would look at ISIS's Twitter feed, correct?

13  A.  Yes.

14  Q.  And you would also look at any newspaper articles in the

15  countries where ISIS is most vocal, correct?

16  A.  Correct.

17  Q.  And you said you don't have native fluency but you have

18  some fluency in Arabic, correct?

19  A.  Yes, I can read and do research with it.

20  Q.  You don't write Arabic?

21  A.  No.

22  Q.  So your next step would be, as you put it on direct, would

23  be to read what you had culled that day and put it in context

24  and compare it to what you had previously read about that

25  particular issue, correct?

1    A.  Yes.

2    Q.  And that's because this is a fluid, fluid process, right?

3    A.  Yes.  Things evolve and we get new information all the

4    time.

5    Q.  And things also evolve because there are so many entities

6    at play, correct?

7    A.  Yes.

8    Q.  So, for example, if you were just looking at the topic of a

9    particular day on the border of Syria and Turkey, you may read

10   about the Islamic State, correct?

11   A.  Yes.

12   Q.  You could read about Jabhat al-Nusra, correct?

13   A.  Yes.

14   Q.  You could read about the Free Syrian Army, correct?

15   A.  Yes.

16   Q.  You could read about any number of tribal groups that are

17   at each other's throat in that area, correct?

18   A.  Yes.

19   Q.  Would it be fair to say that there are a whole host of such

20   tribal groups, correct?

21   A.  Yes, although they all sort of operate in their own

22   particular locales or villages.  Especially with the Islamic

23   State, which is very authoritarian and totalitarian.  They

24   don't let other groups operate within their own territory, but

25   if you look at territories controlled by other groups they sort

H1DFGAM2                         Zelin - cross

1    of mix and mingle at times so there's less of an issue.

2    Q.  So the Islamic State has its own set of rules, correct?

3    A.  Yes.

4    Q.  And in the other provinces, because the Islamic State would

5    call them their reliats, correct?

6    A.  Yes.

7    Q.  And the tribal groups which fight among themselves have a

8    different set of rules with which they fight, correct?

9    A.  Yes.

10   Q.  Is it fair to say that there is, of course, an overarching

11   fight between Al Quada and ISIS, correct?

12   A.  Yes.

13   Q.  Two powerhouses that are fighting for control all the time,

14   correct?

15   A.  I wouldn't say all the time, but depending if they get up

16   to each other in a territory and they see it as a threat, yes.

17   Q.  And that relationship is a difficult and sometimes

18   confusing relationship, correct?

19   A.  Yes, it can be.

20   Q.  And it's fair to say in fact that at one point it was

21   ISIS's great hope that Jabhat al-Nusra would join them?

22   A.  Yes.

23   Q.  In fact, ISIS funded Jabhat so they would help them in

24   Syria?

25   A.  Yes.  That's what I testified yesterday.

1   Q.  And they gave them a whole bunch of money and said go in

2   and establish a presence for us, correct?

3   A.  Yes.

4   Q.  They told Jabhat al-Nusra that because Jabhat al-Nusra had

5   had a lot more of a presence in that region than ISIS had,

6   correct?

7   A.  Yes.

8   Q.  And they wanted to pave the way for ISIS?

9   A.  Yes.

10  Q.  And then al-Nusra said no can do?

11  A.  Yes.

12  Q.  And then al-Nusra said, you know what, we're going to go

13  back to Al Quada, correct?

14  A.  Yes.

15  Q.  Not something ISIS was expecting?

16  A.  Yes.

17  Q.  And you read all about this by reading the newspaper,

18  correct?

19  A.  Yes.

20  Q.  By looking at TV shows, correct?

21  A.  Yes.

22  Q.  Looking at TV channels in countries such as Lebanon, right?

23  A.  I don't know about like specifically Lebanon, but whatever

24  the media was inside of Syria in particular.

25  Q.  Okay, so let me go back to where I was in terms of your

H1DFGAM2                          Zelin - cross

1    research process.  As you learn about these things, you lecture

2    about them, correct?

3    A.  Yes, I have.

4    Q.  You yourself have YouTube videos, correct?

5    A.  Yes.

6    Q.  Some of which I watched.  And you also testify on such

7    topics, correct?

8    A.  Yes.

9    Q.  And you've testified once before, correct?

10   A.  Yes.

11   Q.  And you've testified in the case of United States v. Pugh,

12   correct?

13   A.  Yes.

14   Q.  That was a trial in the Eastern District of New York?

15   A.  Correct.

16   Q.  And you testified for the government, not the defense,

17   correct?

18   A.  Correct.

19   Q.  In fact you've never testified for the defense.

20   A.  Correct.

21   Q.  And the government, just like this government, paid for

22   your testimony?

23   A.  Yes.

24   Q.  Nothing wrong with that.  They paid you 350 bucks an hour?

25   A.  Yes.

1  Q.  And when you were maintaining your website, we'll talk

2  about this website a little bit more, it's called

3  jihadology.net, correct?

4  A.  Yes.

5  Q.  You testified it was an archive?  You tell me what it is.

6  A.  Yeah, it's just a primary source archive.  Essentially,

7  it's a library of content from different jihadist groups so

8  that individuals can access it for their own research.

9  Q.  And by primary source you mean documents that really

10  emanate out of the group, your research?

11  A.  Yes, the official video messages, statements, audio

12  messages, magazines, etc., etc., from the specific

13  organization.  It's not something that someone else is writing

14  about that particular group, but what they're actually putting

15  out themselves.

16  Q.  Now, let's just talk about ISIS just for a short time.

17  ISIS puts out its own set of rules and regulations, right?

18  A.  Yes.

19  Q.  It sets out, I don't know, is "manual" a correct word, a

20  manual as to how to reach ISIS, is that right?

21  A.  Yes.  They've released different content over time.

22  Q.  And what is that called, hijrah, right?

23  A.  Yes.

24  Q.  There is a pamphlet they put out, hijrah to the Islamic

25  State, what to do?

H1DFGAM2                        Zelin - cross

1    A.   Yes.  That was put out in 2015, I believe.

2    Q.   And there was a prior version of that correct?

3    A.   Yes.

4    Q.   And that's a manual telling people how to get to ISIS if

5    they want, correct?

6    A.   Yes.

7    Q.   And they give you, correct me if I'm wrong, a set of things

8    to do, right?

9    A.   Yeah, as well as potential scenarios.

10   Q.   So it tells you if you want to join ISIS this is how you

11   should get to us, right?

12   A.   Yes.

13   Q.   And it tells you how to buy your airline ticket, correct?

14   A.   Yes.

15   Q.   It tells you to buy a round-trip ticket, right, don't buy a

16   one-way ticket?

17   A.   Yes.

18   Q.   It tells you to book on a regular airline flight, correct?

19   A.   Yes.

20   Q.   Make sure you look happy and don't look stressed out in the

21   airport, correct?

22   A.   Yes.

23   Q.   And it gives such detailed instructions also about what to

24   bring, correct?

25   A.   Yes.

1   Q.  Tells you to bring a backpack?

2   A.  Yes.

3   Q.  A strong, sturdy backpack?

4   A.  Yes.

5   Q.  And it tells you what to put in the backpack?

6   A.  Yes.

7   Q.  Tells you to bring clothes, shoes, different types of

8   shoes, better or worse, correct?

9   A.  Yes.

10   Q.  And it also tells you what to do in case you want more

11   information, correct?

12   A.  Yes.

13   Q.  Directs you to a Twitter feed, correct?

14   A.  Yes.

15   Q.  And it lists for you literally the Twitter feeds on which a

16   person can go to get more information on how to get to ISIS,

17   correct?

18   A.  Yeah, at least that particular point.  One of the things --

19   Q.  Just yes or no is good.  You can explain later.  Just for

20   now, yes or no?

21   A.  Yes.

22   Q.  Now, let's talk about the Twitter and ISIS relationship,

23   shall we?  Is that good?

24   A.  Sure.

25   Q.  ISIS has its own Twitter channels, correct?

H1DFGAM2                          Zelin - cross

1   A.  They did previously.  Not at this juncture, but yes.

2   Q.  Let's just focus on the time period of 2014.

3   A.  Yes.

4   Q.  And in 2014 they definitely had a Twitter feed, correct?

5   A.  Yes.  They had various ones.

6   Q.  And they were very prolific on Twitter, right?

7   A.  Yes.

8   Q.  And they would invite people to join their Twitter feeds,

9   correct?

10  A.  Well, they'd invite people to have conversations with them,

11  yes.

12  Q.  They are an inviting group indeed, right?

13  A.  Pardon me?

14  Q.  They want people to come and learn about them?

15  A.  Yes.

16  Q.  That is the whole point of the ISIS media wing, correct?

17  A.  Yes.

18  Q.  And one of the things that makes ISIS so dangerous is its

19  ability to manipulate the media, correct?

20  A.  Yes.

21  Q.  And their media is very high level compared to Al Quada or

22  Jabhat al-Nusra or the Free Syrian Army or anybody else,

23  correct?

24  A.  Yes.

25  Q.  And they do this because they want, as you call them,

H1DFGAM2                         Zelin - cross

1   foreign fighters to have a feed on which they can go, correct?

2   A.  Yes.

3   Q.  And Twitter was one of those feeds, right?

4   A.  Correct.

5   Q.  In fact, you've written very many articles about ISIS and

6   Twitter, correct?

7   A.  Yes.

8   Q.  You've discussed ISIS personalities on Twitter, correct?

9   A.  Yes.

10  Q.  Shami Witness was one of those personalities you discussed?

11  A.  Yes.

12  Q.  Do you remember what you posted about Shami Witness, by the

13  way, on your Twitter feed?

14  A.  It depends what date you're talking about.

15  Q.  How about the one where it says, "People should pay

16  attention to this dude.  He knows his," and you can fill in

17  that word for me.

18  A.  Shit.

19  Q.  And you described him as being the most underrated Twitter

20  ISIS personality, correct?

21  A.  Yes.

22  Q.  And Shami Witness was somebody that people followed, right?

23  A.  Yes.

24  Q.  And people followed him because he spoke about the internal

25  workings of ISIS?

H1DFGAM2                    Zelin - cross

1    A.   He talked about various things that were going on.

2    Q.   Right.  He was a proponent of the Islamic State, right?

3    A.   Yes.

4    Q.   Now, as part of maintaining your website, which is

5    jihadology.net?

6    A.   Yes.

7    Q.   You also look at the Twitter feeds?

8    A.   Yes.

9    Q.   Of course you look for it with a different purpose.  I'm

10   not impugning your purpose in any way.

11   A.   Of course.

12   Q.   But you look at the feed, correct?

13   A.   Yes.

14   Q.   You look at the feed, you comment on it in your

15   jihadology.net?

16   A.   Yes.

17   Q.   Now, you're not an expert, are you, in terms of how other

18   people comment on ISIS Twitter feeds; you just know how you do

19   it?

20   A.   Yes.

21   Q.   And you don't know and you're not an expert either on how

22   people comment on ISIS on Facebook; you just do your work as

23   you would do it, correct?

24   A.   Yeah, and the Islamic State never has had an official

25   account on Facebook either, so --

H1DFGAM2                          Zelin - cross

1    Q.  That's true, but I'm just talking about people commenting

2    on ISIS on different social media.

3    A.  Yes.

4    Q.  And you yourself don't have actual access to the primary

5    source, correct?

6    A.  What do you mean by that?

7    Q.  Okay, so let's talk about it, let me see if I can make it

8    more specific.  At one point on your jihadology website you

9    posted regulations for the Mosul operations and this was in

10   December of 2015, '16, sometime around then.

11   A.  All right.

12   Q.  And what jihadology did was, you had a guest writer or a

13   guest poster on your blog, correct?

14   A.  Yes.

15   Q.  Should I call it a blog?  What should I say?

16   A.  I say website.

17   Q.  So you have many guest speakers on your website?

18   A.  Yes, I have people that guest.

19   Q.  And those people, are they chosen by you?

20   A.  Either that or I ask somebody to write something I think

21   will be interesting.

22   Q.  And one of the people who wrote on your website is a

23   gentleman called Aymenn Jawad al-Tamimi, correct?

24   A.  Yes.

25   Q.  He's a person who works out of London, correct?

1   A.  He did.  He lives in northern Israel now.

2   Q.  And he posted on your site?

3   A.  Yes.

4   Q.  And he has access, does he not, to primary source material?

5   A.  Yes.

6   Q.  And he's the one who posted on the Islamic, the unseen

7   Islamic regulations for the Mosul operations, correct?

8   A.  Yes.

9   Q.  And he also had various other documents that were primary

10  source documents, correct?

11  A.  Yes.

12  Q.  And is it fair to say that in all the countries that you

13  visited Turkey was not one of them?

14  A.  Correct.

15  Q.  And it's hard for you to go to Turkey, correct?  You

16  testified about that before.

17  A.  Yes.

18  Q.  And it's hard for you because you're a known personality

19  you've said?

20  A.  Yes.

21  Q.  And you have safety concerns, correct?

22  A.  Exactly.

23  Q.  So you yourself have never been to Turkey, right?  For

24  whatever reason it is, you've never been to Turkey, right?

25          MR. QUIGLEY:  Objection.

H1DFGAM2                          Zelin - cross

1              THE COURT:  Overruled.

2     A.  Yes.

3     Q.  And you've never obviously been, then, it's a silly

4     question, but I'll ask it nonetheless; Istanbul or Ufra,

5     Gaziantep or Kilis or any other part of Turkey, correct?

6     A.  Correct, but I know many colleagues, people who live there,

7     work there, so I do talk to them.

8     Q.  Of course.  I just wanted to make sure you've never been

9     there.

10    A.  Correct.

11    Q.  And you've never been to Syria, right?

12    A.  No, I have not.

13    Q.  Let's talk about this part of Turkey because you said

14    you're familiar with it.

15    A.  I'm familiar with it in terms of recruitment and foreign

16    fighters flows.

17    Q.  Let's talk about Gaziantep, because you talked about

18    Gaziantep, correct?

19    A.  Yes.

20    Q.  Gaziantep is major city in Turkey, correct?

21    A.  Yes.

22    Q.  The sixth largest city in Turkey, correct?

23    A.  Yes.

24    Q.  It is populated with individuals who are trying to leave

25    Syria, correct?

1   A.  Yes.

2   Q.  In fact, it is overflowing with refugees from Syria

3   correct?

4   A.  Yes.

5   Q.  The refugee population in Gaziantep is the highest refugee

6   population in Turkey, correct?

7   A.  I don't know off the top of my head.

8   Q.  How about one of the highest refugee populations in Turkey?

9   A.  Yes.

10  Q.  That is because Gaziantep has a whole bunch of refugee

11  camps in there?

12  A.  Yes.

13  Q.  They are refugee camps sponsored by the United Nations?

14  A.  Yes.

15  Q.  The camps provide homes for the Syrians who are displaced?

16  A.  Yes.

17  Q.  They provide schools for the Syrian children who are

18  displaced, correct?

19  A.  Yes.

20  Q.  Medical care for the Syrian people who are displaced,

21  correct?

22  A.  Yes.

23  Q.  Let me show you --

24          MS. SHROFF:  May I approach, your Honor?

25          THE COURT:  You may.

1            MS. SHROFF:  Just so the jury has a sense of -- your

2     Honor, may we show Defense Exhibit 700, please?

3            THE COURT:  Do you want to move it into evidence?

4            MS. SHROFF:  Yes.

5            MR. QUIGLEY:  No objection.

6            THE COURT:  It will be received.

7            (Defendant's Exhibit 700 received in evidence)

8     Q.  You recognize this map, right?

9     A.  Yes, it's southern Turkey.

10    Q.  And could you just point out for the jury, if you would,

11    where Kilis is?

12    A.  Here it is.

13    Q.  And then if you could just work your way all the way over

14    to where Urfa is?

15    A.  Urfa is here.

16    Q.  Let me direct your attention if I could to the second map,

17    which is Exhibit 701 and we ask that it be moved into evidence,

18    your Honor.

19            MR. QUIGLEY:  No objection.

20            THE COURT:  701 will be received.

21            (Defendant's Exhibit 701 received in evidence)

22    Q.  And now move to the third one -- actually, that's not the

23    right one I wanted, 701.  Your Honor, we move it into evidence,

24    702?

25            MR. QUIGLEY:  No objection.

1           THE COURT:  702 will be received.

2           (Defendant's Exhibit 702 received in evidence)

3   Q.  Do you see, do you recognize the cities there, sir,

4   Mr. Zelin?

5   A.  Yes, it looks like the different provinces in southern

6   Turkey.

7   Q.  And marked next to the different provinces are the

8   different refugee camps, correct?

9   A.  Yes, I would assume so, since's from the U.N. but I don't

10  independently study Syrian refugee camps.

11  Q.  That's true, but you just are very familiar with that

12  region, correct?

13  A.  Yes.

14  Q.  And in fact you have talked to lots of people who have

15  lived in that region, correct?

16  A.  Yes.

17  Q.  And you have spoken to lots of people who are exactly in

18  your field of work in that region, correct?

19  A.  Yes.

20  Q.  And of course having done all that research work you would

21  be familiar with the fact that southern Turkey, which is

22  reflected on that map there, has several Syrian refugee camps,

23  correct?

24  A.  Yes, of course.

25  Q.  I'm not going to belabor every one of them, but could we

H1DFGAM2                          Zelin - cross

1    just look at a couple if you don't mind?

2    A.  Sure.

3    Q.  Let's start with the refugee camp, if you could show the

4    area to the jury that would be most helpful to me, the refugee

5    camp near Gaziantep?

6    A.  So this is Gaziantep.  There's one there, one there, one

7    there, there's some here.

8    Q.  And how about Adana?

9    A.  Adana is right here and there's a refugee camp right here.

10   Q.  Thank you very much.  Now, you would agree, would you not,

11   that your research has also taught you that Turkey is having

12   trouble with the number and the influx of refugees into its

13   country, right?

14   A.  Yes.

15   Q.  Now, shifting topics a little bit, you have testified on

16   direct about some of ISIS's beliefs and rules, correct?

17   A.  Yes.

18   Q.  And it's fair to say, is it not, that ISIS is working

19   towards having a Sunni Islamic State, correct?

20   A.  Yes.

21   Q.  And who is the one group that they hate more than most?

22   A.  I mean, they pretty much hate everybody that disagrees with

23   them so it's hard to say specifically, to be honest.

24   Q.  How about the shiites?

25   A.  Yes, they dislike the shiite Muslims.

H1DFGAM2                         Zelin - cross

1    Q.  In fact, it is ISIS's position that the Shia Muslims are to

2    be despised the most, correct?  They are the apostates to them?

3    A.  Yes.

4    Q.  And the Shia live where?  Mainly in Iran?

5    A.  Yes, they are in Iran, but they are also in Iraq, southern

6    Lebanon, a majority in Bahrain and some in northern Lebanon.

7            THE COURT:  I'm sorry, I apologize for interrupting

8    but I believe the word "apostate" has been used and I don't

9    believe it's been defined for the jury.

10   Q.  I apologize, your Honor.  Mr. Zelin, go ahead.

11   A.  An apostate is somebody who is in this particular case not

12   a real Muslim or a true Muslim, so in this case it's legitimate

13   for groups like ISIS to spill their blood or kill them.

14   Q.  So that would include Iranians everywhere, correct?

15   A.  Yes.

16   Q.  The process by which ISIS legitimizes this is called

17   takfir, correct?

18   A.  Yes.

19   Q.  That is the killing of Muslims who do not follow the very

20   narrow interpretation of ISIS and how you should live under

21   their rules and regulations, correct?

22   A.  Yes.

23   Q.  Now, the one place in the world that no ISIS supporter

24   would want to live is Iran, correct?

25   A.  Most likely.

H1DFGAM2                          Zelin - cross

1    Q.  If a Shia Muslim moved into, as you called it, D'ala Al

2    Islamia, they would be killed, correct?

3    A.  Yes, if they knew that the individual was a shiite.

4    Q.  Now, one of the other rules and regulations that ISIS has

5    strong feelings about is smoking, correct?

6    A.  Yes.

7    Q.  ISIS believes that Islam and Islamic law prohibits smoking,

8    correct?

9    A.  Yes.

10   Q.  And you know that because you have studied ISIS's primary

11   source documents on that topic, correct?

12   A.  Yes.

13   Q.  And those documents are detailed in the rules about ISIS,

14   correct?

15   A.  Yes.

16   Q.  And they're promulgated by that rule, correct?

17   A.  Yes.

18   Q.  And ISIS has a very structured hierarchy, correct?

19   A.  Extremely structured.

20   Q.  And the rules are not open to debate, correct?

21   A.  Correct.

22   Q.  No discussion, correct?

23   A.  Yes.

24   Q.  In fact, the hijrah manual says listen and obey, correct?

25   A.  Yes.

1   Q.  And included in those regulations are rules about smoking,

2   correct?

3   A.  Yes.

4   Q.  It is forbidden to smoke, correct?

5   A.  Yes.

6   Q.  What is the punishment, by the way, for a person who would

7   smoke?

8   A.  I don't know the specific punishment off the top of my head

9   but it's possible they either whip them or kill them.

10  Q.  Now, all of these rules including the rule on smoking is

11  strictly enforced by hisbah, correct?

12  A.  Yes.

13  Q.  And hisbah is the word for the police in the Islamic State,

14  correct?

15  A.  Yes.

16  Q.  They have a hisbah car, they sit in the car, they drive

17  around and they police, correct?

18  A.  Yes.

19  Q.  And they stop the car wherever they feel like pointing out

20  breaking of the rules, correct?

21  A.  Yes.

22  Q.  So they drive down the streets of Syria and they see

23  somebody smoking, they effectuate punishment, correct?

24  A.  Yes.

25  Q.  And they have actually said -- by "they," of course, I mean

1    ISIS -- that smoking is forbidden in the Koran, correct?

2    A.  Yes.

3    Q.  And they have said smoking is forbidden in the Koran

4    because whoever sips poison will sip it in hellfire, right?

5    A.  Yes.

6    Q.  And they have also said that smoking is a slow suicide

7    under shariah law, correct?

8    A.  Yes.

9    Q.  And they have therefore banned smoking completely in the

10   Islamic State, correct?

11   A.  Yes.

12   Q.  And the veliyat al-Anbar which is one of the veliyat -- by

13   veliyat I mean province of the Islamic State --

14   A.  Yes.

15   Q.  -- has regulations which say if I catch you smoking, says

16   ISIS, you will be flogged to death, correct?

17   A.  Yes.

18   Q.  Now, another thing that ISIS simply does not appreciate at

19   all is voting, correct?

20   A.  Yes.

21   Q.  And ISIS believes that voting is unIslamic, is that right?

22   A.  Correct.

23   Q.  And the Muslims who vote, according to ISIS, are apostates,

24   correct?

25   A.  Yes.

H1DFGAM2                          Zelin - cross

1    Q.   And ISIS is opposed to voting because it's a sign of

2    democracy, correct?

3    A.   Yes.

4    Q.   And they're against democracy?

5    A.   Yes.

6    Q.   And ISIS believes only God can make laws, correct?

7    A.   Exactly.

8    Q.   And because you vote in a democracy and only God can make

9    laws, they conclude that voting is a crime against God?

10   A.   Yes.

11   Q.   Now, you yourself have published on jihadology.net a

12   document called the Murtad Vote, correct?

13   A.   It's possible.  I don't remember off the top of my head,

14   since I've published thousands of things on it.

15   Q.   That is true?

16   A.   But it sounds true.

17   Q.   Could you tell the jury what Murtad means?

18   A.   It just means an apostate.

19   Q.   I'm sorry?

20   A.   It means somebody who is an apostate.

21           THE COURT:  Ms. Shroff, it is now 11:00.  Let's break

22   for our morning break.  Ladies and gentlemen, please do not

23   discuss the case, do not read any media and do not do any

24   research.

25           (Recess)
             (Continued on next page)

H1D5gam3                          Zelin – cross

1          THE COURT:  Anything for me?

2          MR. QUIGLEY:  Not from the government, your Honor.

3          MS. SHROFF:  No, your Honor.  Thank you.

4          THE COURT:  15 minutes.

5          (recess)

6          THE COURT:  Can we bring the jury out?  Are you ready?

7          MS. SHROFF:  Yes, your Honor.  Thank you.

8          THE COURT:  Thanks.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Ms. Shroff?

3          MS. SHROFF:  Thank you, your Honor.

4    BY MS. SHROFF:

5    Q.  Mr. Zelin, working right off of your wonderful website,

6    Jihadology, you mentioned on it Al-Hayat Media Center, correct?

7    H-A-Y-A-T, correct?

8    A.  Yes.

9    Q.  And that is ISIS' main media?

10   A.  Yes, it is one of them.

11   Q.  I'm sorry?

12   A.  I said, yes, it is one of them.

13   Q.  Could you tell the jurors which others there are?

14   A.  Al-Furqan, Ajnad Media, al-I'tisam, and then their

15   provincial media offices.

16   Q.  Thank you.

17          And those media offices are responsible for

18   disseminating ISIS' rules and their propaganda material,

19   correct?

20   A.  Yes.

21   Q.  And it would be fair to say that ISIS has never encouraged

22   and would in fact discourage voting, right?

23   A.  Yes.

24   Q.  And ISIS' position is that anyone who votes has made

25   himself a rival to God, correct?

1    A.  Yes.

2    Q.  And they are therefore, no matter where they are in the

3    world, they are an apostate?

4    A.  Yes.

5    Q.  So, no matter where you are in the world you may not vote,

6    right?

7    A.  Correct.

8    Q.  And is it fair also to say that ISIS does not believe in

9    negotiating, right?

10   A.  Yes.

11   Q.  So it is not going to negotiate, for example, with Israel

12   and work out a peace treaty regarding Palestine, correct?

13   A.  Correct.

14   Q.  And I don't want to belabor this, but ISIS is of course

15   against and forbids adultery, correct?

16   A.  Yes.

17   Q.  No matter where you are, the law of ISIS is no adultery,

18   correct?

19   A.  Yes.

20   Q.  No gambling, correct?

21   A.  Yes.

22   Q.  No pornography, obviously.

23           Strict laws, all of these violations of any of these

24   three rules would get you beheaded, correct?

25   A.  Yes.

H1D5gam3                    Zelin - cross

1   Q.  Now, I apologize.  I covered this portion before but I

2   failed to just show you certain documents.

3           May I, your Honor?

4           THE COURT:  You may.

5   Q.  I would like to show you what is marked, with consent of

6   the government introduced as evidence Defendant's Exhibit 304

7   and 304-P.

8           THE COURT:  Very well.

9           MR. QUIGLEY:  I think it was 304-O and 304-P.

10          MS. SHROFF:  I'm sorry, 304-0.

11          THE COURT:  Very well.  Those will be received.

12          (Defendant's Exhibits 304-O and 304-P received in

13  evidence)

14  BY MS. SHROFF:

15  Q.  What does RT mean, Mr. Zelin?

16  A.  Retweet.

17  Q.  And can you tell the jury who ShamiWitness is, from your

18  knowledge?

19  A.  He is an individual that started to become more popular on

20  Twitter within the Islamist community around 2012, and over

21  time he became more and more radical, and by the time that he

22  was arrested, I don't remember the year, it was either -- I

23  think it was 2015, in India, he was pretty much a partisan of

24  ISIS.

25  Q.  And that's how he spells his name, right?

H1D5gam3                         Zelin - cross

1   S-H-A-M-IWitness, correct?

2   A.  Yes.

3   Q.  And here he is retweeting about ISIS, correct?

4   A.  Yes.

5   Q.  Okay.

6            And, Mr.  --

7            MR. QUIGLEY:  Objection.

8            THE COURT:  Overruled.

9   Q.  The account Elgorhythm is retweeting ShamiWitness, correct?

10  A.  Yes.

11  Q.  And you already testified from Mr. Quigley about the air

12  strikes on Kobane, correct?

13  A.  Yes.

14  Q.  Now, let me ask you this while we are talking about Kobane.

15           Did there come a time where, because of the bombings

16  on Kobane, that entry into Syria from Turkey shifted course?

17  A.  It became more difficult, at least on that border area,

18  since Kobani is a border town in Syria with Turkey.

19  Q.  Right; and by that point ISIS was -- and by that point I

20  mean 2013 and 2014 -- ISIS had very much intermingled with

21  other rebel groups in the area, correct?

22  A.  It depends which particular months you are talking about

23  because before January 2014 ISIS didn't have overt issues with

24  other groups.  It was only after that that there was overt

25  aggression between the factions because they realized that ISIS

H1D5gam3                          Zelin - cross

1   was more monopolizing.

2   Q.  Right.  I am talking about the period after February of

3   2015 -- '14.  My fault; February to '14.

4   A.  After February 2014 ISIS was not working with or involved

5   with other groups.

6   Q.  Right.

7           And they were constantly fighting the rebels in that

8   area, correct?

9   A.  Yes.

10  Q.  There were very distinct, as your website puts it, battle

11  lines and zones of control, correct?

12  A.  Yes.

13  Q.  And therefore, the only way to enter into Syria during that

14  time period was Jarablus and Tell Abyad, am I pronouncing it

15  correctly?

16  A.  Yes, Jarablus and Tell Abyad.

17  Q.  And it is only after 2015 then that Tell Abyad closed as a

18  border, correct?

19  A.  Yes.

20  Q.  And that's because the Turkish forces seized it in 2015,

21  correct?

22  A.  Yes.

23  Q.  So, 2014 onward the point of entry, really, was Jarablus

24  and Tell Abyad, and then that shifts again, correct?

25  A.  Well, at least the official ones.  Of course people were

H1D5gam3                         Zelin - cross

1   also crossing the border illegally.

2   Q.  Of course.

3   A.  So, they weren't at official checkpoints, so.

4   Q.  But at this point hijrat -- hijrat was --

5          MR. QUIGLEY:  Objection.  To what point we are talking

6   about?

7          THE COURT:  We will get to it.  She is still in the

8   middle of a question.

9   Q.  I was just talking about after February of 2014 until early

10  2015, ISIS was recommending that people enter through Jarabulus

11  and Tell Abyad?

12  A.  Yes.

13  Q.  The city -- you know what?  It's okay.

14         Now, going back and staying with the region of

15  northern Syria, correct, would I be correct in saying that ISIS

16  was opposed to any of its members leaving ISIS and going back

17  into the western world?

18  A.  No.

19  Q.  Did ISIS want its supporters, did it encourage them to

20  defect?

21  A.  No, but they allowed people to leave for medical care to

22  visit family, but also they dispatched individuals to go back

23  home to conduct terrorist attacks.

24  Q.  I apologize.  I should have been much more clear.

25         What I meant is if you were a member of ISIS and you

1   decided you no longer wanted to be part of the group, ISIS

2   would not let you go, correct?

3   A.  Yes.

4   Q.  And is it fair to say that ISIS would in fact kill you if

5   they found out you were trying to leave, correct?

6   A.  It is a possible.

7   Q.  Well, what would --

8   A.  They could imprison you also, but yes.

9   Q.  So, it is a certainty that they would not sanction it,

10  correct?

11  A.  Yes.

12  Q.  It is a certainty that they would not ever allow it,

13  correct?

14  A.  Yes.

15  Q.  But it's unclear to you whether they would imprison you,

16  flog you, or kill you, correct?

17  A.  Yes.

18  Q.  And that is because ISIS believes in the message of its

19  caliphate, correct?

20  A.  Yes.

21  Q.  And it believes that the caliphate is a refuge, correct?

22  A.  Yes.

23  Q.  And no one should ever dare to leave that refuge, correct?

24  A.  Yes.

25  Q.  And to leave the caliphate would be to leave the land of

1    believers for the non-believers, correct?

2    A.  Yes.

3    Q.  And, again, around the same time period, and I am talking

4    about 2014 to 2015, that time period, right along the same

5    border there were other militant groups at play, correct?

6    A.  Yes.

7    Q.  And, Jabhat al-Nusra you have already talked about, right?

8    A.  Yes.

9    Q.  Al Said you have already talked about?

10   A.  Yes.

11   Q.  The Free Syrian Army was also at play over there, correct?

12   A.  Yes.

13   Q.  And how about YPG?  Was that also at play over there?

14   A.  Yes.

15   Q.  Can you tell the jury what YPG is?

16   A.  It is a Kurdish, non-state, militant actor that's

17   essentially the group that's fighting on behalf of the Kurds in

18   Northeastern Syria.

19   Q.  And they were also fighting ISIS, correct?

20   A.  Yes.

21   Q.  And is it fair to say that their goal was to free the

22   Syrian people?

23   A.  No.

24   Q.  What was their goal?

25   A.  Their goal is to connect the different Kurdish cantons in

H1D5gam3                              Zelin - cross

1    northern Syria so they can create a band of Kurdish territory

2    to eventually create their own Kurdish state.

3    Q.  Right; so get away from the Islamic State, correct?

4    A.  Yes.

5    Q.  Form their own place to live, correct?

6    A.  Yes.

7    Q.  So, their goals were also anti-ISIS, correct?

8    A.  Yes; very much so.

9    Q.  And they also wanted to get away from ISIS' control,

10   correct?

11   A.  Yes.

12   Q.  And would it be fair to say that Americans in the United

13   States would support that movement?

14   A.  Yes.

15   Q.  Okay.

16        The Free Syrian Army, they supported a secular state,

17   correct?

18   A.  I don't know about secular, but nationalist.

19   Q.  And by nationalist, what do you mean by nationalist?

20   A.  Something that's for Syrians, it is not necessarily for a

21   particular ideological program like Islamism but more just a

22   general state.

23   Q.  Right.

24   A.  A civilian state.

25   Q.  So they were also anti-ISIS, right?

H1D5gam3                        Zelin - cross

1    A.  Yes.

2    Q.  And all of these groups are fighting right along exactly

3    the same border that we have been talking about, correct?

4    A.  Yes.  Different areas of the border, but yes.

5    Q.  Sure.

6           Now, you have testified as to how ISIS had networks

7    everywhere, correct?

8    A.  Yes.

9    Q.  And that, of course, includes Turkey, right?

10   A.  Yes.

11   Q.  And we are still, just so that we are clear, it is the same

12   time period I am talking about, okay?

13   A.  Yes.

14   Q.  Now, you would you say, and correct me if I am wrong, that

15   ISIS had about 200 networks within Turkey at that time?

16   A.  I have no way of independently assessing that.

17   Q.  Okay.

18          Given your position as an expert in the field of

19   jihaddism, how many networks do you think ISIS had within

20   Turkey?

21   A.  It is hard to say since it is a clandestine organization

22   and they're not going to publicly talk about security

23   operations that they're planning to do.  Usually you only find

24   out about certain things if there are actual attacks and the

25   governments arrest or there are preemptive arrests and they

1   break up plots.

2   Q.  So, would it be fair to say though, and I don't want to put

3   words in your mouth, that ISIS had a fairly underground and

4   active presence in Turkey?

5   A.  Yes.

6   Q.  And they had an active presence in Ankara, correct?

7   A.  Yes.

8   Q.  And Ankara is a major city in Turkey, correct?

9   A.  Yes.  It is the capital.

10          MR. QUIGLEY:  Objection to the lack of time period.

11          MS. SHROFF:  I'm sorry?  I didn't hear that.

12          THE COURT:  The lack of time period.

13          MS. SHROFF:  It is the same time period we have been

14   talking about, 2014 to early 2015.

15          THE COURT:  Okay.

16          MS. SHROFF:  No change in the time period.  Okay?

17   Q.  And the same question for Istanbul, is that correct?

18   A.  Yes, they had networks in Istanbul.

19   Q.  And they had networks because one of the things they wanted

20   to do was recruit foreign fighters from those places, correct?

21   A.  Yes, amongst other aims; but yes.

22   Q.  Of course.

23          And now you have testified already on direct, did you

24   not, that there were many reasons why people joined ISIS,

25   correct?

H1D5gam3                          Zelin - cross

1   A.  Yes.

2   Q.  In fact, I think you gave a speech that was on YouTube

3   where you listed five or six different reasons why a person

4   would join ISIS, correct?

5   A.  Yes.

6   Q.  And one of them, interestingly enough, was trouble with

7   girls, correct?

8   A.  I don't believe it was specific to that but it was more

9   related to personal issues or past criminal activities.

10  Q.  Okay.

11          Didn't you also say on your -- may I, your Honor?

12  Just one second.

13          THE COURT:  Sure.

14          (counsel conferring)

15  BY MS. SHROFF:

16  Q.  Do you recall posting on YouTube a video where you said

17  one, amongst other reasons, people join ISIS is because it was

18  easily accessible, correct?

19  A.  Yes.

20  Q.  You recall that speech you gave where you said it is very

21  different from going to, like, Pakistan or Afghanistan,

22  correct?

23  A.  Yes.

24  Q.  You go to a major city like Istanbul, it is a tourist spot,

25  easy to get to, correct?

H1D5gam3                          Zelin - cross

1    A.   Yes.

2    Q.   Tickets are freely and cheaply available you said?

3    A.   Yes.  I was talking in the context of Europe I think but

4    it's probably cheap in other areas as well.

5    Q.   Okay.  And it holds true for other people also, right?

6    Because it is easier to get to Turkey, according to your

7    speech, than it is to Afghanistan?

8    A.   Yes.

9    Q.   And one of the other reasons you said people join is

10   because it gives them a sense of fraternity, correct?

11   A.   Yes.

12   Q.   And by fraternity you mean brotherhood, oneness; correct?

13   A.   Yes.

14   Q.   And it makes somebody feel like they have cohorts and

15   colleagues around them with the same sentiment and same warm

16   and fuzzy feel, correct?

17   A.   Yes.

18   Q.   And one of the other reasons you said was because it

19   allowed men to marry, correct?

20   A.   Yes.

21   Q.   It allowed them to have a wife, correct?

22   A.   Yes.

23   Q.   And it allowed them to have a wife at far earlier an age

24   than they would otherwise be able to get in their own

25   countries, correct?

1   A.  Yeah, in the context of the Arab world mostly.

2   Q.  Right.

3        And the same would hold true if you were having

4   difficulty getting a girl for any other reason in a non-Arab

5   country, the motivation is the same, you could get married in

6   ISIS, correct?

7   A.  Yes, it is possible.

8   Q.  You could get married, it is not just possible.  There are

9   all sorts of rules.

10  A.  I was talking more in the differences between, say, trying

11  to get a girlfriend or marriage in the U.S. or Europe versus in

12  the Arab world, just because the economic barriers and

13  conditions in the Arab world are of course different than in

14  western countries.

15  Q.  Of course.

16       The reasons an Arab man may not be able to marry could

17  be different from why a western man could not marry, right?

18  A.  Yes.

19  Q.  So, an Arab man may not be able to get married, as you said

20  on your website -- not open your website, on YouTube, because

21  they didn't have a job I think you said, and didn't have enough

22  money to support a family, correct?

23  A.  Yes.

24  Q.  And they wouldn't have that problem in ISIS, correct?

25  A.  Correct.

H1D5gam3                    Zelin - cross

1    Q.   And a man in the western world who had difficulty with
2    women would still have the same solution in an ISIS state,
3    correct?
4    A.   Yes.
5    Q.   He could still get a girl, correct?
6    A.   Yes.
7    Q.   He could still marry, correct?
8    A.   Yes.
9    Q.   And in fact the Islamic state has a whole set of rules
10   about how you can get married, correct?
11   A.   Yes.
12   Q.   And even if the woman is the one traveling and doing hijra,
13   she can tell someone how she wants to get married, correct?
14   A.   Correct.
15   Q.   She can say on the application form that they have I want
16   to get married, correct?
17   A.   Yes.
18   Q.   They would put her in a house that allowed for women who
19   are waiting to get married, correct?
20   A.   Yes.
21   Q.   She would look at the man or the man would look at her
22   through her hijab, niqab and hands, correct?
23   A.   Yes.
24   Q.   They would say yes or no to each other, correct?
25   A.   Yes.

H1D5gam3                          Zelin - cross

1   Q.  Seek permission from the marriage committee, correct?

2   A.  Yes.

3   Q.  And you are done, correct?

4   A.  Yes.

5          MS. SHROFF:  Your Honor, may I just have a moment,

6   please?

7          THE COURT:  Sure.

8          MS. SHROFF:  Thank you.

9          (Counsel conferring)

10  BY MS. SHROFF:

11  Q.  Mr. Zelin, I think you already testified about this but I

12  just want to make sure I understand this.  Dabiq was an

13  Islamic -- I withdraw that.

14          You tell them what Dabiq is, could you?

15  A.  Dabiq is just the city in northern Syria that has residents

16  within Islamic military and thought essentially related to end

17  times prophecy where there will be a great battle there between

18  the so-called crusaders and the real Muslims and therefore, for

19  the Islamic State, which was partially apocalyptic.  It was

20  relevant for them to take over the territory but also invoke it

21  in their own propaganda as a recruitment tool to say that the

22  signs are here and that there could be the end of times.

23  Q.  And they put out a magazine with that city's name as the

24  name of the magazine, right?

25  A.  Yes.

H1D5gam3                          Zelin - cross

1   Q.  And that was in existence until when?

2   A.  I believe they stopped -- or they haven't released any new

3   issues in the past half year.

4   Q.  And at one point they changed the name of the magazine,

5   right?

6   A.  It's believed that after they lost the City of Dabiq that's

7   one of the reasons why their main English language magazine is

8   now just called Rumiya or Rome, but that's only been in the

9   last six months.

10  Q.  Right.

11          So, prior to the six-month time frame the ISIS

12  magazine was called Dabiq, right?

13  A.  Well, the English language one.  They have ones in other

14  languages as well, but yes.

15  Q.  In these magazines ISIS put out what was their ideology,

16  correct?

17  A.  Yes.

18  Q.  They put out what they thought about other countries,

19  correct?

20  A.  Yes.

21  Q.  And they put out what they thought about other fighter

22  groups, correct?

23  A.  Yes.

24  Q.  They put out what they thought were the rules and

25  regulations by which to live by, correct?

1   A.  Yes.

2   Q.  And then they put out the attacks that they were proud of

3   or thought emanated from their doing, correct?

4   A.  Yes.

5   Q.  Now, Mr. Quigley on direct here had you testify about the

6   Paris attacks, correct?

7   A.  Briefly.

8   Q.  Could you tell us when they were?

9   A.  The Paris attacks were in November 2015 -- at least the

10  main ones.  Of course there was an attack in January 2015 as

11  well, but the one that I was specifying was in November 2015.

12  Q.  November of 2015, correct?

13  A.  Yes.

14  Q.  Okay.

15          MS. SHROFF:  May I have a second, your Honor?

16          THE COURT:  Yes.

17          (Counsel conferring)

18  BY MS. SHROFF:

19  Q.  I just have a final few questions.

20          Mr. Zelin, I referred many times to your website

21  jihadology, correct?

22  A.  Yes.

23  Q.  But you and I have never spoken before, correct?

24  A.  Correct.

25  Q.  And you and I had no prep session before, correct?

H1D5gam3                    Zelin - redirect

1   A.  Correct.

2   Q.  And you and I didn't view any videos together, correct?

3   A.  Correct.

4   Q.  And you and I didn't go over any chats together, correct?

5   A.  Correct.

6   Q.  And I didn't show you any chats where Baghdad was part of

7   the chat and asked you which country it is the capital of,

8   correct?

9   A.  Yes.

10  Q.  That was all your prep with the government, correct?

11  A.  Yes.

12          MS. SHROFF:  Thank you very much, sir.  I have no

13  further questions.

14          THE COURT:  Redirect?

15          MR. QUIGLEY:  Thank you, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. QUIGLEY:

18  Q.  Mr. Zelin, you were asked some questions about somebody

19  named ShamiWitness; do you recall that?

20  A.  Yes.

21  Q.  And he, I think you said he eventually became an ISIS

22  proponent or supporter?

23  A.  Yes.

24  Q.  How would you describe the evolution of his views over

25  time?

H1D5gam3                    Zelin - redirect

1   A.   Originally, when he came online he was more just garden

2   variety Islamist, pro Muslim Brotherhood.  But then, after the

3   Egyptian coup as well as then the announcement of ISIS'

4   caliphate, he became more and more radical as well as him, I

5   assume, seeing a lot of the slaughter that happened inside of

6   Syria against Sunni Muslims and therefore, by the time of his

7   arrest, he was an ISIS partisan.

8   Q.   And while he was posting online throughout his online

9   career, if you will, where did people believe he lived?

10  A.   Most people believed that he was a Libyan based in the

11  United Kingdom.

12  Q.   Where did it turn out he lived?

13  A.   He was living in India.

14  Q.   And he worked in an office?

15  A.   Yes.

16  Q.   Went to Hawaiian pizza parties?

17  A.   According to the Indian media, yes.

18  Q.   He had a normal job?

19  A.   Yes.

20         MS. SHROFF:  Objection to normal job.

21         THE COURT:  Sustained as to form.

22  Q.   He had an office job?

23  A.   Yes.

24  Q.   How many online ISIS supporters would you say there are

25  throughout the world?

H1D5gam3                       Zelin - redirect

1   A.   During the time period, probably tens of thousands.

2   Q.   And how many people live in ISIS-controlled territory?

3   A.   Millions.

4   Q.   And of those millions -- of the tens of thousands of online

5   supporters, does every one of those people follow Shariah law

6   to a T?

7   A.   No, because most of them don't necessarily live inside of

8   the Islamic State's territory.

9   Q.   And even within the Islamic State's territory -- well,

10  Ms. Shroff talked to you about something called the police in

11  the Islamic State territory?

12  A.   Yes.

13  Q.   The Hisbah?

14  A.   Yes.

15  Q.   And the reason there is a Hisbah is because people

16  sometimes break the rules, right?

17  A.   Yes.

18  Q.   And even among -- even within -- so, for example,

19  Ms. Shroff asked you that the Islamic State has had -- has

20  strict laws against pornography, for example, right?

21  A.   Yes.

22  Q.   And it has been publicly reported, has it not, that large

23  caches of pornography have been found on computers captured

24  from ISIS?

25  A.   Yes.

H1D5gam3                         Zelin - redirect

1    Q.   They have -- ISIS has strict laws against adultery, right?

2    A.   Yes.

3    Q.   But ISIS is also prolific in the sex slave trade, right?

4    A.   Yes.

5    Q.   You were asked some questions about Iran, do you recall

6    that?

7    A.   Yes.

8    Q.   Iran is mainly a Shiite country?

9    A.   Yes.

10   Q.   Are there Sunnis in Iran?

11   A.   Yes.

12   Q.   Are you aware of any Sunni militant jihadists individuals

13   that live in Iran?

14        MS. SHROFF:   Objection.   Outside the scope of his

15   expertise.

16        THE COURT:   Overruled.

17   A.   Yes, there have been some militants that have tried to

18   conduct attacks in Iran.

19   Q.   Were senior Al Said figures living in Iran at some point?

20   A.   Yes; and I believe some still do.

21   Q.   You were asked some questions about relief groups operating

22   in the Turkey and Syria region?

23   A.   Yes.

24   Q.   Do any of those groups operate in areas controlled by ISIS?

25   A.   No.

1   Q.  Why is that?

2   A.  Because the Islamic State doesn't view them as legitimate.

3           MR. QUIGLEY:  One moment, your Honor?

4           THE COURT:  Yes.

5           (counsel conferring)

6           MR. QUIGLEY:  No further questions.

7           THE COURT:  Very well.

8           MS. SHROFF:  May I, your Honor?

9           THE COURT:  You may.

10          MS. SHROFF:  Thank you.

11  RECROSS EXAMINATION

12  BY MS. SHROFF:

13  Q.  His name was Mehdi Biswas, right?

14  A.  Yes.  I think it is Mehdi Biswas.

15  Q.  M-E-H-D-I?

16  A.  Yes.

17  Q.  Biswas, B-I-S-W-A-S; right?

18  A.  Yes.

19  Q.  And there was a lot of controversy over whom ShamiWitness

20  was, correct?

21  A.  Yes.

22  Q.  And there were articles written incessantly over whether or

23  not one person's interpretation of who he was was correct over

24  another, correct?  Yes or no?

25  A.  It is possible.  I don't recall specifically since that was

1   a couple years ago.

2   Q.  It was a couple years ago and they were articles that you

3   retweeted on your Twitter feed, correct?

4   A.  Yes.

5   Q.  Okay.

6           You had a Twitter feed that said who is ShamiWitness,

7   correct?

8   A.  Yes.

9   Q.  And you had a Twitter feed that said ShamiWitness debunked,

10  correct?

11  A.  Yes.

12  Q.  And, ShamiWitness nobody knows.  You have certainly never

13  met him right?

14  A.  Correct.

15  Q.  Us have never to Bangor, India, correct?

16  A.  Correct.

17  Q.  You never went to his office, correct?

18  A.  Correct.

19  Q.  And, in fact, you were not sure if that story was correct

20  which is why there was a Twitter feed called ShamiWitness

21  debunked, correct?

22  A.  I honestly don't recall.

23  Q.  All right.

24          Now, Mr. Quigley talked to you, did he not, about

25  Shariah law, correct?

1   A.  Yes.

2   Q.  And he said that -- adultery versus sex slaves was

3   something he questioned you about, correct?

4   A.  Yes.

5   Q.  ISIS views sex slaves as perfectly proper, correct?

6   A.  Yes.

7   Q.  In fact, they encourage sex slaves, correct?

8   A.  Yes.

9   Q.  So, ISIS would not consider sex slaves adultery, correct?

10  A.  Yes.

11  Q.  Adultery they would push by flogging correct?

12  A.  Yes.

13  Q.  Sex slaves are welcome in ISIS; is that not right, sir?

14  A.  Yes.

15  Q.  And that rule would hold true for pornography too, correct?

16  A.  In terms of?

17  Q.  In terms of what western culture sees as permissible ISIS

18  would not, correct?

19  A.  Yes.

20  Q.  And if ISIS did not it would not matter whether sex slaves

21  were abhorred by the western world, correct?

22  A.  Yes.

23  Q.  Nor would it matter to ISIS that adultery was sanctioned --

24  I mean, pornography was sanctioned by the western world,

25  correct?

1    A.   Yes.

2    Q.   Now, Mr. Quigley talked to you about Iran, correct?

3    A.   Iran, yes.

4    Q.   Right.

5         And is it your testimony, sir, that an average Sunni

6    would go and live in Iran?

7    A.   Pardon me?

8    Q.   Would an average Sunni citizen, a Sunni Muslim be it from

9    Iran, India, Pakistan, any of those countries; would they go

10   live in Iran?

11   A.   I can't speculate about that specifically.  I mean I

12   haven't, like, asked --

13   Q.   It is not your field of expertise, right, where Sunni

14   Muslims live?

15   A.   I mean, I know where Sunni Muslims live and there is a

16   Sunni population that does live in Iran.

17   Q.   Right, a very tiny Sunni population or big population?

18   A.   It is a minority.

19   Q.   Okay.

20        So there is still a Sunni population in Iran it is

21   your position, right?

22   A.   Yes.

23   Q.   Okay.

24        So, let me see if I get this right.  If a Sunni Muslim

25   wanted to live in Iran, would it be fair to say that Sunni

1    Muslim could not be pro ISIS?

2              MR. QUIGLEY:  Objection.  Outside the scope.

3              THE COURT:  Overruled.

4    Q.  Correct?

5    A.  I mean, it is just speculation.

6    Q.  Of course, but you have testified ISIS hates Sunni,

7    correct?

8    A.  Well, they dislike Sunnis that have a different idea than

9    them.  That's all.

10   Q.  Right.  So, they dislike Sunnis.  So, if a Sunni were to go

11   live in Iran, that Sunni is not likely to be an ISIS supporter,

12   correct?

13             MR. QUIGLEY:  Objection.  Calls for speculation.

14             THE COURT:  Overruled.

15   A.  Yes, but at the same time I'm talking about Sunnis that

16   were born in Iran, not Sunnis that have moved.  That's what we

17   are talking about.

18   Q.  No, no.  I'm only talking about Sunnis that are moving,

19   sir?

20   A.  Okay.

21   Q.  Not Sunnis born in Iran; forget about them, I'm not

22   interested in them.

23   A.  Okay.

24   Q.  Now, you also testified, when Mr. Quigley was questioning

25   you, that there were al Qaeda operatives in Iran, correct?

1   A.  Yes.

2   Q.  And is it fair to say, sir, that almost all of the al Qaeda

3   operatives that were living in Iran were living in prison,

4   correct?

5   A.  Not all of them.

6   Q.  Not all of them, right?  But a huge number of them?

7   A.  I don't know off the top of my head but I know that some

8   were in prison, some were under house arrest.

9   Q.  Some were in prison so and some were under house arrest, is

10  that correct?

11  A.  Yes.

12  Q.  Sulaiman Abu Ghaith was in prison for a while, correct?

13  A.  Yes.

14  Q.  And then they released him into house arrest, correct?

15  A.  Yes.

16  Q.  Then they allowed him to live in a camp, correct?

17  A.  Yes.

18  Q.  He got married in that camp, correct?

19  A.  I don't know off the top of my head.

20  Q.  He had children in that camp?

21          MR. QUIGLEY:  Objection.  Outside the scope of

22  redirect.

23          THE COURT:  Overruled.

24  A.  If he had a wife I would assume he possibly could have had

25  children.

H1D5gam3

1    Q.   And, in fact, Iran had a almost double life with al Qaeda,

2    correct?

3    A.   Yes.

4    Q.   On the surface they said they were anti al Qaeda but nobody

5    really knew what was going on, correct?

6    A.   Yes.

7            MS. SHROFF:   Thank you very much.  I have nothing

8    further.

9            MR. QUIGLEY:   No further questions, your Honor.

10           THE COURT:   Mr. Zelin, you may step down.

11           THE WITNESS:   Okay.

12           THE COURT:   Government, please call your next witness.

13           MS. TEKEEI:   Your Honor, we ask to publish the Court's

14   judicial notice of ISIS.

15           THE COURT:   Very well.

16           MS. TEKEEI:   Government Exhibit 1006.

17           THE COURT:   You can proceed.

18           MS. TEKEEI:    Thank you, your Honor.

19           The Court hereby takes judicial notice that the

20   Islamic State of Iran and the Levant, including its aliases the

21   Islamic State of Iraq and el-Sham, the Islamic State of Iraq

22   and Syria, al Dawla al Islamiyah, fi al-Iraq wa sh-Sham, Daesh,

23   Dawla al Isalmiya, Al Furqan Establishment for Media

24   Production, Islamic State, ISIL and ISIS is a designated

25   foreign terrorist organization and has been designated a

1    foreign terrorist organization by the United States secretary

2    of state since October 15, 2004.

3              Your Honor, the government calls Renata Lewis.

4              THE COURT:  Please step into the witness box and

5    remain standing.

6     RENATA LEWIS,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9              THE COURT:  Please, be seated, pull your chair up to

10   the microphone, and please begin by stating your full name and

11   spelling your last name for the record.

12             THE WITNESS:  Renata Lewis.  L-E-W-I-S.

13   DIRECT EXAMINATION

14   BY MS. TEKEEI:

15   Q.  Ms. Lewis, where do you work?

16   A.  Verizon Wireless.

17   Q.  What is Verizon Wireless?

18   A.  A telecommunications company.

19   Q.  What is your title at Verizon Wireless?

20   A.  I'm a custodian of record.

21   Q.  How long have you been working there?

22   A.  14 years.

23   Q.  And in your work as a custodian of records at Verizon

24   Wireless, what is it that you do?

25   A.  Authenticate Verizon Wireless' records pursuant to legal

1    request.

2    Q.   What types of services does Verizon provide?

3    A.   Cell phone service, mobile devices.

4    Q.   And in your work at Verizon, have you become familiar with

5    the types of records Verizon keeps in the regular course of its

6    business?

7    A.   Yes.

8    Q.   In preparation for your testimony here today, have you

9    reviewed records that Verizon provided in connection with legal

10   process in this case?

11   A.   Yes, I have.

12           MS. TEKEEI:  Your Honor, may I approach?

13           THE COURT:  You may.

14   Q.   I have handed you what is marked for identification as

15   Government Exhibits 510, 511 and 512.  Do you recognize those

16   documents?

17   A.   Yes, I do.

18   Q.   How do you recognize them?

19   A.   I reviewed them prior to coming here today.

20   Q.   Are the records contained on Government's Exhibits 510, 511

21   and 512 true and accurate copies of Verizon records?

22   A.   Yes.

23   Q.   Does Verizon maintain these records in the regular course

24   of business?

25   A.   Yes.

H1D5gam3                        Lewis – direct

1    Q.  Is it the regular practice of Verizon to maintain these

2    records?

3    A.  Yes.

4    Q.  Are these records generated at or near the time of the

5    events they reflect therein?

6    A.  Yes.

7           MS. TEKEEI:  The government offers Government's

8    Exhibits 510, 511, and 512.

9           MS. MIRÓN:  Your Honor, may I voir dire briefly?

10          THE COURT:  Sure.

11   VOIR DIRE EXAMINATION

12   BY MS. MIRÓN:

13   Q.  There are call detail records in one of those exhibits,

14   right?

15          THE COURT:  I'm sorry, Ms. Mirón.  Can you bring a

16   microphone closer?

17   Q.  One of those exhibits contains call detail records, right?

18   A.  Yes.

19   Q.  Which one is that?

20   A.  11.

21   Q.  Can you just give -- were you done?

22   A.  And 512.

23   Q.  Would you give us a date range?

24   A.  Yes; 511 is from January 1st of 2015 through June 29th of

25   2015, and 512 is also from January 1st -- oh the, I'm sorry.

Hold on.  512 is from March 15th of 2014 through March 12th of

2015.

        MS. MIRÓN:  Thank you.  No objection, your Honor.

        THE COURT:  Very well.  510, 5 11 and 512 will be

received.

        (Government's Exhibits 510, 5 11 and 512  received in

evidence)

        MS. TEKEEI:  Thank you, your Honor.  May we publish

510?

Q.  Thank you, Ms. Quinones.

        Ms. Lewis, looking at Government Exhibit 510,

generally speaking, what kind of records are these?

A.  This is what is referred to as subscriber information.

Q.  And who is the subscriber listed here?

A.  First name Ahmed, last name El Gammal.

Q.  And what is the telephone number listed?

A.  623-692-7880.

Q.  Thank you.

        MS. TEKEEI:  Your Honor, may we publish Government

Exhibit 511?

        THE COURT:  You may.

        MS. TEKEEI:  Thank you.

Q.  Ms. Quinones?  Thank you very much.

        Looking at page 1 of Government Exhibit 511, generally

speaking, what types of records are on page 1 and in the

1  following 275 pages?

2  A.  These are what are referred to as call detail records with

3  cell site information.

4  Q.  So, we will talk about that in just a minute but looking at

5  page 1, what is the telephone number that these records

6  correspond to?

7  A.  623-692-7880.

8  Q.  Is that the same number that we just talked about on

9  Government Exhibit 510 belonging to Mr. El-Gammal?

10  A.  Yes.

11  Q.  Now, I just want to walk you through some of these columns.

12  We have in the left column network element name.  What does

13  that represent?

14  A.  That represents the switching station that serviced the

15  call.

16  Q.  And what is the mobile directory number?

17  A.  That's also referred to as the target number and that's the

18  number for which these are the records.

19  Q.  And what is the dialed digit number?

20  A.  That is the number that was dialed to place the call.  So,

21  if it's an incoming call you will see the target number.  If it

22  is an outbound call you will see the number that was called.

23  Q.  And on that note there is a call direction column; what

24  does that represent?

25  A.  That indicates whether the call was an inbound call, an

1   outbound call, or call that came in and went to voicemail.

2   Q.  And there are some numbers in that column, I see a number

3   3; what does that denote?

4   A.  3 indicates that it was an outbound call.

5   Q.  And further along the page there is a number 6; what does

6   that indicate?

7   A.  6 indicates an inbound call.

8   Q.  And there is also an F; what does that indicate?

9   A.  F is a call that came in and went to voicemail.

10  Q.  And then there are three columns at the end -- excuse me,

11  toward the end, first serving cell face, last serving cell

12  site, list serving cell face, last serving cellface -- excuse

13  me.  Generally, what do these columns represent?

14  A.  The numbers that are in the columns labeled first serving

15  cell site and last serving cell site indicate which cell tower

16  processed that call.

17  Q.  And what about the cell face columns?

18  A.  Cell face columns indicate which side of the cell tower

19  serviced the call.

20  Q.  Thank you.

21          Setting that to the side, showing you -- your Honor,

22  may we publish Government Exhibit 512?

23          THE COURT:  Yes.

24          MS. TEKEEI:  Thank you.

25  Q.  And showing you Government Exhibit 512, generally speaking,

H1D5gam3                    Lewis - cross

1    what are these records?

2    A.   These are also call detail records.

3    Q.   And then -- and looking at page 1, do these show the same

4    categories of information we just walked through in Government

5    Exhibit 511?

6    A.   Yes.

7    Q.   But they're missing some categories, is that correct?

8    A.   Correct.

9    Q.   Which ones are they, do these not include?

10   A.   These do not include the information about the cell towers.

11   Q.   And these records that we have been reviewing, Government's

12   Exhibit 510, 511 and 512, do they show the content of any

13   communications?

14   A.   No.

15             MS. TEKEEI:  Thank you.  No further questions at this

16   time.

17             THE COURT:  Cross?

18             MS. MIRÓN:  Briefly, your Honor.

19   CROSS EXAMINATION

20   BY MS. MIRÓN:

21   Q.   If we could pull up 511, please?

22             Just looking at the columns labeled cell site or cell

23   face; what do those digits refer to?

24   A.   That indicates which cell site serviced the call.

25   Q.   And so, if someone were to locate the cell site tower at a

H1D5gam3                      Lewis - cross

1    particular place, how would they use this chart to find a

2    place?

3    A.   When you receive records like this, usually you would

4    receive an itemization of the cell towers that are located in

5    the area, so you would use the cell site number and find the

6    corresponding number on the chart and you would have the

7    information about the location of the cell tower.

8    Q.   And to be clear, in the exhibits that you just spoke of,

9    that chart is not present, right?

10   A.   Correct.

11   Q.   How often is that chart updated, if you know?

12   A.   Whenever there is a change, whenever there is a new cell

13   tower added it is updated regularly.

14   Q.   And, is it fair to say that whenever a cell tower is out of

15   service there might be an indication that it is no longer

16   working?

17   A.   Yes.

18   Q.   Does Verizon capture cell site data when a text message is

19   received or sent?

20   A.   No.

21   Q.   What about when a person is using data on their cell phone?

22   A.   No.

23              MS. MIRÓN:   Thank you.  No further questions.

24              MS. TEKEEI:  No redirect, your Honor.

25              THE COURT:  Ms. Lewis, you may step down.

H1D5gam3                          Lewis - cross

1               Will the government please call their next witness?

2               MS. TEKEEI:  Thank you, your Honor.  The government

3    calls David Lee.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THOMAS DAVID LEE,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. TEKEEI:

6    Q.  Mr. Lee,where do you work?

7    A.  I work as a consultant to AT&T.

8    Q.  What's AT&T?

9    A.  AT&T is a holding company for a lot of telecommunication

10   networks, including local land line and cellar operations.

11   Q.  Prior to your current job as a consultant to AT&T where did

12   you work?

13   A.  I worked for AT&T for almost thirty years, the last twenty

14   of which were associated with various wireless technologies.

15   Q.  And what are your current duties as a subcontractor for

16   AT&T?

17   A.  My duty is to be a technical witness regarding cell phone

18   records.

19   Q.  Where is AT&T located?

20   A.  The home office is in New York, I think, or I'll say New

21   Jersey.

22   Q.  What types of services does AT&T provide, generally

23   speaking?

24   A.  Telecommunications services, whether it be land line, which

25   is regular wired telephone or cellar communications and other

1   business enterprises.

2   Q.  In your work at AT&T, have you become familiar with the

3   types of records that AT&T keeps in the regular course of its

4   business?

5   A.  Yes, I have.

6   Q.  And in preparation for your testimony in this case have you

7   reviewed records that AT&T provided in connection with legal

8   process in this case?

9   A.  Yes, I have.

10          MS. TEKEEI:  Your Honor, may I approach?

11          THE COURT:  You may.

12  Q.  I'm showing you what's been marked for identification as

13  Government Exhibit 500, 501 and 501A.  Do you recognize those?

14  A.  Yes, I do.  I have seen them previously, these same

15  records.

16  Q.  Thank you.  Have you reviewed, let's start with Government

17  Exhibit 500.

18  A.  Okay.

19  Q.  Have you reviewed that, sir?

20  A.  Yes, I have.

21  Q.  Have you reviewed the contents of the CD's that are marked

22  501 and 501-A?

23  A.  Yes, I have.

24  Q.  And how can you tell?

25  A.  They have my initials on this particular disk.

H1DFGAM4                          Lee- direct

1    Q.  Are the records contained in Government Exhibit 500, 501

2    and 501A true and accurate copies of AT&T records?

3    A.  Yes, they are.

4    Q.  Does AT&T maintain these records in the regular course of

5    its business?

6    A.  Yes, they do.

7    Q.  Is it the regular practice of AT&T to maintain these

8    records?

9    A.  Yes.

10   Q.  Are these records generated at or near the time of the

11   events they reflect therein?

12   A.  Yes.

13           MS. TEKEEI:  Your Honor, we offer Government Exhibits

14   500, 501 and 501-A.

15           MS. MIRON:  A few questions.

16           THE COURT:  Sure.

17   BY MS. MIRON:

18   Q.  Could you give us the time range details for those records,

19   the call detail records?

20   A.  I don't have a hard copy.

21           MS. TEKEEI:  Your Honor, we may put them on the screen

22   to help the witness identify the date range, if that's all

23   right?

24           THE COURT:  They're not in evidence yet.  They're not.

25   There's no hard copy provided?

H1DFGAM4                          Lee- direct

1              MS. TEKEEI:  There are several hundred pages.

2              THE COURT:  We could move the screen.

3    BY MS. MIRON:

4    Q.  While we're doing that, could you tell us if the records

5    are in a particular time zone?

6    A.  If I remember without looking at them, eastern time zone.

7              MS. TEKEEI:  Your Honor, may I approach?

8              THE COURT:  Yes.

9              (Pause)

10             MS. MIRON:  Your Honor, I would not object to the

11   admission of the records if the witness could after that

12   clarify the date.

13             THE COURT:  Very well.

14             MS. MIRON:  And we could publish to the jury.

15             THE COURT:  You can proceed Ms. Tekeei.

16             MS. TEKEEI:  Thank you, your Honor.

17   BY MS. TEKEEI:

18   Q.  Let's begin with Government Exhibit 500.  Can you see that,

19   Mr. Lee?

20   A.  Not on this screen.  I can see it on this screen.

21   Q.  All right.  What types of records are these, generally

22   speaking?

23   A.  This is a subscriber information record.  It has to do with

24   the person that's responsible for paying the bill, contact

25   number, associated cell numbers.

1    Q.  And looking at the top line right under financially liable

2    party, what's the name of the financially liable party for

3    these records, for these accounts?

4    A.  Goarany Group, if I'm pronouncing it correctly.

5    Q.  Looking at the bottom of the page what is the phone number

6    listed on the first page listed on these subscriber records?

7    A.  (845)283-9079.

8    Q.  Now, let's take a look at Government Exhibit 501.  All

9    right, sir.  Looking at page 1, generally speaking, what are

10   the types of records displayed in Government Exhibit 501?

11   A.  Phone calls.

12   Q.  And looking at the top of that, where it says voice usage

13   for, what is the telephone number listed there?

14   A.  (845)283-9079.

15   Q.  And is that the number that we were just looking at that's

16   in Government Exhibit 500?

17   A.  I think so.  Not looking at it side by side, but yeah.

18   Q.  Sir, if you could take a look at Government Exhibit 500

19   right in front of you.  Is that the same number that's listed

20   on the first page of Government Exhibit 500?

21   A.  Yes, it is.

22   Q.  Thank you.  And we talked a little while ago about

23   Government Exhibit 501-A.  Are the records reflected on this CD

24   marked 501-A the same records as reflected in 501 but in just a

25   different format?

1    A.  Yes.

2    Q.  Okay.  So let's take a look through some of the columns of

3    data that are in Government Exhibit 501.  Beginning with, you

4    see at the top left, conn date.  What does that represent?

5    A.  It's the date that the phone call was connected.

6    Q.  And then looking at conn time, what does that column

7    reflect, sir?

8    A.  That's the amount of time it was, it's the time it was

9    connected in universal time code.

10   Q.  And what is universal time code?

11   A.  Universal time code is the time on which world standards

12   are set on times throughout the world.  It starts at 12:01 a.m

13   Universal time is in England.

14   Q.  And are all the times reflected in this column that says

15   conn time (UTC) then universal time code times?

16   A.  Yes.

17   Q.  And what does the seizure time column represent?

18   A.  That's how long it takes to establish the call between when

19   you hit the send button and you get the connection to the other

20   phone.

21   Q.  Thank you.  And how about ET?

22   A.  Elapsed time is the duration of the call.

23   Q.  And then over to the far right, in this pullout anyway,

24   originating number, what is that?

25   A.  That's the number that originated the call or dialed the

1    call.

2              MS. TEKEEI:  And, Ms. Quinones, could you pull up the

3    far right part of the screen?

4    Q.  How about the terminating number, what does that represent?

5    A.  That's the number that was called.

6    Q.  Sir, in the far right there's a cell location column.

7    Generally speaking, what does that column represent?

8    A.  That represents the location of the cell site and the

9    identification numbers for a particular cell site that was

10   handling that phone call or part of that phone call.

11   Q.  Thank you.

12             MS. TEKEEI:  Ms. Quinones, could you just pull out the

13   date at the top left of this exhibit?  Scrolling down just a

14   little bit into the call detail record section.  Thank you.

15   Q.  Sir, what is the first connection date that's reflected

16   there?

17   A.  January 2, 2014.

18   Q.  Okay.  Ms. Quinones, could you pull up page 1455?  And can

19   you pull up the last column?  Thank you.  At the bottom of 1455

20   do you see a date reflected there, sir?

21   A.  Yes.

22   Q.  And what is that date?

23   A.  January 28, 2015.

24   Q.  And so does that describe the date range of the records

25   reflected here from January of 2014 through the end of January

1    of 2015?  Approximately.

2    A.  Yes, if that's the last line in the records it does.

3    Q.  Thank you.  And then, Ms. Quinones, could you please pull

4    up page 1456?  Sir, earlier when we were looking at page 1 you

5    were describing call detail records.  Ms. Quinones, if you

6    could just blow up the far right columns here.  Sir, what types

7    of activity are reflected on this page where it says d-e-s-c,

8    desc?

9    A.  Short message service terminated and short message service

10   originated.

11   Q.  What is that in common language?

12   A.  Text message.

13   Q.  These records we've been reviewing Government Exhibit 501,

14   do they show the content of any communications?

15   A.  No, they do not.

16        MS. TEKEEI:  Thank you.  No further questions at this

17   time.

18        THE COURT:  Cross-examination?

19   CROSS-EXAMINATION

20   BY MS. MIRON:

21   Q.  Could we pull up Government Exhibit 500?  Could you

22   highlight the first box?  So the financially liable party here

23   is a party called Goarany Group.

24   A.  Right.

25   Q.  Do you know if that's an individual or a company?

H1DFGAM4                          Lee- cross

1   A.  I assume it's a company but I don't know.

2   Q.  And is this party liable for other phone lines within the

3   same account?

4   A.  I think I have seen other phone lines associated with that

5   same account.

6   Q.  Okay.  So let's look at page two in the bottom box.  Is

7   that a different phone number associated with this same

8   account?

9   A.  Offhand, I don't remember what the first one was, to be

10  honest with you.

11  Q.  Okay.  We can go back to the first one, page 1.

12  A.  Okay.

13  Q.  Bottom box.

14  A.  Yes, it is a different number.

15  Q.  And let's go to page 3.  And the 646 number, that's yet a

16  third number?

17  A.  Right.

18  Q.  And then page 4.  Bottom box.  Is that a fourth number

19  associated with that same account?

20  A.  Yes.

21  Q.  And page 5?  Bottom box.  Is that a fifth number?

22  A.  Yes.

23  Q.  And finally page 6.  Bottom box.

24  A.  Yes.

25  Q.  Six numbers.  So the financially liable party would have

H1DFGAM4                         Lee- cross

1   access to the phone records from all of those phone lines,

2   right?

3   A.  They would get the phone bills, yes.

4   Q.  Directed to the address on file, correct?

5   A.  Yes.

6   Q.  And in this case it's Middletown, New York, Goarany Group,

7   right?

8   A.  Right.

9   Q.  And would the e-mail account holder associated with the

10  account have access on line to the phone records?

11  A.  They would get phone bills, but not access to the data

12  we're seeing now.

13  Q.  So this account holder would not have permission to access

14  online AT&T phone records?

15  A.  They would have to go through a process to do so.

16  Q.  Sign up for an account on line, right?

17  A.  Yeah, I'm not sure what the process is, to be honest with

18  you.

19  Q.  How much do you know about cell site location data?

20  A.  I understand it.

21  Q.  Why don't you explain it to the jury a little bit?

22  A.  Cell site location data is when, cell phones are unique in

23  that when you're traveling and moving around you can start

24  talking at one cell tower and if you get out of range that have

25  one tower it would automatically switch to a different tower.

H1DFGAM4                         Lee- cross

You won't know it happened and then as you were driving down

the highway you might work on five or six different cell towers

on the call and you wouldn't notice the switching.

Q.  A cell tower provides coverage for a particular call at a

particular time, is that right?

A.  Yes.

Q.  And for AT&T cell towers, you maintain information about

the GPS coordinates of each cell tower connected on a call,

right?

A.  Right.

Q.  It's not that AT&T knows where a phone is at any time,

unless that's separate --

A.  Most cell sites have sectors; one point north, another

southeast, another southwest so we know which sector it was

talking on, but other than that, we don't know, it's just an

area covered by that cell site.

Q.  Depending on the density of the location we're talking

about, it could be several city blocks, right?

A.  Yes.

Q.  And if it's a less dense area it could be a mile?

A.  Yes.

Q.  Does AT&T keep data about text messages that connect to a

particular cell tower?

A.  Yes, they keep records of the call but not the contents of

the call.

1   Q.  Okay.  But in particular there's a record about when

2   someone sends or receives a text message it connects with a

3   particular cell tower, right?

4   A.  Yes.

5   Q.  And that's true of GPS coordinates for data used by AT&T

6   mobile phones, right?

7   A.  Yes, the coordinates would be the same for the cell tower.

8   Q.  How reliable is that data cell site information?

9          MS. TEEKEI:  Objection.

10  A.  If it wasn't correct you'd have a lot of dropped calls and

11  we'd start getting complaints because the cell site has to know

12  where the next cell site is for handover and that's all done by

13  computer programming for a particular cell site.  It says okay

14  if the signal starts to get weak here are your choices to hand

15  over to and the computer will decide which would be the one

16  best to hand over to and do the switching.

17  Q.  I don't mean how reliable is AT&T network.  We're not

18  talking about that.  I mean the data maintained by AT&T

19  regarding cell site connections when someone is using internet

20  usage data.

21         MS. TEEKEI:  Objection, your Honor.  If the witness

22  knows.

23         THE COURT:  If he knows.

24  Q.  Do you know how reliable that information is?

25  A.  Well, again, as far as cell sites are concerned, it

H1DFGAM4                          Lee- cross

1    wouldn't work if it -- you'd lose the connection if it didn't

2    have the right information.

3    Q.  So how often do you -- I'm sorry.  Is there a separate

4    chart of all of the AT&T cell tower locations within New York

5    City?

6    A.  There's a database, of course there's a lot of ways to

7    query the database, but you could query the database and get a

8    list of the cell towers.

9    Q.  To be clear, the database of cell tower locations is not

10   contained in any of the records you just spoke about, right?

11   A.  The records are pulled from the database.  When they pull

12   the records they will say, well, here's a cell site.  In the

13   billing issues they wouldn't necessarily have the coordinates

14   there, so they would go to the master database and pull the

15   coordinates that are affiliated with those cell sites to get

16   those records.

17   Q.  I am asking you about how many cell towers exist in New

18   York City and how we could see a map of all the cell towers.

19   Do you know how we could do that?

20   A.  I know AT&T has the database and the records to do so.

21   Q.  But the records you spoke about earlier do not reflect the

22   database information about cell towers existing in New York

23   City, right?

24   A.  May I look at the records again and see what we're talking

25   about here?  The billing, the user information forms?

H1DFGAM4                        Lee- cross

1   Q.   Sorry?

2   A.   Could you repeat the question?

3   Q.   Could you tell the jury based on your review of the records

4   how many cell towers there are in New York City or do you not

5   know?

6   A.   I didn't count them.  There's a lot.

7   Q.   We wouldn't know based on these records, is that fair to

8   say?

9   A.   Would know there are a lot of cell sites.

10  Q.   We wouldn't know how many?

11  A.   Oh, no.

12  Q.   Thank you.  Nothing further.

13           MS. TEEKEI:  Thank you.  We don't have any redirect,

14  your Honor.

15           THE COURT:  Very well, sir, you may step down.  It's

16  about 25 after the hour.  Do you want to break now?

17           MS. TEEKEI:  Sure.  Yes, your Honor.

18           THE COURT:  Ladies and gentlemen, let's break now for

19  lunch.  We'll give you until 25 minutes after the hour.  So

20  1:25.  Please don't be late.  Please don't discuss the case,

21  don't view any media and do not do any research.

22           (Jury excused)

23           (Continued on next page)

24

25

1          (In open court; jury not present)

2          THE COURT:  Anything?

3          MS. SHROFF:  Your Honor, whenever you want for the

4    CIPA proceeding.

5          MR. DEFILIPPIS:  Your Honor, Mr. Rucker is here, the

6    government is available now if you would like.

7          MR. QUIGLEY:  One housekeeping matter?

8          THE COURT:  Sure.

9          MR. QUIGLEY:  I think on Wednesday, Wednesday when we

10   moved in the first set of Facebook exhibits, 100, I'm not going

11   to recount all the letters but C through S, there was an

12   objection, there was a sidebar, the objection was overruled,

13   but they were never formally received.  The Court said they

14   were in evidence, but I don't know if you want to re-move for

15   their admission at some point.

16         THE COURT:  Very well, you can move for their.

17   admission at any time.

18          (Luncheon recess)

19          (Pages 591-595 CLASSIFIED by order of the Court)

20

21

22

23

24

25

<pre>
 1                        AFTERNOON SESSION

 2                            1:25 p.m.

 3            (In open court; jury not present)

 4            MR. PATEL:  Your Honor, I've been appointed to be

 5   counsel for Tarek El-Goarany, who I expect to be a witness in

 6   the case.  About an hour before I arrived in your Honor's

 7   courtroom today I received a subpoena issued by the Federal

 8   Defenders office for all electronically stored information on

 9   my client's phone and another phone from June, towards through

10   June 2015.  Your Honor, I would like an opportunity to be heard

11   to move to quash that subpoena both as overly broad and

12   seeking, since I have communicated with my client over the

13   phone by e-mail, voice and text, there's privileged material on

14   that phone.  Additionally, the subpoena is just overbroad and I

15   won't even talk about the timing of this subpoena.  But if your

16   Honor would like, I'd be happy to submit papers.

17            THE COURT:  Why don't you?  Do we have an idea, is the

18   government in a position to say when Mr. Tarek El-Goarany will

19   be testifying?

20            MS. TEEKEI:  Early next week, your Honor, most likely

21   Tuesday.

22            MS. SHROFF:  Your Honor, could we just take a look at

23   the subpoena?

24            THE COURT:  Sure.

25            MS. SHROFF:  May I just hand up the subpoena to the
</pre>

1   Court for a second?

2            THE COURT:  Sure.  Okay.

3            MS. SHROFF:  Your Honor, the subpoena is not to --

4            THE COURT:  Correct.

5            MS. SHROFF:  So I'm not --

6            THE COURT:  It's a subpoena directed to New Singular

7   Wireless.

8            MS. SHROFF:  Right.

9            THE COURT:  But does it relate to Mr. Tarek

10  El-Goarany's phone?

11           MS. SHROFF:  I just was -- I was just talking about

12  the timing issue.

13           THE COURT:  Okay.

14           MS. SHROFF:  Because the subpoena was served on New

15  Singular Wireless, so I just wanted to put that on the record.

16  I'm sure Mr. Patel will brief whatever he deems fit but I just

17  wanted the Court to be aware as to who the subpoena was served

18  on.

19           THE COURT:  When was the date of the subpoena?  When

20  was it served, if you know?

21           MR. PATEL:  I believe it was January 5, 2017.

22           THE COURT:  So last week.  Why don't you put in

23  whatever papers you feel are appropriate, Mr. Patel?

24           MR. PATEL:  When would you like those, your Honor?

25           THE COURT:  Well, as soon as possible, since -- today

H1DFGAM4B                    Trial

1    is Friday, correct?  So Tuesday is when we'll be together next,

2    and the Court is closed on Monday.  I suspect we'll all be

3    working.  I certainly will be, so if you could submit it by

4    midday Monday that would be very helpful.

5              MR. PATEL:  It will be done.

6              THE COURT:  And if we -- can you say whether or not

7    Mr. El-Goarany will be testifying in the morning or in the

8    afternoon on Tuesday?

9              MS. TEEKEI:  We're not sure, your Honor.  It depends a

10   little bit on the timing of the witnesses for this afternoon

11   and a couple of other timing issues.  However, we should know

12   by Monday, mid-Monday, the order.

13             THE COURT:  Very well.

14             MS. MIRON:  Your Honor, I'd just like to specify that

15   the subpoena asks for certified copies of any and all

16   subscriber information, texts, call records and CDR for two

17   phone numbers, from June, 2014 to December 2015.  It's call

18   detail records that we're seeking from the phone company.  It's

19   not a search of the devices or anything like that.  It's the

20   phone company data.

21             THE COURT:  Okay, understood.

22             MR. PATEL:  Text messages are far more than call

23   records.

24             THE COURT:  But would you actually get the content of

25   the text messages.

H1DFGAM4B                    Trial

1          MR. PATEL:  You actually get the context of the text

2     messages.

3          MS. MIRON:  No, your Honor, there were just AT&T

4     messages admitted into trial, there were no text messages.

5          THE COURT:  You're barking up the wrong tree.  Why

6     don't we wait and see what Mr. Patel has to say on Tuesday.

7          MR. PATEL:  There's a problem.  AT&T has said they

8     plan to comply with the subpoena tomorrow.  So I would ask that

9     your Honor order that any materials Federal Defenders may or

10    may not have received from them be sequestered until your Honor

11    has had a chance to rule on that.

12         THE COURT:  I think that's appropriate.  Until I rule.

13         MS. MIRON:  In addition, if the government accepts the

14    subpoena we ask that it be provided pursuant to Rule 6 for the

15    discovery of the defense.

16         MR. PATEL:  Your Honor, if they're seeking discovery

17    that's a grounds to quash the subpoena itself.

18         THE COURT:  There's a separate issue concerning the

19    government's obligations.  I want to get the jury out, so

20    Mr. Patel, good to see you again.

21         MR. PATEL:  Thank you, your Honor.

22         THE COURT:  Looking forward to seeing your papers.

23    Let's get the jury.

24         Who will the next witness be?

25         MR. DEFILIPPIS:  Your Honor, we have two brief

H1DFGAM4B                          Trial

1    stipulations to read and the next witness will be Jai Patel.

2              THE COURT:  Nice to see there are actually some

3    stipulations in this case.

4              (Continued on next page)

1                    (In open court; jury present)

2              THE COURT:  Ladies and gentlemen, I apologize for the

3     slight delay.  We had an unexpected legal issue come up right

4     before we were about to meet, so I apologize.  Next witness?

5              MR. DEFILIPPIS:  The government is going to read two

6     brief stipulations into the record.

7              THE COURT:  Very well.

8              MR. DEFILIPPIS:  The first is Government Exhibit 1108

9     which reads in relevant part, if called to testify as a

10    witness, a records custodian of Wells Fargo Bank, N.A., would

11    testify as follows:  Government Exhibits 1003 and Government

12    Exhibit 1004 were retrieved from the files of Wells Fargo Bank,

13    N.A.  The records reflected on Government Exhibits 1003 and

14    1004 were created by a person with knowledge of or created from

15    information transmitted by a person with knowledge of the

16    information shown, were created at or near the time the

17    information became available to Wells Fargo Bank, N.A. and were

18    created and maintained by Wells Fargo Bank, N.A. as part of

19    their regularly conducted business activity.

20              The records contained in Government Exhibit 1003

21    consist of a business account application submitted in July,

22    2014 by Ahmed Mohammed El Gammal, a/k/a Jammie Gammal, the

23    defendant, to representatives of Wells Fargo Bank, N.A. in

24    Phoenix, Arizona.

25              The records contained in Government Exhibit 1004

H1DFGAM4B                          Trial

1   consists of an account statement from October 2014 for the bank

2   account numbered 1285897334, which was created upon approval of

3   the aforementioned application by Ahmed Mohamed El Gammal,

4   a/k/a Jammie Gammal, the defendant.

5           The parties further stipulate and agree that the

6   Government Exhibit 1003, 1004 and this stipulation may be

7   received into evidence as Government Exhibits at trial.

8           So, your Honor, the government enters into evidence

9   Government Exhibit 1003, 1004 and the stipulation which is

10  Government Exhibit 1108.

11          THE COURT:  On the stipulation of the parties those

12  exhibits will be received.

13          (Government's Exhibits 1003, 1004 and 1108 received in

14  evidence)

15          MR. DEFILIPPIS:  Your Honor, if we could briefly

16  publish first Government Exhibit 1003?

17          THE COURT:  Certainly.

18          MR. DEFILIPPIS:  And Government Exhibit 1004.

19          Your Honor, I'll move to the next stipulation we can

20  always republish on the big screen.

21          Exhibit 1107 reads in relevant part as follows:  If

22  called to testify as a witness, a records custodian of JPMorgan

23  Chase Bank, N.A. would testify as follows:  Government Exhibit

24  1001 was retrieved from the files of JPMorgan Chase Bank, N.A.

25  The records reflected on Government Exhibit 1001 were created

H1DFGAM4B                        Trial

1   by a person with knowledge of or created from information

2   transmitted by a person with knowledge of the information

3   shown, were created at or near the time the information became

4   available to JPMorgan Chase, N.A. or were created and

5   maintained by JPMorgan Chase, N.A. as part of their regularly

6   conducted business activity.

7          The records contained in Government Exhibit 1001

8   consists of A, a personal signature card dated January 7, 2014

9   for the bank account numbered 862144987 held in the names of

10   Samy M. El-Goarany and Mohamed El-Goarany, power of attorney,

11   and, B, account statements for the aforementioned bank account.

12          The parties further stipulate and agree that

13   Government Exhibit 1001 and this stipulation may be received

14   into evidence as Government Exhibits at trial.  So, your Honor,

15   the government offers Government Exhibit 1001 and Government

16   Exhibit 1107.

17          THE COURT:  On stipulation of parties those exhibits

18   will be received.

19          (Government's Exhibits 1001 and 1107 received in

20   evidence)

21          MR. DEFILIPPIS:  Ms. Quinones, can we briefly publish

22   Government Exhibit 1001?

23          Thank you, why don't we briefly publish Government

24   Exhibit 1003?  And finally, 1004.  Thank you, your Honor.

25          THE COURT:  Will the government please call its next

1   witness?

2          MS. TEEKEI:  Thank you, your Honor.  The government

3   calls Mr. Jai Patel.

4    JAI PATEL,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MS. TEKEEI:

9   Q.  Mr. Patel, where do you work?

10  A.  I work in the Howard Johnson.

11  Q.  Where is that located?

12  A.  In Jamaica, New York.

13  Q.  What is the address of that hotel?

14  A.  139-09 Archer Avenue, Jamaica, New York 10485.

15  Q.  What is your title at the Howard Johnson?

16  A.  I'm a hotel front desk manager.

17  Q.  How long have you been working there?

18  A.  For two years.

19  Q.  In the course of your duties at the Howard Johnson, are you

20  familiar with the types of records Howard Johnson keeps?

21  A.  Yes.

22          MS. TEEKEI:  Your Honor, may I approach?

23          THE COURT:  You may.

24  Q.  Looking at what's been into evidence as Government Exhibit

25  1014, do you recognize that?

1   A.  Yes, that's the hotel.

2           MS. TEEKEI:  Your Honor, may we publish that to the

3   jury?

4           THE COURT:  You may.

5   Q.  Just to be clear, Mr. Patel, this is the Howard Johnson

6   hotel on Archer Avenue in Jamaica, Queens that you were just

7   describing?

8   A.  Yes.

9   Q.  And this is the hotel where you work?

10  A.  Yes.

11  Q.  What is that to the right of that photograph at sort of

12  the, what we can see the underpart of?

13  A.  Can you say that again?

14  Q.  Is there public transportation around the hotel?

15  A.  Across the street there is public transportation, yes.

16  Q.  What type of transportation?

17  A.  There's MTA Long Island Rail Road.

18  Q.  Thank you.  Sir -- thank you, Ms. Quinones.  In preparation

19  for your testimony in this case have you reviewed records that

20  Howard Johnson provided in connection with legal process?

21  A.  Yes.

22  Q.  And showing you what's been marked for identification as

23  Government Exhibit 1002 --

24  A.  Yes.

25  Q.  Do you recognize that?

1    A.  Yes.  It's the hotel ledger.

2    Q.  Have you reviewed Government Exhibit 1002?

3    A.  Yes, it's the hotel ledger for the hotel on that date.

4    Q.  And what date is that, sir?

5    A.  It's October 6, 2014.

6    Q.  Are the records contained in Government Exhibit 1002 true

7    and accurate copies of Howard Johnson records?

8    A.  Yes, it's a typical hotel ledger, so, yes.

9    Q.  Does the Howard Johnson hotel maintain those records in the

10   regular course of his business?

11   A.  Yes.

12   Q.  Is it the regular practice of Howard Johnson to maintain

13   these records?

14   A.  Yes.

15   Q.  And are these records generated at or near the time of the

16   events they reflect therein?

17   A.  Yes, it would be for that date.

18           MS. TEEKEI:  Your Honor, we offer Government Exhibit

19   1002.

20           THE COURT:  Any objection?

21           MS. SHROFF:  No, your Honor.

22           THE COURT:  1002 will be received.

23           (Government's Exhibit 1002 received in evidence)

24           MS. TEEKEI:  Thank you, your Honor.  May we publish

25   this to the jury?

H1DFGAM4B                         Patel - direct

```
 1            THE COURT:  You may.
 2            MS. TEEKEI:  Ms. Quinones.  Thank you.
 3   Q.  Okay, Mr. Patel, what type of information is conveyed on
 4   this hotel ledger?
 5   A.  It would be all the guests staying in house for that date.
 6   Q.  And just looking at the middle of the page, there's a guest
 7   name, last name El Gammal.  Do you see that line towards the
 8   bottom in that pullout, or you can look at the exhibit that's
 9   in front of you.
10   A.  Yes, I see that.
11   Q.  And what dates did Mr. El Gammal stay at the Howard Johnson
12   Hotel in Jamaica, Queens on Archer Avenue?
13   A.  According to the ledger from 10/67 to 10/8/2014.
14   Q.  Sir, there's a column there right next to those dates.
15   What information is contained in that column?
16   A.  I mean, it's just the room type and room number and the
17   rate.
18   Q.  And, sir, what is the room type that Mr. Ahmed El Gammal
19   stayed in?
20   A.  NQ1 would be a non-smoking queen room in the hotel.
21   Q.  When it says 2-0 what does that information convey?
22   A.  That information would be the amount of adults and children
23   in the room.
24   Q.  Thank you.  You can put that to the side.  Now, if you
25   could take a moment and look at what's in evidence as
```

1    Government Exhibit 1015.  Do you recognize that?

2    A.  Yes.  It's a note pad we provide in the hotel guest rooms.

3              MS. TEEKEI:  Thank you.  No further questions at this

4    time.

5              THE COURT:  Very well.  Any cross?

6    CROSS-EXAMINATION

7    BY MS. SHROFF:

8    Q.  How you doing, Mr. Patel?

9    A.  Good.  How are you?

10   Q.  Good.  So, I just have a few questions for you.  Did you

11   generate these records, sir?

12   A.  They're generated by the hotel system, yes.

13   Q.  So the hotel put them together and then you reviewed them?

14   A.  Um, yes, it's a system that the hotel properly manages, the

15   system that generates a report every day.

16   Q.  You manage the front desk you said, right?

17   A.  Um, yes.  I'm a manager.

18   Q.  You're familiar with the hotel?

19   A.  Um, yes.

20   Q.  And how you book a reservation in the hotel?

21   A.  Um, yes.

22   Q.  And Howard Johnson has deals with various travel agencies

23   and on websites, correct?

24   A.  Um, yes.  We do.

25   Q.  Sometimes you have specials, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1DFGAM4B                     Patel - cross

1   A.  Occasionally, yes.

2   Q.  And you don't remember sitting here today whether there

3   were any specials in place at this time and date, right?

4   A.  Um, for that specific date I do not know if there were

5   specials for that date, no.

6   Q.  Fair enough.  And the government lawyer, she directed your

7   attention, right, to the name, Ahmed El Gammal, correct?

8   A.  Um, correct.

9   Q.  And you told her the dates of the arrival, right?

10  A.  Um, yes.

11  Q.  And the date of departure, right?

12  A.  Um, yes.

13  Q.  And if the date is on there you would check to see that he

14  gave you a license and showed you a piece of paper and he

15  checked in, correct?

16  A.  Usually, yes.

17  Q.  Like a regular check-in?

18  A.  Yes.

19  Q.  And it says, it had a queen bed, is that right, the room

20  had one queen bed?

21  A.  The room type is NQ1 so it would be a non-smoking queen

22  bed.

23  Q.  So that would be one big bed in the room?

24  A.  A queen-sized bed, yes.

25  Q.  And the price was 199 -- what is it?  Okay.  And there is a

H1DFGAM4B                      Patel - cross

1   rate plan, right, that's some kind of internal code for how you

2   people, how Howard Johnson decides what's going on, right?

3   A.  Yes.  It depends what external reservations, that Extranet

4   it came through.  There's different Extranets, we get

5   reservations from it, so the Extranet is what it came through.

6   Q.  And do you recall the government showing you photographs of

7   the Howard Johnson on the screen and you said, yes, that's what

8   it looked like?

9   A.  Yes.

10  Q.  You don't recall if that scaffolding was on in 2014,

11  correct?

12  A.  Um, I do not.

13  Q.  Okay, thank you very much, sir have a good day.

14          MS. TEKEEI:  No redirect, your Honor.

15          THE COURT:  Okay, sir, you may step down.

16          (Witness excused)

17          MS. TEKEEI:  Your Honor, before we call our next

18  witness, we would just like to publish Government Exhibit

19  120-A, which is already in evidence.

20          THE COURT:  Very well.

21          MS. TEKEEI:  AT, excuse me.  It is also in the jury's

22  binders.  120-AT, at page 40.  Your Honor, may I publish it by

23  reading?

24          THE COURT:  You may.

25          MS. TEKEEI:  Thank you.  All right, beginning at the

H1DFGAM4B                    Patel - cross

1  top, October 6, 2014, 3:18 UTC.

2          "ATTIYA:  Why aren't you answering me Gammal.

3          "EL GAMMAL:  Great very good great narrator voice.

4          "ATTIYA:  Thumbs up sticker.  I am saddened because of

5  you.

6          "EL GAMMAL:  Why are you sad?  Listen, give me your

7  number in Turkey so my American friend can call you when he

8  arrives.  Call me on Skype.

9          "ATTIYA:  You do not call me or say good evening or

10  send me likes or comment.  Turns out you are real Egyptian.

11          "EL GAMMAL:  I am not logging on Facebook at all.

12          "ATTIYA:  Why my friend.

13          "EL GAMMAL:  I am in New York now busy.

14          "ATTIYA:  Then you are excused.

15          "EL GAMMAL:  Call me on Skype.

16          "ATTIYA: 905060570555.  Okay.

17          "EL GAMMAL:  Ha ha.  Another opinion.

18          "ATTIYA:  Fine.  What is it about.  Did you hear it?

19          MS. TEKEEI:  October 8, 2014.  17:34.

20          "ATTIYA:  What is the origin of your American friend,

21  Gammal?

22          "EL GAMMAL:  Egyptian.

23          "ATTIYA:  How come he does not speak Arabic?  Okay,

24  the tourism company needs somebody they know and trust because

25  they do not want him to cause them trouble in the program.

H1DFGAM4B                    Patel - cross

1        "EL GAMMAL:  Do not worry, I think he knows one of the

2    producers.

3        "ATTIYA:  I mean, does he know anybody in the company

4    or somebody knows him?  I actually have a good relationship

5    with the tourism couple and they trust me.

6        "EL GAMMAL:  Then fine.  Take care of him.

7        "ATTIYA:  Okay, but I need to understand his situation

8    from you, because there are tourism agencies that send people

9    so they would know how other companies operate and work.  You

10   do not -- excuse me, you do understand how companies would

11   sneak around.

12       "EL GAMMAL:  Attiya, am I an idiot.  Am I a jackass or

13   am I a moron?

14       "ATTIYA:  Fine I am just saying that this tourism

15   company takes no monkey business.  Your brother might very well

16   make a fool of himself.

17       MS. TEKEEI:  Thank you, Ms. Quinones.

18       MR. DEFILIPPIS:  And, your Honor, the government calls

19   Eric Perry.

20       THE COURT:  Sir, when you step up into the witness

21   box, please remain standing.

22    ERIC PERRY,

23       called as a witness by the Government,

24       having been duly sworn, testified as follows:

25       THE COURT:  Mr. DeFillipis?

H1DFGAM4B                         Perry - direct

1              MR. DEFILIPPIS:  Thank you, your Honor and before I

2    begin with Mr. Perry, your Honor, if the government could just

3    turn to the Facebook exhibits referenced during Mr. Quigley's

4    examination and formally offer Government Exhibits 100 C, D, F,

5    G, H, I, J, K, M, N, O, P, R and S.

6              THE COURT:  Those exhibits will be received.

7              MR. DEFILIPPIS:  Thank you, your Honor.

8              (Government's Exhibits 100C, D, F, G, H, I, J, K, M,

9    N, O, P, R and S received in evidence)

10   DIRECT EXAMINATION

11   BY MR. DEFILIPPIS:

12   Q.  Good afternoon, Mr. Perry.

13   A.  Good afternoon.

14   Q.  Where do you work?

15   A.  I work with the Federal Bureau of Investigation, otherwise

16   known as the FBI.

17   Q.  What's your position there?

18   A.  I'm a special agent.

19   Q.  How many years have you been with the FBI?

20   A.  A little over eight years.

21   Q.  What did you do before that?

22   A.  I was a state trooper with the Colorado State Patrol.

23   Q.  And before that?

24   A.  I was a law enforcement ranger for the National Park

25   Service based out of Mesa Verde National Park in Colorado.

H1DFGAM4B                          Perry - direct

1    Q.   Now, within the FBI are you assigned to any specialized

2    unit or squad?

3    A.   Yes, I am.

4    Q.   Which one is that?

5    A.   I'm currently assigned to our cellular analysis team which

6    goes by the acronym of CAST, that's c-a-s-t.

7    Q.   How long have you been doing that work?

8    A.   Since 2011.

9    Q.   Generally speaking, what does that unit do?

10   A.   Our unit actually provides specialized investigative

11   assistance with regards to the mapping and analyzing of cell

12   phone records or sometimes they're referred to as call detail

13   records and to further an investigation to help find fugitives

14   to help recover additional evidence such as surveillance video

15   as well as develop patterns of life of individuals based on

16   their cell phone usage.

17   Q.   And what generally are cell site location records?

18   A.   Any time that your cell phone is used, a cell phone is used

19   at a location to make or receive a call, send a text, surf the

20   internet, check your Facebook page, send an Instagram, records

21   are generated and saved by the cell phone providers such as

22   AT&T, Verizon, Sprint, and T-Mobile.

23   Q.   Did you mention another type of cell phone records that you

24   encounter?

25   A.   There are call records which have the information of the

1    use of the particular phone but the cell phone providers will

2    also provide what are called the cell tower keys, or cell tower

3    location.  This is actually a spreadsheet of every single cell

4    tower and some additional evidence, I'm sorry, additional

5    information that are within their network and where they are

6    located.

7    Q.  How do you typically receive these kinds of data?

8    A.  We usually receive them from the investigator that we're

9    assisting or the agent or the prosecution and they usually come

10   through, predominantly they come through a court order or a

11   warrant or sometimes under exigent circumstances or sometimes

12   under consent in certain circumstances.

13   Q.  Are you familiar with GPS location data?

14   A.  Yes, I am.

15   Q.  And what does that refer to?

16   A.  GPS is the global positioning system that is the

17   utilization of satellites up in the atmosphere to provide

18   predominantly precision location of your whereabouts of a

19   particular device.  But it's utilizing the satellites in the

20   sky.

21   Q.  In the course of your work do you analyze that type of data

22   as well?

23   A.  Yes, I do.

24   Q.  Approximately how many cellular site analyses have you

25   conducted in your career with the FBI?

1  A.  I've been utilizing cell site analysis since 2007 so it's

2  well over a thousand.

3  Q.  Have you testified previously in state or federal court on

4  these types of topics?

5  A.  I've testified in state and federal court throughout the

6  country.

7  Q.  If you were to guess, how many times?

8  A.  I believe it's over 35 times now.

9  Q.  Have you been qualified as an expert in any way or received

10  any training in this field?

11  A.  I've been qualified as an expert in all those.  I've

12  testified, provided expert-based testimony in every one of the

13  trials, but part of my training and experience I've received a

14  substantial amount of specialized training from the various

15  providers.

16            (Continued next page)

17

18

19

20

21

22

23

24

25

1              MR. DEFILIPPIS:  Your Honor, we offer Agent Perry as

2    an expert in the field of cell site data and analysis.

3              MS. MIRÓN:  No objection.

4              THE COURT:  He will be received as an expert.

5    BY MR. DEFILIPPIS:

6    Q.  Agent Perry, I would like to talk specifically about your

7    analysis of location data in the New York City area.  Have you

8    analyzed cases that involve the New York City area?

9    A.  My cases are predominantly based out of New York City,

10   Westchester County vicinity.

11   Q.  And based on your experience, are there multiple cellular

12   towers in the New York City area or how many are there?

13   A.  Several hundred, if not thousands in some cases.  Every

14   provider, your bigger providers such as AT&T, T-Mobile and

15   Verizon are going to have close to a thousand, if not more.

16   Q.  Just describe for us, very basically, what is a cellular

17   tower and what does it do?

18   A.  A cell tower, more specifically the cellular antennas, are

19   the devices and the equipment that transmits and receives the

20   cellular signals to and from a particular area and that's what

21   allows your phone to communicate wirelessly to another phone.

22   Q.  Now, there is more than one cellular provider in the New

23   York area; is that a fair statement?

24   A.  Yes.

25   Q.  Do these providers have different towers or do they all use

1  the same ones?

2  A.   Verizon phones that communicate with Verizon towers, and

3  the same thing with all the other providers such as AT&T,

4  they're going to use their own cell towers.  T-Mobile, as well

5  as Sprint will use all of their own towers.

6  Q.   When a cell phone is in contact with a particular cellular

7  tower, does anyone keep a record of that?

8  A.   Yes, they do.

9  Q.   And just describe that process.

10 A.   As I stated previously, during the use of your phone,

11 records are collected and maintained by the cell phone

12 providers so if you are a Verizon customer, Verizon Wireless

13 will maintain your records.

14 Q.   And what do those records typically show?

15 A.   They typically show the date and time in which the

16 connection occurred, the two numbers that are in communication

17 with each other, the direction whether it was inbound or

18 outbound, the duration of which -- how long the call occurred,

19 and then they'll actually provide you the location; the cell

20 tower that it communicated with, and then what particular

21 face -- you will hear me use the term face or sector, that

22 means the particular side of the tower that was used for that

23 communication.

24 Q.   Now, based on your experience, is cellular location

25 analysis generally reliable?

1   A.   Absolutely.

2   Q.   And how, if at all, have you tested or has anyone you're

3   aware of tested the reliability of cellular location analysis?

4   A.   Like I said, I have been utilizing this since 2007 to

5   locate and apprehend fugitives, to collect evidence.  There are

6   times we will see somebody on a phone and we will make note of

7   that while doing surveillance, we will go back, maintain phone

8   records and map out the call, cell tower and sector that was

9   used, and they will be in the vicinity or in the general

10  vicinity or the area where that tower sector provides coverage.

11        I have actually obtained my own phone records and

12  mapped out my phone records.  There is several different

13  instances.

14        We also are trained to conduct drive tests.  This is

15  the same process that all the major providers use.  If you

16  remember that commercial, the Verizon guy who now actually

17  switched over to Sprint, he used to walk around saying Can you

18  hear me now? and then he would take a few steps and say, Can

19  you hear me now?  So, a drive test is fairly simple.  I have a

20  GPS and it actually logs my specific location, and then the

21  drive test equipment will actually tell me the cell tower and

22  sector that provides service to that area.

23  Q.   And in conducting those tests, did the data prove reliable?

24  A.   Yes.

25  Q.   Now, how is GPS data different from cellular location data?

1    A.  Again, GPS, satellites, satellites in the sky.  Your phone

2    has a GPS receiver built into it -- at least now with the smart

3    phones almost all smart phones do so the more satellites your

4    phone will see, i.e. if you are out in the middle of a field,

5    out in the middle of Central Park, clear line of sight, the

6    location is going to be more precise.

7            Cellular analysis is used utilizing the cellular

8    towers in identifying the locations in the coverage area of

9    particular towers, and once you know that then you can

10   determine the general area in which a person was or phone was

11   when it made a call.

12   Q.  Now, Agent Perry, were you asked to conduct a cellular

13   location analysis in this case, United States v. Ahmed Mohammed

14   El Gammal?

15   A.  Yes.

16   Q.  And did you do that?

17   A.  Yes, I did.

18   Q.  Now, in preparing your analysis, what sorts of records or

19   data did you rely upon?

20   A.  I was actually provided a set of Verizon cell phone

21   records, they're called detail records, as well as a Verizon

22   cell tower key.  I was also provided a set of phone records

23   called detail records for an AT&T phone.

24           AT&T is a company that actually includes the locations

25   of the cell towers that were used into one report.  So, you

1    actually have all of the information -- who called who, the

2    date and time, the duration, and they'll give you a GPS

3    coordinate of where that tower was located, all in one report.

4    Q.  Now, you mentioned a key that you relied upon in your work.

5    Can you describe what that key was?

6    A.  Yes.

7             Verizon actually maintains a list of all the locations

8    of all of their cell towers and they also, in that cell tower

9    key, they'll provide what is called an azimuth or an

10   orientation.  That is simply a compass heading.  So, that

11   information, if they say sector 1 is oriented at 60 degrees,

12   then I know that that would be -- that tower and sector would

13   provide service to the north, northeast.  And I will have an

14   example of that in my exhibit.

15   Q.  Now, let me ask you other than phone records, were there

16   any other types of records or data that you looked at in

17   preparing your analysis?

18   A.  I was provided some additional information as far as some

19   transactional information such as hotel receipts, as well as an

20   ATM transaction, as well as I was provided, I believe, some

21   airline information as well.

22             MR. DEFILIPPIS:  Your Honor, may I approach?

23             THE COURT:  You may.

24   Q.  Mr. Perry, I'm going to hand you Government's Exhibits,

25   what have been marked Government's Exhibits 500, 501 and 501-A.

1    If you would just browse through those?  Do you recognize those

2    records, Agent Perry?

3    A.   I recognize the records.  There is subscriber information

4    and -- for an AT&T phone in GX- 500.  I do recognize these,

5    yes.

6    Q.   So, are these AT&T records, are these the records you

7    relied upon in preparing your presentation?

8    A.   Yes.

9    Q.   And are they -- again, just remind us which types of data

10   you obtained and analyzed from AT&T.

11   A.   They were cell cite or call detail records, as well as

12   subscriber information.

13   Q.   I'm going to hand you what has been marked Government

14   Exhibit 510, 511 and 512.  If you would just take a look

15   through those?

16   A.   Yes.

17   Q.   Do you recognize those?

18   A.   These are actually, they include subscriber information for

19   the Verizon phone that I analyzed as well as the call detail

20   records for that phone.

21   Q.   These are from which provider then?

22   A.   Verizon Wireless.

23   Q.   Again, was it the same type of records as you received from

24   AT&T?

25   A.   Yes.

H1D5gam5                        Perry - direct

1   Q.  Did they also provide you -- did both companies provide you

2   with a key or did you receive a key from both companies as you

3   mentioned?

4   A.  No; only from Verizon Wireless.

5   Q.  Why is that?

6   A.  As I stated earlier, AT&T is gracious enough to actually

7   include the location of the cell towers in that one report, in

8   their call detail records.

9   Q.  How does that affect your analysis one way or the other?

10  A.  It doesn't.  It just makes it a lot easier when it comes to

11  looking up the location of the tower.

12  Q.  Now, in comparing these two providers, does one provide

13  more or less data based on the activity of the user's phone?

14  A.  Yes, they do.

15  Q.  And in what way?

16  A.  AT&T will provide, in their call detail records, they can

17  provide all of the activity based on your voice usage, your

18  texts are referred to as SMS, as well as your data connections.

19  Verizon will only provide the location information for voice

20  activity.

21  Q.  And so how, if at all, does that affect your analysis when

22  you prepare reports?

23  A.  AT&T, because they collect information on your voice, data,

24  and SMS, it allows to -- we are able to obtain a higher volume

25  of location information versus just voice activity that Verizon

H1D5gam5                              Perry - direct

1   does.

2   Q.  I am going to hand you Government's Exhibits 1002, 1003,

3   and 1004.  If you could just look first at 1002 and see if you

4   recognize that one?

5   A.  I do.  This is actually a hotel ledger with names and dates

6   on it.

7   Q.  Is that something you looked at in the course of your work?

8   A.  Yes.

9   Q.  And I think we will come to that a bit later.  If you could

10  look at the other two exhibits in front of you, 1003 and 1004?

11  A.  Exhibit 1003 is a business account application for Wells

12  Fargo.

13  Q.  And 1004?

14  A.  This is actually a Wells Fargo Business Choice Checking --

15  I believe it to be a statement from wells Fargo as well.

16  Q.  And again, Agent Perry, are they things you relied upon in

17  preparing your analysis in this case?

18  A.  Yes.

19  Q.  And finally, I would like to show you what's been marked as

20  Government Exhibit 520.  Do you recognize this, Agent Perry?

21  A.  I do.

22  Q.  What is this?

23  A.  This is actually the exhibits that I created for my

24  testimony today.

25  Q.  So, does it consist of a single presentation?  Is it a

H1D5gam5                         Perry - direct

1   slide presentation?

2   A.  Yes.  Yes, it is.

3   Q.  Is this the report you prepared that you have been

4   describing the analysis that you relied upon these other

5   exhibits in preparing?

6   A.  Yes, it is.

7   Q.  And does it contain your conclusions regarding the analysis

8   in this case?

9   A.  Yes, it does.

10          MR. DEFILIPPIS:  Your Honor, the government offers

11   Government Exhibit 520.

12          MS. MIRÓN:  May I voir dire briefly?

13          THE COURT:  Certainly.

14          MS. MIRÓN:  Thank you.

15   VOIR DIRE EXAMINATION

16   BY MS. MIRÓN:

17   Q.  Mr. Perry, you mentioned that you received a Verizon cell

18   tower key, right?

19   A.  Yes, ma'am.

20   Q.  Did you receive that when you first conducted a cellular

21   analysis in this case in July 2015?

22   A.  Verizon Wireless, because of the sheer volume that is -- of

23   records that are obtained by the FBI from the cell phone

24   providers, Verizon Wireless actually provides the cell tower

25   keys on, I believe, a bi-weekly basis, to the FBI.

1   Q.  So, is the analysis you conducted in July 2015, does it

2   reflect the same cell tower locations as this report?

3   A.  Yes, it does.

4          The cell towers that were located -- I used the cell

5   tower list for the time frame of the records, if that's what

6   you are asking, counsel.

7   Q.  Okay.

8          And, with AT&T, you did not receive a key?

9   A.  They already included the cell towers into their records.

10  Q.  To be clear, the cell tower is where calls connect, right?

11  A.  Calls, texts, and data.

12  Q.  But your report reflects other cell towers from AT&T,

13  right?

14  A.  That were not utilized, yes.  The adjacent towers, yes.

15         MS. MIRÓN:  So, we would object to the reflection of

16  the AT&T cell towers that were not reviewed by this agent.

17         MR. DEFILIPPIS:  Your Honor, do you wish to see us at

18  side bar?

19         THE COURT:  Yes.

20         MR. DEFILIPPIS:  Okay.

21

22

23

24

25

1              (At side bar)

2              MS. MIRÓN:  Your Honor, the blue dots indicate the

3    AT&T cell towers.  I imagine that's what they indicate but

4    there has been absolutely no testimony about the location of

5    additional AT&T cell towers.  It is relevant because this

6    witness will testify that usually a call connects to the

7    nearest cell tower and it is therefore relevant what is the

8    nearest cell tower to a particular location.  There has been no

9    testimony about AT&T, in fact he said he didn't receive any

10   data about these AT&T cell towers.

11             MR. DEFILIPPIS:  Your Honor, I think that Mr. Perry

12   has been transparent in his methodology.  The jury has heard

13   his explanation of where he derived the various towers from, he

14   has been very transparent that the various tower were not set

15   to be used in this case.  So I think it is completely within

16   the scope of his expert testimony to apply his methodology and

17   defense counsel can make whatever argument to attack it that

18   they like.

19             THE COURT:  I guess I don't understand the objection.

20             Is the objection that this particular map shows cell

21   towers in addition to the ones that the agent will be speaking

22   about?

23             MS. MIRÓN:  It purports to depict additional cell

24   towers, yes.  And not just the subject of the testimony but he

25   is going to draw conclusions based on the locations of all of

1   the cell towers, not just the ones connected to it because it
2   is a relative analysis.  If you are going to say that somebody
3   was at a particular location you need to look at the nearest
4   cell tower relative to the other cell tower so it is very
5   important where those other cell towers are.  This reflects
6   other cell towers but AT&T didn't explain where they are and he
7   hasn't verified where they are.

8            THE COURT:  I honestly -- I'm not understanding.

9            What I hear you saying is that there are extraneous
10  towers depicted on the map that he will not be relying on that
11  did not figure into the analysis?

12           MS. MIRÓN:  No, I'm saying the opposite.  There are
13  extraneous towers for which there has been no testimony that he
14  will be relying on because he is going to testify that a cell
15  phone call connects to the nearest cell tower and of course it
16  is important where those other cell towers are in order to draw
17  that conclusion.

18           THE COURT:  In other words, that he may be referring
19  to cell towers that you were not previously informed about?

20           MS. MIRÓN:  That there has been no testimony about and
21  he hasn't even reviewed them.  AT&T hasn't provided those.  We
22  don't know where these came from so he is going to make a
23  conclusion based on no data.

24           MR. DEFILIPPIS:  Your Honor, I think -- as I said, he
25  has been very straightforward about where he obtained the data,

H1D5gam5                              Perry - direct

where he obtained the different towers.  If defense counsel

wants to attack the basis for any conclusions drawn from that,

they are welcome on cross, they're welcome in closing.  I think

this is just -- they're quibbling with the methodology but

there is nothing improper about him putting on the map what he

knows from his observation to be cell towers and then, again,

if they want to argue that they could never have been used and

therefore should be discounted, that's within their --

            THE COURT:  I am going to overrule the objection.

1           (In open court)

2           MR. DEFILIPPIS:  Your Honor, so the government offers

3      Government Exhibit 520.

4           THE COURT:  It will be received.

5           (Government's Exhibit 520 received in evidence)

6      BY MR. DEFILIPPIS:

7      Q.  Ms. Quinones, if we can publish the first cover page of

8      that document?

9           So, Agent Perry, you prepared this cover page here?

10     A.  Yes, I did.

11     Q.  And just explain to us below the title there, there are two

12     phone numbers indicated in different colors; could you just

13     walk us through what those numbers are?

14     A.  The first phone number highlighted in red was the phone

15     number that I, from Verizon Wireless, that I completed my

16     analysis on.  It is actually area code 623-692-6880 and listed

17     up there, the date range of the records that I was provided,

18     and that is from July 2nd, 2014 through June 29th, 2015.

19     Q.  And was that a date range you determined or was that

20     determined by the records you received?

21     A.  That was the first -- that was actually the records that I

22     received, the first line of data and the last line of data.

23     Q.  Okay.

24          And looking at the number ending in 9079?

25     A.  Yes; that was the second number that I analyzed, and that's

an AT&T wireless phone, and it is area code 845-283-9079, and

the cell site records for that phone expanded from January 2nd,

2014 through January 27th, 2015.

Q.  And if you know, do you know what area -- what geographic

areas those two area codes are associated with?

A.  Yes.

        623 is going to be the Arizona area as well as 845 is

going to be the Orange County, New York area.

Q.  If we could move to the next slide?

        In this slide titled Example, what are we looking at?

A.  This is a demonstrative slide or photograph of a

typical-looking cell tower.  This is an example.

Q.  And could you point out to us just the key parts of the

tower and their function?

A.  Actually, if I look at the right-hand side there is a

triangle shape, that's actually the three different sides.

That triangle represents three different sectors.  The gray

boxes attached to those triangles is what is referred to as a

cellular antenna.  Those are the devices that transmit and

receives the cellular signals.

Q.  Next slide?

        Now, Mr. Perry, what are we looking at here?

A.  Not all cell towers look like the typical metal poles.

Especially here in Manhattan, the cellular providers will

actually lease space such as building, flag poles, water

1    towers, already existing structures to affix their antennas to

2    and this is just a collage of those various structures in which

3    various antennas can be found.

4    Q.   Okay.  Next slide?

5         Mr. Perry, if you would like to use a pointer during

6    the presentation, I will drop one with you.

7    A.   Thanks.

8    Q.   So, this slide titled Common Cell Tower Sector Layout, what

9    does this depict?

10   A.   Your typical cell tower is divided into three sectors and

11   generally they're approximately a 120 degree coverage area in

12   each sector.  When you put them all three together, that will

13   actually provide a 360 degrees coverage of that particular

14   tower.  This is actually just an indication of how a typical

15   cell tower could be laid out.

16   Q.   So you testified earlier that when there is activity on a

17   phone it sometimes utilizes or has contact with a particular

18   tower.  Does it also have contact with a particular sector?

19   A.   Yes, it does.

20   Q.   And what, if anything, can you conclude about the sector

21   that it has contact with?

22   A.   If I -- once I determine the direction in which the

23   particular sector on the tower provides its coverage and a

24   phone connected to that particular tower and sector, then we

25   can determine the general location in which that phone was

1    located at the time of the call.

2    Q.  And when you say general location, how precise or imprecise

3    is the location data?

4    A.  It is all relevant to the number of towers, the adjacent

5    towers.  For example, here in New York City there are cell

6    towers located almost every block, where in New York City the

7    cell towers and sector will provide coverage between two to

8    five blocks is what we see in Manhattan including some parts of

9    Queens and Bronx.  But, if you get out into the area such as

10   North Dakota or South Dakota where you have cell towers every

11   six to seven miles, that area is going to be much larger there

12   as opposed to here in the city.

13   Q.  So, here in the city are you able to approximate about how

14   close to a tower you can tell someone is if they hit on that

15   particular tower?

16   A.  Again, it is much more -- it is going to be a lot closer to

17   the tower than like I described in the rural settings.  As I

18   stated earlier, what we have seen when I conducted drive tests

19   and from other examples that we have done, it is between two to

20   five blocks.

21   Q.  Let's turn to the next slide.

22          Agent Perry, what are these red dots that we see on

23   the map here?

24   A.  Those are the Verizon -- the locations of the Verizon cell

25   tower in October of 2014.

H1D5gam5                          Perry - direct

1   Q.   How did you determine those locations?

2   A.   Those towers were determined by the cell tower key that

3   Verizon Wireless provided.

4   Q.   And it is as of the October 2014 date?

5   A.   Yes.

6   Q.   Okay.  Next slide?

7           Agent Perry, what are we looking at here?

8   A.   This is actually the subscriber information for both phones

9   that I analyzed, one from Verizon Wireless and one from AT&T.

10  Q.   So, looking first to the Verizon Wireless phone, is that

11  the one ending in 7880?

12  A.   Yes.

13  Q.   And to whom is that one subscribed?

14  A.   Actually, it is up there.  It is actually subscribed to an

15  individual, the first name is Ahmed, the last name is

16  El Gammal.

17  Q.   Okay.

18           Is there a listed address?

19  A.   There is, it is actually 3800 North El Mirage Drive, and

20  that's in Avondale, in Arizona.

21  Q.   And now the second phone, is that the one ending in 9079?

22  A.   Yes, it is.

23  Q.   And who is the listed subscriber on that phone?

24  A.   That's actually -- I apologize, it is going to be the

25  Goarany Group.  Again, the pointer is not working, if you can

1    zoom in?  Yes.

2    Q.  Agent Perry, I'm going to hand you what's been marked

3    Government Exhibit 110-A.

4              Your Honor, permission to approach?

5              THE COURT:  You may.

6    Q.  Agent Perry, have you seen records like this before?

7    A.  Yes.  I was just looking at a set today, actually, on

8    another case.

9    Q.  And what types of records are these?

10   A.  These are records provided to us by -- they are business

11   records provided to us by Facebook.

12   Q.  And, generally speaking, looking at the first page, what

13   does it depict?

14   A.  This is going to be the subscriber, the user information,

15   the subscriber information, I believe the account setup

16   information, as well as some e-mail addresses for -- pertaining

17   to a particular Facebook account.

18   Q.  And since this is already in evidence, Ms. Quinones, can we

19   publish Exhibit 110-A?  And if we can first highlight the

20   registered -- there we go.

21             So, Agent Perry, just tell us, what is the listed name

22   on the Facebook subscriber account?

23   A.  It is actually going to be the first name of Samy, S-A-M-Y,

24   and the last name is Mohamed, M-O-H-A-M-E-D.

25   Q.  Okay.

1            And the city and state listed?

2   A.   Queens, New York.

3   Q.   And looking at the first page, is there a phone number

4   listed with this account?  Maybe if you look on the hard copy?

5   A.   Yes, there is.  Yes.  And that's the same phone number that

6   I conducted my analysis on, it is 845-283-9079.

7   Q.   Okay.

8            Was that the New York-based phone number?

9   A.   Yes.

10  Q.   Let's turn to Government Exhibit 520 and moving to the next

11  slide?

12           Agent Perry, does this slide depict some of the data

13  that you analyzed?

14  A.   Yes, it does.  This is actually the beginning of my cell

15  site mapping that I did.

16  Q.   And in mapping this data, did you rely on one or another

17  phone in order to map the data, in other words the AT&T or

18  Verizon?  Or both?

19  A.   For this particular side or in general, on the whole?

20  Q.   Let's start with this particular side.

21  A.   This is actually I relied on the records that were provided

22  to me for the Verizon phone number ending in 7880.

23  Q.   Again, which individual was that phone subscribed to?  Was

24  that Mr. El-Gammal or the other one?

25  A.   It was associated to Mr. El-Gammal.

1    Q.   Okay.

2              So, describe what is depicted on the map.

3    A.   This is a phone call that occurred on the 7880 phone number

4    that utilizes a cell tower in the direct vicinity of Phoenix

5    Sky Harbor International Airport, and that call occurred on

6    October 6, 2014, at approximately 8:121 a.m. local time.

7    Q.   And when you refer to times in this presentation, are they

8    all Phoenix local time or how did you calibrate the times?

9    A.   This is actually -- these times are the location in which

10   the phone is located at that time.

11   Q.   Okay.

12   A.   So, if the phone is in Arizona it is going to be Arizona

13   time.

14   Q.   Okay.

15             And the red dots that we see on the map there, what

16   are they?

17   A.   Those actually are the locations of cell towers within the

18   vicinity of -- within the vicinity of the sky harbor

19   international airport.

20   Q.   And the sideways V-shaped depiction there, what is that

21   referring to?

22   A.   That refers to the particular sector face that the phone

23   7880 utilized during this communication.

24   Q.   And remind us again the date and time of this particular

25   call?

1    A.   This was on October 6, 2014, at 8:21 a.m.

2    Q.   Okay.  Let's move to the next slide.

3         There is a map of the United States, Agent Perry, and

4    what have you depicted here?

5    A.   The next call that I mapped, the phone was located in New

6    York City.  This is just a visual representation to show the

7    travel from Arizona to the east coast and to New York.  It is

8    just to show that the phone traveled from Arizona to New York.

9    Q.   And, just to be clear, did you actually review any travel

10   records or did you conclude that the user had traveled based on

11   your location analysis?

12   A.   At the time of this exhibit I actually concluded that the

13   phone traveled from Arizona to New York.

14   Q.   And, again, which phone is this?

15   A.   7880.  The Gammal phone, if I can refer to it as that.

16   Q.   Turning to the next slide?

17        Does this reflect additional data that you mapped,

18   Agent Perry?

19   A.   Yes, it does.

20   Q.   And tell us what that showed.

21   A.   These are actually two phone calls that occurred where

22   phone number 7880 utilized a cell tower at John F. Kennedy

23   International Airport later that evening on October 6, 2014, I

24   believe it was at 5:35 -- I'm sorry, 5:34 and then again at

25   5:39 p.m. New York time.

H1D5gam5                          Perry - direct

1   Q.  Now, when you say phone calls occurred, is there any other

2   type of data or activity that would trigger a hit on a cell

3   tower?

4   A.  As I stated earlier, with Verizon you are only going to be

5   able to map out the voice calls.  AT&T, you can map out the

6   voice, data, and text messages.

7   Q.  There are two red arrows depicted next to the box there;

8   what do they indicate?

9   A.  There is actually a key in the upper right-hand corner of

10  my slide.  Those red arrows will indicate communication or

11  calls between the 9079 phone number and the 7880 number.

12  Q.  And so, if there is no red arrow on a particular call, what

13  does that indicate?

14  A.  It means that the phone, 7880 was calling a phone other

15  than the 9079 number.

16  Q.  Okay.

17          Now, if we look at the map here, there is a key which

18  has a blue and red dot.  Just describe for us what that

19  signifies.

20  A.  Blue will represent the locations of the AT&T cell towers

21  that were utilized by the phone 9079, as well as the red dots

22  will indicate the Verizon cell towers that the -- sorry, the

23  phone 7880 utilized as well as the adjacent towers.

24  Q.  Okay.

25          So, is it fair to say this was several hours after the

1    previous slide we saw at the Phoenix airport?

2    A.  Yes, it was.

3    Q.  Let's move to the next slide.

4         So, Agent Perry, tell us generally what you have

5    depicted on this slide?

6    A.  This slide actually includes the previous calls made by

7    phone 7880 and the location in which those calls occurred.

8    That phone was in communication with the AT&T phone at 9079.

9    Now, this slide includes the cell towers that phone 9079

10   utilized when it was in contact with the other phone as well on

11   the top as the actual excerpt of the Verizon phone records to

12   show these two calls.

13   Q.  Okay.

14        So just breaking that down, if we start towards the

15   bottom of the slide where we see a blue shaped V, again, remind

16   us which phone that represents or phone number?

17   A.  That represents the AT&T phone 9079.

18   Q.  And is that the New York-based number or the Arizona based?

19   A.  Sorry.  This is the New York-based phone number.

20   Q.  And looking at the V there, what can we tell about the

21   location of that phone at the times shown there?

22   A.  There is two different sectors, if we can refer to it as

23   that.  The one that has an open V is a particular vector that

24   would provide service to the north of that tower, and then you

25   see a smaller circle.  Cell phone providers utilize smaller

1    antennas called a DAS -- D-A-S -- and that's a Distributed

2    Antenna System and they're manufactured to provide coverage in

3    a 360-degree space.  So, such as the area in the airport which

4    sees a lot of phone usage in the high population of travelers,

5    they'll install these smaller towers to help provide additional

6    coverage.

7    Q.  So, looking at the blue V at the bottom with the blue box

8    what, if at all, can you conclude about whether that phone was

9    in the vicinity of John F. Kennedy Airport at the times

10   depicted which would be, is it around 5:00 p.m.?

11   A.  Yes.  Actually, I believe the first call was around 4:40.

12   Q.  Okay.

13   A.  For those four calls highlighted in the blue box the phone

14   had to have been in the vicinity of JFK International Airport

15   because JFK is a fairly large property out there.

16   Q.  Okay.

17        Moving up to the next V, the red just above it, is

18   that again the other phone?

19   A.  Yes; and that's actually the same calls that occurred on

20   the previous slide.

21   Q.  Okay.

22        And how close in time were those calls to the calls

23   made by the blue phone?

24   A.  Well, two of those calls occurred almost at the exact same

25   time because they were calling each other.  There will be a

1    little bit of difference between because my records -- if I'm

2    calling you, counselor, my phone record is going to start

3    earlier than when you pick up, and vice versa.  So, there might

4    be a little bit of difference in seconds between the two.  And

5    then, obviously, there is two calls that the 9079 phone made to

6    other phones and that occurred at 4: -- that would have

7    occurred at 4:40 p.m. and then 5:03 p.m.

8    Q.  Are you able to conclude from this that those two phones

9    were both in the vicinity of John F. Kennedy Airport calling

10   one another at the depicted times?

11   A.  Yes.

12   Q.  Finally, let's move to the top V.

13   A.  That's a call that occurred on the phone 9079 that occurred

14   at 6:12 p.m. and it was utilizing a cell tower located along

15   the Belt Parkway.

16   Q.  If you know, is that near or far from John F. Kennedy

17   Airport?

18   A.  It is just to the north of JFK International Airport.

19   Q.  If I can direct your attention to the grid at the top of

20   the slide?  What have you laid out there?

21   A.  This is an excerpt of the actual phone records in which I

22   analyzed.  The boxes that are highlighted in blue are the phone

23   number 9079, and the box highlighted in red are the -- it

24   includes the phone number for 7880.

25   Q.  So, where it says mobile director number, what number does

1  that display?

2  A.  That's actually displaying the Verizon phone that ends in

3  7880.

4  Q.  And the dial digit number, what does that indicate?

5  A.  That is going to say that that phone number dialed the

6  phone number of 9079.

7  Q.  And the call direction, what do those numbers indicate?

8  A.  Verizon uses numbers to indicate the direction.  In this

9  case 3 would be an outbound call from the Verizon phone and the

10  6 below it will represent an inbound call.

11  Q.  Okay.

12        And the next column, Seizure Time, what does that

13  refer to?

14  A.  That's the date and time in which the call occurred.

15  Q.  And duration -- seizure duration?

16  A.  That's actually in seconds, so that is 83 seconds for the

17  duration of that call.

18  Q.  Now, where it says first serving cell site, what does that

19  tell you?

20  A.  Verizon Wireless will actually number their cell towers in

21  a particular geographic area.  It just indicates that cell

22  tower 55 was utilized to make this call.

23  Q.  And where it says first serving, does that have any

24  significance?

25  A.  It does.  Verizon Wireless will capture the tower and

1    sector that your call starts and also selects the cell tower in

2    which the call ends on.

3    Q.  So, would that be the last serving cell site?

4    A.  Yes.

5    Q.  And can they be different?

6    A.  Absolutely.  Yes.

7    Q.  And then where it says last serving cell face, how does

8    that differ from cell site?

9    A.  The cell serving face is actually going to indicate the

10   particular side of the tower or the particular sector that was

11   used on that tower.

12   Q.  And finally, the calling party number?

13   A.  That's, again, to reflect the number that was making the

14   call.

15   Q.  Okay.

16           So, before we move on, just remind us, what date and

17   time we are at right now?

18   A.  This is October 6, 2014, at 5:34 and 5:39 p.m., to the

19   Verizon phone.

20   Q.  Okay.  So, let's look at the next slide.

21           First, Agent Perry, what geographic area or location

22   does this map depict?

23   A.  This is actually in the vicinity of the AirTrain in Jamaica

24   Queens, New York.

25   Q.  Did you say the AirTrain?

H1D5gam5                          Perry - direct

1   A.  AirTrain, yes.

2   Q.  How far or close is that to John F. Kennedy Airport?

3   A.  It has been a while since I have ridden on it but I believe

4   it is a 20-minute train ride.

5   Q.  And describe for us again the three Vs there; what do they

6   depict?

7   A.  They depict the towers and sectors in which the phones

8   communicated with.

9   Q.  Are they in relative close proximity to each other?

10  A.  Yes, they are.

11  Q.  And how long after the previous calls on the previous slide

12  were these?

13  A.  For the Verizon phone, the last call was at 5:39 and this

14  call, the first call that I mapped here was approximately

15  almost an hour later at 6:39.

16  Q.  And it looks like you have depicted a location in the

17  middle of the three Vs there; what is that location or place?

18  A.  That's actually the location of the Howard Johnson Hotel

19  that was located at the AirTrain -- in the vicinity of the

20  AirTrain, I believe it is Howard Johnson Air Train is the name

21  of the location.

22  Q.  And directing your attention to the top of the slide, what

23  is that?

24  A.  That's actually an excerpt of the hotel log or registry.

25  Q.  In whose name was the hotel reservation?

H1D5gam5                        Perry - direct

1   A.  That was Ahmed El Gammal.

2   Q.  So, looking at this slide what, if anything, can we

3   conclude about whether these two phones were in the vicinity of

4   that hotel at the depicted times?

5   A.  They were.

6   Q.  Okay.  Let's move on.

7           What are we looking at here?

8   A.  This is -- the only thing, this is the exact same slide as

9   the previous one.  All I did was brought in the Google earth

10  satellite imagery to show buildings so you can actually -- you

11  can see that there are -- there is train tracks right there,

12  there is a terminal, just for geographic awareness.

13  Q.  Now what, if anything, can we conclude about whether these

14  phones were calling each other at the time they were located

15  near the Howard Johnson Hotel?

16  A.  They were not.

17  Q.  Okay.  Next slide?

18          What are we looking at here, Agent Perry?

19  A.  These are cell towers and sectors that both phone 7880

20  utilized as well as phone 9079 utilized the next day on October

21  7th of 2014.

22  Q.  Okay, so this is the day after they were -- the day after

23  the slide we just looked at?

24  A.  Yes.

25  Q.  And are they at the same location, generally speaking?  Or

1    a different location?

2    A.   They are actually in the same general vicinity of the

3    Howard Johnson Hotel.

4    Q.   And at what times were these registered?

5    A.   This occurred around 10:38 and 10:41 a.m.

6    Q.   And how many calls were there?

7    A.   They're in contact with each other and there is a total of

8    two calls.

9    Q.   And how far apart were those calls?

10   A.   I believe three minutes -- about three minutes.

11   Q.   And were there any other -- were these the only calls on

12   that day that you observed both phones in that vicinity of the

13   Howard Johnson Hotel?

14   A.   Both phones together in the vicinity?  Yes.

15   Q.   And remind us again, the blue and red dots on the map?

16   A.   The red dots are the locations of the Verizon cell towers

17   and the blue dots are the locations of the AT&T cell towers.

18   Q.   Now, could these phones be using one or the other of those

19   towers?  Or what would determine which tower was used?

20   A.   Your phone is constantly seeking for the strongest and

21   clearest signal, it is a term that we use, stacking and

22   racking, and that happens very fast.  It is constantly trying

23   to maintain the strongest and clearest signal so it can provide

24   the strongest and clearest call for you.  Here in New York

25   City, in general that is going to be your closest tower but

1    here in New York City, especially in Manhattan, that is

2    sometimes not the case because you have buildings, you may have

3    structures that may interfere with that signal.  A lot of it

4    has to do with line of sight.

5    Q.  Okay.

6         What date are we again on this?

7    A.  This is October 7, 2014.

8    Q.  Let's move to the next slide.

9         What have you depicted here?

10   A.  Again, this is the same data as previous, the previous

11   slide except for the layer to show the buildings and structures

12   such as the train tracks.

13   Q.  Okay.  We will move on.

14        Agent Perry, what location does this map depict?

15   A.  This is going to be approximately midtown Manhattan right

16   along the southern border of Central Park.

17   Q.  Was this the same day or a different day than the October

18   7th slide we looked at?

19   A.  This is actually later in the afternoon of October 7th, so

20   same day.

21   Q.  And about what day did these calls occur?

22   A.  These calls occurred around 3:45 p.m.

23   Q.  And what, if anything, can we conclude about where these

24   two phones were at that time?

25   A.  They had to have been in the same general vicinity as one

another which would be indicated by the red wedge for the

Verizon phone and the blue wedge for the blue phone, and it

would encompass kind of the general vicinity around the Central

Park, southern border of Central Park.

Q.  And how many calls were registered in that area?

A.  I only -- this is calls that occurred between the two of

them at this time and there is one.

Q.  And the green box at the bottom depicts a particular

address; why did you show that there?

A.  I was provided the information of an ATM transaction that

occurred at this address at 1345 Avenue of America in New York,

New York.

Q.  And was that derived from the Wells Fargo bank records that

we looked at previously?

A.  Yes.  Yes, it was.

Q.  Directing your attention to the top of the slide, what do

we see there?

A.  That is actually an excerpt for the statement for that ATM

transaction and it lists the address of 1345 Avenue of

Americas, and I believe there is a date on the left-hand side

that says 10/7.

Q.  Okay.

        Can you tell anything about the transaction from this

information depicted, the amount?

A.  Yes.  There was a transaction for $303 and they nailed you

H1D5gam5                         Perry - direct

1   for the $2.50 fee.

2   Q.  They get you every time.

3   A.  Yes.

4   Q.  Next slide.

5           THE COURT:  Before we go to the next slide.  It is a

6   quarter of 3:00, let's take the afternoon break.

7           Ladies and gentlemen, 15 minutes.  Please do not

8   discuss the case, please do not read any news about it, and

9   please do not do any research.  15 minutes.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Anything?

3           MR. QUIGLEY:  Nothing from the government, your Honor.

4           MR. HABIB:  Very brief ex parte, your Honor?

5           (Pages 652-654 SEALED and EX PARTE by order of the

6    Court)

7           (Continued next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2                MS. TEKEEI:  Your Honor, we object to the ex parte

 3      nature of these discussions.  We should at least be informed as

 4      to the topic matter.  We believe we should at least -- we

 5      request at least be informed of the topic matter of these ex

 6      parte discussions.

 7                THE COURT:  That objection is overruled.  Period.

 8                MS. TEKEEI:  Thank you, your Honor.

 9                THE COURT:  Okay.

10                And again, the side bar that I had with the defense

11      will be sealed with copies only made available to the defense,

12      upon request.

13                (recess)

14                THE COURT:  Are we ready?

15                MS. MIRÓN:  Yes, your Honor.

16                THE COURT:  Okay.  Get the jury.

17                (Continued next page)

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. DeFillipis.

2          MR. DEFILIPPIS:  Thank you, your Honor.

3   Q.  Agent Perry when we left off I think we were talking about

4   the $2 ATM fee.  What if anything can you conclude from these

5   slides about whether the phones were in the vicinity of Central

6   Park at the depicted times?

7   A.  They were.

8   Q.  Let's move to the next slide.  Is this the same or

9   different location depicted on the map?

10  A.  This is actually the same location.

11  Q.  As the previous slide or as one of the other slides we've

12  seen?

13  A.  I believe this is three slides ago.  There is the vicinity

14  of the Howard Johnson at the Queens Jamaica AirTrain.

15  Q.  And what can we tell about the location of these two

16  phones?

17  A.  That they would be located in the same vicinity as one

18  another.

19  Q.  How long after the locations depicted on the previous slide

20  were these?

21  A.  This is actually the next morning and now we're into

22  October 8, 2014.

23  Q.  And again, the snapshot you produced at the top of the

24  slide or excerpted, what is that?

25  A.  That's an excerpt of the hotel ledger or register.

1    Q.  So at about what time did these calls occur?

2    A.  These occurred at 11:43 a.m.

3    Q.  And were the calls, were the phones calling, communicating

4    with each other or with others?

5    A.  They were in contact with one another.

6    Q.  Let's move to the next slide.  What have you shown here?

7    A.  Again, this is just same slide as the previous one, the

8    satellite view showing the building and structures.

9    Q.  And remind us, what date is this?

10   A.  October 8 of 2014.

11   Q.  Next slide?  What area is shown here?

12   A.  This is actually, we're back at the vicinity of JFK

13   International Airport.

14   Q.  And which phone registered on a cell tower in the vicinity

15   of the airport?

16   A.  The Verizon wireless, the phone register subscribed to

17   Gammal.

18   Q.  Is this on the same date or different date?

19   A.  This is still on the 8th of October.

20   Q.  At what time?

21   A.  12:56 p.m. as well as I believe 12:59 p.m.

22   Q.  Again, is that New York local time?

23   A.  Yes, it is.

24   Q.  And the red dots that we see around, what do they depict?

25   A.  Those are depicting the Verizon cell towers.

H1DFGAM6                        Perry - direct

1   Q.  Next slide?  Agent Perry, what does the arrow on the map of

2   the United States indicate?

3   A.  Indicates that this phone traveled back to, from New York

4   back to Arizona.

5   Q.  And this is the 7880 phone?

6   A.  Yes, it is.

7   Q.  Next slide?  And where does this map show?

8   A.  We're actually back at Sky Harbor International Airport in

9   Phoenix, Arizona.

10  Q.  How many calls are shown that are shown on this slide?

11  A.  One.

12  Q.  And is it with the other, the blue phone or with another

13  phone?

14  A.  With another phone.

15  Q.  At what time?

16  A.  This would have occurred at 4:09 p.m.

17  Q.  So several hours after the previous slide?

18  A.  Yes.

19  Q.  Next slide?  What have you shown here?

20  A.  These are all of the calls for phone number 7880 for the

21  time, while the phone was in the New York City area on

22  October 6 through October 8 of 2014 and the cell towers that

23  were used.

24  Q.  So that was the phone registered to Mr. El Gammal?

25  A.  Yes, it was.

1   Q.  And how many occasions are depicted in which you detected

2   that phone?

3   A.  Three.

4   Q.  And just describe for us each one and how many calls,

5   approximately how many calls occurred at each place?

6   A.  If we start with the cell tower in the bottom of the

7   screen, that's at JFK International Airport and there's a total

8   of four calls there; two on October 6 and two on October 8.

9   Then if you focus on the call at the hotel, which is the center

10  of the exhibit.  Do you want me to count them all?

11  Q.  I think the jury can see how many.  Again, which area

12  geographically did these calls occur?

13  A.  In the vicinity of the Howard Johnson Hotel.

14  Q.  Which dates?

15  A.  October 6, October 7 and October 8 of 2014.

16  Q.  And finally, what was the third location at which you

17  located this phone?

18  A.  In the vicinity of the southern edge of Central Park in

19  Manhattan.

20  Q.  And on what date and time?

21  A.  There's one call and that was October 7 of 2014.

22  Q.  Now, based on your review of the call and location data,

23  did you detect this phone at any other locations within the New

24  York City area or anywhere?

25  A.  For this particular time period, no.

1  Q.  Next slide.  And what's shown here, Agent Perry?

2  A.  This is an excerpt of the call detail records for the phone

3  number of 7880 for every instance in which it was communication

4  with phone 9079.  These records came from the cell site records

5  themselves.

6  Q.  Okay, so these are all the calls between those two numbers?

7  A.  Based on the cell site data, yes.

8  Q.  Did you also review the toll data or just the pure to/from

9  data before these numbers?

10  A.  I'm familiar with the toll records but I utilized the cell

11  site data for my analysis.

12  Q.  And in your review of the toll records were there any other

13  calls you identified?

14  A.  I believe I identified two text messages as well as one,

15  one voice call that was outside of this time period.

16  Q.  And do you recall whether they were before the time period

17  or after, if you remember?

18  A.  I recall it was June 9 of 2014 was the voice call and I

19  can't remember the actual two text messages.

20  Q.  And again, were those calls between those two phones or

21  with either of these two phones and other phones?

22  A.  The text messages in that one call are between the two

23  phones.

24  Q.  Now, what area are we looking at here?

25  A.  This is actually an overview, the bigger portion of the map

1   is an overview of the New York City area as well as the

2   Westchester/Orange County northern New Jersey area.

3   Q.  And what date is depicted on this map; what date did these

4   calls occur?

5   A.  This was for a date of January 16 of 2015.

6   Q.  And is that a date that you were asked to look into?

7   A.  Yes.

8   Q.  And what did it show about, and again, which phone is this,

9   the 7880 number or the 9079?

10  A.  This is for 9079.

11  Q.  What if anything did it show about the location of that

12  phone on that date?

13  A.  All of the activity for phone 9079 occurred in the vicinity

14  of Goshen, New York which is indicated by the red dots and

15  that's actually about an hour and a half north of New York City

16  in Orange County.

17  Q.  What does each red dot reflect?

18  A.  The cell towers that were utilized, that phone number 9079

19  connected to.

20  Q.  Is that our last?

21  A.  It is.

22          MR. DEFILIPPIS:  No further questions for now, your

23  Honor.

24          THE COURT:  Cross-examination.

25          MS. MIRON:  Thank you.

H1DFGAM6                         Perry - cross

1    CROSS-EXAMINATION

2    BY MS. MIRON:

3    Q.  Good afternoon.

4    A.  Good afternoon, counselor.

5    Q.  Let me just understand the way cell site, historical cell

6    site location data works.  This is not GPS monitoring data,

7    correct?

8    A.  Correct.

9    Q.  GPS monitoring permits an agent like yourself to specify

10   exactly where a cell phone is located according to the GPS

11   coordinates?

12   A.  It's all relative to the accuracy and how many satellites

13   it's seen.  I've seen GPS down to 4 meters I've seen it down to

14   10,000 meters.  It all depends on the conditions at the time it

15   was taken.

16   Q.  Okay, but in the best case scenario you could precisely

17   locate a cellular phone within four meters of the coordinates

18   if you're using GPS monitoring, right?

19   A.  Yes, ma'am.

20   Q.  And when using historical cell site data, you're looking at

21   the cell tower locations of the providers, correct?

22   A.  Yes.

23   Q.  Not exactly where the cell phone is.  You don't know that

24   based on the call detail records, correct?

25   A.  We know the general vicinity and as I testified earlier,

1   ma'am, here in New York --

2   Q.  That's okay, I don't need you to repeat.  The general

3   vicinity?

4   A.  Yes.

5   Q.  And if you're in a suburb in the middle of the country,

6   that could be a very large vicinity, right?

7   A.  Correct.

8   Q.  In Manhattan it may be very small, it may be some city

9   blocks, correct?

10  A.  Correct.

11  Q.  In Queens could be a little more spread out, right?

12  A.  Yes.

13  Q.  There are fewer cell tower locations in Queens than

14  Manhattan, right?

15  A.  Correct.

16  Q.  Let's pull up your Exhibit 520 and publish page 11, and

17  look closely at -- well, first of all, the red dots, what do

18  those indicate?

19  A.  Those are the location of the Verizon cell towers.

20  Q.  That was based on the key you received from Verizon?

21  A.  Yes.

22  Q.  What are the blue dots?

23  A.  Those are the locations of the AT&T cell towers.

24  Q.  All of the AT&T cell towers?

25  A.  Yes.

H1DFGAM6                              Perry - cross

1    Q.  So you just know that?

2    A.  As I testified earlier, Verizon provides the FBI, so does

3    AT&T, they provide them as well on an ongoing basis.

4    Q.  When did you get these keys?  Are they accurate?

5    A.  They said they were accurate as to the information provided

6    to us by AT&T, yes.

7    Q.  And they're accurate as to the date we're interested in,

8    October 6, 2014, right?

9    A.  The towers there, yes.

10   Q.  Is there a blue dot near the red tower location that you're

11   indicating here, is there a blue dot there?

12   A.  If you can zoom in I can --

13   Q.  Let's try to zoom in.

14   A.  Yes, there is.

15   Q.  So there is a blue dot right next to a phone call made by

16   Mr. El Gammal's phone, right?

17   A.  Yes, there is.

18   Q.  And the blue indicated calls are not reflected on that dot,

19   correct?

20   A.  No, they're not.

21   Q.  They're reflected on two other dots, is that right?

22   A.  Yes, ma'am.

23   Q.  Fair to say that historical cell site data does not permit

24   you to know whether someone's inside a building?

25   A.  Correct.

H1DFGAM6                        Perry - cross

1   Q.  Or inside a particular room, right?

2   A.  Correct.

3   Q.  In the general vicinity is what you can conclude.

4   A.  Yes, ma'am.

5   Q.  You focused on three locations, right?

6   A.  I was provided, I mapped out the locations in which that

7   phone 7880 was located at and the cell towers that were used

8   and it happened to be three locations, yes.

9   Q.  And that's where you directed your focus?

10  A.  Yes.

11  Q.  But Verizon doesn't keep track of where a cell phone text

12  message bounces off a cell tower, right?

13  A.  No, they don't, ma'am.

14  Q.  Nor does it keep track if you're on your phone, say, on

15  Facebook?

16  A.  They do now.  Actually, there are certain reports --

17  Q.  I'm interested in this time period.

18  A.  This time period, I can't remember if they had data session

19  reports then.  They do now, I just don't know if they were

20  available back at that time.

21  Q.  Do you need to review your records from Verizon?

22  A.  I did not receive any data records and that in the last

23  couple of years have just become available to law enforcement.

24  Q.  Fair to say that if the phone was being connected to the

25  internet it is possible we could know where else it was, right?

H1DFGAM6                          Perry - cross

1    A.  Absolutely.

2    Q.  We could know if it was in a restaurant, right?

3    A.  I just stated we can't tell if it's inside or out, so no.

4    Q.  We could know if it's in the general vicinity of a

5    restaurant?

6    A.  Yes, ma'am.

7    Q.  We could know if it's in the general vicinity of the

8    Belgian Beer Cafe, right?

9    A.  Yes.

10   Q.  You testified about an ATM location and so let's show page

11   15.  Now, the data you received about the ATM withdrawal did

12   not indicate a time, right?

13   A.  It did not, ma'am, it only was a date.

14   Q.  So at any time on October 7 there was a ATM withdrawal

15   made.

16   A.  Yes.

17   Q.  As far as you know?

18   A.  Yes.

19   Q.  But you chose to depict these times because there are cell

20   phone calls at these times, right?

21   A.  I depicted this one because this is the call that 7880

22   made.  It's one of the locations and the cell towers are

23   located in close proximity in distance to them.

24   Q.  But you don't know if the cell phone was there eight hours

25   earlier for example, right?

H1DFGAM6                          Perry - cross

1    A.   I do not.  I know it was at the hotel in the morning, but I

2    don't -- on the 7th, it was at the hotel in the morning, so

3    there is a time difference.  I know where it was early in the

4    morning but not in between.

5    Q.   Okay.  So within the hours at the hotel, from those hours

6    to this time period, you don't know where it was?

7    A.   I do not, ma'am.

8    Q.   You received additional information about where the AT&T

9    phone was during these three days, right?

10   A.   Additional information?

11   Q.   Than what's depicted in your presentation?

12   A.   I did, as far as -- I focused on January 16 of 2015 for

13   that day to determine the location of that phone and the towers

14   that were used.

15   Q.   I'm talking about October 6, 7 and 8.

16   A.   Oh, yes, but that's included.  I thought you said outside

17   of my exhibits.

18   Q.   What's included, all of the towers that the AT&T cell phone

19   connected to are included in this presentation?

20   A.   No.  No, it's not.  The towers that --

21   Q.   Let's stop there.  It's fair to say that the cell phone

22   associated with the 845 number connected to additional towers,

23   right?

24   A.   Yes, it's fair to say.

25   Q.   Throughout this city?

H1DFGAM6                     Perry - cross

1    A.  Yes.

2    Q.  In fact, in Greenwich Village, right?

3    A.  That's possible.  I'm not familiar if it did or didn't.

4    Q.  Well, did you prepare a Google Earth file when you first

5    looked at this data?

6    A.  I prepared it for the mapping purposes, but I was not

7    familiar with each and every one of the calls outside of my

8    exhibit, so it's possible.  If it's in that Google Earth file

9    that you're referring to, then I would agree with that.  But

10   I'm not familiar exactly with that call.

11   Q.  Okay.  Are you saying you don't remember?

12   A.  I don't remember if a call exactly there but if you're

13   saying it's in the Google Earth file then I could tell you it

14   did occur.

15   Q.  We want to be accurate.  Would you like to refresh your

16   recollection as to this particular question?

17   A.  I mean, if you have the file and you want to show me.

18   Q.  I can show you a printout of Defense Exhibit 703.  Is this

19   a fair and accurate depiction of the analysis you first

20   performed on this data in June 2015?

21   A.  Yes.

22   Q.  And does it accurately reflect the additional cell tower

23   locations that you were able to locate when analyzing the 845

24   number?

25   A.  Yes, it does, ma'am.

1             MS. MIRON:  I would ask that this be admitted into

2     evidence as Defense Exhibit 703.

3             MR. DEFILIPPIS:  No objection, your Honor.

4             MS. MIRON:  And be published to the jury.

5             THE COURT:  Very well, it will be admitted and

6     published.

7             (Defendant's Exhibit 703 received in evidence)

8     Q.  Let me focus first on the date of 10/8 and those entries

9     below it on the left bottom corner.  Just highlight that for

10    the jury.  The left bottom corner, just the date and time.

11    Thank you.  And are you able to enhance that?  All right.

12            So October 8th of 2014 at 9:06 a.m., the 845 number

13    was in Rego Park, right?

14    A.  Yes.

15    Q.  And that's your typing?

16    A.  No, that's actually taken directly from the cell tower

17    location information from AT&T.

18    Q.  So it's accurate?

19    A.  Yes.

20    Q.  Okay.  And are you aware that the owner of that phone lives

21    in Rego Park?

22    A.  I'm not sure exactly specifically where, I know it is in

23    Queens somewhere.

24    Q.  But not at the Howard Johnson, right?

25    A.  I'm not aware he lived there, if he did.

H1DFGAM6                          Perry - cross

1    Q.   Let's just look right above that.  Okay, the Jamaica Avenue

2    and Sutphin Avenue location, is that the same location as the

3    Howard Johnson?

4    A.   Those are the calls that I previously marked, the 10:38 and

5    the 10:41 on October 7, those are the ones reflected on my map

6    in the vicinity of Howard Johnson.

7    Q.   And they're also in the vicinity of a train station, the

8    LIRR?

9    A.   I believe it runs there.

10   Q.   And the E train runs there?

11   A.   Can't remember the exact line.

12   Q.   The J train runs there?

13   A.   I'll trust you on that.

14   Q.   And the Z train?

15   A.   I'll trust you on that, too.  It's been a while.  I'm a 4

16   and 5 guy.

17   Q.   And above that on October 6, there are a bunch of towers

18   that are not named.  Any idea where they were?

19   A.   For this one, based on that particular information, no.

20   Q.   Let's just explain for the jury how many blue indications

21   there are.  If you could just look closely as it.  Perhaps we

22   could circle them for you.

23   A.   I count ten.

24   Q.   So they're not just three, right, they're not just three

25   cell towers that you can locate, right?

H1DFGAM6                        Perry - cross

1   A.  For phone number 9709, yes.

2   Q.  There are ten?

3   A.  Yes.

4   Q.  When the phone is not being used, for example, when the

5   user is asleep, it wouldn't be connecting to a cell tower?

6   A.  Unless there's a data event that was allowed or phone call

7   came in or text message.  It could possibly happen.

8   Q.  You indicated, let's turn to page 11.  I'd like to

9   highlight that blue upper box and expand it.  So again these

10  calls did not connect to the same tower that the red phone line

11  connected to, correct?

12  A.  Well, same tower it's Verizon, AT&T.  I think you're

13  talking about the blue dot you pointed to earlier in the same

14  vicinity?

15  Q.  Yes.

16  A.  They did not.

17  Q.  There are two calls within minutes of each other, 18:37 and

18  18:40?

19  A.  Yes.

20  Q.  And then there's a gap, correct?

21  A.  There is.

22  Q.  It's true that the phone had moved away from this location

23  within that gap, right?

24  A.  Can I look at Exhibit 703?

25  Q.  It's in front of you.

H1DFGAM6                           Perry - cross

1   A.   Yes, there's several calls starting I believe from 9:41,

2   well, 9:41 to 9:43 p.m. in that gap.

3   Q.   But not at this vicinity, correct?

4   A.   No, ma'am.

5   Q.   And let's highlight the box below that.  The small blue

6   box.  Just so we're clear, this is October 6 at 4:12 p.m.,

7   right?

8   A.   Yes, ma'am.

9   Q.   That is before the red phone landed in JFK, correct?

10  A.   Correct.

11  Q.   So the phone is in the vicinity of, say, the Howard Johnson

12  before the cell phone landed in JFK?

13  A.   Yes, ma'am.

14  Q.   Let's go over the list of phone calls between the two

15  numbers and that's on page 23.  And highlight the first two

16  lines, please.  The earliest call that you listed is July 7,

17  2014, right?

18  A.   Yes.

19  Q.   But you just testified there are other calls.

20  A.   Yes, there's, there's one additional call that occurred on

21  June 9 of 2014 that was, the toll records that did not have

22  location information expanded, started earlier than this time

23  frame of July 7.

24  Q.   Okay, but in addition to that July call there's a June 10,

25  2014 call, right?

H1DFGAM6                          Perry - cross

A.   June 10th?  I was reviewing Mr. Gammal's phone records to

determine that, so if you have records that you want to show me

and I can review, then I'd agree with you if that's the case,

but they should have shown up -- what was the date?

Q.   June 10 of 2014.

A.   They should have shown up on Mr. Gammal's phone records if

he in fact answered it and his phone was on, they might have

showed up there.

Q.   Are you saying he might have missed it?

A.   I'm saying the call was -- I think it was June 9 is what I

testified to.  Here's the thing.  You got time difference,

three-hour time difference, that could be the call I'm talking

about, where the defendant -- Mr. Goarany could have made that

call where it's June 10 here but June 9 when Mr. Gammal

received it because of the three-hour time difference.  If you

have the records, I'd be more than happy to talk about it.

Q.   I do.  Government Exhibit 502 page 193.  Now, there's a

call on July 8.  Maybe that's the one that you're thinking of,

between the two numbers.

A.   No, I'm talking about June 9, 2014 on the toll records for

7880.

Q.   Okay, so July 8, this is the AT&T?

A.   Yes.

         MS. MIRON:  We would ask that Exhibit 502 be admitted

into evidence.  It was authenticated by the providers.

1             THE COURT:  Any objection?

2             MR. DEFILIPPIS:  Your Honor, could we go to sidebar?

3             THE COURT:  Sure.

4             (Continued on next page)

H1DFGAM6                           Perry - cross

1              (At the side bar)

2              THE COURT:  What is 502?

3              MS. MIRON:  There are additional AT&T records that's

4     Government Exhibit 502.  I was under the impression they

5     offered it into evidence.  It's similar phone records but they

6     date back a little earlier and that's what I'd like to address.

7              MS. TEKEEI:  Your Honor, we did not authenticate or

8     enter as business records what was previously marked as

9     Government Exhibit 502 because we did not intend to rely on

10    them.

11             MS. MIRON:  We can recall the witness.

12             MS. TEKEEI:  Let me finish.  We have no objection to

13    them admitting them as records.  We just didn't do it today and

14    that's all we wanted to flag for the Court is that it's not in

15    evidence right now.

16             THE COURT:  But you intend to put it into evidence?

17             MS. MIRON:  I do.

18             THE COURT:  And you object?

19             MS. TEKEEI:  No, we don't.

20             MS. MIRON:  I guess it would be Defense Exhibit 502.

21             THE COURT:  Very well.

22             (Continued on next page)

23

24

25

1              (In open court; jury present)

2              MS. MIRON:  For the record, we move Defense Exhibit

3     502 into evidence.

4              MR. DEFILIPPIS:  No objection, your Honor.

5              THE COURT:  Defense 502 will be received.

6              (Defendant's Exhibit 502 received in evidence)

7     Q.  We can publish this page.  So you were not thinking about

8     this July 8 call when you said there's an additional call?

9     A.  Correct, ma'am, because this call again I only focused on

10    7880, if in fact it was a connected call I would have seen that

11    on the records.

12    Q.  Okay, and then June 10, 2014 at page 181 towards I believe

13    the top.  There is a call between these two numbers on June 10,

14    2014, that lasted approximately 121 minutes, right?

15    A.  Ma'am, if I could direct you to the call to the right

16    there's in parenthesis says UTC time which is Greenwich mean

17    time.  So this actual call occurred on June 9, five hours, or

18    actually four hours before this time stamp.  Because these

19    records are provided in UTC time.

20    Q.  June 9.  Then, on page 133 there's a January 26, 2014 call.

21    That's the bottom.  Can you tell how long that call lasted?

22    A.  Could you just move the box down a bit so I can see the

23    call headings?  There's a column called ET which is elapsed

24    time that's going to be 109 seconds.

25    Q.  Are you sure it's seconds?

1    A.  I'm sorry, 109 minutes.

2    Q.  Thank you.  And then finally, on page 22, March 6, 2013,

3    there's another call, right?  And how long is that one?

4    A.  For 111 minutes and 55 seconds.

5    Q.  Okay.

6              MS. MIRON:  No further questions.  Thank you.

7              THE COURT:  Any redirect?

8              MR. DEFILIPPIS:  Very briefly, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. DEFILIPPIS:

11   Q.  Agent Perry, does any of the new data that Ms. Miron showed

12   you on cross-examination, does that change any of your

13   conclusions of the analysis you conducted?

14   A.  No, it does not.  And I can address.  There's one issue she

15   brought up about that blue dot on the cell tower.  If you want

16   I can address that.

17   Q.  Sure.  Why don't we turn to slide 11 of the deck.  So I

18   understood Ms. Miron to have asked you, to have pointed out

19   first and confirmed that there were two red dots and a blue dot

20   clustered very close together.  Do you recall that?

21   A.  I do.

22   Q.  What basically does that mean or what does it signify?

23   A.  It means there are Verizon cell towers and AT&T cell towers

24   located in the vicinity of one another right there.

25   Q.  What if any conclusions do you draw from the way that the

1    calls are depicted here about whether or not those calls used

2    the nearest cell towers or anything else relevant to your

3    analysis?

4    A.  Well, I was asked to compare, I was comparing a Verizon

5    phone to an AT&T phone.  To determine the coverage area you

6    have to look at the adjacent towers on both.  So the next

7    closest Verizon tower from the tower that that one actually

8    used is way out here near the New York sign to the right.  So

9    the coverage for that tower can be a lot further to the east

10   and could be closer to the blue AT&T towers as well.

11   Q.  If you want, you can use the pointer.

12   A.  It's not working so good.  What I'm just trying to say, the

13   coverage area, if there is, if Verizon and AT&T had towers

14   located next to each other in each one of these scenarios, that

15   would change the coverage area, but the Verizon phone, the

16   coverage area is going to extend a good distance out to the

17   tower to the right where the New York is.  That's what I'm

18   saying.  So that phone could be, as I stated earlier with

19   defense counsel, that phone could be anywhere in that sector

20   which includes the vicinity of the AT&T towers which are

21   highlighted in blue.

22   Q.  Stepping back, is the density at JFK Airport towers, are

23   they relatively close together or are they far?

24   A.  There's an open space because of the runways, so they're a

25   little farther apart than in the Jamaica AirTrain vicinity.

H1DFGAM6                        Perry - redirect

1   Q.  In locating these calls if you were to give an approximate

2   zone of accuracy with which you could say this phone was within

3   two blocks, ten blocks, six miles, are you able to approximate

4   hoe close they were to the vicinity of JFK Airport?

5              MS. MIRON:  Objection, your Honor.

6              THE COURT:  Overruled.

7   A.  This one here you want to know how close to the vicinity of

8   JFK?  I have an overview map that would show that better, I

9   have a summary slide that would show JFK and this area but I

10  believe it's a 20-minute cab ride.  The AirTrain takes 20

11  minutes to go to JFK.  I guess four or five minutes.

12  Q.  Let me ask you, is it possible in your opinion looking at

13  this data that one or both of these phones was a mile away from

14  JFK Airport?

15  A.  This here?

16  Q.  Yes?

17  A.  Both of these phones --

18  Q.  I'm sorry, and I apologize.  I'm saying JFK Airport.  I

19  mean the location depicted which is the Howard Johnson.

20  A.  The Howard Johnson sits right in the heart of both of these

21  sectors for both AT&T and Verizon.

22  Q.  So is it possible in looking at this data here that one or

23  both of these phones was a mile away from the Howard Johnson?

24  A.  Absolutely not.

25  Q.  Is it possible that they were ten blocks away from the

H1DFGAM6                          Perry - recross

1    Howard Johnson?

2    A.   In this situation I'd have to count the blocks, but you're

3    getting kind of closer.  I would say it's possible on the outer

4    fringes.

5    Q.   Is it fair to say that both of these phones were within

6    blocks of the Howard Johnson Hotel?

7    A.   Yes.  It's fair to say that.

8    Q.   Are there any other conclusions of yours that were

9    affected, or are there any conclusions of yours that were

10   affected by the data you've seen?

11   A.   No.

12           MR. DEFILIPPIS:  Thank you.  No further questions.

13           MS. MIRON:  Briefly.

14   RECROSS EXAMINATION

15   BY MS. MIRON:

16   Q.   Agent Perry, you have the capability of doing what's called

17   a drive test, right?

18   A.   We do, yes.

19   Q.   And you've done that before, correct?

20   A.   Yes, ma'am.

21   Q.   You've driven out to a particular location you're

22   interested in and tested the connection of the tower to your

23   phone, right?

24   A.   Yes, ma'am.

25   Q.   You didn't do this in your case?

1   A.  It's a case from 2014, ma'am.  It's two years old.

2   Q.  Is that a no?

3   A.  No, I did not.

4           THE COURT:  Anything further?

5           MR. DEFILIPPIS:  Nothing further, your Honor.

6           THE COURT:  Mr. Perry, you may step down.

7           THE WITNESS:  Thank you, your Honor.

8           (Witness excused)

9           THE COURT:  Does the government have another witness?

10          MR. DEFILIPPIS:  Yes, your Honor.  The government

11  calls Mary Horvath.

12   MARY HORVATH,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15          THE COURT:  Please be seated, pull your seat up to the

16  microphone and please begin by stating your full name and state

17  spelling your last name for the record.

18          THE WITNESS:  Mary Horvath, H-o-r-v-a-t-h.

19          THE COURT:  Thank you Mr. DeFillipis.

20  DIRECT EXAMINATION

21  BY MR. DEFILIPPIS:

22  Q.  Good afternoon, Ms. Horvath.  Where do you work?

23  A.  The FBI.

24  Q.  What do you do at the FBI?

25  A.  I'm a digital forensic examiner.

1    Q.  How long have you been a digital forensic examiner?

2    A.  Since 1993.

3    Q.  What did you do before that?

4    A.  I was a software developer for a private company as a

5    contractor for the government.

6    Q.  What educational degrees do you hold?

7    A.  I have a bachelors degree with a double major in math and

8    computer science and a master's degree in forensic science.

9    Q.  What are your general duties as a forensic examiner?

10   A.  To examine, extract all the data from digital devices such

11   as computers, cell phones, cameras, you name it, analyze the

12   data, all sorts of types of analysis.

13   Q.  And are you a member of a particular unit or squad at the

14   FBI?

15   A.  Yes.  I'm a member of the digital evidence field operations

16   unit, formerly called the computer analysis response team.

17   Q.  What types of investigations do you typically work on?

18   A.  These days anything and everything that has a digital

19   device attached to it.

20   Q.  During your time with the FBI have you received particular

21   training in the field of forensics?

22   A.  I have.

23   Q.  Can you describe to us what sorts of training you've

24   received?

25   A.  You initially get a baseline training from the FBI that

1    actually certifies you by the FBI to be a forensic examiner for

2    the FBI, but since then you're required to do annual updated

3    training.  On average, for the past 23 years I think on average

4    I've had about two to three training classes per year.

5    Q.  In the course of your work, about how many electronic

6    devices would you guess or estimate that you have examined?

7    A.  Well, during the course of a year it varies based on what

8    cases I have, depending on whether I've actually multiyear very

9    huge cases or a number of smaller cases, but it can be anywhere

10   from just a handful a couple of few items to a few dozen items.

11   Q.  And do you participate in industry conferences and/or teach

12   in your field?

13   A.  Yes, sir.  I attend multiple conferences.  I also chair a

14   couple of national organizations in digital forensics.  I'm a

15   participating member of the National Committee on Forensic

16   Science, Scientific Working Group on Digital Evidence, High

17   Technology Crime Investigators Association and a few others.

18            MR. DEFILIPPIS:  Your Honor, the government offers

19   Ms.  Horvath as an expert in computer forensics.

20            MS. MIRON:  No objection.

21            THE COURT:  She will be received as an expert.

22   Q.  Now, Ms. Horvath, what types of devices do you typically

23   review?

24   A.  I typically review computer-related devices, typically;

25   hard drives, media cards, DVD's, CD's but I'm also certified to

1    examine hand-held devices such as cell phones, GPS's, even

2    automobiles for that matter.

3    Q.  And what sorts of forensic tools do you use?

4    A.  We actually have a tool box.  Much like you have a tool box

5    with your construction tools we have a tool box for digital

6    evidence tools.  Various tools meet certain requirements,

7    various tools are approved and vetted to analyze data on

8    certain types of devices, so we have various ones that we're

9    allowed to pull from.

10   Q.  Are you familiar with the term forensic image?

11   A.  I am.

12   Q.  And what is a forensic image?

13   A.  Commonly accepted in our community, a forensic image is

14   actually a bit-for-bit copy of a digital device.  So basically

15   from the very beginning bit zero to the end of all the data

16   that's been maintained in that device, that's typically what we

17   refer to as a forensic image.

18   Q.  Just explain for the jury, what is a bit?

19   A.  A bit, actually, if you think about when you write a letter

20   on the computer you're writing in characters; A, B, C, D.  Each

21   of those characters are represented on your computer by eight

22   bits.  So every character that you type has eight bits

23   associated to that character.  That's a general description.

24   Q.  What methods do you use to insure the integrity of the

25   data, in other words, to insure data is not changed or altered?

1    A.  We actually use various numerous levels of what's called

2    write blocking.  Most of our tools have it embedded within

3    them.  We also have hardware write blockers.  Basically what

4    they do is they interact with a computer to prevent any writes

5    taking place within the digital evidence.

6    Q.  Do you ever use forensic software to generate reports on

7    particular devices?

8    A.  Yes, commonly.

9    Q.  Just tell us what that process entails.

10   A.  Once a forensic image is taken of a device you now have

11   just basically a bucket of data, so often we use commercial

12   vendor tools, very few in-house developed tools, that will

13   actually go through that bucket of data and process it so it

14   produces a report that's readable.  For example, if you had in

15   your contacts database in your cell phone, you natively don't

16   see that in the bucket of data of ones and zeroes, but the

17   software will in turn extract each record from that address

18   book and print it out in a report so it's in a readable form.

19   Q.  How generally does the report display the data?  How does

20   it look when you read it?

21   A.  It looks very user readable, very in English.

22   Q.  Are there categories or fields how is it laid out?

23   A.  It can be, depending on the software utilized, but, yes,

24   the software utilized for this purpose literally lays it out in

25   different sections in different reports.

H1DFGAM6                          Horvath – direct

1   Q.  Did there come a time when you were asked to analyze one or

2   more devices in this case, United States v. Ahmed Mohamed El

3   Gammal?

4   A.  Yes, there was.

5   Q.  How many devices did you review?

6   A.  Just one.

7   Q.  What kind of device was it?

8   A.  It was an Apple iPad mini.

9   Q.  Was it your understanding that that was a device seized by

10  the FBI in connection with the case?

11  A.  That was my understanding.

12          MR. DEFILIPPIS:  Your Honor, may I approach?

13          THE COURT:  You may.

14  Q.  Ms. Horvath, I'm going to put three exhibits on the stand

15  for you and ask you about each.  Mrs. Horvath, the bag in front

16  of you has been marked Government Exhibit 3.  Would you look at

17  that and its contents and see if you recognize it?

18  A.  I already immediately recognize the bags that's contained

19  within it and the tin foil wrapping and, yes, I recognize the

20  device within it.

21  Q.  Okay.  What is it?

22  A.  This is the Apple iPad mini that I examined.  It actually

23  has my initials on it from the examination.

24  Q.  Thank you.  And if I could turn your attention next to

25  Government Exhibit 3A, which is contained in one of the folders

1    there.

2    A.  Yes.  Okay.

3    Q.  And do you recognize that?

4    A.  I do recognize this.  This is a copy of one of the reports

5    that I produced and written to DVD.

6    Q.  And was that in connection with a report generated in

7    connection with that Apple iPad mini?

8    A.  Actually, this is not the actual DVD that I produced.  This

9    must be a copy of it.

10   Q.  Okay.

11   A.  So then, yes, it would have been the electronic report that

12   I produced.

13   Q.  Okay.  And that report was of the GX, of the Government

14   Exhibit 3, the Apple iPad mini?

15   A.  Yes.

16   Q.  And finally, if you could look at Government Exhibit 6.

17   A.  Yes.  This is the actual printout of sections of the report

18   that was prepared for display today.

19   Q.  So is that a presentation that you prepared, Government

20   Exhibit 6?

21   A.  Yes.

22   Q.  And was it, what were the sources of data for that

23   presentation?

24   A.  These are actually produced cut sections from the big

25   master report that I produced, the master report that I

1    produced was probably 2000-some pages this is a subsection of

2    it specific to what you wanted me to address today.

3    Q.  And other than extracting data from the report or placing

4    headings on the report, did you import any other data?  Does it

5    contain anything other than the contents of the report?

6    A.  That I can recall specifically, a photograph that I also

7    took of the item that was examined.

8    Q.  Of the iPad?

9    A.  Yes.

10               MR. DEFILIPPIS:  Your Honor, the government offers

11   Government Exhibit 6, the presentation.

12               MS. MIRON:  Subject to the previous objection.

13               THE COURT:  Very well, it will be received.

14               (Government's Exhibit 6 received in evidence)

15   Q.  Let's publish the first page of Government Exhibit 6.  Ms

16   Ms. Horvath, on the first page here what are we looking at?

17   A.  This is actually a photograph of the Apple iPad mini that I

18   examined as it was turned on.

19   Q.  Is that a photograph you took?

20   A.  Yes, it is.

21   Q.  And the 1B3 number next to the bullet, what does that

22   signify?

23   A.  That is a designation provided by the field office.  It's

24   not a designation that I actually provided, but it's given to

25   me when it's submitted.

1  Q.  Next line?  This line is titled device information.  Is

2  that a section of the report that you prepared or generated?

3  A.  Yes, it is.

4  Q.  And what sorts of information is displayed in that section

5  of the report?

6  A.  This is basically an itemization of the physical

7  characteristics of the iPad.  So specifically it will show you

8  the model number, the specific model number to Apple which is

9  the iPad 2, 5; the common name of it, which is iPad mini.  The

10  parenthesis contained in the characters wifi represents that it

11  only has wifi capacity.  It also doesn't have cellular

12  capability, so it can't call anybody.

13          The third line is the operating system version that's

14  running on the Apple iPad mini and the fourth is an Apple ID

15  required by Apple.  It's the e-mail address of whoever

16  registers that device with Apple.

17  Q.  In this case what is the e-mail address?

18  A.  ElGammal44@yahoo.com.

19  Q.  What if anything is that e-mail address used for on the

20  device?

21  A.  It's literally required by Apple to register the device to

22  Apple designating this e-mail as the owner who has the most

23  security that writes on this device.

24  Q.  Next line?  Is this also taken from the device information

25  section of the report?

H1DFGAM6                         Horvath - direct

1    A.  Yes, it is.

2    Q.  And what sort of data are we looking at here?

3    A.  These are actually some lines that were extracted from a

4    much larger listing of lines and basically it's a listing of

5    all the specific IP addresses that when this device was

6    connected to the internet wherever it was connected from at

7    this point in time it received these IP addresses assigned to

8    it.

9    Q.  Can you explain briefly what is an IP address?

10   A.  Effectively much like your house on your street has an

11   address it's unique to you and your house only, across the

12   United States, the IP address here is basically the internet,

13   it's the connection of the host provider.  For example, if you

14   went to Starbucks and you connected your cell phone at

15   Starbucks to their website this would have been the Starbucks

16   IP address.  So it's basically the address of the router you

17   attached to to connect to the internet.

18   Q.  So is it fair to say there's an address associated with

19   each device that's connected to the internet, is that accurate?

20   A.  Ultimately, yes, every device has to have an IP address but

21   they do do a function called dynamic host control protocol

22   which allows sharing of multiple IP addresses.  You may lease

23   it for a short period of time so eventually when you're done

24   using it they can provide it to another user.  There are local

25   IP addresses, internet IP addresses, it goes into such a much

1   more difficult explanation.

2   Q.  So just enlarging a few of the rows here.  What is the IP

3   address depicted on these entries?

4   A.  68.231.161.237.

5   Q.  Look at the first row.  Is there a date and time depicted?

6   A.  It is.  It's January 22 of 2015 at 12:51:43, which this

7   specific report is displayed in universal coordinated time or

8   UTC time which is the world time, coordinated time zone of

9   zero.  So in eastern standard time we're minus five for UTC, so

10  this would be at UTC specifically.

11  Q.  What can we conclude about that IP address and this device

12  at that time?

13  A.  At January 22, 2015 at 12:51:43 of universal coordinated

14  time, this device connected to a router attached to the

15  internet containing that IP address.

16  Q.  And looking at that slide there, do they all contain the

17  same IP address?

18  A.  Yes, they do.

19  Q.  Turning to the next slide, what is shown here?

20  A.  This is the exact same description.  However, this is for a

21  different IP address of 68.2.251.171.

22  Q.  And the dates depicted to the right, do they signify the

23  same as the previous slide?

24  A.  Yes.

25  Q.  And what is the IP address on this slide?

H1DFGAM6                          Horvath - direct

1    A.  68.2.151.171.

2    Q.  Thank you.  Next slide.  Ms. Horvath, is there a section of

3    the slide called searches?

4    A.  Yes.

5    Q.  What's on that?

6    A.  Essentially the forensic software that analyzes the data

7    dump, the bucket of software I indicated earlier.  Its

8    processes multiple files within that dump and it basically

9    calls all the information that it has determined to be related

10   to some sort of searches; be it a Google history search you

11   performed or a map search you performed.

12   Q.  Looking at this entry labeled 1130 where it says map source

13   file, then it appears to have some sort of file location

14   afterwards, what can you tell from that file location?

15   A.  The text that starts with iPad/applications/com.Apple.maps

16   and so on and so forth, that basically is your, as on your C

17   drive in your home computers you have a folder and then

18   subfolders beneath it, that's what's called your path.  So the

19   uppermost folder would be the iPad itself and then folders

20   within it ultimately resulting in what is the actual file

21   within the last folder, which is history.maps data.

22   History.maps data is a file used by the maps application within

23   the Apple device to track all the history that was performed

24   using that maps application.

25   Q.  So that's from the maps function of the device?

1   A.  Yes.

2   Q.  And if you look to the right where it says Syria, do you

3   see that?

4   A.  I do.

5   Q.  What if anything can you conclude from the fact that the

6   word "Syria" appears in this file or entry?

7   A.  All we can conclude is that somehow either Syria was typed

8   in like, for example, into the search bar of the maps

9   application or possibly a world map was opened up and he

10  touched his finger to the country of Syria, but somehow an

11  entry got into the history maps file, the history.maps data

12  file relating to some search for Syria.

13  Q.  When you use the word he, who did you mean?

14  A.  The user of the device.

15  Q.  Let's turn to the next slide?  This is labeled locations.

16  Is there a section of the report called locations?

17  A.  Yes, there is.

18  Q.  And tell us what that section of the report shows and what

19  we see here?

20  A.  Again, the forensic software calls through all the various

21  files within the device and it will pull out and accumulate all

22  entries related to various location data as in geographical

23  locations.  So it doesn't have to come from your maps, it could

24  come from contacts, it could come from wherever you have

25  location information.

1   Q.  Now looking at the first row there, the row labeled 29.

2   Let me just pause and ask you when you extracted data from your

3   forensic report, did you take all entries from a particular

4   section or just entries that you were directed to examine?

5   A.  Specific entries I was directed to examine.

6   Q.  And looking at row 29, what is labeled 29, it says,

7   description Syria, and then a time of 8/28/2014 with a UTC time

8   after that.  Do you see that?

9   A.  I do.

10  Q.  And do you see in the right where it says Apple maps?

11  A.  I do.

12  Q.  What can we conclude about the activity on the device from

13  this entry?

14  A.  Again, similar to the last entry that was displayed prior

15  to this, in some manner the maps application was utilized to

16  either do a search or a lookup or dropped a pin having to do

17  with the country of Syria or in all honesty for this specific

18  entry it could have been a town named Syria.  However, if you

19  relate it to the next entry, the three of them together, it

20  sets the foundation for some sort of search was done utilizing

21  the maps application for Syria.

22  Q.  So let's move on to that next entry labeled 672 that says,

23  name, Syria source file, and then again map search in the

24  right-hand corner.  What do you conclude from that data?

25  A.  Once again, it's kind of the culmination of the three of

H1DFGAM6                        Horvath - direct

them together.  So this specific last entry is also from the

history.maps data file which has to do with the maps

application on the iPad device.  Specifically the entry

referred to named Syria pulls up the actual latitude and

longitude of the center of the country of Syria.  If you look

it up you can actually see it.  More often than not when you

utilize something like a maps application or any application on

your cell phone devices or mobile devices it will establish, it

will create more multiple records than just one record.  So

it's the culmination of the three of them together that leads

one to think that some sort of search was done for Syria using

the maps application.

Q.  Okay, next slide.  Tell us about the contacts section and

what's shown on this slide?

A.  This is actually, your contacts is actually information

that is pulled relative to your address book or recent contacts

that you've been in touch with in one manner or another, be it

through text messaging or e-mail or phone call or however.

This specific one came a file referred to as recents.  You can

see the path and the folder names right there and the folder

named recents.  The recents file is a file on Apple devices

that keeps track of who you -- excuse me -- who the user of the

device has recently been in contact with.  That's why it's

called recents.  It could be text messaging, could be e-mail,

could be chat sessions, could be any manner of recent contact.

H1DFGAM6                           Horvath - direct

1   Q.  And the number of this particular contact is what?

2   A.  845-283-9079.

3   Q.  Next slide.  What's shown here, Ms. Horvath?

4   A.  These are also extractions taken from the recents file.  On

5   the far right column you can see the folders and the full path

6   entries and also the file name of recents.  Again, establishing

7   all the recent contacts that have been made to that specific

8   phone number, which is all the same of 1-845-283-9079, the

9   different dates and times that those contacts were made.  Again

10  in universal coordinated time.

11  Q.  And SMS, which is shown at the top; what does SMS stand

12  for?

13  A.  SMS stands for short messaging service.

14  Q.  What is short messaging service?

15  A.  Commonly short messaging is your text messaging when you

16  text someone back and forth.  However in our field SMS's are

17  done via cellular network.  For example, your cell phone uses

18  your cellular network but when you utilize other applications

19  such as messaging or chat applications, it stores it in the

20  recents file as a recent contact and the software stores it

21  generically as a recent contact.

22  Q.  Did you say this is an iPad mini?

23  A.  Yes.

24  Q.  Can an Apple I iPad mini operate as a phone?

25  A.  This one specifically cannot.

Q.   Can it communicate with phones?

A.   The same way you can run a chat application on your cell phone with another person, specifically with Apple, Apple has an application called Messages where it specifically utilizes the Apple ID's to allow you to talk direct from Apple device to Apple device or Apple device to another phone number.

Q.   So looking at these entries indicating some sort of communication with the listed phone number, what sort of communication would that have been?

A.   That most likely would have been a chat or a text message.

Q.   And would it have been on the reflected dates and times on the middle column?

A.   Yes.

Q.   Next slide?

        THE COURT:  Before we get to the next slide, it's now 4:00 in the afternoon, so we're going to end for this week. Ladies and gentlemen, as I indicated earlier in the week, this is a three-day weekend for the court system so we will not be sitting Monday.  Feel free to go to work if you like, but please be back here Tuesday morning no later than 9:20 in the jury room so we can get started on time.  Until then, I hope you have a very pleasant three-day weekend.  Please do not discuss the case, please do not read any media about the case and please do not do any research about the case.  Have a wonderful and safe weekend.  See you Tuesday morning.

 1              THE COURT:  Anything further?

 2              MR. QUIGLEY:  Not from the government.

 3              MS. MIRÓN:  Briefly, we are trying to arrange

 4      Mr. Roloff's video conference testimony.

 5              THE COURT:  Yes.

 6              MS. MIRÓN:  And we have preliminarily scheduled him

 7      for Monday the 23rd, based on an estimation that the

 8      government's case would be two weeks.  So, we would just like

 9      an update.  If we need to move it to a different court house

10      for a different day we can start that process.

11              MR. QUIGLEY:  Sure.

12              THE COURT:  And I suppose, if need be, we can take him

13      out of turn?

14              MR. QUIGLEY:  Yes, your Honor.  I think we are

15      proceeding at pace.  I mean, we estimated a week and a half,

16      two weeks, I think and we are still in that range.

17              THE COURT:  Very well.

18              Thank you, folks.  If you could clear the tables,

19      unless there is something else someone wanted to raise?

20              MS. MIRÓN:  We would just like the Tuesday witnesses

21      specified for us.

22              MR. QUIGLEY:  We are happy to provide them.

23              THE COURT:  Talk to the government.

24              MR. DEFILIPPIS:  Related to that, your Honor, one

25      issue, which is that defense had indicated that they would be

H1D5gam7

1    filing a motion to gain access to one of our witness'

2    electronic devices.  Given that it is possible that witness

3    could testify as early as Tuesday, we just wanted to inquire as

4    to the status or likelihood of that motion given that there

5    wouldn't be much time to comply.

6              MS. SHROFF:  Your Honor, the moment they let us know

7    their witness list we will be able to respond to them

8    appropriately.

9              THE COURT:  Very well.  So, work it out.

10             MR. DEFILIPPIS:  Thank you, your Honor.

11             MS. TEKEEI:  Thank you, your Honor.

12             THE COURT:  Have a good weekend, folks.  And if you

13   need me I will be around certainly Monday, probably Sunday, and

14   Monday.

15             MR. QUIGLEY:  Your Honor, we will collect the jury

16   binders?

17             THE COURT:  Yes, please.

18             MR. QUIGLEY:  I don't know if any jurors wrote in

19   them, that's the only thing.  It might be better to leave them

20   in place.

21             THE COURT:  Okay.  Just leave them on the chairs then.

22             MR. QUIGLEY:  Thank you.

23             (Adjourned to 9:15 a.m., January 17, 2017.)

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    AARON ZELIN

4    Direct By Mr. Quigley . . . . . . . . . . . 481

5    Cross By Ms. Shroff  . . . . . . . . . . . . 512

6    Redirect By Mr. Quigley . . . . . . . . . . 556

7    Recross By Ms. Shroff  . . . . . . . . . . . 560

8    RENATA LEWIS

9    Direct By Ms. Tekeei . . . . . . . . . . . . 567

10   Cross By Ms. Mirón . . . . . . . . . . . . . 573

11   THOMAS DAVID LEE

12   Direct By Ms. Tekeei . . . . . . . . . . . . 576

13   Cross By Ms. Miron . . . . . . . . . . . . . 583

14   JAI PATEL

15   Direct By Ms. Tekeei . . . . . . . . . . . . 604

16   Cross By Ms. Shroff  . . . . . . . . . . . . 608

17   ERIC PERRY

18   Direct By Mr. Defilippis . . . . . . . . . . 613

19   Cross By Ms. Miron . . . . . . . . . . . . . 662

20   Redirect By Mr. Defilippis . . . . . . . . . 677

21   Recross By Ms. Miron . . . . . . . . . . . . 680

22   MARY HORVATH

23

24

25

```
 1   Direct By Mr. Defilippis . . . . . . . . . . . 681

 2                   GOVERNMENT EXHIBITS

 3   Exhibit No.                             Received

 4   703   . . . . . . . . . . . . . . . . . . . . 499

 5   902   . . . . . . . . . . . . . . . . . . . . 504

 6   901   . . . . . . . . . . . . . . . . . . . . 505

 7   12 and 13  . . . . . . . . . . . . . . . . . 509

 8   510, 5 11 and 512  . . . . . . . . . . . . . 570

 9   1003, 1004 and 1108  . . . . . . . . . . . . 602

10   1001 and 1107  . . . . . . . . . . . . . . . 603

11   1002   . . . . . . . . . . . . . . . . . . . 606

12   100C, D, F, G, H, I, J, K, M, N, O, P,  . . . 613

13          R and S

14   520   . . . . . . . . . . . . . . . . . . . . 630

15   6   . . . . . . . . . . . . . . . . . . . . . 688

16                   DEFENDANT EXHIBITS

17   Exhibit No.                             Received

18   700   . . . . . . . . . . . . . . . . . . . . 529

19   701   . . . . . . . . . . . . . . . . . . . . 529

20   702   . . . . . . . . . . . . . . . . . . . . 530

21   304-O and 304-P  . . . . . . . . . . . . . . 540

22   703   . . . . . . . . . . . . . . . . . . . . 669

23   502   . . . . . . . . . . . . . . . . . . . . 676

24

25
```