H1i5gam1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 Cr. 588 (ER)

5   AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7   ------------------------------x

                                    New York, N.Y.
8                                   January 18, 2017
                                    9:15 a.m.
9

10
    Before:
11
                    HON. EDGARDO RAMOS,
12
                                    District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BRENDAN F. QUIGLEY
17  NEGAR TEKEEI
    ANDREW J. DeFILIPPIS
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
20  BY:  SABRINA SHROFF
         ANNALISA MIRÓN
21       DANIEL G. HABIB

22

23

24

25

H1i5gam1

```
1           (Trial resumed; jury not present)
2           THE COURT:  Are we all ready?  I figure we can take
3   care of a little business before we start.
4           Currently outstanding, I did receive the defense
5   submission concerning the government's request for a limiting
6   instruction to be given to the jury whenever some mention of
7   Mr. El-Gammal's activities in his day-to-day life in Phoenix
8   was mentioned and the request to admit Mr. Mateen's voting
9   records.  Both motions are denied.
10          I think that with respect to those activities of
11  Mr. El-Gammal's that the defense has highlighted both his --
12  and, by the way, I do think that they have limited, in some
13  fashion, although I think that they emphasize it just slightly
14  more than the defense has categorized it, it has been a limited
15  presentation and it is the type of argument that I believe the
16  government can respond to in its summation, and certainly there
17  will be a jury instruction which the jury will have with them
18  as they deliberate, that Mr. El-Gammal did not need to be a
19  member of ISIS in order to have carried out these alleged
20  activities.
21          With respect to the Mateen voting records, I could
22  almost do it on 403 grounds alone, particularly given the most
23  recent activity in that case.  The jury has been told not to
24  read about this case, they have not been told not to read about
25  any other cases and it has been front page news over the last
```

H1i5gam1

1    couple of days that Mr. Mateen's wife has just been arrested.

2    In addition, Mr. Mateen is alleged to have carried out the

3    largest terrorism act since 9/11.  It is a very, very different

4    type of case and, as the defense points out, has not been

5    determined that it had anything to do with ISIS.

6            And so, for those reasons, I don't think it would be

7    appropriate to allow the government to introduce Mr. Mateen's

8    records in order to show that, on occasion, some alleged

9    members of ISIS behave in ways contrary to a strict ISIS

10   orthodoxy.  So, that is the Court's ruling on those two issues.

11           Now, as far as I am aware, the only thing that is

12   outstanding right now in terms of motions that have been made

13   is the defense motion to cross-examine the elder

14   Mr. El- Goarany with respect to his more recent fraud

15   conviction.  That's still outstanding and I am still deferring

16   on that.

17           MR. DEFILIPPIS:  Your Honor, I think we can dispose of

18   that.  The government will not oppose cross-examination on that

19   issue.

20           THE COURT:  Very well.

21           Yes, Mr. Habib?

22           MR. HABIB:  Thank you.  We did want to -- if the Court

23   is done, we wanted to front one more possible issue that may

24   arise this morning.

25           THE COURT:  Sure.

H1i5gam1

| | |
|---|---|
| 1 | MR. HABIB:  So, it is conceivable that during the |
| 2 | cross-examination of Tarek El Goarany, when it resumes, the |
| 3 | defense will seek to introduce GX- , I believe it is 145, which |
| 4 | is Samy El- Goarany's so-called exculpatory YouTube video.  The |
| 5 | Court has already ruled that the video is admissible.  We may |
| 6 | seek to introduce it on cross. |
| 7 | THE COURT:  Okay. |
| 8 | Will there be an objection to that? |
| 9 | MR. QUIGLEY:  Your Honor, I don't think he has ever -- |
| 10 | I mean, there is a foundational issue that he has ever seen |
| 11 | that.  It comes in -- it came in as co-conspirator statement, |
| 12 | that's how the Court ruled it admissible.  Of course, the |
| 13 | defense does not have a parallel ability to offer |
| 14 | co-conspirator statements.  The Court found in its ruling on |
| 15 | the motion *in limine* that his statement was admissible as a |
| 16 | co-conspirator statement of the conspiracy involving the |
| 17 | defendant, Attiya, and Samy El- Goarany.  Of course, there is |
| 18 | no conspiracy between the government and Samy El- Goarany so I |
| 19 | don't think it is appropriate for the defense to offer it. |
| 20 | THE COURT:  Mr. Habib, go ahead. |
| 21 | MR. HABIB:  Two brief points. |
| 22 | One, as to foundation, Tarek can certainly testify |
| 23 | that his brother is the person depicted in the video.  As to |
| 24 | hearsay, the defense would be proffering it pursuant to Rule |
| 25 | 806 which allows impeachment of a hearsay declaration with an |

H1i5gam1

1   inconsistent statement.  Yesterday the government elicited from

2   Tarek El Goarany Samy's statement that Mr. El-Gammal, quote,

3   helped him, and in this video Samy makes an inconsistent

4   statement, he says that no one helped me including

5   Mr. El-Gammal so we don't need it to qualify the exhibit for

6   admission, it comes in under 806.

7           Yes; and, in addition, the government elicited from

8   Tarek El Goarany that Samy had said Mr. El-Gammal helped him,

9   quote, in the vaguest of terms.  That was Tarek's

10  characterization of Samy's statement.  The YouTube video is not

11  vague at all, it is quite specific and direct in denying

12  Mr. El-Gammal's participation.

13          MR. QUIGLEY:  Your Honor, I think on the impeachment

14  issue it doesn't mean it can come in as substantive evidence.

15  Again, the statement was admitted as a co-conspirator statement

16  which, because the conspiracy here involved the defendant and

17  two other people and not the government and two other people,

18  it can't be introduced by the defense on that basis.

19          MR. HABIB:  Your Honor, Rule 806 says the Court may

20  admit evidence of the declarant's inconsistent statement.

21          THE COURT:  That is may.

22          MR. HABIB:  That is, obviously, as all evidentiary

23  rulings are, subject to the Court's discretion, but we also

24  cited in a filing a few days ago and I think the filing in

25  response to the government's motion to preclude Attiya, that

H1i5gam1

1   despite the discretionary language of the rule, both Weinstein

2   and some circuit case law cited in that motion indicate that

3   once a hearsay statement has been admitted, the Court's

4   discretion is constrained and if the defense proffers an

5   inconsistent statement, the Court must admit it as substantive

6   evidence.   I can dig up the citations if the Court wants but I

7   do remember citing it.

8           THE COURT:  Yes, you did.

9           Mr. Quigley?

10          MR. QUIGLEY:  Again, your Honor, I think it comes in

11  as a co-conspirator statement.   That was the Court's ruling.

12  They can certainly impeach him on it but I don't think it

13  should be admitted as substantive evidence with Tarek

14  El Goarany on the stand.

15          THE COURT:  What does that mean, that they can impeach

16  him on it?

17          MR. QUIGLEY:  They can ask him about it but I don't

18  think they should publish it to the jury with Tarek on the

19  stand.

20          THE COURT:  I will not allow the defense to put in the

21  video.

22          Anything else?

23          MR. QUIGLEY:  Not from us, your Honor.

24          THE COURT:  We have got five minutes, so.  I am right

25  that there is nothing more on my docket to decide, at least

H1i5gam1

1    that's pending?

2              MR. QUIGLEY:  Not from us, your Honor.

3              THE COURT:  But we have Mr. Patel.

4              MR. PATEL:  I submitted a proposed order to your

5    Honor's chambers.

6              THE COURT:  That will be executed.

7              MR. PATEL:  Thank you.

8              MR. HABIB:  Your Honor, may I clarify?

9              Is the Court's ruling that we can question Tarek about

10   this video?

11             THE COURT:  Yes.

12             MR. HABIB:  Can we show him the video?

13             THE COURT:  You can show him the video.

14             MR. HABIB:  We cannot publish the video?

15             THE COURT:  Correct.

16             MS. SHROFF:  We can show him the video though?

17             THE COURT:  Yes.

18             I take it, by the way, that he has seen the video?

19             MS. TEKEEI:  Your Honor, we have not shown him the

20   video.  He has not seen the video, as far as we are aware,

21   which is another reason why we don't think he should be shown

22   the video.

23             MR. HABIB:  He can be asked if he has seen the video.

24             THE COURT:  Yes.

25             Didn't it appear on YouTube?  Is that how it came

H1i5gam1

1    about?

2              MS. TEKEEI:  It did, your Honor.  However, the link to

3    which it is accessed by YouTube is not --

4              MS. SHROFF:  Actually, the link is there.  We checked

5    last night.

6              MS. TEKEEI:  Excuse me.  It is not public in terms of

7    out there for the world to see at this point, as far as we're

8    aware.  You can click on the link and you can see it but the

9    actual link is not a publicized fact.

10             THE COURT:  Was it once upon a time?

11             MS. TEKEEI:  It was sent from Mr. Aboualala to another

12   individual over Facebook.  While it is posted and publicly

13   available it is not, how do I say -- not everybody knows that

14   that link exists and where it is available on YouTube.

15             MS. SHROFF:  Your Honor, before the government

16   produced it to us in discovery, long before they produced it

17   Mr. Quigley handed it to me in court.  I found that video on

18   YouTube just with no investigative skills or any other skills.

19             THE COURT:  So you found it as a member of the general

20   public?

21             MS. SHROFF:  That's all I am.

22             THE COURT:  Okay.  I mean, if he hasn't seen it he

23   hasn't seen it.

24             Okay.  Are we ready?  Is Mr. El- Goarany here?

25             MS. TEKEEI:  I will go check, your Honor.

H1i5gam1

1                THE COURT:  Okay.

2                Are you ready to proceed, Ms. Shroff?

3                MS. SHROFF:  I am, your Honor.  If he is not here I'm

4     going to use the ladies room.  If not, I'm going to just start.

5                THE COURT:  Yes.

6                MS. SHROFF:  He is not here yet, your Honor.

7                THE COURT:  Why is that?

8                (Pause)

9                THE COURT:  Is he here?

10               MS. TEKEEI:  Someone is checking the security line to

11    see if he is in the security line.  We understand from

12    Mr. Patel that he was very close by 10 minutes ago.

13               THE COURT:  This is the second time now that he has

14    detained us so talk to him, will you?

15               MS. TEKEEI:  Your Honor, he is on cross so we have not

16    talked to him but we will make it clear.

17               THE COURT:  You can tell him to be on time or tell

18    Mr. Patel to tell him to be on time.

19               MS. TEKEEI:  Yes, your Honor.

20               (Pause)

21               MS. SHROFF:  Your Honor, while we are waiting may we

22    deal with the exhibits?  I did not move them into evidence

23    yesterday and would so move now.

24               THE COURT:  Okay.  Is there any objection?  I don't

25    know what exhibits, exactly, you're talking about.

H1i5gam1

1          MS. SHROFF:  113-BB, 111-CC, and 140-AA.

2          THE COURT:  Okay.

3          We are going to get the jury.  You can step up,

4     Mr. El- Goarany.

5          I take it you are still looking at those exhibits?

6          MR. QUIGLEY:  Yes, your Honor.

7          THE COURT:  Okay.

8          (Witness resumes the stand)

9          MS. SHROFF:  May I, your Honor?

10          THE COURT:  You may.  Absolutely.

11          MS. SHROFF:  Thank you.

12          THE COURT:  By the way, for the marshals, I have a

13     criminal matter here at 12:30.  That won't be a problem for you

14     folks, right?

15          THE MARSHAL:  No, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

H1i5gam1                         T. El-Goarany - cross

1          (Jury present)

2          THE COURT:  Everyone, please, be seated.

3          Ladies and gentlemen of the jury, thank you, again,

4     for being so prompt.  We continue with the cross-examination of

5     Mr. Tarek El Goarany.

6      TAREK EL-GOARANY, resumed.

7          THE COURT:  Ms. Shroff?

8     CROSS EXAMINATION (Continuing)

9     BY MS. SHROFF:

10    Q.  Good morning.

11    A.  Good morning.

12    Q.  We covered some ground yesterday and one of the things we

13    discussed yesterday was your father's trip to Turkey in May

14    2015, correct?

15    A.  Correct.

16    Q.  And you knew that your father was going to go to Turkey,

17    correct?  He had told you that?

18    A.  Yes, I do.

19    Q.  And he told you the purpose, he told you he wanted to trace

20    the route Samy took, correct?

21    A.  Correct.

22    Q.  And you and he had a conversation about what he hoped to

23    accomplish before your father left for Turkey, correct?

24    A.  That's correct.

25    Q.  And your father told you what he was going to do in Turkey

1    and what he hoped to accomplish, correct?

2    A.  Yes.

3    Q.  And you told him all that you knew about Samy up until that

4    point, correct?  You didn't keep him in the dark right before

5    he was going to Turkey, did you?

6    A.  I don't -- I don't remember what I said.

7    Q.  Well, your mom had already found Attiya's phone number by

8    then, correct?

9    A.  I don't remember.  I don't remember.  Sorry.

10   Q.  Your whole family had had a slew of conversations about who

11   knew what, correct?

12   A.  We discussed certain things, yeah.  Yeah, we discussed

13   things.

14   Q.  Right.

15         And you knew that this trip was really important to

16   your father; he was going all the way to Turkey, correct?

17   A.  Yes.  It was important to all of us.

18   Q.  Right.

19         And you made sure, because it was important to all of

20   you including you, that you told him everything you knew up

21   until that point, correct?

22   A.  I don't remember exactly what I told him.

23   Q.  Fair enough.

24         So, let me just ask you this.  While he was in Turkey,

25   do you recall having Facebook interactions with Samy?

H1i5gam1                              T. El-Goarany - cross

1   A.  Yes.

2   Q.  And you recall one of the Facebook interactions was you

3   letting Samy know that dad was in Istanbul, correct?

4   A.  That's correct.

5   Q.  Right.

6            And you told him that -- by him I mean Samy -- you

7   told Samy that dad wants to talk to you, to see your face;

8   correct?

9   A.  Yeah.

10  Q.  And you told him, Samy, that dad has zero intention of

11  convincing you to come back or anything like that, correct?

12  A.  Correct.

13  Q.  And then you told Samy he told me that himself -- he being

14  your dad -- in a very serious conversation, correct?

15  A.  Yeah.

16  Q.  Seems like you had a very serious conversation with your

17  dad before he left to Turkey, correct?

18  A.  He told me his intentions, yeah.

19  Q.  Now, before your dad left for Turkey you, yourself, had

20  seen Samy online, correct, even though -- is that correct?  Do

21  you recall that in April of -- April 11th through April 15th,

22  sometime during that time period?

23  A.  Yeah.

24  Q.  Let me just show you what is marked as a Government Exhibit

25  and make sure that this is the conversation we are both talking

1    about.  Can you see that, sir?

2    A.  Yes, I can.

3    Q.  And this is on April 15th, 2015, right?

4    A.  Yes.

5    Q.  And you tell your brother that you are sure that he can see

6    your messages because you see Samy online, correct?

7    A.  That's what I said, yeah.  I didn't --

8    Q.  Okay.

9    A.  I didn't know who was -- I assume it was Samy but I didn't

10   know for certain who was viewing the messages.

11   Q.  Well, that's not true, right?  You say:  At least I have

12   some comfort knowing -- not hoping -- knowing that you can see

13   my messages.

14   A.  Yeah.  What I meant by that is when you're -- there is read

15   receipts on Facebook so it can show if somebody read your

16   message.  And it showed that that profile, Samy's profile read

17   that message but I don't know if that was Samy or someone else

18   because he hadn't responded until much later.

19   Q.  But he doesn't respond much later.  He responds later but

20   let's just stick to this message here, though.

21        As far as you can tell when you are writing that you

22   don't say:  And I hope it is you brother, not someone else;

23   correct?

24   A.  No, I don't say that.

25   Q.  Right.

H1i5gam1                          T. El-Goarany - cross

1          In fact, you say:  Hey bro -- and I am going to the

2     first section -- just want to know if you're safe and I would

3     like to hear from you.  I love you and I wish you all the best.

4          Right?  And that's literally four days before, if my

5     math is correct.  And then on the 15th you say -- because

6     something must have happened to give you discomfort -- you say,

7     at least I have some comfort knowing.

8          Correct?  That's what you say?

9     A.  Yeah, knowing that he can read my messages.

10    Q.  Right.

11    A.  But I didn't know if it was Samy or not.

12    Q.  Okay.

13         As far as you're concerned, you're talking to Samy but

14    you're not sure it is Samy.  That is your testimony here today?

15    A.  That is my testimony, yeah.

16    Q.  Okay.

17         And did you, by then, sir, have several conversations

18    with Samy exactly through this methodology?

19    A.  I hadn't talked to Samy for a while when I --

20    Q.  No, no.

21         MS. TEKEEI:  Objection.

22    Q.  I am talking when you are on Facebook with Samy.

23         THE COURT:  Overruled.

24    Q.  In all the years you talked to Samy this is one of the ways

25    you talked to Samy, correct?

H1i5gam1                           T. El-Goarany - cross

1   A.   Yeah.  Facebook was a way we conversed, yeah.

2   Q.   Thank you.  You may take that down.

3            Now, one of the other topics we discussed yesterday

4   was you telling your dad that your father was in Istanbul and

5   he was staying in the first hotel you went to.  Do you recall

6   that?

7            Can we put up Exhibit 111-CC?

8   A.   I don't remember saying 'first hotel' but I remember saying

9   that I told Samy that my dad was staying at the hotel he stayed

10  at.

11           MS. TEKEEI:  Your Honor, this exhibit is not yet in

12  evidence.

13           MS. SHROFF:  It's all right.  I will show it to you to

14  refresh your recollection since you can't remember.

15  A.   Okay.

16  Q.   Does that refresh your recollection, sir?

17  A.   I mean, I see that I wrote that.  I don't know why I would

18  say first hotel, but.

19  Q.   That wasn't the question.

20  A.   Okay.

21  Q.   My question was does that refresh your recollection that is

22  in fact what you said.  Yes or no.

23  A.   No.

24  Q.   Okay.

25           MS. SHROFF:  Your Honor, we move this document into

H1i5gam1                         T. El-Goarany - cross

1    evidence at this time.

2            MS. TEKEEI:  No objection, your Honor.

3            THE COURT:  Very well.  That's 111-CC?

4            MS. SHROFF:  Yes, your Honor.

5            THE COURT:  That will be received.

6            (Defendant's Exhibit 111-CC received in evidence)

7    BY MS. SHROFF:

8    Q.  Now, one of the other questions I asked you yesterday,

9    Mr. El- Goarany, was whether or not you and Ms. Tekeei had

10   reviewed, during your preparation here for this trial, the

11   conversation and exchanges you had with your cousin Ahmed.  Do

12   you recall that question?

13   A.  I do.

14           MS. TEKEEI:  Objection.  Relevance.

15           THE COURT:  Overruled.

16   A.  I do recall that question.

17   BY MS. SHROFF:

18   Q.  And she did not review those conversations with you,

19   correct, during your preparation for this trial and your

20   testimony here today?

21   A.  Yeah.  That's correct.

22   Q.  She did not, correct?

23   A.  No.

24   Q.  So, in the eleven times you met with her she went through

25   all the documents that she used in her direct testimony of you,

H1i5gam1                        T. El-Goarany - cross

1   correct?

2   A.  And others, yeah.

3   Q.  Right.

4         She reviewed more but she certainly reviewed every

5   piece of evidence that has come into this trial through you,

6   correct?  Yes or no.  Hard to keep track when you met with her

7   11 times.

8         MS. TEKEEI:  Objection.

9   A.  I don't --

10        THE COURT:  Sustained.

11  Q.  Do you recall if you went through all of the documents,

12  Mr. El- Goarany?

13  A.  We went through whatever we went through.  I --

14  Q.  Okay.

15  A.  I wasn't in control of what we went through.

16  Q.  Was there any document she put up during your direct

17  testimony that came as a surprise to you?

18  A.  No.

19  Q.  Thank you.

20        Now, one of the documents she went through with you,

21  sir, was your contract with them, your agreement with them;

22  correct?

23  A.  Yeah.  Yes.

24  Q.  And you reviewed that document with Ms. Tekeei, correct?

25  A.  Yes.

H1i5gam1                          T. El-Goarany – cross

1    Q.  And you reviewed all of the clauses of that document with

2    her.  She went over the document with you methodically,

3    correct?

4    A.  We went over the document, yeah.

5    Q.  We will get to that in a minute, though, but I want to take

6    you back now to your conversations with your brother Samy

7    El- Goarany while Samy was in ISIS, okay?  That's the time

8    period.

9            Do you recall that once he was settled there he

10   started to reach out to people more frequently?  Do you

11   remember that time frame?

12   A.  Yeah.  He reached out to people.

13   Q.  Right.

14           You were one of them for sure, correct?

15   A.  Yeah.

16   Q.  And your parents were others that he reached out to,

17   correct?

18   A.  Eventually, yeah.

19   Q.  And he started to then reach out to people that were his

20   friends, correct?

21   A.  Yeah.

22   Q.  He reached out to Khalafalla Osman, correct?

23   A.  He did.

24   Q.  And he told Khalafalla Osman that I am now with the Islamic

25   State Dawla al Islamiyya?

H1i5gam1                        T. El-Goarany - cross

1             MS. TEKEEI:  Objection, hearsay.

2             THE COURT:  Overruled.

3   A.  Yeah.

4   Q.  And Khalafalla Osman was shocked, was he not, sir?

5             MS. TEKEEI:  Objection.

6             THE COURT:  Sustained.

7   Q.  Didn't Khalafalla Osman tell you that he was shocked?

8             MS. TEKEEI:  Objection.

9             THE COURT:  Sustained.

10  Q.  Did you have a conversation with Mr. Khalafalla Osman about

11  Samy being in the Islamic State?

12  A.  Yeah.

13  Q.  And during that conversation, Mr. Khalafalla Osman said to

14  you that he was shocked that Samy was there, correct?

15            MS. TEKEEI:  Objection.  Hearsay.

16            THE COURT:  Sustained.

17  Q.  Did Khalafalla Osman appear to you to be shocked by that

18  revelation?

19            MS. TEKEEI:  Objection.

20            THE COURT:  Overruled.

21  A.  He -- we talked about it, yeah, and he was -- he was

22  shocked, yeah.

23  Q.  And Khalafalla Osman's response to your brother was to tell

24  him to never contact him again, correct?

25            MS. TEKEEI:  Objection.  Hearsay.

H1i5gam1                                    T. El-Goarany - cross

1              THE COURT:  Sustained.

2    Q.  Did Khalafalla Osman tell you that he never wanted him to

3    contact him again?

4              MS. TEKEEI:  Objection.

5              THE COURT:  Sustained.

6    Q.  Mr. El- Goarany, did you tell Khalafalla Osman to not

7    contact or tell anyone else that Samy was in the Islamic State?

8    A.  Yeah.

9    Q.  You were mad at Khalafalla Osman were you not, sir?

10   A.  I was surprised.

11   Q.  No, you were upset with Mr. Osman; is that not true?

12   A.  I was surprised.

13   Q.  You were surprised?

14   A.  Yes.

15   Q.  And as a result of your surprise, Mr. El- Goarany, tell us

16   what you did.

17   A.  We talked about it.

18   Q.  Who is we?

19   A.  Khalafalla and me.

20   Q.  And what did you say to him?

21   A.  I told him that I was surprised at his -- him involving or

22   telling others, other friends.

23   Q.  You were upset were you not, sir, that Khalafalla Osman,

24   upon learning that Samy had joined the Islamic State, had

25   called Nico, had called Samir and had called others and told

H1i5gam1                          T. El-Goarany - cross

1   them that Samy was in the Islamic State, correct?

2   A.  I was surprised at what he did because he didn't tell me he

3   was going to do it.

4   Q.  And what did he do?

5   A.  He told me that --

6   Q.  No.  What did he do that surprised you?

7   A.  I'm getting there.

8           He told me that he informed Nico and Ali, which are

9   two of our -- my -- our mutual friends, about Samy being in

10  ISIS.

11  Q.  And you told Khalafalla Osman not to tell anyone else that

12  Samy was in ISIS, correct?

13  A.  Yes.

14  Q.  You told him I have things under control, correct?

15  A.  I don't remember saying that.

16  Q.  Do you recall telling him I have been in touch with the

17  authorities from day one?  Isn't that what you told Mr. Osman?

18  A.  Yes.  I told him that.

19  Q.  That wasn't true, was it?

20  A.  Well, I lied to the authorities but I was in touch with the

21  authorities, yeah.

22  Q.  From day one?

23  A.  From --

24  Q.  Your first interview with them was when?

25  A.  Early February, which was, like, seven days after Samy

1    left.

2    Q.  So not day one.

3    A.  No.

4    Q.  Eighth day, in fact.

5    A.  Correct.  It is a figure of speech.

6    Q.  Now, you were so surprised, as you say, by Khalafalla's

7    disclosure to others that your brother was in the Islamic

8    State, that you discussed this with your brother when he called

9    you on August 1st, correct?  Do you recall that?

10              MS. TEKEEI:  Objection.  Relevance.

11              THE COURT:  Overruled.

12   A.  Can you repeat the question?  I'm sorry.

13   Q.  Sure.  Let's try it a different way.

14              August 1st your brother calls you, right?

15   A.  When?

16   Q.  August 1st.

17   A.  I don't remember the exact date.

18   Q.  Let me see if this will help you remember.

19   A.  Okay.

20   Q.  You talked to him on August 1st, correct?

21   A.  I don't remember it being August 1st but I remember a

22   conversation like this, yeah.

23   Q.  Okay.

24              And Samy had called you just as he would call you now

25   quite frequently, correct?

H1i5gam1                          T. El-Goarany - cross

1   A.   Yeah.  We spoke.  Yeah, we spoke frequently.

2   Q.   And this particular conversation was almost 40 minutes

3   long, right?  A long conversation?

4   A.   I don't remember how long it was but it was -- we had

5   lengthy conversations, yeah.

6   Q.   And in this conversation he talked to you about life in

7   ISIS, correct?

8   A.   We talked about -- yeah, the day-to-day activities, like in

9   ISIS frequently.

10  Q.   And in this particular conversation he talked to you about

11  this girl that he liked, correct?

12  A.   Yeah.

13  Q.   He told you that this girl was texting him which was

14  unusual in ISIS territory, correct?

15          THE COURT:  I'm sorry, did you say test or text?

16          MS. SHROFF:  Text.  T-E-X-T.

17          THE COURT:  Thank you.

18  A.   I don't remember that part of the conversation.

19  Q.   You don't remember the part of the conversation where he

20  said he was very excited because he said they were going to

21  have a chance encounter on the street and she was going to look

22  at him to see if she liked him and what he looked like.

23          Do you recall that?

24  A.   Yeah, I recall that.

25  Q.   Right.

H1i5gam1                          T. El-Goarany - cross

1          And he mentioned that to you because he was very

2     excited about this happening, correct?  He sounded happy about

3     it, right?

4     A.   Yeah.

5     Q.   And he in fact told you that he also applied for a marriage

6     application by then, correct?

7     A.   Yeah, he did.

8     Q.   He had gone through the interview for the marriage,

9     correct?

10    A.   I don't -- I don't remember if he did at that time.

11    Q.   Do you recall him telling you that the Islamic State had

12    approved of his application for marriage?

13    A.   Yeah.

14    Q.   And then he talked to you, did he not, that he was hoping

15    this chance encounter, this plan that they had would work and

16    she would like him, correct?

17    A.   Yeah.

18    Q.   Now, during this conversation you guys talked about other

19    things, right?  Random stuff, right?

20    A.   Like any conversation, yeah.  We had different topics.

21    Q.   You talked about the NBA finals, correct?

22    A.   I don't remember.  Maybe we did.

23    Q.   I'm sorry?

24    A.   I don't remember specifically talking about the NBA finals.

25    Q.   Do you remember him telling you how he wanted to behead the

H1i5gam1                          T. El-Goarany - cross

1   president of the United States in that conversation?

2   A.   Yeah.

3   Q.   You remember him telling you Hamas was a farce?  Do you

4   remember him saying that?

5          MS. TEKEEI:  Objection.  Ground.

6          THE COURT:  Overruled.

7   A.   I don't remember that one specifically.

8   Q.   Really?

9   A.   Yes.

10  Q.   Okay.

11         And after he talks to you about how he wants to behead

12  the president of the United States, he goes back to talking to

13  you about the girl who is texting him from the square, correct?

14  All in the same breath.

15  A.   I don't remember the order of the conversation or what we

16  talked about when we talked about it.

17  Q.   Well, let's move on and focus on the time frame when he

18  reaches out to you to tell you that he is actually married,

19  correct?

20  A.   Yeah.  Eventually he became -- he was married, yeah.

21  Q.   October he is married.  By October he is married, right?

22  October 5th to be precise.

23  A.   I can't recall exactly.  I know it was like a month or so.

24  I don't remember when exactly he got married.  I don't remember

25  that date.

H1i5gam1                          T. El-Goarany - cross

1   Q.  He tells you he married a girl name Alaa, correct?

2   A.  Yeah.

3   Q.  Tells you she is 16 years old, correct?

4   A.  Yeah.

5   Q.  And tells you that they have a home together now, correct?

6   A.  That's correct.

7   Q.  Texts your mother; mom you are now a mother-in-law,

8   correct?

9   A.  I don't remember that.

10  Q.  And by now it is extremely clear to you, sir, is it not,

11  that Samy has established a happy life for himself in the

12  Islamic State, correct?  At least that's what he is telling you

13  because you don't even know if this is still Samy or in this

14  case you are now convinced it is Samy.

15  A.  I was speaking to him on the phone, so.

16  Q.  No, no.  This is a post that you sent.

17  A.  Which post?

18  Q.  When he posts to your mother you are now a mother-in-law

19  and you reply back to the post, that's a Facebook post?

20  A.  I don't remember that Facebook post specifically but, yeah,

21  my mom knew about the marriage and -- yeah.

22  Q.  And during this time you are Facebooking with him, right,

23  if that's a phrase?

24  A.  Yes.

25  Q.  And you are not concerned now whether or not this is Samy,

H1i5gam1                          T. El-Goarany - cross

1    right, anymore?

2    A.   No.

3    Q.   Okay.

4           And you are also in touch with Alaa, correct?  She

5    texts you and your parents occasionally?

6    A.   Yeah.

7    Q.   And time goes by and now we are talking after

8    Mr. El-Gammal's arrest your family is still in touch with Samy,

9    correct?

10   A.   Yes.

11   Q.   Samy sends a photo of himself that they showed you before,

12   Ms. Tekeei?

13          Could you put that photo up for me, please?  901?

14          While she is looking for that, do you remember that

15   photo that Ms. Tekeei showed you of your brother?

16   A.   There was two photos, so.

17   Q.   Right; well, you remember them both, right?  How about that

18   one right there, do you remember that?

19   A.   Yeah.  I remember this photo, yeah.

20   Q.   And you recall that your dad told him to stop posting

21   photos like this on Facebook because everything in the

22   El Goarany family was still telling others that he was doing an

23   internship in California, correct?

24   A.   He didn't post this on Facebook.

25   Q.   Did your dad tell him not to post photos on Facebook

H1i5gam1                           T. El-Goarany - cross

1    because they were still telling the family that he was doing an

2    internship in California?

3              MS. TEKEEI:  Objection, hearsay.

4    A.  He didn't post this on Facebook.

5    Q.  I know.  That's your testimony.  I'm asking you a follow-up

6    question, sir.

7              Did your father tell him -- him being Samy -- not to

8    post any photos on Facebook because the family was still

9    telling people that he was doing an internship in California?

10             MS. TEKEEI:  Objection.  608.  Hearsay.

11             THE COURT:  Sustained.

12   BY MS. SHROFF:

13   Q.  Did you tell people at this time when people were asking

14   you -- you can take that down, thank you -- what your brother

15   was up to?  Were you telling people that he was doing an

16   internship in California?

17             MS. TEKEEI:  During what time period?

18             THE COURT:  Yes, occurring what time period.

19             MS. SHROFF:  2015.

20             MS. TEKEEI:  When in 2015?

21   BY MS. SHROFF:

22   Q.  Let me show you a chat that your father had about this

23   issue.

24             MS. TEKEEI:  Can we get an exhibit number, Ms. Shroff?

25             MS. SHROFF:  Here.  I will do you one better.

1           MS. TEKEEI:  Thank you so much.

2    BY MS. SHROFF:

3    Q.  Is this one of the documents Ms. Tekeei reviewed with you

4    during your prep?

5    A.  It's not my messages so we didn't review it.  No.

6    Q.  And does it refresh your recollection, Mr. El- Goarany,

7    that your father -- that your father -- tells Samy that he will

8    keep the statement for everyone that might ask about him and

9    that he should see it the same, which is that you are working

10   in California at a job and you got it through Chobo?

11          MS. TEKEEI:  Objection.  608.  Hearsay.  Did not

12   refresh his recollection.

13          THE COURT:  He hasn't answered as to whether or not it

14   refreshes his recollection.

15   Q.  Does it refresh your recollection, sir?

16   A.  No.

17   Q.  It doesn't.

18   A.  No.  I have never seen this before, so.

19   Q.  No, no, I know you haven't seen it before.  You testified

20   to that.  You did not see it during the prep.  My question is

21   does this document refresh your recollection that that is in

22   fact what your father and mother were telling other people

23   during the time frame of June 2015?

24          MS. TEKEEI:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

1    A.  No, it doesn't.

2    Q.  What were you telling people in June 2015 about Samy's

3    whereabouts?

4    A.  Either he was, you know, doing an internship in California

5    or, depending on the person, which was very, very few,

6    humanitarian work.

7    Q.  And there came a point, right, in November, when you

8    learned and you were the one who learned that Samy had died,

9    correct?

10   A.  Yes.

11   Q.  And after he died his wife continued to reach out to you

12   and your family; is that correct?

13   A.  That's correct.

14   Q.  And your family, after he passed away, had a memorial

15   service for Samy, correct?

16   A.  That's correct.

17   Q.  And the memorial service was in the United States, correct?

18   A.  Yes.

19   Q.  And at the memorial service everyone at the memorial

20   service was told that Samy died in a car accident, correct?

21   A.  Correct.

22   Q.  Now, Mr. El- Goarany, there came a point, did there not,

23   when the prosecutors -- and by the prosecutors I mean the three

24   people sitting at this table here -- worked out an agreement

25   with you, right?

H1i5gam1                          T. El-Goarany - cross

1    A.  What do you mean?  Like the non-pros agreement?

2    Q.  What did you call it?  I couldn't hear the word.

3    A.  Non-prosecution agreement.

4    Q.  A non-prosecution agreement?

5    A.  Yes.  That's what I said.

6    Q.  And, they worked one out with you, right?

7    A.  Yeah.  Like I testified before, yeah.

8    Q.  Non-prosecution; they're not going to prosecute you,

9    correct?

10   A.  That is correct.

11   Q.  And the deal was that you would testify for them, correct?

12          MS. TEKEEI:  Objection.

13          THE COURT:  I don't think the question was finished.

14          MS. SHROFF:  That's okay.

15   Q.  The deal was you would testify for them, correct?

16   A.  Um --

17   Q.  You know what, let me get you the agreement since

18   Ms. Tekeei put it into evidence.  You have it right there

19   underneath the documents.  I'm sorry.

20   A.  That's all right.

21   Q.  The deal was you would testify for them, correct?

22   A.  Yeah.  I have been subpoenaed to testified, yeah.

23   Q.  And of course they told you that you had to testify

24   truthfully, correct?

25   A.  Yes.

H1i5gam1                              T. El-Goarany - cross

1    Q.  And then they said -- and this was after you had met with

2    them, and I want to make sure I have this correctly, by then

3    you had met with them, just with Ms. Tekeei 11 times, with the

4    FBI you had met with on February 6th -- let me just count it

5    up -- one, two, three, four, five, six, seven, eight, nine,

6    ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen,

7    seventeen, eighteen, nineteen, twenty -- twenty times just with

8    the FBI, correct?

9              MS. TEKEEI:  Objection.

10             THE COURT:  Overruled.

11   A.  I don't remember how many times we met.  It was a lot.

12   Q.  Fair enough.

13             But by then everybody knew what you were going to say,

14   right?  They had gone through this with what they wanted to

15   hear with you, correct, during the preps?

16   A.  No.

17   Q.  No?

18   A.  We prepared and to recall the events that had happened but

19   it wasn't a rehearsal, it was just a preparation.

20   Q.  It wasn't a rehearsal?

21   A.  No.  I wasn't -- I'm not rehearsing my answers.

22   Q.  No, no.  I'm not saying you are rehearsing your answers.

23   I'm saying when you met with them you did a question and answer

24   colloquy with them, right?

25   A.  Yeah, we prepared questioning.  Yeah.

H1i5gam1                     T. El-Goarany - cross

1    Q.  That's a rehearsal, right?  You prepared exactly what you

2    are doing here, you sat down and prepared with them, right?

3    It's okay.

4    A.  Yeah, we prepared, yeah.

5    Q.  There you go.

6           And, the deal they worked out with you was that they

7    would not charge you, correct, with any federal crime, right?

8           MS. TEKEEI:  Objection.

9           THE COURT:  Overruled.

10   A.  Yeah, with pertaining to this case.  Yeah.

11   Q.  Well, you haven't committed any other federal crimes,

12   right?

13   A.  No.  Not that I'm aware of.

14   Q.  So, they would not charge you with the federal crimes you

15   committed in this case, correct?  That's the deal I'm talking

16   about.  That's all I'm talking about.

17   A.  That is correct.

18   Q.  And they also promised you that they would not prosecute

19   you for those crimes, correct?  I mean, they're not going to

20   charge you, they're not going to prosecute you; right?

21   A.  Right.  Right.

22   Q.  And when they came up with this deal for you, right, you

23   really didn't have much of a choice, isn't that true?  It is a

24   good deal for you, it is a great deal.

25   A.  It's a --

H1i5gam1                         T. El-Goarany - cross

1   Q.  How could the deal get any better?

2   A.  Yeah.  I mean it's -- it's -- yeah, it's an agreement, it

3   is a deal.  Yeah, sure.

4   Q.  It is a really good deal, right?  You walk away scot-free?

5            MS. TEKEEI:  Objection.

6            THE COURT:  Sustained.

7   Q.  Now, you committed some very serious federal crimes, right?

8   A.  Yes.

9   Q.  Ms. Tekeei told you that in fact, correct?

10  A.  Yes.

11  Q.  And she told you that you aided and abetted Samy in his

12  quest to provide material support to a foreign terrorist

13  organization, correct?

14  A.  Yeah.  I helped him, yeah.

15  Q.  And that, in itself, carries 20 years in prison, correct?

16           MS. TEKEEI:  Objection.

17           THE COURT:  Overruled.

18  A.  I don't know how long.

19  Q.  You don't know how long?

20  A.  Yes.

21  Q.  You were facing exactly these charges, correct?

22           MS. TEKEEI:  Objection.

23           THE COURT:  Overruled.

24  A.  I'm -- yeah.  I'm facing charges that are outlined in the

25  document, yes.

H1i5gam1                        T. El-Goarany - cross

1   Q.  And you don't know how much time that charges carries, of
2   the very charge that you could have to face?
3   A.  I don't know.
4   Q.  Okay.
5         Now, you also committed the crime of aiding and
6   abetting Samy in his desire to become a combatant for the
7   Islamic State you testified, correct?
8   A.  Yes.
9   Q.  And you know that that crime carries a mandatory sentence
10  of 10 years or a fine, correct?
11  A.  I don't know the exact years of --
12  Q.  Ms. Tekeei didn't go over all the years you faced with you
13  when she signed that contract with you?
14  A.  I don't recall.  I don't recall.
15  Q.  Okay.  And you face up to five years for smashing the
16  computer or Samy smashing the computer and you helping him
17  smash it, correct?  That's another five, correct?
18  A.  I don't know.
19  Q.  And you face another eight years, do you know,
20  Mr. El- Goarany, for lying to the FBI about a terrorism act,
21  correct?
22  A.  Yes.  I committed all these crimes.  Yes.
23  Q.  Even if you were to just hypothetically add up all these
24  numbers it would be scary for you, correct?
25  A.  Yeah.

H1i5gam1                              T. El-Goarany - cross

1    Q.  And these three prosecutors basically gave you -- not

2    basically, gave you a no-charge card, right?

3             MS. TEKEEI:  Objection.

4             THE COURT:  If you understand it.

5             THE WITNESS:  I don't.

6    BY MS. SHROFF:

7    Q.  They're not going to charge you, correct?

8             MS. TEKEEI:  Objection.

9             THE COURT:  Overruled.

10   Q.  For not one of these crimes are you ever going to get

11   charged, correct?

12            MS. TEKEEI:  Objection.

13            THE COURT:  Overruled.

14   A.  No.  I don't believe.

15   Q.  What?

16   A.  I will not get charged.  That's it.

17            (Continued on next page)

18

19

20

21

22

23

24

25

H1IFGAM2                              T. El-Goarany - cross

1    Q.  Now, you testified on direct that you did all of this

2    because you loved your brother, Samy, correct?

3    A.  Yes.

4    Q.  And you testified that you helped him join this one

5    organization, the organization whose primary goal is to kill

6    all of us.  You helped him join that because you wanted to keep

7    the lines of communication open with Samy, correct?

8    A.  I did it for a lot of reasons, and continually speaking to

9    him, to Samy, was one of those reasons.

10   Q.  And the reasons were all personal, having to do only with

11   you and your brother, correct?

12   A.  That's incorrect.

13   Q.  Really?

14   A.  Yes.

15   Q.  Did they have to do with the larger good?  Was it good for

16   society for you to have helped him?  No, right?

17   A.  I don't know.

18   Q.  You don't know.  You don't know if it was good for society

19   to help your brother join the Islamic State, is that your

20   testimony here today?

21   A.  No, it wasn't.

22   Q.  Now, you also testified on direct, sir, did you not, that

23   Mr. Gammal was somebody you had a conversation with with Samy

24   El-Goarany, correct?

25        MS. TEKEEI:  Objection.

H1IFGAM2                          T. El-Goarany - cross

1          THE COURT:  Overruled.

2     A.  Can you rephrase the question?  I'm sorry.

3     Q.  Do you remember Ms. Tekeei asking you about how Mr. El

4     Gammal helped Samy, correct?  She asked you that precise

5     question?

6     A.  Yes.

7     Q.  And you said in the vaguest and the most general of those

8     terms is how he answered, correct?

9     A.  Yeah, he wasn't specific.

10    Q.  Samy never told you Mr. El Gammal recruited you, correct,

11    him, correct?

12    A.  No, he did not.

13    Q.  Samy never told you Mr. El Gammal ever motivated him,

14    correct?

15    A.  Samy never told me that.

16    Q.  Samy never told you that Mr. El Gammal had a direct contact

17    with ISIS, correct?

18    A.  He did not.

19    Q.  In fact, Samy said that nobody showed him the way to get

20    there, nobody helped him along the way to get there, isn't that

21    true?

22    A.  No, he didn't say that.

23    Q.  All right, well, let me show you what --

24          MS. SHROFF:  Your Honor, at this time may we play a

25    short video for Mr. El-Goarany?

H1IFGAM2                          T. El-Goarany - cross

1                THE COURT:  Mr. Quigley?  I'm sorry.

2                MS. TEKEEI:  Your Honor, as that video is not yet in

3     evidence, we intend to put it into evidence later, if we could

4     turn the sound down so the jury doesn't hear it.

5                THE COURT:  That was my concern, the sound.  I don't

6     know if we can play it at a level where Mr. El-Goarany can hear

7     it and not the jury.

8                MS. SHROFF:  I suppose we could mute the sound.

9                THE COURT:  Mute the sound -- well, however you want

10    to go about it.

11               MS. SHROFF:  Or we could take a break and he can watch

12    it during the break.

13               THE COURT:  I was going to suggest that we take the

14    jury out just for that purpose.  So why don't we take ten

15    minutes.

16               (Jury excused)

17               (Continued on next page)

18

19

20

21

22

23

24

25

H1IFGAM2                         T. El-Goarany - cross

1                    (In open court; jury not present)

2               THE COURT:  Okay, be seated.

3               (Video shown)

4               MS. SHROFF:  Thank you, your Honor.

5               THE COURT:  We have a few minutes, I told the jury, so

6       should we bring them back now?

7               MS. SHROFF:  Up to you.

8               THE COURT:  See if they're ready.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; jury present)

2                    THE COURT:  Everyone please be seated.  Ms. Shroff.

3     BY MS. SHROFF:

4     Q.  Mr. El-Goarany, does that refresh your recollection that on

5     that video that Samy said nobody showed me the way to get here

6     and nobody helped me along the way to get here, including Ahmed

7     El Gammal.

8                    MS. TEKEEI:  Objection.

9                    THE COURT:  Overruled.  Does it refresh your

10    recollection?

11    A.  No.  That was the first time I saw the video.

12    Q.  Let me just go back to one last thing, Mr. El-Goarany.  Can

13    you pull up his non-pros  agreement?  Mr. El-Goarany, your

14    obligation is to tell the truth under this agreement, that's

15    what you testified on direct, right?

16    A.  Yes.

17    Q.  Who decides whether you're telling the truth or not?

18    A.  The jury.

19    Q.  Really?  The jury decides or Ms. Tekeei decides?

20    A.  Sorry.  Under this agreement, yeah.  Sorry.  Sorry, under

21    this agreement to my understanding the government decides, yes.

22    Q.  The government, meaning Brendan Quigley, Negar Tekeei,

23    Mr. Andrew DeFilippis and Komaal Collie they, they are the

24    government here, is that correct?

25    A.  I believe so.

H1IFGAM2                          T El-Goarany - redirect

1   Q.   And they decide whether you are telling the truth?

2   A.   Yes.

3   Q.   And you are testifying for the government here today,

4   correct?

5   A.   That is correct.

6   Q.   Let me just see the signature page there of this contract

7   of yours.  Could you just zoom in to make sure it's clear?  The

8   jury is not a party to this contract, correct?

9   A.   Yes.  I'm sorry.

10  Q.   And Judge Ramos isn't a party to this contract, correct?

11  A.   No.  I'm sorry.

12  Q.   No, no.  Just to be clear.  He doesn't have anything to do

13  with whether you're telling the truth, correct?

14  A.   No.

15          MS. SHROFF:  I have nothing further.

16          THE COURT:  Redirect.

17  REDIRECT EXAMINATION

18  BY MS. TEKEEI:

19  Q.   Mr. El-Goarany, you were asked on cross-examination about

20  whether you were charged for your lies to the FBI.  Do you

21  recall that?

22  A.   Yes.

23  Q.   You were also asked whether you were charged for your

24  conduct in accompanying your brother along and helping him, is

25  that correct?

1    A.  Yes.

2    Q.  And you were asked about meetings that you had with the

3    government in preparation for your testimony.  Do you recall

4    those questions?

5    A.  I do.

6    Q.  And Ms. Shroff asked you about the non-prosecution

7    agreement, we just saw it here.  She used the word "deal."  Do

8    you recall her using that word?

9    A.  Yeah, I do.

10   Q.  When you were provided with this agreement did you make any

11   changes to it?

12   A.  No.

13   Q.  Did you negotiate it in any way?

14   A.  I did not.

15   Q.  What is your only job, the only thing that you must do as a

16   witness?

17   A.  Tell the truth.

18   Q.  What do you understand would happen to you if you lie

19   during your testimony?

20   A.  I'll be prosecuted for perjury, for lying, and for the rest

21   of the crimes I committed.

22   Q.  What happens if you violate the terms of that agreement

23   that Ms. Shroff put up?

24   A.  The government will prosecute me for lying and for the

25   crimes committed.

H1IFGAM2                          T El-Goarany - redirect

1    Q.  And the government, meaning the prosecution team sitting

2    here, is that correct?

3    A.  That's correct.

4    Q.  Ms. Shroff asked you some questions about your brother's

5    laptop.  Other than accompanying your brother in the car where

6    he drove to the Dumpster and threw the hard drive into the

7    Dumpster, did you do anything else to help with him in that

8    process?

9    A.  I did not.

10   Q.  You were asked some questions about your brother's views on

11   ISIS.  Just to be abundantly clear, approximately when did he

12   first tell you he wanted to join ISIS?

13   A.  It was September, 2014.

14   Q.  You also testified about how your mother confronted Samy

15   when she learned about his travel.  Do you recall that

16   testimony?

17   A.  Yes.

18   Q.  And you testified about the story that Samy told your

19   mother when she confronted him.  Do you recall that?

20   A.  Yes.

21   Q.  What understanding did you have about whether he told her

22   the truth?

23   A.  I understood that he did not tell the truth.

24   Q.  Leading up to your brother's departure for ISIS, did he

25   tell you the exact day that he planned to leave for ISIS?

H1IFGAM2                              T El-Goarany – redirect

1   A.  No, he did not.

2   Q.  Why?

3   A.  I asked him not to.

4   Q.  Why?

5   A.  I didn't know –– I didn't want to know when he was leaving

6   because it was, it was too hard for me to know.

7   Q.  You testified about how you drove your brother to the train

8   station a few days before he left New York.  Do you recall

9   that?

10  A.  Yeah.

11  Q.  When you dropped him off at the train station you described

12  his demeanor.  Do you recall that?

13  A.  Yes.

14  Q.  Did you suspect that he would be leaving for ISIS soon?

15  A.  Yeah.  I had a feeling.  Yeah.

16  Q.  And just to be clear, what day did you return to your

17  Queens apartment after dropping your brother off at the train

18  station?

19  A.  January 20, when the semester started.

20  Q.  You were asked a few questions about your discussions with

21  the FBI in early 2015.  In particular, during the first

22  interview when you told the FBI that your brother might have

23  joined a local militia in Syria, do you recall that?  Do you

24  recall getting asked questions about that?

25  A.  Yeah.

H1IFGAM2                          T. El-Goarany - recross

1   Q.  At that time, did you in fact know that your brother had

2   already joined ISIS?

3   A.  Yes.

4   Q.  Ms. Shroff asked you some questions about how frequently

5   you spoke to your brother.  Were there periods of time when you

6   didn't hear from him at all when he was in ISIS?

7   A.  Yes.

8   Q.  For example, when he was deployed in battle?

9   A.  Correct.

10          MS. TEKEEI:  Nothing further, your Honor.

11          MS. SHROFF:  May I, your Honor?

12          THE COURT:  Yes.

13  RECROSS EXAMINATION

14  BY MS. SHROFF:

15  Q.  Just to be clear, she decides if you're telling the truth

16  or not, correct?

17          MS. TEKEEI:  Objection.

18          THE COURT:  Overruled.

19  A.  Yes.

20  Q.  Okay.  Now, you testified, did you not, on redirect here

21  that you were present when Samy lied to your mother, correct?

22  A.  I was.

23  Q.  Right.  And Samy and your mother had a long conversation

24  about how he wanted to do humanitarian work, correct?

25  A.  Correct.

H1IFGAM2                              T. El-Goarany - recross

1    Q.  And Samy in fact had a ticket at that time, a ticket that

2    he did not use, correct?

3    A.  Correct.

4    Q.  And in fact, you and your mother believed, did you not,

5    that Samy had actually changed his mind about going, correct?

6    A.  Correct.

7    Q.  And in fact, when Ms. Tekeei asked you that question, she

8    did not ask you right now about that change of heart that he

9    had, correct?

10              I'll withdraw that.

11              MS. SHROFF:  I have nothing further.

12              MS. TEKEEI:  Nothing further, your Honor.

13              THE COURT:  Mr. El-Goarany, you may step down.

14              (Witness excused)

15              THE COURT:  Will the government please call its next

16   witness?

17              MS. TEKEEI:  Thank you, the government calls Serpil

18   Kahveci-Ceceli.

19              THE COURT:  Please watch your step.  Please step up

20   into the witness stand and please remain standing.

21    SERPIL KAHVECI-CECELI,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24              THE COURT:  Please be seated, pull your chair up to

25   the microphone and please begin by stating your full name and

H1IFGAM2                          Kahveci-Ceceli - direct

1    spelling your last name for the record.

2             THE WITNESS:  S-e-r-p-i-l, last name K-a-h-v-e-c-i,

3    dash, C-e-c-e-l-i.

4             THE COURT:  Thank you so much.  Ms. Tekeei.

5             MS. TEKEEI:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MS. TEKEEI:

8    Q.  Where do you work?

9    A.  I work at Turkish Airlines at JFK Airport.

10   Q.  How long have you worked at Turkish Airlines?

11   A.  The past three years.

12   Q.  What did you do before you were an employee at Turkish

13   Airlines?

14   A.  I was working at the airport for a new company still with

15   Turkish Airlines.

16   Q.  What are your current day-to-day responsibilities for

17   Turkish Airlines?

18   A.  Responding to customer complaints, researching them and

19   writing, referring back to the passengers.

20   Q.  What's your official title?

21   A.  Customer service representative.

22   Q.  You mentioned that you work at JFK.  Where is Turkish

23   Airlines located?

24   A.  It's in Terminal 1 at JFK Airport.

25   Q.  In the course of your work at Turkish Airlines have you

1    become familiar with the manner and method in which Turkish

2    Airlines maintains its records?

3    A.  Yes.

4    Q.  What types of records do you deal with on a day-to-day

5    basis?

6    A.  Passenger reservations, ticket details, check-in details,

7    flight details.

8             MS. TEKEEI:  Your Honor, may I approach?

9             THE COURT:  You may.

10   Q.  Okay.  I have handed you what's been marked for

11   identification as Government Exhibits 801, 802, 803, 804, 805

12   and 806.  Could you take a moment to look through those?

13            MS. SHROFF:  Your Honor, the defense has no objection

14   to any of those coming into evidence.

15            THE COURT:  Okay, they may be received.

16            (Government's Exhibits 801 through 806 received in

17   evidence)

18            MS. TEKEEI:  Thank you, your Honor.  Go ahead and take

19   a moment to look through those.

20            (Pause)

21   Q.  Generally speaking, what are those records?

22   A.  These are reservation and ticket details belonging to

23   passengers listed on the ticket.

24   Q.  Thank you.

25            MS. TEKEEI:  Since they are in evidence, your Honor,

H1IFGAM2                           Kahveci-Ceceli - direct

1    may we publish 802?

2              THE COURT:  You may.

3              MS. TEKEEI:  Thank you.

4    Q.  Looking at Government Exhibit 802, and you can either look

5    at it on the screen or in the hard copy in front of you,

6    describe for the jury what is shown in 802?

7    A.  This is a reservation detail for a passenger Samy

8    El-Goarany.  It was created on October 22 of 2014.  Ticket was

9    issued.  Payment was done in cash and I see the booking dates,

10   the flight dates for the passenger.

11   Q.  What are those dates?

12   A.  The departure date is listed as November 6 of 2014,

13   departing at 1:15 arriving to Istanbul at 5:45 a.m. the

14   following day.  The return date was listed as November 17, 2014

15   from Istanbul at 1:25 p.m. arriving here to New York at

16   5:45 p.m.

17   Q.  Thank you.  Can you tell looking at these records where

18   this ticket was purchased?

19   A.  I can tell you that the reservation was created at the

20   airport.

21   Q.  And is that because you're looking at the created line?

22   A.  Correct.  The second line where it says JFK.

23   Q.  What time was the reservation created?

24   A.  It is showing as 18:15 Zulu.

25   Q.  What is 18:15 Zulu?

H1IFGAM2                           Kahveci-Ceceli – direct

1    A.   It is mean time, Greenwich time.

2    Q.   Is that the same thing as UTC time?

3    A.   Yes.

4    Q.   How can you tell that the passenger paid for this in cash?

5    A.   Looking at the payment line it indicates it's cash payment,

6    the amount is showing as USD 875.60.  Payment line with M shows

7    that the payment is in cash.

8    Q.   Okay, thank you.  Setting that to the side.  Looking at

9    Government Exhibit 803.

10             MS. TEKEEI:  Your Honor, may we publish that to the

11   jury?

12             THE COURT:  You may.

13   Q.   What do you see in this record?

14   A.   This is a new reservation created for the same passenger.

15   It was created on October 29 of 2014 with a new reservation

16   confirmation.  It was done at JFK with a sales staff, code AR.

17   It was issued in exchange of a previous ticket he purchased and

18   it was, we could see once again that the payment, original

19   ticket was paid in cash.  He did make an additional payment to

20   change the ticket, an additional $272 and the new ticket number

21   was generated again, where it says ticket on October 29th.

22   Q.   And how do you know that this reservation was made at the

23   airport?

24   A.   Again, looking at the "created" line, we see the three

25   letter code for the airport, JFK.

1   Q.  And how do you -- earlier you said it was the same

2   passenger.  Who is that passenger?

3   A.  Samy El-Goarany.

4   Q.  Looking at the bottom of the first page, where it says:

5   "Remarks," two lines from the bottom, where it says, "Booking

6   canceled as per passenger request."  Do you see that?

7   A.  By looking at the remarks, I can tell that this passenger

8   requested to change this ticket once again after making changes

9   to the ticket.  This booking was canceled based on the

10  passenger request on November 17, 2015.

11  Q.  What was the method of that cancellation?

12  A.  It was by the passenger at the airport.

13  Q.  How can you tell that?

14  A.  Because looking at the agent sign-in code towards the end,

15  right before the date, where it says JFK FASU, JFK is the

16  three-letter code, once again, for JFK airport, FA is the agent

17  who canceled the booking and entered the remarks on passenger's

18  reservation.

19  Q.  So this record like the previous one we showed, 802, were

20  generated after the passenger came to the airport in person to

21  either purchase a ticket or make a reservation, is that

22  correct?

23  A.  Yes.

24  Q.  And what are the initial dates of travel that are reflected

25  in Government Exhibit 803?

1   A.  November 24, 2014 and December 4, 2015 as a return flight.

2   Q.  And just to be totally clear, where it says the created

3   line on page 1, it says October 29.  Do you see that?

4   A.  Yes.

5   Q.  Can you -- what does that indicate?

6   A.  The reservation was booked on October 29, 2014.

7   Q.  At what time?

8   A.  22:02 Zulu time again, Greenwich time.

9   Q.  I think you said the passenger then later changed the

10  reservation again and canceled it on November 17, is that

11  right?

12  A.  Yes.

13  Q.  All right.  Turning your attention to Government Exhibit

14  804.  What does this exhibit reflect?

15  A.  This is a new reservation for the same passenger, Samy M.

16  El-Goarany.  It was created on November 22 of 2014 at 01:51

17  Zulu time.  New booking reference was given.  Once again, it

18  was issued in exchange for the previous ticket he made changes

19  on.  Once again the payment was, the changes were done at JFK

20  Airport.  You could tell by looking at the created line.  Once

21  again, the payment was done in cash.

22  Q.  And what are the dates of travel reflected here?

23  A.  The new travel dates are listed at January 27, 2015, return

24  date at February 3, 2015.

25  Q.  And was this the final flight that was booked for this

H1IFGAM2                         Kahveci-Ceceli - direct

1   passenger?

2   A.   This was the final flight booked for this passenger.

3   However, looking at the remarks there was a flight

4   cancellation -- just want to take a quick look at that, please?

5   Q.   Yes, of course.

6   A.   Sorry.  Okay.  The flight that he was supposed to depart on

7   January 27, 2015 at 1:15 was canceled.

8   Q.   Does it say why?  Do you know why?

9   A.   It doesn't reflect why it's canceled.  The passenger's PNR,

10  but the booking was canceled.

11  Q.   Was the passenger scheduled for another flight?

12  A.   Yes, he was scheduled to leave same day at a later flight

13  in the evening.

14  Q.   And what flight was that?

15  A.   Flight number 12 at 11:40, 23:40.

16  Q.   Is that local time?

17  A.   Local time.

18  Q.   Showing you now Government Exhibit 805.  What does this

19  reflect?

20  A.   This is the check-in history for the passenger's flight.

21  On TK12 January 27, 2015.  Can I just go over it?

22  Q.   Yes, of course.

23  A.   Passenger's name, which is listed as Pax, El-Goarany, Samy.

24  PNR is a reservation record for, the final reservation record

25  for this passenger.  Status; the five displays show us that the

H1IFGAM2                          Kahveci-Ceceli - direct

1    passenger did actually travel on this flight.  There was no off

2    load.  He was not a no-show.  He was boarded on the flight.

3    Seat number 49 alpha was given.  Gender shown as M, which is

4    mail.  Destination is Istanbul.  It shows class as Y, referring

5    to economy class.  He checked in one bag at 23 kilos.  He did

6    not have any, he was not coming from a domestic flight or he

7    was not going out on an outbound flight, meaning from Istanbul

8    on.  He had no connections.  His E-ticket number it is listed

9    there which he purchased.  And looking at the bottom, the last

10   line, we could tell that he was boarding on this flight.

11   Q.  Thank you.  So turning your attention now to Government

12   Exhibit 801.  What is this document?

13   A.  This is the passenger manifest for TK12 on January 28.

14   It's showing as January 28th because of once again the

15   Greenwich time.  But this is a passenger manifest, the actual

16   passenger manifest for TK12 on January 27.

17   Q.  And directing your attention approximately halfway down

18   this page, looking at the passenger in the seat 49A?

19   A.  Yes.

20   Q.  Who is that passenger?

21   A.  Just want to find his name.

22   Q.  A little below the middle of the page.

23   A.  I can't see it there, but I can see it on my doc here.

24   Q.  That's all right if you see it on your copy?

25   A.  We can see that passenger 49 alpha, once again, Samy

1    El-Goarany was on that flight.  This is the final list of

2    passengers who were boarded on that flight, TK12 on January 27.

3    Q.  Thank you.  Now, turning your attention to Government

4    Exhibit 806.  What is this record?

5    A.  This is a flight detail information for flight TK4 on

6    January 27 which is showing us canceled due to weather.

7    Q.  Okay.  Setting that to the side, you discussed earlier the

8    return flight that the passenger Samy El-Goarany had booked on

9    the last part of the, the last time that he scheduled his

10   flight.  Do you recall that?

11   A.  Yes.

12   Q.  Did you have an opportunity to review records for that

13   return flight?

14   A.  Yes.

15   Q.  Was he on the return flight?

16   A.  He was not.  His return ticket was still shown as open.  He

17   was not listed on the passenger manifest for that return flight

18   and he was on the no-show list for that flight.

19   Q.  Thank you.

20              MS. TEEKEI:  No further questions, your Honor.

21              THE COURT:  Any cross?

22              MS. SHROFF:  Just one question.

23   CROSS-EXAMINATION

24   BY MS. SHROFF:

25   Q.  Good afternoon.

1  A.  Good afternoon.

2  Q.  Actually, it's still morning.  I'm sorry.  49A?

3  A.  Yes.

4  Q.  Window seat?

5  A.  Window seat.

6          MS. SHROFF:  Thank you very much.  Nothing further.

7          MS. TEKEEI:  Nothing further, your Honor.

8          THE COURT:  You may step down.

9          (Witness excused)

10          THE COURT:  Will the government please call its next

11  witness?

12          MR. QUIGLEY:  Yes, your Honor.  The government calls

13  Timothy McNulty.

14          THE COURT:  Sir, please step forward and remain

15  standing when you get into the witness stand.

16          THE WITNESS:  Yes, sir.

17   TIMOTHY McNULTY,

18      called as a witness by the Government,

19      having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. QUIGLEY:

22  Q.  Good morning, sir.

23  A.  Good morning.

24  Q.  Where do you work?

25  A.  I'm a special agent with the Federal Bureau of

H1IFGAM2                         McNulty - direct

1    Investigation, New York office, counterterrorism division.

2    Q.  How long have you been with the FBI?

3    A.  Eleven years.

4    Q.  What did you do before you became an FBI agent?

5    A.  I was a police officer.

6    Q.  Where was that?

7            MS. MIRON:  Your Honor, I can't hear the witness.

8            THE COURT:  Sorry.  Mr. McNulty, could you bring the

9    microphone closer and get right up on top of it, if you don't

10   mind.

11   Q.  Where was that?

12   A.  Village of Hanover Park, a suburb of northwest Chicago.

13   Q.  What did you do before you became a police officer?

14   A.  I was a commissioned officer of the United States Marine

15   Corps.

16   Q.  When did you become involved in this investigation?

17   A.  Spring of 2016.

18   Q.  And in the course of your work in this investigation, did

19   you review certain materials the government obtained from

20   Facebook?

21   A.  Yes, I did.

22   Q.  I'm handing you what's been marked for identification as

23   Government Exhibit 113A.  And I'm also handing you a copy of

24   what's in evidence as Government Exhibit 113AT.  So directing

25   your attention first to 113A.  Do you recognize that?

H1IFGAM2                          McNulty - direct

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  It's a Facebook Messenger conversation between Samy Mohamed

4    and Attiya Aboualala.

5           MR. QUIGLEY:  Your Honor, the government offers

6    Government Exhibit 113A in evidence.

7           MS. MIRON:  Subject to previous objection, your Honor.

8           THE COURT:  Very well.  That exhibit will be received.

9           (Government's Exhibit 113A received in evidence)

10          MR. QUIGLEY:  Could we publish what's in evidence as

11   Government Exhibit 113AT and the jury can if they want turn in

12   their binders to Government Exhibit 113AT?

13   Q.  So we can go to the bottom of page 6.

14   A.  On 113AT?

15   Q.  Yes.  And read the entries on May 7, 2015 and July 21, 2015

16   and I will read the part of Samy El-Goarany, if you can read

17   the part of Attiya.

18   A.  Okay.

19          "ATTIYA:  There are two missed calls.

20          MS. MIRON:  Objection.

21          THE COURT:  Overruled.

22          "ATTIYA:  When should we meet?

23          "S. EL-GOARANY:  Forgive me brother, internet is bad

24   here.  God willing I still need to complete training.  I can

25   meet you after I finish with the camp.

```
 1              "ATTIYA:  God willing.

 2              MR. QUIGLEY:  July 21, 2015.

 3              "S. EL-GOARANY:  Eid Mubarek, my friend.  May God

 4    accept from us and from you.

 5              "ATTIYA:  Amen my God.

 6              MR. QUIGLEY:  Let's go ahead to the entries beginning

 7    on September 5, 2015 and we'll read until page 14 when we get

 8    to the entries on September 6 of 2015.  And, again, I'll read

 9    the part of Samy El-Goarany if you could read the part of

10    Attiya.

11              THE WITNESS:  Okay.

12              "ATTIYA:  Samy.  You cause a big problem for Ahmed.

13              "S. EL-GOARANY:  How?

14              "ATTIYA:  It is now in prison.

15              "S. EL-GOARANY:  Glory be to Allah I knew nothing I

16    have not spoken to him in over a month.  Also, there is nothing

17    dangerous, okay?

18              "ATTIYA:  Possible.  Do you know where is he?

19              MR. QUIGLEY:  I think you skipped a line there.

20              MS. MIRON:  Objection, your Honor.

21              THE COURT:  Overruled.

22              THE WITNESS:  Oh, I'm sorry.

23              "ATTIYA:  Can you help him?

24              "S. EL-GOARANY:  Possible.  Do you know where is he?

25    Did you speak with him recently?
```

1        "ATTIYA:  I spoke with his friend knew.

2        "S. EL-GOARANY:  Is he in jail in America?

3        "ATTIYA:  Yeah.  How can we help him?  Can you help

4   him?

5        "S. EL-GOARANY:  I do not know.  I need to learn the

6   details of his imprisonment.  I need to know where he is and

7   what the charges are against him and I need to know when this

8   happened, what the reason is.

9        "ATTIYA:  Accused of facilitating the arrival to the

10  State.

11       "S. EL-GOARANY:  And when did he get imprisoned?

12       "ATTIYA:  I do not know.

13       "S. EL-GOARANY:  I'm very limited in my contacts here,

14  brother.  I do not know anything about Ahmed's situation.  All

15  I know is what you tell me.  God willing I will pray for him.

16  But I don't know how I can help him in any other way.

17       "ATTIYA:  Dad spoke with how you can help.

18       "S. EL-GOARANY:  What did my father say?

19       "ATTIYA:  Could provide any help.  You are the cause

20  of the problem.

21       "S. EL-GOARANY:  Are you certain that I am the cause?

22       "ATTIYA:  Yeah.

23       "S. EL-GOARANY:  I cannot do anything for him here.

24       "ATTIYA:  You can connect your father.

25       "S. EL-GOARANY:  And did he not know why they did not

H1IFGAM2                          McNulty - direct

1   arrest him earlier, if I really am the cause.  I do not know

2   why they chose to do it now.  And what can my father do?  I do

3   not think it is safe to involve my family in this.

4            "ATTIYA:  I do not know.  Ask him.

5            "S. EL-GOARANY:  How are you certain that I am the

6   cause?  What is your proof?

7            "ATTIYA:  A friend told me.

8            "S. EL-GOARANY:  Glory be to Allah.  That is strange.

9   They had a lot of time to do this to him.  I don't know why

10  they chose now.

11           "ATTIYA:  This is not the important thing now is we

12  need to help him.  Do you contacted your father?  I am talking

13  with your father now.

14           "S. EL-GOARANY:  What is my father saying to you?  I

15  do not want to contact my father about this.

16           U.S. ATTORNEY:  Must relate to him and ask him for

17  help.

18           "S. EL-GOARANY:  I do not know how my father can

19  possibly help him, except with money maybe but I do not see how

20  he can help Ahmed be freed.

21           "ATTIYA:  Ask him.

22           "S. EL-GOARANY:  I mean, if my father gets involved,

23  he could be in danger too because I am no longer in America.

24           "ATTIYA:  Ahmed has a problem because of you and you

25  have to help him.

1      "S. EL-GOARANY:  I don't want my father to go to jail

2  too, okay?  How do you suppose my father helps him?  By

3  speaking to the same authorities who jailed him?

4      "ATTIYA:  Can we meet?

5      "S. EL-GOARANY:  I will talk to my father, God

6  willing, but do not think he can do anything for Ahmed except

7  send him money.  We can meet if you come to the State.

8      "ATTIYA:  I want to meet you in Istanbul.

9      "S. EL-GOARANY:  I cannot come back to Istanbul.  It

10  is too dangerous.  It is easier for you to come here.

11      "ATTIYA:  Can a city near you.

12      "S. EL-GOARANY:  No, brother, even that is unsafe.

13      "ATTIYA:  Hallelujah, great.

14      "S. EL-GOARANY:  I did not make hijrah to go back to

15  Dar al Kufir.  This is a permanent move.  I can talk to you no

16  problem, but to go back to Turkey is not good.

17      THE WITNESS:  Attiya appears to post a couple of phone

18  numbers.

19      "S. EL-GOARANY:  Okay, but I don't have a mobile now.

20  I will asked you when I get my phone back, God willing.  Maybe

21  in three weeks.

22      THE WITNESS:  There's an attachment sticker posted by

23  Attiya.

24      "S. EL-GOARANY:  I am sorry for Ahmed, really, but be

25  patient brother, God willing, Allah will protect him from the

H1IFGAM2                          McNulty - direct

1    tyrants in America.

2            "ATTIYA:  Ahmed was taken into custody by the FBI 15

3    days ago.  We still don't know the reason and whatever the

4    reason is can you please help us to find any of his friends in

5    the U.S.A. so that we can contact them.  His mother is there

6    and she doesn't know any of Ahmad's friends as his cell phone

7    and laptop have been taken away by the FBI.  Please try to help

8    us.  His mother is in a very bad condition.  She doesn't know

9    English and unable to do anything.

10           "S. EL-GOARANY:  Do you have his mother's number?  If

11   you do, I will give it to my father God willing he can help

12   her.

13           "ATTIYA:  Look for it.

14           "S. EL-GOARANY:  What is her name?  Does she have

15   Facebook?

16           "ATTIYA:  No.

17           "S. EL-GOARANY:  Give me the name of someone he is

18   related to, then, someone who is on Facebook who may have his

19   mother's number?

20           "ATTIYA:  No.

21   BY MR. QUIGLEY:

22   Q.  Can we stop there for a second?  So, Agent McNulty, after

23   this message at 20:21:13 on September 5, 2015 what's the date

24   and time of the next message between Samy El-Goarany and Attiya

25   Aboualala?

H1IFGAM2                         McNulty - direct

1    A.   It's the next day 9/6/2015 at 8:13:52.

2    Q.   Let's go there.  Do you see a link there, a link to an

3    ABC.com news article?

4    A.   Yes.

5    Q.   Were you able to find an ABC15.com news article discussing

6    the defendant's arrest?

7    A.   Yes.

8    Q.   Did it mention Samy El-Goarany or Attiya by name in this

9    article?

10            MS. MIRON:  Objection, hearsay.

11            THE COURT:  Sustained.

12            Before we go on, we should take our morning break.

13   Fifteen minutes, ladies and gentlemen.  Don't discuss the case,

14   don't do any research, don't read any news accounts of the case

15   if you should come across one.  Fifteen minutes.

16            (Jury excused)

17            (Continued on next page)

18

19

20

21

22

23

24

25

H1IFGAM2                         McNulty - direct

1                (In open court; jury not present)

2                MS. SHROFF:  Your Honor, we still have some exhibits

3   that we don't know if Mr. Quigley is going to object or not.

4   But we can do that after lunch before the redirect.  I'm

5   reminding the parties.

6                THE COURT:  I think one came in, though.

7                MS. SHROFF:  We're waiting on the other.

8                MR. QUIGLEY:  One we're not going to object to.  We

9   object to one but not the other.

10               MR. HABIB:  Which one do you not object to?

11               MR. QUIGLEY:  I think it's BB.

12               MS. SHROFF:  Your Honor, the second matter is the

13   government has informed us that they do not intend to put into

14   evidence in their case in chief Mr. Ahmed El Gammal's

15   post-arrest statement.

16               THE COURT:  All right.

17               MS. SHROFF:  I just wanted to let the Court know that.

18               THE COURT:  Is that right?

19               MR. QUIGLEY:  Yes.

20               MS. SHROFF:  We will try to now adjust our witnesses,

21   because I think they're case is going to be shorter and we're

22   working on it.

23               THE COURT:  Very well.  Thank you.  Since there's

24   nothing more, twenty after the hour.  Don't be late.

25               (Continued next page)

H1i5gam3                        McNulty - direct

 1              THE COURT:  Are we all ready?

 2              MS. TEKEEI:  Your Honor, we are just trying to

 3      schedule our witness lineup.  Approximately what time do you

 4      plan on taking a lunch break today?

 5              THE COURT:  12:30.  I have a 12:30 criminal matter.

 6              MS. TEKEEI:  Thank you, your Honor.

 7              THE COURT:  Can we get the jury?

 8              MS. MIRÓN:  Your Honor, there was a lot of record in

 9      the recent Facebook exchanges regarding Mr. El-Gammal's

10      imprisonment.  We would like that the jury be instructed that

11      they are to draw no inference related to guilt.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2                THE COURT:  Please, be seated everyone.

3                Mr. Quigley?

4                MR. QUIGLEY:  Thank you, your Honor.

5    BY MR. QUIGLEY:

6    Q.   So, we can focus back on Government Exhibit 113-A-T at page

7    14.  If we can start reading at 12:22:30, I will read the part

8    of Samy El- Goarany if you can read the part of Attiya, Agent

9    McNulty?

10   A.   Okay.

11         "EL-GOARANY:  What did my father do?  Is he the one

12   that made this complaint?  Marwa El Gammal told me my father is

13   the one who is responsible for this problem.  Is this true?

14         "ATTIYA:  Yes.  Yes.

15         "EL-GOARANY:  God help.  I was not aware of this at

16   all.  So, you should stop saying that I am the cause of this.

17   Now you know that I am not the cause.

18         "ATTIYA:  Your father is making the problem.

19         "EL-GOARANY:  Why did he do this?  Did he tell you?"

20   A.   Attiya posts a hyperlink to a newspaper article.

21         "ATTIYA:  Your father is lying.

22         "EL-GOARANY:  Yes, he is lying, but I want to know why

23   he is lying.  He never told me about any of this.  Ah, so he is

24   denying to you that he did this?

25         "ATTIYA:  He wants to go back to America.

1          "EL-GOARANY:  I know he wants me to come back but

2     glory be to Allah, he did a very, very bad thing."

3     A.  Attiya posts a --

4                MS. MIRÓN:  Objection to hearsay, your Honor.

5                THE COURT:  Overruled.

6     A.  Attiya posts an article for a press conference.

7     Q.  You don't have to read the whole thing, we will keep it up

8     there a second.

9                If you can go to the next page, Ms. Quinones?

10               We will continue reading:

11          "EL-GOARANY:  I do not know what to say, really.  I

12    did not even know that dad knew who Gammal was.

13          "ATTIYA:  You have to help your brother.

14          "EL-GOARANY:  I know, and I am trying to reach dad but

15    he hasn't responded to my messages yet today.  What my father

16    did is unacceptable.  If he really did this to Gammal, its you

17    Kufr Akhbar.  I swear to God."

18    Q.  Let's stop there for a second.

19               Agent McNulty, based on your involvement in the

20    investigation, was the defendant arrested because of a

21    complaint by Samy El- Goarany's father?

22    A.  No.

23    Q.  So, continuing on 9/6/15 at 12:48, can you read the next

24    part?

25          "ATTIYA:  Do not leave your brother.  You have to tell

H1i5gam3                    McNulty - direct

1   them that he had nothing to do by going to Syria.

2          "EL-GOARANY:  I will, because it is true."

3   A.  Attiya posts a sticker.

4          "ATTIYA:  You can fool your father.

5          "EL-GOARANY:  What do you mean by fool?

6          "ATTIYA:  Defraud?

7          "EL-GOARANY:  God knows.

8          "ATTIYA:  We tell him you come to Istanbul on the

9   condition that he helps Ahmed.

10         "EL-GOARANY:  Okay.  I tell.

11         "ATTIYA:  I tell him you will come to Istanbul but

12  only exit Ahmed.

13         "EL-GOARANY:  I will also tell him that he must help

14  Ahmed's mother right now.

15         "ATTIYA:  Okay.

16         "EL-GOARANY:  I have the mother's number, by the way,

17  phone number.

18         "ATTIYA:  Yes.  Viper.  You do not speak English?

19         "EL-GOARANY:  I cannot speak to her.  You know I speak

20  poor Arabic.

21         "ATTIYA:  Okay.

22         "EL-GOARANY:  But God willing, I will try my best to

23  force my father to speak with her and take care of her but, God

24  willing, I will try my best to force my father to speak with

25  her and take care of her."

1    A.  There is an attachment.

2              "ATTIYA:  The father admitted that he had caused the

3    problem and said he wanted to return to America.  We want to

4    record video and published it says that the news published by

5    TV liar.  Do you understand?

6              "EL-GOARANY:  Save the video but do not publish it

7    yet.  Patience, brother.

8              "ATTIYA:  Ahmed says that the thing does not know

9    about your trip and I also?

10             "EL-GOARANY:  You mean the information in the video?

11             "ATTIYA:  Yes.  Ahmed did not know anything about your

12   trip.  I did not know anything about your trip.  Your father

13   injustice Ahmed to be the reason for your return?

14             "EL-GOARANY:  Okay.  Then publish the video.

15             "ATTIYA:  Your father injustice Ahmed to be the reason

16   for your return."

17   Q.  There is a hyperlink from Samy Mohamed.  Agent McNulty, did

18   you click on the hyperlink in this investigation?

19   A.  I did.

20             MS. MIRÓN:  Objection hearsay.

21             THE COURT:  Overruled to that objection.

22   A.  It is a hyperlink that leads to press conference regarding

23   the case.

24   Q.  Regarding this case?

25   A.  Yes, sir.

H1i5gam3                        McNulty - direct

1    Q.  So let's stop right there.

2              After that hyperlink, what is the date on that

3    communication from Samy El- Goarany at 15:36:09?

4    A.  That was September 6, 2015.

5    Q.  What date did we start reading the September conversations

6    on?  It is on page --

7    A.  It started on September 5th, 2015.

8    Q.  So, going back to page 21, after the conversation on, at

9    15:57 on September 6, when is the next time that Attiya and

10   Samy El- Goarany exchange a Facebook message?

11   A.  The next day, September 7th, 2015.

12   Q.  At what time?

13   A.  Attiya's first message is at 18:50:25.

14   Q.  Can we read from there to -- and continue reading from

15   there?

16   A.  Okay.

17   Q.  To page 20:52:08 on page 22:

18              "ATTIYA:  Please can record video quickly.  Please,

19   send it to us now.

20              "EL-GOARANY:  I misunderstood your messages before.  I

21   will not record a video.  Trust me, it will not help Gammal.

22   The authorities in America have no reason to believe anything I

23   say.  They will not free him just because I make a video.  It's

24   a waste of time.

25              "ATTIYA:  Send video.  Lawyer says he's important?

1          "EL-GOARANY:  He has a lawyer now?

2          "ATTIYA:  Yeah.

3          "EL-GOARANY:  Did the lawyer say that this video will

4     guarantee him his freedom?

5          "ATTIYA:  Please send a video.  Often.  Now, I spoke

6     with Ahmed, who is asking you to send video, is very necessary.

7     Please and please send video.  Ahmed says he is important.  He

8     says that going to Syria, the result of a personal desire to

9     have and Ahmed had nothing to do so.

10         "EL-GOARANY:  It's late night over here and I do not

11    have the ability to make a video where I am.  I will let you

12    know tomorrow, God willing."

13    Q.  And so, what is the date on this message at 20:52:08, Agent

14    McNulty?

15    A.  September 7th, 2015.

16    Q.  When is the next message between Samy El- Goarany and

17    Attiya?

18    A.  The following day; September 8, 2015.

19    Q.  So, can we start reading at 13:33:06 and read to the bottom

20    of page 23?

21         "EL-GOARANY:  I will send it soon, God willing.  What

22    is your WhatsApp number?"

23    A.  A phone number.

24         "EL-GOARANY:  Okay.  I will send it soon to that

25    number.  Patience, God willing."

1    A.  There is a missed call.

2              "EL-GOARANY:  I sent the video.  Let me know when you

3    receive it.

4              "ATTIYA:  Okay.

5              "EL-GOARANY:  Make sure this video will be used to

6    help him.  I mean, this is a serious thing for me to expose

7    myself like this.  I am only doing this to help him and because

8    it is the truth.

9              "ATTIYA:  Could it be that the camera close?

10             "EL-GOARANY:  Why close?  The distance is good enough.

11   If you want to make it closer you can edit the video yourself.

12             "ATTIYA:  Okay.  Is good."

13   Q.  Okay.  We can stop right there.

14             Agent McNulty, do you see where Samy El- Goarany and

15   Attiya have referenced a video in here?

16   A.  Yes.

17   Q.  During the course of this investigation, did you attempt to

18   locate such a video?

19   A.  I did.

20   Q.  And did you find it?

21   A.  I did.

22   Q.  Where did you find it?

23   A.  It was in the search warrant return for Attiya's Facebook.

24             MR. QUIGLEY:  Your Honor, may I approach?

25             THE COURT:  You may.

H1i5gam3                         McNulty - direct

1   Q.  I am handing you what's been marked for identification as

2   Government Exhibit 143.  Do you recognize that?

3   A.  Yes.

4   Q.  What is that?

5   A.  This is the DVD the video was burned to.

6             MS. MIRÓN:  I am having trouble hearing the witness,

7   your Honor.

8             THE WITNESS:  Sorry.

9             This is the DVD the video was burned to.

10             MR. QUIGLEY:  Your Honor, the government offers

11   Government Exhibit 143.

12             MS. MIRÓN:  Previous objection, your Honor.

13             THE COURT:  Overruled.  Government Exhibit 143 will be

14   received.

15             (Government's Exhibit 143 received in evidence).

16             MR. QUIGLEY:  May we publish 143?

17             THE COURT:  You may.

18             MR. QUIGLEY:  Thank you, your Honor.

19             (File played)

20   Q.  So, when was this video made again, Agent McNulty?  Month

21   and year?

22   A.  That it was made?

23   Q.  Yes.

24   A.  That it was posted on or around September 8th.

25   Q.  Of what year?

1    A.  2015.

2    Q.  So, I want to step back in time a little bit over -- a

3    little over a year to September of 2014.

4            First, may I approach, your Honor?

5            THE COURT:  You may.

6    Q.  I am going to hand you Government's Exhibits 122-C, D, E,

7    F, G, and I.  Do you recognize those?

8    A.  Yes, I do.

9    Q.  Are they excerpts of Government Exhibit 122?

10   A.  Yes, they are.

11           MR. QUIGLEY:  Your Honor, the government offers

12   Government Exhibit 122-C, D, E, F, G, and I.

13           MS. MIRÓN:  Previous objection, your Honor.

14           THE COURT:  They will be received.  Including H?

15           MR. QUIGLEY:  No, your Honor.

16           (Government's Exhibits 122-C, D, E, F, G, and I

17   received in evidence)

18   BY MR. QUIGLEY:

19   Q.  Can we publish what is in evidence as Government Exhibit

20   122-F-T and have the jury turn in their binders to what is

21   marked Government Exhibit 122-F-T.

22           THE COURT:  Very well.

23   Q.  Can we go to the entry on the second page on 6/12/14 at

24   7:25:31?  And who is the speaker here, Agent McNulty?

25   A.  It is Attiya.

1   Q.  What is -- can you summarize what Attiya appears to be

2   discussing here and on the next page?

3            MS. MIRÓN:  Objection to the summary, your Honor.

4            THE COURT:  Sustained.

5   Q.  Let's read the next three lines, or the next three rows.  I

6   will read the part of Attiya if you can read the part of the

7   defendant.

8            "ATTIYA:  Away from any political, ideological, or

9   even sectarian opinion --

10            THE COURT:  Can you slow down, Mr. Quigley?

11            MR. QUIGLEY:  Sorry.

12   Q.  If you are a supporter or an opponent, or even if you did

13   not have an opinion to start with, you sit there watching:

14   Would you like to know the exact meaning of the word terrorism?

15   Look at what is happening in Iraq.  The majority of al-Maliki's

16   soldiers abandoned their vehicles and weapons and ran away as

17   they've heard that the fighters of the Islamic State in Iraq

18   and Levant were coming.  They took control of Mosul, the second

19   largest city in Iraq, and entered Takrit in the Salahuddin

20   governorate.  They will not sit and wait to fight and that they

21   might possibly resist.  They have the fear of previous battles

22   and know that if they will get arrested, they will get dragged

23   along the ground, dissected, and then tied to a pole.

24   Afterwards, they will think whether they will leave him like

25   that until he dies by himself or if they have sympathy for him

H1i5gam3                        McNulty - direct

1   and fire the mercy bullet at him.  This is for you to know that

2   the Brotherhood are sissies and calling them terrorists is

3   nothing but futility and political intellectual terrorism to

4   all those opposing the coup.

5          Can you say how the defendant responds?

6   A.  He responds:

7          "EL-GAMMAL:  Beheading has magical effect, Attiya.

8   You know?  If we would have had beheaded a few at the time of

9   revolution, the country would have gotten better and everything

10  would have been straightened out."

11  Q.  What does Attiya say next?

12  A.  Attiya says:

13         "ATTIYA:  I watch very carefully what is happening in

14  Iraq because this could be either the beginning sign of

15  breaking what is already broken, or the collapse of the

16  Sykes-Picot with all its consequences."

17  Q.  And how does the defendant respond?

18  A.  The defendant responds:

19         "EL-GAMMAL:  I pray to God to grant them victory and

20  control over entire Iraq and the Levant, then we join them in

21  conquering Egypt and, from there, to Jerusalem, God willing."

22  Q.  You can stop there.

23         What is the date of that entry?

24  A.  From June 12, 2014.

25         MR. QUIGLEY:  May I approach, your Honor?

1          THE COURT:  You may.

2     Q.  Handing you what's been marked for identification as

3     Government Exhibit 110-D; do you recognize that?

4     A.  Yes.

5     Q.  And what is that?

6     A.  It's a Facebook messenger conversation between Samy

7     Mohammed and Facebook user 686466726.

8     Q.  Is that an excerpt from Government Exhibit 110?

9     A.  Yes, it is.

10         MR. QUIGLEY:  Your Honor, the government offers

11    Government Exhibit 110-D.

12         MS. MIRÓN:  Previous objection, your Honor.

13         THE COURT:  110-D will be received.

14         (Government's Exhibit 110-D received in evidence)

15    BY MR. QUIGLEY:

16    Q.  If you would go to page 6 of Government Exhibit 110-D,

17    Agent McNulty?  Directing your attention to the top of the

18    page, do you see the date on which that message was sent?

19    A.  Yes.

20    Q.  What date is that?

21    A.  It's August 14th of 2014.

22    Q.  And what's the time?

23    A.  03:40 UTC.

24    Q.  What does the user of the 726 account say?

25    A.  He says:  I'm trying to send you a pick but I can't here.

H1i5gam3                         McNulty - direct

1    Q.  And directing your attention to the top of page 7, the

2    first entry, what does the user of the 726 account appear to

3    say about the picture?

4    A.  It says:  Anyways, it's a kid pulling a dead man from his

5    hair and smiling.

6    Q.  What does he say in the next message?

7    A.  A kid with Daesh.  They killed this man and ikhwan says he

8    was a pious Sheikh in Iraw.

9    Q.  If we go further down the page at 03:48:57 and what does

10   the user of the 726 account says there?

11   A.  Says:  One of the Ikhwans I know shared the pic and

12   insulted Daesh.  Surprisingly, I found el-Jammal commenting

13   saying seriously kos omak, El Dawla (he means Daesh) will

14   continue to expand.

15   Q.  And how does Samy El- Goarany respond?

16   A.  Samy asked:  He said that?

17   Q.  And what does he say -- sorry.

18          What does the user of the 726 account say in the next

19   message?

20   A.  Says:  As I told you, the difference between ikhwan and

21   Daesh is huge.  No hope.

22   Q.  So, can we go to the bottom of the page?

23          MS. MIRÓN:  Your Honor, may we approach briefly?

24          THE COURT:  Sure.

25

```
 1                     (At side bar)

 2                     MR. HABIB:  Just a few points.

 3                     On this exhibit, when the Court admitted it during

 4       motion in limine practice, the Court said it would give a

 5       limiting instruction and I would just ask the Court to give the

 6       limiting instruction that the Court said it was going to give,

 7       that there is no evidence that Mr. El-Gammal made the

 8       statements that are being attributed to him.

 9                     MR. QUIGLEY:  That was the Court's ruling.  That's

10       fine.  That was your ruling, your Honor, that's fine.

11                     THE COURT:  Okay.  This is only with respect to this.

12                     MR. QUIGLEY:  This is the only exhibit that is being

13       offered to show the effect on the listener.

14                     MR. HABIB:  That's right.

15                     THE COURT:  Okay.  So that it is not being for its

16       truth.

17                     MR. HABIB:  Exactly what the Court said.

18                     THE COURT:  Can I have this?

19                     MR. HABIB:  Sure can.

20                     MS. MIRÓN:  And then after this witness we are going

21       to ask that the Court issue an instruction that the jury can

22       draw no negative inference related to Mr. El-Gammal's

23       imprisonment, nor were those statements offered for the truth.

24                     MS. SHROFF:  Also his arrest.

25                     THE COURT:  Also his arrest.
```

1           MS. SHROFF:  Thank you.

2           MR. HABIB:  One more point.

3           We are open to ways to address this but there were --

4   Attiya made a statement that Mr. El-Gammal's lawyer said making

5   the video was important.  Obviously we didn't make the

6   statement but we are concerned that the jury may think that we

7   did.

8           THE COURT:  Okay.

9           MR. HABIB:  So I don't know what instruction may be

10  appropriate.  I don't know if the Court has other ideas.

11          THE COURT:  He had a lawyer in Arizona, correct?

12          MR. HABIB:  He did, but at the time that -- he did

13  have a lawyer in Arizona.  At the time that the statements were

14  made we were counsel of record.

15          MS. SHROFF:  We were not.

16          MR. HABIB:  In September we were here.

17          THE COURT:  I think there is no dispute that as a

18  factual matter you guys didn't ask for the statement.

19          MR. HABIB:  No.

20          MR. QUIGLEY:  And we would not dispute a statement

21  instruction that the Federal Defenders did not -- did not.

22          THE COURT:  Okay.  Why don't you work out some

23  language I am happy to tell them.

24          MR. HABIB:  I think you heard evidence that Attiya

25  said that Mr. El-Gammal's lawyers asked for the video and said

H1i5gam3                         McNulty - direct

1    it was important.  I instruct you that Mr. El-Gammal's lawyers,

2    the Federal Defenders of New York made no such statement.

3              MR. QUIGLEY:  His current attorneys.

4              THE COURT:  His current attorneys.

5              MR. QUIGLEY:  Yes.

6              THE COURT:  So you want me to give this instruction

7    now, give your instruction when he is done?

8              MS. SHROFF:  Wait.  Are you suggesting that you can't

9    identify who his client was?  Why can't you?  You identify

10   yourself as the United States Attorney's office all the time,

11   it is perfectly appropriate who we are.  That's who we are.

12             MR. QUIGLEY:  That's not what I was saying.

13             MS. SHROFF:  You should specify which lawyer, that

14   we're the Federal Defenders of New York, we are.  It is

15   correct.  It is a factually accurate statement because there is

16   other comments he heard about people hiring lawyers for him and

17   it is accurate to make sure it is clear who we are.

18             MR. QUIGLEY:  I don't think I was disputing that.

19             THE COURT:  Right.

20             So, I will give this one now, yours when he is done,

21   and then the one concerning the request for the tape when?

22             MR. HABIB:  I think also when you give the one with

23   respect to imprisonment.

24             THE COURT:  Very well.

25             MR. HABIB:  And arrest.

H1i5gam3                          McNulty – direct

1          THE COURT:  Okay.

2          MR. HABIB:  Thanks.

1            (In open court)

2            THE COURT:  Ladies and gentlemen, with respect to the

3     exhibit that we are reviewing now, there is a stipulation

4     between the parties that there is no -- that these statements

5     attributed to Mr. El-Gammal are being admitted not for the

6     truth but rather for the effect on the listener, in this case I

7     believe it is Mr. Attiya, and there is no evidence that

8     Mr. El-Gammal actually made these statements.  Again, they're

9     not being offered for truth, okay?

10           MR. QUIGLEY:  Your Honor, if I may just clarify, the

11    listener here is Mr. El- Goarany.

12           THE COURT:  I'm sorry.  I apologize.

13    BY MR. QUIGLEY:

14    Q.  Directing your attention to the bottom of page 9 to the

15    message at 03:59:22, can we read from there to the end?  And I

16    will read the part of Mr. El- Goarany, if you can read the part

17    of the user of the 726 account, Agent McNulty?

18           "726:  Okay.  SubHanAllah.  I was just looking at the

19    comments section at that ikhwany, bro, and I found Jammal

20    insulting because he defends Daesh.  The world is small and it

21    seems Daesh grabbed the attention of the world.

22           "EL-GOARANY:  I'm confused.  Jammal was defending the

23    ikhwany or defending Daesh?

24           "726:  Daesh.

25           "EL-GOARANY:  Ah, okay.

1          "726:  Saying to the ikhwani kos omak.  The Dawla will

2    continue to expand.

3          "EL-GOARANY:  I see.

4          "726:  But such conflict isn't healthy, right?

5          "EL-GOARANY:  I wonder what's the group's explanation

6    for killing this man.  That's the messed up part.  Everybody

7    tells a different story.  It's hard for us to know the truth.

8          "726:  People putting Rabaa pics but insulting each

9    others.  Other.

10         "EL-GOARANY:  It is unhealthy for sure.

11         "726:  Even if Daesh was truthful, the pics are stupid

12   and beget more harm than benefit.

13         "EL-GOARANY:  I completely agree.  They do serve a

14   purpose, to scare their enemies.  And it's worked a lot for

15   they've scared the -- explicit -- out of Maliki's men and

16   Assad's too.  They know what they're doing with these pics.

17   Still, though, doesn't make it right.

18         "726:  At that kid's age I most probably was happy

19   that I won't need pampers anymore.  I can't survive in this

20   cruel world.

21         "EL-GOARANY:  It's ugly, man.  That's war.  I hate the

22   fact that the group does such nasty things in the name of

23   Islam.  They should be condemned but at the same time I can't

24   consciously ignore the fact that they would never exist if it

25   wasn't for our savage regimes.  Some bros started freaking out

1   when they saws pics of Daesh hanging the heads of Bashar's

2   soldiers on the gates of Raqqah.  But what do they expect?

3   After everything that's happened, that these rebels are just

4   going to give them ice cream?  Bashar is even worse with the

5   prisoners he has."

6           Agent McNulty, what is the time stamp on that last

7   message?

8   A.  It is August 14th, 2014 at 04:08:57 UTC.

9   Q.  And, Ms. Quinones, can we put up 04:08:57, like he said?

10  And if we could put up Government Exhibit 100-B from the

11  defendant's Facebook account and go to page 5 and highlight the

12  entry on 20/08/14 and go to the entry at 04:06:00?

13          So, looking at that exhibit, that entry in 100-B of

14  the defendant's account, how does that time compare to the

15  entry we just watched and looked at in 110-D?

16  A.  They're the same day, a few minutes apart.

17  Q.  So the last one in 110-D is what time?

18  A.  Say again?

19  Q.  So the last one in 110-D is what time?

20  A.  Ends at 04:08:57.

21  Q.  So you are saying this is about two minutes earlier?

22  A.  Yes.

23  Q.  And if we could go back to 110-D for a second and go to

24  page 10 and blow up the first two entries on the page where

25  El Goarany asks whether Jammal was defending the ikhwani or

1   defending Daesh and Samy Mohamed says Daesh; what is the time

2   on those?

3   A.   04:00:01 and 04:00:08 UTC.

4   Q.   So that was about six minutes before the conversation in

5   100-B regarding cryptocat?

6   A.   Yes.  About that.

7   Q.   We can take that down and go to Government's Exhibits

8   100-E-T and can we go to page 72?  It is in the jury's binders

9   if anyone wants to take a look.

10          Agent McNulty, who is this conversation between?

11  A.   Between Gammal and Facebook user Mah Moud.

12  Q.   And have you previously reviewed this conversation in

13  preparation for testimony today?

14  A.   Yes.

15  Q.   Can you read the first entry on September 9th, 2014 at

16  20:39?

17  A.   "Imagine, Omar told my dad that I support Daesh so that my

18  father would warn me.  My father was worried about me and he

19  called me.  Omar knew from my postings, I mean."

20  Q.   And can we go through, Ms. Quinones, just scroll through

21  pages 73 through77?

22          Again, what does it appear, Agent McNulty, that the

23  defendant did with the majority of the messages on those pages?

24  A.   The majority of the messages were deleted.

25  Q.   Can we go back to page 74 to a few that weren't deleted and

H1i5gam3                    McNulty - direct

1    can you read from 20:53:03 to 20:04:29?

2    A.   Mah Moud states or asks:  How?

3            Gammal replies:  How come what?  I do not understand.

4            Mah Moud then says:  The one who travels, how he goes

5    in?

6            And Gammal replies:  I don't know.

7    Q.   What is the date on these communications?  Look at page 72.

8    A.   These are from September 9th, 2014.

9    Q.   If we can take a look at pages 78 through 84 and, again,

10   just slowly scroll through?

11           Agent McNulty, based on your review of this exhibit of

12   this exhibit now and your prior review, what does Mah Moud

13   appear to be discussing here with the defendant?

14           MS. MIRÓN:  Objection to the summary.

15           THE COURT:  Sustained.

16   Q.   So, if we can go back to page 79?

17           Agent McNulty, the entry on 9/13/14 at 11:43:14, can

18   you read the first two sentences?

19   A.   "Security experts expect the spread of electronic

20   eavesdropping in the coming days and complete violation to the

21   privacy of users under the pretext of countering Daesh.  Daesh

22   will not be the only one to have its privacy violated."

23   Q.   If we can move ahead to page 80 and if you could read --

24   sorry -- the last sentence on page 79 carrying over onto page

25   80?

H1i5gam3                          McNulty – direct

1   A.   "Regarding the social network sites, of course Facebook is

2   not secure and there is no privacy.  The violation of privacy

3   is beyond all imaginations.  Twitter is safe and secure to

4   communicate through."

5   Q.   And if we can go ahead to page 81, the entry on 10/8/2014?

6   Can you read that entry at 7:59:18?

7   A.   "Peace be upon you, Mr. Ahmed.  How are you?  Why did you

8   come back from there?"

9   Q.   And then on the entry on page 82 on 10/15/14, can you read

10  the first sentence that Mah Moud sends to the defendant?

11  A.   "The applications Skype, BBM, Wee Chat, Tango, WhatsApp,

12  Line, Facebook messenger are not secure to connect since most

13  of them are not encrypted and the others give governments the

14  right to monitor their users' conversations."

15  Q.   And if we can go ahead to page 83, what does the defendant

16  say at 9:39:46?

17  A.   "There is a signal application for iPhone."

18  Q.   9:39:46 at the bottom of the page.

19  A.   Sorry.

20       "Thank you, brother."

21  Q.   And then on the next page?

22  A.   At 9:40:10 Gammal posts:  I found something called

23  Surespot.

24  Q.   Okay.  We can take that down.

25       MR. QUIGLEY:  May I approach, your Honor?

H1i5gam3                    McNulty - direct

1         THE COURT:  You may.

2    Q.  Agent McNulty, handing you what's in evidence as

3    Government's Exhibits 120-S-T and 120-A-T.  These are also in

4    the jury binders.  Can we publish what is in evidence as

5    Government's Exhibits 100-S-T from the defendant's Facebook

6    account and look at segment L beginning on page 34?

7         Who are these messages between?

8    A.  Attiya and Gammal.

9    Q.  And what is the date on the messages on pages 33, 34, and

10   35?

11   A.  These are from 10/27/2014.

12   Q.  And if we can now look at Government Exhibit 120-A-T, page

13   43 from Attiya's account?  What are these, Agent McNulty?

14   A.  This is a conversation from Attiya's Facebook between him

15   and Gammal.

16   Q.  Is this the same conversation in 100-S, segment L?

17   A.  Yes.

18   Q.  Just from a different account?

19   A.  Correct.

20   Q.  So, what do you see when you look at 120-A-T, what do you

21   see with respect to most messages in Attiya's account in

22   segment L?

23   A.  They're deleted.

24   Q.  So let's go back to 100-S, segment L, and read from

25   4:01:49 -- sorry, read from the beginning until 14:47:24 and I

H1i5gam3                       McNulty - direct

1    will read the part of the defendant and you read the part of

2    the Attiya:

3              "EL-GAMMAL:  My friend will get there on November 6.

4              "ATTIYA:  Fine.  Let him call me.  The day of November

5    7, the airport at 5:45 a.m., flight number TK0004, terminal 1.

6              "EL-GAMMAL:  How could he call you?  He doesn't know

7    Arabic.  He could barely manage.

8              "ATTIYA:  No problem.  Don't worry.

9              "EL-GAMMAL:  You just take him to the address where

10   the hotel is."

11   Q.  Now if we can stop at that entry at 14:27:24; what does it

12   appear that the defendant did with that message?

13   A.  It's been deleted.

14   Q.  If you go to 120-A-T to the same message which is on page

15   43, were you able to find it in 120-A-T?

16   A.  Yes.

17   Q.  And what happened in 120-A-T also?

18   A.  Also deleted.

19   Q.  If we go back to 100-S at 33?  Do you see where, beginning

20   at 14:47:31 Attiya says:  "In face," there is some question

21   marks, and then there are three deleted messages at 14:47:46,

22   14:48:05, and 14:48:27?

23   A.  Yes.  I see that.

24   Q.  And when you go to 120-A-T were you able to find those

25   messages?

1    A.   Yes.

2    Q.   The ones at 14:47:46, 14:48:05 and 14:48:27?

3    A.   Yes, I did.

4    Q.   And what do you see when you go to 120-A-T?

5    A.   They're also being shown as deleted from the account.

6    Q.   So let's go back to 100 S, segment L and continue reading

7    from 14:48:44.  I will read the part of the defendant, if you

8    can read the part of Attiya.

9    A.   Okay.

10          "EL-GAMMAL:  Yes, yes.  Delete."

11   A.   There is an attachment:

12          "ATTIYA:  Okay.

13          "EL-GAMMAL:  Delete, man.

14          "ATTIYA:  Fin.  Fine.

15          "EL-GAMMAL:  What disaster with this Egyptian

16   ignorance.  Please concentrate, Attiya, and delete the comments

17   you have.

18          "ATTIYA:  I deleted the conversation, all of it.

19          "EL-GAMMAL:  Okay.  Most importantly, I am not going

20   to tell you anything more -- I'm not going to tell you more.

21   Please meet him at the airport.  He knows how you look.

22          "ATTIYA:  Is he staying in a hotel or should I make a

23   reservation for him?

24          "EL-GAMMAL:  No.  He reserved one night at a hotel in

25   the old city.

```
 1              "ATTIYA:  Okay."
 2     Q.  And there is an address and if you could pick up at
 3     14:59:19?
 4              "ATTIYA:  Ha ha ha ha.
 5              "EL-GAMMAL:  Do you know some English now or still
 6     ignorant?
 7              "ATTIYA:  Some.
 8              "EL-GAMMAL:  God will make things easier.  Thank you,
 9     Young, Attiya.  How is work at your channel?
10              "ATTIYA:  Ha ha ha ha.  Perfect".
11     Q.  So, if we can back up one second to the entry at 14:49:45,
12     do you where that attachment has been deleted?
13     A.  Yes.
14     Q.  When you look at 120-A-T, segment L, what do you see with
15     respect to that message?
16     A.  That same message at 14:49:25 has also been deleted.
17     Q.  Are you familiar with what's been marked for identification
18     as Government's Exhibits 102?  It is not in front of you.
19     A.  What is 102?
20     Q.  Did you review the contents of Government Exhibit 102 in
21     preparing for testifying?
22     A.  Yes.  Yes, I did.
23     Q.  That's a record from the defendant's Facebook account?
24     A.  Yes.
25     Q.  And were you able to find any communications between the
```

1    defendant -- any Facebook messages between the defendant and

2    Samy El- Goarany in GX- 102?

3    A.  No.

4              MR. QUIGLEY:  No further questions, your Honor.

5              THE COURT:  Very well.

6              Ladies and gentlemen, before cross-examination of the

7    Agent just a couple of things I wanted to go over with you.

8              First of all, during some of the conversations that

9    were read to you through Agent McNulty, reference was made to

10   the fact that Mr. El-Gammal was arrested and was imprisoned

11   immediately after his arrest for some period of time.  As I

12   told you when the trial started, Mr. El-Gammal is presumed

13   innocent.  He is as innocent as he sits in this courtroom today

14   as you or I and that presumption never changes.  It doesn't

15   change unless and until you, the jury, find after hearing all

16   of the evidence and after having had a full opportunity to

17   deliberate, to determine that he is guilty of the crimes

18   charged.  But, until then, the fact that he may have been

19   arrested and may have been imprisoned should play no role in

20   your deliberations.

21             Secondly, there was some reference made to -- in one

22   of the tapes, I believe it was Mr. Attiya that was speaking

23   that said, in effect, that Mr. El-Gammal's lawyers asked for a

24   videotape to be made by Samy El- Goarany.  There is no dispute

25   in this case that Mr. El- Gammal's lawyers, the three lawyers

1    sitting here today or any member of Federal Defenders of New

2    York made no such request.  Okay?

3              With that, cross-examination.

4    CROSS EXAMINATION

5    BY MS. MIRÓN:

6    Q.  Good afternoon, Agent McNulty.

7    A.  Good afternoon.

8    Q.  How long have you been an FBI agent?

9    A.  About 11 months.

10   Q.  Okay.

11             And you were a police officer before that?

12   A.  Yes, I was.

13   Q.  So you are aware that it is not good practice to have

14   civilians investigate a criminal matter, right?

15             MR. QUIGLEY:  Objection.  Outside the scope.

16             THE COURT:  Overruled.

17   A.  What do you mean?

18   Q.  I mean when you conduct investigations, the agents are

19   supposed to do that, not civilians involved in a criminal

20   matter, correct?

21   A.  Can you be more specific?

22   Q.  Sure.

23             Are you aware that Mohammed El Goarany traveled to

24   Turkey in May of 2015?

25   A.  Yes.

H1i5gam3                         McNulty – cross

1    Q.  Okay.  I'm talking about that.

2            So, fair to say it is not good FBI practice to have

3    family members of targets of investigations going to another

4    country to investigate, right?

5            MR. QUIGLEY:  Objection.  Outside the scope.

6            THE COURT:  Overruled.

7    A.  Say it one more time?

8    Q.  Is it FBI protocol to have the father of a target of a

9    terrorism investigation go to a different country to

10   investigate himself?  Is that proper FBI protocol?

11   A.  That would be situation-dependent.

12   Q.  Okay.  So it is your testimony that it's a good idea,

13   depending on the situation, to have a father of the target of

14   the investigation go out and interview witnesses?

15   A.  No.

16   Q.  Okay.  That's what I'm asking.

17           So, let's put some of this in context.  Mohammed

18   El Goarany went to Turkey in May of 2015, right?

19           MR. QUIGLEY:  Your Honor, can we approach?

20           THE COURT:  Yup.

21

22

23

24

25

1          (At side bar)

2          MR. QUIGLEY:  Your Honor, this agent testified that he

3     has only been on the case since the spring of 2016, a year

4     after Mohammed El Goarany went over there.  He has no

5     first-hand knowledge of this.  This is all hearsay and it is

6     not -- I mean, it may be proper impeachment of Mohammed

7     El Goarany but this is not the witness to do it.

8          THE COURT:  Yes.  I don't know what Ms. Mirón intends.

9          I allowed that initial question because I didn't know

10    where you were going but where are you going?

11         MS. MIRÓN:  Well, to be fair, the exhibits that were

12    published through this witness addressed May 5th, 2015

13    conversations with Attiya.  I am placing those in context.

14         MR. QUIGLEY:  They were not exhibits on May 5th that

15    were published through this witness.  We started later on.  I

16    think there is one conversation on May 7th.  He didn't testify

17    about anything on May 6th.  The majority --

18         THE COURT:  The majority?

19         MR. QUIGLEY:  The majority was from the video which

20    was in September of 2015 and then some earlier conversations in

21    the fall of 2014.  He wasn't even on -- he wasn't even in the

22    FBI in May 2015 when Mr. El- Goarany went overseas.  He has

23    been an FBI agent 11 months.

24         THE COURT:  Maybe this is not the witness to do it

25    through --

H1i5gam3                    McNulty – cross

1              MS. MIRÓN:  Well, is it within the scope of his

2     direct.

3              MR. QUIGLEY:  No, it is not, your Honor.  He didn't

4     say anything about Mohammed El Goarany.

5              THE COURT:  I think the alternative is to have the

6     defense call him as a witness.

7              MR. QUIGLEY:  Right.  I mean they can -- I just --

8     they can inquire.  They inquired of Agent Collie about similar

9     issues.  Agent Collie was one of the case agents at the time

10    and that was a big part of his cross, that they crossed him

11    extensively on Mohammed El Goarany's unauthorized travel and it

12    is getting cumulative, number one, and this is not -- we put up

13    one of the case agents, it was one of the case agents at that

14    time who testified that Mohammed El Goarany was not authorized

15    to go there, that he was stopped by the FBI as soon as he got

16    off the plane at JFK and his devices were searched.

17             MS. MIRÓN:  Your Honor, they introduced evidence

18    through this witness of missed phone calls between Attiya and

19    Samy.  I am entitled to place those in context about what

20    prompted those phone calls.  It was Mohammed El Goarany's trip.

21             THE COURT:  Okay.  I mean, I will allow you some

22    leeway in questioning him about that but try to stay within

23    some bounds.  Okay?

24             MS. MIRÓN:  Okay.

25

H1i5gam3                              McNulty - cross

1              (In open court)

2    BY MS. MIRÓN:

3    Q.  Could you display Government's Exhibit 113-D-T, I believe

4    it is page 18?  A little bigger -- actually, let's start from

5    the beginning, first page, and just scroll until May 5th.

6              So you, when reading this exhibit, said there were

7    phone calls that were missed from Attiya to Samy Mohammed,

8    right?

9    A.  Yes, I did.

10   Q.  But looking at it closely it says:  Missed false, correct?

11   A.  Correct.

12   Q.  And so, indeed, on May 7th, 2015, a call was made and

13   received, correct?

14   A.  Yes.

15   Q.  And the duration was 51 seconds?

16   A.  Correct.

17   Q.  That was a Facebook call, right?

18   A.  Yes.

19   Q.  Not a cellular phone call.  In other words, not a direct

20   number from one cell phone to the other, this was through

21   Facebook?

22   A.  From what I understand that's how it works, yes.

23   Q.  Okay.

24              If you scroll back up to January 17th or 16th, you

25   read this on direct too, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1i5gam3                        McNulty – cross

1              MR. QUIGLEY:  Objection.  Mischaracterizes the

2    testimony.

3              THE COURT:  Overruled.

4    Q.  Well, let me just focus your attention to January of 2015.

5              17:24:51 Samy asks Attiya for a phone number, right?

6    A.  Yes.

7    Q.  And he gives it to him, correct?

8    A.  Yes.

9    Q.  Fair to say in reading this that Samy didn't have the phone

10   number yet, right?

11   A.  I don't know.

12   Q.  Based on your review of this exchange?

13   A.  You're asking if he had a phone number previous to this

14   exchange?

15   Q.  I'm asking you whether he asked for the phone number on

16   that date.

17   A.  Yes, he asked for a phone number.

18   Q.  Okay.  And it was given on that date, right?

19   A.  That phone number, yes.

20   Q.  Okay.

21             Let's go to Government Exhibit 120-A-T, page 53, and

22   scroll up until we can see the date, May 5th.

23             So, when you testified about communications between

24   Attiya and Samy on May 7th, that followed this May 5th

25   exchange, right?

H1i5gam3                        McNulty - cross

1    A.  Yes.

2    Q.  And scroll down to the next page and highlight 18:57:11?

3    Fair to say Gammal is saying:  Maybe his father is using his

4    account.

5            Is that what it says?

6    A.  Yes, it does.

7    Q.  Thank you.

8            When you testified about the video that Attiya

9    solicited from Samy, in that exchange Samy gave him a WhatsApp

10   number, right?

11   A.  One of them.  I remember there was a WhatsApp number

12   exchange.  I don't recall who offered.

13   Q.  But you know that it was September 7th of 2015?  Would you

14   like to refresh your recollection?

15   A.  Yes, please.

16   Q.  Can you publish that exchange between Attiya and Samy

17   regarding the video, please?

18           Around September 7th at 2015 okay, that's the

19   exchange, September 8th, Samy tells Attiya I will send it soon,

20   God willing.  What is your WhatsApp number.

21           Right?

22   A.  Yes.

23   Q.  So, fair to say Samy didn't have Attiya's WhatsApp number

24   at that point before he asked for it?

25   A.  Yes, I think that can be assumed.

H1i5gam3                              McNulty – cross

1    Q.  Okay.

2            Attiya Aboualala is a journalist in Turkey, right?

3    A.  From what I know, yes.

4    Q.  From your review of all of the materials you were provided

5    in the investigation of this case he is a journalist, right?

6    A.  Yeah.  It looks like he does journalism, some kind of media

7    outlet.

8    Q.  Okay, and he escaped Egypt and went to Turkey around

9    September of 2014?

10   A.  I don't know.

11   Q.  You didn't review his own Facebook messages?

12   A.  Attiya?

13   Q.  Yes, Attiya's.

14   A.  Yes, I have looked at them.

15   Q.  And the exchange with Mr. El-Gammal about his travel to

16   Turkey, did you review that?

17   A.  I probably have, yes.

18   Q.  Okay.

19           So, when we come back from lunch we will publish that

20   and perhaps you can see if you recognize it.

21   A.  Okay.

22   Q.  Are you familiar with the Muslim Brotherhood and the term

23   ikhwan?

24   A.  I have heard it before, yes.

25   Q.  So, ikhwan is another term from Muslim Brotherhood, right?

H1i5gam3                       McNulty - cross

1    A.  Yes.

2    Q.  And Daesh is a derogatory term for ISIS?

3    A.  I don't understand it to be derogatory.

4    Q.  Well, ISIS members don't use that term to refer to

5    themselves, is that right?

6    A.  I don't know.

7    Q.  You work in the counter-terrorism unit of the New York FBI

8    office?

9    A.  Yes.

10   Q.  And you don't know whether ISIS members refer to themselves

11   as Daesh?

12   A.  I can't make a blanket statement of what they, every single

13   member of ISIL or ISIS calls themselves.

14   Q.  What do you know about the term Daesh?

15   A.  It's one word that is kind of a -- it is saying the actual

16   acronym.

17   Q.  ISIS members call themselves members of the state, right?

18   A.  Yes.

19   Q.  They don't say Daesh, do they?

20   A.  I don't know.

21   Q.  Okay.

22       You have reviewed profile pictures of Mr. El-Gammal

23   posted on his own Facebook page, right?

24   A.  Yes.

25   Q.  And are you familiar with the four finger symbol?

H1i5gam3                          McNulty – cross

1    A.   Yes.

2    Q.   What is that symbol?

3    A.   It's referring to four, I believe it was younger men,

4    killed in Rabaa during a protest.

5    Q.   Right.

6              What was Rabaa?

7    A.   That might have been the University.  I don't remember,

8    specifically, what Rabaa was.

9    Q.   Okay.  Just one moment.

10             (Counsel conferring)

11             MS. MIRÓN:  This might be a good time to break for

12   lunch if that's okay, your Honor.

13             THE COURT:  Absolutely.

14             Ladies and gentlemen, we will break for lunch now.

15   Please be in the jury room no later than 1:30 so we can get

16   started.  Until then, please do not discuss the case.

17             (Continued on next page)

18

19

20

21

22

23

24

25

H1i5gam3                        McNulty – cross

1              (Jury not present)

2              MR. QUIGLEY:  I don't see either lawyer here for my

3    1:30.

4              MS. SHROFF:  They might be in your other courtroom.

5              THE COURT:  Anything for me?

6              MR. QUIGLEY:  Not from us, your Honor.

7              MS. MIRÓN:  No, your Honor.

8              THE COURT:  Okay.  1:30.

9              (Luncheon recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1I3GAM4

```
 1                          AFTERNOON SESSION

 2                              1:30 p.m.

 3              (In open court; jury not present)

 4              MR. HABIB:  Your Honor, just two brief evidentiary

 5      matters before the jury comes back.  We have two evidentiary

 6      memos that the parties have discussed.  I think they require

 7      court action.

 8              The first concerns Defense Exhibit -- Ms. Miron is

 9      going to hand up copies to the Court.  The first concerns

10      Defense Exhibit 122-II-T which was the subject of a motion in

11      limine on which court ruled yesterday.  This is a

12      September 2015 Facebook conversation between Attiya and an

13      individual named Ahmed Ghanim.  We indicated that at least two

14      statements in the exhibit were admissible pursuant to Rule 806.

15      We just want to clarify the Court's ruling.  Is the entire

16      exhibit admissible?  Is that the Court's ruling?

17              THE COURT:  It's not.

18              MR. HABIB:  Which part is admissible?

19              MR. QUIGLEY:  I think the Court had ruled that the

20      part about Attiya saying "I instructed Samy to make the video"

21      was admissible and that was the only thing that was admissible

22      under 806.

23              THE COURT:  Weren't there two parts?

24              MR. HABIB:  Yes.

25              MR. QUIGLEY:  There were two parts that the defense
```

H1I3GAM4

argued were admissible.  Their theory of admissibility on the

first part was, which is the part at 13:07:55 was to impeach

the statement about Brother Ahmed that the government ended up

not offering.  So I think that was -- so the only part that is

coming in under 806 is the entry at 13:09:37 when Attiya says

"I asked Samy to record a video and say he went to Syria on his

own free will."

MR. HABIB:  In light of the government's election to

withdraw the Brother Ahmed comment, we would respectfully

submit that the first statement, "Samy's father accused him

only because Samy knows it but he has nothing to do with Daesh"

is still admissible on either of two grounds.

The first is it is admissible to impeach suggestions

and other statements by Attiya that our client was affiliated

with ISIS.  In particular the exchanges elicited during Special

Agent McNulty's testimony concerning the use of encrypted apps

by ISIS, and our client's statement "thank you" at the end of

that exchange.  And second we think it is also necessary for

the non-hearsay purpose of providing context and

intelligibility to the entire conversation.

MR. QUIGLEY:  With respect to those, the first

exchange Mr. Habib referenced was between Mamoud and the

defendant.  So Attiya's statement is not impeaching anyone

under 806.  So that doesn't come in under that.

I think context, I don't think it provides any

H1I3GAM4

context.  It says they can elicit date that 9/8/15 and say

13:09:37 Attiya said "I asked Samy to record a video and say

that he went to Syria out of his own will."  That gets them

exactly where they want to be.  That will be clear to the jury.

THE COURT:  I agree.  So only that statement will come

in.  And the other one?

MR. HABIB:  The second exhibit is Defense Exhibit

122-FF-T.  The government had moved in limine to preclude this

exhibit on -- is it relevance grounds?  We had asked the Court

to defer ruling while we considered whether or not we sought to

introduce the exhibit.  We now seek to introduce the exhibit.

This is a November 2014 Facebook conversation between

Attiya and an individual named Kamal Imad in which Attiya and

Mr. Imad discuss Attiya's work as a journalist in Egypt, in

which Mr. Imad discusses the possibility that he will emigrate

from Egypt to Turkey, in which Attiya offers to provide

assistance both in terms of the logistics of the move,

residency expenses, as well as him finding work.

We think that these statements are relevant because

they show, as the Court has already ruled with respect to other

exhibits, that Attiya has a legitimate job in Turkey, that he

is a journalist.  And more precisely, that it was not at all

unusual for Attiya to assist Egyptians leaving Egypt and coming

to Turkey, both in terms of acquiring housing and acquiring

work.  And on a similar rationale to the exhibit that the Court

H1I3GAM4

admitted yesterday via motion in limine, this evidence is

relevant to negate the government's theory of the purpose for

Mr. El Gammal's referral of Samy to Attiya.

          MR. QUIGLEY:  Your Honor, if I may.  So this again was

an exhibit we had moved in limine to keep out prior to trial.

The defense didn't respond because they said they were still

assessing whether to use it.

          There is I think a significant hearsay issue with this

exhibit.  Mr. Habib's kind of implicitly alluded to that in

saying this shows what Attiya was doing in Turkey.  These

statements are being offered for the truth of the matter

therein.  They've already introduced evidence about Attiya's

work as a journalist.

          But just taking some of the specific statements and

looking at the hearsay issues involved in them.  At 21:14:19,

Mr. Ahmed says "You know that my problem is I have a family and

my source of income here will stop and I have to figure things

out.  I have contacts with the Brotherhood and I've been known

to them for so long.  My son takes part in protests and I do

sometimes."

          Next page, "The coup has taken a sharp downturn at a

high speed.  That increase the fears very much.  But the

revolution has specific formulas and they're falling into place

now.  The economic crisis is getting more acute."

          These are all statements of fact.  Attiya at the

H1I3GAM4

1    bottom of the page "I'm waiting for your proposal in a form

2    that can be presented for people that are waiting for you in

3    Turkey."

4           Next final page "Egyptians currently receive

5    humanitarian residency."

6           Those are all statements of fact that are coming in

7    for the truth of the matter asserted.  And so the defense can't

8    use the rule of completeness to bootstrap their own evidence in

9    here.  So, I think this should be excluded on hearsay grounds.

10           MR. HABIB:  Your Honor, the statements that the

11   government has cited by Kamal Imad are not being offered for

12   their truth.  None of Kamal Imad's statements are being offered

13   for their truth.  They're being offered to show their effect on

14   Attiya, i.e. the effect that when Egyptians describes problems

15   in Egypt, and a desire to emigrate to Turkey, Attiya's responds

16   by offering assistance, both logistical and professional.

17           MR. QUIGLEY:  Again, even Attiya's statement on the

18   top of page two "I never spoke to anyone in Egypt since the

19   coup and found they desired to stay in Egypt."  That's a

20   statement of the factual assertion.

21           THE COURT:  There are any number of factual assertions

22   by Attiya in this exhibit.  And certainly in this form I'm not

23   going to allow it in.  If you want to cut it down in some

24   fashion and have me take a look at it, I'm happy to do it.  As

25   it stands I'm not going to allow it.

H1I3GAM4

1              MR. HABIB:  Thank you, your Honor.

2              MR. QUIGLEY:  Thank you, your Honor.

3              THE COURT:  Let's get the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1I3GAM4                    McNulty - cross

1        (Jury present)

2            THE COURT:  Ms. Miron.

3            MS. MIRON:  Thank you.

4    CROSS-EXAMINATION

5    BY MS. MIRON:

6    Q.  Agent McNulty, let me get a sense of how much you're

7    familiar with this case.

8            You've been working on it since spring of last year?

9    A.  Yes.

10   Q.  Have you had conversations with the prosecution about it?

11   A.  Yes.

12   Q.  How about Agent Collie?

13   A.  Yes.

14   Q.  And were you involved in prep sessions with some of the

15   witnesses?

16   A.  Yes.

17   Q.  Who in particular?

18   A.  Tarek El-Goarany, Theresa El-Goarany, Mohammed El-Goarany,

19   various custodians.

20   Q.  Okay.  Did you review Attiya Aboualala's Facebook account?

21   A.  Yes, I looked at that time.

22   Q.  And the translations of some of those communications?

23   A.  Yes.

24   Q.  Okay.  So, let's try again with Rabaa Square.  It was a

25   massacre, right?

H1I3GAM4                         McNulty - cross

1   A.   Yes.

2   Q.   There weren't just four people who died.  It could have

3   been a thousand who were killed?

4   A.   Yes, that's correct.

5   Q.   Up to 4,000 were killed?

6   A.   I don't know.

7   Q.   But those were supporters of Morsi.

8   A.   Yes.

9   Q.   Muslim Brotherhood members, right?

10  A.   Yes.

11  Q.   And Attiya Aboualala was present during that protest?

12           MR. QUIGLEY:  Objection.  Hearsay.

13           THE COURT:  Overruled.

14  A.   I don't know.

15  Q.   Based on review of Attiya Aboualala's Facebook account, do

16  you know?

17  A.   No.

18  Q.   Do you know whether Mr. Gammal was present in Rabaa Square?

19  A.   No.

20  Q.   You don't know if that's how they met?

21  A.   No.

22           MS. MIRON:  Okay.  So, at this point I would ask that

23  a profile photo be admitted, and we can raise it at sidebar,

24  your Honor, if necessary, but profile photo of Mr. Gammal with

25  the four finger sign.

1    MR. QUIGLEY:  What is the exhibit number?

2    MS. MIRON:  It is in Government Exhibit 100, page

3  1565.

4    MR. QUIGLEY:  We have no objection, your Honor.

5    THE COURT:  Okay.

6    MS. MIRON:  Thank you.  I'd ask that the government

7  Exhibit 100, page 1565, be displayed.

8    THE COURT:  Are you moving for the admission of that

9  exhibit?

10    MS. MIRON:  I am, thank you.

11    THE COURT:  We'll have to give it a defense number if

12  you don't mind.

13    MS. MIRON:  Defense 100-GG.

14    THE COURT:  Okay.  Do we have that exhibit?

15    MS. MIRON:  Thank you.

16    (Defendant's Exhibit 100-GG received in evidence)

17  Q.  Okay.  Have you seen this before?

18  A.  Yes.

19  Q.  You've seen it as part of Mr. Gammal's Facebook account,

20  right?

21  A.  I think so.

22  Q.  He uploaded this -- it was uploaded December of 30, 2013.

23  A.  I don't know.

24  Q.  Do you know whether this picture was provided to agents

25  from the FBI?

H1I3GAM4                         McNulty - cross

1           MR. QUIGLEY:  Objection, relevance.

2           THE COURT:  Overruled.

3   A.  What do you mean?

4   Q.  Was this photograph provided to anybody involved in this

5   case, as far as you know?

6   A.  I don't know.

7   Q.  By Mohammed El-Goarany, for example?

8   A.  I don't know.

9   Q.  Okay.  Attiya Aboualala was, from your review of his

10  Facebook account, Attiya fled Egypt to go to Istanbul, right?

11  A.  I know he moved from Egypt to Istanbul.

12  Q.  Well, do you know that demonstrators from Rabaa Square were

13  being persecuted after the massacre?

14  A.  Yes.

15  Q.  And they were being arrested, right, for their

16  participation in the protests?

17  A.  I don't know.

18  Q.  Okay.  But you do know that Attiya Aboualala went to

19  Istanbul.  Do you know when he went?

20  A.  No.

21  Q.  Okay.  Have you reviewed an exchange between Attiya

22  Aboualala and Mr. Gammal regarding Mr. Aboualala's intention to

23  move to Turkey?

24          MR. QUIGLEY:  May we approach?

25          THE COURT:  You may.

H1I3GAM4                         McNulty - cross

1          (At the sidebar)

2          MR. QUIGLEY:  Your Honor, I would just renew our prior

3     objection.  Number one, this is way outside the scope of his

4     direct.  Number two, they questioned Agent Collie extensively

5     about many of these same issues.  Agent Collie -- he's not

6     frankly a percipient witness.  He's been in the FBI less than a

7     year.  He's been on this case less than a year.  He's frankly

8     primarily been in witness preps, and I think they're creating a

9     misimpression with the jury to say he was responsible or

10    involved in the precharge investigation of this case.

11         THE COURT:  I don't know what his involvement has

12    been.  That's certainly something you can clean up on redirect

13    examination.

14         MR. QUIGLEY:  He testified that he had been only on

15    the case since spring of 2016.

16         THE COURT:  I don't know what he's done since the

17    spring of 2016.  That's a long time.

18         So again, Ms. Miron, I don't know what it is that you

19    want to do with this guy, but I'll allow the questioning to

20    proceed at this point.  It appears as though, again, I'm not

21    going to say anything about what it appears, but you have the

22    representation from the government.  Do what you think is

23    appropriate, but again, I will at some point I suppose begin to

24    sustain objections on the basis it is beyond the scope of

25    direct examination.

H1I3GAM4                         McNulty – cross

1          MS. MIRON:  Okay.  To be clear, Agent Collie did

2     testify that there were rotating case agents and this case

3     agent was in the audience the whole trial.

4          MR. QUIGLEY:  He's been outside in the hallway the

5     whole trial, because he's been sequestered.

6          THE COURT:  I've seen him around but I don't think

7     he's been in the courtroom while the questioning has been going

8     on.

9          The fact that one agent has been questioned with

10    respect to a topic doesn't mean that other agents if they were

11    also involved could not be questioned about the same topic, so

12    that's not a basis for objection.  If he wasn't involved then

13    he doesn't know, and he didn't review certain documents then he

14    can certainly say so.

15         MS. SHROFF:  Also we reviewed your handwritten notes

16    of all the prep sessions, and he was at almost every one of the

17    prep sessions for Tarek El-Goarany.

18         THE COURT:  That doesn't mean he has knowledge that

19    can be elicited at this trial.  So you folks have a better

20    understanding of who was involved and what their involvement

21    was than I do.  I'm not going to give a general instruction but

22    the objection is overruled.

23         MR. QUIGLEY:  Thank you.

24         THE COURT:  We'll take it a question at a time.

25         MR. HABIB:  Can we square up redactions to this

H1I3GAM4                          McNulty - cross

1    exhibit so our paralegal can prepare it.  This is II, the one

2    the Court just ruled on.  Attiya we're proposing to introduce

3    everything up to here.  Cross out the part about he has nothing

4    to do with Daesh.  And then introduce the statement about Samy,

5    "I asked Samy to record a video" and rest of it we can cross

6    out.

7               MR. QUIGLEY:  Let me see the first page.  Again, your

8    Honor, I think this is hearsay here and they have the date.  It

9    is going to be unclear to the jury when he said "I asked Samy

10   to record a video."

11              MR. HABIB:  The government put in these same articles

12   also by Attiya to Samy.  To provide context to that exchange

13   we're just matching what the government put in.

14              MR. QUIGLEY:  The first statement I don't care

15   about --

16              THE COURT:  I don't know that this statement has come

17   in.

18              MR. HABIB:  Which one?

19              THE COURT:  The top one.  I know it hasn't come in,

20   but I don't know whether the substance of that.

21              MR. HABIB:  I mean, I take your Honor's point, but

22   with respect, I think this is necessary for the non-hearsay

23   purpose of making the document intelligible.  It is the first

24   line in the communication.  It sets the tone.

25              THE COURT:  It's not in dispute.

H1I3GAM4                        McNulty – cross

1              MR. QUIGLEY:  You're taking out the "this is a huge

2      problem."

3              MR. HABIB:  Sure.  It will be up to here, the links.

4              MR. QUIGLEY:  And the statement.

5              MR. HABIB:  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1I3GAM4                         McNulty – cross

1    (In open court)

2    BY MS. MIRON:

3    Q.  Fair to say Attiya Aboualala and Mr. Gammal are Facebook

4    friends, based on your review of the Facebook evidence, right?

5    A.  Yes.

6    Q.  And they had been friends at the time this profile photo

7    was posted?

8    A.  I don't know.

9    Q.  I'd like to show you what's in evidence as Government

10   Exhibit 120-A-T and direct your attention to page 37.  All

11   right.  So this is a conversation between Attiya and

12   Mr. Gammal, right?

13   A.  Yes.

14   Q.  And Attiya says "I will go to Jordan on the 5th."  Right?

15   A.  Correct.

16   Q.  Mr. Gammal says "God be with you."  Right?

17   A.  Yes.

18   Q.  Attiya says "I urge you by Allah to pray for me."  Right?

19   A.  Yes.

20   Q.  Gammal says "May God give you success and ease your

21   difficulty."  Right?

22   A.  Yes.

23   Q.  And Attiya says "I reserved a flight on the 5th and will be

24   in Istanbul the 8th or the 10th."

25   A.  Okay, yes.

H1I3GAM4                              McNulty – cross

1    Q.  And so, based on your review of the Facebook evidence,

2    Attiya arrived or said he would arrive in Istanbul around the

3    8th or the 10th of September 2014.

4    A.  Say that again?

5    Q.  Sure.  Based on your review of the Facebook evidence,

6    including this exhibit, did you review this exhibit before

7    today?

8    A.  Yes.

9    Q.  Okay.  This is an exchange between Attiya and Mr. Gammal,

10   right?

11   A.  Yes.

12   Q.  Attiya is telling Mr. Gammal when he is to arrive in

13   Istanbul, when he, Attiya, is arriving in Istanbul, right?

14   A.  Yes.

15   Q.  And he is going to arrive September 8th or the 10th.

16   A.  That's what he says.

17   Q.  Okay.  Based on your review of the Facebook evidence, did

18   Attiya Aboualala assist other supporters of Rabaa Square in

19   arriving in Istanbul?

20              MR. QUIGLEY:  Objection.

21              THE COURT:  Overruled.

22   A.  I don't know.

23   Q.  Or offered to assist?

24   A.  I don't know.

25   Q.  Or get solicitations to assist?

1          To be clear, we're talking about people leaving Egypt,

2    okay, because they are supporters of Rabaa Square and being

3    persecuted and looking for a place to go.

4          Did Attiya Aboualala receive any solicitations, based

5    on your review, of help in arriving in Istanbul?

6    A.  I don't recall.

7    Q.  Okay.

8          MS. MIRON:  Just a minute.

9    Q.  You read an exchange regarding the video that Samy

10   El-Goarany produced.  You read that to the jury, right?

11   A.  Yes.

12   Q.  And Attiya told Samy El-Goarany that he, Mr. Gammal, had

13   asked for that video.  That's what essentially he purported to

14   say, right?

15   A.  Yes.

16         MS. MIRON:  I'd like to ask that Defense Exhibit

17   122-LL-II-T be admitted in a limited fashion.

18         MR. QUIGLEY:  It's II, right?

19         MS. MIRON:  II.

20         MR. QUIGLEY:  No objection, your Honor.

21         THE COURT:  That exhibit will be received.

22         (Defendant's Exhibit 122-LL-II-T received in evidence)

23         MS. MIRON:  And that it be published to the jury.

24         THE COURT:  Very well.

25   Q.  Let me just situate us.  The date on this exhibit is

H1I3GAM4                    McNulty - cross

1    September 8th of 2015, right?

2    A.  Yes.

3    Q.  And that is, if not the day Samy posts the video, it's the

4    day after, right?

5    A.  It's on or around that day, yes.

6    Q.  Thank you.  Attiya says "A brother" if you can just zoom in

7    a little maybe.

8            "A brother is detained in America and we still don't

9    know what they're going to do with him.  We contacted a lawyer

10   and he still has to look into the case."

11           That's what he first says, right?

12   A.  Yes.

13   Q.  And he says "We may need to launch a campaign regarding his

14   arrest."  Right?

15   A.  Yes.

16   Q.  And the person receiving this communication, Ahmed Ghanim,

17   asks "Who's that?"  Right?

18   A.  Yes.

19   Q.  And he posts what looks like a link to Mr. Gammal's

20   Facebook account.  Right?

21   A.  Yes.

22   Q.  He say "What does detained mean?  Immigration?"  Right?

23   A.  Yes.

24   Q.  And then there is a post to that same press release or

25   newspaper article, right?

H1I3GAM4                        McNulty - cross

1   A.  Yes.

2   Q.  Okay.  Let's just show the second page.  Attiya says "I

3   asked Samy to record a video and say in it that he went to

4   Syria out of his own will."  Right?

5   A.  Yes.

6   Q.  It's not that he says Mr. Gammal asked for the video to be

7   made.  Right?

8   A.  Correct.

9   Q.  And in the exchange that you read between Attiya and Samy,

10  Attiya references Samy's father.  In September of --

11  A.  Yes.

12  Q.  -- 2015, right?

13  A.  Yes.

14  Q.  And Attiya asks Samy's father essentially to drop the case;

15  something to that effect, right?

16          He says he wants Samy's father to not proceed.

17  A.  Something to that effect, yes.

18  Q.  This exchange follows from the May 2015 Mohammed El-Goarany

19  trip to Turkey, right?

20  A.  Yes.

21  Q.  So Mohammed El-Goarany had spoken with Attiya Aboualala by

22  this point.  Correct?

23  A.  Yes.

24  Q.  And do you know the details of that investigation that

25  Mohammed El-Goarany did on his own?

1    A.  No.

2    Q.  You don't know exactly what was said between Attiya and

3    Mohammed, right?

4    A.  No.

5    Q.  You don't know because the FBI wasn't there.

6    A.  I don't know.

7    Q.  The FBI had no involvement in Mohammed El-Goarany's trip to

8    Turkey, right?

9    A.  Correct.

10   Q.  Thank you.

11              MS. MIRON:  Nothing further.

12              THE COURT:  Redirect?

13              MR. QUIGLEY:  Just briefly, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. QUIGLEY:

16   Q.  Sir, just to pick up where Ms. Miron left off.  Is it your

17   understanding that Mr. El-Goarany's trip to Turkey was not

18   authorized by the FBI?

19   A.  Yes.

20   Q.  Just briefly, when did you say you got on the case?

21   A.  I started assisting with it in the March timeframe of 2016.

22   Q.  Had the defendant been arrested by that point?

23   A.  Yes.

24              MR. QUIGLEY:  No further questions, your Honor.

25              MS. MIRON:  Nothing further.

H1I3GAM4

1           THE COURT:  Agent, you may step down.

2           THE WITNESS:  Thank you, your Honor.

3           (Witness excused)

4           THE COURT:  Government, please call your next witness.

5           MS. TEKEEI:  Thank you, your Honor.  We call Maria

6     Mascaro.

7           MR. QUIGLEY:  With the Court's permission we can

8     publish a brief stipulation.

9           THE COURT:  Very well.

10          MR. QUIGLEY:  It is hereby stipulated and agreed

11    between the parties that:

12          If called to testify, a custodian of records from

13    Surespot LLC would testify as follows:

14          He or she is familiar with the record-keeping

15    practices of Surespot.

16          Surespot is a free secure mobile messaging

17    application, defined here as the Surespot app, that includes

18    text messages, images, and voice messages exchanged between

19    users of the application.

20          Surespot, which operates the Surespot app, cannot

21    view, decipher, or see the messages sent and received by

22    Surespot app users.  This is because the Surespot app uses

23    end-to-end encryption technology with encryption keys that

24    Surespot itself cannot see and does not hold.  The Surespot app

25    takes a user's text message, image, or voice messages, and

H1I3GAM4

locks them using this encryption technology.  Only the Surespot

user who receives the text messages, images, or voice messages

will have the encryption key and be able to open the encrypted

text messages, images, or voice messages.

The Surespot app uses what is called a zero-content

system, which means that personal identifiable information of

its users and the contents of their communications are not

available.  Surespot does not collect any personal information

about the users of the Surespot app.  Surespot app accounts are

not associated with e-mail addresses or phone numbers.

Furthermore, if a user deletes his or her account, any messages

sent by that account would be deleted from Surespot's server

and would not appear in the record of any other Surespot

account.

Government's Exhibits 601 and 602 are true and

accurate copies of business records maintained by Surespot for

the accounts jimmy730 and samyelza.  Defense Exhibit 202 is a

true and accurate copy of business records maintained by

Surespot from the account tarekel92.  Defense Exhibit 203 is a

true and accurate copy maintained by Surespot for the account

AbMuradK.  The information contained in Government Exhibits 601

and 602 and Defense Exhibits 202 and 203 were recorded at or

near of the time that the activity reflected therein took

place; was recorded by, or obtained from, persons with

knowledge of the activity reflected therein; was kept in the

H1I3GAM4

1  regular course of the business activity of Surespot; and is

2  relied on as a regular practice of Surespot.

3          Government's Exhibits 601 and 602 show that, on

4  December 1st, 2014, the account samyelza sent the account

5  jimmy730 a message.  This was the 970th message exchange

6  between these two accounts.  The message was received by the

7  server at 11:33 p.m.  This is the only message that Surespot

8  retains on its server between those two accounts.  It is not

9  possible to determine whether this message was viewed by the

10 account jimmy730.  All 969 prior messages between the two

11 accounts were deleted.  It is not possible to determine over

12 how many days the messages were exchanged between the two

13 accounts.

14         Government Exhibit 602 also shows that on February 4,

15 2015; February 18, 2015; March 29, 2015; and April 4, 2015,

16 Surespot user nohopeboy sent four messages to the samyelza

17 account.

18         Defense Exhibit 202 shows that on September 15, 2014,

19 the account tarekel92 sent samyelza a message, that the message

20 was received at 9:03 p.m., that this message was deleted from

21 samyelza's account, and there is no record of any other

22 messages exchange between these two accounts.

23         Defense Exhibit 203 shows that on September 25,

24 October 5 and October 9, 2015, the account AbMuradK sent

25 messages to abubakralsudani, and on July 16, 2015, the account

H1I3GAM4

1   AbMuradK sent two messages to the account tarekbey, and the

2   account tarekbey sent a message to the account AbMuradK, and

3   none of these messages were deleted from the account AbMuradK.

4   There is no record that the account AbMuradK exchanged messages

5   with the account jimmy730, and there is no record that either

6   account added the other as a friend.

7          It is further stipulated and agreed that this

8   stipulation, which is Government Exhibit 1106, along with

9   Government Exhibit 601 and 602 and Defense Exhibits 202 and

10  203, may be received into evidence at trial in the above

11  referenced trial.

12         So we'd offer the stip and 601 and 602.

13         THE COURT:  On stipulation the exhibits will be

14  received.

15         MR. QUIGLEY:  Thank you.

16         (Government's Exhibit 1106, 601, 602 received in

17  evidence)

18         THE COURT:  Next witness, please.

19         MS. TEKEEI:  Thank you, your Honor.

20         Maria Mascaro.

21         THE COURT:  Please watch your step and when you step

22  into the witness box, please remain standing.

23         (Witness sworn)

24         THE COURT:  You may be seated.  Please pull your seat

25  up to the microphone and please begin by stating your full name

H1I3GAM4                           Mascaro - direct

1   and spelling your last name for the record.

2             THE WITNESS:  Maria Mascaro.  M-A-S-C-A-R-O.

3             THE COURT:  Ms. Tekeei.

4    MARIA MASCARO,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. TEKEEI:

9    Q.  Ms. Mascaro, where do you work?

10   A.  American Airlines at LaGuardia Airport.

11   Q.  How long have you worked there?

12   A.  35 years.

13   Q.  What is your position at American Airlines?

14   A.  I am an auditor for the station.

15   Q.  What are your day-to-day responsibilities?

16   A.  I'm responsible to reconcile all the cash sales,

17   accountable documents, any type of revenue taken in the station

18   or revenue given to passengers.

19   Q.  In the course of your work at American Airlines, have you

20   become familiar with the manner and methods in which American

21   Airlines maintains its records?

22   A.  Yes.

23             MS. TEKEEI:  Your Honor, may I approach?

24             THE COURT:  You may.

25   Q.  Showing you what's been marked for identification as

H1I3GAM4                          Mascaro - direct

1    Government Exhibits 800, 807, and 808.  Do you recognize those

2    documents?

3    A.  Yes.

4    Q.  Generally speaking, what are they?

5    A.  The first one, 800, is a manifest of our flight, one of our

6    flights which includes all the passengers that were on board,

7    it includes the passenger name, seat numbers, origination and

8    destination of the flight.

9    Q.  Generally speaking, what does 807 show?

10   A.  807 shows the actual flight number and schedule in arrival

11   of departure, and arrival of a particular flight between

12   certain cities.

13   Q.  How about 808, just generally speaking.

14   A.  808 is the records of a passenger reservation from the

15   moment it was created with the history of every step from

16   check-in to boarding.

17   Q.  Does American Airlines maintain these records in the

18   regular course of its business?

19   A.  Yes.

20   Q.  Is it the regular practice of American Airlines to maintain

21   these records?

22   A.  Yes.

23   Q.  Are these records generated at or near the time of the

24   events they reflect therein?

25   A.  Yes.

H1I3GAM4                          Mascaro - direct

1          MS. TEKEEI:  Your Honor, we offer Government Exhibits

2     800, 807 and 808.

3          MS. SHROFF:  No objection.

4          THE COURT:  Those documents will be received.

5          (Government's Exhibit 800, 807, 808 received in

6     evidence)

7          MS. TEKEEI:  Thank you.  May we publish 808?

8          THE COURT:  You may.

9          MS. TEKEEI:  Thank you.

10    Q.  Ms. Mascaro, looking at page one of 808, can you describe

11    for the jury what types of records these are.

12    A.  This is a reservation made for a passenger El Gammal,

13    Ahmed, it was made through the website, it includes his phone

14    number.  At the time it was USAirways.com, which it was

15    previously U.S. Airways, we just merged with American Airlines.

16    It includes the e-mail, there is a ticket number, a fare, the

17    amount it was paid for, it indicates the credit card number,

18    the date of purchase.

19    Q.  What is that date of purchase?

20    A.  Date of purchase was September 20.

21    Q.  Turning to page two, six lines down beginning with the line

22    that starts with web SU.

23    A.  All the way down?

24    Q.  I misspoke.

25    A.  I'm sorry.  Yes.

H1I3GAM4                        Mascaro - direct

1   Q.  What time was this fare purchased?

2   A.  6:47.

3   Q.  Thank you.  You can put that one to the side.

4           Looking at Government Exhibit 800.  I believe earlier

5   you said this was the flight manifest.  Is that correct?

6   A.  Correct.

7   Q.  What is the flight number?  To what flight does this

8   manifest relate?

9   A.  Flight 425 from Phoenix to J.F.K. on October 6, 2014.

10  Q.  To be clear, this is a list of passengers who were on the

11  flights that are reflected in this exhibit?

12  A.  That's correct.

13  Q.  Looking approximately midway down the first page, there is

14  a passenger listed in seat 31D.  Who is that passenger?

15  A.  El Gammal, Ahmed.

16  Q.  Is that the same passenger for whom we saw the reservation

17  in Government Exhibit 808?

18  A.  Yes.

19  Q.  You may put that to the side.  Thank you.

20          Then looking at Government Exhibit 807, are these

21  flight details for that same flight we were just talking about,

22  Flight 425 from Phoenix to J.F.K. on October 6?

23  A.  Correct.  Actually shows the schedule time of departure and

24  the actual time of departure.

25  Q.  What is the actual departure time?

H1I3GAM4                    Mascaro - cross

1   A.  8:56 Phoenix time.

2   Q.  What is the actual arrival time at J.F.K.?

3   A.  1657, which is 4:57 New York time.

4           MS. TEKEEI:  No further questions, your Honor.

5           THE COURT:  Any cross?

6   CROSS-EXAMINATION

7   BY MS. SHROFF:

8   Q.  Good afternoon, ma'am.

9   A.  Hi.

10  Q.  Could I have 808 put up, please.

11          May I ask was this ticket was paid for by cash or by

12  credit card?

13  A.  Credit card.

14  Q.  What credit card did the person use, ma'am?

15  A.  It doesn't -- I'm sorry.  It says American Express.

16  Q.  Could you just focus on the address.  And the name of the

17  person traveling is El Gammal, correct?

18  A.  Correct.

19  Q.  If you take a look, please, further down, oh, right there.

20  There you go.

21          It says cardholder, correct?

22  A.  Correct.

23  Q.  Ahmed M. El Gammal?

24  A.  Correct.

25  Q.  And cardholder's address is given over there, correct?

H1I3GAM4                          Mascaro - cross

1    A.   Correct.

2    Q.   Could you just read that out loud for me.

3    A.   3800 North El Mirage Road, Avondale, Arizona 85392 U.S.A.

4    Q.   From this you would conclude, would you not, that the

5    person who bought this ticket bought it by a credit card,

6    right?   Not cash.   Credit card.

7    A.   Correct.

8    Q.   Gave your airline his accurate address, that was put into

9    the computer, correct?

10   A.   He typed that address.

11   Q.   Right.   But it's in your computer system, correct?

12   A.   Correct.

13   Q.   And he then purchased the ticket based on the information

14   provided to the airline, correct?

15   A.   Correct.

16   Q.   And he booked it, correct, for a particular day?

17   A.   Yes.

18   Q.   Traveled on the particular day, right?

19   A.   Correct.

20   Q.   Didn't change it three times, correct?

21   A.   No.   It didn't say he changed it three times.

22   Q.   Not at all, right?   He booked it, right?

23   A.   Correct.

24   Q.   Okay.

25            MS. SHROFF:   I actually don't have any further

H1I3GAM4                          Mascaro - cross

1    questions.  Thank you.

2              THE COURT:  Very well.  Redirect?

3              MS. TEKEEI:  No questions, your Honor.  Thank you.

4              THE COURT:  Ms. Mascaro, you may step down.

5              (Witness excused)

6              THE COURT:  Does the government want to call its next

7    witness.

8              MS. TEKEEI:  Yes.  The government calls Teresa

9    El-Goarany.

10             THE COURT:  If members of the jury want to stand up

11   and stretch in between witnesses, please feel free to do so.

12             Miss, please step up into the witness box and please

13   remain standing.

14             (Witness sworn)

15             THE COURT:  Please sit down, pull your seat up to the

16   microphone.  And please begin by stating your full name and

17   spelling your last name for the record.

18             THE WITNESS:  My name is Maria Teresa El-Goarany.

19   M-A-R-I-A T-E-R-E-S-A E-L-G-O-A-R-A-N-Y.

20             THE COURT:  Thank you.  Ms. Tekeei.

21             MS. TEKEEI:  Thank you.

22    MARIA TERESA EL-GOARANY,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1I3GAM4                           M.T. El-Goarany – direct

1    BY MS. TEKEEI:

2    Q.  Mrs. El-Goarany, where were you born?

3    A.  I was born in Colombia.

4    Q.  Where did you grow up?

5    A.  I grew up in Colombia.

6    Q.  What schools did you attend?

7    A.  I attended Catholic school, and then I moved to high school

8    and college.

9    Q.  When did you come to the United States?

10   A.  I came to the United States in the late '70s, beginning of

11   the '80s.

12   Q.  Where do you work now?

13   A.  I work now for a foundation.  That -- I work with

14   immigrants and migrants at the same time.  So the immigrants

15   and migrants in this country.

16   Q.  Are you married?

17   A.  Yes, I am.

18   Q.  To whom?

19   A.  To Mohammed El-Goarany.

20   Q.  Without giving us the exact address, where do you live now?

21   A.  I live upstate New York.

22   Q.  Have you and Mr. El-Goarany ever had children?

23   A.  Yes, we have two children.

24   Q.  Who are they?

25   A.  Samy, S-A-M-Y, and Tarek, T-A-R-E-K.

H1I3GAM4                      M.T. El-Goarany - direct

1    Q.  Directing your attention to the fall of 2014.  How often

2    did you see your son Samy during that time period?

3    A.  I see Samy every weekend and every time that I had a day

4    off.

5              MS. TEKEEI:  Your Honor, may I approach?

6              THE COURT:  You may.

7    Q.  I'm showing you what's been previously marked for

8    identification as Government Exhibits 1009 and 1010.  If you

9    can just take a moment and look at them.

10             Mrs. El-Goarany, do you recognize those documents?

11   A.  Yes, I do.

12   Q.  Generally speaking, what are they?

13   A.  They are copies or pictures that I took from papers that I

14   found in the backpack of my son Samy.

15   Q.  When did you find the documents that are in the pictures

16   Government Exhibits 1009 and 1010?

17   A.  I found them when I was cleaning his apartment.

18   Q.  Approximately when was that?

19   A.  That was in November, middle to end of November 2014.

20             MS. TEKEEI:  Your Honor, the government offers

21   Government Exhibits 1009 and 1010.

22             MS. SHROFF:  We have no objection, your Honor.

23             THE COURT:  Those exhibits will be received.

24             (Government's Exhibit 1009, 1010 received in evidence)

25   Q.  What, if anything else, did you find in your son Samy's

H1I3GAM4                          M.T. El-Goarany - direct

1    backpack after finding what's in Government Exhibit 1009 and

2    1010?

3    A.  I found a gift wrapped gift, and when I felt it, it felt

4    like it was a book.

5          MS. TEKEEI:  Your Honor, may we publish Government

6    Exhibit 1009.

7          THE COURT:  Yes.

8          MS. TEKEEI:  Thank you.

9    Q.  Mrs. El-Goarany, looking at this document, what is it?

10   A.  This is a receipt of --

11         THE COURT:  I'm sorry, Mrs. El-Goarany, can you speak

12   directly into the microphone.

13         THE WITNESS:  Sure, I'm sorry.

14   A.  This is a receipt of hotel in Turkey.

15   Q.  Are the dates on that receipt, do they show November 25,

16   2014 to November 26, 2014?

17   A.  Yes.

18         MS. TEKEEI:  And setting that to the side for a

19   minute, your Honor, may we publish Government Exhibit 1009 --

20   I'm sorry 1010.

21         THE COURT:  Yes, you may.

22   Q.  This is another -- this is a note that you found in Samy's

23   backpack in mid November -- I'm sorry.  In November of 2014?

24   A.  Yes.  I'm sorry.  This is another one that I found on that

25   time.  And it has a name with a number, a contact number.  And

H1I3GAM4                              M.T. El-Goarany - direct

1   it has some words in Arabic and a translation in English.

2   Q.  Thank you, Mrs. El-Goarany.  What, if anything, did you do

3   after finding these materials inside of Samy's backpack?

4   A.  After that, I ask my son what was that about.

5   Q.  Approximately when did you ask your son Samy what these

6   materials were about?

7   A.  I think it was after a few days when I saw him again.

8   Q.  How did he react?

9   A.  He was surprised, he said, mom, you shouldn't go through my

10  backpack.

11  Q.  What, if anything, did he say about what he had intended to

12  do?

13  A.  He said he didn't tell me because he was afraid that

14  something might happen to me.

15  Q.  Describe what he told you about his plans for travel.

16  A.  He told me that he was -- he wanted to go to Turkey to help

17  the Syrian refugees and to work in a tent passing supplies to

18  them.

19  Q.  After this conversation, what, if anything, did he say

20  about whether he still intended to travel?

21  A.  He said, mom, don't worry.  I'm not going to go.  I decided

22  not to go again, and I'm going to focus in finishing my career,

23  and he sign up for his courses and he showed me when he signed

24  up for those courses.

25  Q.  What, if anything, did he ask you to do?

H1I3GAM4                          M.T. El-Goarany - direct

1    A.  He asked me not to tell anything to his father.

2    Q.  Did you follow those -- that wish?

3    A.  Yes, I did.  I didn't tell him anything.  I trusted my son.

4    Q.  When was the last time you saw Samy in person?

5    A.  The last time I saw him was in January, end of

6    January 2015.

7    Q.  In front of you are what have been previously marked for

8    identification as Government Exhibits 1017 and 1018.  Do you

9    recognize those?

10   A.  Yes, I recognize them.  The first one here is a note.

11   There's two notes in here.  And one said "one God" and the

12   other one says "one God, one path."

13   Q.  Do you recognize the handwriting?

14   A.  Yes.

15   Q.  Whose handwriting is that?

16   A.  This is Samy's handwriting.

17          MS. TEKEEI:  Your Honor, we offer Government Exhibits

18   1017 and 1018.

19          MS. SHROFF:  May I just have a very brief voir dire.

20          THE COURT:  Yes.

21   BY MS. SHROFF:

22   A.  Hello.

23   Q.  Hi.  Can you tell me, please, when you found what is marked

24   as 1017?

25   A.  I don't remember exactly when.  But I remember where I

H1I3GAM4                              M.T. El-Goarany - direct

1    found it.

2    Q.  Do you remember exactly when you gave it to Ms. Tekeei?

3    A.  I'm sorry, can you repeat your question?

4    Q.  Sure.  After you found them, you gave them to Ms. Tekeei,

5    right?  You know her as Negar.

6    A.  Oh, yes, of course.

7    Q.  You gave them to her, correct?

8    A.  I gave her, yes, I did.

9    Q.  And you gave her, let's just stay with 1017 first.

10   A.  Okay.

11   Q.  You gave it to her how close to when you found it?

12   A.  It was recently because -- yeah, it was recently.  I'm

13   sorry.

14   Q.  That's okay.  When?  Like recently when, last week?

15   A.  I would say two weeks maybe.

16   Q.  Two weeks ago?

17   A.  I don't remember exactly, yes.

18   Q.  The moment you found them you gave them to her?

19   A.  The moment I found them?

20   Q.  Who did you give them to?

21   A.  Oh, to Negar.  Yeah.

22   Q.  Okay.  And how about 1018.  Did you also find it two weeks

23   ago?

24   A.  Let me take a look, please.

25          MS. TEKEEI:  Objection, your Honor.  That

H1I3GAM4                          M.T. El-Goarany – direct

1    mischaracterizes the witness's testimony about when she found

2    those notes.  She's discussing when she handed them to us, but

3    not when she found them.

4              THE COURT:  Overruled.  The jury will recall what the

5    testimony was.

6    A.  This is the same note.  Yeah.

7    Q.  About the same time?

8    A.  Yeah.

9              MS. SHROFF:  Thank you.

10             THE WITNESS:  You're welcome.

11   BY MS. TEKEEI:

12   Q.  Mrs. El-Goarany, when did you first find the notes that are

13   marked as 1017 and 1018, approximately?

14   A.  I found these notes when Samy left, in around the time when

15   he left.  It might be three days or a week, but it was on the

16   time when he left.

17   Q.  Where did you find them?

18   A.  I found these notes on his desk.

19             MS. TEKEEI:  Your Honor, again we offer 1017 and 1018.

20             MS. SHROFF:  No objection.

21             THE COURT:  1017 and 18 will be received.

22             (Government's Exhibit 1017, 1018 received in evidence)

23             MS. TEKEEI:  Thank you, your Honor.  May we publish

24   them to the jury?

25             THE COURT:  You may.

H1I3GAM4                      M.T. El-Goarany – cross

1          MS. TEKEEI:  Thank you, Ms. Quinones.

2   Q.  Mrs. El-Goarany, when was the last time you received a

3   communication from Samy?

4   A.  I heard from Samy, the last time I heard from Samy was on

5   October, end of October 2015.

6          MS. TEKEEI:  Thank you.  No further questions at this

7   time.

8          THE COURT:  Any cross-examination?

9   CROSS-EXAMINATION

10  BY MS. SHROFF:

11  Q.  Good afternoon, Mrs. El-Goarany.

12  A.  Good afternoon.

13  Q.  Mrs. El-Goarany, you testified that you found certain

14  documents, a total of four, you found all four in Samy's Rego

15  Park -- Samy and Tarek's Rego Park apartment, correct?

16  A.  No.

17          (Continued on next page)

18

19

20

21

22

23

24

25

H1i5gam5                         M.T. El-Goarany – cross

 1   BY MS. SHROFF:

 2   Q.  Okay.

 3           So, let's just go through the first one.  Could you

 4   please put up the one with Attiya's phone number?  Let's start

 5   with this one, okay?  Where did you find this document?

 6   A.  I found this note in his backpack.

 7   Q.  And the backpack was where?  I'm sorry.

 8           Where was the backpack?

 9   A.  Oh, the backpack was on the floor.  I was cleaning the

10   apartment and the backpack was partially open so the papers

11   were coming out from his backpack, yes.

12   Q.  And which apartment was that?

13   A.  The apartment where he was living with his brother in Rego

14   Park Queens.

15   Q.  Okay.

16           And you testified on direct that this was around

17   November, correct?

18   A.  Yes.

19   Q.  And you saw that there was, you read what you found,

20   correct?

21   A.  Yes.

22   Q.  And you read that there was a name on the top, correct?

23   A.  Correct.

24   Q.  And then there was a phone number underneath, correct?

25   A.  Correct.

1  Q.  And you testified also on direct that you had a

2  conversation about this document and other things with Samy,

3  correct?

4  A.  I had a conversation with Samy about these papers.

5  Q.  And did you ask him who that person was?

6  A.  I asked him general what was that about.

7  Q.  Okay.

8         But you didn't ask -- you didn't show him that name

9  and number and say who is that person?

10 A.  I didn't ask him at that time.  I don't remember asking

11 that.

12 Q.  Okay.

13        And below that is written:  Relax.  And then there is

14 the counterpart Arabic word, correct?  Take it easy, correct?

15 And then there is another third thing written down below,

16 correct?

17 A.  Correct.

18 Q.  And you didn't ask Samy specifically about this but you had

19 a general conversation with him about the other things you also

20 found in his backpack, correct?

21 A.  I, in general, asked him what was that about, all these

22 papers about.

23 Q.  And Samy told you what that was about, correct?

24 A.  Samy told me, in general, that he wanted to go to Turkey

25 and that's why he had those papers in his backpack.

H1i5gam5                       M.T. El-Goarany - cross

1   Q.  And what did he tell you about working in a tent?  Could

2   you remind me, please?

3   A.  He told me that he was -- the reason why he was going to

4   Turkey was because he was going to do humanitarian work and he

5   was going to be helping the refugees near the border to --

6   working in a tent to help passing supplies to them.

7   Q.  And you had a conversation with him because you didn't want

8   him to go, correct?  That is fair to say?

9   A.  Well, we -- we had a conversation about the papers and

10  that's the reason he said to me for the papers that I found.

11  Q.  Okay.

12          Do you recall, by any chance, how long the

13  conversation was?

14  A.  I don't.

15  Q.  And do you recall if your other son Tarek was there at that

16  time?  Or no.

17  A.  I don't remember.

18  Q.  Okay.

19          And after this conversation, Samy came and told you

20  that he wasn't going to go on this trip, correct?

21  A.  The same time that I asked him, he said, mom, don't worry.

22  I'm not going to Turkey.  I'm not going to go.  I'm just going

23  to focus on my studies and finishing my career.

24  Q.  And it's fair to say that is in fact what Samy did, right?

25  He focused on his studies, correct?

H1i5gam5                      M.T. El-Goarany - cross

1    A.  He showed me, yes, that he signed up for his courses.

2    Q.  And, in fact, he updated his resume around that same time,

3    correct, looking for a job?

4    A.  He updated his resume because, yes, he was looking for a

5    job at the same time.

6    Q.  And you also testified about another document that was --

7    that says one God, correct?  Could I please have that up?

8          You found this document at about the same time but you

9    recently gave it to the prosecutor, correct?

10   A.  I found that document, yes, but not in the same place.

11   Q.  Okay.

12         And one God means something to you?  Would the phrase

13   mean something to you?

14   A.  Well, that's what we always say in the religion, yes, when

15   we pray.  There is one God, yes.

16   Q.  A normal phrase, right?

17   A.  Yes.

18   Q.  And the same thing for the second piece of paper, correct?

19   A.  That is what he wrote, one path.

20   Q.  Right.

21   A.  I don't know what he meant by that.

22   Q.  Okay.

23         And, is it fair to say, Mrs. El Goarany, that you

24   don't know when Samy wrote this piece of paper that says one

25   God, correct?

1   A.  I don't know when he wrote it.

2   Q.  Right.

3          And you also don't know when he wrote one God, one

4   path, correct?

5   A.  I don't know.

6   Q.  Could I just have a second, your Honor?

7          THE COURT:  Sure.

8          (counsel conferring)

9   Q.  Ms. El Goarany, you testified that you did not discuss

10  these things that you found with your husband, correct?

11  A.  I said to Samy I was not going to let my husband know and I

12  didn't.

13  Q.  Okay.

14         And did you discuss all of these things with Tarek

15  because Tarek was there when this conversation was happening

16  between you and Samy?

17  A.  I don't remember that if Tarek was there, but, no, I

18  didn't.

19  Q.  Okay.

20         And you testified, right, that the document -- not

21  these two but the first one that has the phone number on it, do

22  you recall when you first gave it and to whom?  Do you recall

23  giving it to the FBI, by any chance?

24  A.  Yes.  I remember giving it to the FBI.

25  Q.  Right.

1           And you gave that to the FBI fairly early on, correct?

2   A.  I'm sorry?

3   Q.  You gave that to the FBI fairly early on, right?  Early on

4   meaning not this year or last year, correct?

5   A.  I gave them -- I gave those papers to them early, yes.

6   Q.  Right.

7           And did you also at that time give those papers to

8   your husband?

9   A.  I remember -- let me just remember, it was such a long

10  time.

11          After I gave the papers to the FBI and after my

12  husband knew when we were with the FBI in the same room, then

13  we spoke about it.

14  Q.  Right.

15          So you were there with your husband and the FBI and

16  you gave the FBI this piece of paper that had the phone number

17  on it and your husband was present for that, correct?

18  A.  Correct.

19          MS. SHROFF:  I have nothing further, your Honor.

20  Thank you.

21          MS. TEKEEI:  A few questions, your Honor.

22  REDIRECT EXAMINATION

23  BY MS. TEKEEI:

24  Q.  Mrs. El Goarany, I just want to be totally clear.

25  Ms. Shroff asked you some questions about Government's Exhibits

1    1009 and 1010.  Can you just take a moment and pull those out?

2              Ms. Quinones, can you please publish them?

3              You testified that these are pictures of documents

4    that you found in Samy's backpack; is that correct?

5    A.  Correct.

6    Q.  Did you keep the actual pieces of paper after you took the

7    pictures of the documents?

8    A.  No, I didn't.

9    Q.  Where did you put the pieces of paper that are reflected in

10   these pictures?

11   A.  I put them back in the same place.

12   Q.  And approximately when did you find the pieces of paper

13   that are reflected in these pictures?

14   A.  Can you repeat your question?

15   Q.  Sure.

16             The papers that are reflected in these pictures,

17   approximately when did you first find them in Samy's backpack?

18   A.  Around November.  Middle of November to end of November.

19   Q.  What year was that?

20   A.  2014.

21   Q.  And, am I correct that after you took the pictures you put

22   the papers back in his backpack; is that right?

23   A.  Yes.

24   Q.  And so, then in February of 2015, when you met with the

25   FBI, what did you provide them; the pictures or papers?

1    A.  The pictures.

2    Q.  And just to be abundantly clear, looking at Government

3    Exhibit 1017 and 1018, one more time, approximately when did

4    you find these documents?

5    A.  That was when, approximately, after a week when he left in

6    January 2015.

7    Q.  So, just to be clear, you found those after your son Samy

8    had already left; is that right?

9    A.  Yes.  He left already, yes.

10   Q.  And then, finally, had your son Samy ever received any

11   medical training?

12   A.  Any?  I'm sorry?

13   Q.  Medical training.

14   A.  Medical?

15   Q.  Yes, ma'am; medical training as a physician or staff at a

16   hospital?

17           MS. SHROFF:  Objection.

18   A.  No.

19           MS. TEKEEI:  Thank you.  No further questions.

20           MS. SHROFF:  May I, your Honor?

21           THE COURT:  Yes.

22   RECROSS EXAMINATION

23   BY MS. SHROFF:

24   Q.  Ms. El Goarany, I just want to be clear.  You gave the FBI,

25   in whatever form, paper, photo, the first time you met the FBI

H1i5gam5

1    you gave them the information that's contained including the

2    name and the phone number, correct?

3    A.  Yes, I did.  I took those pictures and I gave -- I sent

4    those pictures to the agent.

5    Q.  Right.

6          And you recall Ms. Tekeei asking you if Samy had any

7    medical training, correct?

8    A.  Medical training?

9    Q.  Right.

10   A.  No.

11   Q.  Right.

12         Samy's interest was basically in humanitarian work,

13   correct?

14   A.  He was interested, yes.

15   Q.  In humanitarian work?

16   A.  In humanitarian work, yes.

17   Q.  And, in fact, when he talked to you about this conversation

18   that you had, what he was telling you is that his desire to go

19   to Turkey was to do humanitarian, not medical work, correct?

20   A.  Humanitarian.

21         MS. SHROFF:  Thank you.  Nothing further.

22         MS. TEKEEI:  No further questions, your Honor.

23         THE COURT:  Mrs. El Goarany, you may step down.

24         (Witness excused)

25         THE COURT:  Government, please call your next witness.

H1i5gam5

1      MS. TEKEEI:  Thank you, your Honor.

2          With the Court's permission, we would like to publish

3  to the jury a portion of 120-A-T and publish it by reading it.

4          THE COURT:  Very well.

5          MS. TEKEEI:  Thank you.

6          If the jury would like to follow along, again, it is

7  Exhibit 120-A-T in the jury binders beginning at page 49.

8          MR. DEFILIPPIS:  Starting with the top message on May

9  3rd, 2015, at 9:29 -- excuse me, 9:21:29, I will read the role

10  of the defendant and Ms. Tekeei will read the role of Attiya

11  Aboualala:

12          "EL-GAMMAL:  Check their videos and channel and ask

13  them.  Have you seen the new harvest of the spies?

14          "ATTIYA:  Send links.

15          MS. TEKEEI:  Starting at May 4th, 2015, at 15:0.

16  the messages between Attiya and the defendant:

17          "ATTIYA:  Hey, Gammal.  Call me quickly.  Urgent.  The

18  father of Samy is asking about."

19          MR. DEFILIPPIS:  Question marks.

20          MS. TEKEEI:  Call.

21          "ATTIYA:  Hey Gammal.

22          "EL-GAMMAL:  Speak up Attiya.  What's going on.

23          "ATTIYA:  His father called me and is asking me about

24  him.  I told him I don't know anything about him.

25          "EL-GAMMAL:  How does he know you and how did he get

H1i5gam5

1    your number?

2              "ATTIYA:  Samy has previously told him that he

3    communicated with me through you only.  He got my number from

4    Abdallah Al Jazzar, a news anchor at the El Sharq Channel.

5              "EL-GAMMAL:  And from where does he know Al Jazzar?

6              "ATTIYA:  Tell me what I should tell him.  I don't

7    know.

8              "EL-GAMMAL:  Next time, don't answer.  And don't ever,

9    ever mention me.  Not even my name.

10             "ATTIYA:  Okay.  He wants me to met him."

11             MR. DEFILIPPIS:  Call.  Missed call.  Followed by

12   another missed call.

13             "ATTIYA:  The net is very slow.

14             "EL-GAMMAL:  Meet who?  I don't understand.

15             "ATTIYA:  It will not permit me to finish the call.

16   His father.  Here in Istanbul.

17             "EL-GAMMAL:  Who wants to meet you?

18             "ATTIYA:  I will get rid of him by telling that I

19   don't know anything about him since January and that I did not

20   communicate with him at all since January, and he was a friend

21   on Facebook, a Muslim of Egyptian decent who said that he is

22   coming to Istanbul and I wanted to help him.  Afterwards, I had

23   no more communications with him.

24             "EL-GAMMAL:  Exactly, and don't ever, ever mention me

25   or my name.

H1i5gam5

1          "ATTIYA:  Fine, but Samy's brother told his father

2     that you know me.  Anyways, I will tell him that I do not know

3     you.

4          "EL-GAMMAL:  Did he ask about me?

5          "ATTIYA:  Yes.  He mentioned your Facebook name, the

6     one you use on Facebook.

7          "EL-GAMMAL:  Because we are friends on Facebook.

8          "ATTIYA:  I will meet him and inform you about the

9     results of the meeting.

10         "EL-GAMMAL:  You are a mutual [mutual Facebook friend]

11    of me and him.

12         "ATTIYA:  Maybe it is because of this.

13         "EL-GAMMAL:  You don't have to meet him.

14         "ATTIYA:  It's okay.  Don't worry.  No, because I do

15    not want him to have strange thoughts.

16         "EL-GAMMAL:  Okay.

17         "ATTIYA:  Perfect.  I erased the friendship so he

18    would not know that I know you."

19         MR. DEFILIPPIS:  Entry reflecting a missed call.

20         "ATTIYA:  On the net I have a Facebook and Twitter

21    package only, and that's why there could be a problem in

22    communication.

23         "EL-GAMMAL:  Call me on tango.

24         "ATTIYA:  Anyways, I covered up for you and I told him

25    that I don't know you and my relationship was direct with Samy.

H1i5gam5

He spoke to me and said that he wanted to visit Istanbul.  I

met him for one day and then I didn't know anything about him

afterwards.  I do not have Internet, I have a package to surf

Facebook and Twitter only.

     "EL-GAMMAL:  Okay.

     "ATTIYA:  The guy is a military and he tells me how

Samy used to tell him that the Army is fooling him and that the

Egyptian Army is against Islam.

     "EL-GAMMAL:  I am surprised that he traveled to

Turkey.  Yeah, Samy told me that he is an adamant supporter of

militarism from a military family.

     "ATTIYA:  Yes, but I debated with him and he did not

know how to answer me.  He told me that Al Sisi made an

achievement with the Suez Canal.

     "EL-GAMMAL:  It seems that he found him in Turkey

because Samy has just posted.  Ha ha ha ha ha.  He achieved

what Canal?  Ha ha ha ha ha.

     "ATTIYA:  I don't know if he didn't know how to

respond or if he just didn't want to anger me because he

expects from me to convey to him any information I lay my hand

on about his son.  Samy wrote a post.

     "EL-GAMMAL:  Yeah.  I saw it in the news feed."

     MS. TEKEEI:  Thumbs up sticker.

     "EL-GAMMAL:  But you don't ever get in contact with

him.  Inbox.

H1i5gam5

1          "ATTIYA:  Why?

2          "EL-GAMMAL:  Maybe his father is using his account.

3          "ATTIYA:  Yeah.  Okay."

4          MS. TEKEEI:  Link to a YouTube.

5          "EL-GAMMAL:  Okay.  Did you take his permission before

6   you published it?

7          "ATTIYA:  The man is very glad and happy with his son.

8   Ha ha ha ha ha.

9          "EL-GAMMAL:  I don't understand.  Does he agree that

10  you publish?

11         "ATTIYA:  He is happy about the spirit with which Samy

12  is talking to him.

13         "EL-GAMMAL:  Elaborate.  I don't understand.  Did Samy

14  call?

15         "ATTIYA:  Samy called him yesterday and he was happy.

16  He said for the first time, I feel my son is a man.

17         "EL-GAMMAL:  He is in Turkey or did he go back?

18         "ATTIYA:  Not yet.  He is going to Egypt tomorrow.

19         "EL-GAMMAL:  And how did he reach Samy?

20         "ATTIYA:  Samy called him yesterday on WhatsApp.

21         "EL-GAMMAL:  Good.  Thank God.  Truly in the video, he

22  seems reassured and happy.  He sent me an add.  Can you imagine

23  that?  And frankly, Samy is a true, true, true man and noble.

24         "ATTIYA:  Accept and don't worry.

25         "EL-GAMMAL:  I accepted it a long time ago.  But I

H1i5gam5

1    found it strange.  I have been with his son for six years and

2    he never added me.  Can you call me?

3              "ATTIYA:  There is no sound.

4              "EL-GAMMAL:  The heck.  So he is going to travel to

5    Egypt and then come back?

6              "ATTIYA:  Honestly, I don't know.

7              "EL-GAMMAL:  I don't know how did he get to you, he is

8    a very smart man.

9              "ATTIYA:  From Facebook he checked who are Samy's

10   friends and he got into me.

11             "EL-GAMMAL:  And what do you mean he got into you?

12   Speak Arabic, Attiya.  Ha ha ha.

13             "ATTIYA:  He logged into my profile and spoke to

14   someone who was with me in the picture.

15             "EL-GAMMAL:  And why didn't he talk to you directly?

16   Why did he talk to the other guy in the picture?

17             "ATTIYA:  I don't know.

18             "EL-GAMMAL:  Was he afraid of you by any chance?

19             "ATTIYA:  Maybe.

20             "EL-GAMMAL:  Ha ha ha ha ha.  And who is that friend?

21             "ATTIYA:  But he made a lot of supplications for me.

22   He thought I was the one who got him in contact with his son.

23             "EL-GAMMAL:  What is his name?  Then who?  Didn't Samy

24   get a Turkish phone number?

25             "ATTIYA:  But he is in the Levant now.

H1i5gam5

1          "EL-GAMMAL:  So how did he get in contact with him?

2          "ATTIYA:  LK HGTDS.  On Face.

3          "EL-GAMMAL:  Most importantly is how he is doing and

4     his morale, the father.

5          "ATTIYA:  Very high.

6          "EL-GAMMAL:  Praise be to Allah.  Although he is a

7     Sisi supporter.  Okay, no problem.  Sorry for annoying you,

8     Attiya.  May God keep you safe and grant you success.

9          "ATTIYA:  My God, buddy.  What annoyance are you

10    talking about?

11         "EL-GAMMAL:  All this matter.  I heard you are going

12    to start a channel, the channel of the revolution.

13         "ATTIYA:  Ha ha ha ha ha."

14         THE COURT:  Are you between?

15         MR. DEFILIPPIS:  Your Honor, the witness is ready.

16    Before he takes the stand we are just going to read a brief

17    stipulation.

18         THE COURT:  Read the stipulation and then we will take

19    a break.

20         MR. DEFILIPPIS:  Perfect, your Honor.

21         The stipulation marked Government Exhibit 1109 reads,

22    in relevant part:

23         Government Exhibit 145-T contains true and accurate

24    Arabic to English and Turkish to English translations of the

25    video which is contained in Government Exhibit 145.  The

H1i5gam5

1    parties further stipulate and agree that Government Exhibit

2    145, Government Exhibit 145-T, and this stipulation, may be

3    received into evidence as government exhibits at trial.

4            Your Honor, the government offers Government Exhibit

5    145, 145-T, and Government Exhibit 1109.

6            THE COURT:  Those exhibits will be received on

7    stipulation.

8            MR. DEFILIPPIS:  And we will publish them during the

9    testimony.

10           THE COURT:  Very well.

11           Ladies and gentlemen, let's take our afternoon break.

12   Let's see if you were paying attention, we will come back at

13   15:07 Zulu.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H1i5gam5

1              (Jury not present)

2              THE COURT:  Anything for me?

3              MR. DEFILIPPIS:  Your Honor, we just wanted to let

4    your Honor and defense know that our next witness is Mohammed

5    El Goarany.

6              THE COURT:  Very well.  Okay.

7              MS. SHROFF:  Your Honor, can we just have one minute?

8    It doesn't -- a couple minutes ex parte with the Court?

9              THE COURT:  Sure.

10             MS. SHROFF:  Thanks.

11             (Discussion off the record at side bar).

12             (Recess)

13             THE COURT:  It appears as though we are going to go a

14   couple minutes over.  I have instructed Ms. Rivera to let the

15   jury know that we are discussing legal issues that the jury

16   need not concern itself with.

17             (Pause)

18             (Continued on next page)

19

20

21

22

23

24

25

H1i5gam5                          M. El-Goarany - direct

1                   (Jury present)

2                   THE COURT:  Everyone, please, be seated.

3                   Will the government call its next witness?

4                   MR. DEFILIPPIS:  Yes, your Honor.

5                   The government calls Mohammed El Goarany.

6                   THE COURT:  Sir, please step into the witness stand

7      and remain standing.

8       MOHAMMED EL-GOARANY,

9            called as a witness by the Government,

10           having been duly sworn, testified as follows:

11                  THE COURT:  Please begin, sir, by stating your full

12     name and spelling your last name for the record.

13                  THE WITNESS:  My full name is Mohammed El Goarany.  My

14     last name is E-L G-O-A-R-A-N-Y.

15     DIRECT EXAMINATION

16     BY MR. DEFILIPPIS:

17     Q.  Good afternoon, Mr. El- Goarany.

18     A.  Good afternoon, sir.

19     Q.  Are you familiar with an individual Samy El- Goarany?

20     A.  He's my son.

21     Q.  And where is he today?

22     A.  He's been killed.

23     Q.  Approximately when did your son pass away?

24     A.  November 2015.

25     Q.  Mr. El- Goarany, we will come back to that topic but let me

H1i5gam5                          M. El-Goarany - direct

1    ask you, where were you born?

2    A.   Alexandria, Egypt.

3    Q.   Mr. El- Goarany, what was your line of work in Egypt?

4    A.   I'm an engineer -- officer engineer in the Egyptian Army

5    and Navy.

6    Q.   Do you currently reside in the United States?

7    A.   Yes.

8    Q.   When did you come to the United States?

9    A.   1988.

10   Q.   Since coming to the U.S., what has been your main line of

11   work here?

12   A.   Real estate.  Self-employed real estate.

13   Q.   You said real estate?

14   A.   Real estate broker.

15   Q.   And is that what you do today for work?

16   A.   Yes.

17   Q.   Mr. El- Goarany, have you ever been convicted of a crime?

18   A.   Yes.  Once.

19   Q.   And what specific offense were you convicted of?

20   A.   With kickback for racketeering in a co-op business in

21   Queens.

22   Q.   Mr. El- Goarany, do you recall the specific offense that

23   you were actually convicted of?

24   A.   Yeah.  I plead guilty for one count grand larceny.

25   Q.   Did you say grand larceny?

1   A.   Yes.

2   Q.   Very briefly, can you tell us what did you do that led to

3   the charges in that case?

4   A.   I was on the board of director in a co-op building in

5   Queens for six years at the time and the management company

6   asked me to refer them to another buildings to get new jobs and

7   I did that.

8   Q.   And in return for referring these people to other buildings

9   what, if anything, did you get in return?

10  A.   They gave me some money compensation, about $36,000.

11  Q.   Did you plead guilty in that case?

12  A.   Yes.

13  Q.   And what punishment did you receive?

14  A.   I got probation for five years from 2000 to 2005, and I had

15  to step down from the board, to resign from the board.

16  Q.   Mr. El- Goarany, how old was Samy El- Goarany the last time

17  you saw him?

18  A.   24 and a few months.

19  Q.   When was that?

20  A.   January of '15.

21  Q.   Of what year?

22  A.   2015.

23  Q.   And where was Samy living at that time, Samy El- Goarany?

24  A.   With us at home in Orange County, Upstate New York, and he

25  has an apartment we are renting for him and his brother in

H1i5gam5                          M. El-Goarany - direct

1   Queens -- in Rego Park, Queens.

2   Q.  And who was living in your home at that time?

3   A.  Myself, my wife, and Samy, and Tarek.

4   Q.  Was your son Samy El- Goarany in school at the time?

5   A.  Yes.  He was in college.

6   Q.  Where?

7   A.  Baruch College in Manhattan.

8   Q.  Did there come a time when your son left home, your son

9   Samy?

10  A.  Yes.

11  Q.  About when was that?

12  A.  In the middle of the week of the last week of January 2015.

13  Q.  How did you learn that he had left?

14  A.  He already said he was going to Queens and to hang over

15  with his friends with holiday Monday, Tuesday until the college

16  was starting Wednesday, and he left by way to Queens.

17  Q.  And you didn't hear from him?

18  A.  Since then I didn't hear from him.

19  Q.  What, if anything, did you do initially to try to contact

20  him?

21  A.  When my wife told me Tuesday morning -- I think he left on

22  Monday, the next day in the morning after he left, my wife told

23  me that she believed that Samy is going to leave out of the

24  country.  I didn't believe her or I didn't -- I didn't want to

25  believe her so I started to call everyone, all his contacts and

1   friends, schools, e-mailing, messaging.

2   Q.  Did you have any success?

3   A.  No, I didn't.

4   Q.  Did there come a time when you or someone else notified the

5   authorities that he was gone?

6   A.  Yes.  By the end of the week the family decided that the

7   best thing to call the authorities to report Samy's absence.

8   Q.  Did there come a time when you traveled in order to look

9   for your son?

10  A.  Yes.

11  Q.  When was that?

12  A.  In May 2015.

13  Q.  And where, specifically, did you go?

14  A.  First I went to Istanbul in Turkey.

15  Q.  Now, Mr. El- Goarany, how did you come -- how did you

16  decide that you wanted to go to Istanbul, Turkey?

17  A.  When Samy left we had the chance to go in the Facebook to

18  see his messages and posts, who he was talking to, and we found

19  that information that he traveled to Istanbul.

20  Q.  Mr. El- Goarany, without getting into the contents of

21  anything you saw on Facebook, the messages, did you attempt to

22  identify people whom you wanted to ask questions?

23  A.  Yes.

24  Q.  And which people did you identify?

25  A.  The first conversation in the Facebook was a person named

H1i5gam5                         M. El-Goarany - direct

1    Jimmie Gammal and other people in Istanbul; Attiya Aboualala,

2    and another person like Abdallah Jazzar.

3    Q.  And where, at the time, if you had an understanding, did

4    you understand that Jammie Gammal was located?  Which country?

5    A.  I believe from the Facebook in the states -- here in the

6    states.

7    Q.  And how about as to, did you say Attiya Aboualala?

8    A.  Attiya Aboualala in Istanbul, Turkey.

9    Q.  And then the third person you mentioned was?

10   A.  Same things in news, TV, news in Istanbul.

11   Q.  And what was the third person's name, just to?

12   A.  Abdallah al Jazzar.

13   Q.  And what, if any connection, did you understand there to be

14   between Abdallah al Jazzar and Attiya Aboualala?

15   A.  They both work in the same TV called Al Sharq TV, and

16   Attiya is a writer and al Jazzar is a broadcaster, talk show.

17   Q.  So, Mr. El- Goarany, did you get a flight to Istanbul,

18   Turkey?

19   A.  Yes.

20   Q.  Did you go directly there?

21   A.  Yes.

22   Q.  And when you arrived in Istanbul, Turkey, what did you do?

23   A.  I checked in -- I mean, a made a reservation in the hotel

24   before I left New York from Expedia to the same hotel my son

25   Samy was in.

H1i5gam5                              M. El-Goarany - direct

1    Q.   Is that something you had learned through your review on

2    Facebook?

3    A.   From the Facebook everything with details, yeah.

4    Q.   Let me also ask you about your review on Facebook.  Were

5    you logged in to your own account or someone else's account?

6    A.   No, Samy's account.

7    Q.   How did it come to be that you logged into your son Samy's

8    Facebook account?

9    A.   Samy -- Samy, before he leaves, he was in contact with his

10   older brother who have a master degree of computer and science

11   and he asked him to help him to stop harassment he received on

12   Facebook from other people.  And that's why he give his brother

13   his passwords, to log in and to follow these things.

14   Q.   So, is it accurate that you used that password you received

15   from your other son in order to log into the account?

16   A.   Yeah.  We called the other son on the same day we started

17   to look for Samy and he give me the code.  Yeah.

18   Q.   Thank you.

19        Now, when you arrived, did there come a time when you

20   arrived at this hotel you mentioned?

21   A.   Yes.

22   Q.   And when you arrived at the hotel, what did you do then?

23   A.   I checked in and they -- I put my things in the room and

24   then I went back to the reception.  That hotel is a small

25   hotel, different small buildings, the reception and the manager

H1i5gam5                         M. El-Goarany - direct

1    in one building and the room where they give it to me in

2    another building.  So, I came back with my computer to the

3    reception, I sit down there, tried to be friendly with the

4    manager to know information I want to know.

5    Q.  Did there come a time when you tried to contact

6    Mr. Aboualala?

7    A.  Yes.  As soon as we went to the hotel I called Abdallah

8    Jazzar on the Sharq TV, yes.

9    Q.  Was that the other person you had identified on Facebook?

10   A.  Yes; because in the Facebook Attiya Aboualala has no

11   contacts.

12   Q.  And did you ask, was the purpose of your call to Mr. Jazzar

13   to get you in touch with Mr. Aboualala?

14   A.  Yes.  Mr. Jazzar was a friend of Mr. Aboualala and he has a

15   big shot of on the cover page of Facebook with Aboualala.

16   Q.  Did he in fact put you in touch with Mr. Aboualala?

17   A.  Say again?

18   Q.  Did Mr. Jazzar put you in touch with Mr. Aboualala?

19   A.  Yes.

20   Q.  Did there come a time when you met with Mr. Aboualala?

21   A.  Yes.

22   Q.  How many times did you meet with Attiya Aboualala during

23   your trip to Turkey?

24   A.  Twice.

25   Q.  Let's talk about the first time but, first, let me ask you,

1   why did you want to meet with Attiya Aboualala?

2   A.   To find my son and that was the main reason.  I want to

3   find my son, I want to hug him.  I miss him.  And that was the

4   only hope, that Attiya Aboualala would connect me to my son,

5   because since he left in mid-January 2015, we have no contact

6   with him.  He never called me or his mother or anybody else.

7   Q.   Now, you said let's talk about your first meeting with

8   Mr. Aboualala.  How did you meet him and where?

9   A.   Mr. Al Jazzar called me back in the hotel and I asked him

10  to connect me with Mr. Aboualala, and at the same night

11  Mr. Aboualala called me on the phone, I asked him to come meet

12  me at the hotel.

13  Q.   Did he do that?

14  A.   Yes.

15  Q.   Now, when he first arrived at the hotel, what happened?

16  A.   He came with a taxi but he did not bring the taxi to the

17  same reception or the management -- I mean the hotel entrance.

18  He came walking.  He can come but he came walking to the

19  reception and he met me in the reception.

20  Q.   And where, if anywhere, did you and he go next?

21  A.   After half an hour talking in the reception I trying to be

22  friendly to him so I told him let's go for dinner.  I was like

23  to invite him for dinner.

24  Q.   Did there come a time before you left the hotel when you

25  went back to your room.

H1i5gam5                          M. El-Goarany - direct

1    A.   Yes.  I have to go back to the room to put my computer, my

2    laptop, all my things in the room.

3    Q.   And when you did that, did Mr. Attiya Aboualala accompany

4    you or not?

5    A.   Yes, he came with me from that building, the reception to

6    the building where my room is.

7    Q.   And when you arrived at the building where your room was,

8    can you describe what you and he did?  What happened?

9    A.   Yeah.

10         Because of the way that hotel structuring, they give

11   us the key for the building and the key for the room.  So,

12   Mr. Attiya came with me walking to the, about two blocks, and

13   then we went to the building.  I opened the door of the

14   building and Mr. Attiya beside me and he entered the room of

15   the building before me even.

16   Q.   He entered the building before you?

17   A.   Yes.

18   Q.   And did you then proceed to your room?

19   A.   Yes.  The room was in the third floor and we -- told him.

20   He asked me where was the room?  I said the third floor.  He

21   walked -- it is a very narrow hotel or very small, he walked in

22   the steps before me to the third floor and every floor only two

23   doors, room right and left, my room was on the right.  And

24   he -- I told him room no. 30, 3-0, and he went up, he waited in

25   front of the room.  I was walking slowly but he was much

1   younger than me.

2   Q.  And who -- did you enter the room?

3   A.  Yes.  I have opened the room and I just opened the door.

4   Q.  And did Mr. Aboualala enter?

5   A.  He entered before me.

6   Q.  And what, if anything, did he do, when he got in the room?

7   A.  He was looking like somebody searching for everything in

8   the room; under the bed, he went to the bathroom, he went to

9   the closet.  He was like suspecting maybe somebody is hiding in

10  the room.

11  Q.  How long were you in the room with Mr. Aboualala?

12  A.  10 minutes.  15 minutes.

13  Q.  And after that where, if anywhere, did you go?

14  A.  After that we came down from the hotel and we took a taxi

15  and he told me -- I told him to take us to a good restaurant in

16  Istanbul and he knows because he lives there.

17  Q.  So, did he do that?

18  A.  Yes.

19  Q.  And was it dinner that you ate with him?

20  A.  Yes.  We went to dinner in a restaurant, nice restaurant,

21  on a street called El Fath Street in an area around the mosque.

22  Q.  About how long would you say that dinner lasted?

23  A.  A couple of hours.

24  Q.  During that dinner, were you the only two together at that

25  dinner?  Was anyone else there?

```
 1   A.  Yes.

 2   Q.  You were the only two?

 3   A.  Say again?

 4   Q.  You were the only two at that dinner?

 5   A.  Yes.

 6   Q.  Now, during that dinner what, if anything, did Attiya

 7   Aboualala say about his prior interactions with your son Samy?

 8   A.  He told me that he met Samy for a couple of hours in the

 9   same area where we were.  Even from the window of the

10   restaurant, he pointed at the subway station across the street;

11   here where I met your son Samy for two hours, but -- and he,

12   after that, my son -- he said my son left him.

13              MR. DEFILIPPIS:  Your Honor, I would like to publish

14   Government Exhibit 145, which is a video entered by

15   stipulation.

16              THE COURT:  Very well.

17              MR. DEFILIPPIS:  And we will direct the jury to

18   Exhibit 145-T in your jury binder.

19              And, Ms. Quinones, if we can just bring up an initial

20   screenshot of the video before we play it?

21              (Continued next page)

22

23

24

25
```

H1I3GAM6                          M. El-Goarany – direct

1       (Video recording playing)

2              MR. DeFILIPPIS:  May I approach briefly, your Honor?

3              THE COURT:  You may.

4    Q.  Mr. El-Goarany, I'm going to give you a copy of the

5    transcript so you can follow along as well.

6              Mr. El-Goarany, just seeing those first few seconds

7    there, do you recognize this video?

8    A.  Yes.

9    Q.  Tell us what you know about it?  How did this come to be

10   recorded?

11   A.  This is the restaurant where I went with Mr. Attiya

12   Aboualala.  He choose the restaurant, and we're having dinner

13   there and he choose the plate also, so I have no idea.  And

14   they were making this, he said this is a very nice kind of

15   plate.  They were cooking in front of us.

16   Q.  Mr. El-Goarany, who recorded this video?

17   A.  Mr. Attiya Aboualala gave his phone to one of the waitress

18   in the hotel and the restaurant, or the manager maybe.

19             MR. DeFILIPPIS:  Ms. Quinones, will you continue

20   playing the video.

21             (Video recording playing)

22   Q.  Just pausing briefly, Mr. El-Goarany, is that you on the

23   left there?

24   A.  Yes.

25   Q.  Who is depicted on the right-hand side?

H1I3GAM6                          M. El-Goarany - direct

1    A.  This is Mr. Attiya Aboualala.

2              MR. DeFILIPPIS:  Continue.

3              (Video recording playing)

4    Q.  Mr. El-Goarany, did you see Mr. Aboualala make a sign with

5    his hand there?

6    A.  Yeah, he make a sign with four fingers.  Like that.

7    Q.  What, if anything, does that sign mean to you?

8    A.  This is the symbol of the people of Muslim Brotherhood, and

9    they believe in the Muslim Brotherhood.

10   Q.  Did you say the Muslim Brotherhood?

11   A.  Yes.

12   Q.  What, if anything -- we'll see it on the video -- but what,

13   if anything, did you do after that?

14   A.  I want to show I'm not support of the Muslim Brotherhood, I

15   don't agree with them, and I moved my right hand with five

16   fingers.

17   Q.  What did you mean to signify with five fingers?

18   A.  Number one to say I'm not Muslim Brotherhood.  Number two,

19   this in our culture when you put this with someone in the face

20   of somebody, you're saying "don't push my luck" or something

21   like that.

22   Q.  Don't push my luck?

23   A.  To protect myself.

24             MR. DeFILIPPIS:  Let's continue.

25             (Video recording playing)

H1I3GAM6                          M. El-Goarany - direct

1   Q.  Mr. El-Goarany, would you agree that you looked happy and

2   relaxed in that video?

3   A.  Yes.  I look like that.

4            MS. MIRON:  Objection, your Honor.

5            THE COURT:  Overruled.

6   A.  Can you say it again?

7   Q.  Sure.  Would you agree that you appeared to be happy and

8   relaxed in that video?

9            You can answer.

10  A.  Yes.

11  Q.  At the time, were you in fact happy and relaxed?

12  A.  Absolutely not.

13  Q.  But why were you appearing that way?

14  A.  I just want to get his trust.  Until this moment he didn't

15  tell me anything about my son except he met him only for two

16  hours and that's not the purpose of my trip.

17  Q.  Mr. El-Goarany, if I can just briefly direct you to page

18  six of the transcript in front of you.

19  A.  Yes.

20  Q.  Do you see at the top, you're indicated in the pink

21  writing.  There you ask "Do you know Abdullah from here or from

22  Egypt."  Do you see that part?

23  A.  Yes.

24  Q.  And Attiya Aboualala says "Abdullah I know him from here,

25  from Turkey."

H1I3GAM6                        M. El-Goarany - direct

1  A.  Yes.

2  Q.  What Abdullah is being referred to here?

3  A.  He is the key that I reach Attiya.  Attiya has no contact

4  with Facebook, and in the cover page of the Facebook, of the

5  cover page of the Facebook of Attiya was Al Gazar was full of

6  other people.  So when I tagged on everyone name, the only one

7  have connection with Abdullah Gazar.  And he the one who took

8  me to meet Attiya.

9  Q.  The man you referenced earlier?

10 A.  Yes.

11 Q.  Let me ask you after that first meeting with Mr. Aboualala,

12 did there come a time when you heard from your son Samy?

13 A.  Yes.  Next day in the morning at about 11 o'clock Samy

14 called me.

15 Q.  How did he reach you?

16 A.  He called my phone from his phone.

17 Q.  Were you still in Turkey at that time?

18 A.  I was in the room in shower in the hotel.  I came out of

19 the shower.  It was good to hear from Samy, yes.

20 Q.  What, if anything, did Samy say to you about where he was

21 and what he was doing there?

22 A.  He said he's in Syria, far from me.  About 300 miles.

23 That's what he said.

24 Q.  What, if anything, did he say about whether he could see

25 you?

H1I3GAM6                          M. El-Goarany - direct

1    A.  I was begging him to see him.  To come to me to meet with

2    me or I can come to him, but he was not helping me.  He never

3    told me where he is.  And he said it is dangerous for me to go

4    and it is not easy to go.

5    Q.  Now, after that phone call, did you have any further

6    meetings with Attiya Aboualala?

7    A.  Yeah, one hour later, Attiya Aboualala called me.

8    Q.  Did you agree to meet him?

9    A.  Yes, he was -- yes.

10   Q.  How long after the phone call you received from Samy was

11   that second meeting?

12   A.  In the afternoon.  In the -- yeah, the afternoon.  It was

13   three, four hours.

14   Q.  Where did you and Mr. Aboualala meet?

15   A.  He told me to meet with him in Al Fatih Mosque in Istanbul.

16   Q.  Was that near your hotel?

17   A.  No, it's not very close but I took a taxi to go there.

18   Q.  At the Al Fatih Mosque, was it just you and Mr. Aboualala?

19   A.  Yes.

20   Q.  About how long were you there?

21   A.  Half an hour.

22   Q.  Where, if anywhere, did you go after that?

23   A.  We went to a hotel.  He ask me to go to a hotel to meet one

24   of the former minister in Egypt coming from overseas and he

25   wants to introduce me to him.

H1I3GAM6                          M. El-Goarany - direct

1    Q.  Did you say a former minister of Egypt?

2    A.  Yeah.  When the Muslim Brotherhood was in charge in Egypt,

3    the government, he was a minister there and he was a

4    Congressman also.

5    Q.  So he was a Congressman?  Is that what you meant by

6    minister?

7    A.  Yes.

8    Q.  And where did you, Mr. Aboualala, and the minister from

9    Egypt meet?

10   A.  He took me to the hotel.  His name is Bassem I believe.  So

11   I met him in his hotel.

12   Q.  Was Mr. Aboualala there?

13   A.  Yeah, he took me there.

14   Q.  For how long did you meet with them?

15   A.  In the hotel, for another half an hour.

16   Q.  Did you go anywhere after that?

17   A.  Yeah.  Mr. Aboualala invited me and Bassem for dinner the

18   same day.

19   Q.  About how long did that dinner last?

20   A.  One and a half hours.

21   Q.  During that dinner, what, if anything, did Mr. Aboualala

22   say about your son and what he might be doing?

23   A.  Mr. Aboualala told me, like, he was making, like, fun of

24   me, like a joke.  But it wasn't joke for me.  He told me he --

25   or he was talking to Bassem, and he say it is funny to be here

1    sitting in the table, Bassem is a minister of the Muslim

2    Brotherhood, they consider themselves to be Brotherhood because

3    they never -- agreed with what the changes have been in Egypt.

4    And Mohammed or Mr. El-Goarany, which is me, is a retired

5    career engineer with the Egyptian Army, which is Sisi support.

6    Sisi is the president of Egypt.  And I'm a Muslim Brotherhood

7    activist or administrator, and El-Goarany son Samy is now in

8    Syria fighting with Daesh.

9    Q.   That word "Daesh," what does that mean or what did you

10   understand it to mean?

11   A.   It is the Arabic word they call it for the ISIS or for the

12   Dawla Islamiya.

13   Q.   Was that the first time Mr. Aboualala mentioned that your

14   son was with Daesh or ISIS?

15   A.   Yes.

16   Q.   After that dinner, and before you returned to the United

17   States, did you communicate again with your son Samy?

18   A.   Yes, we were talking in a daily basis, because it was very

19   good thing to hear from him.

20   Q.   During those conversations, what, if anything, did he tell

21   you about what organization or group, if any, he was with?

22   A.   He said he is with al-Dawla and he is now taking religious

23   training.  And after the religious training he will take

24   military training.  Until they could certify him or he, they

25   would consider him one of them, certified as one of them, and

H1I3GAM6                          M. El-Goarany - direct

1   then he can travel.  That was the reason I want to see him.

2   Q.  And when you referenced the word "Dawla," he said he was

3   with Dawla?

4   A.  Yes.

5   Q.  What does that mean?

6   A.  Dawla is the other name for Daesh or they consider

7   themself, Dawla is a country or the state.  Like United States.

8   Dawla.  Dawla.

9   Q.  So when you heard that word, what group did you understand

10  him to be referring to?

11  A.  I understand that he was Daesh, to confirm what Attiya was

12  saying.

13  Q.  Did you go straight back to the United States from Turkey?

14  A.  No, I went to Egypt for another 10 days.

15  Q.  What were you doing in Egypt?

16  A.  In May 13 is the anniversary of our graduation day.  I

17  graduate from the college in 1971, so after 1996, we started to

18  meet from the silver anniversary every year on May 13.  My

19  colleague, all my colleagues.

20  Q.  After that stop, then did you return to the United States?

21  A.  Yes, I returned to the United States.  To New York, J.F.K.

22  Q.  When you arrived back in the United States, did there come

23  a time when you spoke with law enforcement?

24  A.  Yes.

25  Q.  How soon after you got back was that?

1   A.  They were waiting for me at the door of the airplane.

2   Q.  Did you speak with them about your trip?

3   A.  Yes.

4   Q.  During those conversations with law enforcement, were you

5   truthful to law enforcement about what you had learned about

6   your son?

7   A.  No.

8   Q.  What did you tell them that was not truthful?

9   A.  I told them that my son is with the Muslim Brotherhood in

10  Syria.

11  Q.  Why did you tell them that?

12  A.  To protect my son.  I was still hoping that my son can come

13  back, and I didn't want him to be arrested as a terrorist man.

14  And because Muslim Brotherhood is not terror group yet in

15  America.

16  Q.  Did you eventually tell the FBI about everything you

17  learned and about what you knew?

18  A.  Yes.

19  Q.  Mr. El-Goarany, are you testifying today pursuant to a

20  particular agreement?

21  A.  Yes.

22  Q.  Let me put in front of you what's been marked Government

23  Exhibit 1019.

24          MR. DeFILIPPIS:  If I may approach, your Honor.

25          THE COURT:  You may.

H1I3GAM6                          M. El-Goarany - direct

1    Q.  Mr. El-Goarany, do you recognize that agreement?

2    A.  Yes.

3    Q.  What is it?

4    A.  It is a non-prosecution agreement signed with the

5    prosecutors, not to prosecute me for my testifying.

6           MR. DeFILIPPIS:  Your Honor, the government offers

7    Government Exhibit 1019.

8           THE WITNESS:  Can you say it again?

9           MR. DeFILIPPIS:  I was speaking to the judge.

10          MS. MIRON:  No objection.

11          THE COURT:  Government Exhibit 1019 will be received.

12          (Government's Exhibit 1019 received in evidence)

13   Q.  Mr. El-Goarany, based on your understanding, what has the

14   government agreed to do in this agreement?

15   A.  To say the truth.

16   Q.  No --

17   A.  Nothing but the truth.

18   Q.  I'm sorry, Mr. El-Goarany.  What has the government agreed

19   to do?

20   A.  Say it again?

21   Q.  What has the government agreed to do in this agreement?

22   A.  Not to prosecute me if I saying the truth.  I'm not hiding

23   anything else.

24   Q.  Not to prosecute you for what?

25   A.  For the -- for lying to the FBI.

H1I3GAM6                          M. El-Goarany - direct

1   Q.  Does your ability to benefit from this agreement depend in
2   any way on the outcome of this trial?
3   A.  I don't understand the question.
4   Q.  Is it, does it matter one way or the other under this
5   agreement whether the defendant is found guilty or not guilty
6   at this trial?
7   A.  No.
8   Q.  Mr. El-Goarany, after you returned to the United States,
9   did you keep in touch with your son for some time?
10  A.  Yes.
11  Q.  Did there come a time when you learned of the arrest of
12  someone named Ahmed Mohammed El Gammal?
13  A.  Yes.
14  Q.  After you learned about that arrest, did you speak to
15  Mr. Attiya Aboualala?
16  A.  Yes.
17  Q.  What, if anything, did Attiya Aboualala say to you with
18  regard to that arrest?
19  A.  Mr. Attiya --
20          MS. MIRON:  Your Honor, may we have a side bar?
21          THE COURT:  Sure.
22          (Continued on next page)
23
24
25

H1I3GAM6                          M. El-Goarany – direct

1              (At the sidebar).

2              MS. MIRON:  We don't know exactly what answer will be

3     elicited --

4              MS. SHROFF:  I think he's talking to someone.

5              THE COURT:  He's talking to Jazmin.

6              MS. MIRON:  It seems to call for both hearsay and pose

7     a confrontation clause problem.

8              MR. DeFILIPPIS:  Your Honor, for the reasons stated

9     yesterday with regard to the statements, this is not, it

10    doesn't in any way implicate the --

11             MS. SHROFF:  He's talking directly to the jury.

12             THE COURT:  Mr. El-Goarany, please don't address

13    anyone.  When a question is asked, you may answer the question.

14             THE WITNESS:  I'm thirsty.

15             THE COURT:  Ms. Rivera will get you some water.

16             MR. DeFILIPPIS:  Your Honor, I think for the very same

17    reasons stated yesterday, Mr. El-Goarany was -- there is

18    nothing testimonial about statements that Mr. Aboualala made to

19    Mr. El-Goarany.  These actually were essentially the subject of

20    the Court's in limine ruling about the post-arrest what the

21    government has deemed coverup efforts.

22             Again, we never know what a witness will say, but we

23    expect he'll say something along the lines of that

24    Mr. Aboualala asked Mr. El-Goarany to help El Gammal, including

25    possibly by lying to the FBI.  So I think it falls squarely

1    within the Court's in limine ruling.

2              THE COURT:  Was this over the phone?

3              MR. DeFILIPPIS:  It was over the phone, yes, your

4    Honor.

5              THE COURT:  Okay.

6              MR. HABIB:  The testimony will be that Attiya asked

7    the witness to help Mr. El Gammal by lying to the FBI?

8              MR. DeFILIPPIS:  By, among other things, and again, I

9    can't speak for the witness but --

10             MS. SHROFF:  You prepared him, right?

11             MR. DeFILIPPIS:  And which is relevant both because it

12   falls within the in limine ruling of the communications on that

13   issue, and also because of the fact that it was said and how it

14   affected subsequent actions and communications.

15             MR. HABIB:  What is the hearsay exception?

16             MR. DeFILIPPIS:  So the co-conspirator statement was

17   the rationale of the Court's ruling, among other things.

18             MR. HABIB:  First of all, we would object on the

19   ground that the conspiracy had terminated and on the ground

20   that efforts to conceal the conspiracy don't fall within the

21   exception.

22             MR. DeFILIPPIS:  Your Honor, again, this was the

23   subject of briefing.  Our contention is that the conspiracy in

24   fact had not at all ended.  The arrest pursuant to the cases we

25   cited in our brief, the arrest of one co-conspirator does not

1    end a conspiracy.  And it was an object of this conspiracy from

2    the very beginning to conceal the method and means by which

3    Samy and others traveled to ISIS territory.

4             MR. HABIB:  We've briefed it and I'm happy to retrieve

5    the cases if the Court wants, but it is my recollection from

6    the motion in limine briefing there is Second Circuit and

7    Supreme Court authority that statements made during the pure

8    concealment phase of a conspiracy are not in furtherance of a

9    conspiracy.  And that if what the government is saying were

10   true, then every conspiracy could be assumed to include an

11   objective to conceal it, then no conspiracy would ever end.  I

12   think that's the Supreme Court's decision I believe it is

13   *Krulewitch*, a case from the '50s.

14            MR. DeFILIPPIS:  The Second Circuit's *Persico* case, it

15   was organized crime where one co-defendant was arrested, and

16   the others continued, and this was the subject of your Honor's

17   ruling, but the idea that Samy El-Goarany continued to provide

18   himself as personnel to ISIS, and continued, and Aboualala

19   continued to further their initial objective of concealing his

20   transit devices, the conspiracy continued.

21            MR. HABIB:  They're no longer concealing where Samy is

22   or what he's doing.

23            MR. DeFILIPPIS:  It was concealing the means by which

24   he traveled, namely through Gammal and others.

25            MR. HABIB:  Again --

H1I3GAM6

1          MS. SHROFF:  That's clearly not the subject of the --

2          THE COURT:  It is almost 4 o'clock.  This is very

3     interesting so let's continue.  Let me send the jury home.

4     Okay.

5          MS. SHROFF:  Your Honor, could we have a minute to

6     pull the case.

7          THE COURT:  Sure.

8          MR. HABIB:  In light of the time, your Honor, we write

9     every day, so we're happy to write on it too.

10          THE COURT:  Okay.

11          (In open court)

12          THE COURT:  Ladies and gentlemen, it is almost

13     4 o'clock, so rather than keep you we're going to end it for

14     today.  Please have a very pleasant evening.  Please do not

15     discuss the case, please do not read anything about the case or

16     listen to any news coverage of the case.  Please don't do any

17     research.

18          we'll see you bright and early tomorrow morning.

19     Please be in the jury room no later than 9:20.  Thank you so

20     very much.

21          (Jury excused)

22          THE COURT:  Mr. El-Goarany, you may step down.

23          THE WITNESS:  Should I leave?

24          THE COURT:  Yes.

25          (Witness temporarily excused)

H1I3GAM6

```
1         THE COURT:  We can continue the conversation.  I know
2   Mr. Habib asked for the opportunity to submit something in
3   writing.  I am happy to give you folks the opportunity.  So we
4   can continue to talk or we can break now or discuss something
5   else.
6         MR. DeFILIPPIS:  Your Honor, the government of course
7   would be fine if Mr. Habib would like to put something in in
8   writing.  But I do think, the government's view is this is not
9   a close question.  I think effectively it was decided by your
10  Honor's rulings in the motions in limine, and especially now,
11  given that the defense has offered communications of
12  Mr. Aboualala on this very topic with the third party in which
13  they're discussing the defendant's arrest, again, all the more
14  reason why what's good for one side has to, in fairness, be
15  good for the other.  And again we think this was resolved
16  pretrial, but obviously we won't prevent anyone from writing on
17  anything.
18        THE COURT:  Okay.
19        MR. HABIB:  We're happy to write on it, your Honor.
20        THE COURT:  Very well.  Then I will await your
21  submission.
22        In the meantime, is there anything else that we need
23  to or should discuss this afternoon?
24        MR. QUIGLEY:  Just in terms of housekeeping, your
25  Honor.  As I said I think last week we were on pace and that
```

H1I3GAM6

1    means from our perspective there is a good chance we'll rest

2    tomorrow.  We have about three more witnesses.

3            THE COURT:  Okay.

4            MR. QUIGLEY:  So, we've asked defense, just for the

5    record, about their case, they provided some information.  Not

6    a ton, but just in terms of getting -- we'd like to get their

7    witnesses and figure out who we're going to have to be

8    preparing cross for.  I don't know if the Court wants to

9    schedule a charge conference at some point or if that is

10   premature.  Also it would be good to know in terms of length of

11   the defense case, because we may have, obviously we're not

12   planning to put on a rebuttal case now, but we may have some

13   people lined up just in case.

14           THE COURT:  Obviously not holding you to anything,

15   Ms. Shroff, but, is the defense in a position to make some

16   representation about any defense case at this point?

17           MS. SHROFF:  I e-mailed them this morning in light of

18   them being ahead of schedule because we were supposed to start,

19   if the Court recalls, we anticipated putting on a defense case

20   on I think Monday is the 23rd.  We have reached out to our

21   witnesses, including the expert witness, we're waiting to hear

22   back.  We're actually trying to convince Professor Marsh to see

23   if he can accommodate us by testifying earlier.  He seems

24   somewhat unable to, given his commitments at Yale, but we're

25   still trying.  And that's the same with everybody else that

H1I3GAM6

1    we've informed the government of.

2             I have actually responded to them this -- as much as I

3    know, they know.  Because they are actually a day and a half

4    ahead of schedule.  And I am trying to --

5             THE COURT:  Okay.  And the witnesses you have

6    tomorrow, I guess Mr. El-Goarany will be on for some period of

7    time longer on direct?

8             MR. DeFILIPPIS:  Yes, not much longer though, your

9    Honor.  We're nearing the end of it.

10            THE COURT:  Very well.  And the balance of the three

11   witnesses, are they in the nature of document custodians?

12            MR. QUIGLEY:  Your Honor, we're going to try to avoid

13   calling any more document custodians.  We have a witness, a

14   phone examiner from the FBI who is one of our experts, and then

15   a summary witness, a paralegal at the end.

16            THE COURT:  Let's see how far we get tomorrow.  And

17   whether the defense if they're going to put on a case will be

18   in the position to put on any witnesses, if not tomorrow, then

19   Friday.  Obviously it is always a good thing when we're moving

20   faster than we hoped, so I'm not going to begrudge anyone from

21   finishing up sooner than later.  And it may be that we'll have

22   to give the jury maybe a half day at some point, maybe at the

23   end of the week, depending on the availability of the defense

24   witnesses.  But we will try to get you a draft of the charge by

25   end of day tomorrow at some point.  So if we can, we can have a

H1I3GAM6

1   jury charge on Friday if we have some time.

2          MR. QUIGLEY:  A charge conference, your Honor?

3          THE COURT:  I'm sorry?

4          MR. QUIGLEY:  A charge conference?

5          THE COURT:  Yes.

6          MR. QUIGLEY:  Okay.

7          THE COURT:  What did I say?

8          MR. QUIGLEY:  You said a charge.

9          I would anticipate, it doesn't sound like under

10  anybody's view we will be closing on Friday.

11         MS. SHROFF:  I think the government's pretty aware

12  that we have the expert Mr. Roloff testifying on Monday.  So, I

13  think that answers Mr. Quigley's question that there is no

14  chance we would be closing on Friday.

15         MR. QUIGLEY:  That's fine, your Honor.

16         THE COURT:  That's why I suggested that we may need to

17  give the jury a little extra time on Friday if we don't have

18  witnesses available.

19         MR. QUIGLEY:  Okay, great.

20         MS. SHROFF:  I think we are also going to have an

21  objection on the government's purported summary witness, but we

22  will let the Court know as we move along.

23         THE COURT:  Very well.  Who is this summary witness

24  and what is he going to purport to summarize?

25         MR. DeFILIPPIS:  It will be paralegal Jake Sidransky

H1I3GAM6

1    who is sitting behind me of the summary chart we prepared

2    pursuant to Rule 1006.  Simply a visual representation that

3    combines various exhibits or portions of exhibits in the case,

4    including Facebook communications, messaging communications,

5    toll records, and cell site location records, again for the

6    very purpose set out in Rule 1006 which is to present evidence

7    to the jury that is voluminous, and under several Second

8    Circuit cases this has been allowed fairly routinely.

9             THE COURT:  Will this be in the nature of charts or

10   video or PowerPoint or what type of media?

11            MR. DeFILIPPIS:  We can hand up to you the current

12   draft of the chart if you'd like to see it.

13            THE COURT:  Very well.

14            MS. SHROFF:  Your Honor, if you can take a look at the

15   compilation that they intend to put into evidence, because it

16   is a verbatim assimilation of the testimony and essentially

17   cumulative and it's the government's essential third summation.

18   So, if you can just take a look -- I think we can argue this

19   later.  But I think the rule in and of itself, Rule 1006, I do

20   not think that either this case, which has been less than two

21   weeks on its direct, falls within the ambit of the rule.

22            And in fact, what they've provided to the Court, which

23   is not a summary, a calculation, or something that synthesizes

24   voluminous writings or recordings, falls within the category of

25   a summary exhibit.  But as I said, your Honor, we can address

H1I3GAM6

1    it if and when we get there.

2              THE COURT:  Very well.

3              MS. SHROFF:  Thank you.

4              THE COURT:  Okay.

5              MR. DeFILIPPIS:  Thank you, your Honor.

6              THE COURT:  Anything else?

7              MR. DeFILIPPIS:  Not from the government, your Honor.

8              MS. MIRON:  No, your Honor.

9              THE COURT:  We'll see you tomorrow.  Be here at

10   9 o'clock tomorrow.

11             (Adjourned until January 19, 2017, at 9 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     TAREK EL-GOARANY

 4     Cross By Ms. Shroff . . . . . . . . . . . . 897

 5     Redirect By Ms. Tekeei . . . . . . . . . . 929

 6     Recross By Ms. Shroff . . . . . . . . . . . 933

 7     SERPIL KAHVECI-CECELI

 8     Direct By Ms. Tekeei . . . . . . . . . . . 935

 9     Cross By Ms. Shroff . . . . . . . . . . . . 943

10     TIMOTHY McNULTY

11     Direct By Mr. Quigley . . . . . . . . . . . 944

12     Cross By Ms. Mirón . . . . . . . . . . . . . 983

13     Cross By Ms. Miron . . . . . . . . . . . . .1000

14     Redirect By Mr. Quigley . . . . . . . . . .1013

15     MARIA MASCARO

16     Direct By Ms. Tekeei . . . . . . . . . . . .1018

17     Cross By Ms. Shroff . . . . . . . . . . . .1022

18     MARIA TERESA EL-GOARANY

19     Direct By Ms. Tekeei . . . . . . . . . . . .1025

20     Cross By Ms. Shroff . . . . . . . . . . . .1032

21     Redirect By Ms. Tekeei . . . . . . . . . . .1038

22     Recross By Ms. Shroff . . . . . . . . . . .1040

23

24

25
```

1  MOHAMMED EL-GOARANY

2  Direct By Mr. Defilippis . . . . . . . . . .1051

3                          GOVERNMENT EXHIBITS

4  Exhibit No.                                    Received

5   801 through 806  . . . . . . . . . . . . . . 936

6   113A   . . . . . . . . . . . . . . . . . . . 946

7   143   . . . . . . . . . . . . . . . . . . . 962

8   122-C, D, E, F, G, and I . . . . . . . . . 963

9   110-D  . . . . . . . . . . . . . . . . . . . 966

10  1106, 601, 602  . . . . . . . . . . . . . .1017

11  800, 807, 808  . . . . . . . . . . . . . . .1020

12  1009, 1010  . . . . . . . . . . . . . . . .1026

13  1017, 1018  . . . . . . . . . . . . . . . .1031

14  1019  . . . . . . . . . . . . . . . . . . .1072

15                          DEFENDANT EXHIBITS

16  Exhibit No.                                    Received

17  111-CC  . . . . . . . . . . . . . . . . . . 903

18  100-GG  . . . . . . . . . . . . . . . . . .1002

19  122-LL-II-T  . . . . . . . . . . . . . . . .1010

20

21

22

23

24

25