H1J5gam1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        15 Cr. 588 (ER)

5    AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7    ------------------------------x

8                                   New York, N.Y.
                                    January 19, 2017
9                                   9:10 a.m.

10

     Before:
11
                         HON. EDGARDO RAMOS,
12
                                        District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BRENDAN F. QUIGLEY
17   NEGAR TEKEEI
     ANDREW J. DeFILIPPIS
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
20   BY:  SABRINA SHROFF
          ANNALISA MIRÓN
21        DANIEL G. HABIB

22

23

24

25

H1J5gam1

1           (Trial resumed; jury not present)

2           THE COURT:  Are you folks ready?

3           MR. QUIGLEY:  Yes, your Honor.

4           THE COURT:  Okay.  I have gotten the parties' papers.

5      With respect to the statements -- the proposed

6      proffer, rather, concerning the government's proffer of what

7      Mr. Mohammed El Goarany would testify to, I am going to allow

8      that testimony to come in and at the request of the defense,

9      upon further reflection, I will also allow to come in the

10     snippet concerning, I think it was Mr. Aboualala's statement

11     concerning Mr. El-Gammal, or referring to Mr. El-Gammal that he

12     is not Daesh, Mr. Mohammed's El Goarany's proposed testimony

13     and his testimony from yesterday that caused me to further

14     reflect and determine that it is appropriate to allow that

15     testimony under 806.  So, both of those statements will come

16     in.

17          Concerning the summary chart, let me look to the

18     government.  I looked at it and I don't pretend to understand

19     all of it but, tell me, it seems to me that these are excerpts

20     and not a summary.  What is exactly being summarized here?

21          MR. DEFILIPPIS:  Your Honor, these are in fact in a

22     sense excerpts, but excerpts are also precisely what has been

23     allowed and is sort of the essence of a summary chart.  There

24     is a case, a summary order case, United States v. Boxwood that

25     is a Second Circuit case that we cited in our brief and in that

H1J5gam1

1    case what was at issue were toll records, there were voluminous

2    toll records, and in fact the Court in that case considered

3    voluminous I think it was something like a hundred calls.

4    Certainly we have hundreds and hundreds of messages in this

5    case.  The purpose of the chart in that case, as approved by

6    the Court, was to select or excerpt from those toll records,

7    toll records that were relevant because they occurred on

8    particular days relevant to the conspiracy and involve

9    particular people relevant to that conspiracy.

10           So, to the extent that there are excerpts in these

11   charts, which there are, that is the precise purpose that

12   Courts have allowed in these charts which is to synthesize and

13   present for the jury, in a digestible way, records that would

14   otherwise be difficult to digest, and that's compounded here or

15   enhanced here by the fact that we have multiple different types

16   of records.

17           I think just sitting in this courtroom we can all see

18   and experience for ourselves that the evidence in this case,

19   when presented non-chronologically, is very difficult to absorb

20   and so this is just an effort to do precisely what these charts

21   are intended to do.

22           THE COURT:  So, walk me through it.  What is 1201?

23           MR. DEFILIPPIS:  Your Honor, looking first to 1201,

24   and I should note, your Honor, that these exhibits that are

25   presented as multiple exhibits today are substantially the same

H1J5gam1

1    as what we handed up to the Court yesterday just sliced into

2    smaller pieces with small changes.

3          THE COURT:  I tried to synchronize it but I was not

4    able to.  I was able to for some, going through I guess the

5    first three or four but not after that.

6          MR. DEFILIPPIS:  Your Honor, for example, Government

7    Exhibit 1201 are selected Facebook communications and toll

8    records for the time period listed, June 9 through October 2nd,

9    and this, sort of in line with the approach taken in the

10   Boxwood case, the Second Circuit case we cited, highlights what

11   is a key time period in the case or chooses a key time period

12   in the case and then extracts for that time period these

13   messages involving two key players -- of course Mr. El- Goarany

14   and Mr. El-Gammal.  We can see messages at the top there which

15   were messages exchanged on Facebook and then interspliced, if

16   that's a word, your Honor -- spliced after the Facebook

17   messages are toll records that show, so the jury gets a sense

18   for where within the chain of this conversation they were also

19   speaking through another medium, through the phone and, again,

20   exactly what Rule 1006 is designed or permits the government or

21   any party to do in order to help the jury digest.

22         THE COURT:  And I take it all these, I will call them

23   conversations, are already in evidence?

24         MR. DEFILIPPIS:  Yes, your Honor.  Every single piece

25   of data here, communication, is already in evidence.  We worked

H1J5gam1

1    very hard not to include any commentary or editorializing in

2    either the headings or the way we present the data.  It is

3    simply extracting and presenting it in more digestible form.

4           THE COURT:  And are these all the excerpts in Exhibit

5    1201, are they from one exhibit or multiple exhibits?

6           MR. DEFILIPPIS:  These are from -- in each instance,

7    your Honor, the heading indicates which exhibit they're drawn

8    from, so these communications and toll records are from

9    Government's Exhibits 100-B and Government Exhibit 511.

10          THE COURT:  And what is the size of those exhibits in

11   terms of number of pages?

12          MR. DEFILIPPIS:  Your Honor, for those specific

13   exhibits I would have to go back but -- yeah, 511, for example,

14   Ms. Tekeei reminds me, we didn't even print out because it was

15   so voluminous.  And so, the idea here is just to help the jury

16   wade through a mass of documents that they otherwise would, I

17   think, find it very difficult to understand.

18          THE COURT:  What will the witness say about this?

19          MR. DEFILIPPIS:  All the witness will say, your Honor,

20   is, as I stated, a paralegal in our office, is that he -- the

21   process by which he compiled these -- so, he would describe

22   going back to the exhibits, he will describe how he has

23   indicated on the chart where, for example, something is

24   indicated to be an excerpt or not an excerpt, and he will

25   simply describe the process by which he frankly, very

H1J5gam1

mechanically, compiled the summary chart from documents already

in evidence.  He will not offer any editorializing or

interpretation of the documents.

THE COURT:  And I am sure he is a very able and bright

young man, but did he do this at the direction of lawyers?

MR. DEFILIPPIS:  He did, your Honor.  He did it at the

direction of lawyers and in consultation with lawyers but

the -- yes, but the process by which he compiled it was

essentially a mechanical process of summarizing or synthesizing

evidence already in the record.

THE COURT:  So he was told put together the following

conversations into one chart?

MR. DEFILIPPIS:  Essentially, your Honor; yes.

THE COURT:  Okay.

And with respect to 1202?

MR. DEFILIPPIS:  So, 1202, your Honor, this is

extracted from the historical cell site presentation that was

given from Special Agent Perry and, again, it simply extracts

something that appeared exactly like this in the presentation.

But, the reason why this is helpful to the jury in summarizing

or synthesizing is because, in the chronology of exhibits, if

one reads these exhibits chronologically, they extract

different pieces of evidence in chronological order so that the

jury can make some sense of them.

Your Honor, and 1202 also includes, for example, and

H1J5gam1

1    this is point I am making, right after the cell site records

2    you see other communications, these are communications from

3    Facebook.  So, sitting through the trial thus far, the jury I

4    think would have no sense of where did that exhibit I saw from

5    Agent Perry fall in the chain of communications between the

6    parties and this simply lays it out in a non-argumentative,

7    purely extraction, summary fashion.

8         THE COURT:  Do you have a sense of how many such

9    conversations have been presented to the jury over the course

10   of the trial?

11        MR. DEFILIPPIS:  Your Honor, so if your question is

12   how many have been admitted, I think it is fair to say that the

13   volume is in the thousands of messages.  In terms of how many

14   messages we have actually read to the jury, without having -- I

15   don't want to guess.  I think it is a very small fraction of

16   those thousands and, again, I think that the sheer volume in

17   this case does not make this presentation in any way cumulative

18   or repetitive or is in any way designed to circumvent the

19   purpose of Rule 1006 which is precisely where there are

20   thousands of messages and different modes of communication over

21   multiple platforms of social media.  Again, I think this is

22   precisely what Rule 1006 contemplates.

23        MR. HABIB:  Thank you, your Honor.  And I appreciate,

24   obviously we are working hard so the filings are -- we are

25   giving the Court less time than the Court would ideally like.

H1J5gam1

1          THE COURT:  The filings were very helpful.

2          MR. HABIB:  As a factual matter, on pages 2 and 3 of

3     our submission, we have indicated the contents of each of

4     Government Exhibit 1201 through 1206, and for each of those

5     exhibits we have identified at the corresponding page trial

6     transcript on which the contents of those exhibits were read to

7     the jury.  My principal point is this:  Every single piece of

8     information in the government's proposed summary exhibits has

9     been admitted into evidence, published to the jury, and already

10    read aloud to the jury sometimes more than once.  For example,

11    the Facebook communications between Mr. El-Gammal and Attiya

12    found in GX- 1203 have now been read into evidence twice by the

13    government and that's at T 724 to 727 and T 978 to 981.  Given

14    that, a couple of points.

15         First, the evidence is cumulative, repetitious, and

16    clearly barred by Rule 1006.  Weinstein and the cases applying

17    Rule 1006 say that Rule 1006 applies to summary proof of

18    material that is not in evidence.  Rule 1006 does not apply to

19    summaries of material that is already in evidence.  I can cite

20    to the Court United States v. Bradley, a Second Circuit case

21    from 1989, 869 F.2d 121, 123.

22         In addition, so Rule 1006 just doesn't apply, period,

23    because the material is already in evidence.  What Rule 1006

24    contemplates is we have 500 pages of toll records of which a

25    small handful are relevant; a witness prepares a summary of the

H1J5gam1

1   small, relevant handful and introduced that to prove the

2   contents of the whole.  So, with respect, 1006 is simply not

3   applicable in this situation at all.

4           What the Second Circuit said -- and the case is cited

5   on the first page of our motion and that's the Connolly case --

6   is a chart submitted by the prosecution is a very persuasive

7   and powerful tool and must be fairly used since, by its

8   arrangement and use it is an argument to the jury during the

9   course of the trial.  And I grant that the document does not

10  contain comments that are argumentative in nature but it is

11  impossible to read all 41 pages of those exhibits and come away

12  with any other impression than that it is an advanced

13  summation.  It is obvious the intent and we agree that if

14  presented in summation, all of this material would be proper.

15  The government can give this presentation using these very

16  exhibits.  What it cannot do is misapply a rule to introduce

17  that as substantive evidence through a witness and ask the

18  witness to repeat -- and I assume that would be part of the

19  witness' testimony, would be re-reading this material -- my

20  friend Mr. DeFilippis can correct me if I am wrong -- for the

21  second and in some cases the third time material that the jury

22  has already heard, in some cases has heard as recently as

23  yesterday, and in some case will hear this morning, for what is

24  the obvious purpose of sneaking in a summation before it is

25  time to do that.  We don't object to the substance coming in in

H1J5gam1

1    summation, this is proper summation.

2            THE COURT:  Can this document or these documents be

3    used during summation?

4            MR. HABIB:  As demonstratives sure.  I am sure the

5    government is going to present a PowerPoint at summation, they

6    can submit this PowerPoint.

7            THE COURT:  And that would not be something to go back

8    with the jury.

9            MR. HABIB:  And the case law is quite clear on that.

10   Even if the Court grants the government's request -- which the

11   Court should not do -- these documents cannot go back to the

12   jury, they're not substantive evidence, they're demonstratives.

13           THE COURT:  Demonstratives can certainly be part of

14   the evidence.

15           MR. HABIB:  Well, I would want to look more closely at

16   that point.  I want to look more closely at the case law on

17   that point.

18           THE COURT:  For example, a map, and if a witness

19   writes on a map that's been admitted into evidence, that is an

20   exhibit.

21           MR. HABIB:  So long as the Court instructs the jury on

22   the difference between demonstrative and substantive exhibits

23   and that if there is and there is a question about the

24   underlying information that the jury should look in the first

25   instance at the substantive exhibits but that's not the issue.

H1J5gam1

1       The issue is do they put it in -- and that issue can be

2       addressed when the jury is set to deliberate.  The issue at the

3       moment is will the government have an opportunity to put in an

4       additional summation through the testimony of a very nice, and

5       as the Court pointed out, a bright young man, who we will

6       essentially be powerless to cross-examine on substance because

7       he has no first-hand knowledge of any of the communications in

8       here, or with no prejudice to the government at all, can the

9       government simply make this argument where it would be made in

10      99 percent of cases on summation.

11              I would also encourage the Court to consider that the

12      cases relied upon by the government, and we have

13      parenthetically described some of them, were much different and

14      much more complicated cases.  They were multi-week trials,

15      multiple defendants, complex conspiracy and tax fraud schemes,

16      multiple counts of indictment.

17              We have a volume of evidence, that's true, but a

18      fairly simple factual and chronological narrative that the

19      government has presented.  The government's theory is that

20      Mr. El-Gammal and Samy spoke online.  They met in person.

21      Mr. El-Gammal introduced him to a friend in Turkey, Samy went

22      to Turkey, he met the friend, he went to ISIS, and everyone

23      covered up.  That's not a complicated narrative and, frankly,

24      does not give the jury enough credit to suggest that they need

25      to have their hands held a third time through this material.

H1J5gam1

1          THE COURT:  The narrative is certainly

2     straightforward, I agree, but this is a case like no other that

3     I have tried on either side, either on the bench or from the

4     well, where so much of it is social media, so much of it is

5     different platforms of social media, and I have been scratching

6     my head the entire time:  Where is this from? How are they

7     communicating? Are they on the phone? Are they using a

8     particular app?  There was a lot of emphasis placed on all of

9     those questions and it was, honestly, quite confusing for me

10    trying to follow exactly what was going on and despite the fact

11    that, exactly as you say, 15 years ago this would have been a

12    very simple case with respect to the type of evidence that was

13    presented.  Now, because all of these devices make life so much

14    easier they make trials that much more difficult.  And it was

15    certainly -- well, I would have expected that what I see here

16    in the proposed summary charts is what we would have seen

17    during the course of the trial because so much of what was

18    presented to the jury, I would say 90-plus percent was metadata

19    and made it difficult to see who is saying what and where is

20    the text.  So, in a sense these charts certainly would be very,

21    very helpful to the jury.

22          I guess the question that I have and one that I don't

23    know -- I haven't had an opportunity to read the cases but the

24    idea that 1006 can only consist of materials not in evidence

25    doesn't seem right to me.  I mean, I could be wrong, but it

H1J5gam1

1      seems counterintuitive, right?  Because you can have a subpoena

2      return from a telephone company that has hundreds of calls

3      between various co-conspirators, all of which would be

4      relevant, and it would be helpful to the jury, certainly, for

5      the government to summarize how many calls there were, how many

6      calls there were between particular co-conspirators on what

7      days.  That all seems to me the type of stuff that's sort of

8      garden variety summary chart and the idea that that would be

9      inappropriate under 1006 seems wrong.

10             MR. HABIB:  To respond to that, I would encourage the

11     Court to consult the Bradley case which is cited on page 3 of

12     our papers and the case distinguishes, to be clear, we are not

13     arguing that -- we are not arguing and the cases do not support

14     the argument that a summary is never admissible when it

15     incorporates material in evidence.  No.  The proper vehicle of

16     the Bradley case would be Rule 611.  The importance of that

17     distinction, though, is that evidence admitted pursuant to Rule

18     611 and, obviously, like all evidence subject to Rule 403, the

19     Court has a much wider measure of discretion.  Rule 611 is a

20     rule addressed to the Court's power to regulate the manner of

21     proof, whereas 1006 would seem to provide a more direct avenue

22     for the summary admission, for the admission of summary proof

23     of a voluminous record, the Court in applying Rule 611 to a

24     summary of material that's already in evidence really needs to

25     ask harder questions like, Is this material genuinely helpful

H1J5gam1

to the jury? Is there no other preferable way for the

government to do it?, and, most importantly, and I want to

emphasize this -- most importantly -- will the admission of the

material in this manner prejudice the defendant whereas its

admission in a different manner will not prejudice the

defendant?

          Again, I want to reiterate, every single demonstrative

the government has produced can be used in summation.  They can

show the entire presentation to the jury and I am sure they

will show one very much like this, if not nicer, because

they'll have more time to work on it.  And that's not a knock,

they do fine work.  The question is, and I think the Circuit

has been very clear on this, it is a persuasive and powerful

tool because it is an argument used during the course of the

trial.  I just do not appreciate how the government is any

worse off from presenting this at summation.  They can present

this exact material in this exact order through Mr. Quigley or

Ms. Tekeei or Mr. DeFilippis, whoever delivers the opening

summation.

          MR. DEFILIPPIS:  All right, your Honor --

          MR. HABIB:  If I may, to finish briefly?

          The difference is that summation is the ordinary way

for this to happen because we, when they are finished with

their summation, can stand up and respond.  But when they put

it in through a witness, who is going to read all of this

H1J5gam1

material, and again, material the jury has already heard -- all

of these chats have been read out loud by the agent, by the

government, by the agent in conjunction with the government --

all of this is going to be old news to the jury, they have

heard it already, their eyelids are drooping already.  It is

going to be 45 minutes to an hour of testimony for a 41-page

document all of which they have heard already and as to which I

am at a loss as to what our cross would be.

*You selected these at the government's direction?*

*Yes.*

*You don't know anything first hand about any of this,*
*right?*

*No.*

I'm not sure how we cross that.  And the government

rests on a very powerful presentation that really properly

should be preserved for argument.  The choice is between a

course that doesn't prejudice the government at all and allows

them to put in all this evidence in the ordinary manner in

summation versus a course that the Circuit, Second Circuit,

First Circuit, Fifth Circuit poses a real danger to the defense

and should be used with caution.

That's the choice the Court has.

THE COURT:  Mr. DeFilippis.

MR. DEFILIPPIS:  Yes, your Honor.

I think these types of charts are, and as the case law

suggests and all of our experience suggests, routinely admitted

1    in trials with evidence far less voluminous and less

2    complicated and varied than this.  I can think we can imagine

3    if we were in the jury room trying to recall a particular

4    conversation and marry it up with a particular toll record, I

5    mean, it would be an extremely daunting and intimidating task

6    that you can locate these things in the record and that is

7    precisely the purpose of Rule 1006.  And although defenders

8    cite a 1989 case for their proposition, many, many cases in the

9    following decades including as recently as the Blackwood case

10   which we cite have said definitively, the Second Circuit has

11   said summary charts may be comprised and are routinely

12   comprised of documents already in evidence and that is why in

13   case after case in this district summary charts, very similar

14   to this, have been admitted.

15          And, your Honor, again, this is a neutral presentation

16   of evidence.  As your Honor suggests, it is very difficult to

17   wrap one's head around all of the communications and different

18   natures of communications in this case and so, your Honor, by

19   the time we get to summation, absent any summary like this, the

20   evidence will, again, be awash in the jury's head.  It is very

21   difficult to organize.  And so, again, we think that this is

22   squarely within the purpose of Rule 1006.

23          And, Your Honor, as well as Rule 611 which is the

24   demonstrative rule, which I think there could be no question

25   that this would satisfy that rule, but again, I think we are

H1J5gam1

1   squarely in the realm of a summary chart that achieves the very

2   purpose of Rule 1006.

3           THE COURT:  I think a juror was going to be late.  Is

4   she not here yet?

5           THE DEPUTY CLERK:  No, she is not.

6           THE COURT:  She called a half hour ago.

7           MR. HABIB:  Your Honor, if I may?

8           THE COURT:  Sure.

9           MR. HABIB:  Two sentences.  They'll be long so I keep

10  my word.

11          The Blackwood case on which the government relies is a

12  non-precedential summary order.

13          MR. DEFILIPPIS:  It cites Yousef, your Honor.

14          MR. HABIB:  And Yousef, as we point out in our papers,

15  was a three-month long multi-defendant trial on an 18-count

16  indictment and that's why a summary was necessary in that case.

17          A case involving Facebook records is not different

18  because it involves Facebook records.  There is nothing

19  confusing about the manner in which the parties in this case

20  communicated and the government's evidentiary presentation

21  substantially simplified it.  The conversations were read as

22  though they were in real-time.  Indeed, that was the purpose of

23  the government's staging the reading of the conversations over

24  defense objection in the way that it did.

25          I will also just say, finally, that of the summary

H1J5gam1

1    exhibits, the vast majority of the exhibits, I would venture to

2    say more than 90 percent, are all Facebook chats.  So, this

3    really is just a repackaging of Facebook chats the jury has

4    already heard once -- in every case once and in some cases

5    twice, as recently as yesterday.

6              MR. DEFILIPPIS:  I am going to allow the government to

7    use the charts.  The evidence in this case is, strictly

8    speaking, voluminous.  And although I take the defense argument

9    that when one steps back, the arc of the narrative is fairly

10   straightforward and over a period of some months, the method

11   with which it has had to be presented to the jury has been not

12   ordinary and has been, I think, somewhat disjointed by virtue

13   of the various media including apps, etc., that have been used.

14   I think it would be helpful to the jury.  I think that the

15   defendant would not be prejudiced because this is all

16   information that has been presented to the jury.  It is within

17   my discretion and therefore it will be allowed.

18             Anything further?

19             MS. MIRÓN:  Your Honor, I received, late last night,

20   several additional 3500 documents for Mohammed El Goarany.  I

21   frankly haven't had a chance to read them or think about them,

22   so could we take a break after he finishes his direct for 15

23   minutes?

24             THE COURT:  Certainly.

25             MR. DEFILIPPIS:  Absolutely, your Honor.

H1J5gam1

```
 1              THE COURT:  What he said.
 2              MS. MIRÓN:  Thank you, Judge.
 3              THE COURT:  So, we will wait for the jury.
 4              (Recess)
 5              MS. SHROFF:  Your Honor, since the juror is late, may
 6    we have a moment to confer with Mr. El-Gammal in the back?
 7              THE COURT:  Certainly.
 8              MS. SHROFF:  Or maybe I should ask Mr. DeFilippis
 9    instead.
10              MR. DEFILIPPIS:  I'm sorry, your Honor.  I heard my
11    name mentioned but I don't know -- I probably don't want to
12    hear.
13              THE COURT:  Okay.
14              (Recess)
15              THE COURT:  Is Mr. El- Goarany here?
16              MR. DEFILIPPIS:  He is, your Honor.
17              THE COURT:  Why don't you bring him in.
18              (Continued on next page)
19
20
21
22
23
24
25
```

H1J5gam1                              M. El-Goarany - direct

1          (Jury present)

2                THE COURT:  Everyone, please, be seated.

3                Ladies and gentlemen, good morning.  I trust you had a

4    pleasant evening and I want to thank the juror for calling and

5    letting us know.  That was very, very helpful.

6                We will now continue with the direct examination of

7    Mr. El- Goarany.

8                Mr. DeFilippis?

9                MR. DEFILIPPIS:  Thank you, your Honor.

10   MOHAMMED EL-GOARANY, resumed.

11   DIRECT EXAMINATION (Continued)

12   BY MR. DEFILIPPIS:

13   Q.  Mr. El- Goarany, just returning briefly to your trip to

14   Turkey, did you take that trip with the FBI -- at the FBI's

15   request on or your own initiative?

16   A.  On my own.

17   Q.  When you were in Turkey and spoke with your son, Samy

18   El- Goarany what, if anything, did he say to you about how he

19   got from Turkey to Syria?

20   A.  He told me that he met Attiya Aboualala and -- for a couple

21   of hours, and Attiya Aboualala was -- he told him --

22                MS. MIRÓN:  Your Honor, can we have a side bar?

23                THE COURT:  Okay.

24

25

H1J5gam1                          M. El-Goarany – direct

1                    (At side bar)

2                    MS. MIRÓN:  We are just registering a continuing

3      objection to this testimony relating to Attiya's conduct.

4                    THE COURT:  Very well.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2                MR. DEFILIPPIS:  Mr. El- Goarany, I think the mic

3      might be a little close, if you can move it back.

4      BY MR. DEFILIPPIS:

5      Q.  Let me ask you again what, if anything, did your son Samy

6      El- Goarany say to you about how he got from Turkey into Syria.

7      A.  Mr. Attiya Aboualala told him where to go and he told me

8      that he didn't go for the borderline Turkey to Syria using his

9      passport, he had been smuggled.  So, he met somebody to smuggle

10     him there.

11     Q.  Mr. El- Goarany, let's return to the period after the

12     defendant's arrest which we were discussing yesterday when we

13     left off.

14           You said -- you testified yesterday that you spoke to

15     Mr. Aboualala after the defendant's arrest; is that right?

16     A.  He sent me a text message, he called me many times, three

17     or four times.  I didn't reply, I wasn't available, and he send

18     me on the messenger of Facebook the charges from the, I think

19     New York Times or -- and I give it to you.

20     Q.  Mr. El- Goarany, what, if anything, did Mr. Aboualala ask

21     you to do in relation to the defendant's arrest?

22     A.  He was very upset.  He told me that I have to help

23     Mr. El-Gammal because he is a Muslim brother, I cannot hurt

24     him, the Muslim brother, and he asked me to hire a lawyer and

25     do whatever I can to get him out of trouble or out of jail.

H1J5gam1                          M. El-Goarany - direct

1  Q.  And what, if anything, did he ask you to do in relation to

2  the U.S. government or the FBI?

3  A.  He asked me to change my information and to lie to the FBI.

4  Q.  Did you do any of those things?

5  A.  I called the FBI and I met with them and they told me there

6  is no need to do this because even I change my words or I

7  change the things I give it to them before, the information

8  about Mr. El-Gammal.

9  Q.  So, Mr. El- Goarany, did you do -- did you lie to the FBI

10  when he asked you to?

11  A.  No, I didn't.

12  Q.  Did there come a time when you spoke to your son Samy

13  El- Goarany about Mr. El-Gammal's arrest?

14  A.  Yes.  He called me and he told me that Attiya Aboualala

15  called him, and he asked him to call me and ask me also to help

16  Mr. El-Gammal to go out of trouble.

17  Q.  And what, if anything, did your son ask you to do in

18  relation to the U.S. government or the U.S. authorities?

19  A.  He didn't say specifically things but what is meant that to

20  change --

21          MS. MIRÓN:  Objection.

22  A.  He --

23          THE COURT:  Stop, stop, stop.

24          MS. MIRÓN:  Your Honor?

25          THE COURT:  Overruled.

H1J5gam1                          M. El-Goarany - direct

1              MR. DEFILIPPIS:  Your Honor, let me rephrase the

2      question, perhaps.

3      Q.  What, if anything, did you understand your son to be asking

4      to you do in relation to the U.S. government or the FBI?

5              MS. MIRÓN:  Objection.

6              THE COURT:  Overruled.

7      A.  To lie to the FBI.

8      Q.  And did you do that when your son asked you to do it?

9      A.  I did not.

10     Q.  Let me return to Mr. Aboualala.  What, if anything, did he

11     offer or promise to do for you if you were to do the things he

12     wanted you to do?

13     A.  When I did not do any effort for hiring a lawyer or

14     something to help Mr. El-Gammal, Mr. Attiya Aboualala was very

15     upset and he asked me or he offered me a trade that if I

16     succeed to get Mr. El-Gammal out of trouble and go out of jail,

17     he will give me -- he will get my son back from the Daesh to

18     Turkey.

19     Q.  Mr. Aboualala, let me ask you a few more questions --

20     A.  El Goarany.

21     Q.  I'm sorry.

22             Mr. El- Goarany, let me ask you a few more questions

23     about your son before he went to Syria.

24     A.  Okay.

25     Q.  Did your son ever vote in any elections that you recall?

H1J5gam1                         M. El-Goarany - direct

1    A.   Yeah.  He vote with me twice in the election for, of the

2    Egyptian president.

3    Q.   Let me back up and ask you, of what country or countries

4    was your son a citizen?

5    A.   I made an Egyptian passport for them and Egyptian I.D.,

6    and -- because he is born from, with an Egyptian father.  So if

7    I -- any time he can inherit things, easy for me in Egypt

8    there.

9    Q.   So, was this an election in Egypt in which your son voted?

10   A.   Yes.  With he Egyptian I.D. he can vote.  Even though he is

11   an American citizen he is Egyptian citizen.

12   Q.   Where did he vote, physically?

13   A.   In the General Consulate for Egypt in New York.

14   Q.   Did you accompany him or did he go there alone?

15   A.   I went with him and his brother, the three of us.

16   Q.   And approximately when was that?

17   A.   By the end of 2012, the first time, and the second time

18   was -- yeah, in 2012, two times.

19   Q.   And why was it -- why were there two times?

20   A.   The first time was more candidates, five candidates, and

21   there was nobody get enough votes to succeed or to win the

22   election.  So, by the Egyptian rules they repeated election

23   again with the highest two people that get votes.

24   Q.   And who or which party, if you know, did he vote for?

25   A.   The first time we voted for a candidate named Abu Al Fatoh,

H1J5gam1                         M. El-Goarany – direct

1    he was a doctor.

2            (Continued on next page)

H1J3GAM2                          M. El-Goarany - direct

1  Q.  Was that candidate associated with a particular group or

2  party?

3  A.  Unfortunately, no.  He become the -- he did not win the

4  election.

5  Q.  My question was, was that candidate associated with a

6  particular group or political party?  Was he a member of a

7  particular --

8  A.  He originally one of the headquarter of the Muslim

9  Brotherhood, but he was more liberal.  And he defected from

10 them, but he was the Muslim guy, and we know that he used to be

11 Muslim Brotherhood.

12 Q.  In the second election during that year, for whom did Samy

13 vote, if you know?

14 A.  He vote with me for the one who won the election,

15 Dr. Mohammed Morsi.

16 Q.  Mr. El-Goarany, after you returned to the United States

17 from Turkey, did you keep in communication with your son Samy

18 El-Goarany?

19 A.  Yes, he, since he stopped to call me in Turkey, he keep

20 calling me on a weekly basis, one time Friday or more than one

21 time sometimes, more than one time a week.

22 Q.  Did there come a time later during that year when you

23 stopped hearing from him?

24 A.  Yes, I stopped hearing from him twice.  One of them was on

25 July for about 21 days, and after that, I knew that he was

H1J3GAM2                          M. El-Goarany - direct

1    deployed by Daesh after he finished his military training.

2    That was his first deployment.

3    Q.  You said he was deployed by Daesh?

4    A.  Yes.

5    Q.  Did there come another time after you stopped hearing from

6    him?

7    A.  Yes, after he got married in October.  At the end of

8    October also he told me that he is going for another deployment

9    will be at least a week or 10 days.  But it took more than a

10   time for that, and he, by the end of his deployment, he had

11   been killed there in the field.

12              MS. MIRON:  Objection.

13              THE COURT:  Overruled.

14   Q.  Mr. El-Goarany, how did you learn that your son had been

15   killed in the field?

16              MS. MIRON:  Objection, your Honor.

17              THE COURT:  Overruled.

18   A.  Abu Adam and Abu Malik, they told me that.

19   Q.  Did they tell you directly or did they tell someone else

20   who told you?

21   A.  No.  They -- Abu Adam sent the message of his passing, the

22   one who is Samy's handwriting to his brother texting and his

23   brother give it to me.  And the other one, Abu Malik, he is

24   Egyptian guy and he spoke to me in Arabic on the phone and he

25   also texted me.

H1J3GAM2                          M. El-Goarany - direct

1   Q.  You referenced now Abu Adam and Abu Malik.  Did you

2   understand them to be members of ISIS?

3   A.  Yeah.  All of them are mujahideen ISIS.  They call

4   themselves mujahideen.

5   Q.  You referenced a letter.  Was as that a letter from your

6   son Samy?

7   A.  Yes.

8   Q.  Did you read that letter?

9   A.  Yes.

10  Q.  Is that when you first learned that your son Samy had died?

11  A.  Yeah.  It was a very bad moment, yeah.

12          MR. DeFILIPPIS:  Thank you, your Honor.  No further

13  questions.

14          THE COURT:  Cross-examination?

15          MS. MIRON:  Your Honor.

16          THE COURT:  Ladies and gentlemen, we're going to take

17  a break right now for about 10 minutes.  So please do not

18  discuss the case and don't do any research about the case and

19  don't read any media about the case.

20          (Jury excused)

21          (Continued on next page)

22

23

24

25

H1J3GAM2                          M. El-Goarany – direct

1              THE COURT:  I understand there is a delegation here

2        from China.  Do you want to come forward?

3              (Recess)

4              MR. HABIB:  A brief issue.  Can we have a 30 second ex

5        parte?

6              THE COURT:  Sure.  Let's get Mr. El-Goarany.

7              (Pages 1116-1117 sealed)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J3GAM2                          M. El-Goarany

 1                (In open court; jury present)

 2                THE COURT:  Ms. Miron.

 3                MS. MIRON:  Thank you.

 4    CROSS-EXAMINATION

 5    BY MS. MIRON:

 6    Q.  Mr. El-Goarany, you have two sons with Teresa El-Goarany?

 7    A.  I don't hear you well.  Can you repeat the question?

 8    Q.  Yes.  You have two sons with Teresa El-Goarany.

 9    A.  Yes.

10    Q.  One of those sons joined ISIS.

11    A.  Yes.

12    Q.  The other son helped him.

13    A.  I have no idea.

14    Q.  And you lied about the whole situation.

15    A.  I never lied.

16    Q.  You never lied.  Is that what you just said, sir?

17    A.  I never lied about this situation.  I didn't know about

18    that.

19    Q.  Okay.  Well, you just said you never lied.  And that -- let

20    me finish my question.

21    A.  Okay.

22    Q.  That means never, ever lied.

23    A.  I did, when I testified yesterday that I lied once to the

24    FBI when I came from Egypt that my son -- I know my son was

25    Daesh.

H1J3GAM2                          M. El-Goarany

1   Q.  So you have lied, is that your testimony?

2   A.  Once I did.

3   Q.  A single time.  You said you lied one time to the FBI.

4   A.  Yes, in Kennedy Airport in May 2015.

5   Q.  Okay.  Sir, you did not tell the FBI that you were planning

6   to travel to Turkey, right?

7   A.  I did not tell them about my trip.

8   Q.  So --

9   A.  But --

10  Q.  You were in contact --

11  A.  I didn't finish my answer.  But --

12  Q.  I'm sure Mr. DeFilippis will allow to you do that, sir.

13  A.  You asked me the question.

14          MR. DeFILIPPIS:  Objection.  If Ms. Miron can let him

15  finish his answers.

16          THE COURT:  Mr. El-Goarany, listen very carefully to

17  the question and answer the question.  Okay?

18          THE WITNESS:  Yes.

19  A.  Can you repeat again the question?

20  Q.  You did not tell the FBI you were planning to travel to

21  Turkey, correct?

22  A.  No.

23  Q.  Okay.  You were in contact with them since February of

24  2015, right?

25  A.  Yes.

H1J3GAM2                          M. El-Goarany

1    Q.  Indeed, you first met with them February 2nd of 2015,

2    right?

3    A.  Yes.

4    Q.  At a real estate office, correct?

5    A.  It is not my office.

6    Q.  I did not ask if it's your office.  Was it a real estate

7    office?

8    A.  Yes.

9    Q.  Your sister-in-law's office, correct?

10   A.  Yes.

11   Q.  Okay.  Did you also meet with the FBI on February 3?

12   A.  Yes.

13   Q.  And February 5 of 2015?

14   A.  Yes.

15   Q.  And February 10 of 2015?

16   A.  We met many times, yes.

17   Q.  Did you meet with them on the 10th of February 2015?

18   A.  I don't remember the date, but maybe yes.

19   Q.  Did you have the FBI's cell phone numbers?

20   A.  Yes.

21   Q.  Were you in communication with them electronically?

22   A.  What does it mean?

23   Q.  It means when you receive some communication from your son,

24   you could forward it, right?

25   A.  At that time I did not receive any communication from my

H1J3GAM2                          M. El-Goarany

1    son.

2    Q.  So, let me go over that with you.

3    A.  Okay.

4    Q.  You testified yesterday under oath that you had not heard

5    from your son since his departure in January.  Right?

6    A.  Yes.

7    Q.  That when you went to Turkey, you, neither you nor your

8    family had heard from your son.

9    A.  Yes.

10   Q.  And that was a lie.

11   A.  No.

12   Q.  All right.  Let's talk about that.  Your son had not called

13   you since his departure, right?

14   A.  Yes.

15   Q.  But he had called your wife.  Correct?

16   A.  I don't know.

17   Q.  So it is your testimony today that you were not aware

18   Teresa El-Goarany received a phone call on February 9 of 2015

19   from your son?

20   A.  On my -- on the best of my knowledge, I don't know.

21   Q.  Your wife received that phone call at 8 a.m. on February 9,

22   correct?

23   A.  No.

24   Q.  She told you about it, she told you about it that same day,

25   correct?

H1J3GAM2                          M. El-Goarany

1    A.  No.

2    Q.  She never told you?

3    A.  She never told me.

4    Q.  At 1 p.m. on February 9 that she had received that phone

5    call?

6    A.  No.

7    Q.  Were you aware that she informed Le Nguyen, the FBI agent,

8    of that phone call on that same day?

9    A.  I have no idea.

10   Q.  So you weren't involved in those conversations.

11   A.  I don't remember, and to the best of my knowledge she never

12   get any calls from my son Samy until I went to Turkey on May 4.

13   Q.  So it is your testimony today that FBI Agent Le Nguyen did

14   not tell you that you were supposed to make the agents aware of

15   these types of communications?

16   A.  Yes.

17            MR. DeFILIPPIS:  Objection, your Honor.

18            THE COURT:  Overruled.

19   Q.  Specifically, he did not tell you, according to you, that

20   you should contact investigators immediately if any future

21   contact occurs?

22   A.  Repeat the question again, slowly.

23   Q.  Sure.  Your wife received a phone call from Samy El-Goarany

24   on February 9 of 2015.

25   A.  No.

H1J3GAM2                         M. El-Goarany

1    Q.   Okay.   And you say that you were not aware of that phone

2    call, right?

3    A.   Yes.

4    Q.   You also say today that Agent Nguyen did not tell you that

5    you must inform the investigators immediately if any future

6    contact occurs.

7    A.   He ask me to tell them everything I plan to do, but that

8    trip to Turkey I did not tell them because I asked them many

9    times let's goes to Turkey together, and they did not do it.

10   So I did it on my own.

11   Q.   I'm not asking you about Turkey right now, sir.

12   A.   You said that you asked the trip to Turkey I did not tell

13   the FBI.

14   Q.   I'm not asking you about that.  I'm asking about a

15   conversation you had with FBI agent Le.  You know his first

16   name Le?

17   A.   Yes.  Le Nguyen.

18   Q.   You were in communication with him throughout the month of

19   February 2015, right?

20   A.   Yes.

21   Q.   And indeed, he told you after your wife got that phone

22   call, to let them know again when Samy calls?

23   A.   No.

24   Q.   All right.  Your son received a Facebook message from his

25   brother in February, did he not?

H1J3GAM2                              M. El-Goarany

1   A.  I didn't see this messages.

2   Q.  All right.  So, I want to direct your attention to

3   February 16 of 2015.  It's your testimony today that Tarek

4   El-Goarany never showed you the Facebook message he received

5   from Samy on that day?

6   A.  Yes.

7           MS. MIRON:  Let's please publish Government Exhibit

8   110G, page six.  Highlight the message from February 16

9   regarding PQ chat and the company.

10  Q.  It is your testimony as you sit here today that Tarek

11  El-Goarany never showed you this Facebook message from Samy in

12  February 2015?

13  A.  Can you increase the letters?

14  Q.  Just the main paragraph starting "I'm so sorry."

15  A.  I don't read from far.

16  Q.  If you need it in paper, you let us know.

17  A.  Yeah, I'm sorry.

18          (Pause)

19  A.  Okay.

20  Q.  Is that the first time you're reading this message?

21  A.  The first time I see that.

22  Q.  Ever?

23  A.  Ever.

24  Q.  Okay.  It's your testimony today that on February 16 of

25  2015, Tarek never showed you that message?

H1J3GAM2                          M. El-Goarany

1   A.  Yes.

2   Q.  And that you never asked him to forward it to Agent Le

3   Nguyen?

4   A.  No.

5   Q.  Okay.  Were you aware it was forwarded to Le Nguyen?

6   A.  I didn't see the message and we didn't talk about it and I

7   didn't tell anything about that to Le.  I used to give

8   everything to Le from my phone or from my site.

9   Q.  It is your testimony that Tarek El-Goarany didn't show you

10  this message and he didn't show Teresa El-Goarany this message

11  on February 16?

12  A.  He didn't show it to me for sure.

13  Q.  You did not ask him to forward it?

14  A.  I didn't know about it, and he didn't show it to me.

15  Q.  And it's your testimony that you weren't asked about this

16  message on February 16?

17  A.  I didn't ask, because I didn't know.  Nobody told me about

18  it.

19  Q.  Did you meet with the FBI?

20  A.  I met with the FBI many times since we report to them or

21  since the family called the authority.  I met with them many

22  times.

23  Q.  It's your testimony you didn't know in February that Samy

24  was talking about his phone and laptop being taken away?

25  A.  Yes, I didn't know.

H1J3GAM2                          M. El-Goarany

1   Q.  You didn't know in February that he said he was going

2   through religious training?

3   A.  I didn't see this message, I don't know where my son, I

4   don't know what he is doing until I talk to him on May 4 or

5   May 5 I believe.

6   Q.  Okay.  So it's your testimony, let me go back to this

7   message for a minute.  You've been married to Teresa El-Goarany

8   for how many years?

9   A.  Since 1990.

10  Q.  Fair to say you share the same room in your home?

11  A.  Yes.

12  Q.  In February of 2015, specifically February 16 of 2015, were

13  you with Tarek El-Goarany in your home?

14  A.  What date again?

15  Q.  February 16 of 2015.

16  A.  I was home with Teresa.

17  Q.  And Tarek was there?

18  A.  Tarek probably was in his studio, because he has a studio

19  in the college.  He doesn't live with me in the whole time.  He

20  comes only on the weekend and vacations.

21  Q.  But when he's home, he speaks with both you and Teresa,

22  right?

23  A.  He speaks to me and Teresa, yes, he speaks but --

24  Q.  Let me ask you a more general question.  Before your travel

25  to Turkey --

H1J3GAM2                           M. El-Goarany

1    A.   Yes.

2    Q.   -- you had talked to Tarek El-Goarany about what he knew

3    Samy was up to, right?

4    A.   Repeat the question again.  I spoke to Tarek about what?

5    Q.   About Samy.

6    A.   I spoke about Samy a lot since Samy left the house.  We

7    missed our son.  We lost our son.

8    Q.   You talked with him about what Samy was doing?

9    A.   Nobody knows what Samy was doing at that moment from my

10   point of view or my knowledge.  Best of my knowledge nobody

11   knows, in my knowledge nobody knows.  That's why we call, we

12   spoke to the FBI and they were trying to help us.  That's the

13   only thing I can tell you.

14   Q.   Samy El-Goarany e-mailed your wife?

15   A.   Samy El-Goarany?

16   Q.   E-mailed your wife, his mother, Teresa, January 30, 2015.

17   Right?

18   A.   I believe so.  When he was in Turkey.

19   Q.   So you admit he contacted your family via e-mail before he

20   got to Turkey?

21   A.   He did not e-mail to me anything.

22   Q.   That's not my question, sir.

23   A.   If he e-mailed my wife, he e-mailed my wife.

24   Q.   Is it your testimony today that the first time you

25   personally heard from Samy El-Goarany after his departure in

H1J3GAM2                          M. El-Goarany

1   January was when he called you?

2   A.  When I was in the hotel in Turkey, yes.

3   Q.  Specifically when he telephone called you.  Is that your

4   testimony?

5   A.  Yes.

6   Q.  You hadn't heard from him via Facebook at that point?

7   A.  No.

8   Q.  Not at all?

9   A.  Not at all.

10          MS. MIRON:  I would ask that Defense Exhibit 111-DD be

11  admitted into evidence.

12          THE COURT:  Any objection?

13          MR. DeFILIPPIS:  No, your Honor.

14          THE COURT:  That exhibit will be admitted.

15          MS. MIRON:  Thank you.  And published to the jury.

16          THE COURT:  It may.

17          (Defendant's Exhibit 111-DD received in evidence)

18          MS. MIRON:  Please just highlight the first two

19  entries.

20  Q.  This is a Facebook message that you sent to Samy April 3 of

21  2015, right?

22  A.  Yeah, this, yes.

23  Q.  Why don't you read it for the jury.

24  A.  Say again?

25  Q.  Could you please read it out loud for the jury.

H1J3GAM2                          M. El-Goarany

1    A.   The recipient Samy Mohammed and Mohammed El-Goarany I copy

2    myself.  And author is Mohammed El-Goarany and in May 4, '13.

3    Q.   That's April 3, 2015.

4    A.   May -- I mean April 3, 2015.

5    Q.   Just read what you wrote.

6    A.   Okay.  "ASAK" -- Asalaamu alaikum -- "Samy we all miss you

7    a lot.  Hope you are okay, safe and in good health.  I'm still

8    very anxious and waiting to receive your reply and talk to you.

9    May Allah protect you inshallah, salaam, dad."

10   Q.   Okay.  And you e-mailed -- you Facebook messaged him again

11   April 22, 2015, right?  I'll read that one.

12   A.   April 22 with the same recipients and the body of the

13   language message is "What's up Samy, my dear son.  It is

14   April 22 already and we still didn't hear from you.  Hope

15   everything is okay with you.  Please let us hear from you.  We

16   miss you and pray for your safety inshallah.  Dad."

17   Q.   He replied to that Facebook message, didn't he?

18   A.   I don't recall.  I didn't see it.

19   Q.   Let's look at the record, sir, May 5, the next entry.

20   That's a reply from Samy via Facebook, right?

21   A.   You say May 5.  I was in Turkey May 5 and he spoke to me

22   before that.  And he has his computer back and replies.

23        This makes sense.  All the message before that is not

24   message for Samy.  I was sending message in the air trying to

25   find him.  Trying to get Samy to call me.  I miss my son, I

H1J3GAM2                         M. El-Goarany

1     want to hug him.

2              I don't know what the question here.  There is no link

3     between this and this.  It doesn't mean he received my message,

4     he didn't return my messages in April.  Now he call me in

5     April -- in May when I was in the hotel, and he has his phone

6     because he called me from his phone number.  And his phone has

7     Internet and he go to the Internet cafe and he started to

8     communicate back in Facebook.  And that's what I told you.

9     Until May 4 I didn't hear from Samy, I didn't have

10    communication, I don't know where is him.  I didn't hear from

11    him again.

12             THE COURT:  Mr. El-Goarany, the question to you was

13    that's a reply from Samy via Facebook, right?

14             THE WITNESS:  Yes, but --

15             THE COURT:  Yes or no.  Is that a reply from Samy via

16    Facebook?

17             THE WITNESS:  Yes.

18             THE COURT:  Please, sir, listen very carefully to the

19    question.  If the question asks you for a yes or no answer,

20    answer yes or no.  Okay?

21             THE WITNESS:  Okay.

22    Q.  Let's continue.  I'll read this one.  The last line.  I

23    will read it, sir.  It's okay.  You don't need to read it.

24    A.  No, but --

25    Q.  "I have more freedom now to speak so inshallah let me know

H1J3GAM2                          M. El-Goarany

1    what time in the day you're available to speak on the phone and

2    I will contact you via Viber."

3              Right, that's what he wrote?

4    A.  I don't read it but what you say.  I can't see it to

5    confirm.  You show it to me I confirm.

6    Q.  Let's go to the message May 5 at 8:56:15.  It says "ASAK,

7    my dear son, Samy.  Please call me now.  I'll love to have hear

8    your voice.  Thanks.  Dad."

9              Right?

10   A.  Yes.

11   Q.  So he was replying to your messages on Facebook.  Right?

12   Before you spoke with him on the phone.

13   A.  Yes.

14   Q.  Okay.  It's not that Attiya somehow got in contact with him

15   in some secret fashion.  Right?

16   A.  No.

17   Q.  The reality is he's reading your messages and replying on

18   Facebook.

19   A.  If he --

20   Q.  Right?  Yes or no?

21   A.  Yes.

22   Q.  Okay.  Before Samy El-Goarany took his flight on

23   January 27, he had asked you for his Social Security card and

24   his passport, right?

25   A.  Repeat the question again?

H1J3GAM2                         M. El-Goarany

1    Q.   Sure.   Before your son took the flight in January of 2015,

2    he had asked you for his Social Security card and his passport.

3    Correct?

4    A.   Yes.

5    Q.   And he gave you back his Social Security card, right?

6    A.   Yes.

7    Q.   But he did not give you back his passport, is that correct?

8    A.   Yes.

9    Q.   He also had a cell phone that you had given to him.

10   A.   Yes.

11   Q.   And you had told him that it was unlocked, right?

12   A.   He knows that.

13   Q.   And that he could easily replace the SIM card if he's

14   traveling internationally.   Right?

15   A.   Yes.

16   Q.   You paid for his phone bill?

17   A.   Say again?

18   Q.   Did you pay for his phone bill?

19   A.   Yeah.

20   Q.   Or did your company pay for his phone bill?

21   A.   The account name Goarany Group that was the one paying,

22   company bank.

23   Q.   Are you deducting that in your taxes?

24   A.   Yes.

25   Q.   This is the same phone that he took to Turkey and Syria,

H1J3GAM2                          M. El-Goarany

1   right?

2   A.   Yes.

3   Q.   And you were in control of his bank accounts, right?

4   A.   He's one of the accounts, yes.

5   Q.   You would put money in it regularly, his Chase checking?

6   A.   The account was AT&T and they took the bill automatically

7   from our bank account, yeah.

8   Q.   I am talking about his bank accounts.

9   A.   What's that?

10  Q.   Bank.   Banking.

11  A.   Bank account online.   I mean auto payment.

12  Q.   I'm not talking about his phone bill anymore.   I'm asking

13  you about his bank accounts.

14  A.   Samy bank account?

15  Q.   Yes.

16  A.   Yes.

17  Q.   You were in control of those, right?

18  A.   Yes, yes.

19  Q.   You had access to the information in his accounts, right?

20  A.   Yes.

21  Q.   You gave him monthly deposits, correct?

22  A.   No.

23  Q.   You didn't regularly deposit money in his account?

24  A.   No.

25  Q.   Did you deposit $100 while he was traveling in his account?

H1J3GAM2                         M. El-Goarany

1   A.  Once before maybe, but not on a regular basis.

2   Q.  You also paid for some of the tuition for his college,

3   correct?

4   A.  Yes, and we got refund back from the city.

5   Q.  You got a refund?

6   A.  Yes.

7   Q.  When?

8   A.  We get refund.  Usually his mother apply for tuition

9   because we don't have enough income to cover his tuition and

10  his brother tuition.  And they give me finance, New York City

11  finance.  He is at CUNY university.  City University.  Not a

12  private university.

13  Q.  Sir, how much income do you make per year?

14  A.  Myself?

15  Q.  And your wife combined.

16  A.  Somewhere between 20 to 30.

17  Q.  20 to 30,000?

18  A.  Yes.

19  Q.  And you own a home?

20  A.  Yes.

21  Q.  Your home is worth a lot of money in Middletown, right?

22  A.  Yeah, but we don't pay mortgage since 2009.

23  Q.  Okay.  Before his travel to Turkey, Samy had asked you

24  about some Arabic phrases, right?

25  A.  Yes, he always does.

H1J3GAM2                          M. El-Goarany

1  Q.  I'm asking you specifically about the phrases "relax."  He
2  asked you how you say that in Arabic, "relax."
3  A.  Yes.
4  Q.  He asked you how you say "take it easy," right?
5  A.  Yes.
6  Q.  He asked you how you say "I'm not sad"?
7  A.  Yes.
8  Q.  All right.
9          MS. MIRON:  Just if you could just publish the Howard
10 Johnson exhibit.  Government Exhibit 1010.  Just highlight the
11 bottom half.
12 A.  Yes, I see that.
13 Q.  Those are the words that you translated for him, right?
14 A.  Yes.
15 Q.  You've seen this paper before today?
16 A.  Yes.
17 Q.  Your wife showed it to you?
18 A.  Yes.
19 Q.  Let's look at the top.  There is a phone number for Attiya,
20 correct?
21 A.  Yeah.  Yes.
22 Q.  So, when you testified yesterday that you had no idea how
23 to contact Attiya because his Facebook page didn't have contact
24 information, you had the phone number?
25 A.  Yes.

H1J3GAM2                        M. El-Goarany

1   Q.  Did you have his phone number?

2   A.  I don't -- I didn't remember that the phone is there, but I

3   knew how to get Attiya.  I did not remember that phone -- that

4   note has the phone number.  I didn't think -- I didn't take it

5   with me to Turkey.  But even has the phone number, he wouldn't

6   answer his phone.

7   Q.  Wait, your testimony is you tried to call him?

8   A.  I was talking to Attiya in Turkey --

9   Q.  Sir, before leaving for Turkey, did you try to call that

10  number, yes or no?

11  A.  No.

12  Q.  Okay.  Let's show the accompanying exhibit, 1011 or 1009.

13  Did you see this receipt before traveling to Turkey?

14  A.  Yes.

15  Q.  Indeed --

16  A.  Yes.

17  Q.  Indeed, that's how you knew where to go, right?

18  A.  Yes.

19  Q.  You knew to go to that particular hotel because your wife

20  had showed you this receipt.

21  A.  Yeah.

22  Q.  When did she show it to you?

23  A.  After Samy left, when she found it in his room.

24  Q.  Okay.  Samy left on January 27 in the evening, right?

25  A.  I don't know the date, but I think it was a Monday or

H1J3GAM2                          M. El-Goarany

1    Sunday night.

2    Q.  Well, let me ask you this.  Within 24 hours, you were

3    logging on to his Facebook account, right?

4    A.  Within 48 hours or maybe 72 hours.

5    Q.  Sir, it's your testimony that the first time you logged

6    into his account was at least 48 hours after he had departed on

7    the plane?

8    A.  I believe it was Tuesday, one day after we -- he did not

9    return all my calls and text messaging.  I got in touch with

10   his older brother, and he give me the access to his Facebook.

11   And I went to -- I logged in, in his account.

12   Q.  Okay.  By the way, you and Samy -- were you Facebook

13   friends?

14   A.  Yes.

15   Q.  But on occasion you were not, correct?

16   A.  Say again?

17   Q.  On occasion he would remove his friendship from you.

18   A.  Sometimes.

19   Q.  Indeed, shortly before he left, you were not Facebook

20   friends, right?

21   A.  No, we were.  Before his birthday in October 2014, we

22   become again friends, and I think a month or two before,

23   September or August 2014.

24   Q.  Part of the reason he would remove you is because he

25   disagreed with your politics, right?

H1J3GAM2                         M. El-Goarany

1    A.  We had different political visions with the situation in

2    Egypt.

3    Q.  Very different, correct?

4    A.  It was far distance on that time.

5    Q.  Okay.  Fair to say you were a supporter -- you are a

6    supporter of the Egyptian military, right?

7    A.  And the Egyptian people.

8    Q.  Let me just ask you about military.

9    A.  Yes, I'm a military retired person.

10   Q.  So you are a former military from Egypt?

11   A.  Yes.

12   Q.  Correct?  The same military involved in the Rabaa Square

13   massacre?

14   A.  And getting back the Egyptian people rights back.  Because

15   Rabaa Square was not the right thing for Egypt.

16   Q.  I'm not asking you why.  I'm just asking you if it is the

17   same military.

18   A.  You're taking me to certain direction politically, you're

19   talking to me politically now, not about Samy.  So I'm giving

20   you my views.  I have the right to talk.

21          THE COURT:  Mr. El-Goarany, you have the right to

22   answer the questions that are posed to you, okay.  So please

23   listen very carefully to the questions and answer the question

24   posed.

25          THE WITNESS:  Okay, sir.

H1J3GAM2                         M. El-Goarany

1   Q.  It is the same military, right, involved in Rabaa Square,

2   correct?

3   A.  Yes.

4   Q.  I would like to show you the video from when you're meeting

5   with Attiya in Turkey.

6   A.  Yes.

7   Q.  Government Exhibit 145.  And specifically, when you

8   testified yesterday that you put up your hand?

9   A.  Yes.

10  Q.  Is that not a pro Sisi gesture?

11  A.  It is nothing do with Sisi.  It is just to say to you I'm

12  not a Muslim Brotherhood member, and I'm not Muslim Brotherhood

13  supporter.

14  Q.  Okay.  Let's just play it.

15          (Video recording playing)

16  Q.  So the reason you did that is to indicate that you're not

17  with this, right?

18  A.  Absolutely yes.

19  Q.  It has nothing do with warding off evil eye?

20  A.  Both.

21  Q.  Okay.  And what about this, sir?

22  A.  Celebration, Turkish way celebration.

23  Q.  What type of celebration?

24  A.  What's that?

25  Q.  What type of celebration?

H1J3GAM2                    M. El-Goarany

1    A.  To celebrate the person in the Middle East we always say

2    that.  That's -- the like maybe big celebration, just to trying

3    to be friendly for the people.

4    Q.  Okay.  But it was tense at that dinner, correct?

5    A.  Tense?

6    Q.  Tense.

7    A.  What does it mean by "tense"?

8    Q.  It means Attiya is Muslim Brotherhood, right?

9    A.  Yes.

10   Q.  You are not.

11   A.  I am not.

12   Q.  Definitely absolutely not?

13   A.  Yes.

14   Q.  Okay.  You wanted to make that clear to whoever was taking

15   the video, right?

16   A.  Yes.

17   Q.  Had you spoken with Samy about ISIS in the summer of 2014?

18   A.  Yes.

19   Q.  What was your view of ISIS in the summer of 2014?

20   A.  I didn't like what they do.  And Samy knew in that time he

21   didn't like what they do.  Or that what he told me, but

22   probably wasn't the real thing in his mind.

23   Q.  So, it's your testimony that Samy knew you didn't like what

24   ISIS did.

25   A.  Yes, I think until he died he know I don't like ISIS.

H1J3GAM2                          M. El-Goarany

1            THE WITNESS:  Can I have some water?

2            THE COURT:  Sure.

3            MS. MIRON:  For the record we are going to seek to

4    introduce Defense Exhibit 113-PP.

5            THE COURT:  Any objection?

6            MR. DeFILIPPIS:  Objection, your Honor.

7            THE COURT:  Sidebar.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J3GAM2                          M. El-Goarany

1           (At the sidebar)

2           THE COURT:  Okay.

3           MS. MIRON:  This is just a one-page exchange between

4    Samy Mohammed and his friend Khalafalla Osman July of 2014.

5    And it is a statement that Samy Mohammed says he knows my dad

6    isn't much against them either.  That's ISIS.

7           So I'm seeking to admit that to show the state of mind

8    of Samy Mohammed, which this witness contradicted on the stand.

9           MR. DeFILIPPIS:  Your Honor, I think it's clear this

10   is being offered for the truth of this statement.  That

11   Mr. El-Goarany in the defense view -- sorry -- isn't against

12   ISIS.  It's classic hearsay.  There is no applicable exception.

13   They can put this in front of him and ask if it refreshes his

14   recollection about his views on ISIS.

15          But what this line of question is obviously getting to

16   is whether Mr. El-Goarany had any sympathetic views to ISIS.

17   It's offered for its truth and it is classic indisputable

18   hearsay.

19          MS. MIRON:  It is either state of mind exception or

20   effect on the listener about Samy's impression of his dad's

21   views on ISIS.

22          THE COURT:  But it is Samy that's speaking, so it is

23   not going to his state of mind.  And I don't see another

24   exception.  I'm not going to allow it.

25          MS. MIRON:  Present sense impression that his dad is

1    not against it either.

2              MR. DeFILIPPIS:  If his dad were in the room talking

3    about ISIS and he said this, that would be contemporaneous.

4    But it is not a present sense impression.

5              THE COURT:  The objection is sustained.  Can I just

6    speak with the defense for a moment.

7              (Continued on next page)

8              (Page 1144 sealed)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              MS. MIRON:  May I proceed?

 3              THE COURT:  You may.

 4    BY MS. MIRON:

 5    Q.  Did you debate your political view with Samy in the summer

 6    of 2014?

 7    A.  Say again?

 8    Q.  Did you have debates with Samy El-Goarany in the summer of

 9    2014 about your competing political views?

10    A.  We always have debates.

11    Q.  You had debates in person, right?

12    A.  Father and son.

13    Q.  And sometimes he got angry at you, right?

14    A.  Yes.

15    Q.  And sometimes he defriended you from Facebook, correct?

16    A.  You mean -- say again?  Yes.

17    Q.  He removed his friendship?

18    A.  Yes, he did.

19    Q.  Because he was angry at your views, correct?

20    A.  Yes.

21    Q.  Okay.  Were you ever on PQ chat?

22    A.  No.

23    Q.  Were you ever showed how to use PQ chat?

24    A.  I tried to but I couldn't succeed.  So I didn't continue.

25    Q.  You were showed by Tarek how to use PQ chat, right?

H1J3GAM2                         M. El-Goarany - cross

1    A.  He told me how to do it, yes.

2    Q.  And he told you how to set up an account?

3    A.  Yes.

4    Q.  And you got a user name, right?

5    A.  It didn't work.

6    Q.  You got a name, you had a name on your PQ chat account?

7    A.  Yes.

8    Q.  And that name was Steve Sabaccia, correct?

9    A.  E?

10   Q.  Steve Sabaccia.

11   A.  No.

12   Q.  What was your name?

13   A.  My name was M. Goarany everywhere, my user name is M.

14   Goarany everywhere.  I don't change it.

15   Q.  When you were communicating with Samy El-Goarany via

16   Facebook from Turkey, you spoke to him about communicating on

17   PQ chat, right?

18   A.  No.

19   Q.  He never wrote to you that Tarek can give you my PQ info?

20   A.  I told him that I tried to install PQ chat as Tarek told

21   me, he tried to show me, but it didn't work.

22   Q.  The truth is you told him, quote, "I'll be sure to get your

23   PQ info from Tarek."

24   A.  Yes.  But I never succeed, as I said.

25   Q.  How many times in all did you meet with the FBI and the

H1J3GAM2                         M. El-Goarany – cross

1    prosecutors, approximately?

2    A.   The prosecutors I met with them since August.  But the FBI

3    I always meet them since February.

4    Q.   So, fair to say about 20 times?

5    A.   No.  Less, much less.  You talk about the prosecutor or the

6    FBI?

7    Q.   Let's go with the FBI first.

8    A.   Yeah, maybe 20 times FBI.  Not all them the same person,

9    but sometimes Le Nguyen is, sometimes his assistant.  But most

10   of the time Le and then he would be replaced by another guy and

11   then another guy.  Now nobody's here from them.

12   Q.   Before May of 2015, you had met with them several times,

13   right?

14   A.   Many times.

15   Q.   You were in contact with them from your cell phone,

16   correct?

17   A.   Yes.

18   Q.   You never told them you planned to go to Turkey, right?

19   A.   I asked them to take me with them to Turkey, but they did

20   not make it, and they told me wait, we'll let you know.  Once

21   they didn't do it, I took the initiative myself because it's my

22   son.  It is not their son.  I asked them to bring my son back.

23   I want to see my son, I want to hug him, I miss him.  Nobody

24   did anything for me.  So, what do you wanted me to do?  I went

25   myself.  I didn't tell them I'm leaving.

H1J3GAM2                          M. El-Goarany - cross

1   Q.  You went by yourself without telling them because you did

2   not want them to arrest Samy, right?

3   A.  No.

4   Q.  It's clear you didn't want them to arrest Samy, right?

5   A.  I don't want them to arrest Samy.  If I succeed to get Samy

6   and comes back with me, I don't want him to go to jail, I want

7   him to be with us.

8   Q.  Of course you don't want your son to go to jail.  Nobody is

9   asking you that question.

10  A.  Yes.

11  Q.  But that's why you didn't tell them, right?

12  A.  No.

13  Q.  You had a plan for your son to work in Egypt in real

14  estate, right?

15  A.  Any place.  I told him he choose the place, just come leave

16  Daesh to go to Egypt, to go to Dubai, to go anywhere.  I just

17  want my son to be out of trouble.

18  Q.  You wanted your son to go anywhere except for jail, right?

19  A.  Yes.

20  Q.  You've been convicted of a felony before.

21  A.  Once.

22  Q.  That is from stealing, right?

23  A.  I pled guilty for one count of grand larceny.  Yes.

24  Q.  You were a member of the board of a co-op, right?

25  A.  Yes.

H1J5gam3                          M. El-Gammal - cross

1   BY MS. MIRÓN:

2   Q.   Were you living in that co-op?

3   A.   In the beginning.  From '92  to '96 I lived in the co-op

4   but I moved to Long Island.  When they charged me or they -- I

5   got this conviction, I wasn't living in the co-op, I was living

6   in Long Island.

7   Q.   When you were stealing were you living in the co-op?

8   A.   No.

9   Q.   You knew those people as your neighbors, right?

10  A.   Say again?

11  Q.   You knew some of them those people as your neighbors,

12  right?

13  A.   I know all of them.  I was a board member for eight years.

14  Q.   And they trusted you as a board member?

15  A.   Yes.

16  Q.   And you personally profited from those kickbacks, correct?

17  A.   Not from the people's money, from the management money.

18  Q.   What were these contracts about?

19  A.   What is that?  Say again?

20  Q.   What were you profiting from?  How were you getting the

21  money?  Explain it to us.

22  A.   The management company, they always greedy, they like to

23  get more jobs, more accounts, more ability to make money and

24  they want to be referred for another building.  When it come

25  from a board member to the strong recommendation and other

H1J5gam3                          M. El-Gammal - cross

1    board member in the other building, they would consider hiring

2    them as the management company and they make big money.  So,

3    they were compensating me for that money.

4    Q.  And the tenants were relying on you to make sure there was

5    no money wasted by that management company, right?

6    A.  Yes.

7    Q.  And you didn't tell the tenants that you were personally

8    taking over $40,000 for yourself?

9    A.  Say again?

10   Q.  You never told the tenants, by the way, I'm making $40,000

11   for my recommendations?

12   A.  36, not 40.  If you want me to correct you.

13   Q.  You said it is 36 not 40, right?

14   A.  Yes, but that money was not from the tenants' money, as I

15   said; from the management money.

16   Q.  You had to pay back over $40,000, right?

17   A.  $36,000.

18              And if you read the case, it is $36,000.  It is extra

19   money to the building, not from the building money.  So, the

20   building actually profited from my pleading guilty for one

21   count because the management company, they -- they deceived me,

22   they did not tell me --

23              THE COURT:  Mr. El- Goarany, there is actually no

24   question before you.  None.

25              THE WITNESS:  Okay.

H1J5gam3                          M. El-Gammal - cross

BY MS. MIRÓN:

Q.  It is a minor point but you did steal, right?  You are not
denying that today?

A.  It is not a minor point in my point of view, it is a big
point.

Q.  The $36,000 versus $41,000, that's a minor point.

A.  No.  The 36 is the money being in the account, I
committed -- plead guilty for that, and I have to pay back this
money to the co-op.

Q.  Sir, you were not told by the Court on February 28th of
2000 that you would need to pay the restitution amount of
$41,500?

A.  Say again what date you said?  Say again the question.

Q.  The date that you pled guilty to this crime?

A.  That was in 2000 or 1998, 1999.

Q.  Whenever.

A.  Yes.

Q.  You were told by the Court that you needed to pay back
$41,500, correct?

A.  Yes.

Q.  Not $36,000?

A.  The count was 36.  I don't know what number came in, some
fees or charges, but I paid the money whatever they told me to
pay.

Q.  Okay.

H1J5gam3                         M. El-Gammal - cross

1   A.  But if you allow me --

2   Q.  Sir, there is no question.

3        When you traveled to Turkey without telling the FBI,

4   you checked into the hotel where Samy had stayed, correct?

5   A.  Yes.

6   Q.  And you did not check in under your own name?

7   A.  In my own name.

8   Q.  Well, your own name minus a couple of letters, correct?

9   A.  No.  My own name through my account on Expedia.

10  Q.  Sir, you did not check in under your name minus the O and

11  the A?

12  A.  No.  I did not.  My account on Expedia with my user word M.

13  El Goarany and my full name is Mohammed El Goarany and the

14  passport is Mohammed El Goarany.  I never change my name.

15  Q.  We will get back to that.

16       When you went through Attiya's Facebook page you

17  noticed that he was friends with a lot of Muslim Brotherhood

18  people, right?

19  A.  I don't hear what.  Say it again.

20  Q.  When you went through Attiya's Facebook page you reviewed

21  that from Turkey, right?

22  A.  In New York before I travel.

23  Q.  Okay.  At some point before you traveled you reviewed

24  Attiya's Facebook page, correct?

25  A.  Yes.

H1J5gam3                         M. El-Gammal — cross

1    Q.   And you saw that he was friends with several Muslim

2    Brotherhood members, right?

3    A.   Yes.

4    Q.   Indeed, the way that you contacted Attiya is through one of

5    those members, right?

6    A.   Yes.

7    Q.   Did you bribe the hotel manager to get you in contact with

8    one of those members?

9    A.   No.  Just be friendly with him.

10   Q.   I'm sorry?

11   A.   Just be friendly.  I never bribe anybody.

12   Q.   So, it is your testimony that you never told anyone from

13   the FBI or from the prosecution that you bribed the hotel

14   manager?

15   A.   When I buy lunch for somebody sitting with him at the

16   reception talking to him to help me find my son, do you call

17   that a bribe?

18   Q.   I don't call it a bribe, you call it a bribe, right?

19   A.   I don't call it a bribe, I'm being very friendly to him.

20   Then he help me for everything I want.

21   Q.   You told the FBI that you bribed the hotel manager.  That

22   was your word.

23   A.   No, I did not.

24   Q.   When you first met with Attiya you concocted a story to

25   tell him, right?

H1J5gam3                         M. El-Gammal - cross

1  A.  Say again?

2  Q.  When you first met with Attiya you concocted a story to

3  tell him?

4  A.  I don't understand the question.

5  Q.  You lied to him?

6  A.  I didn't lie to him.

7  Q.  You told him -- you didn't tell him that you had logged

8  into Facebook, right?

9  A.  I told him.

10  Q.  No, you did not tell him that at first.  Let me explain and

11  you can answer.

12        You told him that Tarek had told you whatever had

13  happened between Samy and Attiya, right?

14  A.  Tarek had no idea about Attiya.

15  Q.  I'm not asking you about that.

16  A.  You said to many --

17  Q.  I am asking whether you told Attiya a story.

18  A.  Attiya asked me how did I get to him.  I told him I went to

19  Facebook, I clicked on the friends in the covering page and the

20  only one had information, contact information on the four

21  people beside Attiya on the covering page is or was Abdullah

22  Jazzar who works at Al Sharq TV.  You know that.

23  Q.  Let me just specify.

24        You met with the FBI at the airport, right?

25  A.  Yes.  They waited for me by the plane door.

H1J5gam3                         M. El-Gammal – cross

1   Q.  And they kept you for several hours?

2   A.  Two hours.

3   Q.  And they searched all your devices, right?

4   A.  Yes.

5   Q.  And they were angry at you, correct?

6   A.  Yes.

7   Q.  Okay.  When you met with Agent Collie at the airport you

8   told him that you made up a story to Attiya that included Samy

9   telling Tarek about his interaction with Attiya.

10          Did you tell Agent Collie that at the airport?

11  A.  I don't remember.  Show it to me if you have it.

12  Q.  Okay.  It is highlighted.

13  A.  Yes.

14  Q.  So you did, you made up a story to tell Attiya, right?

15  A.  I was going to do anything and tell Attiya, yes.

16  Q.  And Attiya told you he didn't know anything about your son,

17  correct?

18  A.  In the beginning, yes.

19  Q.  And that even though he thought you had spoken -- that

20  Tarek had talked to Samy about Attiya, he still told you he

21  didn't know anything, where your son had gone and how he had

22  gotten there.  That's what he told you, sir, correct?

23  A.  I don't understand the question again.

24  Q.  Well, when you concocted this story --

25  A.  Yes.

1    Q.   -- to Attiya, to imply that Samy had told your family

2    about their interactions, Attiya's response was that he

3    didn't -- he met with him for two hours and didn't know what

4    Samy had done, correct?

5    A.   That's what he said in the beginning.

6    Q.   Okay.  And that's when he thought that you had learned

7    something from Samy, correct?

8    A.   That was the story, what I made it at that time.

9    Q.   Let's talk about the dinner that you had -- well, you had

10   two dinners, right?

11   A.   Yes.

12   Q.   One was in the video, correct?

13   A.   Yes.

14   Q.   And the other was with a Congressman, correct?

15   A.   Yes.

16   Q.   And a Muslim Brotherhood minister, right?

17   A.   Former minister, yes.

18   Q.   And when you first spoke with the FBI after your trip, you

19   told them not that Attiya had said your son is in Daesh.  You

20   didn't tell them that, right?

21   A.   Yes.

22   Q.   Correct, you did not tell them that, correct?

23   A.   I lied to them.

24   Q.   Well, you said that Attiya said your son is a good guy, he

25   is with us, correct?

H1J5gam3                          M. El-Gammal - cross

1    A.  Yes.

2    Q.  And by "us" he means Muslim Brotherhood?

3    A.  Say again?

4    Q.  By "us" Attiya meant Muslim Brotherhood?

5    A.  Yes.

6    Q.  Because there were two Muslim Brotherhood members there,

7    right?

8    A.  In the dinner, yes.

9    Q.  Okay.

10          You met with the FBI or the government several times

11   after that May airport interview, right?

12   A.  Yes.

13   Q.  But the very first time you talked about Attiya having

14   anything to do with smuggling was in February of 2016, right?

15   A.  February 2016?

16   Q.  Correct.

17          Well, let's just be clear it wasn't right away.  You

18   didn't say that right away?

19   A.  I don't remember.

20   Q.  You did not say that to the FBI for a long time after your

21   arrival from Turkey, correct?

22   A.  No.  I did.

23   Q.  What you told them was Samy said he had been smuggled,

24   correct?

25   A.  Yes.

H1J5gam3                              M. El-Gammal - cross

1   Q.  You told them that in February of 2016?

2   A.  I say it before that.

3   Q.  You said Samy had been smuggled but you didn't say anything

4   about Attiya, is that right?

5   A.  No.

6   Q.  Okay.

7         When did you first get offered the non-prosecution

8   agreement?

9   A.  A month ago.

10  Q.  And to be clear, that agreement --

11  A.  January 5th.

12  Q.  That agreement protects you --

13  A.  Yes.

14  Q.   -- for your lies?

15  A.  Yes.

16  Q.  You won't be arrested, ever, for your lies; correct?

17  A.  Yes.

18  Q.  You won't be prosecuted, ever, for your lies?

19  A.  Yes.  If I did not lie again.

20  Q.  You testified yesterday that Attiya was looking around your

21  hotel room, right?

22  A.  Yes.

23  Q.  And, in your words, he was suspicious?

24  A.  Very suspicious.

25  Q.  You're a part of the Egyptian military, correct?

H1J5gam3                          M. El-Gammal - cross

1    A.  I'm retired.

2              MR. DEFILIPPIS:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  I'm sorry.  You're retired Egyptian military, correct?

5    A.  Yes.

6    Q.  To be clear again, the same military that massacred people

7    in Rabaa Square?

8              MR. DEFILIPPIS:  Objection, your Honor.

9              THE COURT:  Sustained.

10   BY MS. MIRÓN:

11   Q.  Are you aware that Muslim Brotherhood members are afraid

12   for their safety after Rabaa Square?  Are you aware of that?

13   A.  They are mostly in jail now.

14   Q.  Well, the ones in Turkey are not in jail, right?

15   A.  No.  The ones in Egypt are in jail.

16   Q.  I'm talking about the Muslim Brotherhood members in Turkey;

17   they are not in jail, right?

18   A.  They ran away.

19   Q.  And Attiya is not in jail, right?

20   A.  No.

21   Q.  You, when you traveled through Turkey, were on your way to

22   a reunion for the Egyptian military?

23   A.  My colleague, yes.  My retired colleagues like me.  They

24   graduated the same year I graduated from the college, yes.

25   Q.  Okay.

1       After Attiya searched that hotel room he went to

2  dinner with you two times, right?

3  A.  Yes.

4  Q.  And he replied to you over Facebook, correct?

5  A.  In messages.

6  Q.  And he videotaped part of the dinner, correct?

7  A.  Yes.

8  Q.  He didn't know what you were going to say on that videotape

9  before he started filming, right?

10  A.  Yes.

11  Q.  When you spoke to your son in Turkey, he told you he was

12  learning to use a weapon, correct?

13  A.  Say again?

14  Q.  When you spoke with your son in Turkey, did he tell you he

15  was learning to use a weapon?

16  A.  I didn't hear the last word.

17  Q.  A gun, a rifle, some weapon?

18  A.  The first time he spoke to me he was telling me he is

19  having religious training or religious training.

20  Q.  So, when did he tell you he was practicing shooting?

21  A.  When I came back to the states, in June, I believe, or

22  July.

23  Q.  Okay.

24       So it was in July that he told you he was learning how

25  to shoot, correct?

H1J5gam3                          M. El-Gammal - cross

1    A.  Yes.

2    Q.  And you joked with him about how good at shooting he was.

3    A.  Yes.

4    Q.  That wasn't a laughing matter, right?

5    A.  Say again?

6    Q.  That wasn't funny.

7    A.  I had been told by the FBI to continue talking to Tarek,

8    keep a friendly relationship.

9    Q.  Yes or no, was it funny his shooting with ISIS.  Was that

10   funny to you?

11   A.  Yes, it is funny to me.

12   Q.  Why?

13   A.  Because I'm being friendly.  *Are you better than your*

14   *father as a shooter or you're a good shooter*?  Just keep a

15   friendly relationship from him.  I want to keep him talking to

16   me.  That was the purpose of my talking to him.

17   Q.  Were you talking to him about shooting civilians?

18   A.  Say again?

19   Q.  Were you talking to him about shooting people?

20   A.  About the training he has, kind of what kind of training he

21   has.

22   Q.  Were you asking him how good he is at shooting people?

23   A.  I was trying to be friendly to him.  There is nothing wrong

24   with that.

25   Q.  After your son died you met with the FBI again, right?

H1J5gam3                    M. El-Gammal – cross

1   A.  I texted them the note we got by message, yes.

2   Q.  And then you met with them, right?

3   A.  Yes.

4   Q.  And they asked you whether your son had ever recruited

5   anyone in your family to join ISIS, correct?

6   A.  I don't remember if they asked me this question.

7   Q.  Do you remember telling them that he had not recruited

8   anyone, according to you?

9   A.  I don't know that Samy was recruiting anyone.

10  Q.  Well, do you know that Samy had sent Tarek a lot of

11  literature?  Did you know that?

12  A.  No.

13  Q.  Did you know that they were in communication a lot while he

14  was in ISIS?

15  A.  No.

16  Q.  You never learned that?

17  A.  No.  I was one who contact Samy and Samy started to call

18  them by the phone since May 4, 2015 until he dies.  He never

19  stopped talking to his mother or his brother.

20          MS. MIRÓN:  Okay.  Just a moment?

21          (pause)

22  Q.  You testified today that Attiya asked you to lie, right?

23  A.  Yes.

24  Q.  The reality is Attiya asked you to tell the truth.

25  A.  No.

H1J5gam3                         M. El-Gammal - cross

1    Q.  The truth is your son got to Syria on his own.

2    A.  No.

3    Q.  He was smuggled by people he had contacts with, yes or no?

4         MR. DEFILIPPIS:  Objection.  I don't think these are

5    questions.

6         THE COURT:  Overruled.

7    A.  No.

8    Q.  Your testimony right now is that he was not smuggled by

9    people he had contacts with?

10   A.  He met Attiya Aboualala at the subway station for two hours

11   and Attiya Aboualala told him how to go, to go to Syria, to

12   meet some people who will smuggle him into Syria.  I don't know

13   the people, I have no idea who the people, but that was the

14   link of Attiya to Samy.

15   Q.  That is your testimony, sir?

16   A.  It's the truth.

17   Q.  Your story today --

18   A.  I never made a story.  I only say the truth, nothing but

19   the truth.

20   Q.  Okay.  Let's publish the non-prosecution agreement once

21   again.

22   A.  I have it here.

23   Q.  Okay.  Well, you have it in front of you.  Do you have the

24   agreement in front of you, sir?

25   A.  Yes.

H1J5gam3                          M. El-Gammal - cross

1    Q.  When you say that you always tell the truth, that in and of

2    itself is a lie, correct?

3    A.  I had this agreement because I lied to the FBI in the

4    airport.  That's why I felt that I need to have an agreement.

5    Q.  So you don't always tell the truth.  Can you admit that to

6    us?

7    A.  Only once I said the lie but after that I said the truth

8    and that now I am saying the truth.  You believe it or not but

9    I'm saying the truth.

10   Q.  Okay.

11        Did you lie when you stole money in 2000?

12   A.  I have been told with my lawyer at the time to, that I have

13   to commit a crime or to plead guilty for one count.  That was

14   the charges.  I have been punished, I move ahead with my life,

15   and the Judge give me certificate of relief for all instability

16   at the end of the probation.

17   Q.  It is a very simple question, Mr. El- Goarany.  When you

18   stole money, did you lie?  Yes or no.  It is simple.

19   A.  I did not steal the money as I explained to you how did the

20   money come to me.  But, if you want to call this stealing, call

21   it.  The count is but, as a matter of fact, it wasn't stealing

22   money from nobody in the co-op.  I made money for the co-op.

23   Q.  You pled guilty to grand larceny; a felony, correct?

24   A.  Yes.

25   Q.  And larceny is stealing, correct?

H1J5gam3                         M. El-Gammal - cross

1    A.  To avoid going to jail.  That was the only chance to not to

2    go to trial and not to go to jail so I agreed with my lawyer

3    advice.

4    Q.  Okay.  So now your story is that you were never guilty of

5    that either, right?

6    A.  No.  I understood after that because of I am a board

7    member, I should not have conflicted to refer the same

8    management to other people, I should not do that.  But I didn't

9    know my legal point of view at that time, that's why I made the

10   mistake, I commit the mistake.  I already gave the plead guilty

11   once and then I moved ahead with my life.

12   Q.  Okay.

13   A.  20 years ago.

14   Q.  It is a simple question.

15   A.  Yes.

16   Q.  Were you guilty of the crime you pled guilty to?  Yes or

17   no.

18   A.  I plead guilty for one count to stop the trial.

19   Q.  Were you guilty of the crime you pled guilty to?  Yes or

20   no.

21   A.  Yes.

22   Q.  You swore to the Judge that you were guilty, right?

23   A.  Yes.

24   Q.  And so you were, correct?

25   A.  Say again?

H1J5gam3                         M. El-Gammal – cross

1    Q.  And you were guilty?

2    A.  I pleaded guilty for one count only to stop the trial and

3    not to have the chance maybe I go to jail.  To avoid that I

4    plead guilty and I stepped down from the board and I moved on

5    again with my life.  It is 18 years ago.

6             MS. MIRÓN:  Your Honor, would this be an okay time to

7    take a break?

8             THE COURT:  Yes, it would.  Ladies and gentlemen,

9    let's take our morning break.  15 minutes.  Please, do not

10   discuss the case.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J5gam3                        M. El-Gammal – cross

1              (Jury not present)

2              THE COURT:  You may step down.

3              (Witness steps down)

4              THE COURT:  15 minutes, folks.

5              (Recess)

6              THE COURT:  Okay.  Let's get Mr. El- Goarany back on

7    the stand.

8              MR. DEFILIPPIS:  Your Honor, his counsel says he is in

9    the men's room.

10             THE COURT:  I just saw him come in.

11             MR. DEFILIPPIS:  Your Honor, apologies.  I understand

12   there is a bit of a crowd at the restroom because of the

13   Chinese delegation.

14             THE COURT:  Well, let's get him back in here.

15             (Witness resumes the stand)

16             THE COURT:  Let's bring the jury in.

17             (Continued on next page)

18

19

20

21

22

23

24

25

H1J5gam3                          M. El-Gammal - cross

1    (Jury present)

2                THE COURT:  Everyone, please, be seated.

3                Ms. Mirón?

4                MS. MIRÓN:  Thank you.

5    BY MS. MIRÓN:

6    Q.  I just want to understand.  When you said that your income

7    is between $20,000 and $30,000 per year --

8    A.  Yes.

9    Q.  -- does that include the commission you receive from your

10   real estate business?

11   A.  Yes.

12   Q.  And do you own properties?

13   A.  No, I don't.

14   Q.  Well, you own your home?

15   A.  No, I don't.

16   Q.  Okay.

17          Do you receive rent in any fashion from tenants in

18   Queens?

19   A.  I manage the apartments that the family own and I collect

20   the tenant money.  It is not me, I don't own the apartment.

21   Q.  Who owns them?

22   A.  The trust and my mother.

23   Q.  You had a power of attorney over your mother, right?

24   A.  Yes.

25   Q.  So you're in charge of those finances, correct?

H1J5gam3                          M. El-Gammal - cross

 1    A.  Yes.

 2    Q.  And that money will go to you eventually, right?

 3    A.  It goes to the trust account.

 4    Q.  What happens to the trust when it finishes?

 5    A.  We pay the -- are you asking -- what is the question again?

 6    Q.  What is the purpose of the trust?

 7    A.  Is to keep the ownership of the properties in the name of

 8    the trust, not in my own.

 9    Q.  To avoid taxes?

10    A.  No.  Because I have a lot of judgments against me when I

11    was building homes and I have -- I lost all my credits so I

12    don't want anything affect the family money, the beneficiary,

13    not me.  The beneficiary is my wife and my three childrens.

14    Q.  And who?

15    A.  My three boys, sons.

16    Q.  How many properties are in this trust?

17    A.  Two.

18    Q.  Your home in Middletown?

19    A.  And another apartment in Queens.

20    Q.  And the rent goes to that trust?

21    A.  Say again?

22    Q.  And the rent for that apartment goes to the trust?

23    A.  Only our apartment because our house, I told you, we don't

24    pay the mortgage for.  Yes.

25    Q.  The one apartment?

1   A.  Yes.

2   Q.  The rent?

3   A.  Yes.

4   Q.  Goes to the trust?

5   A.  Yes.

6   Q.  Okay.

7            And you did not need to declare that trust on the

8   financial aid application, right?

9   A.  No.

10  Q.  Because it was your opinion that they didn't need to know

11  about it?

12  A.  Everybody knows about it.  It is official.

13  Q.  The financial aid office in Baruch College did not need to

14  know about the trust?

15  A.  It is not our income.

16  Q.  Well, it's to go to your sons, right?

17  A.  Yeah.  Do you know how many income?

18  Q.  Tell me, how much income?

19  A.  The rent is $1,600.  The maintenance is almost $800, so

20  together about $800 a month.  No more than $10,000 a year.

21  Q.  I'm sorry?

22  A.  It is no more than $10,000 a year, rent and income.

23  Q.  It is an asset, right?

24  A.  What?

25  Q.  An asset.  Asset.  Something you own?

H1J5gam3                          M. El-Gammal – cross

1    A.  An asset, yeah.  Not me.

2    Q.  And in the name of your son Samy El- Goarany?

3    A.  No.

4    Q.  He was one of the beneficiaries, is that what you're

5    saying?

6    A.  Yes.

7    Q.  And he was the one applying for financial aid, right?

8    A.  Yeah, but we did not -- we did not distribute the money out

9    of the trust so Samy had no income from the trust.

10   Q.  But it is in -- it is partially in his name, right?

11   A.  No, not in his name.  He is a beneficiary when we

12   distribute the money of the trust, if I die or if they decided

13   to dissolve the trust, they take the money out of the trust,

14   distribute it, but none of them paying -- the trust paying its

15   expenses.

16   Q.  Isn't it fair to say that you formed this trust to stop

17   your creditors from getting access to those properties?

18   A.  In the beginning, no.  But it was the end now is the case.

19   Nobody can put his hand on our house because the trust has been

20   established in 2001 before I have been in financial trouble.

21   The financial trouble, when the markets went down in 2007/2008,

22   but we did not do the trust to hide anything.

23   Q.  Initially.

24   A.  Initially.

25   Q.  But now you are?

1    A.   It is not -- we are but it is a benefit now from the trust.

2    That's why everybody does trust.

3    Q.   When you asked Samy to apply for financial aid you knew

4    then that you were hiding this assets, right?

5    A.   I did not ask him.

6    Q.   You never asked Samy to apply for financial aid?

7    A.   His mother was the one doing that.

8    Q.   You asked him to apply to financial aid when he was in

9    Syria, correct?

10   A.   First year Samy was in St. John's College we paid for him

11   $32,000 but we couldn't pay more than that.  That was in 2008

12   and we couldn't pay in 2009 when the market went down and

13   that's why Samy started to apply for -- we transfer him from

14   St. John's to Baruch which is a city university.

15   Q.   Sir, simple question.  When Samy was in Syria --

16   A.   Yes.

17   Q.   -- you told him to apply for financial aid, correct?

18   A.   I didn't tell him.

19   Q.   Okay.  Just a moment.

20        Sir, on February 3rd of 2015 -- let me ask you this.

21   The El Goarany e-mail account, El Goarany@aol.com, you have

22   access to that account, right?

23   A.   It is a family account but the one use it is Maria Teresa

24   El Goarany, she's my wife.

25   Q.   On occasion you use it?

1   A.  I have access to it but I don't use it.

2   Q.  When you send e-mails from your iPhone under your name

3   you're using it, right?

4   A.  I can see the message but I don't usually.  Usually I use

5   my own e-mail which is Mel Goarany@gmail.com.

6   Q.  So, from the El Goarany account you e-mailed Samy

7   El- Goarany to forward a reminder to apply for financial aid,

8   correct?

9   A.  It wasn't me.

10  Q.  It was not you when your name was on the e-mail?

11  A.  As I said, Goarany@aol.com has been established from the

12  late '90s and after that I let this e-mail be used only by

13  Teresa Goarany.  I can read it in my iPhone but I don't use it.

14  I don't send e-mail from my iPhone from myself using

15  Goarany@AOL.com.

16  Q.  Do you have a signature in your iPhone that says Mohammed

17  El Goarany?  Do you have a signature?

18  A.  I have five signatures in my iPhone.

19          MS. MIRÓN:  Okay.  I would like to introduce

20  Defendant's Exhibit 610.

21          MR. DEFILIPPIS:  No objection, your Honor.

22          THE COURT:  Defendant's Exhibit 610 will be received.

23          (Defendant's Exhibit 610 received in evidence)

24          MS. MIRÓN:  And highlight the top?

25  Q.  That's an e-mail on February 3rd, 2015, correct?

H1J5gam3                         M. El-Gammal – cross

1    A.  February 3rd, yes.

2    Q.  After Samy had left, correct?

3    A.  Yes.

4    Q.  From an iPhone, correct?

5    A.  Uh-huh.

6    Q.  With your signature:  Mohammed El Goarany; correct?

7    A.  No.  Actually it is my name but the structure, if you send

8    that e-mail from any other phones, the AOL account with my

9    signature have a permanent signature for my four account, five

10   accounts.  AOL goes this.  Gmail is another one.  Yahoo is

11   another, ARA that was --

12          I do have five e-mails.  The usual e-mail I use is my

13   gmail which is my business, professional one, but AOL only

14   Maria Teresa El Goarany, she use it for her contacts for anyone

15   and they always CC me.  My name is here, copy me, and that

16   automatically from the iPhone goes Mohammed El Goarany.

17   Teresa's iPhone, it will go to Mohammed El Goarany.

18   Q.  Okay.  Let's assume you were only copied on this e-mail.

19   A.  Yes.

20   Q.  You read the copy of the e-mail, right?

21   A.  Sure.

22   Q.  Yes or no?

23   A.  I don't remember.

24   Q.  Does it refresh your recollection to look at it?

25   A.  I don't remember and I didn't care to read it.  Teresa is

1    the one that handled all the financial aid for my son.

2    Q.  So you didn't talk to Teresa about Samy making a financial

3    aid application while he is in Syria?  Did you talk to her

4    about that?  That is the question.

5    A.  Yes.

6    Q.  Okay.

7           And at that time you were not disclosing the trust,

8    correct?

9    A.  There is no income to distribute it to the source.

10   Q.  Yes or no, was it an asset you disclosed on any of Samy

11   El- Goarany's financial aid applications?

12   A.  Yes, but the accountant said you don't need it because you

13   did not distribute it to people.  When you give people in their

14   hand money you can -- you should add it to your income tax,

15   personal income tax, but if you didn't give money to Samy from

16   the trust you don't have to report it.

17   Q.  All right.  So you are following your accountant's advice?

18   A.  Yes.

19   Q.  Okay.

20          I'm going to talk to you about when Mr. El-Gammal was

21   arrested.

22   A.  Okay.

23   Q.  And you testified, did you not, that Samy El Goarany asked

24   you to lie?

25   A.  Yes.

H1J5gam3                         M. El-Gammal – cross

1    Q.  The truth is you had lied.

2    A.  No.

3    Q.  I would like to introduce Defendant's Exhibit 114-GG.  Wait

4    before you publish it.

5              MR. DEFILIPPIS:  No objection, your Honor.

6              THE COURT:  114-GG will be received.

7              (Defendant's Exhibit 114-GG received in evidence)

8    BY MS. MIRÓN:

9    Q.  Okay, sir.  Can you see the screen?  Do you see that?

10   A.  I read it.

11   Q.  Okay.  It is not that Samy is asking you to lie, right?

12   A.  Samy --

13   Q.  Sir, based on what you just read, in that Facebook message

14   on September 6th did Samy ask you to lie?

15   A.  After that.

16   Q.  I'm asking you about this.

17   A.  In this?  No, he didn't ask but he was questioning me.

18   Q.  Indeed, he said you had lied.

19   A.  He was questioning if I lied or not.

20   Q.  He said:  You ruined a man's life based on a lie.  Did he

21   not write that?  It's right there.

22   A.  I read it.  Yes, he wrote that.

23   Q.  He wrote that.

24   A.  But can I explain?

25   Q.  Is it not true that he thought you had lied?

1  A.  He thought that.

2          MS. MIRÓN:  Okay.  Nothing further.

3  A.  But I didn't --

4          THE COURT:  Any redirect?

5          MR. DEFILIPPIS:  Yes, your Honor.

6  REDIRECT EXAMINATION

7  BY MR. DEFILIPPIS:

8  Q.  Mr. El- Goarany, you were asked some questions about your

9  conversation with your wife about your son's departure to

10 Syria.  Do you recall that?

11 A.  Yes.

12 Q.  And you were asked some questions about whether your family

13 had heard from your son before you went to Turkey.  Do you

14 recall that?

15 A.  Yes.

16 Q.  Mr. El- Goarany, before your son left for Turkey, did there

17 come a time when he told your wife that he was thinking of

18 doing that?

19 A.  Yes.

20          (Continued on next page)

21

22

23

24

25

H1J3GAM4                          M. El-Goarany - redirect

1    Q.  Did your wife tell you about that?

2    A.  No.

3    Q.  Did you later find out that she had kept that from you?

4    A.  Yes.

5    Q.  When did you learn that?

6    A.  The second day he left.  He left home.

7    Q.  How did you learn that?

8    A.  She was sitting and crying in the den, dining table, and I

9    was surprised to see her crying, and I asked her, why are you

10   crying?  And she said she thinks that Samy left us and we don't

11   see him again.

12   Q.  Did she tell you he had previously mentioned to her that he

13   was thinking of going overseas?

14   A.  On that time she told me the story that he in October told

15   her that he will have tickets and he was planning to go to

16   Syria to help the Syrian people.

17   Q.  And as you understand it, was that a lie?

18   A.  Yes.

19   Q.  What was your reaction when you found out that your wife

20   had kept that from you?

21   A.  I was so upset, but at that moment we have to stay strong

22   as a family and we -- I already, as I said yesterday, I did

23   make all calls to friends, to e-mail, to texting, to the

24   college, to try to find out where is Samy.

25   Q.  Mr. El-Goarany, are you still upset or angry about that

1   today?

2   A.   I lost my son.  What can I do more than that.  I don't care

3   about the outcome of the charge here.  But, who is going to

4   bring my son back.

5   Q.   Mr. El-Goarany, is it your understanding that Tarek

6   El-Goarany, your son, knew that Samy was going to go to fight

7   with the ISIS?

8   A.   I just found -- yes, I know now that Tarek knew, but he

9   tried to stop him also and he couldn't succeed.

10  Q.   If you need a moment, Mr. El-Goarany or tissues, there are

11  some there.

12              THE WITNESS:  Can I have water more?

13              THE DEPUTY CLERK:  You have water here.

14              THE WITNESS:  Thank you.

15              Go ahead.

16  Q.   Mr. El-Goarany, is it your impression that or is it your

17  understanding that Tarek, your other son, knew that Samy was

18  going to fight with ISIS?

19  A.   I didn't know before, but now I know.

20  Q.   When did you learn that Tarek knew in advance?

21  A.   The FBI told me and then Tarek told me.

22  Q.   What was your reaction when you learned that he knew?

23  A.   I was very upset.  I wish he told me before.  He would

24  never travel.  I would do my best to stop him from doing this.

25  Q.   Mr. El-Goarany, you were shown a note from the Howard

1   Johnsons, do you recall that, with Attiya's phone number on it?

2   A.  Yes.

3   Q.  Do you remember testifying yesterday that you got in

4   contact with someone in Turkey named Abdullah al-Gazar who put

5   you in touch with Mr. Aboualala?

6   A.  Yes.  That's the only one on Facebook who had contact info.

7   Q.  If you had recalled or taken with you that phone number for

8   Attiya, would you have contacted Mr. Gazar?

9        MS. MIRON:  Objection.  Calls for speculation.

10        THE COURT:  Sustained.

11   Q.  Mr. El-Goarany, did you contact Mr. Gazar because you did

12   not know how else to get in touch with Attiya Aboualala?

13   A.  Yes.  But I decided not to call Mr. Attiya with that number

14   because I don't want to prepare him to see -- to know I'm

15   coming to meet with him there.  He might be hiding my son

16   somewhere.  That was my thinking, yeah.

17   Q.  You were also asked during your cross-examination whether

18   you had bribed the hotel manager in Turkey, is that right?

19   A.  Yes.

20   Q.  Did you in fact treat the hotel manager to meals while you

21   were there in Turkey?

22   A.  Yeah, one lunch and one breakfast.

23   Q.  Why did you treat him in that way?

24   A.  He was sitting in the room in front of me, and I was hungry

25   and I wanted to eat.  I invited to join me to be friendly with

H1J3GAM4                          M. El-Goarany - redirect

1    him, because he was actually helping me.

2    Q.  Did you ever hand him a bundle of cash or anything like

3    that?

4    A.  No.  Only the money in the hotel, checked in.

5    Q.  Mr. El-Goarany, if I can draw your attention to the e-mail

6    you were looking at which is labeled Defense Exhibit 610.

7         MR. DeFILIPPIS:  If we can publish that again.

8    A.  This one?

9    Q.  Yes.

10   A.  Yes.

11   Q.  Mr. El-Goarany, I want to draw your attention to the date

12   of that e-mail.  Do you see that where it says February 3,

13   2015?

14   A.  Yes.

15   Q.  How long after Samy left your home was that?

16   A.  A couple of days.  Three, four days.

17   Q.  At this time were you still hoping that you would find

18   Samy?

19   A.  Yes.

20   Q.  Were you still hoping that he would come home?

21   A.  Yes.

22   Q.  Am I correct that your testimony was that this is an e-mail

23   that your wife wrote from an account that you shared?

24   A.  Yes.

25   Q.  When she said "hope you are safe and able to follow up."

H1J3GAM4                          M. El-Goarany - redirect

1    Did you have an understanding as to why she said "hope you are

2    safe"?

3              MS. MIRON:  Objection.

4              THE COURT:  Overruled.

5    A.  Yes.

6    Q.  Why was that?

7    A.  She missed him.  She doesn't know -- nobody knows where is

8    him, if he's safe or not, and at the same time also the follow

9    up with that e-mail about the financial aid because we --

10   usually we paid money upfront to the college for the tuition,

11   and the financial aid refund for us that money back or a big

12   part of the money.  So she wants Samy to know from Samy he

13   receive anything before he leaves to follow up.

14   Q.  So is it fair to say that your hope was that Samy would

15   soon come home and maybe reenroll in college?

16   A.  We always did, yeah.

17   Q.  Mr. El-Goarany, you were asked several questions about

18   political issues in Egypt.  Do you recall that?

19   A.  Yes.

20   Q.  You said you are a former member of the Egyptian military?

21   A.  Yes.

22   Q.  You were also asked a number of questions about the Muslim

23   Brotherhood.  Do you recall that?

24   A.  Yes.

25   Q.  Is it fair to say that you are in favor of or against the

H1J3GAM4                       M. El-Goarany – redirect

1   Muslim Brotherhood?

2   A.   Against.

3   Q.   In your understanding, does the Muslim Brotherhood engage

4   in violent or militant activities?

5   A.   A lot.

6              MS. MIRON:   Objection.

7              THE COURT:   Overruled.

8   Q.   What is that understanding based on?

9   A.   They got the government, they succeeded to put one of them,

10  the President Mohammed Morsi, and they got the Congress, they

11  got the Senate, they got all the power, and we the Egyptian

12  people were trying to find out or to see development in the

13  country that they promised, but they didn't.

14             So the Egyptian people started to be against them, and

15  they want to do a reelection again, and Morsi refused.  That's

16  why the military got involved and they took Morsi out and they

17  made the real election again in the democratic way.  We have a

18  Constitution, we have a Parliament and everything in order, and

19  the Egyptian is better than the regime of the Muslim

20  Brotherhood.

21  Q.   Is it your understanding, though, that the Muslim

22  Brotherhood has had ties to violence, terrorist or militant

23  activities?

24             MS. MIRON:   Objection.

25             THE COURT:   Overruled.

H1J3GAM4                         M. El-Goarany - redirect

A.   They are still doing it.  If you read the news they're

still killing people in Sinai, in part of Egypt.  They're still

killing people inside.  They even in the Christmas, they made

announcing, actually that announcement was part of the Muslim

Brotherhood and Daesh also together, they get responsible for

bombs in the church and they killed over 50 people, innocent

people celebrating the Christmas.

Q.   Mr. El-Goarany, are you aware of any specific terrorist

groups that have historically been affiliated or tied to the

Muslim Brotherhood?

            MS. MIRON:  Objection.

            THE COURT:  Let's see the parties at sidebar.

            (Continued on next page)

H1J3GAM4                         M. El-Goarany - redirect

1            (At the sidebar)

2            THE COURT:  What are you doing?

3            MR. DeFILIPPIS:  Your Honor, the defense in their

4    cross-examination seems to have clearly put at issue

5    Mr. El-Goarany's both political affiliations and his potential

6    sympathies for groups including Muslim Brotherhood and ISIS,

7    drawing attention to the symbols and things.  So I don't expect

8    to do any more of this, but we wanted to draw out

9    Mr. El-Goarany's state of mind with regard to these various

10   groups and politics in the region in response.

11           MS. SHROFF:  Your Honor, that is not what the defense

12   did.  In fact, we came to the Court on a sidebar at the

13   government's objection, the Court ruled that we could not ask

14   him about his views about ISIS.  We were precluded from asking

15   any questions on that point.  And now Mr. DeFilippis is doing

16   precisely what this Court did not allow us to do.

17           THE COURT:  There has been a lot of discussion about

18   the Muslim Brotherhood throughout the trial, including the fact

19   that they are a democratically oriented organization.  And

20   there were questions concerning Mr. El-Goarany's political

21   views, which is why I allowed the first question.

22           MR. DeFILIPPIS:  We're done.

23           THE COURT:  I'm going to sustain the objection to any

24   questioning along these lines.

25           MS. SHROFF:  We would move to strike the last answer

H1J3GAM4                    M. El-Goarany - redirect

though.  The last answer that Mr. Mohammed El-Goarany made we
would move to strike.  We ask the Court most respectfully to go
back and reread the way he answered.  The answer is completely
irrelevant.  Even by the government's own expert, every single
body at issue in this trial, including the Muslim Brotherhood,
would be a different entity in 2017 than it is in 2016 or 2015.
Most respectfully, the government purposefully elicited that
testimony to make a tie between the Muslim Brotherhood and
violence.  We did not cross their expert Zelin on this topic.
There is no testimony from Mr. Zelin on that topic, and that is
precisely because of what we correctly thought was elicited on
the issue, and the government should not be able to backdoor
that testimony through this witness.

            So we ask that you take a look at the timeframe he's
talking about, it's complete rank hearsay.  It is rank hearsay.

            THE COURT:  I don't know what time period you were
talking about.

            MS. SHROFF:  Last Christmas.  This Christmas 2016.

            THE COURT:  Three weeks ago?

            MS. SHROFF:  Yes.  That's right.

            MR. DeFILIPPIS:  If I may, I think he was asked very
pointedly whether he was a member of the same Egyptian military
that had committed massacres.  Other witnesses have been
asked --

            THE COURT:  The objection to that question was

1    sustained.

2              MS. SHROFF:  The objection was sustained.  You did not

3    let us elicit that response.

4              MR. DeFILIPPIS:  It was elicited once and he answered

5    that in fact he was a member of the military.

6              MS. MIRON:  Jazmin has a note for your Honor.

7              THE COURT:  The witness needs to use the bathroom.

8              MR. DeFILIPPIS:  Okay.

9              THE COURT:  We can take an early lunch I suppose.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J5gam5                              M. El-Goarany - redirect

1           (In open court)

2           THE COURT:  Ladies and gentlemen, we're going to take

3    an early lunch today.  We'll give you until 1:30 so you'll have

4    a slightly longer lunch.  Please don't be late.  Thank you so

5    much.

6           (Jury excused)

7           THE COURT:  You may step down.  Thank you.

8           (Witness temporarily excused)

9           THE COURT:  I've had an opportunity to read the prior

10   two questions.  I overruled both objections.  After sidebar I'm

11   going to now sustain the objection to the question that's

12   pending and grant the request to strike the last question and

13   answer.  And the government is directed to move on to another

14   topic.

15          MR. DeFILIPPIS:  Yes, your Honor.

16          THE COURT:  Anything else?

17          MS. SHROFF:  No, your Honor.  Thank you.

18          THE COURT:  Okay.

19          (Recess)

20          (Continued on next page)

21

22

23

24

25

1                          A F T E R N O O N   S E S S I O N

2                                    1:30 p.m.

3              (Jury present)

4              THE COURT:  Everyone, please, be seated.

5              Ladies and gentlemen, before we continue with

6    Mr. El- Goarany's cross-examination, I just wanted you to know

7    that the last question pending before we broke, the objection

8    was sustained and the last question that was asked and for

9    which an answer was given, the question and answer were

10   stricken.  Okay?

11             Ms. Mirón.

12             MR. DEFILIPPIS:  Your Honor, we were on redirect but I

13   actually have nothing further, so.

14             THE COURT:  Okay.  Any recross?

15             MS. MIRÓN:  Yes, your Honor.

16   RECROSS EXAMINATION

17   BY MS. MIRÓN:

18   Q.  Fair to say that by the summer of 2015 you knew Samy was in

19   ISIS, right?

20   A.  Say that again?

21   Q.  By the summer, by June 28th of 2015, you knew Samy was in

22   ISIS?

23   A.  Yes.

24   Q.  But you continued to lie to people about that?

25   A.  Only the people, not the government.

1   Q.   Okay.

2           And your wife lied to people about that?

3   A.   Yes.

4           MS. MIRÓN:   I would like to introduce Defendant's

5   Exhibit 112-CC?

6           MR. DEFILIPPIS:   Objection, your Honor.

7           THE COURT:   Bring a copy of it.   Side bar.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J5gam5                          M. El-Goarany - recross

1              (At side bar)

2              THE COURT:  Okay.

3              MR. DEFILIPPIS:  Your Honor, the government objects

4     that this is inadmissible hearsay because it's being offered --

5     it is a communication between Mr. Mohammed El Goarany and Samy

6     El- Goarany in which Mohammed is indicating that they are

7     telling people he's working in California and got a job.  It

8     seems that the content of that, that they told people that he

9     was working in California, got a job, is the very truth for

10    which it is being offered.  They're trying to establish that

11    that's what people were being told, that was the thrust of the

12    question being asked.

13             THE COURT:  Isn't this already before the jury?

14             MR. QUIGLEY:  It is also not impeachment because he

15    didn't deny that he made those statements.

16             MR. DEFILIPPIS:  Right.  And to the extent she wants

17    to impeach there is No conflict between the statement here.  I

18    think someone may have been refreshed or crossed with it but I

19    don't know that it has been admitted into evidence.  Ms. Mirón

20    just offered it so I don't think so.

21             MS. SHROFF:  Can I just have a second with Ms. Mirón?

22             THE COURT:  Sure.

23             MS. SHROFF:  Thank you.

24             (Counsel conferring)

25             MS. MIRÓN:  The relevance is the fact of the statement

H1J5gam5                    M. El-Goarany - recross

1    being made, right, that he -- this witness testified that his

2    wife was on one set of information, he was on another, and we

3    are showing that, through this document, that they had shared

4    information and they were lying to the public about it.  We are

5    not offering it for the truth of the California fact; in fact

6    we are offering it for the opposite, that they lied.

7         MS. SHROFF:  You see, the whole time this witness has

8    testified that he didn't know anything about what was going on

9    with his son, in fact his wife didn't even bother to tell him

10   when the son emailed on January 30th and he was actually on

11   that e-mail.  Then, in February, again in early February, the

12   wife gets a phone call, a very important phone call which gives

13   her much relief and she talks about this with the government

14   and she says, you know, Samy called, I could hear him clearly

15   talking to me but the connection was bad, I couldn't talk back

16   to him.  Then she lets him know that she received a phone call.

17   This witness tells the wife, tell the FBI immediately.  The

18   wife says I have a headache, you tell the FBI.  And he tells

19   the FBI that I got a -- that my wife got a phone call.

20        He has denied all of this.  He has denied ever being

21   so close to his wife that the two of them know exactly what is

22   going on with their son and this goes to show that he in fact

23   does know and the two of them are together and they're coming

24   up with stories.  And of course it is not true, we have told

25   them it is not true.

1    THE COURT:  But no one is saying that the fact that he

2    is working in California is true.

3         MS. SHROFF:  Right, it is not for the truth.

4         THE COURT:  The government is saying it is being

5    offered for the truth that they, together, were lying about

6    what he was doing.

7         MR. DEFILIPPIS:  Right, that they told Amir and Nadir

8    that that is true.  This is being offered to prove precisely

9    what it says, that they told people that was true.

10        MS. MIRÓN:  Am I able --

11        THE COURT:  You can cross-examine.

12        MS. MIRÓN:  Whose idea it was and when he denies it?

13        THE COURT:  You can absolutely cross examine but it

14   will not be admitted, at least at this juncture?

15        MS. SHROFF:  What happens when he denies it.

16        THE COURT:  Then you can impeach him with it.

17        MS. SHROFF:  Okay.  Thanks.

18

19

20

21

22

23

24

25

H1J5gam5                        M. El-Goarany - recross

1    (In open court)

2         THE COURT:  The objection is sustained.

3    BY MS. MIRÓN:

4    Q.  Sir, you testified earlier that you did not learn from your

5    wife that Samy had called in February of 2015, right?

6    A.  Yes.

7    Q.  It is your testimony that she never shared that information

8    with you, correct?

9    A.  Yes.

10   Q.  And it is your testimony that she was never told, by you,

11   to report everything to the FBI.

12   A.  No.

13   Q.  Did you tell her to report everything to the FBI?

14   A.  Absolutely not.

15   Q.  You told her to keep things from the FBI?

16   A.  No.  To tell the FBI everything she knows.  Whenever she

17   received anything, message, any phone calls, we would take a

18   shutter screen on the phone and we forward it to the lead FBI

19   agent.

20   Q.  And that's what happened on February 16th of 2015 when

21   Tarek showed you the message from Samy, right?

22   A.  I -- the Facebook message?

23   Q.  The one where he, Samy says he is undergoing religious

24   training.  That message.

25   A.  I don't recall seeing probably before that when Samy had

H1J5gam5                        M. El-Goarany - recross

1    the phone because Samy did not have the phone after February

2    3rd up until the 2nd or 3rd.

3           ISIS took the phone from Samy, took the computer, took

4    everything.  He could not communicate with us.

5    Q.  And when he got his stuff back on February 16th or before

6    that he sent a message to Tarek?

7    A.  Absolutely not.  He didn't take his things back now.  He

8    take his things back maybe in April or May.  That's what he

9    said in the message you showed to me here.

10          MS. MIRÓN:  Could we please publish that exhibit?

11          MR. DEFILIPPIS:  Objection.  I don't believe it is in

12   evidence.

13          MS. MIRÓN:  Yes, it is; the exhibit that was shown to

14   this witness earlier.

15          MR. DEFILIPPIS:  Which exhibit number?

16          MS. MIRÓN:  Just a moment.

17          THE COURT:  You can publish any exhibit that is in

18   evidence.

19          MS. MIRÓN:  Thank you.

20          MR. DEFILIPPIS:  Objection, your Honor.  Outside the

21   scope of redirect.

22          THE COURT:  I don't know what it is.

23          MS. MIRÓN:  Would you highlight the communication from

24   February 16th?

25          MR. DEFILIPPIS:  Objection, your Honor.  Outside the

H1J5gam5                    M. El—Goarany - recross

1    scope of redirect.

2              THE COURT:  Overruled.

3    BY MS. MIRÓN:

4    Q.  In this communication Samy says they had taken his phone

5    and laptop away.

6              You saw this communication on February 16th of 2015,

7    right?

8    A.  It says February 2nd here.

9    Q.  The day it was sent, February 16th, can you read the date?

10   A.  Yes.  The first one February 16, 2015.

11   Q.  Okay.

12             Sir, you just testified that it was your practice to

13   forward all communications from Samy to the FBI, right?

14   A.  I didn't see this message.  I told you before.

15   Q.  So, it is your testimony that you did not ask Tarek to

16   forward this message?

17   A.  No.

18   Q.  When you were --

19   A.  I did not.

20   Q.  Okay.

21             When you were telling people a lie about Samy's

22   whereabouts in June of 2015, did your wife help you come up

23   with the lie?

24   A.  All of us did to keep my son image good.  It is not good to

25   say my son with a terror group like ISIS.

H1J5gam5                          M. El-Goarany - recross

1    Q.   So, fair to say your whole family --

2    A.   Yes.

3    Q.   -- came up with certain lies to tell the public?

4    A.   We agreed to say that Samy is an intern in California to

5    avoid any question about where is Samy, why he didn't attend

6    all the family socials.

7    Q.   And, indeed, it is your wife's idea to tell them that?

8    A.   It was actually my idea.

9    Q.   It was not your wife's idea to tell the family that Samy is

10   working in California in a job Samy got through Chocho?

11   A.   With whom?

12   Q.   Chocho?

13   A.   Chocho is an ex-brother-in-law of my wife.  He is

14   ex-husband of her younger sister; Chocho.

15   Q.   And, indeed, Samy asked you who came up with that idea,

16   didn't he?

17   A.   We told Samy when we were talking to him on the phone after

18   we came from Turkey that that was what we said to people if

19   anybody asked him, we should confirm that, as I said, we would

20   like to keep our son's image good.  I don't want my son to be

21   characterized as a terror.  This is the last thing in my mind.

22   Q.   The question is whether it was your wife's idea to tell

23   people about that.

24   A.   No.  This was my idea and my wife agreed and confirmed it

25   and we kept saying the story until Samy died.

H1J5gam5                          M. El-Goarany - recross

1    Q.  So, when Samy asked you on June 28th of 2015 who came up

2    with that very good idea, your testimony is you did not write

3    back "Mom"?

4               MR. DEFILIPPIS:  Objection.

5               THE COURT:  Overruled.

6    A.  I don't remember.

7    Q.  Let me show you.

8    A.  Yes, it is written here I said "Mom," maybe just to keep

9    Samy image -- Samy feeling good that his mom is also involved

10   with us and this idea.  That may be the reason I said that

11   "Mom" but actually, as a matter of fact, it was my idea to tell

12   people that he is in California with an intern with Chocho.

13   Q.  So, it is your testimony that you lied to Samy about whose

14   idea it was so that he could be happy that his mom is lying?

15   A.  It wasn't a lie, it was some kind of -- tell Samy the

16   background of this.  He even said in here answering --

17              MS. MIRÓN:  Your Honor, at this point I would ask --

18   A.  *Ma fi mushkilaha*, which means no problem.

19   Q.  Wait.

20   A.  Can I read?

21   Q.  I would ask for the exhibit to be admitted so the witness

22   can read from it.

23              THE COURT:  Yes.  The exhibit will be admitted.

24              Go ahead.

25              MS. MIRÓN:  112-CC, and it will be published.

1          (Defendant's Exhibit 112-CC received in evidence)

2     BY MS. MIRÓN:

3     Q.  Sir, can you see it on the screen or would you like a hard

4     copy?

5     A.  Yes.

6     Q.  What does it say Samy said?

7     A.  When I said to Samy that on May, June 28, Samy answered

8     back in the same day after that, three hours after and he said

9     *ma fi mushkilaha*, that's actually a good idea.  Who came up

10    with that?

11          So I just said "Mom," quick answer, to make him happy.

12    Q.  You did not say "mom," you continued, because Samy said

13    smart lady that mom.  And your answer, correct me if I'm wrong:

14    Yes, I know, that's why I married her.  Laugh out loud -- LOL.

15          Is that what you wrote?

16    A.  The first answer directly after you, after we sent Samy the

17    information and Samy replied at the same day 15:13 which is

18    3:00 afternoon -- 13 -- I replied to him on two minutes after

19    and I said "Mom."  And then after that Samy answered back smart

20    lady, that mom.  That's after that but I told him "mom" only

21    one word.  I didn't say too much words.

22    Q.  Well you replied:  Yes, I know, that's why I married her.

23    A.  Yes.  That's what I said.

24    Q.  So your testimony right now is that you were lying to Samy

25    about who came up with that idea.

H1J5gam5                         M. El-Goarany - recross

1    A.  The word is lie but that wasn't the meaning of lie.  That

2    was making my son happy that his mom cared about him and we

3    said all of this idea to everybody.  If Samy comes back, nobody

4    will know anything.  Samy didn't come back, Samy is gone.

5    Q.  Sir, I didn't ask you what your interpretation of the word

6    lie is.

7    A.  That is the background.

8    Q.  I am asking you whether it was the truth or not to tell

9    Samy it was his mother's idea.  Was that the truth?  Or not?

10   A.  We shared the idea but the idea initially was me.

11   Q.  What about the lie that you told the public during your

12   son's memorial service, whose idea was that?

13             MR. DEFILIPPIS:  Objection, your Honor.

14             THE COURT:  Overruled.

15   A.  I said to the public my son passed away in a car accident

16   in Canada and we did not -- we couldn't bury him to bring his

17   body to bury to New York, that's why we made the memorial

18   without a funeral, just to answer the questions.

19   Q.  And, as a family, you guys decided to tell everyone that,

20   right?

21   A.  Yes.  Before the memorial we did in the mosque, all the

22   family came to my house and I told them the truth and then I

23   told them that we will say that to try to keep, also, my son's

24   image good.  He passed away, we lost him.  We don't want to

25   feel losing a terrible guy.

H1J5gam5                           M. El-Goarany - recross

1    Q.  So, after you knew your son passed away you kept lying

2    about the situation; is that right, sir?

3    A.  Repeat the question again?

4    Q.  Even after you found out your son had passed away, you kept

5    lying about the situation; is that true?

6    A.  Yes.

7              MS. MIRÓN:  Thank you.

8              THE COURT:  Anything further?

9              MR. DEFILIPPIS:  Nothing from the government, your

10   Honor.

11             THE COURT:  Mr. El- Goarany, you may step down.

12             THE WITNESS:  Thank you very much.

13             THE COURT:  Thank you.

14             THE WITNESS:  Yes.

15             (Witness excused)

16             THE COURT:  Government, please call your next witness.

17             MR. DEFILIPPIS:  Yes, your Honor.  The government

18   calls Craig Roth.

19             THE COURT:  Mr. Roth, please step forward, step up

20   into the witness box and remain standing.

21    CRAIG ROTH,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24             THE COURT:  Sir, you may be seated.  Please pull your

25   chair up to the microphone and please begin by stating your

1   full name and spelling your last name for the record.

2           THE WITNESS:  Sure.  First name is Craig, C-R-A-I-G,

3   last name is Roth, R-O-T-H.

4           THE COURT:  Mr. DeFilippis.

5           MR. DEFILIPPIS:  Thank you, your Honor.

6   DIRECT EXAMINATION

7   BY MR. DEFILIPPIS:

8   Q.  Good afternoon, Mr. Roth.

9   A.  Hi.

10  Q.  Where do you currently work?

11  A.  I am employed by the FBI.

12  Q.  What is your position there?

13  A.  IT specialist, forensic examiner.

14  Q.  Now, Mr. Roth, what degrees do you hold?

15  A.  I have an undergrad in IT, which is information technology,

16  from the University of Hartford, and I have a masters from

17  Boston University in CIS.

18  Q.  How long have you been at the FBI?

19  A.  For about six years now.

20          THE COURT:  What is CIS?

21          THE WITNESS:  CIS stands for computer information

22  systems.

23          THE COURT:  Thank you.

24  BY MR. DEFILIPPIS:

25  Q.  Before joining the FBI, who did you do for work?

H1J5gam5                          Roth - direct

1    A.  Sure.  I was employed by Pratt & Whitney which is an

2    aerospace engineering company, I worked in the IT field also.

3    Q.  Are you a member of a particular unit or squad at the FBI?

4    A.  Yes.  We are CY4 CART which is CY4 is cyber, and CART is

5    Computer Analysis Response Team.

6    Q.  Generally speaking, what does the computer analysis

7    response team do?

8    A.  Sure.

9        We conduct forensic analysis on any electronic media.

10   Q.  What sorts of electric tropic immediate why?

11   A.  Anything from cell phones to laptops, hard drives, thumb

12   drives, essentially anything that can store a file.

13   Q.  During your time at the FBI, have you received training in

14   the field of computer forensics?

15   A.  Yes.

16   Q.  What sorts of training?

17   A.  There is roughly about a year and a half-long training

18   process that you must finish.  From the start you are assigned

19   a mentor to try to walk you through the whole process.  During

20   that year and a half you also have to attend multiple training

21   classes, pass them all, and a few exams also.

22   Q.  About how many training courses would you say you have

23   taken in your career at the FBI?

24   A.  Close to a dozen or so, if not a few more.

25   Q.  And about how many devices have you reviewed as a forensic

H1J5gam5                    Roth - direct

1   examiner?

2   A.  I would say several hundred.

3          MR. DEFILIPPIS:  Your Honor, at this time the

4   government offers Mr. Roth as an expert in the field of

5   computers and computer forensics.

6          MS. MIRÓN:  No objection.

7          THE COURT:  Very well.  His testimony will be received

8   as expert testimony.

9          You may proceed.

10  BY MR. DEFILIPPIS:

11  Q.  Mr. Roth, how do you analyze the electronic devices that

12  you receive?

13  A.  That would matter which electronic media it is.  We kind of

14  break it down into two separate areas.  There is cell phones

15  which is area one, and there is other electronic media such as

16  hard drives, laptops and anything else that can store a file

17  that is not a phone.

18  Q.  So, turning first to cell phones, what types of tools are

19  typically used on those?

20  A.  We use industry standard cell phone software.  The main one

21  that we use is UFED by a place called Cellebright.

22  Q.  Did you say Cellebright?

23  A.  Cellebright.

24  Q.  And I think the jury has heard some testimony on

25  Cellebright.

1          Turning to the other devices you referenced other than
2    cell phones, what types are they?
3    A.   Hard drives, thumb drives, disks, anything else that can
4    store a file.
5    Q.   What sorts of tools do you analyze those devices with?
6    A.   The first thing we do, if you want me to walk you through
7    the entire process is we hook up, let's say it is a hard drive
8    to a piece of equipment that is a small square and it is called
9    a write block.  And what that does is it doesn't allow you to
10   make any writes to that hard drive; so, it is your source
11   media, you never want to alter it.  You then hook that up to
12   your exam station and once that's hooked up, then you create
13   what we call an image file.
14         An image file is another word for exact copy, a
15   bit-for-bit copy, a forensic copy.  We use a piece of software
16   called FTK Imager and what that software does is it reads the
17   very first file to the very last file on that hard drive and it
18   creates a specialized file called an image file.  Once that
19   image file is complete, it creates a hash file.  And that hash
20   file is important because what that does is it is a
21   mathematical calculation saying that your image copy or your
22   exact copy matches exactly from your source media.
23         So, you now have an exact copy, a forensically sound
24   copy so you know that you can work off that copy and not alter
25   any of your source media.

H1J5gam5                           Roth - direct

1   Q.  Are you familiar with the term or tool FTK?

2   A.  Yes.

3   Q.  What is FTK?

4   A.  FTK a forensic software application -- Forensic Tool Kit --

5   by a place called Access Data.

6   Q.  And what does it do and in what context?

7   A.  It does quite a bit.

8           Once the image file or your exact copy is created, we

9   then would process that with FTK Lab, as we call it, and what

10  that does -- it is a pretty cool piece of software.  It kind of

11  takes that image file or your exact copy and it kind of runs

12  through a few things and it is able to spit out all the photos,

13  all the files, all the videos that were on that source media

14  and present it in an easily viewable way for the case squad to

15  then look through.

16  Q.  And what is an FTK report?

17  A.  And FTK report is a report that is created by myself for

18  the files that were flagged important by the case squad.

19  Q.  Mr. Roth, were you, at some point, asked to analyze

20  electronic devices in this case?

21  A.  Yes.

22  Q.  How many devices?

23  A.  There was a few phones and a laptop.

24  Q.  So how many devices in total?

25  A.  Three.

H1J5gam5                        Roth - direct

1              MR. DEFILIPPIS:  Your Honor, may I approach?

2              THE COURT:  You may.

3    Q.  I am going to hand you what have been marked Government's

4    Exhibits 1, 2, and 4.  Mr. Roth, if you would take a look at

5    those and see if you recognize them?

6    A.  Yes.  Government Exhibit no. 2 is an iPhone.

7    Q.  Is that one of the devices that you analyzed in this case?

8    A.  Yes.

9              And Exhibit 4 is another iPhone.

10   Q.  Again, another one you analyzed in this case?

11   A.  Yes.  Correct.

12   Q.  And finally, look into the last exhibit.

13   A.  The final exhibit is a laptop that was analyzed by me.

14   Q.  And is it your understanding that those devices were seized

15   by the FBI in connection with this case?

16   A.  Yes.

17   Q.  Now, did there come a time when you prepared -- talking

18   about the cell phones first, did you prepare the kinds of

19   reports that you described on the two cell phones?

20   A.  Yes.

21   Q.  And were they what you have called the Cellebright report?

22   A.  They were.  Correct.

23   Q.  And then, with regard to the laptop, what sorts of reports,

24   if any, did you prepare?

25   A.  There was an FTK report that was created by the files that

1  were flagged by the case squad.

2  Q.  And what sorts of files were they?

3  A.  I believe they were video files.

4          MR. DEFILIPPIS:  Your Honor, may I approach again?

5          THE COURT:  You may.

6  Q.  I will hand you exhibits is that have been marked

7  Government Exhibit 2A, 4A, 11, 12, 13, and 15.  If you could

8  just look through the disks contained in each of those folders

9  and see if you recognize them?

10  A.  Yes.  These are the cell phone and FTK reports that were

11  created by myself.

12  Q.  So, as to 11, 12, 13 and 15, are those the reports you

13  prepared from the laptop?

14  A.  11, 12, 13 and 15?

15  Q.  Yes.

16  A.  Yes.

17  Q.  And 2A and 4A, are they from the cell phones?

18  A.  Correct.

19          MR. DEFILIPPIS:  Your Honor, at this time the

20  government offers only exhibits 11, 12, 13 and 15.

21          MS. MIRÓN:  Subject to the previous objection.

22          THE COURT:  Those exhibits will be received.

23          (Government's Exhibits 11, 12, 13 and 15 received in

24  evidence)

25  BY MR. DEFILIPPIS:

H1J5gam5                    Roth - direct

1   Q.  Finally, Mr. Roth, I'm going to show you what has been

2   marked Government Exhibit 5.  Do you recognize that document?

3   A.  Yes.

4   Q.  And, generally speaking, what is it?

5   A.  This is a PowerPoint slide show containing information from

6   the reports.

7   Q.  So, does this PowerPoint contain anything other than

8   information you extracted from the devices and reports?

9   A.  No.

10  Q.  Did there come a time when you took photographs of the

11  actual devices?

12  A.  Yes.

13  Q.  And did you include those in this as well?

14  A.  Yes, I did.

15          MR. DEFILIPPIS:  Your Honor, the government offers

16  Government Exhibit 5.

17          MS. MIRÓN:  Same objection.

18          THE COURT:  Government Exhibit 5 will be received.

19          (Government's Exhibit 5 received in evidence)

20          MR. DEFILIPPIS:  And if we can publish Government

21  Exhibit 5 to the jury?

22          THE COURT:  You may.

23  BY MR. DEFILIPPIS:

24  Q.  Mr. Roth, is this the first slide of that exhibit?

25  A.  Yes, it is.

H1J5gam5                         Roth - direct

1   Q.  And what are we looking at here?

2   A.  We are looking at the photographs that I took of the laptop

3   of 1B1.

4   Q.  And what is 1B1?

5   A.  1B1 was the unique evidence item number assigned to this

6   laptop.

7   Q.  Turning to the next slide, the title reads:

8   Registry-windows logon.  Is this from a particular report you

9   ran on the laptop?

10  A.  Yes.  This is from the registry that was stored on the

11  laptop and the registry is kind of the brains behind the

12  operating system; it controls everything about it and all the

13  information stored within it.  So, this is portraying a

14  screenshot of that registry report.

15  Q.  And if we could enlarge the bottom several rows of the

16  registry chart?  In the field listed as default user name, what

17  is displayed there?

18  A.  That is the user account used to log on to the laptop which

19  is listed as ElGammal44@yahoo.com.

20  Q.  What, if anything, can we conclude about the fact that that

21  e-mail address is listed as the default user name?

22  A.  That e-mail address was used to register and log on to that

23  laptop with.

24  Q.  Let's turn to slide 3.  Is this just an enlarged version of

25  what we saw?

H1J5gam5                        Roth - direct

1    A.  Yes.

2    Q.  Slide 4?

3            Mr. Roth, what are we looking at here?

4    A.  We are looking at a screenshot of the FTK report for one

5    video file.

6    Q.  And looking at each of the fields here where it says "name"

7    in the upper left here and there appears to be a file name to

8    the right, what can we tell from that?

9    A.  That was the name of the file.

10   Q.  And looking at the information displayed here, can you tell

11   where on the computer, in any particular folder or area, where

12   the file was located?

13   A.  Yes.  A few rows down there is a row called path and that's

14   where the file was stored to.

15   Q.  Ms. Quinones, if it is possible to go on a wider view just

16   to capture the path?

17           Okay, and Mr. Roth, just looking at this path of where

18   the file was located, what, if anything, can you tell about the

19   file?

20   A.  Well, there is two separate things.

21           The first thing I can tell, as you read through the

22   path it shows you that it is from windows.old, so what that

23   means is that this particular laptop had a version of windows

24   on it and then it was upgraded to a newer version.  If you

25   follow that it tells you that this particular file was located

H1J5gam5                         Roth - direct

1   in the Internet cache file path for Internet Explorer.

2   Q.   What is an Internet cache?

3   A.   Internet cache is, are files that are downloaded to your

4   laptop by the websites.  It is called cache which is spelled

5   C-A-C-H-E.  And it does that so the next time you visit that

6   site it could reference those files locally on your laptop or

7   whatever you are on instead of reaching out back to the server.

8   So, it is a lot quicker way of reading those files.

9   Q.   So, is it fair to say that the origin of this file was the

10  Internet?

11  A.   Yes.

12  Q.   And is it fair to say that at some point a user of this

13  device transferred the file, or at least part of the file to

14  this device, from the Internet?

15  A.   It can be explained that the video was viewed in a browser

16  by the user of that laptop.

17  Q.   And just for those who don't -- what is a browser?

18  A.   A browser is a software application that allows you to

19  connect to the Internet and view various websites.

20  Q.   Now, looking at the file type "field," what does that

21  display?

22  A.   File type is just that, it is the type of actual file which

23  is an Mpeg4 video file.

24  Q.   And then, how about "physical and logical" size?

25  A.   Physical and logical size are the sizes of the actual file.

H1J5gam5                          Roth - direct

1    Q.  And MD5 hash, is that a term you referenced earlier in your

2    testimony?

3    A.  Yes.

4    Q.  Just remind us briefly, what is that?

5    A.  Sure.

6           So, MD5 hash is a mathematical calculation that is run

7    either on an image file or single file itself.  It is unique to

8    that file.  If two files have the same hash file then it can be

9    said that they are the exact same file.

10   Q.  And I just want to draw your attention to the three fields

11   towards the bottom:  Created date, accessed date, and modified

12   date.

13          Starting with created date, what can you tell from

14   that field?

15   A.  Sure.

16          So, the creation date is described as the first time

17   that file existed on that laptop.

18   Q.  And here, when is that?

19   A.  That is February 21st, 2015.

20   Q.  And is there a time given?

21   A.  Yes; 23:44:31 UTC.

22   Q.  And UTC being?

23   A.  Universal time.  It is absolute zero on the clock so

24   everything is based off of that time.

25   Q.  Now, the accessed date field, what does that refer to?

H1J5gam5                         Roth - direct

1    A.  The accessed date is a legacy field that was left in there

2    by Microsoft Windows.  It is no longer being tracked or really

3    used.

4    Q.  And the modified date?

5    A.  The modified date is just that, it is the last time that

6    that file was modified or altered.

7    Q.  How can a file be modified or altered by the user of a

8    device?

9    A.  I guess it would matter on what kind of file it is.  It

10   could be opened up and edited with -- it can be opened up and

11   you change a few things.  As soon as you change anything within

12   a file it would alter that modified date.

13   Q.  Finally, the "exported as" field, what does that tell you?

14   A.  Just what the forensic software FTK exported that file as.

15   Q.  Now, if we could just go back out to the full slide?

16          The screenshot in the lower right there, is that a

17   screenshot of the video that this data is referring to?

18   A.  Yes, it is.

19   Q.  And is that contained in the report you prepared of

20   Government Exhibit 11?

21   A.  Yes.

22          MR. DEFILIPPIS:  With the Court's permission, your

23   Honor, we would publish Government Exhibit 11.

24          THE COURT:  Very well.

25          MS. MIRÓN:  Same objection.

```
 1              THE COURT:  I'm sorry.  Is it in evidence already?
 2              MR. DEFILIPPIS:  It is from earlier in his testimony,
 3    your Honor.
 4              THE COURT:  Okay.
 5              MS. MIRÓN:  Your Honor, for the record, a relevance
 6    objection, and prejudice.
 7              THE COURT:  Overruled.
 8              (file played)
 9    BY MR. DEFILIPPIS:
10    Q.  Now, Mr. Roth, did your review determine whether in fact
11    the entire video was contained in this file?
12    A.  Yes.
13    Q.  And was it?
14    A.  It was not.
15    Q.  Ands what, if any conclusions, can you draw about why?
16    A.  Well, this video was located in Internet cache and
17    depending on what website this video came from, what usually
18    happens when you view a video in a browser, it will start to,
19    you know, buffer it or stream it.  And then, once you buffer
20    that video, it will automatically download to the Internet
21    cache.  Depending on how that website was set up and depending
22    on the user actions, the video buffering did not complete until
23    the end of the video.
24    Q.  Okay.
25              And did you undertake any work to determine what
```

1    website or platform, if any, the video was originally

2    downloaded from?

3    A.  No.

4    Q.  And what, if anything, just to be clear, can you conclude

5    that a particular person or user actually looked at the video

6    or viewed the video?

7    A.  I cannot.  No.

8    Q.  And so, what is it that can you tell just by knowing that

9    the video was located in that path?

10   A.  The user with access to that laptop went to a website that

11   was hosting this video and the video buffering was able to

12   buffer up to how long that video was.

13   Q.  Let's turn to the next slide.

14        Is this a similar depiction for another video found on

15   the device?

16   A.  Yes.  This is another screenshot of an FTK report.

17   Q.  And was this video -- tell us about where this video was

18   found on the device.

19   A.  It was found in the same file path as the last video in the

20   Internet cache.

21   Q.  So, again, the conclusions you drew as to the previous

22   video, are they the same as to this one?

23   A.  Yes.

24   Q.  And looking to the created, accessed, and modified dates;

25   when was this file created on the computer?

H1J5gam5                         Roth - direct

1    A.   The creation date is listed as December 24th, 2014, at

2    6:52:07 UTC.

3    Q.   And the accessed date?

4    A.   Accessed date is listed as December 24th, 2014, at 6:52:07

5    UTC.

6    Q.   And the modified date?

7    A.   Modified date is December 24th, 2014 at 6:52:29 UTC.

8    Q.   Now, I think you testified that the accessed date is what

9    was the term you used, no longer used?

10   A.   It is an old legacy field that is no longer be used,

11   correct.

12   Q.   So, of these three categories, when trying to figure out

13   when a video was accessed by a particular device, which do you

14   consider the most reliable?

15   A.   Well, the creation date is the first time that file existed

16   on that laptop so that would be the most relevant one.

17   Q.   And finally, turning your attention to the screenshot in

18   the lower right-hand corner, is that a shot from the video

19   contained in the file that we have been talking about?

20   A.   Yes.

21   Q.   Is that the file that, for which you prepared a report on

22   Government Exhibit 12?

23   A.   Yes.

24   Q.   Oh, I'm sorry, was this Government Exhibit 15?

25   A.   Yes.

H1J5gam5                          Roth - direct

1              MR. DEFILIPPIS:  And with the Court's permission, your

2       Honor, we will publish Government Exhibit 15?

3              Just one second, your Honor?

4              (Counsel conferring)

5              MS. MIRÓN:  Objection to relevance.  Prejudice.

6              THE COURT:  Overruled.

7       BY MR. DEFILIPPIS:

8       Q.  Your Honor if we can draw the jury's attention to

9       Government Exhibit 15-T in their binders?

10             (file played)

11      BY MR. DEFILIPPIS:

12      Q.  Mr. Roth, with regard to this video, did your work reveal

13      whether the entirety of the video or just part of the video was

14      downloaded to the device?

15      A.  Judging by the time frame listed in the video, only a

16      portion of the video was in Internet cache.

17      Q.  And again, the conclusions you stated earlier with regard

18      to the other video about how and when it was accessed, did you

19      draw similar conclusions?

20      A.  Yes.

21      Q.  Adjusting for the date and time?

22      A.  Correct.

23      Q.  Okay, let's move to the next slide.

24             Mr. Roth, is there a third video that was discovered

25      on the laptop?

H1J5gam5                        Roth – direct

1    A.  Yes.

2    Q.  The location of this video was?

3    A.  The same as the others; in the Internet cache folder.

4    Q.  And the time it was created on the device?  Time and date?

5    A.  I'm sorry?

6    Q.  I'm sorry.  The time and date?

7    A.  Yes.  The creation date is listed as January 5th, 2015, at

8    7:52:17 UTC.

9    Q.  And the screenshot in the lower right-hand corner, is that

10   a screenshot of the video obtained from the device?

11   A.  Yes.

12   Q.  And is that contained in Government Exhibit 13?

13   A.  Yes.

14           MR. DEFILIPPIS:  Your Honor, with the Court's

15   permission, we will publish Government Exhibit 13.

16           MS. MIRÓN:  May we approach, your Honor?

17           THE COURT:  Sure.

18

19

20

21

22

23

24

25

H1J5gam5                          Roth - direct

1          (At side bar)

2          MR. HABIB:  This has been played already during the

3     testimony of Mr. Zelin.

4          MS. MIRÓN:  This and another video has been played.

5          MR. DEFILIPPIS:  Your Honor, our proposal for this

6     would be to publish it for four or five seconds, enough that

7     the jury recognizes it and we don't intend to play more beyond

8     that, so that they can draw the connection to the previous

9     viewing.

10         THE COURT:  Anything more after this?

11         MR. DEFILIPPIS:  No more videos, your Honor -- I'm

12    sorry.  There is one more after this which we will do the same

13    thing, play four or five seconds.

14         MS. MIRÓN:  Your Honor, they don't need to play it

15    again.  It was referenced in the testimony when Mr. Zelin

16    testified what exhibit number it was.  We did not object to the

17    fact that it was, should be subject to connection because they

18    had not put on Mr. Roth yet, but the fact it was playing --

19         MR. DEFILIPPIS:  Your Honor --

20         We are agreeing with you.

21         We are happy to rely on the screenshot.

22         THE COURT:  Very well.

23

24

25

H1J5gam5                          Roth - direct

1         (In open court)

2    BY MR. DEFILIPPIS:

3    Q.  So, Mr. Roth, again, is it your testimony that the way in

4    which it arrived on the device was similar to the previous two

5    videos?

6    A.  Yes.

7    Q.  And the jury having seen this before, we are going to move

8    to the next slide.

9    A.  Okay.

10   Q.  Is this the last of the videos that were identified on the

11   laptop?

12   A.  Yes, it is.

13   Q.  And I guess I should be clear, Mr. Roth.  When I say that

14   these were videos recovered from the laptop, were these all the

15   video files contained on the laptop, or were they just ones

16   that were identified to you, by agents, as of interest?

17   A.  They were just the ones that were flagged by the case

18   squad.

19   Q.  And looking to the relevant fields on this slide, what can

20   we tell about where this video was located and where and when

21   it was downloaded?

22   A.  Sure.  Same as the others.  It was located in the Internet

23   cache and the creation date was February 22nd, 2015, at 4:41:47

24   UTC.

25         (Continued on next page)

H1J3GAM6                          Roth - direct

1   Q.  Again, with regard to this and the previous video, do you

2   recall whether the entirety of the file was downloaded or was

3   it just part of the file?

4   A.  It was not the whole file.

5   Q.  Is that for the same reasons as you testified as to the

6   first video we watched?

7   A.  Yes.

8   Q.  Moving to the next slide.

9           What device is depicted on this slide?

10  A.  These are photos of an iPhone 6 Plus.

11  Q.  One of the two iPhones you analyzed in this case?

12  A.  Yes.

13  Q.  Moving to the next slide.

14          What do we see depicted here?

15  A.  This is a screen shot of the cell phone report with the

16  general area describing the information about the phone on

17  there.

18  Q.  If we can highlight the first row or enlarge the first row

19  titled "Apple ID."

20          What does the Apple ID row tell you?

21  A.  The Apple ID row displays ElGammal44@Yahoo.com.

22  Q.  What does that mean, that that e-mail address is displayed

23  in that row?

24  A.  That's the registered owner of the phone.

25  Q.  Next slide.

1          Mr. Roth, what section or category of the report you

2    prepared was this data drawn from?

3    A.  This was a screen shot from the cell phone report of the

4    user account area.

5    Q.  What can we tell about the user account or accounts

6    associated with the device?

7    A.  Well, the cell phone software was able to pull out the user

8    names for a few applications that were installed on the phone,

9    including Skype, Facebook, Viber, and WhatsApp.

10   Q.  What, if anything, can you conclude about whether the user

11   of the device used those applications?

12   A.  Whatever the name and user name were entered in as, is what

13   the user names are.

14   Q.  Can we see the same e-mail address we saw in a prior slide

15   ElGammal44@Yahoo?

16   A.  Yes.

17   Q.  Are there any other e-mail addresses listed on this slide

18   here?

19   A.  Yes, there are.

20   Q.  Which one or ones are they?

21   A.  I see an e-mail address listed as JimmyGammal@hotmail.com.

22   Q.  Next slide.

23          It looks like this data was also drawn from the user

24   account section, is that right?

25   A.  Correct.

H1J3GAM6                    Roth - direct

1   Q.  What can we tell from this?

2   A.  This is a screen shot of the user account for the Skype

3   application.

4   Q.  What is the user name for that Skype application?

5   A.  The user name is listed as JimmyGammal44.

6   Q.  Are there any phone numbers associated with the account?

7   A.  Yes, there is.

8   Q.  What's the number?

9   A.  +1 623-692-7880.

10  Q.  Finally the picture there, what is your understanding does

11  that show?

12  A.  That's a photo of a man.

13  Q.  In what way is that photo associated with the Skype

14  functionality?

15  A.  That is his -- what we refer to as his user account profile

16  picture.

17  Q.  Is that something that the user of the device would have

18  inputted into the Skype application?

19  A.  Yes.

20  Q.  Turning to the next slide.

21          Is this drawn from the user account section of the

22  report?

23  A.  Yes, it is did.

24  Q.  What, if anything, can we tell from looking at this slide?

25  A.  It has the same photo as the last slide.  And it has

1    information for a WhatsApp.

2    Q.   Briefly, if you know, what is WhatsApp?

3    A.   It a free messaging application that is widely used.

4    Q.   The name associated with this WhatsApp account?

5    A.   User name is Jimmy, J-I-M-M-Y.

6    Q.   Turning to slide 13.

7              What can we tell from this segment of the user

8    accounts report?

9    A.   This is another screen shot from the cell phone report for

10   the Facebook user account information.

11   Q.   Where it says phone numbers and e-mails, what do we see

12   there?

13   A.   ElGammal44@Yahoo.com.

14   Q.   And the number above it?

15   A.   1231043183.

16   Q.   Let's turn to slide 14.

17             Mr. Roth, what is an SMS message log?

18   A.   An SMS message log is a -- just exactly that.  It's a log

19   file containing SMS messages.

20   Q.   What does SMS stand for and what are they?

21   A.   SMS is referred to as a message that is sent from one cell

22   phone, you know, to another cell phone containing some sort of

23   message, words.

24   Q.   Is it similar to a text message?

25   A.   Yes.

H1J3GAM6                        Roth - direct

1   Q.  What specifically does the message log display or what can

2   you tell from the message log?

3   A.  Well, this report is showing the iPhone recents log, which

4   is a log from the iPhone containing only outgoing text messages

5   and when and who they were sent to.  It does not contain any

6   information about the message itself.

7   Q.  So looking at the time stamp field, what does that display?

8   A.  The exact time that the message was sent.

9   Q.  Does this include both outgoing and incoming or one or the

10  other?

11  A.  This iPhone recents log is only outgoing messages.

12  Q.  Why is that?

13  A.  It is just one way that the creator of the phone, Apple,

14  they just made a log that only refers to that.

15  Q.  Where it says "parties" and then list numbers, what are

16  they?

17  A.  That was who the message was sent to.

18  Q.  Were these numbers listed here all of the numbers that you

19  found in the recents log or was it -- or were you asked to

20  focus on this particular number?

21  A.  Only for that number listed.

22  Q.  What is that number?

23  A.  +1 845-283-9079.

24  Q.  Generally speaking, when did the SMS messages with this

25  number occur?

H1J3GAM6                        Roth - direct

1    A.  There was three on October 8 of 2014, one on October 9 and

2    one on October -- yeah.  The October 24 of that same year.

3    Q.  How were you able to tell -- so each one represents a

4    different message, is that right?

5    A.  Yes, each row is its own separate message.

6    Q.  Next slide, please.

7            Mr. Roth, what is a Tango chat log?

8    A.  Yeah, Tango chat log is just another type of messaging

9    application that you can use to send a message to who also has

10   that app on their phone.  This is a screen shot of the cell

11   phone report containing one Tango chat.

12   Q.  What briefly does the Tango app do or allow one to do?

13   A.  Send and receive messages.

14   Q.  Looking to the right of the slide there, is that a set of

15   Tango messages that was recovered from this device?

16   A.  Yes.

17   Q.  Looking at the start time and last activity fields, what do

18   you understand that to convey?

19   A.  The start time is when the messaging chat first started for

20   that message, and last one is when that last chat was sent or

21   received.

22           MR. DeFILIPPIS:  Ms. Quinones, if we can move to the

23   next slide.

24   Q.  What device do we see photographed here?

25   A.  This is an iPhone 5C which was one of the phones that was

H1J3GAM6                      Roth - direct

1    looked at.

2    Q.  That was the third and last of the devices that you

3    analyzed?

4    A.  Yes.

5    Q.  Next slide.

6         Does this next slide depict the sort of general

7    information we saw with respect to the other two devices?

8    A.  It does, yes.

9    Q.  If we can highlight the first two or three rows of this

10   section.  What e-mail address or addresses were associated with

11   the Apple ID of this device?

12   A.  ElGammal44@Yahoo.com and one ends with a B.

13   Q.  What, if anything, did you conclude about why there are two

14   different iterations of that address?

15   A.  It could be that when the user was, you know, typing in

16   their e-mail address, they actual -- they accidently hit the

17   letter B and it was, you know, stored in there.

18   Q.  Let's turn to the next slide.

19        What sort of information is shown on slide 18?

20   A.  Just like the last phone, this is a screen shot of the cell

21   phone report containing information about the user account

22   information.

23   Q.  Do we see the same two e-mail addresses that we saw

24   previously?

25   A.  Yes.

H1J3GAM6                          Roth - direct

1   Q.   The WhatsApp, the last row there, which says "service type

2   WhatsApp," what does that indicate?

3   A.   That that is for the WhatsApp application that was

4   installed on the phone.

5   Q.   What phone number on this device was associated with the

6   WhatsApp application?

7   A.   According to this, it has a user name listed as

8   1-623-692-7880.

9   Q.   Is there a particular Facebook account that was registered

10  or used on this device?

11  A.   There is a Facebook user ID listed.  And there is a

12  Facebook name also listed.

13  Q.   What is the name?

14  A.   It is spelled J-A-M-M-I-E, last name Gammal, G-A-M-M-A-L.

15  Q.   Moving one row above that.  What is Yahoo Messenger?

16  A.   Yahoo Messenger is just another type of messaging

17  application.

18  Q.   One row above that, what is Viber?

19  A.   Viber yet again is just another free messaging app that can

20  be installed and used on a phone.

21  Q.   The phone number associated with the Viber account?

22  A.   This one is listed as +1 623-692-7880.

23  Q.   Moving to slide 19.

24          Mr. Roth, what is a call log for these purposes?

25  A.   Sure.  A call log is just a listing of all the outgoing,

H1J3GAM6                          Roth - direct

1   incoming, and missed calls for that cell phone.

2   Q.   Were these particular calls all of the calls contained in

3   the call log or ones you were asked to focus on?

4   A.   Just ones we were asked to focus on.

5   Q.   Was that with the same number we referenced earlier ending

6   in 9079?

7   A.   Yes.

8   Q.   Generally speaking, what was the time period of these calls

9   with the number ending in 9079?

10  A.   The first one was January 6, 2015, and the last one was

11  ending in January 5 -- January 15, that same day.

12  Q.   Was it all incoming or outgoing calls or a mix of both?

13  A.   It was a mix.

14  Q.   Slide 20.

15         I think we saw a Tango call log with regard to a

16  previous device.  Is this a similar log for this device?

17  A.   Yes.

18  Q.   The "parties" field in this slide is blank.  Is there any

19  particular reason for that?

20  A.   It looks like the cell phone software was not able to find

21  any entries for that field.  So it's blank.

22  Q.   And the times of these two particular Tango calls?

23  A.   The first time is January 29, 2015 at 8:05:35 UTC.  And

24  January 29, 2015, at 1:23:12.

25  Q.   And the duration field there, what does that tell you?

H1J3GAM6                          Roth - direct

1  A.  How long the actual phone call was.

2  Q.  Slide 21, please.

3          Is this further information from the Tango call log?

4  A.  Yes, it is.

5  Q.  Slide 22.

6          Mr. Roth, when someone uses an application like Tango

7  on a device, are the chats typically stored on the device?

8  A.  Yes.

9  Q.  Is that true even when an application may be encrypted?

10  A.  Yes.

11  Q.  So looking at slide 22, are these Tango chats that were

12  exchanged with the user of the device?

13  A.  Yes, they were.

14  Q.  Slide 23.

15          Is that just a continuation of those chats, Mr. Roth?

16  A.  Yes.

17  Q.  Slide 24.

18          Similarly with the messaging application WhatsApp, is

19  it your understanding that those messages are often encrypted?

20  A.  They might be, yes.

21  Q.  Even if they are encrypted, is it possible sometimes to

22  recover those chats from or messages from a device itself?

23  A.  It's possible, yes.

24  Q.  Looking at slide 24, is this a WhatsApp chat that was

25  recovered from this particular device?

H1J3GAM6                          Roth - direct

1    A.  Yes, this is a screen shot from the cell phone report

2    containing a WhatsApp chat.

3    Q.  And what, if anything, can you tell about the party or

4    parties involved in the chat?

5    A.  There is a phone number listed there as +1 845-283-9079.

6    Q.  When is the date of the first communication?

7    A.  Start time is listed as July 16, 2015, at 8:08:05.

8    Q.  So the 9079 number you mentioned, is that the user of the

9    device or the person the user was exchanging messages with?

10   A.  That's the user of the phone.

11   Q.  If we can just enlarge on the screen the full set of

12   messages.

13              MS. MIRON:  May we approach, your Honor?

14              THE COURT:  Okay.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H1J3GAM6                         Roth – direct

1                    (At the sidebar)

2                    MS. SHROFF:  Your Honor, we withdraw the objection.

3                    (Continued on next page)

1              (In open court)

2    BY MR. DeFILIPPIS:

3    Q.  Mr. Roth, you testified, I think you had said that the 9079

4    number was the -- did you say that was the user of the device

5    or the person the user is communicating with?

6    A.  That is the person who the user is messaging with.

7    Q.  So in other words, the user of the device would be a

8    different number, this is just who they were --

9    A.  Yes, correct.

10             MR. DeFILIPPIS:  Your Honor, may I approach?

11             THE COURT:  You may.

12             MR. DeFILIPPIS:  I'm going to hand you two exhibits

13   marked Government Exhibit 4-C and 4-B.

14   Q.  Do you recognize those?

15   A.  Yes.

16   Q.  What are they?

17   A.  These are screen shots of a messaging chat.

18   Q.  Are these two of the screen shots that we have viewed in

19   your presentation that were drawn from the device?

20   A.  Yes.

21             MR. DeFILIPPIS:  Your Honor, the government offers

22   Government Exhibits 4-B and 4-C.

23             THE COURT:  Any objection?

24             MS. MIRON:  Subject to the previous objection, your

25   Honor.

1       THE COURT:  Very well.  They will be received.

2              (Government's Exhibit 4-B, 4-C received in evidence)

3       MR. DeFILIPPIS:  Thank you, your Honor.  No further

4   questions.

5       THE COURT:  Ladies and gentlemen, let's take our

6   afternoon break.  15 minutes.  Don't discuss the case.

7              (Jury excused)

8       THE COURT:  Anything for me?

9       MR. QUIGLEY:  Not from us, your Honor.

10       MS. SHROFF:  No, your Honor.

11       THE COURT:  15 minutes, folks.

12              (Recess)

13       THE COURT:  Everyone ready?

14       MS. SHROFF:  Yes.

15       MR. DeFILIPPIS:  Yes, your Honor.

16              (Jury present)

17       THE COURT:  Cross-examination of Agent Roth.

18       MS. MIRON:  Thank you.

19   CROSS-EXAMINATION

20   BY MS. MIRON:

21   Q.  Good afternoon, Mr. Roth.

22   A.  Hello.

23   Q.  You testified about some communications via the WhatsApp

24   application on one of the phones, right?

25   A.  Yes.

H1J3GAM6                          Roth - cross

1  Q.  And you were asked about whether or not if it's encrypted,

2  whether you can still view the communications.  You were asked

3  that question on direct, right?

4  A.  Yes.

5  Q.  Are you aware that WhatsApp did not begin encryption until

6  March of 2016?

7  A.  I know that they later started incorporating encryption,

8  but I'm not sure of the exact date.  But I know their initial

9  launch of the application did not include encryption.

10 Q.  So you don't know sitting here today whether when those

11 messages were received, whether WhatsApp was ever encrypted at

12 that point?

13 A.  What were the dates that the messages were sent?

14 Q.  You have your report in front of you?

15 A.  Yes.

16 Q.  I believe it is the last page.  July 2015.

17 A.  Okay.

18 Q.  Fair to say that's before March 2016, right?

19 A.  Yes.

20 Q.  And if you know, is it before WhatsApp began encryption?

21 A.  I'm not sure of the exact date that WhatsApp deployed

22 encryption.

23 Q.  What about Tango?  Tango was never encrypted, isn't that

24 true?

25 A.  I'm not sure.

H1J3GAM6                          Roth - cross

1  Q.  When you were asked about encryption of Tango, you don't

2  even know if Tango was ever encrypted?

3  A.  I don't know off the top of my head of whether it was

4  encrypted or not.

5  Q.  Okay.  You can put the report aside.

6         I just want to speak in plain language about the

7  videos.

8  A.  Sure.

9  Q.  You testified about four videos.

10  A.  Right.

11  Q.  Right?  And those videos you found in the cache area of the

12  laptop.  Right?

13  A.  Yes.

14  Q.  The file path was the cache.  Correct?

15  A.  Yes, it was.

16  Q.  Explain to the jury what the cache is.

17  A.  Sure.  So as I mentioned earlier, cache are files that are

18  downloaded to the local hard drive by the website.  So later on

19  it can access those files locally, rather than going back to

20  the server.  It is a lot faster way.

21  Q.  But it's different when a user clicks on a video and saves

22  it, for example, to their desktop, right?  That's a different

23  path?

24  A.  If somebody hits "file save as," when they hit "file save

25  as" on the file, they can put it wherever they want to.

H1J3GAM6                          Roth - cross

1    Q.   But it's different than the cache, right?

2    A.   Wherever they put it is where it would go.

3    Q.   The cache is hidden from the user.  Right?

4    A.   Yes.

5    Q.   So they're not going to put it in the cache if they're

6    saving it, fair to say?

7    A.   The average user, no.

8    Q.   So, when you reviewed the four videos, you testified that

9    they could be downloaded, they could be automatically

10   downloaded from the browser.  Is that fair to say?

11   A.   It is certainly possible, yeah.

12   Q.   So, for example, someone could click on a website like The

13   New York Times, okay?

14   A.   Hmm-hmm.

15   Q.   And a video could be playing automatically, right?

16   A.   Sure.

17   Q.   And that could go to the cache, correct?

18   A.   Yes.

19   Q.   Without the user intending to view the video.  Is that fair

20   to say?

21   A.   Correct.  It all matters on how the website is set up.

22   Q.   What about if someone has multiple browsers open?  If one

23   browser is in the background, the video is playing, they could

24   have another browser on top, and the video could still go to

25   the cache, right?

H1J3GAM6                          Roth - cross

1    A.  Yes.

2    Q.  Did you do any testing about where the four videos came

3    from, what browser, what website they came from?

4    A.  We determined or I did a little bit of research on what

5    came installed with Windows 8.  And there is the Internet

6    Explorer 11 browser.

7    Q.  For example, you don't know whether the browser had clicked

8    on say The New York Times?

9    A.  There was no web history URLs that were found by the

10   forensic software.

11   Q.  You don't know whether it was, say, Facebook running in the

12   background when these videos were downloaded to the cache?

13   A.  There was no web history that was found.  So we were unable

14   to locate which website at that time.

15   Q.  You didn't test whether videos like this have any

16   identifying feature when they're accessed via Facebook.  You

17   didn't test that mechanism, right?

18   A.  I'm sorry.  Can you rephrase that question?

19   Q.  Sure.  Is there a way to determine whether videos that are

20   associated with Facebook, in other words, on someone else's

21   page when you go to that page, you didn't test whether there is

22   any type of identifying feature of those videos when you did

23   your examination?

24   A.  I did browse to a Facebook website and I found that the

25   file names were very similar to the file names of the four

1    videos that were found in Internet cache.

2    Q.   Okay.  Is it fair to conclude that it's certainly possible

3    this was on someone else's Facebook page?

4    A.   The file names were similar to how Facebook saves their

5    Internet cache right now.  But since we don't have any other

6    information, I can't say for certain.

7    Q.   These were not fully downloaded, is that right?

8    A.   The file lengths of the video do not appear to be fully

9    downloaded.

10   Q.   That means that the user of the laptop did not have open on

11   their screen the entire video.  Right?  The entire length of

12   the video?

13   A.   What do you mean by open?  Sorry.

14   Q.   It wasn't running for the entire length of the video?

15   A.   Yes, correct.

16   Q.   Okay.  So someone could browse to a Facebook page, right?

17   A.   Someone -- yeah, sure.

18   Q.   See that a video is playing, right?

19   A.   Hmm-hmm.

20   Q.   Click off that browser, close the browser, right?

21   A.   Yes.

22   Q.   And that video would have been downloaded to the cache,

23   fair to say?

24   A.   It depends how the website is set up.  Sometimes websites

25   will automatically download stuff.  Sometimes you have to click

1   on to launch it.  Sometimes it will only buffer like 30 seconds

2   ahead, or sometimes it will buffer the whole video, so it

3   really matters on how the website is, you know, set up.

4   Q.  Did you test Facebook in that regard?

5   A.  I did for the current version of Facebook, but I don't know

6   what version was running back when these files were accessed.

7   Q.  But it's fair to conclude it was possible that the video

8   was automatically playing, and before it finished, the browser

9   was closed.  Right?

10  A.  Yes.

11          MS. MIRON:  Just a moment.

12  Q.  Are you familiar with the news feed of Facebook?

13  A.  Yes.

14  Q.  And those videos play automatically on the news feed,

15  right?

16  A.  For the current version that's out there, yes.

17  Q.  What about the version in 2015?

18  A.  Unfortunately, I do not know.

19  Q.  You can't tell this jury whether the user of the laptop had

20  open on his screen someone else's news feed, and then where

21  these four videos came from.  You can't say whether that's true

22  or not true.

23  A.  Is that a question?

24  Q.  It is.

25  A.  Okay.  Can you please rephrase that?

H1J3GAM6                          Roth - redirect

1   Q.   Sure.  So because you did not test Facebook at the time,

2   you are not able to say whether those four videos were

3   associated with a Facebook news feed on someone else's Facebook

4   page.

5   A.   They certainly could be, sure.

6   Q.   Thank you.

7             MS. MIRON:  Nothing further.

8             THE COURT:  Redirect?

9             MR. DeFILIPPIS:  Yes, briefly, your Honor.

10  REDIRECT EXAMINATION

11  BY MR. DeFILIPPIS:

12  Q.   Mr. Roth, I just wanted to clarify, when you were asked

13  whether about WhatsApp, do you recall Ms. Miron asking you

14  about the WhatsApp application?

15  A.   Yes.

16  Q.   Did you say you weren't sure when WhatsApp started

17  encrypting their messages?

18  A.   Correct, I don't recall off the top of my head.

19  Q.   If you were to learn that in fact the date when they

20  started was in fact in the middle of 2015, is that something

21  you have any knowledge of?

22  A.   I am not sure right now, no.

23            MR. DeFILIPPIS:  Thank you, your Honor.  No further

24  questions.

25            MS. MIRON:  Just one moment, your Honor.

H1J3GAM6

1    RECROSS EXAMINATION

2    BY MS. MIRON:

3    Q.  So you don't know whether there was any encryption

4    available for the iPhone in July of 2015?

5    A.  I know that the cell phone software was able to extract the

6    messages, so therefore they were not encrypted at that time.

7    Q.  The messages were not encrypted?

8    A.  Correct.

9              MS. MIRON:  Thank you.  Nothing further.

10             THE COURT:  Mr. DeFilippis?

11             MR. DeFILIPPIS:  Nothing, your Honor.

12             THE COURT:  Mr. Roth, you may step down.

13             THE WITNESS:  All right.  Thank you.

14             (Witness excused)

15             THE COURT:  Government, please call your next witness.

16             MR. DeFILIPPIS:  Yes, your Honor.  The government

17   calls Jake Sidransky.

18             MR. HABIB:  Your Honor, may we briefly?

19             THE COURT:  Sure.

20             (Continued on next page)

21

22

23

24

25

H1J3GAM6

1                    (At the sidebar).

2                    MR. HABIB:  So during the break, this is on the

3          summary exhibit issue.  During the break, I went back to

4          Weinstein's and I just want to make my record clear.  I'm

5          looking at Weinstein Section 1006.08(4).  And it distinguishes,

6          as I was trying to do perhaps less artfully this morning,

7          between Rule 1006 summaries and summaries of the type that I

8          believe the government is proffering.

9                    It says:  Rule 1006 summaries should be distinguished

10         from, quote, summaries or charts used as pedagogical devices

11         which organize or aid the jury's examination of testimony or

12         documents, which are themselves admitted into evidence.

13         Pedagogical device summaries are used to summarize evidence,

14         but they are not evidence themselves.  Their use is based on

15         the Court's authority under Rule 611(a).

16                    In addition, as to customary pedagogical devices such

17         as visual aids or charts, a summary witness may testify in

18         order to give the jury a clear picture of the entire mass of

19         evidence.  It is error to admit as evidence in chief a chart or

20         summary that properly can be used only as an aid for a jury's

21         understanding of the evidence.

22                    The Court should clarify through a limiting

23         instructions that jury aids, unlike Rule 1006 summaries, are

24         not evidence in chief, but are only the proponents organization

25         of the evidence presented.

H1J3GAM6

1    I think the government agreed that this is the

2    proponent's organization of the evidence presented.

3         Finally, while the Court retains discretion to permit

4    the jury to take such aids into their deliberation, most courts

5    do not allow it.  The better practice is not to allow jury aids

6    into the jury room without the consent of all parties since

7    they are more akin to argument than evidence.

8         So, based on Weinstein we make three requests.  One,

9    I'd like to clarify that the summary exhibits are being

10   admitted as what Weinstein calls pedagogical devices, not

11   substantive evidence.  We'd ask for a limiting instruction to

12   that effect, i.e., that the exhibits are not evidence.  The

13   jury should consult the underlying evidence.  And we would also

14   ask that they not go back for deliberations.

15        MS. SHROFF:  Could I just have one second with

16   Mr. Habib.

17        THE COURT:  Sure.

18        MR. HABIB:  And Ms. Shroff reminds me that we renew

19   our position that the exhibits are not properly admitted under

20   1006 for the reasons in our papers, and also because they are

21   not in fact a neutral summary.  They are a summary that I'm

22   sure the government will agree was prepared by them as an

23   argumentative tool.

24        MR. DeFILIPPIS:  Your Honor, the term pedagogical aid

25   or demonstrative frequently refers to aids that are prepared

H1J3GAM6

that do not simply reproduce evidence already in the record.

Although this section cites a number of out-of-circuit cases,

the law in the Second Circuit is that it is entirely proper to

admit summary charts that merely reproduce or synthesize

evidence already in the record.

     Frequently the types of charts that are deemed

pedagogical aids are those that, for example, provide pictures

of key players in the events or things that package the

information in ways that require packaging.

     This summary, your Honor, the keystone of what we're

saying is Rule 1006 applies when their evidence is voluminous

and helps the jury synthesize information that is too

voluminous to otherwise synthesize.

     That's precisely what we're doing by avoiding any

pedagogical devices that would provide illustrations to them

beyond what is already in evidence.  And so, that's why we

think these fall squarely on the side of Rule 1006 rather than

the demonstrative pedagogical device.

     MR. HABIB:  So, I think the Court likely has our

argument at this point, but just to be crystal clear, it is our

position that they don't fall within 1006, because they do not

satisfy the plain text of the rule.  That is, they can't be

conveniently examined in court and they have been conveniently

examined in court.  And as I said a moment ago, the summaries

do not purport to be a, for lack of a better word, neutral

H1J3GAM6

1    summary.  That is to say it is a selective summary based on the

2    government's case theory.

3         THE COURT:  Okay.  You've made your record.  I'm

4    sticking by my decision of earlier today.  And the objection is

5    overruled.

6         MR. HABIB:  Thank you.

7         MS. SHROFF:  Your Honor, one other issue.  As recently

8    as during the lunch break I received an updated version of what

9    the government is using as a summary exhibit, so I'm going to

10   ask for some time before I have to cross.  I just want to make

11   sure the Court knows that.

12        MR. DeFILIPPIS:  That's fine.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   (In open court)

2   (Witness sworn)

3   THE COURT:  Pull your seat up to the microphone.

4   Please state your full name and spell your last name for the

5   record.

6   THE WITNESS:  Jake Sidransky, S-I-D-R-A-N-S-K-Y.

7    JAKE SIDRANSKY,

8   called as a witness by the Government,

9   having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. DeFILIPPIS:

12  Q.  Good afternoon, Mr. Sidransky.

13  A.  Good afternoon.

14  Q.  Where do you work?

15  A.  I work at the United States Attorney's Office for the

16  Southern District of New York.

17  Q.  What do you do there?

18  A.  I am a paralegal.

19  Q.  As a paralegal, have you worked on this case United States

20  v. Ahmed Mohammed El Gammal?

21  A.  I have.

22  MR. DeFILIPPIS:  Permission to approach, your Honor?

23  THE COURT:  You may.

24  Q.  Mr. Sidransky, I'm going to hand you what have been marked

25  Government Exhibits 113-C, 110-I, and 110-K.  Do you recognize

H1J3GAM6                          Sidransky - direct

1    those?

2    A.  I do.

3    Q.  What are they?

4    A.  Government Exhibit 113-C is an excerpt from Government

5    Exhibit 113, which comes from the Facebook account of Samy

6    El-Goarany.  And Government Exhibits 110-I and 110-K are

7    excerpts from Government Exhibit 110, also come from the

8    Facebook account of Samy El-Goarany.

9    Q.  Finally the last -- is that all of them?

10   A.  Yeah.

11             MR. DeFILIPPIS:  Your Honor, government offers those

12   three exhibits.

13             MS. SHROFF:  We object, your Honor.

14             THE COURT:  Overruled.

15             MS. SHROFF:  Your Honor, may we approach?

16             THE COURT:  Okay.

17             MS. SHROFF:  Thanks.

18             (Continued on next page)

19

20

21

22

23

24

25

1       (At the sidebar)

2       MR. HABIB:  We can hand the exhibits up to your Honor

3   but these are Facebook chats, Facebook messages by Samy in

4   which he discusses voting.  The first one says "I'm going to

5   vote in the election too."  The second one says "You know who

6   you're going to vote for yet."  Ahmed El-Goarany has a

7   response.  Samy says "Same here.  I was curious to know your

8   opinion.  Me, Tarek and Khalid are all voting for him."

9       MS. SHROFF:  This one.  That's the second.  There is

10  still 110-G and 110-L.  Were you planning to offer those?

11      MR. QUIGLEY:  No.

12      MS. SHROFF:  You keep changing your package.  What

13  about 110-M?

14      MR. DeFILIPPIS:  Only what you have.

15      MR. HABIB:  On the voting, our position is obviously

16  we can't contest relevance because we put in similar evidence

17  with respect to our client.  But we think now both parties have

18  made their point.  And any further evidence on this point is

19  cumulative and confusing.

20      There was extensive testimony elicited from Mohammed

21  El-Goarany about going to vote for his son in the Egyptian

22  elections.

23      And finally, I would note that the date of these

24  statements is I believe both in 2011 and 2012.  And if the

25  government puts those in, then we would respectfully request

1   that at the appropriate time we put in much more recent chats

2   from 2015 from Samy to his mother Teresa in which he says --

3           MS. SHROFF:  "Do not vote."

4           MR. HABIB:  "Do not vote.  Voting makes you Kuffar or

5   an unbeliever.  Democracy is Kuffar."

6           So, our view is at this point both parties have put in

7   their evidence on this issue, and enough is enough.  But fair

8   warning, if the government has to introduce this, I think we

9   will have to be allowed to match this with evidence that's more

10  probative of his mental state.

11          MS. SHROFF:  It is an actual voter ID card.  It's not

12  somebody talking about somebody else voting.  If you have

13  Samy's voter ID card, that's different.

14          MR. DeFILIPPIS:  Thank you, Ms. Shroff.

15          Your Honor, we don't expect to have any further

16  protracted evidence on this.  This is just in the way of

17  corroborating or reflecting the testimony of Mr. El-Goarany who

18  I expect defense in closing argument may seek to ask the jury

19  not to believe, and so this is a limited way to corroborate

20  that testimony.  We don't expect to open the door to any

21  further issues on this.

22          MS. SHROFF:  Your Honor, we have enough to impeach

23  Mr. Mohammed El-Goarany's credibility.  That we will not be

24  relying on whether or not he voted for with the son.

25          MS. MIRON:  I did not ask a single question about that

H1J3GAM6                         Sidransky – direct

1    direct testimony.  I did not touch it for this very reason

2    because we are done with this issue.

3              MS. SHROFF:  Given his many, many other false

4    statements on the witness stand, I'm certain none of us will

5    rely on that.

6              MR. DeFILIPPIS:  Your Honor --

7              THE COURT:  I'll leave it up to you guys.  It seems to

8    me if I allow this in, I will probably allow in this evidence.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (In open court)

2           MR. DeFILIPPIS:  Your Honor, government offers the

3     three exhibits.

4           THE COURT:  Very well.  They will be received.

5           MS. SHROFF:  Objection, your Honor.

6           THE COURT:  The objection is overruled.

7           MS. SHROFF:  Thank you.

8           MR. DeFILIPPIS:  I apologize, your Honor.  We are

9     offering only 113-C.

10          THE COURT:  Very well.

11          MS. SHROFF:  Same objection, your Honor.

12          THE COURT:  Same ruling.

13          (Government's Exhibit 113-C received in evidence)

14          MR. DeFILIPPIS:  May I approach, your Honor?

15          THE COURT:  You may.

16   Q.  Mr. Sidransky, I've placed in front of you Government

17   Exhibits 1201 through 1206.  Do you recognize those?

18   A.  Yes, I prepared them.

19   Q.  What are they?

20   A.  These are summary charts that place in chronological order

21   communications, cell site location data, toll records, and

22   airline records, all of which have previously been admitted

23   into evidence.

24   Q.  So is there anything in these exhibits that has not been

25   admitted into evidence in terms of the data or communications

1    that you display here?

2    A.  No.  All of the contents of these exhibits were already

3    admitted into evidence.

4    Q.  With whom or in consultation with whom did you prepare

5    these exhibits?

6    A.  I prepared these exhibits in coordination with the

7    prosecution.

8    Q.  In displaying the data, did you provide headers and

9    categories at the top of the relevant pages?

10   A.  Yes, at the top of each relevant page, the first line

11   describes the nature of the data displayed on the page.  The

12   second line describes the time period for which that data is

13   relevant.  And the third line cites the exhibits, as I

14   mentioned, that were already admitted into evidence from which

15   that data was drawn.

16   Q.  Is that the same format you used for each of these

17   exhibits?

18   A.  Yes.

19        MR. DeFILIPPIS:  Your Honor, the government offers

20   Government Exhibits 1201 through 1206.

21        MS. SHROFF:  Subject to our prior objection, your

22   Honor.

23        THE COURT:  And those exhibits will be admitted over

24   those objections.

25        (Government's Exhibit 1201 through 1206 received in

H1J3GAM6                              Sidransky – direct

1   evidence)

2   Q.  Mr. Sidransky, was your testimony that these exhibits

3   present somewhat of a chronology, that the order in which the

4   evidence presented is chronologically?

5   A.  With some slight --

6           MS. SHROFF:  Leading, your honor.

7           THE COURT:  Yes, don't lead, Mr. DeFilippis.

8   Q.  How did you organize the information contained in these

9   exhibits?

10  A.  In chronological order with some slight overlaps.

11  Q.  Is that starting with 1201 all the way to 1206?

12  A.  Yes.

13          MR. DeFILIPPIS:  May we publish Government Exhibit

14  1201?

15          THE COURT:  You may.

16          MR. DeFILIPPIS:  Your Honor, may we also pass out hard

17  copies to the jury?

18          THE COURT:  Yes.

19  Q.  Mr. Sidransky, looking at Government Exhibit 1201 on the

20  first page here, can you just describe for us in the context of

21  this exhibit how you organized the headers as you described.

22  A.  This is a combination of Facebook messages and toll records

23  between the defendant and Samy El-Goarany.  And the Facebook

24  messages were taken from Government Exhibit 100-B, the toll

25  records from Government Exhibit 511, and the toll records are

H1J3GAM6                        Sidransky – direct

1  inserted in green boxes chronologically along with the Facebook

2  messages.

3  Q.  In any instance where there is a white row or a gap between

4  rows on the chart as we see here on the first page, what does

5  that indicate?

6  A.  That signifies either a break in time between one block of

7  text and the next, or the insertion of another form of data.

8  Q.  You said these are Facebook communications, the messages?

9  A.  Yes.

10 Q.  So the date field on the left there, how did you gather

11 data for that field?

12 A.  That data came directly from the Facebook exhibit.

13 Q.  Where it says time and in parenthesis UTC, tell us how you

14 arrived at those times.

15 A.  Those times came from the exhibit as well.

16 Q.  Were they adjusted in any way?

17 A.  The times of the toll records were adjusted because the

18 toll records are produced in local time, so the times were

19 adjusted to match UTC, in order to show the chronological.

20 Q.  And the author field?

21 A.  Author field came directly from the exhibit, as did the

22 calling party number.

23 Q.  Finally, content.

24 A.  The content came directly from the part of the exhibit

25 labeled "body."

H1J3GAM6                          Sidransky – direct

1    Q.  Just looking, did you say the green are the toll records?

2    A.  Yes.

3    Q.  Looking at the toll records, where it says "seizure date."

4    How did you arrive at that information?

5    A.  That information came from the toll records directly.  In

6    the event that the seizure time when corrected for UTC crossed

7    the international dateline, the date was adjusted as well.

8    Q.  What do you understand "seizure time" to refer to?

9    A.  The time at which the call took place.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1J5gam7                         Sidransky - direct

1    BY MR. DEFILIPPIS:

2    Q.  And seizure duration?

3    A.  The length of the call.

4    Q.  Mr. Sidransky, would you read the messages of

5    Mr. El- Goarany and I will read the messages of Mr. El-Gammal?

6    A.  Yes.

7    Q.  Starting at the top?

8            "EL-GOARANY:  You free to talk right now?  We haven't

9    spoken in a while.

10           "EL-GAMMAL:  Driving.  40 minutes.  Call me.

11   Available.

12           "EL-GOARANY:  Okay."

13   Q.  And then are those green rows the calls that we were

14   discussing?

15   A.  Yes.  So, there was a call approximately 30 seconds later

16   that lasted 1,268 seconds.

17   Q.  What date was that?

18   A.  That was on June 10th, 2014.

19   Q.  Continue on.

20           "EL-GOARANY:  You free to talk, brother?

21           "EL-GAMMAL:  Yeah, call."

22   A.  Then there are two calls that follow approximately 30

23   seconds later.

24   Q.  And with what phone number?

25   A.  The calling party number is 845-283-9079, so that would be

H1J5gam7                              Sidransky – direct

1    the number that placed the call.

2              "EL-GOARANY:  Salam, bro.  You know what cryptocat is?

3              "EL-GAMMAL:  No.

4              "EL-GOARANY:  Crypto.cat.

5              "EL-GAMMAL:  I heard of crypto-Jew, what it means.

6              "EL-GOARANY:  No, this is an app for your browser.

7    Check out the link, I think you will find it useful.

8              "EL-GAMMAL:  Okay."

9    A.  Link to crypto.cat.

10             "EL-GOARANY:  Glenn Greenwald used it when he was in

11   Hong Kong to keep his messages with Edward Snowden private.

12             "EL-GAMMAL:  You think it is safer than Facebook?

13             "EL-GOARANY:  It can be added onto your browser like

14   Chrome or Firefox and you can use it for Facebook chats but

15   only with other people who have it.  I would like to use it

16   with you, if it is cool.

17             "EL-GAMMAL:  Okay.  What should I do?  On my iPhone.

18             "EL-GOARANY:  Yeah.  You can download it on your

19   phone, if you want, our your web browser.  Whatever you prefer.

20             "EL-GAMMAL:  Doing it now.  Wait."

21   A.  And then a string of next and numbers.

22             "EL-GOARANY:  You using it from your phone?

23             "EL-GAMMAL:  Yes.  It's an app.  Made a chat called

24   Samy.

25             "EL-GOARANY:  Hey.

H1J5gam7                         Sidransky - direct

1              "EL-GAMMAL:  How to connect?

2              "EL-GOARANY:  Can't say.  I can't download it on my

3     phone because I don't have IOS 7."

4     Q.  String of letters and numbers:

5              "EL-GAMMAL:  No, I got already, but how can I add you?

6              "EL-GOARANY:  Okay, try a different program from your

7     phone.  It is just as good.  Go to appstore and download

8     surespot.  When you search for it you'll find an icon with a

9     blue circle and a line in the middle.  Download that one."

10    Q.  Attachment name.

11             "EL-GAMMAL:  Do not what to do here.  What about

12    viper?  I have viper, what's up, and tango.

13             "EL-GOARANY:  Ya, forget it.  Just try Surespot.

14    Trust me.  It will work better.

15             "EL-GAMMAL:  Okay.  So delete crypto at?

16             "EL-GOARANY:  Ya, delete it.

17             "EL-GAMMAL:  Now what?

18             "EL-GOARANY:  Add me once you set up your account,

19    Samyelza."

20    Q.  There is a link to the YouTube video.

21             In the context of your work on this investigation, did

22    you learn what that YouTube video is?

23    A.  I believe that video is a Vice News video, The Islamic

24    State.

25             "EL-GAMMAL:  Who is Rameez Faroouki?  He reminds me

H1J5gam7                              Sidransky – direct

```
 1   with this bird guy.  You remember him?

 2            "EL-GOARANY:  He is a college friend of mine."

 3   Q.  Attachment.

 4            "EL-GOARANY:  Salam bro.  Down to Surespot?

 5   Q.  Mr. Sidransky, just briefly, what date are we at now?

 6   A.  September 2nd, 2014.

 7            "EL-GAMMAL:  Not now.  Kind of busy.

 8            "EL-GOARANY:  Okay.

 9            "EL-GAMMAL:  Samy.  You here?  Available?

10            "EL-GOARANY:  Yeah.

11            "EL-GAMMAL:  Okay, let's go.  Surespot.

12            "EL-GOARANY:  Okay.  Give me a second.

13            "EL-GAMMAL:  Okay."

14   A.  Now, September 14th, 2014:

15            "EL-GOARANY:  Salam, bro.  Let me know if you're

16   available to Surespot today.

17            "EL-GAMMAL:  Available now.

18            "EL-GOARANY:  Okay.  Give me a few min.  I'll hit you

19   up ISA.

20            "EL-GAMMAL:  Okay.

21            "EL-GOARANY:  I'm on now.  Just messaged you."

22   A.  There were several calls between the parties from the

23   period of September 19th, 2014, through October 2nd, 2014.

24   Q.  Mr. Sidransky, so the last communications of that segment

25   are, again, what date?
```

H1J5gam7                          Sidransky - direct

1    A.  The last Facebook messages are September 14th, 2014, and

2    the last call, telephone call is October 2nd, 2014.

3             MR. DEFILIPPIS:  May we now publish Government Exhibit

4    1202?

5             THE COURT:  You may.

6    Q.  Does this exhibit pick up chronologically from the previous

7    exhibit?

8    A.  Yes.  The previous exhibit concluded on October 2nd, 2014,

9    this exhibit begins on October 6th, 2014.

10   Q.  And what is depicted on this exhibit?

11   A.  This exhibit is an excerpt from Government Exhibit 520, it

12   depicts cell site location data.

13   Q.  And again, in depicting the slide, did you add or subtract

14   or modify any of the data here?

15   A.  No.  This is taken directly from the exhibit.

16   Q.  Turning to the next page?  If we can briefly return to the

17   previous slide?

18             Can you point out to us the two phone numbers depicted

19   on this slide here?

20   A.  Yes.  845-283-9079, and the other is 623-692-7880.

21   Q.  All right.  Next slide.

22             What types of communications are depicted by this

23   slide?

24   A.  These are Facebook communications from the period of

25   October 7th through October 10th, 2014, taken directly from

H1J5gam7                          Sidransky - direct

1   Government Exhibit 120-A-T and Government Exhibit 100-S-T.

2   Q.  And how long after the date depicted in the slide on the

3   previous page were these communications?

4   A.  These begin on the same day.

5   Q.  I will read the messages of Gammal if you will read Attiya.

6   Starting on October 7th, 2014, at 4:42:15 UTC time:

7           "EL-GAMMAL:  Why are you sad?  Listen.  Give me your

8   number in Turkey so my American friend can tell you when he

9   arrives.  Call me on Skype.

10          "ATTIYA:  You do not call me or say good evening or

11  send me likes or comment.  Turns out you are real Egyptian.

12          "EL-GAMMAL:  I am not logging on Facebook at all.

13          "ATTIYA:  Why, my friend?

14          "EL-GAMMAL:  I am in New York now.  Busy.

15          "ATTIYA:  Then you are excused.

16          "EL-GAMMAL:  Call me on Skype."

17  A.  Skype number provided:

18          "ATTIYA:  Okay."

19  A.  And then attachments sent:

20          "EL-GAMMAL:  Ha ha ha.  Another opinion.

21          "ATTIYA:  Fine.  What is it about?  Did you hear it?"

22  A.  Then the next day, on October 8th, 2014:

23          "ATTIYA:  What is the origin of your American friend?

24  Gammal.

25          "EL-GAMMAL:  Egyptian.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           "ATTIYA:  How come he does not speak Arabic?

2           "Okay, the tourism company needs somebody they know

3     and trust because they do not want him to cause them trouble in

4     the program."

5           MS. SHROFF:  Your Honor, I think they failed to read

6     some dates.

7           MR. DEFILIPPIS:  That's fine, your Honor.

8     Q.  Mr. Sidransky, just to situate us in the document, turning

9     back to page 3, when Gammal says Egyptian what is the date of

10    that communication?

11    A.  October 9th, 2014.

12    Q.  And the previous message when Attiya asks what is the

13    origin of your American friend Gammal; how long before was

14    that?

15    A.  That was the day before.

16    Q.  Okay.  So, if you could just reread at the top of page 4,

17    9:20:48:

18          "ATTIYA:  Okay.  The tourism company needs somebody

19    they know and trust, because they do not want him to cause them

20    trouble in the program.

21          "EL-GAMMAL:  Do not worry.  I think he knows one of

22    the producers.

23          "ATTIYA:  I mean, does he know anybody in the company

24    or somebody knows him?  I actually have a good relationship

25    with the tourism company and they trust me."

H1J5gam7                              Sidransky - direct

1    Q.  October 10th, 2014, 1:48:21:

2              "EL-GAMMAL:  Then fine.  Take care of him.

3              "ATTIYA:  Okay, but I need to understand his situation

4    from you because there are tourism agencies that send people so

5    they would know how other companies operate and work.  You do

6    understand how companies would sneak around.

7              "EL-GAMMAL:  Attiya, am I an idiot?  Am I a jack ass?

8    Or am I a moron?

9              "ATTIYA:  Fine.  I am just saying that that tourism

10   company takes no monkey business.  Your brother might very well

11   make a fool of himself."

12   Q.  Turning to page 5, what do we see depicted here?

13   A.  Here is an excerpt from -- are excerpts from Government's

14   Exhibits 100-B and 120-B.  So, first is a Facebook

15   communication between the defendant and Samy El- Goarany.

16   Q.  And what is the content of the communication sent by

17   Mr. El-Gammal?

18   A.  Mr. El-Gammal sends, on October 11th, 2014, what appears to

19   be a link to Attiya's Facebook page and Mr. El- Goarany

20   responds:  JZK, I'm going to add him now.

21   Q.  And what is displayed in the screenshot below that?

22   A.  In the screenshot below that is an excerpt from Government

23   Exhibit 120-B which shows the account information for Attiya

24   Aboualala and you can see that the vanity name matches the

25   vanity name contained in the message from Mr. El- Goarany.

1  Q.  And again, just to situate us in time, how long after the

2  comment about the tourism company on the previous page are

3  these communications between Mr. El-Gammal and Mr. El- Goarany?

4  A.  A day later.

5  Q.  That brings us to Government Exhibit 1203.  What do we see

6  depicted on this slide?

7  A.  Depicted here is an excerpt from Government Exhibit 802

8  which is from the Turkish Airlines.  This is the ticket that

9  Samy El- Goarany purchased from JFK to Istanbul.

10         MS. SHROFF:  Your Honor, we object to the explanation

11 of the exhibit.

12         THE COURT:  Sustained.

13 BY MR. DEFILIPPIS:

14 Q.  Mr. Sidransky, what is the "issued on" date of this

15 reservation?

16 A.  October 22nd, 2014.

17         MS. SHROFF:  Objection.

18         THE COURT:  Overruled.

19 Q.  And could you just read the issued by line?

20 A.  Issued by TK/JFK/33990563/EY.

21 Q.  And if you go towards the bottom, if you would read to the

22 right of where it says CPN 1?

23 A.  CPN 1 ex-exchanged/reissued TK.  TK 0004 W 20141106 JFK IST

24 1315-0545.

25 Q.  And finally towards the top where it says PAX name, what is

1  the listed name?

2  A.  Samy M. El Goarany.

3  Q.  And you just read the lines that begins Turkish Airlines?

4  A.  Turkish Airlines J.F. Kennedy U.S./0235.

5  Q.  Mr. Sidransky, turning to the next page, what did you

6  include here?

7  A.  Here are Facebook communications between Mr. El- Goarany

8  and Mr. El-Gammal from the period of October 21st, 2014 through

9  October 22nd, 2014, excerpted from Government Exhibit 110-B.

10  Q.  And can I ask you, how long after the issued on date that

11  we saw on the previous slide were these communications?

12  A.  These communications, the first three communications are

13  from the day before the issued on date and the final

14  communication is from the day of the issued on date.

15  Q.  So, I will read the messages of Mr. El-Gammal.  October

16  21st, 2014 at 15:47:01:

17       "EL-GOARANY:  Salam ya Jammie.  Are you available to

18  Surespot today?

19       "EL-GAMMAL:  Okay.  Now?"

20  A.  Then the next message is on October 22nd:

21       "EL-GOARANY:  Surespot me whenever you get the chance

22  today."

23  Q.  Turning to the next slide.  Are these additional Facebook

24  communications?

25  A.  Yes.  These are Facebook communications between

H1J5gam7                              Sidransky – direct

1   Mr. El-Gammal and Attiya Aboualala from the period of October

2   22nd through October 27th, 2014, excerpted from Government's

3   Exhibits 120-A-T and Government Exhibit 100-S-T.

4   Q.  And how long after the messages between Mr. El- Goarany and

5   Mr. El-Gammal that we just read, were these?

6   A.  These begin on October 22nd, which is the day that the

7   previous slide concluded.

8   Q.  I will read the Gammal messages beginning on October 22nd,

9   2014 at 4:01:49:

10          "EL-GAMMAL:  My friend will get there on November 6th.

11          "ATTIYA:  Fine.  Let him call me."

12  Q.  Let me pause for a minute and ask you, Mr. Sidransky; there

13  is a column on this slide "deleted by initially" with a

14  footnote.  Can you explain how you came upon that or what you

15  did?

16  A.  Yes.

17          The initial search warrant on each account indicated

18  whether or not the user had deleted the message in question.

19          MS. SHROFF:  Objection, your Honor.

20          May we approach?

21          THE COURT:  Sure.

22

23

24

25

1          (At side bar)

2          MR. HABIB:  Your Honor, we would ask that the

3    testimony be limited to reading the document.  Explaining how

4    the document -- he is now relating via hearsay the contents of

5    another document.

6          THE COURT:  Yes.

7          MS. SHROFF:  Not only that, your Honor, they are

8    reading dates.  There is a date.  There is no need for

9    Mr. DeFilippis to keep going on about how many minutes expired

10   or how much time expired.  There are dates he can read.  He is

11   planning to read the entire chart and all of these pages into

12   evidence, right?  So he can read -- I mean, there is no problem

13   going all the way left, just read 10/22/2014 is when it starts.

14         Mr. DeFilippis is literally leading the witness

15   throughout the entire testimony.

16         MR. DEFILIPPIS:  Your Honor, on the dates I only did

17   that because Ms. Shroff seemed to vigorously object when I

18   failed to reference the date.

19         MS. SHROFF:  Right.  Just reference the date.  You

20   don't have to ask him how many minutes, seconds and days

21   expired.  They're not morons, you know, they're smart people in

22   the jury box.

23         THE COURT:  Why don't you go through your summary in

24   summary fashion, Mr. DeFilippis.

25         MR. DEFILIPPIS:  Your Honor, the only reason I asked

him to explain the deleted column is because it explains how he

identified a particular message as deleted and why there is a

footnote that says -- in other words, just explaining how he

made the chart briefly.  Otherwise, to be honest, when I first

looked at I didn't quite understand so I thought it required

explanation.

          MS. SHROFF:  If their explanation is to go into all

the search warrants and all the underlying documents, that's

going to open up a whole wide world for me.  So.

          THE COURT:  So, in summary fashion, sir.

          MR. DEFILIPPIS:  May I ask him to explain the footnote

and the --

          MS. SHROFF:  There is no reason to explain the

footnote.  He has put something in there.  That's what he has

put in there.  There is nothing to explain.

          MR. DEFILIPPIS:  It explains how he compiled the chart

which the case law says is exactly what he is to do.

          MS. SHROFF:  He is not explaining how he compiled the

chart.  To explain how he compiled the chart he would say I

reviewed -- go ahead.

          MR. HABIB:  Ms. Shroff has -- all he needs to say is I

reviewed exhibit such and such and such reflects that the

message was deleted.

          MS. SHROFF:  That is it.

          MR. DEFILIPPIS:  That's what I expect his testimony to

H1J5gam7                          Sidransky – direct

1   be.

2              MS. SHROFF:  No, no.

3              MR. QUIGLEY:  Can he ask, when you said put a name and

4   "deleted by initially" field, why did you do that?

5              MS. SHROFF:  No.  What do you mean why did he do that?

6   It is clear not only that -- it is extremely clear, right, that

7   this poor kid has no independent initiative.  He did what the

8   prosecutors told him to do.  Do they really want us, on cross,

9   sitting there with every search warrant going through this with

10  him?

11             THE COURT:  I don't know that it opens up the doors

12  that widely but, again, you can have him explain the footnote.

13             MR. DEFILIPPIS:  It will be very brief.

14             THE COURT:  Very briefly.

1          (In open court)

2     BY MR. DEFILIPPIS:

3     Q.  Mr. Sidransky, could you just very briefly explain the

4     footnote "Gammal eventually deletes all," and how it relates to

5     the text that it references?

6     A.  Yes.

7          It can be seen in Government Exhibit 103-A that

8     Mr. El-Gammal, at some point, deleted all of the messages

9     displayed in this conversation.  So, the purpose of "deleted by

10    initially" is to demonstrate which messages were deleted in the

11    first round of deletions versus in the ultimate round of

12    deletions.

13    Q.  Thank you.

14         All right.  So, starting on October 22nd, 2014, I will

15    read the messages of Gammal:

16         "EL-GAMMAL:  My friend will get there on November 6th.

17         "ATTIYA:  Fine.  Let him call me."

18    A.  October 27th, 2014:

19         "ATTIYA:  The day of November 7th, the airport at 5:45

20    a.m.  Flight number TK 0004, terminal 1.

21         "EL-GAMMAL:  How could he call you?  He doesn't know

22    Arabic.  He could barely manage.

23         "ATTIYA:  No problem.  Don't worry.

24         "EL-GAMMAL:  You just take him to the address where

25    the hotel is."

1   Q.  Both deleted.

2            "ATTIYA:  In face?

3   Q.  Both deleted.  Both deleted?

4   A.  Both deleted.

5            "EL-GAMMAL:  Yes.  Yes.  Delete.

6            "ATTIYA:  Both deleted.  Okay.

7            "EL-GAMMAL:  Delete man.

8            "ATTIYA:  Fin.  Fine.

9            "EL-GAMMAL:  What a disaster with this Egyptian

10  ignorance.  Please concentrate, Attiya, and delete the comments

11  you have.

12           "ATTIYA:  I deleted the conversation.  All of it.

13           "EL-GAMMAL:  Okay.  Most importantly, I am not going

14  to tell you more.  Please meet him at the airport.  He knows

15  how you look.

16           "ATTIYA:  Is he staying at a hotel or should I make a

17  reservation for him?

18           "EL-GAMMAL:  No.  He reserved one night at a hotel in

19  the old city.

20           "ATTIYA:  Okay.

21           "EL-GAMMAL:  Address 5 cad I Turkey 34480 Kumasi

22  Turkey 1.  Ooh, Turkeli.

23           "ATTIYA:  Ha ha ha ha.

24           "EL-GAMMAL:  Do you know some English now or still

25  ignorant?

1        "ATTIYA:  Some.

2        "EL-GAMMAL:  God will make things easier.  Thank you,

3   young Attiya."

4   Q.  Turning to the next slide, Mr. Sidransky, what have you

5   included here?

6   A.  This is an excerpt from Government Exhibit 803.

7   Q.  And what sort of record did you understand that to be?

8   A.  This is a record provided by Turkish Airlines.

9   Q.  The name listed associated with the record?

10  A.  Samy M. El Goarany.

11  Q.  And the issued on date?

12  A.  October 29th, 2014.

13  Q.  And the remarks at the bottom in the top row?

14  A.  Booking cancelled at per passenger request.  JFKFASU17NOV.

15  Q.  Proceeding to the next slide, what sort of data is depicted

16  on this slide?

17  A.  These are toll records excerpted from Government Exhibit

18  511 from November 17th, 2014, and these are calls between

19  Mr. El-Gammal and Mr. El- Goarany's cell phones.

20  Q.  How many calls?

21  A.  Three calls.

22  Q.  And the column on the right, do you know what that refers

23  to?

24  A.  Yes.  That refers to the duration of the calls so the first

25  call was 50 seconds, the second call 34 seconds, and the third

1    call 738 seconds.

2    Q.  And again, those are on the 17th?

3    A.  Yes.

4    Q.  Next slide?  Are these additional Facebook communications?

5    A.  Yes.

6    Q.  And who are they between?

7    A.  These are between Mr. El-Gammal and Aboualala from November

8    18th, 2014, and they're excerpted again from Government Exhibit

9    120-A-T and Government Exhibit 100-S-T.

10   Q.  If you can read the messages of Mr. Attiya starting on

11   November 18th:

12           "ATTIYA:  Where is the guy, Jammie.  You said on the

13   17th.

14           "EL-GAMMAL:  No.  I said 24.

15           "ATTIYA:  Okay.

16           "EL-GAMMAL:  Anyways, the matter cancelled.

17           "ATTIYA:  I am providing him with lodging, food, and

18   drink.

19           "EL-GAMMAL:  I just found out yesterday.  May God

20   bless you, chief.  His mother has a problem so he cancelled the

21   travel for the time being.  I am sorry we disturbed you busy.

22   Your excellency, Mr. Media man Attiya.

23           "ATTIYA:  Ha."

24   Q.  Turning to the next slide, where did you draw this

25   information from?

1  A.  This information comes from Government Exhibit 804.

2  Q.  And whose records were those?

3  A.  Turkish Airlines.

4  Q.  Who is the name of the passenger?

5  A.  Samy M. El Goarany.

6  Q.  And on what date was this ticket or reservation issued,

7  according to the "issued on" column?

8  A.  21st of November, 2014.

9  Q.  So, that completes Government Exhibit 1203.  We will move

10  on to Government Exhibit 1204.

11          THE COURT:  Actually, before you do that, it is almost

12  5 minutes of four.  Ladies and gentlemen, I just want to speak

13  with the lawyers at side bar about some scheduling issues.  So,

14  please, hold on.

15

16

17

18

19

20

21

22

23

24

25

 1              (At side bar)

 2              THE COURT:  Does the government have another witness

 3      after him?

 4              MR. QUIGLEY:  No.  He is it, your Honor.

 5              MS. SHROFF:  Of course this is their third summation,

 6      this is where they rest.

 7              THE COURT:  Are you going to be ready to put on

 8      witnesses tomorrow?

 9              MS. SHROFF:  Well, here is the thing.  We have at

10      least one witness that must go tomorrow because then he's out

11      of pocket.

12              THE COURT:  Okay.

13              MS. SHROFF:  So, we have one but I don't think we are

14      going to do the whole day.

15              THE COURT:  Okay.  I just want to know what to tell

16      the jury.

17              MS. SHROFF:  If it is all right with the Court, we

18      would like to end by -- after that one witness, however long it

19      takes.  I don't know how long this is going to go on for.  I

20      have no clue.

21              MS. MIRÓN:  A short day tomorrow would be no more than

22      by 12:00 p.m.

23              MR. QUIGLEY:  How long are you going to cross him for?

24              MS. SHROFF:  What?

25              MR. QUIGLEY:  I guess it depends on his cross.

1           MS. MIRÓN:  Well, by lunchtime I think we will be

2      done.

3           MS. SHROFF:  Depending how long they will read.  I

4      don't know how long this reading is going to take.

5           MR. QUIGLEY:  I think we are at least halfway done.

6      The later ones are shorter.

7           THE COURT:  Your witness is an hour?

8           MS. SHROFF:  Shorter.

9           THE COURT:  So, I will tell them probably it will be

10     close to half a day tomorrow and we will take up some legal

11     stuff in the afternoon.

12          I will try to get you guys the draft jury instruction

13     so that at least you have it and then you can let me know

14     tomorrow whether you want to discuss is it.

15          MS. SHROFF:  Your Honor, could we have the charge

16     conference on Monday?  Mr. Habib really must go home to that

17     child or his wife will kill him.

18          THE COURT:  I am happy to have it Monday.

19          MS. SHROFF:  Your Honor, also while we are at the side

20     bar, Exhibit 113-C that was allowed in over our objection did

21     not have anything to do with the voting records, it is a chat

22     between, I think Tarek El Goarany and Samy El- Goarany during

23     the time period after Mr. El-Gammal's arrest.  I wasn't sure

24     if -- we would like to have the opportunity to actually review

25     the whole thing and come back to the Court and point out what

H1J5gam7                              Sidransky – direct

1    is extremely prejudicial and we believe should not stay in.  We

2    didn't want to flush that out while the jury was in the box but

3    I am giving you a heads up.

4               THE COURT:  Okay.

5               MR. QUIGLEY:  We are happy to discuss that exhibit.

6               THE COURT:  Okay.

7               MS. TEKEEI:  Your Honor, may we inquire who the

8    defense witness will be tomorrow.

9               MS. SHROFF:  We have already told you; Rameez Farooqi.

10              MS. TEKEEI:  Okay.  Thank you very much.

11              MS. SHROFF:  You're welcome.  That's all we have.  If

12   we have another witness, within moments of knowing that we have

13   the witness we will tell the government.

14              THE COURT:  Okay.

15              MS. TEKEEI:  Thank you.

16              MS. SHROFF:  Thanks.

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  Ladies and gentlemen, it is now 4:00 so we

3   are going to end today.  What I want to tell you, the reason I

4   wanted to speak with the lawyers, was tomorrow will likely be a

5   very short day.  We expect to go maybe as far as lunch and then

6   we will need to break because there is a lot of work that I

7   need to go over with the lawyers in order to make the

8   presentation of evidence more efficient for all of you.  So, be

9   aware of that, that we will likely be breaking.  It is hard to

10  say right now but figure on a half day tomorrow.  Okay?

11       So, we will see you tomorrow.  Be in the jury room no

12  later than 9:20.  Until then, have a pleasant evening, do not

13  discuss the case, do not read about the case.

14       (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H1J5gam7                         Sidransky – direct

1              (Jury not present)

2              THE COURT:  Okay.  Unless there is anything else, I

3    have a 4:00 that I need to get to.

4              MR. QUIGLEY:  Not from the government, your Honor.

5    Good night.

6              MS. SHROFF:  Thank you, your Honor.

7              (Adjourned to 9:15 a.m., January 20, 2017)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MOHAMMED EL-GOARANY

Direct By Mr. Defilippis . . . . . . . . . . .1105

Cross By Ms. Miron . . . . . . . . . . . . .1118

Redirect By Mr. Defilippis . . . . . . . . .1177

Recross By Ms. Mirón . . . . . . . . . . . .1189

CRAIG ROTH

Direct By Mr. Defilippis . . . . . . . . . .1202

Cross By Ms. Miron . . . . . . . . . . . .1235

Redirect By Mr. DeFilippis . . . . . . . . .1242

Recross By Ms. Miron . . . . . . . . . . . .1243

JAKE SIDRANSKY

Direct By Mr. DeFilippis . . . . . . . . . .1248

GOVERNMENT EXHIBITS

Exhibit No.                                            Received

11, 12, 13 and 15   . . . . . . . . . . . .1208

5   . . . . . . . . . . . . . . . . . . . .1209

4-B, 4-C   . . . . . . . . . . . . . . . .1235

113-C   . . . . . . . . . . . . . . . . . .1253

1201 through 1206   . . . . . . . . . . . .1254

DEFENDANT EXHIBITS

Exhibit No.                                            Received

111-DD   . . . . . . . . . . . . . . . . . .1128

610   . . . . . . . . . . . . . . . . . . .1173

114-GG   . . . . . . . . . . . . . . . . . .1176

112-CC   . . . . . . . . . . . . . . . . . .1199