H1K5gam1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        15 Cr. 588 (ER)

AHMED MOHAMMED EL GAMMAL,

              Defendant.

------------------------------x

                                        New York, N.Y.
                                        January 20, 2017
                                        9:15 a.m.


Before:

                    HON. EDGARDO RAMOS,

                                        District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  SABRINA SHROFF
     ANNALISA MIRÓN
     DANIEL G. HABIB
```

H1K5gam1

1                    (Trial resumed;  Jury not present)

2                    THE COURT:  Looks like everyone is here.  Good

3    morning, everyone.

4                    MR. QUIGLEY:  Good morning, your Honor.

5                    MS. SHROFF:  Good morning, your Honor.

6                    THE COURT:  Are there any issues that the parties wish

7    to bring up before we start this morning?

8                    MR. DEFILIPPIS:  Just one from the government, your

9    Honor.

10                    We understand that Mr. Roloff, the defense expert,

11   will testify on Monday via video at 9:30 a.m.  The government

12   is assessing whether it might make sense or be necessary for

13   one of us from the government to be in Georgia with Mr. Roloff

14   for cross-examination purposes because it may be the case that

15   we would like to show him the physical -- one or more of the

16   physical devices.  So, we wanted to flag that for the Court and

17   the defense.  Obviously, we would not be object at all to

18   having a defense representative there in Georgia as well but we

19   haven't reached a final decision.  But, we wanted to flag the

20   issue.

21                    THE COURT:  Okay.

22                    I have a question in that regard.  Where are we going

23   do that?  Is this courtroom equipped to do that?  Because once

24   upon a time my understanding is that there was no courtroom in

25   this building where we can do video hookup.

H1K5gam1

1           MR. DEFILIPPIS:  I understand the defense has been

2      doing some work on that.  I don't --

3           MS. MIRÓN:  I personally have not done the work but

4      our paralegal Megan Hauptman has arranged for a test call

5      between the Macon court house in Georgia and a court house

6      here.  I don't know exactly.  I know she knew this is the room

7      but I can contact her now and see where the test call came in

8      and out.

9           THE COURT:  As long as someone is doing that, that the

10     parties are not expecting me to take care of that.

11          MS. MIRÓN:  I am taking care of it.

12          THE COURT:  Okay.

13          MR. DEFILIPPIS:  I guess I would just ask your Honor

14     whether your Honor has any problem with a representative of the

15     government and the defense being present.

16          THE COURT:  I absolutely do not.

17          MR. DEFILIPPIS:  Okay.

18          MS. SHROFF:  Your Honor, actually Mr. Quigley was

19     going to tell the Court why he was objecting to two of our

20     exhibits.

21          THE COURT:  Okay then, Mr. Quigley.

22          MR. QUIGLEY:  Thank you, your Honor.

23          So, your Honor, I think during the -- guess during the

24     cross-examination of Mr. Tarek El Goarany the defense used two

25     exhibits -- or one exhibit to refresh his recollection, and

H1K5gam1

1    then another exhibit was shown to him, the exhibit that was

2    used to refresh his recollection was Defendant's Exhibit

3    140-AA, and so we object to that coming in as substantive

4    evidence for a couple reasons.  Number one, it contains

5    hearsay -- a number of pieces of hearsay.  It also, under

6    608(b), is extrinsic evidence used for impeachment and even

7    short of that, again it was only used to refresh his

8    recollection.  I looked at the transcript last night, I didn't

9    see any place where he had actually denied making any of the

10   statements in 140-AA.  In fact, when he was shown the exhibit

11   he either said that refreshed my recollection and yeah, I made

12   that comment, or that doesn't refresh my recollection.

13          So, I don't think it can come in as substantive

14   evidence for those reasons.

15          THE COURT:  I take it it is not in evidence.

16          MR. QUIGLEY:  It is not in evidence.

17          THE COURT:  Is the defense proposing that it be put in

18   evidence?

19          MR. HABIB:  Yes.

20          MR. QUIGLEY:  That's my understanding.

21          THE COURT:  And was it only used to refresh his

22   recollection?

23          MR. QUIGLEY:  Yes, your Honor.

24          THE COURT:  Okay.

25          MR. QUIGLEY:  Based on my review of the transcript.

H1K5gam1

1          And then, similarly, Defendant's Exhibit 113-BB which

2    is an exchange between Samy El- Goarany and somebody named

3    Dawaja Mosin Ali, we would object to on hearsay grounds.  It is

4    a short exhibit.  The substance of the exhibit is that

5    Mr. El- Goarany, in December 2014, is meeting with this person

6    to discuss his resume and then later on, in May 2015, after he

7    has traveled overseas, he thanks the person for their help back

8    in December.  But, the relevance of it depends on the

9    conversation about the resume in December and that contains,

10   again, a number of factual assertions that are hearsay; for

11   example, I have updated my resume with details that you

12   recommended from the last time we spoke; I have been slow to

13   jump into the job market; Mr. Ali says -- or I don't know if it

14   is a man or a woman -- the other person says:  Meet me by my

15   job, it is on 22nd and Park.

16         And so, there are again a number of hearsay assertions

17   to which the relevance of this exhibit depends.  The fact that

18   Samy El- Goarany had updated his resume, the fact that he was

19   meeting with this person and had a location to discuss the

20   resume, all of those are hearsay.  I am happy -- I have marked

21   my copies up, otherwise I am happy to hand them to the Court.

22         MR. HABIB:  May we have one moment, your Honor?

23         THE COURT:  Sure.  You have eight minutes.

24         (pause)

25         MR. QUIGLEY:  If your Honor wants these I am happy to

H1K5gam1

1      hand them up.

2                    THE COURT:  Sure.

3                    MS. SHROFF:  Your Honor, we need a minute.  We asked

4      the government to let us know what their objections were before

5      now.  We hadn't heard yet so we just need a minute to get back

6      to the Court.

7                    THE COURT:  Okay.  We will start at 9:30 in any event

8      since these documents will not be at issue with this current

9      witness, correct?

10                   MR. DEFILIPPIS:  Correct, your Honor.

11                   (pause)

12                   THE COURT:  Let's get the jury and Mr.  --

13                   MR. QUIGLEY:  Jake.

14                   THE COURT:  Him.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Good morning, everyone.  Please, be

3    seated.

4            Ladies and gentlemen, we will now continue with the

5    direct examination of Mr. Sidransky.

6            MR. DEFILIPPIS:  Thank you, your Honor.

7     JAKE SIDRANSKY, resumed.

8    DIRECT EXAMINATION

9    BY MR. DEFILIPPIS:

10   Q.  Good morning, Mr. Sidransky.

11   A.  Good morning.

12   Q.  Yesterday we left off as we were turning to Government

13   Exhibit 1204.  If I can turn your attention to 1204 and publish

14   it for the jury?

15           Mr. Sidransky, what exhibits is exhibit 1204 drawn

16   from?

17   A.  This exhibit is drawn -- the first page of this exhibit is

18   drawn from defense Exhibit 502 and Government Exhibit 5.

19   Q.  And what sort of information is conveyed on the exhibit?

20   A.  This exhibit conveys toll records and Tango calls from the

21   period of January 14th, 2015, through January 15th, 2015.

22   Q.  Looking at this first slide, can you just describe for us

23   the calls that you included on the chart here?

24   A.  The calls in yellow, light blue -- yellow and light blue

25   are from the toll records, and the call in dark blue is from

Tango call records.

Q.  And on what dates and times were each of those calls?

A.  First call is on January 14th, 2015 and the next three are on January 15th, 2015.

Q.  The first call says it was from Mr. El- Goarany to Mr. El-Gammal; is that correct?

A.  Correct.

Q.  Now, the second call which is a Tango call; is that right?

A.  Yes.

Q.  That just says Gammal outgoing Tango.  Why does it not include another party?

A.  It was not clear, based on the evidence in Government Exhibit 5, to whom that call was placed.

Q.  And then the final two, just describe which direction and between which parties they were?

A.  Correct.

Q.  I'm sorry.  If you can describe for each call the direction and the parties of the call?

A.  The first call is from Mr. El-Gammal to El Goarany, duration was none; and the second call was from Mr. El- Goarany to Mr. El-Gammal, and the duration was four minutes and two seconds.

Q.  So, is it fair to say that where a call doesn't indicate it was over Tango it was from the phone records, the conventional phone records?

H1K5gam1                          Sidransky – direct

1   A.   Correct.

2   Q.   Let's turn to the next slide.

3            What communications are displayed on this slide?

4   A.   The slide displays communications between Mr. El- Goarany

5   and Attiya from Facebook on January 16th, 2015, and they were

6   drawn from Government Exhibit 113-A-T.

7   Q.   If you would read the messages of Mr. El- Goarany, I will

8   read those of Mr. Aboualala.

9   A.   On January 16th, 2015:

10           "EL-GOARANY:  Peace be upon you, Attiya.  My name is

11  Samy.  I'm Gammal's friend.  He told me you could help me with

12  a career opportunity in Istanbul.  I'll be visiting soon to

13  look for an internship for the summer, God's willing.  I'd

14  really appreciate your help.  Please reply whenever you get the

15  chance.  God bless you.

16           "ATTIYA:  We are at your service.

17           "EL-GOARANY:  Thank you.  Do you have a phone number I

18  can reach you by?"

19  Q.   Number provided.

20           "EL-GOARANY:  Thank you.  I have a favor to ask of

21  you, brother.  I'm landing in Istanbul on January 28.  Would it

22  be possible for to you pick me up and give me a ride to my

23  hotel?

24           "ATTIYA:  Yes.  Called me just before.

25           "EL-GOARANY:  Okay.  It will be very early in the

H1K5gam1                          Sidransky - direct

1    morning, though.  I'm landing at 5:45 a.m.

2               "ATTIYA:  Do not worry."

3    Q.  Mr. Sidransky, in preparing this chart did you include

4    communications from every date on which there were

5    communications between these parties?

6    A.  No.  Only selected communications.

7    Q.  And, for example, was Government Exhibit 100-B an exhibit

8    that you reviewed in connection with preparing this chart?

9    A.  Yes.

10   Q.  And did you include all of the communications on Government

11   Exhibit 100-B?

12   A.  No.

13   Q.  If I could just briefly ask that we publish 100-B and if

14   you could turn your attention to that?

15              MS. SHROFF:  Objection, your Honor.

16              THE COURT:  Overruled.

17   Q.  Mr. Sidransky, remind us, what was Government Exhibit

18   100-B?

19   A.  Government Exhibit 100-B is an excerpt from Government

20   Exhibit 100.

21   Q.  And if we could just please turn to page 20, Mr. Sidransky,

22   I'm just going to ask that we read through a brief excerpt.

23              MS. SHROFF:  Your Honor, could we have a side bar as

24   to what testimony Mr. DeFilippis is eliciting?

25              THE COURT:  Sure.

H1K5gam1                          Sidransky - direct

1          MS. SHROFF:  And while we're --

H1K5gam1                        Sidransky – direct

1              (At side bar)

2              THE COURT:  What are you doing?

3              MR. DEFILIPPIS:  Your Honor, this is the only exhibit

4    not in the chart that we intend to refer to.  We were just

5    going to read an excerpt from that exhibit.

6              MS. SHROFF:  No.

7              THE COURT:  No.

8              MS. SHROFF:  Thank you, your Honor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (In open court)

2   BY MR. DEFILIPPIS:

3   Q.  Mr. Sidransky, we are going to move on to page 4 of

4   Government Exhibit 1204.

5   A.  Okay.

6   Q.  And if you will read the messages of Mr. El-Gammal, I will

7   read those of Mr. El- Goarany.

8   A.  On January 29th, 2015:

9       "EL-GAMMAL:  Found info from Aria.  AIAA hahaha.

10  True.  I think long time to Adana or Gaziantiep is like 35 or

11  40 dollar.

12      "EL-GOARANY:  Ah, okay.  Ya, that's nothing.

13      "EL-GAMMAL:  Sorry.  Turkish.

14      "EL-GOARANY:  Even better.

15      "EL-GAMMAL:  Yup.

16      "EL-GOARANY:  BTW.

17      "EL-GAMMAL:  Did you exchange any money?

18      "EL-GOARANY:  I'm in contact with someone from the

19  company, directly inside the company and he knows people here.

20  Can possibly help me get there in three to four days ISA."

21  Q.  Turning to page 6, Mr. Sidransky; where were these

22  communications drawn from?

23  A.  These communications were drawn from Facebook, Government

24  Exhibit 113-A-T, on January 29th, 2015.

25  Q.  If you would read Mr. Aboualala's messages:

H1K5gam1                           Sidransky - direct

1           "ABOUALALA:  I can go to you now.

2           "EL-GOARANY:  Okay."

3    A.  Attachment sticker.

4           "EL-GOARANY:  Do you want me to wait in my hotel or do

5    you want me to come to Sultanahmet Mosque?

6           "ABOUALALA:  As you like.

7           "EL-GOARANY:  Meet me in Sultanahmet Mosque.  This is

8    easier.  How much time do you think you will take?

9           "ABOUALALA:  30.

10          MS. MIRÓN:  Okay.  I'm leaving my hotel now."

11   A.  Attachment sticker.

12          "EL-GOARANY:  Please meet be there.  I will be in

13   Front of the mosque."

14   Q.  Turning to page 7, Mr. Sidransky, what sorts of

15   communications were these?

16   A.  These are from -- these are Tango chats from Government

17   Exhibit 5 on January 29th, 2015.

18   Q.  So, the same date as the previous messages?

19   A.  Yes.

20   Q.  I will read Mr. El-Gammal's messages:

21          "EL-GAMMAL:  What's up?  Why.  Sleeping.

22          "ABOUALALA:  I tried to call you.  Call me or send me

23   a text.  The man wants to talk to you."

24   A.  And then there is an outgoing call like the other call.  It

25   is not clear to whom it was sent.

1    "ABOUALALA:  Answer, man.  Are you awake or not yet?

2    Call me when you wake up."

3    Q.  Page 8, where and from what type of communication platform

4    was this drawn?

5    A.  These are communications between Samy El- Goarany and Tarek

6    El Goarany from Facebook, taken from Government Exhibit 110-G

7    on January 29th, 2015.

8    Q.  And again, was it the same date as the previous messages?

9    A.  Yes.

10   Q.  If you would just read that communication?

11   "EL-GOARANY:  Salam, bro.  Just want to let you know

12   I'm safe and about to head out in a bit.  Let mom and dad know

13   I'll reach them in three days max to let them know I'm safe.

14   I'll be too busy to do so before then but promise that I will

15   do so.  Don't worry."

16   Q.  Turning to the next page of that exhibit, what do we see

17   here?

18   A.  This is another outgoing Tango call from Government Exhibit

19   5.  Again, it is not clear who the recipient was and the

20   duration is five minutes and six seconds.

21   Q.  And who placed the call?

22   A.  Mr. El-Gammal.

23   Q.  Okay.  So, that completes Government Exhibit 1204.

24   We will turn to Government Exhibit 1205.  Looking at

25   the first page there, what is displayed?

H1K5gam1                        Sidransky - direct

1   A.   These are Facebook communications between Mr. El-Gammal and

2   Attiya taken from Government's Exhibits 120-A-T and 100-S-T

3   from the period of April 19th through May 6, 2015.

4   Q.   Okay, and I will read the messages of Mr. El-Gammal.   April

5   19th, 2015:

6               "EL-GAMMAL:  Did you see?

7               "ABOUALALA:  Who?

8               "EL-GAMMAL:  The video."

9   A.   April 24th, 2015.

10              "ABOUALALA:  What is it, Gammal?  Did you get scared?

11  I am going to delete the comments.

12              "EL-GAMMAL:  No.  I am not afraid.

13              "ABOUALALA:  Delete them.

14              "EL-GAMMAL:  But no need for showing off every now and

15  then.

16              "ABOUALALA:  Ha ha ha ha ha.

17              "EL-GAMMAL:  No need to get into trouble because of

18  some nonsense talking.

19              "ABOUALALA:  Remove it.  I did.

20              "EL-GAMMAL:  No, it is not in my nature to delete.  I

21  am not afraid but awareness and smartness are a must,

22  especially that things became complicated in Turkey.

23              "ABOUALALA:  Remove.  Remove.  I did.

24              "EL-GAMMAL:  What's the matter about Rabiaa channel?

25  Who shut it down?

1        "ABOUALALA:  It incites violence.

2        "EL-GAMMAL:  Who shut it down?

3        "ABOUALALA:  France.

4        "EL-GAMMAL:  And the rest?

5        "ABOUALALA:  On the way.

6        "EL-GAMMAL:  That's why you pushed Wajdi Ghneim away;

7   however, you still didn't please them.  Check their videos and

8   channels and ask them.  Have you seen the new Harvest of the

9   Spies?

10        "ABOUALALA:  Send links."

11  A.  May 4th, 2015:

12        "ABOUALALA:  Hey Gammal.  Call me quickly.  Urgent.

13  The father of Samy is asking about."

14  Q.  Question marks.

15  A.  Missed call:

16        "ABOUALALA:  Hey Gammal.

17        "EL-GAMMAL:  Speak up, Attiya.  What's going on?

18        "ABOUALALA:  His father called me and is asking about

19  me about him.  I told him I don't know anything about him.

20        "EL-GAMMAL:  How does he know you and how did he get

21  your number?

22        "ABOUALALA:  Samy has previously told him that he

23  communicated with me through you only.  He got my number from

24  Abudallah Al Jazzar, a news anchor at the Al Sharq channel.

25        "EL-GAMMAL:  From where does he know Jazzar?

1         "ABOUALALA:  Tell me what should I tell him.  I don't

2 know.

3         "EL-GAMMAL:  Next time don't answer and don't ever,

4 ever mention me, not even my name.

5         "ABOUALALA:  Okay.  He wants me to meet him."

6 Q.  There is a call, a missed call at 16:16:32, and another

7 missed call at 16:17:04:

8         "ABOUALALA:  The net is very slow.

9         "EL-GAMMAL:  Meet who?  I don't understand.

10         "ABOUALALA:  It will not permit to finish the call.

11 His father.  Here in Istanbul.

12         "EL-GAMMAL:  Who wants to meet you?

13         "ABOUALALA:  I will get rid of him by telling that I

14 don't know anything about him since January, and that I did not

15 communicate with him at all since January, and he was a friend

16 on Facebook.  A Muslim of Egyptian decent who said that he is

17 coming to Istanbul and I wanted to him.  Afterwards, I had no

18 more communications with him.

19         "EL-GAMMAL:  Exactly, and don't ever, ever mention me

20 or my name.

21         "ABOUALALA:  Fine, but Samy's brother told his father

22 that you know me.  Anyways, I will tell him that I do not know

23 you.

24         "EL-GAMMAL:  Did he ask about me?

25         "ABOUALALA:  Yes.  He mentioned your Facebook name,

H1K5gam1                          Sidransky - direct

1   the one you use on Facebook.

2          "EL-GAMMAL:  Because we are friends on Facebook.

3          "ABOUALALA:  I will meet him and inform you about the

4   results of the meeting.

5          "EL-GAMMAL:  You are a mutual -- mutual Facebook

6   friend -- of me and him.

7          "ABOUALALA:  Maybe it is because of this?

8          "EL-GAMMAL:  You don't have to meet him.

9          "ABOUALALA:  It's okay.  Don't worry.  No, because I

10  do not want him to have strange thoughts.

11         "EL-GAMMAL:  Okay.

12         "ABOUALALA:  Perfect."

13  A.  On May 5th, 2015:

14         "ABOUALALA:  I erased the friendship so he would not

15  know that I know you."

16  Q.  Record of a missed call at 18:49:22:

17         "ABOUALALA:  On the net I have a Facebook and Twitter

18  package only, that is why there could be a problem in

19  communication.

20         "EL-GAMMAL:  Call me on Tango.

21         "ABOUALALA:  Anyways, I covered up for you and I told

22  him that I don't know you and my relationship was direct with

23  Samy.  He spoke to me and said that he wanted to visit

24  Istanbul.  I met him for one day and then I didn't know

25  anything about him afterwards.  I do not have Internet, I have

H1K5gam1                            Sidransky - direct

1    a package to surf Facebook and Twitter only.

2              "EL-GAMMAL:  Okay.

3              "ABOUALALA:  The guy is a military and he tells me how

4    Samy used to tell him that the Army is fooling him and that the

5    Egyptian Army is against Islam.

6              "EL-GAMMAL:  I am surprised he traveled to Turkey.

7    Yeah, Samy told me he is an adamant supporter of militarism

8    from a military family.

9              "ABOUALALA:  Yes, but I debated with him and he did

10   not know how to answer me.  He told me that al Sisi made an

11   achievement with the Suez canal.

12             "EL-GAMMAL:  It seems that he found him in Turkey

13   because Samy has just posted.  Ha ha ha.  He achieved what

14   canal?  Ha ha ha ha.

15             "ABOUALALA:  I don't know if he didn't know how to

16   respond or he just didn't want to anger me because he expected

17   from me to convey to him any information I lay my hand on about

18   his son.

19             "Samy wrote a post.

20             "EL-GAMMAL:  Yeah, I saw it in the news feed."

21   A.  Thumbs up sticker attachment.

22             "EL-GAMMAL:  But don't you ever get in contact with

23   him.  Inbox.

24             "ABOUALALA:  Why?

25             "EL-GAMMAL:  Maybe his father is using his account.

1          "ABOUALALA:  Yeah, okay."

2     A.   Then on May 6 there is a link sent to YouTube:

3          "EL-GAMMAL:  Okay.  Did you take his permission from

4     you before you published it?

5          "ABOUALALA:  The man is very glad and happy with his

6     son.  Ha ha ha.

7          "EL-GAMMAL:  I don't understand.  Does he agree that

8     you publish?

9          "ABOUALALA:  He is happy about the spirit with which

10    Samy is talking to him.

11         "EL-GAMMAL:  Elaborate.  I don't understand.  Did Samy

12    call?

13         "ABOUALALA:  Samy called him yesterday and he was

14    happy.  He said, for the first time, I feel my son is a man.

15         "EL-GAMMAL:  Is he in Turkey or did he go back?

16         "ABOUALALA:  Not yet.  He is going to Egypt tomorrow.

17         "EL-GAMMAL:  And how did he reach Samy?

18         "ABOUALALA:  Samy called him yesterday on WhatsApp.

19         "EL-GAMMAL:  Good.  Thank God.  Truly, in the video,

20    he seems reassured and happy.  He sent me an add.  Can you

21    imagine that?  And frankly, Samy is a true, true, true man and

22    noble.

23         "ABOUALALA:  Accept.  And don't worry.

24         "EL-GAMMAL:  I accepted it a long time ago but I found

25    it strange.  I have been with his son for six years and he

1 | never added me.  Can you call me?

2 |         "ABOUALALA:  There is no sound.

3 |         "EL-GAMMAL:  The heck.  So, he is going to travel to

4 | Egypt and then come back?

5 |         "ABOUALALA:  Honestly, I don't know.

6 |         "EL-GAMMAL:  I don't know how did he get to you.  He

7 | is a very smart man.

8 |         "ABOUALALA:  From Facebook.  He checked who were

9 | Samy's friends and then he got into me.

10 |         "EL-GAMMAL:  And what do you mean he got into you?

11 | Speak Arabic, Attiya.  Ha ha ha ha ha.

12 |         "ABOUALALA:  He logged into my profile and spoke --

13 | had spoke to someone who was with me in the picture.

14 |         "EL-GAMMAL:  And why didn't he talk to you directly?

15 | Why did he talk to the other guy in the picture?

16 |         "ABOUALALA:  I don't know.

17 |         "EL-GAMMAL:  Was he afraid of you by any chance?

18 |         "ABOUALALA:  May be.

19 |         "EL-GAMMAL:  Ha ha ha.  And who is that friend?

20 |         "ABOUALALA:  But he made a lot of supplications for

21 | me.  I thought he was the one who got him in contact with his

22 | son.

23 |         "EL-GAMMAL:  What is his name?  Then who?  Didn't Samy

24 | get a Turkish phone number?

25 |         "ABOUALALA:  But he is in the Levant now.

H1K5gam1                          Sidransky – direct

1              "EL-GAMMAL:  So how did he get in contact with him?

2              "ABOUALALA:  Ikh gtds.  On Facebook.

3              "EL-GAMMAL:  Most importantly is how he is doing and

4     his morale, the father.

5              "ABOUALALA:  Very high.

6              "EL-GAMMAL:  Praise be to Allah.  Although he is a

7     Sisi supporter.  Okay.  No problem.  Sorry for annoying you,

8     Attiya.  May God keep you safe and grant you success.

9              "ABOUALALA:  My God, buddy.  What annoyance are you

10    talking about?

11             "EL-GAMMAL:  All this matter.  I heard you are going

12    to start a channel, the Channel of the Revolution.

13             "ABOUALALA:  Ha ha ha ha."

14    Q.  Turning to page 11, and on what date did we leave off in

15    those previous communications?

16    A.  May 6th, 2015.

17    Q.  And what is the date of the communications on page 11?

18    A.  May 7th, 2015.

19    Q.  And what types of communications are they?

20    A.  These are Facebook communications between Attiya and

21    Mr. El- Goarany taken from Government Exhibit 113-A-T.

22    Q.  The first row there on May 7, 2015, at 15:47; what type of

23    communication was that?

24    A.  That is a Facebook communication that shows a missed call.

25    Q.  A call placed by whom?

1    A.  By Attiya.

2              MS. SHROFF:  Your Honor.

3              THE COURT:  Is there an objection?

4              MS. SHROFF:  I think it mischaracterizes the evidence,

5    your Honor.

6              THE COURT:  Overruled.

7    Q.  And what was the duration of that call?

8    A.  51 seconds.

9    Q.  And let's just read the following messages.  I will read

10   Attiya Aboualala at 15:48:

11             "ABOUALALA:  When should we meet?

12             "EL-GOARANY:  Forgive me, brother.  Internet is bad

13   here.  God willing, I still need to complete training.  I can

14   meet you after I finish with the camp.

15             "ABOUALALA:  God willing."

16   Q.  Now, turning to the last page of Government Exhibit 1205,

17   are these also drawn from Facebook?

18   A.  Yes.  These are drawn from Government's Exhibits 111-A and

19   112-A from the period of May 7th through July 4th, 2015.

20   Q.  And the date range?

21   A.  May 7 through July 14th, 2015.

22   Q.  If you would read Mr. El- Goarany's messages?

23   A.  On May 7th:

24             "EL-GOARANY:  Salam alaikom ya.  It's been a long time

25   but I'm doing well and I just want to let you know I'm safe and

H1K5gam1                          Sidransky - direct

1   secure and everything is going according to plan.  When I get

2   completely settled over the coming months I will contact you

3   more to let you know what's up at my new job.  I hope

4   everything is well with you.  InshAllah.

5          "EL-GAMMAL:  Hi Samy.  Is it easy to park a car into

6   your job parking lot?"

7   Q.  Thumbs up sign.

8   A.  On July 13th, 2015:

9          "EL-GOARANY:  I don't know.  I need to ask my

10  superiors at work at first, inshAllah, but I think it is risky

11  because the parking lot these days is going under a lot of

12  renovation, especially in the north side.  Khair inshAllah.

13  You planning on driving any time soon?

14         "EL-GAMMAL:  Yes.  Mid-August inshAllah.  Check

15  Facebook more often.

16         "EL-GOARANY:  You still on Surespot?  Ad me.  User

17  name is abmuradK.  I'll help you make your parking job easier

18  inshAllah."

19  Q.  And now we will turn to Government Exhibit 1206.  Looking

20  at the first page of 1206, what did you display here?

21  A.  These are WhatsApp communications between Mr. El-Gammal and

22  Mr. El- Goarany excerpted from Government Exhibit 4-B-T on July

23  16th, 2015.

24  Q.  If you would read Mr. El- Goarany's messages?

25  A.  July 16th, 2015:

1        "EL-GOARANY:  Peace be upon you, brother.  It's Samy.

2   I'm available to be reached on WhatsApp during most days of the

3   week here, so feel free to contact me when you have the chance.

4   Blessed Eid.  I hope everything is well with you, God willing.

5        "EL-GAMMAL:  Blessed Eid, Samy.  Great to hear from

6   you.  I wish you and your family happy Eid.

7        "EL-GOARANY:  Great to hear from you to, Pasha.  Life

8   has changed a lot for me at this new job but I love it and I

9   don't regret taking up the offer.  Thank God.  May God reward

10  you with goodness.  You too, brother.

11       "EL-GAMMAL:  Great."

12  Q.  Mr. Sidransky, what is shown on the final two pages of this

13  exhibit?

14  A.  These pages between tweets posted by Mr. El- Goarany from

15  the period of July 16th through July 21st, 2015.  They are

16  excerpted from Government Exhibit 303.

17  Q.  And why don't we just alternate dates.  Why don't you

18  reaped the ones from July 16th, 2015.

19  A.  RT@Abu_Baral1.  **Eid Mubarak!** Taqabbal Allahu minna wa

20  minkum (May Allah accept it from us and from you).  Make dua

21  for Muslims suffering -- It is cut off.

22       The next one at 21:27:30:  RT@Gleaming_Razor:

23  @AbuMurad_IS and there is a link.

24       At 22:37:23:  RT@ironMuhajir:  Alhamdulilah that Allah

25  brought us from the lands of kufr to the land of the Khalifa.

1  Wallah, it's a dream -- and it is cut off.

2  Q.  July 18th, 2015:  RT@Mujahidreams.  When they killed Sheikh

3  Osama bin Laden they thought jihad would be extinct but their

4  bullets only breeded a new generat -- cut off.

5          Do you fear them, (the kuffar)?  It is Allah you

6  should fear if you are true believers.  Fight them.  Allah will

7  punish them at your hands.

8          Next message:  He will disgrace them.  He will help

9  you to conquer them.  He will heal the believers' feelings and

10 remove the rage from their hearts.

11         [Surat Al-Tawba 13-15].

12         RT@AbuSayfillaah:  Every Muslim should be allocated

13 time to study the deen every week.  The prophet said seeking

14 knowledge is compulsory u...

15         RT@islamRahman:  Wilayat #Sinai adopts more deadly

16 attacks of military check points that was attacked earlier this

17 month.  #Egypt.

18         RT@AbuSayfillah:  If you're sacred of being labeled

19 extremist/radical/hate preacher by the disbelievers, you will

20 find it difficult to be...

21         There will come a day when Muslims in the west are

22 persecuted so bad to the point that they will start calling to

23 us for help.  Itaqullah.

24         If you so much as even speak against a Muslim in

25 support of a kaffir, that makes you a kaffir too.  Do not slide

H1K5gam1                              Sidransky - cross

1   into ridda based on ignorance.  It's one thing not to support

2   us but do not allow yourself to become a mouthpiece for the

3   kuffar who are fighting us.  It is better for you to shut up

4   and humble yourselves.

5   A.  On July 21st, 2015, RT@abu_Baraal1:  #Islamic State are

6   your Muslim Brother.  Before repeating some rumor, remember

7   that one word that you didn't verify can take...

8              Anybody know the name of this nasheed?

9              And there is a link.

10             MR. DEFILIPPIS:  Thank you.  No further questions at

11  this time.

12             THE COURT:  Cross-examination.

13  CROSS EXAMINATION

14  BY MS. SHROFF:

15  Q.  Mr. Sidransky, could you take a look, please, at 1205 and

16  go to the last page -- actually, go to the page that has May

17  7th and where you say May 7, 2015, in pink, right?  You have

18  that?

19             MS. SHROFF:  Excuse me.  Could you take the screen

20  down, please?  Thank you.

21  Q.  Do you have that?

22  A.  I am looking for it.  Yes.  Page 11.

23  Q.  We are on the same page at the bottom, it says page 11?

24  A.  Yes.

25  Q.  Okeydokey.

H1K5gam1                         Sidransky - cross

1              Explain to me, how is a call miss and has a duration

2      of 51 seconds?

3      A.   Looking at it now I think I read it -- I was mistaken in my

4      reading.  I think it was completed with the duration of 51

5      seconds because --

6      Q.   I didn't misread it, right?

7      A.   It says missed falls if you look at the --

8      Q.   Right.  So there is no asterisk at the bottom as to what

9      "missed false" means, correct?

10     A.   No.

11     Q.   Right.

12             You could have just said missed, correct, on your

13     chart?

14     A.   No, because this is copied and pasted from the Facebook

15     record.

16     Q.   Okay.

17             So at the bottom you could have said an asterisk, as

18     you put asterisks on other parts of the chart, you could have

19     put an asterisk and said:  False, call not missed call made.

20             Correct?  It is your chart, right?

21     A.   No.  I made this chart at the direction of the prosecutors

22     and they didn't request that so I did not do that.

23     Q.   Okay.  So, let's talk about that because obviously there is

24     at least one mistake in your chart, right?

25     A.   No, I don't view that as a mistake.

H1K5gam1                        Sidransky - cross

1    Q.  You don't view it as a mistake.

2             You view it as a mistake in reading it to the jury

3    that this 51 second call -- what is it, was it missed or made?

4    Which one?

5    A.  It is missed false.

6    Q.  Right.  So, it is not missed, or is it missed?

7    A.  It is not missed.

8             MR. DEFILIPPIS:  Objection, your Honor.

9    Argumentative.

10            THE COURT:  Sustained as to argumentative.

11            One question at a time.

12            And, Mr. Sidransky, wait for the question, answer the

13   question, okay?

14   BY MS. SHROFF:

15   Q.  Let's try it again.  What do you want the jury to conclude

16   from this?  Because you want them to make certain conclusions

17   from all your charts, right?

18            MR. DEFILIPPIS:  Objection, your Honor.

19            THE COURT:  Sustained.

20   Q.  What's the point of this chart?

21   A.  To display the information that's in evidence.

22   Q.  Is that all?  To just display it?

23   A.  Yes.  It is copied and pasted.

24   Q.  Okay.

25            So, when you displayed this information you displayed

H1K5gam1                        Sidransky - cross

1   all the information, correct?

2   A.  No.

3   Q.  Or just information you wanted -- by you I just mean the

4   United States Attorney's office as a block -- this block.

5   A.  I worked at the direction of the prosecutors.

6   Q.  So you only put in what they told you to put in, right?

7   A.  Correct.

8   Q.  And you only put in what obviously helps your side,

9   correct?

10  A.  I'm not qualified to judge that.

11  Q.  They are though, right?

12  A.  We didn't have a conversation about that.

13  Q.  Well, you don't have an opinion as to whether or not

14  Mr. Quigley is qualified to present the opinions of the United

15  States Attorney's office to a jury of 12 and three or four more

16  alternates?  You don't have an opinion?

17          MR. DEFILIPPIS:  Objection.  Compound question.

18          THE COURT:  Sustained.

19  Q.  Do you have an opinion, sir?

20          MR. DEFILIPPIS:  Objection.  Unclear.

21          THE COURT:  Sustained.

22  Q.  Do you have an opinion about Mr. Quigley's qualifications

23  to martial this information and direct you to put it in a chart

24  in a way that is convincing to the jury about the United

25  States?

1    MR. DEFILIPPIS:  Objection.  Compound question.

2  Irrelevant.

3    THE COURT:  Sustained.

4  Q.  Mr. Sidransky, how did you make this chart?

5  A.  By copying and pasting the elements of the exhibits at the

6  request of the prosecutors.

7  Q.  Well, let's see.  That's not what you said on direct,

8  right?

9    Do you recall your direct testimony?

10  A.  Yes.

11  Q.  Okay.  So, in your direct testimony you said that you made

12  this chart in coordination with the prosecution, correct?

13  A.  That is correct.

14  Q.  Right.

15    And you would agree with me, would you not, that the

16  prosecution has its own views, correct?

17  A.  I think everybody has their own views.

18  Q.  That's not the question.  Could you answer my question?

19  A.  I don't know what their views are.  They do have their own

20  views.

21  Q.  Okay.  So you can answer my question, correct?

22  A.  Yes.

23  Q.  And your answer to my question is that the prosecution has

24  its own views, correct?

25  A.  Yes.

H1K5gam1                          Sidransky – cross

1   Q.  And those views were deep in the minds of all of you when

2   you worked, in coordination, with the prosecution to prepare

3   this chart?

4          MR. DEFILIPPIS:  Objection.

5          THE COURT:  Sustained.

6   Q.  Did you discuss this chart with Mr. Quigley?  Let's start

7   with him.

8   A.  Yes?

9   Q.  How about Ms. Tekeei?

10  A.  Yes.

11  Q.  How about Mr. DeFilippis?

12  A.  Yes.

13  Q.  How about Agent Collie?

14  A.  No.

15  Q.  Let's start again with Mr. DeFilippis, okay?  Let's go

16  backward this time.

17          How many minutes do you think you spent with

18  Mr. DeFilippis putting these charts together?

19  A.  Couple of hours.

20  Q.  Really.  Just a couple of hours?

21  A.  Somewhere between two and four hours.

22  Q.  You spent between -- you are testifying --

23  A.  Not with him.  I worked on it for that long.  In terms of

24  how long I actually spoke to him about it, probably less than

25  two hours.

H1K5gam1                          Sidransky - cross

1   Q.  You spoke to Mr. DeFilippis about the charts for less than

2   two hours?

3   A.  Yes.

4   Q.  And that's just the speaking time, correct?

5   A.  Yes.

6   Q.  How about the e-mailing time?

7   A.  We exchanged a few e-mails.

8   Q.  That's not included in the speaking time, correct?

9   A.  No.

10  Q.  And also not included in the speaking time, so to speak, is

11  all the times he marked up the charts that you gave him as

12  drafts, correct?

13  A.  He never handed me a marked up copy of a chart.

14  Q.  Okay.  How about e-mailing you marked up copies of the

15  chart?

16  A.  I believe that happened one time.

17  Q.  Okay.  So you didn't include that in the speaking either,

18  correct?

19  A.  I couldn't quantify an e-mail in terms of speaking time.

20  Q.  Well, Mr. Sidransky, you knew you were going to testify in

21  this case from the beginning, right?

22  A.  Yes.

23  Q.  You knew they were going to call you as a summary witness,

24  correct?

25  A.  Correct.

H1K5gam1                          Sidransky – cross

1   Q.  They discussed what a summary is with you, correct?

2   A.  Correct.

3   Q.  They prepared you for your testimony here today, correct?

4   A.  Correct.

5   Q.  They prepped you for just this cross, correct?

6   A.  Correct.

7   Q.  And in doing all of that you knew that you would have to

8   answer questions to a defense lawyer, correct?

9   A.  Of course.

10  Q.  And of course you are not on the defense side, are you now?

11  A.  No.  I work for the United States Attorney's office.

12  Q.  Okay, the answer was yes or no.  Are you on the defense

13  side?

14  A.  No.

15  Q.  Okay.

16          So, when you were putting this chart together you were

17  working only with the United States Attorney's office, right?

18  A.  Yes.

19  Q.  Okay.

20          Now, before you put even the charts together, did

21  Mr. DeFilippis himself cull some information and say this is

22  what I want in the chart?

23  A.  No.

24  Q.  Okay.  So, who did that?

25  A.  Mr. or Mr. Quigley.

1   Q.  All right.  We will get to Mr. Quigley, he is at the end.

2           What else did Mr. DeFilippis review with you about

3   these charts?

4   A.  We reviewed them and we made some changes together.

5   Q.  Okay.

6           Now, we have already established that you knew you

7   were going to testify, correct?

8   A.  Yes.

9   Q.  Did you make notes of all the changes you two made together

10  on these charts?

11  A.  I saved each draft individually.

12  Q.  You saved each draft individually, right?

13  A.  Yes.

14  Q.  But did you make notes?

15  A.  No.

16  Q.  And, by the way, Mr. Quigley sat down with you on a table,

17  side by side, and went over these things with you?  Or no?

18  A.  No.

19  Q.  He just sent e-mails and talked to you and then you put the

20  chart together with him?

21  A.  Correct.

22  Q.  Now, how about Ms. Tekeei; how much time did she spend with

23  you on these charts?

24  A.  Not very much.

25  Q.  I don't know what not very much means.

H1K5gam1                         Sidransky - cross

1    A.  Less than 20 minutes.

2    Q.  You didn't keep notes of any meetings you had with

3    Mr. DeFilippis as timing.  Let me just go back to him.  How

4    many minutes, how many hours; nothing, right?

5    A.  No.

6    Q.  No calendar entries, no, correct.

7    A.  Correct .

8    Q.  No time sheets, correct?  Nothing?

9    A.  No.

10   Q.  Absolutely nothing?

11   A.  No.

12   Q.  Okay.

13           How about Ms. Tekeei.  You said 20 minutes, correct?

14   A.  Correct.

15   Q.  So let's just put her aside.  Let's go to Mr. Quigley.

16           MR. DEFILIPPIS:  Objection, your Honor.  Relevance.

17           THE COURT:  Overruled.

18   Q.  How many?

19   A.  How many what?

20   Q.  Let me see, should I start with seconds, minutes or hours.

21   Let's just start with minutes.

22           How many minutes do you think you spent with

23   Mr. Quigley over this chart?

24   A.  An hour.

25   Q.  An hour all together?

1   A.  Yes.

2   Q.  Okay.

3        And what exactly do you understand when I say put the

4   chart together?

5   A.  When I put the chart together?  How long did I spend with

6   him?  Is that what you are asking me?

7   Q.  I think you know what I'm asking you, Mr. Sidransky, but

8   how about if I help you out a little bit.

9        Let's start with the first exhibit, shall we?  1201.

10  A.  Yep.

11  Q.  Who told you what to put in 1201?

12  A.  Ms. Tekeei.

13  Q.  Ms. Tekeei.

14        She identified what chats to include, correct?

15  A.  Yes.

16  Q.  She identified what information to put in there, correct?

17  A.  Yes.

18  Q.  And she told you how to put it together, correct?

19  A.  Yes.

20  Q.  Okay.

21        And did she pick the color scheme or was that left up

22  to your discretion?

23  A.  That was left up to my discretion.

24  Q.  Excellent.  All right.  So at least you decided something

25  here.

1           Let's keep going, just with 1201.  Okay?  On 1201 you

2    made no decision without the prosecutor's input, correct?

3    A.  Correct.

4    Q.  Okay.

5    A.  Other than the color scheme which we just discussed.

6    Q.  Right.

7           And, the purpose of 1201 was not to give the jury the

8    flavor of the defense case, correct?

9    A.  We didn't discuss the purpose of 1201 like that.

10   Q.  I'm asking you what you think the purpose of 1201 is and

11   whether that incorporates giving the jury a flavor of the

12   defense case; yes or no.

13   A.  I don't know.

14   Q.  Okay.  Good to know.

15          Now, let's just stay with 1201.  You kept -- again you

16   have already told us, right, no notes of what anybody asked you

17   to keep in or take out, correct?

18   A.  Correct.

19   Q.  Now, was 1201 read to the jury before?

20          MR. DEFILIPPIS:  Objection.

21          THE COURT:  Overruled.

22   A.  I know that elements of Government Exhibit 100-B were read

23   to the jury.  I don't know which elements.  I don't know if

24   these specific elements were read.

25   Q.  Mr. Sidransky, you were sitting right there through the

H1K5gam1                    Sidransky – cross

1    whole trial, right?

2    A.  I could refer to the record.  I was sitting right there for

3    the whole trial, yes.

4    Q.  All right.

5         Let me see if I can help up out with the record.  Do

6    you have the transcripts in front of you?  Or did you not bring

7    them?

8    A.  I didn't bring them up here.

9    Q.  Let's see if Mr. Quigley or Mr. DeFilippis objects to this.

10        You recall, do you not, and if not we will put the

11   transcripts up for you one by one, that Mr. DeFilippis and you

12   read these out loud to the jury yesterday.  You at least

13   remember that, right?

14   A.  Yes.  That I remember.

15   Q.  And it is your testimony that you do not remember that that

16   exact exchange that is reflected in this exhibit, 1201, was

17   read by Mr. Quigley and Special Agent Collie to the jury

18   exactly in the same way as you two read it out yesterday?

19        MR. DEFILIPPIS:  Objection.  Your Honor, can we have a

20   brief side bar?

21        THE COURT:  Sure.

22

23

24

25

H1K5gam1                          Sidransky – cross

1              (At side bar)

2              MR. DEFILIPPIS:  Your Honor, I think at some point

3    extensively questioning Mr. Sidransky on what was or was not

4    read to the jury becomes irrelevant and cumulative.  Ms. Shroff

5    has made her point that some of these were read before and

6    she's wasting the jury's time.  And, I would also add that some

7    of her questions are quite argumentative, bordering on abusive

8    to Mr. Sidransky.

9              MS. SHROFF:  They are way shorter than all the reading

10   they've done; trust me, way shorter.  And, I am entitled to

11   cross.

12             THE COURT:  And we have only just begun.

13             MS. SHROFF:  Only just begin.

14             THE COURT:  Right, so.  Overruled.

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2    BY MS. SHROFF:

3    Q.  Transcript pages 123, onward.  Do you recall, sir,

4    Mr. Quigley and Agent Collie reading exactly those charts to

5    exactly this jury?

6    A.  Yes.

7    Q.  Okay.

8          Now, the toll records that are in Exhibit 1201, they

9    were also displayed to the jury, correct?

10   A.  Yes.

11   Q.  They were also displayed by the prosecutor and their team,

12   your colleague right there, the other paralegal specialist,

13   correct?

14   A.  Correct.

15   Q.  Ms. Quinones, correct?

16   A.  Correct.

17   Q.  Now, these toll records were also shown to the jury through

18   the Verizon witness and then again through Special Agent Perry,

19   correct?

20   A.  Correct.

21   Q.  And, again, on this exhibit you have already testified you

22   selected none of the chats and you selected none of the calls,

23   correct?

24   A.  Correct.

25   Q.  And they told you what to put and you put them together,

H1K5gam1                          Sidransky – cross

1    correct?

2    A.  Correct.

3    Q.  Now, let's move to Government Exhibit 1202.  Do you have

4    that one?  They gave you instructions of which map to pick?

5    A.  Yes.

6    Q.  Okay.

7            And you, of course, did not challenge them in any way,

8    correct?

9    A.  No.

10   Q.  Okay.

11           And you picked the map they told you?

12   A.  Correct.

13   Q.  That's the first page you chose?

14   A.  Correct.

15   Q.  You put in the chats they told you to put?

16   A.  Correct.

17   Q.  And you chose the color scheme?

18   A.  Correct.

19   Q.  Okeydokey.

20           Who worked with you on 1202?

21   A.  Mr. Quigley.

22   Q.  We will get to Mr. Quigley's hours in a minute.

23           And this was also read to the jury, correct?

24   A.  Correct.

25   Q.  Read to the jury by Mr. Quigley and Ms. Tekeei, correct?

H1K5gam1                          Sidransky – cross

1    A.  Correct.

2    Q.  All right.

3            I think actually, correct me if I am wrong, these were

4    read to the jury twice plus the time you and DeFilippis read

5    them to them?  Correct?

6    A.  That might be true.

7    Q.  Might be?  Here.  Let me help you out.  Maybe this will

8    help you refresh your recollection.

9    A.  Okay.

10   Q.  Okay?

11   A.  Yes.

12   Q.  Okay.

13           So, once by Mr. Quigley and Ms. Tekeei, that was a

14   pairing, and once the pairing was Mr. Quigley and Special Agent

15   Collie, correct?

16   A.  Correct.

17   Q.  And the third time was you and Mr. DeFilippis, correct?

18   A.  Correct.

19   Q.  Now let's talk about 1203.

20           This ticket was also shown to the jury several times;

21   names, dates all highlighted, correct?

22   A.  Don't recall.

23   Q.  Okay.

24           I guess the poor Turkish Airlines lady did not make an

25   impression on you?

H1K5gam1                        Sidransky - cross

```
 1              MR. DEFILIPPIS:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3   Q.  You and Mr. DeFilippis read this to the jury yesterday?

 4   A.  Yes.

 5   Q.  And you read out whatever information you thought would

 6   help the government, correct?

 7   A.  I read out the information I was instructed to read.

 8   Q.  By the prosecutor, correct?

 9   A.  Correct.

10   Q.  Not the defense side, correct?

11   A.  Correct.

12   Q.  And that was also read to the jury by the Turkish Airlines

13   witness, correct?

14   A.  Correct.

15   Q.  And these chats that follow, let's just keep going, it will

16   be very quick; all of these chats are chosen by some prosecutor

17   at the prosecution table?

18   A.  Correct.

19   Q.  Not chosen by the defense?

20   A.  Not chosen by the defense.

21   Q.  And you read to the jury more than once, correct?  In fact,

22   these were also read to the jury twice before the time you and

23   Mr. DeFilippis read them to the jury, correct?

24   A.  Correct.

25   Q.  Okay.  Once the tag team was Ms. Tekeei and Mr. DeFilippis,
```

H1K5gam1                          Sidransky – cross

1    correct?

2              MR. DEFILIPPIS:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  Correct?

5    A.  Correct.

6    Q.  And then once by Special Agent McNulty and Mr. Quigley,

7    correct?

8    A.  Correct.

9    Q.  And you did not pick any of those chats?

10   A.  I did not.

11   Q.  Prosecutor told you what to put in?

12   A.  Correct.

13   Q.  They chose?

14   A.  Correct.

15   Q.  They may have met with you or without you, correct?

16   A.  Correct.

17   Q.  And you have no idea how many hours, minutes or seconds you

18   spent preparing it, correct?

19   A.  That's not true.  I told you how many hours.

20   Q.  Well, no.  You said you never kept time sheets you could

21   only estimate; isn't that correct?

22   A.  You asked if I know, I can estimate, yeah.

23   Q.  You can estimate, right?

24   A.  Yeah.

25   Q.  But you don't know for sure?

H1K5gam1                          Sidransky – cross

1   A.   No.

2   Q.   Okay.

3            1204.  You ready?

4   A.   Okay.

5   Q.   Also read to the jury twice before you read it with

6   Mr. DeFilippis?

7   A.   Yes.

8   Q.   Okay.

9            And you and Mr. DeFilippis read it to the same jury

10  the third time yesterday, correct?

11  A.   Correct.

12  Q.   Now, let's just stay with 1204.  Do you see that first

13  page?

14  A.   Yes.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H1KFGAM2                        Sidransky - cross

1   Q.  Do you recall if you left out any phone calls from here?

2   A.  No.

3   Q.  Okay.  Let's go to the second page.  Do you see how you

4   focus on January 16, correct?

5   A.  Correct.

6   Q.  And you focus in your -- actually, let me ask you a

7   different question.  Did you and Mr. DeFillipis practice how

8   you would speak in front of the jury?

9   A.  No.

10  Q.  Did you speak about inflections or tone?

11  A.  None whatsoever.

12  Q.  So when you were reading that was just him and you speaking

13  as you would normally emphasize things, correct?

14  A.  That's how I read out loud, correct.

15  Q.  And when you were looking to put together this particular

16  exhibit, correct, do you remember which one of those three gave

17  you these chats?

18  A.  Mr. Quigley.

19  Q.  Who?

20  A.  Mr. Quigley.

21  Q.  And you didn't ask him about any other chats that you

22  thought should come in, correct, that was not part of your job,

23  correct?

24  A.  Correct.

25  Q.  You didn't have a discussion with him; he told you what to

H1KFGAM2                          Sidransky - cross

 1  do and you did it?

 2  A.  That's correct.

 3  Q.  So if there was testimony that was omitted here it wasn't

 4  your decision, correct?

 5  A.  Correct.

 6  Q.  Now, can you flip to page 3?  You did not put in that this

 7  flight was never made by El-Goarany, correct?

 8  A.  I only put in what's on the page.

 9  Q.  So the answer is no, you did not have your chart reflect

10  that Mr. Samy El-Goarany did not take this flight, correct?

11  A.  Correct.

12  Q.  That's missing from the chart, correct?

13  A.  What did you say again; Exhibit 1204?

14  Q.  I think so. You're talking about a flight, right, on page

15  3.  Am I missing something?

16  A.  Yes.  Okay, no, I did not put that in.

17  Q.  So I'm not missing anything, correct?

18  A.  Right.

19  Q.  Yes or no?

20  A.  You are not.

21  Q.  So 1204, do you see where you're saying, "I'm landing at

22  5:45 a.m."?

23  A.  Yes.

24  Q.  The jury knows now, right, after my cross-examination that

25  Mr. El-Goarany did not take that flight, correct?

H1KFGAM2                          Sidransky – cross

1   A.  The jury may have known before but they certainly know now.

2   Q.  And you didn't put that in the chart, right?

3   A.  No.

4   Q.  Okay.  Let's flip to the next page.  Do you see this thing

5   about the long trip to Adana, correct?

6   A.  Yes.

7   Q.  You did not add in from Mr. Zelin that there was no

8   testimony about Adana, did you?

9   A.  Didn't add anything.

10  Q.  So they didn't give you the testimony from Zelin, you

11  didn't put it in, correct?

12  A.  No.

13  Q.  Okay.  Let's go to page 7.  Do you see how you have that

14  Tango all over there in that chart?

15  A.  Yes.

16  Q.  You have no idea who that call was to at all, correct?

17  A.  That's correct.

18  Q.  You just want the jury to infer that somehow this call is

19  related to Attiya and Mr. El Gammal, correct?

20          MR. DEFILIPPIS:  Objection, your Honor.

21          THE COURT:  Overruled.

22  A.  I don't want the jury to infer anything.

23  Q.  Right; that would be the prosecutors who would want the

24  inference, correct?

25          MR. DEFILIPPIS:  Objection.

H1KFGAM2                    Sidransky - cross

1   A.  I can't assume what they want.

2              THE COURT:  Sustained.

3   Q.  All right, let's move to the next one.  1205.  Do you

4   recall how many times 1205 has been read to the jury?

5   A.  I do not.

6   Q.  It was read to the jury by Mr. DeFillipis and Ms. Tekeei,

7   correct?

8   A.  Correct.

9   Q.  And also read during Mr. Zelin's testimony, correct?

10  A.  Correct.

11  Q.  And during Mr. Zelin's testimony the government just put up

12  several exchanges without any questions even being asked,

13  correct?

14  A.  Don't recall.

15             MR. DEFILIPPIS:  Objection, your Honor.

16             THE COURT:  Overruled.

17  Q.  You don't recall Mr. Quigley standing up there doing the

18  direct and just putting up messages after messages and no

19  question posed to Mr. Zelin?  You don't recall that?

20  A.  It's been a long two weeks.  I don't recall.

21  Q.  Ah, okay.  Now, the Facebook messages between Attiya

22  Aboualala and Samy El-Goarany were also previously read to the

23  jury, correct?

24  A.  Correct.

25  Q.  Same jury, same readings, correct?

H1KFGAM2                          Sidransky - cross

1    A.  Correct.

2    Q.  And they were read by Mr. Quigley and Special Agent

3    McNulty, correct?

4    A.  Correct.

5    Q.  And the Facebook messages between Mr. El Gammal and Samy

6    also previously read to the jury by Mr. Quigley and Special

7    Agent Collie, correct?

8    A.  Correct.

9    Q.  All right.  Let's go to 1206.  Was that messages between

10   Mr. El Gammal and Samy also previously read and testified to to

11   the same jury by government expert translator, correct?

12   A.  Correct.

13   Q.  And they were also read again by Special Agent Varani to

14   the jury, correct?

15            MR. DEFILIPPIS:  Objection, your Honor.

16            THE COURT:  Overruled.

17   Q.  Transcript pages --

18   A.  Correct.

19   Q.  Okay.  So short of the very last exhibit, Samy El-Goarany's

20   Twitter account, every single exhibit has been read to this

21   very same jury at least three times, correct?

22   A.  I didn't count every single one just now.  I don't know if

23   it was at least three, but they've all been read before.

24   Q.  Now, go back, if you would, please, for me to Exhibit --

25   actually, look at any of the exhibits you want and tell me

H1KFGAM2                        Sidransky - cross

1   anywhere did you include Government Exhibit E-T where Attiya

2   and Gammal speak and the conversation is this:

3        Attiya says, "Gammal I'm afraid to go to Turkey what

4   do you think?"

5        And Gammal says, "No, you will be arrested.  You take

6   a direct flight but with the touristic group, with a tourism

7   agency."

8        Attiya says, "I don't know."

9        Gammal says, "But not by yourself."

10        And Attiya says, "So should I make arrangements with

11   the tourism?"

12        You didn't put that in, correct?

13   A.  Correct.

14   Q.  Now, on Government Exhibit 1205, right, it covers a

15   specific time period, correct?

16   A.  Correct.

17   Q.  And during your preparation for 1205 the prosecutors did

18   not tell you to include any of the conversations between other

19   people that Samy had, correct?

20   A.  This is what they asked me to include.

21   Q.  So they didn't have you include any of Samy's conversations

22   with his parents, correct?

23   A.  Correct.

24   Q.  No conversations with his very many friends, correct?

25   A.  Correct.

H1KFGAM2                        Sidransky - cross

1   Q.  No conversations included in your exhibit about his

2   conversations with his brother, correct?

3   A.  I know there's one with his brother.  I'm not sure if it's

4   this exhibit.

5   Q.  Let's put the brother aside for a minute because I don't

6   want to keep the jury, but there's certainly no conversations

7   included about Nasibah Elmi in there, correct?

8   A.  No.

9   Q.  And when you reflected on the summary chart the interchange

10  and exchanges between Mr. El Gammal and Mr. Attiya, your chart

11  certainly does not reflect what Mr. Attiya was doing with other

12  people on that date, correct?

13  A.  You mean in messages, what Mr. Attiya was doing in his

14  Facebook messages on that date or in general?

15  Q.  Well, you wouldn't know in general, right?

16  A.  No, that's why I'm asking.

17  Q.  You know what I'm asking.

18  A.  No, there are no other Facebook messages from Attiya on

19  that date.

20  Q.  Attiya is a journalist.  You heard that testimony?

21  A.  Yes.

22  Q.  And you knew who he was talking to?  You do, you have the

23  whole Facebook return.

24  A.  I haven't reviewed the entirety of the evidence.

25  Q.  You haven't reviewed the entirety of the evidence?

H1KFGAM2                          Sidransky – cross

1   A.  Not myself.

2   Q.  No; you relied on them, correct?

3   A.  Correct.

4   Q.  They told you what to do and you put it in?

5   A.  Yes.

6   Q.  So you didn't review what Attiya was doing on that day as a

7   journalist in Turkey, correct?

8           MR. DEFILIPPIS:  Objection, asked and answered.

9           THE COURT:  Sustained.

10  Q.  By the way, did you include the conversation between Samy

11  El-Goarany and Rameez Farooqi where Samy El-Goaraney asked

12  Rameez Farooqi to use Cryptocat?

13  A.  I didn't include any conversations with Rameez Farooqi.

14  Q.  That's because they didn't tell you to include them,

15  correct?

16  A.  Correct.

17  Q.  That's because they're the prosecutors and you work for

18  them?

19  A.  Correct.

20          MR. DEFILIPPIS:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22  Q.  If I told you to add something to the chart, would you have

23  listened to me?

24  A.  No.

25  Q.  Now, did you review Defense Exhibit 122-II?

H1KFGAM2                          Sidransky - cross

1   A.  Not in preparing these exhibits, no.

2   Q.  And that's because it's a defense exhibit, right?

3   A.  Actually, there is a defense exhibit included.

4   Q.  No, that's not what I asked you.  Please.

5   A.  That is not why I didn't review it, no.

6   Q.  You didn't review it because they didn't give it to you to

7   review, correct?

8   A.  No.

9          MS. SHROFF:  Your Honor, pursuant to the Court's prior

10  ruling we move to admit 122-II-T.

11         MR. QUIGLEY:  Your Honor, as long as it's pursuant to

12  the prior ruling -- yes.

13         THE COURT:  It will be received.

14         (Defendant's Exhibit 122-II-T received in evidence)

15  Q.  Would you read that out loud to the jury?

16  A.  "Yeah.  Samy's father accused him only because Samy knows

17  him but he has nothing to do with Daesh."

18  Q.  That's not in your chart, right?

19  A.  No.

20  Q.  Now, is it fair to say, sir, that up until yesterday

21  afternoon you were still making changes to these charts?

22  A.  That is fair.

23  Q.  And in fact, as of this morning you were still informing

24  the defense what changes you had made, correct?

25  A.  I don't think that's true.

H1KFGAM2                         Sidransky - cross

1    Q.  Right?  Here.  This was sent, you know what, I'll just let

2    you refresh your recollection.  Are you aware of any e-mail

3    exchanges between you and Mr. DeFillipis about these charts?

4    A.  Yes.  These e-mail exchanges are from January 18.  That's

5    Wednesday.  Not this morning.

6    Q.  Right.  And do you know when Mr. DeFillipis informed us of

7    the changes and those e-mails?  Sir?

8            MR. DEFILIPPIS:  Objection.

9            THE COURT:  If he knows.

10   A.  I believe he provided you with this document this morning.

11   Q.  Right.  What time this morning, do you know?

12   A.  No.

13   Q.  Okay.  So that document lists all the changes in the

14   exhibits, right?

15   A.  Yes.

16   Q.  Okay.  So he provided that to me this morning, correct?

17   A.  Yes.

18   Q.  Okay.  May I?  And in one of the exchanges you asked --

19   actually, you know what, let me ask you this:  You had

20   questions that you asked the prosecutors, correct, about these

21   charts?

22   A.  Yes.

23   Q.  And they of course answered your questions?

24   A.  Yes.

25   Q.  And one of your questions was, "Is this what everyone is

1    envisioning?  Perhaps we could still get away with combining

2    Exhibits 112 to 115 since they all occur on the same day,"

3    correct?

4    A.  I wrote that, yeah.

5    Q.  So you wanted to make sure, right, that you participated in

6    the process of putting to this jury information that you

7    thought would be helpful to the prosecution, correct?  You

8    actually participated in that, correct?

9    A.  I was clarifying if I had done what they wanted me to do

10   properly.

11   Q.  Nice, but try to answer my question.

12            MR. DEFILIPPIS:  Objection.

13   Q.  Did you participate, sir?

14   A.  Depends how you interpret participation.

15   Q.  Interpret it any which way you want.  I'm sorry --

16   A.  I did not participate in the decision-making process of

17   what the exhibits, how they would be divided, no.

18   Q.  "Perhaps we could still get away with combining Exhibits

19   112 to 115."  Sounds like participation to me, right?

20   A.  But that wasn't the final determination.

21   Q.  Of course not.  I never said you had decision making.  I

22   just asked if you participated, sir.

23   A.  Yeah.

24   Q.  Okay.  The ultimate decision was the prosecutor's, correct?

25   A.  Every decision was the prosecutor's.

H1KFGAM2                         Sidransky - cross

1    Q.  Right.  And all tolled how much time do you think you and

2    Mr. Quigley participated with each other to making these

3    charts?

4    A.  Four hours.

5              MS. SHROFF:  I have nothing further.  Thank you.

6              THE COURT:  Any redirect?

7              MR. DEFILIPPIS:  Nothing, your Honor.

8              THE COURT:  Okay.  Mr. Sidransky, you may step down.

9              (Witness excused)

10             THE COURT:  Does the government have another witness?

11             MR. QUIGLEY:  Your Honor, the government rests.

12             THE COURT:  Ladies and gentlemen, the government has

13   rested.  What we're going to do now is we're going to take our

14   morning break, fifteen minutes.  Please do not discuss the

15   case.

16             (Recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

H1KFGAM2                      Trial

1                (In open court; jury not present)

2            MR. HABIB:  A few matters, your Honor.  First we're

3    moving pursuant to Rule 29 for a judgment of acquittal on the

4    grounds of insufficiency.

5            MR. QUIGLEY:  Your Honor, we think the government has

6    established a prima facie case certainly to allow the jury to

7    convict the defendant on all counts of the indictment.  So

8    there's a sufficient basis to find that Samy El-Goarany did

9    travel in fact to join ISIS.  There are numerous pictures of

10   him appearing to be in ISIS, social media communications where

11   he indicates that he's in ISIS especially when combined with

12   the expert testimony about the training that ISIS recruits

13   receive.  There's certainly a basis to find that the defendant

14   both aided and abetted and conspired with El-Goarany by helping

15   him get to Turkey and link up with Attiya, and there's a basis

16   to find that the defendant knew what he was doing from the

17   social media communications, from post-travel communications

18   and from various attempts to conceal his actions.  So we think

19   certainly there's a basis for a reasonable jury to find guilt

20   on each and every count.

21           THE COURT:  The application is denied.

22           Mr. Habib?

23           MR. HABIB:  Thank you.  With respect to the objections

24   the government raised as to Defense Exhibits 140AA and 113BB,

25   we don't intend to offer 140AA.

H1KFGAM2                    Trial

1              THE COURT:  Which one is that?

2              MR. HABIB:  That was the conversations -- those were

3     statements that were shown to Tarek El-Goarany during his

4     testimony.

5              THE COURT:  To refresh his recollection?

6              MR. HABIB:  And which on review of the transcript he

7     endorsed them.

8              THE COURT:  Very well.

9              MR. HABIB:  113BB is a conversation between, it's a

10    Facebook conversation from December 2014 between Samy

11    El-Goarany and an individual whose Facebook ID is Awaja Mohsen

12    Ali, concerning, in brief Samy is approaching Awaja Ali for

13    assistance in preparing his resume and securing a job.  We can

14    hand this up to the Court.  Ours is also marked up.  But what

15    we seek to admit is on the first page of the exhibit in which

16    Samy says, "Salam Aleikem, bro.  Are you available to meet up

17    tomorrow?  I've updated my resume with details you recommended

18    from the last time we spoke but I'm a little nervous because

19    I've been slow to jump into the job market.  Also worried about

20    the info I put about me being in the accounting club in case

21    someone would try to verify that.  Do you still recommend going

22    for the MTA job vtw?  Sorry if I'm bothering you with this at a

23    bad time, man.  It's been a hectic semester for me that things

24    aren't working out the way I planned.  I'm trying to get on a

25    track work wise and you're one of the few I trust with that

H1KFGAM2                        Trial

1    fact so I'm trying to make the most out of the time I have to

2    talk with you before the time I graduate.  Here's the new

3    resume.  Jazak allah.  AKHI."  And then he sends the resume.

4               So we think this material qualifies under any number

5    of hearsay exceptions, most obviously they qualify as pursuant

6    to Rule -- either as a non-hearsay evidence of Samy's then

7    existing state of mind or under Rule 803(3) of Samy's then

8    existing state of mind.  A number of the communications in this

9    exchange are posed in the form of questions.

10              THE COURT:  Assuming that they speak to Mr.  -- I'm

11   sorry, it's Attiya, correct?

12              MR. HABIB:  No, this is Samy speaking to an individual

13   whose name has not come up in this case, someone who appears to

14   be an acquaintance from college.

15              THE COURT:  He's talking about changes to his resume?

16              MR. HABIB:  This is December 2014, so about two months

17   before he leaves, six weeks before he leaves, he's talking

18   about having revised his resume and looking for jobs and he

19   wants Awaja Ali to review his resume, give him some advice

20   about his resume and give him some advice about what jobs he

21   should apply for, how he should approach the job search

22   process.

23              THE COURT:  Okay.

24              MR. HABIB:  We think it's evidence of his state of

25   mind at that time and it negates or suggests that he was not

1    firm in his plans to travel to Turkey and Syria at that time

2    and thus weakens the inference that Mr. El Gammal must have

3    been aware of his plan to do so.  Or at a minimum, again,

4    consistent with other evidence the Court has admitted, that he

5    was not forthright -- either that he was genuinely undecided

6    about his plans at that time, which would negate the inference

7    that the government has asked the jury to draw with respect to

8    Mr. El Gammal's mental state, or that he misled other people,

9    again evidence of which has already been admitted to support

10   the defense contention that he may have misled Mr. El Gammal as

11   well.

12           THE COURT:  Mr. Quigley?

13           MR. QUIGLEY:  Your Honor, the relevance of the entire

14   exchange depends on the statement.  "I've updated my resume

15   with details that you recommended from last time we spoke,"

16   which is a hearsay statement, that is, it doesn't have anything

17   to do with Samy El-Goarany's state of mind.  He's stating a

18   fact.  "I've updated my resume with details that you

19   recommended from the last time we spoke."  He attaches his

20   resume.  And then, "I've been slow to jump into the job

21   market."  These are adequate statements whose relevance depends

22   on the truth of the matter asserted that he has updated his

23   resume and that he was going to meet with this person.  And

24   then the person says, "Meet me by my job.  It's on 22nd and

25   Park at five."  So, again, another hearsay statement.  So the

H1KFGAM2                        Trial

1    relevance depends on, they're not admitting these to say Samy

2    El-Goarany lied about his resume, they're submitting it to say

3    he updated his resume, this is accurate and that he's looking

4    for a job.

5           THE COURT:  I think they're clearly hearsay, Mr.

6    Habib, so --

7           MR. HABIB:  Your Honor, at that point, "I've updated

8    my resume with details you recommended from the last time we

9    spoke," we are not seeking to prove that Samy has in fact

10   updated his resume with details Awaja Ali recommended from the

11   last time they spoke.  We haven't seen the resume and we don't

12   know what the details of the prior conversation were.

13          THE COURT:  But the arguments, and you tell me if I'm

14   wrong, but the only conceivable argument you can make from that

15   is he did update his resume he was in the process of updating

16   his resume and therefore counter the government's case that he

17   intended to go to Syria to fight with ISIS.

18          MR. HABIB:  I would say two things, your Honor.  Let

19   me explain, reiterate the relevance theory.  The relevance

20   theory is twofold.  If Samy is genuinely undecided in

21   December 2014 whether to apply for a job in New York or travel

22   to Turkey and there on to Syria, that negates the government's

23   argument or at least weakens the government's argument that

24   Mr. El Gammal must have been aware of Samy's plans at that

25   time.  Because if Samy himself did not know what his plans

1    would be, then necessarily Mr. El Gammal could not have been
2    aware of them.  In the alternative, if Samy was aware of his
3    plans and was simply misleading the individual with whom he's
4    speaking, that, too, is relevant because it supports the
5    defense argument that Mr. El Gammal was also misled.
6            So, again, and frankly if the Court is concerned about
7    the statement "I've updated my resume," that sentence or that
8    sentence fragment can be stricken or redacted from the exhibit.
9    What's important is that Samy is expressing his then-existing
10   state of mind in December 2014 to apply for jobs in New York.
11           MR. QUIGLEY:  Your Honor?
12           THE COURT:  Yes.
13           MR. QUIGLEY:  The problem with that is the entire --
14   the "I've updated my resume" statement is the building block of
15   everything that follows.  If you take that out, everything
16   becomes meaningless.
17           THE COURT:  If you have another -- as it stands, I'm
18   not going to let it in, without prejudice to make a subsequent
19   submission.  So let's take our break.  Is your witness here?
20           MS. SHROFF:  He's on his way, your Honor.
21           THE COURT:  When will he arrive?
22           MS. SHROFF:  I'm waiting to hear from him, but I'm
23   assuming in the next ten minutes.
24           THE COURT:  Okay.  So we'll tell at least for now the
25   jury that we're fighting legal battles.  Okay.  Don't go far.

H1KFGAM2                        Trial

```
 1    Who is the witness?
 2             MS. SHROFF:  Rameez Farooqi.
 3             THE COURT:  Who is he?
 4             MS. SHROFF:  A friend of Mr. El-Goarany.
 5             THE COURT:  The jury is anxious about a statement I
 6    made yesterday.  Will we be finished by lunch?
 7             MS. SHROFF:  I assure you it will be the shortest of
 8    all directs of any that has gone on in this case so far, but
 9    what do I know?  I'm going to just step out and call him again,
10    your Honor.
11             THE COURT:  Okay.
12             (Recess)
13             THE COURT:  Okay, let's get the jury in.  Could I ask
14    a question of the defense, if you're in a position to say, how
15    much more of a case do you have?
16             MS. SHROFF:  Your Honor, could we just approach to
17    tell you?
18             THE COURT:  Sure.
19             MR. QUIGLEY:  Your Honor, could I come up too?
20             MS. SHROFF:  No.
21             MS. TEEKEI:  Your Honor, it's an open trial, it's an
22    open courtroom.
23             THE COURT:  Let me just speak with them.
24             (Discussion off the record)
25             (Continued on next page)
```

 1                  (In open court; jury present)

 2              THE COURT:  Ladies and gentlemen, I apologize for the

 3      delay.  As I've indicated or as I've instructed you at least a

 4      couple of times, in a criminal case the defendant has no

 5      obligation to do anything and remains with the presumption of

 6      innocence throughout the trial.  In this case Mr. El Gammal has

 7      decided to present some evidence and we will now proceed to the

 8      defense case.  Ms. Shroff.

 9              MS. SHROFF:  Thank you, your Honor.  The defense

10      called Mr. Mohamed Farooqi.

11              THE COURT:  Sir please watch your step, step into the

12      witness box and remain standing.

13       MOHAMED FAROOQUI,

14           called as a witness by the Defendant,

15           having been duly sworn, testified as follows:

16              THE COURT:  Sir, you may be seated.  Please pull your

17      seat up to the microphone and please begin by stating your full

18      name and spelling your last name for the record.

19              THE WITNESS:  Sure.  My full name is Mohamed Dahir

20      Farooqui, last name is spelled F-a-r-o-o-q-u-i.

21              THE COURT:  Ms. Shroff.

22              MS. SHROFF:  Thank you, your Honor.

23      DIRECT EXAMINATION

24      BY MS. SHROFF:

25      Q.  Mr. Farooqui, could you tell the jury if you knew a person

H1KFGAM2                         Farooqui - direct

1   named Samy El-Goarany?

2   A.   Yes, I did.

3   Q.   And were you friends?

4   A.   We were.

5   Q.   And would you say, when did your friendship first start?

6   A.   I'm not certain on the dates, but I believe it was around

7   2010, 2011.

8   Q.   And your friendship continued, would you say, until what

9   time?

10   A.   Until 2014.

11   Q.   Would you say late 2014, early 2014?

12   A.   I'm sorry, what was the question?

13   Q.   Up until what time frame, what year, just generally --

14   A.   Generally, 2014.   Roughly December.

15   Q.   December of 2014?

16   A.   Right.

17   Q.   And would it be fair to say that you were friends on

18   Facebook?

19   A.   Yes, we were.

20   Q.   And could you tell the jury what kinds of things you would

21   talk about on Facebook?

22   A.   On Facebook we would discuss, we both were very interested

23   in music, movies, sports as well.   That was the majority of our

24   conversation on Facebook.

25   Q.   Do you recall having a conversation with him about the

H1KFGAM2                        Farooqui - direct

1    Egyptian coup?

2    A.  I don't recall any conversations about that.

3    Q.  Do you recall having -- let me show you if something would

4    help you refresh your recollection.

5              THE COURT:  Mr. Farooqui, could I ask you to keep your

6    voice up and bring the microphone perhaps a little closer?

7              THE WITNESS:  Yes, your Honor.  I'm sorry.

8    Q.  Let me hand you your interactions with Mr. El-Goarany on

9    Facebook, okay?  Now, does that refresh your recollection that

10   you and he would talk about topics that included the Egyptian

11   coup?

12   A.  Yes.  Upon looking at this document it seems like we did

13   have at least one, he had one comment about the Egyptian coup,

14   yes.

15   Q.  He was explaining to you why Rab'a Square was named Rab'a

16   Square, correct?

17             MS. TEEKEI:  Objection, hearsay.

18             THE COURT:  Overruled.

19   Q.  And during that same time period you were also talking to

20   him, as you just mentioned, about sports, correct?

21   A.  Do you want me to rely on the document in answering that or

22   just --

23   Q.  How about if I try to help you out here?  Do you remember

24   talking to him about James LeBron and whether or not he had a

25   good fan base or not?

H1KFGAM2                          Farooqui - direct

1    A.  I remember that conversation.

2    Q.  So it's fair to say you discussed a range of topics with

3    Samy El-Goarany, correct?

4    A.  Yes, correct.

5    Q.  And there were times when you would invite him to come over

6    and watch a basketball game or just hang out, correct?

7    A.  Correct.

8    Q.  And the same thing in the reverse; sometimes he would ask

9    you to come join him, do normal friend stuff, correct?

10   A.  Correct.

11   Q.  Now, sometime in the fall of 2014, do you recall Samy

12   El-Goarany asking you about Cryptocat?

13   A.  Yes.

14   Q.  And do you recall what he asked you?

15   A.  He asked me to download it.

16   Q.  And before he asked you to download it, did you have

17   Cryptocat?

18   A.  No, I did not.

19   Q.  And did you do what Samy El-Goarany asked you?

20   A.  Yes, I did.

21   Q.  And what did you do?

22   A.  I downloaded Cryptocat.

23   Q.  And did Samy El-Goarany use Cryptocat with you?

24   A.  Yes, he did.

25   Q.  And could you tell the jury how he used it?

1    A.  He used it to message me.  He, when we were on Cryptocat he

2    was messaging me from essentially what I recall the technical

3    aspects of the program, how it's used.  I'm not that big of a

4    techie myself, so I need a lot of instruction sometimes when it

5    comes to that sort of thing.  So, yes, he basically discussed

6    with me on Cryptocat how the program works essentially.

7    Q.  Then he had a conversation with you on Cryptocat, correct?

8    A.  Correct.

9    Q.  In the part of the discussion when he was talking about it

10   he told you Cryptocat was encrypted, correct?

11   A.  Correct.

12   Q.  And when you had the conversation with him on Cryptocat,

13   you don't recall sitting here today what the conversation

14   was -- do you recall what it was about?

15   A.  I don't recall.  Outside of I know he mentioned some of the

16   technical aspects of the program, but outside of that, I don't

17   recall.

18   Q.  Do you recall Samy El-Goarany reaching out to you and

19   telling you he wanted specifically to talk to you on Cryptocat?

20   A.  Yes.

21   Q.  Right, and he told you that he had a personal issue that he

22   wanted to discuss with you, is that correct?

23   A.  Yes, I would say that's correct.

24   Q.  And you had that discussion with him, correct?

25   A.  In very vague terms.  I never actually learned what that

1  personal issue was about.

2  Q.  He never told you he was contemplating going to join the

3  Islamic State, correct?

4  A.  No.

5  Q.  He never told you he was thinking of joining or doing

6  anything with the Islamic State, correct, during that

7  conversation?

8  A.  No.

9  Q.  And that conversation was on Cryptocat, correct?

10  A.  Correct.

11  Q.  What is your name on Facebook?  I know your real name is

12  Mohamed Farooqui, but you go by what name on Facebook?

13  A.  I go by Rameez Farooqi on Facebook.

14  Q.  And at some point you also on Facebook asked Samy

15  El-Goarany, "What should I tell the fellows if they ask,"

16  correct?  Do you remember that exchange you had with him?

17  A.  I do.

18  Q.  And he replied to you and said, "If they ask, just say I

19  got an internship," correct?

20  A.  Correct.

21  Q.  And by when he said that, you did not think he was getting

22  an internship at the Islamic State, did you?

23  A.  No.

24  Q.  And you did not think it was an internship in any code,

25  correct?

H1K5gam3                        Farooqi – direct

1    A.  No, I did not.

2    Q.  Now, moving forward to November/December of 2014, do you

3    recall the time period in your life?

4    A.  I'm sorry, could you repeat the question?

5    Q.  Sure.  Do you recall the period of November/December of

6    2014 what was going on in your life?

7    A.  I do.

8    Q.  And what was going on in your life?

9    A.  I was finishing up graduate studies and I was also getting

10   ready to be married in December.

11   Q.  Did you invite Samy El-Goarany to your wedding?

12   A.  Yes, I did.

13   Q.  And when was your wedding, sir?

14   A.  Late December.

15               (Continued next page)

16

17

18

19

20

21

22

23

24

25

H1K5gam3                         Farooqi - direct

BY MS. SHROFF:

Q.   Okay.

     And did Samy El- Goarany show up to your wedding?

A.   He did.

Q.   Now, you and I have spoken before, correct?

A.   Correct.

Q.   And you and the FBI have spoken before, correct?

A.   Correct.

Q.   And you and Ms. Tekeei have spoken before, correct?

A.   Correct.

Q.   And, when was the last time you spoke to me about your

testimony here today?

A.   About the testimony?  Yesterday.

Q.   And about arrangements to come here you spoke to me this

morning, correct?

A.   Correct.

Q.   And when was the last time you spoke to Ms. Tekeei?

A.   I believe it was yesterday morning.

         MS. SHROFF:  May I have one second, your Honor?

         THE COURT:  Yes.

         (pause)

         MS. SHROFF:  Your Honor, if I may, could I ask that

Defendant's Exhibit 113-AA be put up?

         THE COURT:  Is it in evidence?

         MS. SHROFF:  Yes.

1          THE COURT:  Certainly.

2     BY MS. SHROFF:

3     Q.  Do you see it there?

4     A.  Yes, I do.

5     Q.  Okay.

6          And it starts with Mr. Samy El- Goarany saying

7     cryptocat, correct?

8     A.  Correct.

9     Q.  And if you go over to page 2, 29011, right, it says on top:

10    When we start talking on that I will fill you in.

11         Correct?

12    A.  Correct.

13    Q.  And that's the conversation you have but your testimony

14    today, under oath, is that he does not ever tell you anything

15    about the Islamic State, correct?

16    A.  Correct.

17    Q.  Now, if you could go to page 29013 at the bottom and then

18    the following pages, do you see that gobbledygook which is not

19    English at all?

20    A.  Yes.

21    Q.  That's cryptocat, correct?

22    A.  I assume so.  I don't know the details of this program

23    enough to say certainly.

24    Q.  And Mr. Farooqi, without really going into much detail

25    about it, what is your present occupation?

1   A.  I'm an attorney.

2           MS. SHROFF:  I have nothing further, your Honor.

3   Thank you.

4           THE COURT:  Cross-examination.

5           MS. TEKEEI:  Briefly, your Honor.

6   CROSS EXAMINATION

7   BY MS. TEKEEI:

8   Q.  Hi, Mr. Farooqi.  You were asked on direct some questions

9   about messages between you and Samy El- Goarany on October

10  14th; it was Exhibit 113-AA, right?

11  A.  Correct.

12  Q.  You spoke with Samy El- Goarany on cryptocat on one day; is

13  that correct?

14  A.  Yes.

15  Q.  One day only; is that right?

16  A.  Yes.

17  Q.  And at the end of those messages that Ms. Shroff showed

18  you, he didn't send you a link to an ISIS video, did he?

19  A.  No.

20  Q.  And you didn't send him a link it an ISIS video, did you?

21  A.  No.

22          MS. TEKEEI:  Thank you.

23          THE COURT:  Redirect.

24          MS. SHROFF:  No, your Honor, none.  Thank you.

25          THE COURT:  Mr. Farooqi, you may step down.

H1K5gam3

1          (Witness steps down)

2          THE COURT:  Ladies and gentlemen, as I indicated

3    yesterday we will be finishing early today, in fact we will be

4    finishing now.  I am told by the attorneys that we are still on

5    track so this case should be concluded next week, including

6    deliberations.  And so, we will see you Monday morning.  Please

7    be in the jury room by no later than 9:20 so we can begin at

8    9:30.  Enjoy your weekend.  Actually, you are missing the start

9    of the inauguration, unfortunately, but please do not discuss

10   the case, do not read any news reports about the case, and do

11   not do any research on your own about the case.

12          Have a wonderful weekend.

13          (Continued on next page)

H1K5gam3

1             (Jury not present)

2             THE COURT:  I did want to make a brief record on an

3     issue.

4             I have, throughout the course of this trial, I believe

5     had three ex parte meetings with the defense team, and

6     certainly prior to the trial I had several communications with

7     the defense team ex parte.  There are any number of reasons why

8     it is necessary and entirely appropriate, on occasion, for a

9     Judge to meet with the defense team ex parte.  For example, it

10    is not unusual for defense counsel to approach me and request

11    that an investigator be assigned to a case ex parte and that is

12    kept from the prosecution.  It is not unusual for defense

13    counsel to approach Judges about subpoenas that they wish to be

14    issued and they don't want that to be provided to the

15    government or knowledge about those situations to be provided

16    to the government because it reveals defense strategy.

17            There are occasions when the defense -- when defense

18    counsel approach me because of attorney-client relationships

19    and problems with that relationship so that the Court can take

20    appropriate -- so that they can first of all advise the Court

21    about what's going on and to anticipate any problems that may

22    arise and so that I can take appropriate steps.  I'm not saying

23    that any of those things happened here but there are -- I just

24    use those by way of example as when it might be appropriate.

25    And so, the government has objected, I think at least once,

H1K5gam3

maybe twice, to those times when we meet -- when I met with

defense counsel ex parte and I assure the government that it

was for reasons like the ones I just described where the

communications related to defense strategy and tactics.

MR. QUIGLEY:  Your Honor, if I may, briefly?

THE COURT:  Sure.

MR. QUIGLEY:  We understand, that makes complete sense

to us, and obviously we have filed our own ex parte, one

voluminous ex parte submission here so we realize that there

are times and places where ex parte communications may be

appropriate.  Our only request at this point is that for our

own -- you know, the defense has said they are going to call

Dr. March, I guess potentially their interpreter, and

Mr. Roloff I guess on Monday.  Obviously the defendant

testifying, that's an issue that is always last minute but

beyond that, it would be, I think appropriate and a matter of

the same courtesy we extended to them, to get a sense of who

their witnesses are and essentially the length of their case.

THE COURT:  Absolutely.

I don't know what the relationship has been -- well, I

do -- but giving advice or warning about upcoming witnesses, I

had assumed that the government has been telling the defense

who the witnesses -- who they were that would be coming up at

least a day in advance or so.

MR. QUIGLEY:  We have been, your Honor.

H1K5gam3

1            THE COURT:  So, to the extent that the defense knows,

2     obviously it will be most efficient if you were to give them

3     some idea.  I understand that Mr. Roloff is testifying Monday

4     morning so you know at least that and I don't know, presumably,

5     there will be no gaps in the presentation of your evidence or I

6     am directing that there be no gaps if it could at all be

7     avoided.  So, to the extent you know who the people will be

8     testifying on Monday, you should let the government know.

9            Also, on the issue of Mr. El-Gammal's testimony or

10    not, I do want the parties to begin thinking about whether you

11    want me to do some sort of allocution with him as to whether he

12    wants to testify or if he is not going to testify and, if so,

13    what questions you believe I should be asking him.

14            MS. SHROFF:  Thank you, your Honor.

15            Your Honor, again, I am answering the government's

16    question, I have answered it on e-mail, I am happy to answer it

17    on the record.

18            As of now, on Monday, we intend to call Mr. Roloff,

19    which we have previously informed them of; the translator that

20    we have, Marwan that we have informed them of.  On Tuesday we

21    are hopeful that Professor March will be testifying, although,

22    if the government thinks they could have more success nailing

23    down his schedule I would welcome them because he is as -- I

24    don't even know what metaphor to draw on but we are still

25    struggling just with getting Professor March to commit to a

H1K5gam3

1    full time slot.  So, Professor March is another witness.  And I

2    have told them which other fact witnesses we may call.  I have

3    given them the names including Khaled El Goarany, Khalafalla

4    Osman, I gave them Rameez Farooqi and he did in fact testify.

5    I told them every person in the Bronx squad is a potential

6    witness.  If I know more and I narrow it down they will be the

7    first to know but this is what I know as of today and I have

8    now conveyed it to the government.

9              Oh, and they asked me about whether or not the family

10   of Mr. El-Gammal might testify.  I told them one of them would

11   and one of them -- no, I told them one of them possibly would

12   but one of them was not.

13             And I have conveyed all of this information to them.

14   I know nothing more specifically so what I don't know I really

15   cannot tell them.

16             THE COURT:  Okay.

17             MR. QUIGLEY:  Your Honor, we will obviously be in

18   communication with Ms. Shroff but it is almost Friday

19   afternoon, we are talking about -- and obviously everybody is

20   going to be working all weekend.  I assume the defense is going

21   to be preparing some people over the weekend for testimony on

22   Monday beyond those two witnesses, so we just ask we be

23   notified as soon as possible; extend to us the same courtesy we

24   have extended to them throughout the trial.

25             THE COURT:  I am sure that they will.

H1K5gam3

1          Anything else?

2          MR. QUIGLEY:  Are you thinking of charge conference on

3     Monday, your Honor?

4          THE COURT:  Yes.  I mean, I will be prepared to

5     proceed.  We will get you a copy of the draft today.

6          MR. HABIB:  That's fine, your Honor.

7          THE COURT:  Okay.

8          MS. MIRÓN:  Your Honor, it may be not be perfectly

9     convenient for the jury, but I propose that that be scheduled

10    right before the regular lunch break, they can have a longer

11    lunch.  This way we can have Mr. Roloff in the court house in

12    Macon can and know for certain he is going on at 9:30.

13         THE COURT:  Oh, no.  He is going on at 9:30.  We can

14    do the charge at the end of the day.

15         MS. MIRÓN:  The other scheduling issue is our

16    interpreter can only be here at 3:00 on Monday.  We are going

17    to try to get him in earlier but we have sort of bookended

18    witnesses with scheduling issues.

19         MS. SHROFF:  Mr. Farooqi is apparently taking a flight

20    out today so we had to get him in today.

21         THE COURT:  No, no.

22         Okay, obviously you should control your witnesses and

23    get them here so that we disrupt the lives of the jurors as

24    minimally as possible.  Okay?

25         MS. MIRÓN:  Okay.

H1K5gam3

1        THE COURT:  Unless there is nothing else -- just off

2   the record.

3            (Discussion off record)

4        THE COURT:  Okay.  So we will be in touch.

5        MS. TEKEEI:  Thank you, your Honor.

6        THE COURT:  Unless anything comes up, we will see you

7   at 9:15 Monday morning.

8            (Adjourned to 9:15 a.m. January 23, 2017.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   JAKE SIDRANSKY

4   Direct By Mr. Defilippis . . . . . . . . . .1290

5   Cross By Ms. Shroff  . . . . . . . . . . . .1311

6   MOHAMED FAROOQUI

7   Direct By Ms. Shroff . . . . . . . . . . . .1350

8   Cross By Ms. Tekeei  . . . . . . . . . . . .1359

9                    DEFENDANT EXHIBITS

10  Exhibit No.                          Received

11   122-II-T    . . . . . . . . . . . . . . . .1339

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```