H1N3GAM1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          15 Cr. 588 (ER)

5   AHMED MOHAMMED EL GAMMAL,

6              Defendant.

7   ------------------------------x

8                                         New York, N.Y.
                                          January 23, 2017
9                                         9:15 a.m.

10

    Before:
11
                        HON. EDGARDO RAMOS,
12
                                          District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BRENDAN F. QUIGLEY
17  NEGAR TEKEEI
    ANDREW J. DeFILIPPIS
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
20  BY:  SABRINA SHROFF
         ANNALISA MIRÓN
21       DANIEL G. HABIB

22

23

24

25

H1N3GAM1

1           (In open court; jury not present)

2           THE COURT:  There are a number of items that had been

3    brought to my attention.

4           First of all, let me ask, I've been told that we would

5    not be beginning with the videotaped testimony of Mr. Roloff.

6    Is that because we're not going to be taking his testimony at

7    all or because we're doing it after Agent Nguyen?

8           MS. MIRON:  No, we are not calling Mr. Roloff.

9           THE COURT:  Okay.  So, let's talk first about this

10   special agent.  First of all, is he here?

11          MS. TEKEEI:  Yes, your Honor.  He's here.

12          THE COURT:  The government has moved pursuant to *U.S.*

13   *v. Touwe* is it to limit his testimony to certain items that had

14   been specifically identified by the defense.  Is there any

15   objection to the government's request?

16          MS. MIRON:  Your Honor, I believe the testimony we

17   plan to elicit will fall within those four categories for which

18   we've provided notice.

19          THE COURT:  Very well.  So that should take care of

20   that.

21          MS. MIRON:  While we are on the topic of the agent,

22   would I have permission to lead him as an adverse witness?

23          THE COURT:  I suppose.  Any objection to that?

24          MR. QUIGLEY:  No, your Honor.

25          MS. MIRON:  Thank you.

H1N3GAM1

1          THE COURT:  Let's put aside the issue of the jury

2    instructions for now because they're going to take up more

3    time.

4          Let's now talk about the defense request to admit

5    redacted version of DX 113-BB.  Is there an objection to that

6    from the government?

7          MR. QUIGLEY:  So, yes, on 113-BB, but just to save

8    time, on 113-A we're fine with that redacting, that partial

9    that they also objected to, so there is no issue there.  The

10   part that Ahmed was vocal in his --

11         THE COURT:  Okay.  So that's coming in, you don't

12   object to that coming in.

13         MR. QUIGLEY:  No.  There are two issues in the defense

14   letter.  One was an objection to 113-A, a portion of 113-A.

15   Sorry 113-C.  We will redact that portion of the exhibit so

16   that's not an issue.

17         On 113-BB, Defense I guess 113-BB, we still believe

18   that there's a couple of issues.  I think we still believe

19   there is hearsay in here, specifically the "here's the résumé"

20   piece of that.  The part where Samy El-Goarany says "I'm trying

21   to get on track work-wise though," that is a statement that is

22   coming in for the truth of the matter asserted that he is in

23   fact trying to get on track work-wise.  And "here's new résumé"

24   is a statement.  He's saying here's new résumé.  Statement of

25   fact.  So there's that.

H1N3GAM1

 1              There is also the issue that with these redactions, we

 2      think any relevant, relevance of this exhibit had been

 3      substantially diminished.  And there's been ample testimony or

 4      there has been testimony in the record that Samy El-Goarany was

 5      doing different things at this time, was exploring different

 6      options, so we think there is also with the redactions a

 7      relevance and 403 issue and this evidence will be cumulative

 8      especially in light of the low probative value.

 9              But I think the main objection is it still contains

10      these statements of fact, which the defense can say they're

11      going for state of mind, but they're offering it for the truth

12      of the matter asserted, that "I am trying to get on track

13      work-wise.  You're one of the few who I trust.  Here's new

14      résumé."

15              THE COURT:  Okay.  Mr. Habib.

16              MR. HABIB:  Thank you, your Honor.  As detailed in our

17      submission, each of statements in the exhibits falls squarely

18      within a settled hearsay exception or is admissible for a

19      non-hearsay purpose.

20              To respond to the two statements the government has

21      just identified, statement "I'm trying to get on track

22      work-wise," is very squarely a statement of either state of

23      mind or in particular a statement of future intent which is

24      permissible pursuant to the Second Circuit's decision in,

25      *Badalamenti* cited in our submission.

1          With respect to the statement "here is the résumé,"

2    that is a statement which is admissible for the non-hearsay

3    purpose of clarifying El-Goarany's conduct.  That is he had

4    sent his interlocutor a file which is his résumé, and the

5    statement "here is the résumé" is admissible for the purpose of

6    clarifying ambiguous conduct.  And that's also pursuant to

7    Second Circuit case law cited in our submission.

8          As to relevance, the statement is highly probative of

9    Mr. El-Goarany's mental state at the crucial time in this

10   prosecution, December 2014, immediately before he's leaving.

11   It's not cumulative because it's testimony that comes or it is

12   evidence that comes from Mr. El-Goarany himself.  There has

13   been testimony from other individuals recounting statements

14   about what Mr. El-Goarany may or may not have been intending to

15   do.  But these statements, which are from Mr. El-Goarany

16   himself, describing his then existing state of mind and his

17   future intent to seek work in the United States, are highly

18   relevant in that they are probative of a mental state at the

19   time, it's inconsistent with or at least undermines the mental

20   state necessary for the crimes charged.

21          THE COURT:  I disagree that the statements are

22   non-hearsay.  He did it with "I'm trying to get on track" it's

23   not necessary, or it could be seen as a statement of future

24   intent, but it could also be seen as a current statement of his

25   current, and "here's new résumé" obviously would only come in

H1N3GAM1

```
1   to clarify that statement and therefore that should not come in

2   either.

3           So what I would allow to come in, if the defense wants

4   to use it because I don't find it is cumulative and I think it

5   is arguably relevant, is when Samy says "Salaam alaikum, bro.

6   Are you able to meet up tomorrow and do you still recommend

7   going for the MTA job by the way."  And then down to I take

8   it -- you want in la salaam broski?

9           MR. HABIB:  Yes, your Honor.

10          THE COURT:  "Let's meet at five today.  Don't worry.

11  I'll try to help as much as possible."

12          So if you wish you can put that in and not the

13  balance.  Then the other issue is?

14          MR. QUIGLEY:  So I'm clear, basically in the first

15  message everything after by the way or BTW is out?

16          THE COURT:  Yes.

17          MR. QUIGLEY:  Okay.  Thank you.

18          THE COURT:  Okay?  What else do we need to do that

19  does not involve -- oh, does anyone know whether Ms. Manley is

20  going to be here today?

21          MS. SHROFF:  She is, your Honor.

22          THE COURT:  Do we have any idea as to when they are

23  expected?

24          MS. SHROFF:  We do, your Honor.

25          THE COURT:  When is that?
```

H1N3GAM1

1          MS. SHROFF:  She should be here by 11, 11:30 or 12.  I

2     think there is some difficulty with the weather, the wind is

3     not cooperating, but I'm given to understand that she is on her

4     way.

5          THE COURT:  Do we know how they are traveling?

6          MS. SHROFF:  Yes, your Honor.

7          THE COURT:  How are they traveling?

8          MS. SHROFF:  By car.

9          THE COURT:  She's bringing Mr --

10          MS. SHROFF:  Khalafalla Osman with her.  As well as

11     the second lawyer because there seems to be some dispute about

12     the attributions made to Mr. Osman, and two lawyers from his

13     side attended the meetings.

14          THE COURT:  So what are we fighting about with respect

15     to Mr. Osman?  Is it expected that he will invoke the Fifth

16     Amendment with respect to any question he's asked about his

17     meetings with the FBI and the prosecutors?

18          MS. SHROFF:  Your Honor, actually I think that it is a

19     good question what we're fighting about, and I'm hoping we're

20     fighting about nothing because in the first instance it is

21     incumbent upon the government to inform both the defense as

22     well as Mr. Osman and counsel for Mr. Osman whether or not they

23     believe he has any exposure.

24          I understand the Department of Justice manual calls

25     exactly for that.  That United States attorney's office is to

inform in open court whether or not they believe the witness,
number one, has exposure; number two, what the exposure is for;
number three, what their responses are going to be to that
exposure.

That is my understanding.  And I confess, your Honor,
having never been a federal prosecutor, I had to rely on the
expertise of other federal prosecutors who are now members of
the Criminal Justice Act panel.  So, with that I turn over to
the government and see if I'm correct in what I have learned
from their prior colleagues.

MR. QUIGLEY:  Judge, I think I'm not -- we can look at
that provision.  I'm not aware of it.  Certainly it seems
without knowing what the witness is going to say, it is hard
for us to say whether he has any exposure.  But there is,
well -- there is numerous cases that we cite in our brief,
other cases that happened in the District Court, recently I
believe the case before Judge Swain, where Courts precluded
testimony from defense witnesses on the grounds that the
witness had invoked his Fifth Amendment right against
self-incrimination.  And an in camera, often after in camera
session with the witness, the Court determined that the witness
had a reasonable fear of being prosecuted.

It is not on us to say what Mr. Osman will say or not
say.  That's the purpose, that would be the purpose of the
Court discussing with him in camera what his potential exposure

H1N3GAM1

1    is.

2            THE COURT:  Let's go through since we have a little

3    bit of time, go through what he is expected to say and what the

4    government's view is.  It seems as though he was interviewed at

5    least twice.

6            Based on my quick review of what was said, and I

7    haven't had an opportunity to read the 302, but I read

8    Ms. Manley's summation of what he is expected to say.  He made

9    certain statements about what Samy El-Goarany told him

10   concerning where he was going and what he would do there,

11   whether he would come back, whether what he was doing was --

12   whether Samy believed what he was doing was not militant or not

13   illegal, and whether he directed him during the meeting to turn

14   off the phone, etc.  And that some of the information that

15   Mr. Osman provided on the second interview differed at least

16   slightly.

17           So the question is, to the extent that he made

18   different statements, I guess an initial question is are they

19   material such that they would expose him to liability?  And if

20   so, and I don't know whether Ms. Shroff is correct about this,

21   I don't know that necessarily the government needs to say in

22   open court, yeah, we will or we won't prosecute him.  The

23   question is whether Mr. Osman has a well-based fear that he

24   could be subject to prosecution.

25           MS. SHROFF:  Your Honor, if I may just to set the

H1N3GAM1

1    background so to speak.  If I may, I'm going to hand up to the

2    Court all of the 302s just in case you wish to examine them.

3              THE COURT:  Okay.

4              MS. SHROFF:  I want to point out right off the bat

5    that Mr. Quigley's citation to the *Stewart* case before Judge

6    Swain is wholly distinct.  Especially because there is clearly,

7    even under the government's very stringent and narrow view what

8    was they consider Brady, Brady -- he is literally even in their

9    opinion a Brady witness.

10             They have spoken to him, and when the government spoke

11   to him, they did not speak to him much like they spoke to all

12   the other witnesses.  Right.  So when they spoke to Khaled

13   El-Goarany, they didn't have a proffer agreement.  When they

14   spoke to Tarek El-Goarany, they did not have a proffer

15   agreement.  When the government went and spoke to

16   Mr. Khalafalla Osman the second time, for which we did not have

17   the 302s until last night at 8:35 p.m., present for that

18   meeting were two assistant United States attorneys, an FBI

19   agent, and a proffer agreement.

20             It puts a different slant on what even the government

21   considers Mr. Khalafalla Osman to be.  The information that the

22   government got from Mr. Khalafalla Osman is of course

23   memorialized in these 302s.  The 302 for the May 6 meeting is

24   different, the facts in the May 6 302 are different than the

25   facts in the earlier two 302s.

H1N3GAM1

1          THE COURT:  You said earlier two 302s.  Are they 302s

2    written by different agents concerning the same meeting?

3          MR. QUIGLEY:  There are only two 302s.

4          MS. SHROFF:  There is one 302, there is one attachment

5    that accompanies the Brady letter.  Here, let me hand it up to

6    you.

7          THE COURT:  I have that one.  That's the one you sent

8    last night.

9          MS. SHROFF:  Right.  I sent you only the Brady letter.

10   I did not send you the other two 302s.  If the Court at some

11   point wants them, I have got a copy.

12         THE COURT:  You attached a June 8 letter.

13         MS. SHROFF:  That was the first Brady disclosure.

14   Then there is an actual 302 which was dated -- this is a

15   June 8, 2016 Brady disclosure letter with an attachment.  It

16   has some kind of FBI printout, can't tell who wrote it, but it

17   had to be either Special Agent Nguyen or Special Agent Collie.

18         The second document is a document dated July 24, 2015,

19   which is a 302, and it says that the investigation date was

20   7/22/2015.  That was also produced as part of their 3500

21   production in the second round, not in the first.

22         And then the third document, which is dated May 12,

23   2016, the most recent of 302s, was produced to us yesterday, at

24   8:35 p.m. and that's reflects Ms. Tekeei's notes, it appears,

25   of May 5, 2016.

H1N3GAM1

1         It is my understanding that Ms. Manley signed on

2   behalf of Mr. Osman as did Mr. Osman a proffer agreement

3   pursuant to which they had the May 2016 meeting.

4         Now, here is the thing.  After that, and you know,

5   Ms. Manley can speak to this and it is probably better for her

6   to speak to this than for me.  But as I understand it, the

7   government invited them to reach out to her pursuant to the

8   proffer agreement for yet another meeting.

9         THE COURT:  What does that mean, "invited her"?

10        MS. SHROFF:  Said can you bring your witness in and

11  come back and we'll have another debriefing pursuant to the

12  proffer agreement that we had before.

13        So obviously, they consider Mr. Osman in somewhat of a

14  different category.  As I understand it, and this is third

15  hand, as this trial was unfolding, the government again reached

16  out to Ms. Manley and informed her that there had been, quote

17  unquote, significant testimony about Mr. Osman and she should

18  reach back out to the government.

19        All of the signals that it seems she has received, and

20  again, I'm speaking third hand so if I'm inaccurate I

21  apologize.  There seems to be some current of this kid may have

22  exposure.

23        So if that is the current that they're sending out,

24  and maybe they're not, and this is their opportunity to

25  clarify, they should -- and I'm not asking them for anything

H1N3GAM1

1    more than to simply give notice to the record, first of all,

2    for appeal, that's my primary issue, second of all for

3    Mr. Osman's sake and Ms. Manley's sake.  They should know if

4    the government doesn't consider him to have exposure, then we

5    don't have an issue.  We're all wasting our time.  We can just

6    put him on the witness stand, do our direct, and move on.

7         It is clear we certainly intend to call Khalafalla

8    Osman.  It's clear they don't want us to call him.  Here's the

9    thing:  If he has exposure, please tell us, because I'm not an

10   assistant United States attorney and I cannot say whether or

11   not Mr. Osman has exposure.

12        Ms. Miron passes me a note that, of course, in the

13   Sean Stewart case, the father and the son worked together.  The

14   father was the person to whom Sean Stewart leaked information.

15   It was clear he had exposure and government said so.  I don't

16   understand, they want us to -- they, meaning the government,

17   wants this Court to engage in this complicated analysis of

18   invocation.

19        THE COURT:  As I read Ms. Manley's letter, I

20   understand the exposure that she was concerned about to refer

21   to perhaps different statements that Mr. Osman gave to the

22   government first in 2015 and then in 2016.  I did not

23   understand her to be concerned that he had any substantive

24   involvement in the crimes charged in this case.

25        But, Mr. Quigley, I'll turn to you.  What do you think

H1N3GAM1

1      about all that?

2              MR. QUIGLEY:  That's how we understand it too.

3      Ultimately, he knows what he knows.  And whether he was

4      truthful with the government in the interviews, whether he was

5      not truthful.  And that's why the Court we believe should do an

6      in camera interview with him and certainly not allow him to

7      invoke the Fifth in front of the jury.

8              Just in terms of -- we have no information that he had

9      any substantive involvement in this crime.  I think that's an

10     important point, your Honor, in terms of the relevance in this

11     testimony.  This is someone who had no interaction, as far as

12     we know, with the defendant.  This is another witness in the

13     vein of these are people Samy El-Goarany talked to before going

14     overseas but who weren't, you know, at all -- Mr. Osman would

15     say, and you know, he would say I had no idea when he left, I

16     didn't know he left.  That puts him in a very different

17     category than the defendant.

18             So I think this testimony is in many ways tangential.

19     But at the end of the day, it is ultimately the witness's --

20     the issue is whether the witness has a reasonable fear of being

21     prosecuted.  That's the issue for the Court and that's why it

22     should be taken up in in-camera inspection.

23             THE COURT:  I suppose one aspect that I should

24     consider is whether or not, to the extent that there are any

25     discrepancies in the statements that he made to the government,

H1N3GAM1

whether such discrepancies are material.  Right?  Because if
they're not material, arguably they're not actionable and he
can't be prosecuted for them.

        So, to the extent the government could give me some
direction in that regard, that would be helpful.  Obviously, if
I'm Ms. Manley, and again, I haven't analyzed the statements
side by side so closely, but she appears to believe there may
be some discrepancy in what he told the government, and because
of that, one or more of those statements may be material,
particularly early on when the government was I suppose
actively looking for Mr. El-Goarany, and I know what I would do
if I were her.  I would instruct him to invoke the Fifth.

        MR. QUIGLEY:  I agree with you, certainly early in the
investigation, when he did make -- without, again, without
knowing what he actually knows, what he believes he may have
been -- Ms. Manley's letter seemed to refer to discrepancies
between the first interview and the second interview.  But to
the extent there is other information out there, I think there
is a likelihood it would be material.  As you said, especially
early on in the investigation when Mr. El-Goarany was still
alive and when the government was still trying to
potentially -- I won't use "extract" but we held out some hope
he would leave ISIS and potentially come back.  So those things
would be material.

        I would just add to correct one thing.  The reason

H1N3GAM1

1    that we gave him a proffer agreement and didn't give other

2    witnesses a proffer agreement is because he retained an

3    attorney who asked for one and we thought --

4              THE COURT:  That was my assumption.

5              MR. QUIGLEY:  Right.

6              MS. SHROFF:  We have witnesses that we take in without

7    a proffer agreement all the time.  That's not neither here nor

8    there.

9              Let me go back to this witness being tangential.  I

10   want to take a minute and read for the Court, if the government

11   considers this tangential to the defense, then I shudder to

12   think whether we're all at the same trial.  And I quote from

13   the 302 that we received last night.  "Samy said he was going

14   to Syria to help with refugees.  Samy said parents did not know

15   about it.  Samy acknowledged that he did not speak Arabic.

16   Samy said he was going to do humanitarian work, Samy told K.O.

17   he was going to Turkey, said it was not legal, no real

18   internship, non-violent, humanitarian work."

19             I don't think that's tangential.  What is tangential

20   is whether the government is trying to say that Mr. Khalafalla

21   Osman's statement to the FBI in response to their request of

22   whether he turned off a phone, he said to the FBI I pretended

23   to turn off the phone but I didn't really turn it off.

24             Literally, I think that was in the interview where he

25   had no lawyer and they showed up to interview him in a

H1N3GAM1

1    supermarket.  I think it was Price Chopper.  And they took his

2    consent I believe either on a napkin, which we've asked the

3    government to bring to court today, or some kind of paper that

4    they took from the grocery store as we understand it.  So we

5    would like to see the original.

6              THE COURT:  Consent for what?

7              MS. SHROFF:  To take snapshots of his chats with Samy

8    El-Goarany telling Samy El-Goarany, hey buddy, don't contact me

9    ever again because you're in ISIS.

10             Right.  So the false statement that they think that

11   they want invocation on is whether or not he turned off that

12   cell phone.  A statement which he literally, moments later,

13   clarified as being untrue in the proffer.  Right.

14             And if you compare that conduct to Mr. Tarek

15   El-Goarany's conduct, for which he walked out of this courtroom

16   with a non-prosecution agreement, it's really boggles the mind

17   as to why we're still having this discussion without the

18   government still being on record whether or not they believe he

19   has exposure.

20             Since we have time, your Honor, and since the DoJ

21   manual is available online, and since all three assistant

22   United States attorneys have cell phones with Internet access,

23   could we just take two minutes to find out if that is the

24   proper way to proceed?

25             THE COURT:  First of all, I don't know that the United

H1N3GAM1

1   States attorneys manual necessarily guide what I need to do,

2   but certainly they can check.  And I think that I need to hear

3   from Ms. Manley as to what she believes her client's exposure

4   is so we'll leave it there.

5          Do we have a jury?

6          THE DEPUTY CLERK:  We do.

7          THE COURT:  How long would Mr. Nguyen be on the stand?

8          MS. MIRON:  Not very long.  15 minutes for direct.

9          THE COURT:  Is there a next witness that you folks

10   have ready to go?

11          MS. MIRON:  Yes, Anna Finkel, our investigator should

12   be outside.

13          THE COURT:  Wonderful.  Should we get the jury?

14          MS. SHROFF:  Your Honor, could we ask for the Court's

15   assistance here so we can inspect the original consent form

16   written by Mr. Osman?

17          THE COURT:  Do you have the original?

18          MR. QUIGLEY:  Judge, a copy of the original had been

19   produced to the defense.

20          MS. SHROFF:  May we have the original please?

21          THE COURT:  Is the original in the courtroom?

22          MR. QUIGLEY:  No, it's not.

23          MS. SHROFF:  Your Honor, we did make a request for

24   them to bring the original.

25          MR. QUIGLEY:  At 9 o'clock last night.

H1N3GAM1

| 1 | MS. SHROFF:  Right after the 8:35 302.

| 2 | THE COURT:  Do we know where the original is?  Are we

| 3 | talking about the original for Mr. Osman, the original consent?

| 4 | MS. SHROFF:  Yes, your Honor.

| 5 | THE COURT:  Okay.  Can I see the copy?

| 6 | MR. QUIGLEY:  Yes, your Honor.

| 7 | (Jury present)

| 8 | THE COURT:  Ladies and gentlemen, good morning.  I

| 9 | trust you all had a wonderful weekend and that your travels

| 10 | into the courthouse this morning were not unduly treacherous.

| 11 | Please know that we are keeping tabs on the weather,

| 12 | and I know there has been some talk perhaps of closing the

| 13 | courthouse down early.

| 14 | Don't worry, what we are interested in most is making

| 15 | sure that we disrupt your lives as little as possible and we

| 16 | get you home and back safe.  So we are keeping tabs on that.

| 17 | With that, we will now continue with the defense case,

| 18 | and Ms. Miron, please call your next witness.

| 19 | (Continued on next page)

| 20 |

| 21 |

| 22 |

| 23 |

| 24 |

| 25 |

H1N3GAM1                         Nguyen - direct

1              MS. MIRON:  Thank you, your Honor.  The defense calls

2    Special Agent Le Nguyen.

3              THE COURT:  Sir, please step up into the witness box

4    and remain standing.

5              (Witness sworn)

6              THE COURT:  Please pull your chair up to the

7    microphone.  And begin by stating your full name and spelling

8    your last name for the record.

9              THE WITNESS:  Le Nguyen.  Last name is spelled

10   N-G-U-Y-E-N.

11    LE NGUYEN,

12        called as a witness by the Defendant,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. MIRON:

16   Q.  Good morning, Agent Nguyen.  Where are you employed?

17   A.  I'm employed at the FBI.

18   Q.  In what division?

19   A.  I am currently employed in the training division.

20   Q.  Prior to that appointment, were you employed in the New

21   York counterterrorism unit?

22   A.  Yes.

23   Q.  Were you the main case agent assigned to investigate this

24   case initially?

25   A.  I was the main case agent for the Samy El-Goarany

H1N3GAM1                        Nguyen - direct

1   investigation.

2   Q.  Okay.  When were you assigned to investigate the Samy

3   El-Goarany situation?

4   A.  In February of 2015.

5   Q.  As part of that assignment, did you meet with the

6   El-Goarany family, in other words, Tarek, Teresa, and Mohammed,

7   in early February of 2015?

8   A.  Yes.

9   Q.  At that time, you were not sure where Samy was, right?

10  A.  No.

11  Q.  And you weren't sure what he was doing, correct?

12  A.  When we were initially informed, no.

13  Q.  In fact, the family had told you he was doing humanitarian

14  work.  Right?  Early in February 2015?

15  A.  The -- as a whole, the family was unsure of what he was

16  doing.

17  Q.  Did you speak to the family as a unit or individually when

18  you were first meeting with them?

19  A.  I spoke with the aunt, the mother and the father, initially

20  our initial contact was together.

21  Q.  And then Tarek individually?

22  A.  Later on, yes.

23  Q.  As part of your investigation, you told the El-Goarany

24  family to let you know if Samy contacted them, right?

25  A.  Yes.

1   Q.  In fact, on February 8, 2015, you received a call from

2   Teresa El-Goarany, correct?

3   A.  Yes.

4   Q.  And she had been contacted by Samy.

5   A.  Yes.

6   Q.  She had been called by Samy?

7   A.  Yes.

8   Q.  She didn't call you right away, correct?

9   A.  You mean when she was contacted by Samy?

10  Q.  Right.  There are several hours that passed before she

11  called you, right?

12  A.  Yes.

13  Q.  In fact, she didn't tell her husband until five hours after

14  she received the call, correct?

15          MR. QUIGLEY:  Objection, hearsay.

16          THE COURT:  Overruled.

17  A.  I would have to look at the 302 to look at the exact amount

18  of time.

19  Q.  Okay.  When did she receive the call from Samy on

20  February 8?

21  A.  She received the call at 8:02 in the morning.

22  Q.  When did she tell her husband, Mohammed El-Goarany?

23  A.  She did not tell her husband until 1:10 p.m.

24  Q.  But she did tell him, according to your notes, right?

25  A.  Yes.

H1N3GAM1                          Nguyen - direct

1    Q.   Indeed, he urged her to call you, correct?

2    A.   Yes.

3    Q.   And so you spoke to both of them about this phone call,

4    right?

5    A.   I spoke to Teresa.

6    Q.   Well, did you not remind Mohammed individually that he

7    needs to let you know if Samy contacts the family again?

8         Directing your attention to the bottom of your 302.

9    A.   Yes.

10   Q.   So you did speak to Mohammed El-Goarany on that day about

11   Samy having contacted the family?

12   A.   Yes.

13   Q.   You can put that aside.

14        On February 16, you heard from Tarek -- I'm sorry, you

15   heard from Mohammed El-Goarany, right?

16   A.   We had numerous contacts with the family in early February.

17   I would have to look at the -- my notes or the 302 for the

18   specific date.

19   Q.   Let me show you them.

20        Does that refresh your recollection as to the date

21   Tarek El-Goarany contacted you?  I mean Mohammed El-Goarany

22   contacted you in relation to Tarek?

23   A.   Yes.

24   Q.   It's fair to say that Tarek had received a Facebook

25   communication from his brother on that day, February 16, 2015?

H1N3GAM1                          Nguyen - direct

1    A.  Yes.

2    Q.  And he showed that message to both of his parents?

3             MR. QUIGLEY:  Objection, hearsay.

4             THE COURT:  Overruled.

5    Q.  According to your investigation?

6    A.  Yes.

7    Q.  Mohammed indeed told you that, right?

8    A.  Yes.

9             MR. QUIGLEY:  Objection, hearsay.

10            THE COURT:  Overruled.

11   Q.  So, to be clear, I'm going to read the message that Tarek

12   received and you let me know if that's the one Mohammed told

13   you about.

14            "I'm so sorry for the sudden disappearance, man.  I've

15   got a lot of explaining to do, but first off, I just want to

16   say I'm sorry for not being aware about the protocol in my new

17   company.  Hours after our last PQ chat conversation, I had my

18   phone and laptop taken from me by the company for safety

19   reasons.  They're going to give it back to me after my training

20   is over inshallah.  Right now I'm going through the religious

21   training, which will end in nine days.  Then I'm going to be

22   enrolled in my main training course, which will take a month to

23   complete.  After that, I'll be a regular employee and they'll

24   give me back my stuff, all of my stuff, and I can contact you

25   24/7 like I did before.  That will probably be around the end

H1N3GAM1                          Nguyen – direct

1    of March to mid-April."

2              Is that the Facebook message that Mohammed had seen on

3    February 16?

4    A.  Yes.

5    Q.  So, did you ask Mohammed what he thought his son meant by

6    "religious training"?

7    A.  No.

8    Q.  Did you ask him what he thought Samy meant by "main

9    training course"?

10   A.  No.

11   Q.  Or the company?  Did you ask him what he thought Samy meant

12   by "the company"?

13   A.  No.

14   Q.  But he did tell you that he had seen that message.

15   A.  Yes.

16   Q.  And that Teresa had seen that message?

17   A.  Yes.

18   Q.  Okay.  As part of your investigation, you were looking for

19   people who were aware Samy had left, right?  Had left the

20   country?

21   A.  Can you reask the question?

22   Q.  Early on in your investigation, you were looking for people

23   who were aware Samy El-Goarany had departed the country.

24   A.  Yes.

25   Q.  And you wanted to know what they knew about his travel,

1   correct?

2   A.  Yes.

3   Q.  So, you spoke with Nico, right?

4   A.  Eventually we spoke with Nico, yes.

5   Q.  And you spoke with Khalafalla Osman eventually?

6   A.  Yes.

7   Q.  And Khalafalla Osman had Surespot, right?  On his phone.

8   A.  I'd have to look at my notes to see.

9   Q.  Okay.

10  A.  Yes.

11  Q.  To be clear, you spoke with Khalafalla Osman in July of

12  2015, right?

13  A.  Yes.

14  Q.  Is that the first time you spoke with him, as far as you

15  know?

16  A.  Yes, that was the first time we spoke with him.

17  Q.  Khalafalla Osman's Surespot name was nohopeboy.

18  A.  Yes, that is -- that's what he told us during the

19  interview.

20  Q.  He had communicated with Samyelgo on Surespot, right, based

21  on your investigation?

22  A.  Yes.

23  Q.  Okay.  In the course of your investigation, you learned

24  that Khalafalla Osman and Samy El-Goarany were good friends,

25  right?

H1N3GAM1                          Nguyen – direct

1   A.  Yes.

2   Q.  And they spoke frequently on Google Hangout, correct?

3   A.  Google Hangout is one of the platforms in which they used

4   to talk to each other, yes.

5   Q.  They talked about politics, right?  Middle Eastern

6   politics?

7   A.  They conversed about many topics.  That was one of them,

8   yes.

9   Q.  They talked about religion too?

10  A.  Yes.

11  Q.  And he had spoken to Samy a lot over the phone, right?

12  A.  I would have to look at the phone records to see the

13  frequency.

14  Q.  Putting that aside, you knew that Samy El-Goarany had

15  visited Khalafalla Osman in the fall of 2014, right?  You

16  learned that?

17  A.  Yes.

18  Q.  He went, Samy El-Goarany went up to Albany to see

19  Khalafalla Osman, right?

20          MR. QUIGLEY:  Objection, hearsay.

21          THE COURT:  Overruled.

22  A.  Yes.

23  Q.  And in that meeting, Samy El-Goarany asked Khalafalla Osman

24  to turn off his phone, right?

25  A.  Yes.

H1N3GAM1                          Nguyen - direct

1   Q.  And he told, Samy El-Goarany told Khalafalla Osman he was

2   going to do something illegal in Syria, correct?

3   A.  I'd have to look at my notes.

4   Q.  Let me direct your attention to a particular part.

5   A.  Sure.

6            He -- Osman had asked if it was legal.

7   Q.  Let me take that back first.

8   A.  Okay, sure.

9   Q.  Okay.  So, to be clear, Samy El-Goarany told Khalafalla

10  Osman, the original story he told Osman and their friends is

11  that, about the computer system internship was a lie, right?

12  He said that in the fall of 2014.

13           Do you need to look at your notes again?

14  A.  The -- sure.

15           Can you repeat your question?

16  Q.  Sure.  It's your understanding that Samy El-Goarany began

17  this conversation with Khalafalla Osman by explaining that

18  indeed Samy El-Goarany had lied when he told everybody he was

19  going to do an internship.

20  A.  He did lie to people.

21  Q.  And then he said "turn off your phone," right?

22  A.  Yes.

23  Q.  And then Samy El-Goarany said he's going to do something in

24  Turkey and Syria, he's going to do humanitarian work in Turkey

25  and Syria.

H1N3GAM1                          Nguyen - cross

1   A.  Yes.

2   Q.  And Khalafalla Osman you're asked Samy El-Goarany "is what

3   you're doing legal."  Right?

4   A.  Yes.

5   Q.  Samy El-Goarany said no.

6   A.  Yes.

7   Q.  Khalafalla Osman then asked "is what you're doing

8   militant."  Right?

9   A.  Yes.

10  Q.  And Samy El-Goarany said no.  Correct?

11  A.  Yes.

12  Q.  So Samy El-Goarany, he told Khalafalla Osman he was going

13  to do something illegal but not violent in Syria, correct?

14  A.  He said that it wasn't going to be militant.

15  Q.  Okay.

16          MS. MIRON:  One second, your Honor.  No further

17  questions.

18          THE COURT:  Cross-examination.

19          MR. QUIGLEY:  Thank you, your Honor.

20  CROSS-EXAMINATION

21  BY MR. QUIGLEY:

22  Q.  Good morning, Agent Nguyen.

23  A.  Good morning.

24  Q.  Agent Nguyen, just so we are on the same page, you said you

25  work in the training division of the FBI?

H1N3GAM1                          Nguyen - cross

1    A.  Yes.

2    Q.  Where are you stationed?

3    A.  Quantico, Virginia.

4    Q.  How long have you been stationed in Virginia?

5    A.  For a little bit over nine months.

6    Q.  So since that time, other than really preparing to testify

7    today, have you had any involvement in this case?

8    A.  No, I have not.

9    Q.  What do you do, just briefly, at the training division?

10   A.  I am an instructor in the tactical training unit.

11   Q.  That's the FBI academy?

12   A.  Yes.

13   Q.  That's where the new agents are trained?

14   A.  Yes.

15   Q.  Let's focus on some of the questions Ms. Miron asked you.

16   You were asked about a call that the El-Goarany family received

17   from Samy El-Goarany on February 8, 2015.  Do you recall that?

18   A.  Yes.

19   Q.  The El-Goarany family advised of that call on February 8,

20   2015, right?

21   A.  Yes.

22   Q.  The same day.

23   A.  Yes.

24   Q.  And you were asked about a Facebook message that the

25   El-Goarany family received from Samy El-Goarany on February 16,

H1N3GAM1                      Nguyen - cross

1    2015.  Do you recall that?

2    A.  Yes.

3    Q.  The El-Goarany family provided you, provided the FBI with

4    that Facebook message on February 16, correct?

5    A.  Yes.

6    Q.  The same day.

7    A.  Yes.

8    Q.  You were asked at the end there some questions about an

9    interview you had with Khalafalla Osman, right?

10   A.  Yes.

11   Q.  And in that interview, he recounted a meeting he had with

12   Samy El-Goarany in about October of 2014, correct?

13   A.  Yes.

14   Q.  That was some time before Samy El-Goarany actually left to

15   join ISIS, correct?

16   A.  Yes.

17   Q.  He left at the end of January, right?

18   A.  Yes.

19   Q.  During that interview, Khalafalla Osman stated that -- if

20   you need to look at the 302, if you don't recall, just let us

21   know we'll hand it up.

22        That Samy El-Goarany told him that what he was doing

23   was in fact illegal, right?

24   A.  Yes.

25   Q.  And that he was going, when Osman asked him where he was

H1N3GAM1                          Nguyen - cross

1    going, he said he was going to Raqqah, Syria, correct?

2    A.  Yes.

3    Q.  Are you aware of any humanitarian organizations operating

4    in Raqqah, Syria?

5              MS. MIRON:  Objection.  Outside of the scope.

6              THE COURT:  Overruled.

7    A.  No, I am not.

8    Q.  Is it correct to say that Raqqah, Syria, is the capital of

9    ISIS, right?

10   A.  Yes.

11   Q.  And it had been in ISIS control since before October of

12   2014 when this meeting supposedly took place, correct?

13             MS. MIRON:  Objection.  He's not an expert in ISIS.

14             THE COURT:  Sustained.

15   Q.  Khalafalla Osman said that after Samy El-Goarany told him

16   this news, about joining a humanitarian organization,

17   Khalafalla Osman went in his room and cried, correct?

18   A.  Yes.

19   Q.  And he was concerned that Samy El-Goarany was joining --

20   was a government informant, correct?

21   A.  Yes.

22   Q.  Even though he supposedly said he was joining a

23   humanitarian organization, right?

24   A.  Yes.

25             MR. QUIGLEY:  I have nothing further, your Honor.

H1N3GAM1

1          THE COURT:  Any redirect?

2          MS. MIRON:  Just a moment, your Honor.

3   REDIRECT EXAMINATION

4   BY MS. MIRON:

5   Q.  You never heard of refugees wanting to leave Raqqah, Syria?

6          MR. QUIGLEY:  Objection.  Mischaracterizes his

7   testimony.

8          THE COURT:  Sustained.

9   Q.  Have you ever heard of refugees wanting to leave Raqqah,

10   Syria?

11          MR. QUIGLEY:  Same objection.

12          THE COURT:  Overruled.

13   A.  I've heard of people trying to flee Raqqah, Syria.

14   Q.  Indeed, there were many humanitarian organizations on the

15   border of Turkey and Syria around January 2015, right?

16          MR. QUIGLEY:  Objection.  He's not an expert.

17          THE COURT:  Sustained.

18          MS. MIRON:  Your Honor, they elicited on direct the

19   question regarding this.

20          Nothing further.

21          MR. QUIGLEY:  No recross.

22          THE COURT:  Agent Nguyen, you may step down.

23          (Witness excused)

24          MS. MIRON:  May we have a minute, your Honor?

25          THE COURT:  Sure.

1          MS. MIRON:  May we call our next witness?

2          THE COURT:  Sorry?

3          MS. MIRON:  We're prepared to call our next witness.

4          THE COURT:  Please do.

5          MS. MIRON:  We call Anna Finkel.

6          (Witness sworn)

7          THE COURT:  Please be seated.  Pull your seat up to

8     the microphone and please begin by stating your full name and

9     spelling your last name for the record.

10          THE WITNESS:  Anna Elise Finkel, F-I-N-K-E-L.

11     ANNA ELISE FINKEL,

12          called as a witness by the Defendant,

13          having been duly sworn, testified as follows:

14     DIRECT EXAMINATION

15     BY MS. MIRON:

16     Q.  Good morning, Ms. Finkel.

17     A.  Good morning.

18     Q.  Where are you currently employed?

19     A.  I'm employed by Federal Defenders of New York.

20     Q.  Is that the same office as the defense?

21     A.  It is.

22     Q.  How long have you been working with the Federal Defenders

23     of New York?

24     A.  I've worked in the office approximately 16 years.

25     Q.  What are your duties there?

1  A.  I'm responsible for reviewing documents, locating and

2  interviewing witnesses, serving subpoenas, taking photographs,

3  testifying at trials, things of that nature.

4  Q.  You are an investigator in the office?

5  A.  I am.

6  Q.  Do you also review records that you receive pursuant to

7  subpoenas?

8  A.  Yes, I do.

9  Q.  Are you familiar with this case?

10  A.  Yes, I am.

11  Q.  Have you recently been tasked with an assignment related to

12  it?

13  A.  Yes.

14  Q.  What was that assignment?

15  A.  I was asked to review a Twitter account to see if there

16  were Twitter names that were associated with ISIS or that

17  invoked ISIS in some way.

18  Q.  So, before we get to that Twitter account, I'm going to

19  show you what's in evidence as Government Exhibit 303 and

20  direct your attention to the second page.  You can display

21  that.  The second page of 303.  If you would highlight these.

22          What Twitter account is this?

23  A.  This Twitter account is AbuMurad_IS.

24  Q.  Is it associated with this e-mail address?

25  A.  Yes, it is associated with the e-mail address

H1N3GAM1                          Finkel - direct

1   Samybey1@Gmail.com.

2   Q.  When was it created, this account?

3   A.  This was created in May, on May 11 of 2015.

4   Q.  You can put that account aside.

5          Let me show you Defense Exhibit 304.  Is this a fair

6   and accurate copy of the account information associated with

7   the Elgorhythm Twitter account?

8   A.  Yes.

9              MS. MIRON:  I would ask this exhibit be admitted.

10             MR. DeFILIPPIS:  No objection, your Honor.

11             THE COURT:  It will be admitted.

12             (Defendant's Exhibit 304 received in evidence)

13             MS. MIRON:  And ask that Exhibit 304 be published.

14             THE COURT:  It may.

15             MS. MIRON:  And highlighted.

16  Q.  Is this the same e-mail address as the AbuMurad_IS address?

17  A.  It is.

18  Q.  When was it open?

19  A.  This was opened on August 12, 2013.

20  Q.  As part of your task, were you asked to identify particular

21  people on the following list of this account?

22  A.  On the Elgorhythm account, yes.

23  Q.  How did you select who to identify?

24  A.  I looked through the list and I was looking for words or

25  phrases that could be ISIS related.

H1N3GAM1                    Finkel - direct

1   Q.  Let me show you Defense Exhibit 300-BB.

2   A.  Thank you.

3   Q.  Just explain to the jury what following means, according to

4   Twitter?

5   A.  According to Twitter, these are the individuals that Samy

6   was following on Twitter.  There are other Twitter members and

7   he was following their Twitter feeds, their postings.

8   Q.  Did you highlight particular individuals that -- well, the

9   Elgorhythm account was following?

10  A.  I did.

11  Q.  Do you recall which individuals you highlighted?

12  A.  If I can look at my notes that would help refresh my

13  recollection.

14          MS. MIRON:  May I, your Honor.

15          THE COURT:  You may.

16          MS. MIRON:  I would ask that Defense Exhibit 300-BB be

17  admitted.

18          MR. DeFILIPPIS:  No objection, your Honor.

19          THE COURT:  It will be admitted.

20          (Defendant's Exhibit 300-BB received in evidence)

21          MS. MIRON:  And published, please.

22  Q.  Did you find any particular names of Twitter account

23  holders in the following list?

24  A.  I did.  There was one on the first page, it's

25  IS_worldpress.

H1N3GAM1                           Finkel - direct

1    Q.  Can you highlight that one.  How did you identify that one?

2    A.  IS stands for Islamic State.

3    Q.  What about aldawlawi?  Did you locate that one?

4    A.  I did.

5    Q.  Dawla meaning Daesh?

6    A.  Daesh.

7    Q.  Of those two accounts, are they still active as far as you

8    know?

9    A.  No, they've been suspended.

10   Q.  What about Ghazi Shami on that same page; do you know if

11   that account still active?

12   A.  That account has been suspended.

13   Q.  Was the Elgorhythm account following that account?

14   A.  Yes.

15   Q.  By the way, why in your knowledge would Twitter suspend an

16   account?

17            MR. DeFILIPPIS:  Objection, your Honor.

18            THE COURT:  Sustained.

19   Q.  Have you had the opportunity to review Twitter's suspension

20   policies?

21   A.  Yes.

22            MR. DeFILIPPIS:  Objection, your Honor.  Hearsay.

23            THE COURT:  Overruled.

24   Q.  Is one of those reasons for abusive or threatening

25   language?

1   A.  Yes.

2           MR. DeFILIPPIS:  Objection, your Honor.

3           THE COURT:  Sustained.

4           MR. DeFILIPPIS:  Your Honor, we move to strike the

5   last answer.

6           THE COURT:  Granted.

7   Q.  Are there any other following individuals that you notice

8   in the Defense Exhibit 300-BB?

9   A.  There was the Ghazi_Shami.  And then the following page, I

10  guess it is page two, it's GhaziShami one word.

11  Q.  And Shami is another way of saying Syria, right?

12  A.  Yes.

13          MS. MIRON:  Could you just highlight Ghazi Shami in

14  the middle of the page.  Thank you.

15  Q.  What does it mean to be a Twitter follower?

16  A.  These are individuals that were following Samy, viewing his

17  feeds, view things he had posted on Twitter.

18  Q.  On occasion, is it possible for the followers and following

19  to communicate via direct message?

20  A.  Yes.

21          MR. DeFILIPPIS:  Objection, your Honor.

22          THE COURT:  Overruled.

23  Q.  I'd like to show you what had been marked as Defense

24  Exhibit 300-CC.  Is this a fair copy of the followers list for

25  the Elgorhythm account?  Fair and accurate and complete copy?

H1N3GAM1                          Finkel - direct

1    A.  Yes.

2              MS. MIRON:  I would ask that this Defense Exhibit

3    300-CC be admitted.

4              MR. DeFILIPPIS:  No objection, your Honor.

5              THE COURT:  300 CC will be admitted.

6              (Defendant's Exhibit 300-CC received in evidence)

7    Q.  Did you locate any ISIS-related names on this list?

8    A.  I did.

9    Q.  Do you recall which names?

10   A.  If I can take a look at my notes, that would help refresh

11   my recollection.

12             MS. MIRON:  May I, your Honor?

13             THE COURT:  You may.

14             MS. MIRON:  I would ask that Defense Exhibit 300-CC be

15   published.

16             THE COURT:  Very well.

17   Q.  So, tell the jury what names you located that are ISIS

18   related.

19   A.  The first one DaeshReloaded_.  Further down on that page,

20   IslamicState1_FB.

21   Q.  Any others on that page?

22   A.  No.

23   Q.  What about the next page?

24   A.  No.

25             On the following page IS_Ordu.

1    Q.  Of those three, do you know if any of them are still

2    active?

3    A.  No, they've been suspended.

4    Q.  Did you locate any others?

5    A.  No.

6    Q.  Did you have the opportunity to compare the following and

7    followers of both of the two Samybey1 accounts?

8    A.  Yes.

9    Q.  Are there any in common?

10   A.  Yes, there is some overlap.

11   Q.  Okay.  So let me show you Defense Exhibit DD.  Is this a

12   fair and accurate copy of the overlap between the follower and

13   following lists of the two Samybey1 accounts?

14   A.  Yes.

15   Q.  Is it a complete list of the overlap?

16   A.  Yes.

17          MS. MIRON:  I'd ask that Defense Exhibit 300-DD be

18   admitted.

19          MR. DeFILIPPIS:  No objection, your Honor.

20          MS. MIRON:  And published.

21          THE COURT:  Very well.

22          (Defendant's Exhibit 300-DD received in evidence)

23          MS. MIRON:  And highlighted.

24   Q.  So to be clear, the top category are the following list

25   that's in common between the two Twitter accounts?

H1N3GAM1                              Finkel - direct

1    A.   That's correct.

2    Q.   So, when Samybey1 opened his AbuMurad_IS, these following

3    users continued to be associated with Samybey's account?

4    A.   Yes, he was following these people on both accounts.

5    Q.   And what are they, if you can just read them for the jury.

6    A.   Sure.   AJEnglish, agenda_kid, GleamingRazor, GlenFordBAR,

7    IslamRahman, Mondoweiss, RasalGhul321, SyriaDirect,

8    abdelbariatwan, intifada, mamzbondok, marwanbishara.

9    Q.   What about followers?

10   A.   GleamingRazor was following him on both accounts.

11   Q.   Based on your review of the Twitter records in this case,

12   is it possible to match up the names of the account holders

13   with the ID numbers on the Twitter records?

14   A.   No, not based on the information that I have, that I had.

15   Q.   So, fair to say you aren't able to tell which of these

16   account holders communicated directly with the Samybey1

17   accounts?

18   A.   That's right.

19             MS. MIRON:   I have nothing further.

20             THE COURT:   Cross-examination?

21             MS. MIRON:   Oh.   Your Honor, may I ask one additional

22   question?

23             THE COURT:   Sure.

24             MS. MIRON:   By "one," I mean a few additional

25   questions.

H1N3GAM1                          Finkel - direct

1           THE COURT:  Go ahead.

2   Q.  I'd like to show you what's being marked as Defense Exhibit

3   200.  Are you familiar with this record?

4   A.  I am.

5   Q.  Is it a Kik account record?

6   A.  It is.

7   Q.  On the last page, do you see a certification?

8   A.  Yes.

9           MS. MIRON:  I would ask that Defense Exhibit 200 be

10  admitted as a self-authenticating business record.

11          MR. DeFILIPPIS:  No objection, your Honor.

12          THE COURT:  It will be admitted.

13          (Defendant's Exhibit 200 received in evidence)

14          MS. MIRON:  And published to the jury.

15          THE COURT:  Very well.

16  Q.  Could you highlight the middle box of information.  Which

17  e-mail address is associated with this Kik account?

18  A.  Samybey1@Gmail.com.

19  Q.  What is Kik?

20  A.  Kik is an instant messaging messenger application that

21  people use on their cell phones.

22  Q.  Do you know based on this record when the account was

23  opened?

24  A.  The account was open on November 4 of 2014.

25  Q.  What is the first name associated with the account?

1   A.  The first name is Abu Gehad.

2   Q.  Based on this record, are you able to tell with whom Abu

3   Gehad Salim communicated on Kik?

4   A.  No.  Based on the paperwork, I can't.

5   Q.  Okay.

6           MS. MIRON:  I'm finished now, thank you.

7           THE COURT:  Cross-examination.

8   CROSS-EXAMINATION

9   BY MR. DeFILIPPIS:

10  Q.  Good morning, Ms. Finkel.

11  A.  Good morning.

12  Q.  You work for the Federal Defenders of New York.  That's

13  what you testified, is that right?

14  A.  I do.

15  Q.  Your job is to investigate in coordination with defense

16  counsel, is that right?

17  A.  Yes.

18  Q.  You don't work for the government?

19  A.  No.

20  Q.  Your job is to aid investigations in support of the Federal

21  Defenders' clients, right?

22  A.  Yes.

23  Q.  In fact, in this case, you received various documents, is

24  that right, in connection with the case?

25  A.  Yes.

H1N3GAM1                              Finkel - cross

1    Q.  In fact, we just looked at Twitter records for -- was it

2    two different Twitter accounts?

3    A.  Yes.

4    Q.  Those records were provided to you by the government, is

5    that right?

6    A.  That's right.

7    Q.  In fact, those weren't the only documents provided in

8    connection with those accounts, right?

9    A.  I believe so.  I mean, I reviewed these documents from the

10   testimony today.

11   Q.  So the two documents we looked at, those are documents that

12   the Federal Defenders got from the government as part of its

13   investigation, right?

14   A.  Yes.

15   Q.  In fact, there were also communications, the contents of

16   communications associated with those accounts, right?

17   A.  I believe so.

18   Q.  And government provided those to the Federal Defenders?

19   A.  I believe so.

20   Q.  And then the contents of the Tweets, for example, again,

21   that came from the government?

22   A.  Yes.

23   Q.  So these aren't things that you uncovered as part of your

24   investigative work?

25   A.  No.

1  Q.  I just want to turn briefly to the Kik records that we just

2  looked at.

3  A.  Sure.

4  Q.  Defense Exhibit 200.  Just to be clear, the Abu Gehad name

5  associated with that account, you are not able to see any

6  communications associated with that Kik account, is that

7  correct?

8  A.  No.

9  Q.  In fact, you have no idea whether there were any

10  communications whatsoever associated with that account, right?

11  A.  No.

12        MR. DeFILIPPIS:  Thank you, your Honor.  No further

13  questions.

14        MS. MIRON:  Nothing further, your Honor.

15        THE COURT:  Ms. Finkel, you may step down.

16        (Witness excused)

17        MS. MIRON:  May we take a few minutes, your Honor?

18        THE COURT:  I'm sorry?

19        MS. MIRON:  I believe Ms. Shroff is in the hallway.

20  Can I go retrieve her?

21        THE COURT:  Okay.

22        Is the defense prepared to call its next witness?

23        MS. SHROFF:  Thank you, your Honor.  The defense calls

24  Ms. Sherry Dubrow.

25        (Witness sworn)

1    THE COURT:  Please pull your seat up to the microphone

2    and please begin by stating your full name.

3                THE WITNESS:  Sherry.

4                THE COURT:  And spelling your last name for the

5    record.

6                THE WITNESS:  Thank you.  Sherry Lee Dubrow,

7    D-U-B-R-O-W.

8    SHERRY L. DUBROW,

9        called as a witness by the Defendant,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MS. SHROFF:

13   Q.  Good morning, Ms. Dubrow.

14   A.  Good morning.

15   Q.  Ms. Dubrow, where do you live?

16   A.  I live in Goodyear, Arizona.

17   Q.  I'm sorry, could you sit back a little bit?  There you go.

18           Now tell me again where you live?

19   A.  Goodyear, Arizona.

20   Q.  Do you know somebody named Jimmy Gammal?

21   A.  Yes.

22           (Continued on next page)

23

24

25

H1N5gam2                          Dubrow - direct

1   BY MS. SHROFF:

2   Q.  And how long have you known Mr. El-Gammal?

3   A.  Over 20 years.

4   Q.  And how is it that you came to know Mr. El-Gammal?

5   A.  He's my ex son-in-law.

6   Q.  So, he was married to your daughter?

7   A.  Yes.

8   Q.  And what is your daughter's name?

9   A.  Celeste Mann Dubrow.

10  Q.  How long has it been since they were married?

11  A.  I'm sorry.  I don't understand.

12  Q.  That was not a good question.

13          When did they divorce?

14  A.  I believe two, three years ago.  To be honest with you, I'm

15  not sure because nothing has changed in our relationship, so.

16  Q.  So, since their divorce have you kept in touch with

17  Mr. El-Gammal?

18  A.  Oh, absolutely.

19  Q.  Now, could you tell me, please, if you and Mr. El-Gammal

20  socialize in the same circles?

21  A.  Well, frequently, yes.

22  Q.  And what kind of events is it that you two attend together?

23  A.  Well, I belong to several motor cycle groups and we do a

24  lot of charity work and that involves getting people there to

25  spend money, and Jimmie would come and support those groups

1    with me.

2    Q.  Did there come a time Ms. Dubrow, where you were employed

3    by Mr. El-Gammal?

4    A.  Yes.

5    Q.  And could you tell me when that was?

6    A.  I believe it was right around 2009, 2010.

7    Q.  And could you tell the jury how that came about?

8    A.  Sure.

9    Q.  Jimmie had a business buying and selling vehicles,

10   repairing and selling them, and I would help him to do that.

11   He needed me to run errands to get parts for cars, paint.

12   Those kinds of things.

13   Q.  And, for how long did you work for him?

14   A.  Off and on I have worked for him ever since, up until maybe

15   last year.

16   Q.  And would you say that while working for him you became

17   familiar with his customers and his business acquaintances?

18   A.  Yes.

19   Q.  And, have you been to Mr. El-Gammal's home?

20   A.  Oh yes.

21   Q.  And where is his home?

22   A.  In Avondale, Arizona.

23   Q.  And do you have a key to Mr. El-Gammal's home?

24   A.  I do.

25   Q.  And do you have a key to Mr. El-Gammal's garage?

H1N5gam2                          Dubrow - direct

1   A.  The garage is actually a combination lock but, yes, I have

2   that combination.

3   Q.  And could you tell us why that is?

4   A.  Well, one of his businesses was buying and selling

5   evaporative coolers, and if he wasn't able to meet a client, I

6   would go over and conduct the sale of that cooler.

7   Q.  Now, would there be any other reason you would go to his

8   home?

9   A.  Sure.  He has a cat and I would go and feed the cat if he

10  was not in town.

11  Q.  Now, Ms. Dubrow, there came a point in October of 2015 when

12  Mr. El-Gammal traveled -- I'm sorry, October of 2014 when

13  Mr. El-Gammal traveled to New York.  Did you know that he was

14  traveling in 2014?

15  A.  Beforehand?  No.  Not usually.

16  Q.  And would it be fair to say that Mr. El-Gammal traveled

17  frequently?

18  A.  Yes.

19  Q.  And he traveled without too much planning?

20  A.  Very much, yes.

21  Q.  Now, let me show you what is marked as Government Exhibit

22  512 and if you could please display pages 159 to 160?  Is there

23  a telephone number on that page, Ms. Dubrow, that you

24  recognize?

25  A.  Yes.

H1N5gam2                        Dubrow - direct

1   Q.   And what is that telephone number?

2   A.   623-692-7880 and 623-249-9677.

3   Q.   So let's start, please, with the number ending at 7880.

4   Whose number is that?

5   A.   That's Jimmie's -- Jimmie's cell phone.

6   Q.   Who's number is the number that follows which is 623,

7   ending with 9677?

8   A.   That's my daughter Celeste.

9   Q.   And could you take a look for me on the next column and see

10  what the dates are of those calls?

11  A.   October 22nd.

12  Q.   No, no.  Can you just highlight the dates for her?  There

13  you go.  Take a look.

14  A.   Okay.  October 6th.

15  Q.   Now, if you could flip over to page 160 of Government

16  Exhibit -- do you see the same phone number again, Ms. Dubrow?

17  A.   Yes.

18  Q.   And could you tell the jury, please, the dates which are

19  reflected on the column?

20  A.   October 7th, 2014.

21  Q.   And below that?

22  A.   October 8th, 2014.

23  Q.   Now, Ms. Dubrow, would it be fair to say that you know

24  Mr. El-Gammal well?

25  A.   Yes.

H1N5gam2                          Dubrow - direct

1    Q.   And do you know him to pray five times a day?

2    A.   Oh, no.

3    Q.   And do you know him to go to the mosque daily?

4    A.   Oh, no.   No.

5    Q.   Weekly?

6    A.   No.

7    Q.   Monthly?

8    A.   No.

9    Q.   Your Honor, at this time I would like to introduce into the

10   record a business record -- a document from Expedia which is a

11   business record certification of Expedia documents, if I may?

12              THE COURT:   Okay.   Any objection?

13              MR. DEFILIPPIS:   No objection, your Honor.

14              THE COURT:   Very well.   It will be received.   What is

15   the exhibit number?

16              MS. SHROFF:   The exhibit number is 806.

17              (Defendant's Exhibit 806 received in evidence)

18   BY MS. SHROFF:

19   Q.   Ms. Dubrow, does that document tell you about the trips

20   that Mr. El-Gammal took including trips to Las Vegas and

21   California?

22   A.   Yes.

23   Q.   Thank you.

24              Ms. Dubrow, since the time of Mr. El-Gammal's divorce

25   from your daughter, has he still remained part of your family?

H1N5gam2                          Dubrow – direct

1    A.   Oh, absolutely.  He's included in Christmas holidays,

2    Thanksgiving; all of that.  Of course.

3            MS. SHROFF:  I have no further questions, your Honor.

4    Thank you.

5            THE COURT:  Ladies and gentlemen, it is almost 10:30

6    so let's take our morning break.  15 minutes.  Please, do not

7    discuss the case.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down.

3          (Witness steps down)

4          THE COURT:  15 minutes.

5          (Recess)

6          MS. MIRÓN:  Your Honor, scheduling issue.

7          MS. SHROFF:  I have an update for Ms. Manley.  She

8     thinks that she should be getting to New York City in about a

9     half hour.  I'm not sure how great she is about finding a

10    parking garage but somebody is trying to help her.

11         THE COURT:  Also, New York City is the north Bronx.

12         MS. SHROFF:  Well, I could call and ask but I am

13    assuming she means our area.  I can step out and ask.

14         MS. MIRÓN:  Here are the imminent issues.

15         Our next witness is the interpreter who is on his way,

16    he expects to be here at 11:00.  So, I don't know how long the

17    cross will be but there may be a little bit of a gap.  And then

18    the next witness and only other witness we have available for

19    today is Mr. Osman, so we would ask to take an early break for

20    lunch and if it resolves favorably we would call him in the

21    afternoon.

22         THE COURT:  How, because I haven't had an opportunity

23    to think mechanically, how we go through this.  So, Ms. Manley

24    appears, she makes her record that she believes, I assume, that

25    Mr. Osman may be in jeopardy should he testify, and then I

conduct some sort of in camera proceeding to determine whether

the fear is well placed or well-founded.  Who is in there with

me?

          MS. MIRÓN:  The defense is asking to be present, it is

our witness.  We have proposed possible direct questions that

we would pose to the Court and the Court would be permitted to

hear Mr. Osman's responses.  We don't want the government to

hear our work product before it is in court.  I think I can

provide the case cite for your Honor but there was a Second

Circuit 2016 summary order where the process was defense

counsel was permitted to conduct, essentially, a mock

examination of a witness outside the presence of the jury in

the presence of the Court, but based on that reading I don't

know if the government was permitted to be present.  We were

asking to be present without the government.

          MR. QUIGLEY:  Your Honor, I think inasmuch as his

answers, either on direct or on cross, could raise a Fifth

Amendment issue, I don't think either side should be present

because the questions we may ask may raise as much of a Fifth

Amendment issue for him as would defense.

          THE COURT:  Do you have the questions written out?

          MS. SHROFF:  I actually do but it's -- I did it very

late last night and I do mean late, but again, look, the

government is still not saying what his exposure is.  It just

seems --

1        THE COURT:  Well, first of all, isn't it fairly clear

2    that there is at least 1001 liability?

3        MS. SHROFF:  No, I don't think it is that clear

4    because there may not be a liability where somebody corrects a

5    false statement within minutes.  The thing is it isn't just

6    what I think the exposure is or what you think the exposure is,

7    with all due respect to the Court, the only person who can

8    charge him with an offense are the people at that table.

9        We could cut this short, we could have Mr. Osman take

10   the witness stand literally at 11:30 or noon.  Right?  They

11   could stand up and tell the Court, look.  We think he has

12   exposure on this, this, and this question.  Or, he has no

13   exposure.  Whatever it is, even if they want to tell the Court

14   ex parte without us, that's fine, but I think that Mr. Osman is

15   entitled to know.  How can he invoke if he is not told by the

16   very agents that are responsible for charging him with a crime

17   whether or not he has reason to invoke.  It is almost like

18   they're inviting him to invoke.  On the one hand they're

19   inviting an invocation and then they're saying because he has

20   invoked, Judge, just don't have him testify at all and preclude

21   this witness.

22       THE COURT:  Well, the assumption in at least first

23   part of your statement is that there is only one inconsistent

24   statement that he made as between the two meetings and I don't

25   know that that is the case.  Certainly, as I sit here, I don't

1    know the case law but I think that my -- something in the back

2    of my memory banks tells me that where someone corrects,

3    promptly corrects a misstatement there may not be liability but

4    I don't want to rely on that.  Certainly if it is my client who

5    is in jeopardy.

6              But, Mr. Quigley, is there only one statement that is

7    arguably inconsistent?

8              MR. QUIGLEY:  I think there are a couple, your Honor.

9              The broader question is was Mr. Osman being forthright

10   in both interviews.  I mean, to be clear, we did not -- you

11   know, his attorney reached out to us and said he is going to

12   invoke.  We didn't suggest to him that he should invoke.  The

13   reason, as I said before, the only reason we had a proffer

14   agreement with him is because his attorney wanted one and

15   wouldn't talk to us without one.  So, invoking -- we would

16   frankly prefer he didn't invoke and just testify because we are

17   trying to avoid invocation in front of the jury and a side

18   show.  That's our main concern.

19             THE COURT:  Let's get the jury.

20             MS. SHROFF:  Your Honor, one last thing.

21             THE COURT:  Sure.

22             MS. SHROFF:  Mr. Quigley and Ms. Mirón and I actually

23   had a similar experience in a case where Mr. Quigley put a

24   client of ours into the grand jury and Mr. Quigley, as the law

25   requires, insisted that the witness invoke, question by

1    question, and Mr. Quigley properly educated both me and

2    Ms. Mirón that you can only invoke per question.  So, per

3    Mr. Quigley's direction, Ms. Mirón and I had the witness go

4    into the grand jury and exit the grand jury after each specific

5    question because Mr. Quigley and the case law required, and

6    properly, that invocation be narrow and only on the question

7    where the government believes there is exposure.  I would cite

8    the case for you but, as Mr. Quigley well knows, it was sealed

9    and it was before Judge Andrew Carter.

10           Thank you.

11           THE COURT:  Let's get the jury.

12           And is it the case that if he invokes as to any

13   question that he ought not be allowed to testify?

14           MR. QUIGLEY:  That's our view, your Honor, and I think

15   that is consistent with the practice in prior cases.  As

16   Ms. Shroff actually pointed out, there is no pointed assertion

17   of the Fifth Amendment but Courts and Courts that we cited in

18   our letter have repeatedly upheld the preclusion of testimony

19   of any testimony from the witness when the witness invokes and

20   that would make no sense if those cases -- those cases would

21   make no sense if you say, oh, we are going to ask him only the

22   seven questions he doesn't invoke on.

23           MS. SHROFF:  Your Honor, that's not true, but

24   Mr. Quigley knows once a person invokes the Department of

25   Justice is required to take a step and determine whether or not

H1N5gam2                          Dubrow - direct

1    they will immunize him.  The Department of Justice is also

2    required to flush out whether or not they will offer him a

3    non-prosecution agreement.  The Department of Justice is also

4    required to inform the Court why they are not taking either of

5    those two steps.

6              Also, your Honor, if the testimony on specific

7    questions is precluded, the witness' prior statements are, in

8    fact, admissible at a trial.  There is no such thing that just

9    because a witness invokes the defendant is then left without a

10   remedy, especially where the information being elicited is

11   Brady.  So, we disagree with what Mr. Quigley is saying.  And,

12   since the jury is coming in, we can take this up later, if the

13   Court wishes.

14             THE COURT:  We will talk later.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Everyone, please, be seated.

3          Cross-examination.

4          MR. DEFILIPPIS:  Thank you, your Honor.

5   CROSS EXAMINATION

6   BY MR. DEFILIPPIS:

7   Q.  Good morning, Ms. Dubrow.

8   A.  Good morning.

9   Q.  You are the defendant's ex mother-in-law, correct?

10  A.  Correct.

11  Q.  Fair to say you don't see everything he says or does, for

12  example, online; is that right?

13  A.  Correct.

14  Q.  You don't see his online communications all of them, is

15  that right?

16  A.  Correct.

17  Q.  You don't see what he says privately with other people on

18  his computer; is that right?

19  A.  Correct.

20  Q.  Now, you mentioned in October 2014 trip that he took to New

21  York?

22  A.  Yes.

23  Q.  You did not accompany him on that trip, correct?

24  A.  No.

25  Q.  And so you do not know what he did on that trip, correct?

H1N5gam2

1   A.   Correct.

2            MR. DEFILIPPIS:  Thank you, your Honor.

3            THE COURT:  Anything further?

4            MS. SHROFF:  No, your Honor.  Thank you.

5            THE COURT:  Ms. Dubrow, you may step down.

6            THE WITNESS:  Thank you, your Honor.

7            (Witness excused)

8            THE COURT:  Ms. Mirón?

9            MS. MIRÓN:  Your Honor, at this time we would ask to

10   read a stipulation into the record.

11            THE COURT:  Very well.

12            MS. MIRÓN:  It is Defendant's Exhibit 800 and it

13   states:

14            It is hereby stipulated agreed, by and between the

15   United States of America and by Ahmed Mohammed El Gammal, the

16   defendant by and through his counsel Sabrina Shroff, Annalisa

17   Miron and Daniel Habib, and Preet Bharara, United States

18   Attorney for the Southern District of New York, Andrew J.

19   DeFilippis, Brendan F. Quigley, Negar Tekeei, assistant United

20   States Attorneys, of counsel, that:

21            Defendant's Exhibits 401, 100-BB-T, 100-CC-T,

22   122-AA-T, 122-BB-T, 122-CC-T, 122-DD-T, 122-EE-T, 122-FF-T,

23   122-GG-T, 122-HH-T, 123-AA-T contain true and accurate Arabic

24   to English translations of Arabic language materials contained

25   in Government's Exhibits 2, 100, 122, and 123.  Signed by the

H1N5gam2

1    parties

2              THE COURT:  Very well.

3              MS. MIRÓN:  And may we approach briefly?

4              THE COURT:  Yes.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1N5gam2

1          (At side bar)

2          MS. MIRÓN:  This is the timing issue I was flagging.

3   So, we have about 10 more minutes until he arrives.

4          THE COURT:  So we will wait.

5          MS. MIRÓN:  Thank you.

6          THE COURT:  Ladies and gentlemen, the wind is playing

7   havoc with certain witnesses' travel and so our next witness

8   has not yet arrived in the building so we are going to break

9   briefly.  I don't know how long it will be, hopefully not more

10  than, say, 10 or 15 minutes.  So, we will break.

11         Go back to the jury room and relax.  Please, do not

12  discuss the case.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H1N5gam2

1              (Jury not present)

2              MS. MIRÓN:  Thank you, your Honor.

3              (recess)

4              THE COURT:  By the way, before I forget, it is my

5    practice to give the jury not only a copy of the charge but

6    also a copy of the indictment.  So, if I can get from the

7    government, at some point, a clean copy of the indictment to

8    provide to the jury?

9              MR. QUIGLEY:  Yes, your Honor.  Do you want forfeiture

10   allegation redacted?  All that stuff?

11             THE COURT:  Yes, unless the defense has any strong

12   view.  I don't think the forfeiture allegation needs to go to

13   the jury.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H1N5gam2                        Abdel-Rahman – direct

1              (Jury present)

2              THE COURT:  Everyone, please, be seated.

3              Ms. Mirón.

4              MS. MIRÓN:  Thank you.

5              The defense calls Marwan Abdel-Rahman.

6     MARWAN ABDEL-RAHMAN,

7          called as a witness by the Defendant,

8          having been duly sworn, testified as follows:

9              THE COURT:  Sir, please begin by stating your full

10    name and spelling your last name for the record.

11             THE WITNESS:  Marwan Abdel-Rahman.

12    DIRECT EXAMINATION

13    BY MS. MIRÓN:

14    Q.  Good morning.

15    A.  Good morning.

16    Q.  What is your profession?

17    A.  I'm a freelance interpreter/translator.

18    Q.  For what languages?

19    A.  Several dialects of Arabic and English, of course.

20    Q.  And including Egyptian Arabic?

21    A.  Egyptian Arabic, Levantine Arabic, Modern-Standard Arabic,

22    Classic-Standard Arabic.

23    Q.  Where did you learn Arabic?

24    A.  I was born in an Arabic speaking country and that is Egypt.

25    Q.  How far did you go in school in Egypt?

H1N5gam2                          Abdel-Rahman – direct

1   A.  I received a bachelor degree from Cairo University where

2   the medium of instruction was always Arabic from elementary

3   through college.

4   Q.  And what about English?

5   A.  English, I took English as a foreign language in Egyptian

6   schools including college.  Then, when I arrived as an

7   immigrant, I enrolled in college as well and received a masters

8   degree in education as a teacher of English as a second

9   language.

10  Q.  Where did you receive your masters?

11  A.  It used to be New Jersey City State College now it is New

12  Jersey City University.

13  Q.  Are you certified to translate Arabic to English and

14  English to Arabic?

15  A.  Yes, I am

16  Q.  Where are you currently certified to translate?

17  A.  I am approved.  That is a more accurate term, approved,

18  than certified.

19       I am approved by several court systems.  I started

20  with New Jersey Court system, New York Court system,

21  Immigration Court system, U.S. District Court system.

22  Q.  What about in this district?

23  A.  This district in particular I started late 2001, and this

24  district has a certain policy about approving or disapproving

25  interpreters and it requires a very tough examination.

1    MS. TEKEEI:  Objection.  Non-responsive.

2    THE COURT:  Overruled.

3  Q.  Have you worked for both the government and the defense in

4  different cases?

5  A.  I have.

6  Q.  Have you been admitted as an expert in other cases?

7  A.  I have.  I have.  In the Southern District and elsewhere.

8  Q.  The Southern District of New York?

9  A.  Yes.

10    MS. MIRÓN:  I would ask that Mr. Abdel-Rahman be

11  admitted as an expert in Arabic-to-English and

12  English-to-Arabic translation.

13    MS. TEKEEI:  We have no objection, your Honor.

14    THE COURT:  Very well.  His testimony will be received

15  as expert testimony.

16    MS. MIRÓN:  Thank you.

17  BY MS. MIRÓN:

18  Q.  Did you have the opportunity to review certain Facebook

19  communications and other social media for this case?

20  A.  Yes, I did.

21  Q.  And to conduct written translations from Arabic to English?

22  A.  Yes, I did.

23  Q.  I would like to show you a few exhibits.  First Defendant's

24  Exhibit 100-DD-T; did you translate that from Arabic to

25  English?

1    A.  Yes, I did.

2    Q.  That's a two-page document.

3    A.  Yes.

4    Q.  And, how do you recognize that to be the accurate

5    translation?

6    A.  Because my initials appear on the bottom of the page.

7    Q.  Is it a fair and accurate copy of the translations that you

8    performed from Arabic to English that you made?

9    A.  Yes, it is.

10            MS. MIRÓN:  I would ask that this be admitted as

11   Defendant's Exhibit 100-DD-T.

12            MS. TEKEEI:  Your Honor, we object on hearsay grounds.

13   May we have a side bar?

14            THE COURT:  Yes.

15

16

17

18

19

20

21

22

23

24

25

H1N5gam2                           Abdel-Rahman - direct

1                    (At side bar)

2                    MS. TEKEEI:  Your Honor, there are two pages to this

3       exhibit and both pages are offering the statements for the

4       truth of the matter asserted and are therefore hearsay on their

5       face.

6                    The first page shows the defendant speaking with two

7       individuals about the Luxor Hotel.

8                    THE COURT:  You have to keep your voice up.

9                    MS. TEKEEI:  Sure.

10                    It shows the defendant speaking with two individuals

11       about the Luxor Hotel.  There is maybe one sentence here that

12       may not be hearsay because it is a question and that's "Where

13       is that?" but outside of the other statements that are on this

14       page it would be totally irrelevant.

15                    And the second page also contains hearsay in every

16       statement again except for potentially the one that's a

17       question:  "What are you doing in Las Vegas?"  But the

18       relevance of that, if there is any, only depends on the prior

19       statements.

20                    THE COURT:  What is this?

21                    MS. MIRÓN:  Your Honor, it is a present sense

22       impression of where Mr. El-Gammal was when he took these

23       photographs.  It is consistent with his behavior when he was in

24       New York and took photographs of his sightseeing.

25                    THE COURT:  And it is relevant because?

1          MS. MIRÓN:  Because this is his normal behavior.  When

2     he travels he takes photographs of tourist attractions, he

3     posts them on Facebook.  It is not hearsay because it is a

4     present sense impression about what he views from his room and

5     from the sights he visits.

6          MS. TEKEEI:  On the first page he says:  Luxor is a

7     hotel in Las Vegas, not Luxor of Egypt.  That is a hearsay

8     statement.  And on the second page, one person is surmising or

9     guessing where the picture is from.  Those are not present

10    sense impressions and they're also totally irrelevant.

11         THE COURT:  I was under the impression that this guy

12    was going to testify about disputed translations that the

13    government put into evidence.  Is he going to do anything along

14    those lines?

15         MS. MIRÓN:  He is going to go over one exhibit but we

16    with had him translate additional documents which I don't think

17    the government would have been prepared to stipulate to because

18    they're new.

19         MR. QUIGLEY:  That's why we didn't object pretrial,

20    your Honor, because we just got them.

21         THE COURT:  I'm sorry?

22         MR. QUIGLEY:  We just got these a day or two before

23    trial, that's why we didn't raise an objection earlier.

24         MR. QUIGLEY:  There is also no showing they're

25    contemporaneous, that these are present sense impressions.  I

H1N5gam2                          Abdel-Rahman - direct

1    mean, he may have been at the hotel at the time but present

2    sense impression requires a showing that the statement is made

3    contemporaneous with the thing being described and that is not

4    present here.

5              THE COURT:  That's the proffer that is being made.

6              MS. TEKEEI:  Well, if you look at the first page at

7    5:47 he says Luxor.  At 5:59, more than 10 minutes later he

8    says:  Luxor is a hotel in Las Vegas, not Luxor of Egypt.  So,

9    there is significant time difference between those two

10   statements.  And on the second page, similarly, the

11   communications span the entire day, 1:30, 2:39, 3:04, 8:31,

12   11:31.

13             MR. HABIB:  Your Honor, in our prior filing on present

14   sense impressions we provided authority based on the advisory

15   that a time-lag between the perception and statement is

16   acceptable and we cited cases approving time-lags I think up to

17   a half hour.

18             THE COURT:  I think that's right, I have no problem

19   with that, necessarily, but clearly "the Luxor is a hotel in

20   Las Vegas not Egypt," that is hearsay.

21             MR. QUIGLEY:  Your Honor, they could -- I mean if they

22   wanted it on present sense impression piece I am sure there is

23   metadata to show when these photos were taken.  In the Facebook

24   return it should be, it says date taken.  I know it says date

25   and time taken in the photo so they could show it.  I don't

H1N5gam2                        Abdel-Rahman - direct

1    think they've shown it is a present sense impression without

2    showing when the photo --

3           MS. TEKEEI:  All that they have shown is the image

4    uploaded date and time but not the date taken.

5           THE COURT:  Is it the defense theory that it was taken

6    at the same time, that the picture and the conversation took

7    place at the same time?

8           MS. MIRÓN:  I don't know precisely the time.  I know

9    that it is not always possible from Facebook records to see

10   when the picture was taken but it was uploaded at a particular

11   time and I think that's the present sense impression that he's

12   conveying.

13          THE COURT:  I will allow these.

14          MS. MIRÓN:  Thank you.

H1N5gam2                          Abdel-Rahman – direct

1           (In open court)

2           MS. MIRÓN:  I would ask that Defendant's Exhibit

3    100-DD-T be admitted.

4           MS. TEKEEI:  No objection.

5           THE COURT:  It will be received.

6           (Defendant's Exhibit 100-DD-T received in evidence)

7           MS. MIRÓN:  And published to the jury.

8           THE COURT:  Very well.

9    BY MS. MIRÓN:

10   Q.  Can you read the translation and the speakers to the jury?

11   A.  Attiya:  Where's that?

12          Marwa El Gammal:  Long live Egypt

13          Gammal:  Luxor.

14          Gammal:  Luxor is a hotel in Las Vegas, not Luxor of

15   Egypt.

16   Q.  This is an image that was uploaded on June 6, 2014; is that

17   right?

18   A.  Yes.

19   Q.  Okay.  On the next page of that same exhibit could you

20   read -- this image was uploaded on June 5th, 2014, right?

21   A.  Right.

22   Q.  Could you just read the conversation and the speakers?

23          Waleed Naazii.  This picture is probably from the City

24   of Hollywood or the City of Los Angeles.  I mean California

25   anyway.

1           Gammal:  Las Vegas.  This picture is from my room.

2           Ehab el Gammal:  Ha ha ha ha.  What are you doing in

3    Las Vegas?

4           Hint bag:  The idols!!!

5    Q.  You can put that aside.  Let me show you what is in

6    evidence -- well, let me show you Defendant's Exhibit 120-A-T.

7    Is that a fair and accurate copy of the translation you did and

8    reviewed in Defendant's Exhibit 100-A T?

9    A.  Yes, did and reviewed.  I did it from scratch.  Did and

10   reviewed.

11   Q.  You approved some translations and performed your own?

12   A.  Correct.

13          MS. MIRÓN:  I would ask that this exhibit be admitted.

14          MS. TEKEEI:  No objection, your Honor.

15          MS. MIRÓN:  Okay, and published.

16          THE COURT:  That exhibit will be received and

17   published.

18          MS. MIRÓN:  Thank you.

19          (Defendant's Exhibit 120-A-T received in evidence)

20   BY MS. MIRÓN:

21   Q.  And this, to be clear, contains additions and revisions to

22   Government Exhibit 120-A-T; is that right?

23   A.  Yes.

24   Q.  Could you turn to page 25 and highlight the first line?

25          What change did you make about this translation?

1   A.  The original translation said:

2                Gammal, I am afraid of going to Turkey, what do you

3   think?

4                I added the word "directly."  Afraid to go directly to

5   Turkey.

6   Q.  Why did you add the word "directly"?

7   A.  Because there is an Arabic word that was somehow missed by

8   the translator which means directly very clearly.  No doubt.

9   No doubt in my mind.

10  Q.  What is that word?

11  A.  That word in Arabic is wsh.

12  Q.  Can you tell us more or less where it is?

13  A.  It is a two letter word to the far right of the second

14  line.

15  Q.  Okay.  So the accurate translation is:  Gammal, I am afraid

16  to go directly to Turkey.  What do you think?

17  A.  Yes.

18  Q.  Please focus on page 53 and highlight the line at 18:56:50.

19                Your translation is slightly different from the

20  original, right?

21  A.  I believe the original translation was don't you ever, ever

22  communicate with him.

23  Q.  And what is your understanding of the Arabic to English

24  translation?

25  A.  My understanding was the translation was meant to be in

H1N5gam2                           Abdel-Rahman - direct

1   writing so don't you ever write him.

2   Q.  And then page 51, the original, if you recall, was because

3   I don't want him to think strange thoughts.  You have changed

4   that, right?

5   A.  Right.

6   Q.  What is your understanding of the meaning of the Arabic?

7   A.  Because I don't want him to think something funny.

8   Q.  Okay.

9        Let me focus your attention to page 4 of this document

10  sorry, page 20 of this document -- oh, no, page 4 for now.

11  There is a reference to a CV, right?

12  A.  Yes.

13  Q.  Let me show you what's marked as Defendant's Exhibit 400.

14  Is that an accurate copy of the translation that you did on

15  that exhibit?

16  A.  Yes, it is.

17            MS. MIRÓN:  I ask that this be admitted.

18            THE COURT:  Any objection?

19            MS. TEKEEI:  One moment, your Honor?

20            THE COURT:  Yes.

21            (Counsel conferring).

22            MS. TEKEEI:  Your Honor, one brief voir dire question?

23            THE COURT:  Sure.

24  BY MS. TEKEEI:

25  Q.  Is that exhibit actually the attachment?

1    A.   This exhibit.

2    Q.   That's -- I'm sorry he -- that's depicted in the Facebook

3    communication?

4    A.   This is not the Facebook communication.

5    Q.   Right.  I'm sorry, let me be clear.

6              Looking up at the page where it says 11/7/2013 and

7    there is an attachment there?

8    A.   I did not deal with that.  I dealt with the actual printout

9    of the resume as sent by Attiya.

10             MS. MIRÓN:  I would ask that this be admitted, subject

11   to connection.

12             MS. TEKEEI:  We have no objection as to relevance,

13   only as to the authentication, your Honor.

14             THE COURT:  It will be admitted subject to connection.

15             (Defendant's Exhibit 400 received in evidence)

16   BY MS. MIRÓN:

17   Q.   And publish to the jury page 1.

18             What is the name on the top of this CV?

19   A.   Attiya Mohammed Aboualala.

20   Q.   Would you highlight it for the jury?

21             And could you read the media experience listed, just

22   the first couple of lines?

23   A.   MPZ Corporation, specialized in marketing documentary

24   materials, which is based in London, from February 2011 to

25   August 2011.

H1N5gam2                        Abdel-Rahman - direct

1    Q.   Okay.

2    A.   Alhiwar Channel, co-preparation and managing the Egyptian

3    party of Awraq Masriya (Egyptian paper) TV program since 2200

4    8.

5              And I believe there is a typo.

6    Q.   Okay.  Let me point your attention to the second to last

7    indication on that same page beginning "observation."

8    A.   Observation of the incidents of the Egyptian revolution and

9    authenticating some of them since its commencement.  Material

10   is on my channel at YouTube.

11   Q.   And then the third page, the third page, third line from

12   the top?

13   A.   Wait.

14             MR. QUIGLEY:  Your Honor, may we approach?

15             THE COURT:  Yes.

16

17

18

19

20

21

22

23

24

25

1    (At side bar)

2              THE COURT:  Isn't the exhibit that I admitted subject

3    to connection?

4              MR. QUIGLEY:  Right, and we had a prior discussion

5    about this your Honor, I think last week, where you agreed

6    there was significant amount of hearsay and we agreed with

7    defense to put up certain redactions.  They published a

8    completely unredacted version to the jury.

9              MS. MIRÓN:  Your Honor, I did not understand that our

10   tech person didn't have the most recent redaction.  We won't

11   publish it any further.

12             THE COURT:  The sections to which I directed the jury,

13   were they in the unredacted?

14             MR. QUIGLEY:  Media experience is fine.  I think when

15   she was going through pages though --

16             MR. HABIB:  Your Honor, I think what happened is our

17   litigation support person put up the wrong file by mistake.  We

18   have the wrong file.

19             MS. MIRÓN:  I am going to move on anyway.

20             THE COURT:  I just want to make sure that the items

21   that were highlighted that you directed his attention to were

22   items that I determined could come in.

23             MS. TEKEEI:  Yes.

24             MR. QUIGLEY:  Yes.

25

1                   (In open court)

2    BY MS. MIRÓN:

3    Q.  Okay.  I am going to move on back to Defendant's Exhibit

4    120-A-T, page 20, and this is a communication from Attiya

5    saying take a look and tell me your opinion; is that right?

6    A.  Yes.

7    Q.  And attached as a reference is resume?

8    A.  Yes.

9    Q.  On page 34 you have added "some communication."

10                  (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Let's start at page 33, and just read the entire document.

2   A.  "Attiya:  May God be with us.  I am traveling.

3          "Gammal:  Good.  Where to?  Iran or Daesh?

4          "Attiya:  Hahaha.  Turkey.

5          "Gammal:  You are too wimpy to be Daesh.

6   Congratulations."

7   Q.  You added, you agree it is accurate to add those S's to

8   "congratulations"?

9   A.  Well, you know, the Arabic word was "*mabrouk*" and Gammal

10  wrote it with several vowels, O-O-O-O-O, to indicate emphasis.

11  And the usual way for translators is to repeat a little in the

12  word in the Arabic language to give the same effect.

13  Q.  Keep reading.

14  A.  "Congratulations.  I'm coming to visit you, man.

15          "Gammal:  It's a must.

16          "Attiya:  Man, where is Daesh."

17  Q.  You can keep reading.

18  A.  "Attiya:  Are you coming to Turkey?

19          "Gammal:  Hush hush.  Yeah.  To visit you.  And show

20  you around.  We will go to Kusa Dasi.

21          "Attiya:  Hahaha.  I don't know what is Kusa.

22          "Gammal:  A city over there.

23          "Attiya:  Okay.

24          "Gammal:  Full of bikinis.

25          "Attiya:  Hahahaha.  I need a wife who can solve this

H1N3GAM3                        Abdel-Rahman - direct

1   problem."

2   Q.  Thank you.  Page 37 you've added one line and can you read

3   that first line on August 23, 2014 from Attiya?

4   A.  "I'm doing my masters tests at the present time and will be

5   done in one week."

6   Q.  Thank you.  Page 39.  Actually starting on page 38 just

7   read the conversation beginning 9/11/2014.

8   A.  "Attiya:  Jimmy.

9           "Gammal:  What's new with you.  In the country of

10  Turks.

11          "Attiya:  Hahaha.  Nice.

12          "Gammal:  Praise to Allah.

13          "Attiya:  Listen, I might marry a Turkish girl and I

14  need a favor from Marwa.  I want her to recommend me to her

15  parents.

16          "Gammal:  Okay.  I think she can do it.

17          "Attiya:  Hahaha.  You think?

18          "Gammal:  She will not get you a bride.  You are the

19  one who must get her.

20          "Attiya:  I understand.  There is a bride but they

21  need to inquire about me.

22          "Gammal:  Okay.

23          Attiya:  Call her.  Okay.  Two question marks.

24          "Gammal:  When you get a bride I will call her.

25  That's it.

1           "Attiya:  Yesterday one girl requested photos.

2           "Gammal:  Get me the bride and I will call her.

3           "Attiya:  Perfect."

4     Q.  Then just the first few lines on page 40.

5     A.  "Attiya:  Why aren't you answering me, Gammal.

6           "Gammal:  Great.  Very good.  Great narrator voice."

7     Then there is a sticker.

8           "Attiya:  I am saddened because of you."

9     Q.  You can put that aside.  Just going to show you two

10    additional defense exhibits.  Those are Defense Exhibits 404

11    and 402-T.  Do you recognize those?

12    A.  Yes, I do.

13    Q.  As fair and accurate translations?

14    A.  Yes.

15    Q.  At this time we're not asking they be admitted but we want

16    to confirm that is your signature on the document.

17    A.  It is.

18          MS. MIRON:  Just one moment.  Nothing further.  Thank

19    you.

20          THE COURT:  Cross-examination?

21          THE WITNESS:  You're done with me?

22          MS. MIRON:  You're going to be crossed.

23          THE COURT:  Not so fast.

24    CROSS-EXAMINATION

25    BY MS. TEKEEI:

H1N3GAM3                          Abdel-Rahman - cross

1    Q.  Good morning.

2    A.  Good morning.

3    Q.  Just a few questions.  Ms. Miron covered with you Exhibit

4    120-A-T just now, correct?

5    A.  Correct.

6    Q.  That exhibit is approximately 50 -- excuse me.  Not

7    approximately.  Is exactly 57 pages long.

8    A.  I don't remember, but that seems about right.

9    Q.  Okay.  It's a long document, is that right?

10   A.  It is.

11   Q.  The changes that you have went over with Ms. Miron right

12   now, in your direct testimony, those were the only changes that

13   you had to 120-A-T, to Government Exhibit 120-A-T?

14   A.  I cannot confirm that.  I have to look through the entire

15   document and tell if you there were additional changes that I

16   make.  And there could be changes that I do not remember that I

17   made.  You have to keep that in mind as well.

18   Q.  Of course.  The ones that she went over with you, those are

19   the ones that are important to convey, is that correct?

20              MS. MIRON:  Objection.

21   A.  I have no idea what's important.

22              MS. TEKEEI:  One moment, your Honor.

23   Q.  As you sit here today, you're not aware of any other

24   changes, other than the ones Ms. Miron reviewed with you?

25   A.  I am aware of many other changes that I made.  Not

H1N3GAM3

1     necessarily in that particular document.  But I have made many,

2     many other changes.

3     Q.  As to that particular document, 120-A-T, you are not

4     sitting here today aware of any other changes that you made

5     that she did not go over with you?

6              MS. MIRON:  Objection.  Asked and answered.

7              THE COURT:  Overruled.

8     A.  I cannot confirm that these are the only changes or they

9     are not the only changes.  I mean, I was just given the

10    document, asked a few questions about it, I answered the

11    questions to the best of my ability, but I cannot confirm that

12    these were the only changes.

13             MS. TEKEEI:  Thank you sir.

14             MS. MIRON:  Just one moment, your Honor.  Nothing

15    further.

16             THE COURT:  Any redirect?

17             MS. MIRON:  No, your Honor.

18             THE COURT:  Sir, you may step down.

19             THE WITNESS:  Thank you, your Honor.

20             (Witness excused)

21             THE COURT:  Does the defense have another witness?

22             MS. SHROFF:  Not at this time, your Honor.

23             THE COURT:  I'm sorry?

24             MS. MIRON:  Not at this moment.

25             THE COURT:  Okay.  So let's talk.

H1N3GAM3

```
 1              (At the sidebar)

 2              THE COURT:  I take it your next witness is --

 3              MS. SHROFF:  Mr. Osman.  The attorney is here.  She

 4    stepped in.  Her only question to me was whether or not she

 5    could talk with the CJA on duty.  I didn't know how to answer

 6    so I just told her to have a seat.

 7              THE COURT:  What should I tell the jury?

 8              MS. MIRON:  Early lunch and come back at 1:30?

 9              MS. SHROFF:  Your Honor, if the Court thinks you're

10    going to resolve the issue by 1:30, let's make sure.

11              THE COURT:  We can tell them to be back by 1:30.

12              MS. SHROFF:  I understand the CJA on duty, we made a

13    call to find out who it is.  It is Lori Cohen.  We have not

14    spoken to Ms. Cohen.  We're just letting the Court know who it

15    is.  Ms. Manley is here.

16              THE COURT:  She is a criminal defense lawyer, is she

17    not?

18              MS. SHROFF:  Ms. Manley?

19              THE COURT:  Yes.

20              MS. MIRON:  We don't think she's admitted.

21              MS. SHROFF:  She's not admitted to this district.  She

22    sent you an e-mail last night.

23              THE COURT:  Right, but I can --

24              MS. SHROFF:  You can do whatever you want.

25              THE COURT:  So I'll tell the jury come back at 1:30.
```

H1N3GAM3

1              (In open court)

2              THE COURT:  Ladies and gentlemen, Mark Twain once said

3        "I'm sorry this letter is so long.  I didn't have time to make

4        it shorter."  The point of me telling you that is sometimes we

5        have to do some legal work in order to make sure that the

6        evidence is presented in front of you in the most efficient

7        way.  This is one of those moments.

8              So what we're going to do is break now for lunch and

9        I'm going to give you some extra time.  So please be in the

10       jury room no later than 1:30, and we should be able to get

11       going then.  Okay.  Until then do not discuss the case, do not

12       read any news about the case, and do not do any research

13             (Jury excused)

14             THE COURT:  Is Ms. Manley available?

15             MS. SHROFF:  Your Honor, I think she's right outside.

16             THE COURT:  Okay.

17             (Pause)

18             MS. SHROFF:  Your Honor present in the courtroom now

19       is defense witness Khalafalla Osman and his counsel Kathy

20       Manley.

21             THE COURT:  Good morning to you both.  Mr. Osman,

22       there may be a request to have you wait just outside while we

23       discuss certain legal matters.  If you don't mind, just stay

24       right outside the door so we can get you if we need you.

25             THE WITNESS:  Okay.  Thank you.

H1N3GAM3

1          MS. MANLEY:  Good morning, your Honor.

2          THE COURT:  There is a podium over there if you want

3     to speak into a microphone, and I would request you do that

4     because the acoustics in this room are pretty awful.

5          Good morning, Ms. Manley.  I understand that you are

6     concerned that you are not admitted to the bar of the Southern

7     District of New York.

8          MS. MANLEY:  That is correct.  I'm admitted in the

9     Northern District, but not in this district.  And I understood

10    that there was a CJA attorney that could be available to work

11    with me.  I don't know if that --

12         THE COURT:  We've made a request that the CJA attorney

13    be present, but let me just ask, are you in good standing in

14    the Northern District of New York?

15         MS. MANLEY:  Yes.

16         THE COURT:  And in the State of New York?

17         MS. MANLEY:  Yes.

18         THE COURT:  In order to move along as efficiently as

19    we possibly, I'll allow you to appear for purposes of this

20    particular issue.

21         Now, as I understand it, you have a concern that if

22    called as a witness, your client, Mr. Osman, may be required to

23    invoke his Fifth Amendment right against self-incrimination.

24    Is that correct?

25         MS. MANLEY:  Yes.  Out of caution I think that it

H1N3GAM3

1  would be in his best interests if asked certain questions to

2  invoke his Fifth Amendment right.  And if there is going to be

3  an inquiry as to the basis for that, I would prefer there be an

4  in camera proceeding.

5          THE COURT:  Okay.  There is going to be an inquiry

6  with respect to that.  It is very much contested.  Are you in a

7  position to state just generally what the basis of that

8  invocation would be?

9          MS. MANLEY:  Well, as in my letter -- did you see my

10  letter?

11          THE COURT:  I did.

12          MS. MANLEY:  Okay.  So there's just a concern that

13  there's one or two possible inconsistencies with -- there is a

14  couple of statements that Mr. Osman made to federal agents and

15  once the prosecutors were there and I was also there.

16          And for example, there was something that the

17  prosecutors claimed that he said in the first meeting where I

18  was not there in 2015.  And I am afraid that if he -- you know,

19  he says he didn't say that.  So if he testified and was asked

20  that question, he would say he didn't say that, and then there

21  can be a problem.

22          So I understand that the Fifth Amendment doesn't

23  protect you against perjury, but if there is an inconsistency

24  from something he said before, I'm concerned about the

25  possibility of a false statement prosecution.

H1N3GAM3

1          Now, I don't know how much of a risk that is.  I

2     haven't gotten any assurances.  Originally the prosecution said

3     that they were not looking to prosecute him, that they were

4     interested in talking to him as a possible witness, and that

5     they did not want to call him.  I thought we were done.  Then

6     later I met with the defense, many months later, I felt like it

7     was only fair I met with the prosecution, we met with the

8     defense, and now I'm not sure what the position is with the

9     prosecution with the defense wishing to call my client.  So,

10    I'm hoping that there is no desire on their part to prosecute

11    him.  But, you know, there's -- I don't know.

12         THE COURT:  Very well.  So, why don't we do this.  Why

13    don't we meet ex parte and what I will do is I will have the

14    defense team meet with us at least for the initial part of that

15    ex parte meeting.  Okay?

16         MS. MANLEY:  Okay.

17         THE COURT:  Let's get Mr. Osman and we'll meet in the

18    robing room.

19              (Pages 1458-1469 SEALED)

20              (Continued on next page)

21

22

23

24

25

h1n3gam3

1          (In open court; jury not present)

2          THE COURT:  Based on the representations made ex

3   parte, and after Ms. Manley and Ms. Cohen who is the CJA lawyer

4   on duty, after they conferred, they determined that Mr. Osman

5   would not be invoking his privilege against self-incrimination

6   and therefore will be testifying at 1:30.

7          Unless there is anything more for me, we'll see you at

8   1:30.

9          Before we all run off, who is up after this?

10          MS. SHROFF:  We may rest.

11          MS. MIRON:  You're speaking about today?

12          THE COURT:  Yes.

13          MS. SHROFF:  You were asking about today?

14          THE COURT:  Yes.

15          MS. SHROFF:  I'm sorry.

16          MS. MIRON:  Nobody else is available today.  We were

17   thinking the charge conference could occur around 2:30 or 3.

18          THE COURT:  We'll do it then.

19          It appears it wasn't a napkin.  You still want the

20   original?

21          MS. SHROFF:  We were trying to introduce it into

22   evidence, that's why we asked for the original.  If the

23   government is willing to stipulate that comes in in lieu of the

24   original, that is up to them.  I think pursuant to Rule 16 it

25   is something we're allowed to have.

h1n3gam3

1          MR. QUIGLEY:  We had the agents look into it.  The

2     original is in Albany.  In the FBI office in Albany.

3          THE COURT:  Okay.

4          MR. QUIGLEY:  Obviously we'll reserve any objection to

5     that coming into evidence even as a copy.

6          (Luncheon recess)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

h1n3gam3

```
 1                    A F T E R N O O N   S E S S I O N

 2                             1:30 p.m.

 3             (Trial resumed; jury not present)

 4             THE COURT:  Mr. Quigley?

 5             MR. QUIGLEY:  Briefly, before the testimony of

 6    Mr. Osman, I wanted to flag an issue with the Court based on

 7    3500 we received for him which was one piece before the break.

 8             Ms. Shroff's representation about wanting to introduce

 9    potentially the consent to his phone that he signed, we think

10    it would be -- I mean, we have seen some signals that the

11    defense may want to use this witness to go into topics that we

12    think are clearly irrelevant such as the FBI's impression of

13    him, the possibility that he was once considered as a potential

14    government witness at some point, suggesting that the

15    government wouldn't call him if the defense would.  Also, he is

16    not a percipient witness to know how, for lack of a better

17    word, special he is in the eyes of the government.  The

18    government interviewed dozens of people in this case both

19    associates of Mr. El- Goarany, and Mr. El-Gammal from Arizona.

20    For this witness to say, oh, they called me X times and leave

21    the jury with the impression that that was somehow out of the

22    ordinary would be completely inappropriate and, likewise, to go

23    into the circumstances of the consent that he signed to have

24    his Facebook message copied from his phone, is really far

25    afield from issues here, particularly given that this witness,
```

h1n3gam3

```
 1    as far as we know, never interacted with the defendant.

 2              THE COURT:  I saw Ms. Shroff shaking her head.

 3              Ms. Shroff?

 4              MS. SHROFF:  I was not planning to ask that line of

 5    questioning but, you know, there is always that word objection

 6    and I'm sure Mr. Quigley knows how to use it, so.

 7              THE COURT:  Okay.

 8              MS. SHROFF:  I have no -- well, you'll see.

 9              THE COURT:  Where is the witness?

10              MS. SHROFF:  He is outside, your Honor.  May I go

11    fetch him?

12              THE COURT:  Yes, why don't you, and let's get the

13    jury.  The jury is all here.

14              MS. SHROFF:  He might have been taking a moment to

15    pray with his father, I think it is that time, so I think they

16    might just be one more minute.  That's it.

17              THE COURT:  Forgive the ignorant question, but how

18    long does that take?

19              MS. SHROFF:  Very few minutes.  It is not a long

20    prayer.

21              (pause)

22              THE COURT:  Okay.  Let's get the jury.

23              (Continued on next page)

24

25
```

1    (Jury present)

2              THE COURT:  Everyone, please be seated.

3              Briefly, before we get started, there is a mistake

4    that I made that I need to correct on the record, ladies and

5    gentlemen.

6              Before we broke I attributed a particular quote to

7    Mark Twain.  Apparently I was wrong, that was first apparently

8    uttered by the French mathematician Blaise Pascal.

9              So, with that, does the defense have a next witness?

10             MS. SHROFF:  Yes, your Honor.  The defendant calls

11   Mr. Khalafalla Osman.

12             THE COURT:  Please step up into the witness stand,

13   watch your step and please, remain standing.

14    KHALAFALLA MOHAMMED OSMAN,

15        called as a witness by the Defendant,

16        having been duly sworn, testified as follows:

17             THE COURT:  Please begin, Mr. Osman by stating your

18   full name and spelling your last name for the record.

19             THE WITNESS:  My name is Khalafalla Mohammed Osman.

20             THE COURT:  Ms. Shroff?

21             MS. SHROFF:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MS. SHROFF:

24   Q.  Good afternoon, Mr. Osman.

25   A.  Good afternoon.

H1N5gam4                        Osman – direct

1   Q.  How did you know Samy El- Goarany?

2   A.  I have known him originally on Facebook through a mutual

3   friend of ours; he was sharing an article regarding the Newtown

4   school catastrophe and it was discussing, I guess, the

5   selective outrage of children dying and therefore I -- Samy was

6   really vocal arguing that case of selective outrage while I was

7   trying to discuss a more spiritual approach of saying that that

8   is not -- that's not Islamic to talk about, and I provided

9   evidence.

10          And so, that was how the friendship originally

11  started.

12  Q.  And, could you tell the jury what year that was?

13  A.  That was the year 2013.

14  Q.  And who was the mutual friend?

15  A.  The mutual friend was Ali Malek.

16  Q.  Do you recall how you then became -- well, let me rephrase.

17  Did you then become friends with Mr. Samy El- Goarany?

18  A.  Yes.

19  Q.  And could you just tell us, briefly, how that came about?

20  A.  After providing more, you know, Islamic evidence and we

21  spoke privately, he came to the understanding that I was

22  correct, that he shouldn't have said what he said, and from

23  there we developed our friendship.

24  Q.  Now, when you said you spoke privately, did you mean

25  privately in person or privately online?

H1N5gam4                          Osman – direct

1   A.  Online.

2   Q.  And, were there other topics that you and Samy El- Goarany

3   had in common?

4   A.  Yes.

5   Q.  And could you tell us, please, what those topics were?

6   A.  Hip hop, sports, and Middle Eastern politics, and Islam.

7   Q.  Did you and Mr. El- Goarany discuss Egypt?

8   A.  Yes.

9   Q.  And did you and Mr. El- Goarany discuss Abdel Fattah

10  el-Sisi?

11  A.  Yes.

12  Q.  And did Mr. El- Goarany make you aware of his views on

13  Sisi?

14  A.  Yes.

15  Q.  And what were his views?

16  A.  He was against President Sisi.

17  Q.  And did he explain to you why?

18  A.  Because he was in agreement with the democratically-elected

19  president Mohammed Morsi before.

20  Q.  And by "he" you mean Samy, correct?

21  A.  Yes.

22  Q.  And did you also discuss other topics with Mr. El- Goarany

23  including the Muslim Brotherhood?

24  A.  Yes.

25  Q.  And did you also discuss Hamas?

H1N5gam4                         Osman - direct

1    A.  Yes.

2    Q.  And did you also discuss Israel and Palestine?

3    A.  Yes.

4    Q.  Did you also talk about Turkey and Syria?

5    A.  Yes.

6    Q.  Did you also talk about -- and I got this wrong -- Lebron

7    James and basketball?

8    A.  Yes.

9    Q.  And did you also talk about school?

10   A.  Yes, we did.

11   Q.  And at that time could you tell the jury where you were in

12   school?  And by that time I mean late 2013-2014 time period.

13   A.  I was a freshman at the State University at Albany.

14   Q.  And try and keep your voice up, okay?

15   A.  Okay.

16   Q.  What were you studying, sir?

17   A.  I was studying political science and business

18   administration.

19   Q.  And what was Samy doing at that time, if you know?

20   A.  I don't remember.

21   Q.  Now, when you were in an online friendship with Samy, was

22   there somebody else named Nico that was also part of that

23   group?

24   A.  Yes.

25   Q.  And what did the three of you have in common?

H1N5gam4                         Osman - direct

1    A.  We worked on music together.

2    Q.  And do you recall a discussion between Samy, yourself, and

3    Nico where Samy advised you not to use religion to pacify

4    Muslims?

5    A.  Yes.

6    Q.  Could you tell us what that was about?

7    A.  Basically, Samy believed that my religious views were

8    pacifying his activist views in the sense that sometimes he

9    would be a little too -- I guess at times he would take it too

10   far and so I would say, well, that's not Islamic, therefore you

11   shouldn't think that way if you claim to be a Muslim.

12   Q.  Now, Mr. Osman, could you tell the jury, where did you

13   study Islam?

14   A.  I studied Islam with my local teachers at the mosque and I

15   also went to a newer Islamic school which is from preschool to

16   eighth grade, so yes.

17   Q.  And do you speak Arabic?

18   A.  Yes.

19   Q.  And are you a native Arabic speaker?

20   A.  It's my second language.

21   Q.  When you said you went to your local school?  Is that what

22   you said?

23   A.  I went to my local scholars.

24   Q.  And by local you mean in Albany, correct?

25   A.  Yes.

H1N5gam4                          Osman - direct

1    Q.  And did Samy El- Goarany speak Arabic?

2    A.  No.

3    Q.  Now, throughout the time of 2013-14 did Mr. El- Goarany ask

4    you, at times, to translate articles that were in Arabic?

5    A.  Yes.

6    Q.  And did you guys or did you two exchange articles on these

7    topics that we have discussed before?

8    A.  Yes.

9    Q.  And is it fair to say you also exchanged videos, correct?

10   A.  Yes.

11   Q.  Now, did there come a time when you and Mr. Samy

12   El- Goarany met in person?

13   A.  Yes.

14   Q.  Could you tell us when that was?

15   A.  The first time we met in person was in New York City in

16   2013, and it was after a conference that I attended in North

17   Carolina.  So, it was a long trip -- I it was a long waiting

18   time so he came to me after I told him I was in the city and

19   that was the first time we met.

20   Q.  And you were waiting at where?

21   A.  I was waiting at Penn station.

22   Q.  And Mr. El- Goarany met you at the Penn station?

23   A.  Yes.

24   Q.  And do you recall what, if anything, you guys talked about?

25   A.  Yeah; we spoke about basketball and hip hop.

H1N5gam4                         Osman – direct

1    Q.   Now, after that meeting you continued to have an online

2    friendship with Mr. El- Goarany, correct?

3    A.   Yes.

4    Q.   And what platforms did you speak to him on?  Do you

5    understand my question?

6    A.   Yes.

7         Facebook and text messages, and phone calls, and

8    Google hangout.

9    Q.   Could you tell me, please, what was your phone number at

10   that time?

11   A.   My phone number at that time was 518-779-0324.

12   Q.   And did you also have a home number at that time?

13   A.   Yes.

14   Q.   And what was that?

15   A.   518-426-3159.

16   Q.   And would Samy El- Goarany call you on both of those

17   numbers?

18   A.   No.   Only my cell phone.

19   Q.   Now, did you become aware that Samy El- Goarany was also

20   active on Twitter?

21   A.   Yes.

22   Q.   And could you tell the jury your impression of his use of

23   that app or platform or whatever it's called?

24   A.   Yes.  He used Twitter to discuss his political views,

25   mostly, and he was regarded very influential on Twitter, a lot

H1N5gam4                          Osman - direct

1   of people followed him and cared of his opinion.

2   Q.  And was Samy shy about voicing his opinion on Twitter?

3   A.  Absolutely not.

4   Q.  Now, was Samy also on a platform called electronic

5   Intafada?

6   A.  Only for reading, but yes.

7   Q.  And how about Angry Arab?

8   A.  Yes.

9   Q.  And could you tell the jury what those two platforms are?

10  A.  Those are just online publications where they discuss

11  anti-Zionist views.  So, they discuss basically everything in

12  regards to Palestine and they were a pro-Palestinian source of

13  news.

14  Q.  Is it fair to say that Mr. El- Goarany was pro-Palestine?

15  A.  Yes.

16  Q.  Anti-Israel?

17  A.  Yes.

18  Q.  Anti-Zionist?

19  A.  Yes.

20  Q.  Did there come a time that you recall that Samy started to

21  discuss the Islamic State or the Islamic State of Iraq and

22  Syria with you?

23  A.  Yes, he was.

24  Q.  Do you recall when the first of those discussions was or --

25  do you recall?

1    A.  I don't recall the exact time.

2    Q.  Do you have a general idea when that was?

3    A.  All I remember is it was during the -- like, we were

4    discussing the Syrian conflict.

5    Q.  And do you remember what Mr. El- Goarany's views were about

6    ISIS?

7    A.  He disagreed with their methodology however he, I guess,

8    seemed to admire their state of being kind of like a rogue

9    organization like they didn't -- he was of the impression that

10   they weren't funded by any powers -- world powers or anything

11   and that they were just doing what they were doing on their

12   own.

13   Q.  Did Mr. El- Goarany agree with their violent methods?

14   A.  No.

15   Q.  Did he tell you specifically that he did not agree with

16   their violent methods?

17   A.  Yes, he did not agree.

18   Q.  I'm sorry.  Could you keep your voice up, sir?

19   A.  Yes.  Sorry.

20   Q.  And did there come a time, as you recall, in 2014, when he

21   continued to research them at the same time condemn them to

22   you?

23   A.  Yes.

24   Q.  Now, during this time frame did you and he discuss ISIS?

25   A.  Yes.

1   Q.  And did you also send each other and exchange articles and

2   videos about the organization?

3   A.  Yes, we have.

4   Q.  And did you talk about it also over Google hangout?

5   A.  Yes.

6   Q.  Now, did there come a time when Samy introduced a code word

7   for ISIS to you?

8   A.  Yes.

9   Q.  And what was that?

10  A.  It was groundhogs.

11  Q.  Groundhogs?

12  A.  Yes.

13  Q.  Did he tell you why he chose that specific word?

14  A.  The reason he referred to them as that is because they came

15  out of nowhere, like they popped out of a hole in the Syrian

16  conflict.

17  Q.  Kind of like the groundhog?

18  A.  Yes.

19  Q.  Now, directing your attention to November of 2014; do you

20  recall that time period?

21  A.  November 2014?

22  Q.  Yes.

23  A.  Yes.

24  Q.  Now, do you recall during that time period meeting with

25  Samy El- Goarany?

H1N5gam4                          Osman - direct

1    A.  Yes, I do.

2    Q.  And where was it that you met Samy El- Goarany?

3    A.  At the University at Albany.

4    Q.  And you were a student at Albany at that time, correct?

5    A.  Yes, I was.

6    Q.  And were you the chairperson or the head of the Muslim

7    student association there?

8    A.  Yes.  I was the president.

9    Q.  You were president.

10   A.  Uh-huh.

11   Q.  And was Samy aware of that?

12   A.  Yes.

13   Q.  And was there a specific event that Samy showed up to?

14   A.  Yes.  It was called Chai Tea Night.

15   Q.  Say that again?

16   A.  It was called Chai Night Tea.

17   Q.  Chai Night and then tea?

18   A.  Yes.

19   Q.  Had you invited Samy to this event?

20   A.  No, I did not.

21   Q.  And did Samy just show up on his own?

22   A.  Yes, he has -- yes, he did.

23   Q.  Were you surprised to see him there?

24   A.  Yes, I was.

25   Q.  Could you tell the jury what happened after you spotted him

H1N5gam4                        Osman - direct

1  at the event?

2  A.   So, I saw Samy and he was my -- he was my best friend so I

3  was very excited to see him, very surprised as well.  And as

4  soon as the event ended, he gave me a ride home.  During the

5  ride home he told me to turn off my phone, and after that he

6  told me that he was not going on his internship anymore because

7  he told a group of us friends that he was going on -- he had an

8  internship for, I guess, something in the computer science

9  field.  And so, he told me that he wasn't going to have an

10 internship but rather that he was going to do humanitarian aid

11 in Turkey helping Syrians cross the border to Turkey.

12 Q.   Now let me take you back for a second, Mr. Osman.

13 A.   Yes.

14 Q.   Were you expecting Samy El- Goarany to give you a ride on

15 that night?

16 A.   No.

17 Q.   Who were you planning to get home with?

18 A.   My parents.

19 Q.   And was it your suggestion that Samy El- Goarany give you a

20 ride?  Or was it his?

21 A.   It was his.

22 Q.   And you thought nothing of it, right; as you said, he was

23 your best friend and he offered you a ride and you took the

24 ride, correct?

25 A.   Yes.

H1N5gam4                          Osman – direct

1    Q.  And it was Samy who drove you to your home or at least

2    toward your home, correct?

3    A.  Yes.

4    Q.  And Samy asked you to turn off your phone; is that correct?

5    A.  This is correct.

6    Q.  And did you in fact do as Samy asked and turn off your

7    phone?

8    A.  Yes.

9    Q.  Now, let's just talk about that for a minute and step

10   forward about that one statement.  Did you at any point not

11   tell the FBI the truth about turning off that phone?

12   A.  Yes.

13   Q.  And when was that that you did not tell them the truth?

14   A.  During the second meeting.

15   Q.  Your second meeting with whom, sir?

16   A.  With the FBI.

17   Q.  And during your first meeting with the FBI, did you tell

18   them the truth?

19   A.  I don't recall.

20   Q.  And who was present for the first meeting with the FBI?

21   A.  Two agents.

22   Q.  And?

23   A.  And that's it.  No lawyer.

24   Q.  You were present, right?

25   A.  And myself.  Sorry.  Yes.

H1N5gam4                         Osman - direct

1   Q.  So, it was you and two agents of the FBI, correct?

2   A.  Yes.

3   Q.  At the second meeting who was present; do you recall?

4   A.  There were many agents so I don't remember -- or many

5   people, but I was there and my lawyer was there.

6   Q.  Well, why don't we take a look at the prosecutorial table

7   right here -- actually, let's start at the defense table right

8   there, over there.  Was anybody from that table present for

9   that meeting?

10  A.  No.

11  Q.  Was I present?  Because I'm not at the table.

12  A.  No.

13  Q.  Okay.

14          Now let's just start from the corner there; was the

15  first person who is the female sitting in front of the

16  computer, was she present?

17  A.  I don't think so.

18  Q.  Okay.  How about the next person?

19  A.  Yes.

20  Q.  And the record should reflect that would be Assistant

21  United States Attorney Brendan Quigley.

22          And was the person sitting next to him present?

23  A.  Yes.

24  Q.  The record should reflect that would be Assistant United

25  States Attorney Negar Tekeei.

H1N5gam4                          Osman - direct

1           Was the next person present?

2    A.   Yes.

3    Q.   Okay.  And you think Assistant United States Attorney

4    Andrew DeFilippis was present?

5    A.   I don't recall that.

6    Q.   And how about the person at the corner, was he present?

7    A.   Yes.

8    Q.   Special Agent Collie, correct?

9    A.   Yes.

10   Q.   And that meeting occurred in May of 2016, correct?

11   A.   Yes.

12   Q.   And you lied to them and you said that -- what was the lie

13   that you told them?

14   A.   I told them that I turned my phone off -- Samy told me to

15   turn my phone off and I pretended to turn my phone off.

16   Q.   And that was a lie?

17   A.   Yes.

18   Q.   And did you correct the lie?

19   A.   Yes, I did.

20   Q.   And when did you correct the lie?

21   A.   The same -- the same meeting.

22   Q.   The same meeting?

23   A.   Yes.

24   Q.   The lie did not go past the end of that meeting, correct?

25   A.   Yes.  Correct.

1   Q.  And when you corrected the lie, would you tell the jury,

2   please, how you corrected it and what did you say to them?

3   A.  I told them that the one lie that I made was that I told

4   them that I pretended to turn the phone off but, in actuality,

5   I followed exactly what Samy told me to do which is turn my

6   phone off.

7   Q.  So now let's go back in time back to the car ride, correct?

8   A.  Uh-huh.

9   Q.  And during this car ride Samy told you, you testified, that

10  what he had been telling other people about having an

11  internship with the computer information systems was not

12  correct, right?

13  A.  Correct.

14  Q.  And he told you in fact that he was going to go on a --

15  what was the word he used?

16  A.  Vacation.

17  Q.  And did he tell you if he was planning to return from that

18  vacation?

19  A.  No.  He did not -- yes, he did not plan on returning.

20  Q.  And did he explain to you what he was going to do on that

21  vacation?

22  A.  Yes.  He planned on helping Syrian refugees cross the

23  Turkish border.

24  Q.  How did he refer to Turkey by the way when he discussed it

25  with you on that day?

1   A.  On that day he referred to it as Turkey.

2   Q.  And what did he say exactly that he was going to do in

3   Turkey?

4   A.  He was going to work with an organization that would help

5   bring Syrian refugees into Turkey.

6   Q.  From where?

7   A.  From Syria.

8   Q.  Now, did he tell you whether or not -- what kind of an

9   organization did he describe it as?

10  A.  As a humanitarian organization.

11  Q.  And did you ask him any follow-up questions about that?

12  A.  Yes.

13  Q.  And what was the question that you asked him?

14  A.  The first question I asked him was is it illegal.

15  Q.  And what did he say?

16  A.  He said yes.

17  Q.  And what was your next question to him?

18  A.  I said is it non-violent.

19  Q.  And what did Samy El- Goarany say?

20  A.  He said yes.

21  Q.  So, Samy El- Goarany said that he was going to go do

22  humanitarian work which was illegal and not violent?

23  A.  Yes.

24  Q.  And what was your reaction, Mr. Osman, to Samy's

25  declaration to you?

H1N5gam4                          Osman - direct

1    A.  I was in shock because he cannot speak Arabic.

2    Q.  And did you discuss the wisdom of such a decision with Samy

3    El- Goarany?

4    A.  Yes.

5    Q.  And what did you say to him?

6    A.  I asked him if he really thought this through, the fact

7    that he cannot speak any Arabic, the fact that he is now

8    working with an organization that seemed to be a legitimate one

9    to cross the border and help Syrian refugees would be a bad

10   idea for him, would be a dangerous idea for him, and I

11   mentioned that if he was to be captured, being an American

12   citizen he would be in great danger.  Plus, he can't speak any

13   Arabic, as I said before.  I also mentioned that as an American

14   citizen he can help Syrian refugees a lot more effectively here

15   in the United States than to go abroad.

16   Q.  And did Samy have a response to this?

17   A.  Yes.  He said that he put a lot of thought into this.  When

18   I asked him for more detail he just said I can't tell you.

19   Q.  And did you also discuss whether or not his parents knew

20   about this plan of his?

21   A.  Yes.  I asked him if his parents knew and he said no.

22   Q.  Now, obviously the car ride came to an end at some point,

23   correct?

24   A.  Correct.

25   Q.  And did Samy accompany you somewhere once he reached your

H1N5gam4                        Osman – direct

1  home?

2  A.  Yes.

3  Q.  Where did he accompany you?

4  A.  He accompanied me to my house, inside, where we had some

5  tea and we –– he wanted to install some encrypted communication

6  software on my computer and my phone.

7  Q.  And did you allow him to do that?

8  A.  Yes.

9  Q.  And what communication software did he try to install and

10 where?

11 A.  He tried to install Cryptocat on my laptop but it was

12 unsuccessful.  He successfully installed Surespot on my phone

13 and we tested it out to see if it works.

14 Q.  And what happened after that?

15 A.  After that we –– I was bidding him farewell outside the

16 door, we hugged, I told him to think about this, don't do it.

17 We got a little teary and then he left.

18 Q.  Now, did there come a time when you once again heard from

19 Samy El- Goarany?

20 A.  Yes.

21 Q.  And do you recall whether he called you or you called him?

22 A.  He called me.

23 Q.  And what is it that he called you for?

24        MR. QUIGLEY:  Objection.

25 A.  He called me to inform me that he changed his mind on this

H1N5gam4                         Osman - direct

1    vacation of his.

2    Q.  So he called to say he had changed his mind?

3    A.  Yes.

4    Q.  And did he tell you that -- did he tell you what the reason

5    was that he had changed his mind?

6    A.  Yes.

7    Q.  And what was the reason?

8    A.  The reason was the words that I told him, he said that they

9    got to him and that he realized that he was wrong and he wanted

10   to stay with his friends and his family.

11   Q.  And after that, did your friendship with him continue as

12   before?

13   A.  Yes.

14   Q.  And, did you continue to talk to him on the same social

15   media that you had talked to him before?

16   A.  Yes.

17   Q.  And did you continue to speak to him on Google chat?

18   A.  Yes.

19   Q.  And did you continue to hang out with him when the occasion

20   arose?  I mean, did you see each other?

21   A.  In person?

22   Q.  Yes.

23   A.  I don't believe so after that.

24   Q.  Now, when was the next time that you heard from

25   Mr. El- Goarany?

H1N5gam4                          Osman - direct

1    A.  The next time I heard I do not remember the exact timing.

2    Q.  Do you generally recall the month and the year?

3    A.  It was the -- I guess, like, December 2014.

4    Q.  And in December of 2014 did you, he, and Nico put together

5    some kind of song?  Is that how you talked about what you

6    talked about in December?

7    A.  Yes.

8    Q.  And then, moving forward, do you recall when was the next

9    time you heard from Samy El- Goarany?

10   A.  After we put the song out he completely disappeared for a

11   few months.  I believe the next time I heard from him, I'm not

12   sure, but I think it was February.

13   Q.  Okay.

14          Can I just have one second, your Honor?

15          THE COURT:  Yes.

16          (Counsel conferring)

17   BY MS. SHROFF:

18   Q.  Just for a moment, Mr. Osman, let me take you back to July

19   2014.  Do you recall we discussed that time period before?

20   A.  Yes.

21   Q.  And you talked about discussions that you had with

22   Mr. El- Goarany about many organizations including ISIS,

23   correct?

24   A.  Correct.

25   Q.  And you and he talked on Facebook about ISIS, correct?

H1N5gam4                          Osman – direct

1    A.  Correct.

2    Q.  Let me show you what is marked as Defendant's Exhibit

3    113-SS for a moment.

4              May I approach, your Honor?

5              THE COURT:  You may.

6    Q.  Do you see that, Mr. Osman?

7    A.  Yes.

8    Q.  Do you recognize that?

9    A.  Yes, I do.

10   Q.  What do you recognize that to be?

11   A.  A Facebook conversation between me and Samy.

12             MS. SHROFF:  Your Honor, the defense would offer

13   Defendant's Exhibit 113-SS into evidence.

14             MR. QUIGLEY:  Objection.  Hearsay.

15             MS. SHROFF:  Your Honor, may we approach?

16             THE COURT:  You may.

17

18

19

20

21

22

23

24

25

H1N5gam4                          Osman – direct

1          (At side bar)

2          THE COURT:  Yes?

3          MR. QUIGLEY:  So, your Honor, we think there are a

4    number of pieces of hearsay in here.  First, the third message

5    down where Samy says that, in response to his question about

6    *the Imam of the Mosul of Masjid said no, that's a lie.*  That's

7    a statement of fact.

8          MR. HABIB:  We don't need that one, Judge.

9          THE COURT:  Okay.

10         MR. QUIGLEY:  So the first three I guess are out.

11         Then, *the propaganda is coming.*  Again, statement of

12   fact.

13         On the next page, first page, second page:  *I*

14   *instantly jumped on the anti-Isis bandwagon.*

15         THE COURT:  Okay.

16         MR. QUIGLEY:  *Right now I am just taking a step back.*

17   *None of us are there and we don't have the intellectual or*

18   *experiential capacity to form a solid stance.  A lot of people*

19   *are very quick to Judge and mock.*

20         Then, the third page:  *Exactly, my friend.  Right now*

21   *my friend from QI instantly jumped on the anti-ISIS bandwagon.*

22         MR. QUIGLEY:  Don't need that one.

23         THE COURT:  What is QI?

24         MR. HABIB:  QI?  My friend from QI?  I actually don't

25   know.

1          MR. QUIGLEY:  Samy at the bottom of the page:  *I was*

2     *finally able to delete that article.  Ha ha.*  Statement of

3     fact.  The rest of that sentence is maybe a thought but the

4     first part is definitely an assertion of fact.

5          So, I think based on that, this document contains

6     numerous pieces of hearsay and shouldn't be admitted.

7          THE COURT:  The whole thing doesn't get admitted but.

8          Now, I didn't understand you to object to the first

9     two statements:  *Were you asked the question* --

10         MR. QUIGLEY:  I think a question is not a factual

11    assertion.  And then first two are not hearsay.

12         MR. HABIB:  On the first page, Judge, *the propaganda*

13    *is coming,* by definition cannot be an assertion of fact, it is

14    a prediction of the future.  It is like me saying the wind is

15    going to get stronger or is going to get stronger this

16    afternoon.  I don't think a prediction about the future is

17    being offered for its truth, it is being observed to show

18    Samy's belief about what is going to happen in the future and,

19    thus, his state of mind.

20         THE COURT:  I will allow that one, propaganda is

21    coming.  Depending on what context it could be a statement of

22    fact but here it appears to be a prediction about what is going

23    to happen in the future.

24         MR. HABIB:  On the second page, the two statements:  *I*

25    *instantly jumped on the anti-ISIS wagon without any research*,

H1N5gam4                    Osman - direct

are not offered for their truth, they're offered to show their

effect on the listener, Mr. El- Goarany, that is

Mr. El- Goarany immediately endorses that belief and talks

about why prudence is the better course and we should take

the -- that's the best stance to have, we should take time to

inform ourselves before we are quick to judge.

So, again, we do not care to establish that Mr. Osman

instantly jumped on the anti-ISIS wagon, how much research he

did or didn't do before doing so.  What is being offered is

what it prompts Samy to say in response.

MR. QUIGLEY:  But those are factual assertions also.

*None of us are there and we don't have the intellectual*

*capacity to form a solid stance.*  So, what they're being used

is to show the effects on the listener is itself hearsay.

MR. HABIB:  So, again, Judge, we don't -- we can take

out "none of us are there."  *We don't have the intellectual or*

*experience shall capacity to form a solid stance,* again, this

is an expression of Samy's then existing state of mind.  He is

describing indecision, uncertainty, ambivalence, and he is

endorsing the suggestion by Mr. Osman that a wait and see

approach is proper.  And he is not offering it to prove the

metaphysical assertion that these people do or don't have the

intellectual ability or the life experience to opine about

ISIS, it is that they are not opining about ISIS.

THE COURT:  What is IDK ISH?

H1N5gam4                      Osman - direct

1              MR. QUIGLEY:  I don't know shit.

2              MR. HABIB:  I don't know shit.

3              THE COURT:  Really?

4              MR. HABIB:  That's what the young kids tell me, Judge.

5              THE COURT:  Okay.  Then on the next page?

6              MR. HABIB:  I think we agree *my friend from QI*, we can

7    loose that one.

8              THE COURT:  And then --

9              MR. HABIB:  We can lose:  *I was finally able to delete*

10   *the article.*

11             THE COURT:  The whole thing?

12             MR. HABIB:  I think Mr. Quigley only objected to:  *I*

13   *was finally able to delete the article.*

14             THE COURT:  Hat are you keeping in?

15             MR. HABIB:  *Ha ha.  Maybe now FBI won't kick my door*

16   *down.*

17             THE COURT:  Okay.

18             So then I will take out on page 1:  *That's not a lie*;

19   on page 2:  *None of us are there.*

20             MR. HABIB:  None of us are there, yes.

21             THE COURT:  On page 3:  *Exactly my friend...* that

22   entire long, and:  *I finally was able to delete that article.*

23             MR. HABIB:  Yes.

24             MR. QUIGLEY:  Your Honor, can we get an instruction

25   that statements aren't coming in for the truth?

H1N5gam4                          Osman – direct

1          THE COURT:  Yes.

2          MR. QUIGLEY:  Thank you.

1    　　　　(In open court)

2    BY MS. SHROFF:

3    Q.  Mr. Osman, did you have an opportunity to read that

4    document?

5    A.  Yes.

6    Q.  And does that refresh your recollection a little bit as to

7    whether this was around the time when Samy started discussing

8    ISIS with you?  If you would take a look at the date?

9    A.  Yes.

10   Q.  And is that about the time or somewhere close in time when

11   there was a lot of news reporting that Mosul had fallen to the

12   Islamic State of Iraq and Syria?

13   A.  Yes.

14   Q.  And do you recall during that time where you were?

15   A.  I was in Dallas, Texas.

16   Q.  And what were you doing in Texas?

17   A.  I was studying Arabic.

18   Q.  And where was Mr. El- Goarany?

19   A.  He was in New York City.

20   Q.  And did he reach out to you about this?

21   A.  Yes.

22   Q.  And, at that time did he also continue to express that he

23   did not agree with the violent side of ISIS?

24   A.  Yes.

25   Q.  And, did you have a conversation with him about that?

1    A.  Yeah.

2    Q.  And was that -- I take it that conversation was over the

3    phone, correct?

4    A.  It was on the phone.  Correct.

5           MS. SHROFF:  I'm going to publish portions of that

6    document.

7           Your Honor, may I approach?

8           THE COURT:  Ladies and gentlemen, this document will

9    be admitted into evidence as Defendant's Exhibit 113-SS and it

10   is part of the evidence being admitted solely not for the truth

11   of what is on this transcript but however, for whatever effect

12   you believe it may have had on Mr. Samy El- Goarany.  Okay?

13   BY MS. SHROFF:

14   Q.  Do you see that, Mr. Osman?

15   A.  I see it here, yes.  Yes.

16   Q.  And could you do me a favor and read where the author is

17   noted as you?

18   A.  The body of -- you want me to read the message?

19   Q.  Yes, please.

20          Could you highlight it for him, Mr. Fisher?

21          So, there you go.

22   A.  Thank you.

23          *Yo, is it true that the Imam of Mosul Masjid got*

24   *executed?*

25   Q.  And in reply Samy El- Goarany says:  *By who?  Dawla?*

1   A.   Dawla, yes.

2   Q.   Who is that?

3   A.   That's the Islamic State in Arabic.

4   Q.   Could you read for me your response?

5   A.   *Okay.   Thought so.*

6   Q.   And in response Samy El- Goarany says:   *Bro, brace*

7   *yourself*; correct?

8   A.   Correct.

9   Q.   And then he follows up by saying:   *The propaganda is*

10  *coming*, correct?

11  A.   Correct.

12  Q.   And what follows after that?

13  A.   I said:   *You know, it just started to hit me.*

14  Q.   And then?

15  A.   *I instantly jumped on the anti-ISIS wagon without any*

16  *research.*

17  Q.   Okay.

18            And what is the response back?

19  A.   *Right now I'm just taking a step back.*

20  Q.   And that's still you talking, correct?

21  A.   Correct.

22  Q.   Okay.

23            And you continue speaking.

24  A.   *And humbling myself.*

25  Q.   Okay.

H1N5gam4                          Osman - direct

1    A.  *Cuz IDK ISH.*

2    Q.  What is I-S-H?

3    A.  It means like thinks, or I don't know anything.

4    Q.  Okay.

5         And what does he say -- by he I mean Samy

6    El- Goarany -- he responds back:  *That's the best stance to*

7    *have*; correct?

8    A.  Correct.

9    Q.  And then what does Samy El- Goarany continue and say:  *And*

10   *we do not have the intellectual or experiential capacity to*

11   *form a solid stance*; correct?

12   A.  Correct.

13   Q.  And he is talking about a solid stance on ISIS, correct?

14   A.  Correct.

15   Q.  And then what is the next response that he continues and

16   gives?

17   A.  He says:  *A lot of people (Muslims including) are very*

18   *quick to judge and mock.  Okay, that's their prerogative but*

19   *what do they really know that gives them the authority to act*

20   *like that?*

21   Q.  And do you have a response to that?  That is Samy's

22   response, right?

23   A.  Yes, that's Samy's response.

24   Q.  And he says:  *It's something to think about*; correct?

25   A.  Correct.

1   Q.  And it's fair to say around that time you had several

2   theoretical discussions with -- you can take that down, thank

3   you -- with Samy El- Goarany about ISIS, correct?

4   A.  Correct.

5   Q.  And he always, throughout the time, condemned their

6   violence, correct?

7   A.  Absolutely.

8   Q.  And it is fair to say he continued to have theoretical

9   discussions about this and many other topics with you, correct?

10  A.  Correct.

11  Q.  Now, let me forward your attention if I may, to May of

12  2015.  Is it possible that that's the next time Mr. El- Goarany

13  contacted you and not February?

14  A.  Perhaps.

15  Q.  And do you, by any chance, recall your interaction with

16  him?

17  A.  At this moment I do not recall.

18  Q.  Let me see if I can hand up a document that might refresh

19  your recollection.

20            (Continued on next page)

21

22

23

24

25

H1N3GAM5                        Osman - direct

1           (Pause)

2    Q.  Mr. Osman, does that refresh your recollection that maybe

3    you heard or you had contact with Samy El-Goarany in about

4    April of 2015?

5    A.  Yes.

6    Q.  Is it fair to say that at that time -- why don't you tell

7    the jury where did you think Mr. El-Goarany was at that time?

8    A.  At that time, I thought he was in Turkey.

9    Q.  Did there come a time later in July of 2015 that you heard

10   once again from Mr. El-Goarany?

11   A.  Correct.

12   Q.  How did that happen, how did that contact occur?

13   A.  At first he messaged me on WhatsApp asking me if I was

14   free, and then he gave me a phone call via WhatsApp.

15   Q.  Before you received that phone call, had you an opinion as

16   to where Samy had been before that time?

17   A.  I believed he was in Turkey.

18   Q.  Right.  Did you tell other people, including your friends

19   Nico and Ali, that that's where Samy was?

20   A.  Yes.

21   Q.  You told them that because you thought it was true,

22   correct?

23   A.  Correct.

24   Q.  Did something happen in July of 2015 that changed your mind

25   about where Samy was?

H1N3GAM5                         Osman - direct

1   A.  Yes.

2   Q.  What was that?

3   A.  He called me on the WhatsApp and informed me that he was in

4   Syria.

5   Q.  When he informed you he was in Syria, did he then follow up

6   and tell you what exactly he was doing in Syria?

7   A.  Yes.

8   Q.  Could you tell the jury what it is that Mr. Samy El-Goarany

9   told you?

10  A.  He told me that he's now part of ISIS.

11  Q.  Go ahead.

12  A.  By using the term "groundhogs."

13  Q.  If you can remember, I know it's been a while, if you can

14  remember, can you tell the jury what it is that Mr. El-Goarany

15  told you?

16  A.  What, like, what did he say to me in that phone call?

17  Q.  Yes.

18  A.  So, at first, he told me that, you know, he's done lying to

19  me, because I heard a Syrian accent in the background.  He was

20  in an Internet cafe.  So I asked him where is he, he told me

21  that he's done lying to me, he's in Syria.

22          Then he -- when I asked him what is he doing in Syria,

23  he told me that he's with the groundhogs.  And after that, I

24  told him -- basically, I asked him, you know, what does he mean

25  that he's with the groundhogs.  He told me that he's -- he's

1   been training there.  He has weapons, that he literally made it

2   the movie Taken reference saying he has a special set of

3   skills, ones that can make it a nightmare.  It was a very sick

4   joke.

5           And he then told me that whatever I know about --

6   whatever I've been told about ISIS, I shouldn't believe it.

7   And how I should have an open mind, since he's there.  And he

8   told me to -- to not tell anybody, if I was a Muslim.  He

9   attacked any scholars that condemned ISIS, which were most --

10  which were all of my teachers and scholars that I studied

11  under, and referred to them as apostates or kuffar.  And I was

12  very upset with his remarks.

13  Q.  Did there come a time when the call between you and him got

14  cut off?

15  A.  Correct, yes.

16  Q.  Did then Mr. El-Goarany, Samy El-Goarany reach out back to

17  you again?

18  A.  Yes.

19  Q.  When he reached back out to you, did you then hear

20  Mr. El-Goarany also talking to somebody where he was, wherever

21  that was?

22  A.  During the first call, yes.

23  Q.  What is it that you heard in the background being said?

24  A.  The first thing I heard was in Arabic a person said that

25  he's going to the place of women, which was very odd.  And then

H1N3GAM5                          Osman - direct

1   he -- then Samy said okay, make sure you bring me one of them.

2   He said.

3   Q.  What did you understand him to mean when he said "make sure

4   you bring me one"?

5   A.  I think he was referring to getting himself a wife.

6   Q.  Getting himself what?

7   A.  A wife.

8   Q.  Is it fair to say, Mr. Osman, that you had a fairly lengthy

9   conversation with Mr. El-Goarany at this point?

10  A.  Yes.

11  Q.  It is fair to say, is it not, that you were shocked by the

12  information you were receiving from him, correct?

13  A.  I was very shocked.

14  Q.  You had a long conversation with him about it, correct?

15  A.  Hmm-hmm.

16  Q.  And eventually, the conversation came to an end how?

17  A.  The first one or -- the first part or the second?

18  Q.  The first part you said was disconnected, correct?

19  A.  Yes.

20  Q.  How did the second part come to an end?

21  A.  The second one came to an end after we were arguing over

22  the fact that he was saying that if you condemn ISIS, you are

23  an apostate and leave the folds of the Islam.  I told him that

24  the person who taught you Islam, which is now I'm referring to

25  myself, is a kafir, and I hang up the phone angrily.

1    Q.  After you hung up the phone, did you reach out to

2    Mr. El-Goarany again?

3    A.  Yes.

4    Q.  What did you say in that reach out?

5    A.  I messaged him on Facebook Chat.  Sorry.  WhatsApp.  And I

6    told him, I said, hey, I just want to let you know that I don't

7    think we should be talking anymore.  I told him that I wouldn't

8    tell anybody about what has happened.  And then I also

9    condemned everything he said, because he said that we saw eye

10   to eye.  I said no, we do not see eye to eye.  He said that it

11   was his duty to fight in ISIS, and I told him actually, it

12   isn't, according to textual evidence in our Islamic tradition.

13   And I told him I still love him as a brother.  However, I

14   strongly disagree with his actions, and I pray that he gets a

15   second chance and survives his mistake.  And I told him that he

16   betrayed his country and that he, you know, we shouldn't be

17   talking anymore.  Basically.

18   Q.  When you told Samy El-Goarany you wouldn't tell anyone, is

19   that because Samy had asked you not to tell anyone during that

20   conversation?

21   A.  Yes.

22   Q.  Did Samy tell you why he didn't want anyone else to know?

23   A.  Yes.

24   Q.  Why was that?

25   A.  Because he didn't want his family to be in any form of

1    trouble.

2    Q.  Now, you did in fact tell other people, correct?

3    A.  Correct.

4    Q.  Mr. Osman, who did you tell?

5    A.  First person I told was a friend of mine in Philadelphia.

6    Q.  Who else did you tell?

7    A.  Then I told Tarek, and I told my imam, my local scholar,

8    and my parents.

9    Q.  Let me just direct you to Tarek's reaction to you telling

10   him that.

11   A.  Yes.

12   Q.  Did Tarek respond to you appropriately in your opinion?

13              MR. QUIGLEY:  Objection.  Relevance.

14              THE COURT:  Overruled.

15   A.  He told me to not tell anybody.

16   Q.  Did you think that was the right thing?

17   A.  No.

18   Q.  Why was that?

19   A.  Because Samy has the capability of contacting all of his

20   friends, which would have incriminated or implicated all of us.

21   And whatever -- because he's in an illegal territory.

22   Q.  Did there come a time, Mr. Osman, when you were contacted

23   by the Federal Bureau of Investigation?

24   A.  Yes.

25   Q.  When was the first time that you had -- let me rephrase

H1N3GAM5                          Osman - direct

1    that.

2                When was the first time that the FBI reached out to

3    you?

4    A.  I believe it was late July.

5    Q.  Do you recall where you were when they first -- late July

6    of what year, first of all?

7    A.  2015.

8    Q.  Where were you in late July of 2015?

9                MR. QUIGLEY:  Objection, relevance.

10               THE COURT:  Overruled.

11   A.  I was in -- I was at my brother's dentist appointment at a

12   dental office while they were at my house with my parents.

13   Q.  Did you then receive phone calls from the FBI?

14   A.  Many phone calls.

15   Q.  What is many?

16               MR. QUIGLEY:  Objection, relevance.

17               THE COURT:  Overruled.

18   A.  I would say more than 10.

19   Q.  Did you respond to the phone calls?

20   A.  I did not until -- because I didn't see them and then I

21   called them back I believe.

22   Q.  When you saw the phone calls, did you receive a voice

23   message or something that prompted you to respond?

24   A.  Yes.

25   Q.  What did you receive?

 1  A.  I received a voice mail from an FBI agent.

 2  Q.  Did you respond to it?

 3  A.  Yes.

 4  Q.  What happened after you responded to it?

 5  A.  They asked if we could meet and have an interview.

 6  Q.  What did you say to them?

 7  A.  I said I would -- I wouldn't mind having the interview, as

 8  long as I spoke with my lawyer.

 9  Q.  Did they agree to wait and interview you after you got a

10  lawyer?

11  A.  No.

12          MR. QUIGLEY:  Objection.

13          THE COURT:  Sustained.

14  Q.  Did you meet with the FBI?

15  A.  Yes.

16  Q.  Where did you meet with them?

17  A.  At a local supermarket called Price Chopper.

18  Q.  Price Chopper?

19  A.  Yes.

20  Q.  Who was present for that meeting?

21  A.  Myself, my brother, and two agents or -- no, sorry.  Three

22  agents.

23  Q.  How old is your brother, by the way?

24  A.  My brother at the time I believe was 18.

25  Q.  I take it that your brother was not seated at the same

H1N3GAM5                         Osman – direct

1    table as you and the FBI?

2    A.  He was not.

3    Q.  Okay.  Between the time you returned their call and the

4    time that you had the meeting, were you provided with an

5    opportunity to contact a lawyer?

6              MR. QUIGLEY:  Objection, relevance.

7              THE COURT:  Overruled.

8    A.  No.

9    Q.  You had a meeting with the FBI, correct?

10   A.  Correct.

11   Q.  You answered the FBI's questions to the best of your

12   ability, correct?

13   A.  Yes, I did.

14   Q.  You tried to be truthful, correct?

15   A.  Correct.

16   Q.  You tried to be complete, correct?

17   A.  Correct.

18   Q.  They asked you your consent to look at your phone, correct?

19   A.  Correct.

20   Q.  You gave them the consent, correct?

21   A.  Yes.

22   Q.  You gave them your full name and your address, which they

23   already had, but you reconfirmed it for them, correct?

24             MR. QUIGLEY:  Objection to the leading.

25   A.  I believe so.

H1N3GAM5                         Osman - direct

 1              THE COURT:  Sustained.

 2    Q.  What else did the FBI ask you, sir?

 3    A.  At the first meeting?

 4    Q.  Sure.  You know what?  I don't want to -- your Honor --

 5    never mind.

 6              How long was your meeting with the FBI?

 7    A.  It was very, very long.

 8    Q.  Estimate for us.

 9    A.  I believe it was more than two hours.

10    Q.  You didn't take notes, correct?

11    A.  I did not take notes.

12    Q.  Did they take notes?

13    A.  I don't recall.

14    Q.  Is it fair to say they never gave you their notes to

15    review, correct?

16    A.  They never did.

17    Q.  After that meeting with the FBI, did you then in fact get a

18    lawyer?

19    A.  Absolutely.

20    Q.  After you got a lawyer, did you then again meet with the

21    FBI?

22    A.  Yes.

23    Q.  At that second meeting, who was present?

24              MR. QUIGLEY:  Objection.  Asked and answered.

25              THE COURT:  Sustained.

H1N3GAM5                          Osman - direct

1   Q.  Let me just focus you on the second meeting.  Okay.  Let me

2   start with the first meeting.

3          Did you ever tell anybody at the prosecutorial table

4   that Samy El-Goarany told you that he went to Raqqah, Syria?

5   A.  No, I did not talk about it.

6   Q.  You never told them that at the first meeting, correct?

7   A.  Correct.

8   Q.  And you never told them at the second meeting, correct?

9   A.  Correct.

10          MR. QUIGLEY:  Objection to the leading.

11          THE COURT:  Ms. Shroff, do not lead.

12   Q.  What did you tell them?

13   A.  I told them that I believed that he was in Turkey for

14   humanitarian causes.  And when he did call me on the WhatsApp

15   phone call, he told me that he was in a city -- in the city

16   where every gun was pointed at, which was the only implication

17   of Raqqah, but I've never said it.

18   Q.  When was that?

19   A.  That was in July.

20   Q.  July of what year?

21   A.  Or late June.  No, no.  Sorry.  July.

22   Q.  Of what year?

23   A.  Of 2015.

24   Q.  Before that, you had absolutely no indication, correct,

25   that he was in Raqqah, Syria?

H1N3GAM5                          Osman - direct

1    A.  I had no indication.

2              MR. QUIGLEY:  Objection to the leading.

3    Q.  Mr. Osman, have you met with me before?

4    A.  Yes.

5    Q.  Me and who else at the defense table have you met with, do

6    you recall?

7    A.  I recall meeting with Sarah and an investigator.

8    Q.  Do you recall when that was?

9    A.  It was -- I don't recall, but it was -- yeah, I don't

10   recall.

11   Q.  Was your lawyer present?

12   A.  Yes.

13   Q.  Did you meet with me again after that?

14   A.  No.  Well, on the phone, yes.

15   Q.  But you met with me today, right?

16   A.  Yes.

17   Q.  I include today.

18   A.  Yes.

19   Q.  You met with me today, correct?

20   A.  Yes.

21   Q.  When we met today, was your lawyer present?

22   A.  Correct.

23   Q.  Mr. Osman, it's fair to say, right, that at all times you

24   did your very best to tell all of us the truth?

25             MR. QUIGLEY:  Objection, leading.

1            THE COURT:  Don't lead, Ms. Shroff.

2            MS. SHROFF:  I have nothing further, your Honor.

3    Thank you.

4            THE COURT:  Cross-examination.

5    CROSS-EXAMINATION

6    BY MR. QUIGLEY:

7    Q.  Good afternoon, Mr. Osman.

8    A.  Good afternoon.

9    Q.  Just to be clear, between the phone interviews and the

10   in-person interviews, you've met or talked to the defense three

11   times and the government twice.

12           MS. SHROFF:  Objection, misstates facts in evidence.

13           THE COURT:  Overruled.

14   Q.  Let's break that down.  You said you met with Sarah, I

15   think, you said from the defense, right?

16   A.  Yes.

17   Q.  You had additional phone call with Ms. Shroff, correct, or

18   an additional phone call with the defense?

19   A.  With the defense, correct.

20   Q.  And then you met with them again today, correct?

21   A.  Correct.

22   Q.  That's three.

23   A.  Yes.

24   Q.  You met with the government, the FBI, once in July 2015,

25   right?

H1N3GAM5                          Osman - cross

```
 1   A.  Yes.
 2   Q.  And the FBI and the government again in May 2016, right?
 3   A.  Yes.
 4   Q.  So three to two.
 5   A.  Hmm-hmm.
 6   Q.  Okay.  So, you don't know the defendant in this case,
 7   Mr. El-Goarany, right?
 8   A.  I do not.
 9   Q.  Never met him?
10   A.  Never met him.
11   Q.  Never spoken to him?
12   A.  Never spoken to him.
13   Q.  You don't know what went on between him and Samy
14   El-Goarany?
15   A.  I do not.
16   Q.  So let's talk about Samy El-Goarany for a second.  He left
17   the U.S. to join ISIS, right?
18   A.  Yes.
19   Q.  And it's your testimony he didn't tell you he was actually
20   leaving the U.S. in late January 2015, right?
21   A.  Can you repeat the question?
22   Q.  You testified about a conversation that you had with him
23   in --
24   A.  Yes.
25   Q.  -- October of 2014, right?
```

1    A.   Hmm-hmm.

2    Q.   Then you talked to him again, and he said I'm not going

3    overseas, right?

4    A.   Yeah, he told me he wasn't going to go.

5    Q.   You were not aware that he left the U.S. at the end of

6    January 2015?

7    A.   I was not aware.

8    Q.   He didn't give you the flight number of the plane he was

9    flying out on?

10   A.   He did not.

11   Q.   He didn't say anything to you about when he would arrive in

12   Istanbul?

13   A.   He did not.

14   Q.   You didn't actually know when he left?

15   A.   I did not know.

16   Q.   He didn't contact you to tell you he had arrived in Turkey?

17   A.   He did not contact me until later.

18   Q.   In May sometime?

19   A.   Yes.

20   Q.   You didn't put him in touch with anybody in Turkey before

21   he left, right?

22   A.   Never.

23   Q.   He never asked you to reach out to anyone in Turkey for

24   him?

25   A.   Correct.

H1N3GAM5                          Osman – cross

1   Q.  Or Syria?

2   A.  Correct.

3   Q.  He never asked you to translate anything for him while he

4   was in Turkey, right?

5   A.  He did not.

6   Q.  You never directed him to any particular location in Turkey

7   or Syria, correct?

8   A.  Nope.

9   Q.  And during the time after he left the United States, you

10  never told him about the cost of travel to cities near the

11  Turkey and Syria border, correct?

12  A.  I did not.

13  Q.  He didn't tell you in May 2015 that everything was going

14  according to plan, right?

15  A.  I don't believe so, no.

16  Q.  You never asked him about parking a car in his parking lot?

17  A.  No.

18  Q.  You had hundreds, maybe thousands of Facebook

19  communications with him, right?

20  A.  Yes.

21          MS. SHROFF:  What time period, your Honor?

22  Q.  For all time.  You had hundreds, if not thousands, of

23  Facebook communications?

24  A.  Yes.

25          MS. SHROFF:  Objection.

1       THE COURT:  Overruled.

2   Q.  Up to some time in 2015, right?

3   A.  Yes.

4   Q.  In fact, the relationship with him was primarily an online

5   relationship, right?

6   A.  Correct.

7   Q.  You didn't go back and delete your Facebook messages with

8   him, correct?

9   A.  I did not.

10  Q.  As far as you know, he didn't delete all his Facebook

11  messages or any of his Facebook messages with you, correct?

12  A.  Not to my understanding, correct.

13  Q.  You've never told anyone that you had been with the FSA,

14  you were now with Jabhat al Nusra and now you are with the

15  Islamic State?

16  A.  Yeah, never.

17  Q.  You never told anyone, in talking about the situation in

18  Iraq, that jihad was a duty.  You never said that, right?

19  A.  I never said that?

20  Q.  Right.

21  A.  Yeah, I've never said that.

22  Q.  Right.  And you said that Mr. El-Goarany called you and he

23  was very excited in June 2014 when Mosul fell to the Islamic

24  State.  He was happy about that, correct?

25  A.  Correct.

H1N3GAM5                          Osman - cross

1    Q.  You didn't go out and go online and say Allah is great,

2    Mosul falls to the Islamic State?

3    A.  Never.

4    Q.  Just checking.

5         You never posted anything online when ISIS took over

6    some Syrian army units and said that was a great piece of news,

7    and hopefully the expansion of the Islamic State will reach

8    Cairo someday?

9    A.  I never said that.

10   Q.  Not something you would say?

11   A.  No.

12   Q.  Backing up one second.  You met with the FBI twice.  You

13   know a lot of Samy El-Goarany's friends, right?

14   A.  Yes.

15   Q.  Fair to say the FBI talked to many, if not all, of them?

16          MS. SHROFF:  Objection.  How would he know.

17          THE COURT:  If he knows.

18   A.  I have some sort of a clue.

19   Q.  Right.

20   A.  Yes.

21   Q.  You heard from people like Nico and that the FBI had talked

22   to most of Samy's friends, right?

23   A.  Yes.

24   Q.  So, I want to talk about some of Samy's views before he

25   left the United States just briefly.

H1N3GAM5                          Osman - cross

1          You knew he was interested in ISIS before he left the

2   United States, right?

3   A.   I knew he was not directly --

4   Q.   You knew he was interested in ISIS, right?

5   A.   Yes, academically.

6   Q.   Well, he was excited when Mosul fell to ISIS, right?

7   A.   Yes.

8   Q.   You said he called you and he was very excited about that?

9   A.   Yes.

10  Q.   Because it was a significant victory for ISIS, right?

11            MS. SHROFF:  Objection.

12            THE COURT:  Overruled.

13  A.   More like it was a big news story.

14  Q.   Do you recall he told you that he was tired of the Muslim

15  Brotherhood protesting and getting shot?

16  A.   He said that in the WhatsApp call.

17  Q.   When he was in Iraq or Syria, right?

18            MS. SHROFF:  Objection.

19  Q.   He told you at one point that ISIS guys were a little

20  crazy, but at least they were doing something, right?

21  A.   Yes.

22  Q.   That was before he left?

23  A.   Yes.

24  Q.   He would send you, before he left, links to ISIS videos and

25  talks about ISIS, right?

H1N3GAM5                          Osman - cross

1   A.   Hmm-hmm.

2   Q.   He had asked you to -- you've got to answer yes or no.

3   A.   Yes.

4   Q.   He had asked you to translate those for him, right?

5   A.   Yes.

6   Q.   He discussed -- you knew him pretty well, right?  You knew

7   Samy El-Goarany pretty well?

8   A.   Yes.

9   Q.   He never really been outside the United States on his own,

10  correct?

11            MS. SHROFF:   Objection.

12  A.   I'm not aware.

13  Q.   You don't know?

14  A.   Yeah.

15  Q.   Okay.  You knew he didn't speak Arabic?

16  A.   Yeah, he did not speak Arabic fluently.

17  Q.   Sorry?

18  A.   Fluently he did not speak Arabic.

19  Q.   Really at all?

20  A.   Barely, yes.

21  Q.   He knew a few words?

22  A.   Very few.

23  Q.   In fact, sometimes you might make a little fun of his

24  messed up Arabic?

25  A.   Yes.

H1N3GAM5                          Osman - cross

1    Q.  In fact, when he told you in October of 2014 that he was

2    going overseas, you wondered how he would make it in Turkey or

3    Syria without speaking Arabic, correct?

4    A.  Correct.

5              MS. SHROFF:  Objection to the compound questions, your

6    Honor.

7              THE COURT:  Break it down, Mr. Quigley.

8    Q.  So, I want to talk move ahead to those WhatsApp calls you

9    had in July 2015.

10   A.  Okay.

11   Q.  He called you, he called you from, as you said, the city

12   that had every gun pointed at it, correct?

13   A.  Correct.

14   Q.  You understood that to mean he was in Raqqah, Syria?

15             MS. SHROFF:  Objection.  That is not the testimony on

16   direct.

17             THE COURT:  The jury will recall what the testimony

18   was.

19   A.  He said in the WhatsApp call, yes.

20   Q.  So you understood him to be saying he was in Raqqah?

21   A.  I understood it.  Correct.

22   Q.  Do you recall he told you he had help getting to ISIS?

23             MS. SHROFF:  Objection.

24             THE COURT:  Overruled.

25   A.  Yes.

1   Q.  Do you recall that he said he did have help getting to

2   ISIS, right?

3   A.  Yes.

4   Q.  Do you recall he said it will be impossible to get to ISIS

5   without help, right?

6   A.  He did say that.

7   Q.  Do you recall he said that this company will continue to

8   expand?

9   A.  He did use that term, correct.

10  Q.  You understood the term "company" to be a reference to

11  ISIS, correct?

12  A.  Correct.

13  Q.  Do you recall that Samy, even after he joined ISIS, used

14  the term "Daesh" to refer to ISIS?

15  A.  Yes.

16          MR. QUIGLEY:  One moment, your Honor.

17          THE COURT:  Yes.

18          MR. QUIGLEY:  I have nothing further.

19          MS. SHROFF:  May I, your Honor?

20          THE COURT:  You may.

21  REDIRECT EXAMINATION

22  BY MS. SHROFF:

23  Q.  Mr. Osman?

24  A.  Yes.

25  Q.  First time Samy El-Goarany ever said anything that led you

H1N3GAM5                        Osman - redirect

1   to think about Raqqah, Syria was in July of 2015, correct?

2   A.  Correct.

3   Q.  Let's just got slowly, okay, because Mr. Quigley was a

4   little fast.  Where is Istanbul?

5   A.  Istanbul is in Turkey.

6   Q.  Is that where Samy said he was going?

7   A.  Yes.

8   Q.  Would it be common if you had known somebody in Istanbul

9   that you would say "I have a friend in Istanbul, let me

10  introduce you to him"?

11          MR. QUIGLEY:  Objection.

12  A.  Yes.

13          THE COURT:  Objection sustained.

14          MR. QUIGLEY:  Move to strike the answer.

15          THE COURT:  Granted.

16  Q.  Samy was a close friend of yours, correct?

17  A.  Correct.

18  Q.  If you had a friend in a country where he was traveling,

19  would you have hooked them up?

20          MR. QUIGLEY:  Objection.

21  A.  Yes.

22          MR. QUIGLEY:  Speculation.

23          THE COURT:  Overruled.

24  Q.  You would have hooked them up, right?

25  A.  Yeah.

H1N3GAM5                      Osman - redirect

1   Q.  Thank you.  Let me focus also on the time that Samy said

2   that he thought the Muslim Brotherhood was too peaceful.  That

3   was in July of 2015, correct?

4   A.  I believe so, yes.

5   Q.  After he was in ISIS, correct?

6   A.  Yes.

7   Q.  Now, before he was in ISIS, he told you he thought they

8   were a little crazy, correct?

9   A.  ISIS?

10  Q.  Right.

11  A.  Correct.

12  Q.  Right.  Now, is it fair to say, Mr. Osman, that you were a

13  good friend to Samy El-Goarany?

14  A.  Very good friend.

15  Q.  And he lied to you, did he not?

16  A.  He did lie to me.

17  Q.  And he lied to you so well that you believed him, did you

18  not?

19  A.  Yes.

20  Q.  And wasn't Nico a good friend to Samy El-Goarany?

21  A.  Yes.

22  Q.  And he lied to him as well, did he not?

23  A.  Yes.

24  Q.  And both you and Nico believed that he was going there to

25  do humanitarian work, correct?

```
 1              MR. QUIGLEY:  Objection to what Nico believed.
 2              THE COURT:  Sustained.
 3   Q.  You, one of Samy El-Goarany's closest friends, believed
 4   Samy El-Goarany when he said to you he was going to go do
 5   humanitarian work, correct?
 6   A.  Yes.
 7   Q.  He lied, correct?
 8   A.  Yes.
 9   Q.  Successfully, correct?
10   A.  Correct.
11   Q.  And he left you at risk, correct?
12   A.  Correct.
13   Q.  And he left Nico at risk, correct?
14   A.  Correct.
15   Q.  And he left Ali at risk, correct?
16              MR. QUIGLEY:  Objection.
17   A.  Yes.
18   Q.  And the only person he did not leave at risk was his
19   family, correct?
20              MR. QUIGLEY:  Objection.
21   A.  Correct.
22              THE COURT:  Sustained.
23              MR. QUIGLEY:  Move to strike.
24   Q.  Actually let me rephrase.  Did Samy El-Goarany tell you who
25   he wanted to protect?
```

H1N3GAM5                              Osman - recross

```
 1   A.  His family.
 2             MS. SHROFF:  Thank you.  I have nothing further.
 3             MR. QUIGLEY:  Brief recross, your Honor.
 4   RECROSS EXAMINATION
 5   BY MR. QUIGLEY:
 6   Q.  Sir, focusing on that conversation in, I guess it was
 7   October of 2014, where Samy El-Goarany spoke to you about his
 8   desire to go overseas.
 9   A.  Yeah.
10   Q.  It's your testimony that he told you he would be joining
11   some illegal humanitarian organization, correct?
12   A.  He did say that.
13   Q.  Right.  Illegal, right?
14   A.  Illegal.
15   Q.  There's nothing wrong with helping refugees, right?
16             MS. SHROFF:  Objection.  Calls for speculation for
17   him.
18             THE COURT:  Overruled.
19   A.  Correct.
20   Q.  It is a very laudable thing, right?
21   A.  Yes.
22   Q.  And yet, after he told you that he was joining this illegal
23   humanitarian organization, you went up to your room and cried,
24   right?
25   A.  Yes.
```

1   Q.  You were so concerned for weeks -- you were concerned for

2   weeks after that, that Samy El-Goarany might be an FBI

3   informant, correct?

4           MS. SHROFF:  Your Honor, objection.  Outside the

5   scope.

6           THE COURT:  Sustained.

7           MR. QUIGLEY:  I have nothing further, your Honor.

8           MS. SHROFF:  I have one.  Maybe even two.

9   REDIRECT EXAMINATION

10  BY MS. SHROFF:

11  Q.  Mr. Osman.

12  A.  Yes.

13  Q.  Smuggling people out of Syria and crossing them into Turkey

14  would be illegal, correct?

15          MR. QUIGLEY:  Objection.

16          MS. SHROFF:  He opened the door.

17          THE COURT:  If he knows.

18  Q.  You know, right?

19  A.  Yes.

20          MR. QUIGLEY:  Objection.

21  Q.  It would be illegal, correct?

22  A.  Yes.

23  Q.  It would be non-violent, correct?

24  A.  Correct.

25  Q.  And it certainly would be humanitarian, would it not?

H1N3GAM5

1    A.  Yes.

2              MS. SHROFF:  I have nothing further.

3              MR. QUIGLEY:  Very briefly, your Honor.

4    RECROSS EXAMINATION

5    BY MR. QUIGLEY:

6    Q.  Sir, you're not an expert in Syrian law, correct?

7    A.  I am not an expert in Syrian law.

8    Q.  You're not an expert in Turkish law?

9    A.  No.

10   Q.  You're not an American lawyer, correct?

11   A.  I'm not an American lawyer.

12             MR. QUIGLEY:  No further questions.

13   REDIRECT EXAMINATION

14   BY MS. SHROFF:

15   Q.  Mr. Osman, have you traveled?

16   A.  Yes I have.

17   Q.  Is it illegal to smuggle people out of one country and into

18   another?

19   A.  I believe so.

20             MS. SHROFF:  Thank you.

21             THE COURT:  Nothing further.

22             Mr. Osman, you may step down.

23             THE WITNESS:  Thank you.

24             (Witness excused)

25             THE COURT:  Let me talk to the lawyers.

H1N3GAM5

1                    (At the sidebar)

2                    THE COURT:  I take it there is no additional witnesses

3      today?

4                    MS. MIRON:  Correct.

5                    THE COURT:  So I should send the jury home?

6                    MS. SHROFF:  Frankly, I'd like to go home.

7                    THE COURT:  Well --

8                    MR. QUIGLEY:  That's fine with us.

9                    THE COURT:  Let's send them home.  Let me ask about

10     tomorrow.  I take it Mr. March will testify in the morning?

11                   MS. SHROFF:  Yes.

12                   THE COURT:  After that?  Any idea?

13                   MS. SHROFF:  I think we may have one more witness, but

14     we're just not sure.  We're trying to get the witness together.

15     It's not a fact witness.  How about that.

16                   MR. QUIGLEY:  Okay.  Is it an expert witness?

17                   MS. SHROFF:  No.  We might put up a summary witness.

18                   MR. QUIGLEY:  Judge, the only thing we'd ask is, given

19     the uncertainty about the length of tomorrow, there is a

20     chance -- I'm not saying a high chance -- depending what the

21     expert says, the government may put on a very brief rebuttal

22     case.  Given the uncertainty about how many witnesses the

23     defense will call, that we close on Wednesday.

24                   THE COURT:  Let me ask this.  Have you made a decision

25     as to whether or not Mr. El Gammal will be testifying?

H1N3GAM5

1          MS. SHROFF:  We have told the government, your Honor,

2     I told them over the weekend so that they would not work on

3     this unnecessarily, it is my understanding that he's not going

4     to testify.  I did tell them Saturday.  I reiterated on Sunday

5     and I believe I reiterated it to Mr. Quigley this afternoon.

6          THE COURT:  Just --

7          MS. SHROFF:  I'm assuaging their concern.  And that

8     still holds true.  You're welcome to conduct an inquiry if you

9     want.

10          THE COURT:  That's up to the parties if you want me to

11     do that.  So then I'll send them home and we'll talk about

12     whether we stick around.

13          (In open court)

14          THE COURT:  Ladies and gentlemen, that is going to do

15     it for today.  We will meet again tomorrow morning.  Please be

16     in the jury room no later than 9:20.

17          Assuming that the reports are correct, the storm will

18     have passed by then and there shouldn't be any problems with

19     mass transportation.  Obviously we'll be monitoring that

20     situation closely.  Do plan on being here at 9:20.

21          We're still very much on track to finish this week.

22     We may be done with all of the evidence tomorrow.  There is a

23     chance we will not be.  I'm told we are still on track to

24     finish this week over all.  So hopefully, that is some hope to

25     you.  We'll see you tomorrow morning.

H1N3GAM5

1          Please do not discuss the case, please get home

2     safely.

3          (Jury excused)

4          THE COURT:  Let me ask this.  I generally don't put

5     limits on arguments, summations included.  But I do expect that

6     the parties behave reasonably in that regard.  Do we have an

7     idea as to how long these summations will be?

8          MR. QUIGLEY:  Your Honor, we're still working on ours.

9     So could we let you know in the morning?

10          MS. TEKEEI:  Part of it depends on the defense case

11     that they are continuing to put on.  So if we can give an

12     approximate amount, but I can't be completely wedded to that

13     and I don't want to mislead the Court.

14          THE COURT:  I understand.  Is there some outside range

15     that we're working with as we sit here?

16          MS. TEKEEI:  I would say approximately two hours for

17     our summation.

18          MR. HABIB:  Less than an hour, your Honor.

19          THE COURT:  Okay.

20          MS. SHROFF:  Is it two hours for the main and the

21     rebuttal or just the main?

22          THE COURT:  I assume the main.  Mr. Quigley will be

23     giving the rebuttal?

24          MR. QUIGLEY:  That is the current plan, your Honor.

25          THE COURT:  Okay.  With respect to the charge

H1N3GAM5

```
1    conference, we can do it tomorrow I suppose.  I see a lot of
2    heads.
3              MS. SHROFF:  Please.
4              THE COURT:  Let's do it tomorrow.  My fear, although I
5    want to be fair to all sides, is that it's going to be a very
6    short day tomorrow.  Maybe one witness, maybe two.  Certainly
7    one witness, maybe two.  So maybe a half day.  Will we even get
8    to lunch tomorrow if we have just those two witnesses?
9              MS. SHROFF:  Honestly, I told this to the government,
10   we think Dr. March will be short.  Certainly not as long as
11   Mr. Zelin was.  Short.
12             THE COURT:  Okay.  I guess I'm asking these questions
13   because of the government's request that summations take place
14   on Wednesday.  Any objection?
15             MS. SHROFF:  No, your Honor.
16             THE COURT:  So we'll certainly have the charge
17   conference tomorrow.  Anything further?
18             MR. QUIGLEY:  Not from us, thank you, your Honor.
19             MS. MIRON:  Just a minute, your Honor.
20             MR. HABIB:  That's fine, thank you, your Honor.
21             MS. SHROFF:  We were trying to figure out Professor
22   March, but this is fine.  Thank you, your Honor.
23             THE COURT:  Have a good night, folks.
24             (Adjourned until January 24, 2017, at 9:15 a.m.)
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

LE NGUYEN

Direct By Ms. Miron  . . . . . . . . . . . .1387

Cross By Mr. Quigley . . . . . . . . . . . .1396

Redirect By Ms. Miron  . . . . . . . . . . .1400

ANNA ELISE FINKEL

Direct By Ms. Miron  . . . . . . . . . . . .1401

Cross By Mr. DeFilippis  . . . . . . . . . .1411

SHERRY L. DUBROW

Direct By Ms. Shroff . . . . . . . . . . . .1414

Cross By Mr. Defilippis  . . . . . . . . . .1427

MARWAN ABDEL-RAHMAN

Direct By Ms. Mirón  . . . . . . . . . . . .1432

Cross By Ms. Tekeei  . . . . . . . . . . . .1450

KHALAFALLA MOHAMMED OSMAN

Direct By Ms. Shroff . . . . . . . . . . . .1474

Cross By Mr. Quigley . . . . . . . . . . . .1518

Redirect By Ms. Shroff . . . . . . . . . . .1527

Recross By Mr. Quigley . . . . . . . . . . .1531

Redirect By Ms. Shroff . . . . . . . . . . .1532

Recross By Mr. Quigley . . . . . . . . . . .1533

1  Redirect By Ms. Shroff . . . . . . . . . . . .1533

2                        DEFENDANT EXHIBITS

3  Exhibit No.                                  Received

4   304   . . . . . . . . . . . . . . . . . .1403

5   300-BB   . . . . . . . . . . . . . . . .1404

6   300-CC   . . . . . . . . . . . . . . . .1407

7   300-DD   . . . . . . . . . . . . . . . .1408

8   200   . . . . . . . . . . . . . . . . . .1410

9   806   . . . . . . . . . . . . . . . . . .1419

10  100-DD-T   . . . . . . . . . . . . . . .1440

11  120-A-T   . . . . . . . . . . . . . . . .1441

12  400   . . . . . . . . . . . . . . . . . .1444

13

14

15

16

17

18

19

20

21

22

23

24

25