H1o5gam1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        15 Cr. 588 (ER)

AHMED MOHAMMED EL GAMMAL,

              Defendant.

------------------------------x

                                      New York, N.Y.
                                      January 24, 2017
                                      9:20 a.m.


Before:

                    HON. EDGARDO RAMOS,

                                      District Judge


                       APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  SABRINA SHROFF
     ANNALISA MIRÓN
     DANIEL G. HABIB
```

H1o5gam1

```
 1              (Trial resumed;

 2         THE COURT:  Okay, folks.  I only got a proposed

 3    verdict sheet from the government.  It looks like what I would

 4    have put together if it were me but if you guys have any

 5    comments, let me know.  And, I have also have had handed to you

 6    folks my proposed jury charge on the First Amendment issue.

 7              Is there anything that the parties wish to raise with

 8    me before we bring out the jury?  Is Professor March here?

 9         MS. MIRÓN:  Yes.

10         THE COURT:  Welcome, sir.

11         MR. QUIGLEY:  Your Honor, we have one issue to raise.

12         THE COURT:  I'm sorry?

13         MR. QUIGLEY:  We do have one issue to raise.

14         THE COURT:  Okay.

15         MR. QUIGLEY:  We just got handed a translation by

16    Ms. Shroff that she intends to admit.  Apparently this was

17    something the government had produced earlier in the case when

18    it was a draft translation but we don't -- I mean, this is an

19    Arabic language document, it refers to -- so, we don't think

20    it's -- I mean they've already called their translator so if

21    there is an issue with the translation; and number two, it is

22    also coming in, it is a hearsay document because it is a

23    message to Attiya from somebody.  It says the International

24    Union -- I can hand it up but International Union of Muslim

25    Scholars sends their highest regards --
```

H1o5gam1

1          THE COURT:  Slow down, please.

2          MR. QUIGLEY:  Sorry.

3          As per your request, we are pleased to inform you that

4     you have been accepted in the Union and we ask God, to whom we

5     ascribe all perfection and majesty, to grant you success as an

6     active member.

7          So, it is coming in for the truth of the matter

8     asserted that Attiya has been accepted into the International

9     Union of Muslim Scholars and I also think --

10          THE COURT:  What is that?

11          MR. QUIGLEY:  I have no idea.  That's part of the

12     issue, your Honor.  This was also not -- if they're going to

13     have Mr. March testify about this, this was not in their expert

14     disclosure.  Given the translation, hearsay issue, and given

15     the fact that this is not something they put in expert

16     disclosures, we don't think it should be admissible.

17          I am happy to hand it up.

18          THE COURT:  Ms. Shroff?

19          MS. SHROFF:  Your Honor --

20          THE COURT:  Mr. Habib?

21          MS. SHROFF:  It is a document that was produced to us

22     by the government.  The translation is also by the government.

23     We are happy to have the government put in a refreshed -- I

24     don't know, modified, a more polished translation.  The

25     translation is not an issue for us.  It is a document that

H1o5gam1

1   Dr. March reviewed and it forms his expert opinion on this

2   case.  It is also -- it is an honorific given to someone.  It

3   is a certificate, no different than any honorific given to

4   anyone else.

5            THE COURT:  So, address the hearsay issue then.

6            MS. SHROFF:  Okay.  Just give me one second.

7            MR. QUIGLEY:  Do you want my copy, your Honor?

8            THE COURT:  Sure.

9            MS. SHROFF:  Your Honor, there is one of the documents

10   that Dr. March was shown.  It is one of the documents on which

11   his expert testimony was based and we are entitled to examine

12   him on that point.

13            MR. HABIB:  And I think, your Honor, pursuant to Rule

14   703, Dr. March can base his opinion on facts that he has been

15   made aware of, they need not be --

16            Your Honor, under Rule 703 an expert may base an

17   opinion on the facts that the expert has been made aware of.

18   If the experts in A particular field would reasonably rely on

19   those facts in forming an opinion they need not be admissible

20   for the opinion to be admitted.  If the facts would otherwise

21   be inadmissible, proponent may disclose them to the jury only

22   if their probative value helping the jury evaluate the opinion

23   substantially outweighs their prejudicial effect.

24            So, I think that even assuming that the government is

25   correct in that the material is not offered for its truth and

H1o5gam1

1      it does not satisfy the hearsay exception, under 703 it is

2      proper in that it forms a part of the basis for Dr. March's

3      opinion.  I don't detect any prejudice to the government in

4      presentation of this information and its probative value as to

5      who Mr. Aboualala is; it will assist the jury in evaluating

6      Dr. March's opinion testimony.

7                  THE COURT:  That all, obviously, is correct since I

8      was reading along with you but it raises the question, what

9      opinion did Dr. March reach as a result of reviewing this

10     document?

11                 MS. SHROFF:  Your Honor, I have asked Dr. March to

12     step out.

13                 What opinion did Dr. March reach?  Is that the Court's

14     question?

15                 THE COURT:  Yes.  What is he going to say about it?

16     How did this document inform his opinion?

17                 MS. SHROFF:  It informed his opinion as to whether or

18     not Mr. Attiya Aboualala was in fact and is in fact still part

19     of the Muslim Brotherhood and recognized as a scholar in the

20     Muslim Brotherhood.

21                 MR. QUIGLEY:  Your Honor, then we would object on

22     expert notice grounds because this is the last day of trial.

23     This person was retained in December sometime.  We had two

24     rounds of briefing on the expert notice.  This was not -- this

25     is late, late notice at the end of the defense case.  Nothing

H1o5gam1

1     about in their notice -- I mean, I am happy to hand up their

2     supplemental notice.  Again, nothing in their notice says

3     anything.  There are some general comments about whether Attiya

4     was -- sorry, some general comments about the background on the

5     Muslim Brotherhood but then there is nothing at all remotely

6     talking about Attiya in the Muslim Brotherhood, the

7     International Association of Muslim Scholars or anything like

8     that.  And I also think this testimony would run close to Rule

9     704 which, although Attiya is not on trial here, prevents an

10    expert from opining on the mental state in a criminal case.

11              THE COURT:  Yes.  I'm not going to let it in.  So.

12              MR. QUIGLEY:  Thank you, your Honor.

13              THE COURT:  The objection is sustained.

14              MS. SHROFF:  Your Honor, may I just flesh out, because

15    I don't want to have him on the witness stand -- I want to

16    understand.  We gave the government ample notice that Dr. March

17    was testifying about the Muslim Brotherhood.  We supplemented

18    over and over again to make sure that was clear because their

19    expert notice did not cover Muslim Brotherhood and even then

20    they had leeway to elicit testimony about the Muslim

21    Brotherhood from Mr. Zelin.  We are not seeking, here, to

22    introduce testimony that is any surprise to Mr. Quigley.  The

23    entire case has been about whether or not Attiya Aboualala was

24    in fact openly and notoriously a member of the Muslim

25    Brotherhood.

1           THE COURT:  That's what this trial has been about?

2           MS. SHROFF:  It seems to be.  They have introduced

3     chat after chat, your Honor, including in their summary

4     exhibit, about whether or not Attiya and Mr. El-Gammal had

5     exchanges about whether or not he supported the Islamic State.

6     Mr. Quigley introduced evidence that said -- that tried to

7     convince the jury that Mr. El-Gammal and his co-conspirator

8     Mr. Attiya Aboualala in fact were pro-ISIS.  That's been their

9     whole theory.  If you look at their summary chart which

10    includes documents where they're saying: *I'm going to join the*

11    *State; the State is good; I may have to go join the State,* they

12    introduced that.  They introduced that into evidence.  Are they

13    going to stand up in summation and say Attiya is Muslim

14    Brotherhood?  No, they're not.  Are they going to say Attiya

15    and Mr. El-Gammal exchanged videos about ISIS?  Yes.  Had

16    conversations about ISIS?  Yes.  Supported ISIS?  Yes.

17          That's what their theory is.

18          THE COURT:  Mr. Quigley?

19          MR. QUIGLEY:  Your Honor, I completely disagree,

20    number one, on what the trial has been about.  That's been a --

21    but, moreover they have had notice after notice.  They had one

22    notice in which they attached Mr. March's resume.  They said he

23    would opine about the ideology of the Muslim Brotherhood and

24    then, in their supplemental notice, which was filed four days

25    before the start of trial they said, they talk about the Arab

H1o5gam1

1    Spring, they talk about some of the history of the Muslim

2    Brotherhood, it is bylaws, the Rabaa Square protests.

3          THE COURT:  I am not allowing it in on the basis of

4    late notice.

5          MS. SHROFF:  Your Honor, could I just direct --

6          THE COURT:  No.  The jury is here.  I will let you

7    make your record later.

8          (Pause)

9          MS. SHROFF:  Your Honor, the record should reflect --

10         THE DEPUTY CLERK:  All rise.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.  The

3    storm, apparently, has passed.  We are continuing now with the

4    defense case.

5            Will the defense please call your next witness?

6            MS. SHROFF:  The defense calls Dr. Andrew March.

7    ANDREW MARCH,

8         called as a witness by the Defendant,

9         having been duly sworn, testified as follows:

10            THE COURT:  Sir, you may be seated.  Please begin by

11   stating your full name and spelling your last name for the

12   record.

13            THE WITNESS:  My name is Andrew March.  M-A-R-C-H.

14            THE COURT:  Ms. Shroff?

15            MS. SHROFF:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MS. SHROFF:

18   Q.  Good morning, Dr. March.

19   A.  Good morning.

20   Q.  Dr. March, could you tell the jury where you work?

21   A.  I'm an associate professor of political science and an

22   associate professor adjunct at Yale university.

23   Q.  And what is Yale University?

24   A.  Yale University is a very prestigious University about two

25   hours up the road on the MetroNorth in New Haven, Connecticut.

H1o5gam1                    March - direct

1   Q.  And how long have you been an associate professor at Yale?

2   A.  About six years, and I have been there nine years in total.

3   Q.  And prior to the six years, what did you do at Yale?

4   A.  I was an assistant professor.

5   Q.  At Yale?

6   A.  Yes.

7   Q.  And prior to working at Yale, where did you work?

8   A.  I was at Michigan State University.

9   Q.  Now, let me back track a bit, if I may, and ask you where

10  did you attend school?

11  A.  I went to high school in -- near Portland, Maine.  I was

12  and undergraduate at University of Pennsylvania and then I did

13  my graduate work at Oxford University in the UK.

14  Q.  Dr. March, I am going to ask you, for the court reporter,

15  to speak a little more slowly if you may.  Okay?

16          Now, did you write your Ph.D?

17  A.  Yes.

18  Q.  And what was your Ph.D -- a Ph.D is a doctorate?

19  A.  Yes, ma'am.

20  Q.  What did you write your doctorate in?

21  A.  My doctorate was in political science and the topic of my

22  dissertation was on Islamic legal thought pertaining to Muslims

23  living in non-Muslim countries.

24  Q.  And did your dissertation receive any honors, Dr. March?

25  A.  Yes.  The dissertation won an award from the American

H1o5gam1                    March - direct

1    Political Science Association and then the published book won

2    an award from the American Academy of Religion.

3    Q.  And, since your employment at Michigan and then later at

4    Yale, did you write articles that were reviewed by your peers?

5    A.  Yes.  I published, I think, roughly 20 peer-reviewed

6    articles.

7    Q.  And have you published articles on the Muslim Brotherhood?

8    A.  I have published articles on the thought of thinkers who

9    are associated with or friendly to the Muslim Brotherhood, as

10   well as to other kinds of Islamist political thought.

11   Q.  What other kinds of Islamist political thought have you

12   written on?

13   A.  I have written on the political thought of ISIS and their

14   legal system and their relationship to the thought of other

15   groups like the Muslim Brotherhood.

16   Q.  And the jury has heard some testimony about peer-to-peer

17   articles but essentially, in two lines or less, could you

18   refresh their memory?

19   A.  If you publish a peer-reviewed article it is an article

20   that has been submitted to a journal or a press and then the

21   press asks somewhere between three and five people that don't

22   know who the author of the piece, to review it and see if it is

23   worthy of publication.

24   Q.  Now, Dr. March, have you written any books?

25   A.  Yes.  I have written one book.

1    Q.  And what is the title of that book?

2    A.  Islam and Liberal Citizenship.

3    Q.  And are you in the process of writing another book right

4    now?

5    A.  Yes.  I have a book under contract that is probably two

6    thirds complete, and it is on modern doctrines of sovereignty

7    and democracy in Islamic thought with particular focus on the

8    thought of thinkers who have been influential in the Muslim

9    Brotherhood.

10   Q.  And who are you under contract with to publish that book?

11   A.  Harvard University Press.

12   Q.  Now, Dr. March, have you studied the Arabic language?

13   A.  Yes.

14   Q.  And are you fluent in it?

15   A.  I wouldn't claim full fluency.  I read Arabic texts related

16   to political and legal thought at a very high level of

17   proficiency.

18   Q.  So, is it fair to say you are not a native speaker but you

19   read the language?

20   A.  That's correct.

21   Q.  And you are not a native speaker but you speak the

22   language?

23   A.  I speak it less than I read it but I speak various dialects

24   with pretty good proficiency.

25   Q.  And what are the dialects?

H1o5gam1                          March - direct

1    A.  I spent some time in Syria, I have spent some time in

2    Jordan, Egypt, and so with those dialects I have a high degree

3    of comfort, as well as modern standard Arabic.

4    Q.  And, do you speak any other languages other than Arabic and

5    of course English, in which you are testifying?

6    A.  Yes.

7    Q.  And what other languages do you speak?

8    A.  I speak a view Slavic languages; Slovak, Russian,

9    Serbo-Croatian, some Spanish.

10   Q.  Let me hand to you what is marked as Defendant's Exhibit A.

11   Do you recognize that document, Dr. March?

12   A.  Yes.

13   Q.  Could you tell me what that document is?

14   A.  This is my resume or CV.

15           MS. SHROFF:  Your Honor, we would ask that Dr. March's

16   resume be received into evidence as Defendant's Exhibit A.

17           MR. QUIGLEY:  Objection.  Hearsay, cumulative.

18           THE COURT:  Sustained.

19   BY MS. SHROFF:

20   Q.  Now, Dr. March, have you been qualified as an expert

21   before?

22   A.  Yes.

23   Q.  And when was that?

24   A.  That was, I believe in 2010 in the case of U.S. versus

25   Tarek Mehanna.

1   Q.  And where was that?

2   A.  That was Boston, Massachusetts.

3            MS. SHROFF:  Your Honor, at this time I would ask the

4   Court to recognize Dr. March as an expert in modern Islamic

5   political and legal thought, and modern Islamist and jihadi

6   movements.

7            MR. QUIGLEY:  No objection.

8            THE COURT:  Very well.  His testimony will be received

9   as expert testimony in those areas.

10  BY MS. SHROFF:

11  Q.  Now, Dr. March, could you explain to the jury the phrase

12  "Islamist movement"?

13  A.  Sure.

14           Islamist movement is a very general term to refer to

15  groups or movements that, one, the Islamic religion as they

16  understand it, to have a very strong role in government,

17  politics, and organizing society.

18  Q.  And through what means would they organize a society?

19  A.  So, Islamist movements by and large are used to refer to

20  groups that either are organized into political parties that

21  compete in democratic elections or that organize themselves

22  through various kinds of social organizations, charity

23  organizations, or educational organizations.

24  Q.  And could you give the jury an example of a group that

25  would fit within the Islamist movement?

1   A.  So, the Egyptian Muslim Brotherhood is the oldest Islamist

2   organization in the modern Middle East and is, by and large,

3   considered to be the best example of that kind of movement.

4   Q.  And has the Muslim Brotherhood in Egypt then spawned other

5   Muslim Brotherhood movements in other countries?

6   A.  Yes.  The Egyptian Muslim Brotherhood is the inspiration

7   for a kind of global movement that has branches in many

8   countries and has some organizational connection to the

9   Egyptian Muslim Brotherhood but are very often independent from

10   it in terms of its own leadership.

11   Q.  And could you give the jury an example of some countries

12   that have -- where the Muslim Brotherhood has a presence?

13   A.  Well, Syria traditionally had a fairly strong Muslim

14   Brotherhood presence until it was destroyed and kicked out in

15   the early 1980s.  There are wings or parties that claim some

16   kind of affinity with the Muslim Brotherhood in Kuwait, in

17   Jordan, in Palestine, in Tunisia, in Morocco.  Most countries

18   that have a strong Sunni Muslim population have some movement

19   that is inspired by the Muslim Brotherhood.

20   Q.  And, did there come a time when the Muslim Brotherhood in

21   Egypt or the members of the Muslim Brotherhood in Egypt were at

22   fear of persecution in Egypt?

23            MR. QUIGLEY:  Objection.

24            THE COURT:  Overruled.

25   A.  For the vast majority of their history, the Muslim

1    Brotherhood has been first of all illegal, so membership in it

2    in Egypt, according to Egyptian law is illegal.  And so many of

3    the leadership of the Muslim Brotherhood have spent decades in

4    prison and have had to organize themselves through other kinds

5    of charitable or business or educational organizations.

6    Q.  Is one of the countries that Muslim Brotherhood in Egypt

7    emigrated to Turkey?

8    A.  Yes.

9    Q.  Is that true for the time period of 2014, 2015, 2016, and

10   even to this day?

11   A.  Yes.

12   Q.  Now, could you please explain to the jury what the phrase

13   "jihadi movement" means?

14   A.  So, I am sure the jury has heard testimony about the

15   meaning of the word jihad which can mean struggle or fighting

16   in Arabic but very often is associated with militant or violent

17   forms of struggle or fighting.  And so, jihadi movements have

18   just become a way of referring to groups that primarily seek to

19   advance their aims through violence as opposed to democratic

20   participation.

21   Q.  Now, could you give the jury, please, an example of an

22   organization, perhaps more than one, that would fit within the

23   phrase "a jihadi movement"?

24   A.  So, al Qaeda and ISIS are two of the best known

25   organizations that are referred to as jihadi movements.

H1o5gam1                    March - direct

1  Q.  And would it be fair to say that you would not characterize

2  the Muslim Brotherhood as a jihadi movement?

3  A.  Not in its present organization, no.

4  Q.  How about in the organization in 2014 and 2015?

5  A.  No.

6  Q.  Now, not to be repetitive, but could you just tell the jury

7  briefly what the differences are between a group that is an

8  Islamist movement and a group that is a jihadi movement?

9  A.  So, Islamist movements, that's a broad category to refer to

10 groups that seek to have Islam as the guiding ideology of a

11 society and they, by and large, seek to advance their aims

12 through peaceful and very often through electoral means.

13        Jihadi groups tend to be organizations that see all

14 other non-extreme Islamist or jihadi groups as worth working

15 with at all and usually see them as objects -- legitimate

16 objects of violence.

17 Q.  Would it be fair to say then that the Islamist movement is

18 more theoretical and more intellectual than a jihadi movement?

19 A.  It is possible to generalize in that way, although I think

20 it is important to remember that jihadi movements also have

21 their own ideologs and doctrinal expressions.

22 Q.  And would ISIS be any different or would ISIS also have its

23 own ideology and its own doctrinal rituals?

24 A.  ISIS has a lots of its own doctrine and propaganda and

25 legal justifications for its behavior.

H1o5gam1                          March - direct

Q.  We will get to that in a minute but let's just focus,

Dr. March, if we can, on the Muslim Brotherhood.

        Could you give the jury a very succinct background on

the Muslim Brotherhood in Egypt during the time period of 2014

and 2015?

A.  Would it be okay to start a little bit before that in 2011?

Q.  Sure.

A.  So, as is well known in January and February of 2011, there

were movements in many countries of the Middle East that is

often referred to as the Arab Spring.  These were broad-based

popular demonstrations that sought the removal of long-standing

dictators and they were successful, particularly in Egypt and

in Tunisia, where the long-standing dictators of those

countries were forced to be removed from power.

        After that, in Egypt and Tunisia there were elections

that were -- the first free and fair elections in those

countries since their independence.  In Egypt, the Muslim

Brotherhood or the party that the Muslim Brotherhood formed out

of its membership won a series of elections to parliament, to

the assembly that wrote the Constitution, and then eventually

for the presidency.  So, between 2011 and 2013 the political

wing of the Muslim Brotherhood won a series of elections, won

the presidency, and was by and large in charge of the electoral

side of the government.

        In the summer of 2013, after a series of political

1    disappointments and popular disapproval of the Brotherhood, the

2    Egyptian Army stepped in, removed the Brotherhood from power,

3    arrested the president of the country and almost all of the

4    brotherhood's top leadership and jailed tens of thousands of

5    its members and killed hundreds of its members in August of

6    2014 -- excuse me, 2013.

7    Q.  Now, you said -- and I hate to correct my own expert,

8    but --

9    A.  Yes.

10   Q.   -- you said that the military stepped in?

11   A.  Yes.

12   Q.  Did it step in in any way that was less than horrific,

13   correct?

14           MR. QUIGLEY:  Objection.

15           THE COURT:  Sustained as to the form.

16           Rephrase, Ms. Shroff.  Rephrase it.

17           MS. SHROFF:  Sure.

18   BY MS. SHROFF:

19   Q.  Could you explain to the jury what you meant by "the

20   military stepped in"?

21   A.  So, the military, after a number of days of popular

22   demonstrations, used force to arrest the president and arrest

23   hundreds of members of the top leadership of the Muslim

24   Brotherhood.  In response to this --

25   Q.  Let me just stop you there.

H1o5gam1                         March - direct

1    A.   Yes.

2    Q.   What do you mean by when you say used force?

3    A.   They used tanks, that used guns, they used various sorts of

4    aggressive physical force to remove them from power and put

5    them in jail.

6    Q.   And when you say the President of Egypt at that time --

7    A.   Mohammed Morsi, who is a long-standing top leader of the

8    Muslim Brotherhood.

9    Q.   And who did they put in his place?

10   A.   So, the person that stepped in and has been leading Egypt

11   since then was the defense minister and head of the Army, goes

12   by the last name Sisi.

13   Q.   And just staying with this time period, when you spoke

14   about hundreds of people being killed, were they killed in one

15   particular area that has now become famous?

16   A.   Yes.

17             So, in response to the coup, Muslim Brotherhood

18   organized peaceful -- by and large peaceful demonstrations in a

19   square that -- that congregated in a square of Egypt known as

20   Rabaa Square and remained there for a lengthy period of time

21   until it was violently cleared by -- I think it was a

22   combination of the police and the military; and I believe up to

23   800 people died just during the clearing of the square.

24   Q.   And could you tell the jury, please, if you know, from what

25   parts of the world people came to show support for the

1    democratically-elected Egyptian government during that time?

2    A.  It was a very, very popular site of protest and it was

3    relatively open so people could have traveled to Egypt during

4    that time with some risk but not necessarily impossibly to join

5    these protests and lend support.

6    Q.  And would it be fair to -- actually, you know what?  Let me

7    ask you more open-endedly.

8         Was Rabaa Square covered by journalists?

9    A.  Yes.  Quite extensively.

10   Q.  And were there Egyptian journalists covering Rabaa Square?

11   A.  Yes.

12   Q.  Foreign correspondents covering Rabaa Square?

13   A.  Yes.

14   Q.  And of course American correspondents covering Rabaa

15   Square?

16   A.  Yes.

17   Q.  And is it fair to say that the massacre at Rabaa Square was

18   particularly painful to the people of Egypt?

19        MR. QUIGLEY:  Objection to the leading.

20        THE COURT:  Sustained.

21   Q.  To whom was the Rabaa Square massacre particularly painful?

22        MR. QUIGLEY:  Same objection.

23        THE COURT:  Overruled.

24   A.  The massacre was an enormously traumatic experience for

25   Egyptian people who, up to that point, had seen two or more

H1o5gam1                        March - direct

1    years of democratic transformation only to see hundreds and

2    hundreds of their fellow citizens massacred.

3    Q.  Now, after the military took power and Sisi was in place,

4    what was the state of affairs of the Muslim Brotherhood members

5    in Egypt?

6    A.  The Muslim Brotherhood membership was completely persecuted

7    in Egypt.  The Muslim Brotherhood had -- was declared a

8    terrorist group by the Egyptian government.  There were massive

9    show trials in which hundreds of people would be prosecuted and

10   found guilty all at once for acts that perhaps one or two

11   people had participated in.  And so, I think at some point

12   various international human rights organizations reported up to

13   30,000 people were in jail at some point since the July 2014

14   coup.  So, to be an activist or a member of the Muslim

15   Brotherhood during this period since 2013 has been extremely

16   dangerous within Egypt.

17   Q.  And were journalists included in the people prosecuted at

18   that time?

19   A.  Yes.  There were a number of high profile cases in which

20   international, not even Egyptian journalists were held in

21   prison for a number of years simply for covering the Muslim

22   Brotherhood and purportedly being sympathetic to them.

23   Q.  And as a result of the coup, was there an impact on

24   migration of Muslim Brotherhood members out of Egypt?

25   A.  Yes.  Many Muslim Brotherhood members, in order to survive

1  or to avoid being arrested, had to flee the country.

2  Q.  And what was the most popular country they fled to?

3  A.  I believe that the most popular single country was Turkey,

4  although a number of European countries were also popular.

5  Q.  Now, as a result of Rabaa Square, Dr. March, did they

6  develop or even prior to that, a physical hand symbol for the

7  Muslim Brotherhood?

8  A.  Well, not for the Muslim Brotherhood but for the Rabaa

9  massacre.

10          So, Rabaa is related to the word for "four" in Arabic

11  and so it was actually, it was the name of a woman, sort of

12  like a saintly, holy woman a long time ago but it also meant

13  the word "four."  So, in order to symbolize sympathy with the

14  victims of the Rabaa massacre, it was very common to hold up

15  the four fingers symbol.

16  Q.  So, if somebody was sitting in a restaurant or in a movie

17  theater or a park and held up these fingers --

18  A.  It could be very dangerous.

19  Q.  Okay, but what would it also tell the person receiving the

20  symbol?

21  A.  That they share a sympathy for the victims of the Rabaa

22  massacre.

23  Q.  Now, what does the word ikhwan mean?

24  A.  Ikhwan is the plural word for "brother" or "brotherhood" in

25  Arabic.

H1o5gam1                              March - direct

1    Q.  Now, let me just shift to another group and that is the

2    group that is called Dawla al Islamiyya.  Could you tell the

3    jury what Dawla al Islamiyya is?

4    A.  So, the word Dawla al Islamiyya simply means these Islamic

5    states and it is the name that what we, in English, often refer

6    to as ISIS or ISIL.  It refers to itself simply as the Islamic

7    State because they regard themselves as the only legitimate

8    Islamic State in the world.

9    Q.  Now, what are the basic beliefs of the Islamic State?

10   A.  So, the Islamic State has a series of political and legal

11   justifications for its own existence and it also has an

12   official interpretation of Islamic theology or creed that it

13   seeks to impose on everybody who lives within its own

14   territory.  Would you like me to focus on one or either of

15   those?

16   Q.  Sure.  You can tell the jury, but very briefly --

17   A.  Yes.

18   Q.  -- what the belief system is of the Islamic State

19   vis-a-vis other groups.  Why don't we start there so that you

20   are more directed.

21   A.  Right.

22        So the Islamic State, as I said, regards itself as the

23   only legitimate Islamic State on earth.  It claims, since 2014,

24   to have reestablished something called the caliphate which is

25   the supreme political authority for all Muslims on the planet.

1    So, they feel because they liberated territory in Iraq and

2    Syria as they understand it and that they have the only

3    righteous leadership of Muslims on the planet, that they are

4    entitled to declare themselves the global leadership for all

5    Muslims and anybody that rejects that claim is potentially even

6    no longer a Muslim because they're rejecting a basic aspect of

7    theology and loyalty to the Muslim community.

8    Q.   So how would ISIS regard al Qaeda, for example?

9    A.   ISIS and al Qaeda were actually at war for a significant

10   period of time in that period between late 2013 and 2014 or

11   2015.  So, they regard al Qaeda as not sufficiently dedicated

12   to the project of recreating an Islamic State.

13   Q.   And how about ISIS' view of the Muslim Brotherhood?

14   A.   ISIS has actually declared the Muslim Brotherhood to be

15   non-Muslims so they have declared them to be an Arabic *murtad*,

16   which means apostates or no longer part of the Muslim

17   community, which mean that they regard them as legitimate for

18   killing without a trial.

19   Q.   Now, Dr. March, are you familiar with a document that is

20   called Dabiq?

21   A.   Yes.

22   Q.   And what is Dabiq, by the way?

23   A.   Dabiq is a town in -- it is a small town in Syria in the

24   northwest part of Syria, and there was a famous prophecy that

25   the final battle between good and evil, sort of the apocalypse

1   will happen when the armies of Islam face off against the

2   armies of the anti-Christ in this small town in Syria, of all

3   places.

4   Q.  Has ISIS adopted the word "Dabiq"?

5   A.  Yes.  ISIS actually seized control of this town and so when

6   they began to issue their English language glossy PDF magazine,

7   they named it after this to symbolize their belief that they

8   were bringing about a prophecy of returning the Muslim

9   community to righteous leadership.

10  Q.  And, did ISIS have an opinion as to the Muslim Brotherhood

11  that they published in Dabiq?

12  A.  Yes, they did.  They published a large, sort of a cover

13  story in which they even, after the massacre, that they

14  referred to the Muslim Brotherhood as apostates and not part of

15  the Muslim communities.

16  Q.  Was there a particular disease that referred to the Muslim

17  Brotherhood by?

18  A.  Possibly, but I don't remember at the moment.

19        MS. SHROFF:  Your Honor, may I refresh Dr. March's

20  recollection?

21        THE COURT:  You may.

22        MS. SHROFF:  Thank you.

23  Q.  You know what?  I will come back to the question because

24  the article is somewhat dense, but could you just take a look

25  at the top page of that magazine, please?

1  A.  Yes.

2  Q.  And, do you recognize the top page?

3  A.  Yes, I do.

4  Q.  And do you recognize that to be a magazine published by the

5  Islamic State?

6  A.  Yes.  This is Dabiq, their main English language

7  publication.

8  Q.  And let's just stay with that for a minute, even though it

9  is a little bit out of my order.

10             Was that magazine prepared by the Islamic State?

11  A.  Yes.

12  Q.  And did they -- by "they" I mean the Islamic State -- put

13  out magazines in different languages?

14  A.  Yes.

15  Q.  And fair to say that Dabiq is their English version,

16  correct?

17  A.  That's correct.

18  Q.  And it is a recruitment tool; is that right?

19  A.  Recruitment, propaganda, yes.

20  Q.  And could you tell the jury if they put out the magazine in

21  different languages?

22  A.  So I think they have different ones in different -- with

23  different titles, so there was a Russian language one that I

24  believe is called Constantinople but I could be wrong about

25  that; they have an Italian language one; they have a French

1  language one; of course they have Arabic language.  So, they

2  all have slightly different titles.

3  Q.  And what do you think, as an expert, is the point of the

4  Islamic State when they publish these magazines in different

5  languages?

6  A.  There is a couple of points.

7      One, they want to project to the global Muslim

8  community that they are thriving, that they are expanding, that

9  they are strong, that that's the center of action, that's where

10  it's all happening.  They also want to make it seem appealing,

11  they also want to make it seem like a place where young Muslims

12  who might want to experience the glory of fighting for their

13  religion will experience that sort of success and glory and

14  they want to give information about what the Islamic State sees

15  as the basis of its own success in fighting back against its

16  enemies.

17  Q.  Is it also a recruitment tool for ISIS?

18  A.  Yes.  They explicitly call for people to join them, to

19  engage in what is sometimes referred to as hijrah or migration

20  to the Islamic State.

21  Q.  And it is available online, correct?

22  A.  Yes.

23  Q.  In fact, have you ever heard of a website called

24  jihadology.net?

25  A.  Yes, I have.

H1o5gam1                         March - direct

1    Q.   Is it available on jihadology.net?

2    A.   Yes.  This is frequently available there.

3    Q.   Let me show you another document off the jihadology.net

4    website which is called Hijrah to the Islamic State.  It is

5    marked Defendant's Exhibit 704.  Do you recognize that

6    document, Dr. March?

7    A.   Yes, I do.

8              MS. SHROFF:  Your Honor, at this time we move

9    Defendant's Exhibit 704 in evidence.

10             MR. QUIGLEY:  Objection.  Hearsay.

11             MS. SHROFF:  Your Honor, may we approach?

12             THE COURT:  Yes.

13             MS. SHROFF:  Thank you.

14

15

16

17

18

19

20

21

22

23

24

25

1       (At side bar)

2       THE COURT:  First tell me what is being offered.

3       MS. SHROFF:  It is an article that is put out -- it

4   was an exhibit in the Pugh trial that Mr. Quigley provided

5   notice of.

6       MS. TEKEEI:  It's not --

7       THE COURT:  Sorry.  Tell me what it is.

8       MS. SHROFF:  Sure.

9       It is an article put out by the Islamic State, it is

10  like a magazine, it is a guide by the Islamic State telling

11  people here is how you get to us.  These are the --

12      MR. HABIB:  The Court may recall that the government's

13  expert, Mr. Zelin, was questioned about this, this very

14  document, and agreed that it was issued by the Islamic State

15  for the purpose of providing guidance to individuals in the

16  west as to how they would make hijrah or a migration to the

17  Islamic state.

18      MR. QUIGLEY:  Your Honor, it is a 49-page document.

19  It contains numerous pieces of hearsay about different fighters

20  recounting how they got to Syria and Turkey.  It's not -- it

21  shouldn't be admitted.  It contains Twitter accounts of

22  people --

23      MS. SHROFF:  Exactly.

24      MR. QUIGLEY:  -- closely associated with the Islamic

25  State.  This is coming in for the truth of the matter asserted.

1    These are Twitter accounts of people associated with the State.

2    This is some guy, some person's --

3           MS. SHROFF:  Some person.

4           MR. QUIGLEY:  Sorry, a British jihadist.

5           MS. SHROFF:  Ah.

6           MR. QUIGLEY:  -- five page account of how he got

7    there.  There is all coming in for the truth of the matter

8    asserted and it is actually how he got over there.

9           MS. TEKEEI:  And there is no evidence that anyone

10   involved, any of the conspirators involved in this case had

11   this document.

12          MS. SHROFF:  Oh.  We -- that's not our point at all

13   but let Mr. Habib address it.

14          MR. HABIB:  I was also going to add that under Rule

15   803.18 a statement containing a pamphlet meets a hearsay

16   exception if it is called to the attention of an expert witness

17   on cross-examination -- which it was -- and the publication is

18   established as a reliable authority by the expert's admission

19   or testimony -- which it also was, through Mr. Zelin.

20          MS. SHROFF:  Mr. Zelin testified to it extensively --

21          MR. QUIGLEY:  No.

22          MS. SHROFF:  -- and adopted it, in fact.  Mr. Zelin

23   has noted it as an Islamic State-published publication.  And

24   look, here it is:  We are open to redaction of stories.  We

25   don't care.  We don't want the whole document in.  If, after

1    the break, the Court wants to produce it and cut out the

2    narrative, we are perfectly happy with that.  We would like to

3    introduce it, though, as a pamphlet because it certainly goes

4    to also the state of mind of several people who are interested

5    in the Islamic State.  It is fair.  That's why his expert

6    testified to it.  His expert has testified to it twice and

7    adopted it twice.

8              THE COURT:  I'm sorry.  When you say twice, you mean

9    in another trial?

10             MS. SHROFF:  In another trial United States v. Pugh

11   before Judge Garaufis in the Eastern District of New York.

12             THE COURT:  Okay.

13             MS. SHROFF:  It is a proper -- well, he has already

14   said it but it is not -- it is a pamphlet specifically put out

15   for a very specific purpose by an organization and they had

16   their expert testify to those points -- exactly to those

17   points.

18             MR. QUIGLEY:  It is not a pamphlet, your Honor, it is

19   a 50-page document.  And also, it doesn't go -- absent the

20   showing, that anyone in this case received it.  It doesn't go

21   to anyone's state of mind.

22             MS. SHROFF:  They can argue all of that.  That goes to

23   weight, not admissibility.  They can feel free to sum up.

24   Ms. Tekeei can incorporate it right into her two-hour main

25   submission but it is admissible under 803.

1        MR. QUIGLEY:  There has got to be a basis on which we

2   could find that it was seen by someone and there is none here.

3        THE COURT:  803.18 you were saying could be admissible

4   if an expert on cross-examination is examined with respect to

5   it.

6        MR. HABIB:  So, as I am now continuing to read the

7   rule I do have to acknowledge, the Court can read the rule.  I

8   do have to -- I didn't finish reading the rule but it does say

9   that the statement may be read into evidence but not received

10  as an exhibit so I have to acknowledge that.

11       MS. SHROFF:  You want me to read parts of that.

12       MR. HABIB:  But what it does say is a statement

13  contained in a treatise, article, or pamphlet if it is (a)

14  called to the attention of expert witness on cross -- which it

15  was, Mr. Zelin -- and is established as a reliable authority by

16  the expert's admission or testimony -- he said, yes, that's an

17  ISIS magazine, I have reviewed it, it is guidance for people in

18  the west who want to travel to the Islamic State -- so, again,

19  it may be read into evidence.

20       THE COURT:  Okay.  So you can read from it.

21       MS. SHROFF:  Okay.  Thanks.

22       MR. HABIB:  Thanks.

23

24

25

                    (In open court)

BY MS. SHROFF:

Q.   Could you take a look at that for me, please?

A.   Yes.

Q.   I want you to turn, if you would, to page 47 of that

document.  Do you see a list of Twitter accounts --

A.   Yes.

Q.   -- listed in the documents?

A.   Yes.

Q.   And those are Twitter accounts, are they not?

A.   Yes.

Q.   For ISIS supporters, correct?

A.   Yes.

Q.   And they list them, correct?

         MR. QUIGLEY:  Objection to the leading.

         THE COURT:  Yes.  Don't lead.

         MS. SHROFF:  Okay.

BY MS. SHROFF:

Q.   Tell me, are there Twitter accounts listed?

A.   So, this is a list of Twitter accounts that is said to be

people who live in the Islamic State and can be accessed

through various sorts of private message apps as well as

Twitter.

Q.   And they give you -- it is a list, right?

A.   Yes, it is a list of multiple, different Twitter accounts.

H1o5gam1                          March - direct

1    Q.  And let's just do this.  Does the list give you a name for

2    each Twitter account?

3    A.  It gives you the Twitter name.

4    Q.  Right?

5    A.  Yes.

6    Q.  Right.

7           So, it tells you how to contact the person on Twitter,

8    correct?

9    A.  That's correct.

10   Q.  So, there is Abdul_Aliy_4, correct?

11   A.  Yes.

12   Q.  FarisBritani, correct?

13   A.  Yes.

14          MR. QUIGLEY:  Objection to the leading.

15          THE COURT:  Overruled.

16   Q.  Lover_of_Hoor1, correct?

17   A.  Yes.

18   Q.  AbuKambozz2, correct?

19   A.  That's correct.

20   Q.  And why don't you just read the rest for the jury.

21   A.  Abuismaelak, AllAlfarsiii, abu_dharda34, dujana99lives,

22   hudheyfa_99.

23          THE COURT:  Sorry, Professor.  Could you slow it down

24   a little bit?

25   A.  Yes.  Of course.  I apologize.  Yes.

1              AbuHussain1337_, magnetgas1, hudheyfa_99, Abumalik04,

2    FatherOfDuust, and AbuHafsa.  That's just the men.  There is

3    also a list of women.

4    Q.  It's okay.

5    A.  All right.

6    Q.  So, it gives you people -- let me go back.

7              What do you conclude this reference list to be for?

8    A.  People who live in the Islamic State and can be contacted

9    directly for information about how to travel into the Islamic

10   State.

11   Q.  Okay.  Now, take a look, would you, on page 6 of that

12   article, because I want to make sure that a person who is just

13   on page 6 of that pamphlet would actually take the time to go

14   in the back.  Does it say useful Twitter contacts who are in IS

15   to private direct message, correct?

16   A.  That's correct.

17   Q.  Do you see that?  And then it tells you there is a long

18   list at the end pages of the book, right?

19   A.  Yes.

20   Q.  All right.

21             Now, go to page 9 -- actually, go to page 8.  Does the

22   ISIS pamphlet give the person who wants to do hijrah their way

23   a list of things they should bring with them?

24   A.  Yes.  It is a packing list.

25   Q.  And the suggested setup for packing is a satchel-type bag,

H1o5gam1                          March – direct

1    correct?

2    A.   Yes.

3    Q.   A backpack?

4    A.   Yes.

5    Q.   Suit case?

6    A.   Yes.

7    Q.   It tells you to add as vital belongings:  Handkerchief?

8    A.   Amongst other things, yes.

9    Q.   Wet wipes, tissue paper, flashlight; correct?

10   A.   Yep.

11   Q.   Tells you to bring a mobile phone, correct?

12   A.   Yes.

13   Q.   A plane ticket, correct?

14   A.   Yes.

15   Q.   Now, let's just turn to the backpack, right?

16   A.   The backpack.

17   Q.   ISIS is pretty specific, is it not, when it tells what you

18   kind of backpack they should carry.

19   A.   Yes, they are.

20   Q.   And they tell you that it should be a sturdy one, the one

21   you get should be padded, correct?

22   A.   Yes.

23   Q.   It should be tough?

24   A.   Tough.

25   Q.   Help you with the running and roughing it around, correct?

1   A.  And lots of pockets.  Lots of different pockets.

2   Q.  Lots of different pockets.

3           Now, going to the bottom, right, it tells you to

4   bring, if possible, a tablet, correct?

5   A.  Yes.

6   Q.  A charger, correct?

7   A.  Yes.

8   Q.  They're very specific.  They say, if possible, bring a

9   solar charger, correct?

10  A.  Right.  Very commendable.

11  Q.  Now, flip over to the next page.  You see the penultimate

12  paragraph:  Footwear?

13  A.  Yes.

14  Q.  If you can get your hands on military-style boots, correct?

15  A.  Yes.

16  Q.  Also tells you to bring a pair of trainers or what we call

17  regular sneakers, correct?

18  A.  Yes.

19  Q.  Tells you to bring socks, correct?

20  A.  Socks.

21  Q.  Tells you to bring a jacket, correct?

22  A.  Yup.

23  Q.  And then it gives you a list of others which I am going to

24  skip reading because there are far too many.

25          It is quite specific, is it not?

H1o5gam1                        March - direct

1   A.  Yes; very thorough packing list.

2   Q.  Does it also tell you to bring a bottle?  It says bottle,

3   and sports water bottle would do as well, correct?

4   A.  Correct.

5   Q.  And that was on page 11.

6          Turn the page, please, on page 12 it says:  Your

7   trousers should be hard-wearing and even military grade if you

8   can afford, correct?

9   A.  Correct.

10  Q.  Camping grade or hunting grade would also be useful,

11  correct?

12  A.  Correct.

13  Q.  And then it says trousers with multiple side pockets are

14  very useful, correct?

15  A.  Yes.

16  Q.  And sports t-shirts are good too, correct?

17  A.  Yes.

18  Q.  Could you put up for me, please, the photograph of Mr. Samy

19  El- Goarany?  The one Mr. Quigley introduced.

20         While they're doing that, Dr. March, could you focus

21  your attention to page 15?  Does it read:  abdul_Aliy_4,

22  correct?

23  A.  Yes.

24  Q.  Another Twitter account, correct?

25  A.  Yes.

H1o5gam1                          March - direct

1   Q.  And then it gives you a website, does it not, that says:

2   Http://justpasteit.it/HijrahAdvice2; correct?

3   A.  That's correct.

4   Q.  What is hijrah, by the way?

5   A.  Hijrah is the Arabic word for migration which suggests

6   migration to the Islamic State.  It has very symbolic meaning

7   in Islamic religious contexts because it refers to the

8   migration of Mohammed from Mecca to Medina during his lifetime

9   with all of his followers.

10  Q.  Let me show you what is Government Exhibit 903.  Do you see

11  a pant with pockets on there?

12  A.  Yes.

13  Q.  Do you see his shoes over there?

14  A.  Adidas.

15  Q.  And you see the undershirt and the socks on his feet?

16  A.  Yes.

17  Q.  And, it basically comports with the list given in Hijrah to

18  the Islamic State, correct?

19  A.  Yes.

20  Q.  Thank you.  You can take it down.

21          Now, let me direct your attention to the views of the

22  Islamic State on people wanting to join them.  It is fair to

23  say the Islamic State was a welcoming organization?

24  A.  For people that would support their activities, yes.

25  Q.  And what happened when people wanted to leave them?

H1o5gam1                         March - direct

1   A.   They were not allowed to do so without their permission.

2   Q.   And what was ISIS' view of people who wanted to leave the

3   Islamic State?

4   A.   They could be deserters and even apostates because it could

5   be interpreted as rejecting the legitimacy of the caliphate and

6   the obligation to live under the authority of Islam.

7   Q.   And did they call that un-Islamic to want to leave?

8   A.   Yes, absolutely.  It could potentially be apostasy or

9   departure from Islam.

10   Q.   Let me show you, again going back to the website of

11   jihadology, have you reviewed articles on that website?

12          Do you know who it is run by, by the way?

13   A.   I believe it is run by Aaron Zelin.

14   Q.   And does Mr. Zelin publish articles on how the Islamic

15   State views individuals who want to flee the Islamic State and

16   no longer live in Syria?

17   A.   Usually that website posts propaganda and other articles

18   from Jihadi and other organizations and it sometimes has

19   analysis articles by him and some other colleagues in the

20   field.

21   Q.   And is he well respected, right?

22   A.   The website is very well respected as a resource, as a

23   primary source site for getting Jihadi propaganda.  My

24   understanding is that Aaron Zelin is still completing his Ph.D

25   and is still looking to develop his own personal reputation in

H1o5gam1                         March – direct

1    the field.

2              MR. QUIGLEY:  Objection.

3              THE COURT:  Overruled.

4    Q.  Now, Dr. March, I handed you a document and can you take a

5    look at it and see if I am correct in that there are articles

6    on that website --

7    A.  Yes.

8    Q.  -- that speak to what happens to people who want to leave

9    Syria?

10   A.  Yes.  This is an article that he wrote for the Washington

11   Institute that is referred to as a policy analysis document.

12   Q.  And is it fair to say that he agrees with your analysis,

13   does he not, that it would be very against ISIS' beliefs to let

14   refugees leave Syria?

15             MR. QUIGLEY:  Objection to leading and hearsay.

16             THE COURT:  Yes.  Don't lead.  Rephrase, Ms. Shroff.

17             MS. SHROFF:  Sure.

18   Q.  Dr. March, is your opinion and Mr. Zelin's opinion the same

19   on the issue of refugees wanting to leave the Islamic State?

20   A.  Yes.

21             So, Mr. Zelin says the Islamic State loathes that

22   individuals are fleeing Syria for Europe and I would agree with

23   that.

24   Q.  And that's because they think the caliphate is the ultimate

25   place for all Muslims, correct?

H1o5gam1                          March - direct

1   A.  If you're a good Muslim you should want to live under the

2   caliphate.

3   Q.  And that is the belief of the Islamic State now and that

4   was the belief always, correct?

5   A.  Yes.  That was the purpose of establishing the caliphate.

6   Q.  Going back one step in terms of ISIS' ability to recruit, I

7   am not going to go too far but would you say that their level

8   of recruitment -- how would you compare their level of

9   recruitment to other organizations?

10  A.  From the period from early 2014 until sometime in mid to

11  late 2016 they were the most popular destination for Muslims

12  living in other countries that wanted to go fight.  So, they

13  were much better at recruiting people to join them than rival

14  groups like al Qaeda.

15  Q.  And they had several Twitter accounts, correct?

16  A.  Countless Twitter accounts.

17  Q.  What do you mean by countless?

18  A.  Well, they would just set up -- I mean not countless in a

19  literal sense but they would have hundreds and hundreds of

20  accounts because Twitter accounts would get shut down by

21  Twitter, by the government, and so they were constantly

22  disseminating their views through various Twitter accounts.

23  Q.  They also use other apps, correct?  They also use Surespot,

24  correct?

25  A.  Yes.

H1o5gam1                          March - direct

1    Q.   And they also used -- what are the other apps they used do

2    you remember?

3    A.   I'm not sure what apps for communication, I am more

4    familiar with websites they would use for disseminating their

5    views and propaganda.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1O3GAM2                          March - direct

1    Q.   What were the websites?

2    A.   Justpaste.it, the one you mentioned is a very, very common

3    one.  And you may often find documents that were just listed

4    there.

5    Q.   What about justask.com?

6    A.   I'm not familiar with that.

7    Q.   Did they disseminate documents and magazines through

8    al-Furqan?

9    A.   Furqan?  Is it maybe Furqan?

10   Q.   Yes.

11   A.   That's the one, yes.

12   Q.   How about al Hayat?

13   A.   I believe so.

14   Q.   And how about Adnani, do you recall that one?

15   A.   I'm not sure.  I'd have to see it written down.  Possibly.

16   Q.   Of course we've already gone through the other two

17   documents.

18          Now, Dr. March, I'm going to shift topics for a minute

19   and would you agree with the statement that to recruit ISIS,

20   ISIS uses people as a force multiplier online?

21   A.   So, I'm not a huge expert on that kind of technological

22   stuff.  I think that --

23          MR. QUIGLEY:  Objection, your Honor.  He just said

24   he's not an expert.

25          MS. SHROFF:  He said he's not a huge expert.

1    A.  So the term "force multiplier" is ambiguous to me.  It

2    could mean something like an automatic sort of bot that sends

3    things out in many directions, or it could refer to people that

4    are just sharing propaganda.  But the term to me is very

5    ambiguous because perhaps the Jihadology website is a force

6    multiplier because it makes these things easier to access.

7    Q.  What is a force multiplier?

8              MR. QUIGLEY:  Objection.  Asked and answered.

9              THE COURT:  Overruled.

10   A.  My understanding is that a force multiplier refers to

11   multiple sources of social media or other media propagation

12   where files or data can be sent out in many directions.

13   Q.  Let me show you what is marked as Defense Exhibit 120-AA-T.

14   Actually I'm going to start with a different one.

15             Let me start with Defense Exhibit 124-AA.

16             Do you have it, Mr. Quigley?

17   A.  Yes.

18             MS. SHROFF:  Do you have an objection?

19             MR. QUIGLEY:  Are you going to offer it?

20             MS. SHROFF:  Yes.

21             MR. QUIGLEY:  We have no objection.

22             THE COURT:  Very well.

23             MS. SHROFF:  So could you publish Defense Exhibit

24   124-AA for me.

25             (Defendant's Exhibit 124-AA received in evidence)

1          MS. SHROFF:  Let's just focus that a little bit.

2     Q.  Dr. March, do you recognize the individuals in this photo?

3     A.  So, yes.  I recognize the person standing, who is I believe

4     the former head of the Muslim Brotherhood, who is now presently

5     in jail in Egypt.

6     Q.  Given the documents that you reviewed for this case, do you

7     recognize who the younger man with the big smile on his face on

8     the front is?

9     A.  Is that Attiya Aboualala?

10    Q.  Could you pronounce that last name for me?

11    A.  I believe it is Aboualala.  Yes.

12    Q.  Do you recognize the third person sitting there?

13    A.  Well, where you see -- you don't see it here, but there is

14    an Arabic post by I believe Attiya that says who the people

15    are.

16         MR. QUIGLEY:  Objection.  He's not a translator.

17         THE COURT:  Objection sustained.

18    Q.  Just yes or no, do you know who that person is?

19    A.  I have access to their names, yes.

20         MR. QUIGLEY:  Objection.

21         THE COURT:  Overruled.

22    Q.  He's not a member of ISIS, right?

23    A.  Certainly not.

24    Q.  Okay.  You can take that down.  Let me show you what is

25    marked as 120-AA-T.

H1O3GAM2                          March – direct

1              MS. SHROFF:  Your Honor, the defense would move to

2     admit 120-AA-T.

3              MR. QUIGLEY:  Objection.  Hearsay.

4              MS. SHROFF:  May we approach?

5              THE COURT:  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (At the sidebar).

2       THE COURT:  What is it?

3       MR. HABIB:  This is a public Facebook post by Attiya

4    on this date, which the Court will recall is the day that is

5    alleged that he met with Samy El-Goarany in Istanbul.  Same

6    day.  Just that sentence.

7       THE COURT:  And the objection is?

8       MR. QUIGLEY:  Hearsay, your Honor.  It is being

9    offered for the truth that that statement was made by John

10   McCain.

11      MR. HABIB:  It's being offered not for its truth and

12   we don't object to a limiting instruction so advising the jury.

13   It's being offered to demonstrate Attiya's state of mind and we

14   expect the witness will testify that the substance of the Tweet

15   that is the mental impression or belief that Attiya is

16   conveying is hostile to ISIS or unsympathetic to ISIS.  So it

17   is highly probative.  That was at the exact time when he's

18   supposed to be sending Samy to ISIS, the government's theory,

19   he's publicly posting on Facebook a message that is in

20   substance hostile to ISIS's actions.

21      MR. QUIGLEY:  Then we'd object on expert notice

22   grounds.  They never noticed that he would opine on Attiya's

23   Facebook posts.  I can bring the notice up to your Honor.  This

24   is beyond the scope of the notice.

25      MS. SHROFF:  It is beyond the scope of his notice that

 1    somebody who sends that post would be for the Muslim

 2    Brotherhood or against ISIS.  Or that it's beyond the scope of

 3    our notice that we think that ISIS is not -- is an organization

 4    that other people in the world would ignore.

 5              THE COURT:  Who is Davutoglu?

 6              MR. HABIB:  The former prime minister of Turkey.

 7              MR. QUIGLEY:  There was nothing in their notice that

 8    he would opine about Attiya's Facebook posts.

 9              MS. SHROFF:  He is not opining about Attiya's Facebook

10    posts.  He's opining about something posted on Attiya's

11    Facebook.  It is irrelevant where it's posted for his expert

12    opinion.  It is irrelevant where it's posted.  We gave him

13    notice that he reviewed Attiya's Facebook page.

14              MR. HABIB:  He can explain to the jury on modern

15    Middle Eastern jihadi movements to explain what his position

16    was on Syria.  He's not going to testify about what Attiya's

17    opinion was, that's something we can argue.  He's just going to

18    explain to the jury right --

19              THE COURT:  You can do that without using this

20    document though.

21              MS. SHROFF:  But the document is properly in evidence,

22    your Honor.  It's properly in evidence.  It is a document

23    published to show Attiya's state of mind at that time.  And

24    Attiya's state of mind impacted, especially since the United

25    States attorney's office has said that Attiya and Samy were so

H1O3GAM2                         March – direct

1    close and speaking to each other over Facebook.  It is

2    important that that document, which was on Attiya's website,

3    also influences Samy El-Goarany's mental state at the time, at

4    the very same day that they are arguing that in Samy

5    El-Goarany's head all he knows is Attiya is ISIS.

6                THE COURT:  What is this exactly?  Is this something

7    that Attiya wrote?

8                MR. HABIB:  Yes.

9                MS. MIRON:  I would remind the Court that through

10   Aaron Zelin, the government was permitted to play laptop videos

11   that were argument that was relevant to Mr. Gammal's state of

12   mind.  Mr. Gammal and Attiya communicated via Facebook on this

13   date.

14               MR. QUIGLEY:  Our notice specifically said he would

15   comment -- that Zelin would testify about those videos.  They

16   said nothing about their expert commenting on Attiya's Facebook

17   posts.

18               MS. SHROFF:  He's not commenting on Attiya's Facebook

19   posts.  He's commenting on an article, and the article happens

20   to be on Attiya's Facebook post.

21               MR. HABIB:  He won't give any testimony about what

22   Attiya might have thought.  That's all for argument.

23               MR. QUIGLEY:  It is irrelevant.

24               THE COURT:  You're saying different things.  You are

25   saying he is not commenting on Attiya's post, he's commenting

1    on the article.

2            MS. SHROFF:  They put in a thousand articles that were

3    on Attiya --

4            MR. HABIB:  Let me be more precise.  He's not going to

5    opine on Attiya's state of mind.  He is not going to opine on

6    Attiya's state of mind.  I expect what Ms. Shroff will do is

7    publish this exhibit, ask the witness who is Davutoglu, what

8    was his plan regarding Syria, which is well within the scope of

9    matters in which he's been qualified as an expert and that's

10   it.

11           THE COURT:  You can do that without putting the

12   document into evidence.  So I'm not going to allow it.

13           MS. SHROFF:  Your Honor, it goes to the state of mind

14   on the very date --

15           THE COURT:  Now you're making conflicting arguments.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

H1O3GAM2                         March – direct

1            (In open court)

2    Q.  Dr. March, do you recall in January 19, 2015, who John

3    McCain was?

4    A.   John McCain has been a senator from the the state of

5    Arizona for a very long time.

6    Q.   Who was O-G-L-U?

7    A.   The O-G-L-U is a very common ending for Turkish names.  So

8    it means son of, so it is a very common way for Turkish last

9    names to end.

10           But during this period, this was also the ending of

11   the last name of the Turkish foreign minister, Ahmet Davutoglu.

12   Q.  Let me correct that date.  It was January 29, 2015.

13           And do you recall reviewing a notation that John

14   McCain regrets and says he should have listened to Oglu

15   regarding Syria?

16           MR. QUIGLEY:  Objection.

17           THE COURT:  Sustained.

18   Q.  Do you have an opinion as an expert in modern Islamic

19   thought as to John McCain's regret regarding Syria on

20   January 29, 2015?

21           MR. QUIGLEY:  Objection.

22           THE COURT:  Overruled.

23   Q.  Go ahead.

24   A.   John McCain has been very active in the Senate in trying to

25   formulate policy, U.S. policy on Syria.  And the two main

```
 1   issues at stake were how to fight ISIS once they arose, and
 2   whether U.S. policy should be aimed at toppling the government
 3   of Bashar al-Assad in Syria.  And it was the policy of the
 4   Turkish government that bore most of the burdens of the refugee
 5   crisis, and ISIS terrorism, that a solution to the problem of
 6   terrorism had to include toppling of the Assad government and
 7   replacing it with an inclusive democratic government.  And John
 8   McCain has been on record saying that the U.S. should have
 9   developed a more aggressive stance against the Assad
10   government, in addition to being against ISIS.
11   Q.  On January 29, McCain posted his regret, did he not?
12             MR. QUIGLEY:  Objection.
13   A.  I believe --
14   Q.  What was his regret exactly?
15             MR. QUIGLEY:  Objection.
16             THE COURT:  Sustained.
17   Q.  Subsequent to this time period, are you familiar with John
18   McCain's continued position on this issue?
19   A.  Not particularly well.
20   Q.  As part of your review of this case, did you review the
21   government's summary exhibits which I gave you which were
22   Government Exhibit 1201, all the way to 1206?
23   A.  Yes, I have seen these.
24   Q.  These were Facebook interactions between people, correct?
25   A.  Yes.
```

H1O3GAM2                           March - direct

1   Q.  You reviewed them as part of the evidence in this case,

2   correct?

3   A.  Yes.

4           MR. QUIGLEY:  Your Honor, I'm going to object on

5   notice grounds.

6           THE COURT:  Ladies and gentlemen.  Let's take our

7   morning break.  15 minutes.

8           (Jury excused)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Professor March, you may step down.

2          MS. SHROFF:  Actually, Professor March, could you step

3     out?

4          THE WITNESS:  Of course.

5          (Witness not present)

6          THE COURT:  If might have been helpful if all this had

7     been fronted before today.

8          MR. QUIGLEY:  Your Honor, that's our point, that it

9     wasn't fronted before today.  We got an expert notice, a very

10    minimal expert notice in late December.  We asked the defense

11    to supplement.  They did through a motion.  And we have been

12    hit over the head repeatedly in this case from the defense with

13    the idea that expert notice requires disclosure of the expert's

14    opinions and the bases of those opinions, and the topics of his

15    testimony.  And we are now far, far -- and I think we have been

16    frankly conservative in objecting to some of these things, but

17    we have been far, far, far beyond the scope of the notice for

18    Mr. March or Dr. March right now.

19         When Mr. Zelin was testifying, even though we

20    explicitly noticed him that he was going to give some

21    background about the Muslim Brotherhood, our ability to examine

22    him about that was particularly constrained.  And that's fine.

23    But the point is we're far, far beyond the portions of

24    Mr. March's notice right now.

25         I realize the summary exhibits were produced during

1    the government's case, but that was over a week ago now.  If he

2    had some opinion on them, they should have been produced.  We

3    got exactly two pieces of 3500 material for Mr. March.  It's

4    kind of hard to believe there is not more out there.

5           MS. SHROFF:  That's not true.

6           MR. QUIGLEY:  If we had gotten adequate notice, we

7    could have addressed this.  That's the reason we're raising it

8    now, is we don't have adequate notice.  That's precisely the

9    issue.

10          THE COURT:  Ms. Shroff, what do you intend to ask and

11   how is it within the scope of the notice that was provided?

12          MS. SHROFF:  First of all, we gave them the exhibits.

13   Okay.  They may have had two pieces of 3500 material, which we

14   told them over and over again that the 3500 material was

15   actually limited.  But the exhibits were provided to them.

16   These are also government exhibits.  I mean, there is -- when

17   there is nothing about a summary exhibit that they spent hours

18   and hours putting together, that should come as any surprise to

19   them when somebody is asked to give testimony just because it's

20   not coming out of their spoonfed witness's mouth.

21          I'm not really clear.  Should I give them my entire

22   direct of every witness?  It's their evidence.  Surely they

23   know that an expert being called from the other side is going

24   to review their evidence.  That's precisely why you have

25   another expert.

1            But putting that aside, all I simply wanted to show

2    through this witness is that he had in fact reviewed the

3    government's exhibits and it did not change his opinion one way

4    or the other on his testimony about Muslim Brotherhood, and its

5    relationship to the Islamic State, or his impression of any of

6    the other pieces of evidence he's reviewed in this case,

7    including his opinion on whether or not Attiya Aboualala was

8    part of the Muslim Brotherhood.

9            I'm not clear as to what is Mr. Quigley claiming some

10   kind of surprise?  Some kind of surprise that is not cured by

11   him having 15 more minutes to cross-examine?  Is that really

12   what the government is saying?  That they are so surprised that

13   the defense would put in the government's own evidence, that

14   their only remedy is preclusion?

15           MR. QUIGLEY:  Your Honor, at this stage it is.  The

16   issue is, as Ms. Shroff repeatedly emphasized to the government

17   both in written submissions and over the phone during the fall,

18   expert notice must include the expert's opinions, and the bases

19   for those opinions.  Dumping a bunch of exhibits on the

20   government the night before or a couple of days before the

21   witness is supposed to testify is not expert notice.

22           MS. SHROFF:  Your Honor, there were three exhibits.

23   Dumping?  I don't think you can dump three exhibits.  They gave

24   us a 302 dated May 2016 on January --

25           THE COURT:  We're talking about a specific topic right

1    now, Ms. Shroff.

2              MR. QUIGLEY:  So, the law is very clear, and again I

3    think we've been, I know we've objected, but we've allowed a

4    significant amount of leeway with the spirit of notice.

5    Opining on summary charts, opining on some of the other issues

6    we've objected to, is well beyond the scope of the expert

7    notice.

8              THE COURT:  Okay.

9              MS. SHROFF:  Your Honor, may I just complete the

10   record on two grounds because I also did not have the

11   opportunity to complete the record on the translation that was

12   previously precluded.

13             THE COURT:  Absolutely.

14             MS. SHROFF:  Okay.  So, your Honor, just on that

15   exhibit, it is also a --

16             THE COURT:  Just so the record is clear, just on what

17   exhibit?

18             MS. SHROFF:  Going back to what I had marked in

19   evidence as Defense Exhibit 405, which is a document that is a

20   certificate issued to Mr. Attiya Aboualala inducting him into

21   the International Union for Muslim Scholars.  That was a

22   document produced to us by the government.  Not only was the

23   Facebook production included in discovery, it was the

24   government also actually translated and we adopted without any

25   revision their translation.  I don't need to tell Mr. Quigley

1   every single piece of paper I'm going to introduce as evidence.

2   I don't think that's what the law calls for.  It is a document

3   that was the basis of Dr. March's testimony, and we should be

4   allowed to at least refer to it, if not admit it into evidence.

5   That's one.

6           Your Honor, I am assuming that the Court's ruling was

7   that not only would the defense not be able to admit it, also

8   we would not be able to refer to it.  Is that right or did I

9   misunderstand the ruling?

10          THE COURT:  That's the ruling with respect to that.

11          MS. SHROFF:  Thank you.

12          Your Honor, as to Defense Exhibit 120-A-T, again, this

13  document was provided to the government as a possible exhibit.

14  They had it.  It's their document.  It is a highly probative

15  document.  And I just wanted the record to be clear that it is

16  in fact a document that they also had translated and they

17  produced it to us in their discovery production.

18          THE COURT:  All of that doesn't necessarily add up to

19  relevance.

20          MS. SHROFF:  No, no, it adds up to notice, your Honor.

21  That's right.  It is not about the relevance.  That's

22  absolutely correct.

23          The summary exhibits, those are the government's own

24  exhibits.  We objected to them.  They were put into evidence

25  over our objection.  The paralegal testified as to the hours he

1    worked closely, in fact he said the most amount of time he

2    spent preparing those summary exhibits were with Mr. Quigley.

3    So I'm not really sure how preclusion is the appropriate remedy

4    here.  But if that's the Court's ruling, that's the Court's

5    ruling.  Thank you.

6              THE COURT:  Mr. Quigley.

7              MR. QUIGLEY:  Your Honor, just briefly.  To make

8    clear, we've received no notice, and I think it is clear, but

9    in an abundance of caution, either that the witness would be

10   opining on the summary exhibits or he would be issuing any kind

11   of opinion of Attiya personally, as to the Muslim Brotherhood

12   personally, or as to the Muslim Brotherhood generally, so we

13   would move to preclude both of those opinions.

14             THE COURT:  That is the Court's ruling.  Period.  We

15   have 10 minutes.

16             Just to be clear, the defense cannot inquire of

17   Professor March including the summary charts.

18             MS. SHROFF:  Your Honor, the same ruling holds then

19   for the government if they call Mr. Zelin in rebuttal, right?

20             THE COURT:  If he doesn't go into it on direct, he

21   can't go into it on rebuttal.

22             I don't want you to take too much away from what I'm

23   saying.  The subject matter that Professor March is testifying

24   to would be appropriate fodder for a rebuttal case.

25             MS. SHROFF:  Of course.

1           MR. QUIGLEY:  Your Honor, just we would also object to

2       any testimony, any opinion that Attiya was a member of the

3       Muslim Brotherhood because that again was clearly not included

4       in the expert notice.

5           THE COURT:  Do you intend to elicit that from him?

6       How can he possibly give an opinion of whether or not a person

7       was a member of an organization?

8           MS. SHROFF:  All he can do is testify as to the

9       documents reviewed and what conclusions he drew.  That's proper

10      for somebody who reviewed the government's documents that we

11      told him that the expert reviewed.

12          THE COURT:  Okay.

13          MS. SHROFF:  But I also want to make sure in terms of

14      Mr. Zelin's testimony, right, that Mr. Zelin's testimony is

15      limited to what the testimony was from Dr. March, right?  Is

16      that the general parameter?

17          THE COURT:  I would think that his testimony would be

18      limited to the defense case in the areas for which notice was

19      given.

20          MS. SHROFF:  You are saying they can put Mr. Zelin on

21      the witness stand and review with him anything they want, as

22      long as it was part of the defense case originally or just

23      limited to Dr. March's testimony?

24          THE COURT:  It is not typical for me to sit here and

25      figure out what would be appropriate and not, and I don't know

1    that Mr. Zelin will be called or that the government will have

2    a rebuttal case.

3         MS. SHROFF:  I want to make sure the record is clear,

4    we received from the government no documents about Mr. Zelin's

5    rebuttal testimony, no exhibits for Mr. Zelin's rebuttal

6    testimony, nothing in addition, especially given their very

7    limited notice on Muslim Brotherhood, and I just want to make

8    sure that what's good for the goose is good for the gander.

9    Right?

10        MR. QUIGLEY:  That's fine.  Rule 16 discusses the

11   expert notice with respect to the government in the case in

12   chief.

13        I can say we have not made a decision, Mr. Zelin is

14   here.  We have not made a decision as to whether we will call

15   him.  Whether we're going to put on a rebuttal case, whether

16   Mr. Zelin will be part of that rebuttal case, or what, if

17   anything, he would testify about in a rebuttal case.  So as

18   soon as we know, we'll let the defense know.

19        But just on the issue of Attiya's membership in the

20   Muslim Brotherhood, Ms. Shroff said the witness would be

21   stating a conclusion.  I think a conclusion is another name for

22   opinion, so we would still move to preclude that.

23        THE COURT:  I will not allow you to have him testify

24   as to Aboualala's membership in the Muslim Brotherhood.  Okay.

25        (Recess)

1              THE COURT:  Sir, you can step forward.

2              (Jury present)

3              THE COURT:  Ms. Shroff.

4              MS. SHROFF:  Thank you, your Honor.

5    BY MS. SHROFF:

6    Q.  Now, Dr. March, the last we left off, you were testifying

7    about ISIS's position on people who want to leave Syria,

8    correct?

9    A.  Yes.

10   Q.  Let's just talk, and this is your last topic on direct,

11   about the border between Turkey and Syria during the relevant

12   timeframe of 2014 and 2015.

13             Do you have that timeframe in your mind?

14   A.  Yes.

15   Q.  Could you tell the jury how many local militia groups would

16   be on that border?

17   A.  So, the Syrian civil war was notorious for having dozens

18   and dozens of various rebel groups on the antigovernment side,

19   sometimes grouped together in larger sort of forces and

20   sometimes not.

21             So, the border between northern Syrian, southern

22   Turkey, there was a couple of points of exit and entry, which

23   is where all refugees would have to flow, all humanitarian

24   access would have to go in and out, and all supplies of

25   personnel and weapons would have to go for various rebel

H1O3GAM2                              March - direct

1   groups.  But it was many.

2   Q.  Now, in your opinion, would these exit and entry points

3   remain stable at all times?

4   A.  No.  The Turkish government had the capacity to close and

5   monitor them, depending on the development of their policy.

6   Q.  Would it be fair to say that certain points that were open

7   on Monday would be closed on Tuesday?

8   A.  Very possible.

9   Q.  Now, were there any NGOs or non-governmental organizations

10  also on the border of Turkey and Syria?

11  A.  Many.

12  Q.  An NGO, by definition, is not an entity or an organization

13  or a company sponsored by a government, correct?

14  A.  Non-government organization.

15  Q.  There were also many ad hoc organizations, were there not,

16  right around the border?

17  A.  Charity groups and so forth, yes.

18  Q.  These were not listed charity groups, correct?

19  A.  There could be many, so a charity might decide I want to go

20  help Syrian refugees and bring some supplies, and they would

21  not necessarily be registered or have a long-standing

22  affiliation.

23            MR. QUIGLEY:  Objection.  Non-responsive.

24            THE COURT:  Overruled.

25  Q.  Let's just talk about Gaziantep.  Are you familiar with

H1O3GAM2                        March - direct

1    that place in Turkey?

2    A.  Yes.  It is the largest city close to the Syrian border in

3    southern Turkey.

4    Q.  Could you tell the jury how one could get to Gaziantep?

5    A.  From Istanbul it would be fairly straightforward to get

6    there by land.

7    Q.  It's information that's available on tourist sites,

8    correct?

9    A.  Tourist sites, Google Maps, bus schedules and so forth.

10   Q.  Could you explain to the jury what the concept of tazkiya

11   is?

12   A.  Tazkiya is an Arabic term meaning a kind of verification or

13   recommendation, vouching for one person -- vouching of one

14   person for another.

15   Q.  Has the Islamic State somehow coopted that word?

16   A.  Yes.  It is very common in organizations like that, that

17   you want to know who is coming and that there is somebody that

18   you can trust, so as things got more dangerous for them, they

19   would want to be able to verify who people are that are coming

20   and claiming to want to join them.

21   Q.  By "they" and "them" you mean --

22   A.  The Islamic State.

23   Q.  Or ISIL, correct?

24   A.  Or ISIS, correct.

25   Q.  I just want to make sure I understand the process.  If I

1   wanted to join ISIS, I would need a tazkiya from somebody that

2   is within ISIS, correct?

3   A.  Most likely.

4   Q.  Right.  And the person within ISIS would be in essence

5   vouching for me, correct?

6   A.  Yes.

7   Q.  And ISIS would refer to that word tazkiya almost as a

8   purification of me, correct?

9   A.  That's right.

10  Q.  And I would need that to be received into their company,

11  correct?

12  A.  Somebody like you certainly, but yes, most people as well.

13  Q.  I won't be insulted by the "somebody like you" comment, but

14  I have nothing further.

15          Thank you, Dr. March.

16          THE COURT:  Cross-examination.

17          MR. QUIGLEY:  Yes, your Honor.

18  CROSS-EXAMINATION

19  BY MR. QUIGLEY:

20  Q.  Sir, how are you?

21  A.  Good morning.

22  Q.  So just beginning where we left off, the concept of

23  tazkiya, that has changed in ISIS over time, correct?

24  A.  So, yeah, there are periods in which they're more open to

25  people coming and there are periods where they need to be more

H1O3GAM2                        March - cross

1   suspicious, yes.

2   Q.  Early on, particularly 2013, 2014, early 2015, they were

3   less suspicious, correct?

4   A.  Can you repeat the dates?

5   Q.  Sorry.  Early on --

6           MS. SHROFF:  Could he break down the dates.

7   A.  I'm sorry.  Am I allowed to know your name?

8   Q.  Brendan Quigley?

9   A.  Thank you.

10  Q.  Over time, ISIS has become more suspicious, correct?

11  A.  Yes.

12  Q.  There are times when you didn't need tazkiya at all to get

13  into ISIS, correct?

14          MS. SHROFF:  Your Honor, could we have a date, please?

15          THE COURT:  Can you focus him on a particular time

16  period, Mr. Quigley.

17  Q.  2014, 2015, there were times when you did not need tazkiya

18  at all to get into ISIS, correct?

19  A.  ISIS would always want to put you through some kind of

20  process of verification and training.

21  Q.  Sir, can you just answer my question?

22  A.  So I don't know about those particular periods when you

23  wouldn't have -- definitively not needed a tazkiya.

24  Q.  Fair to say, though, it changed over time and it changed

25  over time --

1    MS. SHROFF:  Objection to "over time."

2    THE COURT:  Overruled.

3  A.  Possibly.

4  Q.  So, I want to talk about the Muslim Brotherhood for a

5  second.  You said the Muslim Brotherhood is not a jihadi

6  movement, correct?

7  A.  Not the way that we've come to use the term jihadi

8  movement.

9  Q.  But, it's fair to say that people have, from the Muslim

10  Brotherhood, have become jihadis over the years?

11    MS. SHROFF:  Objection.

12    THE COURT:  Overruled.

13  A.  There have been people that have been activists or members

14  of the Muslim Brotherhood that have joined wars throughout the

15  years, that's correct.

16  Q.  So let's talk about Ayman al-Zawahiri.

17  A.  Yes.

18  Q.  He is the leader of al Qaeda, correct?

19  A.  Yes.

20  Q.  And he was the number two person in al Qaeda for many

21  years, correct?

22  A.  Yes.

23  Q.  Behind Osama bin Laden?

24  A.  Yes.

25  Q.  He was directly involved in the 9/11 -- in the planning of

H1O3GAM2                         March - cross

1    the 9/11 attacks, correct?

2    A.   I think so.  A lot of that evidence -- I thought it was

3    Sheik Mohammed, but yes.

4    Q.   We'll get to him in a second.  But Ayman al-Zawahiri was in

5    the Muslim Brotherhood before he joined al Qaeda?

6    A.   My understanding is he was in a group called al-Gama'a

7    al-Islamiyaa, or the Egyptian Islamic group that participated

8    in the assassination of Anwar al-Sadat.  My understanding is he

9    doesn't come out of Muslim Brotherhood, but comes out of the

10   more radical group called the Islamic group.

11   Q.   Which came out of the Muslim Brotherhood, correct?

12   A.   Not particularly, no.  I wouldn't say it came out of the

13   Muslim Brotherhood.  It was a group that was formed I believe

14   in the 1970s as a more radical alternative in opposition to the

15   Muslim Brotherhood.

16   Q.   So, Khaled Sheik Mohammed, planner of 9/11.  Correct?

17   A.   So they say.

18   Q.   He was also a Muslim Brotherhood member at one time,

19   correct?

20   A.   That, I don't know.  He's from Kuwait, right?

21         MS. SHROFF:  Your Honor, could the witness be allowed

22   to finish his answer, please.

23         THE COURT:  He's allowed to finish his answers.

24   Q.   Abdullah Azzam, are you familiar with him?

25   A.   Yes.

1    Q.  He was the one of the founders of al Qaeda, correct?

2    A.  I -- actually, my understanding is it was his assassination

3    by groups around the Afghan jihad that allowed for the

4    formation of al Qaeda.

5    Q.  He was a jihadist though?

6    A.  He was somebody that fought in the Afghan jihad against the

7    Soviets, supported by the United States.

8    Q.  Sounds like he was a jihadist.

9              MS. SHROFF:  Objection.

10             THE COURT:  Sustained.

11   Q.  He was a member of the Muslim Brotherhood at one point,

12   too, correct?

13   A.  I don't remember his organizational affiliation.

14   Q.  Would it refresh your recollection to know that his wiki

15   page says that --

16             MS. SHROFF:  Objection.  If he wants to show him a

17   page, he may.

18             THE COURT:  Overruled.

19   Q.  That in the mid 1950s Azzam joined the Muslim Brotherhood

20   after being influenced by Shafiq Asad `Abd al-Hadi, a local

21   teacher who was a member of the Brotherhood?

22             MS. SHROFF:  Objection, your Honor, to Wikipedia.

23             THE COURT:  Overruled.

24   A.  So, I don't have the Wikipedia site in front of me.  I

25   don't remember Azzam's biography at the moment, but it's

H1O3GAM2                         March - cross

1    plausible.  What you're saying is plausible.

2    Q.   Okay.  Abu Bakr al-Baghdadi, are you familiar with him?

3    A.   Yes.

4    Q.   He is the current leader of ISIS, right?

5    A.   Yes.

6    Q.   When he was in graduate school he joined the Muslim

7    Brotherhood in Iraq, correct?

8    A.   Is that true?  I thought he was -- I thought he was an

9    official government paid sort of prayer leader under Saddam.

10   Q.   So you're familiar with William McCants?

11   A.   Yes.

12   Q.   You've written articles with him, correct?

13   A.   Published articles with his organization, yes.

14   Q.   So, if he said in an article in the BBC that during

15   Baghdadi's time in graduate school, his uncle persuaded him to

16   join the Muslim Brotherhood, would you find that likely

17   accurate?

18   A.   Yes.

19   Q.   Let's talk about Osama bin Laden.  Probably the most famous

20   terrorist in the world, correct?

21   A.   Yes.

22            MS. SHROFF:  Objection to the characterization.  He

23   can ask a question if he wishes.

24            THE COURT:  Overruled.

25   Q.   Responsible for deaths of thousands of American, correct?

H1O3GAM2                      March - cross

1          MS. SHROFF:  Objection.

2          THE COURT:  Overruled.

3   A.  I am aware of Osama bin Laden.

4   Q.  So you're saying he wasn't responsible for the deaths of

5   thousands of Americans?

6   A.  No, no, I'm saying he was, and I know who Osama bin Laden

7   was.

8   Q.  He was a Muslim Brotherhood member also, correct?

9   A.  In his youth I believe that he -- I don't know if he was a

10  member, but I believe in his youth he was affiliated with some

11  teachers from the Muslim Brotherhood.

12  Q.  Sheik is an honorific title in Arabic, correct?

13  A.  That's correct.

14          THE COURT:  Mr. Quigley, could you get closer to the

15  microphone.

16          MR. QUIGLEY:  Sorry.

17  Q.  Bin Laden was killed in 2011, right?

18  A.  Yes.

19  Q.  And at the time of his death, the Muslim Brotherhood issued

20  a statement honoring him with the title Sheik, correct?

21  A.  Is that in evidence?  I don't remember --

22  Q.  If you don't remember, I'm happy to show you a document.

23  A.  Yeah.

24          MS. SHROFF:  May we approach for a moment, please?

25          THE COURT:  Sure.

H1O3GAM2                          March – cross

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            MS. SHROFF:  I just want to understand.  Mr. Quigley

3   objected when I asked him if Attiya Aboualala was part of the

4   Muslim Brotherhood.  But he can ask if all of these individuals

5   were originally in some way, shape or form associated with the

6   Muslim Brotherhood.  I just want to make sure I understand the

7   Court's ruling.  And number two, Mr. Quigley is misstating

8   testimony including William McCants' book.  William McCants'

9   book makes clear --

10           THE COURT:  Is that in evidence?

11           MS. SHROFF:  He cited to it.

12           THE COURT:  In this trial?

13           MS. SHROFF:  He just --

14           THE COURT:  Before.

15           MS. SHROFF:  No, not before.  So William McCants wrote

16   a book in which he said that the guy was kicked out of the

17   Muslim Brotherhood for his violence.

18           THE COURT:  Which guy?

19           MS. SHROFF:  Baghdadi.

20           MR. QUIGLEY:  It was a direct quote.

21           MS. SHROFF:  I'm not finished.

22           THE COURT:  Go ahead, Ms. Shroff.

23           MS. SHROFF:  So that misstates actually what is

24   written in McCants' book.  Number one, it misstates it, okay.

25   So I want to point out the misstatement, just in case it is a

1    mistake by Mr. Quigley, he can correct that if he wants.  If

2    not, I can clean it up on redirect.

3         But my objection here is asking if other people were

4    Muslim Brotherhood or not certainly opens the door in our

5    opinion as to whether or not Attiya Aboualala was Muslim

6    Brotherhood.

7         MR. QUIGLEY:  It does not.  They have gone to great

8    lengths in this trial to say that the Muslim Brotherhood is a

9    peace loving --

10        THE COURT:  Is a?

11        MR. QUIGLEY:  Is a peace loving democratic

12   organization that would have nothing to do with violence, and

13   this they've asked numerous witnesses about that, including

14   this witness, including Mohammed El-Goarany, including the case

15   agent.  And it is well within the scope of cross of their

16   expert to cast doubt on that.

17        The Attiya issue is one of relevance.  But also two of

18   notice.  They did not notice that this expert would be opining

19   in any way, shape or form that he was a member of the Muslim

20   Brotherhood, so it is two completely different issues.

21        THE COURT:  I'm happy to hear Mr. Habib.

22        MR. HABIB:  I don't want to offer a conflicting

23   opinion with my colleague who always knows better.  I think on

24   the question of membership in the Muslim Brotherhood, so what

25   they're doing is eliciting evidence that at various, in some

1   cases distant points in history, individuals today or in the

2   recent past associated with terrorism may or may not have had

3   loose affiliation or affiliation of some unspecified type with

4   the organization.

5            It would be equivalent to asking Timothy McVeigh

6   wasn't he a Young Republican.  Something like that.  And so,

7   it's quite attenuated.

8            But if the government is going to pursue this line of

9   argument about asking the membership of particular people in

10  the Brotherhood, we think that this opens it up on redirect

11  asking him about Attiya.  And if the problem is notice, the

12  fact that they've opened it up on redirect I think excuses any

13  notice deficiency.

14           THE COURT:  I disagree.  I think that one of the

15  issues that has been raised in this trial is the nature of the

16  Muslim Brotherhood, and Professor March testified that is

17  essentially a peaceful organization.  You contrasted it

18  specifically, explicitly to jihadist movements and indicated

19  that the Muslim Brotherhood was an Islamist movement.  And what

20  Mr. Quigley is doing by mentioning particular individuals whose

21  names have come up during the course of this trial, although I

22  don't know whether Osama bin Laden's name has come up.

23           MS. SHROFF:  No.

24           THE COURT:  But certainly individuals who exercised, I

25  think there would be no dispute, leadership roles in these

H1O3GAM2                         March - cross

various movements, individuals whose names have been mentioned

or would be known to the jury.  I am sure all members of the

jury has heard of Osama bin Laden, to contrast Professor

March's testimony that the Muslim Brotherhood is and accepts

essentially peace loving individuals, I think it is perfectly

appropriate impeachment, and does not in my mind open up the

issue of whether an individual who I assume Mr. March has never

heard of and who I assume has never had a leadership role in

any of these organizations was a member.

          MS. SHROFF:  That's not true.  Dr. March has heard of

Attiya Aboualala.  He has in fact reviewed all of Attiya

Aboualala's public posts, and certainly Attiya Aboualala's

membership in the Muslim Brotherhood has been a huge issue

before this jury.  In fact, the government has tried to

insinuate repeatedly, and I direct the Court to one of the

government's chats that they put in their summary exhibit and

they will certainly use at summation, "I am thinking of joining

the state."  That is the government's, they introduced that

post.  Right.  So the government has interjected whether or not

Attiya Aboualala, they planted that seed in the jury's mind.

Is Attiya Aboualala actually with the state?  They planted

that.  They just don't want -- they are arguing notice on

somebody wanting to clean that up when they have introduced it

themselves.

          Osama bin Laden was never any part of this trial.

1    And, to the extent Attiya's name has been mentioned, it has

2    been mentioned I would say at least 100 times more than Osama

3    bin Laden, so certainly the jury is familiar with him.

4              THE COURT:  I understand that.

5              MR. QUIGLEY:  I have a few more questions on this

6    area.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2   BY MR. QUIGLEY:
 3   Q.  When we left off, you had said you didn't remember whether
 4   the Muslim Brotherhood issued is a statement after Mr. bin
 5   Laden's death.
 6   A.  Correct.
 7   Q.  So, just take a look at that, that paragraph.
 8   A.  Hmm-hmm.
 9   Q.  And tell me whether that refreshes your recollection
10   that --
11              MS. SHROFF:  Does the government have a copy for the
12   defense?
13              MR. QUIGLEY:  I'll bring you a copy.
14              THE COURT:  After Professor March reviews it, you can
15   review it.
16   Q.  Sir, does that refresh your recollection that shortly after
17   Osama bin Laden's death, the Muslim Brotherhood issued a
18   statement honoring him with the title Sheik?
19              MS. SHROFF:  Your Honor, I have not reviewed the
20   exhibit.  Thank you.
21              THE WITNESS:  Should I answer or wait?
22              MS. SHROFF:  Your Honor, I just need one second.  Let
23   me return it to you.
24              THE WITNESS:  Thank you, yes.
25   A.  So, this is an oral from --
```

1        THE COURT:  I'm sorry, Professor March.

2        THE WITNESS:  I beg your pardon?

3        THE COURT:  Professor March, the answer is a yes or no

4   question.  And then if depending on what the answer is,

5   Mr. Quigley will go forward or he'll move on.

6        THE WITNESS:  I apologize.

7   A.   This claims that they have a site where they do that, and

8   it wouldn't surprise me if that were true.

9   Q.   Thank you.  So, you said the Muslim Brotherhood has

10  branches throughout the Sunni world, correct?

11  A.   Yes.

12  Q.   One of those branches is in Palestine, correct?

13  A.   Yes.

14  Q.   And that is called Hamas, correct?

15  A.   Yes.

16  Q.   And Hamas is a designated foreign terrorist organization,

17  right?

18  A.   That's correct.

19  Q.   Hamas has killed civilians?

20  A.   Yes.

21  Q.   And the Egyptian Muslim Brotherhood has funded Hamas,

22  correct that?

23  A.   Is -- I don't know.  I think it is very difficult for them

24  to do that when they were illegal in Egypt, so I couldn't tell

25  you whether they as an organization funded them.

H1O3GAM2                         March - cross

1   Q.  You said that you are working on a book or worked on a book

2   about influential Muslim Brotherhood figures.  Do you recall

3   that?

4   A.  Yes.

5   Q.  Are you familiar with Sayyid Qtub?

6   A.  Yes, I've written an article about him.

7   Q.  Fair to say he is an influential Muslim Brotherhood figure?

8   A.  He was, particularly in the 1950s and '60s.

9   Q.  Yes or no?

10  A.  Yes.

11          In order to answer truthfully, I'd like to say that he

12  was extremely influential in the '50s and '60s, but the

13  Brotherhood formally renounced his ideas after his death.

14  Q.  He promoted something called takfiri, correct?

15  A.  That's not quite true.

16  Q.  He has become influential in other groups, correct?

17  A.  Sayyid Qutb is an important figure in 20th century Islamist

18  thought, and he's read by many, many different people and

19  groups across a wide spectrum.

20  Q.  Would it surprise you to know that his book *Milestones* is

21  distributed in ISIS training camps?

22  A.  It would surprise me mildly, because they have serious

23  theological problems with him, and they have their own list of

24  scholars.  So, it would surprise me mildly, but I wouldn't say

25  that it's not possible.

H1O3GAM2                     March - cross

1    Q.  You testified about Islamist movements, right.  Just how
2    would you define an Islamist movement?
3    A.  I believe the way I defined it earlier is as a group that
4    is organized to advance the ruling role of Islam over the
5    public social and educational sphere.
6    Q.  The Muslim Brotherhood is an Islamist movement, correct?
7    A.  It is the fountainhead of most 20th century Islamist
8    groups.
9    Q.  Meaning they want a society based on Islamist laws,
10   correct?
11   A.  They want a society -- the Muslim Brotherhood's ideology is
12   very complicated.
13   Q.  It is a yes or no question.
14           MS. SHROFF:  Objection, your Honor, it is not --
15           THE COURT:  It was a yes or no question.  If Professor
16   March can't answer it yes or no, he should say so.
17           THE WITNESS:  It's complicated.
18   Q.  They want a society based on sharia law, correct?
19   A.  That's also complicated.  They want a society in which the
20   Muslims are faithful to their religion, and the government
21   tries in some way to adapt Islamic law to modern needs.
22   Q.  Let's talk about kind of the current or the 2013 Muslim
23   Brotherhood in Egypt.
24           Just prior to the coup, the Muslim Brotherhood called
25   for jihad or a Muslim Brotherhood cleric called for jihad in

H1O3GAM2                         March - cross

1    Syria, correct?

2    A.   Yes.  Everybody was calling for war against Assad in Syria,

3    including John McCain.

4    Q.   But also including the Muslim Brotherhood, correct?

5    A.   Yes, they opposed the Assad government.

6    Q.   They were they treated -- sir, are you familiar with the

7    motto of the Muslim Brotherhood?

8    A.   The model?

9    Q.   The motto.

10   A.   Oh, the motto.  Yes, right.

11   Q.   Is it "Allah is our goal, the messenger is our role model,

12   the Koran is our Constitution, jihad is our path, death for

13   Allah's causes is our greatest aspiration"?

14   A.   That was the traditional motto, yes.

15   Q.   So, let's talk briefly about -- sorry.  Couple of last

16   questions on the Muslim Brotherhood.

17             Very large organization, right?

18   A.   Yes.

19   Q.   Hundreds of thousands of members throughout the world?

20   A.   I'm not trying to be evasive, but membership in the group

21   is sometimes hard to pinpoint.  But I would say activists,

22   affiliates, associates, you don't necessarily get a membership

23   card.

24   Q.   That would be in the hundreds of thousands though?

25   A.   I would guess, I would surmise.

1   Q.  So let's talk about just briefly about the coup in Egypt

2   and the lead up to it.  Muslim Brotherhood Morsi government

3   came into power in 2011, 2012, correct?

4   A.  Yeah.  Yes.

5   Q.  And they got in power and they enacted a Constitution,

6   correct?

7   A.  Not just the Muslim Brotherhood.  There was a

8   constitutional assembly that was elected directly by the people

9   of Egypt that developed a Constitution over the course of late

10  2011, up until 2012.

11  Q.  And they quickly became unpopular, correct, the ruling

12  government?

13  A.  So, Egypt is a very, very divided country.  It is a very,

14  very divided country.  Many people did not want the Muslim

15  Brotherhood to come to power, and so they opposed it from the

16  very beginning.  So, yes, it is not surprising that a large

17  number of Egyptians did not like them and opposed them.

18  Q.  So, I'm going to read you something and I want you to let

19  me know if you wrote this.

20  A.  Yes.

21  Q.  The shared -- referring to the shared failure of the

22  Brotherhood and the front to resolve their mutual mistrust.

23  A.  Yes.

24  Q.  This was an article you wrote in the Boston Review?

25  A.  Yes, a short article in the Boston Review.

H1O3GAM2                        March - cross

```
1    Q.  You said "This failure in turn led vast numbers of
2    Egyptians, including the non-Islamist political elites who
3    participated in elections and the constituent assembly to
4    decide that a political system dominated by the Brotherhood was
5    more threatening to them than a return to military rule."
6              You wrote that, correct, sir?
7    A.  Yes, that's correct.
8    Q.  And there were protests against the Brotherhood or against
9    the government which was run by the Brotherhood in June of
10   2013?
11   A.  Yeah, end of June 2013, yes.
12   Q.  These were millions of people were protesting.
13   A.  The numbers are heavily disputed and politicized, sort of
14   like our inauguration, but it wouldn't surprise me if the
15   numbers went into the millions.
16   Q.  So, shifting topics again, you testified that one area that
17   a lot of disaffected Muslim Brotherhood people went was Turkey,
18   correct?
19   A.  Yes.
20   Q.  Turkey, in fact, the government there is like an offshoot
21   of the Muslim Brotherhood, correct?
22   A.  I wouldn't characterize them in that way.  They are a
23   government that's led by a party that is regarded as Islamist
24   and is friendly to the cause of the Muslim Brotherhood, but
25   Turkey has its own political development.  So I would not refer
```

H1O3GAM2                          March - cross

 1   to the AKP as an offshoot of the Muslim Brotherhood.

 2   Q.  Nonetheless, it is an Islamist party.

 3   A.  Yes.

 4   Q.  You talked about how they had different controls of the

 5   borders at various times, correct?

 6   A.  So, they always had control of the border.  They had policy

 7   decisions on whether to let people go into Syria from their

 8   border.

 9   Q.  Okay.  Those policies changed over time, correct?

10   A.  Yes.

11   Q.  You were asked some questions on direct about this book The

12   Road to Hijrah, correct?

13   A.  Yes, a pamphlet I believe.

14   Q.  You still have it up there?

15   A.  Yes.

16   Q.  It's about 50 pages, correct?

17   A.  Yeah, exactly 50 pages.

18   Q.  If you can look at the Twitter accounts.  First, you don't

19   know when this document was published, correct?

20   A.  It has 2015 on the cover.  I don't know if there was

21   information that's part of this that was released before this.

22   Q.  You don't know either way?

23   A.  No.  I don't.

24   Q.  If you can go to page 38.  There is some Twitter posts

25   there from January 20, 2015, correct?

H1O3GAM2                      March - cross

1   A.  That's correct, yeah.

2   Q.  So this document, based on that, could not have been

3   published before January 20, correct?

4   A.  Yes.  As assembled.

5   Q.  If you go to page 47.

6   A.  Actually, I'm sorry, there is a post here from January 17,

7   yes.

8   Q.  January 20 is the latest date on that page.

9           MS. SHROFF:  Objection, your Honor.  Could he let the

10  witness answer, please.

11          THE COURT:  They're helping each other out.

12  A.  No, I agree with you.

13  Q.  If you go to page 47, correct?

14  A.  Yes, this is a list of the Twitter handles.

15  Q.  Right.  You said ISIS and at another point in your direct

16  has ISIS followers and supporters.  There are many, many

17  Twitter accounts out there for them, correct?

18  A.  That's correct.

19  Q.  Not all those people are in the Islamic State, correct?

20  A.  Well, that's part of the problem with Twitter, is you don't

21  really know who is on the other end, right.

22  Q.  Right.  So fair to say they're --

23  A.  Not everybody is in Syria or Iraq under the control of the

24  Islamic State.

25  Q.  Right.  And not everyone who is on Twitter supporting the

H1O3GAM2                        March - cross

1  Islamic State is a member of the Islamic State, correct?

2  A.  It is not really a group that has membership.  You give

3  your oath of loyalty which could be located, but I'm sure it is

4  logically true that not everybody has done this.

5  Q.  You also testified about how Twitter routinely shuts down

6  many of the more pro ISIS Twitter accounts, correct?

7  A.  Yes.

8  Q.  Sitting here today, you don't know how long any of those

9  accounts on page 47 were active for, correct?

10 A.  I don't.

11 Q.  Sir, you were asked some questions about ISIS and leaving

12 the caliphate, correct?

13 A.  Yes.

14 Q.  Generally, that's looked down upon, correct?

15 A.  Absolutely.

16 Q.  Fair to say ISIS has voiced support of people who never

17 made it to Syria, correct?

18 A.  They voice support of people that have -- like people that

19 support them but have not been able to make it to Syria?

20 Q.  Right.

21 A.  Yes.

22 Q.  They've endorsed their actions?

23 A.  If they are actions that are in line with the goals of the

24 Islamic State, yes.

25 Q.  Right.  Like, for example, the Orlando nightclub shooter,

1   correct?

2   A.  I believe.

3          MS. SHROFF:  Objection.  Objection to the time period,

4   your Honor.

5          THE COURT:  I didn't hear what you said.

6          MS. SHROFF:  We object, the questions that are being

7   asked are outside of the time period in this case.  He's asking

8   about something that happened in 2017 or '16.

9          THE COURT:  Overruled.

10  Q.  Like the Orlando nightclub shooter, correct?

11         MS. SHROFF:  Objection.

12         THE COURT:  Overruled.

13  A.  It's very common for ISIS to express support for violent

14  actions.

15  Q.  So the answer is yes, correct?

16  A.  Yes.

17  Q.  The San Bernardino shooters, correct?

18  A.  I believe they expressed support for that.

19         MR. QUIGLEY:  One moment, your Honor.  I have nothing

20  further.

21         MS. SHROFF:  Your Honor, may I?

22         THE COURT:  Yes, absolutely.

23  REDIRECT EXAMINATION

24  BY MS. SHROFF:

25  Q.  Hi again, Dr. March.

H1O3GAM2                      March - redirect

1   A.  Hello.

2   Q.  Let me show you this book.  ISIS -- actually, why don't you

3   tell the jury what the title is.

4   A.  *The ISIS Apocalypse*.  It is written by William McCants,

5   which was mentioned by Mr. Quigley.

6   Q.  And he asked you if you read the book, correct?

7   A.  I have read this book.

8   Q.  So have I.  So let me direct you to page 75 of that book,

9   correct?

10  A.  Yes.

11  Q.  Who is Mr. McCants talking about on that page?

12  A.  He's talking about the man that was to become known as Abu

13  Bakr Al Baghdadi, the head of ISIS.

14  Q.  What was his real name?

15  A.  Ibrahim al-Badri I believe is his birth name.

16  Q.  Does Mr. McCants speak about that person when he was not

17  yet the caliphate of ISIS?

18  A.  Yes, he's referring to the period of 1999 to 2000.

19  Q.  Is that person the person that was thrown out of the Muslim

20  Brotherhood?

21          MR. QUIGLEY:  Objection, hearsay.

22          THE COURT:  Overruled, if he knows.

23  A.  This book quotes Badri, later Baghdadi, as saying the

24  Muslim Brotherhood does not embrace me as he left the

25  organization.  He was radicalized in a different direction that

1  was not compatible with being in the Muslim Brotherhood.

2  Q.  He was thrown out of the Muslim Brotherhood, correct?

3  A.  It says here he left the organization.  But it's possible

4  that it was a mutual divorce.

5  Q.  Could you take a look at the citation for me.

6  A.  Page 20, that's to a Washington Post article.

7  Q.  Is it fair to say, Dr. March, that there is no literature

8  whatsoever of the Muslim Brotherhood saying, please, please,

9  Mr. Bakri, stay with us, correct?

10  A.  I'm not aware of that.

11  Q.  Right.  And in fact, there is no support whatsoever from

12  the Muslim Brotherhood about Mr. Bakri when he was just Ibrahim

13  Bakri, correct, when he left the Muslim Brotherhood?

14  A.  I'm not aware of any support for him.

15  Q.  When he became the caliph, the Muslim Brotherhood could

16  have, could they not, have embraced that caliph, right?

17  A.  They could have given the oath of loyalty known as the

18  Bayat to him, and they defiantly did not.

19  Q.  What do you mean when you say defiantly did not?

20  A.  Meaning that ISIS or the Islamic State demanded all Muslim

21  organizations to join them and to give their loyalty, and the

22  Brotherhood publicly rejected their methods, and in turn ISIS

23  declared them to be apostates, so not even Muslims, and people

24  you can kill indiscriminately.

25  Q.  ISIS considered Muslim Brotherhood apostates in 2013,

H1O3GAM2                          March - redirect

1  correct?

2  A.   ISIS always regarded participation in democratic election

3  as un-Islamic, and the Brotherhood has always sought influence

4  through participation in elections, so that's always been

5  regarded as incompatible with Islam by groups like ISIS.

6  Q.   That continued in 2014, correct?

7  A.   Yes.

8  Q.   And 2015, correct?

9  A.   Yes.

10  Q.   Now, Mr. Quigley also talked to you, did he not, about the

11  positions of the Muslim Brotherhood vis-a-vis Assad, correct?

12  A.   Yes.

13  Q.   Did members of the United States Congress vote in

14  opposition to the tyranny of Assad?

15  A.   Yes.

16  Q.   How about president Obama, what was his position regarding

17  Assad?

18            MR. QUIGLEY:  Objection, relevance.

19            THE COURT:  Overruled.

20  A.   Obama from the beginning of the civil war in Syria tried to

21  declare that if Assad crossed certain red lines, that the

22  international community might intervene on humanitarian grounds

23  to remove Assad.  But, that policy was never realized.

24  Q.   Would it be fair to say he was not a fan?

25  A.   He said Assad must go.

H1O3GAM2                        March - redirect

Q.   Thank you.  Let me direct you, sir, to Mr. Quigley's

questions about the Brotherhood.

A.   Yes.

Q.   He lumped together members of the Muslim Brotherhood,

affiliates of the Muslim Brotherhood, and supporters of the

Muslim Brotherhood.

          MR. QUIGLEY:  Objection to the characterization.

          THE COURT:  Overruled.

Q.   Tell the jury, sir, what is a member of the Muslim

Brotherhood?

A.   So I can speak with a little bit more familiarity about

Egypt, which is where the Muslim Brotherhood is traditionally

strongest.  And the Brotherhood is known for having sort of

concentric circles of membership.

          So at the widest level you may be an affiliate or a

brother, and you may have a small group of people that you

socialize with and do study circles with, but you may go

through many years before you are let into a closer circle.

          So they have sort of ranks of membership, kind of like

a police force or a military or any other kind of organization

where you ascend or you get closer and closer based on the

years of membership and the amount of trust and the way in

which you've built your life around membership in the

Brotherhood.

Q.   You could be born into the Muslim Brotherhood, correct?

A.  As a metaphor, so Brotherhood, the Brotherhood is known for
having people try to marry within it.  You may marry somebody
whose father and mother are members of the Brotherhood.  So
yes, it is very common for people to have as much of their
lives as possible happen within Brotherhood socialization.
Businesses and families and things like that.

Q.  You could be a supporter of the Muslim Brotherhood from the
United States, could you not?

A.  Yes.

Q.  You could be a supporter or an affiliate of the Muslim
Brotherhood from the United States, could you not?

A.  So, I've always been a little bit unclear if you're not
there, what your formal relationship is.  You may maintain
ties, you may maintain an emotional or a kind of a moral
support.

        I don't believe that you are expected to pay dues or
that you are expected to go to any kind of meetings or anything
like that.  It is mostly a matter of your social network and
the feelings that you have and the things that you read.

Q.  The Muslim Brotherhood has its own media, correct?  It runs
TV channels in Egypt and in Turkey, correct?

A.  Well, not in Egypt certainly now.

Q.  I'm sorry.  Turkey.

A.  Yes, there may be satellite channels that are run by people
that were associated with the Brotherhood.

H1O3GAM2                       March - redirect

1   Q.  If you're running a TV channel that's run by the

2   Brotherhood, to work there, you're Brotherhood, correct?

3              MR. QUIGLEY:  Objection.  And also beyond the scope.

4              THE COURT:  Sustained.

5   Q.  Does the Brotherhood have employment and business

6   opportunities for its constituents?

7   A.  Yes.

8   Q.  A TV channel is a business opportunity, correct?

9   A.  Yes.

10  Q.  Now, Mr. Quigley asked you questions about many other

11  people whom he described as the bases for various jihadi

12  organizations.  Let's start with Sayyid Qutb.

13             When did Sayyid Qutb die, by the way?

14  A.  1966.

15  Q.  Is it fair to say that when Sayyid Qutb was alive, he did

16  not have any position on the Islamic State, correct?

17  A.  That's correct.

18  Q.  Who knows what is Sayyid Qutb would have to say about the

19  Islamic State, correct?

20  A.  That's correct.  There would be only speculation.

21  Q.  Sayyid Qutb, by the time he passed away, his basic

22  teachings lent themselves to many different offshoots, correct?

23  A.  Yes.  There are many people that read Qutb and read this as

24  a call for warfare, and there are many people that read it as a

25  call for social transformation through education.  So it is

1    sort of, you know, it's sort of like you read into it what you

2    want to get out of it.

3    Q.  Right.  So you can, just like the United States

4    Constitution.  You can read into it severe or you can read into

5    it conservative or you can read into it liberal, correct?

6    A.  I wouldn't compare it to the Constitution.  But like many

7    texts he's not -- his main mission is to say that Muslims

8    should be faithful to God, and direct all of their loyalty to

9    God.  But he doesn't outline whom you have to fight against

10   here or there or anything like that.

11   Q.  Now, Mr. Quigley also went over with you the motto?

12   A.  Yes, the motto.

13   Q.  Could you take us through that motto very slowly, please.

14   Do you remember it?

15   A.  So --

16   Q.  Because I don't.

17   A.  Perhaps Mr. Quigley could remind us.  The Koran is our

18   Constitution.

19   Q.  Right.

20   A.  Is that correct?

21   Q.  Let me just stop you there.  What is the Koran by the way?

22   A.  The Koran is the Muslim holy book thought by Muslims to be

23   directly revealed by God to the Prophet Mohammed.

24   Q.  Kind of like the Bible?

25   A.  Not really like the Bible, actually kind of like Jesus.

1   Q.  Okay.  So, that's one.  What was the other thing that he

2   said?  And I honestly don't recall it.  Something about Allah

3   being one God.  Is that part of it?

4   A.  Yes, of course Muslims --

5   Q.  Oh wait, I think I have.  "Allah is our objective."

6   A.  Allah God is our objective, is our goal.  That to which we

7   direct all of our desires and energies.

8   Q.  Do you see anything militant about that?

9   A.  Not inherently.  It is a statement of monotheism.  I think

10  any Jew or Christian that takes the Abrahamic tradition

11  seriously would agree with that.

12  Q.  "Prophet is our leader."

13  A.  So the Muslims believe that the Koran was revealed

14  infallibly to the Prophet Mohammed, and his actions and

15  guidance remain exemplary for Muslims today.

16  Q.  "The Koran is our law."

17  A.  That's pretty self-explanatory.  It says in the Koran,

18  because it is the revealed word of God, that that is the

19  ultimate authority on matters of belief and religious practice.

20  Q.  "Jihad is our way."

21  A.  So, I think it is important to spend some time talking

22  about jihad.  As I mentioned earlier, "jihad" means struggle.

23  So, when you asked me earlier about jihadi movements, I tried

24  to specify that this is a term that we use to refer to some

25  specific groups today, that are using violence in a kind of

1   wanton way.  But "jihad" is a term that is part of Islam and

2   that every Muslim in some way believes in struggle on behalf of

3   God.  And so, if a group or an individual is referring to

4   jihad, it doesn't make them a jihadi in the sense of al Qaeda

5   or ISIS.  It is the way that when after 9/11, when President

6   Bush called it a crusade against terrorism, nobody really

7   thought that he meant trying to turn the Holy Land Christian

8   again -- or some Muslims thought that.  But we didn't hear it

9   that way.  We heard it as a righteous struggle against

10  terrorism.

11          It is a term that is very common in Arabic.  You might

12  refer to a jihad for education or a jihad for women's rights.

13  So it is not surprising at all to find Muslim groups using this

14  term.

15  Q.  In fact there was a jihad for women's rights on the day

16  after Donald Trump was elected, right?  That would actually be

17  a jihad for women's rights, correct?

18          MR. QUIGLEY:  Objection.  Relevance.

19          MS. SHROFF:  He covered the same time period with

20  other events, your Honor.

21          THE COURT:  Overruled.

22  Q.  Correct?

23  A.  If you wanted to call the women's march a jihad for women's

24  rights, then that would certainly not be incompatible with the

25  meaning of the word.

H1O3GAM2

1    Q.   Thank you.  And "dying in the way of Allah is our highest

2    hope" is a Koranic phrase, correct?

3    A.   I don't think that itself is literally a Koranic phrase,

4    but the idea is that it's sort of like many Americans believe

5    is that they would be happy to die for America.  And so you

6    have your ultimate loyalty to your religion and to God, and

7    there is nothing greater than that.

8    Q.   And there is nothing about any of these lines that a

9    law-abiding Muslim person would in any way shy away from,

10   correct?

11              MR. QUIGLEY:  Objection.  Calls for speculation.

12              THE COURT:  Overruled.

13   A.   Abiding of which law?

14   Q.   No, just these words.  If an average Muslim person said

15   these words, they would be perfectly in keeping with their

16   lawful daily existence, correct?

17   A.   Yes.

18              MS. SHROFF:  I have nothing further, your Honor.

19   Thank you.

20              MR. QUIGLEY:  No recross, your Honor.

21              THE COURT:  Professor March, you may step down.

22              THE WITNESS:  Thank you.

23              (Witness excused)

24              MS. SHROFF:  Your Honor, can we have a five-minute

25   break?

H1O3GAM2

1        THE COURT:  We can have a five-minute break.  Let's

2   make it 10 minutes.  Don't discuss the case.

3        (Jury excused)

4        (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1O3GAM2

1          THE COURT:  Folks, will there be another witness?

2          MS. MIRON:  Yes, your Honor.  Sarah Howard, our

3    investigator.

4          THE COURT:  Okay.

5          MS. MIRON:  I anticipate introducing several exhibits

6    which have been provided to the government.  I believe there

7    might be a better practice for us to hash out some of our

8    arguments about them.

9          THE COURT:  Maybe objected to?

10          MR. DeFILIPPIS:  Some will, your Honor.

11          THE COURT:  Talk about those.  If you can let me see

12    the copies of the ones that are going to be controversial.

13          MS. MIRON:  Could you give us a few minutes to confer?

14          THE COURT:  Okay.

15          I'll be in the back, just let me know.

16          (Recess)

17          (Continued on next page)

18

19

20

21

22

23

24

25

H1o5gam3

|||
|---|---|
| 1 | THE COURT:  So, what areas of disagreement are there? |
| 2 | MR. DEFILIPPIS:  Your Honor, just a few exhibits that |
| 3 | we were provided by the defense and if you don't mind, I will |
| 4 | just refresh my own recollection and then hand each up to your |
| 5 | Honor; we only have one copy. |
| 6 | THE COURT:  Okay. |
| 7 | MR. DEFILIPPIS:  So, there is an exhibit which depicts |
| 8 | a screenshot of a YouTube video that depicts what looks like |
| 9 | Mr. Aboualala making a Muslim Brotherhood sign, and then the |
| 10 | caption of the video which has been translated says:  October |
| 11 | 4th, 2014 Erdogan -- who I understand is the president of |
| 12 | Turkey -- raises Rabaa sign with one of the Egyptians after the |
| 13 | Eid prayers. |
| 14 | So, essentially this is a screenshot of a video, your |
| 15 | Honor, of Attiya Aboualala with the president of Turkey making |
| 16 | a Muslim Brotherhood sign.  And the government's contention is |
| 17 | that this is, one, impermissible hearsay because it is being |
| 18 | offered, the translated caption is being offered for the very |
| 19 | truth of the fact that Mr. Aboualala made a Muslim Brotherhood |
| 20 | sign with the president of Turkey and so we think it is |
| 21 | inadmissible on those grounds.  And I would note that this is |
| 22 | being offered, I understand, through the Federal Defenders' |
| 23 | investigator who I presume has no first-hand knowledge of that |
| 24 | exchange or of the Turkish president. |
| 25 | MS. MIRÓN:  I can speak to how Ms. Howard obtained |

H1o5gam3

1    this screenshot.

2              The video is publicly available on YouTube, I believe

3    to this day.  The government can review it.  It was posted and

4    uploaded by Attiya with the date of October 4th, 2014, which is

5    a few days before Mr. El-Gammal contacted Attiya regarding Samy

6    and so relevant in terms of his state of mind about Attiya's

7    Muslim Brotherhood affiliation.  I think it falls squarely in

8    the exception to hearsay which covers views or statements of

9    belief.  Plenty of exhibits have come in to this trial under

10   that exception.

11             THE COURT:  Mr. DeFilippis?

12             MR. DEFILIPPIS:  Your Honor, I think that, number one,

13   the witness has no first-hand knowledge, as I said, of what is

14   depicted in the video and even if the video were to come in

15   under state of mind, the caption itself, which we don't know

16   who wrote, who translated it, certainly the investigator can't

17   testify as to the translation, that caption itself which

18   explains what is going on in the video is being offered solely

19   and primarily for its truth which is to describe what is going

20   on.

21             THE COURT:  Haven't we already seen in this trial

22   photos of Mr. Aboualala making this sign?

23             MR. DEFILIPPIS:  We have, your Honor, and that was

24   offered by a witness who was also depicted in the video.  I

25   mean, if they wanted to call the Turkish president I might not

H1o5gam3

1    object but Mohammed El Goarany testified that he, while at a

2    dinner with Mr. Aboualala, observed him make that sign and so,

3    in that instance, it was perfectly natural for him to

4    authenticate that video but, in addition, and perhaps this is

5    what your Honor is getting at, it is not relevant because it is

6    cumulative.  The government isn't disputing that Mr. Aboualala,

7    on one or more occasions, made that sign.

8            THE COURT:  Well, I mean, I will let you put in the

9    image but not the caption.

10           MS. MIRÓN:  Okay.

11           Could we put in the date, your Honor?

12           THE COURT:  No.

13           MR. HABIB:  So we are just going to -- we are going to

14   redact what is within the red box?

15           THE COURT:  Yes, although the date is on top of that

16   as well and I don't know whether any of the jurors, I don't

17   believe any of them do, speak Arabic or can read Arabic, but

18   only the image should be shown.

19           MR. DEFILIPPIS:  Your Honor, the next exhibit is a

20   Facebook posting which has been translated, it is a posting of

21   Mr. Aboualala that reads, or the translation reads:

22           Attiya Aboualala added five new photos.  There is a

23   photo of a gentleman wearing an orange jumpsuit with what looks

24   like an ISIS flag behind it.

25           It says:  Dean of Al-Imam al-A'zam College in Baiji

H1o5gam3

1    and  Professor of jurisprudence, a Noble Quran memorizer, a man

2    well known for his cordiality, Dr. Ahmed Ali Saleh Arjan

3    al-Qaisi, after he was detained in the Islamic State

4    organization for a period of time, for refusing to give fealty

5    to the organization.

6           Again, your Honor, this appears to be a purported

7    event that Mr. Attiya has posted about and, again, it seems the

8    defense is trying to establish the fact of that event through

9    the posting and so it similarly would be hearsay.

10          THE COURT:  Okay.

11          MR. HABIB:  Your Honor, this material is offered not

12   for its truth but to show the speaker's state of mind, that is,

13   Attiya's state of mind.  It is, in substance, identical to any

14   number of exhibits the government has introduced as evidence of

15   Mr. El-Gammal's state of mind.  The Court will recall the

16   government, through Special Agent Collie and other witnesses,

17   introduced numerous articles that Mr. El-Gammal posted to

18   Facebook, articles concerning things like Mossad spy captured

19   by ISIS, ISIS captures down of Daraya in Syria.  We asked the

20   Court for a limiting instruction that those headlines were not

21   admitted for their truth, the Court declined to give that

22   instruction, but sauce for the goose.  The government has

23   introduced exactly this kind of evidence to prove

24   Mr. El-Gammal's mental state down to the forum where it was

25   posted.

H1o5gam3

1          MR. DEFILIPPIS:  Your Honor, unfortunately the rules

2     of evidence aren't exactly goose gander on this issue.  The

3     government is, as defense notes, permitted to offer the party

4     opponent statements and that the defense is expressly not

5     permitted to do that.  These are statements not of

6     Mr. El-Gammal but of Mr. Aboualala and, again, the fact that he

7     posted this --

8          THE COURT:  But he is an alleged co-conspirator, is he

9     not?

10         MR. DEFILIPPIS:  He is, your Honor but, again, number

11    one, the defense is not permitted to offer co-conspirator

12    statements so they have to do it under state of mind theory and

13    here it doesn't show anything about his state of mind.  He is

14    simply transmitting an article, the facts of which it seems the

15    defense wants to establish as truth but which is not permitted

16    by the hearsay rules.

17         MR. HABIB:  Judge, if an individual post of a Facebook

18    article isn't probative of state of mind what is the relevance

19    of Mr. El-Gammal's posts?

20         MR. DEFILIPPIS:  Your Honor, they're permitted as

21    statements of the party opponent.  That's what the rule says.

22         THE COURT:  This could be admitted under the state of

23    mind exception within with an appropriate instruction to the

24    jury.

25         MR. DEFILIPPIS:  And then, your Honor, there are two

H1o5gam3

1      additional exhibits which I will just let your Honor read but

2      just to characterize them, these are from the Facebook posts of

3      Samy El- Goarany, I believe, one referencing ousted Egyptian

4      president Mohamed Morsi chanting during a trial session in

5      support of the embattled Gaza strip, and a second posting

6      discusses the need to do most in cases of the Syrian revolution

7      is to listen to the people who participated in it and discusses

8      abhorrent violence.

9              Again, your Honor, same objection.  I will hand these

10     up.

11             THE COURT:  These are both Samy El- Goarany posts?

12             MS. MIRÓN:  Yes.  All three are.

13             Are you only objecting to two?

14             MR. DEFILIPPIS:  Sorry, I only had two there.

15             THE COURT:  And the defense theory?

16             MR. HABIB:  Your Honor, the analysis is identical to

17     the analysis the Court has just employed in admitting evidence

18     of Mr. Aboualala's state of mind.  This is exactly the same

19     type of evidence.  These are news media articles and videos

20     posted by Samy during the time of the alleged conspiracy and

21     they're offered as evidence of his state of mind.  It is the

22     same analysis.

23             THE COURT:  It will be allowed.

24             MS. MIRÓN:  I think we are ready then.

25             THE COURT:  Okay.  Let's get the jury.

H1o5gam3

1              How long will this be, Ms. Mirón?  If you know.

2              MS. MIRÓN:  I would say half an hour.

3              THE COURT:  Okay.  I will look at you around 12:30 and

4    you left me know if there is going to be substantially more or

5    not much more.

6              MS. MIRÓN:  Okay.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  Everyone, please, be seated.

3            Will the defense please call its next witness?

4            MS. MIRÓN:  Thank you, your Honor.  Defense calls

5    Sarah Howard.

6     SARAH HOWARD,

7        called as a witness by the Defendant,

8        having been duly sworn, testified as follows:

9            THE COURT:  You can be seated.  Pull your seat up to

10   the microphone and begin by stating your full name and spelling

11   your last name for the record.

12           THE WITNESS:  My name is Sarah Howard.

13           THE COURT:  Ms. Mirón?

14           MS. MIRÓN:  Thank you.

15   DIRECT EXAMINATION

16   BY MS. MIRÓN:

17   Q.  Good afternoon, Ms. Howard.  Where do you work?

18   A.  I work at the Federal Defenders.

19   Q.  In what capacity?

20   A.  I'm a criminal defense investigator.

21   Q.  How long have you been an investigator with the Federal

22   Defenders?

23   A.  Just about three years.

24   Q.  And before that, what did you do?

25   A.  I was also a criminal defense investigator at a different

H1o5gam3                         Howard - direct

1    office.

2    Q.  And what are your duties as a federal defender

3    investigator?

4    A.  I interview witnesses, find them, I take photographs,

5    measurements, go to scenes.  Things like this.

6    Q.  Do you subpoena records?

7    A.  I do.

8    Q.  And review those records?

9    A.  I do, yes.

10   Q.  And do you do training on a regular basis as an

11   investigator?

12   A.  Yes.

13   Q.  What types of training?

14   A.  There is a yearly national training put on for the federal

15   criminal defense investigators, and a periodic New York State

16   training as well.

17   Q.  Okay.

18            Are you familiar with this case?

19   A.  I am.  Yes.

20   Q.  And, have you reviewed records relating to this case?

21   A.  Yes, I have.

22   Q.  I would like to direct your attention to some Facebook

23   records.

24   A.  Okay.

25            MS. MIRÓN:  I ask that Defendant's Exhibit 113-DD,

H1o5gam3                          Howard - direct

1    113-CC and 113-OO be admitted.

2              MR. DEFILIPPIS:  No objection, your Honor.

3              THE COURT:  Those exhibits will be admitted.

4              MS. MIRÓN:  Thank you.

5              (Defendant's Exhibits 113-DD, 113-CC and 113-OO

6    received in evidence)

7    BY MS. MIRÓN:

8    Q.  Let's start with 113-DD; what is that?

9    A.  This is a public shared post from a Facebook record.

10   Q.  And whose record?

11   A.  This is related to Samy El- Goarany.

12   Q.  I would ask that that be published for the jury, 113-DD.

13             THE COURT:  Ladies and gentlemen, this will be

14   published, however it is not being offered for its truth but

15   simply for whatever effect you believe it may have had on

16   Mr. El- Goarany -- Samy El- Goarany's state of mind.

17   Q.  Could you please highlight the text?

18             Ms. Howard, please read the date on the top?

19   A.  It is July 15th, 2014.

20   Q.  And whose Facebook account?

21   A.  This is Samy El- Goarany.

22   Q.  And please read the text, the first text?

23   A.  The text line says:  Gaza solidarity protest from Yarmouk

24   refugee camp in Syria.

25   Q.  And what about the following date?  What is that?

H1o5gam3                         Howard – direct

1   A.   Below that is July 14, 2014.

2   Q.   Okay.  And what about the summary?

3   A.   The summary says:  Ousted Egyptian President Mohamed Morsi

4   chanted, during a trial session on Sunday, in support of the

5   embattled Gaza strip where at least 166 people have been killed

6   in Israeli air strikes since Monday.  Morsi appeared in court

7   for a session in his trial... Daily Sabah.

8   Q.   You can put that aside.  Do you have 113-OO in front of

9   you?

10  A.   I do.

11  Q.   OO?

12  A.   Yes.

13           MS. MIRÓN:   Let's publish that, with permission of the

14  Court.

15           THE COURT:   This exhibit is also subject to the same

16  instruction.  It is not being offered for its truth.

17  Q.   Could you focus on the text?  Is this also from Samy

18  El- Goarany's Facebook account?

19  A.   Yes, it is.

20  Q.   What is the date of this post?

21  A.   This is September 21st, 2014.

22  Q.   And is this a public post?

23  A.   It is.

24  Q.   What about the one that you just read?

25  A.   Yes; both are shared publicly.

H1o5gam3                         Howard – direct

1   Q.  So friends who are on Facebook could read it?

2   A.  That's correct.

3   Q.  What does the summary say?

4   A.  The summary says:  Possibly what we need to do most in the

5   case of the Syrian revolution is listen to people who

6   participated in it and those who are facing the abhorrent

7   viole... and then it is cut off.

8   Q.  What about the text?

9   A.  The text reads:  Palestinian refugees from Syria speaking

10  out about the oppression they've suffered under Bashar al

11  Assad's dictatorship.  Press "cc" for English subtitles.

12  Q.  Do you have 113-CC in front of you?

13  A.  I do not.

14          MS. MIRÓN:  Okay.  I would ask that this be published

15  as well.

16          THE COURT:  Very well.

17  Q.  And the text highlighted.

18          Is this also from Samy El- Goarany's Facebook account?

19  A.  Yes, it is.

20  Q.  What is the date?

21  A.  The date here reads September 24th, 2014.

22  Q.  And the status?

23  A.  The status reads:  There is only two things the U.S. can do

24  to help the people of Syria, Iraq, or any other conflict zone

25  in the world.  And that is:  1) to completely withdraw from

H1o5gam3                          Howard – direct

1     these countries and never come back; 2) to accept all the

2     refugees who've been forced to flee from the violence.

3     Q.  Thank you.

4              In the course of your investigation, have you

5     subpoenaed PayPal records for Samy El- Goarany?

6     A.  Yes, I have.

7     Q.  Let me show you those records.

8     A.  Okay.

9     Q.  Is that a formatted version of the PayPal records that you

10    received?

11    A.  Yes.

12             MS. MIRÓN:  I would ask that that, along with the full

13    set of PayPal records which are self—authenticating and

14    certified business record be admitted into evidence?

15             MR. DEFILIPPIS:  No objection, your Honor.

16             THE COURT:  What is the exhibit number?

17             MS. MIRÓN:  802.

18             THE COURT:  802 will be received.

19             MS. MIRÓN:  Thank you.

20             (Defendant's Exhibit 804 received in evidence)

21    BY MS. MIRÓN:

22    Q.  So, I am not sure if this will project but let's give it a

23    try, with the Court's permission?

24             THE COURT:  Certainly.

25             MS. MIRÓN:  I'm sorry, 804 is the reformatted

1   spreadsheet.

2   Q.  Are you able to highlight the left column?  No.  So, we

3   will read to the jury.

4           So, just so the jury is aware, how did you find out

5   whose PayPal account this is?  How do you know it is Samy

6   El- Goarany's PayPal account?

7   A.  Oh, in the subpoena we addressed to PayPal based on the

8   e-mail associated with Samy El- Goarany.

9   Q.  And that's samybey1@gmail.com?

10  A.  Yes.

11  Q.  Are you familiar with the types of donations reflected in

12  this document?

13  A.  I am.  Yes.

14  Q.  So, what are certain types of money sent and received?

15  A.  In the first column they are different types of payments

16  for services or goods that the user is paying for.

17  Q.  Okay.

18  A.  The funding source would be the type of account it is

19  coming from where the money is directed from.

20  Q.  Let's stop there for a moment --

21  A.  Sure.

22  Q.  -- because on the screen you can see a donation was sent to

23  the Syrian Association of Ottawa?

24  A.  Yes, I see that.

25  Q.  What, if you know, what exactly does that relate to?

1    A.   The Syrian Association of Ottawa?

2    Q.   Yes.

3    A.   In another column in the spreadsheet it refers to a

4    campaign that they had run to elicit donations and such for

5    their aid effort.

6    Q.   And do you recall, as you sit here today, exactly the type

7    of campaign where it was posted and the type of campaign for

8    the Syrian Association of Ottawa?

9    A.   Sure.

10         The website for the campaign was included in this

11   document so when I did, through my investigation, I came to

12   realize that it no longer was active, the website, so then I

13   went to a -- it is called the Wayback Machine, it is like an

14   archive for websites that are no longer active or quite old so

15   that one could see how it was back then.

16         MR. DEFILIPPIS:  Objection, your Honor; hearsay.

17         THE COURT:  Overruled.

18   Q.   So, I would like to show you what's being marked as

19   Defendant's Exhibit 805.  Is that what you found when you

20   conducted a search for the web page that was associated with

21   the Syrian Association of Ottawa?

22   A.   That's right.

23         MS. MIRÓN:  I would ask that this be admitted into

24   evidence.

25         MR. DEFILIPPIS:  Objection, your Honor.  Authenticity

H1o5gam3                           Howard – direct

1     and hearsay.

2                THE COURT:  Can I see that?

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1o5gam3                        Howard - direct

```
 1                 (At side bar)
 2                 THE COURT:  Can I see it?
 3                 MS. MIRÓN:  It is hard to read, yes.
 4                 THE COURT:  It is impossible for me to read.  What is
 5      this?
 6                 MS. MIRÓN:  This is a document that is a copy of the
 7      web page available on the Wayback Machine which is a publicly
 8      available website which allows users to search for archived web
 9      pages.
10                 THE COURT:  Okay.
11                 MS. MIRÓN:  It is very similar to the database that
12      the government introduced about the Facebook records without
13      any foundation.
14                 THE COURT:  What is the difference between this
15      document and 804 which is the one --
16                 MR. DEFILIPPIS:  804 were self-authenticating business
17      records of PayPal, this is apparently a now defunct website
18      that another website claims existed and attempted to retrieve
19      and portray in some way but, you know, there are any levels
20      where this could be inauthentic or garbled or amended.  We have
21      no way to authenticate this.
22                 THE COURT:  As I understand Wayback you can go to way
23      back and it gives you essentially screen shots of what various
24      websites looked like once upon a time.
25                 MR. DEFILIPPIS:  Right.
```

1           THE COURT:  Strictly speaking, the objection is

2    well-founded.  I don't know whether Ms. Howard, through her

3    training -- I mean, is she going to be able to authenticate

4    this in some way if you were to inquire?

5           MS. MIRÓN:  She is going to say that she did a search

6    for that URL and this came up and it matches precisely the URL

7    in the PayPal document.  We could subpoena a witness to

8    authenticate it but I don't think it is necessary.

9           MR. QUIGLEY:  It is not a business record.

10          THE COURT:  It is not PayPal-specific.  I am going to

11   sustain.

12          MR. HABIB:  Your Honor, for the record, I knew that I

13   had come across this earlier but there is a -- I can provide

14   the Court citations to District Court cases in which Courts

15   have taken judicial notice of sites from the Internet archives,

16   from the Wayback Machine.  Specifically there is -- I will just

17   provide the Westlaw number, but it is an S.D.N.Y. case, 2013

18   Westlaw 6869410 at star 4 note 65, S.D.N.Y. December 30th,

19   2013.  There are a number of citations also from the federal

20   circuit -- Northern District of California, Eastern District of

21   Michigan, District of Massachusetts.  I can provide them to the

22   Court in a letter if the Court wants.

23          THE COURT:  Substantively the difference between the

24   information here and information in 804?

25          MS. MIRÓN:  The information in 804 just provides the

H1o5gam3                          Howard - direct

1   name Syrian Association of Ottawa.  This information says that

2   while over 400,000 Syrians are living in makeshift camps and

3   the harsh winter is up ahead -- it just describes exactly the

4   reason the funding was being solicited.

5           MR. DEFILIPPIS:  Your Honor, even if defense could get

6   over the authentication hurdle it would then just be an

7   out-of-court statement offered to prove what the organization

8   does.

9           MS. MIRÓN:  State of mind as to --

10          THE COURT:  I'm not going to allow it.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1o5gam3                          Howard - direct

1             (In open court)

2    BY MS. MIRÓN:

3    Q.  Are there other transactions reflected in this document

4    related to Turkey?

5    A.  Yes, there is.

6    Q.  And could you point out a date?

7    A.  Yes; at the very bottom it's January 28, 2015.

8    Q.  What does that entry say?

9    A.  In the name column it says Expedia.com.

10   Q.  How much money was transferred?

11   A.  In the gross column it says $33.41 USD.

12   Q.  Are there other Expedia entries in the PayPal account?

13   A.  There are, yes.

14   Q.  Could you indicate where in the chart they are?

15   A.  Two columns above that there is another entry.

16   Q.  Okay.

17   A.  For January 1, 2015.  The gross amount is $38.71 USD.

18   Q.  And what is the type of -- Jason, if you could highlight

19   the bottom three rows as much as possible?

20             What is the type?

21   A.  The type here indicated is express checkout payment sent.

22   Q.  And amount of?

23   A.  $38.71.

24   Q.  And was there also withdrawal funds to a bank account?  In

25   January?

H1o5gam3                        Howard - direct

1    A.  Yes, there was.

2    Q.  For January 17th, 2015 in the amount of $10.29?

3    A.  Yes.

4    Q.  Okay.  You can put that aside.

5             Are you familiar with CARE, the organization CARE?

6    A.  Yes.  Yeah.

7    Q.  What is it?  C-A-R-E; that organization.

8    A.  It is a humanitarian aid organization that operates

9    globally.

10   Q.  And did you have the opportunity to subpoena records from

11   Care, C-A-R-E?

12   A.  Yes, I did.

13   Q.  Let me show you what's being marked as 801.  Are those the

14   records that you subpoenaed from CARE related to the samybey

15   e-mail account?

16   A.  Yes, they are.

17             MS. MIRÓN:  I would ask these be admitted as

18   self-authenticated business records.

19             MR. DEFILIPPIS:  No objection, your Honor.

20             THE COURT:  801 will be received.

21             MS. MIRÓN:  Thank you.

22             (Defendant's Exhibit 801 received in evidence)

23   BY MS. MIRÓN:

24   Q.  Could you publish the second page?

25             Where is the user, the account holder information?  Is

H1o5gam3                          Howard – direct

1    that on the second page?

2    A.   Yes.  It is on the left-hand side of the page.

3    Q.   What does it say?

4    A.   It says:  Primary name, Mr. Samy El- Goarany.  Below that

5    there is a phone number indicated, an e-mail address, and

6    preferences related to his donation account.

7    Q.   And when was this donation set up, as far as you know?

8    A.   I don't recall the date just now, it is in this record.

9    Q.   Let me see if I can help.  What page are you on?  You might

10   want to count backwards.

11   A.   Okay.  It's the sixth page from the end.

12   Q.   Great.

13            And when was the first donation from Samy El- Goarany

14   to CARE?

15   A.   The first date indicated in this, on this page for

16   donations given is January 27, 2014.

17   Q.   And were these regular monthly recurring donations?

18   A.   They do appear to be recurring, yes.

19   Q.   And the amount, how much?

20   A.   $30 and $20, depending.

21   Q.   Okay.  You can put that aside.

22            Did you have the opportunity to review Attiya

23   Aboualala's Facebook account?

24   A.   Yes.

25   Q.   And his YouTube account?

H1o5gam3                         Howard - direct

1    A.  Yes.

2    Q.  So, I am going to show you what's been previously marked as

3    Defendant's Exhibit 402-A and ask you to look at it.  Without

4    reading any text on the document, can you just explain to the

5    jury what this document is?

6    A.  Sure.

7    Q.  How you found it?  Let me put it that way.

8    A.  Sure.

9            In my investigation I viewed Attiya Aboualala's

10   YouTube channel which is open to the public for videos and this

11   is a screenshot of one of those videos I found.

12           MS. MIRÓN:  And I would ask that this be admitted

13   subject to the ruling by the Court.

14           MR. DEFILIPPIS:  No objection, your Honor.

15           THE COURT:  Very well.  That exhibit will be admitted.

16           (Defendant's Exhibit 402-A received in evidence)

17   BY MS. MIRÓN:

18   Q.  Based on your viewing of Attiya Aboualala's Facebook

19   account, is this the same man at the front of the image?

20   A.  At the front right; yes, that appears to be.

21   Q.  Do you know who the other gentleman is?

22   A.  I don't know him personally but by view, yes, that's the

23   president of Turkey.

24   Q.  Erdogan?

25   A.  Erdogan, yes.

H1o5gam3                          Howard - direct

1    Q.  Thank you.  You can put that aside.

2              MS. MIRÓN:  I am going to ask you to look at 122-CC-T

3    and ask that that be admitted, subject to the Court's ruling?

4              MR. DEFILIPPIS:  No objection, your Honor.

5              THE COURT:  That will be admitted.

6              (Defendant's Exhibit 122-CC-T received in evidence)

7    BY MS. MIRÓN:

8    Q.  Mr. Fisher, would you please publish that?

9              This is from Attiya Aboualala's Facebook account,

10   right?

11   A.  Correct.

12   Q.  And it is dated October 31st, 2015?

13   A.  That's correct.

14   Q.  Is this a direct message to Attiya and someone else?

15   A.  It is.

16   Q.  And who is the other person?

17   A.  Alaa Ibn Eljebbah.

18   Q.  So, if you can read that author and I will read Attiya

19   Aboualala's entry.

20   A.  Starting October 31st, 2015:

21             "ELJEBBAH:  The state claims responsibility for

22   bringing the plane down.  Did you see the news?

23   Q.  We can turn to the next page and highlight the first half?

24   A.  This message continues:

25             "ELJEBBAH:  Breaking:  A Russian aircraft was brought

H1o5gam3                          Howard - direct

1    down killing more than 220 Russian crusader that were on board.

2    The State of Sinai.  The soldiers of the caliphate were

3    successful in bringing down a Russian aircraft on the State of

4    Sinai that was carrying on board more than 220 Russian

5    crusader, all of whom were killed, thank God, and may you know

6    you Russians and all your allies that you have no safety on the

7    Muslims' lands or their air, and that the killing of the tens

8    daily on the land by the bombardment of your aircrafts will

9    only bring misery on you, and that you kill and shall be killed

10   by God's will and God is the victor but most people do not

11   know.  Allah God is the greatest and the mightiest is to God

12   and that is the biggest evidence that

13   #TheIslamicStateisaRussianagent."

14   Q.  #TheIslamicStateisaRussianagent?

15   A.  Yes.

16   Q.  And Attiya's response to this post is:

17            "ATTIYA:  That's a disaster."

18            Right?

19   A.  Correct.

20            "ATTIYA:  You happy?

21            "ELJEBBAH:  Man, I am just spreading the news to you.

22            "ATTIYA:  Hhhhhh."

23   A.  It continues:

24            "ELJEBBAH:  What's the disaster?

25            "ATTIYA:  Russia will send aircrafts to bombard Sinai.

1      "ELJEBBAH:  Bombard who?

2      "ATTIYA:  Sinai's people.

3      "ELJEBBAH:  Damn.  It's going to hit Sinai's people

4  like that, just like that.

5      "ATTIYA:  Hmm.  Yes.

6      "ELJEBBAH:  That way then if we follow the same

7  principle, if ISIL hits Israel, we'd be upset and say it will

8  come and hit our families in Sinai."

9  Q.  Attiya writes:

10     "ATTIYA:  The aftermath of the State of Sinai claiming

11 responsibility for bringing down of the Russian aircraft.  The

12 State of Sinai claiming responsibility for bringing down the

13 Russian aircraft is a sad event that will cause many negative

14 consequences for the following reasons:

15     "First:  The bringing down of a civilian aircraft has

16 nothing to do with the principles or the morals and it does not

17 express any kind of moral victory.  It is condemned incident on

18 all levels.  There is no explanation that could justify the

19 attack of a civilian aircraft, even if the Russian airstrikes

20 kill innocent lives in Syria.  That is not a moral

21 justification to kill innocent Russians (do not condemn by

22 other sin).

23     THE COURT:  Ms. Mirón, can you slow down a little bit?

24     MS. MIRÓN:  Yes.

25     "ATTIYA:  Secondly:  Committing the State of Sinai,

1   this horrible crime will open the door to toughen the security

2   in Sinai and perhaps in Egypt, the causes of democracies and

3   freedoms will take a back stand, and the name of Sinai will go

4   on the list of the Arabic regions that have a dangerous ISIL

5   presence which will call for a stronger international focus to

6   eradicate ISIL in Sinai instead of focusing on finding a

7   solution to the Egyptian crisis.

8           "Thirdly:  The incident may open the door to

9   additional intervention and military support to the regime from

10  Russia's part and Israel in specific, and the incident will

11  push the west world on a similar path.

12          "Fourth:  Egypt is in a difficult economical and

13  unstable state.  This incident is of an international scale and

14  it will deepen the image of Egypt as a country that's

15  undergoing a serious crisis and all this will not help the

16  cause of the political change and the transformation towards

17  democracy.  The security discourse will surface to the front

18  more and more and the political discourse will take a back

19  stand."

20  Q.  Okay.  You can just read the final entry.

21  A.  Still continued on October 31st, 2015:

22          "ELJEBBAH:  We don't disagree that they are civilians

23  but you bring up the point that this will open an intervention

24  in Sinai, then on this premise it's allowed to hit someone and

25  crush its edges in Sinai?  And on the premise that Syria had no

1    intervention in it?"

2              MS. MIRÓN:  Thank you.

3              Pursuant to the Court's ruling, I would ask that

4    100-BB-T be admitted.

5              THE COURT:  Very well.

6              MR. DEFILIPPIS:  No objection, your Honor.

7              MS. MIRÓN:  Thank you.

8              THE COURT:  100-BB-T will be received and it may be

9    published.

10             (Defendant's Exhibit 100-BB-T received in evidence)

11   BY MS. MIRÓN:

12   Q.  Just for a moment we have switched to Mr. El-Gammal's

13   Facebook account.

14   A.  That's correct.

15   Q.  And what is the date of this post?

16   A.  January 18, 2014.

17   Q.  If you could read Gammal, I will read Waleed Nazii.

18             "EL-GAMMAL:  Look.  Infidelity in Egypt is worse than

19   that of the Americans.

20             "NAZII:  It is true that Americans are infidels, but

21   at least they have ethics and principles but (those have) no

22   faith, principles or ethics (I mean) but in Egypt.

23             "EL-GAMMAL:  To me, a prostitute here is a million

24   times more honorable than those women wearing hijab who dance

25   for el-Sisi.

H1o5gam3                          Howard - direct

1          "NAZII:  Very true.

2          "EL-GAMMAL:  They hate lying here, and average

3   Americans are good people.

4          "NAZII:  God grants victory to a diligent and ethical

5   infidel and not to a believer without ethics.

6          "EL-GAMMAL:  Even if a whore who doesn't hate Islam

7   but those Muslims in Egypt hate Islam.  Exactly."

8          MS. MIRÓN:  Thank you.

9          I would ask that 122-BB-T be admitted pursuant to the

10  Court's ruling.

11         MR. DEFILIPPIS:  No objection.

12         THE COURT:  It will be received.

13         (Defendant's Exhibit 122-BB-T received in evidence)

14  BY MS. MIRÓN:

15  Q.  This is January 24, 2016, right?

16  A.  March 14th, 2016?

17  Q.  Sorry, March 14th, 2016.

18  A.  Yes.

19  Q.  I will ask you to read the entry from -- this is Attiya's

20  Facebook account, right?

21  A.  Correct.

22  Q.  Could you read Attiya's notes?

23  A.  Yes:

24         "ATTIYA:  Come on, Master.  I renounce and condemn

25  severely what Turkey incurs from treacherous terroristic

H1o5gam3                          Howard - direct

1  onslaught amid reticence, disregard, and support from some

2  member of international committee that we witnessed rush to

3  support France against the Paris attacks in a high protest.

4  Worth noting in this last explosion that left behind more than

5  120 victims beyond injured or killed, that the American embassy

6  had published on its website a warning to its nationals from

7  possible explosions in the morning of the day of the explosion

8  according to A.H.A. agency suggesting that Turkey faces a

9  conspiracy and a real war that targets its safety and will."

10  Q.  You can continue.

11          "ATTIYA:  An Egyptian reporter who lives in Istanbul."

12          The next entry is blank.

13  Q.  Ahmed Ismail puts a question mark.

14          "ATTIYA:  See, and tell me what you think.

15  Q.  All right.  Could you write it in the form of a

16  justification, not a judgment?

17          "ATTIYA:  I see that it should and it's completed.

18  Q.  You want an analytical opinion?  Maybe the second

19  paragraph.  It works?

20          "ATTIYA:  No, put first.  Format it in an analytic

21  form in a purplish form as long as you just put it.

22  Q.  You can continue.

23          "ATTIYA:  Show it to me before publishing it, and

24  after publishing, send me the link so that I could share it.

25  Q.  Man, let go of that brotherhood style of doing things.

H1o5gam3                      Howard - direct

1    HHHHH.

2    A.  And the description:  An Egyptian reporter living in

3    Istanbul.

4    Q.  All right.  Attiya Aboualala, an Egyptian reporter living

5    in Istanbul.  We cannot determine the front that executed the

6    explosion, but we could say that there are many messages from

7    this terrorist act, the most important of which is warning

8    Turkey from delving into the Syrian file in which it led an

9    effective proactive role.  Aboualala added to statements made

10   to Mosr Al Arbia that despite the fact that the Kurdistan

11   workers' party was behind many of the attacks in Istanbul and

12   other areas in Turkey in the past period since the breach of

13   the truce with the Turkish authority, he expects that the last

14   explosion was on foreign hands.  He further notes that there is

15   an international conspiracy against Turkey confirmed by the

16   fact that the American embassy had published on its website a

17   warning to its national from potential explosions per the news

18   agency A.H.A. which raises suspicion.

19   A.  All right.

20          And then the following entry is a missed call.

21   Q.  Attiya Aboualala, an Egyptian reporter living in Istanbul.

22   What Turkey incurs from treacherous terroristic attacks amid

23   reticence, disregard, and support from some members of

24   international committee that we witnessed rush to support

25   France and against the Paris attacks.  Aboualala added to

1    statements made to Mosr al Arbia that there is an international

2    conspiracy against Turkey confirmed by the fact that the

3    American embassy had published on its website a warning to its

4    nationals from potential explosions the morning of the day of

5    the explosion according to A.H.A. agency which is mistrustful

6    and raises suspicion any time.

7           THE COURT:  Ms. Mirón, you sped up through that

8    reading so, please, slow down a little bit.  Okay?

9           MS. MIRÓN:  Okay.

10   A.  Attiya responds:  Great.  Did you publish the report?

11   Q.  I think we can stop there.

12          Then, did you have occasions to review Facebook

13   communications to Attiya Aboualala and Mohammed El Goarany?

14   A.  Yes, I did.

15   Q.  I would ask that Defendant's Exhibit 123-AA-T be admitted.

16          THE COURT:  Any objection?

17          MR. DEFILIPPIS:  No objection, your Honor.

18          THE COURT:  123-AA-T will be admitted.

19          (Defendant's Exhibit 123-AA-T received in evidence)

20          MS. MIRÓN:  I will show Ms. Howard and publish to the

21   jury, your Honor?

22          THE COURT:  You may.

23   BY MS. MIRÓN:

24   Q.  Just highlight the top half.

25          So the jury is situated, is this from Attiya

H1o5gam3                              Howard - direct

1    Aboualala's Facebook account?

2    A.  Yes, it is.

3    Q.  And is it a communication between Attiya and Mohammed

4    El Goarany beginning June 6 of 2015?

5    A.  Yes, it is.

6    Q.  If you read Attiya I will read Mohammed El Goarany.

7    A.  The first entry on June 6, 2015 is blank:

8            "EL-GOARANY:  Are you going to join too?

9            "ATTIYA:  Of course not.

10           "EL-GOARANY:  No news from Samy.  I hope that you'd

11   give me some reassurance about him.

12           "ATTIYA:  I really don't know.

13           "EL-GOARANY:  Try.  And if you are able to get in

14   touch with him, have him call me or at least write to us.  I

15   thank you so much, really appreciate it.  God bless.

16           "ATTIYA:  If I could, I certainly will do.

17           "EL-GOARANY:  I'm sure you will because you're a man,

18   a good one too.  I hope you'll always be able to give me

19   reassurances about him.

20           "ATTIYA:  Hopefully so.  God almighty willing.

21           "EL-GOARANY:  God grant you success to accomplish

22   that.

23           "ATTIYA:  Amen."

24   Q.  A thumbs up.

25   A.  And a thumbs up.

1          Attiya continues:

2          "ATTIYA:  Greetings of peace and mercy to you."

3          The following two entries are illegible letters, then

4     continuing, now we are August 4, 2015:

5          "ATTIYA:  Peace be on you."

6     Q.  Call, duration 479.  Call duration 55.  Picture posted.

7          "EL-GOARANY:  Samy's phone in America, 1-845-283-9079

8     may God enable you to convince him to come by you and live in

9     Turkey, God willing.

10          "ATTIYA:  May peace, blessings and God's mercy be on

11     you.

12          "EL-GOARANY:  And may peace be on you, too.  I hope

13     you're fine, thanks to God.  I wonder if you've been successful

14     in contacting my son Samy.  Please spare no effort in that

15     regard.  God willing, you'll be able to convince him to come to

16     Turkey and live in it.  I hope to hear some good news soon.

17     Peace be on you.

18          "ATTIYA:  God willing.  Send me your number.

19          "EL-GOARANY:  1-646-296-0666.  I believe I gave you a

20     business card when we met.  You can also talk to me any time on

21     Facebook.

22          "ATTIYA:  Peace be on you."

23     A.  The following entry is a missed call:

24          "ATTIYA:  Peace be on you."

25          Then a thumbs up sticker, followed by a link to an ABC

H1o5gam3                        Howard - direct

 1    news item related to this case.  The following entry says:

 2                "ATTIYA:  Hello.  His name is Martine 202-862-4341."

 3    A.  The following is a link to a press release from the Justice

 4    Department related to this case.

 5    Q.  Okay.  You can put Attiya Aboualala's Facebook account

 6    aside.

 7                Have you reviewed what is in evidence as Defendant's

 8    Exhibit 10, an SD card?

 9    A.  Yes.

10    Q.  And have you reviewed an extraction report from the SD

11    card?

12    A.  Yes, I have.

13    Q.  Are there photos on that SD card?

14    A.  Yes.

15    Q.  Is there also a video on the SD card?

16    A.  Yes, there is.

17                MS. MIRÓN:  Your Honor, may we approach briefly?

18                THE COURT:  Sure.

19

20

21

22

23

24

25

1       (At side bar)

2           MS. MIRÓN:  I anticipate they're going to object and

3   your Honor wanted an update.  I have about 15 more minutes.

4           THE COURT:  Let's send them to lunch.

5           MS. MIRÓN:  Okay.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1o5gam3                          Howard – direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, we are going to take

3    our lunch break now, one hour, so please be in the jury room no

4    later than 1:45.  Don't discuss the case.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Jury not present)

2               THE COURT:  Be seated.

3               MS. MIRÓN:  I would ask Ms. Howard if she can step

4       down.

5               THE COURT:  I'm sorry.  You can step down.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1O3GAM4

1          MS. MIRON:  So the record is clear, 10-A is the

2     proposed defense exhibit, a very short video which was

3     contained on this SD card seized from Mr. Gammal's home when he

4     was arrested.  And it came in through Agent Collie, the SD card

5     did, subject to connection.  This is the small segment of

6     evidence we'd like to introduce in the SD card.

7          THE COURT:  Came in subject to connection on direct or

8     cross-examination?

9          MS. MIRON:  Cross.

10          THE COURT:  I'm sorry, what is depicted on the video?

11          MS. MIRON:  The video is a very short video where

12     there are two books by Jimmy Carter and autographed.  It is

13     just a video showing the book being opened with the small --

14     signature.

15          THE COURT:  How long is the video?

16          MS. MIRON:  10 seconds.

17          THE COURT:  Can I see it?

18          MS. MIRON:  Of course.

19          (Video recording playing)

20          THE COURT:  Connect it up.

21          MR. HABIB:  So the idea, your Honor, is the government

22     opened on, among other things, Mr. El Gammal's electronic

23     devices provide a window into his state of mind, and the

24     government has followed through on that promise by introducing

25     from his electronic devices substantial evidence tending to

H1O3GAM4

1    reflect his state of mind.

2          Testimony was elicited from Mr. Zelin, the

3    government's expert, to the effect that ISIS would reject

4    negotiation from Israel and to object to a negotiated

5    disposition to the Israeli-Palestinian conflict.

6          Evidence that Mr. El Gammal was proudly displaying a

7    book that advocates just such a disposition was relevant to his

8    state of mind, and negates the inference that he had the

9    requisite state of mind to participate in the crimes charged.

10         MR. DeFILIPPIS:  Your Honor, I believe it was probably

11   about a week ago we received a representation from defense

12   counsel that they were essentially done with this kind of

13   average American non-threatening evidence that they had put in

14   through the smoke shop cards and the voting records.

15         Again, I think this is extremely marginal relevance.

16   The fact that a video whose date we don't know, this could have

17   been years before the charged offense, displaying a book in an

18   odd and unexplained fashion without any commentary on the book

19   or statement as to whose book it is, who took the video, no

20   relevance has been established and cannot be established

21   through this investigator, who simply is going to play a video

22   taken from a drive.  And again, she has no sense of the origins

23   of the video.  Your Honor, we just think that this has no

24   relevance.

25         I will say that if the defendant's devices are truly a

H1O3GAM4

1    window into his mindset, I think this opens the door for the

2    government to show evidence which we I think again described to

3    the Court more than a week ago about his telegram account.

4            THE COURT:  What is the argument that you are going to

5    make from this video?  Let me ask this.  Is this a video that

6    was taken at his home?  Are these his books?  There is no

7    evidence on the record concerning that, correct?

8            MR. HABIB:  There is no evidence in the record

9    concerning where this video is shot, no.  All we know is the

10   books were written around 2009.  So the video must postdate

11   that period.

12           THE COURT:  What argument would you make from that?

13           MR. HABIB:  I'm sorry?

14           THE COURT:  What argument would you make from that

15   snippet?

16           MR. HABIB:  The argument would be that someone who

17   proudly displays an autographed copy of a book that advocates a

18   negotiated settlement to the Israeli-Palestinian dispute would,

19   that video, would make it less likely that such a person would

20   also participate in the charged offenses, because it is

21   incompatible with the belief system that the alleged FTO has.

22           And as to the average American argument, I think to be

23   fair, and I think the record will bear me out on this, that

24   we'd said we were done with voting and the smoking, and the

25   Court had reserved --

H1O3GAM4

1          THE COURT:  I don't think this goes to the same

2     argument.  I don't know that you can logically make that

3     argument based on this piece of evidence when, and tell me when

4     I say something that's wrong, we don't know who made this

5     video, we don't know when it was made, we don't know where it

6     was made, we don't know whether these books belong to Mr. El

7     Gammal.

8          MS. MIRON:  On that point, your Honor, there are

9     photographs of the search of his house that depict the books in

10    the house.  And if necessary, we would ask to admit those

11    photographs to connect it to this video.

12         MR. DeFILIPPIS:  We also heard testimony that his

13    ex-mother-in-law had keys to the house, keys to the garage,

14    that he lived with someone else.  He could have had friends at

15    the house.  Again, we know nothing about how this was

16    introduced, and the investigator will add nothing.

17         THE COURT:  The other issue that I have with the

18    proffer that's been made is, he has these books, we know what

19    the title of the books are.  We know that they were written by

20    Jimmy Carter.  But I don't know that you can make the leap from

21    that to the argument that these clearly show that he was open

22    to a negotiated settlement with Israel.

23         Again, remind me what the title of the books are?  I

24    don't know that necessarily can be made.

25         MR. HABIB:  I think it's --

H1O3GAM4

1          (Video recording playing)

2          MR. HABIB:  So, you know, I think the Court is

3    certainly aware, as we all are, that Jimmy Carter's legacy is

4    attempting to broker a peaceful solution to the

5    Israeli-Palestinian conflict.  The book is called *We Can Have*

6    *Peace in the Holy Land*.  The Palestinian flag is on the right.

7    Mr. El Gammal's finger is covering it, but I'm sure it is the

8    Israeli flag on the left.

9          If that's the Court's concern, and we're not proposing

10   to put in evidence the book, but the jury can infer, based on

11   its common knowledge of who Jimmy Carter is and what he's done

12   with regard to Israel and Palestine, and from the title of the

13   book, and from the proud display of the book, that a certain

14   mental state is associated with that.

15         Again, if the government wants to argue, doesn't mean

16   he endorsed everything in the books, doesn't mean they're even

17   his books, someone else could have put them in his house,

18   proper argument, but properly addressed to weight and not

19   admissibility.

20         MR. DeFILIPPIS:  The fact that it's proudly displayed

21   is something that's totally unsupported.  He could have been

22   intending to post this on Facebook next to his pro ISIS rants

23   cursing Jimmy Carter.  We just don't know.

24         THE COURT:  I'm going to allow it in under the state

25   of mind exception.

H1O3GAM4

1          MR. DeFILIPPIS:  Given that the defense is now taking

2     rather wide latitude to explore the defendant's electronic

3     devices as a window to his mindset, they've had drawn to their

4     attention now for I think over a week what the government had

5     mentioned in court, which is that his iPad telegram account

6     reflects a profile picture of someone making the ISIS sign.

7     And so we would respectfully request permission to

8     cross-examine Ms. Howard or other witnesses about that.

9          MR. HABIB:  This material is not at all related to

10     that material.  This is admitted for a specific relevance

11     theory.  Whether or not he had this -- so again, backing up one

12     step.

13          When the government initially proposed to introduce

14     this evidence, we objected on the ground of inadequate notice.

15     The Court sustained the objection.  Including that we would be

16     prejudiced in our trial preparation and presentation by delayed

17     notice.  So as a result, that's been the ruling of the Court,

18     and that has governed our continued trial preparation and

19     presentations.  The same prejudice concerns that obtained when

20     the Court excluded this evidence apply with equal force as we

21     stand here today.

22          MS. MIRON:  Let me add, I did not cross Mary Horvath,

23     we also did not call Josiah Roloff who would speak to these

24     electronic encryption apps.  We did not open that door in any

25     way.

H1O3GAM4

```
1          THE COURT:  The government's second half of that
2   request is denied.  I don't believe this opens up the door to
3   cross-examination on the telegraph or whatever it is.  Anything
4   else?
5          MS. MIRON:  No, your Honor.  Thank you.
6          THE COURT:  Let me ask.  Is there going to be another
7   witness after Ms. Howard?
8          MS. SHROFF:  Not from the defense, your Honor.  I
9   don't know about the government's rebuttal case.
10         THE COURT:  Does the government intend to put on a
11  rebuttal case?
12         MR. QUIGLEY:  Not at this point, your Honor.  I think
13  it may depend on the rest of the cross-examination or the
14  direct of Ms. Howard, but we're not intending to presently.
15         MS. SHROFF:  Your Honor, can we just get a yes or no
16  from Mr. Zelin so our expert can go home?
17         THE COURT:  I don't think that I can limit the
18  government in that regard.  So 1:45, folks.
19         (Recess)
20         (Continued on next page)
21
22
23
24
25
```

H1O3GAM4

AFTERNOON SESSION

1:45 p.m.

1        MS. MIRON:  Your Honor, we have one other evidentiary disagreement.

5        THE COURT:  Is that so?

6        MR. HABIB:  If the Court can believe it.

7        MS. MIRON:  I think Mr. Gammal is coming out, but I'll pass this up.

9        THE COURT:  I have what appears to be a package including recommendations for drafting a cover letter, a draft of a cover letter, and a résumé for Mr. Samy El-Goarany.

12        MR. HABIB:  To clarify, your Honor, we would only seek to admit the first page of the package, the page that begins Excel tutorial, one tutorial each day.

15        THE COURT:  So page one and two?

16        MR. HABIB:  I'm sorry?

17        THE COURT:  Page one and two or just page two.

18        MR. HABIB:  Yes.  Page one of the document and page two of -- yes.  One and two.

20        THE COURT:  What do you want to say about this?

21        MR. HABIB:  So essentially this is Samy's e-mail to himself, storing what I think was fairly common to collect some documents and e-mail them to oneself so one has access to them in the cloud so to speak.

25        It is a to-do list and it is a series of notes on how

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

H1O3GAM4

1    to compose a cover letter.  The to-do list is I think there

2    could not be a clearer example of statements of future intent.

3    And the notes to self on a cover letter are evidence of Samy's

4    then existing state of mind.  And the relevance again is that

5    in December of 2014, December 9 of 2014, the heartland of the

6    charged conspiracy, Samy is making notes that reflect his

7    intention to apply for jobs in the United States.  Not travel.

8                THE COURT:  Where does it say applying for jobs in the

9    United States?

10               MR. HABIB:  Point taken.

11               MS. MIRON:  Not yet.  We are not asking to introduce

12   this.  But the third page does include a cover letter to a job

13   in New York, December 4, 2014.  So, I think if that's going to

14   be the issue, then we could include that third page.

15               MR. HABIB:  Or at a minimum, applying for legitimate

16   jobs, jobs that ordinary college students seek.

17               MR. DeFILIPPIS:  Your Honor, if all they want to

18   introduce is the first two pages, then we won't contest that.

19               THE COURT:  Very well.  Okay.  That's it?

20               MR. DeFILIPPIS:  Sorry, your Honor, we had one matter.

21               THE COURT:  Okay.  What is it?

22               MR. DeFILIPPIS:  We understand defense is going to

23   seek to introduce several photographs of the -- maybe not.

24               MS. MIRON:  Here's what we plan to introduce through

25   this witness:  Samy's Expedia records, this e-mail.

H1O3GAM4

| | |
|---|---|
| 1 | THE COURT:  I thought the Expedia records were in. |
| 2 | MS. MIRON:  Samy's have not been admitted. |
| 3 | Mr. Gammal's have. |
| 4 | THE COURT:  Okay. |
| 5 | MS. MIRON:  The e-mail that we just discussed.  The |
| 6 | profile photo of Mr. Gammal that I opened on which appears to |
| 7 | have been taken October 8 in New York, which is relevant to |
| 8 | that time period where -- |
| 9 | THE COURT:  The one at the Empire State Building. |
| 10 | MS. MIRON:  Correct.  And then a section of his |
| 11 | American Express credit card records relating to this time |
| 12 | period of October 2014, essentially when he was in New York. |
| 13 | THE COURT:  Okay. |
| 14 | MS. MIRON:  That's it.  No other, besides the 10-A |
| 15 | Jimmy Carter.  We're not introducing other. |
| 16 | MR. DeFILIPPIS:  Without the Niagara Falls photos, |
| 17 | that's fine. |
| 18 | THE COURT:  Okay. |
| 19 | MS. MIRON:  We've narrowed it, your Honor. |
| 20 | THE COURT:  Very well.  Unless there is nothing more, |
| 21 | Juror No. 11 I believe -- there is a reason I ask you guys to |
| 22 | slow down when you read these things.  Juror No. 11 said he |
| 23 | could not read Exhibits 801, 802, 804. |
| 24 | MS. MIRON:  Okay.  So we can either read them again or |
| 25 | just instruct the jury that they will be available for review |

H1O3GAM4

1      after the parties --

2                  THE COURT:  Let's do that.

3                  MR. QUIGLEY:  No objection.

4                  MS. MIRON:  I sped up because it was getting

5      repetitive, but I understand the Court's admonition.

6                  THE COURT:  There is also the court reporter to

7      consider.

8                  MS. MIRON:  As always.  If the government is the

9      planning to call Mr. Zelin, well, we'd ask --

10                 (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury present)

2              THE COURT:  Good afternoon, everyone.  We did get a

3       note, well, we got a message from the jury that it was

4       difficult at least to read three of the exhibits that were just

5       put into evidence by the defense, Exhibits 801, 802 and 804.

6       We're not going to go over those exhibits again, ladies and

7       gentlemen, but do know when you deliberate you will have copies

8       of all of the exhibits with you.  Okay?  Very well.

9              With that, Ms. Miron.

10             MS. MIRON:  Thank you.

11      BY MS. MIRON:

12      Q.  Let me turn back for a moment to Samy El-Goarany.

13      A.  Okay.

14      Q.  Have you reviewed subpoenaed documents from Expedia related

15      to Samy El-Goarany?

16      A.  Yes, I have.

17      Q.  So let me show you a copy of those.

18             MS. MIRON:  I'd ask that Defense Exhibit 812 be

19      admitted as a self-authenticating business record?

20             MR. DeFILIPPIS:  No objection.

21             THE COURT:  Very well.  It will be received.

22             (Defendant's Exhibit 812 received in evidence)

23      Q.  It is going to be difficult to publish so I'll ask you to

24      read the entries to the jury.  First of all, how many entries

25      are there in this Expedia document?

H1O3GAM4                         Howard - direct

1   A.  There is six entries.

2   Q.  How do you know it relates to Samy El-Goarany?

3   A.  Because it relates to the e-mail that we associate with

4   him, Samybey1@Gmail.com.

5   Q.  Does it also have his name as the traveler on each and

6   every entry?

7   A.  It does.

8   Q.  Why don't you just read the booking date of the first

9   entry.  At the top.

10  A.  At the top?  Yeah.  It's May 16, 2013, it was a hotel

11  booking in Montreal, Quebec.

12  Q.  Do you know how long that stay was for or the check-in and

13  check-out dates?

14  A.  Yeah.  The check-in date is June 7, 2013.  Check-out date

15  June 14, 2013.

16  Q.  What about the next line?

17  A.  The next line was a hotel originally booked May 11, 2014,

18  it was subsequently canceled on May 13, 2014, for a hotel in

19  Montreal, Quebec.  For a stay checking in May 15, 2014, until

20  check-out date May 17, 2014.

21  Q.  Okay.  The next entry.

22  A.  Following was a hotel booked July 26, 2014, again in

23  Montreal, Quebec, for a check-in date August 8, 2014 until

24  August 10 that same year.

25  Q.  Okay.  Then what about the fourth entry?

1    A.  The following was a hotel booked on October 30, 2014,

2    subsequently canceled November 23, 2014, for Istanbul, Turkey.

3    Q.  What's the name of the hotel?

4    A.  Sultanahmet Suites.

5    Q.  What was the original check-in and check-out date of that

6    booking?

7    A.  November 25, 2014 until November 26, 2014.

8    Q.  The next entry?

9    A.  The following is a hotel booked January 1st, 2015,

10   subsequently canceled January 27, 2015.  The name of that hotel

11   is Sunrise Hotel also for Istanbul, Turkey, a check-in date of

12   January 28 with a check-out of January 29, 2015.

13   Q.  The last one?

14   A.  The last entry is a hotel booking made on January 27, 2015,

15   again in Istanbul, Turkey, again at the Sultanahmet Sultan

16   Apartments, it's under the hotel column.  With a check-in date

17   January 28, 2015, check-out January 29, 2015.

18   Q.  Thank you.  As part of your work on this case, did you

19   review an e-mail from Samy El-Goarany's e-mail account?

20   A.  Yes, I did.

21   Q.  Let me show it to you.  Who is the e-mail -- what is the

22   e-mail address from?

23   A.  This e-mail is from, well, the name associated with this

24   e-mail account would be like a vanity name, I suppose.  It is

25   still Samybey1@Gmail.com.  It's to also the same e-mail address

1   Samybey1@Gmail.com with the vanity name Queensbey.

2   Q.  That's Defense Exhibit 602?

3   A.  Yes, it is.

4            MS. MIRON:  I ask that be admitted, the first two

5   pages.

6            MR. DeFILIPPIS:  No objection.

7            THE COURT:  It will be received.

8            (Defendant's Exhibit 602 received in evidence)

9   Q.  Just highlight the top box, please.  So this is an e-mail

10  subject zippo, dated December 9, 2014, at 3:35 a.m.?

11  A.  Yes.

12  Q.  From Sultan which has the Samybey1@Gmail.com to Queensbey

13  Samybey1@Gmail.com.  Right?

14  A.  Correct.

15  Q.  And the attachments line reads résumé and cover letter zip?

16  A.  Correct.

17  Q.  Please publish the second page.  Could you just read these

18  notations for the jury.

19  A.  Sure.  The first notation says Excel tutorial, one tutorial

20  each day.

21           The next line get vit D3 5,000 pills from Costco.

22           Following line says hit up Garik.

23           Following line sample cover letter and tutorial.

24           Following line go to bursar office and inquire about

25  the 2,149 pending financial aid.

H1O3GAM4                     Howard - direct

1            Following line is learn to cook.

2            Following is notations related to a cover letter.

3    Listing --

4    Q.  You don't need to read all those.

5    A.  Okay.

6            MS. MIRON:  But I'll leave them up for the jury for a

7    moment.  These will also be available for the jury, your Honor.

8    Correct?

9            THE COURT:  Yes.

10   Q.  We were discussing what was previously marked as Defense

11   Exhibit 10, which is an SD card?

12   A.  Correct.

13   Q.  That was taken from Mr. Gammal's home upon arrest?

14   A.  That's correct.

15           MS. MIRON:  I would ask that Defense Exhibit 10-A be

16   admitted.

17           MR. DeFILIPPIS:  No objection, your Honor.

18           THE COURT:  Exhibit 10 will be admitted.  Defendant's

19   10.

20   Q.  To be clear, this is a video from that card.

21   A.  Correct.

22           MS. MIRON:  Okay.  So I would like it played for the

23   jury, please.

24           (Defendant's Exhibit 10-A received in evidence)

25           (Video recording playing)

H1O3GAM4                          Howard - direct

```
 1   Q.  You don't have any personal knowledge about this video?

 2   A.  No.

 3   Q.  But you can say that it was taken from the SD card that was

 4   in Mr. Gammal's home at the time of his arrest?

 5   A.  That's correct.

 6   Q.  I'd like to direct your attention to Defense Exhibit 808-A.

 7   Is that a subset of records from American Express?

 8   A.  Yes, it is.

 9           MS. MIRON:  I would ask that 808-A be admitted into

10   evidence.

11           MR. DeFILIPPIS:  No objection, your Honor.

12           THE COURT:  It will be received.

13           (Defendant's Exhibit 808-A received in evidence)

14           MS. MIRON:  Could you please publish the first page or

15   the second page.

16   Q.  Whose American Express records do these pertain to?

17   A.  These pertain to Ahmed M. El Gammal.

18   Q.  I believe you're looking at two or three statements.  The

19   first is the closing date 9/19/14, is that right?

20   A.  Correct.

21           MS. MIRON:  Please publish page 17 and highlight the

22   top half.  Actually, start on the page before.  1016, sorry.

23   Q.  There is a ticket or a reference to Expedia on 9/21/14,

24   right?

25   A.  Correct.
```

H1O3GAM4                         Howard - direct

1    Q.   And it says Cairo to London, Los Angeles, Phoenix, London.

2    Right?

3    A.   Yes.

4    Q.   Passenger name Sherif/Samiya Soliman?

5    A.   That's correct.

6    Q.   You can scroll down.  You can keep going.

7         There is an entry for October 3, 2014, Howard Johnson

8    Inn, Jamaica, New York?

9    A.   Correct.

10   Q.   Arrival date 10/3, departure date 10/3 it says?

11   A.   Right.

12   Q.   Okay.  You can keep going.  You can stop there.  What does

13   it say on October 6, 2014?

14   A.   It indicates a purchase at MTA MVM 46th Street B line, New

15   York, New York for $10.

16   Q.   And the next entry?

17   A.   The next entry is a purchase at the Mangal Kabob Turkish

18   restaurant in Sunnyside, New York for $70.

19   Q.   You can scroll down and stop there.  October 7, 2014?

20   A.   October 7, 2014, a purchase made at East Side Observer,

21   Observatory, New York, New York, for 63.22.

22   Q.   Through your investigation, do you know what that relates

23   to?

24   A.   Yes, it relates to a souvenir shop related to the Empire

25   State Building.

H1O3GAM4                          Howard - direct

1    Q.  October 7, 2014?

2    A.  This is a purchase made to FA Management, New York, New

3    York, below that there is a description of taxi.  And an amount

4    of 8.90.

5    Q.  What about October 7 at the next entry?

6    A.  The next entry reads or indicates a purchase of 71.95 at

7    the Belgian Beer Cafe in New York, New York.  It's a

8    restaurant/bar.

9    Q.  We'll skip Walgreens and then that $122 purchase?

10   A.  On October 7, 2014, it indicates a purchase made at New

11   York Skyline, New York, New York for $122.

12   Q.  Then the Albertsons, is that in Arizona in October 8?

13   A.  Yes, it is.

14   Q.  You can put that aside.

15             MS. MIRON:  I would ask that Defense Exhibit 100-FF be

16   received into evidence.

17             MR. DeFILIPPIS:  No objection, your Honor.

18             THE COURT:  Defense Exhibit 100-FF will be received.

19             (Defendant's Exhibit 100-FF received in evidence)

20             MS. MIRON:  Let me show it to Ms. Howard.  Permission

21   to publish, your Honor?

22             THE COURT:  You may.

23   Q.  Where does this photograph come from?

24   A.  This comes from Jimmy Gammal's Facebook record.

25   Q.  On the next page, does it say more about the photograph?

H1O3GAM4                          Howard – cross

1   A.  Yes, it gives some indication about uploading dates and

2   times specifically here.

3   Q.  You can publish the second page.  To be clear, this page

4   was taken from the Facebook record.

5   A.  Correct.

6   Q.  Okay.  And what does the Facebook record indicate?

7   A.  The Facebook record indicates that this image was uploaded

8   on October 12, 2014.  And there is a taken or indication of a

9   date taken here as October 8, 2014.

10  Q.  What type of phone?

11  A.  Here it indicates a Apple iPhone 3GS.

12  Q.  As the camera?

13  A.  Correct.

14          MS. MIRON:  Just publish the first page once again.  I

15  have no further questions.

16          THE COURT:  Cross-examination.

17          MR. DeFILIPPIS:  Thank you, your Honor.

18  CROSS-EXAMINATION

19  BY MR. DeFILIPPIS:

20  Q.  Good afternoon, Ms. Howard.

21  A.  Good afternoon.

22  Q.  You are an investigator, correct?

23  A.  That's right.

24  Q.  Would you say you consider yourself a thorough

25  investigator, try to be?

H1O3GAM4                      Howard - cross

1   A.  I try to be, yeah.

2   Q.  I want to talk a little bit about the video that we looked

3   at, the Jimmy Carter book.

4   A.  Correct.

5   Q.  That's something that you identified as possibly relevant

6   during your investigation, is that right?

7   A.  I identified it as being associated with one of the

8   devices, yes.

9   Q.  So, in looking at that video, I guess stepping back, one

10  thing an investigator does is try to determine the source of

11  particular files or videos, is that right?

12  A.  Sure, if there's information available.

13  Q.  Did you say that this came from a -- what sort of drive was

14  it?

15  A.  It was a SD card.

16  Q.  Okay.  What is that, just basically?

17  A.  Well, generally speaking, it maintains files related to a

18  device.  In this case I believe a digital camera.

19  Q.  One of the things you can do as an investigator is

20  determine when a particular file was created, correct?

21  A.  Occasionally, yeah.

22  Q.  You do that by looking at what's called the metadata?

23  A.  You can, yes.

24  Q.  You can determine, for example, when a photograph was

25  taken, is that right?

H1O3GAM4                          Howard - cross

1  A.  Occasionally, yes, if the metadata is available in the

2  file.

3  Q.  Or when a video is filmed, is that what metadata helps you

4  do?

5  A.  Sure, yeah.

6  Q.  And in the case of this Jimmy Carter video, is that a step

7  you took here?

8  A.  Yes, it is a step I took, yeah.

9  Q.  Is it correct that that video was filmed on February 13,

10  2008, is that right?

11  A.  Truthfully, I don't know if it was filmed on that date, but

12  there is a date, a 2008 date related to that file, yes.

13  Q.  And that was the date on which that video was filmed; was

14  that the conclusion you drew?

15  A.  No.  That was not my conclusion.

16  Q.  Did you draw any conclusion in that regard?

17  A.  I did.  One of the books in the video was published in

18  2010.  So, to me, that indicated that data related to that

19  image was incorrect.

20  Q.  So, your investigation was able to draw no conclusions

21  whatsoever about when that video was made?

22  A.  That's right.

23  Q.  It could have been any time, you have no idea?

24  A.  Correct.

25  Q.  In terms of who took that video, your investigation drew no

```
 1    conclusions in that regard either, right?
 2    A.  None whatsoever.
 3    Q.  Or who the book belonged to, you didn't know that?
 4    A.  Not from the video, no.
 5    Q.  In terms of what anyone might have intended to do with that
 6    video, if it were the defendant's video, you didn't know
 7    whether he was going to post it online, right?
 8    A.  No, definitely not.
 9    Q.  You didn't know if he was going to condemn Jimmy Carter as
10    a Zionist on Facebook?
11    A.  No.
12    Q.  You didn't know if he was going to say he hated Jimmy
13    Carter?
14    A.  No.
15    Q.  You didn't know what it was?
16    A.  No.
17    Q.  Okay.  We looked at some American Express records from
18    October of -- was it 2014?
19    A.  Yes.
20    Q.  Some of those records were October 6 through 8 of 2014, do
21    you recall those?
22    A.  Yes, I do.
23    Q.  Are you aware that was a Monday through Wednesday in 2014,
24    is that right?
25    A.  I was not aware of that but --
```

H1O3GAM4

1    Q.  Okay.  It was about, what, nine years of American Express

2    records that the Defenders got in response to the subpoena you

3    served?

4    A.  I don't know the answer to that.

5    Q.  But it was several years.  It was a thick stack, right?

6    A.  It was more than one year, yes.

7    Q.  You didn't find any other evidence in those records of

8    trips to New York other than what you discussed in your

9    testimony, did you?

10   A.  I really couldn't recall right now, no.

11   Q.  Okay.

12            MR. DeFILIPPIS:  Thank you, your Honor.

13            THE COURT:  Any redirect?

14            MS. MIRON:  Just a moment, your Honor.  Nothing from

15   the defense.  Thank you.

16            THE COURT:  Ms. Howard, you may step down.

17            THE WITNESS:  Thank you.

18            (Witness excused)

19            THE COURT:  Does the defense have another witness?

20            MS. MIRON:  Can we approach sidebar briefly?

21            THE COURT:  Sure.

22            (Continued on next page)

23

24

25

H1O3GAM4

1        (At the sidebar).

2        MS. MIRON:  While Mr. Quigley is reviewing, these are

3    additional Facebook communications that have been ruled

4    admissible by the Court during motions in limine, a couple of

5    profile pictures that I understand the government does not have

6    objections to, Samy's profile and Attiya's profile and two

7    Surespot records that were discussed during a stipulation, and

8    then we plan to rest.

9        MS. TEKEEI:  We're taking a look at them right now.

10   We received them previously.  We're reviewing the stack

11   Ms. Miron provided.

12        THE COURT:  Very well.  The representation is made

13   I've already ruled on their admissibility?

14        MS. MIRON:  Correct.  On the Facebook records, yes.

15        THE COURT:  Okay.  So if they come in, you'll publish

16   them to the jury?

17        MS. MIRON:  I don't think we're going to publish them.

18   We want them in, in case we want to make arguments about them.

19        THE COURT:  Okay.

20        (Continued on next page)

21

22

23

24

25

H1O3GAM4

1              (In open court)

2              MS. MIRON:  The defense would ask that the following

3    exhibits be received in evidence.  100-CC-T, 110-AA, 113-BB,

4    122-KK, 401, 202 and 203.

5              MR. QUIGLEY:  We have no objection.

6              THE COURT:  Very well.  Those exhibits will be

7    received.

8              (Defendant's Exhibit 100-CC-T, 110-AA, 113-BB, 122-KK,

9    401, 202, 203 received in evidence)

10             MS. MIRON:  And the defense rests.

11             THE COURT:  Ladies and gentlemen, the defense has

12   rested.

13             Mr. Quigley, is the government putting on a rebuttal

14   case?

15             MR. QUIGLEY:  No, your Honor.

16             THE COURT:  Ladies and gentlemen, that concludes the

17   taking of evidence in this case.  We are now going to move

18   towards closing argument.  However, that's not going to begin

19   until tomorrow morning.  So we're going to break now.

20             Please be in the jury room no later than 9:20 tomorrow

21   morning so we can get started promptly at 9:30.  We will begin

22   with the government's closing argument, then the defense, and

23   then the government will have a chance to give a rebuttal

24   summation.

25             So again, do not discuss the case, do not read any

1    media about the case, and do not do any research on your own.

2    We'll see you tomorrow morning bright and early.  Good night.

3              (Jury excused)

4              THE COURT:  Okay.  Shall we have our charge conference

5    now or do people want a break?

6              MR. HABIB:  We're ready to proceed.

7              MS. SHROFF:  I just need one minute to let my expert

8    go if I may.  Mr. Habib can start.

9              MS. TEKEEI:  Your Honor, because there is really no

10   need for all three of us to be here for the charge conference,

11   with the Court's permission, may I be excused?

12             THE COURT:  Absolutely.  And the same is true for

13   anyone at the defense table except for Mr. El Gammal.

14             If we're all ready, we'll begin with the First

15   Amendment instruction.  I provided a proposed instruction in

16   what I distributed Friday.  The government objected.  The

17   Federal Defenders were supportive of that instruction.

18             I had revisited and I provided to counsel this morning

19   a revised instruction touching upon Mr. El Gammal's First

20   Amendment rights.

21             So let me turn to the government, do you object to the

22   instruction as revised?

23             MR. DeFILIPPIS:  No, your Honor.  We think it looks

24   like a good instruction to us.

25             THE COURT:  And Mr. Habib?

1          MR. HABIB:  For purposes of our appellate record we'll

2    maintain our preference for the initial instruction, but won't

3    elaborate on that point here.

4          THE COURT:  Very well.

5          MR. HABIB:  May I though make one?

6          THE COURT:  Absolutely.  By the way, let me just make

7    sure I emphasize this.  Like I said, I give the instruction to

8    the jury.  So any change that you have, whether it be a

9    typographical error or grammatical error, no pride of

10   authorship.  To a point.  Just let me know that, okay?

11         MR. HABIB:  Yes.  So along those lines, small

12   technical point.  In the second paragraph, the sentence in the

13   middle that begins "Thus while defendant is not on trial,"

14   right now it reads "is not on trial for having extremist

15   religious or political views, and must not allow any evidence

16   to be held such views...."

17         Perhaps I'm being overly meticulous, but I want to

18   avoid the suggestion to the jury that the Court is endorsing

19   that proposition.  So I would propose crossing out "having

20   extremist" and replacing it with "his."

21         So "Thus, while defendant is not on trial for his

22   religious or political views," and then at the end of that line

23   striking out the word "such" and then on the next line after

24   "views or beliefs" inserting "that you may find extreme."

25         So the sentence would read "Thus, while defendant is

1    not on trial for his religious or political views, and you must

2    not allow any evidence that he held views or beliefs that you

3    may find extreme..."

4              THE COURT:  Any comment?

5              MR. DeFILIPPIS:  That's fine with us, your Honor.

6              THE COURT:  Those changes will be made.  So that takes

7    care of that one.

8              The next one that was raised by the government's

9    letter was the conscious avoidance instruction.

10             MR. DeFILIPPIS:  Yes.

11             THE COURT:  And quite frankly, that was me not seeing

12   the conscious avoidance argument there, but tell me what it is.

13             MR. DeFILIPPIS:  Your Honor, just to start briefly,

14   the Circuit has held in other cases that the government need

15   not be forced to choose between a conscious avoidance theory

16   and a straight knowledge theory.  *United States v. Ferguson*,

17   676 F.3d at 278.

18             A conscious avoidance instruction is appropriate here

19   we think, your Honor, precisely because the facts of the case

20   lend itself to it and the arguments made by the defense have

21   lent themselves to it.

22             In their very opening statement, the defense argued

23   that neither Attiya Aboualala nor the defendant knew what,

24   quote, Samy El-Goarany was up to.

25             And so, very much the strain of the defense case has

1    been that even if there were these signals that Samy El-Goarany

2    was going to ISIS, there were not enough such signals or there

3    were not signals that the defendant himself internalized

4    amounting to knowledge.

5         We think it is very much the case that the defense

6    will try to argue knowledge.  And in the cases cited in our

7    letter, your Honor, we point to those that say where knowledge

8    is at issue and a central issue, that is where conscious

9    avoidance instruction is appropriate.

10        We pointed to several factual issues in this case,

11   involving coded language, involving the defense argument that

12   Mr. El-Goarany engaged in secrecy and lies, all of those things

13   make this a case where a conscious avoidance instruction is

14   entirely appropriate.

15        MR. HABIB:  Thank you.  Your Honor, we would object to

16   the giving of a conscious avoidance instruction.

17        To respond to the government's points, we agree that

18   we've put knowledge in issue.  But of course as the Court is

19   aware, a defense of lack of knowledge is not by itself

20   sufficient to justify the giving of a conscious avoidance

21   charge.  If it were, such a charge would be given in virtually

22   every case.

23        What's also necessary, the Circuit has said, is that

24   there be some evidence that the defendant took deliberate steps

25   to blind himself to what should have been obvious.  And the

H1O3GAM4                      Charge conference

1    Circuit has been quite clear, and for example, in *United States*

2    *v. Cuti* cited on page four of our submission, a conscious

3    avoidance charge is "inappropriate when the evidence is such

4    that either the defendant knows, that is has actual knowledge,

5    or he does not know." So it is an either/or.

6             In an either/or situation, which is this case, the

7    government says defendant and Samy had had a detailed plan,

8    discussed at great length in a series of meetings and

9    communications that Samy would travel to ISIS. We say no,

10   there was no such plan formed between them. That's an

11   either/or. There is no step that Mr. El Gammal took where he

12   refused to learn facts that should have put him on notice of

13   what Samy's intentions were. There was no evidence, as there

14   might be in a drug courier case, he did not open the suitcase

15   that he had been asked to transport. Or a case Ms. Miron

16   recently tried that a defendant did not look in the closet

17   where the contraband was hidden even though he lived in the

18   house. He did not bury his head in the sand, so to speak.

19            This is an either/or case and I think the Court's

20   first instinct is correct.

21            MR. DeFILIPPIS: Just to I think crystalize a bit more

22   what the government is getting at. Mr. El Gammal was, the

23   evidence has shown, there were strong evidence he was certainly

24   aware of ISIS and what they did. He was aware, a very acute

25   observer of the world situation as it related to ISIS. That's

H1O3GAM4                        Charge conference

clear from the Facebook communications.

          What I am sure the defense will put at issue in their
closing, as they did in opening, is the degree to which he
understood that Samy El-Goarany was going to go to ISIS.  And I
expect that there very well could be an argument that he knew
Samy El-Goarany was going to Turkey but not what he was going
to do in that final step.  Or that Samy El-Goarany's coded
communications may have given him an inkling that he was going
to Syria, but not for what purpose.

          And in response to that kind of argument, the
government is perfectly entitled to argue that Mr. El Gammal
could not simply shield his eyes from what it is that he
thought Samy was going to do in the final leg of his journey or
shield his eyes from what Samy meant when he talked about the
company, when he knew full well and when the inferences all
supported the fact he was going to ISIS.

          But a reasonable juror could well conclude that
Mr. Gammal had all of the tools at his disposal to conclude
that Samy El-Goarany wanted to go to ISIS and was intent on
doing that, but that he just avoided learning certain
confirmatory details that would make it an absolute certainty.
And I think, your Honor, that is the classic conscious
avoidance case.

          MR. QUIGLEY:  If I may just quickly.

          THE COURT:  Sure.

1     MR. QUIGLEY:  On the *Cuti* case that Mr. Habib cited,

2  I'm reading from the slip opinion.  But, the Second Circuit

3  said "this purported lack of knowledge defense, despite the

4  defendant's deep involvement in transactions that effectuated

5  the fraud, all but invited the conscious avoidance charge.  The

6  same evidentiary facts that supported the government's theory

7  of actual knowledge also raise the inference that he was

8  subjectively aware of a high probability of the existence of

9  illegal conduct, and thus properly serve as a factual predicate

10  for the conscious avoidance charge."

11     Finally, the government did not have to choose between

12  an actual knowledge theory or a conscious avoidance theory as

13  cited in the *Ferguson* case we earlier cited.  So obviously *Cuti*

14  was a fraud case.  This is not.  But, by analogy, we have the

15  defendant deeply involved in the travel of Samy El-Goarany to

16  Syria and to Turkey, numerous messages over Facebook, clear

17  evidence he was kept regularly updated on Samy El-Goarany's

18  travel plans as evidenced by the communications between the

19  defendant and Attiya discussing Samy El-Goarany's cancellation

20  of his travel plans in November.  So he was, like the defendant

21  in *Cuti*, deeply involved in the transaction in that where

22  knowledge is at issue, it is a sufficient factual predicate for

23  a conscious avoidance charge.

24     MR. HABIB:  I would also point out that in the *Cuti*

25  case, there is the following appears in the slip opinion.  "In

1    response, defendant argued both that the evidence was lacking

2    that he knew of the fraud, and that the facts of which he was

3    aware were insufficient to alert him to a high probability of

4    the fraud."

5         We are simply arguing no knowledge period.  And I

6    think this makes it an either/or situation in which the Circuit

7    has said the conscious avoidance charge is not appropriate.

8    And I still have not heard from the government what actions

9    akin to refusing to look inside the suitcase, refusing to

10   inspect the suspicious bag in the closet, refusing to inquire

11   Mr. El Gammal is alleged to have undertaken that would have

12   represented what the Circuit said is necessary, which is a

13   deliberate effort by the defendant to bury his hand in the

14   sand, to blind himself.

15        This is just a straight up he knew or he didn't.  I

16   don't think it's -- I don't think the evidence supports the

17   argument that he took any steps to avoid confirming what he

18   should have known.

19        MR. DeFILIPPIS:  Your Honor, in this context of this

20   case law, the defense again doesn't get to choose which theory

21   the government will rely on.  The government's entitled to rely

22   on either.

23        In terms of concrete steps that the defendant might

24   have taken, your Honor, this is a classic case in the sense

25   that there was a connect in Turkey, someone the defendant put

1    Samy El-Goarany in touch with.  And someone who he, the

2    government may argue, avoided getting the precise details, just

3    because he did not want to know what he effectively already

4    knew, which is that the defendant was on his way to ISIS.  He

5    handed off responsibility to someone else to get him there, but

6    it's certainly within the realm of colorable arguments that he

7    avoided details about that final leg of his trip in order to

8    maintain some element of plausible deniability.

9              MR. HABIB:  Your Honor, with respect to the final leg

10   of the trip, the conversations have been placed in evidence.

11   With respect to the government, I do not observe a single

12   comment from Mr. El Gammal in which he asks Samy, for example,

13   not to tell him something.  Right.  To withhold information

14   from him.  For example, when Samy says I'm in touch with

15   someone inside the company, conscious avoidance would be

16   appropriate if the response was "I don't want to hear about

17   it."

18             MR. DeFILIPPIS:  He did delete thousands of messages.

19             MR. HABIB:  That's consciousness of guilt.

20             MR. QUIGLEY:  He deleted those very specific messages

21   in February or January 2015, which is certainly evidence of

22   consciousness of guilt, but it is also evidence he wanted to

23   avoid learning information about where Samy El-Goarany was

24   headed, what he was doing when he said I'm in contact with

25   someone from the company, directly inside the company, and he

H1O3GAM4                        Charge conference

1    can get me there in three to four days.

2              MR. HABIB:  I'm not sure how deleting a message you've

3    already read is evidence that -- he can't unknow what he read.

4    It's consciousness of guilt, and they're free to argue that,

5    but it is not avoiding the contents.

6              THE COURT:  I tend to look at these jury instruction

7    issues largely from the perspective of the jury.  Mr. Habib,

8    I'll ask you this.  A lot of the defense case both in your

9    direct case and through cross-examination have tended to

10   suggest an alternate rationale for Mr. Samy El-Goarany to

11   travel to Syria.

12             I guess what's to prevent the defense from saying,

13   well, he didn't know and he couldn't have known because there

14   were so many other aspects going on or so many other activities

15   going on in which Mr. El-Goarany had an interest that need not

16   have been to join ISIS.

17             MR. HABIB:  May we have a moment, your Honor?

18             THE COURT:  Sure.

19             MR. HABIB:  Your Honor, may we have a brief ex parte?

20             MR. DeFILIPPIS:  At the conclusion of the trial we

21   can't imagine any reason why, other than to simply

22   strategically hide information from the government, why that

23   would be appropriate.

24             MR. HABIB:  We plan to discuss the contents of our

25   summation with the Court.

H1O3GAM4                         Charge conference

1              MR. DeFILIPPIS:  We're happy to discuss the potential

2      contents of ours in open court, as should they be.

3              THE COURT:  They're not required to.  I'll talk to

4      them.

5              (Page 1717 sealed)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1O3GAM4                        Charge conference

1           (In open court)

2           THE COURT:  I think it is a very close question on the

3    conscious avoidance request.  As I indicated, I initially

4    didn't think of it.  But it is certainly the case that the

5    evidence has come in can give rise to a question in the minds

6    of the jurors concerning what Mr. El Gammal may have known, and

7    for that reason, and because of the case law that the

8    government presented, I think it would be appropriate to give

9    the conscious avoidance instruction, having taken into

10   consideration also the arguments or the information provided by

11   the defense to the Court ex parte.

12          However, having so concluded, I have looked at the

13   Sands conscious avoidance instruction and will give that one,

14   in lieu of the one proposed by the government.

15          MR. HABIB:  Two points, your Honor.  One, the Circuit

16   case law is -- so well, let me ask this.  With respect to which

17   count is the Court going to apply the conscious avoidance

18   instruction?

19          THE COURT:  Generally.

20          MR. HABIB:  I would say then the conscious avoidance

21   instruction I think must be tailored to reflect that conscious

22   avoidance can only prove knowledge, not intent.  And so for

23   example, we do not think that the conscious avoidance charge

24   would be -- and that limitation would apply to the attempt

25   theory on Count One, the aiding and abetting theory on Count

1   One, the conspiracy theory on -- all of Count Two, all of Count

2   Three, and all of Count Four.

3            So, I would just ask for some clarification in each of

4   those instructions, however the Court chooses to do it, whether

5   the Court plans to give a global instruction or a

6   count-by-count instruction, that a defendant cannot consciously

7   avoid forming -- that is, a defendant can consciously avoid --

8   a defendant can through conscious avoidance form knowledge but

9   he cannot through conscious avoidance form intent.  So, the

10  jury should be instructed that it can consider conscious

11  avoidance only with respect to establishing knowledge, not, for

12  example, the specific intent to commit a crime that is the

13  subject of an attempt.  The specific intent to aid and abet a

14  crime, the specific intent to further the unlawful objectives

15  of the conspiracy.

16           The second point is, I would ask the Court to rule to

17  give a conscious avoidance instruction without prejudice to a

18  reapplication at the close of summations, and at that point the

19  Court may reassess.

20           THE COURT:  Very well.

21           MR. DeFILIPPIS:  We agree with the law as stated by

22  Mr. Habib.  It only goes to knowledge and not to intent.  If

23  the defense wants to propose a revision to the Sands

24  instruction.

25           THE COURT:  Why don't do you that.  Send some proposed

1   language to me and the government, and we'll try to get this

2   back out later this evening.

3               MR. HABIB:  Sure.  Does the Court plan to give a

4   global conscious avoidance charge?

5               THE COURT:  I think the way I do it or I tend to do it

6   is where knowledge is first defined, I'll do like a general

7   definition of knowledge.  And then in subsequent with respect

8   to subsequent elements say, you know, it has to be done

9   knowingly as I've already defined that term for you.  That's

10  likely what I will do.

11              MR. HABIB:  So as I'm -- okay.  That's fine.

12              THE COURT:  Very well.  The next one raised by the

13  government concerns accomplice testimony, and they have

14  proposed some language that the defense apparently does not

15  object to.  Am I correct about that?

16              MR. HABIB:  Not to the government's proposal, no.  We

17  had another request with respect to that charge, but no

18  objection.

19              THE COURT:  Let's get to that since we're talking

20  about it.

21              MR. HABIB:  On page 10 of our submission we had two

22  requests.  One was to -- I'm looking at now page 30 of the

23  Court's proposed charge.  In the third paragraph, the sentence

24  that begins in fact.

25              THE COURT:  Page 30?

H1O3GAM4                           Charge conference

 1              MR. HABIB:  Page 30 of the Court's proposed charge.

 2     Third paragraph.  The paragraph that begins "experience will

 3     tell you."

 4              THE COURT:  Okay.

 5              MR. HABIB:  The sentence that begins "In fact, in

 6     federal courts," we would propose deleting that sentence.  The

 7     sentence reads "In fact, in federal courts, the law is that the

 8     testimony of a cooperating witness in itself may be enough for

 9     a conviction if the jury believes it proves guilt beyond a

10     reasonable doubt."

11              That proposition may be true in the abstract, but I

12     don't think it has application to this case.  I think as it is

13     included really for illustrative purposes, it simply encourages

14     juror confusion on this point and I don't think it is

15     necessary.

16              THE COURT:  Any objection to taking out that sentence?

17              MR. DeFILIPPIS:  Your Honor, again, in our experience

18     this has been given fairly routinely in our trials, but I don't

19     think we strenuously object.

20              THE COURT:  That sentence will be taken out.

21              MR. HABIB:  Thank you.  The second request is we're

22     requesting the Sand instruction 7-9 concerning the motivations

23     of accomplice or in this case cooperating witnesses and how the

24     jury should scrutinize their testimony.

25              In addition, pursuant to *United States v. Vaughn*, 430

1   F.3d 518, (2d. Cir. 2005), the Circuit has said it's prudent

2   for a district judge to advise the jury of not just the

3   motivations of a cooperating witness in general, which may be

4   to lie, may be to tell the truth as the witness's particular

5   circumstances dictate, but specifically that the jury should be

6   instructed to scrutinize cooperating witness testimony, and

7   that a district judge call the jury's attention to the fact

8   that a cooperating witness has a powerful motive to curry favor

9   with the government.

10          So, we think the Sand charge is appropriate and should

11  be given.  But some balancing language in the charge suggesting

12  or at least advising the jury of the motive for a cooperating

13  witness to testify falsely to curry favor with the government

14  is necessary.

15          THE COURT:  Any objection to including that language

16  from --

17          MR. DeFILIPPIS:  We thought the Court's instruction

18  was quite balanced and advised of competing motivations on both

19  sides.  We thought that the Sand instruction sort of leans too

20  far to caution by saying it should be received by you with

21  suspicion.  We thought the Court's instruction was more

22  balanced.

23          THE COURT:  I like mine too, so I am going to deny

24  that request.  How did you want to take your other --

25          MR. HABIB:  I don't know if the government has any

H1O3GAM4                         Charge conference

1    line-by-line comments or if the government's comments are

2    limited to the letter.

3            MR. DeFILIPPIS:  We do have some line-by-line, not a

4    huge amount, your Honor, so we can address those whenever.

5            MR. HABIB:  Maybe we should go page by page.

6            THE COURT:  Let's go page by page.

7            MR. HABIB:  I don't have a lot beyond what's in the

8    letter.  Just some typos.

9            THE COURT:  Anything on pages two and three?

10           MR. HABIB:  No.

11           MR. DeFILIPPIS:  Not from the government.  We don't

12   feel strongly, we thought perhaps since I think both parties

13   have referred to ISIS as ISIS, we might change ISIL to ISIS for

14   the purposes of the charge, but I don't think we feel strongly.

15           MR. HABIB:  No view on that, your Honor.

16           THE COURT:  Okay.  We referred to it as ISIS

17   throughout, correct?

18           MR. DeFILIPPIS:  I think so, your Honor.

19           MR. QUIGLEY:  Not to disagree with my colleague, your

20   Honor, but the indictment I think refers to it as ISIL.  So

21   maybe the first time we mention it we would say ISIL also known

22   as ISIS.  I think that's on page five.

23           THE COURT:  Okay.  I'm happy to do that.  I don't

24   think that's going to confuse anybody on the jury.  But I will

25   do that.

H1O3GAM4                          Charge conference

1         MR. HABIB:  Our next objection would be on page four

2    and five, the reasonable doubt charge.  We're just asking for

3    the Sand charge.  Pursuant to Second Circuit case law that

4    really discourages alternative formulations of the reasonable

5    doubt charge.  As the Court is no doubt aware, there is a

6    plethora of cases regarding the propriety of reasonable doubt

7    charges and the structural error, we think the Sand instruction

8    is the safest course.  We think the charge as written is

9    potentially unbalanced and dilutes the government's burden of

10   proof.

11        THE COURT:  Any view?

12        MR. DeFILIPPIS:  Your Honor, again in our collective

13   experience, this is the one that we're accustomed to in this

14   district.  We think it is quite balanced.  And I think our view

15   is this one is appropriate.

16        THE COURT:  This is the one that I always give.  Not

17   that I've had that many, or any of us had that many criminal

18   trials around here in the last couple of years.  But I don't

19   think it's much different from Sand, so I'm happy to give the

20   Sand instruction.

21        MR. HABIB:  Thank you.  Our next comment was on page

22   eight.

23        THE COURT:  Anything before page eight?

24        MR. QUIGLEY:  If I may on the reasonable doubt, I

25   don't have the Sand instruction in front of me, but based on my

1    recollection, I think the one change we would make to bring it

2    in line with the Court's charge is where it says I believe that

3    Sand instruction says if you have no -- if you have no

4    reasonable doubt, then you may convict the defendant.

5              I would ask that the language be modified to reflect

6    the Court's original charge that the jury has no reasonable

7    doubt, it is their duty to convict the defendant.

8              THE COURT:  The Sand charge, and it is the last

9    sentence of that charge reads as follows:  "On the other hand,

10   if, after fair and impartial consideration of all the evidence,

11   you are satisfied beyond a reasonable doubt of the defendant's

12   guilt with respect to a particular charge against him, you

13   should find the defendant guilty of that charge."

14             MR. QUIGLEY:  Your Honor, we would ask that should be

15   changed to "must" to balance out the language in the sentence

16   before that.  Which says "You must find the defendant not

17   guilty if you have reasonable doubt."

18             MR. HABIB:  We're not going to argue nullification

19   obviously, Judge, but I don't think "must" is a correct

20   statement of the law.

21             THE COURT:  I think it relays the obligation of the

22   jurors.  So I'll leave it as is.

23             Anything before page eight, Mr. Quigley or

24   Mr. DeFilippis?

25             MR. QUIGLEY:  No, your Honor.

H1O3GAM4                          Charge conference

 1            THE COURT:  Mr. Habib?

 2            MR. HABIB:  On page eight, Count One, first element,

 3   we think given the way that the proof has come in, for purposes

 4   of clarity, and this applies to all of the counts that

 5   incorporate this definition, rather than material support of

 6   resources, it should simply be "personnel."  I don't think

 7   there has been an allegation that any other form of material

 8   support was provided.

 9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Well, I think what I want to do there,

2     because I take your point that it mentions a lot of stuff that

3     is not necessarily relevant.

4              MR. HABIB:  Truly, Judge, this is just in the interest

5     of clarity.

6              THE COURT:  Yes.

7              MR. DEFILIPPIS:  Your Honor, I think the government

8     would prefer to keep it as is.  The party, the government has

9     referenced that there are various ways one can provide support.

10    I think that is a contextual point that the jury is entitled to

11    know that the law prohibits various kinds of support, that

12    personnel is one of them, it is not a personnel statute, it is

13    a support statute and, again, there is no harm and certainly it

14    is a more comprehensive view of the law to give the jury the

15    full picture.

16             THE COURT:  I think my thought was to have a slightly

17    more complete definition up front and then do it in summary

18    fashion to subsequent counts.  So, that page I will leave it as

19    is and I think I took out a lot of other definitions that were

20    included in the statute, so just to keep training and

21    personnel, I believe I took that part of the statute out.

22             MR. HABIB:  Well, I guess that brings me to my second

23    point which is the -- we are asking, pursuant to, again, any

24    time the term -- it doesn't have to be repeated but the term

25    personnel should be defined for the jury pursuant to 2339(b)(h)

1    to specify that the statute permits conviction only if the

2    personnel is provided under the direction and control of ISIS.

3              MR. DEFILIPPIS:  Your Honor, on this the proposed

4    instruction that defense has asked for, I think would,

5    unfortunately, just adapting Judge Garaufis' instruction to

6    this case would get the law exactly wrong and backwards.

7              I can hand up for your Honor the provision that

8    defense is referring to which is 2339(b)(h).

9              THE COURT:  Please do.  I didn't bring my statutes.

10             MR. DEFILIPPIS:  And your Honor, I am just turning to

11   Judge Garaufis' instruction.

12             So, your Honor, what defense has proposed the Court

13   say is:  *The defendant cannot be convicted for a violation of*

14   *this statute in connection with X, Y, and Z if you find that he*

15   *is knowingly attempted to provide one or more individuals which*

16   *may include himself, to work under ISIS' direction or control.*

17             So, that sentence may be fine.

18             *However, the defendant cannot be convicted if he*

19   *worked independently of ISIS to advance its goals and*

20   *objectives.*

21             Now, in the Pugh case, that was accurate because the

22   defendant there was providing himself as personnel to ISIS and

23   it is a requirement that the personnel, the individual being

24   provided as personnel, intend to work under ISIS' direction and

25   control.

1           Here, to instruct the jury that the defendant cannot

2   be convicted if he worked independently of ISIS to advance its

3   goals and objectives, that statement would be wrong.  There is

4   no requirement that Mr. El-Gammal need work at ISIS' direction

5   and control.  In fact, the jury can and should convict him if

6   they find that he supported Samy El- Goarany's efforts even if

7   he did it absent ISIS' direction and control.  And it includes

8   in that the conspiracy.  And subsection H, your Honor, says

9   that that person has knowingly provided, attempted to provide,

10  or conspired to provide a foreign terrorist organization with

11  one or more individuals, who may include himself, to work under

12  that organization's direction or control.  So, it is the one

13  being provided who must work under their control.

14          THE COURT:  I will include that language but not the

15  last sentence.

16          MR. HABIB:  Then two things, your Honor.

17          THE COURT:  Yes.

18          MR. HABIB:  Now looking at page 7 of our submission,

19  the proposed charge from Pugh, right now it reads:

20          The defendant can be convicted for a violation of this

21  statute in connection with providing, attempting to provide...

22  personnel.  After the word "personnel" I would ask that you

23  include the word "only," that is, can be convicted... only if

24  you find that he has knowingly attempted to provide, blah,

25  blah, blah, to work under ISIS' direction or control.

1    THE COURT:  I'm sorry.  Why don't you -- I don't know

2    where you are.

3    MR. HABIB:  I'm sorry.

4    I'm on page 7 of our submission.

5    THE COURT:  Yes.

6    MR. HABIB:  Paragraph B.

7    THE COURT:  Yes.

8    MR. HABIB:  After the citation to Pugh there is a

9    quote which contained our proposed charge.

10   THE COURT:  Yes.

11   MR. HABIB:  If you count down one, two, three -- four

12   lines after the word personnel.

13   THE COURT:  Yes.

14   MR. HABIB:  I would propose to insert the word "only."

15   THE COURT:  That's fine.

16   MR. HABIB:  Okay.

17   And then I would also ask, after direction or control,

18   that you include the rest of the statutory definition, the last

19   sentence of 2339(b)(h):  *Individuals who act entirely*

20   *independently of the terrorist organization to advance its*

21   *goals or objectives shall not be considered to be working under*

22   *the foreign terrorist organization's direction and control;*

23   which I think is taking the government's point that the

24   individual must be working under the foreign terrorist

25   organization's control is Samy, this language is applicable to

H1o5gam5                        Charge Conference

1    Samy.

2              MR. DEFILIPPIS:  Your Honor, I think the sentence,

3    while it may not be technically inaccurate, I think that

4    sentence sitting on its own referring to individuals generally

5    would give the jury a misimpression that that's a requirement

6    as to the defendant so I don't think we think it is necessary.

7    Direction and control will be clear in the instruction and that

8    that applies to the personnel being provided.  I don't think

9    anyone is arguing here that Samy, once he got to ISIS, was

10   acting independently.

11             THE COURT:  I'm not going to use that language.  I

12   mean, maybe if I used Samy El- Goarany's name.

13             MR. HABIB:  That's fine.

14             THE COURT:  I'm not saying that I will, but maybe.

15             MR. HABIB:  Then, if the Court wants to instead of

16   individuals who act entirely independently, you can use Samy's

17   name instead of individuals.  If you find that Samy acted

18   independently of the foreign terrorist organization and he is

19   not considered to be working under its direction or control.

20             MR. DEFILIPPIS:  Your Honor, I think it is just

21   confusing the matter for the jury.  It is really not an issue

22   here whether Samy was acting independently once he got to ISIS

23   and so I think it is going to cause confusion.

24             THE COURT:  I agree.  I agree.  I'm not going to

25   include that.

1          MS. SHROFF:  Wait, your Honor.  Can we just have a

2     second?

3          THE COURT:  Sure.

4          (Counsel conferring)

5          MR. HABIB:  Your Honor, on that point we do want to

6     clarify that the statute requires the knowing provision of

7     personnel, that is that Mr. El-Gammal must have known at the

8     time that he engaged in the conduct charged that Samy would

9     work under ISIL's direction or control and that's why we

10    believe the second part of the statutory language is essential.

11         We agree that the evidence, as it has come in,

12    supports and we certainly don't intend to dispute that once he

13    was in Syria Samy was under ISIL's direction or control.  The

14    substantive issue of concern to us is when Mr. El-Gammal

15    engaged in the acts charged did he intend that Samy would work

16    under ISIL's direction or control.  That's why we feel that the

17    additional language is necessary.  As we have said in our

18    papers, we think this is an element and we think the jury has

19    to make a factual finding with respect to the limitations

20    imposed by 2339(b)(h).  So, we would ask for the substance of

21    the entire statutory subsection.

22         THE COURT:  Let me come up with some language.

23         MR. HABIB:  Okay.

24         On pages 9 and 10, when the Court is defining

25    terrorist activity, we think that numbers 1 and 5 can be

H1o5gam5                         Charge Conference

1    deleted because there is no evidence of either in this case.

2    So, number 1 is hijacking or sabotage of an aircraft; and

3    number 5 is use of any chemical, biological or nuclear weapons

4    or device.  I don't think there is evidence that either of

5    those things occurred in this case.

6            MR. DEFILIPPIS:  Your Honor, I think it is fine.

7    There was a defense exhibit today referencing a sabotaging of

8    an aircraft.

9            THE COURT:  I will take out 1 and 5.

10           MR. DEFILIPPIS:  That's fine.

11           THE COURT:  There was?

12           MR. HABIB:  It was not of sabotage but military strike

13   that took --

14           MR. DEFILIPPIS:  There was an ISIS blowing up a

15   civilian plane, I think.

16           THE COURT:  Was I here?

17           MR. DEFILIPPIS:  It was Mr. Attiya Aboualala's

18   Facebook communications about a downed jet.

19           THE COURT:  Okay.

20           MR. HABIB:  Which was admitted not for its truth, your

21   Honor, right?

22           MR. DEFILIPPIS:  Fair enough.

23           THE COURT:  I was wondering what that was.

24           Next?

25           MR. HABIB:  My next comment would be on page 13.

1    THE COURT:  Yes, sir.

2    MR. HABIB:  On 13, the aiding and abetting charge, we

3    have no objection to what's in the charge.  We think the charge

4    should actually include a substantive definition of aiding and

5    abetting beyond the statutory language which just appears to

6    repeat the terms and we would request the instruction that we

7    proposed in docket no. 75, request no. 6 which we derived from

8    the Supreme Court's recent aiding and abetting decision in

9    Rosemond and from Sand 11.2.

10    I can hand up our proposal to the Court.

11    THE COURT:  I have it.  What number is it?

12    MR. HABIB:  If you have our request to charge in front

13    of you?

14    THE COURT:  I do.

15    MR. HABIB:  Request no. 6.

16    THE COURT:  Okay.  What language from here?

17    MR. HABIB:  The two bullet points that appear on page

18    10, perhaps with the prefatory sentence:  In order to

19    convict...

20    MR. QUIGLEY:  Your Honor, we have no objection to the

21    charge reflecting the Rosemond decision.  We are trying to see

22    if we have any objections to the specific language here in the

23    defendant's proposal.

24    MS. SHROFF:  Your Honor, may I just interrupt for one

25    second?  May I ask the Court to excuse Mr. El-Gammal so I can

H1o5gam5                        Charge Conference

1   speak to him in the back?  Would that be permissible?

2           MR. HABIB:  We will waive his presence for purposes of

3   this conference.

4           MS. SHROFF:  Thank you.

5           THE COURT:  But, Mr. El-Gammal, you understand you

6   have every right to be here, correct?

7           THE DEFENDANT:  Correct.

8           THE COURT:  Okay.

9           MS. SHROFF:  Thank you, your Honor.

10           MR. QUIGLEY:  Your Honor, I apologize for this, but we

11   would like a little more time to look into this.  Perhaps we

12   can confer with defense.  We are open to -- we understand it is

13   our office's policy after Rosemond that it must -- the aiding

14   and abetting charge must include similar language to this.  We

15   just want to make sure we are on the right page.

16           THE COURT:  Okay.

17           MR. HABIB:  Whatever the Court wants to do.  If you

18   guys want to give me language later, we can come back to the

19   Court with it.

20           THE COURT:  Okay.

21           MR. HABIB:  Okay.

22           Next was on page 15, just a typo at the bottom of the

23   page, last sub paragraph:  *You have heard testimony about trial*

24   *during ISIL, the conspiracy charged in "Count One"...* should be

25   "Count Two."

H1o5gam5                     Charge Conference

1                THE COURT:  Is that right?

2                MR. QUIGLEY:  It is, your Honor; yes.

3                THE COURT:  Okay.

4                MR. HABIB:  Pages 16 to 19, Count Two, first element.

5     Acknowledging the Court's ruling on the definition of

6     personnel.  We are just asking for the -- we make the same

7     request that we made with respect to Count One with respect to

8     personnel in Count Two.  I appreciate the Court's ruling.

9                THE COURT:  I'm sorry.  And where is that?

10               MR. HABIB:  So, Count Two, first element, existence of

11    conspiracy so this would be on page 19.  Object of conspiracy.

12    Count Two of the indictment, and this is on the top of page 19,

13    Count Two of the indictment charges conspiracy with one object

14    that is to provide material support or resources to a foreign

15    terrorist organization.  So, two requests.  We request to place

16    material support or resources personnel, that would take care

17    of it, and then incorporate by reference our request with

18    respect to Count One for a particular definition of personnel.

19               THE COURT:  What about to provide material support or

20    resources in the form of personnel?

21               MR. HABIB:  That's fine.

22               MR. DEFILIPPIS:  That's fine with the government, your

23    Honor.

24               THE COURT:  As that term is defined, was previously

25    defined for you.

1        MR. HABIB:  Turning back to page 17, last line.

2        THE COURT:  Yes.

3        MR. HABIB:  I think the word "to" has been omitted.

4    *To find a conspiracy existed it is enough to find that two or*

5    *more people...*

6        THE COURT:  Correct.  Okay.

7        MR. HABIB:  Page 19.  Page 19, Count Two, second

8    element.  As we requested in our submission, we are requesting

9    some clarifying language with respect to the necessary mental

10   state.  We have included proposed language on pages 8 and 9 of

11   our submission.  We just want to make clear that -- there are

12   just a few lines and, again, maybe we are being persnickety but

13   there are a few lines in the suggestion that suggest a relaxed

14   mental state and we want the jury to understand that the

15   necessary mental state here is Mr. El-Gammal must have joined

16   the conspiracy with knowledge that its unlawful objective was

17   to provide material support in the form of personnel.

18       THE COURT:  I'm sorry, Mr. Habib.  Let me stop you.

19   Where are you?

20       MR. HABIB:  I'm sorry.

21       Actually, I should have made this more simpler.  The

22   Court included basically the language we are asking for on page

23   28 with respect to Count Four, so if you look at page 28 --

24       THE COURT:  Yes.

25       MR. HABIB:  -- under the heading Count Four, first

1    and second elements?

2              THE COURT:  Yes.

3              MR. HABIB:  The second that begins:  *And with respect*

4    *to the second element, the government must prove*...

5              THE COURT:  Yes.

6              MR. HABIB:  We ask that that sentence also be

7    reproduced in here with respect to Count Two.

8              THE COURT:  That sentence?

9              MR. HABIB:  The sentence:  *And with respect to the*

10   *second element, the government must prove that Mr. El-Gammal*

11   *knowingly and willfully became a member of that charged*

12   *conspiracy during the applicable time period knowing that its*

13   *goal was to receive military-type training from ISIL.*  So, I

14   guess instead of foresee military-type training from ISIL, it

15   would say provide personnel to ISIL and by his action helping

16   to achieve that goal.

17             THE COURT:  Where?

18             MR. HABIB:  I think you could put that on page 21, the

19   first paragraph, last sentence.  You could either add it at the

20   end of that paragraph or you could replace the last sentence of

21   that paragraph with what we have proposed.

22             THE COURT:  The sentence that begins what is

23   necessary?

24             MR. HABIB:  Yes.

25             THE COURT:  Okay.  I will make that change.

1          MR. HABIB:  Thank you.

2          On page 22.

3          THE COURT:  Yes.

4          MR. HABIB:  Count Three, elements.

5          THE COURT:  Okay.

6          MR. HABIB:  Again, in an abundance of caution, we are

7     concerned that the jury may infer that it is enough that Samy

8     did these things.  We would just ask for a fifth element that

9     says the defendant aided and abetted the person's receipt of

10    military-type training because there is no -- that's the only

11    basis for liability.

12         MR. QUIGLEY:  That's fine with the government, your

13    Honor.

14         THE COURT:  Okay.

15         MR. HABIB:  Page 23, at the bottom, it is again just a

16    typo.  It says:  The second element is that the defendant

17    provided material support or resources to a, and I think it

18    should just be that a person received military-type training

19    from a --

20         THE COURT:  The second is that the --

21         MR. HABIB:  That a person received military-type

22    training from a foreign terrorist organization.

23         THE COURT:  Okay.  Is that it?

24         MR. HABIB:  Aiding and abetting we will work out with

25    the government.

1          On page 29, particular investigative techniques

2     charge.  We are just asking for an inclusion of some Sand

3     language.  So, on page 29(I)(1), after the first sentence which

4     ends were not used by the government, we would ask for the Sand

5     language from sand 4.4 be included.

6          THE COURT:  Which is?

7          MR. HABIB:  You may consider these facts in deciding

8     whether the government has met its burden of proof.

9          MR. QUIGLEY:  Judge, we would --

10         THE COURT:  Let him finish.

11         MR. HABIB:  That's all.

12         MR. QUIGLEY:  I think we would object to that and only

13    because, I mean this is -- I am looking at our proposed charge

14    on the particular investigative techniques issue, this is

15    already, I think, a very balanced version of that charge.  I

16    mean, it doesn't include language which has been, I have seen

17    in a number of other trials, for example, law enforcement

18    techniques so the government is not on trial and police

19    department techniques are not your concern.  That's typically

20    included in that charge.  It is not here.  We think it is

21    already a fairly balanced charge on this issue.

22         THE COURT:  I agree.  I'm not going to include that

23    language from Sand.

24         MR. QUIGLEY:  And just one typo in that paragraph if I

25    may, Judge.

1    THE COURT:  Sure.

2    MR. QUIGLEY:  Last sentence refers to each defendant's

3  guilt.

4    THE COURT:  Right; the defendant's guilt.

5    Okay.  Next?  Mr. Habib?

6    MR. HABIB:  Yes.

7    Very, small, small few small things.  On page 32,

8  translations, the second sentence:  For that reason, it was

9  necessary for the government -- please insert "and the

10  defense."

11    THE COURT:  How about the parties?

12    MR. HABIB:  That's fine.

13    THE COURT:  Okay.

14    MR. HABIB:  On the same page, charts and summaries?

15    THE COURT:  Yes.

16    MR. HABIB:  We acknowledge the Court's ruling on this

17  issue.  For preservation purposes, we are asking for an

18  instruction that Government Exhibits 1201 through 1206 are not

19  evidence.

20    THE COURT:  They are exhibits.

21    MR. QUIGLEY:  I think they're in, he is asking for

22  preservation purposes.

23    THE COURT:  Okay.  Denied.

24    MR. HABIB:  And I think I just have one more, on page

25  47, G.  Closing comments.

```
 1              THE COURT:  Yes.

 2              MR. HABIB:  Second sentence.

 3              THE COURT:  Yes.

 4              MR. HABIB:  Fourth line of the paragraph:  The crimes

 5   with which the "defendants" are charged.  It should just be the

 6   "defendant" is charged.  And on the next line, I think the

 7   words "you are considering" can be deleted for the same reason.

 8              THE COURT:  Yes.

 9              MR. HABIB:  That's all.

10              THE COURT:  Okay.

11              Government?

12              MR. QUIGLEY:  We have nothing else, your Honor.

13              MR. DEFILIPPIS:  Sorry.  Just a few things, your

14   Honor.  It won't take long.

15              On page 28.

16              THE COURT:  Yes.

17              MR. DEFILIPPIS:  The section titled Count Four, first

18   and second elements, the second sentence:  To remind you, with

19   respect to the first element, the government must prove beyond

20   a reasonable doubt that two or more persons entered an

21   agreement -- it currently reads to receive military-type

22   training from ISIL.

23              THE COURT:  Yes.

24              MR. DEFILIPPIS:  We would propose:  "An agreement for

25   at least one person to receive military-type training"so it
```

H1o5gam5                         Charge Conference

1    doesn't create the impression that the co-conspirators must be

2    the ones receiving the training.

3             THE COURT:  Two or more persons entered into an

4    agreement where at least one person.

5             MR. DEFILIPPIS:  Yes; or you could even say for a

6    person to receive.

7             THE COURT:  Okay.  I will make that change.

8             MR. DEFILIPPIS:  Okay.

9             Your Honor, I assume the Court will leave in and out

10   the various sections about the defendant's testimony so I won't

11   go over those.

12            Finally, on page 32, your Honor -- the section on use

13   of recordings.

14            THE COURT:  I want to make sure.

15            MR. DEFILIPPIS:  Sorry.

16            THE COURT:  Page 33, the defendant's testimony.

17            MR. DEFILIPPIS:  Right.

18            THE COURT:  That comes out?

19            MR. DEFILIPPIS:  Yes, that would come out.

20            THE COURT:  Okay.  Then what?

21            MR. DEFILIPPIS:  On page 32, use of recordings.

22            THE COURT:  Yes.

23            MR. DEFILIPPIS:  The second sentence says:  Whether

24   you approve or disapprove of the recording or interception of

25   those conversations may not enter into your deliberations.

1           THE COURT:  Yes.

2           MR. DEFILIPPIS:  Because we can either strike that

3   sentence or just put in a sentence that says these recordings

4   were not made by the government, the idea being interceptions

5   are really not at issue here.  All the recordings in the case,

6   unless I am missing anything, were not made by the government,

7   so perhaps we can strike that second sentence.

8           THE COURT:  I think we can do that.  Okay.

9           So, it will now read:  The government has offered

10  evidence in the form of audio and video recordings.  I instruct

11  you that these recordings were made in a lawful manner.

12          MR. DEFILIPPIS:  Yes.

13          THE COURT:  Next.

14          MR. DEFILIPPIS:  On page 39, because the defendant did

15  not testify, the if applicable section will come out.

16          THE COURT:  Page 39.  That last paragraph before

17  Section E it comes out?

18          MR. DEFILIPPIS:  Right.

19          THE COURT:  Okay.  So that does it.

20          MR. DEFILIPPIS:  Yes, your Honor.

21          THE COURT:  So, I am expecting some language from all,

22  you are expecting some language from me.  Let's try to do this

23  by no later -- it is now quarter after 3:00 -- 4:30, so that we

24  can turn around another version and get it back to you.

25          MR. DEFILIPPIS:  Yes, your Honor.

1    THE COURT:  Then you get back to us right away because

2    I need to, like I said, I'm going to provide this to the jury

3    so it needs to be put to bed tonight.  Okay?

4          MR. DEFILIPPIS:  Yes, your Honor.

5          MR. QUIGLEY:  Your Honor, I have one other issue.

6          I think it was Attiya's resume which I think was

7    Defendant's Exhibit 400 was admitted subject to connection and

8    we had objected on the basis -- the reason it was admitted was

9    to show its effect on the listener, Mr. El-Gammal.  I don't

10   think there was any evidence that the version of the resume

11   that's in evidence was the version that was actually sent to

12   Mr. El-Gammal so I don't think that connection has been made.

13         It is not something we need to address this second but

14   I just raise it now.

15         THE COURT:  Okay.  So, the issue is whether Attiya

16   Aboualala's resume is in evidence, whether the defense has made

17   the necessary connection to admit it into evidence.

18         MR. QUIGLEY:  Correct, your Honor; yes.

19         MR. HABIB:  In the interest of time I will need to

20   consult with my colleagues and with Ms. Howard, our

21   investigator.

22         THE COURT:  Okay.

23         MR. HABIB:  So, the things that we are, just to recap

24   the bidding the government is going to propose an aiding and

25   abetting charge, we, the defense, are going to propose some

H1o5gam5                              Charge Conference

1   limiting language on the conscious avoidance.

2           THE COURT:  Right; and I'm going to include some

3   language on the definition of personnel.

4           MR. HABIB:  And the Court said by 4:30?

5           THE COURT:  4:30.

6           MR. HABIB:  Thank you, your Honor.

7           MR. DEFILIPPIS:  Thank you, your Honor.

8           MR. QUIGLEY:  Thank you, your Honor.

9           THE COURT:  Thank you, folks.

10          (Adjourned to 9:15 a.m., January 25, 2017)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    ANDREW MARCH

 4    Direct By Ms. Shroff . . . . . . . . . . . .1548

 5    Cross By Mr. Quigley . . . . . . . . . . . .1606

 6    Redirect By Ms. Shroff . . . . . . . . . . .1629

 7    SARAH HOWARD

 8    Direct By Ms. Mirón . . . . . . . . . . . .1649

 9    Cross By Mr. DeFilippis . . . . . . . . . .1699

10                         DEFENDANT EXHIBITS

11    Exhibit No.                              Received

12    124-AA   . . . . . . . . . . . . . . . . . .1585

13    113-DD, 113-CC and 113-OO   . . . . . . . .1651

14    804   . . . . . . . . . . . . . . . . . . .1654

15    801   . . . . . . . . . . . . . . . . . . .1662

16    402-A   . . . . . . . . . . . . . . . . . .1664

17    122-CC-T   . . . . . . . . . . . . . . . . .1665

18    100-BB-T   . . . . . . . . . . . . . . . . .1669

19    122-BB-T   . . . . . . . . . . . . . . . . .1670

20    123-AA-T   . . . . . . . . . . . . . . . . .1673

21    812   . . . . . . . . . . . . . . . . . . .1691

22    602   . . . . . . . . . . . . . . . . . . .1694

23    10-A   . . . . . . . . . . . . . . . . . . .1695

24    808-A   . . . . . . . . . . . . . . . . . .1696

25    100-FF   . . . . . . . . . . . . . . . . . .1698
```

1748

1    100-CC-T, 110-AA, 113-BB, 122-KK, 401, 202, 20305