UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,

-       v.      -

AHMED "JIMMY" EL GAMMAL                          15 Cr. 588 (ER)

                          Defendant.
-----------------------------------------------------------X


**DEFENSE SENTENCING SUBMISSION**


Donald D. Duboulay, Esq.                Megan Wolfe Benett, Esq.
305 Broadway, Suite 602                 750 3rd Avenue, 32nd Floor
New York, NY 10013                      New York, New York 10017
(212) 966-3970                          (212) 973-3406
dondubesq@aol.com                       mbenett@kreindler.com

# TABLE OF CONTENTS

1.  Overview ......................................................................................................................... 2

2.  Objections to the Pre-Sentence Investigation Report ..................................................... 4

    A.  Factual Objections ..................................................................................................... 5

    B.  U.S.S.G. § 3A1.4: Terrorism Enhancement ............................................................ 5

    C.  U.S.S.G. § 2M5.3(b)(1) ............................................................................................ 7

    D.  Adjusted Sentencing Guidelines Calculation .......................................................... 8

    E.  Statutory Sentencing Range ...................................................................................... 8

3.  Fashioning a Sufficient but Not Greater than Necessary Sentence – 18 U.S.C. § 3553(a) .... 9

    A.  Nature and Circumstances of the Offense .............................................................. 10

        i.  Islamic State in Iraq and Levant ..................................................................... 10

        ii.  The Islamic State's Sophisticated Online Propaganda Campaign ...................... 12

        iii.  Samy el-Goarany's Determination to Travel to Syria and the Assistance his
            Brother and Cousin Provided to Him ............................................................. 16

            a.  Samy el-Goarany's Planning ................................................................ 16

            b.  Tarek el-Goarany's Role in Samy's Travel and the Effort to Conceal his
               Misconduct from Federal Investigators ................................................ 18

            c.  Other Family Members Knew of and Hid Samy's True Whereabouts ................ 20

        iv.  Islamist Movements in contrast to Jihadist Organizations; and Egyptian Politics
            and the Events of 2013 – 2014 ........................................................................ 21

    B.  History and Characteristics of Ahmed "Jimmy" el Gammal ........................................ 24

        i.  Early Years ....................................................................................................... 24

        ii.  Mr. Gammal's Work Life in the United States ................................................ 27

        iii.  Mr. Gammal's Personal Life in the United States ........................................... 28

        iv.  Mr. Gammal's Support of his Extended Family .............................................. 29

        v.  Events in Mr. Gammal's Life Preceding his Arrest ........................................ 32

        vi.  Mr. Gammal's Incarceration at the MCC ....................................................... 34

    C.  Comparable Sentences, Achieving Deterrence and Concerns About Recidivism ........ 38

        i.  Comparable Sentences – Avoiding Unwarranted Disparities ........................... 38

        ii.  Deterrence and Risk of Recidivism ................................................................ 42

4.  Conclusion .................................................................................................................... 45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

UNITED STATES OF AMERICA,

    -  v.  -                                           15 Cr. 588 (ER)

AHMED "JIMMY" EL GAMMAL                 **DEFENSE SENTENCING**
                                    Defendant.          **MEMORANDUM**

----------------------------------------------------------X

> *"It is our duty to see that the force of the state, when it is brought to bear through the sentences of our courts, is exerted with the maximum we can muster of rational thought, humanity, and compassion."*
>
> -  **Marvin E. Frankel, Criminal Sentences: Law Without Order 124 (1973)**

Ahmed "Jimmy" el Gammal respectfully offers the following discussion of the statutory sentencing factors in support of his request for a sentence below the recommended Guidelines range.  As explained herein, a sentence of 48-months in custody followed by a period of post-release supervision is sufficient but not greater than necessary to satisfy the goals of the federal sentencing regime in this unique prosecution, given the low likelihood that Mr. Gammal will reoffend and given recent sentences in comparable terrorism cases, which involved substantial downward sentencing variances.

Unlike most terrorism defendants, Jimmy Gammal was well into middle-age when he was arrested in this case; he had no history of radical behavior; he owned a successful small business; he was a devoted family man, a good neighbor and a reliable friend. *See* Exhibit B, Expert Psychiatric Report of Michael B. First, M.D.  The offense conduct involved facilitating the travel of Samy el-Goarany, a radicalized young man who was determined to join the Islamic

State before he ever met Mr. Gammal; a young man whose travel to Syria was also facilitated in large measure by his own brother, who helped Samy purchase airline tickets, who constructed lies to tell family members concerned about Samy's disappearance and who for months hid critical information from federal agents – but who was provided a non-prosecution agreement.

As the Probation Department notes, recent terrorism sentences often vary below the draconian recommendations that result from the mechanical application of the United States Sentencing Guidelines terrorism enhancement.  In Mr. Gammal's case, too, in order to satisfy the parsimony clause of the statutory sentencing regime, a sentence substantially below the Guidelines is necessary.

## 1.  Overview

Mr. Gammal was tried and convicted for his role in facilitating the travel of Samy el-Goarany to Turkey, from which Samy then traveled over the border with Syria and joined the Islamic State of Iraq and the Levant, also known as the Islamic State of Iraq and Syria (referred to herein as "ISIL", "ISIS" or "Islamic State").  Mr. Gammal did not travel himself, nor did he have any plans to do so and thus falls into the "facilitator" category of ISIL cases.[1]  The "facilitator" cases represent less than twenty percent of all federal 144 terrorism prosecutions between March 2014 and August 2017.[2]  When considering not only the offense conduct but also comparable sentences, then, it is important to separate out the facilitator cases from the larger universe of federal terrorism prosecutions, which include "foreign fighter" cases (involving individuals who attempted to, conspired to or actually traveled to join a designated foreign

---

[1] *See The American Exception: Terrorism Prosecutions in the United States – the ISIS Cases, March 2014 – August 2017*, published September 13, 2017, available at www.centeronnationalsecurity/research, at 7 (distinguishing between "foreign fighter" cases and "facilitator" cases within the "foreign operations" category).

[2] *See id.* at 6 – 7.

terrorist organization), "assailants" (who committed violence during a domestic terror attack), "domestic plotters" (who were involved in planning or preparing for a domestic attack) and "cyber" cases (in which domestic plotters were involved in cybercrimes connected to terrorist operations.)[3]

Three recent federal terrorism cases, which will be discussed in greater detail *infra*, provide useful benchmarks in framing the discussion of a sufficient but not greater than necessary sentence for Mr. Gammal. Asher Abid Khan pleaded guilty to providing material support to ISIL in violation of 18 U.S.C. § 2339B, after assisting another individual travel to Turkey, cross over to Syria and join ISIS, where that individual was killed in battle.[4] Though the government sought a 180-month term of imprisonment, the district court sentenced Khan to 18 months in custody.[5] In the second case, Bakhtiyor Jumaev was convicted after a seven-week trial of having provided financial support by wiring funds to a foreign terrorist organization and was sentenced to time served, an effective term of 76-months in prison.[6] In the last of the three recent cases, Islam Natsheh had attempted to travel to join ISIL himself following a period of promoting ISIL causes online, and also had purchased an airplane ticket to facilitate a minor to travel and join ISIL.[7] Despite finding a guidelines range of 360 months to life and despite the government's request for a 180-month sentence, the Court imposed a term of 60 months in prison.[8]

---

[3] *See id.*

[4] *See* 15-cr-263 (S.D.Tex.) (LNH), ECF Doc. 130 at 15.

[5] *Id.* at 21, 39.

[6] *See* 12-cr-33 (D.Colo.) (JLK), ECF No. 1920, p. 42

[7] *See* 16-cr-166 (N.D.Cal.) (RS), ECF Doc. 26 at 32.

[8] *Id.*

When compared to the *Khan* and *Natsheh* cases, Mr. Gammal's conduct is, if anything, less culpable and raises fewer concerns about radicalization, specific deterrence or protecting the public.  The offense conduct here – the communications with Samy and assistance in connecting Samy to an individual in Turkey – occurred during a period in Mr. Gammal's life when he sought a connection to the political and social events in the Middle East, particularly Egypt, when he was consumed by online activity, which provided a misbegotten connection to the political revolution in his former homeland, and when he was experiencing caregiver fatigue as a result of the years of care he provided for a spouse with multiple needs. *See* Exh. B at 6; Exhibit C, Letters of Support, at 2 – 4.  But, as attested to by the expert report of Michael First, M.D. and the letters of support, Mr. Gammal does not bear the indicators of radicalization – he is religiously moderate, is socially well-integrated and is not struggling with identity issues. *See* Exhs. B, D.  Mr. Gammal's offense was aberrational and is highly unlikely to recur.

During his three-plus years in custody Mr. Gammal has resisted any inducement toward radicalization – to which other terrorism defendants, including those housed at the Metropolitan Correctional Center alongside Mr. Gammal, have frequently succumbed – and has instead spent his time planning for his post-custody life and helping his fellow prisoners as a highly commended member of the inmate companion (that is, suicide watch) program.  For all of the reasons discussed in this sentencing memorandum, a period of 48-months in custody followed by supervised release is a sufficient but not greater than necessary sentence to satisfy the federal sentencing regime's concerns.

## 2.  Objections to the Pre-Sentence Investigation Report

The defense has objections to both the factual narrative and the sentencing guidelines calculation in the Pre-Sentence Investigation Report (PRS).

## A. Factual Objections

Mr. Gammal made several factual objections to the draft PSR, as set forth in the objection-letter sent to the Probation Officer. *See* Exhibit A hereto.  Some of those that have not been incorporated are noted in the addendum to the final PSR. *See* Final PSR, Dated 12/024/2018, 23 – 24.  Broadly speaking, the defense objects to (1) the PSR's inclusion of the case agent's beliefs, as those subjective ideas do not constitute evidence of the offense conduct (*see* Exh. A, appendix ¶¶ 25, 27, 29, 33, 37 corresponding to Final PSR ¶¶ 26, 28, 30, 34. 38) and (2) the PSR's incorrect (and incendiary) association of Samy's radicalization with Mr. Gammal, who does not share those characteristics of a radicalized offender, as discussed at greater length, *infra*.

## B. U.S.S.G. § 3A1.4: Terrorism Enhancement

The defense objects to application of United States Sentencing Guideline § 3A1.4, which provides enhanced offense level computation for "a felony that involved, or was intended to promote, a federal crime of terrorism[.]"  The guideline's commentary states that a "'*federal crime of terrorism*' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4, App. Note 1.  That statute, in turn, defines a "federal crime of terrorism" as a violation of various statutory provisions (including the statutes involved in this case, 18 U.S.C. §§ 2339B and 2339D) *if* the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(5)(A).

As is clear from the PSR's sentencing guidelines calculation, the largest single driving force in the advisory range here is U.S.S.G. § 3A1.4, the "draconian" terrorism enhancement. McLoughlin Jr., James P., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law

& Ineq. 51, 54 (2010).  As one commentator has written, the terrorism enhancement "takes a wrecking ball" to the guidelines range.  Brown, George D., *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014).  If it were to apply to Mr. Gammal's case it would more than quadruple the sentencing range of 63 – 78 months (at a base offense level of 26).[9]

As the Second Circuit has held, even if the underlying crime is in the statutory list, the evidence must still establish that the defendant committed the felony with "the 'specific intent' … to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010), quoting *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2008).

Thus, the terrorism enhancement only applies here if Mr. Gammal had some intent beyond what was required for the jury to find him guilty, as the jury was instructed that it could base a conviction merely on Mr. Gammal's willful blindness of Samy's plan to join ISIS.[10]

Responding to the defense theory that Mr. Gammal was deceived by Samy's lie about traveling to Syria to find humanitarian work, the government relied heavily on the conscious avoidance argument in its summation.[11]  Where, as here, the offender's deliberate disregard

---

[9] At least two district courts have recently rejected efforts to apply this enhancement in cases involving the provision of material support to terrorists. *See Khan*, 15-cr-263 (S.D.Tex.) (LNH) and *Jumaev*, 12-cr-33 (D.Colo) (JLK).

[10] *See* Trial Transcript ("Trial Tr.") at 1963 – 64 (instructing jury that if Mr. Gammal "acted with a conscious purpose of avoiding – to avoid learning the truth that Samy El-Goarany intended to join ISIS, then this element may be satisfied" and that if Mr. Gammal "was aware of a high probability that Samy El-Goarany intended to join ISIS and that the defendant acted with deliberate disregard of that high probability, you may find that the defendant acted knowingly.")

[11] *See* Trial Tr. at 1826 – 27 (Mr. Gammal "cannot hide behind a veil of ignorance … .  Even if he didn't know every detail of the plan for El-Gorany to join ISIS, it's only because he deliberately put his head in the sand.  And … willfully blinding yourself, consciously avoiding the facts, is illegal.")

supplied the requisite constructive knowledge, the specific intent required for the terrorism

enhancement is lacking.  The evidence in this case does not establish that Mr. Gammal's

assistance to Samy el Goarany was provided with the specific intent to commit crimes calculated

to influence, affect, or retaliate against a government.  A willful blindness to Samy's true

purpose in travelling to Turkey – foolishly choosing to believe that Samy was pursuing the

humanitarian interests about which he incessantly talked – may have been sufficient for a

conviction here, but it is certainly not sufficient for purposes of the terrorism enhancement,

which exposes Mr. Gammal to an advisory sentencing recommendation or four times what he

would otherwise face.

### C.  U.S.S.G. § 2M5.3(b)(1)

The PSR includes a two-level increase on the basis of an offense involving "funds or

other material support or resources" as provided for in U.S.S.G. § 2M5.3(b)(1).  That section,

however, specifically refers to "dangerous weapons," "firearms," "explosives" or "funds" – none

of which were involved in this case.  The defense raised this objection with the Probation

Department.[12]  Nevertheless, the Probation Department stated that because Mr. Gammal

"provided material support for Elgoarany with the intent, knowledge, and reason to believe

Elgoarany would receive military training and weaponry from ISIL (or ISIS) … the two-level

enhancement is warranted."[13]

This analysis wholly ignores the plain language in the enhancement, which is concerned

with the provision of specific types of material support and the intent, knowledge or belief that

the support was to be used specifically "in the commission of a violent act" – not merely for

---

[12] *See* Final PSR, at 23.

[13] Final PSR, at 23.

purposes of supporting a terrorist organization. U.S.S.G. § 2M5.3(b)(1)(E).  Even if facilitating

Goarany's travel into Syria to join ISIS constitutes "material support or resources" for purpose of

the guideline, because the facilitation does not qualify within subsections (A) through (D), there

must be proof of Mr. Gammal's intent, knowledge or belief that facilitating El Goarany's travel

was to commit a "violent act," not just to join ISIS.  The PSR has identified no such act and §

2M5.3(b) does not apply.  Accordingly, the offense level calculation should not include those

two points.

### D.  Adjusted Sentencing Guidelines Calculation

Without the terrorism enhancement and without the two-points for provision of support

for a violent act, the offense level is 26.  Given the PSR calculation of Mr. Gammal's criminal

history category as I, this yields an advisory sentencing guidelines range of 63 – 78 months.

### E.  Statutory Sentencing Range

This case involved four charges.  Counts One and Two carry a statutory sentencing range

of 0-20 years. *See* 18 U.S.C. § 2339B (Counts One and Two).  Counts Three and Four require

imposition of a fine *or* a ten-year term in prison. 18 U.S.C. § 2239D (Counts Three and Four).

Because the receipt of military-type training statute (18 U.S.C. § 2339D) states that an

offender "shall be fined under this title or imprisoned for ten years, or both," under the plain

language of that statute and binding Second Circuit caselaw, the sentence for Counts Three and

Four may be *either* a fine *or* a ten-year term of imprisonment. *See United States v. Pabon-Cruz*,

391 F.3d 86 (2d Cir. 2004).  Indeed, a different statute that directed an offender "shall be fined

under this title or imprisoned not less than 10 years nor more than 20 years, *and both*," the

Second Circuit held that the authorized penalty was *either* a fine *or* a term of imprisonment

between 10 and 20 years. *Id.* at 105.  In doing so, the Court concluded that the "and both"

statutory language made "no sense as a matter of grammar, usage, or law" whereas the language

in a Congressional Conference Report preceding the bill's enactment into law of "or both" did

"make some sense." *Id.* Because, the Court found, Congress intended the statute's text to be "or

both," a violator of that statute could be sentenced to "*either* a fine or a term of imprisonment of

not less than ten years." *Id.* (emphasis added). Here, the interpretation is even easier. Congress

not only conferenced but passed a law including not "and both" but, rather, "or both" language.

The intent was that a sentencing court could impose *either* a fine or a ten-year term of

imprisonment. Mr. Gammal may therefore be sentenced to a fine for his Count Three and Four

violations and a term of imprisonment between 0 and 20 years on his Count One and Two

violations.

### 3.  Fashioning a Sufficient but Not Greater than Necessary Sentence – 18 U.S.C. § 3553(a)

In *Nelson v. United States*, 555 U.S. 350 (2009), the Supreme Court reiterated that *United*

*States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007) and *Rita v.*

*United States*, 551 U.S. 338 (2007)

> do not allow a sentencing court to presume that a sentence within the applicable
> Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms:
> "We repeat that the presumption before us is an appellate court presumption… .
> [T]he sentencing court does not enjoy the benefit of a legal presumption that the
> Guidelines sentence should apply." 551 U.S., at 351. And in *Gall v. United*
> *States*, 552 U.S. ___(2007), we reiterated that district judges, in considering how
> the various statutory sentencing factors apply to an individual defendant, "may
> not presume that the Guidelines range is reasonable."

*Id.* at 352. Thus, while it must accurately calculate a Sentencing Guidelines range, a sentencing

court must also consider all of the factors laid out in 18 U.S.C. § 3553 and has wide latitude to

vary from a Guidelines recommendation when fashioning a sentence that is sufficient but not

greater than necessary to comply with federal sentencing goals.[14]  Failure to give equal weight to all of the statutory factors would "come perilously close to reinstituting the very rigid restraints on sentencing that caused the unpruned sentencing statute to be unconstitutional in the first place." *Booker*, 543 U.S. at 233.  When considering all of those factors, a 48-month period of incarceration is an adequate, yet not greater than necessary, sentence in this unique case.

### A.  Nature and Circumstances of the Offense

A review of the history and pervasive online presence of ISIL, Samy el-Goarany's determination to travel to Syria (and the deception he deployed on those around him when doing so), the role that Samy's family played in facilitating his travel and the political upheaval in Egypt from 2013 into 2015 all are necessary to understand the context in which the offense occurred here.

### i.    Islamic State in Iraq and Levant[15]

Though it took its present form in June 2014, the group now known as ISIS, ISIL or the Islamic State has roots that reach back long before Mr. Gammal's case, to an earlier organization, Jama'at al-Tahwide w'al Jihad.[16]  In 1999, a Jordanian militant, Abu Masab al-Zarqawi, was released from prison and became affiliated with Al-Qaeda, then led by Osama bin

---

[14]  Those include: adequately punishing the crime, promoting deterrence, protecting the public, providing a defendant with any needed services, while also taking into account the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available and the need to avoid unwarranted sentencing disparity. 18 U.S.C. § 3553(a).

[15] Counsel notes the substantial assistance provided by other defenders, whose work researching and summarizing the history of ISIL and its online propaganda efforts is largely replicated here.

[16] Bobby Ghosh, *ISIS: A Short History,* The Atlantic, Aug. 14, 2014, available at http://www.theatlantic.com/international/archive/2014/08/isis-a-short-history/376030/ ("Ghosh").

Laden.[17]  After the United States unseated the Taliban, Zarqawi fled to Iran and by 2003 he had resurfaced in Iraq.[18]  After mobilizing personnel and resources against various enemies, Zarqawi was killed in 2006 and the Al-Qaeda affiliate in Iraq was rebranded as the Islamic State in Iraq.[19]

Until about 2011, the strength of the Islamic State grew but after local militia, tribes and the United States military fought back against this growth, the group lost most of its influence.[20] Then, Abu Bakr Al-Baghdadi, a new leader, arose and "took Zarqawi's tactics and supercharged them."[21]  After Syria's post-2011 collapse, the Islamic State gained force again, initially aligning itself with the Nusra front, which was fighting against the brutal Syrian President Bashar al Assad.[22]  During this period, the Islamic State and Al-Qaeda had a falling out and ISIL rebranded itself as a worldwide organization seeking to build an Islamic State.  On June 29, 2014, ISIL declared a caliphate – the successor to past Islamic empires, ending with the Ottomans.  While the news media widely covered the military activities in Syria generating world-wide attention, the brutality of the Islamic State was slower to emerge and become known.

In the meantime, however, ISIL took advantage of its international renown and unfurled an unprecedented online propaganda operation, featuring an intensive and sophisticated use of social media to recruit supporters and to develop an audience.

---

[17] Daniel Byman, *Understanding the Islamic State - A Review Essay,* 40 International Security No. 4, at 131 (Spring 2016), available at mitpressjournals.org/doi/abs/10.1162/ISEC_r_00235?journalCode=isec#.WEZV32WFDzI ("Byman").

[18] *Id.*

[19] *Id.* at 132.

[20] *Id.* at 132 – 33.

[21] Ghosh.

[22] *Byman* at 135.

11

###### ii.      The Islamic State's Sophisticated Online Propaganda Campaign

One of the most remarkable and unprecedented features of ISIL's strategic operations is its intensive and sophisticated use of social media to recruit new members and supporters. On a variety of social media platforms, ISIL has engaged in an international propaganda campaign, featuring glossy online magazines, videos with high production values, drone images and multi-lingual, easily-relayed messages – propaganda efforts that are "designed to target today's young," especially "those who may be disillusioned or wrestling with their identity."[23] Despite its repugnant tactics, ISIL had "gotten one important thing right: It … created a clear – and to some, compelling – idea of citizenship and state-building in a region almost completely bereft of either."[24]  As psychologist John G. Horgan adds, ISIL says to its young audience, "[b]e part of something that's bigger than yourself and be part of it *now*."[25]

The impact of ISIL's propaganda can be measured in the huge numbers of foreign fighters that have flocked to join insurgent groups in Syria – an estimated 20,000 fighters by early 2015, the overwhelming majority to join ISIL.[26]  As an extensive study by Alberto M. Fernandez for the Brookings Institution published in October 2015 concludes, "[e]fforts to blunt

---

[23] *See* Remarks by the President at the Summit on Countering Violent Extremism, Feb. 19, 2015 ("President Obama CVE Remarks"), available at https://www.whitehouse.gov/the-press-office/2015/02/19/remarks-president-summit-countering-violent-extremism-february-19-2015.

[24] *See* Thanassis Cambanis, *The Surprising Appeal of ISIS,* Boston Globe, June 29, 2014, available at https://www.bostonglobe.com/ideas/2014/06/28/the-surprising-appeal isis/l9YwC0GVPQ3i4eBXt1o0hI/story.html.

[25] *See* Scott Shane and Ben Hubbard, *ISIS Displaying A Deft Command of Varied Media,* New York Times, Aug. 31, 2014, available at http://www.nytimes.com/2014/08/31/world/middleeast/isis-displaying-a-deft-command-of-varied-media.html *("ISIS Displaying A Deft Command")* (emphasis added).

[26] Peter Neumann, *"Foreign Fighter Total in Syria/Iraq Now Exceeds 20,000; Surpasses Afghanistan Coeflict in the 1980s,"* The International Centre for the Study of Radicalisation and Political Violence, Jan. 26, 2015, http://icsr.info/2015/01/foreign-fighter-total-syriairaq-now-exceeds-20000-surpasses-afghanistan-conflict-1980s/.

ISIS propaganda have been tentative and ineffective . . . dwarfed by the sheer size of the ISIS footprint. No effort to date has matched the tailored nature, the scope, nor the electrifying content of the Islamic State's material."[27]

The quality, quantity and reach of ISIL's media warfare is extraordinary. As the Syrian war escalated, ISIL's brand of propaganda emerged: "a focus on Syria, high quality production values, an emphasis on social media networks and an appeal to a wider, pan-Islamic and non-Arabic speaking audience."[28]  Harnessing the "free-wheeling, decentralized nature"[29] of YouTube, Twitter, Instagram, Facebook, among other social media platforms, one writer has termed ISIL's "war of ideas"[30] as "high-tech media jihad."[31]  "Just as ISIS took advantage of ungoverned space in war-torn parts of Iraq and Syria, it also took advantage of 'ungoverned' virtual space."[32]

Along with its flagship online magazine, "Dabiq," ISIL also produces and disseminates powerful and emotional videos and images. They depict its members as dedicated and fearsome

---

[27] Alberto M. Fernandez, *Here to Stay and Growing: Combating ISIS propaganda Networks,* The Brookings Project on U.S. Relations with the Islamic World U.S.-Islamic World Forum Papers 2015, Oct. 2015, at 1, available at https://www.brookings.edu/wp-content/uploads/2016/07/IS-Propaganda_Web_English_v2-1.pdf

[28] *Id.* at 6.

[29] *Id.* at 12.

[30] James P. Farwell, *Jihadi Video in the "War of Ideas,"* Survival, Vol. 52. No. 6, December 2010-January 2011, at 127-150.

[31] Alex Marshall, *How Isis Got its Anthem,* The Guardian (US edition), Nov. 9, 2014, available at https://www.theguardian.com/music/2014/nov/09/nasheed-how-isis-got-its-anthem.

[32] Brookings Report at 12.

warriors;[33] they highlight the ravages of the Syrian war, particularly on children;[34] and they illustrate ISIL's role not just as combatant, but also as nation-builder.[35]  ISIL's prodigious media output juxtaposes images of battle, gore, and executions with warmer images of "foot soldiers eating Snicker's bars and nurturing kittens," aimed to "communicate the message that, while strictly Islamic, ISI[L] stands for promoting the welfare of people, not murdering them."[36]  With meticulous execution, it exploits the "echo chambers" of social media, in which users end up self-selecting their own nuanced virtual existence.[37]

The group's use of Twitter – with its advantages of speed, volume and the ability to tailor a message to a specific audience through hashtags – has been particularly effective.  ISIL has an Arabic-language Twitter application called "The Dawn of Glad Tidings," which facilitates retweeting of ISIL-generated hashtags through thousands of activists, while simultaneously avoiding triggering Twitter's spam-detective algorithms.[38]  When ISIL marched on Mosul in

---

[33] James P. Farwell, *The Media Strategy of ISIS,* Survival, Vol. 56, No. 6, Dec. 2014, 2015, at 50 (December 2014-January 2015) *("The Media Strategy of Isis").*

[34] *See, e.g.,* Katrin Bennhold, *Jihad and Girl Power: How ISIS Lured 3 London Girls,* New York Times, Aug. 17, 2015, available at http://www.nytimes.com/2015/08/18/world/europe/jihad-and-girl-power-how-isis-lured-3-london-teenagers.html.

[35] *See* Dominic Casciani, *IS Propaganda Pushes State-Building, Quilliam Study Finds,* BBC, Oct. 6, 2015, available at http://www.bbc.com/news/world-34448557; Charlie Winter, *Fishing and Ultraviolence: So-Called Islamic State Is Known for its Brutality, But It's Also Hooking People in Far Subtler Ways,* BBC, Oct. 6, 2015, available at http://www.bbc.co.uk/news/resources/idt-88492697-b674-4c69-8426-3edd17b7daed ("Fishing and Ultraviolence").

[36] *The Media Strategy of ISIS* at 50.

[37] *Fishing and Ultraviolence.*

[38] J.M. Berger, *How ISIS Games Twitter,* Atlantic, June 16, 2014, available at http://www.theatlantic.com/international/archive/2014/06/isis-iraq-twitter-social-media-strategy/372856/.

June 2014, its members produced up to 44,000 tweets a day.[39]  Using searchable Twitter

hashtags like #BaghdadIsLiberated and #IraqIsLiberated and professional, multi-lingual or

subtitled promotional videos, ISIL urged support for its "one billion campaign," which called on

Muslims to post messages, photos and videos on Twitter, Instagram and YouTube in support of

ISIS.[40]  During the World Cup, ISIL's media operation creatively used hashtags such as

#Brazil2014, #ENG, #France and #WC2014 to gain access to millions of Twitter users who were

World Cup fans, in the hope that they would follow links to the group's propaganda videos.[41]

At the core of ISIL's successful propaganda efforts is a powerful message to pan-Muslim

and pan-Arabic youth across the world, like Samy el-Goarany: ISIL embodies the one true vision

of Muslim identity and has the capacity to enshrine it in a sustainable concept of Islamic

nationhood. Layered onto this message is a sense of urgency and obligation, telling Muslims that

battling to restore a caliphate is a religious and an immediate duty. This battle is framed in

apocalyptic terms, focused on the boundaries drawn in the Middle East by Western powers after

World War I partitions that ISIL argues were "a divide-and-conquer strategy intended to prevent

Muslims from unifying 'under one imam carrying the banner of truth.'"[42]  Indeed, ISIL's

propaganda campaign has proved to be remarkably successful, causing thousands of young

---

[39] *Id.*

[40] Faisal lrshaid, *How ISIS is Spreading its Message Online,* BBC News, June 19, 2014, available at http://www.bbc.com/news/world-middle-east-27912569.

[41] Cahal Milmo, *ISIS Jihadists Using World Cup and Premier League Hashtags to Promote Extremist Propaganda on Twitter,* Independent, June 23, 2014, available at http://www.independent.co.uk/news/world/middle-east/iraq-crisis-exclusive-isis-jihadists-using-world-cup-and-premier-league-hashtags-to-promote-9555167.html.

[42] *ISIS Displaying A Deft Command.*

foreigners to flock to its borders – "the largest mobilization of foreign fighters in Muslim majority countries since 1945."[43]

It is this focus on the universal idea of belonging and statehood that is at the heart of ISIL's appeal and that the terrorist organization has successfully exploited to recruit Muslim youth such as Samy el-Goarany.

### iii.    Samy el-Goarany's Determination to Travel to Syria and the Assistance his Brother and Cousin Provided to Him

Though Mr. Gammal intends to appeal his conviction, he is not challenging the trial evidence here, but, rather, raises the issue of Samy el-Goarany's obstinate determination to travel to Syria to put the nature of the offense conduct in this case in context.  As discussed above, ISIL's sophisticated propaganda machine was well-designed to target a person like Samy – young, disaffected and looking for meaning in his life.  Primed by ISIL's recruitment strategy before encountering Jimmy Gammal, Samy was fully engaged and ready to join the Islamic State, sharing his plans with some of the people closest to him, such as his brother and cousin, who, in turn, helped him get to Turkey and evade detection long enough to travel to Syria.

### a.  Samy el-Goarany's Planning

Samy had discussed ISIS with family and friends and prior to his departure two people definitively knew that he was planning to travel to join ISIS – his brother Tarek and his cousin Ahmed. Trial Tr. at 282.  As his brother Tarek testified, by the summer of 2014, Samy was frequently speaking about ISIS. Trial Tr. at 746-47.

---

[43] Peter Neumann, *Foreign Fighter Total in Syria/Iraq Now Exceeds 20,000; Surpasses Afghanistan Conflict in the 1980s,* ICSR, Jan. 26, 2015, available at http://icsr.info/2015/01/foreign-fighter-total-syriairaq-now-exceeds-20000-surpasses-afghanistan-conflict-1980s/.

Samy's friends, too, knew that he was researching ISIS and considering traveling to Turkey and Syria. Samy confided in his friend Rameez Farooqi that he would be traveling to Turkey, asking Farooqi to tell anyone asking after Samy that Samy had begun an internship. Trial Tr. at 270. His close friend Khalafalla Osman testified as to Samy's interest in ISIS, researching the group while also expressing disagreement with their violent methods. Trial Tr. at 1482. Samy talked about ISIS with Osman in person and online as early as July 2014, as the news media was heavily covering the fall of Mosul to the Islamic State. Trial Tr. at 1494, 1482 – 83. By November 2014, Samy was telling Osman that he was "going to do humanitarian aid in Turkey" – though when telling Osman this plan, Samy required that their telephones be turned off. Trial Tr. at 1485 – 86. Samy confided in Osman that he would actually be going to Syria and that he did not intend to return to the United States. Trial Tr. at 1489. He also acknowledged to Osman that his work would be illegal. Trial Tr. at 1490. Concerned for his friend, Osman unsuccessfully tried to talk Samy out of traveling. Trial Tr. at 1491. Samy then installed encrypted communication software on Osman's computer, so that they would be able to communicate with each other. Trial Tr. at 1492. After arriving in Turkey and traveling to Syria, Samy continued periodically to contact Osman. Trial Tr. at 1505 – 07.

Samy visited websites that provided information about ISIS and traveling to Syria. Trial Tr. at 277 – 78. Samy made a plan to travel to Istanbul and then go into Syria. Trial Tr. at 747. He made hotel reservations in Turkey in his own name, by himself. Trial Tr. at 290. Before Mr. Gammal's involvement, Samy was following ISIS, having been successfully recruited by the group's online propaganda machine, and was determined to go to Syria to join the group.

### b.  Tarek el-Goarany's Role in Samy's Travel and the Effort to Conceal his Misconduct from Federal Investigators

Tarek el-Goarany, Samy's younger brother, was not only a confidante with whom Samy shared his plans, but also provided key assistance to Samy in his efforts to travel to Turkey and get to Syria before their parents (or investigators) learned where he had gone.

When Samy initially bought a Turkish Airways ticket from John F. Kennedy Airport to Turkey with cash, Tarek was there with him, traveling by subway and AirTrain to the airport. Trial Tr. at 207, 754.  Samy specifically told Tarek that he was not buying a one-way ticket because doing so would arouse suspicion. Trial Tr. at 755.  Tarek witnessed Samy prepare for his trip, joining Samy as he purchased the gear he would need once he arrived, including combat boots and a camel bag. Trial Tr. at 749, 758.

When Samy went to destroy the computer that had evidence of his conversations about his travel plans – critical to the investigation – it was his brother Tarek who accompanied him. Trial Tr. at 236, 735.  Indeed, Tarek was there in late September / early October 2014 to witness Samy driving to a dumpster on a farm, removing the computer hard drive, smashing it on the ground and the dumpster floor before speeding away to a friend's house. Trial Tr. at 753 – 54.

The brothers would discuss Samy's plans to join ISIS, turning off their cell phones (at Samy's request) to avoid any possible government surveillance of their conversations. Trial Tr. at 750.  The two had a code word that they would use for ISIS. Trial Tr. at 750.  Tarek was one of only two people with whom Samy communicated on the encrypted app PQChat, with the other being their cousin Ahmed. Trial Tr. at 275.  Tarek knew that Samy was lying to their mother in claiming that he had hoped to travel to Turkey to help Syrian refugees. Trial Tr. at 756.

Upon his arrival in Turkey, Samy contacted Tarek, asking him to lie to their parents about his whereabouts. Trial Tr. at 760.  In January and February 2015, Samy wrote to Tarek several times, making it abundantly clear that he was traveling to join, and then had joined, ISIS in Syria. Trial Tr. at 761 – 66.  As his training with ISIS continued and advanced, Samy shared detailed information about it with Tarek. Trial Tr. at 785 – 87.  It was Tarek to whom Samy confided that he was going to be deployed into combat in late July or early August 2015. Trial Tr. at 789.

Samy contacted his family member using the telephones of at least three different ISIS members, and communicating with his brother Tarek during the course of the FBI investigation, yet Tarek tried to hide that information from the government. Trial Tr. at 295 - 97.  Tarek also received and accepted a social media request to connect from a known-ISIS member. Trial Tr. at 296.  As Agent Collie testified, in fact, after Samy left to join ISIS he and Tarek were "talking up a storm" on WhatsApp. Trial Tr. at 334 – 35.  Aware that the FBI was investigating him, Samy warned Tarek that the government was likely also monitoring their communications. Trial Tr. at 796.

On February 6, 2015, weeks after Tarek knew that Samy had left for Turkey and Syria, Tarek and his parents sat down for a meeting with the FBI that lasted several hours. Trial Tr. at 864 – 65, 67.  During that meeting, Tarek lied to the FBI, disavowing any knowledge of Samy's location or purpose in traveling. Trial Tr. at 868.  Though the FBI asked Tarek and his family to contact them with any new information, Tarek did not speak with the agents again until May 2015, despite the many contacts he was receiving from Samy and despite the FBI's request to be informed if Tarek had any communications from Samy. Trial Tr. at 868.  Then, at Tarek's second meeting with the FBI in May 2015, initiated by the agents, he continued to lie – claiming

that his father was in Egypt when, in fact, Mr. el-Goarany had traveled to Turkey to follow

Samy's trail. Trial Tr. at 868–69.

Tarek lied to the FBI agents – and was investigated for the critical assistance he provided

in getting Samy to Syria –Trial Tr. at 206 – 07.  He falsely told the agents that Samy was helping

refugees. 767.  He deleted messages with Samy before the agents had a chance to review them.

Trial Tr. at 767.  For months, he concealed from the FBI that Samy was with ISIS, not admitting

it until he was confronted by the agents in the summer of 2015. Trial Tr. at 767.  Tarek kept

secrets for Samy, covered for him and destroyed evidence for him. Trial Tr. at 823 – 24.  Yet for

all of those lies, for the destruction of evidence, Tarek was never arrested. Trial Tr. at 824.[44]

### c.   Other Family Members Knew of and Hid Samy's True Whereabouts

In addition to Tarek, Samy's cousin Ahmed was also brought into the fold with

information about Samy's plans.  On the very day that Samy traveled to Turkey, he

communicated with his cousin Ahmed. Trial Tr. at 292.  Like Tarek, Ahmed knew that Samy had

left to join ISIS. Trial Tr. at 850.  Tarek and Ahmed made a pact to keep the true purpose of

Samy's travel to Syria a secret from their family members. Trial Tr. at 851.  Indeed, Tarek

recommended to Ahmed that they keep the information to themselves and say a "big F--- YOU"

to the rest of the family. Trial Tr. at 857.  And, as the cousins agreed, Ahmed did not share with

anyone other than Tarek where Samy was or what he was doing.

Like Tarek, Samy's father Mohamed el-Goarany also deceived the FBI during the course

of the investigation.  After discovering that Samy was planning to get into Syria, and after

knowing that the FBI was investigating Samy's activities, Mohamed el-Goarany traveled to

---

[44] Not only was Tarek not arrested – despite the help he knowingly provided to support his
brother's plan to join ISIS and despite his months of lies to the federal government – but he was
rewarded with a non-prosecution agreement. Trial Tr. at 768.

Turkey in May 2015 without telling the FBI. Trial Tr. at 262.  While there, he stayed at the same hotel where Samy had stayed and reached out to Attiya Aboualala, who was the person that purportedly got Samy over the border from Turkey to Syria. Trial Tr. at 262, 872.  While the FBI was investigating Samy, and while surreptitiously in Turkey, Mohamed el-Goarany was able to speak with Samy on a telephone call, during which Samy confided in his father that he had joined ISIS. Trial Tr. at 775.  Yet Mr. Goarany tried to hide this information from the FBI.

Samy el-Goarany's travel to Turkey and into Syria to join ISIS, and his evasion of arrest, was a function of his own determination, aided by the active and passive help of his family members, and while the trial evidence may have shown Mr. Gammal played a role in Samy's arrival in Syria, he was surely not alone in doing so.

### iv.   Islamist Movements in contrast to Jihadist Organizations; and Egyptian Politics and the Events of 2013 – 2014

In contrast to proselytizing jihadist organizations such as ISIL, with its wide-ranging and sophisticated propaganda machine which seduced Samy el-Goarany along with thousands of others, Islamist Movements, such as the Muslim Brotherhood (with its long history of oppression in Egypt) have a legitimate political objective and do not seek to achieve their goals through acts of terrorism.  As the trial evidence showed, Mr. Gammal had a long-standing interest in the Muslim Brotherhood and the movement's repression in Egypt, which significantly contributed to his online activity, including those communications that first brought him into contact with Samy el-Goarany.

At trial, Andrew March, Ph.D. testified for the defense as an expert in modern Islamic political and legal thought, and modern Islamist and jihadi movements. Trial Tr. at 1553.  Dr. March explained to the jury how the Muslim Brotherhood was the oldest example of an Islamist Movement (a group organized to have a strong role in government, politics and organizing

society – sometimes political parties, sometimes social organizations, sometimes charities) as distinct from a jihadi movement (a term that has come to be used to refer to groups that primarily seek to advance their aims through violence as opposed to democratic participation.) Trial Tr. at 1553 – 55.

Dr. March also testified to the persecution that members of the Muslim Brotherhood have faced in Egypt, where the group was criminalized, having to organize themselves outside of the political process. Trial Tr. at 1554 – 55.  As Dr. March told the jury, the Muslim Brotherhood is not and was not a jihadist movement. *Id.* at 1556.

Following the events of the Arab Spring in early 2011, Egypt's President Hosni Mubarak, who had kept an iron-clad grip on his office since October 1981 and who was a longtime opponent of the Muslim Brotherhood, was forced from office.[45]  After the anti-Mubarak revolution and a period of military rule, the Muslim Brotherhood took power in Egypt through a series of popular elections, with Mohammed Morsi, a top leader of the Muslim Brotherhood, elected to the presidency in June 2012. Trial Tr. at 1559.  Following Morsi's election, dissension among various political factions and popular disapproval of the Muslim Brotherhood led to protests in the fall of 2012 across the country. Trial Tr. at 1556 – 59.  The pro- and anti- Morsi forces continued to clash, culminating in the Rabaa Square sit-in by Morsi's supporters, starting on June 30, 2013 to celebrate Morsi's one-year anniversary in power.[46]  The Rabaa Square

---

[45] Hafez Ghanem, Egypt's Difficult Transition: Why The International Community Must Stay Economically Engaged, The Brookings Global Economy & Development Working Paper, January 2014 at 7, available at https://www.brookings.edu/wp-content/uploads/2016/06/Arab-EconPaper1Hafez-v3_MR.pdf.

[46] David D. Kirkpatrick and Mayy El Sheiky, Morsi Spurned Deals, Seeing Military as Tamed, New York Times, July 6, 2013, available at https://www.nytimes.com/2013/07/07/world/middleeast/morsi-spurned-deals-to-the-end-seeing-the-military-as-tamed.

protests was "extensively" covered by local and foreign journalists. Trial Tr. at 1560.  Then, on July 3, 2013, Morsi was ousted from power in a military coup d'etat, with defense placing the Egyptian Defense Minister Abdul Fatah al-Sisi in power. Trial Tr. at 1559.  Sisi dissolved the constitution and called for the Egyptian military and police to crack down on protestors during a July 24, 2013 speech at a military parade.[47]

Soon thereafter, the Egyptian military stepped in to end the Rabaa Square protests, jailing tens of thousands of Muslim Brotherhood members and killing hundreds of the Rabaa Square protestors. Trial Tr. at 1558 – 59.  Starting in the early morning of August 14, 2013 and over a twelve-hour period, government forces blockaded Rabaa Square, trapping the protestors, and then fired tear gas and weapons into the crowds.[48]  The military deployed tanks and bulldozers; armored vehicles and rooftop snipers; low-flying helicopters and rubber bullets against the largely peaceful demonstrators. Trial Tr. at 1559; Exh. C.  Hundreds of protestors were killed following the government raid on Rabaa Square. Exh. C.

As Dr. March explained, the Rabaa Square "massacre was an enormously traumatic experience for Egyptian people who, up to that point, had seen two or more years of democratic transformation only to see hundreds and hundreds of their fellow citizens massacred." Trial Tr. at 1560 – 61.  Following Sisi's coup d'etat, the Muslim Brotherhood was declared a terrorist group by the Egyptian government with hundreds of members being prosecuted and convicted simultaneously. Trial Tr. at 1561.  Several high-profile prosecutions involved journalists, some

---

[47] Kareem Fahim and Mayy El Sheiky, Egyptian General Calls for Mass Protests, New York Times, July 24, 2013, available at https://www.nytimes.com/2013/07/25/world/middleeast/egypt.html.

[48] Exhibit C, Timeline of Turmoil in Egypt from Mubarak and Morsi to Sisi, New York Times.

of whom were imprisoned for years simply for covering the Muslim Brotherhood and purportedly showing sympathy to the group. *Id.* at 1561.

In short, the events in Egypt starting in 2011 through 2014 – the end of Mubarak's tenure, Morsi's election and removal from office, Sisi's coup, the August 2013 Rabaa Square massacre of hundreds of peaceful protestors (many of whom were supporters of the Muslim Brotherhood) – formed the most significant political period in the country since Mubarak took office following the assassination of his predecessor, President Anwar Sadat, on October 6, 1981.  For Egyptian citizens, the Egyptian diaspora and anyone invested in the political and social well-being of the country, 2011 was a period of intense optimism, 2013 was a time of anxiety and 2014 presented profound existential questions about the future of Egypt.

It was during this time that Mr. Gammal's social media activities took on a heightened urgency in his life.

**B.  History and Characteristics of Ahmed "Jimmy" el Gammal**

Ahmed Gammal, a naturalized United States citizen of Egyptian heritage, was a supporter of the Muslim Brotherhood whose obsession with political events there lured him into the world of social media, which proceeded to dominate much of his free time between 2014 and 2015.  He is a middle-aged man who has a large and supportive group of friends and family members ready, able and willing to support him upon his release from prison.

**i.   Early Years**

Mr. Gammal was born in Cairo, Egypt on Dec. 6, 1972, the older of his parents two children.



His father was an engineer and his mother worked as a manager at an insurance company.

Mr. Gammal and his younger sister Aliaa both attended English-language schools in Cairo. The

two children were close – sharing, in Aliaa's words, "the same school, same home and the same

principles." Exh. D at 1. He was, to his younger sister, an "idol," as he has become for his young

niece and nephew, as well. *Id.*



The Gammals had extended family nearby, and Ahmed and Aliaa frequently played with

their cousins, who lived nearby and attended the same schools. Exh. D at 9. Mr. Gammal would

help his younger cousins "in studying and getting over whatever problems" they faced at school.

*Id.* While several branches of the family had left Egypt, they would reunite for vacations and

family gatherings. Exh. D at 10.



Mr. Gammal graduated from Helwan University in Cairo with a business degree and thereafter worked in a major bank in Cairo. *See* PSR; Exh. D at 1.  As one of his university friends (who has known him for well over two decades) explains, Mr. Gammal "was always praised for his effort and seriousness" at the bank. Exh. D at 7 – 8.

He is remembered by his friend Tamer in Egypt as having "always been a very kind, easy going and caring person" who was "always the first to help his family and friends … and also very honest and straightforward when entrusted with any affair." Exh. D at 7. When Mr. Gammal borrowed money (to help start his business, for example), he could be trusted to repay it – sometimes "even fast than expected." Exh. D at 7.

Though well liked at his workplace, Mr. Gammal yearned to establish himself outside of Egypt and "build his own world from A to Z." Exh. D at 1.  As his mother explains, "[h]e had a job at a good bank but he insisted on moving to the United States. I was against his decision to quit his job but he insisted to travel and to plan his life accordingly. I couldn't stop him from fulfilling his desire to travel to America, live, work and make a future in it … ." Exhibit F, Video Interview of Samia Sherif, Transcript, at 2. So, when he was 25 years old, Mr. Gammal came to the United States, hoping to create a life for himself here.

### ii.    Mr. Gammal's Work Life in the United States

After emigrating to the United States in 1997, Mr. Gammal settled first in Southern California, where he worked in auto sales and financing and as a mortgage officer, and then followed his job with a bank and relocated to Arizona in 2004.

His first sales job was at a Pasadena Ford car dealership where he worked for three years. One of the desk managers became a manager at a Toyota dealership and recruited him to run the used car lot seeking more challenging professional opportunities.  During the 2004 real estate boom Mr. Gammal started working at Capital One mortgage selling mortgages and refinancing. After about a year at Capital Once, he moved to Phoenix Arizona which is where his mother-in-law lived and where he hoped to buy a home.  He worked for Ameriquest as a loan officer during the height of the subprime loan boom for a year until it was suddenly shut down during the mortgage crisis.  Undeterred and resilient, Mr. Gammal decided to start his own business, first by finishing processing the loans he had been working on at Ameriquest and then going back into car sales, selling used cars obtained from auctions.  The business grew fast and Mr. Gammal expanded by adding a body shop and a car dealership.  He then got into importing evaporative coolers from China, which were very popular in Arizona, and then started importing towing dollies for automobiles.  He also made an arrangement to import ice machines from China, and he was expecting three containers of ice machines and auto dollies at the time of his arrest.



### iii.    Mr. Gammal's Personal Life in the United States

Soon after his arrival in the United States, Mr. Gammal met Celeste Dubrow in California. Exh. D at 5.  The two started dating and were married in 2000.  They traveled together to Hawaii for a delayed honeymoon and eventually moved from California to Arizona, closer to Celeste's mother Cherie. Exh. D, Celeste 1.



In marrying Celeste, Mr. Gammal gained a mother-in-law, further inculcating him into American norms.  Cherie Dubrow and Mr. Gammal developed a very close relationship, with

28

Mrs. Dubrow even lending him money to start his business – money that Mr. Gammal promptly repaid. Exh. D at 5.

But the marriage was not without problems.  As Celeste explains, she suffered from mental health problems and resisted treatment for fear of the stigma attached to the disease. Exh. D at 3.  But it was "Jim" who "was there and helped [Celeste] feel good about [her]self." *Id*.  Mr. Gammal helped to try to convince her to get the help that she needed, finally prevailing on her to seek treatment from a mental health professional. *Id*.  Though her condition worsened, and with it her behavior became increasingly unpredictable, Mr. Gammal remained by Celeste's side. *Id*. at 4.  And when Celeste's health deteriorated to the point where she needed to be hospitalized, it was Mr. Gammal who was "there every step of the way." *Id*.  Mr. Gammal acted selflessly time and time again, and it was only because of "his perseverance and commitment" that Celeste got the treatment that she needed. *Id*.

With Celeste, Mr. Gammal found a lifelong partner.  Though they are no longer married, they remain intimately close.  As Celeste explains, "Jim has done many things for me.  He helped me graduate college, start a fulfilling job, and raise a couple of cats to make our house a home." *Id*.  (Mr. Gammal has always had a soft spot for animals, with a particular fondness for cats, dating to his days in Cairo. *Id*. at 7).

### iv.    Mr. Gammal's Support of his Extended Family

Friends and family alike attest to Mr. Gammal's fine qualities as a caregiver.  This is perhaps nowhere more apparent than in the close relationship he has with his mother, Samia, which grew even closer after his father's death in 1997.

With his only sibling, Aliaa, living in Abu Dhabi, Mr. Gammal worried about his elderly, widowed mother remaining alone in Egypt.  So, Mr. Gammal relocated her from Cairo to Arizona, finding and paying for her apartment, sponsoring her for legal permanent residency and supporting her financially.  Upon her arrival in the United States, Mr. Gammal joyously showed her the wonders of the country that was now his homeland. *See* Exhibit E, Family Photographs.









After Mr. Gammal witnessed the social and political upheaval in Egypt in the summer of 2013, he brought Samia to the United States, helping her obtain legal permanent residency and finding her an apartment near his home.[49]

He likewise became quickly and deeply involved in the lives of his wife's family. After he and Celeste moved to Arizona, Mr. Gammal would help to take care of Celeste's grandmother, who lived in a nursing home. Exh. D at 3. "He would go to visit her, talk to her and occasionally talk to the others at the home. He was respectful and courteous and he would spend many hours there till the end of my grandmother's life," Celeste writes. Exh. D. at 3. Mr. Gammal is also close to Celeste's brother's family, supporting their niece and nephew as they grow, just as he has with his sister's children. *Id.* at 2-3.

---

[49] Given their close relationship, it has been particularly difficult for Mr. Gammal to watch his mother's mental condition deteriorate over his time at the MCC. He has been depressed, being far from Mrs. Gammal yet knowing that her cognitive abilities are slipping, and having very few social visits, with most of his family and friends in Arizona and overseas. Exh. G at 16.

Having been for so long a loyal son, brother, husband, cousin and friend, Mr. Gammal is fortunate in having a wide and welcoming network waiting to assist him as he transitions out of custody.  In the words of one cousin, echoed in spirit in all of the letters of support, Mr. Gammal has the support of many who are "willing to be available as a friend – not only family – to help Ahmed with whatever he needs upon his release from prison and will spare nothing to return him to life as a good member of society." Exh. D at 9.

  **v.**   **Events in Mr. Gammal's Life Preceding his Arrest**

When he was first in the United States, Mr. Gammal felt uninterested in the political life in Egypt. *See* Exh. B, at 4. Following the Arab Spring and the subsequent Egyptian revolution, however, he became enthusiastic about the possibility of meaningful political change in the country. *See* Exh. B, at 4.

From Phoenix, where Mr. Gammal had embraced American democracy so thoroughly that he even served as a poll worker on election days, Mr. Gammal followed events in Egypt through online posts and commentary. *See* Exh. B, at 4; Exh. D at 7 (Cherie Dubrow explains that Mr. Gammal "was very excited the first time he got to vote, and in fact worked at the polling places … a couple of elections.") "[I]t grew on Facebook – it grew and it became a revolution and finally Mubarak left.  People in the square were posting on Facebook   I read the newsfeeds – and posting it on my page.  I would check my phone all the time--whenever I was bored I would check my phone.  … .  I was enjoying the likes and the shares.  It gave me a feeling that I was part of it all." *See* Exh. B, at 4.

Mr. Gammal became especially preoccupied with what was going on Facebook after the coup by the Egyptian Army in 2013.  He was proud of having 900 followers of his postings on Facebook and would spend hours every night commenting on other people's posts. *See* Exh. B,

at 4.  In 2013, during his biannual visit to Egypt to see his mother, Mr. Gammal went to Rabat

Square where the protests occurred.  After the military crackdown and Sisi's power grab, Mr.

Gammal began to lose hope for Egypt's political future, and started planning for his mother's

emigration to the United States, where she could safely live with Mr. Gammal. *See* Exh. B at 4.

> As Dr. Michael First, a psychiatric expert, explained:
>
> His preoccupation with the social media during the Arab Spring was his way of
> continuing to feel involved in Egyptian events and to express his hopes for the
> establishment of a democracy in Egypt, following the model of the United States.   He
> clearly derived both excitement and satisfaction by feeling that he was participating in the
> process in a meaningful way through his posting on Facebook, which were validated by
> the large number of followers of his postings.
> *See* Exh. B, at 6.

Like the quick and immediate stimulation he experienced when getting feedback from the

online community, Mr. Gammal also developed a destructive gambling habit that satisfied the

same sort of short-term needs.[50]  While still living in California, Mr. Gammal was introduced to

gambling by a co-worker at the car dealership.  He soon found himself going to Las Vegas

regularly and then frequenting local casinos on a nearly nightly basis. *See* Exh B at 5.  He

experienced a sense of satisfaction from taking risks and from the prospect of making quick

money. *See* Exh. B at 5.  While he stopped eventually, even up until his arrest in this case he was

impulsively gambling large sums of money, despite the risks it posed to his financial well-being.

In 2013, Mr. Gammal was in a serious car accident, breaking his hip joint and rendering

him bed- and chair-bound for six months. *See* Exh. B at 5. Physicians prescribed him opioids –

Percocet and Vicodin – to manage his pain. *See* Exh. B at 5.  Like so many others, Mr. Gammal

developed a physical and psychological dependence on the drugs, which gave him a sense of

---

[50] He demonstrated some of the same impulse-control problems with cigarettes and soft drinks,
developing a two-pack a day smoking habit and drinking over a case of Red Bull on a daily
basis. *See* Exh. B at 5.

33

ease and well-being. *See* Exh. B at 5. After exhausting his prescriptions, Mr. Gammal began

purchasing them illicitly, taking 7 – 8 pills per day. Exh. B at 5. Mr. Gammal's dependence on

these controlled substances coincided with his growing political preoccupation.

As the political situation in Egypt became more and more heated, around the time of

Sisi's power grab and prosecution of the Muslim Brotherhood, Mr. Gammal began devoting

hours upon hours of his life to interactions on social media. Mostly, he received information

about the political situation in Egypt, but his sources also would at times disseminate information

about the Islamic State – information that he received and occasionally, as with much of the

media he consumed, forward through his own social medial accounts.

Mr. Gammal's social media life, while spiraling out of control, was primarily focused on

his unyielding complaints about Sisi and his deeply-seated concerns about the Egyptian political

crisis. For Mr. Gammal, having come of age in Egypt under Mubarak's dictatorial control and

his suppression of political dissidents, Morsi's election in 2013 represented an unprecedented

opportunity for the Egyptian people. Mr. Gammal spent most of his non-work time following

the news of events in Egypt, which also provided an outlet from the stress he felt as Celeste's

primary caregiver. While the sources of information upon which he relied also provided

information about the Islamic State, Mr. Gammal's primary interest was always Egypt.

### vi.    Mr. Gammal's Incarceration at the MCC

Since the fall of 2015, Mr. Gammal has been incarcerated at the Metropolitan

Correctional Center ("MCC"), an aging administrative facility with deteriorating infrastructure

(such as its frequently out-of-service elevator system) designed primarily for pre-trial detention

and holdover proceedings. Conditions at the MCC are harsh, including frequent rat and

cockroach infestations, nearly constant detention indoors (with only two 1.5 hour visits to the

34

roof each week) and notoriously inedible food.  The unit where Mr. Gammal is housed, 5 North,

is even smaller than the other cramped units in the MCC, because part of 5 North is carved out

for the church, mosque and chaplain's office.  It also is locked down more frequently, when

religious services take place (every Friday, Saturday and Sunday and once a month on

Wednesdays for a Catholic mass.)  The population on 5 North is largely composed of young

gang members, with many fights and incidents of violence on the floor, leading to even further

lockdowns.[51]  Between the infrastructure problems and the lockdowns on 5 North, Mr.

Gammal's limited freedom of movement has been even more restricted than for the average

MCC inmate, and certainly more so than individuals incarcerated at other Bureau of Prisons

facilities.

Despite these conditions, over his three-plus years at the MCC, Mr. Gammal has received

only two minor infractions (for phone abuse and refusing an order), and none since April 2016.

*See* Exhibit G, Bureau of Prisons Records, at 26.  He has suffered from lower back pain, knee

pain and nasal cavity disease, treatment for all of which is frequently delayed. *See* Exh. G.

Then, in June of this year, a fellow inmate became upset with Mr. Gammal and began

assaulting him, punching Mr. Gammal continuously in the face and around his head, breaking

Mr. Gammal's nose. Exh. G at 1 – 11.[52]  Though his nasal fracture requires further medical

treatment and consultation with an oral and plastic surgeon, his care continues to be delayed. *See*

Exh. G at 1 – 5.  While Mr. Gammal was assaulted on June 25, 2018 and has had ongoing pain

---

[51] Just this week, as counsel was attempting to confer with Mr. Gammal on sentencing materials, visits to the MCC were halted as the result of a hostage-taking situation, yet another of the all-too-common occurrences that interfere not only with the personal activities of the inmates but also with attorney-client communications.

[52] Counsel for the MCC has advised that he cannot release photographs of Mr. Gammal's injuries for inclusion with the sentencing materials, but that if the Court wishes to see them, upon a judicial request he will make them available for viewing *ex parte*.

as a result for now nearly six months, with his nose sensitive to the touch simply of water when

washing his face, because of a "shortage of correctional staff" his surgical consultations have

been repeatedly cancelled. *See* Exh. G at 1.  This failure to adequately treat a serious medical

condition is unfortunately typical for the individuals housed at the MCC.

  In addition to the assault and injuries, Mr. Gammal was placed in the segregated housing

unit ("SHU") for 23 days while the correctional staff investigated the assault.  Though Mr.

Gammal was not written up – meaning he was not found to have played a role in the incident –

he nevertheless suffered the deprivations of life in the SHU for nearly a month.

  To the extent that conditions at the MCC are more "punitive" than are conditions at other

non-administrative detention facilities and certainly in light of the 23 days that Mr. Gammal

spent in segregation while prison officials investigated the assault against him, he has been over-

punished, beyond the number of days of his incarceration, and the Court should consider that

factor in fashioning an appropriate sentence under section 3553(a)(2)(A). *See, e.g., United States

v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (in the context of a downward departure, "pre-

sentence confinement conditions may in appropriate cases be a permissible basis for" a below

Guidelines sentence).  Here, after fashioning a sufficient but not greater than necessary sentence

in light of the Section 3553(a) factors, the defense further asks this Court to credit Mr. Gammal

with an additional three-month sentence reduction, which would be four times the number of

days he spent in segregation after being the victim of an unprovoked assault, and consider a

further downward variance in light of the harsh conditions at the MCC.

  Though housed in an especially punitive unit of an especially punitive facility, Mr.

Gammal has proven himself capable of overcoming the obstacles his detention has presented.

He applied for and was chosen for the highly selective inmate companion program. Exhibit H,

Bureau of Prisons Program Records at 1.  As the Bureau of Prisons regulations explain, because

of the very sensitive nature of the work "the selection of inmate observers requires considerable

care." BOP Policy Statement P5324.08, ¶ 13(a).  Inmates are selected to participate:

> based upon their ability to perform the specific task but also for their reputation
> within the institution. In the Program Coordinator's judgement, they must be
> mature, reliable individuals who have credibility with both staff and inmates.
> They must be able, in the Program Coordinator's judgement, to protect the
> suicidal inmate's privacy from other inmates, while being accepted in the role
> by staff. Finally, in the Program Coordinator's judgement, they must be able to
> perform their duties with minimal need for direct supervision.

*Id*.  In his work with the inmate companion program, Mr. Gammal has "exhibited considerable

reliability and dedication to the program." Exh. H at 2.  Beyond his regular hours, Mr. Gammal

"often volunteers to work additional shifts when needed." Exh. H. at 2.  The other companions

and those on suicide watch all like him and Mr. Gammal "exhibits a level of patience and

openness, which contribute to his effectiveness in this position.  Mr. Gammal always presents

with a pleasant and respectful demeanor, and has been a valuable addition to the inmate

companion roster overall." Exh. H at 2.  His work supervisor gives him consistently high ratings

for his work. Exh. H at 2.

Last, Mr. Gammal's time at the MCC also constitutes relevant evidence when weighing

the likelihood of recidivism.  As discussed in section 3.C.ii, *infra*, prisons frequently breed

extremist thought and behavior.  This has been especially evident at the MCC during Mr.

Gammal's tenure there.  Just a year ago, it came to light that an MCC inmate was distributing

terrorist propaganda and publications issued by terrorist organizations to other terrorism

defendants housed at the MCC. *See* 16-cr-760 (S.D.N.Y.) (RMB), ECF No. 176.  This man

would meet with terrorism defendants during the *juma* prayer sessions on Fridays, distributing

extremist materials in his "radicalization efforts." *Id.* at 2.  After the government learned of this,

it took action against that defendant and the others involved in the distribution and receipt of this

extremist material.  Jimmy Gammal was not one of those people.  As argued further below, if

Mr. Gammal can resist any temptation into radicalization while in an environment as bleak as the

MCC, when he is far from his family and friends and faced with entreaties from other inmates,

there is no reason to believe he will be any more likely to become radicalized upon his release

from custody.

### C. Comparable Sentences, Achieving Deterrence and Concerns About Recidivism

As the Second Circuit has noted, terrorism cases present complex sentencing challenges,

as the crimes "represent[] a particularly grave threat because of the dangerousness of the crime

and the difficulty of deterring and rehabilitating the criminal … ." *United States v. Meskini*, 319

F.3d 88, 92 (2d Cir. 2003).  While this may help explain the extremely high recommendations

under the Sentencing Guidelines in terrorism cases, the justification for a long sentence cannot

be simply that a case falls within the rubric of a terrorism statute that justifies a high sentence.

Rather, the specific case, as *Meskini* articulates, should present "difficulty" when considering

deterrence and rehabilitation.

### i. Comparable Sentences – Avoiding Unwarranted Disparities

In those terrorism cases – like this one – that do not have the typical deterrence and

rehabilitation concerns presented by radicalized defendants likely to reoffend, courts have

routinely varied below the Sentencing Guidelines recommendations.  Recently, a district court in

the District of Colorado observed that the United States Sentencing Commission and its

terrorism guidelines "under which defendants are punished uniformly for dissimilar conduct,

exacerbate the infirmities in our justice system … ." *See Jumaev*, 12-cr-33 (D.Colo.) (JLK), ECF

No. 1920 at 42.  In seeking to achieve fairness in sentencing, and in being mindful of the need to

exercise rational thought, humanity and compassion in sentencing, it is necessary here to compare Mr. Gammal's offense conduct to other cases involving facilitation – not travel, not fighting, not acts of violence – and consider the sentences in those cases.

**Bakhtiyor Jumaev – sentenced to time served on July 18, 2018 for provision of material support to terrorist organization**.  In *United States v. Jumaev*, the defendant had sent a small amount of funds to a group titled the Islamic Jihadist Union (an Uzbekistan-focused organization that had been affiliated with al-Qaeda and the Afghan Taliban and that had fought against U.S. force in Afghanistan) at the direction of a friend.  The friend then bragged about his plans to go to Turkey, which Mr. Jumaev encouraged.  After being charged with federal terrorism crimes, Mr. Jumaev proceeded to a seven-week trial.  His defense was that the money he sent was to repay a debt owed to his friend, and that within their cultural context, repaying his friend was greatly important, and that it would have been offensive within Uzbek custom to question why the repayment was going to another entity.  After 15 hours of deliberation, including a weekend recess, the jury returned a guilty verdict.  While the district court concluded that the facts were "certainly … sufficient for the jury to have found him guilty" of providing material support to terrorists, his relative culpability as compared to other material support of terrorism defendants was a critical sentencing factor. 12-cr-33 (D. Colo.) (JLK), ECF No. 42 at 1-2.  The district court rejected application of the terrorism enhancement (*see id.*, at 13) and imposed a sentence of 76 months in prison – effectively time-served. Id. at 42.

**Asher Abid Khan – sentenced to 18 months in prison on June 25, 2018 for provision of material support to terrorist organization.**  In another recent prosecution, *United States v. Khan*, Asher Khan pleaded guilty to providing material support to ISIS after devising a plan with a friend in 2014 to travel to Turkey and then Syria for purposes of joining ISIS.  At the time, Khan

had been living with a relative in Australia and traveled from there to Turkey, after having

contacted a Turkish-based foreign terrorist fighter facilitator.  Khan provided instructions to his

south Texas-based friend on how to travel and how to reach him in Turkey. After meeting in

Turkey, Khan provided his friend with money, knowing the friend planned to travel to Syria to

join ISIS.  Khan then left Turkey and returned to the United States, and again contacted the ISIS

go-between, who confirmed that the friend was on his way to join ISIS.  Over the next few

months, Khan and his friend remained in touch and Khan continued to provide financial support.

After the friend finally connected with ISIS in August 2014, communications ceased and the

friend's family learned that the friend was killed in December 2014 while fighting with ISIS.[53]

The district court sentenced him to 18 months in prison, to be followed by five years of

supervised release. *See* 15-cr-263 (S.D.Tex.) (LNH), ECF No. 126.

  ***Islam Natsheh – sentenced to 60 months in prison on Dec. 14, 2016 for provision of***

***material support to terrorist organization.***  Islam Said Natsheh was a prolific social media

personality and a frequent disseminator of ISIS propaganda who falsely claimed to FBI agents

that he had reformed and deradicalized.  Thereafter, the government learned that Natsheh was in

contact with a person overseas who had attempted to join ISIS, that he had purchased airline

tickets to Turkey and that he intended to travel to join ISIS.  He was detained while attempting to

board a flight from San Francisco to Amsterdam, with plans to travel on to Turkey and then enter

Syria.  He also had purchased a plane ticket for a minor with whom he had been communicating

and who also intended to travel to Syria, but lacked the ability to purchase a ticket.  The district

court sentenced him to 60-months in prison. *See* 16-cr-166 (N.D.Cal.) (RS), ECF Nos. 24, 29.

---

[53] *See* Department of Justice Press Release, Dec. 4, 2017, available at
https://www.justice.gov/opa/pr/texas-resident-pleads-guilty-providing-material-support-isis.

Other recent terrorism cases involving non-cooperator defendants who not only facilitated travel but took affirmative steps to join ISIS or directly assist them in the United States include the following:

- *United States v. Doe* – **20-month sentence**
  The juvenile defendant financially supported the efforts of another to acquire the materials needed to build a pressure cooker bomb after the two had engaged in numerous discussions about their admiration for ISIS, stating that "Islamic State is everywhere." He was sentenced on August 9, 2016 to 20-months in prison and three years of supervised release. *See* 15-cr-302 (E.D.N.Y.) (MKB), ECF No. 79.

- *United States v. Robert Blake Jackson* – **36-month sentence**
  the defendant lied to FBI agents about his social media posts, denying posting any pro-ISIS content, but his internet activity showed violent online comments, searches for Anwar al-Awlaki lectures and a FaceBook post stating an explicit desire to assist ISIS. He was sentenced on January 23, 2017 to 36 months in custody. *See* 16-cr-70 (N.D.Fla.) (MCR), ECF No. 47.

- *United States v. Aaron Daniels* – **80-month sentence**
  Defendant had contact with ISIS recruiters, sent funds via Western Union to ISIS accounts and vocally expressed his desire to commit jihadist attacks in the West, then tried to board a flight to Trinidad and Tobago, from which he intended to continue traveling and join ISIS. *See* 16-cr-222 (N.D.Ohio) (EAS), ECF Nos. 85, 93.

- *United States v. Michael Wolfe* – **82-month sentence**
  Western District of Texas, June 5, 2015. Defendant Wolfe attempted to travel to the Middle East to lend his support to ISIL. He admitted at his change of plea hearing that in preparation, he applied for and acquired a U.S. passport, participated in physical fitness training, practiced military maneuvers, concealed his preparations, and bought an airline ticket for travel to Europe, which he believed would be the first leg of a trip to the Middle East. Instead, he was arrested on the jetway at the Houston, Texas airport as he attempted to board a flight to Toronto, Canada. Judge Sam Sparks sentenced Wolfe to 82 months in prison. 14-cr-213 (W.D.Tx.)

- *United States v. Joseph Hassan Farrokh* – **102-month sentence**
  Defendant Farrokh conspired with co-defendant Mahmoud Amin Elhassan to travel to Syria, where they would join, and fight for, ISIL. Farrokh and Elhassan had numerous communications, using secure apps, about their plans. Farrokh was arrested as he went down the jetway to catch his flight. Farrokh was sentenced to 102-months in prison. 16-cr-20 (E.D.Va.)(AJT), ECF Nos. 30, 49.

Given the relative risk and culpability of the offense in the cases listed above compared with the Sentencing Guidelines range against which the PSR argues Mr. Gammal's sentence should be considered, it is evident how even the PSR's "below-Guidelines" sentence overstates Mr. Gammal's offense conduct and culpability.  Mr. Gammal did not attempt to travel to Syria; he did not engage in acts of violence; and he did not have any plans to join ISIS.  When compared to the offenders listed above, any sentence beyond 48-months in this case would constituted an unwarranted sentencing disparity.

**ii.    Deterrence and Risk of Recidivism**

The heightened sentencing exposure presented by the Sentencing Guidelines' terrorism enhancement is purportedly based on the notion that, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Meskini*, 319 F.3d at 92. But:

> There is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes—and especially those convicted of financing offenses—are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. [§] 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist.

James P. McLoughlin, Jr*., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 114-15 (2010) (footnotes omitted) (pre-dating enactment of 18 U.S.C. § 2339D).

In other terrorism cases, experts on violent extremism have opined as to the risk factors for reoffending.  Recently, in a case in the Eastern District of New York in which a United States citizen who joined ISIS in Syria but escaped and proceeded to cooperate extensive with federal officials, was given a sentence of time served.  Moustafa Ayad, Head of International Communications Programmes for the Institute for Strategic Dialogues, a global counter-

42

extremism non-profit organization and manager of the Against Violent Extremism Network, a

group of former extremists and survivors of extremist events that conducts interventions, public

speaking engagements and a range of programming to stem the tide of violence, polarization, and

extremism globally, testified as a qualified expert in Islamic extremism and strategies to counter

violent extremism.  In addressing the question of what might predict if an individual would be

likely to engage in violent extremism, Mr. Ayad explained:

> there are a number of sort of internal and external push and pull factors that can
> compel an individual to I guess join an extremist organization. In terms of the
> individual, and they vary between every person, push factors include grievances
> such as issues around status in regards to feeling of persecution, perceived
> grievances in regards to socioeconomic status sometimes are involved. Similarly
> mental health on some levels as well as the need for a purpose sort of driven life
> significance. Sometimes it's been called the quest for significance I believe as
> well as a sense of community and identity. A lot of individuals are sort of dealing
> with identity issues. These are push factors and extremist groups are able to
> manipulate those issues and exploit them through narratives that speak
> specifically to those issues and frame them within a religious framework to make
> them seem bigger and more important than it is.

*United States v. Doe*, 14-cr-612 (E.D.N.Y.) (JBW), ECF No. 58 at 21.

Mr. Gammal, of course, does not fit the profile above.  Dr. First recognizes this

meaningful difference between Mr. Gammal and most other terrorism defendants.  He opines:

> It is notable how different Mr. Gammal's profile is from the typical individual
> who has become affected by the pull of radical Islam.  These individuals tend to
> be much younger (in their 20's), are strong rigid adherence to the beliefs and
> practices of Islam, have trouble adapting to the demands of life in the United
> States, feel unmoored in their lives and thus are susceptible to the call for action
> by the proponents of radical Islam.  In contrast, Mr. Gammal has made a stable
> and successful life for himself in the United States, with a thriving business,
> strong family support, and no more than a cultural interest in the practice of Islam,
> and thus do not at all fit the typical profile.

*See* Exh. B at 6 – 7.

Mr. Gammal had his own purpose-driven life prior to this case, starting and running a successful small business; bringing his mother to live with him in the United States; traveling with her and with Celeste; embracing life as an American – even working as a poll supervisor on election day.  His misconduct here was a product not of religious extremism, grievances against the United States and or identity issues – the factors that Mr. Ayad identifies as predictors of extremist behavior.  Rather, Mr. Gammal's:

- preoccupation with Middle Eastern politics in the aftermath of the Arab Spring;
- obsessive online behavior combined with "his craving for excitement";
-  "tendency to act impulsively without taking into consideration potential negative consequences";
- fatigue after years of caring for his spouse; and
- dependence on opioid drugs, which further impaired his decision-making abilities

all explain help to explain why he engaged in the behavior for which he was convicted. Exh. B at 6, Exh. D at 3-4.  Other than the fact of this case, there is no indication from Mr. Gammal's background, history or characteristics that he will recidivate.[54]

With respect to deterrence, as Judge Kane observed in the *Jumaev* case:

Many commentators warn against unnecessarily lengthy sentences for terrorism offenses. One of the reasons behind those warnings is the possibility of further "radicalization" while in prison. "Prison systems throughout the world have been and continue to be breeding grounds for radicalism, recruiting grounds for extremist movements, and facilities for the planning and training of radical activities." Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Services Providers* 6 (2004), *available at* https://oig.justice.gov/special/0404/final.pdf.

---

[54] To the extent that the nature of the offense – not Mr. Gammal himself – causes a fear of recidivism, as another district court stated, it is not right "to act on what I would call an unfounded fear that a defendant might do something, like a terrorist act, and therefore we should lock that person up forever … . I think I need to be conscious of assessing the nature and circumstances of what the defendants did nod not merely react to that title as ascribed to this case." *United States v. Ahmad*, 04-cr-301 (D.Conn.) (JCH), ECF No. 220 at 32.

*Jumaev*, 12-cr-33 (D.Colo.) (JLK), ECF No. 1920 at 29.  "These factors weigh against a

protracted additional term of imprisonment." *Id.*[55]

### 4.  Conclusion

As the Second Circuit has recently reminded us

"Sentencing, that is to say punishment, is perhaps the most difficult task of a trial
court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal
Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing
considerations in every sentencing decision, a sentencing judge must have some
understanding of "the diverse frailties of humankind." *See Woodson v. North
Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality
opinion). In deciding what sentence will be "sufficient, but not greater than
necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing
judge must have a "generosity of spirit, that compassion which causes one to
know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a
Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513
(1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65
A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind. If we
judges could possess but one attribute, it should be a kind and understanding
heart. The bench is no place for cruel or callous people regardless of their other
qualities and abilities. There is no burden more onerous than imposing sentence in
criminal cases.").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017)

This case no doubt presents a difficult sentencing calculus, taking into account the

appropriate punishment, deterrence and public safety.  At the same time, however, Ahmed

"Jimmy" Gammal's long and persuasive personal history of good acts, his supportive family and

friends and the multi-factorial explanation for his offense conduct – his political preoccupation,

his social media addiction, his dependence on opioid medications and his feelings of exhaustion

and helplessness as a result of Celeste's illness –  compel the exercise of a generosity of spirit

---

[55] As discussed above, Mr. Gammal, though hardly "radicalized" prior to this case, has also
resisted any temptation to stray into more extreme political discourse over his past three plus
years at the MCC – yet another indicator of how differently situated he is from other terrorism
defendants and also evidence that upon his release from custody, where the forces toward
radicalization are far less omnipresent than in prison, he will not recidivate.

that can understand the diverse frailties that contributed to the underlying criminal events here, and should guide this Court in following the principle of parsimony.  A sentence of greater than 48-months will serve no legitimate purpose – indeed, a longer sentence would only defer and impair Mr. Gammal's rehabilitation.

We respectfully ask this Court to impose a term of incarceration of 48-months, followed by a period of supervised release.

Dated:  New York, New York
        December 7, 2018

                                        Respectfully submitted,

                                        _____/s/_____

              .                         Megan Wolfe Benett, Esq.
                                        750 3rd Avenue, 32nd Floor
                                        New York, New York 10017
                                        (212) 973-3406
                                        mbenett@kreindler.com

                                        Donald D. Duboulay, Esq
                                        305 Broadway, Suite 602
                                        New York, NY 10013
                                        (212) 966-3970
                                        dondubesq@aol.com