# EXHIBIT A



**KREINDLER & KREINDLER LLP**

750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

November 28, 2018

<u>VIA EMAIL</u>
Johnny Y. Kim
U.S. Probation Officer
500 Pearl Street
New York, NY 10007

   Re: *United States v. Gammal*, 15 Cr. 588
      Objections to Draft Presentence Investigation Report

Dear Mr. Kim:

  Following in the attached Appendix are the defense objections to the factual and legal sections of the draft Presentence Investigation Report.  We ask that you make the changes as indicated below (every paragraph to which we have an objection is set forth below, with the text in the drafts here reflecting the objection and change we ask be made).  Where we believe record evidence may help you understand our objections, we have included citations to the trial exhibits.  To facilitate making changes, we are providing the Appendix in both PDF and Word format.

  We also ask you to include two additional pieces of information concerning Mr. Gammal's period of detention at the Metropolitan Correctional Center.  First, he was the victim of an assault in August of this year, during which he sustained serious injuries, including a fractured nose.  He was placed in the special housing unit for approximately 23 days while the incident was investigated.  Mr. Gammal received no write-up and thus we ask that you both include the fact that he was an innocent victim of an assault at the MCC and note the harsh nature of three weeks of time Mr. Gammal spent in segregation.  Second, he is currently employed as an inmate companion in the suicide watch program, receiving high commendations from his supervisor, and we ask that you include this information, as well.

  Finally, we ask that you speak with Mr. Gammal's former spouse Celeste Dubrown and/or her mother Cherie Dubrow, both of whom are eager to share with you their strong positive opinions of Mr. Gammal's character.

               Regards,

               Megan W. Benett

Enclosure
cc: Donald Doubalay (via email)

California Office
707 Wilshire Boulevard, Los Angeles, CA 90017-3613
Tel: (213) 622-6469  Fax: (213) 622-6019

Massachusetts Office
855 Boylston Street, Boston, MA 02116-2688
Tel: (617) 424-9100  Fax: (617) 424-9120

1

# APPENDIX

**Factual Objections**

Identifying data / Alternate IDs / Aliases: Mr. Gammal's only nickname is Jimmy; the alternate ID "Jammie Gamma" and other "aliases" should be removed

¶ 8: Loss of phone for phone abuse was for 30 days (not 60 days); loss of email and commissary was for 30 days (not 60 days).

¶ 10: Samy Elgoarany, then a 24-year-old college student and resident of New York, NY, first contacted Ahmed El Gammal via Facebook in March 2013 and El Gammal first responded in August 2013. *See* GX-100B (pp. 1 – 2).  In the fall of 2014, Elgoarany, participated with individuals other than El Gammal in social media discussions regarding the Islamic State of Iraq and Syria (ISIS), also known as the Islamic State of Iraq and the Levant (ISIL) [herein collectively referenced to as "ISIL"]. In 2004, ISIL was designated a foreign terrorist organization as ISIL engaged in terrorist activity, as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act (INA), and ISIL engaged in terrorism, as defined in Section 140(d)(2) of the Foreign Relations Authorization Act (FRA), Fiscal Years 1988 and 1989. During this time period, AHMED MOHAMMED EL GAMMAL, a/k/a "Jammie Gammal," and Elgoarany began corresponding via multiple communications platforms.

¶ 11 El Gammal bought a plane ticket on September 20, 2014 to travel to New York, NY in October 2014.  In October 2014, El Gammal traveled from his residence in Arizona to New York and, among other activities, also met with Elgoarany.  While in New York City, EL GAMMAL also contacted an acquaintance, Ateia Aboualala who was based in Turkey, concerning Elgoarany' s plans to travel to Turkey.  After his trip to New York, EL GAMMAL provided Elgoarany with social media contact information for Aboualala. Later, EL GAMMAL and Aboualala had multiple social media exchanges regarding Elgoarany's travel. Elgoarany did not contact Aboualala himself until January 16, 2015. GX 110-F (p. 2).

¶ 12 On January 27, 2015, without notifying his parents or several of his friends, Elgoarany departed from New York City for Istanbul, Turkey. On Janua1y 29, 2015, Elgoarany met with Aboualala in Turkey. [**note: there is no direct evidence that Aboualala told Elgoarany how he would facilitate travel to Syria.**]  Elgoarany then traveled to Syria, where, between early February 2015 and at least early May 2015, he received military-type training from ISIL in Syria.

¶ 13 On May 7, 2015, Elgoarany Facebooked with EL GAMMAL to tell him that "everything is going according to plan." Elgoarany also contacted several others between May 5 and May 7, 2015 delivering similar messages.  A week later, EL GAMMAL contacted Elgoarany, via social media, to ask whether it was, "easy to park a car into ur job parking lot?" Elgoarany did not respond until July 13, 2015, stating that he, "need[ed] to ask my superiors at work first... but I think it's 1isky because the parking lot these days is going under a lot of renovation, especially in the north side." A few days later, Elgoarany contacted EL GAMMAL, via a different social media platform, to tell him that, "Life has changed a lot for me at this new job but I love it and I don't regret taking up the

offer[.] Thank God. May God reward you with goodness .... " **[note: the chat ending "may God reward you with goodness" was retrieved from Gammal's iPhone 5c (within "chats" it is chat no. 334). When that chat is reviewed, it is evident that Elgoarany's final comment consisted of two parts, with the second being a response to Gammal's comment wish for a happy Eid holiday to Elgoarany and his family. Please include this distinction in the discussion of this chat, include the full actual chat or omit the final sentence in the chat.]**

¶ 16 **omit this paragraph – given that ISIS and ISIL were designated as FTOs in 2013 (as addressed in ¶ 15) the information in this paragraph is not relevant**

The header "EL GAMMAL and Elgoarany's Increasing Radicalisation and Support for ISIL" is misleading, given the divergent nature of the interests and the activities of the two (with the vast majority of El Gammal's communications being non-ISIS related, as opposed to Elgoarany's obsession with joining ISIS); a more appropriate header would be "Communications Between EL GAMMAL and Elgoarany Concerning ISIL"

¶ 20 Elgoarany engaged in social media discussions with other individuals conce1ning ISIL. For example, on August 14, 2014, an individual (Associate-2) attempted to send Elgoarany a picture of a "kid," who was "with da3ish [another name for ISIL]," This "kid" was "pulling a dead man from his hair and smiling." Associate-2 told Elgoarany that "al Jammal" [**note: see GX 110-D**] had posted social media comments about the picture and, in response to a question from Elgoarany stated that EL GAMMAL was "defending" ISIL.

¶ 21 Minutes after the exchange between Elgoarany and Associate-2, Elgoarany contacted EL GAMMAL on Facebook and communicated with him for approximately an hour. Elgoarany deleted much of this conversation from his own Facebook **[note: see GX 110-B]** while EL GAMMAL left most, though not all, of his intact. At the end of the conversation, EL GAMMAL sent Elgoarany a link to a documentary about ISIL.

¶ 22 Throughout the next two months, between approximately August 2014 and October 2014, Elgoarany and EL GAMMAL had numerous discussions on social media.

The header "EL GAMMAL Facilitates Elgoarany's Initial Attempt to Travel to Turkey" is misleading, given the evidence that Elgoarany made and paid for all travel plans himself, had the intent to travel to join ISIL prior to any meeting with El Gammal and, upon his arrival in Turkey, was attempting to contact Aboualala directly and only reached out to El Gammal when he could not contact or communicate with Aboulala. A more appropriate header would be "Elgoarany's Travel to Turkey"

¶ 23 Having purchased airplane tickets on September 20, 2014, on October 6, 2014, EL GAMMAL traveled from his residence in Arizona to New York, NY, returning on October 8, 2014. During this time period, EL GAMMAL and Elgoarany phoned / texted approximately 11 times and met at a Howard Johnson's Motel in Queens County (NY) on October 6, 2014, and again in Manhattan on October 7, 2014, where EL GAMMAL called Elgoarany engaged in typical tourist activities.

¶ 24 On October 7, 2014, the same day EL GAMMAL contacted Elgoarany from Manhattan, EL GAMMAL exchanged multiple messages with Aboualala in Turkey via their social media accounts. For example, on October 7, 2014, EL GAMMAL asked Aboualala for his phone number in Turkey so EL GAMMAL's "American friend" could call Aboualala when he arrived in Turkey. Aboualala asked EL GAMMAL why he had not been writing to Aboualala, to which EL GAMMAL responded that he had been busy and was currently in New York City. EL GAMMAL suggested that he speak to Aboualala via Skype.  Aboualala subsequently sent his phone number to EL GAMMAL. **[note: there is no question that Elgoarany travelled to Turkey and from there to Syria to join ISIL so the sentence about how individuals "frequently travelled" is irrelevant and confusing]**

¶ 25 On October 11, 2014, after EL GAMMAL departed New York, NY, he sent a message to Elgoarany containing a link to Aboualala's social media page. Elgoarany responded, "jzk im gonna add him now. lemme know when ur back online so we can test this cat out lol." Elgoarany did not contact Aboualala until January 2015. **[note: given that the first contact between Elgoarany and Aboualala was not until three months later, the FBI case agent's belief about adding Aboualala as a "friend" or testing communications is both misleading and incorrect and is also irrelevant.]**

¶ 26 In October 2014, Elgoarany booked a flight from New York, NY, to Turkey, which was scheduled to arrive in Istanbul on November 25, 2014. Elgoarany cancelled this flight, as his mother, who was aware of his intentions to join ISIL, convinced him to stay in the United States.

¶ 27 On November 18, 2014, EL GAMMAL and Aboualala exchanged multiple messages via social media. EL GAMMAL told Aboualala that his "friend" was expected to arrive on November 24, 2014, but that he had to cancel for the time being because, " (h]is mother has a problem[.]" Aboualala stated that he had been ready to "provid[ e] him with lodging, food, and drink." **[note: again, the case agent's "belief" is speculative, irrelevant and inappropriate.]**

¶ 28 Soon after cancelling his planned November 2014 flight, Elgoarany rebooked a flight from New York, NY, to Istanbul, Turkey, which was scheduled to depart on January 27, 2015. Elgoarany also reserved a room at a hotel in Istanbul for January 28, 2015. Elgoarany kept his travel plans secret from his parents and from several of his friends but told his younger brother Tarek of his plans to travel.  In fact, Elgoarany's younger brother accompanied Elgoarany to the airport and helped prepare for the trip by shopping for clothing and destroying evidence for his older brother.  While records show that Elgoarany and EL GAMMAL spoke multiple times via phone in early January 2015 but there is no evidence about the substance of those calls. Additionally, on January 16, 2015, approximately 11 days before his scheduled departure from the U.S., Elgoarany contacted Aboualala via social media. The following exchange occurred, in substance and relevant part, between Elgoarany and Aboualala:

¶ 29 Elgoarany indicated that EL GAMMAL referred him to Aboualala. **[note: the rest of this paragraph should be omitted – the case agent's "belief" is speculative, irrelevant and inappropriate.**

¶ 30 On January 26, 2015, Elgoarany left his parents' residence in Orange County (NY) accompanied by his brother, with his parents' understanding that he was returning to his apartment in Queens County (NY).  Elgoarany's brother knew that Samy was lying to his parents.  Airline records showed that on January 27, 2015, Elgoarany departed John F. Kennedy International Airport, located in Jamaica, NY, aboard a commercial airliner destined for Istanbul, Turkey, with an arrival date of January 28, 2015. Elgoarany's brother knew of all of Elgoarany's plans.

¶ 31 After Elgoarany arrived in Turkey, on January 28, 2015, Elgoarany contacted EL GAMMAL via Facebook.  Elgoarany said that Aboualala had not picked him up from the airport and complained that it had been difficult "to meet up" with Aboualala since Aboualala "doesn't speak [E]nglish." In this same exchange, Elgoarany told EL GAMMAL to "remind [Aboualala] that my simcard is shit right now. I can't make any calls and I only receive them." EL GAMMAL and Elgoarany also discussed whether Elgoarany should buy an "app" to help in translating conversations with Aboualala. Elgoarany further informed EL GAMMAL that, "the sooner i start the internship the better u know what I mean? I wanna get close to the interview." **[note: case agent's "belief" is speculative, irrelevant and inappropriate.]**

¶ 32:  **[the chats as summarized in this paragraph are incorrect.  The actual chats can be found in the search warrant returns dated 9/28/2015.  Either the actual chats should be included or this paragraph and the chart it contains should be omitted, as it is not accurate.**

¶ 33**[this paragraph should be omitted as the case agent's "belief" is speculative, irrelevant and inappropriate; further, there was no evidence that Aboualala and El Gammal had contact during this time, further undermining the reliability of the case agent's "beliefs" and further warranting omission of this paragraph]**

¶¶ 34 – 35: **"brother (Brother-1)" should be referred to by name (Tarek) – he testified publicly at trial and there is no reason to anonymize him in the PSR.**

¶ 36 In March and April 2015, Elgoarany again remained largely inactive on social media. On May 5 and 6, 2015, Elgoarany had a social media exchange with Brother-1 . During this exchange, Brother-1 expressed skepticism about whether "certain acts ... are justified in the Quran." Elgoarany asked his brother Tarek whether he was talking about, "the bonfire or the one on the beach," which the case agent believed were references to ISIL's widely publicized immolation of a Jordanian pilot in Febma1y 2015, and ISIL's mass execution of Christians on a Libyan beach in April 2015. While Elgoarany expressed reservations about the mass execution of the Christians, he said he supported the execution of the Jordanian pilot. He explained the immolation was justified because, "this guy was dropping tons of campfires on our people living all over the forests here and we made him see the results of his campfires before we decided to return him the favor."

4

¶ 37 On May 7, 2015, Elgoarany contacted EL GAMMAL and stated, "it's been a long time but I'm doing well and I just wanna let u know im safe and secure and everything is going according to plan. When I get completely settled over the coming months I will contact u more to let u know what's up at my new job." **[note: the paragraph should end here for the same objections as noted above regarding the case agent's "beliefs"]**

¶¶ 38 - 39: **[omit these paragraphs, which repeat the information in paragraph 13] – if not omitted, add the following at the end of paragraph 28**: EL GAMMAL never replied to this message from Elgoarany.

¶ 41: change "Brother-1" to "brother Tarek"

The header "Elgoarany's Death and EL GAMMAL's Arrest" should be changed to "EL GAMMAL's Arrest and Elgoarany's Death" to reflect the correct chronological order of events.

¶ 43: we object to the inclusion of this conclusory representation unsupported by any facts.

¶ 44: counsel's last name is spelled "Benett" (not "Benet")

¶ 71: Gammal did not describe the relationship with Dubrow as "complicated" – that was an editorial comment from counsel

¶ 73: date range should be "1998 and 2005"

¶ 75: change "which he treats with" to "for which he is prescribed"

¶ 76: add at the end of the paragraph: "MCC has ignored his requests for treatment."

¶ 81: Gammal attended Helwan University from 1989 to 1993 and received his degree in 1993.

¶ 82: Mr. Gammal graduated from the British High School in Cairo, Egypt in 1988.

¶ 83: omit "used"

¶ 87: the work for Ameriquest was in Arizona (not California)

## Legal Objections

¶ 48: there should not be a two-point adjustment under U.S.S.G. § 2M5.3 as the offense did not involve "the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge or reason to believe such funds would be used to purchase any of the items described in subdivision (A) through (C); or (E) funds or other material support or resources with the intent knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent offense."

This case did not involve provision of funds or weapons and Mr. Gammal's guilt was predicated on facilitating Elgoarany's travel to Turkey, not on the provision of any of the items listed at (A) through (C) or funds to purchase those items; nor was the support provided to Elgoarany made with the intent / knowledge / or reason that he would be involved in the commission of a violent offense.

This two-point enhancement thus does not apply.

¶ 49: we object to the application of U.S.S.G. § 3A1.4(a) (the terrorism enhancement).  At trial, the government relied heavily on a theory of conscious avoidance, arguing to the jury that Mr. Gammal's willful blindness to Elgoarany's plans was not a legal defense.  While that may be legally sufficient for Mr. Gammal's conviction, it fails to satisfy the Second Circuit's standard, which requires proof that "the defendant committed the underlying felony with "the 'specific intent' … to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).

Because the record evidence does not establish Mr. Gammal's "specific intent" to commit an offense calculated to influence or affect the conduct of a government by intimidation or coercion, or to retaliate against government conduct, the terrorism enhancement does not apply.