UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

 UNITED STATES OF AMERICA           :

         - v. -                     :

AHMED MOHAMMED EL GAMMAL,    :    15 Cr. 588 (ER)
   a/k/a "Jammie Gammal,"

                            :

        Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

## <u>GOVERNMENT'S SENTENCING SUBMISSION</u>

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007

Andrew J. DeFilippis
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
- Of Counsel -

## PRELIMINARY STATEMENT

The Government makes this submission in advance of the sentencing of Ahmed Mohammed El Gammal ("the defendant" or "Gammal").

The defendant provided material support to ISIS, a terrorist organization that, at the time of the offense conduct, had already declared itself at war with the United States. More specifically, the defendant facilitated the travel of Samy El-Goarany—a man almost two decades younger than the defendant, who had no formal military training and did not even speak Arabic—to Syria, so El-Goarany could join, be trained by, and fight with ISIS. At the time, the defendant was well aware of ISIS's barbarity—indeed, he was a prolific advocate for ISIS on social media. And, the defendant assisted and encouraged El-Goarany for months prior to El-Goarany's travel, at one point flying thousands of miles from Arizona to New York to meet with El-Goarany. Further, the defendant sought to cover his tracks, deleting numerous social media messages related to El-Goarany and instructing others to do the same. Ultimately, the jihadist path the defendant helped El-Goarany travel resulted in El-Goarany's death.

In light of the seriousness of this offense conduct, and the sentences imposed on defendants convicted after trial of engaging in similar conduct, the Government submits a sentence within the 292 to 365 month Guidelines range would be appropriate in this case.

## BACKGROUND

Beginning in 2014 and continuing through at least August of 2015, the defendant facilitated El-Goarany's travel from New York to Syria so that El-Goarany could train and fight with ISIS, the brutal terrorist organization that plots attacks and slaughters innocent people around the world, including Americans. For months, the defendant and El-Goarany communicated about their shared support of ISIS. Then, when El-Goarany decided he would try

to *join* ISIS, the defendant was at his service.  The defendant met El-Goarany here in New York, vetted El-Goarany, and then put El-Goarany in touch with his associate, Attia Aboualala ("Aboualala"), in Turkey.  When El-Goarany reached Turkey, the defendant continued to assist him, helping to make sure that El-Goarany found his way to ISIS in Syria.  And, while El-Goarany was in Syria receiving ISIS military training and fighting for ISIS in support of the radical, violent ideals he shared with the defendant, the defendant stayed in touch with El-Goarany, who reported back that "everything [was] going according to plan."  In approximately November 2017, El-Goarany was killed while fighting with ISIS in the Middle East.

## I.   The Defendant and El-Goarany's Increasing Radicalization and Support for ISIS

By early 2014, the defendant, then a 42-year-old Arizona resident originally from Egypt, was an outspoken supporter of ISIS and the Caliphate on social media.  His communications with Aboualala and others also demonstrated that not only did he support ISIS's terroristic ideology, but that he was aware of ISIS's brutal methods and unequivocally supported those methods as well.  For example:

- In April 2014, the defendant told an associate ("Associate-1") that he had been "with Jabhat Al Nusra," another foreign terrorist organization operating in Syria, but was "now with the State . . . . the State of Iraq and the Levant and Syria," a reference to ISIS.  (PSR ¶ 18; GX 100-E-T at 5).

- In June 2014, after ISIS captured Mosul, the second largest city in Iraq, the defendant stated "Allah is Great.  Mosul falls by the hands of the State."  (PSR ¶ 18; GX 100-D-T).

- Around the same time, in reference to ISIS's practice of beheading its adversaries, the defendant told Aboualala that "beheading has a magical effect" and "pray[ed]" that "God grant [ISIS] victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to Jerusalem, God willing." (PSR ¶ 18; GX 122-F-T at 3-4).

- On June 16, 2014 defendant also told Aboualala that "Jihad is a duty[.]"  (GX 120-A-T at 24).

2

- Also in the summer of 2014, the defendant wrote to another associate "May God grant them victory and take over Jordan, and then Saudi Arabia, then conquer Egypt after that."  (PSR ¶ 19; GX 100-J-T at 6).

- On July 1, 2014, the defendant wrote:  "Defeat is near, Inevitably; Daesh [another name for ISIS] will come teach those people[.]"  (GX 100-O-T at 2).

- Also on July 1, 2014, the defendant told another associate that if ISIS "gets to Egypt, I will go join them, so I can torture the Egyptians, and whip them[.]"  (PSR ¶ 19; GX 100-O-T at 3).

- On July 9, 2014, the defendant wrote: "I don't get occupied with [*Sharia'a* judgments], , , I want expansion for Jihadis and that's it . . . What I care about is actions on the ground[.]"  (GX 100E-T at 46).

- On July 16, 2014, the defendant wrote: "I support jihad everywhere."  (GX 100-E-T at 54).

Indeed, the defendant even criticized those who opposed ISIS and attempted to rationalize ISIS's brutality.  For example:

- On July 1, 2014, the defendant wrote about ISIS: "May God grant them victory[.] Who would hate the founding of the Caliphate[.]  Glory be to Allah[.]"  (GX 100-E-T at 18-19).

- On the same day, the defendant wrote to Aboualala that "Nothing works with them except Daesh," to which Aboulala responded, "God bless." (GX 100-S-T at 23).

- He also wrote: "All Caliphates started like this and then expanded[.]  No Caliphate came by deliberation.  All by the sword.  It has to be like this; we take it forcibly not peacefully."  (GX 100-O-T at 4).

- He wrote: "I'd rather live in a tent under an Islamic state than in all the luxuries under an infidel state."  (GX 100-O-T at 5).

At the same time that the defendant was increasingly embracing ISIS's violent radical ideology, so was El-Goarany, then a 24-year-old student from New York whose father was originally from Egypt.  (PSR ¶ 20).  In the summer of 2014, El-Goarany appeared to become more radical in his religious views and more vocal about his frustration over U.S. foreign policy regarding the Middle East.  (*Id.*)  For example, in a social media message sent on or about

3

December 14, 2014, El-Goarany told another person that ISIS was the "reaction . . . to the real problem which is US imperialism, mass murder, economic exploitation, systematic torture, the whole 9 yards[.]"  El-Goarany discussed traveling to Turkey and Syria.  (*Id.*)  El-Goarany also frequently discussed the different routes that people took to travel to Syria via Turkey, and commented on how there were special routes that led from Turkey into Syria.  (*Id.*)

El-Goarany also engaged in social media discussions with other individuals about ISIS. (PSR ¶ 21).  For example, on or about August 14, 2014, another individual ("Associate-2") attempted to send El-Goarany a picture of a "kid" who was "with da3ish" "pulling a dead man from his hair and smiling."  Associate-2 told El-Goarany, in sum and substance, that the defendant had posted social media comments about the picture and, in response to a question from El-Goarany, confirmed the defendant was "defending" ISIS.  (PSR ¶ 21; GX 110-D at 8-9).

Minutes after this exchange, El-Goarany contacted the defendant on Facebook and communicated with him for about an hour.  (PSR ¶ 22).  The exact content of these communications is unknown because the defendant and El-Goarany deleted many of the Facebook messages, and conducted their other exchanges over a different communications platform, Surespot, which encrypts messages.  (PSR ¶ 22; GX 100-B at 13, 22, 26, 28, 29 (messages deleted by the defendant); GX 110-B at 4-11, 16-18, 27 (messages deleted by El-Goarany); GX 1201 at 4).  However, at the end of the conversation, the defendant sent El-Goarany a link to a documentary about ISIS that described the types of training—religious and military—that ISIS provided.  (PSR ¶ 22; GX 1201 at 4; GX 140 (Vice News documentary, "The Islamic State Part 2 of 5").

Throughout the next two months, El-Goarany and the defendant had numerous discussions via social media.  (PSR ¶ 23; GX 1201 at 4; GX 1203 at 2).  They exchanged almost

1,000 messages over Surespot, the encrypted communications application.  (PSR ¶ 23; *see also* GX 1106 (trial stipulation indicating that defendant and El-Goarany exchanged at least 970 messages over Surespot.)).

## II.  The Defendant Meets El-Goarany in New York, and Helps El-Goarany Prepare to Travel to Turkey and Syria to Join and Fight with ISIS

In the midst of these discussions between El-Goarany and the defendant, the defendant traveled from his home in Arizona to New York City on or about October 6, 2014 and stayed in New York City for approximately two days.  (PSR ¶ 24; GX 520 (cellsite location analysis); GX 807 and 808 (the defendant's flight records)).   During this time, the defendant and El-Goarany contacted, or attempted to contact, each other approximately 11 times via telephone.  (PSR ¶ 24).  The defendant and El-Goarany met at a Howard Johnson's hotel in Queens on October 6, 2014, where the defendant was staying.  (PSR ¶ 24; GX 1002 (Howard Johnson hotel records)).  The defendant and El-Goarany met again in Manhattan on October 7, 2014, where El Gammal also called El-Goarany.  (PSR ¶ 24; GX 520).

On October 7, 2018, while the defendant was in New York and on the same day that he had met El-Goarany, the defendant also exchanged multiple messages with Aboualala in Turkey over their social media accounts, including the following:

- The defendant asked Aboualala for Aboualala's telephone number in Turkey so that the defendant's "American friend" could call Aboualala when he arrived. (PSR ¶ 25; GX 100-S-T at 31).

- Aboualala asked the defendant why the defendant had not been writing to Aboualala, and the defendant responded that he was currently in New York. (PSR ¶ 25; GX 100-S-T at 31).

- The defendant suggested that they speak on Skype, and Aboualala sent his telephone number to the defendant.  (PSR ¶ 25; GX 100-S-T at 31).

The defendant provided that number to El-Goarany: Aboulala's telephone number was recorded on a piece of Howard Johnson notepad paper—the same type of paper provided to guests of the

Howard Johnson hotel where the defendant stayed when he came to visit El-Goarany in New York—that El-Goarany's mother found in El-Goarany's backpack in November 2014.  (GX 1010; GX 1015).  On October 9 and 10, after the defendant had returned to Arizona from vetting El-Goarany in New York City, the defendant exchanged additional coded messages with Aboualala regarding Aboualala helping El-Goarany connect with ISIS operatives upon El-Goarany's arrival in Turkey.  (GX 100-S-T at 32-33).  The defendant instructed Aboualala to help El-Goarany, stating, "Take care of him."  (*Id.*)

The next day, on October 11, 2014, the defendant also sent a message to El-Goarany containing a link to Aboualala's social media page.  (PSR ¶ 26; GX 1202 at 5).  El-Goarany responded "jzk im gonna add him now.  lemme know when ur back online so we can test this cat out lol."  (PSR ¶ 26; 100-B at 17).  El-Goarany's reference to "add him now" meant that El-Goarany was going to add Aboualala as a contact or "friend" to facilitate future communications between El-Goarany and Aboualala.  (PSR ¶ 26).  The reference to "test[ing] this cat out" was a reference to testing a new communications program that El-Goarany and Aboualala were planning on using to attempt to avoid law enforcement detection.  (*Id.*)[1]

After meeting with the defendant, in October 2014, El-Goarany began preparing to leave for Istanbul, Turkey and on to Syria to join ISIS.  El-Goarany booked a flight from New York City to Turkey, which was scheduled to arrive in Istanbul on or about November 25, 2014.  (PSR ¶ 27).  El-Goarany later cancelled this flight, after his mother found out that he was planning to

---

[1] The defendant objects to the PSR's references to the case agent's beliefs as to certain interpretations of the defendant and El-Goarany's communications.  The Government has no objection to replacing, where appropriate, language such as "the case agent believes" with "the evidence at trial demonstrated."  Such a substitution would be appropriate in paragraphs 26, 28, 30, 32, 34, 36-38, as these are fair inferences to be drawn from the testimony and exhibits admitted at trial and are, of course, consistent with the jury's verdict.

travel to Turkey.  (*Id.*).  El-Goarany consulted the defendant throughout the fall of 2014, as he made and then modified multiple plane reservations in connection with this trip.  (*See* GX 802 (airplane reservations); GX 1203 (the defendant and El-Goarany's communications and toll records reflecting communications surrounding El-Goarany's travel reservations)).

On or about November 18, 2014, the defendant told Aboualala that the defendant's "friend"—El-Goarany—had been expected to arrive on November 24, but that he had to cancel for the time being because "[h]is mother has a problem[.]"  (PSR ¶ 28; GX 100-S-T at 37). Aboualala stated that he had been ready to "provid[e] him with lodging, food, and drink."  (PSR ¶ 28; GX 100-S-T at 37).  The defendant kept Aboualala apprised of El-Goarany's travel plans because he and Aboualala had planned for Aboualala to be El-Goarany's Turkish-based contact to help him reach Syria and join and fight with ISIS.

## III.  El-Goarany Leaves the United States for Turkey

Soon after cancelling his planned November 2014 trip, El-Goarany booked a January 27, 2015 flight from New York City to Istanbul.  (PSR ¶ 29).  El-Goarany also reserved a room at a hotel in Istanbul, Turkey for January 28, 2015.  (*Id.*)

While El-Goarany kept his travel plans secret from his parents and from several of his friends, he and the defendant spoke multiple times on the phone in early January 2015.  (PSR ¶ 29).  Also, on or about January 16, 2015, approximately eleven days before his scheduled departure from the United States, El-Goarany, via social media, contacted Aboualala.  (*Id.*).  El-Goarany and Aboulala exchanged the following messages:

| 1/16/2015 17:05 | El-Goarany | As-Salamu Alaikum [Pease be upon you] Ateyya my name is Samy, I'm **Gammal's** friend. He told me you could help me with a career opportunity in Istanbul. I'll be visiting soon to look for an internship for the summer inshaAllah. I'd really appreciate your help. Please reply whenever you get the chance. BarakAllahu feek  [God bless you] |

| | | |
|---|---|---|
| 1/16/2015 17:14 | Aboualala | We are at your service |

(PSR ¶ 29; GX 113-A-T at 2 (emphasis added)).  Using coded language such as "career opportunity in Istanbul" and "internship," El-Goarany delivered the same message that the defendant had previously conveyed to Aboualala—that El-Goarany was looking for someone who could facilitate his travel to Syria to support ISIS.  El-Goarany even explicitly referred to the defendant ("I'm Gammal's friend") and the fact that the defendant had told El-Goarany that Aboualala could help him.  Since the defendant had already vouched for El-Goarany, Aboualala did not hesitate to express his willingness to help El-Goarany in El-Goarany's plans to join ISIS.

On January 27, 2015, El-Goarany left New York City aboard a commercial airliner from John F. Kennedy Airport to Istanbul, Turkey.  (PSR ¶ 31).  El-Goarany arrived in Istanbul on or about January 28, 2015.  (*Id.*).

## IV. After El-Goarany Arrives in Istanbul, the Defendant and Aboualala Continue to Facilitate El-Goarany's Travel to Syria to Fight with ISIS

Upon El-Goarany's arrival in Istanbul, the defendant, working with Aboualala, continued to facilitate El-Goarany's travel to Syria to join and fight with ISIS.  As soon as El-Goarany arrived in Istanbul, he contacted Aboualala and provided Aboualala with his new cellphone number.  (GX 113-A-T at 4-5).  El-Goarany had never traveled outside of North America and did not speak Arabic, Aboualala's language.  (Tr. 748-49 (Tarek El-Goarany testimony that El-Goarany had only ever traveled to Canada by himself and only spoke English)).  He contacted Aboualala within minutes of landing in Istanbul.  (GX 113-A-T at 4 (El-Goarany to Aboualala: "Brother where are you? Im in the terminal now").  El-Goarany and Aboualala exchanged messages trying to meet, and, the same day, El-Goarany reported back to the defendant that it

had been "tough" to "meet up" with Aboualala because Aboualala did not speak English.  (PSR ¶ 32; GX 100-B at 20).   In the same exchange, El-Goarany told the defendant to "remind [Aboualala] that my simcard is shit right now. I can't make any calls and I only receive them." (PSR ¶ 32; GX 100-B at 20).  The defendant and El-Goarany also discussed whether El-Goarany should buy an "app" to help in translating conversations with Aboualala.  (PSR ¶ 32; GX 100-B at 21).  In addition, in this same exchange, El-Goarany told the defendant that "the sooner i start the internship the better u know what I mean?  I wanna get close to the interview."  (PSR ¶ 32; GX 100-B at 24-25).  El-Goarany's references to the "internship" and the "interview" were references to joining ISIS—code words that he and the defendant used to discuss their plan.

On January 29, 2015, the defendant and El-Goarany continued to communicate regarding El-Goarany's progress toward joining ISIS:

| 1/29/2015 6:58-7:03 | El Gammal | Found info from aria At iaa [Attiya Aboualala] |
| 1/29/2015 7:26 | El Gammal | I think long trip to Adana or gazentep is like 35 or 40 dollar |
| 1/29/2015 8:55 | El-Goarany | ah ok ya thats nothing |
| 1/29/2015 8:56 | El Gammal | Sorry<br><br>Turkish |
| 1/29/2015 9:10 | El-Goarany | even better |
| 1/29/2015 9:14 | El Gammal | Yup |
| 1/29/2015 9:40-10:01 | El-Goarany | im in contact with someone from the company<br><br>directly inside the company<br><br>and he knows ppl here, can probably help me get there in 3-4 days isA[2] |

_____

[2] "isA" is shorthand for "inshallah," the Arabic word for "if Allah wills it."

(PSR ¶ 33; GX 1204 at 5).  In this exchange, the defendant provided El-Goarany with advice on how to get to Adana or Gaziantep ("gazentep"), two Turkish cities near the Syrian border that were common pass-through cities for ISIS foreign fighters.  In addition, El-Goarany reported back to the defendant that he was in contact with someone from "the company," a coded reference to ISIS, who could coordinate his travel to Syria through Adana and Gaziantep.

In messages with his brother, El-Goarany reported that he was waiting in his hotel room to get in touch with his contact in Istanbul.  (Tr. 747).  The next day, El-Goarany arranged to meet with Aboualala (GX 1204 at 6), and, the same day, Aboualala reached out to the defendant with an urgent message that El-Goarany wanted to talk to the defendant.  (GX 4-C-T ("The man wants to talk to you.  Answer, man.  Are you awake or not yet?").  After meeting with Aboualala, El-Goarany reported to his brother that "everything is going according to plan" (GX 110-G at 5-6).  He also told his brother that he had "received the contact" and "he was being transported to a safe house."  (Tr. 763-64).

**V.  El-Goarany Trains with ISIS**

From approximately January 30, 2015 to approximately February 16, 2015, El-Goarany remained largely inactive on social media.  (PSR ¶ 35).  On or about February 16, 2015, El-Goarany sent the following message to his brother regarding his training and activities:

> I'm so sorry for the sudden disappearance man, I've got a lot of explaining to do but first off I just wanna say that I'm sorry for not being aware about the protocol in my new company.  Hours after our last . . .  conversation i had my phone and laptop taken from me by the company for safety reasons.  They're gonna give it back to me after my training is over inshaAllah.  Right now im going through the religious training which will end in 9 days.  Then I'm gonna be enrolled in my main training course which will take a month to complete.

> after that ill be a regular employee and they'll give me back all my stuff and I can contact u 24/7 like I did before.  That'll probably be around end of March to mid April

(PSR ¶ 35; 110-G at 6).  El-Goarany's references to "religious training" and "main training"
described how ISIS trained its new fighters—a period of religious training followed by military
training.  (Tr. 501-502 (Aaron Zelin testimony)).  And, consistent with ISIS's protocol to
confiscate electronic devices from incoming foreign fighters (Tr. 501), El-Goarany's devices—a
phone and a laptop—had been taken from him.  Internet protocol records for El-Goarany's
communications also demonstrated that El-Goarany was communicating using an Internet
service provider used by ISIS members located in ISIS-controlled locations within Syria.  (PSR
¶ 36).

In approximately March and April 2015, El-Goarany remained largely inactive on social
media.  For several days in early May 2015, however, El-Goarany began communicating with
friends and associates, including the defendant, using his own social media account.  El-Goarany
attempted to justify ISIS's terrorist acts, including ISIS's widely publicized immolation of a
Jordanian pilot in February 2015.  (PSR ¶ 39).

On May 7, 2015, El-Goarany reported back to the defendant:  "[I]t's been a long time but
I'm doing well and I just wanna let u know im safe and secure and everything is going according
to plan.  When I get completely settled over the coming months I will contact u more to let u
know what's up at my new job."  (PSR ¶ 38; GX 111-A).  Using the same words that he had used
to tell his brother that he was on his way to ISIS—"everything is going to plan" (GX 110-G at
5)—El-Goarany told the defendant he had arrived in ISIS territory, and promised to report back
to the defendant about his progress.

A week later, on May 14, 2015, the defendant sent El-Goarany a message on social media
asking him whether it was "easy to park a car into ur job parking lot?"—a coded reference to his
own desire to travel to Syria to join ISIS.  (PSR ¶ 39; GX 112-A).  El-Goarany responded in July

2015, stating that he "need[ed] to ask my superiors at work first . . .but I think it's risky because the parking lot these days is going under a lot of renovation, especially in the north side"—an reference to ISIS's losses in northern Syria during this time period and Turkey's attempts to crackdown on individuals traveling through Turkey to join ISIS in Syria.  (PSR ¶ 39; GX 112-A).  El-Goarany asked the defendant whether he "plann[ed] on driving anytime soon?"—a coded reference to whether the defendant intended to travel to Syria in the near future.  (PSR ¶ 39; GX 112-A).  The defendant responded "yes, mid August . . .check Facebook more often."  (PSR ¶ 39; GX 112-A).  El-Goarany then responded by suggesting that the defendant contact him on Surespot, the encrypted communications platform on which they had previously communicated, stating "I'll help u make ur parking job easier."  (PSR ¶ 39; GX 112-A).

A few days later, on July 16, 2015, El-Goarany contacted the defendant via WhatsApp, thanking the defendant for helping him reach ISIS.  El-Goarany wrote to the defendant: "Life has changed a lot for me at this new job but I love it and I don't regret taking up the offer[.]  Thank God.  May God reward you with goodness . . . ."  (PSR ¶ 40; GX 4-B-T).  In an acknowledgement of the help that he provided, the defendant responded: "Great."  (GX 4-B-T).

## VI. The Defendant Attempts to Cover Up His Crimes

In May 2015, El-Goarany's father traveled to Istanbul looking for El-Goarany.  In a desperate attempt to find his son, El-Goarany's father retraced his son's steps, staying at the same hotel where El-Goarany stayed, and reaching out to and meeting with Aboualala.  (Tr. 1055-1062).  Upon learning that El-Goarany's father was looking for him in Istanbul, the defendant and Aboualala engaged in a flurry of text message communications and attempted to speak by phone multiple times.  (GX 1205 at 3-7).  The defendant peppered Aboualala with questions, instructing Aboualala: "[D]on't ever ever mention me[.]  Not even my name[.]"  (GX 1205 at 4).  Aboualala responded" "I will get rid of him by telling that I don't know anything

about him [El-Goarany] since January; and he was a friend on Facebook, a muslim of Egyptian descent, who said that he is coming to Istanbul and I wanted to help him.  Afterwards, I had no more communications with him."  (GX 1205 at 5).  The defendant responded: "Exactly, and don't ever ever mention me or my name[.]"  (*Id.*).

The defendant and Aboualala took additional affirmative steps to hide from El-Goarany's father and others the assistance they had provided to El-Goarany so that he could join and train with ISIS.  For example, Aboualala removed the defendant as a friend on Facebook (GX 122-I at 7) and reported back to the defendant that he had done so (GX 1205 at 6 ("I erased the friendship so he would not know that I know you[.]").  After meeting with El-Goarany's father, Aboualala reported back directly to the defendant:  "Anyways I covered up for you and I told him that I don't know you and any relationship was direct with Sami."  (GX 1205 at 6).  The defendant responded, "OK."  (*Id.*).

In addition, over time, the defendant first deleted *some* of his social media messages with El-Goarany and then, between February 2015 and June 2015—while El-Goarany had safely reached ISIS territory and was receiving military and other training from ISIS—the defendant deleted *all* of Facebook messages with El-Goarany.  (GX 100-B at 13 (messages deleted by the defendant prior to February 2015); Tr. 71 (witness testimony describing that messages appearing on records preserved in February 2015 would have been deleted by the user of the account if they did not then appear in records preserved in June 2015); Tr. 119 (witness testimony describing that messages that appeared in the defendant's social media account on records from February 2015 did not appear in the defendant's social media account on records from June 2015); GX 100-B).  The defendant also deleted *all* of his messages with Aboualala.  (*See* GX 100-C).  The defendant actively destroyed evidence of incriminating communications between

13

himself and his two co-conspirators—El-Goarany and Aboualala—in an attempt to cover up his crimes.

## VII.   El-Goarany Dies in Battle Fighting for ISIS

For the next several months, El-Goarany received weapons and combat training with ISIS, and was deployed and injured in battle fighting for ISIS.  (Tr. 780-81; GX 111-C at 12; GX 902).  In November 2015, an ISIS member contacted El-Goarany's family to advise them that El-Goarany had been killed while fighting for ISIS.  (PSR ¶ 42).

## PROCEDURAL HISTORY

The defendant was arrested on August 24, 2015, at his home in Arizona based on a federal criminal complaint.  The defendant was ordered detained.  On August 27, 2015, a federal grand jury in this District returned an indictment charging the defendant in four counts:

(1) providing material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B (Count One);

(2) conspiracy to provide material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B (Count Two);

(3) aiding and abetting the receipt of military-type training from a foreign terrorist organization, in violation of Title 18, United States Code, Sections 2339D and 2 (Count Three); and

(4)  conspiracy to have another person receive military-type training from a foreign terrorist organization, in violation of Title 18, United States Code, Sections 371 and 2339D (Count Four).

Trial began on January 9, 2017 and ended on January 30, 2017, when the jury found the defendant guilty on all counts.

## APPLICABLE GUIDELINES AND STATUTORY SENTENCING FACTORS

The defendant disputes that the Guidelines enhancements in US.S.G. § 3B1.1 and § 2M5.3(b)(1) apply here.  For the reasons set forth below, the Court should apply those enhancements in this case, resulting in a Guidelines range of 292 to 365 months.  Further, the

defendant argues the Court should impose only a fine on Count Three, which charged a violation of 18 U.S.C. § 2339D, based on the defendant's aiding and abetting El-Goarany's receipt of military-type training from ISIS.  For the reasons also set forth below, the Court should impose a ten-year prison sentence on Count Three.

## I.  The U.S.S.G. § 3A1.4 Terrorism Enhancement is Applicable

Section 3A1.4's enhancement is squarely applicable here.

### A.  Applicable Law

Section 3A1.4 provides for an increased offense level for a defendant who was convicted of "a felony that involved, or was intended to promote, a federal crime of terrorism."  The Guidelines commentary to Section 3A1.4 states that a "federal crime of terrorism" has the meaning provided to that term in 18 U.S.C. § 2332b(g)(5).  U.S.S.C. § 3A1.4 App. Note 1.  That statute, in turn, defines a "federal crime of terrorism" as an offense that is: (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and (2) is a violation of one or more enumerated statutes—including, among others, 18 U.S.C. §§ 2339B (provision of material support to a designated foreign terrorist organization) and 2339D (receipt of military training from a designated foreign terrorist organization).

A defendant's offense "involves" a federal crime of terrorism if the Government shows by a preponderance of the evidence that the defendant violated one of the enumerated statutes and "had the specific intent to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against governmental conduct.'"  *United States* v. *Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (quotations and citations omitted).  In proving such intent, the Government need not prove a defendant's "particular motive" but, rather, must establish that the "*underlying felony* [is] calculated to influence or

15

affect" such conduct, *i.e.*¸ that the offense "was planned—for whatever reason or motive—to achieve the stated object." *Id.* (quotations and citations omitted) (emphasis in original.)

In order to prove alternatively under the provision's second prong that a defendant "intended to promote" a federal crime of terrorism, the Government must prove that "the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined[.]" *Id.* at 315. Under this prong, the defendant's offense itself "need not . . . be 'calculated' as described in Section 2332b(g)(5)(A)." *Id.* Accordingly, Section 3A1.4 "may apply without a showing that the defendant's conduct constitutes an offense listed in 18 U.S.C. 2332b(g)(5)(B) or satisfies the 'calculation' requirement set forth in 18 U.S.C. 2332b(g)(5)(A)." *Id.*

### B.  Argument

The Government proved at trial that the defendant's offense conduct here "involve[d] federal crimes of terrorism" under Section 3A1.4.  As an initial matter, the jury found that El Gammal violated two of the statutes explicitly enumerated by this Guidelines provision (*i.e.*, 18 U.S.C. §§ 2339B and 2339D).  In addition, each of the defendant's crimes was "calculated to influence or affect" or "retaliate against" government conduct through intimidation and coercion. More specifically, the defendant's convictions for aiding, abetting, attempting, and conspiring to provide material support and resources to ISIS (Counts One and Two), and for aiding, abetting, and conspiring in the receipt of military training from ISIS (Counts Three and Four), all plainly meet the "calculation" requirement because each of these crimes entailed acts—*i.e.* the facilitation of El-Goarany's training and fighting with ISIS—that were intended to influence and/or retaliate for government conduct.  More specifically, the defendant participated in El-Goarany's efforts to provide himself as "personnel" to ISIS in Syria, where El-Goarany later fought and died for the terrorist group.  As was proven at trial, one of ISIS's primary missions

and a principal reason for which it recruits fighters is to establish and expand its territory (*i.e.*, its "Caliphate") through violence against governments and others who seek to control such territory. (Tr. 458, 464).  Thus, ISIS, in training and deploying fighters, seeks to influence, overthrow, and defend itself against military action by, governments. (Tr. 4950).  This is particularly true in Syria—the country in which El-Goarany joined ISIS—where the terrorist group for years has engaged in a civil war in an effort overthrow the Syrian government.  (Tr. 1603).  ISIS has also called for and carried out attacks on Western countries in order to retaliate and punish perceived misdeeds by the governments of these countries.  (Tr. 483).  Accordingly, by facilitating El-Goarany's efforts to train and fight with ISIS in the Syrian war zone, the defendant committed offenses that were manifestly "calculated to influence or affect the conduct of government" and to "retaliate against government conduct."  18 U.S.S.G. § 3A1.4.

Moreover, the defendant cannot reasonably dispute his own knowledge that ISIS intended to affect or retaliate against government conduct through the activities of fighters like El-Goarany.  Indeed, the defendant, in professing his own support for ISIS prior to El-Goarany's travel to Syria, stating:

> Beheading has a magical effect.  . . . I pray to God to grant them victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to Jerusalem, God willing.

(GX 122-F-T).

The defendant also identified other nations whose governments he hoped ISIS would topple:

> May God grant them victory and take over Jordan, then Saudi Arabia, then conquer Egypt after that.

(*Id.*)

17

Further, the defendant made the following additional statements evidencing his

knowledge that ISIS fighters sought to affect Government conduct:

> "Defeat is near. Inevitably.  Daesh will come teach those people.
> If Daesh gets to Egypt, I will go join them, so I can torture the Egyptians, and whip
> them."
> [. . .]
>
> "All Caliphates started like this and then expanded. . . . No Caliphate came by
> deliberation.  All by the sword.  It has to be like this; we take it forcibly not peacefully."

(GX 100-O-T).

El-Goarany also expressed his intent to affect government conduct upon his arrival in

Syria, when he explained that he had joined ISIS to retaliate for the acts of the Egyptian

government during the uprising at Rabaa Square in 2014, an event which—not coincidentally the

Government submits—also had a profound effect on the defendant:

> "Over 2 years since Egypt's mlitary coup . . . Approaching the 2nd anniversary of the
> Rabaa massacre . . . . In case ur wondering why I'm here today.")

(Tr. 1797).

Thus, the defendant's and El-Goarany's own words make clear that their offense conduct

was "calculated" for the precise purposes required under Section 3A1.4.

The defendant's further argument that the court's jury instruction regarding willful

blindness precludes application of U.S.S.G. 3A1.4 is similarly meritless.  (Def. Sub. 7-8.)  As an

initial matter, the evidence at trial proved overwhelmingly that the defendant actually knew that

El-Goarany intended to join, train, and fight with ISIS, and was not merely willfully blind.

Nevertheless, it is well-settled that "deliberate ignorance and positive knowledge are equally

culpable."  *United States v. Reyes*, 302 F.3d 48, 54–55 (2d Cir. 2002) (quoting *United States v.

Jewell*, 532 F.2d 697, 700 (9th Cir.1976) (*en banc*)).  Accordingly, it is of no moment for the

purposes of applying Section 3A1.4 that the jury might have convicted the defendant under a

willful blindness theory.  Indeed, "[w]hile willful blindness may be invoked to prove defendant

had knowledge of the unlawful conspiracy," it may not "be used to prove intent to participate in

a conspiracy."  *Id.*  Because a finding of willful blindness does not in any way serve as a

substitute for a jury's finding of criminal intent, "[t]he circuits are uniform in approving willful

blindness instructions" even in cases requiring a showing of "specific intent."  *United States v.*

*Griffin*, 524 F.3d 71, 79 (1st Cir. 2008).  The defendant's conduct was therefore sufficient to

meet the "specific intent" requirements of Section 3A1.4, even if the jury convicted him under a

willful blindness theory.

Finally, even if the defendant's offense conduct did not satisfy Section 3A1.4's

requirement that the offense "involve[d]" a federal crime of terrorism—which it plainly did—his

offense conduct independently satisfies the Guidelines provision's requirement that a defendant

"intended to promote" such a crime.  Namely, by aiding, abetting, and facilitating El-Goarany's

travel to Syria to join and fight with ISIS, El Gammal manifested his intent to promote crimes

that were "calculated" by El-Goarany and by ISIS to achieve the objectives set forth in Section

3A1.4.  Accordingly, the terrorism enhancement is applicable here.

## II.  A Two-Level Increase Pursuant to U.S.S.G. § 2M5.3(b)(1) is Warranted

The defendant next objects to the PSR's application of a two-level increase to the base

offense level pursuant to U.S.S.G. § 2M5.3(b)(1).  This objection is also baseless.

### A.  Applicable Law

Section 2M5.3(b)(1) provides that a two-level increase to the base offense level is

appropriate if the offense "involved the provision of (A) dangerous weapons; (B) firearms; (C)

explosives; (D) funds with the intent, knowledge, or reasons to believe such funds would be used

to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other

material support or resources with intent, knowledge or reason to believe they are to be used to commit or assist in the commission of a violent act[.]"  U.S.S.G. § 2M5.3(b)(1).

### B.  Argument

The defendant's offense conduct satisfies the requirements of Section 2M5.3(b)(1). Specifically, the defendant's offense conduct involved the provision of "material support or resources [*i.e.*, personnel] with . . .  reason to believe that they [were] to be used to commit or assist in the commission of a violent act."  U.S.S.G. § 2M5.3(b)(1).  Here, the defendant's facilitation of El-Goarany's journey to a war zone to join ISIS necessarily entailed "reason to believe" that El-Goarany would engage in violence as an ISIS fighter.  Indeed, the trial evidence included of photograph of El-Goarany in military fatigues in Syria; the testimony of the El-Goarany's brother concerning their communications about El-Goarany's "military training" in Syria (Tr. 787-95); the defendant's martyrdom letter (Tr. 807); and the video El-Goarany produced in which he announces his presence in ISIS territory while appearing in military fatigues (Tr. 1813); all proved that this is precisely the type of support that El-Goarany intended to provide—and did provide—upon arriving in Syria.  The defendant's knowledge of this plan to engage in violent acts was further evidenced by messages in which the El-Goarany confirmed for the defendant that everything was going "according to plan" (Tr. 168), and the defendant's own social media postings, which clearly showed a knowledge of (and support for) ISIS's violent methods.

*United States v. Dhirane*, 896 F.3d 295, 304–05 (4th Cir. 2018) is instructive.  In that case, the Fourth Circuit affirmed the district court's finding that  because the defendants' financial support to a designated foreign terrorist organization (al-Shabaab) was directed at and designed to support al-Shabaab's military operations in fighting a war of terrorism in Somalia and Kenya, the enhancement pursuant to Section 2M5.3(b)(1)(E) was applicable.  *Id.*  The Court

specifically noted that the Guidelines provision "does not require . . . that support be traced to or be designed to lead to a specific act of violence, [but rather] that the defendants be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization."  *Id.*  Here, even more so than in *Dhirane*, the defendant's conduct—*i.e.*, facilitating the travel of an aspiring ISIS fighter to a war zone—evidenced "reason to believe" that the offense would lead to violence,  as it involved El-Goarany's joining ISIS as a fighter, as opposed to merely providing financial support.

Accordingly, an increase in the base level pursuant to U.S.S.G. § 2M5.3(b)(1) is warranted here.

### III. The Resulting Guidelines Range is 292 to 365 Months

Consistent with the PSR, and with the application of these enhancements, the Court should calculate the Guidelines range as follows:

1.  Pursuant to U.S.S.G. § 3D1.2(a), Counts One through Four are grouped together into a single Group.  (PSR ¶ 47.)

2.  Pursuant to U.S.S.G. § 2M5.3(a), the base offense level is 26.  (PSR ¶ 48).

3.  Pursuant to U.S.S.G § 2M5.3(b), because the offenses of conviction involved the provision of material support or resources with the intent, knowledge, or reason to believe they were to be used or commit or assist in the commission of a violent act, two levels are added. (PSR ¶ 49).

4.  Pursuant to U.S.S.G. § 3A1.4, because the offenses of conviction are felonies that were intended to promote a federal crime of terrorism, 12 levels are added.  (PSR ¶ 49).

5.  Pursuant to U.S.S.G. § 3E1.1, because the defendant has not clearly demonstrated acceptance of responsibility for the offense and was found guilty after a jury trial, no reduction is warranted.  (PSR ¶ 55).

6.  In accordance with the foregoing, the total offense level for the Group is 40. (PSR ¶ 56).

With a Criminal History Category I, the defendant's Guidelines range of imprisonment is 292 to 365 months' imprisonment.  (PSR ¶ 105).

21

### IV. The Court Should Impose a Ten-Year Sentence of Imprisonment with Respect to Count Three

The jury found the defendant guilty of, among other things, aiding and abetting the receipt of military-type training from a foreign terrorist organization, in violation of Title 18, United States Code, Sections 2339D and 2 (Count Three).  A defendant convicted under that statute "shall be fined under this title or imprisoned for ten years, or both."  18 U.S.C. § 2339D(a).  In other words, Court may impose a fine, a sentence of imprisonment for ten years, or both a fine *and* a sentence of imprisonment for ten years.  Thus, if the Court imposes *any* sentence of incarceration on the defendant for Count Three, the Court must impose a ten-year term of imprisonment.  In light of the seriousness of the defendant's crime—aiding and abetting El-Goarany's receipt of military-type training from ISIS, and the grave consequences resulting from the defendant's crime—in addition to the reasons stated below, the Court should impose a sentence of incarceration on Count Three, and that sentence should be a mandatory term of ten years' imprisonment.

## DISCUSSION

A Guidelines sentence is both reasonable and warranted here, in light of the nature and circumstances of the offense, the need to provide just punishment, the need to protect the public from further crimes of the defendant, the need to avoid unwarranted sentencing disparities, and the need for specific and general deterrence.

The defendant's offense was extremely serious: in its aims, to assist an organization that had declared war on the United States; in its duration, lasting over a period of months, and in its results, sending a 24-year old American to Syria to wage violent jihad and, ultimately, die.  The

defendant has shown no apparent remorse.  Further, a Guidelines sentence would be consistent with the sentences given to others convicted after trial of providing material support to ISIS.[3]

## I.   The Nature and Circumstances of the Offense Warrant a Guidelines Sentence

The offense here was an incredibly serious one for multiple reasons.

*First*, the defendant provided material support to ISIS, which, at the time of the offense conduct, had publicly declared itself the enemy of the United States and had called for attacks on American civilians.  (PSR ¶ 17 (noting that, "on September 21, 2014[,] ISIL spokesperson Abu Muhammad Al-Adnan called for attacks against citizens, whether military or non-military individuals, of countries participating in the U.S.-led coalition against ISIL")).

While the defense sentencing submission makes much of Samy El-Goarany's "obstinate determination" to join ISIS, *see, e.g.*, Def. Submission at 16, it was not an accident that El-Goarany reached out to the defendant for assistance in trying to join ISIS.  The trial record showed that, for months before El-Goarany contacted him in August 2014, the defendant vocally supported ISIS and its murderous ideology.  For example, as early as April 2014, the defendant told another individual that "I was never with the Free Syrian army.  I was with Jabhat Al Nusra and now the State . . . . The State of Iraq and the Levant/Syria," *i.e.*, ISIS.  (GX 100-E-T- at 5; *see also* PSR ¶ 18).  In June 2014, after ISIS captured Mosul, Iraq's second largest city, the

---

[3] In considering a Guidelines sentence's reasonableness, it bears noting that the Government has not pursued certain plausibly applicable enhancements, such as (i) U.S.S.G. §§ 2M5.3(c)(1) and 2A1.2 (applying a base offense level of 38 when the offenses charged resulted in death), even though least one individual – El-Goarany – died as a result of the offense; or (ii) U.S.S.G. § 3C1.1 (applying a two-level enhancement if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, an investigation of the offense of conviction) in connection with, for example, the defendant's deletions of his social media messages with El-Goarany and Aboualala.  In short, this is not a case where any argument can be made that the Guidelines range results simply from the "piling on" of enhancements by the Government.

defendant commented on social media that "Allah is Great.  Mosul falls by the hands of the State."  (GX 100-D-T at 45; *see also* PSR ¶ 18).  Around the same time, the defendant told another individual on social media that "beheading has a magical effect," and "I pray that God grant them," i.e., ISIS, "victory and control of the entire Iraq and then the Levant."  (GX 122-F-T; *see also* PSR ¶ 18).  And, in another social media exchange, the defendant, referring to ISIS's caliphate, told another individual.  "All caliphates started like this and then expanded. . . .  No caliphate came by deliberation.  All by the sword.  It has to be like this; we take it forcibly[,] not peacefully."  (GX 122-O).

Further, although the defendant's sentencing memo claims that Gammal had "no plans to" join ISIS, the trial evidence showed that, after El-Goarany's travel, Gammal in fact asked El-Goarany, whether it was "easy to park a car into ur job parking lot?"  (PSR ¶ 39).  The ensuing discussion leaves no serious question that Gammal was inquiring about traveling to ISIS himself.  El-Goarany responded stating, "I don't know, I need to ask my superiors at work first inshallah, but I think it's risky because the parking lot these days is going under a lot of renovation, especially in the north side.  Khair inshallah, you planning on driving anytime soon?"  (*Id.*).  In response, the defendant indicated that he was considering "in mid August inshallah [i.e,. God willing], check [social media] more often." (*Id.*)  Following this exchange, El-Goarany asked the defendant to engage in further communications on Suresspot, saying "I'll help u make ur parking job easier inshAllah."  (*Id.*)

Thus, while the defense argues that Gammal "does not share those characteristics of a radicalized offender," Def. Submission at 5, Gammal's own words, over an extended period, belie that notion, as well as the suggestion that Gammal did not support ISIS until an already-radicalized El-Goarany reached out to him.

*Second*, the support the defendant provided to El-Goarany was significant in both its nature and duration.  The defendant and El-Goarany began discussing ISIS no later than mid-August 2014.  More specifically, on August 14, 2014, El-Goarany learned from another individual, via social media, that "Jammal" had posted social media comments supportive of ISIS.  (PSR ¶ 21).  Within minutes, El-Goarany contacted the defendant via Facebook messenger and communicated with him for over an hour.  (*See* PSR ¶ 22).  Although both the defendant and El-Goarany deleted many of these messages and some of them took place over an encrypted messaging application, their exchange's conclusion made its subject matter clear: at the end of the conversation, the defendant sent El-Goarany a link to a documentary about ISIS.  (PSR ¶ 22).

Those communications continued for months, until El-Goarany's travel at the end of January 2017.  During that time, the defendant and El-Goarany exchanged almost 1,000 messages over Surespot, an encrypted communications platform.  (*See* GX 1106 ¶ 6 (stipulation regarding Surespot records)).  And the defendant traveled thousands of miles from his Arizona home to meet with El-Goarany in New York, where, the trial evidence showed, the defendant provided him with basic Arabic language terms and contact information for Aboualala, the defendant's associate in Turkey.  (PSR ¶ 24; *see also* GX 1010 (photo of notepad from Howard Johnson's with basic Arabic terms and Aboualala's first name)).

Repeatedly, at key junctures in his journey from New York City college student to Syria-based ISIS-fighter, the defendant was El-Goarany's lodestar.  For example, days after the defendant met with El-Goarany in New York, El-Goarany contacted the defendant via Surespot and then purchased a plane ticket to Turkey.  (*Compare* GX 802 (reflecting plane ticket purchase on 10/22/14) *with* GX 1203 (reflecting Facebook and Surespot communications between the defendant and El-Goarany on 10/21/14)).  Similarly, when El-Goarany's mother found his travel,

El-Goarany cancelled the trip and told the defendant.  (*See* PSR ¶ 28.  *Compare* GX 100-S-T (Gammal telling Aboualala that trip El-Goarany "cancelled for the time being" because "his mother has a problem") with GX 1203 (toll records reflecting three calls between El-Goarany and the defendant on 11/17/14)).  And, weeks before his departure, immediately before contacting Aboualala directly, El-Goarany again contacted the defendant.  (*See* PSR ¶¶ 29. *Compare* GX 1204 (reflecting multiple calls between Gammal and El-Goarany on 1/14/15 and 1/15/15) *with* GX 113-A-T at 2 (Facebook message from El-Goarany to Aboualala, introducing himself as "Gammal's friend")).

*Third*, the form of assistance provided—facilitating the travel of El-Goarany to ISIS— posed grave risks.  During the relevant period, ISIS dispatched Westerners, who had initially traveled to Syria to train and fight with ISIS, back to their home countries, to use their new found skills to carry out attacks there.  *See, e.g.*, James Rothwell, Majority of Paris attackers used migration routes to enter Europe, reveals Hungarian counter-terror chief, The Telegraph, Oct. 2, 2016 (discussing the backgrounds of the individuals who conducted terrorist attacks in Paris, France in November 2015, which killed 130 people).[4]  Thus, the support provided by the defendant—a young Westerner whom ISIS could train in terrorist tactics, techniques, and procedures—posed a unique threat not only to anti-ISIS forces in Syria generally, but also to the U.S. and allied countries.

*Fourth*, the trial evidence showed that the defendant deleted numerous Facebook communications with El-Goarany, demonstrating that the defendant was well aware of the seriousness of his conduct at the time and sought to hide that conduct from detection.  (GX 100-

---

[4] Available at *https://www.telegraph.co.uk/news/2016/10/02/majority-of-paris-attackers-used-migration-routes-to-enter-europ/* (last visited Dec. 10, 2018).

X with GX 100-A; *see also* GX 1106 (stipulation reflecting that 969 Surespot messages between the defendant and El-Goarany were deleted)).

    *Finally*, the fact that the defendant himself did not carry out any terrorist attacks is not a significant mitigating factor.  The defendant's conduct was in the heartland of the statutes of conviction—providing and conspiring to provide material support to ISIS, aiding and abetting the receipt of military-type training, and conspiring to obtain military-type training.  Had the defendant been convicted of carrying out an actual terrorist attack, he would have faced even more significant penalties under the relevant statutes and the sentencing Guidelines.  (*See, e.g.* Judgement, *United States* v. *Rahimi*, No. 16 Cr. 760 (RMB), ECF No. 199 (imposing life sentence on defendant convicted of 2016 attempted bombings in Manhattan)).

    In short, the defendant provided material support to an organization that had declared itself at war with the United States.  He provided assistance and support to El-Goarany over a period of many months and at key junctures along El-Goarany's path from Queens to Syria.  He knew well the seriousness of what he was doing, taking steps to hide his communications from detection.  In light of these circumstances, a Guidelines sentence is warranted.

## II. The Defendant's History and Characteristics Support a Guidelines Sentence and the need for Specific Deterrence

    The history and characteristics of the defendant are also a significant aggravating factor here.

    *First*, at the time of the offense conduct, the defendant was almost 20 years older than El-Goarany.  (*Compare* PSR at 1 (stating defendant is currently 46 years old) *with* PSR ¶ 11 (stating El-Goarany was 24-years old at the time of the relevant conduct)).  Unlike El-Goarany, or his brother, for that matter, the defendant had spent significant parts of his life living in the Middle East.  And unlike El-Goarany, the defendant spoke Arabic.  (*See, e.g.*, GX 100-S-T at 32-33

(Arabic-language Facebook chat between the defendant and Aboualala, stating that El-Goarany does not speak Arabic); GX 110-B (Facebook message from El-Goarany to Gammal, stating that "we got a wee bit of a situation here bro lol, Atteya doesn't speak english . . . ."). Unlike El-Goarany, or his brother, who appear to have been essentially supported by their parents up until the time of El-Goarany's departure for Syria, the defendant had significant life experience before engaging in the offense conduct. To be clear, El-Goarany was a co-conspirator, not a victim. That said, given the defendant's greater life experience, age, and knowledge of world affairs, he was uniquely positioned to influence El-Goarany. And the influence the defendant provided led El-Goarany to Syria, to ISIS, and ultimately to his death.

*Second*, the defendant's support for jihadist causes was not isolated to his interactions with El-Goarany. In a social media conversation with another individual, the defendant boasted that he had been with "Sheikh Ayman," apparently a reference to Ayman al-Zawahiri, Usama bin Laden's second-in-command, and "Anwar Al-Awlaki," the founder of al Qaeda in the Arabian Peninsula, who was killed in 2011. (*See* GX 100-E-T at 59). Further, the defendant admitted that he had posted YouTube videos of Al-Awlaki's lectures prior to becoming involved with ISIS and El-Goarany. (*See* GX 100-E-T at 61).[5]

Further, in January 2014, the defendant corresponded over social media with another individual ("Individual-1") and expressed a desire to engage in acts of violence and murder:

Defendant:     when the time comes for assassinations I will specialize in Media people.

Defendant:     I will enjoy sniping them.

Individual-1:  Hahaha

---

[5] Prior to trial, the Court excluded a portion of this exchange on Rule 403 grounds and the exhibit actually admitted at trial redacted, among other things, the fact the videos had been deleted, apparently by YouTube, from the defendant's YouTube channel.

Individual-1:   I will prepare a Dragunov for you.

Defendant:      Do you still have access to weapons?

Defendant:      There are people who want to hunt.

In short, the defendant expressed the desire to "specialize" in "assassinations" of "Media people" because he will "enjoy sniping them." After Individual-1 indicated he was able to procure a "Dragunov"—a type of sniper rifle—the defendant asked whether Individual-2 "still has access to weapons" and represented that he had associates who wanted to commit acts of violence ("There are people who want to hunt").

In addition, during a post-arrest search of the defendant's home, FBI agents recovered a quadcopter or drone. While the drone is not itself illegal, it must be viewed in context with evidence of the defendant's state of mind, such as social media messages that the defendant exchanged with another individual ("Individual-2") in which they discussed remote-control planes that can carry cameras—a popular function of drones. The defendant also told Individual-2, however, that these devices are "good for Gaza" because "[t]hey can load it with bombs."

In sum, separate and apart from his interactions with El-Goarany, the defendant repeatedly voiced support for jihadist causes and acts of violence. These actions underscore the need for the sentence imposed to provide specific deterrence and to protect the public from further crimes of the defendant.

*Third,* the defendant's pre-arrest life in the United States is not a significant mitigating factor, nor does it lessen the need for specific deterrence and to protect the public against further crimes of the defendant. While enjoying the benefits of living in this country, the defendant materially supported ISIS, an organization publicly committed to killing Americans. Moreover,

there is nothing in the record to suggest that the defendant's support for ISIS has wavered. Indeed, the recommendation section of the PSR notes the defendant's "lack of remorse."

*Finally*, the defendant's pre-sentencing confinement at the Metropolitan Correctional Center is not a basis for either a variance or a downward departure.  In *United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001), the Court of Appeals held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" under the Sentencing Guidelines.  64 F.3d at 208.  Following *Carty*, "the courts have granted relief generally where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner."  *United States* v. *Mateo*, 299 F. Supp. 2d 201, 211 (S.D.N.Y. 2004) (Marrero, J.); *accord, e.g.*, *United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359, 377-78 (S.D.N.Y. 2004 (Lynch, J.); *United States* v. *Green*, 04 Cr. 424-14 (RWS), 2006 WL 3478340, at *4 (S.D.N.Y. 2006) (Sweet, J.).

Here, the defendant has not identified any basis for arguing that the "severity" of pre-sentencing detention at the MCC has fallen upon him "in some highly unique or disproportionate matter."  As such, his pre-sentencing (and pre-trial) detention do not militate in favor of a lower sentence.

In sum, the history and characteristics of the defendant, the need to for specific deterrence, and the need to protect the public from further crimes of the defendant all weigh in favor of a Guidelines sentence.

### III. A Guidelines Sentence Would Prevent an Unwarranted Sentencing Disparity

Finally, a Guidelines sentence would prevent an unwarranted sentencing disparity.

To begin with, during the period between March 2014 and August 2017, the average sentence for a defendant convicted after trial in ISIS-related cases was over 30 years.  *See* Karen J. Greenberg, ed. *The American Exception: Terrorism Prosecutions in the United States: The*

*ISIS Cases, March 2014-August* 2017 at 4 ("The average sentence for those who went to trial is 32.2 years.").  For example, in *United States* v. *Badawi*, a case in the Central District of California, the defendant was convicted after trial for assisting another individual who attempted to travel to Turkey to join ISIS and sentenced to 30 years.  The trial evidence showed the defendant and his co-conspirators—as was the case here—"used social media to discuss ISIL and terrorist attacks, repeatedly expressed support for ISIL and made arrangements for Elhuzayel to leave the U.S. to join the terrorist organization" and purchased a ticket for his co-conspirator to travel to Turkey.  *See* DOJ Release, Oct. 19, 2016, *Second California Man Who Participated in Conspiracy to Provide Support to ISIL Sentenced to 30 Years in Federal Prison*.[6]

Similarly, in *United States* v. *Pugh*, a case in the Eastern District of New York, the defendant was sentenced to 35 years, after being convicted at trial for attempting to provide material support to ISIS and obstruction of justice.  While in *Pugh*, the defendant himself attempted to travel to join ISIS, the offense conduct here had the same aim, providing ISIS with a fighter.  And, unlike in *Pugh*, here, the conspirators actually achieved that objective.  Further, while Pugh was charged with obstruction of justice based on his destruction of a laptop and several USB drives, in this case, there was also evidence that Gammal sought to destroy evidence, deleting numerous Facebook messages with El-Goarany and also instructing Aboualala to delete Facebook messages relating to El-Goarnay's's travel, *see* GX 120-A-T at 44 ("[D]elete the comments you have").

*Second*, many of the ISIS-related defendants who have been sentenced by courts in this area, even after guilty pleas, have been at or near the statutory maximum.  *See, e.g.*, *United*

---

[6] Available at *https://www.justice.gov/opa/pr/second-california-man-who-participated-conspiracy-provide-support-isil-sentenced-30-years* (last visited Dec. 10, 2018).

States v. *Luchtman*, --- F.3d ----, 2018 WL 6362603 at \*3-5 (2d Cir. Dec. 6, 2018) (affirming, as procedurally and substantively reasonable, sentence of 240 months, for defendant who pled guilty to conspiring to provide material support to ISIS); *United States* v. *Saidakhmetov*, No. 15 Cr. 95, (WFK), 2018 WL 461516, at \*3 (E.D.N.Y. Jan. 18, 2018) (imposing 180-month sentence, the statutory maximum, following guilty plea); *United States* v. *Alaa Sadeh*, No. 15 Cr. 558 (D.N.J) (defendant sentencing to 15 years, the statutory maximum at the time, for helping individual travel to ISIS).[7]

*Third*, in contrast to many ISIS-related cases, including *United States* v. *Aaron Daniels* and *United States* v. *Farrokh*, which are cited in the defendant's sentencing memorandum, the offense conduct here did not involve a sting operation, or the use of any undercover officers or confidential informants more generally. *See also, e.g.*, *Luchtman,* 2018 WL 6362603 at \*1-2 (nothing that defendant had met with individuals cooperating with the FBI); *Saidakhmetov*, 2018 WL 461516, at \*3 (noting that "[t]he Court's sentence also takes into account . . . the role of the FBI's confidential informant in encouraging Defendant's conduct"); *see also* Gov't Sentencing Mem., *United States* v. *Aaron Daniels*, No. 16 Cr. 222 (S.D. Ohio May 29 2018), ECF No. 87 at 2-7 (discussing the involvement of three FBI undercover agents in the offense conduct and also noting that the defendant "may be suffering from a psychological disorder"). While "sting" cases are undoubtedly serious, when considering potential sentencing disparities, it that Gammal was prosecuted and convicted for the actual and successful provision of material support to ISIS, without the involvement of anyone acting at law enforcement's direction.

---

[7] In June 2015, *i.e.*, during the period of the conspiracy charged in this case, the statutory maximum penalty for violating 18 U.S.C. § 2339B, the material support statute, was increased from 15 years, or 180 months, to 20 years, or 240 months.

*Fourth*, the defendant's age distinguishes him from many other defendants sentenced for ISIS-related conduct.  The defendant was 42 when he began assisting El-Goarany, making him almost two decades older than the median age of ISIS defendants nationwide.  *See The American Exception* at 11 ("While the average age for all ISIS-related cases is 27.2, the most prevalent age is much lower, at 20.  The median age is 25.5 years old.").  In *United States* v. *Asher Abid Khan*, for example, a case cited by the defendant in his sentencing memo, the defendant was a 20-year old college student, who attempted to travel to ISIS with a friend, only to return to the United States "after his family tricked him into coming home to Houston because of an alleged hospitalization of his mother."  *See* DOJ Release, Dec. 4, 2017, *Texas Resident Pleads Guilty to Providing Material Support to ISIS*.[8]  In *United States* v. *Ilsam Said Natesh*, a case from the Northern District of California, also cited in the defendant's sentencing memorandum, the defendant was 21 years old at the time of the offense, and unlike Gammal pled guilty and expressed remorse for his conduct.  *See* Sentencing Tr. *United States* v. *Natsheh*, 16 Cr. 166 (RS) (N.D. Cal. Dec. 13, 2016), ECF No. 26 at 31 (noting that the defendant "is and was at time of this offense a troubled young man").  Indeed, in one of the cases cited by Gammal, *United States* v. *Doe*, 15 Cr. 302 (E.D.N.Y.), the defendant was a juvenile.

While many of these other defendants might attribute their offense conduct to youthful naiveté, Gammal, as noted above, had life experience and perspective that these other defendants did not.  And, as noted above, he could have used life experience and perspective to have a positive influence on El-Goarany, or report El-Goarany's travel plans to the authorities.  Instead, the defendant actively assisted El-Goarany's travel to fight for a foreign terrorist organization.

---

[8] Available at *https://www.justice.gov/opa/pr/texas-resident-pleads-guilty-providing-material-support-isis* (last visited Dec. 11. 2018)

In short, a Guidelines sentence is appropriate in light of the sentences imposed on defendants convicted after trial of relatively similar conduct, the sentences in other ISIS material support cases in this district, and the defendant's relative maturity as compared to other ISIS defendants.  A downward variance would result in an unwarranted sentencing disparity.

The other cases cited in the defendant's memorandum are also distinguishable from the facts at issue here.  While the defendant relies heavily on *United States* v. *Jumaev*, 12 Cr. 33 (JLK) (D. Colo.), the offense conduct in that case consisted of writing a single $300 check to the Islamic Jihad Union ("IJU"), a "mostly obsolete" organization operating in Uzbekistan.  *United States* v. *Jumaev*, 12 Cr. 33 (JLK), 2018 WL 3490886, at *1-2 (D.Colo. July 18, 2018).  Further, the defendant had a pre-existing debt to the individual to whom he wrote the check.  *See id.* at *6 (noting "the facts of this case are unique for that reason").  Finally, the defendant had an immigration detainer and was likely to spend additional time in immigration custody before being deported to Uzbekistan, which the court viewed as a significant mitigating factor.  *See id.* at 16 ("Jumaev is currently in immigration removal proceedings and will likely be detained by Immigration and Customs Enforcement as soon as he is released from custody in this case.").

Here, in striking contrast to the IJU, as discussed above, ISIS was actively and openly engaged in hostilities against the United States.  And, here, the defendant's conduct extended over a period of months and was a key factor encouraging and enabling El-Goarany's travel to Syria.  *Cf. United States* v. *Jumaev*, 2018 WL 3490886, at *14 (noting the defendant in that case "did not act in any manner as an instigator or leader or conduit for others to engage in similar conduct").  Finally, unlike Jumaev, Gammal is a naturalized U.S. citizen, which, if anything, is an aggravating factor here, and is not expected to be deported after his sentence.

In addition, in *United States* v. *Robert Blake Jackson*, 16 Cr. 70 (N.D. Fla.), also cited by Gammal, the defendant pled guilty to making false statements under 18 U.S.C § 1001, and not to terrorism charges. *See* DOJ Press Release, Sept. 23, 2016, Pensacola Man Pleads Guilty to Making False Statements.[9]  In *United States* v. *Wolfe*, also cited by the defendant, the public sentencing transcript reflects that the Government made a 5K motion as a result of the defendant's cooperation, and yet the defendant was still sentenced to 82 months, reflecting the seriousness of ISIS-related conduct. *See* Transcript, *United States* v. *Wofle*, No. 14 Cr. 213 (W.D. Tx.), ECF No. 53 at 3 ("In addition to the presentence report, I have reviewed the government's 5K motion . . . ."). Finally, in *United States* v. *Farrokh*, 16 Cr. 20 (E.D. Va.), the defendant was in his 20s, the offense conduct, in part, was based on the defendant's interactions with confidential law enforcement sources, and the defendant pled guilty prior to trial—all of which favorably distinguish the defendant in *Farrokh* from Gammal.

\* \* \*

This was an extremely serious offense. The defendant provided aid to an organization that had openly declared itself an enemy of the United States and that was openly and notoriously engaged in brutal acts of violence. The trial record shows that the defendant's support for El-Goarany's travel and for ISIS was not the result of a one-time whim; instead, it was the product of a long-held commitment to violent jihadist causes. The defendant's age and life experience should have given him perspective that many other defendants in ISIS-related cases lacked. Finally, a Guidelines sentence would be consistent with sentences imposed on other defendants convicted after trial of providing support to ISIS.

---

[9] Available at *https://www.justice.gov/usao-ndfl/pr/pensacola-man-pleads-guilty-making-false-statements* (last visited Dec. 11, 2018).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence within the

applicable Guidelines range is appropriate here.

Dated:  New York, New York
        December 13, 2018

                                  Respectfully submitted,

                                  GEOFFREY S. BERMAN
                                  United States Attorney

                        By:       _____/s/_____
                                  Andrew J. DeFilippis
                                  Brendan F. Quigley
                                  Negar Tekeei
                                  Assistant United States Attorneys
                                  One St. Andrew's Plaza
                                  New York, New York 10007
                                  Tel. No.: (212) 637-2231/2190/2482