**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**------------------------------------------------------x**

**UNITED STATES OF AMERICA,**          :

              **-against-**          :          **15 Cr. 588 (ER)**

**AHMED MOHAMMED EL GAMMAL**   :

              **Defendant.**          :

**------------------------------------------------------x**

**MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR COMPASSIONATE**
**RELEASE PURSUANT TO 18 U.S.C. §**
**3582(c)(1)(A)**

Jeremy Gutman
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 644-5200
*Attorney for Appellant*
*Ahmed Mohammed El Gammal*

# TABLE OF CONTENTS

*Page*

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

     A.    This Court is Authorized to Grant Mr. Gammal's Application
          for Compassionate Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.    Extraordinary and Compelling Reasons Warrant Modification
          of Mr. Gammal's Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     C.    Permitting Mr. Gammal to Complete the Remainder of his
          Sentence on Home Confinement Comports with the Section
          3553 Factors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# EXHIBITS

Exhibit A:    Excerpts of medical records (filed under seal)

Exhibit B:    Application to Warden, FCI Phoenix, for compassionate release

Exhibit C:    Individualized Needs Plan - Program Review, August 25, 2020

Exhibit D:    Individualized Needs Plan - Program Review, March 9, 2020

Exhibit E:    Work Performance Rating, August 19, 2020

Exhibit F:    Certificate of Completion of Inmate Suicide Watch Companion training,
              April 1, 2019

Exhibit G:    Certificate of Completion of Inmate Suicide Watch Companion training,
              March 24, 2020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

**UNITED STATES OF AMERICA,**          :

        **-against-**          :          **15 Cr. 588 (ER)**

**AHMED MOHAMMED EL GAMMAL**  :

        **Defendant.**          :

-------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

## INTRODUCTION

This memorandum is respectfully submitted on behalf of defendant Ahmed Mohammed ("Jimmy") El Gammal in support of his motion for an order granting compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) and modifying his sentence so that, as a condition of supervised release, his remaining term of imprisonment is replaced by an equal period of home incarceration, to be followed by the term of supervised release previously imposed by the Court.[1]

---

[1] Upon his release from incarceration, Mr. Gammal would reside in the home of his ex-wife Celeste Dubrow, which is located at the address listed as Mr. Gammal's residence in his Presentence Investigation Report ("PSR"). Despite the end of their marital relationship, Ms. Dubrow has remained supportive of Mr. Gammal, both emotionally and financially, throughout his prosecution and sentence, and is fully prepared to comply with any requirements necessary to accommodate supervision of Mr. Gammal's confinement at her home by the United States Probation Department for the District of Arizona.

Mr. Gammal is 48 years old, and suffers from severe obesity and other conditions that, as discussed in more detail below, place him among those at the highest risk of severe illness or death in the event of a Covid-19 infection. This is an escalating cause for concern as positive cases surge across the country, throughout the Bureau of Prisons, and, at an alarming rate, at the facility where Mr. Gammal is currently housed. On December 10, 2020, FCI Phoenix issued a notice advising inmates that new restrictions were being imposed because there were positive cases in four of its six units. Approximately a week ago, the BOP reported that there were 24 active cases among inmates at that facility. Today, the BOP website discloses that the number of inmates testing positive has grown to 149.  *See* https://www.bop.gov/coronavirus. Last week, researchers at the University of Arizona reported that positive coronavirus cases in the state are doubling every fourteen days and warned that the situation will likely grow worse in the coming weeks.[2]  In consideration of the serious threat to Mr. Gammal's health and wellbeing, and in light of his rehabilitation and the lack of danger he poses to the community, we ask the Court to permit him to complete his sentence in a non-custodial setting.

------

[2]Fox 10 Phoenix, December 18, 2020, *Arizona researchers: COVID-19 could become 'humanitarian crisis'in the state,* (https://www.fox10phoenix.com/news/arizona-researchers -covid-19-could-become-humanitarian-crisis-in-the-state). *See also* AP News, December 19, 2020, *Arizona continues string of record COVID-19 hospitalizations* (https://apnews.com/article/ pandemics-arizona-coronavirus-pandemic-9e50b66e009808c18faced0ba67e2229) (the actual number of cases is thought to be "far higher" than the record number reported by the Department of Health because many people have not been tested).

**Statement of Facts**

Mr. Gammal was convicted, after trial, of providing material support to

a terrorist organization, and related offenses, based on his facilitation of travel to the

Middle East by a fellow American who was intent upon joining ISIS and becoming one of

its soldiers. On December 18, 2018, he was sentenced to a term of 144 months of

imprisonment, to be followed by a three-year term of supervised release.[3] In imposing that

sentence, this Court observed that Mr. Gammal, a United States citizen who at the time of

the offense was a used-car salesman in his early 40's with no history of engaging in

similar conduct, is "not the typical terrorism defendant." Sentencing transcript, p. 40.

Pointing to his age and other factors, the Court concluded that "I do not believe that after

he is released from prison, Mr. Gammal will commit another crime, much less commit a

crime of terrorism." *Id.*, p. 49.

Mr. Gammal has been in custody since his arrest on the present charges on August

24, 2015. The first three and a half years of his incarceration were spent at the

Metropolitan Correctional Center ("MCC") under the difficult conditions described at

pages 34 to 37 of the Defense Sentencing Submission (ECF Doc. 226). Owing in large

measure to his restricted access to recreation during that period, Mr. Gammal's weight,

which was 200 pounds at the time he entered custody, increased to 280 by the time of his

presentence interview. PSR, ¶ 76. Although he succeeded in bringing his weight down to

---

[3]The judgment of conviction and sentence was affirmed on October 26, 2020, and a
petition for rehearing was subsequently denied.

265 during his first year at FCI Phoenix – the only period of his incarceration when he was able to spend substantial time outdoors and out of a cell – the lockdowns imposed since last March because of the coronavirus pandemic have undermined those efforts. His current weight is 308 pounds which, with a height of 6'1", makes him severely obese – a condition that, as discussed in section B of the Argument below, places him at heightened risk of life-threatening complications from Covid-19. In addition, he has high blood pressure (hypertension) and a history of heavy smoking, which are also identified as risk factors for those infected with the coronavirus.[4]

## ARGUMENT

### A.      This Court is Authorized to Grant Mr. Gammal's Application for Compassionate Release

As amended by the First Step Act ("FSA"), Section 3582(c)(1)(A)(i) authorizes this Court to determine whether extraordinary and compelling reasons warrant a reduction in sentence. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020) (FSA eliminates requirement that BOP move for or support an inmate's release).  On December 3, 2020, Mr. Gammal submitted a request for compassionate release to the warden of FCI Phoenix [Exhibit B]. Under the FSA, Mr. Gammal should be deemed to have exhausted his administrative remedies 30 days after that request was made, regardless of whether BOP has responded within that time. In *United States v. Haney*, the court explained:

---

[4]The most recent weight reported in Mr. Gammal's medical records, excerpts from which are submitted as Exhibit A to this application, indicate that on March 11, 2020, he weighed 273 pounds.

> § 3582(c)(1)(A) does not contain an exhaustion requirement
> in the traditional sense. That is, the statute does not
> necessarily require the moving defendant to fully litigate his
> claim before the agency . . . . Rather, it requires the defendant
> *either* to exhaust administrative remedies or simply to wait 30
> days after serving his petition on the warden of his facility
> before filing a motion in court.

454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020) (emphasis in original).

Furthermore, although 30 days have not yet elapsed since Mr. Gammal's request for compassionate release was filed, numerous courts in the Second Circuit have waived the exhaustion requirement during the COVID-19 pandemic. *See United States v. Zukerman*, 451 F. Supp. 3d 329, 332-33 (S.D.N.Y. 2020); *United States v. Colvin*, 451 F.Supp.3d 237 (D. Conn. 2020); *United States v. Kissi*, 469 F.Supp.3d 21, 27-32 (E.D.N.Y. 2020). "Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). "[T]he requirement of completing the administrative process may be waived 'if one of the recognized exceptions to exhaustion applies.'" *United States v. McCarthy*, 453 F.Supp.3d 520, 525 (D. Conn. 2020) (*quoting United States v. Perez*, 451 F.Supp.3d 288, 291 (S.D.N.Y. 2020). These exceptions include: (1) where exhaustion would be futile, including where undue delay due to exhaustion may result in "catastrophic health consequences," (2) where "the administrative process would be incapable of granting adequate relief;" and (3) where "pursuing agency review would subject plaintiffs to undue prejudice." *Washington*, 925 F.3d at 118-20.

5

District courts have found that all three exceptions apply in cases where incarcerated individuals, due to their age and/or underlying health issues, seek compassionate release in light of the spread of COVID-19. *See, e.g., McCarthy*, 453 F.Supp.3d at 525 ("Even a few weeks' delay carries the risk of catastrophic health consequences for [Mr.] McCarthy . . . [and he] could be unduly prejudiced by such delay"); *Perez*, 451 F.Supp.3d at 292 (waiving exhaustion requirement because delay could result in undue prejudice and render exhaustion futile and inadequate). *See also United States v. Salvagno*, 456 F.Supp.3d 420, 426 (S.D.N.Y. 2020) (given the reality that "prisons are powder kegs for infection and have allowed the COVID-19 virus [to] spread[ ] with uncommon and frightening speed . . . the need to expedite consideration of requests for compassionate release premised on potential exposure to COVID-19 takes on even new urgency") (citations and internal quotation marks omited).

For all of these reasons, and in view of the extraordinary and compelling reasons discussed in the following section, Mr. Gammal's motion for compassionate release should be considered without delay.

**B.    Extraordinary and Compelling Reasons Warrant Modification of Mr. Gammal's Sentence**

To be eligible for a reduction in sentence, a defendant must show that "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1). The Second Circuit held in *Brooker* that, under the FSA, the Sentencing Commission's policy statement regarding what constitutes "extraordinary and compelling reasons" for granting

6

a reduced sentence (U.S.S.G. § 1B1.3 and Application Note 1(D)), does not apply to motions, like the present one, brought directly by an inmate to the district court. Instead, "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F. 3d 228 at 237. This means that the court's discretion is not constrained by the Sentencing Commission's pre-FSA policy statements or the BOP's rules limiting the availability of compassionate release to prisoners with specific medical conditions or family circumstances or who fall within certain age groups. *Id.*

Noting that the term "compassionate release" is a misnomer in the context of a motion to a district court, which is empowered to modify a sentence in a variety of ways short of outright release, the Court of Appeals held that "a district court's discretion in this area – as in all sentencing matters – is broad." *Id*. It recognized that "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" 976 F. 3d at 237-38, *quoting* 28 U.S.C. § 994(t) (emphasis added by Court of Appeals).

According to the Centers for Disease Control ("CDC"), "[h]aving obesity, defined as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above), increases your risk of severe illness from COVID-19."[5]  At his

---

[5] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity.

current weight of 308 pounds, Mr. Gammal's BMI is 40.6, placing him in the category of

severe obesity. Citing numerous recent studies and scientific articles, the CDC notes the

multiple ways that obesity exacerbates the risks associated with a coronavirus infection:

- Having obesity increases the risk of severe
  illness from COVID-19. People who are
  overweight may also be at increased risk.

- Having obesity may triple the risk of
  hospitalization due to a COVID-19 infection.

- Obesity is linked to impaired immune function.

- Obesity decreases lung capacity and reserve and
  can make ventilation more difficult.

- As BMI increases, the risk of death from
  COVID-19 increases.

- Studies have demonstrated that obesity may be
  linked to lower vaccine responses for numerous
  diseases (influenza6, Hepatitis B7,8,9,
  tetanus10).[6]

Mr. Gammal has also been diagnosed with hypertension (high blood pressure), for

which he receives daily medication. According to the most recent guidance from the CDC

(which cautions that, because Covid-19 is a new disease, assessments of pertinent data are

in a constant state of flux), individuals with hypertension "might be at an increased risk

for severe illness from the virus that causes COVID-19."[7] That assessment reflects that,

---

[6]*See* https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (footnotes omitted).

[7]*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people
-with-medical-conditions.html#serious-heart-conditions.

while the evidence is "mixed," studies show that hypertension is associated with an increased likelihood of severe illness and death.[8] *See e.g.* Pranata, R., *et al.*, *Hypertension is associated with increased mortality and severity of disease in COVID-19 pneumonia: A systematic review, meta-analysis and meta-regression. Journal of the Renin-Angiotensin-Aldosterone System*, 2020. 21(2): p. 1470320320926899 (referenced by the CDC at the webpage cited in footnote 6 above).

Mr. Gammal's prospects in the event of an infection are further complicated by his history of excessive tobacco use. Although he quit smoking approximately five years ago, Mr. Gammal had been a heavy tobacco user, smoking as many as two packs a day, since the age of seventeen. According to the CDC, "[b]eing a current or former cigarette smoker increases your risk of severe illness from COVID-19."[9] *See also* Reddy R.K., Charles W.N., Sklavounos A., Dutt A., Seed P.T., Khajuria A. *The effect of smoking on COVID-19 severity: A systematic review and meta-analysis*. J Med Virol. 2020 doi: 10.1002/jmv.26389 ("in the largest meta-analysis available amongst peer-reviewed literature, we report that both current smoking and a smoking history significantly increased COVID-19 severity, whilst smoking history also significantly increased

---

[8]*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ evidence-table.html.

[9]*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with -medical-conditions.html.

mortality risk").[10]

At this point, it is widely recognized that "[t]hose detained in jails and prisons face particularly grave danger" from the pandemic. *United States v. Pacheco,* 2020 WL 4350257, *1 (S.D.N.Y. July 29, 2020) (citing studies reporting that Covid-19 case rates among prisoners are 5.5 times higher than in the general population and that death rates are three times greater). *See United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prisons are powder kegs for infection"). *See also* New York Times, November 30, 2020, *Prisons Are Covid-19 Hotbeds. When Should Inmates Get the Vaccine?* (suggesting that data regarding inmate infections and deaths most likely underestimate the actual numbers because of inadequate reporting). The current, rapid spread of the coronavirus at BOP facilities generally, and at FCI Phoenix in particular, presents a substantial and genuine threat to an individual with Mr. Gammal's underlying conditions.

As the government has conceded in similar cases, an inmate's increased risk of severe illness because of obesity establishes an extraordinary and compelling reason for compassionate release.  *See e.g. United States v. Dasilva*, 2020 WL 5764286, at *2 (S.D.N.Y. September 28, 2020) (the defendant's "obesity alone suffices to satisfy the first prong of the analysis, even without reaching [his] other health conditions"); *United States v. Anderson*, 2020 WL 2849483, at *2 (S.D.N.Y. Jun. 2, 2020) (finding that an obese

---

[10]Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436545.

defendant demonstrated extraordinary and compelling reasons).  It may or may not be that

Mr. Gammal's hypertension alone would establish an extraordinary and compelling

ground for relief, *see United States v. Sawicz*, 453 F.Supp.3d 601 (E.D.N.Y. 2020)

(granting release for inmate being treated with medicine for hypertension), *but see United

States v. Petersen*, 2020 WL 7129705, at *7-8 (notwithstanding recognition that

hypertension may place defendant at higher risk of severe illness, court finds that it does

not, without more, establish an extraordinary and compelling ground). When considered

in conjunction with the level of risk posed by his obesity and his long-term smoking,

however, that condition further supports a determination that the requirement of

"extraordinary and compelling reasons" is satisfied in the present case.

### C.   Permitting Mr. Gammal to Complete the Remainder of his Sentence on Home Confinement Comports with the Section 3553 Factors

Where there are extraordinary and compelling reasons, a court may modify a

defendant's sentence "after considering the factors set forth in section 3553(a) to the

extent that they are applicable." 18 U.S.C. § 3582(c)(1).  In assessing whether the

sentence modification sought by the present motion would be "sufficient, but not greater

than necessary" to reflect the seriousness of the offense and accomplish the purposes set

forth in Section 3553, the Court should bear in mind that we do not seek an order that

would restore Mr. Gammal's liberty, but only one that would substitute a term of home

confinement for the remainder of his term of imprisonment. According to the BOP's most

recent calculations [*see* Exhibit C, Individualized Needs Plan - Program Review, August 25, 2020], Mr. Gammal's projected release date, based on good time credits, is November 13, 2025; pursuant to 18 U.S.C. § 18 U.S.C. 3624(c)(1), he would be eligible for transfer to a halfway house twelve months before that date.[11]

It also bears noting that, as a result of the lockdown restrictions that have been in place at FCI Phoenix since March, Mr. Gammal's term of incarceration has been much more oppressive than the Court could have contemplated at the time the original sentence was imposed. As Judge Rakoff observed in a recent case involving a defendant who was clinically obese and diagnosed with diabetes:

> [T]he pandemic, aside from posing a threat to Rodriguez's health, has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as "prime candidates" for the spread of the virus, *see United States v. Al Kassar*, --- F. Supp. 3d ----, ----, 2020 WL 4813199, at *1 (S.D.N.Y. Aug. 19, 2020), have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal. For someone with Rodriguez's health profile, the risk of suffering severe health consequences if he contracts COVID-19, coupled to the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure Rodriguez's safety, means that "the actual severity of [Rodriguez's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing." *United States v. Mel*, No. TDC-18-0571,

---

[11]As noted in his Individualized Needs Plan - Program Reviews [Exhibits C and D], Mr. Gammal has completed Drug Education programs and his counselors have endorsed his goal of participating in the BOP's Residential Drug Abuse Program [RDAP], completion of which would make him eligible for an additional sentence reduction of up to one year. *See* 18 U.S.C. 3621(e)(2)(B); 28 C.F.R. § 550.55(a)(2).

2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020).

*United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. September 30, 2020).

The same is true for Mr. Gammal, who also was subjected to a particularly long period of pretrial detention – 42 months – far from family and friends who would have visited had he been incarcerated closer to home. The unintended harshness of Mr. Gammal's incarceration should surely factor into assessment of the need for additional punishment to serve the purposes delineated in the sentencing statute.

Mr. Gammal's "history and characteristics" [§3553(a)(1)] – including the many positive attributes described and illustrated in the defense sentencing submission [ECF Doc. 226, pp. 24-38] – weigh in favor of a sentence modification. As the Court recognized at his sentencing, far from conducting himself in the manner of a radicalized terrorist, Mr. Gammal spent his time at MCC productively and endeavored to contribute to the wellbeing of his fellow inmates by, among other things, serving as an Inmate Suicide Watch Companion. He has continued to serve as an Inmate Companion at FCI Phoenix, which entails participation in extensive, ongoing training supervised by staff psychologists. As his Work Performance Rating [Exhibit E] confirms, he has received consistently outstanding evaluations for the quality of his work and his dedication to satisfying the demands of the program. *See also* Certificates [Exhibits F and G].  Mr. Gammal has also worked as part of the facility's recycling crew and has been free of disciplinary infractions. As the Supreme Court has recognized, evidence of a defendant's

post-sentencing rehabilitation provides "the most up-to-date picture of his 'history and

characteristics'" and is "clearly relevant to the selection of an appropriate sentence."

*Pepper v. United States*, 562 U.S. 476, 491-92 (2011).

Nothing in Mr. Gammal's history since the time of sentencing runs counter to this

Court's finding that he is unlikely to recidivate. Sentencing transcript, p. 49. On the

contrary, notwithstanding that his ability to participate in prison programs has been

limited by the pandemic as well as by restrictions emanating from the nature of his

offense, his prison record reflects the behavior of an individual striving to serve others

and prepare for successful re-entry into society. Consistent with the conclusion that he

poses no danger to the public, the BOP recently approved his transfer to FCI Terminal

Island, a low-security facility.[12] *See United States v. Pena*, 459 F.Supp.3d 544, 552

(S.D.N.Y. 2020) (citing the defendant's placement in a low-security facility as evidence

that he did not currently present a danger to the community). Thus, the Court should

readily conclude that further incarceration at a BOP facility is not necessary "to protect

the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

Without gainsaying the "seriousness of the offense" [§ 3553(a)(2)(A)], we urge the

Court to recognize that changed circumstances warrant reconsideration of what

constitutes a "just punishment" [*id*.] in this case.  It could not have been contemplated at

the time of Mr. Gammal's sentencing that his term of imprisonment would, as a

---

[12]Unfortunately, because of the pandemic, that transfer has not occurred).

14

consequence of his medical profile, expose him to a substantial risk of severe illness that could have lifelong consequences and possibly cause his death. Particularly in view of the current surge of positive Covid-19 cases at FCI Phoenix, the suggestion that Mr. Gammal's life and wellbeing are in danger is not hyperbole.

As of next week, Mr. Gammal will have been incarcerated in federal facilities for 64 months, a significant portion of which has been under circumstances that were far more onerous than those that are typical of federal custody. In recognition of the present circumstances and the dire prospects that emerge from them, we urge the Court to conclude that a modification that converts the remainder of Mr. Gammal's present sentence to a prolonged period of strict home confinement will be sufficient to reflect the seriousness of the offense, promote due respect for the law, and achieve a just result.

## CONCLUSION

For the above reasons, this Court should grant Mr. Gammal's application for a modification of his sentence.

Respectfully submitted,

/s/
Jeremy Gutman
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 644-5200
*Attorney for Appellant*
*Ahmed Mohammed El Gammal*

December 20, 2020

15