UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>AHMED MOHAMMED EL GAMMAL,<br>a/k/a "Jammie Gammal,"<br><br>Defendant. | 15 Cr. 588 (ER) |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
*Attorney for the United States of America*

Andrew J. DeFilippis
Negar Tekeei
Assistant United States Attorneys
    *Of Counsel*

**PRELIMINARY STATEMENT**

Ahmed Mohammed El Gammal ("El Gammal" or the "defendant"), who was convicted at trial of terrorism offenses and sentenced to 144 months' imprisonment for facilitating a young man's recruitment into ISIS and travel to ISIS-controlled territory in Syria, now moves this Court to release him immediately from prison in light of the COVID-19 pandemic. This Court should deny El Gammal's motion. The defendant recently contracted and recovered from the COVID-19 virus. To release him now – after he has served only approximately half of his sentence for helping a U.S. citizen join, fight, and die for a violent terrorist group that has waged war against the United States and slaughtered innocent civilians – would severely undermine the objectives of sentencing as set forth in 18 U.S.C.§ 3553(a). The Section 3553(a) factors applicable here weigh overwhelmingly against the defendant's release. Granting the defendant's motion would be at odds with the nature and seriousness of the defendant's offense conduct, weaken the specific and general deterrence value of his sentence, and fail adequately to protect the public. In sum, and as explained in further detail below, the defendant's release from prison would undermine the Court's appropriate recognition, in imposing the sentence that it did, of the seriousness and dangerousness of El Gammal's conduct and of the need to deter the defendant and others who might support violent terrorist groups like ISIS.

**BACKGROUND**

**A. The Defendant's Offense Conduct**

Beginning in 2014, El Gammal facilitated the travel of Samy El-Goarany ("El-Goarany"), a 24-year-old student and U.S. citizen, from New York to Turkey, and then from Turkey to Syria, so that El-Goarany could train and fight with ISIS, a brutal terrorist organization that plots attacks and kills innocent civilians around the world. In his social media communications, the defendant

2

not only embraced ISIS's terrorist ideology but also enthusiastically supported its brutal atrocities. For example:

- In April 2014, El Gammal told an associate that he had been "with Jabhat Al Nusra," another foreign terrorist organization operating in Syria, but was "now with the State . . . . the State of Iraq and the Levant and Syria," a reference to ISIS. (Trial Transcript ("Tr.") 481).

- In June 2014, after ISIS captured Mosul, the second largest city in Iraq, El Gammal wrote "Allah is Great. Mosul falls by the hands of the State." (Tr. 457). Around the same time, El Gammal wrote that "beheading has a magical effect" and "pray[ed]" that "God grant [ISIS] victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to Jerusalem, God willing." (Tr. 965). He also wrote that "Jihad is a duty[.]" (Tr. 506).

- In July 2014, El Gammal told another associate that if ISIS "gets to Egypt, I will go join them, so I can torture the Egyptians, and whip them[.]" (Tr. 458, 1762). Later that month, El Gammal wrote: "I want expansion for Jihadis and that's it . . . What I care about is actions on the ground[,]" and "I support jihad everywhere." (Tr. 481-82, 1764).

- El Gammal criticized those who opposed ISIS and attempted to rationalize ISIS's brutality. On July 1, 2014, El Gammal wrote about ISIS: "May God grant them victory[.] Who would hate the founding of the Caliphate[.] Glory be to Allah[.]" (Tr. 1762). The same day, El Gammal wrote,"[n]othing works with them except Daesh," a reference to ISIS. (Tr. 1936). He also wrote: "All Caliphates started like this and then expanded[.] No Caliphate came by deliberation. All by the sword. It has to be like this; we take it forcibly not peacefully." (Tr. 1762).

For months, El Gammal and El-Goarany communicated about their shared support for ISIS. (*See, e.g.*, Tr. 142-60, 1017, 1255-57). Thereafter, in 2015, the defendant traveled from his home in Arizona to New York, where he met El-Goarany in order to facilitate his path to joining ISIS. The defendant vetted El-Goarany and put him in touch with a co-conspirator in Turkey, Attia Aboualala ("Aboualala"). (Tr. 620-50, 656-61). Months later, and with the defendant's encouragement, El-Goarany left the United States for Turkey via JFK Airport. When El-Goarany reached Turkey and met with Aboulala, the defendant continued to assist him, communicating with him via messaging applications and helping to make sure that El-Goarany found his way to ISIS territory in Syria. (*See, e.g.*, Tr. 143-46). After El-Goarany arrived in Syria and was receiving

ISIS military training and fighting for ISIS, El-Goarany continued to report back to the defendant, stating that "everything [was] going according to plan." (Tr. 168). In approximately November 2015, El-Goarany's family received a suicide letter and message from one of El-Goarany's ISIS associates indicating that El-Goarany had been killed while fighting for ISIS. (Tr. 737-38, 803-06, 1113-14).

On January 30, 2017, a jury convicted the defendant of all four counts in an Indictment charging him with providing material support and resources to a foreign terrorist organization, *i.e.*, ISIS, in violation of 18 U.S.C. § 2339B (Count One); conspiring to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B (Count Two); aiding and abetting the receipt of military-type training from ISIS, in violation of 18 U.S.C. §§ 2339D and 2 (Count Three); and conspiring to have another person receive military-type training from ISIS, in violation of 18 U.S.C. §§ 371 and 2339D (Count Four).

### B. The Defendant's Sentencing and Appeal

On December 18, 2018, this Court sentenced El Gammal to 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four, all to run concurrently. At sentencing, the Court stated that the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 292 to 365 months' imprisonment reflected "the considered thought of our legislators that these crimes be considered as seriously as possible." (Sentencing Tr. at 47). Considering the 18 U.S.C. § 3553(a) factors, including El Gammal's age and history of his involvement in the offenses, the Court sentenced El Gammal to a below-Guidelines term of 144 months' imprisonment, to be followed by three years of supervised release. (Sentencing Tr. at 49-50). In imposing sentence, the Court stated:

> I believe 12 years for [the defendant] is a serious sentence. I do believe that it adequately reflects his activities, his involvement in getting this young man to Syria, where he met an unfortunate death.

4

> I do believe that this crime is certainly the minimum sentence that can be imposed that would adequately reflect the values that are in Title 18, United States Code, Section 3553(a).

(Sentencing Tr. at 49-50).

El Gammal appealed his conviction, claiming, among other things, that the District Court erred in admitting certain evidence and in instructing the jury. *See United States v. El Gammal*, 19-468 (2d Cir.). On October 26, 2020, the Court of Appeals affirmed the defendant's conviction in a Summary Order. *See* Dkt. 234.

El Gammal is currently serving his sentence at FCI Phoenix in Phoenix, Arizona, and has a projected release date of November 13, 2025.

### C. The Defendant's BOP Medical Records

El Gammal's medical records obtained from the Bureau of Prisons ("BOP Medical Records"), attached hereto under seal as Exhibit A, indicate that El Gammal tested positive for COVID-19 on December 19, 2020 after having been exposed to COVID-19 on or about December 15, 2020. (Ex. A at 341, 381). The BOP isolated and monitored El Gammal for approximately ten days, consistent with the guidelines set forth by the Centers for Disease Control and Prevention ("CDC") and the BOP's policies and protocols relating to COVID-19. (Ex. A at 373). The medical records reflect no COVID symptoms during that quarantine period. (Ex. A at 361). On December 29, 2020, after El Gammal was examined and continued to exhibit no COVID-19 symptoms, the BOP released him back to the general prison population. (Ex. A at 373).

El Gammal's BOP Medical Records indicate that he is considered obese, with a body mass index of approximately 36.1. (Ex. A at 359). El Gammal is also receiving treatment for hypertension. His medical records further indicate that he smoked cigarettes (two packs per day) until approximately five years ago. (Ex.A at 355).

D. **The Defendant's Motion for Compassionate Release**

On December 21, 2020, El Gammal filed the instant motion seeking compassionate release in light of the COVID-19 pandemic, and a modification of his sentence "so that, as a condition of supervised release, his remaining term of imprisonment is replaced by an equal period of home incarceration, to be followed by the term of supervised release previously imposed by the Court." (Dkt. 237 ("Def. Mot.") at 1-2). The defendant cites as a basis for his motion the fact that he purportedly suffers from underlying conditions that he claims place him under increased risk for complications arising from the COVID-19 virus, namely, obesity, hypertension, and former tobacco use. (*Id.* at 2, 6-9). The defendant also cites his good behavior since incarceration and his "productive" contributions to the inmate community as further reasons why the Court should grant his motion for compassionate release. (*Id.* at 13). The defendant's December 21 motion does not cite his positive COVID-19 test result (which he did not receive until December 19).

## ARGUMENT

The Government respectfully submits that the Court should deny El Gammal's motion. In these circumstances – involving a terrorism defendant who facilitated a young man's path to train, fight, and die on behalf of America's enemies – the Section 3553(a) factors weigh overwhelmingly against release. As an initial matter, the Government acknowledges that El Gammal has established a potential basis for the Court to find that the threshold "extraordinary and compelling reasons" requirement has been met within the meaning of Section 3582(c). Under guidance issued by the CDC, the defendant's obesity and prior tobacco use render him at increased risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html (last updated Jan. 2, 2021).[1] However, El Gammal has already contracted COVID-19 and successfully recovered from the virus. Particularly against this backdrop, the Section 3553(a) factors weigh strongly and decisively against release. Indeed, permitting a terrorist facilitator like El Gammal to serve only half of his prison sentence would amount to extreme and unwarranted leniency and would severely undermine the objectives of sentencing that the Court rightly sought to achieve in imposing a term of 144 months' imprisonment.

**A. Applicable Law**

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As is relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

---

[1] While El Gammal has also been diagnosed with hypertension (Ex. A at 23, 44), individuals with hypertension only "*might* be at an increased risk for severe illness from the virus that causes COVID-19." *Id.* (emphasis added); *see also United States v. Serrano*, No. 18-CR-393 (LAK), 2020 WL 4340639, at *1 (S.D.N.Y. July 28, 2020) (holding that court was "not persuaded that the combination of defendant's hypertension and age of 55 years amounts to an extraordinary and compelling circumstance").

*Id.* A court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020). Although courts are not constrained by the relevant Sentencing Commission policy statement, it remains instructive. That statement provides that the BOP may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

While the Court is free to consider other circumstances as well, the Application Note describes some of the circumstances under which "extraordinary and compelling reasons" may exist:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at app. note 1(A).

As the proponent of the motion, the defendant bears the burden of showing that he is entitled to release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction.") (citing *Butler*); *United States v. Givens*, No. 14 CR 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (same).

Even if a defendant demonstrates that extraordinary and compelling reasons for compassionate release exist because, for example, he suffers from a qualifying medical condition, the Section 3553(a) factors must be considered and "[a] court is not required to reduce a sentence on compassionate release grounds." *United States v. Gotti*, 433 F. Supp. 3d 613, 619 (S.D.N.Y. 2020) ("The first Step Act was drafted using the word 'may,' not 'must.' In the end, whether to reduce a sentence is a matter that rests in the discretion of the court."); *see also United States v. Miranda*, No. 16 Cr. 128 (VAB), 2020 WL 2124604, at *4 (D. Conn. May 5, 2020) ("Courts have found during the coronavirus pandemic that, even where an individual has medical conditions which make him vulnerable to COVID-19, his danger to the community may ultimately outweigh his health concerns and the balance of factors weighs against release."); *United States v. Butler*, No. 19 Cr. 834 (PAE), 2020 WL 1689778, at *3 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release to defendant who had serious medical conditions in light of Section 3553(a) factors and danger defendant posed to community). "Before a court may grant an application for compassionate release, it must consider the Section 3553(a) factors to determine whether those factors outweigh the extraordinary and compelling reasons supporting compassionate release,

particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Merlo*, No. 17-cr-0738 (LAK), 2020 WL 3001039 at *3 (internal quotation marks and citation omitted). Indeed, whether "extraordinary and compelling reasons" exist is only "[t]he threshold question." *United States v. Daugerdas*, No. 09 CR 581 (WHP), 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020) ("[T]his Court's analysis does not end with a finding that 'compelling and extraordinary reasons' warrant compassionate release. This Court must also 'consider[] the factors set forth in section 3553(a).'"); *see also United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (explaining that a court confronted with a compassionate release motion must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances").[2]

### B. The Section 3553(a) Factors Compel Denial of the Defendant's Motion

The Section 3353(a) factors strongly outweigh any potential health risks that the defendant claims he might face from the COVID-19 virus as a result of his obesity and/or prior tobacco use. Indeed, the same factors that warranted El Gammal's substantial sentence of 144 months' imprisonment militate powerfully against release, particularly because he has served only slightly more than half of that sentence and has already contracted and recovered from the virus with no apparent symptoms or remaining health effects.

---

[2] The Government does not dispute that the defendant has exhausted his administrative remedies in connection with the instant motion pursuant to 18 U.S.C. § 3582(c)(1)(A). In particular, on December 3, 2020, the defendant filed a request for compassionate release to the Warden of FCI Phoenix. On December 17, 2020, the Warden denied that request.

As an initial matter, and as Judge Caproni recently held, "a defendant's successful recovery from COVID-19 weighs against granting that defendant compassionate release." *United States v. Marley*, No. 16 Cr. 374 (VEC), 2020 WL 7768406, at *2 (S.D.N.Y. Dec. 30, 2020) (citing *United States v. Delorbe-Luna*, No. 18 Cr. 384, 2020 WL 7231060, at *2 (S.D.N.Y. Dec. 7, 2020); *United States v. Randolph*, No. 14 Cr. 476-13, 2020 WL 7647197, at *1 (S.D.N.Y. Dec. 23, 2020)). Indeed, "[t]he science and data concerning reinfection rates and the period of immunity one enjoys after contracting COVID-19 is still developing, but it appears that the risk of contracting COVID-19 after having recovered from an initial bout of the illness is very low but not non-existent." *Marley*, 2020 WL 7768406, at *2 (citing *COVID-19: Reinfection*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html). "Nevertheless, the period of immunity after contracting COVID-19 seems to last for at least a period of months." *Id.* (citing S.F. Lumley et al., *Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers*, NEW ENGLAND J. MED. (Dec. 23, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2034545)). Accordingly, while the Government does not seek to diminish the concern that a positive test result may have caused, any COVID-19-related health risks that the defendant claims support his early release are now largely diminished, if not negated, at least for the near term and do not warrant a reduction in sentence. *See, e.g.*, *United States v. Adams*, No. 10-CR-82 (RJS), 2020 WL 4505621, at *3 (S.D.N.Y. Aug. 4, 2020) ("Given [the defendant's] apparent recovery and the minimal impact that COVID-19 appears to have had on him during his incarceration, [the defendant] has not established that his COVID-19 diagnosis, combined with his underlying health defects, will "substantially diminish[ ] [his] ability ... to provide self-care [in prison]."); *see also id.* (noting that the potential for "undetected adverse effects from COVID-19 in the future . . . is simply too speculative to warrant release"); *United States v. Decker*, No. 17-CR-0738 (LAK), 2020 WL 3268706, at *2 (S.D.N.Y. June 17, 2020)

11

(applying Section 3553(a) factors to deny compassionate release to inmate who had recovered from COVID-19 because "[h]owever remote or probable, the possibility of reinfection is speculative"); *United States v. Davis*, No. 12 Cr. 712 (SHS), 2020 WL 3790562, at *3 (S.D.N.Y. July 7, 2020) (denying compassionate release motion of inmate who had contracted and recovered from COVID-19).

In any event, irrespective of the defendant's recent positive test result and recovery, the applicable Section 3553(a) sentencing factors all strongly support the defendant's continued imprisonment and compel denial of his motion.

*First*, a reduction of El Gammal's sentence in favor of home confinement would be wholly inconsistent with the nature and seriousness of his offense conduct. As the evidence at trial established, El Gammal supported a brutal terrorist organization (ISIS) that has waged war against the United States and murdered thousands of innocent civilians, including Americans. As the Court noted at sentencing, the United States "has been engaged in a very costly, very lengthy war against terrorism [for] almost entirety of this century, and for that reason, these types of cases have to be taken very seriously." (Sentencing Tr. 47). In supporting ISIS over a period of years, El Gammal not only embraced its ideology but also participated in the radicalization of a 24-year-old citizen of this country and helped launch him on a path to join, fight, and ultimately die for the terrorist group. Few crimes could be more serious than providing such support to one of the United States' avowed enemies, and putting a young American citizen on the path to his death in the name of that terrorist group. The defendant worked to provide ISIS with a new recruit, likely contributed to acts of violence overseas, and helped to cause the recruit's death. As the Court stated at sentencing, "[t]he consequences of Mr. Gammal's conduct were tragic indeed," in that "[a] young man [] who had a very strong family, committed parents here in the United States, was able, with the help of [the defendant], to travel to Syria and work with an organization that this country has

determined to be a designated terrorist organization." (Sentencing Tr. 46).   Given the gravity of the defendant's conduct, the nature and seriousness of the defendant's offense counsel heavily and decisively in favor of denying his motion.  *See United States v. Mohammed Saleh*, No. 94 Cr. 181 (WHP) (S.D.N.Y. July 8, 2020), Dkt. 1168 at 10 (denying COVID-based compassionate release motion because the Section 3553(a) factors "weigh[ed] against granting" release of the defendant who "joined a terrorist conspiracy [of al Qa'ida] whose objective was the . . . killing of Americans in the name of jihad); *United States v. Monzer Al Kassar*, No. 06 Cr. 354 (JSR) (S.D.N.Y. Aug. 19, 2020), Dkt. 200 at 4-5 (denying COVID-based compassionate release motion based on the "monstrous" nature of the offense where defendant agreed to sell weapons to a designated terrorist organization, the Fuerzas Armadas Revolucionarias de Colombia (*i.e.*, the "FARC") and had "not yet even served half [of his] sentence").

*Second*, a reduction of El Gammal's sentence would severely undermine, if not eviscerate, the important deterrence objectives applicable in this case.  In imposing sentence, the Court stated that a sentence of 144 months was "certainly *the minimum sentence that can be imposed* that would adequately reflect the values that are in Title 18, United States Code, Section 3553(a)." (Sentencing Tr. at 49) (emphasis added).  Accordingly, any sentence of incarceration less than the one imposed by the Court would not adequately reflect the values and considerations applicable pursuant to Section 3553(a).  Indeed, to release a terrorist facilitator to home confinement after serving only approximately half of his sentence would send a harmful message – both to the defendant and the public at large – that his crimes were not sufficiently serious to require completion of his full sentence.  To release such a defendant nearly five years early would justifiably cause members of the public to doubt whether the legal system views El Gammal's crimes of terrorism with sufficient gravity and, accordingly, would fail adequately to deter others who might support violent terrorist organizations.  In light of the foregoing, El Gammal's release from prison would weaken and

seriously undermine the message of deterrence that the Court appropriately sent in imposing a sentence of 144 months' imprisonment. Releasing El Gammal after serving only about half of his 144-month sentence also would result in unwarranted sentence disparities with other recent cases involving defendants convicted of material support offenses based on traveling or facilitating travel to join and fight for ISIS overseas. *See, e.g.*, *United States v. Sajmir Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y. 2019), Dkt. 133, 135 (defendant convicted of attempting to provide material support to ISIS and passport fraud based on his efforts to travel and facilitate another supporter's travel to join ISIS in Syria sentenced to 264 months' imprisonment); *United States v. Adam Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y. 2019), Dkt. 60, 62 (defendant convicted of conspiring and attempting to provide material support to ISIS based on his successful facilitation of a U.S. citizen's travel to Syria to join ISIS and subsequent attempt to travel himself to join ISIS sentenced to 240 months' imprisonment).

*Third*, a reduction in El Gammal's sentence would contravene the compelling need to protect the public from further crimes. There is no evidence establishing that the defendant has completely renounced ISIS's violent ideology, and the risk that he will return to that ideology in the future is another factor further supporting denial of his motion. The fact that the defendant – who devoted himself to ISIS and its radical terrorist agenda – appears to have participated in positive inmate programs and avoided disciplinary infractions while incarcerated (*see* Def. Mot. at 13-14), hardly means that he no longer poses a significant risk to society and does not in any way support release in light of the gravity of his terrorism offenses. *See United States v. Meskina*, 319 F.3d 88, 92 (2d Cir. 2001) ("Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."). Moreover, the Court

already considered the defendant's participation in such programs and professed efforts to rehabilitate as part of its Section 3553(a) calculus when imposing a substantially below-Guidelines sentence just two years ago (*see* Sentencing Tr. at 49); any further reduction based on such arguments would be wholly unwarranted.  In addition, these concerns relating to the risk of recidivism would only become heightened if the defendant were allowed to serve the remainder of his sentence at home, where he would have greater ability to contact former co-conspirators and potentially to access the electronic postings and communications of radical jihadist terrorist groups like ISIS.  In short, given that the defendant fervently embraced and supported a terrorist group's violent ideology less than six years ago (during which time he expressed his support for ISIS's atrocities, including "beheading" and "torture" of its opponents), the sentence of incarceration previously imposed by the Court is still necessary to protect the public.

*Fourth*, and finally, the positive COVID-19 tests that have occurred among inmates at FCI Phoenix do not warrant the defendant's release to home confinement.  (*See* Def. Mot. at 2).  As of the filing of this brief, the BOP reports that there are 147 active positive inmate cases at the facility, and 307 inmates have recovered from the virus.  (The total prison population at FCI Phoenix is approximately 1,043 inmates.)  While these numbers reflect significant occurrences of COVID-19 at FCI Phoenix, the defendant's own recent contraction and recovery diminishes his risk of re-infection, and the serious health risks his motion forecasts and relies upon did not materialize, as he remained asymptomatic.  Indeed, even his release to home confinement would be unlikely to eliminate any remaining or residual risks, given that Arizona recently maintained the highest rate of COVID-19 spread of any state in the nation.  *See* David Baker, THE ASSOCIATED PRESS, *Arizona Has Highest Rate of COVID-19 Spread in the Nation*, Dec. 11, 2020 (https://www.azfamily.com/news/continuing_coverage/coronavirus_coverage/arizona-has-highest-rate-of-covid-19-spread-in-the-nation/article_355ab83c-3bfd-11eb-a0cd-

5f61070a2e3e.html) (last accessed Jan. 2, 2021).  These facts, together with the extensive measures that the BOP has taken and will continue to take to mitigate the spread and impact of the virus within federal facilities, further undermine and refute El Gammal's claim that his risk of contracting COVID-19 at FCI Phoenix warrants his immediate release.  *See United States v. Canales*, No. 16 CR 212 (LAK), 2020 WL 2319294, at *3 (S.D.N.Y. May 9, 2020) ("although the defendant is at risk of contracting COVID-19 if he remains detained at the MCC, he would be at risk even if he were to be sentenced to home confinement") (footnote omitted).

In sum, the basis for the Court's conclusion just two years ago that 144 months' imprisonment was the appropriate sentence remains sound.  The sentenced imposed – below the applicable Guidelines range of 292 to 365 months' imprisonment – appropriately reflected the gravity of El Gammal's conduct, and took into account his history and characteristics.[3]  Reducing El Gammal's sentence to approximately half of what he was sentenced to serve would undermine these sentencing goals.  Indeed, judges in this District have denied similar motions where, as here, the Section 3553(a) factors weighed against modifying the defendant's sentence, even in the presence of medical issues such as residual symptoms of COVID-19 (of which there is no indication here).  *See, e.g.*, *United States v. Zubkov*, 460 F. Supp. 3d 450, 452 (S.D.N.Y. 2020) (denying compassionate release motion of defendant who tested positive for COVID-19 and then claimed that he "ha[d] not fully recovered" because he "continuously cough[ed] blood, ha[d] blood [in his stool], and suffer[ed] from a respiratory condition that ma[de] it difficult for him to breathe"); *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y.

---

[3] El Gammal complains about his period of pretrial incarceration, arguing that the Court should factor the conditions of his pretrial detention into its assessment of his current motion for compassionate release.  (*See* Def. Mot. at 15).  But those arguments were already made at sentencing (*see* Sentencing Tr. at 29), and considered by the Court in imposing its below-Guidelines sentence of 144 months' imprisonment.

Apr. 2, 2020) (denying a request to reduce a sentence of 33 months' imprisonment to home confinement for 72-year-old defendant deemed by BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing"); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020); *cf. United States v. Nunez*, No. 20 Cr. 239 (ER) (S.D.N.Y. Apr. 10, 2020) (rejecting bail application based on COVID-19 and noting that "because there is a pandemic does not mean that the jailhouse doors ought to be thrown open.").

## **CONCLUSION**

For the foregoing reasons, El Gammal's motion should be denied.

Dated: New York, New York
January 4, 2021

                              Respectfully submitted,

                              AUDREY STRAUSS
                              Acting United States Attorney

By:   \_/S/_____
        Andrew J. DeFilippis
        Negar Tekeei
        Assistant United States Attorneys
        One St. Andrew's Plaza
        New York, New York 10007
        Tel. No.: (212) 637-2231/2482