# JEREMY GUTMAN

### ATTORNEY AT LAW
### 40 FULTON STREET, 23RD FLOOR
### NEW YORK, NEW YORK 10038

(212) 644-5200                                                                    E-MAIL: JGUTMAN@JEREMYGUTMAN.COM

January 8, 2021

**By ECF**

Hon. Edgardo Ramos
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    United States v. El Gammal
              15 Cr. 588 (ER)

Dear Judge Ramos:

On behalf of my client, Ahmed Mohammed El Gammal, I am writing in reply to the government's memorandum in opposition to our application for compassionate release ("Govt. Mem.").

The government does not dispute that Mr. Gammal has exhausted administrative remedies and acknowledges that, in the context of the current pandemic, his underlying medical conditions support a finding of "extraordinary and compelling reasons" within the meaning of 18 U.S.C. § 3582(c). *See* Govt. Mem, pp. 6 and 10, n.2. *See also id*. at 15 (recognizing that the numbers reported by the BOP "reflect significant occurrences of COVID-19 at FCI Phoenix"). Its opposition centers on the contention that, in light of his recent recovery from Covid-19, the Section 3553(a) sentencing factors weigh against the limited form of relief sought in our application.[1]  For the reasons that follow, we urge the

---

[1]Medical records from FCI Phoenix indicate that, based on a sample collected on December 16, 2020, a positive Covid-19 test result was reported for Mr. Gammal on December 19, 2020, that he was quarantined for a period of ten days with no reported symptoms, and that he was returned to the general population on December 29, 2020. I received no communications from Mr. Gammal during this period and first learned of

(continued...)

Hon. Edgardo Ramos
January 8, 2021
Page 2

Court to conclude that, because Mr. Gammal continues to face a significant risk of severe illness or death from Covid-19, removing him from a prison that is rife with coronavirus infections and placing him on strict home confinement would be consistent with the purposes of the sentencing statute.

### A.     Mr. Gammal Remains at Risk of Reinfection and Attendant Complications

The government asks the Court to find that, because Mr. Gammal has tested positive for Covid-19 and appears to have recovered without incident, the concerns that gave rise to the present application have been allayed. Govt. Mem., pp. 11-12. In support of that argument, the government cites, *inter alia*, a recent decision in which Judge Caproni, despite recognizing that "the science and data concerning reinfection rates and the period of immunity one enjoys after contracting COVID-19 is still developing," concluded that the likelihood of an inmate's reinfection was so low that relief pursuant to 18 U.S.C. §3582(c)(1)(A) was not warranted. *See United States v. Marley*, 2020 WL 7768406, at *2 (S.D.N.Y. Dec. 30, 2020). To be sure, in this and other cases noted by the government, some courts have relied on preliminary findings about the incidence of reinfection as a ground for denying requests for compassionate release.

Other courts, however, have recognized that the current state of scientific evidence falls far short of establishing that a vulnerable defendant is out of danger following an initial infection. In *United States v. Staats*, 2020 WL 6888224 (E.D. Pa. Nov. 24, 2020), for example, the court cited studies supporting its decision to grant relief notwithstanding a positive test:

> At the beginning of the pandemic, the World Health Organization reported that "there is currently no evidence that people who recovered from COVID-19 and have antibodies are protected from a second infection."[2] Months later, there is

---

[1](...continued)
these circumstances subsequent to the filing of our application, when the government apprised me of them after receiving medical records from BOP on December 30, 2020.

[2][Footnote 23 in original] *'Immunity passports' in the context of COVID-19*, World Health Organization (Apr. 24, 2020) https://www.who.int/news-room/commentaries/
(continued...)

Hon. Edgardo Ramos
January 8, 2021
Page 3

    still no scientific consensus on the dangers of reinfection.[3]
The government concedes this point. Resp. at 16.[4] Cases of
reinfection have been documented in Brazil, Sweden, Mexico,
the Netherlands, and Qatar[5]. As the virus continues its spread,
scientists believe cases of reinfection "could become more
common over the next couple of months as early cases begin
to lose their immunity."[6] Some cases of reinfection have been
far more severe than the initial infection.[7] Because Mr.
Staats's underlying conditions could mean that a second
infection may be more severe or even fatal, the fact he has
tested positive for the virus is not a reason to deny its release.
*See United States v. Babbitt*, 2020 WL 6153608, at *8 (E.D.
Pa. Oct. 21, 2020) (Savage, J.) (noting the risk of re-infection
when granting compassionate release for child pornography
offender who had previously tested positive for COVID-19
while in prison).

2020 WL 6888224, at *5.

---

[2](...continued)
detail/immunity-passports-in-the-context-of-covid-19.

[3][Footnote 24 in original] *See* Jop de Vrieze, *More people are getting COVID-19
twice, suggesting immunity wanes quickly in some*, Science (Nov. 18, 2020),
https://www.sciencemag.org
/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quic
kly-some.

[4][Footnote 25 in original] "We cannot say that the defendant no longer faces any
risk, given that there is not yet a scientific consensus on reinfection." Resp. at 16.

[5][Footnote 26 in original] *See* de Vrieze, *supra* note 21.

[6][Footnote 27 in original] *Id*.

[7][Footnote 28 in original] *Id.* ("Not all reinfections seen so far are milder.").

Hon. Edgardo Ramos
January 8, 2021
Page 4

Similarly, surveying the state of scientific understanding as of late December, a district court in Michigan rejected the government's suggestion that a defendant's risk of reinfection should be discounted:

> As the government points out, some studies have indicated that reinfection is rare. Apoorva Mandavilli, *Immunity to the Coronavirus May Last Years, New Data Hint*, New York Times (November 17, 2020), https://perma.cc/F5J3-CXBF. However, information is sparse and cases of COVID-19 reinfection are beginning to appear with greater frequency. Joshua Cohen, *Though Rare, The Number of Reinfections With Covid-19 Is Growing*, Forbes (November 16, 2020), https://perma.cc/QG5K-6P52; Brenda Goodman, *Study Confirms It's Possible to Catch COVID Twice,* WebMD (Aug. 24, 2020), https://perma.cc/YCA2-RAU4. Further, there have been documented cases where reinfection has led to more severe symptoms than the first COVID-19 infection. Abantika Ghosh, *US reports first case of Covid reinfection with more severe symptoms second time*, ThePrint (Oct. 13, 2020), https://perma.cc/M4V4-WGU7.

*United States v. Coates,* 2020 WL 7640058 (E.D. Mich. December 23, 2020).

Acknowledging the limits of its own understanding, the Centers for Disease Control ("CDC") currently cautions against relaxation of protective measures for those who have survived Covid-19:

> The immune response, including duration of immunity, to SARS-CoV-2 infection is not yet understood. Based on what we know from other viruses, including common human coronaviruses, some reinfections are expected. Ongoing COVID-19 studies will help establish the frequency and severity of reinfection and who might be at higher risk for reinfection. At this time, whether you have had COVID-19 or not, the best ways to prevent infection are to wear a mask in public places, stay at least 6 feet away from other people,

Hon. Edgardo Ramos
January 8, 2021
Page 5

> frequently wash your hands with soap and water for at least
> 20 seconds, and avoid crowds and confined spaces.[8]

In view of the current uncertainty about the operation of this virus (as well as its emerging
mutations and variants), we urge this Court to adopt an approach like that taken in *United
States v. Yellin*, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020). There, the court
announced that it would "not presume to have more information than the experts
researching this virus" and determined that, "[w]ithout scientific conclusions as to
whether reinfection is possible or how long COVID-19 immunity lasts, the Court must err
on the side of caution to avoid potentially lethal consequences for [the defendant]."

Such caution is particularly appropriate in view of the fact that, to the extent that
reinfection data has been considered in scientific papers and studies, it has not been in the
context of prison environments. As discussed in our opening memorandum, the unique
congregate housing arrangements of prisons are widely understood to make them
"powder kegs for infection.*" United States v. Salvagno*, 456 F.Supp.3d 420, 426
(S.D.N.Y. 2020). That description is particularly apt for an institution like FCI Phoenix,
where (based on the numbers of active and recovered cases reported in the government's
memorandum at page 15), 455 out of 1043 inmates have tested positive.[9] *See United
States v. Clayton*, 2020 WL 7404637, at *4 (D.Ariz. December 17, 2020) (after noting the
number of coronavirus cases at FCI Phoenix as of mid-December [over 200], court
concludes that "Defendant's fear of contracting the virus is real and not merely a general
concern").

Given the frightening rapidity with which infections have spread at FCI Phoenix
over the past few weeks, it is audacious for the government to suggest that the Court and
Mr. Gammal should take comfort in "the extensive measures that the BOP has taken and
will continue to take to mitigate the spread and impact of the virus within federal
facilities" or that he would face comparable risks while subject to home confinement.

---

[8]Response to the question "Can people who recover from Covid-19 be reinfected
with SARS-CoV-2?" at https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html
(updated January 7, 2021).

[9]According to a December 28, 2020, press release announcing the Covid-related
death of an inmate at FCI Phoenix (submitted as an exhibit to this letter), the total number
of inmates at that facility is 893; if that number is correct, it would mean that coronavirus
infections have spread to well over half of the inmate population.

Hon. Edgardo Ramos
January 8, 2021
Page 6

Govt. Mem., pp. 15-16. It might have been reasonable to rely on such assurances last October, when there were only four reported cases at FCI Phoenix. *See United States v. Nelson*, 2020 WL 6275232 (D.N.H October 26, 2020) (denying motion for compassionate release based on finding that "the BOP has a mitigation plan in place that appears largely successful in controlling the spread of the virus at FCI Phoenix"). It is anything but reasonable to continue to rely on such an assurance in the face of the stark numbers – not to mention Mr. Gammal's personal experience – demonstrating the failure of the BOP's mitigation efforts.

Despite the BOP's recognition that Mr. Gammal's medical profile puts him at heightened risk, it failed to protect him from exposure to the coronavirus. Although he has thankfully survived that exposure without adverse results, there is no reason to presume that he will not be reinfected if he remains at FCI Phoenix or that a second infection will not precipitate the dire consequences about which the CDC warns with regard to individuals with Mr. Gammal's underlying conditions.

**B.    A Sentence That Substitutes Home Confinement for Incarceration Will Accomplish the Purposes of Section 3553(a)**

Prior to sentencing, the parties submitted memoranda that thoroughly discussed the nature and circumstances of the offense. In those memoranda, the defense cited instances in which defendants convicted of the same or similar offenses received sentences ranging from 18 to102 months (ECF Doc. 226, pp. 38-40), while the government pointed to cases where defendants were sentenced at or near the statutory maximum (ECF Doc. 227, pp. 30-31). Because our present motion presupposes that the Court's assessment of the relative "seriousness of the offense" reflects a well-considered review of those presentations and is unlikely to change at this point, the government's rehashing of its arguments on that subject is largely beside the point. As our opening memorandum emphasized, Section 3553(a)(2)(A) requires consideration not only of the "seriousness of the offense," but also of what constitutes "just punishment" and our motion urges the Court to conclude that, in view of pandemic's impact on the nature of his sentence to date as well as its threat to his health and survival, the modification we seek will result in a sentence that remains sufficient to accomplish that subsection's purposes.[10]

---

[10]Contrary to the government's suggestion, the cases it cites in which

(continued...)

Hon. Edgardo Ramos
January 8, 2021
Page 7

       The government's characterization of the requested relief as allowing Mr. Gammal to serve "approximately half" of his sentence does not realistically depict the practical effect of the modification we propose. As discussed in our opening memorandum, at page 12, he would be eligible for a halfway house a year before his projected release date and, if he were permitted to participate in the BOP's drug treatment program as recommended by his counselors, he would be eligible for a one-year reduction of his sentence. Thus, granting our application would shorten his period of full-fledged institutional custody by only three years. Furthermore, the government's discussion of the impact of the requested relief fails to recognize that home confinement entails substantial and punitive restrictions of a defendant's liberty. *See United States v. Brady*, 2004 WL 86414, at *9 (E.D.N.Y. January 20, 2004) ("The special condition of three months in home confinement further punishes Brady for her crime").

---

[10](...continued)

compassionate release applications of defendants convicted of terrorism-related offenses were denied do not support the contention that the seriousness of Mr. Gammal's offense weighs "decisively" in favor of rejecting the present motion. *See* Govt. Mem., p. 13. The defendant in *United States v. Monzer Al Kassar,* No. 07 Cr. 354 (JSR), was an international arms dealer with a long history of illicit conduct who, at enormous profit to himself, sold "huge quantities" of the "most serious weapons" to a terrorist organization that he knew intended to use them to kill Americans. *Id.*, ECF Doc. 200, p. 4. In *United States v. Mohammed Saleh*, No. 93 Cr. 181 (WHP) (S.D.N.Y. July 8, 2020), ECF Doc. 1168, the defendant was convicted of seditious conspiracy to wage war against the United States based on his participation in an attempt to bomb bridges and tunnels in New York City and he was incarcerated at an institution where there were no reported cases of Covid-19. *Id*, pp. 6,10. The denial of those defendants' applications (which, unlike the present one, sought outright release, not home confinement) hardly demonstrates that the seriousness of a terrorism-related offenses necessarily forestalls a grant of compassionate release. *Cf. United States v. El Hanafi*, 460 F.Supp.3d 502, (S.D.N.Y. 2020) (releasing defendant convicted of providing material support to Al Qaeda 33 months before end of his sentence notwithstanding that his offense was "exceptionally serious"); *United States v. Ferizi*, 16 Cr. 402 (LMB) (E.D. Va. December 3, 2020), ECF Doc. 105 (reducing 240-month sentence to time served after defendant had been incarcerated for five years, notwithstanding the seriousness of his offense, which consisted of providing identifying information about American citizens on an ISIL "kill list").

Hon. Edgardo Ramos
January 8, 2021
Page 8

The government also ignores our argument that conditions arising from the pandemic have made Mr. Gammal's incarceration "harsher and more punitive than would otherwise have been the case." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. September 30, 2020), quoted in our opening memorandum at pages 12-13. It notes that the difficult conditions of his pretrial incarceration have already been taken into account, Govt. Mem., p. 16, n.3, but fails to address our contention that, because of the lockdown conditions imposed at FCI Phoenix in response to the pandemic, his overall time in federal custody has continued to entail a degree of punishment that exceeds what would have been contemplated when his sentence was imposed and that cannot be measured solely in terms of the number of months served. Notwithstanding the government's hyperbolic declaration that the proposed modification would "severely undermine, if not eviscerate" the goal of affording adequate deterrence to criminal conduct [§3553(a)(2)(B)], it is fanciful to suppose that an individual contemplating the reality of what Mr. Gammal has endured as a consequence of his crimes, and the continued restrictions he would face after the proposed modification, would not view them as a deterrent.

The government's suggestion that granting the requested relief "would contravene the compelling need to protect the public from further crimes" [Govt. Mem., p. 14] flies in the face of this Court's declaration that "I do not believe that after he is released from prison, Mr. Gammal will commit another crime, much less commit a crime of terrorism." Sentencing transcript, p. 49.[11] The defense sentencing memorandum, with the support of an expert report and other evidence, explained why Mr. Gammal did not bear "indicators of radicalization" and why his offense-related conduct was aberrational and unlikely to recur. ECF Doc. 226, p. 4. The government did not contradict the assertion in that memorandum that he had resisted inducements to radicalization to which other inmates housed with him at MCC succumbed, *id*., nor does it point to any conduct since the time of his sentencing that should alter the Court's prior determination that Mr. Gammal presents little risk of recidivism.

**Conclusion**

Because there are extraordinary and compelling reasons for the sentencing modification we propose and because it will serve the purposes delineated in Section 3553(a), Mr. Gammal's motion for compassionate release should be granted.

---

[11]A copy of the transcript is attached as an exhibit to this letter.

Hon. Edgardo Ramos
January 8, 2021
Page 9

Respectfully,

 /s/
Jeremy Gutman
*Attorney for Defendant*
*Ahmed Mohammed El Gammal*