ICIAAELG1                    Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          15 CR 588 (ER)

5   AHMED MOHAMMED EL GAMMAL a/k/a
    JIMMIE GAMMAL,
6
                 Defendants.
7
    ------------------------------x
8
                                       New York, N.Y.
9                                      December 18, 2018
                                       3:00 p.m.
10

11  Before:

12                      HON. EDGARDO RAMOS,

13                                      District Judge

14
                        APPEARANCES
15
    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  NEGAR TEKIE
    BRENDAN QUIGLEY
18  ANDREW DEFILIPPIS
             Assistant United States Attorney
19
    MEGAN BENETT
20  DONALD DUBOULAY
         Attorneys for Defendant Gammal
21

22

23

24

25

ICIAAELG1                      Sentence

1              (Case called)

2              MS. TEKEI:  Negar Tekei, Brendan Quigley and Andrew

3     DeFilippis, on behalf of the United States.

4              MS. BENETT:  Good afternoon, Judge Ramos.

5              Megan Benett and Don DuBoulay on behalf of our client,

6     Ahmed El Gammal.

7              And for the record, in the audience today are his

8     mother, his former spouse, as well as his former attorney from

9     the Federal Defenders office.

10             THE COURT:  Good afternoon to you all.

11             This matter is on for sentencing and in preparation

12    for today's proceedings I reviewed the following:

13             I've reviewed the presentence report dated December 4,

14    2018, prepared by the U.S. Probation Officer Johnnie Kim which

15    includes a recommendation.  I've also reviewed a sentencing

16    memorandum submitted by defense counsel, dated December 7 which

17    includes letters from Mr. El Gammal's family and friends;

18    videotaped interview of Mr. El Gammal' mother, along with a

19    translation; family photos; forensic evaluation of Mr. El

20    Gammal prepared by Dr. Michael First; information concerning a

21    recent history of Egypt; Mr. El Gammal's medical records from

22    the MDC; a certificate and performance appraisal of Mr. El

23    Gammal.  And yesterday evening I received a letter from defense

24    counsel dated December 17 which includes some additional

25    photographs and additional certificate and performance

ICIAAELG1                    Sentence

1    appraisal and a letter from Ms. El Gammal's former

2    mother-in-law, Ms. Sherry Dubrow.  To be honest I've been on

3    trial and I haven't had a chance to compare Ms. Dubrow's prior

4    letter and this current letter.  Is there any difference?

5             MS. BENETT:  There is one paragraph, I think it's the

6    penultimate paragraph in the letter submitted yesterday which

7    is at document 228-3 page three.  That provides a little more

8    flavor about the ways that Mr. Gammal had helped her daughter.

9    That's 228-3 at page three.

10             THE COURT:  OK.  And I have reviewed the government's

11    submission dated December 13, 2018.  Is there anything else

12    that I should have received or reviewed?

13             MS. BENETT:  I just want to make sure that the first

14    exhibit to what I filed last night the Court has was Mr. El

15    Gammal's letter.

16             THE COURT:  I do the Mr. El Gammal's letter, yes.

17             Anything else that I should have received?

18             MS. TEKEI:  No.  Thank you, your Honor.

19             THE COURT:  I am taking the letter -- how do you go by

20    "Wolf Benett" or "Benett"?

21             MS. BENETT:  "Benett" is fine.

22             THE COURT:  Thank you.

23             Anything else that I should have received?

24             MS. BENETT:  No, your Honor.

25             THE COURT:  Let's talk about the sentencing

ICIAAELG1                          Sentence

1    guidelines.

2              Ms. Benett, do you continue to challenge the

3    imposition of the two enhancements?

4              MS. BENETT:  We do.  We believe that neither Section

5    3A1.4.2M, nor 2M5.3(b)(1) applied here.  I think that to my

6    mind 2M5.3(b)(1) is an easier argument for the defense.  And in

7    fact, the government's response on that point and I think

8    illustrates the problem of the application here.  Specifically,

9    the -- sorry, not -- yeah, the 2M5.3(b)(1) two point

10   enhancement which requires that the offense include the

11   provision of dangerous weapons, firearms, explosives or funds

12   with the intent, knowledge and reason to believe that the funds

13   would be used to purchase those items or funds or material

14   support with intent knowledge or reason to believe.

15             THE COURT:  Two requests.  Can you slow down a little

16   bit and move the microphone closer to you.

17             MS. BENETT:  Yes.  So if the Court looks at

18   2M5.3(b)(1), there are five separate subsections.  I don't

19   think there's any question that "A", "B", "C" and "D" were not

20   involved that were there was no provision of weapons, firearms

21   explosives or funds in this case.  So then the question would

22   be whether under subsection "E" funds or other material support

23   provided the intent, knowledge or reason that they would be

24   used to commit a violent act.  And certainly, I don't think we

25   need to re-litigate the trial but in summary the trial was

1    about the facilitation of Samy El-Goarany's travel to Syria to

2    join the Islamic state.  There was no testimony at trial

3    concerning whether Samy was known or expected to engage in a

4    specific violent act, whether Mr. El Gammal had any knowledge

5    that Samy would engage in a specific violent act.  And just

6    don't think that there has been sufficient proof proffered to

7    warrant the application of that two-point enhancement.

8         THE COURT:  Wasn't the government's theory -- and

9    obviously they'll speak to it -- wasn't the government's theory

10   that Mr. El Gammal facilitated el-Goarany's travel to Syria so

11   join ISIS and to fight with ISIS?

12        MS. BENETT:  Our position is that the enhancement

13   doesn't apply merely for traveling and joining ISIS but rather,

14   there needs to be a specific intent on the part of the offender

15   to believe that the material support which is here helping Samy

16   el-Goarany, that that material support was going to be used for

17   a specific violent act, not merely joining in a foreign

18   terrorist organization but engaging in a violent act.

19   Otherwise, this would be wholly duplicative if the material

20   support, the provision of material support to join an FTO is

21   enough to warrant this two-point application there would be no

22   circumstance under which it would not apply when 3A1.4 also

23   applies.  That is the nature of provision of material support.

24        THE COURT:  So are you saying that it does not apply

25   unless Mr -- at lease in this case -- unless Mr.  El Gammal

1    facilitated Mr. el-Goarany's travel to join ISIS and

2    participate in a particular event, particular attack, bombing,

3    beheading, whatever, before this provision applies?

4         MS. BENETT:  Well, the provision itself specifically

5    refers to the provision of the material support with the

6    intent, knowledge or constructive knowledge, reason to believe

7    that the material support would be used in the commission of a

8    violent act.  It has to be used.  The pertinent offender must

9    know and intend or have reason to know that the material

10   support would be used in the furtherance of a violent act.

11        So there is certainly testimony during the trial that

12   Samy had many reasons for traveling and joining ISIS and I

13   don't think there is any.  We are not contesting, obviously,

14   that Samy was traveling to Syria in order to join the Islamic

15   state.  But whether Mr. Gammal had knowledge that Samy intended

16   to engage in a particular violent act, the trial evidence

17   doesn't support the application of the guideline under the

18   clear language of the guideline.  And it has to be more because

19   otherwise the sentencing commission has created separate

20   guidelines that apply to the exact same conduct.

21        THE COURT:  I just want to understand the outlines of

22   your argument.  So, are you saying that it's not enough, for

23   example, again, in this particular case, for Mr. El Gammal to

24   have facilitated the young man's travel even if Mr. El Gammal

25   knew not just that he was traveling to Syria to join ISIS but

1    to fight with ISIS, to fight for ISIS, that would not be

2    enough?

3         MS. BENETT:  I think that it would depend on what the

4    specific knowledge was about Samy el-Goarany's intent to be

5    engaged as an ISIS fighter and ISIL fighter.

6         THE COURT:  And you are saying that there wasn't

7    sufficient evidence at trial to establish that Samy el-Goarany

8    went to Syria to become an ISIL fighter?

9         MS. BENETT:  No.  I think that you would have to have

10   that in joining the Islamic state, his intent was specifically

11   to engage in violent acts, not -- I think it's certainly

12   possible to be taking this out of the context of the Islamic

13   state or Syria it's certainly possible to join a militia of

14   some sort for a variety of reasons, one of which may be to

15   engage in an act of violence.  And another may be to engage in

16   conduct that you believe is religiously mandated that you are

17   compelled to do because of your religious fate.  And both of

18   those may get the person to the same place.  They may cause

19   that person to join a militia that engages in violence but they

20   don't both show the same specific intents to engage in a

21   violent act.

22         THE COURT:  OK.  Ms. Tekei or Mr. DeFilippis.

23         MR. DEFILIPPIS:  Yes, your Honor.  So I think the

24   defense is mistaken both on the legal requirements and on the

25   factual application of the proof at trial to the sentencing

ICIAAELG1                      Sentence

1   guideline.

2          First on the legal requirement, the Fourth Circuit

3   which is we think persuasive authority here has said

4   specifically, that this guidelines revision does not require

5   that support be traced to or designed to lead to a specific act

6   of violence but rather that the defendant be shown to have

7   intended, known or had reason to believe that their support

8   would be used to assist in acts of violence by the terrorist

9   organization.  And that case, your Honor, which is United

10  States v. Dirany 896 F.3d 295 involved in fact someone who was

11  not a fighter at all but provided funds to a terrorist

12  organization with the intent to those funds go towards its

13  military activities.

14         So I think as a baseline, your Honor, there is no feed

15  to prove a direct causal link, a direct knowledge of the

16  precise act of violence in which the individual is to engage

17  in.

18         But turning to the facts of this case, I think that

19  threshold is clearly met here for a number of reasons.  First,

20  Mr. El Gammal certainly knew that Mr. el-Goarany was going to

21  join ISIS.  He knew that he was going to do so in Syria which

22  is a war zone.  And he knew that he was going to do so in order

23  to be fighter.  That is the only reason why young men from

24  around the world were at this time flocking to Syria to join

25  ISIS.

1          And it's completely consistent, your Honor, with the

2     proof of what he did when he actually got there.  We saw a

3     video of him in military fatigues.  We saw a photograph of him

4     with a semiautomatic firearm.  And we heard from an expert,

5     Mr. Zellen testified that all ISIS members upon arriving in

6     Syria receive religious indoctrination and military training.

7          So the entire purpose of this conspiracy, the

8     conspiracy both to provide material support and for Mr. El

9     Gammal to receive military training were geared towards his

10     ability and his desire to engage in acts of violence.

11          And I think the milliary training count is

12     particularly relevant there, your Honor, because if we concede

13     as we must that the jury found Mr. El Gammal guilty on that

14     count again, the entire object of that conspiracy was for

15     Mr. el-Goarany to join ISIS as a fighter and as a fighter the

16     entire purpose is to carry out acts of violence for ISIS.

17          THE COURT:  Does it matter whether he's joining an

18     ISIS army, if you will, in order to defend territory or to take

19     territory?

20          MR. DEFILIPPIS:  No, your Honor.  ISIS' aims are

21     twofold.  In that regard they do intend to defend their

22     Caliphate but they also have expansionist vision.  So they've

23     called for the toppling of governments in the Middle East and

24     attacks on western countries who oppose their policies.

25          So the guidelines provision imposes no specificity on

ICIAAELG1                    Sentence

1    the type violence.  It simply says an act of violence.  And so

2    whether Mr. el-Goarany intended to fight to preserve the

3    Caliphate or to expand it, he would still fall squarely within

4    the guidelines provision there.

5            And I would note that this was all confirmed to be a

6    part of the conspiracy and the defendants' plan when they

7    exchanged private messages over social media upon his arrival

8    there.  And after reporting home to his brother that he

9    received military training after producing a photograph of

10   himself with a firearm, he told Mr. El Gammal that everything

11   was going, quote, according to plan.

12           And so that, your Honor, counsel's strongly in favor

13   of a conclusion certainly by a preponderance of the evidence

14   that the plan was for Mr. el-Goarany to train and fight as an

15   ISIS fighter.  And of course the jury saw and we all saw on his

16   martyrdom letter which was the culmination of that plan when he

17   died fighting for the Islamic state.

18           I would note, your Honor, although we didn't have this

19   in our submission, our principle theory for the applicability

20   of this provision is the act of violence sub provision.  But I

21   think the government would also contend that the dangerous

22   weapons or firearms or explosives provisions also are

23   applicable here because the language of the provision does not

24   require that the defendant provide such items to Mr. El Gammal.

25   It simply states that it involved the provision of such items.

1          And here upon his arrival in Syria, Mr. El Gammal did

2     receive a firearm.  There's a photograph of that.  He received

3     military training.  So while it's not the government's primary

4     argument, I think also, your Honor, by a preponderance the

5     offense did involve the provision of one or more of those

6     materials.

7          So I think this case falls squarely, your Honor, in

8     the are heartland of what this provision was seeking to punish

9     which is when someone goes and commits an act of terrorist

10    violence with the assistance of another person and that's

11    reasonably foreseeable to the defendant, the provision applies.

12         THE COURT:  And as I recall -- and correct me if I'm

13    wrong -- the testimony at trial by at lease the expert, if not

14    others, was that at this point in time I had already declared

15    war, if you will.

16         MR. DEFILIPPIS:  You had, your Honor.

17         THE COURT:  Very well.  I do find that this

18    enhancement is applicable.  Each subsection -- I don't think we

19    need to get into the others -- says that funds or other

20    material support or resources would be intent, knowledge or

21    reason to believe that they are to be used to commit or assist

22    in the commission of a violent act requires a two level

23    enhancement.

24         Certainly, my view is of the case at trial could be

25    established easily by a preponderance of the evidence was that

ICIAAELG1                         Sentence

1   Mr. El Gammal engaged in this activity with Mr. el-Goarany

2   knowing that Mr. el-Goarany was very incentivized to travel to

3   Syria in order to fight, to become a fighter with ISIL, an

4   organization that has been deemed to be a foreign terrorist

5   organization, an organization that had declared war against the

6   United States and others and that Mr. El Gammal knew that

7   Mr. el-Goarany was going to willingly engage in acts of

8   violence.  And so, I do find that by at least certainly a

9   preponderance of the evidence the enhancement applies.

10          Ms. Benett.

11          MS. BENETT:  That's obviously over defense's objection

12   to the application.

13          THE COURT:  Please keep your voice up.

14          MS. BENETT:  Moving onto 3A1.4, as we set forth in our

15   sentencing memo the government presented a theory to the jury

16   that had not been argued during their summation that the jury

17   did not need to find that Mr. Gammal had actual knowledge

18   following the dispute between the parties over the conscious

19   avoidance instruction, relied heavily on the conscious

20   avoidance instruction in their summation to the jury in support

21   of their argument that Mr. El Gammal had reason to know.  Even

22   if he individually, if there was not sufficient direct evidence

23   of his actual knowledge, given the universe of information that

24   was around him, he would have had to be consciously avoiding

25   and understanding what Samy's -- there was all the testimony

ICIAAELG1                          Sentence

1    about Samy's disassembling about going for humanitarian

2    purposes or going to volunteer at the border with refugees came

3    out during trial.  He told that to family members.  He told

4    that to his friends.  And the government's theory in response

5    to that was, well, you'd have to be consciously avoiding Samy's

6    true purpose in order to embrace this humanitarian motivation

7    for his travel.

8             The terrorism guideline, the Second Circuit has held

9    that 3A1.4 requires some intent that the defendant's conduct

10   was calculated to influence or affect the conduct of that

11   government and that that required, that must require, that

12   necessarily must require more than conscious avoidance.  Since

13   I would say that our primary argument on this enhancement is

14   that there is an expressed conflict between the conscious

15   avoidance evidence here and the scienter requirement of the

16   terrorism enhancement.

17            THE COURT:  Mr. DeFilippis.

18            MR. DEFILIPPIS:  Your Honor, again, we disagree with

19   the defense on both fronts.

20            First, as to the legal requirement, courts including

21   the Second Circuit and in United States v. Reyes 302 F.3d 48,

22   have made clear deliberate ignorance or what's commonly called

23   conscious avoidance and positive knowledge are equally

24   culpable.  So in other words, just because someone knows of the

25   objective of a conspiracy but simply avoids confirming it by

ICIAAELG1                         Sentence

1    refusing to ask a precise question or learn a precise fact,

2    those are under the law equally culpable.

3            And it's for that reason that all of the circuits have

4    also said that a willful blindness instruction is and should be

5    applied in appropriate cases where the legal requirements are

6    for a finding ever specific intent, the statute that have

7    heightened intent requirements.

8            So we think both of those well settled principles of

9    law make it clear here, your Honor, that just because the

10   guidelines provision requires intent that the act be geared

11   towards affecting the conduct of a government or retaliating

12   against government conduct, legally seeking under those

13   principles the application of willful blindness instruction

14   makes no difference, whatsoever.

15           I would note factually, your Honor, that here, we

16   think certainly well beyond a preponderance the evidence at

17   trial proved that Mr. El Gammal knew full well what

18   Mr. el-Goarany was doing, as your Honor I think just found with

19   regard to the other provision.  But more importantly both

20   Mr. El Gammal and Mr. el-Goarany were very much geared towards

21   and expressed on numerous occasions their personal desires to

22   affect the government conduct and retaliate for government

23   conduct.

24           So the defendant's Facebook and social media postings

25   had all kinds of statements about his desire to punish the

ICIAAELG1                    Sentence

1   Egyptians for ISIS to take over Egypt and Saudi Arabia and

2   Jordan.  And by the same token, Mr. el-Goarany announced after

3   arriving was that the reason he was there was for the Egyptians

4   conduct at Rabaa Square, which was the uprising in 2014.

5           So this, perhaps, more in other ISIS or material

6   support cases, the conduct of the defendant was motivated

7   clearly and manifestly by a desire to affect and retaliate for

8   government conduct.  Now the fact that the jury was instructed

9   that had he simply put his head in the sand in terms of having

10  Mr. el-Goarany tell him specifically he was going to fight ISIS

11  or using those precise words, it makes no difference legally as

12  to his guilty or as to the applicability of the provision.

13          THE COURT:  Thank you.

14          Anything else, Ms. Benett?

15          MS. BENETT:  No.

16          THE COURT:  I find that this provision also applies.

17  3A1.4 indicates that if the offense is a felony that involved

18  or was intended to promote a federal crime of terrorism, a 12

19  level enhancement is permitted.

20          I do find that the fact that the government relied on

21  a theory of willful blindness, used as a proxy for the intent

22  requirement is of no legal moment, as Mr. DeFilippis has

23  indicated, and the facts at the trial, as I recall them, and as

24  are set forth in the government's submission and by

25  Mr. DeFilippis here this afternoon, do indicate that certainly

1   Mr. El Gammal was very motivated.  He was interested in what

2   was going on in Egypt and could be upset about the situation in

3   Egypt and very desirous to do something.

4          And Mr. Samy el-Goarany also indicated that he was

5   motivated in large part by the events at Rabaa Square and

6   therefore, joined Ishola in order to help because at least if

7   in large part because of that.  So I do think that that clearly

8   evinces an intent to promote the crime of terrorism and

9   therefore, I think that it does apply.

10         Anything else with respect to the guideline

11  calculation, Ms. Benett?

12         MS. BENETT:  No, your Honor.

13         THE COURT:  Very well.  Therefore, I find, although I

14  am not required to find to sentence of Mr. el-Goarany within

15  the guidelines.  I do find that the base level is 26 to which

16  two levels are added because of his knowledge that his

17  participation would result in an act of violence and 12 levels

18  because the offense was intended to promote terrorism yielding

19  a total offense level of 40.  Because he has a criminal history

20  category one the guidelines range is 292 to 365 months.

21         Let me, Ms. Benett, ask you, have you read the

22  presentence report and discussed it with Mr. El Gammal?

23         MS. BENETT:  I have and we have, your Honor.

24         THE COURT:  Mr. El Gammal, have you received a copy of

25  the presentence report and discussed it with your attorneys?

ICIAAELG1                    Sentence

1            THE DEFENDANT:  Yes, your Honor.

2            THE COURT:  Are there any other objections concerning

3     its factual advocacy?

4            MS. BENETT:  With respect to -- so I did append to the

5     sentencing memo as Exhibit A the objections that we had

6     provided to Mr. Kim, some of which he incorporated.  I don't

7     think that any of them would affect anything like a designation

8     determination or a security level classification.  So I don't

9     think it's necessary to address them here.  But I did have

10    objections generally to the factual narrative in the PSR which

11    are Exhibit A to our opening memo.

12           THE COURT:  I do note that the government has

13    indicated in its submission that it does not object to the

14    change in language where the PSR talks about the agent believes

15    to as what is established at trial so the parties can submit to

16    me precisely what those paragraphs are.  I'd be happy to make

17    these changes.

18           MS. BENETT:  Thank you.

19           THE COURT:  OK.  Does government wish to be heard

20    concerning sentencing?

21           MS. TEKEI:  Yes, your Honor.

22           As the Court is familiar with the facts of this case

23    having presided over the trial, we will be brief.

24           Your Honor, the defendant provided material support to

25    ISIS and he aided and abetted the receipt of military-type

ICIAAELG1                    Sentence

1    training from ISIS.  When he committed these crimes, ISIS was a

2    terrorist organization that, as the Court has acknowledged, had

3    already declared itself at war with the United States, a

4    terrorist organization that the defendants wholeheartedly

5    supported and advocated.  He knew about their barbaric methods.

6    He understood that ISIS was waging jihad and he was a proud

7    ISIS supporter.

8         The defendant also knew that ISIS needed an army to

9    succeed, an Army of people and that ISIS needed foreign

10   fighters to join its ranks.  But in the fall of 2014, the

11   defendant was not yet prepared, himself, to join ISIS.

12   Instead, he supported ISIS' jihadi efforts by supplying ISIS

13   with Samy el Goarany.  With the defendant's help el Goarany

14   traveled to Syria, joined ISIS, trained in how to wage war with

15   ISIS and then died waging war for ISIS.

16        The defendant assisted el Goarany and encouraged him

17   every step of the way.  The defendant knew what el-Goarany was

18   doing was wrong.  He knew that what he himself was doing was

19   wrong and the defendant even tried to cover his tracks.

20        THE COURT:  I think, Ms. Tekei, that you don't dispute

21   that the point that the defense makes that Mr. el-Goarany

22   himself was set on traveling to Syria and joining ISIS and

23   therefore, Mr. El Gammal's role is not as significant as it

24   otherwise might be if, for example, it was he who recruited and

25   planted the seed in el-Goarany head to do this.

ICIAAELG1                    Sentence

1              MS. TEKEI:  We do dispute that, your Honor.  And

2     Mr. El Gammal was involved with el-Goarany's travel every step

3     of the way.  He flew -- let's pack up for a moment.

4              Samy al Goarany realized that Mr. El Gammal was an

5     ISIS supporter and immediately that day, the person who he

6     reached out to was Mr. El Gammal.  Then in ensuing

7     communications via Facebook and encrypted communication, they

8     engaged in a discussion about precisely that shared interest.

9     At the end of that discussion it was Mr. El Gammal who sent

10    Samy el-Goarany a link to an ISIS documentary that described

11    the way ISIS trains its members, religious training and

12    military-type training.

13             Then Mr. El Gammal flew from Arizona to New York City

14    and he met repeatedly with Samy al Goarany throughout the

15    course of that trip.  During that trip Mr. El Gammal and

16    Mr. el-Goarany discussed the plan.  We know this because Mr. El

17    Gammal then in ensuing communications with the Turkish based

18    facilitator and told him that he had in sum vetted el-Goarany

19    and that they were to help el-Goarany achieve his desired goal,

20    that is to join ISIS.

21             THE COURT:  Yeah, but that's the point, right?  It was

22    Mr. el-Goarany's desired goal.  During that trip to New York

23    Mr. El Gammal did not push him into doing this or try to

24    convince him into doing this.  Mr. el-Goarany was all in even

25    before the time that he met Mr. El Gammal.

1          MS. TEKEI:  Your Honor, I don't think we would agree

2     with that and here is why.  It was only after that meeting with

3     Mr. El Gammal that Mr. el Goarany took the steps towards

4     purchasing a plan ticket to Istanbul, for example.  He

5     immediately communicated with none other than Mr. El Gammal

6     right after he had purchased those plane tickets.  When he

7     canceled those plans he told El Gammal.  When he made those

8     plans again he told El Gammal.  He kept Mr. El Gammal apprized

9     the whole way through and he knew when he traveled to Istanbul

10    he knew that he would have a contact upon arrival.  And in fact

11    one of the first people he contacted was Atia Alwalla, Mr. El

12    Gammal's friend and associate who was part of this conspiracy.

13         So while I think we all agree that Sammy el-Goarany

14    was interested in ISIS, supported ISIS, had a desire to join

15    ISIS, we don't think that that diminishes Mr. El Gammal's role

16    in getting him there.  In fact, Mr. El Gammal played a detailed

17    role every step of the way.

18         Your Honor, we'll just add, it's no accident that when

19    Samy el-Goarany arrived in ISIS territory he tweeted that the

20    reason why he was there was because of what had happened in

21    Rabaa Square.  That is the link.  That is the shared ideology.

22    Those were the shared reasons, the reason that he shared with

23    Mr. El Gammal for their joint support of ISIS.

24         Your Honor, it is because of the seriousness of Mr. El

25    Gammal's crimes and the sentences imposed on defendants

ICIAAELG1                     Sentence

1    convicted after trial of engaging in similar conduct that the

2    government submits a sentence within the guideline range would

3    be appropriate in this case.

4            And we'll add, your Honor, that we submit the Court

5    should impose a sentence on Count Three and that such a

6    sentence should be the mandatory ten-year term of imprisonment.

7            THE COURT:  That's a curious statute.  I've not had

8    occasion to apply it before.  So I can fine him a hundred

9    dollars on this count or sentence him to a term of imprisonment

10   but if it's imprisonment it has to be ten years?

11           MS. TEKEI:  Yes, your Honor, that's what the plain

12   language of the statute says.

13           Your Honor, the reason why we're asking for an

14   incarceratory sentence on that count which would necessarily

15   mean a ten-year term of imprisonment is because it would be

16   appropriately punish Mr. El Gammal for aiding and abetting al

17   Goarany's receipt of military-type training from ISIS.

18           That conduct which we've already discussed length

19   today is at the core of the defendant's crimes.  It resulted in

20   a unique harm beyond the defendant's other actions in providing

21   material support to ISIS.  It resulted in a trained ISIS

22   fighter who fought against ISIS' enemies, among them the United

23   States and who died as a result.

24           The defendant's request for a monetary sentence, a

25   fine, which since the defendant doesn't have an ability to pay

ICIAAELG1                     Sentence

1    that fine is basically a request for no sentence at all on

2    count three.  And we submit that that's just not adequate to

3    adequately punish the defendant for aiding and abetting what he

4    did, aiding and abetting al Goarany's travel to Syria to join

5    ISIS and fight with ISIS to receive military-type training from

6    ISIS.

7            We think the Court should impose a ten year mandatory

8    sentence

9            THE COURT:  Thank you.

10           By the way, that's not required to be imposed

11   consecutively to any other sentence?

12           MS. TEKEI:  That's correct, your Honor.  It can be

13   concurrent.

14           THE COURT:  Thank you.

15           Ms. Benett.

16           MS. BENETT:  Thank you, your Honor.

17           Instead of addressing the government's points right

18   now I'd like to just turn our attention to Section 3553(a)

19   subsection (1), which is as the Court knows sets forth two, I

20   think the phrasing, two equally important considerations when

21   fashioning a sentence.  One is the nature of the offense.  And

22   the other was the history and the characteristics of Jammie

23   Gammal.

24           The government spoke and wrote not at all about

25   Mr. Gammal outside of the facts of this case.  And I think that

though I know we put in a lengthy sentencing submission with

many exhibits, it's important to put on the record here some of

the history and characteristics of Mr. Gammal beyond the

offense conduct that we're talking about.

He is a 46-year-old man who has four decades of

history that don't involve this type of offense conduct.  And

in thinking about what is what I would say the Court's duty to

impose a minimum necessary sentence to comply with the

parsimony of a sentence sufficient but not greater than

necessary, which would mean the minimum sentence that can

satisfy the federal sentencing regime's goals, I would ask the

Court to step away from the guideline calculations here and

consider and step away briefly from the nature of the offense

and try to think of what it would impose on -- what sentence it

would impose on this case given who Mr. Gammal is, given the

goals of the sentencing regime, to promote specific deterrence,

to protect the public, to promote respect for the law and to

take into consideration Mr. Gammal's history and

characteristics.

If this terrorism guideline enhancement applies here,

this would be a base offense level of 26 with a guideline range

of 63 to 78 months.  And I think the question has to be if the

offense conduct that factors into those two enhancements

sufficiently severe that this Court believes that it is the

minimum necessary sentence to go from 63 to 292 months to

ICIAAELG1                          Sentence

1    adequately punish to take into consideration -- well, 292 is

2    the bottom of the guideline range the government is seeking the

3    Court, is asking the Court to apply here.

4            THE COURT:  Right.  But the 63 may be the and

5    inappropriate anchor assuming that the third count that I

6    impose a sentence of incarceration on the third count that's

7    120 months, correct?

8            MS. BENETT:  I don't think the Court should be driven

9    by the statutory minimum term of imprisonment on Count Three

10   because we have Congress's intent on Count Three is clearly

11   expressed in the statute.  No matter what the government's

12   position is about the seriousness of the receipt of military

13   training, Congress has told us that a fine is an adequate

14   punishment in that case.  The elected representatives

15   representing the interests of the American people have said a

16   fine is an adequate punishment in that case.  I think it's a

17   strange statute but it is and Congress has spoken as to what is

18   an adequate punishment for Counts Three and that is a fine or a

19   ten year term of imprisonment.

20           U.S. against Dean the Supreme Court address whether or

21   not it was appropriate for a sentencing court to bottom out a

22   predicate crime when there was a mandatory minimum on a 924(C)

23   charge.  And in Dean the supreme court held that it was an

24   appropriate consideration that you could look at the whole

25   universe of sentencing exposure and that just because you

ICIAAELG1                          Sentence

1    bottom out.  I think it was a Hobbs Act robbery.  You could

2    bottom out of that Hobbs Act robbery if you felt the 84 months

3    that were going to be mandatorily imposed on the 924(C), I

4    believe it was a brandishing but it may have been a discharge

5    case.

6              But in any event, the sentencing court had decided

7    that the sentence on one count was sufficient to punish for

8    both of the crimes.  And so I would say under Dean, this Court

9    certainly is empowered to fashion a sentence collectively that

10   can include a fine on Count Three and a term of incarceration

11   on the other charges that punishes Mr. Gammal and that takes

12   into consideration his history and characteristics that will

13   promote respect for the law, that will protect the public and

14   that will avoid uncharged disparities.  And I will get to that

15   in a moment but I think it's reallying instructive here that

16   the government never addressed the two most comparable

17   facilitation cases from district courts recently.  The Kahn

18   case which has facts that are strikingly similar to the case

19   here and the case out of the Northern District of California.

20             So just to address the Court's question about the

21   military training count, the Court need not impose a sentence

22   of incarceration in court in order to satisfy the rule of

23   federal sentencing regime as the whole sentence.  That should

24   be considered here and the whole sentence need not be 121

25   months if the federal sentencing regime concerns can be

1    satisfied with a sentence below 120 months it's especially

2    incumbent that the sentence be lower than 120 months because

3    that's what the parsimony clause is.  So I'd like to turn a

4    little bit to Mr. Gammal's history and characteristics.

5            The government argued in their memo that because

6    Mr. Gammal is a U.S. citizen that is somehow an aggravating

7    factor because he will not be removed from the country which I

8    think ignores a really important part of who he is.

9            Ahmed Gammal, Jammie Gammal, was born in Cairo, raised

10   by his mother who is here today, his father, along with his

11   sister.  He was raised in a professional middle class

12   household.  He went to university.  He was employed in a small

13   bank in Cairo.  He had a comfortable life but he hungered for

14   something that was his own and longed to join the life that he

15   saw portrayed in popular media and heard about from friends in

16   the United States.  And as his friend Tamer writes:

17           Jam left Cairo with a very small bag and very big

18   plans and he left a comfortable job and he left his family and

19   he came here in the 1990s make a life for himself.  And when he

20   came here he was working, as Cheri Dubrow described in her

21   letter, working as an attendant at a convenience store.  He

22   started from the bottom.  He started there and he worked his

23   way up.  He became a salesperson at a Ford dealership.  He had

24   a successful practice at the Ford dealership in Pasadena and he

25   was rewarded by his employers for his performance.  He had

1    friends in California.  He had a job and he met the woman who

2    would become his wife Celest.

3          And as the Court knows from the sentencing

4    submissions, that relationship was not easy.  But Jam was a man

5    who always put his family first.  And when Celest said that it

6    was important to her to move to Arizona where her mother Sherry

7    had moved the year before, Jam was faced with the decision

8    about leaving the life that he had built, the life he dreamt of

9    when he left Cairo and the life that he created for himself in

10   Pasadena giving that up to follow Celest.  And he made that

11   choice to go with Celest because at that time in Celest's life

12   it was critically important for her wellbeing that she have a

13   home near her mother and away from California.

14         THE COURT:  Didn't he also want to get away from the

15   casinos in California?

16         MS. BENETT:  It was, it factored into his decision

17   making but of course, when he was in Arizona there was access

18   to gambling as well.  And was not the primary motivating

19   factor.  As Cherie writes to the Court, Jam has always remained

20   by Celest's side even when Cherie -- this is in the letter

21   submitted yesterday -- even when Cherie wasn't able to or

22   Celest, Jam was there.  So there may have been reasons that he

23   believed it was the right decision for him as well but it was a

24   decision that was motivated almost entirely by his concern for

25   Celest and his desire to support her and to be there as her

1    partner.

2            When he got there he worked at an auto dealership in

3    Arizona as well.  So Celest writes, he would spend free time

4    with her grandmother in the nursing home with the other elderly

5    residents there.  They were engaged in habitat for humanity.

6    He continued to provide Celest the critical support that she

7    described in her letter as she was struggling with her own

8    problems.

9            He continued to experience some professional success

10   but much as the young man in Cairo, he longed for something

11   more and his mother-in-law, Cherie, offered to help fund, as

12   did his friend Tamer in Cairo, helped fund his small business

13   with Cars Are Us, the automobile business, which he built from

14   nothing to the point where he was employing up to six people at

15   the time of his arrest.

16           He continued to be a man with big dreams.  And I think

17   that the government's position is sort of -- application of the

18   guidelines enhancement here about consideration of all of those

19   parts of who he was just shows how superficial the

20   recommendation of a 292 month sentence is in this case.

21           I think the difficult question I have to imagine, the

22   difficult question for the Court is to figure out how the

23   offense conduct could happen, how somebody who is so

24   differently situated from a typical terrorism defendant, the

25   government has said, well, there's no proof that he -- that's

ICIAAELG1                    Sentence

1    simply not true.  He's been at MCC for nearly four years in an

2    environment which this prosecution team knows well has read

3    radical behavior.  He's been involved in none of that.  He is

4    on the floor where religious services take place, on the floor

5    where some of the dissemination of radical publications take

6    place.  He's been involved in none of that.  He has kept to

7    himself.  He has stayed quiet.  He's been the victim of an

8    assault at the MCC.

9            The government says in response to our argument that

10   there should be some sentencing credit for the conditions of

11   his confinement that we haven't offered anything specific to

12   Mr. Gammal that's not applicable to everybody at the MCC.

13   That's just not true.  He was assaulted and put in segregated

14   housing for almost a month while the assault was investigated.

15   He had nothing to do with it.  He had to be put in the

16   segregated housing unit while the correctional staff

17   investigated the incident.

18           THE COURT:  But there was nothing remarkable about the

19   incident other than a garden variety at the assault, right, at

20   MCC?  He wasn't assaulted because of who he was or --

21           MS. BENETT:  I would say that anybody -- I don't think

22   it should be expected that any inmate at MCC IS going to be the

23   victim of an assault.  So was he targeted because he is and

24   older man?  Was he targeted because he was -- I don't believe

25   he was targeted because -- I think somebody felt like he had

1   spilled something in the kitchen on him.  But the point is that

2   he was in the segregated housing unit during the course of the

3   investigation without any behavioral justification for his

4   segregation.  Most people who have spent time in the SHU are

5   there because they engaged in some sort of misconduct.  He did

6   not.  And his treatment has been delayed repeatedly, as

7   described in the Bureau of Prisons records that we submitted.

8   Almost on a monthly basis he's supposed to have medical

9   treatment and gets deferred because they don't have the staff

10  to get him from Point A to Point B for purposes of treatment.

11  So it's that specific to Gammal.  It's to him in that he

12  specifically suffered that injury at the hands of a different

13  inmate.

14        Additional conditions of his confinement, not

15  everybody is in the same unit that he is in.  He is on Five

16  North which is where the inmates in that unit have

17  additional -- their ability to access a library, have visits,

18  to use the phone because of the use of Five North for religious

19  purposes.  So their movement is more confined on Five North

20  than it would be in other places.

21        Despite this he has been really been an exemplary

22  inmate and his lack of any sort of meaningful disciplinary

23  record is important consideration for this court to take into

24  account when thinking about sort of specific deterrent when

25  protecting the public.

1          Is Mr. Gammal likely to reoffend?  Well, there is

2     proof here he is not.  Other people convicted of terrorism

3     cases, as Judge Weinstein opined in the case of U.S. against --

4     in the Eastern District this August.  These facilities breed

5     radicalization for terrorism defendants, incarceration can be

6     an exacerbating factor and they're likely to reoffend.

7          We have empirical evidence here for three and a half

8     years Mr. Gammal has been in that environment and has not been

9     engaged in any of the behavior that we've seen in other

10     similarly situated cases.  That's meaningful because that's

11     proof that upon his release or it should be provided some

12     assurance to the Court upon his release, he is not likely -- if

13     he is not going to be radicalized at the MCC for three and a

14     half years where he is surrounded by other terrorism

15     defendants, he is not going to be radicalized upon his release.

16          His performance, I was about this today.  He had

17     sought for some long period of time to participate in that.  It

18     was difficult because of where he is housed.  He had requested

19     to be moved in order to participate in that program.  It took

20     quite some time till that program was hiring and as soon as it

21     was he was placed in an inmate companion program.  And I think

22     it is similar to what Mr. Gammal did when he first arrived in

23     Arizona.  He sat with Celest's grandmother.  He sat with other

24     elderly residents at the nursing home.  He is sitting with

25     inmates who are having suicidal thoughts.  He is sitting with

1    inmates who need psychological -- he is there in active

2    generosity in an effort to provide for those people around him

3    some measure of comfort.  This isn't something that he has done

4    simply because he is at the MCC.  AND he know that because he

5    did it when he was in Arizona with Celest's grandmother.  He

6    and Celest did this with their habitat for Humanity work.  His

7    friend from Cairo commented on the generosity and spirit that

8    he showed to his friends and to his family and to his

9    charitable acts.

10           So none of this is addressed by the sentencing

11   guidelines.  The sentencing guidelines as I believe it was the

12   judge in the Colorado case noted terrorism guidelines is sort

13   of takes a recking ball at the sentencing regime.  And the

14   reason that I started out with the 63 to 78 months -- and the

15   Court's right.  It's not a perfect anchor here.  But I am not

16   sure what is because the offense enhancement is so dramatic

17   that it's hard to know how that guideline could adequately take

18   into consideration the statutory sentencing factors.  To go

19   from 63 months to 292 months on the basis of the -- I'm not

20   sure that there could be any material support case that would

21   get the 26 months, that would get 26 level, the level 26 base

22   offense level.  It seems from the government's argument that

23   any meaningful provision of material support necessarily is

24   going to trigger at 12 point enhancement under 3A1.4.  So

25   that's why I bring up the 63 month guideline range for an

1   offense level of 26 because it's really important to take a

2   step back from that 40, that level 40 offense level and 292

3   month starting place.  And when you look at 292 versus the 63,

4   I think the question then has to become, is that additional 229

5   month sentence the bear minimum necessary to satisfy the

6   federal sentencing regime's goals.  I just don't think there's

7   any principled argument that it is.

8          I'd like to briefly address the government's -- I

9   don't know that I need to say much about the offense conduct

10  here.  I think the Court saw the trial evidence.  I think we

11  have detailed what believe was the conduct of Samy el-Goarany

12  predating his relationship with Mr. Gammal where he was

13  demonstrating his interest joining ISIS, supporting ISIS.

14         Certainly, the Court knows that Samy's brother and

15  cousin who were involved in some capacity with facilitating,

16  certainly facilitating Samy's evasion of apprehension if not

17  also in the face of facilitating his travel to ISIS, the

18  government deemed and -- case it's sufficient to provide him

19  with the non prosecution agreement.  I think the question

20  really is does the guidelines range here which is what the

21  government is seeking, does that 292 month sentence adequately

22  take into account the statutory sentencing factors?  Does that

23  delta between 63 months at a level 26 and 292 at a level 40, is

24  that additional 229 months the minimum necessary to satisfy the

25  federal sentencing regime.  I think it is not.  We ask the

Court for a 48 month sentence in the case.  We recognize that
that's a substantial variance from the 292 months.  It's not a
substantial variance from the base offense level of 26.

        We believe it does adequately take into account the
federal sentencing regime's concerns.

        THE COURT:  Why is this case so much like Kahn?
You've indicated that Kahn, I believe, the defendant got an 18
month sentence.

        MS. BENETT:  Kahn was a facilitator.  The government's
comparables I don't think they put in a facilitator cases.
Even the sentences that they argued in their sentencing
submissions were all direct actor cases.  There is a case in
upstate New York.  That was the guy who went out and was buying
knives and machetes and planning a video attack.  He got a
sentence less than the government is recommending here.

        The Sadocfatov case in the Eastern District involved
direct plans on traveling and had direct threats.  He got an
180 month case.  112 months less than the government's arguing
for here.

        The Alsaday case in New Jersey which involved a long
period of contact, planning to get to Syria or working with
other people who are getting to Syria, he got 180 month
sentence, 112 months less than the government is asking for
here.

        The government didn't address Kahn or Nachay, the

ICIAAELG1                    Sentence

 1    California case.  Those are both facilitator cases.  Kahn got

 2    18 months.  Nachay got 60 months.  Kahn was a young man who

 3    traveled from, he was in Australia.  He went to Turkey.  He was

 4    attempting to go to Syria.  Came back to the United States.

 5    Then provided assistance in getting a friend of his from, he

 6    came back to Texas and helped his friend travel to Syria.  His

 7    friend got to Turkey.  Goes over the border into Syria and

 8    kills in Syria. that's why I would say that is one of the most

 9    comparable and strikingly similar fact patterns here.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICIsELG2

1          MS. BENETT:  The government's response to that is,

2     well, he was young and he pled guilty.  So I think to add the

3     three-point enhancement for not accepting responsibility and

4     having gone to trial, that still doesn't explain to me how you

5     can go from 18 months and add 274 months on top of that, and

6     argue that somehow Mr. Gammal is not being treated unreasonably

7     differently.  The Natsheh case was another facilitator case in

8     California where the defendant was planning to travel,

9     purchased a ticket, and purchased the ticket for a minor to go

10    to Turkey and cross into Syria, and he got a 60-month sentence.

11    So that was both facilitator and a direct actor case and he

12    accepted a 60-month sentence.

13          I don't believe that the government's case that they

14    presented are truly comparable here.  They are filter cases.

15    There is a big difference -- I believe I put in a reference to

16    the Fordham University Center of securities analysis of

17    distinction between facilitator Cases and direct actor, active

18    violence cases.  So the government's argument is this was an

19    incredibly serious case because it was a terrorism case.  It

20    was a terrorism case and it is a serious case, but not all

21    terrorism cases are the same.

22          Their argument of the 292-month sentence is that

23    Mr. Gammal is the same as the person who was acting violently

24    in the U.S., same as the person who traveled to join ISIS

25    himself.  I think it is important to distinguish the

ICIsELG2

1    facilitator from the other cases.  Khan and Natsheh, I think,

2    are the fact patterns that are most comparable to the offense

3    conduct here.

4            Could I make one final point?

5            THE COURT:  Sure.

6            MS. BENETT:  Does the court have any other questions?

7            THE COURT:  Not at the moment.

8            MS. BENETT:  I am going to talk briefly about general

9    deterrence and just punishment, which are promoting respect for

10   the law, which are, of course, statutory concerns set forth in

11   3553(a).  I didn't hear a lot about it from the government, but

12   I do want to note -- I didn't address this in my sentencing

13   memo -- to the extent the court is concerned about the general

14   deterrence and sending a message, there is a whole body of

15   social science research that we have seen in the last five to

16   ten years that Daniel Nagin, in a publication in 2013 by

17   University of Chicago Press, that had sort of a longitudinal

18   analysis of the effects of long sentences.  His conclusion was

19   that the evidence in support of the general deterrent effect of

20   the certainty of punishment is far more consistent than for the

21   severity of punishment, and that long prison sentences cannot

22   be justified by a theory of general deterrence.

23           THE COURT:  I am familiar with that body of knowledge.

24   The statute has still not been amended.

25           MS. BENETT:  Well, I don't think it needs to be

ICIsELG2

1  amended.  I think it can be satisfied by imposition, by the

2  certainty of the imposition of a shorter incarceration.

3        I just want to sort of finish with the issue of just

4  punishment, which seems, to me, a difficult one in a terrorism

5  case, sort of promoting respect for the law and making sure

6  that the sentence reflects community values.  There has been

7  some work, the court may be familiar with, by Judge Quinn in

8  the Northern District of Ohio and sort of assessing whether the

9  guidelines accurately reflect community values with respect to

10  sentencing.  He has gone, and he has in several cases, polled

11  the jurors in trials -- this is in the Northern district of

12  Ohio -- polled the jurors after trials to get their sense of

13  what they believed an adequate sentence would be.

14        There is a published piece in the Harvard Review of

15  Law and Public Policy of 2010 that I had not included but I was

16  thinking about as I was preparing for the hearing today.  It

17  doesn't include a discussion of terrorism cases, and I

18  understand that might make some of the responses

19  distinguishable, somewhat distinguishable.  But in his work,

20  what he found in cases, even cases involving child pornography,

21  which I think yield some of the same kind of community

22  reaction, that the sentencing guidelines consistently

23  over-punished, substantially over-punished, frequently even at

24  the low end six times more than what jurors would recommend.

25        I say this because I imagine that a court must always

ICIsELG2

1    be thinking about will this sentence reflect the values of the

2    community in which it is imposed. again, it sort of goes back

3    to the guidelines and this 292-month representation from the

4    government or request from the government.  Is that just

5    punishment.  Does that promote public respect for the law.

6           It is difficult for me to say not to have tried this

7    case.  Certainly, there was no polling of the jurors

8    afterwards.  I'm not sure the court would necessarily even take

9    into account their consideration in fashioning a sentence.  But

10   if in cases of child pornography jurors, the media and juror

11   response as to an appropriate sentence or the guidelines are

12   six times higher than the median juror response, I would not be

13   surprised if that were true as well in the case of a terrorism

14   sentence.

15          I know I cited to the Deacons guideline article

16   concerning the terrorism guideline.  The government says

17   repeatedly this is in the heartland of the terrorism guideline,

18   but that terrorism guideline is not grounded in anything.  It

19   is a number that is a draconian number.  It is a number --

20   there is a wrecking ball.  It does not satisfy the statutory

21   sentencing concerns.

22          We ask the court to consider our request for a

23   substantial downward variance in this case.

24          THE COURT:  Thank you.

25          Actually, I do have a question for the government

ICIsELG2

1    concerning two factors that are in Section 3553(a).

2          One is sentencing similarly situated defendants.

3    Ms. Benett spoke about facilitator cases against direct actor

4    cases.  That is one factor that I want your insight on.

5          The other one is in terms of deterrence, personal

6    deterrence and specific and general deterrence.  In their

7    papers, the defense has put in the report of Dr. First, and he

8    makes the observation, which I don't think that I need an

9    expert to opine on, that Mr. el Gammal is not the typical

10   terrorism defendant.

11         As the parties may be aware, once upon a time, I tried

12   a terrorism case in this courthouse, or across the street, so I

13   became aware of the expert opinion in this field and how one

14   becomes radicalized and what those folks who become radicalized

15   believe and what they continue to do.

16         Certainly, I think the government would agree that

17   Mr. el Gammal doesn't fit that mold and, therefore, what should

18   I do with those two data points?

19         MR. QUIGLEY:  Thank you, your Honor.

20         I think in terms of breaking up cases into buckets of

21   facilitator and direct actor, I think this is clearly a

22   facilitator case.  I think it is different.  It is different in

23   some ways, more serious than sort of the direct actor cases

24   that Ms. Benett sites, and it is certainly different than the

25   Natsheh and Khan cases that she cites.

ICIsELG2

1        I mean, I think the three cases, one from the Second

2   Circuit and one from the Eastern District and one from the

3   District of New Jersey.  What came from the Second Circuit,

4   from the Eastern District and from New Jersey, I think it is

5   worth noting that in all those cases, the court imposed a

6   statutory maximum sentence that it was allowed to impose;

7   15 years in the Eastern District case and the District of

8   New Jersey case and 20 years in the Second Circuit case.

9        So I'm not sure how useful a comparator it is to say,

10   oh, the court only imposed half or a third of the sentence or

11   three quarters of the sentence that the government is asking

12   the court to impose here, when the court imposed in those cases

13   the maximum it could.

14        I think also with respect to many of those direct

15   actor cases, one fact that distinguishes Mr. Gammal, this case

16   certainly, is that there was no involvement of law enforcement

17   during the course of the investigation.  Certainly while sting

18   cases have a place and they serve an important preventative or

19   important way to prevent terrorist attacks, this wasn't a case

20   anyone contacted the direction of law enforcement, induced

21   Mr. El Gammal to arguably help send el-Goarany overseas.  I

22   think that distinguishes many of the direct support cases.

23        I think finally I would say, with respect to your last

24   question about how Mr. Gammal does not fit the profile of a

25   typical terrorism defendant, if there is such a thing, also in

ICIsELG2

1    response to Ms. Benett's point about the <u>Khan</u> and <u>Natsheh</u>

2    cases, I think both those things go together, and the

3    defendants in those two cases were, in many ways,

4    quote-unquote, typical terrorism defendants.  They were young

5    men who had been radicalized.  I think the defendant in Khan

6    was 20 years old.  He attempted to travel to ISIS with a

7    friend.  The defendant in Natsheh was in his 20s.  I believe

8    also the court said he was a troubled young man battling

9    depression and alienation.  He was not appeared to have been

10   in any direct effort to recruit others.  There wasn't any

11   training.

12          These were young men who, like many terrorism

13   defendants, were sucked in by the ISIS propaganda machine, and

14   that is not what happened with respect to the defendant in this

15   case.  The fact that it was distinguishable from those cases is

16   an aggravating factor here.

17          The defendant was 42 years old at the time of the

18   offense conduct.  Unlike Samy el-Goarany, he was well-traveled.

19   He spoke Arabic.  He knew people in the Middle East.  He was a

20   vocal supporter of ISIS.  Samy el-Goarany, the evidence is

21   there was some discussion about how el-Goarany was radicalized

22   when he met the defendant.

23          We know from the documentary evidence at trial that,

24   as Ms. Tekeei said, when Samy el-Goarany learned the defendant

25   had posted -- made posts supporting ISIS, he contacted the

ICIsELG2

1   defendant and they discussed ISIS.  That discussion went on for

2   months and months at key junctures during Samy el-Goarany's

3   trip to/from Queens to Syria.  The defendant was the person he

4   reached out to.

5         The defendant was somebody who, unlike el-Goarany,

6   spoke Arabic, knew people in the Middle East, had the

7   connections, had the benefit of having been around the square

8   during the massacre over there.  He was somebody who could have

9   had a positive influence on Samy el-Goarany, a man almost half

10  his age.  He didn't.  To the contrary, he facilitated the

11  travel over, where he ultimately was killed.

12        THE COURT:  Thank you.

13        Ms. Benett, I don't know whether you want to respond?

14        MS. BENETT:  Well, only with respect to the age issue.

15  I mean, it is a little bit of a heads I win, tails you lose

16  with the government.  I think if he is young, he is more likely

17  to recidivate, and he is a typical radical terrorism defendant

18  profile.  If he is old, he is unusual and should be -- he

19  doesn't have the same kind of excuse of youthful naivety that

20  Samy el-Goarany has.  The fact of Mr. el-Goarany's age is

21  something that should be a mitigating factor here.  All the

22  evidence suggests that the older he is, the less likely he is

23  to engage in offense conduct again.  I think the question

24  really should be with respect to the radicalization, is he

25  going to reoffend.

ICIsELG2

1          We have empirical evidence of his last three and a

2   half years.  It's been a combination with his age, his work

3   history, the support network that is ready to welcome him upon

4   his release, which will, with every additional period of

5   incarceration, that opportunity for successful reintegration

6   will diminish somewhat and make it that much harder for him to

7   reintegrate.

8          So I think those are relevant factors when figuring

9   out what is the minimum necessary sentence here.

10          THE COURT:  Mr. Gammal, you have an absolute right to

11   address the court before I impose sentence.  Is there anything

12   that you wanted me to know?

13          THE DEFENDANT:  I want to say that I'm a proud

14   American.  I love this country.  I was never radical all my

15   life from -- from the time I came to this country.  I practice

16   my life.  I was not radical at all or have any radical

17   behaviors.  There is no neighbors that ever complained about

18   that, coworkers, places I worked for.

19          All my life until my arrest, my wife, my

20   mother-in-law, my mom, the way I lived my life here is just

21   regular providing citizen.  I love this country.  I love

22   everything about it.

23          I also want to address to my family and thank the

24   court for allowing my family to be here today.  And I want to

25   let them know that I love them and I am very sorry for the pain

ICIsELG2

1    that I inflicted on them.

2            I want to also -- the court knows that I have a lot

3    of work ahead of me to get my life back together and help my

4    family.  I affected them so much on so many levels.  I never --

5    I never intended this pain to happen to my family.

6            I love this country.  We are in the months of

7    December.  I need forgiveness and mercy, and I just hope my --

8    everybody here can forgive me.

9            And Merry Christmas.  That's it.  Thank you.

10           THE COURT:  Thank you.

11           In deciding what sentence to impose in addition to the

12   sentencing guidelines, I have considered all of the factors set

13   forth in Section 3553(a) of Title 18 of the United States Code,

14   including, as most relevant to Mr. Gammal's case, the nature

15   and circumstances of the offense and the history and

16   characteristics of the defendant, I have considered the need

17   for the sentence imposed to reflect the seriousness of the

18   offense, to promote respect for the law, to provide a just

19   punishment for the offense, afford adequate deterrence to

20   criminal conduct, to protect the public from further crimes of

21   the defendant, and to provide him with needed educational and

22   vocational training and medical care or other correctional

23   treatment in the most effective manner.  I have also considered

24   the need to avoid unwarranted sentence disparities among

25   similarly situated defendants and the need to provide

ICIsELG2

1    restitution for any victims of the offense.

2         Having considered all of these factors, it is my

3    intention to impose a total sentence of 144 months, that will

4    be followed by three years of supervised release on each count,

5    each to serve concurrently, and I will not impose a fine, as I

6    find that Mr. Gammal is not able to pay a fine, and the

7    mandatory special amendment of $400.

8         I find that this sentence is sufficient but not

9    greater than necessary to comply with the purposes of

10   sentencing for the following reasons:  I think there is a

11   fairly universal agreement in this case that this is a very

12   important case.  It is a terrorism case.  My understanding is

13   that this was the first ISIL-related prosecution, or trial at

14   least, in the Southern District of New York.  It is a case that

15   is a very important one for the government and for the defense,

16   as it was very important for the court.

17        The consequences of Mr. Gammal's conduct were tragic

18   indeed.  A young man, who was fairly young, who had a very

19   strong family, committed parents here in the United States, was

20   able, with the help of Mr. Gammal, to travel to Syria and work

21   with an organization that this country has determined to be a

22   designated terrorist organization, and he agreed to take arms

23   in connection with that organization and against this country

24   and other perceived enemies of the state.

25        I think I take the point of the defense that -- and it

ICIsELG2

1    was a point that was made at trial -- that Mr. el-Goarany was

2    very set on traveling to Syria, and whether or not he would

3    have been successful is another question, but he certainly was

4    going to try to go there.  There was no question in my mind

5    about that, and therefore in my mind, the question was, well,

6    how much did Mr. Gammal attribute.  Clearly he attributed

7    enough to make him guilty of the offenses to which he was

8    convicted.

9         But that fact, I think, is a mitigating factor, and I

10   disagree with the government in that regard.  I do think it is

11   a mitigating factor that he was able to make a connection with

12   this young man, not because he was intent on sending him to

13   Syria, but because they had similar points of view, similar

14   world views, and he agreed to help him find his way into Syria.

15        Obviously it is serious because of the matter of

16   public policy.  This government has been engaged in a very

17   costly, very lengthy war against terrorism since serving the

18   almost entirety of this century, and for that reason, these

19   types of cases have to be taken very seriously.

20        It is uncertain why the guidelines are as high as they

21   are for the typical offense, and the guidelines for Mr. Gammal

22   certainly were very, very high.  While I do not go as far as

23   Ms. Benett goes to say that number comes from nothing, and it

24   means nothing, I think it does reflect the considered thought

25   of our legislators that these crimes be considered as seriously

ICIsELG2

1    as possible.

2            While I do have to deal with those laws, I also have

3    to deal with the other statutes and provisions of the

4    sentencing guidelines that require me to look at the person

5    that is standing before me, and the person that is standing

6    before me is a 48-year-old man who was, as far as anyone knows,

7    as far as I have been told, prior to six years ago, was not

8    involved in any of this type of activity.  He was entering

9    middle age.  He was in and on-again-off-again relationship with

10   his American wife and his American mother-in-law, and was a

11   used car salesman in Phoenix, Arizona.

12           How he got involved in this is still -- I mean, I was

13   told some of the outlines of how he did it, but why he agreed

14   to take the step to commit these very serious felonies as

15   someone, certainly the case as Dr. First indicated, and based

16   on my limited experience, that he is not the typical terrorism

17   suspect.  He is not.  This is just, to use my parlance now, no

18   one else's.  The type of true believer that I have seen in

19   other cases in this court that I have dealt with as a member of

20   the CJA panel in this court.

21           Based on my understanding of or my recollection of the

22   expert testimony concerning terrorism defendants in several

23   courts in the United States, that the process of radicalization

24   sometimes begins in prison.  You have otherwise not

25   particularly religious young men that go to prison and are

ICIsELG2

radicalized there when they meet other young, more religiously zealot Muslim men.

Mr. Gammal, I don't know that he ever became radicalized, if that is the appropriate term. He was very committed, but he was very interested in the political situation in Egypt, and he appeared to become very interested in the exploits of what they were doing in the Middle East. But he came to it at a very late stage, and based on what he has been doing since his arrest also is very unusual. He has emerged himself in the life, as much as he has been allowed to, of the MCC. He has been looking for work. He has been looking to help his fellow inmates. I've not been told that they've been limited to Muslim inmates, so that is very different from the type of defendants, terrorism defendants, that we are used to dealing with.

Because of his age, I think -- and, again, I disagree with the government in this regard -- it is much less likely that he is going to recidivate. That, and because of the relatively lesser extent of radicalization than others, I do not believe that after he is released from prison, Mr. Gammal will commit another crime, much less commit a crime of terrorism.

So for all of those reasons, while there is a very serious sentence and it requires a serious sentence, I believe 12 years for him is a serious sentence. I do believe that it

ICIsELG2

1    adequately reflects his activities, his involvement in getting

2    this young man to Syria, where he met an unfortunate death.  I

3    do believe that this crime is certainly the minimum sentence

4    that can be imposed that would adequately reflect the values

5    that are in Title 18, United States Code, Section 3553(a).

6            With all that, other than what has already been said,

7    is there any reason why I should not impose the sentence as I

8    have indicated?

9            MR. QUIGLEY:  Judge, just in imposing a sentence, I

10   think I understand it is 144 months concurrent on all counts.

11   I think the sentence should reflect that the sentence on

12   Count Four is 60 months, which is a statutory maximum.

13           THE COURT:  Exactly.

14           So ten years on Count Three, 144 months on Counts One

15   and Two, and 60 months on Count Four.

16           MR. QUIGLEY:  Thank you, your Honor.

17           THE COURT:  It is the judgment of the court that he be

18   sentenced to 144 months on Counts One and Two, 120 months on

19   Count Three, and 60 months on Count Four, all to run

20   concurrently.  That will be followed by three years of

21   supervised release on each count.

22           The standard conditions of supervised release 1

23   through 13 shall apply, and in addition, special mandatory

24   conditions shall apply, which are as follows:  The mandatory

25   conditions that he not commit another federal, state, or local

ICIsELG2

1    crime, that he not unlawfully possess a controlled substance,

2    that he refrain from unlawful use of a controlled substance,

3    and submit to one drug test within 15 days of release from

4    imprisonment, and at least two periodic drug tests thereafter

5    as determined by probation.  He must pay the special assessment

6    imposed in accordance with 18 U.S.C. Section 3013.  I will not

7    impose a fine, as I have indicated.

8            The special conditions is that he submit his person,

9    residence, place of business, vehicle, and any property or

10   electronic device under his control to a search on the basis

11   that the probation officer has reasonable suspicion that

12   contraband or evidence of a violation of the conditions may be

13   found.  The search must be conducted in a reasonable time and

14   in a reasonable manner.

15           What are we doing on forfeiture?

16           MS. TEKEEI:  We are not seeking forfeiture,

17   your Honor.

18           THE COURT:  As indicated, he must pay the special

19   assessment, mandatory special assessment of $400, which shall

20   be due immediately.

21           Are there any open counts?

22           MS. TEKEEI:  No, your Honor.

23           THE COURT:  That constitutes the sentence of the

24   court.

25           Mr. Gammal, you have a right to appeal this sentence.

ICIsELG2

1    Counsel, you'll assure me, Ms. Benett and Mr. DuBoulay, will

2    you assure me you will thoroughly and promptly discuss with

3    Mr. Gammal his appellate rights?

4            MS. BENETT:  Yes.

5            Before we adjourn, I would ask the court to put a

6    representation on the judgment and commitment order for the

7    residential drug abuse program.  As the court knows from the

8    presentence investigation report, at the time Mr. Gammal

9    entered the Bureau of Prisons system, he had a dependence on

10   opioid drugs, and he had been initially prescribed and then was

11   using without a prescription.

12           I would ask for a recommendation that he receive the

13   RDAP treatment.  I would ask that the court recommend a

14   designation, but I ask the court to consider putting in a

15   recommendation for designation to the Terminal Island FCI, in

16   Phoenix, or FCI Stafford facilities.  I know that ultimately

17   the decision is up to the Bureau of Prisons, but I have had

18   other cases where the J&C actually reflects a recommendation

19   for a specific facility, not just a geographic recommendation.

20           THE COURT:  Which facility was that?

21           MS. BENETT:  They are all on the West Coast.  FCI

22   Phoenix, which obviously is near his family; FCI Stafford,

23   which is also in Arizona; and then the BOP Terminal Island

24   facility which is in Southern California.

25           THE COURT:  Say that last one.

ICIsELG2

1              MS. BENETT:  Terminal Island.

2              THE COURT:  Terminal Island?

3              MS. BENETT:  Terminal Island, which is in Southern

4    California.

5              THE COURT:  Any objection to the RDAP program?

6              MS. TEKEEI:  No, your Honor.

7              THE COURT:  I will make both of those recommendations.

8              Anything further, Ms. Benett?

9              MS. BENETT:  No.  Thank you, your Honor.

10             THE COURT:  In that event, that is the sentence of the

11   court, the judgment of the court, unless there is anything

12   else, Ms. Tekeei?

13             MS. TEKEEI:  No.  Thank you, your Honor.

14             THE COURT:  We are adjourned.

15             Mr. Gammal, good luck to you, sir.

16                              o0o

17

18

19

20

21

22

23

24

25