UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

AHMED MOHAMMED EL GAMMAL,
a/k/a "Jammie Gammal,"

Defendant.

15 Cr. 588 (ER)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S PETITION FOR WRIT OF HABEAS CORPUS**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew J. DeFilippis
Negar Tekeei
Assistant United States Attorneys
         *Of Counsel*

## PRELIMINARY STATEMENT

Ahmed Mohammed El Gammal ("El Gammal" or the "defendant"), who was convicted at trial of terrorism offenses and sentenced to 144 months' imprisonment for facilitating a young man's recruitment into ISIS and travel to ISIS-controlled territory in Syria, now moves this Court for an order (i) vacating his convictions for aiding and abetting the receipt of military-type training from ISIS, in violation of 18 U.S.C. §§ 2339D and 2 (Count Three), and conspiring to have another person receive military-type training from ISIS, in violation of 18 U.S.C. §§ 371 and 2339D (Count Four), and (ii) resentencing him on his convictions for providing material support and resources to a designated foreign terrorist organization, *i.e.*, ISIS, in violation of 18 U.S.C. § 2339B (Count One), and conspiring to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B (Count Two).  This Court should deny El Gammal's motion.

## BACKGROUND

### A.    The Government's Case

Beginning in 2014, the defendant facilitated Samy El-Goarany's travel from New York to Syria so that El-Goarany could train and fight with the Islamic State of Iraq and al-Sham ("ISIS"), a brutal terrorist organization that plots attacks and slaughters innocent people around the world, including Americans. (Tr. 440-47, 451-58, 464-65, 747, 750-51, 802-03).[1]  For months, the defendant and El-Goarany communicated about their shared support for ISIS. (*See, e.g.,* Tr. 142-60, 1017, 1255-57).  When El-Goarany later decided he would try to join and fight with ISIS, the defendant did everything he could to help El-Goarany achieve that goal.  The defendant met El-Goarany in New York, vetted El-Goarany, and then put El-Goarany in touch with his associate,

---

[1] "Tr." refers to the trial transcript; "Def. Br." refers to El Gammal's brief in support of his Petition. "App. Br." refers to El Gammal's brief on appeal; "A" refers to the appendix filed with that brief; and "Dkt." refers to a docket entry on the District Court's docket in this case.

Attia Aboualala, in Turkey. (Tr. 620-50, 656-61).   When El-Goarany reached Turkey, the defendant continued to assist him, helping to ensure that El-Goarany found his way to ISIS in Syria. (*See, e.g.,* Tr. 143-46).  While El-Goarany was in Syria receiving ISIS military training and fighting for ISIS in support of the radical, violent ideals he shared with the defendant, El-Goarany stayed in communication and reported back that "everything [was] going according to plan."  (Tr. 168).  In approximately November 2017, El-Goarany was killed while fighting for ISIS in the Middle East. (Tr. 737-38, 803-06, 1113-14).

1.      **El Gammal and El-Goarany's Increasing Radicalization and Support for ISIS**

By early 2014, the defendant, then a 42-year-old Arizona resident originally from Egypt, was an outspoken supporter of ISIS and its Caliphate (ISIS-controlled territory) on social media. His communications with Aboualala (his Turkey-based associate) and others on social media demonstrated that not only did he support ISIS's terrorist ideology, but that he was aware of ISIS's brutal methods and unequivocally supported those methods as well.  For example, in April 2014, the defendant told an associate ("Associate-1") on social media that he had been "with Jabhat Al Nusra," another foreign terrorist organization operating in Syria, but was "now with the State . . . . the State of Iraq and the Levant and Syria," a reference to ISIS.  (Tr. 481).

In June 2014, after ISIS captured Mosul, the second largest city in Iraq, the defendant wrote "Allah is Great.  Mosul falls by the hands of the State."  (Tr. 457).  Around the same time, in reference to ISIS's practice of beheading its adversaries, the defendant wrote to Aboualala that "beheading has a magical effect" and "pray[ed]" that "God grant [ISIS] victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to Jerusalem, God willing."   (Tr. 965).  He also wrote to Aboualala that "Jihad is a duty[.]"  (Tr. 506).  On July 1, 2014, the defendant told another associate that if ISIS "gets to Egypt, I will go

3

join them, so I can torture the Egyptians, and whip them[.]"  (Tr. 458, 1762).  Later that month, the defendant wrote: "I want expansion for Jihadis and that's it . . . . What I care about is actions on the ground[,]" and "I support jihad everywhere."  (Tr. 481-82, 1764).

Indeed, the defendant criticized those who opposed ISIS and attempted to rationalize ISIS's efforts to conquer territory and topple existing governments.  On July 1, 2014, El Gammal wrote about ISIS: "May God grant them victory[.]  Who would hate the founding of the Caliphate[.] Glory be to Allah[.]"  (Tr. 1762). The same day, El Gammal wrote to Aboualala that "[n]othing works with them except Daesh," to which Aboualala responded, "God bless." (Tr. 1936).  He also wrote: "All Caliphates started like this and then expanded[.]  No Caliphate came by deliberation. All by the sword.  It has to be like this; we take it forcibly not peacefully."  (Tr. 1762).

At the same time that the defendant embraced ISIS's violent radical ideology, El-Goarany—then a 24-year-old student from New York whose father was originally from Egypt— expressed similar views.  (Tr. 745-61, 1051-52).  In the summer of 2014, El-Goarany became more radical in his religious views and more vocal about his frustration over U.S. foreign policy regarding the Middle East. (Tr. 745-52). El-Goarany discussed traveling to Turkey and Syria on social media.  (Tr. 746-48).  El-Goarany also frequently discussed travel routes to Syria via Turkey. (*Id.*).

On August 14, 2014, an individual named "Mustafa" attempted to send El-Goarany a picture of a "kid" who was "with da3ish [referring to Daesh, or ISIS] pulling a dead man [by] his hair and smiling."  (Tr. 967).  Mustafa, who was in Facebook communications with both El Gammal and El-Goarany, told El-Goarany that "El Jammal," a reference to the defendant, had posted social media comments about the picture and, in response to a question from El-Goarany, confirmed that "El Jammal" was "defending" ISIS.  (Tr. 972-73, 414, 429-30).

4

Minutes after this exchange, El-Goarany contacted the defendant on Facebook and communicated with him for approximately one hour.  The exact content of these communications is unknown because El Gammal and El-Goarany deleted many of the Facebook messages and conducted their other exchanges over an encrypted communications platform, Surespot.  (*See, e.g.*, Tr. 977-79).  At the end of the conversation, the defendant sent El-Goarany a link to a documentary about ISIS that described the types of training—religious and military—that ISIS provided to its recruits.  (Tr. 179-80).

Throughout the next several months, the defendant and El-Goarany communicated extensively via social media, exchanging nearly 1,000 messages over Surespot.  (Tr. 125-27, 1014-18).

### 2.    El Gammal Meets El-Goarany in New York, and Helps El-Goarany Prepare to Travel to Turkey and Syria to Join and Fight with ISIS

During the same time period as these communications, the defendant traveled from his home in Arizona to New York City on October 6, 2014, where he stayed for approximately two days. (Tr. 624-58).  During this time, the defendant and El-Goarany contacted or attempted to contact each other approximately eleven times via telephone.  (Tr. 621-23, 660).  The defendant and El-Goarany met at a hotel in Queens where the defendant was staying on October 6, 2014, and again in Manhattan on October 7, 2014.  (Tr. 175, 604-08).

On October 7, 2018, while the defendant was in New York and on the same day that he had met with El-Goarany, the defendant began facilitating El-Goarany's travel to ISIS-controlled territory in Syria through Aboualala, his contact in Turkey.  The defendant exchanged multiple messages with Aboualala over their social media accounts, including asking for Aboualala's telephone number in Turkey so that his (El Gammal's) "American friend" could call Aboualala when he arrived.  (Tr. 1263).  Aboualala asked the defendant why he had not been writing to

Aboualala, and El Gammal responded that he was currently in New York. (*Id.*). El Gammal suggested that they speak on Skype, and Aboualala sent his telephone number to El Gammal. (*Id.*).

The defendant provided that number to El-Goarany on a piece of paper. (Tr. 175, 1026-28). On October 9 and 10, after the defendant had returned to Arizona, the defendant exchanged additional coded messages with Aboualala regarding helping El-Goarany connect with ISIS operatives upon El-Goarany's arrival in Turkey. The defendant told Aboualala to "[t]ake care of him." (Tr. 1264-65).

The next day, on October 11, 2014, the defendant also sent a message to El-Goarany containing a link to Aboualala's social media page. El-Goarany responded, "jzk im gonna add him now. lemme know when ur back online so we can test this cat out lol." (Tr. 136). El-Goarany's reference to "add him now" meant that El-Goarany was going to add Aboualala as a contact or "friend" to facilitate future communications between El-Goarany and Aboualala. The reference to "test[ing] this cat out" was a reference to testing a new encrypted communications program, Cryptocat, that the defendant and El-Goarany were planning on using to attempt to avoid law enforcement detection. (Tr. 751).

After meeting with El Gammal in October 2014, El-Goarany began preparing to leave for Istanbul, Turkey, and on to Syria to join ISIS. El-Goarany booked a flight from New York City to Turkey, which was scheduled to arrive in Istanbul on November 25, 2014. (Tr. 939-40). El-Goarany later cancelled this flight after his mother found out that he was planning to travel to Turkey. (Tr. 756-57, 940). El-Goarany consulted the defendant throughout the fall of 2014 as he made and then modified multiple plane reservations in connection with this trip. (*See, e.g.,* Tr. 141-42).

On November 18, 2014, the defendant told Aboualala that his "friend"—El-Goarany—had been expected to arrive on November 24, but that he had to cancel for the time being because "[h]is

mother has a problem[.]" (Tr. 727). Aboualala stated that he had been ready to "provid[e] him with lodging, food, and drink." (Tr. 1275). The defendant kept Aboualala apprised of El-Goarany's travel plans because he and Aboualala had planned for Aboualala to be El-Goarany's Turkish-based contact to help him reach Syria and join and fight with ISIS.

> **3.     El-Goarany Leaves the United States for Turkey**

Soon after cancelling his planned November 2014 trip, El-Goarany booked a January 27, 2015 flight from New York City to Istanbul. (Tr. 940-41). El-Goarany also reserved a room at a hotel in Istanbul, Turkey for January 28, 2015. (Tr. 1027).

While El-Goarany kept his travel plans secret from his parents and from several of his friends, he and El Gammal spoke multiple times on the phone in early January 2015. (*See, e.g.*, Tr. 1230-31). Also, on or about January 16, 2015, approximately eleven days before his scheduled departure from the United States, El-Goarany contacted Aboualala via social media and wrote:

> As-Salamu Alaikum [Peace be upon you] Ateyya my name is Samy, I'm Gammal's friend. He told me you could help me with a career opportunity in Istanbul. I'll be visiting soon to look for an internship for the summer inshaAllah. I'd really appreciate your help. Please reply whenever you get the chance. BarakAllahu feek [God bless you].

(Tr. 139-40). Aboualala replied: "We are at your service." (Tr. 140).

On January 27, 2015, El-Goarany left New York City aboard a commercial airliner from John F. Kennedy Airport to Istanbul, Turkey. (Tr. 942-43). El-Goarany arrived in Istanbul on January 28, 2015. (*Id.*).

> **4.     El Gammal and Aboualala Continue to Facilitate El-Goarany's Travel to Syria to Fight with ISIS**

Upon El-Goarany's arrival in Istanbul, the defendant, working with Aboualala, continued to facilitate El-Goarany's travel to Syria to join and fight with ISIS. As soon as El-Goarany arrived in Istanbul, he contacted Aboualala and provided Aboualala with his new cellphone number. El-

Goarany also told the defendant to "remind [Aboualala] that my simcard is shit right now. I can't make any calls and I only receive them." (Tr. 142-43). The defendant and El-Goarany also discussed whether El-Goarany—who did not speak Arabic—should buy an "app" to help translate conversations with Aboualala. (*Id.*). El-Goarany also told the defendant that "the sooner i start the internship the better u know what I mean? I wanna get close to the interview"—coded language referring to joining ISIS. (Tr. 145)

On January 29, 2015, the defendant and El-Goarany continued to communicate regarding El-Goarany's progress toward joining ISIS. The defendant provided El-Goarany with advice on how to get to Adana or Gaziantep ("gazentep"), two Turkish cities near the Syrian border that were common pass-through cities for ISIS foreign fighters. (Tr. 499-500). El-Goarany reported back to the defendant that he was in contact with someone from "the company," a coded reference to ISIS, who could coordinate his travel to Syria through Adana and Gaziantep. (Tr. 146).

In messages with his brother, El-Goarany reported that he was waiting in his hotel room to get in touch with his contact in Istanbul. (Tr. 747). The next day, El-Goarany arranged to meet with Aboualala, and, the same day, Aboualala reached out to the defendant with an urgent message that El-Goarany wanted to talk to him. (Tr. 197-98 ("The man wants to talk to you. Answer, man. Are you awake or not yet?")). After meeting with Aboualala, El-Goarany reported to his brother that "everything is going according to plan" (Tr. 1307-08). He also told his brother that he had "received the contact" and "he was being transported to a safe house." (Tr. 763-64).

### 5.    El-Goarany Trains with ISIS

From approximately January 30, 2015, to approximately February 16, 2015, El-Goarany remained largely inactive on social media. On or about February 16, 2015, El-Goarany sent the following message to his brother regarding his training and activities:

> I'm so sorry for the sudden disappearance man, I've got a lot of explaining to do but first off I'm sorry for not being aware about the protocol in my new company.  Hours after our last . . . conversation i had my phone and laptop taken from me by the company for safety reasons.  They're gonna give it back to me after my training is over inshaAllah.  Right now im going through the religious training which will end in 9 days.  Then I'm gonna be enrolled in my main training course which will take a month to complete.  [A]fter that ill be a regular employee and they'll give me back all my stuff and I can contact u 24/7 like I did before.  That'll probably be around end of March to mid April.

(Tr. 1391-92).  El-Goarany's references to "religious training" and "main training" described how ISIS trained all of its new fighters—a period of religious training followed by military training.  (Tr. 501-02, 764-66).  And, consistent with ISIS's protocol to confiscate electronic devices from incoming foreign fighters (Tr. 501), El-Goarany's devices—a phone and a laptop—had been taken from him.

El-Goarany remained largely inactive on social media in March and April 2015.  For several days in early May 2015, however, El-Goarany began communicating with friends and associates, including the defendant, using his own social media account.

On May 7, 2015, El-Goarany reported back to the defendant: "[I]t's been a long time but I'm doing well and I just wanna let u know im safe and secure and everything is going according to plan.  When I get completely settled over the coming months I will contact u more to let u know what's up at my new job."  (Tr. 1307-08).  In other words, using the same words that he had used to tell his brother that he was joining ISIS as a fighter—"everything is going to plan" (Tr. 763)—El-Goarany told the defendant he had arrived in ISIS territory, and promised to report back to El Gammal about his progress.

A week later, on May 14, 2015, the defendant sent El-Goarany a message on social media asking him whether it was "easy to park a car into ur job parking lot?"—a coded reference to his own desire to travel to Syria to join ISIS.  (Tr. 170).  El-Goarany responded in July 2015, stating

that he "need[ed] to ask my superiors at work first . . . but I think it's risky because the parking lot these days is going under a lot of renovation, especially in the north side"—a reference to ISIS's losses in northern Syria during this time period and Turkey's attempts to crack down on individuals traveling through Turkey to join ISIS in Syria.  (Tr. 502-03).  El-Goarany asked the defendant whether he "plann[ed] on driving anytime soon?"—a coded reference to whether El Gammal intended to travel to Syria in the near future.  (Tr. 170).  The defendant responded "yes, mid August . . . check Facebook more often." (*Id.*).  El-Goarany then responded by suggesting that the defendant contact him on Surespot, the encrypted communications platform on which they had previously communicated, stating "I'll help u make ur parking job easier."  (*Id.*).

A few days later, on July 16, 2015, El-Goarany contacted the defendant via WhatsApp, thanking the defendant for helping him reach ISIS.  El-Goarany wrote to the defendant: "Life has changed a lot for me at this new job but I love it and I don't regret taking up the offer[.] Thank God.  May God reward you with goodness . . . ." (Tr. 414). In an acknowledgement of the help that he provided, the defendant responded: "Great."  (*Id.*).

### 6.     El Gammal Attempts to Cover Up His Crimes

In May 2015, El-Goarany's father traveled to Istanbul looking for El-Goarany. In a desperate attempt to find his son, El-Goarany's father retraced his son's steps, staying at the same hotel in Turkey where El-Goarany stayed, and reaching out to and meeting with Aboualala.  (Tr. 1055-62).  Upon learning that El-Goarany's father was looking for El-Goarany in Istanbul, the defendant and Aboualala engaged in a flurry of text message communications and attempted to speak by phone multiple times. The defendant peppered Aboualala with questions, instructing Aboualala: "[D]on't ever ever mention me[.]  Not even my name[.]"  (Tr. 1042-43).  Aboualala responded: "I will get rid of him by telling that I don't know anything about him [El-Goarany] since January; and he was a friend on Facebook, a muslim of Egyptian descent, who said that he

is coming to Istanbul and I wanted to help him.  Afterwards, I had no more communications with him." (Tr. 1043-44). The defendant responded: "Exactly, and don't ever ever mention me or my name[.]" (*Id.*).

The defendant and Aboualala took additional affirmative steps to hide the assistance they had provided to El-Goarany so that he could join and train with ISIS.  For example, Aboualala removed the defendant as a friend on Facebook and reported back to him that he had done so.  (Tr. 1044).  After meeting with El-Goarany's father, Aboualala reported back directly to the defendant: "Anyways I covered up for you and I told him that I don't know you and any relationship was direct with Sami." (Tr. 1045-46). El Gammal responded, "OK." (*Id.*).

In addition, over time, the defendant first deleted *some* of his social media messages with El-Goarany and then, between February and June 2015—while El-Goarany had safely reached ISIS territory and was receiving military and other training from ISIS—the defendant deleted nearly *all* of his Facebook messages with El-Goarany.  (Tr. 71, 119).  The defendant also deleted *all* of his messages with Aboualala.  (Tr. 1272).

### 7.     El-Goarany Dies in Battle Fighting for ISIS

For the next several months, El-Goarany received weapons and combat training with ISIS, and was deployed and killed in battle.  (Tr. 780-81).  In November 2015, an ISIS member, "Abu Adam," contacted El-Goarany's family to advise them that El-Goarany had been killed while fighting for ISIS.  (Tr. 737-38, 803-06, 1113-14).

## B.     The Defendant's Rule 29 Motion

At the close of the Government's case, El Gammal moved, pursuant to Rule 29, for a judgment of acquittal.  This Court denied that motion.  (Tr. 1343.)

## C.     The Defense Case

El Gammal called five witnesses to testify in his defense: Rameez Farooqi, a friend of El-Goarany's who communicated with El-Goarany via encrypted communications; Special Agent Le Nguyen of the Federal Bureau of Investigation ("FBI"), one of the Government's case agents; Anna Elise Finkel, a defense investigator; Sherry Dubrow, El Gammal's former mother-in-law; Marwan Abdel-Rahman, an Arabic interpreter; and Khalafalla Osman, a friend of El-Goarany's who knew about El-Goarany's plans to travel to Syria.  During cross-examination of Government witnesses and in its case-in-chief, the defense offered into evidence more than seventy exhibits, including photographs of El Gammal, El-Goarany, and Aboualala; excerpts from El Gammal, El-Goarany, and Aboualala's social media messages; and photographs and physical evidence recovered during a search of El Gammal's home upon his arrest.

The defendant renewed his Rule 29 motion before the Government's summation, which motion was, again, denied.  (Tr. 1754.)

## D.     The Verdict and Sentencing

On January 30, 2017, the jury returned its verdict, finding El Gammal guilty of all counts in the Indictment. (Tr. 2038.)

On February 10, 2017, El Gammal sought new counsel (Dkt. 172) and, on February 14, 2017, new counsel was appointed (Dkt. 169).  New counsel requested additional time to consider filing post-trial motions (Dkt. 171, 175, 204, 206, 208), and ultimately decided not to file post-trial motions and to proceed to sentencing (Dkt. 210).

On December 18, 2018, this Court sentenced El Gammal to 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four, all to run concurrently.  At sentencing, the Court stated that the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 292 to 365 months' imprisonment

reflected "the considered thought of our legislators that these crimes be considered as seriously as possible." (Sent. Tr. at 47). Considering the 18 U.S.C. § 3553(a) factors, including El Gammal's age and history of his involvement in the offenses, the Court sentenced El Gammal to a below-Guidelines term of 144 months' imprisonment, to be followed by three years of supervised release. (Sent. Tr. at 49-50). In imposing sentence, the Court stated:

> I believe 12 years for [the defendant] is a serious sentence. I do believe that it adequately reflects his activities, his involvement in getting this young man to Syria, where he met an unfortunate death. I do believe that this crime is certainly the minimum sentence that can be imposed that would adequately reflect the values that are in Title 18, United States Code, Section 3553(a).

(Sent. Tr. at 49-50).

## E.    The Defendant's Appeal

The defendant, represented by newly-appointed appellate counsel, appealed his conviction, claiming, among other things, that (1) this Court erred in admitting certain records at trial, and (2) this Court erred in instructing the jury on conscious avoidance. On October 26, 2020, the Court of Appeals affirmed El Gammal's conviction in a Summary Order. *United States v. El Gammal*, 831 F. App'x 539, 544 (2d Cir. 2020). The Court of Appeals rejected the defendant's claims that this Court erred in admitting certain evidence obtained pursuant to search warrants for Facebook records and found his other challenges to be "without merit." *Id.*

El Gammal is currently serving his sentence at FCI Phoenix in Phoenix, Arizona, and has a projected release date of November 13, 2025.

## F.    The Defendant's Motion for Compassionate Release

On December 21, 2020, El Gammal, represented by the same counsel who handled his appeal, filed a motion for compassionate release. (Dkt. 236). In the motion, El Gammal argued (1) that there were extraordinary and compelling reasons to warrant a reduction in his sentence,

and (2) permitting him to complete the remainder of his sentence on home confinement would comport with the 18 U.S.C. § 3553(a) factors.  (Dkt. 237 at 1-2.)  On April 22, 2021, this Court denied the motion, holding that El Gammal had not established the "extraordinary and compelling" reasons for a sentence reduction.[2]  (Dkt. 247 at 6.)

## G.     The Defendant's Motion Pursuant to 28 U.S.C. § 2255

The defendant now moves pursuant to 28 U.S.C. § 2255, for an order (i) vacating his convictions for aiding and abetting the receipt of military-type training from ISIS, in violation of 18 U.S.C. §§ 2339D and 2 (Count Three), and conspiring to have another person receive military-type training from ISIS, in violation of 18 U.S.C. §§ 371 and 2339D (Count Four), and (ii) resentencing him on his convictions for providing material support and resources to a foreign terrorist organization, *i.e.*, ISIS, in violation of 18 U.S.C. § 2339B (Count One), and conspiring to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B (Count Two) (the "Section 2255 Petition").  (Dkt. 258-1 at 4.)  In his Section 2255 Petition, El Gammal advances two principal claims: (1) appellate counsel was ineffective for failing to challenge his convictions on Counts Three and Four based on the sufficiency of the evidence regarding his intent for El-Goarany to receive military training from ISIS and their unlawful agreement for El-Goarany to receive such training; and (2) appellate counsel was ineffective for failing to challenge the application of Sentencing Guidelines Sections 3A1.4 and 2M5.3(b)(1) at sentencing.  Appellate counsel considered both of these arguments and decided, based on his professional judgment, not to raise them.  (Dkt. 258-1 at 46.)  Notably, although El Gammal complains about certain decisions

---

[2] Accordingly, the Court did not need to and did not consider El Gammal's 18 U.S.C. § 3553(a) arguments.  *Id.*

made by his trial counsel and his sentencing counsel, he does not challenge the effectiveness of his trial or sentencing counsel.  (*See* Dkt. 258-1 at 14 n.15, 25 n.19, 28 n.21).

## ARGUMENT

The Government respectfully submits that the Court should deny the Section 2255 Petition because the defendant has failed to demonstrate that appellate counsel's conduct was objectively unreasonable, or that it prejudiced the defendant in any way.

### A.  Applicable Law

### 1.  Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from the alleged dereliction in counsel's performance.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 693 (1984); *accord Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011).  Only if both elements are satisfied can the petitioner demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  In raising a claim of ineffective assistance of counsel, "[t]he petitioner's burden is a heavy one."  *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012).

In evaluating counsel's performance under the first prong of *Strickland*, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *United States v. Venturella*, 391 F.3d 120, 135 (2d Cir. 2004) (quotation marks omitted).  "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689.  "The determinative question at this step is not whether counsel deviated from best practices or most common custom, but whether his representation amounted to

incompetence under prevailing professional norms." *Harrington*, 689 F.3d at 129-30 (citations and internal quotation marks omitted).

Judicial scrutiny of counsel's performance "must be highly deferential." *Strickland*, 466 U.S. at 689.  The performance inquiry examines the reasonableness of counsel's performance "from counsel's perspective at the time" and "considering all the circumstances." *Id.* at 688, 689. And this Court "must make 'every effort . . . to eliminate the distorting effects of hindsight.'" *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 689).

As to the second prong of the *Strickland* test, in order to demonstrate prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694; *accord United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010).  A defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693.

"Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted); *see also Smith v. Robbins*, 528 U.S. 259, 289 (2000) ("Robbins must satisfy both prongs of the Strickland test in order to prevail on his claim of ineffective assistance of appellate counsel.").

To demonstrate ineffective assistance of appellate counsel in failing to raise an issue on direct appeal, a defendant must show that counsel "'omitted significant and obvious issues while pursuing issues that were clearly or significantly weaker.'" *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)); *see also Clark v. Stinson*, 214 F.3d 315, 327-28 (2d Cir. 2000) (holding that counsel is presumed effective unless

"ignored issues are clearly stronger than those presented . . . .").  It is not enough to show that appellate counsel failed to raise a non-frivolous issue, because counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments and is not required to advance every argument.  *Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017).

In other words, in the appellate context, "it does not suffice 'for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument.'"  *McKee v. United States*, 167 F.3d at 103, 106 (quoting *Mayo*, 13 F.3d at 533); *see also Tatum v. Lempke*, 481 F. App'x 659, 663 (2d Cir.2012).  "Rather, it is the hallmark of effective appellate advocacy to choose wisely which claims are brought on appeal." *Fletcher v. Mann*, 956 F.Supp. 168, 173 (N.D.N.Y. 1997) (internal quotation marks and citation omitted).  "Generally, only when ignored issues 'are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Stewart v. United States*, No. 08 CIV. 7514, 2013 WL 6283473, at *8 (citations omitted); *see Torres v. Irvin*, 33 F.Supp.2d at 257, 266 (S.D.N.Y.1998) (Cote, D.J.).

### 2.      Sufficiency of the Evidence

A defendant challenging the sufficiency of the evidence bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).  The Court of Appeals reviews the sufficiency of the evidence *de novo*, *see United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010), but "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks and citation omitted). Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for

the reviewing court." *United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013) (internal quotation marks and citation omitted).

A conviction therefore must be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Ng*, 934 F.3d 110, 130 (2d Cir. 2019) (holding that a court "may reverse a guilty verdict only if evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."). The jury's verdict "may be based entirely on circumstantial evidence," *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013), and in assessing the proof, this Court must analyze each piece of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011). Courts must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). Rather, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). Put differently, a sufficiency challenge "does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129. Where a defendant challenges a conspiracy conviction, "deference to the jury's findings is especially important because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Santos*, 541 F.3d at 70.

The credibility of a testifying witness is particularly within the province of the jury, not a reviewing court. *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (internal quotation marks omitted)); *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 158-59 (2d Cir. 2008) ("In order to avoid usurping the role of the jury, courts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence." (internal quotation marks and citation omitted)). "[T]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury, not in an appellate brief.' *United States* v. *Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (internal quotation marks omitted). It is then for the jury to decide how those arguments bear on "the weight [it] should accord to the evidence." *United States* v. *Truman*, 688 F.3d 129, 140 (2d Cir. 2012) (internal quotation marks omitted).

### 3.    Elements Required to Convict on Counts Three and Four of the Indictment

Count Three of the Indictment charged El Gammal with aiding and abetting the receipt of military-type training from ISIS, in violation of 18 U.S.C. §§ 2339D and 2. Count Four of the Indictment charged El Gammal with participating in a conspiracy to receive military-type training from and on behalf of ISIS, in violation of 18 U.S.C. § 371.

Title 18, United States Code, Section 2339D provides:

> Whoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both. To violate this subsection, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (c)(4)), that the organization has engaged or engages in terrorist activity (as defined in section 212 of the Immigration and Nationality Act), or

19

that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339D(a).  The term "military-type training" includes "training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction (as defined in section 2232a(c)(2))."  18 U.S.C. § 2339D(c)(1).

As this Court properly instructed the jury, to prove the defendant guilty of aiding and abetting the violation of 18 U.S.C. § 2339D, as charged in Count Three of the Indictment, the Government had to prove each of the following elements beyond a reasonable doubt:

First, that a person received military-type training;

Second, that the person received that military-type training from or on behalf of a designated foreign terrorist organization;

Third, that the person acted knowingly;

Fourth, that one of the jurisdictional requirements . . . has been satisfied; and

> Fifth, that the defendant aided and abetted the person's receipt of military-type training.[3]

(Tr. 1982-83).  To prove El Gammal guilty of participating in a conspiracy to violate 18 U.S.C.

§ 2339D, as charged in Count Four of the Indictment, the Government had to prove each of the

following elements beyond a reasonable doubt:

> First, the existence of an unlawful agreement, that is, an agreement among two or more persons to violate the law;
>
> Second, that the defendant knowingly and willfully joined the conspiracy, that is, that he knowingly and willfully joined in the agreement to violate the law;
>
> Third, that an overt act occurred, that is, that someone within the conspiracy took some action to advance the goal or goals of the conspiracy; and
>
> Finally, … that one of the four jurisdictional requirements [has] been satisfied.

(Tr. 1988-89).

---

[3] This Court correctly instructed the jury as follows, regarding aiding and abetting liability:

> [Aiding and abetting requires,] [o]ne, that the defendant intended to aid in that crime's commission. An intent to aid in some different offense is not sufficient. Instead, the intent must go to the specific crime charged. A person who actively participates in a criminal scheme with full knowledge of its extent and character intends that scheme's commission. Two, the defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.  The mere presence of a defendant where a crime is being committed, even coupled with knowledge by a defendant that a crime is being committed, or merely associating with others who were committing a crime, is not sufficient to establish aiding and abetting. . .

(Tr. 1969).

4.       **Terrorism Sentencing Enhancements**

Section 2M5.3(b)(1) provides, in relevant part, that a two-level increase to the base offense level is appropriate if the offense "involved the provision of . . . funds or other material support or resources with intent, knowledge or reason to believe they are to be used to commit or assist in the commission of a violent act[.]" U.S.S.G. § 2M5.3(b)(1).

Section 3A1.4 provides for an increased offense level for a defendant who was convicted of "a felony that involved, or was intended to promote, a federal crime of terrorism."   The Guidelines commentary to Section 3A1.4 states that a "federal crime of terrorism" has the meaning provided to that term in 18 U.S.C. § 2332b(g)(5).  U.S.S.C. § 3A1.4 App. Note 1.  That statute, in turn, defines a "federal crime of terrorism" as an offense that is: (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) is a violation of one or more enumerated statutes—including, among others, 18 U.S.C. §§ 2339B (provision of material support to a designated foreign terrorist organization) and 2339D (receipt of military training from a designated foreign terrorist organization).

A defendant's offense "involves" a federal crime of terrorism if the Government shows by a preponderance of the evidence that the defendant violated one of the enumerated statutes and "had the specific intent to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against governmental conduct.'" *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (quotations and citations omitted).  In proving such intent, the Government need not prove a defendant's "particular motive" but, rather, must establish that the "*underlying felony* [is] calculated to influence or affect" such conduct, *i.e.¸* that the offense "was planned—for whatever reason or motive—to achieve the stated object."  *Id.* (quotations and citations omitted) (emphasis in original).

In order to prove alternatively under the provision's second prong that a defendant "intended to promote" a federal crime of terrorism, the Government must prove that "the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined[.]" *Id.* at 314. Under this prong, the defendant's offense itself "need not . . . be 'calculated' as described in Section 2332b(g)(5)(A)." *Id.* Accordingly, Section 3A1.4 "may apply without a showing that the defendant's conduct constitutes an offense listed in 18 U.S.C. 2332b(g)(5)(B) or satisfies the 'calculation' requirement set forth in 18 U.S.C. 2332b(g)(5)(A)." *Id* at 315.

## B. Appellate Counsel Was Not Ineffective for Deciding Not to Raise a Sufficiency of the Evidence Argument

El Gammal cannot demonstrate that his appellate counsel fell below an objective standard of reasonableness or that El Gammal suffered any prejudice as a result of appellate counsel's decision not to advance a sufficiency of the evidence argument on appeal. The evidence at trial overwhelmingly established that El Gammal knowingly facilitated El-Goarany's travel from New York to Syria so that El-Goarany could train and fight with ISIS, which El Gammal knew was a designated foreign terrorist organization. The evidence further proved that in so doing, he aided and abetted El-Goarany's receipt of military-type training from and on behalf of ISIS and knowingly and willfully participated in a conspiracy to receive military-type training from and on behalf of ISIS.

In his Petition, El Gammal does not dispute that there was sufficient evidence that (i) El-Goarany received military-type training, (ii) El-Goarany received it from or on behalf of ISIS, a designated foreign terrorist organization, and (iii) El Gammal is a United States citizen and at least part of the alleged crime happened here in the United States, which would satisfy the jurisdictional requirement of 18 U.S.C. § 2339D. Instead, the defendant advances two primary arguments: first,

that the evidence was insufficient to support the jury's verdict that he aided and abetted El-Goarany's receipt of military-type training from ISIS, and, second, that the Government offered "no evidence" of a "meeting of the minds" between the defendant and El-Goarany that El-Goarany would receive military training from ISIS in Syria. El Gammal's principal assertion in support of these arguments appears to be that although he expressed support for various causes and entities, his "primary concern was Egypt," he "expressed support for the Muslim Brotherhood," and, therefore, his statements in support of ISIS were "well within his First Amendment right" and insufficient to establish his guilt. (Dkt. 258-1 at 26).

The Court should reject these arguments, which ignore the extensive trial evidence proving that the defendant did not merely support the Muslim Brotherhood and express disdain for the Egyptian government but also aided and supported El-Goarany's plan to become an ISIS fighter. As an initial matter, the evidence established that El Gammal *knew* that ISIS was a violent terrorist organization and was acutely aware of its military tactics (Tr. 457). On social media and in his messages with others, the defendant advocated ISIS's use of military force to expand the Caliphate (Tr. 1762); supported ISIS's expansion through jihad (Tr. 481-82, 1764); and went so far as to provide El-Goarany with a video that described the types of training—including military training—that ISIS provided to its recruits (Tr. 179-80). That video stated expressly that ISIS provided military training to those over the age of sixteen, thus undermining any argument that the defendant was unaware or did not intend that El-Goarany would receive training as a fighter upon his arrival in ISIS territory in Syria. The defendant was also a consistent and outspoken supporter of ISIS, supporting ISIS's terrorist military operations, and regularly touting ISIS's military tactics and operations (Tr. 457 ("Allah is Great. Mosul falls by the hands of the State."); 965 (writing that "beheading has a magical effect" and praying that "God grant [ISIS] victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to

24

Jerusalem, God willing."); 458, 1762 (Tr. 481 ("I want expansion for Jihadis and that's it . . . What I care about is actions on the ground[,]" and "I support jihad everywhere."); 1762 ("All Caliphates started like this and then expanded[.]  No Caliphate came by deliberation.  All by the sword.  It has to be like this; we take it forcibly not peacefully."); GX 100-N and 100-E-T (profile picture of an armed solder posted by El Gammal the same day he wrote "I want expansion for jihadis and that's it").

Even more critically, El-Goarany himself acknowledged that the defendant was aware of his plans to join and fight for ISIS when after his arrival in ISIS territory, he messaged the defendant stating that "everything is going according to plan."  That plan, of course, was not for El-Goarany to passively or non-violently support ISIS.  Rather, that plan was to do exactly what El-Goarany *actually did*: receive training as an ISIS fighter and then fight in battle for the terrorist group.  Moreover, any argument that the defendant was unaware of El-Goarany's plan to receive military training is belied not only by social media communications reflecting the defendant's support for ISIS's violent agenda but also by the facts established at trial, referenced above, that (i) the defendant and El-Goarany used encrypted messaging applications to conduct most of their communications about El-Goarany's travel to ISIS territory; (ii) the defendant deleted nearly all of his Facebook communications with El-Goarany and *all* of his Facebook communications with Aboulala; (iii) the defendant and El-Goarany used coded language to refer to ISIS (the "company"), travel to ISIS territory ("drive"), ISIS-controlled territory in Syria (the "parking lot"), and ongoing violence in that territory ("renovation. . . in the northern part").  Taken together, these and other facts reflect the defendant's consciousness of guilt and provided the jury with overwhelming evidence that the defendant was fully aware of, supported, and affirmatively participated in El-Goarany's plan to join ISIS as a fighter and receive military training from the group, and that he was therefore guilty on an aiding aand abetting theory of liability.

El Gammal's reliance on *United States v. Kabir*, 828 F. App'x 396 (9th Cir. 2020), is misplaced. In that case, the defendant, Kabir, was convicted of, among other things, conspiracy to receive military-type training from Al-Qa'ida, in violation of 18 U.S.C. §§ 371 and 2339D. 828 F. App'x at 398. The evidence at trial centered on a series of conversations Kabir had with his co-conspirators considering which militant group they would ultimately join when they reached Afghanistan, including the Taliban and Al-Qa'ida, of which only Al-Qa'ida was a designated terrorist organization. *Id.* at 398-99. The Ninth Circuit held that witness testimony supported Kabir's argument that his co-conspirators never agreed to join Al-Qa'ida, and that, although "one could infer that Kabir was *willing* to join Al-Qa'ida, mere willingness is insufficient to support a conspiracy conviction." *Id.* at 399.

Unlike in *Kabir*, the evidence at trial overwhelmingly established that the defendant and El-Goarany were singularly focused on El-Goarany's travel to Syria to join and fight for ISIS and ISIS alone. (*See, e.g.*, Tr. 179-80 (El Gammal sending El-Goarany a link to a documentary about ISIS describing the military and religious training ISIS provided to recruits); 1264-65 (El Gammal exchanging coded messages with Aboualala regarding helping El-Goarany connect with ISIS operatives when El-Goarany arrived in Turkey); 146 (El Gammal and El-Goarany communicating about El-Goarany's progress toward joining ISIS); 1307-08 (El-Goarany, in Syria receiving military training from ISIS, reporting back to El Gammal that "everything [was] going according to plan"). Whether El Gammal also supported the Muslim Brotherhood or other causes is inapposite. The point is that El Gammal *knew* El-Goarany's goal of joining and fighting with ISIS, *agreed* to help El-Goarany achieve that goal, and *helped* El-Goarany achieve that goal by meeting with El-Goarany in New York; connecting him with Aboulala; encouraging Aboulala to help El-Goarany; and communicating with El-Goarany about his recruitment into ISIS before and after he arrived in ISIS territory. Then, after El-Goarany achieved his goal of becoming an ISIS fighter,

the defendant expressed his own desire to join ISIS, asking, in coded language, about how easy it was, in May 2015, to travel to Syria and join ISIS himself.  (Tr. 170, 502-503).

The defendant's attempts to downplay the significance of the documentary about ISIS, GX 140, which described the religious and military training ISIS provided its recruits, are similarly unavailing.  (Def. Br. at 27).  As noted in part above, the evidence at trial established that, on August 14, 2014, after learning that the defendant had posted social media comments in support of ISIS, El-Goarany immediately contacted him on Facebook and communicated with him for approximately one hour.  (Tr. 972-73, 977-79, 414, 429-30).  The defendant and El-Goarany deleted many of these communications.  (*See, e.g.*, Tr. 977-79).  But, at the end of the conversation, the defendant sent El-Goarany a link to a documentary about ISIS that described the types of training—religious and military—that ISIS provided.  (Tr. 179-80).  The documentary depicted life in the Islamic State, and included video of ISIS fighters riding on military equipment, in fatigues, and armed with the military weapons the United States had provided to the Iraqi Army. *See* GX 140.  As is most relevant here, the documentary showed video of an ISIS spokesperson outlining the type of training ISIS provided: "[T]hose over 16, they can attend the military camp. . . . Those who are over 16 and were previously enrolled in the camps can participate in military operations."  GX 140 at 6:06.  The import of the documentary to the defendant's knowledge and intent is clear: the defendant *knew* that El-Goarany wanted to join and fight for ISIS, and then participated in and assisted the criminal venture by sending him a documentary that, among other things, depicted life in the Islamic State for ISIS fighters and discussed the types of training that someone over the age of sixteen, like El-Goarany, living in the Islamic State would receive— "military camp" so that they could "participate in military operations."

In the face of this overwhelming evidence regarding the defendant's knowledge and intent in aiding and abetting El-Goarany's receipt of military-type training from ISIS, and his knowing

and willful participation in a conspiracy for El-Goarany to receive such training, appellate counsel

was not ineffective for deciding not to raise a sufficiency of the evidence challenge to El Gammal's

convictions on Counts Three and Four.  The overwhelming evidence supported the jury's verdict

on Counts Three and Four, and appellate counsel reasonably chose not to pursue a sufficiency of

the evidence challenge that would have been rejected on appeal in light of the "heavy burden,"

*United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), faced by defendants making those

arguments and the exceedingly deferential standard of review by the Court of Appeals, which

"must view the evidence in the light most favorable to the government, crediting every inference

that could have been drawn in the government's favor, and deferring to the jury's assessment of

witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703

F.3d 46, 62 (2d Cir. 2012).  Because any sufficiency of the evidence argument was clearly *weaker*

than those presented by appellate counsel, El Gammal has failed to overcome the strong

presumption of effective assistance.  *See Stewart v. United States*, No. 08 CIV. 7514, 2013 WL

6283473, at *8 (citations omitted); *see also Torres v. Irvin*, 33 F. Supp.2d at 257, 266

(S.D.N.Y.1998).

Moreover, because a sufficiency challenge on appeal would not have been viable, the

defendant cannot show that he was prejudiced in any way by the decision not to raise such a

challenge, or that the outcome of his case would have been different.  Accordingly, the defendant's

argument also fails under the second prong of *Strickland*.

### C. Appellate Counsel Was Not Ineffective for Declining to Challenge the Applicability of U.S.S.G. §§ 3A1.4 and 2M5.3(b)(1)

The defendant next argues that counsel was ineffective for declining to appeal the Court's

application of two Sentencing Guidelines enhancements, namely (1) Section 2M5.3(b)(1), which

provides for a two-level increase to the base offense level if the offense involved "material support

or resources with intent, knowledge or reason to believe they are to be used to commit or assist in

the commission of a violent act," and (2) Section 3A1.4, the so-called "terrorism enhancement"

which provides for a 12-level increase in the offense level for a defendant convicted of "a felony

that involved, or was intended to promote, a federal crime of terrorism." The defendant's argument

is meritless.  The Court properly interpreted the Guidelines in applying both of these enhancements

based on an extensive trial record.  Counsel's decision not to challenge their applicability on appeal

therefore reflected sound appellate strategy and was not ineffective assistance.

### 1.    Background

Prior to sentencing, the Probation Department found in its Presentence Investigation Report

("PSR") that both of the above-referenced Guidelines enhancements applied.  (PSR at 23).  The

Government took the same position in its sentencing submission.  (Dkt. 227 at 15-21).  At

sentencing, defense counsel argued that neither of the Guidelines enhancements should apply.

(Sent. Tr. at 4-17).  First addressing Section 2M5.3(b)(1), defense counsel stated, in part:

> [T]he provision itself specifically refers to the provision of the material
> support with the intent, knowledge or constructive knowledge, reason to
> believe that the material support would be used in the commission of a
> violent act. It has to be used. The pertinent offender must know and intend
> or have reason to know that the material support would be used in the
> furtherance of a violent act.
>
> So there is certainly testimony during the trial that Samy [El-Goarany] had
> many reasons for traveling and joining ISIS and I don't think there is any.
> We are not contesting, obviously, that Samy was traveling to Syria in order
> to join the Islamic State. But whether Mr. Gammal had knowledge that
> Samy intended to engage in a particular violent act, the trial evidence
> doesn't support the application of the guideline under the clear language of
> the guideline. And it has to be more because otherwise the sentencing
> commission has created separate guidelines that apply to the exact same
> conduct.

(*Id.* at 6).  In response, the Government argued that Section 2M5.3(b)(1) "does not require that

[material] support be traced to or designed to lead to a specific act of violence" but merely "that

the defendant be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization." (*Id.* at 8).  The Government further argued that El Gammal's conduct met this standard because, among other reasons, the trial evidence proved that he "knew that [El-Goarany] was going to join ISIS [in a] war zone. . . to be a fighter"; that the military training conspiracy the defendant joined was "geared towards [El-Goarany's ability and desire to engage in acts of violence"; and that El-Goarany expressly confirmed to the defendant after his arrival in Syria that everything was "going according to plan." (*Id.* at 10).

The Court agreed with the Government and held that the enhancement pursuant to Section 2M5.3(b)(1) applied:

> I do find that this enhancement is applicable. Each subsection—I don't think we need to get into the others—says that funds or other material support or resources [with the] intent, knowledge or reason to believe that they are to be used to commit or assist in the commission of a violent act requires a two-level enhancement.
>
> Certainly, my view is of the case at trial could be established easily by a preponderance of the evidence was that Mr. El Gammal engaged in this activity with Mr. El-Goarany knowing that Mr. El-Goarany was very incentivized to travel to Syria in order to fight, to become a fighter with ISIL, an organization that has been deemed to be a foreign terrorist organization, an organization that had declared war against the United States and others and that Mr. El Gammal knew that Mr. El-Goarany was going to willingly engage in acts of violence. And so, I do find that by at least certainly a preponderance of the evidence the enhancement applies.

(*Id.* at 11-12).

The defendant's sentencing counsel next challenged the applicability of Section 3A1.4 and its requirement that the offense conduct be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); U.S.S.G. § 3A1.4 App. Note 1.  Sentencing counsel stated, in part:

> Moving onto 3A1.4. . . the government presented a theory to the jury that had not been argued during their summation that the jury did not need to find that Mr. Gammal had actual knowledge following the dispute between the parties over the conscious avoidance instruction, relied heavily on the conscious avoidance instruction in their summation to the jury[.]
>
> The terrorism guideline, the Second Circuit has held that 3A1.4 requires some intent that the defendant's conduct was calculated to influence or affect the conduct of that government and that that required, that must require, that necessarily must require more than conscious avoidance. Since I would say that our primary argument on this enhancement is that there is an expressed conflict between the conscious avoidance evidence here and the scienter requirement of the terrorism enhancement.

(Sent. Tr. at []). The Government argued in response that "conscious avoidance and positive knowledge are equally culpable" under the law, and that, in any event, the evidence at trial established overwhelmingly that the defendant and El-Goarany actively sought and engaged in conduct that was "geared towards" efforts to retaliate against government conduct. (*Id.* at 14-16). The Government cited social media postings admitted at trial in which, for example, the defendant discussed his desire that ISIS "punish the Egyptians" and forcibly take over the countries of Egypt, Saudi Arabia, and Jordan. (*Id.* at 14-15).

In calculating the defendant's Guidelines range, the Court agreed with the Government, holding that the enhancement pursuant to Section 3A1.4 applied to the defendant's conduct:

> I find that this provision also applies. 3A1.4 indicates that if the offense is a felony that involved or was intended to promote a federal crime of terrorism, a 12-level enhancement is permitted. I do find that the fact that the government relied on a theory of willful blindness, used as a proxy for the intent requirement is of no legal moment, as Mr. DeFilippis has indicated, and the facts at the trial, as I recall them, and as are set forth in the government's submission and by Mr. DeFilippis here this afternoon, do indicate that certainly Mr. El Gammal was very motivated. He was interested in what was going on in Egypt and could be upset about the situation in Egypt and very desirous to do something. And Mr. Samy el-Goarany also indicated that he was motivated in large part by the events at Rabaa Square and therefore, joined ISIS in order to help because at least if in large part because of that. So I do think that that clearly evinces an intent to promote the crime of terrorism and therefore, I think that it does apply.

31

(Sent. Tr. at []). Based on the foregoing, the Court calculated the defendant's base offense level as 26; added two offense levels pursuant to Section 2M5.3(b)(1); and added twelve levels pursuant to Section 3A1.4, resulting in a total offense level of 40. Based on the defendant's criminal history category of I, the Court calculated the defendant's Guidelines range as 292 to 365 months' imprisonment. In fact, the parties, the Probation Department, and the Court overlooked the fact that Section 3A1.4(b) also states that "[i]n each such case, the defendant's criminal history category . . . shall be Category VI." Therefore, applying Criminal History Category VI, the defendant's correct Guidelines range should have been 360 months' imprisonment to life, and, in light of the statutory maximum sentence here, 360 months to 660 months (55 years).

The Court sentenced the defendant well below either Guidelines range to 144 months' imprisonment. In imposing sentence, the Court acknowledged that "this is a very important case" and that "the consequences of Mr. Gammal's conduct were tragic indeed" because "a young man. . . with the help of Mr. Gammal, [] travel[ed] to Syria [to] work with an organization that this country has determined to be a designated terrorist organization[.] The Court went on to state:

> It is uncertain why the guidelines are as high as they are for the typical offense, and the guidelines for Mr. Gammal certainly were very, very high. While I do not go as far as [defense counsel] goes to say that number comes from nothing, and it means nothing, I think it does reflect the considered thought of our legislators that these crimes be considered as seriously as possible. While I do have to deal with those laws, I also have to deal with the other statutes and provisions of the sentencing guidelines that require me to look at the person that is standing before me, and the person that is standing before me is a 48-year-old man who was, as far as anyone knows, as far as I have been told, prior to six years ago, was not involved in any of this type of activity. . . This is just, to use my parlance now. . . [not] [t]he type of true believer that I have seen in other cases in this court that I have dealt with as a member of the CJA panel in this court.

(*Id.* at 46-47).

2.        **Argument**

The defendant's core argument—that appellate counsel's decision not to challenge the Court's application of these enhancements constituted ineffective assistance—fails under *Strickland.* The defendant has not shown that such decision by counsel fell below an "objective standard of reasonableness" under "prevailing professional norms," nor can the defendant "affirmatively prove prejudice." *Strickland*, 466 U.S. at 687-88. To the contrary, the trial and sentencing record reflect that the Court properly applied both sentencing enhancements, rendering any appeal on that basis unlikely to succeed. Moreover, the defendant cannot prove prejudice here because the Court, in imposing a below-Guidelines sentence, made clear that it based its sentence mostly, if not entirely, on considerations other than these Sentencing Guidelines enhancements, namely, the defendant's personal characteristics and offense conduct. In light of the foregoing, appellate counsel's decision to focus his appeal on other issues was entirely reasonable, and his representation of the defendant was well within the bounds of effective assistance.

### a.  Counsel's Decision Not to Appeal the Application of U.S.S.G. § 2M5.3(b)(1) Constituted Effective Assistance

Turning first to Section 2M5.3(b)(1), appellate counsel's decision not to challenge the applicability of this enhancement was objectively reasonable. Extensive trial evidence supported the Court's finding that the defendant's offense conduct "involved" the provision of "material support or resources [*i.e.*, personnel] with . . . reason to believe that they [were] to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3(b)(1). As an initial matter, the jury convicted the defendant of conspiracy to receive military training from a designated foreign terrorist organization pursuant to 18 U.S.C. §§ 371 and 2339D based on his efforts to facilitate El-Goarany's training as an ISIS fighter. The jury therefore necessarily found that the

defendant intended to aid El-Goarany's efforts to train as an ISIS fighter in furtherance of its violent mission, not merely to support ISIS.

In addition, extensive evidence supported the jury's conclusion that the defendant and El-Goarany both sought to facilitate El-Goarany's involvement in acts of violence. The trial evidence included a photograph of El-Goarany in military fatigues in Syria; the testimony of El-Goarany's brother concerning their communications about El-Goarany's "military training" in Syria (Tr. 787-95); the defendant's martyrdom letter (Tr. 807); and the video El-Goarany produced in which he announced his presence in ISIS territory while appearing in military fatigues (Tr. 1813). Moreover, it was clear from the trial evidence that the defendant *knew specifically* of, and encouraged, El-Goarany's plan to become a fighter. For example, he connected El-Goarany with Attiya Aboulala, a facilitator in Turkey who, in turn, helped El-Goarany travel into the Syrian war zone. After El-Goarany arrived in the Middle East, the defendant also messaged El-Goarany, giving him advice on how to get to Gaziantep or Adana—two Turkish cities near the Syrian border that were at the time common pass-through cities for ISIS foreign fighters traveling from Turkey to Syria. (PSR ¶ 33; Tr. 499-500). Moreover, El-Goarany reported back to the defendant that he was in contact with someone from "the company," a coded reference to ISIS, and told him in another message that everything was going "according to plan," a reference to their joint plan for El-Goarany to join ISIS as a fighter. (Tr. 168).

Tellingly, and as noted above, the defendant himself also later used coded language expressing his own desire to join ISIS in the Syrian war zone. On May 14, 2015, he sent El-Goarany a message asking him whether it was "easy to park a car in ur job parking lot?" to which El-Goarany responded that "I think it's risky because the parking lot these days is under a lot of renovation, especially in the north side," a reference to ISIS's losses in northern Syria during this time period. El-Goarany then asked the defendant whether he "plan[ned] on driving anytime

soon"—a coded reference to whether the defendant planned to travel to Syria.  The defendant responded, "yes, mid August. . . check Facebook more often."  Thus, far from acting as a reluctant or unwitting supporter, the defendant expressed his own desire to join El-Goarany in his fight with ISIS.

In sum, the Court based its application of Section 2M5.3(b)(1)'s sentencing enhancement on extensive trial evidence reflecting that the defendant's offense conduct involved the provision of support, namely personnel in the form of El-Goarany, intending, knowing, and having reason to believe that El-Goarany would fight for ISIS and commit violent acts on its behalf—thus clearly establishing the applicability of the enhancement by a preponderance.  In light of this evidence, it was a reasonable exercise of professional judgment for appellate counsel to "avoid[ ] cluttering the court with unnecessary arguments" like those challenging the applicability of this enhancement.  *Weingarten*, 865 F.3d at 53.

*United States v. Dhirane*, 896 F.3d 295, 304–05 (4th Cir. 2018), on which the defendant relies, undermines, rather than supports, his argument.  In that case, the Fourth Circuit affirmed the district court's finding that because the defendants' financial support to a designated foreign terrorist organization (al-Shabaab) was directed at, and designed to support, al-Shabaab's military operations in Somalia and Kenya, the enhancement pursuant to Section 2M5.3(b)(1)(E) was applicable.  *Id.*  The court specifically noted that the Guidelines provision "does not require . . . that support be traced to or be designed to lead to a specific act of violence, [but rather] that the defendants be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization."  *Id.*  Here, even more so than in *Dhirane*, the defendant's conduct—*i.e.*, facilitating the travel of an aspiring ISIS fighter to a war zone—evidenced "reason to believe" that the offense would lead to violence, as it involved El-Goarany's joining ISIS as a fighter, as opposed to merely providing financial support.  And while

35

the defendant argues that "the evidence established that El-Goarany hid his desire to fight for ISIS from his parents" and certain of his friends, these facts have no direct bearing on *the defendant* whose conduct and coded communications make clear that he was well aware of the defendant's plans.  (Def. Br. at 38).

Nor does any evidence support the defendant's contention that the defendant heard or believed El-Goarany's purported "public story" that he was "going to Syria to provide humanitarian aid to civilians and refugees." (Def. Br. at 28).  To the contrary, their communications reflect that they both fervently supported ISIS's violent activities and took steps to ensure that El-Goarany would join ISIS as a fighter in the Syrian war zone (the "parking lot").  Accordingly, any arguments challenging the applicability of this enhancement would have had little prospect of success on appeal, and appellate counsel's choice not to raise such arguments was reasonable.

Finally, the defendant's argument fails for the additional reason that he has not shown pursuant to *Strickland* that he was prejudiced by appellate counsel's choice not to raise the applicability of this enhancement.  As noted above, the Court's comments at sentencing made clear that the Court gave little, if any, weight to the increased offense level triggered by this enhancement, calling the defendant's Guidelines range "very, very high" and imposing a sentence well-below the Guidelines.  Accordingly, even if the defendant had succeeded in challenging the applicability of Section 2M5.3(b)(1), either in this Court or on appeal, there is no reasonable possibility that the Court would have imposed a materially different sentence.

Accordingly, the Court should reject the defendant's argument that his counsel was ineffective for not raising these issues on appeal.

**b. Counsel's Decision Not to Appeal the Application of U.S.S.G. § 3A1.4 Constituted Effective Assistance**

The defendant's argument concerning appellate counsel's decision not to challenge the applicability of Section 3A1.4's terrorism enhancement fails for similar reasons.

First, appellate counsel's decision to forego arguments concerning this enhancement was objectively reasonable given the strength of the Government's proof at trial that the defendant's offense conduct "involve[d] federal crimes of terrorism" under Section 3A1.4.   As an initial matter, the jury found that the defendant violated two of the statutes explicitly enumerated by this Guidelines provision (*i.e.*, 18 U.S.C. §§ 2339B and 2339D).  *See* 18 U.S.C. § 2332b(g)(5)(B).  In addition, each of the defendant's crimes was "calculated to influence or affect" by intimidation or coercion, or "retaliate against," government conduct.  More specifically, and as set forth in the Government's sentencing submission, the defendant's convictions for aiding and abetting, attempting, and conspiring to provide material support and resources to ISIS (Counts One and Two), and for aiding and abetting, and conspiring in the receipt of military training from ISIS (Counts Three and Four), all plainly (and certainly by the applicable preponderance of the evidence standard) meet the "calculation" requirement because each of these crimes entailed acts—*i.e.*, the facilitation of El-Goarany's training and fighting with ISIS—that were intended to influence and/or retaliate for government conduct.  More specifically, the defendant participated in El-Goarany's efforts to provide himself as "personnel" to ISIS in Syria, where El-Goarany later fought and died for the terrorist group.  As the Government proved at trial and highlighted at sentencing, one of ISIS's primary missions and a principal reason for which it recruited fighters is to establish and expand its territory (*i.e.*, its "Caliphate") through violence against governments and others who seek to control such territory.  (Tr. 458, 464).  Thus, ISIS, in training and deploying fighters, seeks to influence, overthrow, and defend itself against military action by, governments.

(Tr. 495).  This is particularly true in Syria—the country in which El-Goarany joined ISIS—where the terrorist group for years has engaged in a civil war in an effort overthrow the Syrian government.  (Tr. 1603).  ISIS has also called for and carried out attacks on Western countries in order to retaliate and punish perceived misdeeds by the governments of these countries.  (Tr. 483). Accordingly, the Court had a sound and extensive basis in finding at sentencing that the defendant committed offenses that were manifestly "calculated to influence or affect the conduct of government" and to "retaliate against government conduct."  18 U.S.S.G. § 3A1.4.

Moreover, on appeal, the defendant could not reasonably or effectively have disputed his own knowledge that ISIS intended to affect or retaliate against government conduct through El-Goarany's activities.  Indeed, the defendant, in professing his own support for ISIS prior to El-Goarany's travel to Syria, stated:

> Beheading has a magical effect. . . . I pray to God to grant them victory and control over entire Iraq and then the Levant; then we join them in conquering Egypt, and from there to Jerusalem, God willing.

(Tr. 343).

The defendant also identified other nations whose governments he hoped ISIS would topple:

> May God grant them victory and take over Jordan, then Saudi Arabia, then conquer Egypt after that.

(*Id.*)

Further, the defendant made the following additional statements evidencing his knowledge that ISIS fighters sought to affect government conduct:

> "Defeat is near.  Inevitably.  Daesh will come teach those people.
> If Daesh gets to Egypt, I will go join them, so I can torture the Egyptians, and whip them."
> [. . . ]

> "All Caliphates started like this and then expanded. . . . No Caliphate came by deliberation. All by the sword.  It has to be like this; we take it forcibly not peacefully."

(Tr. 762; GX 100-O-T).

In addition, El-Goarany also expressed his intent to affect government conduct upon his arrival in Syria, when he explained that he had joined ISIS to retaliate for the acts of the Egyptian government during the uprising at Rabaa Square in 2014, an event which also had a profound effect on the defendant:

> "Over 2 years since Egypt's military coup . . .  Approaching the 2nd anniversary of the Rabaa massacre . . . . In case ur wondering why I'm here today."

(Tr. 1797).

Thus, the defendant's and El-Goarany's own words make clear that the defendant's crimes were "calculated" for the precise purpose required under Section 3A1.4.  *See Alimehmeti*, 16 Cr. 398 (PAE) (S.D.N.Y), Dkt. 133 at 7-17 (applying terrorism enhancement over defense objection where defendant was convicted of attempting to provide material support to ISIS by facilitating travel of ISIS supporter to join ISIS overseas, and specifically rejecting argument that Government had failed to show defendant's conduct was directed at impacting government conduct); *see also United States v. Ullah*, 18 Cr. 16 (RJS) (S.D.N.Y), Dkt. 116 at 11  (applying terrorism enhancement over defense objection where defendant was convicted of attempted terrorist bombing in New York City; *United States v. El Bahnasawy*, 16 Cr. 376 (RMB) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was convicted of conspiring to carry out a terrorist bombing on behalf of ISIS in New York City); *United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y.) (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey).

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), on which the defendant relies, is inapposite.  In that case, the Ninth Circuit reversed the district court's application of the Section 3A1.4 enhancement where the Government proved that the defendant knowingly opened social

media accounts for ISIS members but did not offer any evidence of the defendant's awareness or intent that the accounts would be used to affect government conduct. The Ninth Circuit noted that the district court did not find that the defendant "harbored retaliatory intent against any particular government, or that he posted retaliatory messages from the social media accounts he created." *Id*. at 704.

The facts of *Alhaggagi* are a far cry from the instant case. Indeed, the trial evidence proved, and the Court here found, precisely what the Appeals Court in *Alhaggi* held was missing: a desire to affect and retaliate for specific government conduct. As this Court observed at sentencing, El-Goarany "was interested in what was going on in Egypt," "very desirous to do something," and "motivated in large part by the events at Rabaa Square and therefore [and] joined [ISIS] in order to help because at least if in large part because of that." Moreover, the evidence detailed above reflects that the defendant shared these very same views and objectives, and specifically sought to further them by participating in the charged terrorism crimes. This case is therefore easily distinguishable from *Alhaggagi* and similar cases. *Cf. United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009) (holding that "there is no evidence that [the defendant] himself sought to influence or affect the conduct of a government [and] [t]he enhancement therefore does not apply under the 'involved' prong"). Accordingly, the Court properly applied the Section 3A1.4 enhancement to the defendant's offenses, and appellate counsel was not deficient in exercising his judgment not to raise this issue on appeal.

This Court also clearly did not err in rejecting the defendant's argument at sentencing that the Court's jury instruction regarding willful blindness precluded application of U.S.S.G. § 3A1.4. (Def. Mot. 7-8.) The evidence at trial proved overwhelmingly that the defendant actually knew that El-Goarany intended to join, train, and fight with ISIS, and was not merely willfully blind. Nevertheless, it is well-settled that "deliberate ignorance and positive knowledge are equally

culpable." *United States v. Reyes*, 302 F.3d 48, 54–55 (2d Cir. 2002) (quoting *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.1976) (*en banc*)).   Accordingly, it is of no moment for the purposes of applying Section 3A1.4 that the jury might have convicted the defendant under a willful blindness theory.   Because a finding of willful blindness concerning a defendant's knowledge does not in any way undermine a jury's finding of criminal intent, "[t]he circuits are uniform in approving willful blindness instructions" even in cases requiring a showing of "specific intent." *United States v. Griffin*, 524 F.3d 71, 79 (1st Cir. 2008).   Indeed, the jury here was instructed properly that conscious avoidance "applies only to the element of knowledge, not to the element of intent.   One cannot join a conspiracy unless the person is aware of its existence and specifically intends to do so."   (Tr. 1978-79).   Thus, the jury was well aware that it had to find that the defendant intended to join the relevant conspiracy.   The defendant's conduct was therefore sufficient to meet the "specific intent" requirements of Section 3A1.4, even if the jury convicted him under a willful blindness theory.[4]

In light of the above, counsel reasonably exercised his professional judgment in selecting other grounds for appeal.   *See Weingarten*, 865 F.3d at 53.   Nor were the grounds raised by counsel on appeal "clearly or significantly weaker" than the grounds cited by the defendant.   *Lynch*, 789 F.3d at 311.   The defendant's argument on this issue therefore also fails to establish objectively unreasonable conduct by appellate counsel.

---

[4] Even if the defendant's offense conduct did not satisfy Section 3A1.4's requirement that the offense "involve[d]" a federal crime of terrorism"—which it plainly did—his offense conduct independently satisfies the Guidelines provision's alternate requirement that a defendant "intended to promote" such a crime.   U.S.S.C. § 3A1.4.   Namely, by aiding, abetting, and facilitating El-Goarany's travel to Syria to join and fight with ISIS, El Gammal manifested his intent to promote crimes that were "calculated" by El-Goarany and by ISIS to achieve the objectives set forth in Section 3A1.4.

Finally, the defendant has failed to meet *Strickland*'s prejudice prong with respect to the applicability of the Section 3A1.4 enhancement.  For the reasons set forth above, the defendant's argument on appeal would have lacked merit and therefore would not have changed the outcome of his case.  Moreover, and as set forth above, this Court based its below-Guidelines sentence on its assessment of the defendant's culpability in light of the Section 3553(a) factors without giving substantial independent weight to the increased offense level, which it noted expressly was "very, very high."  Accordingly, there is no reasonable prospect that even a successful appeal on this issue would have reduced the defendant's sentence on remand.  The defendant therefore has not demonstrated any prejudice resulting from appellate counsel's purportedly deficient performance.

## **CONCLUSION**

For the foregoing reasons, the Section 2255 Petition should be denied.

Dated:  New York, New York
        July 8, 2022

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

            By:     /S/_____
                            Andrew J. DeFilippis
                            Negar Tekeei
                            Assistant United States Attorneys
                            One St. Andrew's Plaza
                            New York, New York 10007
                            Tel. No.: (212) 637-2231/2482