# 15-CR-588

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK
——————◆——————

### AHMED EL GAMMAL,

Petitioner,

-against-

### UNITED STATES OF AMERICA

Respondent,

——————◆——————

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

SARAH KUNSTLER, ESQ.
BEENA AHMAD, ESQ.
LAW OFFICES OF SARAH KUNSTLER
*Attorney for Petitioner*
*Ahmed El Gammal*
315 Flatbush Avenue #103
Brooklyn, NY 11217
(718) 783-3682
(347) 402-2014
sarah@kunstlerlaw.net

## PRELIMINARY STATEMENT

At the time that Mr. El Gammal was convicted, the specter of ISIS and its brutal methods of obtaining control loomed large in the minds of Americans. The possibility that young disenchanted American men were going overseas to join ISIS was also a preoccupation of the American legal system. It has been nearly four years since Ahmed El Gammal was sentenced by this Court, and seven years since El-Goarany's death. Since that time, we have seen that a larger threat to our democracy has come from disaffected supporters of former President Trump, who actually stormed the Capitol building, injured members of law enforcement, and sought to kill elected officials, including the Vice President in order to thwart a democratic election. For this conduct, the longest sentence to date for the conduct of these insurrectionists has been 10 years of prison – for an individual who personally engaged in violence and assaulted a police officer.[1] Most of the insurrectionists have received far less time for actually making good on their promises to destabilize this democracy by showing up in Washington, D.C. on January 6, 2021, in a mob threatening this country's seat of power.

Contrary to the government's representations, Ahmed El Gammal was not convicted by "overwhelming evidence"; he was convicted more for his speech than his actions. After three long days of deliberation, the jury ultimately reached its conclusion, relying mostly on Mr. El Gammal's statements expressing admiration for the military prowess of ISIS. From the safety of his home in Arizona, Mr. El Gammal hated the oppressive dictatorship of Abdel Fattah al-Sisi and believed in his people's struggle for a democratic Egypt. As his marriage fell apart, Mr. El Gammal turned to social media as an outlet for connecting with others over politics and his home country of Egypt.

---

[1] *See* Eduardo Medina and Remy Tumin, *Ex-N.Y.P.D. Officer Gets 10 Years for Jan. 6 Attack, Longest Sentence to Date*, N.Y. Times (Sept 1, 2022) (convicted following a jury a trial for assaulting a Washington officer with a metal flagpole.

However, there was scant to no evidence that Mr. El Gammal was actually connected with ISIS or knew that Samy El-Goarany traveled to Turkey to join ISIS's ranks. For these reasons, appellate counsel was ineffective for failing to raise the sufficiency of the evidence on appeal.

Appellate counsel was also ineffective for failing to challenge the fact that the terrorism enhancements under U.S.S.G. §§ 3A4.1 and 2M5.3 had been applied largely because the case involved ISIS, without requisite showings that these enhancements for the terrorism charge were justified. For example, the government did not prove that Mr. El Gammal's conduct, meager assistance to El-Goarany in his effort to reach Turkey, was "calculated to influence or affect" or "retaliate against" government conduct or that Mr. El Gammal knew that El-Goarany's true intentions were join military combat in Syria.  Had appellate counsel challenged whether the conduct in this case qualified for these terrorism enhancements, the proper anchor for Mr. El Gammal's sentence under the Guidelines may have been in the 63 to 78 months range rather than the 292 to 365 months range that resulted from the enhancements. It is true that each case brings its own special considerations. But the erroneous application of the terrorism enhancements in this case is really the only explanation left for why the sentence Mr. El Gammal received for his minor contributions to Mr. El-Goarany's journey to Syria exceeds that received by those who actually picked up arms against our government on U.S. soil and engaged in violent conduct.

## I.      EL GAMMAL'S SUFFICIENCY OF THE EVIDENCE ARGUMENT IS SUPPORTED BY THE WEAKNESS IN THE GOVERNMENT'S PROOF

Mr. El Gammal does not dispute the government's contention that there was evidence that Samy El-Goarany received military-type training, received it from or on behalf of ISIS, or that he is an American citizen. (Gov't Mem. p. 23.) What is missing from the government's proof for both Counts Three and Four is evidence that Mr. El Gammal *knew* that El-Goarany planned to pursue

military-type training with ISIS when he offered El-Goarany the most minimal of advice for traveling to Turkey.[2]

First, the government contends that that the evidence shows that El Gammal "knew that ISIS was a violent terrorist organization" that used "military tactics." (Gov't Mem. p. 24.) Mr. El Gammal does not dispute that he knew what everyone knows in relation to ISIS.

Next, the government conflates several statements and takes others out of context to reach the conclusion that Mr. El Gammal "advocated ISIS's use of military force to expand the Caliphate" and "supported ISIS's expansion through jihad." (Gov't Mem. pp. 3-4; 24.) The exact comment that the government cites in support of this claim is a post on July 1, 2014, that if ISIS "gets to Egypt, I will go join them, so I can torture the Egyptians, and whip [them.]" (Gov't Mem. pp. 3-4.) Mr. El-Gammal's comment was made in the course of his tirade that the Muslim Brotherhood had been a weak force for change in Egypt. [TT 458.] As recounted below, Mr. El Gammal's statements extol the military might of ISIS, which it cannot be said is exactly the same thing as supporting ISIS:

Aboualala:     The majority of al-Maliki's soldiers abandoned their vehicles and weapons and ran away as they've heard that the fighters of the Islamic State in Iraq and Levant were coming. They took control of Mosul, the second largest city in Iraq, and entered Takrit in the Salahuddin governorate. They will not sit and wait to fight and that they might possibly resist. They have the fear of previous battles and know that if they will get arrested, they will get dragged along the ground, dissected, and then tied to a pole. Afterwards, they will think whether they will leave him like that until he dies by himself or if they have sympathy for him and fire the mercy bullet at him. This is for you to know that the Brotherhood are sissies and calling them terrorists is nothing but futility and political intellectual terrorism to all those opposing the coup.

---

[2] Under Count Three, aiding and abetting in the violation of 18 U.S.C. §2339D requires intent i.e. "[a] person who actively participates in a criminal scheme with full knowledge of its extent and character intends that scheme's commission. [Tr. 1969.] Under Count Four, conspiracy to violate 18 U.S.C. § 2399D, the government needed to prove that "the defendant knowingly and willfully joined the conspiracy, that is, that he knowingly and willfully joined in the agreement to violate the law." [TT 1988—89.]

El-Gammal:     Beheading has magical effect, Attiya. You know? If we would have had beheaded a few at the time of revolution, the country would have gotten better and everything would have been straightened out."

Abboualala:    I watch very carefully what is happening in Iraq because this could be either the beginning sign of breaking what is already broken, or the collapse of the Sykes-Picot with all its consequences."

El-Gammal:      I pray to God to grant them victory and control over entire Iraq and the Levant, then we join them in conquering Egypt and, from there, to Jerusalem, God willing.

             [TT 964-65.]

When viewed in full context, Mr. El Gammal was doing nothing more than drawing a comparison between what ISIS was able to accomplish militarily in contrast to the failures in Egypt of the Muslim Brotherhood, who he regarded as "sissies." The rhetoric around the beheadings is obviously hyperbolic and tongue-in-cheek. Mr. El Gammal's comment to Aboulalala on July 1, 2014, "[n]othing works with them except Daesh" must be seen in the same light. [TT 1936.] To take these comments and leap to the conclusion that Mr. El Gammal was ready to throw in his lot with ISIS requires ignoring the relationship between ISIS and Muslim Brotherhood, which is fundamentally at odds. The jury's inability to grasp this nuance does not mean make the government's proof any more sufficient.

The context of some of the statements cited by the government as evidence of Mr. El Gammal's unequivocal support for ISIS should also be seen in light of ISIS's involvement in Iraq in the summer of 2014. At the time, ISIS had just re-appeared in the region, and it was in the early days of fighting two regimes, Iraq and Syria, that were both ruled by brutal, oppressive forces who targeted Sunni Muslims. As a Sunni, Mr. El Gammal sympathized with the victims of these regimes and his support for a "Caliphate" under these circumstances in the early days of ISIS should be viewed in that context.

Most notably, all of the above conversations that the government cites are between Mr. El Gammal and Aboulalala, and not between Mr. El Gammal and Samy. The evidence that Mr. El

Gammal and El-Goarany shared any common views in relation to ISIS is scant. In fact, the one piece of evidence that the government provides to show that Mr. El Gammal supported ISIS undercuts the government's argument that the two saw eye to eye. The government points to a communication that Samy had with a mutual friend, "Mustafa", in which "Mustafa" tells him that "El Jammal" had expressed support for ISIS in a comment posted on Facebook. (Gov't Mem. at 4.) The government makes of the fact that Samy then proceeded to contact Mr. El Gammal a few minutes later, for what reason, no one knows. But the government has no explanation for why in that conversation with Mustafa, Samy had actually disavowed the brutal tactics that ISIS was using: "What Daesh is doing is destroying the dictators in our region to free us from Israel and west. And that is a good thing. But the way they do it is very brutal and I fear it will alienate people." [TT 1767.] The government's feeble attempt for clearing up this incongruity at trial was to argue that "El-Goarany's views about ISIS were evolving." [TT 1766.]

There is no question that Mr. El-Goarany developed increasingly radical views in the subsequent months in 2014, but the government did not prove that this increased radicalization was due to any efforts by Mr. El Gammal. The government relies predominantly on missing Facebook messages and seeks to establish guilt through what is not there. While the missing messages may appear suspicious and might suggest that the Mr. El Gammal had *something* to hide, it does not necessarily mean the Mr. Gammal sought to hide the specific conduct at issue in Counts 3 and 4 of the indictment, aiding and abetting the receipt of military-type training in violation of 18 U.S.C. §§ 2339D and Count 4, participating in a conspiracy to receive military-type training from and behalf of ISIS, in violation of 18 U.S.C. § 371. In the same vein, the coded language, references to a "parking lot" and "everything is going according to plan" used by the government also do not provide the necessary links to ISIS. (Gov't Mem. p. 25.) In order to infuse significance into these statements, the government made a circular argument to the jury: The fact that El-Goarany showed

up in Syria suggests that the "plan" was to send Samy to Syria to join ISIS. [TT. 1789-90.] In sharp contrast, Samy's father and brother actively hid their own involvement in the case from the F.B.I.

The government simply has no basis from which to argue that either Mr. El Gammal or El-Goarany were "singularly focused" on ISIS activities. El-Goarany's own Facebook page, replete with numerous posts of his concern for Syrian refugees, belies the government's argument that El-Goarany was solely concerned with ISIS, such that there would have been no question in El Gammal's mind why El-Goarany wanted to go to Turkey. In that sense, this case is very much like *United States v. Kabir*, 828 F. App'x 396 (9th Cir. 2020), where the Ninth Circuit found the government's proof lacking because it could only show the defendants' desire to travel to Afghanistan. Here, the government can only support Mr. El Gammal's willingness to help El-Goarany get to Turkey through connecting him with Aboualala, and offering the types of very common-sense tips that someone who has traveled would offer a younger person who has never traveled alone, such as downloading a Google app for language translation, and checking fares across multiple bus companies that might run between different cities.

 The crux of the government's argument that Mr. El Gammal was responsible for El-Goarany's radicalization comes down to a *Vice* video segment on ISIS that Mr. El Gammal "went so far as to provide El-Goarany" which "described the types of training – including military training—that ISIS provided to its recruits." (Gov't Mem., p. 24.). The segment that Mr. El-Gammal forwarded to Samy is the second part of a 45-minute piece of journalistic reporting. It is, in fact, wholly irrelevant to El-Goarany because it relates to the experiences of children growing up inside ISIS. It is hard to imagine what information from this documentary would have helped El-Goarany when he arrived in Syria. Indeed, military training is only one small aspect of the series. The film also explores some of the more mundane aspects of ISIS's rule including monitoring civilians on the street for what they are wearing, whether they are drinking alcohol, collecting taxes

from religious non-religious minorities, and the bureaucratic administration of everyday rule in the areas that they controlled. Finally, the film is hardly a piece of ISIS propaganda, as it offers a bleak view of life under ISIS rule and is critical of the large numbers of refugees that have resulted from ISIS's involvement in Syria.

Finally, the only other involvement by Mr. El Gammal in El-Goarany's activities include Mr. El Gammal's trip to New York and the introduction that Mr. El Gammal made for Samy to Mr. Aboualala. However, the evidence shows that Samy had his own independent travels plans and connections. [TT. 277-78, 290.] And neither shows that Mr. El Gammal knew of Samy's true purpose in Turkey or Syria.

Indeed, the evidence establishes that the only person who really knew of El-Goarany's true purpose was his brother, Tarek. It was Tarek who accompanied Samy while he bought a plane ticket, combat boots, and a camel bag. [TT 207, 749, 754, 758.] Once he arrived in Syria, Samy updated Tarek on his military exploits, not Mr. El Gammal. [TT 334-335, 750, 761-66.] The reason that Samy's communications to Mr. El Gammal decreased sharply after he arrived in Syria is because Mr. El Gammal's purpose was over. Samy used Mr. El Gammal to navigate his way through Turkey, and then he had no more use for him because Mr. El Gammal had nothing more to offer. This is because Mr. El Gammal was not someone who had any contacts to ISIS.

In light of the weaknesses in the government's proof, Appellate counsel was ineffective for failing to challenge Mr. El Gammal's conviction. A sufficiency argument would not have taken away from the two arguments that counsel made on appeal: the evidentiary challenges to this Court's rulings, or the "conscious avoidance" jury charge. The sufficiency argument was not ancillary. Rather, an argument related to the sufficiency of the evidence went to the heart of defense counsel's arguments to the jury at trial. Accordingly, Mr. El Gammal was also prejudiced under the second prong of the *Strickland* test by counsel's failure to raise this argument.

7

Thus, this Court should find that counsel was ineffective for not raising this claim on appeal and may review Mr. El Gammal's conviction in this § 2255 proceeding.

## II.   APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO MAKE ANY ARGUMENTS AGAINST THE USE OF INAPPLICABLE SETENCING ENHANCEMENTS

### A.  U.S.S.G. 2M5.3(b)(1) Does Not Apply to the Facts of This Case

The government has failed to establish that Mr. El Gammal knew that Mr. El-Goarany traveled to Syria to commit "a violent act[.]" as required under Section 2M5.3(b)(1).

Section 2M5.3(b)(1) provides a two-level increase to the base level where the offense "involved the provision of…funds or other material support or resources with intent, knowledge or reason to believe they are to be used to commit or assist in the commission of a violent act[.]"

First, the government argues that Mr. El Gammal was convicted of conspiracy to receive military training from a designated terrorist organization pursuant to 18 U.S.C. §§ 371 and 2339D, and therefore the enhancement also necessarily applies. (Gov't Mem. at 33-34.)  However, as Mr. El Gammal contends, *supra* Part I, the evidence was not sufficient to convict him for these offenses.

Second, even assuming ex arguendo that the evidence was sufficient for Mr. El-Gammal's conviction, none of the evidence that the government has offered shows that Mr. El Gammal knew that Samy El-Goarany planned to be involved in violence in Syria. The government primarily relies on evidence that was created *after* El-Goarany had already arrived in Syria. For example, the government points to a photograph of El-Goarany in "military fatigues" to suggest that it was evident that El-Goarany was involved in military exploits. (Gov't Mem. p. 34.) But the government does not explain to whom the photograph was sent and by whom. Moreover, the government did not prove the photograph had ever been sent to Mr. El Gammal. Next, the government relies on the

8

testimony of El-Goarany's brother "concerning their communications about El-Goarany's 'military training' in Syria." (Gov't Mem, p. 34). Again, this testimony only shows that Tarek El-Goarany knew that Samy was in Syria for "military training." [TT 787-95.] The government does not contend that Mr. El Gammal was in any kind of communication with Tarek El-Goarany about his brother or knew what Tarek knew. For the same reason, what the government calls the "defendant's martyrdom letter" proves nothing. This letter was actually sent by Samy El-Goarany to Tarek El-Goarany, and there is nothing that indicates that this letter was ever sent to Mr. El Gammal. [TT 807.]  It is unclear how the government believes this letter imputes anything related to what Mr. El-Goarany was doing in Syria to Mr. El-Gammal.

The government's reliance on Mr. El Gammal's assistance in Turkey also does not impute knowledge of any "violent acts" that El-Goarany planned to undertake in Syria. For example, Mr. El-Gammal does not deny that he introduced Mr. El-Goarany to Aboulala, his contact in Turkey. The advice that Mr. El Gammal gave to Samy about how to get to Gaziantep or Adana is more consistent with the desires that Samy expressed to many of his friends that he wanted to work with refugees, as both of these Turkish cities have received large numbers of refugees resulting from the atrocities of the civil war under the Assad regime. These destinations do not establish that Mr. El Gammal assisted El-Goarany in the commission of any violent acts.

The government then turns to several vague statements made by Mr. El Gammal and Mr. El-Goarany and asks for great leaps of inference to assume that they related to violent conduct. (Gov't Mem. at 34.) For example, the government relies on Mr. El-Goarany's vague message to the defendant that he had been in contact with someone at "the company" and told him in a different message that everything was going "according to plan." (Id.) The government's proof falls short of what was required in *United States v. Dhirane* because it does not establish that Mr. El-Goarany's involvement was used specifically towards violent conduct by the terrorist organization. 896 F.3d

295, 304—05 (4th Cir. 2018). It would not have been enough to show that the defendant or that El-Goarany merely planned to join ISIS, just as in *Dhirane*, it was not enough for the government to show that the defendant sought to provide financial support to al-Shabaab. The government needed to show that the defendant's conduct was "directed and designed to support al-Shabaab's military operations in fighting a war of terrorism in Somalia and Kenya." *Id*. at 305.

Next, the government argues that the fact that Samy El-Goarany had hidden his desire to fight for ISIS has "no direct bearing on the *defendant* whose conduct and coded communications make clear that he was well aware of the defendant's plans." (Gov't Mem. p. 36.) But the government has not in the first instance shown that the coded communications establish Mr. El-Goarany's intent to fight for ISIS, much less that this language shows Mr. El-Goarany's intent to join ISIS in combat in Syria. According to the government, the reference to the "parking lot" refers to northern Syria and "the company" is ISIS. (Gov't Mem., p. 34.) Again, just as was the case in *Dhirane*, a defendant's mere involvement in the terrorist organization, even in a conflict zone is insufficient. This enhancement was meant to punish a defendant's violent objectives through a terrorist organization more severely.

Finally, the government again suggests that the *Vice* documentary is the critical link in this case, establishing that Mr. El Gammal knew that Mr. El-Goarany was interested in ISIS's military operations. As discussed in Part I, *supra*, the video segment shows ISIS engaged in a number of operations, some of them which were entirely civilian in nature, such as patrolling streets to monitor the behavior of citizens, visiting food vendors to ensure that they engaged in fair practices, and presiding over civil disputes between parties and taking care of other administrative matters in the areas that ISIS controlled. It falls far short of establishing that Mr. El Gammal knew of – and supported – Mr. El-Goarany's supposed violent intentions.

Thus, the government fails to argue that a two-point enhancement was warranted under U.S.S.G. §2M5.3(b)(1) based on the facts of this case.

### B.  The Government Has Failed to Show That U.S.S.G § 3A1.4 Should Automatically Apply to The Facts of This Case

The hefty 12-point sentencing enhancement under U.S.S.G § 2A1.4 was erroneously applied when calculating Mr. El Gammal's applicable Sentencing Guidelines range because the government did not establish that the terrorism offenses was "calculated to influence or affect" by intimidation or coercion or "retaliate against" any specific government.

As a preliminary matter, the government still cannot even name which government Mr. El Gammal's crimes were targeted to influence or affect. The government vaguely references to "one of ISIS's primary missions and a principle reason for which it recruited fighters is to establish and expand its territory (*i.e.* its Caliphate) through violence against governments and other who seek to control such territory." (Govt Mem., p. 37.)  Surely, the terrorism enhancement was not intended to apply to groups that blankertly reject *any and all* governments. In any event, the evidence was to the contrary. Both Mr. El Gammal and El-Goarany supported a democratically elected government in Egypt.

Second, the government relies on statements by El-Goarany about Egypt when he arrived in Syria and imputes them to Mr. El Gammal. The government argues that El-Goarany "expressed his intent to affect government conduct upon his arrival in Syria, when he explained that he had joined ISIS to retaliate for the acts of the Egyptian government during the uprising at Rabaa Square in 2014, an act that also had a profound effect on the defendant." (Gov't Mem, at p. 39.)  However, the government misses the fact that this statement does not translate into a retaliation on "the acts of the Egyptian government." Again, El-Goarany's statement actually expresses support for the government of Egypt and condemns the acts of the military that deposed the democratically elected government in Egypt.

While Mr. El Gammal may have shared in Mr. El-Goarany's condemnation of the military coup in Egypt, the government has not pointed to any evidence that Mr. El Gammal and El-Goarany saw eye to eye on Egyptian politics or shared a common objective for the future of the country. Indeed, sending El-Goarany to Syria would have been an extremely roundabout way of effecting political change in Egypt.

The *United States v. Alimehmeti* case does not support the government's argument that a defendant's conduct can be construed as directed at impacting government conduct "where defendant was convicted of attempting to provide material support to ISIS by facilitating travel of ISIS supporter to join ISIS overseas." 16 Cr. 398 (PAE)(S.D.N.Y.), Dkt 133. (Gov't Mem. p. 39) The district's analysis in *Alimehmeti* did not begin and end with his involvement with ISIS or other government. In that case, after determining that the enhancement would apply to conduct that sought to influence foreign governments, the court found that the defendant's conduct was also "directed to the United States." Dkt 133 at *13. The court noted that the defendant had been stockpiling weapons, which the court took to show "preparation for a potential attack in the United States. The stockpiling of weapons served no other conceivable purpose, and the weapons could not conceivably have been taken out of the United States." Dkt. 133 at *14. The other cases that the government cites on page 39 of its submission do not apply because they relate to acts of terrorism that took place on U.S. soil and were meant to target the United States government via ordinary citizens. *See United States v. Ullah*, 18 Cr. 16 (RJS)(S.D.N.Y.), Dkt. 116 at 11; *United States v. El Bahmasawy*, 16 Cr. 376 (RMB)(S.D.N.Y.); *United States v. Rahimi*, 16 Cr. 760 (RMB)(S.D.N.Y.)

The government does not explain what government Mr. El Gammal sought to influence and how helping El-Goarany travel to Turkey was going to achieve that objective. Thus, the government's arguments related to the specific objectives for the commission of the offenses wind

up being just as generalized and insufficient for the enhancement under *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) and *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009).

Finally, there is something perverse in the government's insistence that the terrorism enhancement apply based on the defendant's was statements of support *for* a democratically elected government and criticism for a government that illegitimately seized power and continues to engage in severe acts of oppression over which our own State Department has expressed concern.[3]

### C. Counsel Was Ineffective for Failing to Challenge the Sentencing Enhancements

As a matter of law, counsel was ineffective for failing to challenge the application of the § 3A.4.1 and § 2M5.3(b)(1) enhancements and for solely focusing on discretionary errors at trial such as evidentiary rulings and the "conscious guidance" jury charge.

The government argues that trial counsel was not unreasonable in failing to challenge the enhancement under U.S.S.G. § 3A.4.1 because the government, the Probation office, and the Court all failed to apply the enhancement correctly and raise defendant to Category VI. (Gov't Mem, p. 32.) However, this error does not diminish counsel's obligation to raise the applicability of this enhancement, which resulted in a 12-point adjustment to the base offense level. Indeed, a challenge was warranted because it appears that the enhancement was applied simply because the terrorist group at issue was ISIS. For this reason, too, it was incumbent on counsel to challenge the application of the two-point enhancement under U.S.S.G. § 2M5.3(b)(1).

The government contends that the fact that defendant received a lower than Guidelines makes these arguments futile. However, these enhancements skewed the range that this Court was considering from 63 to 78 months to 292 to 365 months. It cannot be said that the Guidelines were simply irrelevant to the Court's ultimate sentence of 144 months. Indeed, if no enhancements had

---

[3] *See* Missy Ryan, *U.S. Blocks $130 Million in Aid to Egypt Over Human Rights*, The Washington Post (Sept. 14, 2022), available at https://www.washingtonpost.com/national-security/2022/09/14/us-blocks-130-million-aid-egypt-over-human-rights/

been applied, there is a reasonable likelihood that Mr. El Gammal's sentence would have been half the time he ultimately received. *See Johnson v. United States*, 313 F.3d 815, 818 (2d Cir. 2002).

## CONCLUSION

For all of the above-stated reasons, the Court should grant the writ, and order that the Petitioner's conviction on Count Three and Four be vacated, and order re-sentencing on Counts One and Two.

Dated: October 6, 2022

Respectfully submitted,

*Sarah Kunstler*

Sarah Kunstler
Beena Ahmad
LAW OFFICES OF SARAH KUNSTLER
Attorneys for AHMED EL GAMMAL
315 Flatbush Avenue #103
Brooklyn, NY 11217
718-783-3682 (office)
347-402-2014 (fax)
sarah@kunstlerlaw.net